IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| TERESA HIPPLE | : CIVIL ACTION NO. 12-1256 |
| formerly known as | : |
| TERESA CONCEPCION, | : |
| | : |
| Plaintiff | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| v | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| SCIX, LLC, et al, | : Philadelphia, Pennsylvania |
| | : July 27, 2015 |
| Defendants | : 9:27 a.m. |

- - -

TRANSCRIPT OF BENCH TRIAL - DAY ONE
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For the Plaintiff:       GERALD S. BERKOWITZ, ESQUIRE
                         ROBERT A. KLEIN, ESQUIRE
                         Berkowitz and Klein LLP
                         629 Swedesford Road
                         Swedesford Corporate Center
                         Malvern, PA  19355


For Defendant            CLEMENT HIPPLE
C. Hippel, et al:        9206 Andover Road
                         Philadelphia, PA  19114
                         Pro Se

*Transcribers Limited*
17 Rickland Drive
Sewell, NJ 08080
856-589-6100 · 856-589-9005

2

1    Audio Operator:          Carl Hauger

2    Transcribed By:          Michael Keating

3                                  - - -

4          Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
5    transcription service.

6                                  - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              (The following was heard in open court at

2     9:27 a.m.)

3              THE COURT:  Good morning, everyone.

4              ALL:  Good morning, Your Honor.

5              THE COURT:  Please be seated.  Okay, could

6     the attorneys identify themselves for the record?  Mr.

7     Berkowitz, you want to go first?

8              MR. BERKOWITZ:  Gerald Berkowitz for the

9     plaintiff, along with Robert Klein.

10             MR. KLEIN:  Good morning, Your Honor.

11             MR. BERKOWITZ:  I'm sorry, you can introduce

12    yourself.

13             THE COURT:  You got it right.

14             MR. KLEIN:  Good morning, Your Honor.

15             THE COURT:  And your client is present?

16             MR. KLEIN:  Yes.

17             MR. BERKOWITZ:  Yes.

18             THE COURT:  And her name for the record?

19             MR. BERKOWITZ:  Teresa Hipple.

20             THE COURT:  Thank you.

21             MR. BERKOWITZ:  Teresa Hipple, now known as

22    Teresa Concepcion.

23             THE COURT:  Thank you.  Ms. Bowman?

24             MS. BOWMAN:  Good morning, Your Honor, Denise

25    Bowman.

4

1          MR. MARTIN:  Good morning, Your Honor,

2     Michael Martin.

3          THE COURT:  Thank you.

4          THE DEFENDANT:  Good morning, Your Honor,

5     Clement Hipple.

6          THE COURT:  Thank you.  Please be seated.

7     Okay.  Ms. Bowman, you advised me of some information

8     in chambers.  Why don't you tell me what -- why don't

9     you put on the record what you told me in chambers,

10    please?

11         MS. BOWMAN:  Sure, Your Honor.  In chambers

12    where Mr. Berkowitz was also present, I advised the

13    Court that late yesterday afternoon, the defendant, Mr.

14    Hipple, on behalf of himself and also defendants

15    Complete Group, LLC, and Steel Seal, LLC, terminated

16    the services of me, Mike Sullivan, and Mike -- sorry,

17    Mike Martin and the law firm of Hill Wallack in

18    connection with this lawsuit.

19         THE COURT:  Okay.

20         MS. BOWMAN:  And he would like to tell you

21    that himself, obviously.

22         THE COURT:  All right, Mr. Hipple, you wish

23    to be heard?

24         THE DEFENDANT:  Yes.  Basically, as we were

25    going through the things yesterday --

5

1          THE COURT:  You have to speak up, sir,

2  please.  You can --

3          THE DEFENDANT:  As we were going --

4          THE COURT:  You can be seated.  Be seated and

5  speak in the microphone, please.

6          THE DEFENDANT:  There were some issues

7  yesterday that I felt weren't correct and that would

8  present a problem for me, and things that I wanted done

9  that we could not agree upon.

10          THE COURT:  Okay.  This case has been pending

11  since 2012.  Ms. Bowman, how long have you represented

12  or your firm has represented Mr. Hipple in connection

13  with this lawsuit?

14          MS. BOWMAN:  The law firm has represented Mr.

15  Hipple from the beginning of the lawsuit and I think I

16  got involved maybe six or so months after it was

17  commenced.

18          THE COURT:  All right.  In the last three

19  years, you had opportunity to consult with your

20  counsel, Mr. Hipple, about this matter?

21          THE DEFENDANT:  That is correct.

22          THE COURT:  All right.  Well, I cannot

23  continue this.  We are going to start the trial today.

24  Your choice is to do it with Ms. Bowman or not to do it

25  with Ms. Bowman, but we're going to start the trial

6

1    today.

2           This matter has been continued.  If you made

3    this request to me six months ago, perhaps I -- you

4    know, or asked for a continuance, but today, everybody

5    is ready, the plaintiff is here, all the witnesses are

6    ready to go.  We're not going to continue the trial.

7    Do you still wish to proceed without counsel?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Okay.  Let me ask you this.  Are

10   you willing or do you have a desire to discuss trying

11   to resolve this case before we begin testimony?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Okay.  And, Mr, Berkowitz, are

14   you willing to discuss settlement of the case?

15          MR. BERKOWITZ:  Yes, Your Honor.

16          THE COURT:  Okay.  So what I'm trying to do,

17   I can't get involved in settlement because I'm going to

18   hear the case and, typically, what a settlement judge

19   or a mediator does is they will meet what we call ex

20   parte.  In other words, they'll meet privately with you

21   and they'll meet privately with the plaintiff and to

22   see if there's a way the mediator can suggest a

23   resolution somewhere in the middle of where the parties

24   are.

25          Since I'm going to hear the case without a

jury, I potentially could be tainted by those discussions in making a fair resolution of the case, so I'm not going to participate in that process.

Because I got such late notice of this development, I'm trying to find another judge who will sit down with you this morning before we begin testimony, okay? Is that acceptable to both sides?

MR. BERKOWITZ: Yes, Your Honor. I think we'll know very quickly if there is going to be a resolution.

THE COURT: Right. I think you're right. So -- but, Mr. Hipple, I want to advise you if we can't resolve this, we're beginning testimony. I think you're making a mistake in discharging your lawyer at such a late stage. Obviously, they know the case very well, prepared, and Ms. Bowman appeared before me last week or a week or two ago, was very well-prepared, and knew the case inside and out.

I think you're making a mistake, but that's your choice, and I'm not going to override your choice. But we're going to begin the trial, okay, just so you understand it, all right? Do you understand that?

THE DEFENDANT: Yes, I understand.

THE COURT: All right. So let's stay here. Let me see if I can get another magistrate judge at

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

1    least to sit down and discuss with you briefly about

2    the possibility of settlement, okay?

3              THE DEFENDANT:  Thank you.

4              THE COURT:  All right, thank you.

5              MS. BOWMAN:  Your Honor, may I be excused?

6              THE COURT:  No, not yet.

7              MS. BOWMAN:  Okay.

8              THE COURT:  Not today, okay?  Until we can

9    see if the settlement process -- if we can't resolve

10   this -- if it looks like we can't settle the case, then

11   I'm going to allow you to leave, but at least at this

12   stage I want to keep you involved.

13             MS. BOWMAN:  Your Honor, I don't believe my

14   -- I don't believe Mr. Hipple wants me to participate

15   in settlement --

16             THE COURT:  All right.

17             MS. BOWMAN:  -- discussions.

18             THE COURT:  Well, that's fine.  Why don't you

19   have a discussion with Mr. Hipple, and if that -- just

20   to reaffirm that?  But I'm not going to let you leave

21   until I see if the settlement process -- okay?

22             MS. BOWMAN:  Very good.  Thank you, Your

23   Honor.

24             (Recess, 9:33 a.m. to 11:19 a.m.)

25             THE COURT:  Please be seated.  So, Mr.

9

1   Hipple, I completely understand that you have

2   discharged your attorney, Ms. Bowman, and her law firm

3   from representing you in this matter.  We're going to

4   proceed and you're going to represent yourself

5   individually, Clement Hipple.

6           There are two other defendants in the case.

7   One is called Steel Seal, LLC, and I understand Ms.

8   Bowman entered an appearance to represent that

9   corporation and, also, another group, a company called

10  Complete Group, LLC.  So Ms. Bowman has entered an

11  appearance to represent them.

12          In federal court, the corporation must be

13  represented by an attorney.  You're not a licensed

14  attorney, is that right?

15          THE DEFENDANT:  That is correct, Your Honor.

16          THE COURT:  Okay.  You cannot represent these

17  companies.  Only an attorney can, an attorney licensed

18  to practice in this federal court.  Without an attorney

19  representing the corporations, the plaintiff is

20  entitled to what's called a default judgment, which is

21  a judgment without a trial because a corporation can't

22  proceed without an attorney.

23          So I note, the lawyers tell me that there has

24  been default judgments entered against some other

25  entities.  You may be aware of that.  There were

1   default judgments entered against SCIX, Steel Seal Pro,

2   also the administrator of the Estate of Brian Hipple,

3   I understand there was a default against that entity.

4           So all that remains after a default judgment

5   is a hearing on the amount of damages.  So let me ask

6   you, did Ms. Bowman explain that to you, that without

7   an attorney, there would be a default judgment against

8   these entities?  And if you have any questions as I

9   proceed, if you're not quite sure what I'm talking

10  about, just --

11          THE DEFENDANT:  No.  That was a question I

12  was going to ask you prior to it, and now that you're

13  bringing that up because you originally asked me if I

14  was going to defend myself --

15          THE COURT:  Right.

16          THE DEFENDANT:  -- and so it wasn't on the

17  record.  And that was a question I was -- before

18  opening statements I was going to ask you about those

19  other entities.

20          THE COURT:  Right.

21          THE DEFENDANT:  Because it was mentioned --

22  or knowledge of that, they do require an attorney.  So

23  I don't know what the case would be as far as I don't

24  want to see them go into default judgment.

25          THE COURT:  I'm sorry, I couldn't hear.

1  What's --

2        THE DEFENDANT:  I'm sorry.

3        THE COURT:  What did you say, the last thing?

4        THE DEFENDANT:  I would not like to see them

5  to go into default judgment.

6        THE COURT:  Okay.  But do you want to retain

7  Ms. Bowman to represent those -- to keep her

8  representations of those companies?

9        THE DEFENDANT:  I'll tell you -- let me just

10  think about this for just one minute.

11        THE COURT:  Okay.

12        THE DEFENDANT:  So what we would be talking

13  about is a default judgment against Steel Seal, LLC,

14  which is a business that doesn't do any business, okay?

15        THE COURT:  Okay.

16        THE DEFENDANT:  All right?  And we also would

17  be talking about a default judgment against Complete

18  Group, which was owned only by me 50 percent, and 50

19  percent of someone else, okay, and which also --

20        THE COURT:  Who is the other -- what's the

21  identity of the other person?

22        THE DEFENDANT:  Emily Domices.

23        THE COURT:  Would you spell her last name for

24  me?

25        THE DEFENDANT:  D-O-M-I-C-E-S.

1          THE COURT:  Okay.  So it's a -- you're a --

2          THE DEFENDANT:  So basically --

3          THE COURT:  -- 50 percent owner?

4          THE DEFENDANT:  -- I don't -- I don't see a

5   default -- a problem with a default judgment and the

6   necessary for Ms. Bowman to defend those companies,

7   okay.

8          In my opinion, there is -- they are actually

9   void.  They don't do any business, okay?  There's no

10  assets, all right?  So as far as a default -- I don't

11  have a problem with a default judgment against those

12  two companies.

13         THE COURT:  You're the sole owner of Steel

14  Seal, LLC?

15         THE DEFENDANT:  That is correct, Your Honor.

16         THE COURT:  There's no other persons that

17  have ownership interest --

18         THE DEFENDANT:  No, Your Honor.

19         THE COURT:  -- shares of that corporation?

20         THE DEFENDANT:  Right.  That is correct, Your

21  Honor.

22         THE COURT:  And Complete Group, is that an

23  active entity now?

24         THE DEFENDANT:  No, it is not, Your Honor.

25         THE COURT:  And tell me a little bit about

1   Complete Group.  What did they -- what did they do or

2   what was that company?

3           THE DEFENDANT:  Basically, Complete Group was

4   organ -- set up in order to do a license agreement

5   between Complete Group and Steel Seal Pro which, again,

6   Steel Seal Pro is no longer an operating company, so

7   that license agreement would also be void.

8           THE COURT:  The other individual that you

9   identified as being a 50 percent owner of Complete

10  Group, her name again is what?  I'm sorry.

11          THE DEFENDANT:  Emily Domices.

12          THE COURT:  Okay.

13          (Pause in proceedings.)

14          THE COURT:  Is there an address you could

15  supply me that I could send a court notice to her

16  notifying her that you have elected to proceed against

17  Complete Group without an attorney, knowing that

18  there's a default judgment?  Do you understand?  Here's

19  the problem.

20          The problem is we go through this trial and I

21  have no idea how I will rule on this, but if there was

22  a ruling and I found that there should be a judgment

23  against Complete Group, LLC, Ms. Domices could come

24  forward and say Mr. Hipple had no authority on behalf

25  of Complete Group, LLC, to proceed with this trial

14

1  without an attorney.  She's not here, or I don't think

2  she's here.  There's no --

3           THE DEFENDANT:  No, she's not here.

4           THE COURT:  There's no notice of this court

5  proceeding.  Do you understand my concern?

6           THE DEFENDANT:  Yes, I do understand your

7  concern, Your Honor, but the problem compounds itself

8  by Ms. -- or Emily Domices lives in Cali, Colombia.

9  THE COURT:  Okay.

10           THE DEFENDANT:  She's not a United States

11  citizen.  Therefore, you cannot court order her.

12           THE COURT:  Okay.  No, it wouldn't be a court

13  order.  It would be --

14           THE DEFENDANT:  A request for her to --

15           THE COURT:  It would be a request for her to

16  put her on notice --

17           THE DEFENDANT:  Yes.

18           THE COURT:  -- of the proceedings.  Mr.

19  Berkowitz, are you satisfied, based on your

20  investigation into this case, that Mr. Hipple is the

21  sole owner of Steel Seal, LLC, and that he has

22  authority on behalf of the corporation to consent to

23  the entry of a default judgment?

24           MR. BERKOWITZ:  Your Honor, I have seen

25  nothing that would contradict that.

15

 1              THE COURT:  All right.  So you understand,

 2    Mr. Hipple, that by proceeding without an attorney, the

 3    Court is going to enter a default judgment against

 4    Steel Seal, LLC?

 5              THE DEFENDANT:  That is correct, Your Honor,

 6    I understand that.

 7              THE COURT:  And you consent to that?

 8              THE DEFENDANT:  I consent to that.

 9              THE COURT:  And you're representing obviously

10    to this Court that you're the sole owner and have full

11    authority to consent to that?

12              THE DEFENDANT:  Yes, Your Honor.

13              THE COURT:  All right.  Now, Complete Group,

14    LLC, let me ask Mr. Berkowitz, with respect to Complete

15    Group, LLC, do you have any information that is

16    contrary to what Mr. Hipple has told us about Complete

17    Group, LLC, and, specifically, the ownership

18    composition of that company --

19              MR. BERKOWITZ:  I believe I have seen that

20    Mr. Hipple is the managing member of the LLC and that

21    there is another person that is a member of the LLC,

22    but what I have seen is that Mr. Hipple has the

23    authority to direct the corporate actions of the

24    entity.

25              THE COURT:  Mr. Hipple, are you, in fact, the

1  managing member or were you the managing member of that

2  corporation?

3          THE DEFENDANT:  Your Honor, could I have

4  about one minute outside with the attorneys?

5          THE COURT:  Yes, sure.

6          THE DEFENDANT:  Thank you.

7          (Pause in proceedings.)

8          THE COURT:  Let's take a five minute break

9  and be back.

10          (Recess, 11:28 a.m. to 11:31 a.m.)

11          THE COURT:  Please be seated, everybody.  I

12  think my question, Mr. Hipple, was whether you were the

13  managing member of Steel Seal, LLC -- no, it was

14  Complete Group, LLC.  Complete Group, thank you.

15          THE DEFENDANT:  Yes, sir.  Your Honor,

16  originally, how it was set up when the assets were

17  transferred, Emily Domices was the managing member, but

18  I believe after that I took control as management

19  member.

20          THE COURT:  When was that around?

21          THE DEFENDANT:  It would have probably been

22  around six months after the original date of the

23  incorporation, which was around 2012 I believe.

24          THE COURT:  Okay.  And can I ask you, Ms.

25  Emily Domices, is there any relationship between you

17

1    and her, a personal relationship?

2              THE DEFENDANT:  Yes, there is, Your Honor.

3              THE COURT:  Okay.  And that's still ongoing?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Okay.  So you're telling me that

6    some time in 2012, you became the managing member of

7    Complete Group?

8              THE DEFENDANT:  Yes, I believe that is so,

9    Your Honor.  I can think --

10             THE COURT:  Well, at least we know --

11             THE DEFENDANT:  I'm thinking of a doc --

12             THE COURT:  -- we know today you are?

13             THE DEFENDANT:  Yes, I believe I am so --

14   that is so, yes.

15             THE COURT:  All right.  Let me ask you, Mr.

16   Berkowitz.  What's your information?

17             MR. BERKOWITZ:  Your Honor, if you would,

18   volume two, Exhibit 51, that last page of that exhibit

19   is a verification as signed by Clement Hipple as the

20   managing member of Complete Group.

21             THE DEFENDANT:  I concur.

22             (Pause in proceedings.)

23             THE COURT:  Okay.  Okay.  And just for the

24   record, Exhibit 51 of the plaintiff's exhibits is a

25   complaint filed in the Court of Common Pleas of Bucks

18

1  County, Pennsylvania captioned <u>Complete Group, LLC,</u>

2  <u>versus Steel Seal Pro, LLC</u>.

3  MR. BERKOWITZ:  Right.

4  THE COURT:  And that does -- the verification

5  does state what you represent, Mr. Berkowitz.  Did you

6  have a chance to look at that, Mr. Hipple?

7  THE DEFENDANT:  Yes, I did, Your Honor.

8  THE COURT:  Okay.  And is that -- that's true

9  and correct?

10  THE DEFENDANT:  Yes.  That's true and correct

11  with reference to the date I mentioned earlier and that

12  is my signature.

13  THE COURT:  And that's November 21st of 2012?

14  THE DEFENDANT:  That is correct.

15  THE COURT:  Okay, thank you.  Mr. Berkowitz,

16  do you want to say anything else before I rule on the

17  issue of the corporations?

18  MR. BERKOWITZ:  The only thing I'd like to

19  point out is the Complete Group, LLC, is established

20  under the laws of Nevis, and that's in the documents.

21  THE COURT:  You said Nevis?

22  MR. BERKOWITZ:  Nevis.

23  THE COURT:  Is that an island or --

24  MR. BERKOWITZ:  I think it's Exhibit 16.

25  Exhibit 16, the corporate establishment papers.

19

1          THE COURT:  Exhibit 16?

2          (Pause in proceedings.)

3          THE COURT:  Okay.

4          MR. BERKOWITZ:  And Ms. Domices is not

5   subject to the jurisdiction of this Court, although

6   Complete Group is, as is Mr. Hipple, and that he is the

7   managing member of this organization.

8          THE COURT:  Okay.  So, Mr. Hipple, the

9   question is as a managing member of Complete Group,

10  you're consenting to proceed without an attorney, Ms.

11  Bowman, and as a result of that, the consequences of

12  that, you're -- there's going to be a default judgment

13  entered against Complete Group, LLC?

14         THE DEFENDANT:  That is correct, Your Honor.

15         THE COURT:  Okay.  Ms. Bowman, do you wish to

16  say anything at this point?

17         MS. BOWMAN:  No, Your Honor.

18         THE COURT:  Okay.  Anything else from you,

19  Mr. Berkowitz?

20         MR. BERKOWITZ:  No, Your Honor.

21         THE COURT:  All right.  So we will proceed

22  with the trial.  And I understand the only remaining

23  defendant would be Clement Hipple in his individual

24  capacity because an entry of default will be entered

25  against those two entities we just discussed.

20

1        The other remaining entity, there's already

2   been a default judgment entered by Judge DuBois.   So

3   I'm correct with that, Mr. Berkowitz, that's the only

4   entity -- the only individual that at trial -- the

5   remaining defendant?

6        MR. BERKOWITZ:   That's all that's left, Your

7   Honor.

8        THE COURT:   Right.   Okay.   Now, again, I want

9   to -- Mr. Hipple, I just want to make sure you're aware

10  what you're doing here, okay?   So I don't think you're

11  making a wise choice here.

12       I'm not saying you're not wise or you're not

13  smart, but Ms. Bowman has been with this case, her law

14  firm has been with this case, she's represented you

15  well, and now you're going to -- we're going to have a

16  trial and you're not going to have an attorney to help

17  you.   But you're still willing to do that?

18       THE DEFENDANT:   Yes, Your Honor, that is my

19  choice.

20       THE COURT:   Okay.   All right, so I will

21  discharge Ms. Bowman and her law firm from

22  representation and she is free to go.   And we'll

23  proceed with the opening statements once you get your

24  chance to gather yourself and we'll come back in five

25  minutes.   Is there anything else, Ms. Bowman?

1     MS. BOWMAN:  No, Your Honor, only that I have

2  a little bit more of the file in my care because I

3  didn't know how far we would get today with Mr.

4  Berkowitz's case, so if I could --

5     THE COURT:  You want to --

6     MS. BOWMAN:  -- discretely -- if I could get

7  that and maybe discretely just bring that in, and then

8  Mr. Hipple and I will make arrangements for him to get

9  the rest of the file some time this evening or first

10  thing tomorrow, but he has everything -- I brought

11  everything that I would need today and I've identified

12  it all for him.

13     THE COURT:  All right.

14     MS. BOWMAN:  So I may just -- I may just

15  bring the stuff in that's in my car and --

16     THE COURT:  Well, let's do this.  Why don't I

17  suggest this.  It's almost 11:45.  Let's take the lunch

18  break early so Ms. Bowman can do all that.  I don't

19  want him to start the trial when he hasn't had the full

20  file.  So let's say we'll start at 1:00.  It's about

21  11:40.  We'll start at 1:00, is that okay?

22     MR. BERKOWITZ:  That's fine, Your Honor.

23     THE COURT:  Ms. Bowman?

24     MS. BOWMAN:  That's fine, thank you.

25     THE COURT:  That gives you some chance to

22

1    gather your thoughts, okay?

2            MS. BOWMAN:  And I'm free to leave after I

3    provide that to the client then?

4            THE COURT:  Yes.  And I'll enter a notice

5    that you're no longer representing the three defendants

6    in the case.

7            MS. BOWMAN:  Thank you, Your Honor.

8            THE COURT:  So, Mr. Hipple, you're absolutely

9    sure this is what you want to do?

10           THE DEFENDANT:  Yes, Your Honor, I'm

11   absolutely sure.

12           THE COURT:  And you discussed -- you had a

13   chance to discuss this with Ms. Bowman?

14           THE DEFENDANT:  Yes, I did, Your Honor.

15           THE COURT:  All right.  Any questions of me

16   before we begin?

17           THE DEFENDANT:  No, the only question I had

18   which you brought up in reference to the corporations.

19           THE COURT:  All right.  Anything else, Mr.

20   Berkowitz before we --

21           MR. BERKOWITZ:  Not at this point, Your

22   Honor.

23           THE COURT:  All right, I'll see everyone at

24   1:00.  We'll start with opening statements.  And let me

25   very quickly before we go, so, Mr. Hipple, here's the

1   procedure of the trial in event you -- I'm sure you're

2   aware of it, but I'll let you know anyway.

3           Mr. Berkowitz or Mr. Klein will go first and

4   give an opening statement.  It's an opportunity for

5   them to outline what they believe the evidence will be

6   over the next couple days.  It's not an opportunity for

7   argument.  It's just to outline the evidence that they

8   anticipate will be presented to the Court.

9           You'll have the opportunity to respond to

10  that, okay?  After that proc -- by giving your own

11  statement.  After that process is over, Mr. Berkowitz

12  or Mr. Klein will call witnesses and they'll question

13  the witness.  That's what's called direct examination.

14          And then you'll have an opportunity to ask

15  your own questions of these same witness.  It's what's

16  called cross-examination.  The counsel for the

17  plaintiff will have an opportunity to ask further

18  questions, what we call redirect, and I'll -- you have

19  an opportunity to follow up limited to the area of what

20  they -- of the questions they asked on redirect to what

21  we call recross.  And then it's over and we'll continue

22  the witnesses.

23          After they rest their case or they finish

24  calling their witnesses, you'll have a chance to call

25  your own witnesses, including yourself if you wish, to

24

1    testify.

2         When all that's over, we'll have a closing

3    argument.  It's an opportunity for counsel to present

4    their arguments to the Court, and you'll have an

5    opportunity to present your arguments, okay?  After all

6    that's over with, I will read everything, all the

7    exhibits, the testimony, and I'll issue a written

8    ruling, okay.  I'll see everybody at 1:00.  Thanks.

9         THE DEFENDANT:  Thank you, Your Honor.

10        (Luncheon recess, 11:41 a.m.)

11             *  *  *

12           AFTERNOON SESSION

13             1:01 p.m.

14        THE COURT:  All right, please be seated.  All

15   right, Mr. Berkowitz, I'll hear from you.

16        MR. BERKOWITZ:  Your Honor, if I could hand

17   up a timeline --

18        THE COURT:  Sure.

19        MR. BERKOWITZ:  -- of significant events and

20   names that the Court is not familiar with.

21        THE COURT:  Yes.

22        MR. BERKOWITZ:  And I would like to help

23   acclimate everybody to what's going on here.  I was

24   engaged in September of 2010 by a company called SMS

25   from Phoenix, Arizona to help collect a judgment.  I

 1   have done a lot of work for them in the past.

 2          And SMS had been hired by it was Teresa

 3   Hipple at the time to help her collect her judgments

 4   against a company called SCIX, LLC.  That's one of the

 5   defendants that has since defaulted, and it will become

 6   apparent why we have had all these defaults along the

 7   way.

 8          On September 17th, I commenced the execution

 9   process in Bucks County and had a writ of execution

10   served on Wachovia Bank, which was the bank, at least

11   one bank account that we knew of where SCIX had money.

12   And on September 21st, 2010, the SCIX account was

13   frozen by the garnishment.

14          On October 10th, in accordance with the state

15   process, Wachovia answered what are called

16   interrogatories and attachment, a standard document

17   that you file along with a writ of execution,

18   particularly to a banking institution, where they

19   identify assets of the defendant that they have in

20   their possession, and they responded that they had

21   $53,000 of SCIX money in their account.  So that was on

22   10-5 when the interrogatories were answered.

23          On the same date, Brian Hipple, the deceased

24   son of Clem Hipple, signed a promissory note for SCIX

25   in the amount of $210,000 payable to Clement Hipple,

Plaintiff's Opening Statement                    26

1    and he also signed a security agreement in favor of

2    Clement Hipple.

3            On the 6th of October, as part of my normal

4    practice when the bank doesn't have enough money to

5    satisfy the entire judgment, I served on SCIX

6    interrogatories in aid of execution asking that they

7    identify their assets and the location of their assets

8    so I can proceed with my execution.

9            On the next day, on the 7th, Clem Hipple

10   filed a UCC1 in conjunction with the security

11   agreement.  There's a spelling error on that, Your

12   Honor.  I have UUC1 and --

13           THE COURT:  Right.

14           MR. BERKOWITZ:  -- it should be UCC1.  He

15   filed a security -- a UCC1 with the state securing the

16   promissory note with all of the assets of SCIX.  On the

17   8th of October, three days after he got the note from

18   Brian Hipple, Clement Hipple demanded repayment of the

19   note.

20           On the 13th of October, I had a judgment

21   entered against Wachovia Bank in accordance with the

22   state procedures for garnishment.  You enter a judgment

23   against the party that has the assets that they have

24   identified and then you're able to enter a judgment

25   against the garnishee.  It's just part of state

Plaintiff's Opening Statement                    27

1    procedure.

2           On October 13th, Clement Hipple repossessed

3    all of SCIX's assets with the consent of Brian Hipple,

4    his son.  On the 18th of October, Complete Group, the

5    company that just defaulted early, granted a license,

6    and the dates on these documents are incorrect.  They

7    were done in the wrong order, but you'll get the

8    substance of what happened.

9           Complete Group granted a license to a company

10   called Steel Seal Pro, another company that defaulted

11   in this case.  That was Brian Hipple's new company

12   after SCIX.

13          The Complete Group was licensed to Steel Seal

14   Pro allowed them to sell the product Steel Seal.  That

15   is the product where there's a patent and a secret

16   formula and it generates all of the money that we were

17   able to garnish.  It's what SCIX's business was.

18          On October 26th, I received a check from

19   Wachovia Bank based on the garnishment, and that was

20   remitted to SMS and paid to Teresa Hipple.  And once

21   you complete the judgment, you satisfy the judgment on

22   the books and records of Bucks County so that Wachovia

23   Bank no longer has a judgment outstanding.

24          On 10-29, Clement Hipple transferred SCIX's

25   assets, the ones that he repossessed, to Complete

Plaintiff's Opening Statement                    28

1    Group.  So it entered its license, Complete Group

2    entered its license with Steel Seal Pro before it had

3    any assets.  I'll consider that a ministerial mistake.

4    They wanted -- Clem Hipple wanted to transfer his

5    assets, the SCIX assets to Complete Group before

6    Complete Group transferred them to Steel Seal Pro.

7              On November 24th, I sent a letter to Brian

8    Hipple because he had not answered the interrogatories

9    in aid of execution that I had served on SCIX.   I

10   served it on the SCIX address.

11             And on December 6th, I received a letter from

12   Brian Hipple telling me he didn't receive the

13   interrogatories in aid of execution, so I sent out a

14   second set of interrogatories, and on January 12th,

15   2011, I received a response to the interrogatories.

16   SCIX had nothing, all its assets were gone.

17             THE COURT:  By the way, what was Brian

18   Hipple's -- before the transfer of the asset, what was

19   his position with SCIX?

20             MR. BERKOWITZ:  Well, that's an interesting

21   question.  He was purportedly the sole shareholder or

22   -- the sole shareholder in SCIX.  However, Clement

23   Hipple had sold him those shares and retained all the

24   voting rights in SCIX.  So if you follow the

25   documentation, Brian Hipple owned the stock, but

Plaintiff's Opening Statement                29

1   Clement Hipple owned all the voting rights of SCIX.

2        On the 12th of January in 2011, I went on the

3   website and saw that this product, Steel Seal, was

4   still being sold, but instead of the money coming to

5   SCIX and into the Wachovia account, it was now being

6   sold by another company, Steel Seal Pro.

7        On the website it said we have three patents

8   that protect the product.  I checked the patent records

9   and I saw that SCIX still owned the patents because you

10  have to transfer patents in accordance with federal

11  patent law.

12       I then obtained certified copies of Teresa

13  Hipple's judgments against SCIX, the recorded owner of

14  the patents, and I recorded the judgments in the patent

15  office to secure the title on the patent.

16       Because there were two judgments in Bucks

17  County, there were two separate cases.  So I moved to

18  consolidate the cases in Bucks County, which eventually

19  was done, and I filed a petition to appoint a receiver

20  to sell the SCIX patents to satisfy the judgment.

21       On 12-30-11, the Bucks County cases were

22  consolidated and, again, through the internet, I saw

23  that Steel Seal was being sold now by this company

24  called Steel Seal Pro owned by Brian Hipple.

25       On March 12th, 2012, I filed this case, the

1    original complaint in this case, and Complete Group was

2    not a party to this case because I didn't know of

3    Complete Group's existence.   I had enough of the

4    people, but I didn't know them all.

5             On April 30th in 2012, Judge Baldi of Bucks

6    County Court ordered SCIX to sell the patents and pay

7    the judgments to Teresa Hipple, pay the proceeds from

8    the sale of the patents to Teresa Hipple.

9             THE COURT:  So he didn't appoint a receiver,

10   but he ordered the company sold?

11            MR. BERKOWITZ:  Yes.

12            THE COURT:  Okay.

13            MR. BERKOWITZ:  Yes, he ordered them to sell

14   it.  So a couple weeks later on 5-12, May 12th, 2012,

15   Clement Hipple in Complete Group filed an emergency

16   petition to intervene in the Bucks County litigation,

17   and in that petition were the documents that laid out

18   the fraudulent conveyance very neatly.  You will never

19   see a better set of documents showing how a fraudulent

20   conveyance was going.

21            THE COURT:  Is this the same document that

22   Mr. Chevelle (ph) verified?

23            MR. BERKOWITZ:  Well, those are --

24            THE COURT:  Well, the same group?

25            MR. BERKOWITZ:  Yes, those are the documents

Plaintiff's Opening Statement                31

1   Mr. Chevelle filed in Bucks County, signed the

2   verification --

3           THE COURT:  Right.

4           MR. BERKOWITZ:  -- talked about what was in

5   there.

6           THE COURT:  Right.

7           MR. BERKOWITZ:  On September 30th, 2012,

8   Brian Hipple passed away.  And at the time he died, the

9   company that he owned, Steel Seal Pro, had $150,000 in

10  the bank, and that were all the proceeds at the time

11  that we knew about from the sale of this Steel Seal

12  product.

13          On the day of Mr. Hipple's death or the day

14  after, Clement Hipple wrote a check for $40,000, taking

15  $40,000 out of the Steel Seal bank account, and he

16  signed the check, the Steel Seal Pro check, with the

17  signature stamp of his deceased son.

18          THE COURT:  So the check was made out to

19  whom?

20          MR. BERKOWITZ:  To one of Mr. Hipple's

21  companies.  And you will see --

22          THE COURT:  Okay.

23          MR. BERKOWITZ:  -- there are a lot of

24  corporate entities here.

25          THE COURT:  All right.

Plaintiff's Opening Statement                    32

1          MR. BERKOWITZ:  On the 2nd of November, I

2     filed a motion to substitute Melissa Moreno as

3     substitute for Brian Hipple.

4          THE COURT:  Right.

5          MR. BERKOWITZ:  She was the administrator of

6     the estate.  And on the 8th of November, I filed a

7     claim on behalf of Teresa Hipple against the estate of

8     Brian Hipple in Bucks County.  On the 20th of November,

9     Judge DuBois granted the motion and made Melissa Moreno

10    a party to this case.

11          On the 28th of November, 2012, Complete Group

12    sues Steel Seal Pro in Bucks County.  It's a little

13    complicated, and you'll see when the documents come in

14    the basis of that, claiming that all the money in that

15    account belongs to Complete Group.  And the complaint

16    was served on Melissa Moreno.

17          By the -- by the 28th of November, 2013,

18    money continued to come into the account of Steel Seal

19    Pro because the sale of Steel Seal, the product, was

20    still taking place on the internet.  There's a mistake

21    in the data on 11-28-13 for number 34, it should be

22    2012.

23          On December 5th, Melissa Moreno was served

24    with the complaint of Complete Group versus Steel Seal

25    Pro, and Melissa Moreno defaulted on that and a default

Plaintiff's Opening Statement                    33

1   judgment was entered -- I'm sorry, the notice of

2   default for the Bucks County case -- I'm sorry, she

3   defaulted in two cases.  She defaulted in this case and

4   she defaulted in the case of <u>Complete Group versus</u>

5   <u>Steel Seal Pro</u>.  And on January 23rd, 2013, a default

6   judgment for $198,377 was entered against Steel Seal

7   Pro.

8                Melissa Moreno, who filed Brian Hipple's

9   inventory with the estate of Bucks County on January

10   28th, 2013, does not include in her -- in the assets of

11   Brian Hipple his interest in SCIX, which had the

12   patents, and his interest in Steel Seal Pro, which had

13   $200,000 in the -- in the bank account.

14                On January 30th, 2013, a writ of execution

15   was served on the First National Bank of Newtown to

16   execute on the Complete Group's judgment against Steel

17   Seal Pro.  And you'll see as we go through the

18   testimony, particularly with the attorney, the

19   procedure was defective.  It was a fraud uncaught.

20   However, the interrogatories, writ of execution were

21   issued, and judgment against the First National Bank

22   was entered in favor of Complete Group for $197,398,

23   and the judgment was now in favor of Complete Group.

24   They wiped out the Steel Seal Pro account.

25                So at this point, Brian Hipple's estate has

1    nothing in it because it doesn't include SCIX or Steel

2    Seal Pro.  SCIX has nothing because it has all be

3    fraudulently conveyed, and Steel Seal Pro has nothing.

4    So if they all default, there's no reason not to

5    default.

6          Now you've heard this morning that Complete

7    Group is defaulting because they no longer have

8    anything.  It's always one step ahead of our collecting

9    these assets.

10         On August 13th, about a year ago, Judge

11   DuBois granted summary judgment against Melissa Moreno,

12   Steel Seal Pro, and SCIX.  And now we have Complete

13   Group and Steel Seal and we're here today to put a

14   dollar value on those judgments.  But at this point, as

15   you can see, all the assets are gone.

16         The only thing that's -- right now that we

17   can obtain is the patent, but it's questionable whether

18   that patent has any value at this point because at some

19   point, SCIX, the formula for the product, Steel Seal,

20   was changed.  It was a secret formula and it was also

21   fraudulently conveyed.

22         THE COURT:  It's not a new patent?  There's

23   not a new patent generated on --

24         MR. BERKOWITZ:  There's no new patent

25   generated, just a secret, sort of like the recipe for

Plaintiff's Opening Statement                35

1   Kentucky Fried Chicken, very valuable because nobody

2   can deconstruct it, and that's what we have here.

3           So that's what brings us here today.  I have

4   been chasing this judgment for five years and the

5   assets have continuously been moved.  And our job today

6   is to establish for you the basis for one, the dollar

7   value of the judgments that should be entered against

8   all the defaulting parties, and to provide for you the

9   basis for equitable relief that's provided for under

10  the Pennsylvania Uniform Fraudulent Transfer Act.

11  Thank you.

12          THE COURT:  Thank you very much.  Mr. Hipple?

13          (Pause in proceedings.)

14          MR. HIPPLE:  Yes, Your Honor.  I had one

15  question for Mr. Berkowitz.  I'm not sure of the date

16  that the garnishments took place after it was filed,

17  the exact date.

18          MR. BERKOWITZ:  I'm sorry, I'm not going to

19  answer questions.  You have to --

20          MR. HIPPLE:  Okay, I'm sorry.  I missed the

21  part of when the actual date of when the garnishment

22  was filed.

23          THE COURT:  Well, do you have -- do you have

24  a copy of this timeline?

25          MR. HIPPLE:  Pardon me?

Defendant's Opening Statement                    36

1            THE COURT:  Do you have a copy of the time
2    line?
3            MR. HIPPLE:  Yes, I do.
4            THE COURT:  What number are you?  What number
5    are you?  The garnishment looks like --
6            MR. HIPPLE:  I got the date when it was
7    received.
8            (Pause in proceedings.)
9            THE COURT:  You mean the garnishment
10   against --
11           MR. HIPPLE:  Okay.  It looks like 9-21, Your
12   Honor.
13           THE COURT:  Right.
14           THE DEFENDANT:  Right.
15           THE COURT:  Against Wachovia, right.
16           MR. HIPPLE:  All right.  What I would like to
17   do is give you a little bit of background --
18           THE COURT:  Sure.
19           MR. HIPPLE:  -- on everything and how this
20   situation took place and how it started, okay.  Back in
21   1999, I met with a gentleman that had a chemical
22   formula to repair a blown head gasket without taking
23   the engine apart.
24           It was a liquid formula made up of two
25   substances, okay, two silicones.  And I went around

Defendant's Opening Statement                37

1   with him for maybe 20 or 30 vehicles and it fixed every

2   one.  So I was very, very impressed.

3           At the time, the price tag on the formula was

4   $2 million, okay, $1 million up front and $100,000 over

5   a ten-month period, which I personally paid.  So I

6   bought the formula.  When I gave him the million

7   dollars as the deposit he gave me the actual formula --

8   the actual formula.

9           THE COURT:  Right.

10          MR. HIPPLE:  Okay.  All right, okay.  And

11  that -- after that point there were two corporate --

12  now, again, this has all been done by attorneys, okay.

13  There were two corporate entities incorporated.  One

14  was Scientific Chemical, Incorporated, okay?

15          Now, and Scientific Chemical, Incorporated,

16  owned the chemical formula plus the website, okay?

17  Again, I'm sorry, Your Honor, let me back up a little

18  bit.  There's also a website involved here.

19          Okay.  So, basically back in -- then

20  Scientific Chemical owned the chemical formula

21  outright.  Then it had an agreement with Colonial

22  Chemical to manufacture and a confidentiality agreement

23  with Scientific Chemical and Colonial Chemical, which I

24  signed.  Okay.  At that point in time, I was 100 -- or

25  75 percent ownership in the Scientific Chemical -- or

Defendant's Opening Statement                    38

1   no, I'm sorry.  I was 100 ownership -- 100 percent

2   ownership in Scientific Chemical and 75 percent

3   ownership of SCIX, okay?

4           THE COURT:  Okay.

5           MR. HIPPLE:  So the two corporations were

6   formed.  At that point in time, I decided to hire my

7   son, Brian, and Teresa Concepcion to sit in an office

8   sort of like a think tank, all right, and just sit

9   there everyday, think about how they would go about

10  marketing the product, okay?

11          So they -- I think it took approximately nine

12  months to ten months where they sat and they came up

13  with the different ideas and the name and everything to

14  market the product, okay.

15          So at that point in time, after they come up

16  with the ideas, we said set up a website, again, which

17  was owned by Scientific Chemical.  And, Your Honor, you

18  have to remember here there's two companies that are

19  very close in name, okay, SCI, which is Scientific

20  Chemical, Incorporated, and SCIX, it's just the letters

21  themselves.  So there's no -- sometimes people get that

22  confused.  All right.

23          So, basically, after Teresa and Brian worked

24  together they came up with a way of marketing the

25  chemical, all right, and set up a website for which

Defendant's Opening Statement                    39

1    Scientific Chemical owned 100 percent.

2            Okay.  They came up with the idea of making a

3    video showing how the product works, okay, and doing a

4    mailing of 80,000 videos, okay, and also they went to

5    all the mechanic shops throughout the United States and

6    advertised in all the auto magazines.  That was the

7    start of it, okay.

8            I owned the company up to I believe January

9    1, 2001.  Let me back up a little.

10           THE COURT:  You said what -- both companies

11   or the one company?  You said you owned it up to

12   January --

13           MR. HIPPLE:  Well, I owned part --

14           THE COURT:  Part of the SCIX.

15           MR. HIPPLE:  75 percent.  And Brian owned 25

16   percent.

17           THE COURT:  Right.

18           MR. HIPPLE:  But prior -- no, that's my other

19   children, all right?  I'm not going to get in that

20   area.  Okay.  So, basically, in 2001, I turned over

21   ownership of SCIX to Brian --

22           THE COURT:  Okay.

23           MR. HIPPLE:  -- full ownership.  And as far

24   as the voting rights document was drawn up by the

25   accountants, and I never had any voting rights.  I

Defendant's Opening Statement                    40

1   never exercised any voting rights, and that was

2   probably more of a typographical issue that an actual

3   because Brian owned and operated the company solely on

4   his own.

5           The involvement I had in the company after I

6   turned it over to Brian is whenever I would go there I

7   was more or less the delivery boy, okay.  I would run

8   to Colonial Chemical, pick up the chemical, and bring

9   it back for sale or for storage.

10          THE COURT:  Right.

11          MR. HIPPLE:  Okay?  There was one other time

12  around 2004, 2005, which we were having -- he -- all

13  right, there's going to be this "we" had stuff here,

14  okay, instead of the corporations because he's my son,

15  all right.  So instead of me saying -- okay.

16          Back around 2004, SCIX, the company that

17  Brian owned, Brian came to me and said we're having a

18  problem with the chemical.  It's clogging, okay, it's

19  clogging radiators and things of this nature, due to

20  back pressure, and he asked for my help.

21          Now, I have -- I've torn engines apart when I

22  was young.  I did all the repairs on my own vehicle, so

23  I was basically -- I wasn't a mechanic, but I was sort

24  of a mechanic.  So I came up with an idea to actually

25  remove a spark plug from the cylinder, okay, to relieve

Defendant's Opening Statement          41

1   the back pressure and bubbling so it wouldn't get

2   trapped in the cooling system.

3          THE COURT:  Okay.

4          MR. HIPPLE:  Okay?  And it allowed this --

5   the chemical to work.

6          THE COURT:  Right.

7          MR. HIPPLE:  And I was a -- we put a patent

8   on that, okay, and I was a joint patent was Robert

9   Barks.  And the reason that I was joint with Robert

10  Barks, the original -- originally, there were two

11  patents in the beginning, 2001, originally, two

12  patents, a procedure patent and a chemical formula

13  patent, okay, which was owned by Scientific Chemical,

14  all right?

15          So, basically, what happens with patents, if

16  you can make enough change in the patent, you can

17  re-patent it.

18          THE COURT:  Okay.

19          MR. HIPPLE:  In other words, if there's

20  enough change to be made in the patent, so the patent

21  office agreed that by this new method that I came up

22  with to issue another patent.

23          THE COURT:  Right.

24          MR. HIPPLE:  Okay.  But, again, all this

25  company owns and things like this was all done by

1    attorneys, okay, not something that I thought of, okay?

2    The attorneys took care of the patent, they took care

3    of setting up Scientific Chemical, and they decided

4    that SCIX would be the company that would operate and

5    that Scientific Chemical would own the -- would own the

6    website and the chemical formula, okay, and they're --

7                THE COURT:  Okay.

8                MR. HIPPLE:  I guess they -- and, again,

9    truthfully, I guess they did it for -- in case

10   Scientific Chemical was sued at one point in time, this

11   was back in 1999.  So that was the start of basically

12   what was taking place.  All right.  Okay.

13               (Pause in proceedings.)

14               MR. HIPPLE:  Okay.  And I noticed in the

15   documents or the loan documents as -- that were being

16   produced that back in 2010, prior to Teresa Concepcion

17   garnishing the wages, I noticed that -- and that will

18   be a document that will probably be shown later on,

19   that Brian was not only paying her her interest, that

20   he started to pay down the principal.  So, therefore,

21   it meant that, okay, now he's collecting a decent

22   salary I guess, and he can afford to pay a little bit

23   more, and he started paying down the principal.

24               THE COURT:  What loan?

25               MR. HIPPLE:  On Teresa's three notes --

Defendant's Opening Statement                    43

1          THE COURT:  Okay.

2          MR. HIPPLE:  -- that she had with Scientific

3   Chemical.

4          THE COURT:  All right.

5          MR. HIPPLE:  Okay?  All right.  Then the big

6   question comes up here.  9-21, apparently, the wages

7   were garnished, 9-21-2010, the wages of SCI was

8   garnished.

9          And as far as this timeline is concerned,

10  and, again, basically because -- not because I had the

11  knowledge, but somebody that told me, usually what

12  happens is when the wages are garn -- or when the bank

13  account is garnished the same day the sheriff is sent

14  out for the assets, okay, the assets of SCIX.

15         THE COURT:  Right.

16         MR. HIPPLE:  Right.  Okay.  All right.  I got

17  a call from Brian, I was in Colombia, right.  And he

18  called me and let me know that the bank account and all

19  of his money was taken, okay.

20         So the next thing I did was call my attorney,

21  Kevin Fogarty, for advice.  So Kevin gave me advice and

22  I flew into the United States, and that's when all this

23  other stuff took place.  All the information that's in

24  this timeline was not done by me, it was done by the

25  advice of my attorney.

Defendant's Opening Statement                  44

1           THE COURT:  Okay.

2           MR. HIPPLE:  Okay.  It wasn't done by SCIX,

3   it wasn't done by Brian, it was done by an attorney.

4           THE COURT:  So you had some notes reflecting

5   the obligation that SCIX owed you?

6           MR. HIPPLE:  Well, I'm going to get into

7   that --

8           THE COURT:  All right.

9           MR. HIPPLE:  -- just in a -- just in a couple

10  lines --

11          THE COURT:  Sure.

12          MR. HIPPLE:  -- down, okay?

13          THE COURT:  All right, go ahead.

14          MR. HIPPLE:  All right.  Again, what -- the

15  point I'm -- the really serious point here, and we

16  wouldn't even be here today, okay, is that on 9-21-2010

17  when the bank account was garnished or frozen, that was

18  the time for them, for Teresa Concepcion to say okay,

19  capture the assets, okay, which is a normal procedure

20  in collection, okay?  Why they waited until -- okay,

21  let me see the date -- if I can find the date on here

22  of the day he said he tried to collect the assets.

23          THE COURT:  Well, it says here that on

24  October 6th of 2010 --

25          MR. HIPPLE:  He sent an interrogatory.

Defendant's Opening Statement                    45

1      THE COURT:  Right, to try to --

2      MR. HIPPLE:  But that's not collecting --

3      THE COURT:  -- ascertain additional assets

4  over and above the bank account.

5      MR. HIPPLE:  Okay, so that would have been in

6  the timeframe for when he collect -- tried to collect

7  the physical assets?

8      THE COURT:  Well, he was trying to ascertain

9  whether there was any assets that SCIX had over and

10  above the amount in the Wachovia bank account.  That's

11  the way I construe what --

12      MR. HIPPLE:  Okay.  But, again --

13      THE COURT:  -- he just told me.

14      MR. HIPPLE:  -- if -- I'm sure he realized

15  that there were assets.  I mean if he saw them on the

16  internet because he kept checking the internet so

17  apparently --

18      THE COURT:  All right.  Well, we'll get into

19  that in trial.

20      MR. HIPPLE:  -- he saw that.  Okay.  Okay, so

21  that's that part, okay.  And -- okay.  So then what

22  happened, being as they didn't take the assets, and

23  when I did call Kevin Fogarty one of the first

24  questions out of his mouth was well, have they levied

25  on the assets?  And I said no, not as far as I know.

Defendant's Opening Statement                46

1   And that's when Kevin Fogarty started to draft up

2   documents, okay.  The loan that I originally had with

3   -- yeah, let's talk about loans, okay?

4            THE COURT:  Yes.

5            MR. HIPPLE:  I originally had a loan

6   personally with SCIX, okay, for 210,000 at the time of

7   the when I took the assets.  I had four other loans

8   with JC Consulting Corporation and, again, there's

9   comments about all corporations.  Yeah, I owned a lot

10  of corporations in my time, okay?

11           THE COURT:  Right.

12           MR. HIPPLE:  Okay.  So there's JC Consulting

13  and Lease Incorporation, okay?  I had four notes,

14  somewhere in the area of $500,000, okay, loaned

15  throughout 2000 -- I think even before 2001.

16           Now, under those loans, there was an eight

17  percent interest on those loans, okay?  And being as

18  the company never did well, I never foreclosed on the

19  loans, I never received any interest, not one penny in

20  interest.  So when I did a calculation of compound

21  interest, it came up to close to a million two that was

22  owed to me.

23           THE COURT:  So these are three notes?

24           MR. HIPPLE:  Four notes I think

25           THE COURT:  Four notes.

Defendant's Opening Statement                    47

1      MR. HIPPLE:  Four notes.

2      THE COURT:  But one was individually to you?

3      MR. HIPPLE:  No, no, four notes from JC

4  Consulting.

5      THE COURT:  Oh.

6      MR. HIPPLE:  Four separate notes from JC

7  Consulting and one for me personally.

8      THE COURT:  Right.

9      MR. HIPPLE:  Okay.  Then I had a royalty

10 agreement with Brian back in 2001, ten percent of the

11 gross sales for which I never received a dime, never --

12 no, I'm sorry.  I did receive some money around 2010 or

13 so, all right, 2009, 2010.  But during that whole time

14 period I never received any money, okay?  Yes, yes,

15 it's my son, okay?  The company wasn't doing well, it

16 wasn't making enough money, barely enough for him to

17 live and survive, okay?  He never had any large

18 retained earnings, okay?

19     THE COURT:  And just --

20     MR. HIPPLE:  So --

21     THE COURT:  -- give me the -- so what time

22 period would these royalty payments be owed or should

23 have been paid?

24     MR. HIPPLE:  They had been owed --

25     THE COURT:  From when to when?

Defendant's Opening Statement                48

1    MR. HIPPLE:  -- from 2001 forward until SCI

2  went out of business -- SCIX went out of business.

3    THE COURT:  Okay.

4    MR. HIPPLE:  And I never received -- I did

5  receive -- and, again, this is going to come up, okay,

6  I did receive on my tax returns $124,000 in royalties

7  one year and $130,000 in another year, okay?

8    And now everybody is going to say this is

9  illegal, but it's not illegal.  Basically, what I did

10  is I never received the actual money.  I claimed it on

11  my income tax because I had a tax -- a tax loss forward

12  from --

13    THE COURT:  Right.

14    MR. HIPPLE:  -- way back, okay, around

15  $800,000.  So and, again, naturally, the IRS picked up

16  on it, they audited Brian, or they audited SCIX and it

17  passed the audit.  So, basically, I was owed probably

18  somewhere around two and a half million dollars total.

19    THE COURT:  By what, 2010?

20    MR. HIPPLE:  Yeah, by 2010, two and a half

21  million dollars total.

22    THE COURT:  Is this just on royalties or is

23  this combined with everything?

24    MR. HIPPLE:  Royalties, JC Consulting loans

25  and --

Defendant's Opening Statement                    49

1          THE COURT:  All right.

2          MR. HIPPLE:  -- my personal loan.

3          THE COURT:  Right.

4          MR. HIPPLE:  Okay.  So, basically, overall, I

5   was owed close to two and a half million dollars, all

6   right.  So then Mr. Kevin Fogarty drawed up the

7   documentation, okay, and then I presented it to Brian.

8          And I went in to Brian and I said okay, you

9   have no money in the bank, all right, you owe me over

10  $2 million, I'm taking the assets being as Teresa

11  Concepcion never took the assets on the date that she

12  should have, okay?

13         THE COURT:  Right.

14         MR. HIPPLE:  Okay.  So I possessed the

15  assets.  I left the assets at Colonial Chemical.  I

16  took the remaining assets that Brian had in the house

17  and put into a storage unit, okay?

18         THE COURT:  Right.

19         MR. HIPPLE:  And then the next thing -- okay,

20  well, what's the best way, Mr. Fogarty?  What's the

21  next step, all right?  Okay.

22         THE COURT:  When you say the assets --

23         MR. HIPPLE:  The assets included the --

24         THE COURT:  -- like --

25         MR. HIPPLE:  -- chemicals, computers, chair,

Defendant's Opening Statement                    50

1    filing cabinets, and an automobile, okay?

2              THE COURT:  And what about the patent or the

3    formula?  Where -- what was the status?

4              MR. HIPPLE:  They -- I never went after the

5    patents, okay?  I -- even though my UCC-1 says about

6    the intellectual properties, okay, and from what my

7    understanding was, that was the patents also --

8              THE COURT:  Right.

9              MR. HIPPLE:  -- I never went after the

10   patents.

11             THE COURT:  Okay.

12             MR. HIPPLE:  I never made a claim for the

13   patents.

14             THE COURT:  So he -- SCIX or Brian Hipple

15   retained those?

16             MR. HIPPLE:  SCIX retained the patents.

17             THE COURT:  SCIX, right.

18             MR. HIPPLE:  All the patents, okay?

19             THE COURT:  Right.

20             MR. HIPPLE:  I never went after the patents.

21             THE COURT:  So --

22             MR. HIPPLE:  I wasn't interested in the

23   patents, okay?

24             THE COURT:  Right.

25             MR. HIPPLE:  So then, okay, I spoke with Mr.

1  Fogarty.  Again -- okay, now I have this.  I own the

2  website.  I own it, or Scientific Chemical owns the

3  website, okay, and also owns the chemical formula,

4  okay?

5          So now what's my next step?  All right, I got

6  all these assets.  So anybody -- any normal person that

7  would collect the assets, even if Teresa collected

8  them, she would give them to the best person that could

9  sell the assets --

10          THE COURT:  Right.

11          MR. HIPPLE:  -- okay, because if this was not

12  my son, I probably would not be here today, okay?  So,

13  basically, we set up an operating -- Brian came up with

14  an operating agreement, him and I, okay, between

15  Complete Group and Steel Seal Pro to get rid of the

16  assets that I had taken, okay.  So then I turned the

17  assets over to Steel Seal Pro and he continued selling

18  them on the internet, all right?

19          At that point in time, Complete Group, okay,

20  which you know is a Nevus corporation, which you heard

21  earlier, I could not establish a bank account here in

22  the United States because it was a --

23          THE COURT:  Did you establish Complete --

24          MR. HIPPLE:  Complete Group because an

25  attorney told me to --

1          THE COURT:  Just to hold the assets while

2    you're --

3          MR. HIPPLE:  No.

4          THE COURT:  No?

5          MR. HIPPLE:  What -- Complete Group was so

6    that -- I personally turned the assets over to Complete

7    Group --

8          THE COURT:  Right.

9          MR. HIPPLE:  -- a corporation, okay?

10         THE COURT:  Right.  Right.

11         MR. HIPPLE:  And that's on the advice of my

12   attorney --

13         THE COURT:  Okay.

14         MR. HIPPLE:  -- okay?  So that's basically

15   what happened there.

16         THE COURT:  All right.  So go ahead, I'm

17   sorry.

18         MR. HIPPLE:  So I tried to open a bank

19   account here.  First, I tried to open a bank account

20   with Complete Group in Nevus.  Impossible, absolutely

21   impossible, okay.  I tried opening one here in the

22   United States, which I eventually was able to do, but

23   not at the point in time of the -- when this was being

24   done.

25         So, therefore, the revenue that I was

Defendant's Opening Statement                    53

1    supposed to receive from Steel Seal Pro went into a --

2    okay, another corporation, A&C Building and Industrial

3    Maintenance Corporation, which I owned for 30 years

4    which strictly did nothing but government janitorial

5    contracts, federal buildings, okay.  For 30 years I ran

6    that business.  I was the top of the business, okay,

7    A&C Building and Industrial Maintenance.  I had top

8    secret clearance and I had like about 600 employees.

9             THE COURT:  Okay.

10            MR. HIPPLE:  Okay?  So I -- that's where --

11   that was my personal bank account.  I didn't have a

12   personal account in my own name, okay.  So that's why

13   the money was being paid.

14            And everything that -- or every step that I

15   took, okay, was done by the advice by the attorneys,

16   okay.  Every operation or every company that I opened

17   up, the attorneys told me no, you can't use this

18   company, you need to open up a company with a different

19   name.

20            So -- and as far as -- I don't even know if I

21   want to go into this right now because we'll bring it

22   out later, as far as the garnishment of the money that

23   was in Wachovia --

24            THE COURT:  Right.

25            MR. HIPPLE:  -- belonged to Complete Group,

Defendant's Opening Statement                    54

1    okay, under the operating agreement.  It didn't belong

2    to anybody else.  It belonged to Complete Group under

3    the operating agreement.  So I guess that's basically

4    it, and then I guess the rest will come out as we go

5    on.

6              THE COURT:  Okay, thank you.

7              MR. HIPPLE:  Okay?  Thank you.

8              THE COURT:  All right, Mr. Berkowitz, your

9    first witness?

10             MR. BERKOWITZ:  I would like to call Teresa

11   Concepcion, first witness.

12             THE COURT:  Okay, Ms. Concepcion.

13             MR. BERKOWITZ:  Step right up there.  Your

14   Honor, do you mind if I sit down or --

15             THE COURT:  Oh, yeah, that's fine, whatever

16   you're comfortable with.

17             TERESA CONCEPCION, Plaintiff, Sworn.

18             COURTROOM DEPUTY:  Please state and spell

19   your last name for the record.

20             THE WITNESS:  My last name is Concepcion,

21   C-O-N-C-E-P-C-I-O-N, first name, Teresa.

22                     DIRECT EXAMINATION

23   BY MR. BERKOWITZ:

24   Q    Ms. Concepcion, would you tell us what your

25   relationship was with the defendant, Clement Hipple?

Ms. Concepcion - Direct                         55

1    A    I was married to him.

2    Q    Do you recall when you got married?

3    A    March 2001.

4    Q    And do you recall when the marriage ended

5    officially?

6    A    The marriage ended officially April 2011.

7    Q    And do you recall in October of 2010 yourself and

8    Mr. Hipple signing consents to the divorce?

9    A    That's correct.

10   Q    So you were married for about ten years?

11   A    That's correct.

12   Q    And while you were married did you have joint bank

13   accounts with Mr. Hipple?

14   A    Yes, I did.

15   Q    And, Ms. Concepcion, can Mr. Hipple read and write?

16   A    Yes.

17   Q    And how do you know this?

18   A    I've seen him do it.

19   Q    And when you say you've seen him do it, would --

20   while you were married did you seem him read books or

21   send internet letters or the like?

22   A    Yes.

23   Q    Now, could you tell me how did the marriage end?

24        MR. HIPPLE:  Your Honor, I object to this

25   line of questioning, okay?  It has -- it's irrelevant

Ms. Concepcion - Direct                          56

1    to the case.

2              THE COURT:  All right, overruled.

3              MR. HIPPLE:  This is my personal life.

4              THE COURT:  Okay, I'll overrule the

5    objection.  You mean how did it end like in financial

6    terms?

7              MR. BERKOWITZ:  No, I'm just, you know,

8    that --

9              MR. HIPPLE:  I don't understand.

10             MR. BERKOWITZ:  -- the marriage -- that the

11   marriage ended -- I just want to get a couple things.

12             MR. HIPPLE:  But, again, Your Honor, I

13   object.

14             THE COURT:  All right, I'll overrule the

15   objection.  Go ahead, you may proceed.  How did it --

16   was it friendly, amicable, or was it hostile?

17   BY MR. BERKOWITZ:

18   Q    That was -- was it an amicable separation?

19   A    No.

20   Q    Could you tell us what happened?  Did any -- were

21   there any events or incidents that precipitated?

22   A    Yes, there was one final event where I confronted

23   Mr. Hipple with having found in my desk a wallet full

24   of $5,000 cash in small, unmarked bills, fake

25   identification in the name of Jason Whalen (ph) with

Ms. Concepcion - Direct                    57

1   his face on it, a passport, and some paperwork showing

2   that he had gone into Mexico and had come back.

3              MR. HIPPLE:  Objection, Your Honor.

4              THE COURT:  All right, I'll overrule the

5   objection.  You may proceed.

6   BY MR. BERKOWITZ:

7   Q   At any point, did you obtain a protection from

8   abuse order?

9   A   Yes, I did.

10             THE COURT:  I'll sustain the objection.

11             MR. HIPPLE:  Objection.

12  BY MR. BERKOWITZ:

13  Q   Towards the end of your marriage, did you ever have

14  any discussions with Mr. Hipple about repayment of the

15  money that SCIX owed to you?

16  A   Several times.

17  Q   And could you tell us what was said?

18  A   I was -- I was given several different kinds of

19  answers.  Some were assurances that I would be repaid,

20  not to worry about it, that I would get my money back,

21  and other times I was threatened with bodily harm and

22  even death.

23             MR. HIPPLE:  Objection, Your Honor.

24             THE COURT:  I'll overrule the objection.

25  BY MR. BERKOWITZ:

Ms. Concepcion - Direct                    58

1   Q   Are you familiar with the Steel Seal product?

2   A   Yes, I am.

3   Q   And how is it that you know about Steel Seal?

4   A   I worked with the company for a couple of years.

5   Q   And could you tell us how was the product, Steel

6   Seal, sold?

7   A   The product, Steel Seal, was sold on the internet.

8   Q   And do you know what company sold the Steel Seal

9   while you were married to Mr. Hipple?

10  A   While the time I was married to Mr. Hipple I only

11  knew of two different entities that had to do with

12  Steel Seal, and they were Scientific Chemicals,

13  Incorporated, and another one was SCIX.

14  Q   And do you know which was the company that sold

15  Steel Seal on the internet?

16  A   No, I could never keep track of his dealings with

17  one corporation over another.

18  Q   Do you know owned, to the best of your knowledge,

19  who owned SCIX?

20  A   To the best of my knowledge, Clem was the owner.

21  Q   And how do you know that?

22  A   He called all the shots, made all the decisions

23  and --

24          MR. HIPPLE:  Objection, Your Honor.

25          THE COURT:  Overruled.

Ms. Concepcion - Direct                                    59

1              MR. HIPPLE:  Speculation.

2              THE COURT:  I'll overrule the objection.  You

3    worked -- you worked in the office, right?

4              THE WITNESS:  I did.

5              THE COURT:  Right.  Go ahead.

6              THE WITNESS:  Can you restate the question,

7    please?

8    BY MR. BERKOWITZ:

9    Q    I think you've answered it.

10             THE COURT:  Yes, I --

11   BY MR. BERKOWITZ:

12   Q    I'll move on.  After you were married to Mr.

13   Hipple, did you work for SCIX at that point?

14   A    Yes, I did.

15   Q    Okay.  And did you know Brian Hipple?

16   A    Yes, I did.

17   Q    And how well did you know Brian?

18   A    I guess as fairly well as he would have allowed me

19   to know him.

20   Q    Did you work together with him in an office?

21   A    Yes, closely, 40 hours a week for one or two years,

22   three years.

23             MR. HIPPLE:  Again, Your Honor, I don't

24   understand the line of questioning.

25             THE COURT:  I'll overrule the objection.

Ms. Concepcion - Direct                    60

1   BY MR. BERKOWITZ:

2   Q   And were you familiar with Mr. -- with Brian

3   Hipple's handwriting?

4   A   Yes, I was familiar with his handwriting.

5   Q   Now, could you tell us in August of 2000 about a

6   traffic accident in which you were involved?

7   A   Yes, I was -- I was in my car, I was at a

8   stoplight, and basically that's all I remember was I

9   ended up in the hospital.  Afterwards, I was told that

10  I was struck from the rear by a dump truck traveling

11  really fast.

12              MR. HIPPLE:  Objection, Your Honor.

13              THE COURT:  I'll sustain the objection.

14              MR. BERKOWITZ:  Your Honor, you'll see the --

15              THE COURT:  It's hearsay.  You can't --

16              MR. BERKOWITZ:  I will ask the witness -- I'm

17  going to -- can I approach the witness?

18              THE COURT:  All right.  What year are we

19  talking about did this accident happen?

20              THE WITNESS:  Year 2000.

21              THE COURT:  Thank you.

22              MR. HIPPLE:  Objection to the exhibits.

23              THE COURT:  I'm sorry?

24              MR. HIPPLE:  Objection to his exhibits.

25              THE COURT:  On what ground?

Ms. Concepcion - Direct                    61

1        MR. BERKOWITZ:  Can I show the exhibit to the
2  witness?
3        THE COURT:  On what ground?
4        MR. HIPPLE:  It has nothing to do with the
5  case.
6        THE COURT:  All right, well, let's see what
7  exhibit he shows first.
8  BY MR. BERKOWITZ:
9  Q   Ms. Hipple, I'm going to show you --
10       THE COURT:  So we'll take one exhibit at a
11  time and if you think it's improper, you can object.
12  BY MR. BERKOWITZ:
13  Q   I'm going to ask you to look at Exhibit Number 1.
14       THE COURT:  Okay.
15  BY MR. BERKOWITZ:
16  Q   And have you seen those pictures before?
17  A   Yes, I have.
18       THE COURT:  Any objection to this?
19       MR. HIPPLE:  Yes, I object because they have
20  nothing to do with the case, Your Honor.
21       THE COURT:  All right.  Can you -- why don't
22  you make an offer of proof?  What's the accident have
23  to do with this?
24       MR. HIPPLE:  Where's he going with this?
25       THE COURT:  Well, we're going to find out.

Ms. Concepcion - Direct                    62

1          MR. BERKOWITZ:  Your Honor --

2          THE COURT:  That's why -- when I say an offer

3    of proof I ask him to tell me generally --

4          MR. HIPPLE:  Okay.

5          THE COURT:  -- what this is about.

6          MR. BERKOWITZ:  We don't have to remove a

7    jury right now.

8          THE COURT:  Right.

9          MR. BERKOWITZ:  Ms. Hipple was involved in a

10   very serious car accident.  That was the source of the

11   money, the settlement from this accident that was lent

12   to SCIX --

13         THE COURT:  All right.

14         MR. BERKOWITZ:  -- that provides the

15   judgments.

16         THE COURT:  All right.  I'll overrule the

17   objection.

18   BY MR. BERKOWITZ:

19   Q    And could you just briefly tell us what are these

20   pictures of?

21   A    That was the wreck I survived in August of 2000.

22   Q    And could you tell me were you hurt in this

23   accident?

24   A    Yes.

25   Q    And how would you describe the injuries?

Ms. Concepcion - Direct                63

1  A    My injuries were global really, everything.  I

2  sustained an impact by a dump truck over 70 miles an

3  hour.  I wasn't conscious.  I broke the majority of my

4  back, my bones.  I broke more than was not broken.

5  Q    And --

6  A    I have still cognitive issues, memory issues that

7  I'll have forever, and I also suffer from chronic pain

8  since then.

9  Q    And are you -- could you tell me are you classified

10 as disabled?

11 A    I am.

12 Q    Now, was there a lawsuit as a result of this

13 accident?

14 A    Yes, there was.

15 Q    And were you paid any money as a result of that

16 lawsuit?

17 A    Yes, I was.

18 Q    And was any of that money that was paid to you from

19 that lawsuit loaned to SCIX?

20 A    I did not loan money to SCIX.

21 Q    That was not my question.

22      MR. HIPPLE:  Objection, Your Honor.

23 BY MR. BERKOWITZ:

24 Q    Was any of the money loaned to SCIX without regard

25 to how it got there?

Ms. Concepcion - Direct                    64

1    A    Some of my money was loaned to SCIX, yes.

2    Q    And do you recall that it was $350,000?

3    A    Yes.

4              THE COURT:  Are you -- are you disputing the

5    loans?

6              MR. HIPPLE:  I'm objecting to the line of

7    questioning, Your Honor.

8              THE COURT:  Yes, but are you disputing the

9    loans that she made?

10             MR. HIPPLE:  No.

11             THE COURT:  All right.  Then I don't think we

12   need to get too far into this.  All right, go ahead.

13   BY MR. BERKOWITZ:

14   Q    How did you find out that the money was loaned to

15   SCIX?

16   A    Mr. Hipple notified me after the funds were

17   transferred.

18             MR. BERKOWITZ:  Your Honor, could I approach

19   the --

20             THE COURT:  Sure.

21             MR. BERKOWITZ:  -- witness now?

22   BY MR. BERKOWITZ:

23   Q    I'm going to ask you to turn to Exhibit Number 2.

24             MR. HIPPLE:  What book is he in?  What book

25   is that?

Ms. Concepcion - Direct                                    65

1              MR. BERKOWITZ:  It's book one and it's

2    Exhibit Number 2.  They're all in one.

3              MR. HIPPLE:  Hold on for one moment.  Let me

4    get in -- let me get up-to-date here.

5              (Pause in proceedings.)

6              MR. HIPPLE:  Book one, okay.

7              MR. BERKOWITZ:  Exhibit Number 2.

8              (Pause in proceedings.)

9    BY MR. BERKOWITZ:

10   Q    And, Ms. Concepcion, could you tell us what Exhibit

11   Number 2 is?  Could you state the amount also at the

12   top?

13   A    Judgment note for 2000 -- $250,000, July 3rd, 2002.

14   Q    And it's a note for a loan to SCIX, is that

15   correct?

16   A    That's correct.

17   Q    And if you look in the first paragraph, could you

18   tell us what the interest rate was on that note?

19   A    The interest rate on this note is eight percent.

20   Q    Okay.  Did you recall whether there is a default

21   interest rate in the note, and I could refer you to the

22   second page.

23   A    Yes, there is a default rate of 12 percent

24   interest.

25   Q    Okay.  And how did you get this note?

Ms. Concepcion - Direct                66

1   A    Henry VanBlunk (ph).

2   Q    Someone prepared that for you?

3   A    Yes.

4   Q    Okay.  And I would like you to now turn to Exhibit

5   Number 3.  If you could just turn the page.

6   A    Yes.

7   Q    And could you tell us what is Exhibit Number 3?  Do

8   you see that?  It'll say "judgment note."

9   A    Yes, "Judgment note for $100,000," dated August

10  23rd, 2002.

11  Q    Okay.  And it has the same interest rate and

12  default terms as the prior note?

13  A    That's correct.

14  Q    Now, do you know whether any judgments were entered

15  on these notes?

16  A    I'm not sure how to answer the question.

17  Q    Okay.

18          MR. BERKOWITZ:  If I could, Your Honor, could

19  I?

20  BY MR. BERKOWITZ:

21  Q    I'm going to hand you Defense Exhibit Number 60.

22          (Pause in proceedings.)

23          THE COURT:  Mr. Hipple, do you know if you

24  have copies of the defense exhibits with you?

25          MR. HIPPLE:  Yeah, I have these two books.

Ms. Concepcion - Direct                    67

1          THE COURT:  Do you have an extra one for me?

2          MR. HIPPLE:  Yeah, but he's got to slow down

3   just a little bit because, again, I'm not an attorney.

4          THE COURT:  Can we get a copy?

5          MR. HIPPLE:  Here's your two books, yes, Your

6   Honor.

7          THE COURT:  We'll get them.  Jimmy, thank

8   you.

9          MR. BERKOWITZ:  Do you have another copy for

10  the witness?

11         (Pause in proceedings.)

12         THE COURT:  What number, P what?

13         MR. BERKOWITZ:  P-60.

14         THE COURT:  Thank you.

15         (Pause in proceedings.)

16         MR. BERKOWITZ:  Thank you.

17         (Pause in proceedings.)

18         MR. HIPPLE:  Your Honor, I object in one

19  thing, okay?

20         THE COURT:  Sure.

21         MR. HIPPLE:  I wasn't prepared.  I was

22  prepared that I was going to be called as the first

23  witness today, okay?  He changed it to call Teresa.

24  I'm not prepared to cross-examine Teresa.

25         THE COURT:  Well, let's see how far we get

Ms. Concepcion - Direct                    68

1   today, okay?

2           MR. HIPPLE:  Okay.  But, again, I have

3   documentation here I have to read through.

4           THE COURT:  Well, Mr. Hipple, I understand,

5   but you knew this trial was scheduled --

6           MR. HIPPLE:  Yes, but --

7           THE COURT:  -- and you had an attorney so --

8           MR. HIPPLE:  Well, also, I was -- I thought I

9   was going to be --

10          THE COURT:  You made this decision to

11  discharge your attorney at the last minute, the day --

12  I found out about it this morning around 9:00 when I

13  was about to get into trial.

14          MR. HIPPLE:  I understand all that, Your

15  Honor, but I thought I was going to be called as the

16  first witness.

17          THE COURT:  All right.

18          MR. BERKOWITZ:  I never provided the order

19  for the witnesses, Your Honor.

20          THE COURT:  All right.

21  BY MR. BERKOWITZ:

22  Q    Ms. Hipple -- I'm sorry, Ms. Concepcion --

23  A    It's okay.

24  Q    -- I'm going to show you Exhibit 60.

25          MR. BERKOWITZ:  And just to speed it up, Your

Ms. Concepcion - Direct                    69

1   Honor, if I could show her the pages?

2            THE COURT:  Yes.

3   BY MR. BERKOWITZ:

4   Q    I'd like to show you a page that -- D-60 it says

5   "Complaint" --

6            MR. HIPPLE:  Hold on for one minute.  Hold on

7   for one minute.

8            MR. BERKOWITZ:  It's D-60.

9            MR. HIPPLE:  D-60?

10           MR. BERKOWITZ:  Yes, your -- yes, Exhibit 60.

11           THE COURT:  Your black binder.

12           MR. BERKOWITZ:  It's to the back.

13           THE COURT:  Your black binder.

14           MR. BERKOWITZ:  It's in the black binders,

15   yours up on the front of the desk.

16           THE COURT:  60, not 66?

17           MR. BERKOWITZ:  6-0.

18           MR. HIPPLE:  All right.

19           (Pause in proceedings.)

20           MR. HIPPLE:  I'm sorry, I don't have D-60.  I

21   got a D-50.

22           THE COURT:  It's the last exhibit in the

23   second binder -- the last exhibit in the second binder.

24   Or no, it's the second -- third to the last.

25           (Pause in proceedings.)

Ms. Concepcion - Direct                         70

1          THE COURT:  Are you ready?

2          MR. HIPPLE:  Yep.

3          THE COURT:  Okay.

4   BY MR. BERKOWITZ:

5   Q    Ms. Concepcion, could you just read the --

6          MR. HIPPLE:  Sorry, Your Honor.

7   BY MR. BERKOWITZ:

8   Q    -- title of the document?

9   A    "Complaint for Confession of Judgment."

10  Q    Okay.  And I'd like you to look at the last --

11  second to last page of this exhibit that's called

12  verification.  Do you see that page?

13  A    I do.

14  Q    Think you can tell me is that your signature that

15  appears on that page?

16  A    Yes, it is.

17  Q    And I'd like you to look at the last page.  And

18  could you read the amount of the judgment that was

19  entered on that?

20  A    $101,329.50.

21  Q    Okay.

22          MR. HIPPLE:  Your Honor, if I may say, we're

23  not in dispute of the documents or the loans.

24          MR. BERKOWITZ:  Your Honor, I will be quick

25  with this, but it does make a difference.

Ms. Concepcion - Direct                    71

1          THE COURT:  Right.  He's entitled to try the

2     case the way he wants to.  I mean if he wants to

3     present the documents to the witness, he's allowed to

4     do that.

5          MR. BERKOWITZ:  I will try --

6          THE COURT:  Right.

7          MR. BERKOWITZ:  -- do this as quickly as I

8     can.

9          THE COURT:  I know.  Sure, no problem.

10    BY MR. BERKOWITZ:

11    Q    Ms. Concepcion, I'm going to show you Exhibit D-59,

12    and if you could just read the first page --

13    A    "Complaint" --

14    Q    -- of that?

15    A    "Complaint for Confession of Judgment."

16    Q    Okay.  And if we go to the second to last page of

17    Exhibit 59, do you see the verification?

18    A    I do.

19    Q    And is that your signature on the verification?

20    A    It is.

21    Q    And could you tell us the amount of the judgment

22    that is on the final page of this exhibit?

23    A    $252,829.50.

24    Q    And I'll move these out of your way now.

25          (Pause in proceedings.)

Ms. Concepcion - Direct                    72

1    Q    Now, Ms. Concepcion, if you would just turn in

2    Exhibit -- Volume 1 to Exhibit 4.

3              MR. BERKOWITZ:  Your Honor, and I'll make

4    this brief if I could.  There's no need to belabor this

5    point.

6              THE COURT:  Okay.

7    BY MR. BERKOWITZ:

8    Q    Do you see Exhibit 4?

9    A    Yes.

10   Q    Do you see the blue ink on that?

11   A    Yes.

12   Q    And that is a certified copy of the Bucks County

13   docket with the $100,000 judgment?  Do you see that?

14   A    Yes, I do.

15   Q    Okay.  Now, I would like you to turn to Exhibit 5.

16   And do you see that, again with the blue writing?

17   A    I do.

18   Q    The original certified docket for the $250,000

19   note, is --

20   A    I do --

21   Q    -- that correct?

22   A    I do see that, yes.

23   Q    Okay.  Now, to the best of your knowledge, did SCIX

24   ever contest those judgments?

25   A    Never.

Ms. Concepcion - Direct                    73

1   Q   And did they make any payment to you --

2   A   Yes.

3   Q   -- on account of those judgments?

4   A   Yes, they did.

5   Q   And I would like to ask you to turn to Exhibit

6   Number 6, Plaintiff's exhibits in white.  I'm going to

7   represent to you that this is a document that was

8   produced by the defendants in this case.  And if you

9   would look to the second page, do you see under --

10  there's a payment column?  Do you see that?

11  A   I do see that.

12  Q   And you see there's payments to you?

13  A   Yes.

14  Q   And do you recall having received payments?

15  A   I do recall receiving payments.

16  Q   Okay.  And do you have any reason to dispute the

17  accuracy of this document?

18  A   No, I do not.

19  Q   Now, do you know whether Exhibit 6 shows all the

20  payments that you received from SCIX?

21  A   No, they do not.

22  Q   Okay.

23          MR. HIPPLE:  Objection, Your Honor, this

24  document -- there's -- again, I don't know where it

25  came from or how it -- how it came about.

Ms. Concepcion - Direct                                    74

1          THE COURT:  Do you know, Ms. Concepcion, do

2    you know who prepared this document?

3          THE WITNESS:  It looks like it was Mr.

4    Hipple's composition.

5          MR. BERKOWITZ:  Your Honor, you will see

6    where it came from as we go along.

7          THE COURT:  All right.  We're not going to

8    admit it yet into evidence until we establish the

9    authenticity of it.  I don't think she has identified

10   it at this point, so let's --

11         MR. BERKOWITZ:  I'd like to just --

12         THE COURT:  -- allow her to talk about it at

13   this point, but unless he establishes, you know, where

14   it came from as authentic, it won't be admitted, all

15   right?  Mr. Hipple, do you understand that?

16         MR. HIPPLE:  Yes, sir.

17         THE COURT:  Okay, go ahead.

18   BY MR. BERKOWITZ:

19   Q    Now, I just -- let's look at the first page of this

20   Exhibit 6, and do you see the top line?

21   A    Yes.

22   Q    You see that it says "Teresa"?

23   A    Yes.

24   Q    "Clem," do you see that?

25   A    Yes, I do.

Ms. Concepcion - Direct                     75

1    Q    And J.C.?

2    A    Correct.

3    Q    And then under it, "This is Teresa"?

4    A    Yes.

5    Q    Now, I'm going to ask you to look at Exhibit 132.

6            MR. HIPPLE:  Could you hold on for one minute

7    while I change books?  132?

8            MR. BERKOWITZ:  132.

9            MR. HIPPLE:  In book what?

10           MR. BERKOWITZ:  Four.

11           (Pause in proceedings.)

12           MR. BERKOWITZ:  And, Your Honor, I have a

13   blowup of this that will help --

14           THE COURT:   Okay.

15           MR. BERKOWITZ:  -- us go through.

16   BY MR. BERKOWITZ:

17   Q    Now, are you familiar with this document?

18   A    I am.

19           MR. HIPPLE:  Objection, Your Honor, it

20   doesn't say where the document came from.

21           THE COURT:  Well, he may get to that.  He

22   just asked if she's familiar.  She said she's familiar.

23   So let's see what she says.

24           MR. BERKOWITZ:  Can I --

25           THE COURT:  Go ahead.

Ms. Concepcion - Direct                    76

BY MR. BERKOWITZ:

Q    I would like you to tell me did you compare Exhibit
132 with this document and convince yourself that they
are the same?

A    Yes, they are.

Q    Okay.  Now, do you see under "unpaid notes"?

A    Yes, I do.

Q    And you see under August, $350,000?

A    I do see that.

Q    And would that correspond with the two loans that
were made to SCIX?

A    Yes, they would.

Q    And I --

        MR. HIPPLE:  Your Honor, objection again.  We
identified that the money was owed, that the notes are
there.  We identified that.  We agreed to that fact.  I
don't understand where he's going.

        MR. BERKOWITZ:  I'll make it simple, Your
Honor.

        MR. HIPPLE:  He keeps going and going, but
he's not saying where he's going.

        MR. BERKOWITZ:  I'll make it simple.  I can
take you right to the back to show you how much money
is owed.

        MR. HIPPLE:  Okay.

Ms. Concepcion - Direct                    77

1          MR. BERKOWITZ:  Would you prefer that I do

2    that, if there's no objection?

3          MR. HIPPLE:  I would prefer that you do that.

4          THE COURT:  All right, fine, no objection.

5    BY MR. BERKOWITZ:

6    Q    Just go through -- across the top here, eight

7    percent interest, correct?

8    A    Correct.

9    Q    And that was the amount in the note?

10   A    Yes.

11   Q    And then we have a running balance with the

12   interest?

13   A    That's correct.

14   Q    And you can see we didn't compound the interest

15   because the note does not provide for compound

16   interest?

17   A    That's correct.

18   Q    Okay.  Now, can you see on the right side, you see

19   there are payments?

20   A    Yes, I do.

21   Q    And do those correspond with the payments that are

22   shown on Exhibit 6?

23   A    Yes, they do.

24   Q    Now, I don't want to -- on the second page of

25   Exhibit 132 again, under the fourth column, again, you

Ms. Concepcion - Direct                    78

1    see the 350, the interest, the running total?

2    A    Yes, I do.

3    Q    And the payments?

4    A    Yes.

5    Q    Do you see that?  And does that correspond with the

6    Exhibit 6?

7    A    Yes, it does.

8    Q    Okay.  Now, do you recall I told you that you

9    received payments that were not reflected on Exhibit 6?

10   A    That's correct.

11            (Pause in proceedings.)

12   Q    I'm going to show you Exhibit 114.

13            (Pause in proceedings.)

14   Q    I'm going to ask you to look at Exhibit 114, and if

15   you can tell me do you -- what is shown on Exhibit 114?

16   A    A check from SCIX written to me in the amount of

17   $6,020.45.

18   Q    And what is the date on the check, do you recall?

19   A    October 2, 2009.

20            (Pause in proceedings.)

21   Q    Okay.  Let me just get to the right page here.  And

22   what is the amount of that check?

23   A    $6,020.45.

24   Q    Okay.  So if you look on Exhibit 132, page two of

25   four, do you see that $6,000 payment from Wachovia?

Ms. Concepcion - Direct                    79

1   That's money you received, correct?

2           MR. HIPPLE:  What was the other -- the other

3   document?

4           MR. BERKOWITZ:  114 are the checks.

5           MR. HIPPLE:  Number 6?  You're referring back

6   to 6?

7           MR. BERKOWITZ:  No, this is now Exhibit 114.

8           THE COURT:  No, he's referring back to 132.

9           MR. BERKOWITZ:  132 and --

10          THE COURT:  Which is the summary.

11          MR. BERKOWITZ:  -- 114.

12          MR. HIPPLE:  Could you hold on for one

13   moment, please?

14          THE COURT:  Sure.

15          (Pause in proceedings.)

16          MR. HIPPLE:  Okay, October 2nd, 2009.

17          THE COURT:  What's your question?  Mr.

18   Berkowitz, why don't you repeat where we were?

19          MR. BERKOWITZ:  Yeah.

20   BY MR. BERKOWITZ:

21   Q   If you look at October 2009, you said you have a

22   check there from Wachovia payable to you?

23   A   Yes.

24   Q   In the amount of $6,020?

25   A   And 45 cents, yes.

Ms. Concepcion - Direct                    80

1    Q    And if you look at the next check in that Exhibit

2    114?

3    A    6,009.47.

4    Q    And is there another check in November?

5    A    $1,250.

6    Q    Okay.  If you add them up, they come up to

7    $7,259.47?

8              THE COURT:  This is a summary chart, right,

9    of all the checks?

10             MR. HIPPLE:  Yes, but, Your Honor, we agree

11   with the amount that was owed.

12             THE COURT:  All right.  Do you agree with --

13   what's the number, 551?  What's the --

14             MR. BERKOWITZ:  Yes.  And it's just -- I

15   can -- again --

16             MR. HIPPLE:  We are not disputing any amount

17   of number that is owed.

18             MR. BERKOWITZ:  Okay.  I'll show you then on

19   October 2010, when the garnishment took place, we

20   grabbed -- we obtained $53,000 from Wachovia Bank.

21   That paid some principal.

22             THE COURT:  Right.

23             MR. BERKOWITZ:  So now we're calculating

24   interest on the adjusted amount that shows on January

25   2011.

Ms. Concepcion - Direct                    81

1          THE COURT:  Right.

2     BY MR. BERKOWITZ:

3     Q    Now, I believe you told us when you looked at the

4     note, and this is where we defaulted, where we

5     confessed we started to execute.  We started

6     calculating interest at 12 percent, correct?

7     A    That's correct.

8     Q    Okay.  So that that 3,386.30 represents one percent

9     per month, and that is the interest that's carried

10    down?

11    A    That's correct.

12    Q    Okay.  So now when you go to the last page on this

13    exhibit -- now, I'd look -- we are at -- we are at

14    September -- I'm sorry --

15         MR. HIPPLE:  Again.

16         MR. BERKOWITZ:  July -- I'm sorry.

17         THE COURT:  What's the matter, Mr. Hipple?

18         MR. HIPPLE:  We don't -- we don't dispute the

19    amount.

20         THE COURT:  All right.  But, you looked at

21    this Exhibit 132, right?

22         MR. HIPPLE:  Yes.

23         THE COURT:  You don't disagree or dispute any

24    of these numbers or how --

25         MR. HIPPLE:  No.

Ms. Concepcion - Direct                          82

1    THE COURT: -- it's calculated?

2    MR. HIPPLE: I'm not disputing nothing as far

3  as the numbers are concerned at all. The numbers are

4  the numbers and that's it. I'm in total agreement. I

5  don't know where he's going.

6    MR. BERKOWITZ: Okay. I was just --

7    MR. HIPPLE: You said that five minutes ago.

8    MR. BERKOWITZ: All right.

9    THE COURT: Wait a minute. Let him finish.

10  Go ahead, Mr. Berkowitz.

11  BY MR. BERKOWITZ:

12  Q    I'll just ask the witness if you could read August

13  2015. Could you just read that number, 535,034.97?

14  Did I read it correctly?

15  A    Yes.

16  Q    And that's the amount of money that is due to you

17  on the notes, is that correct?

18  A    That's correct.

19  Q    Okay. Thank you.

20    (Pause in proceedings.)

21  Q    While you were married to Mr. Hipple did he use

22  credit cards to pay for things often?

23    MR. HIPPLE: Objection, Your Honor, this is

24  our personal life and has nothing to do with the

25  lawsuit. I don't understand where this line of

Ms. Concepcion - Direct                    83

1    questioning is coming from.

2           MR. BERKOWITZ:  You will see, Your Honor.  I

3    don't want to get ahead of myself, but it is very

4    important and it's a simple question.  She answered

5    yes.

6           THE COURT:  All right.

7           MR. HIPPLE:  What is the purpose?  This

8    is -- this is a lawsuit in reference to her notes,

9    okay?  It has nothing to do with our marital life.  Now

10   what, we're going to bring my whole marital life into

11   this?

12          THE COURT:  Well, I don't know where this is

13   going, but there is an allegation --

14          MR. HIPPLE:  Well, again, the same thing --

15          THE COURT:  You got to let me finish.

16          MR. HIPPLE:  All right.

17          THE COURT:  I'm not sure where this is going,

18   but there is a claim here of fraudulent transfer of

19   assets.  So I'm going to overrule the objection.  I'll

20   see where we're going with this and we may -- I may cut

21   it off.  Go ahead, Mr. Berkowitz.

22          MR. BERKOWITZ:  I'm done with this.

23          THE COURT:  Go ahead.

24          MR. BERKOWITZ:  There's --

25          THE COURT:  Did he use --

Ms. Concepcion - Direct                    84

1          MR. BERKOWITZ:  -- no need to cut it off.

2          THE COURT:  Did he use credit cards?

3          THE WITNESS:  Yes.

4          MR. BERKOWITZ:  Okay.

5   BY MR. BERKOWITZ:

6   Q   Now, I'd like you to look at Exhibit 24, and I'm

7   going to -- volume -- it's volume one.

8          MR. HIPPLE:  Volume one?

9          THE COURT:  P-24, right?

10         MR. BERKOWITZ:  Yes, P-24, volume one,

11  Exhibit 24.

12  BY MR. BERKOWITZ:

13  Q   Could you just read the heading on that document?

14  A   "Interrogatories in Aid of Execution."

15  Q   Okay.  And I'd like you to look through it and see

16  if you can see any handwriting on that.

17         (Pause in proceedings.)

18  A   On the fourth page.

19  Q   Yes, do you see that handwriting?

20  A   I do.

21  Q   Can you identify whose handwriting that is?

22  A   That's the deceased, Brian Hipple's, handwriting.

23         MR. HIPPLE:  Objection, Your Honor.  The

24  witness is not an expert handwriter.

25         THE COURT:  All right.  How do you know that

Ms. Concepcion - Direct                    85

1    that's Mr. Brian Hipple's signature?

2           THE WITNESS:  Because I worked with him for

3    years and we exchanged notes constantly.

4           MR. HIPPLE:  Objection, Your Honor, she

5    worked with him ten years ago.

6           THE COURT:  How long did you work with him?

7    How many years or months or --

8           THE WITNESS:  Three years.

9           THE COURT:  Okay.  And you had occasion to

10   see his signature on numerous --

11          THE WITNESS:  Often.  Like Mr. Hipple said,

12   we were in a think tank.  We constantly wrote notes,

13   exchanged notes.

14          THE COURT:  All right, I'll overrule the

15   objection.

16          MR. BERKOWITZ:  And, Your Honor, I was going

17   to -- because Brian Hipple was not here, I was going to

18   read these as SCIX has defaulted.  I was going to read

19   these as admissions into the record, but to save the

20   Court's time, they are pretty simple.  It identifies

21   that there are no assets left of SCIX.

22          THE COURT:  Do you have any dispute, Mr.

23   Hipple, as to the authenticity of the answers to

24   interrogatories?

25          MR. HIPPLE:  I would have to read them.

Ms. Concepcion - Direct                          86

1          THE COURT:  All right.

2          MR. HIPPLE:  Whose answers are these?

3          MR. BERKOWITZ:  The witness testified that

4    that was Brian Hipple's writing.

5          THE WITNESS:  That's correct.

6          MR. HIPPLE:  Was this addressed to Brian

7    Hipple?

8          MR. BERKOWITZ:  I can answer that, Your

9    Honor.

10         THE COURT:  Yes.

11         MR. BERKOWITZ:  Those were interrogatories

12   in aid of execution that I sent to Brian Hipple and

13   SCIX.

14         THE COURT:  Well, it looks like -- this is

15   Exhibit 24, right?

16         MR. BERKOWITZ:  Correct.

17         THE COURT:  It says it's addressed to SCIX.

18         MR. BERKOWITZ:  Correct.

19         THE COURT:  Not Brian Hipple.

20         MR. BERKOWITZ:  It was -- it was -- right,

21   because SCIX was the defendant.  The envelope and the

22   letter had Brian Hipple, SCIX.

23         THE COURT:  Oh.  But they're answered by

24   SCIX, not Brian Hipple --

25         MR. BERKOWITZ:  Correct.

Ms. Concepcion - Direct                    87

1            THE COURT:  -- individually?

2            MR. BERKOWITZ:  They're answered for SCIX by

3    Brian Hipple.

4            THE COURT:  Right.

5            MR. HIPPLE:  Okay.  And you're saying in

6    reference to Wachovia Bank?

7            MR. BERKOWITZ:  No, that SCIX no longer owns

8    any assets.

9            MR. HIPPLE:  What is the date of this?

10           MR. BERKOWITZ:  It's undated.

11           MR. HIPPLE:  What is the date of the

12   document?

13           MR. BERKOWITZ:  I sent it out on October 6th,

14   2010.

15           MR. HIPPLE:  I object to that.  I don't see a

16   date on this document.

17           THE COURT:  Okay.  So through this witness --

18   by the way, where -- what page is his signature?

19           MR. BERKOWITZ:  There is no signature, Your

20   Honor.  They weren't verified.  I just got them in an

21   envelope with nothing else.

22           MR. HIPPLE:  I object to the document.

23           THE COURT:  All right.

24           MR. HIPPLE:  There's no date, there's no

25   signature.  We have a witness that's --

Ms. Concepcion - Direct                    88

1    THE COURT:  Let me stop you for a minute.  So

2  our witness identified Mr. Hipple's -- Brian Hipple's

3  signature, but where --

4    MR. BERKOWITZ:  No, no, the handwriting.

5    THE COURT:  The handwriting.  Oh, the

6  handwriting.

7    MR. BERKOWITZ:  The handwriting.  And, Your

8  Honor, all I did was offer them as admissions for the

9  defaulting party, SCIX, for the Court to consider, not

10  even to admit it as an exhibit because Brian Hipple is

11  not here.

12    THE COURT:  All right.  Well, so here's the

13  way it works.  Documents are identified for the record,

14  so we've identified this document for the record, but

15  it's not admitted at this point into evidence.  So it's

16  not something I can rely on in making a decision until

17  I formally admit it.

18    Now, there might be some testimony later on,

19  why, Mr. Berkowitz, I have no idea, where he might

20  bring in somebody from his law firm or somebody to

21  testify as to why this came from Brian Hipple, then we

22  may entertain a motion to admit the document.  But at

23  this point, he's not moving to admit it, okay?  Do you

24  understand, Mr. Hipple?

25    So at this point, you know, if he was moving

Ms. Concepcion - Direct                    89

1    to admit it, your objection would be well taken, but at

2    this point, he's not moving to admit it.  He's just

3    having the witness identify it, and she's identified

4    this writing as Brian Hipple's, okay?  It doesn't mean

5    I'm going to admit it.  It's a little piece of the

6    puzzle here.

7              MR. HIPPLE:  I have an objection --

8              THE COURT:  All right, your objection is

9    overruled.

10             MR. BERKOWITZ:  I have no further questions

11   for this witness.

12             THE COURT:  Okay.

13             MR. BERKOWITZ:  Your Honor --

14             THE COURT:  Let's take a ten-minute break.

15   You get --

16             MR. HIPPLE:  I need an hour break.

17             THE COURT:  Well, we're not -- I'm not going

18   to give you an hour break.

19             MR. BERKOWITZ:  It's quarter after two.

20             THE COURT:  I'll give you a ten-minute break,

21   and then you can --

22             MR. HIPPLE:  All right.  Let me relax for ten

23   minutes.

24             THE COURT:  -- compose yourself --

25             MR. HIPPLE:  I'll look at my notes.

1          THE COURT:  -- and you can ask her questions,

2    okay?

3          MR. HIPPLE:  And I was going to study these

4    notes at another time.  I know --

5          THE COURT:  Well, the problem --

6          MR. HIPPLE:  I know --

7          THE COURT:  -- Mr. Hipple, is, you know --

8          MR. HIPPLE:  I understand, Your Honor.

9          THE COURT:  -- that's the consequences of

10   you --

11         MR. HIPPLE:  Okay.  All right.

12         THE COURT:  -- firing your lawyer.

13         MR. HIPPLE:  I'll get it together in ten

14   minutes.

15         THE COURT:  All right.  Take a ten minute

16   break.

17         (Recess, 2:15 p.m. to 2:30 p.m.)

18         THE COURT:  Please be seated.  All right.

19   Mr. Hipple, you may proceed.

20         MR. HIPPLE:  Yeah, I think I'm ready, Your

21   Honor.  Your Honor, we -- unfortunately, all -- the

22   three copies of our attorneys binders are missing

23   Teresa's deposition.  You got the copy that we copied?

24   He has a copy -- two copies, so he can give -- can you

25   give her one of those copies?

1          THE COURT:  Yes, I'll give her mind.

2          MR. HIPPLE:  You don't need it for yourself?

3          THE COURT:  I'll get it back later.  I can

4   listen.

5          MR. HIPPLE:  Okay.

6          THE COURT:  But you have to provide your own

7   copies of exhibits going forward here, okay?  We can't

8   make --

9          MR. HIPPLE:  Yeah, they're all there.

10          THE COURT:  Okay, fine.

11          MR. HIPPLE:  Every book.

12          THE COURT:  We just can't make copies because

13   it's --

14          MR. HIPPLE:  All right, I understand that,

15   Your Honor.

16          THE COURT:  -- taxpayers' money.  Go ahead.

17          MR. HIPPLE:  Okay.  All right.

18                     CROSS-EXAMINATION

19   BY MR. HIPPLE:

20   Q   Being as they brought up our time together, I would

21   like to continue some questioning in that area, okay?

22          THE COURT:  Okay.

23          MR. HIPPLE:  All right.

24   BY MR. HIPPLE:

25   Q   Teresa.  Should I come over there?

Ms. Hipple - Cross                            92

1    THE COURT:  No, stay there.  He's addressing

2    you.

3    BY MR. HIPPLE:

4    Q    Teresa.

5    THE COURT:  He's addressing you.

6    THE WITNESS:  Yes.

7    BY MR. HIPPLE:

8    Q    Okay.  Basically, what timeframe was it when we

9    first met?

10   A    Repeat the question.

11   Q    What timeframe was it when we first met?

12   A    1996.

13   Q    Okay.  All right.  During our first couple years

14   together, okay, and prior to your accident, would you

15   say that we did a lot of black tie events for charity,

16   breast cancer and things of that nature, children's --

17   at five dollars -- $5,000 a plate?

18   A    I do remember things like that.

19   Q    All right.  Do you remember the dresses at $5,000 a

20   dress?

21   A    I remember some dresses, yes.

22   Q    Okay.  At a cost of 5,000, right?

23   A    I don't remember that.

24   Q    Okay.  All right.  As far as the accident is

25   concerned, could you -- could you explain -- well, let

1    me back up.

2           Okay.  You worked for Scientific Chemical you

3    say for three years?

4    A    Approximately.

5    Q    All right.  And how many years were you and Brian

6    just together in the one office?

7    A    I don't remember.

8    Q    Do you remember the year we started selling Steel

9    Seal?

10   A    I do not recall.

11   Q    Okay.  Okay.  Do you remember also being in the

12   other office where everybody was and we did the packing

13   off of -- right off of 95 and Street Road?

14   A    I don't know what you're referring to.

15   Q    The large office that you worked in where David

16   Ecklemeyer (ph) worked, Brian, myself, the construction

17   company?

18   A    Yes.

19   Q    Okay.  All right.  At the time when we were

20   together, we decided to move in and purchase a house,

21   correct?

22   A    Yes.

23   Q    In Newtown, right?

24   A    (No response heard.)

25   Q    Okay.  We all moved in together in Newtown,

1   correct?

2   A    That's correct.

3   Q    And then could you tell me what timeframe you left

4   Scientific Chemical?

5   A    I do not recall.

6   Q    Okay.  Okay.  As far as the accident is concerned,

7   after the accident, you were bedridden for

8   approximately six months, correct?

9   A    I do not recall how long it was.

10   Q    Well, do you have any idea at all?

11   A    No.

12   Q    Okay.  During that six-month period, who took care

13   of you?

14   A    I had a nurse that came into the house, my children

15   took turns taking care of me, and my ex-husband took

16   care of me.

17   Q    Which would be me.  How do we address each other?

18   A    Mr. Hipple.

19   Q    Okay.  All right.  Mr. Hipple took care of you,

20   okay.  I used to run you out there with the wheelchair

21   ramp, pull up the wheelchair ramp, and -- right?  And

22   bunked with you and took you out and bathed you every

23   night?

24   A    Yes.

25   Q    Okay.  So this gentleman that you later on

Ms. Hipple - Cross                                    95

1   described as a monster, okay, that abused you or beat

2   you, do you have any idea when that took place or when

3   I ever hit you?

4   A    I don't recall making that statement.

5   Q    Oh, I thought you said you were abused, that I --

6   you had a court order for abuse against me.

7             THE COURT:   I sustained the objection on that

8   question.

9             MR. HIPPLE:   Okay, all right.

10  BY MR. HIPPLE:

11  Q    So, basically, then -- all right.

12            So up to the early part of that time and the

13  accident, you were being taken care of by me and your

14  children, correct?

15  A    That's correct.

16  Q    Okay.  Okay.  You mentioned that I -- I've --

17  you've seen me reading books.  Could you identify any

18  book I ever read?

19  A    Your stock trading books that I still have in the

20  closet at home.

21  Q    You actually seen me ever read books?

22  A    Yes.

23  Q    And you say that I don't have a problem with

24  spelling and reading, is that correct?  You used to

25  spell all the time for me?

Ms. Hipple - Cross                                         96

1    A    Not all the time.

2    Q    But you did spell for me, is that correct?

3    A    I've spelled for lots of people, yes.

4    Q    Yes.  And would you -- would you consider I do have

5    a reading defect?

6    A    No.

7    Q    And I can -- that I can read any word you're

8    saying?

9    A    You've done it all day here.

10   Q    Well, these are words that I have photographed that

11   I know.

12   A    Well, then you're reading, aren't you?

13   Q    Okay.  Can I -- can I spell?

14   A    I don't know.

15   Q    Okay.  All right.

16          MR. HIPPLE:  I just want to make a point to

17   the Court that I'm not illiterate, okay.  I can only

18   read the words that I have saw in my lifetime which I

19   have photographed, okay?  I never learned the vowels,

20   before, after, or anything of that nature, but yet I

21   was successful somehow.

22   BY MR. HIPPLE:

23   Q    Okay.  Let's go to your deposition.  All right,

24   page 73.

25          (Pause in proceedings.)

Ms. Hipple - Cross                               97

1    Q    Okay.  The question is, "Did at any point in time

2    you come to learn that Clement Hipple had made loans to

3    SCIX?"

4    A    That's what he told me.

5    Q    Could you read your reply?

6    A    What line?

7    Q    Page 73, the first question.  Your answer is on

8    line five.

9    A    Line five, "I had heard of that allegation."

10   Q    Okay.  Okay.  So you heard that I had made loans,

11   right?  So you knew that I had loans with SCIX?

12   A    I heard that you had made those allegations, yes.

13   Q    Okay.

14              MR. BERKOWITZ:  Your Honor?

15              THE COURT:  Yes?

16              MR. BERKOWITZ:  Sorry, I don't want to

17   disturb, Mr. Hipple.  I know he is --

18              MR. HIPPLE:  That's okay, no problem.

19              MR. BERKOWITZ:  -- has been in --

20              MR. HIPPLE:  I'm disturbed as it is.

21              MR. BERKOWITZ:  I think this goes beyond the

22   scope --

23              MR. HIPPLE:  Okay.

24              MR. BERKOWITZ:  -- of the direct testimony,

25   but I'm not sure that --

1    THE COURT:  Well, she's a party, so there's

2  -- that scope limitation doesn't apply to a party.

3    MR. BERKOWITZ:  Okay.

4    MR. HIPPLE:  Okay, I can tell you where I'm

5  going with this, Your Honor.

6    THE COURT:  No, you -- no.

7    MR. HIPPLE:  I don't have to?

8    THE COURT:  You can just -- yes.

9    MR. HIPPLE:  Just go?

10    THE COURT:  Yes, go ahead.

11    MR. HIPPLE:  Okay.  All right.

12  BY MR. HIPPLE:

13  Q   This is the attorney's information, by the way,

14  okay?  All right.  So, "When did you hear that," line

15  seven, same page.  Your answer is on line eight.

16  A   "Several times throughout my marriage."

17  Q   Okay.  All right.  Line ten, question, "Okay.  And

18  from whom did you hear that?"

19  A   "Out of Clement Hipple's mouth."

20  Q   Okay.  Line 13, "So he told you he had loans with

21  SCIX, correct?"

22  A   Yes.

23  Q   You said, "Right."  Okay.  All right, 16, "And did

24  Brian Hipple ever discuss with you that Clement Hipple

25  had made loans to SCIX?"

FORM 1094   ®   PENGAD • 1-800-631-6989 • www.pengad.com

Ms. Hipple - Cross                    99

1  A    And I responded, "I don't remember."

2  Q    All right.  Okay.  Okay, and then strike that,

3  okay?  That's one.  All right, turn to page 121.

4           (Pause in proceedings.)

5  Q    Okay.  Line 15, the question was, "At that time

6  that the bank account was garnished, were you aware of

7  whether SCIX had any other assets?"

8  A    I responded, "I don't know."

9  Q    All right.

10           (Pause in proceedings.)

11  Q    Okay, question number 21 -- or 20, "You do not

12  know," okay.  "Do you know if SCIX was solvent at that

13  point in time?  Do you know what the word "solvent"

14  means?"

15  A    "Was it operating?"

16           THE COURT:  Could you give me some context,

17  Mr. Hipple?  What time are we talking about?

18           MR. HIPPLE:  Okay, what I'm -- what --

19           THE COURT:  Does it say in the deposition

20  what time?

21           MR. HIPPLE:  Oh.

22           THE COURT:  You know, the question assumes a

23  certain time.

24           MR. HIPPLE:  Oh.

25           THE COURT:  Time?

Ms. Hipple - Cross                          100

1        MR. HIPPLE:  No, it doesn't say, no.

2        THE COURT:  Was that the time of the

3   garnishment?

4        MR. HIPPLE:  No, it doesn't say.

5        THE COURT:  Mr. -- all right.

6        MR. HIPPLE:  All right.  Okay.

7        THE COURT:  Go ahead.  I didn't mean to

8   interrupt you.

9        MR. HIPPLE:  It's okay.

10       (Pause in proceedings.)

11  BY MR. HIPPLE:

12  Q    Okay.

13       (Pause in proceedings.)

14  Q    Okay, this is a lot.  All right, here we go.  Okay,

15  the first will be on page 123.

16       (Pause in proceedings.)

17  Q    "In this lawsuit, is there a particular transaction

18  that you contain was somehow important?"

19  A    I responded, "No."

20  Q    Okay.  Okay.  "Why did you sue Clement Hipple and

21  Complete Group?"

22  A    "SCIX was closed."

23  Q    Okay.  "Then just changing coats, same company,

24  just a different name."  Or that was your answer, I'm

25  sorry.  Okay.  "How did you know?"  That don't make

Ms. Hipple - Cross                     101

1   sense.  Skip it.

2            (Pause in proceedings.)

3   Q   So you -- okay, page 124, line three, "So you went

4   after Clem Hipple and Complete Group in the litigation

5   because SCIX you believe was closed, is that accurate?"

6   A   My response was, "Yes."

7            (Pause in proceedings.)

8   Q   All right.  Okay.  Page 125, 21, "Let me rephrase

9   that.  In your lawsuit based upon the belief that

10  Clement Hipple owned SCIX?"

11  A   "No, my lawsuit is based upon those demand notes

12  that are outstanding."

13  Q   Okay.  I'm not going to really go through this.

14  All right.  Okay.  In reference to our divorce

15  document, right, there's a stipulation in there that

16  you signed off on where -- what assets I had and what

17  assets you had, right?  And you signed off on it

18  saying -- acknowledging that I had assets with SCIX

19  of -- in the amount of 200 and some thousand?

20  A   I don't understand the question.

21  Q   Okay.  On our divorce document they separated the

22  parties' assets.  You took this and I -- and I claimed

23  this, Joe-Joe's loan, SCIX's loan?

24  A   Yes, I remember.

25  Q   And you signed off stating that I had a loan with

1   SCIX, correct?

2   A   I don't have that document in front of me.  I can't

3   make that statement.

4           MR. HIPPLE:  Give me one minute, Your Honor.

5           THE COURT:  Yes.

6           (Pause in proceedings.)

7           MR. BERKOWITZ:  Which document are you

8   looking for?

9           MR. HIPPLE:  The divorce document.

10          MR. BERKOWITZ:  Yeah, here.  Let's see, it is

11  in here.  I think it's D-15, the black binder.

12          (Pause in proceedings.)

13  BY MR. HIPPLE:

14  Q   It's in The Supreme Court of the State of Arizona

15  and in forth the County of Maricopa, okay?  This is our

16  -- basically our divorce document.  And if you would

17  turn to page number 16, and item number E, could you

18  read that, please?

19  A   Which one?

20  Q   Item number E.

21  A   E?

22  Q   E, as in Edward.

23  A   E, as in Edward?

24  Q   Yes, please.

25  A   "Husband's loan to SCIX, LLC, including interest

Ms. Hipple - Cross                                103

1    thereon."

2    Q    Okay.  So you acknowledged that I had a loan with

3    SCIX, is that correct?

4    A    Yes.

5    Q    Right.  Okay.

6              (Pause in proceedings.)

7    Q    Okay.  Are you familiar with these following names:

8    David Ecklemeyer?

9    A    Yes.

10   Q    Craig Costello?

11   A    Yes.

12   Q    Joseph Coutry (ph)?

13   A    Yes.

14   Q    And who are these people?  Who is David Ecklemeyer?

15   A    Somebody that used to work in the company.

16   Q    And do you remember what his position was?

17   A    No.  No, I do not.

18   Q    He was an accountant, okay?  Craig Costello?

19   A    Your cousin.

20   Q    He worked for the company also, correct?

21   A    Right.

22   Q    All right.  And Joe Coutry?

23   A    Your friend.

24   Q    But, also came to the office much, right?

25   A    Right.

Ms. Hipple - Cross                                   104

1   Q    Now, what was the actual date of your accident?

2   A    August 3rd, 2000.

3   Q    Did you -- did I -- how do I say this?  Did I or

4   did you receive -- did you receive an employment

5   agreement from SCIX while you were working there which

6   gave you ten percent either of the gross or net profit?

7   A    I do remember a document like that.

8   Q    Right.  Okay.  And, basically when you left the

9   company that document was terminated, is that correct?

10  A    When I was terminated from the company, yes, that

11  document was terminated as well.

12  Q    When you say terminated, you weren't terminated,

13  you decided to leave?

14  A    That's incorrect.

15          THE COURT:  What was correct?

16          THE WITNESS:  That's incorrect.

17          THE COURT:  Well, what is correct then?  How

18  did you leave?

19          THE WITNESS:  I was terminated.  I received a

20  letter of termination.

21          THE COURT:  From the -- from whom?

22          THE WITNESS:  From the deceased, Brian

23  Hipple.

24          THE COURT:  Okay.

25  BY MR. HIPPLE:

1   Q    Okay.  Remember now time has passed that past seven

2   years, okay.  What was the actual date that you left

3   the company?

4   A    I do not remember that.

5   Q    Would you say it was prior to August 3rd, 2000?

6   A    No, I would not say that.

7   Q    Or you don't recall?

8   A    I already answered the question.

9   Q    Okay.

10            MR. HIPPLE:  I'm a witness to this and I

11  can't go forward with it.

12            THE COURT:  Well, you can.  You'll have an

13  opportunity to be a witness in your own case.

14            MR. HIPPLE:  As I'm talking to her?

15            THE COURT:  Not now, no.

16            MR. HIPPLE:  Oh, when I -- when it becomes to

17  her.  Okay.

18            THE COURT:  Well, you can later on -- when

19  your chance -- when you -- to present your case, you

20  can call yourself to the stand and testify.

21            MR. HIPPLE:  Oh, I can call myself --

22            THE COURT:  Sure.

23            MR. HIPPLE:  -- to the stand and testify?

24            THE COURT:  Yes.

25  BY MR. HIPPLE:

Ms. Hipple - Cross                                    106

1   Q   Okay.  So but do you -- you do acknowledge knowing

2   David Ecklemeyer, Craig Costello, and Joe Coutry?

3   A   They were your employees, yes.

4   Q   Yes, okay.  And they worked there the same time you

5   worked there?

6   A   I can't make that statement.

7   Q   You don't remember them working there when you did?

8   A   I don't know the length of their employment.

9   Q   No, I didn't ask you the length of their

10  employment.  I said while you were working there they

11  were working there?

12  A   I did see them, yes.

13  Q   Okay.

14          MR. HIPPLE:  All right.  I'll come back to

15  that when I become a witness.

16          THE COURT:  Okay.

17          MR. HIPPLE:  All right?  Okay.

18  BY MR. HIPPLE:

19  Q   Could you just explain to the Court what was the

20  purpose of you garnishing the wages?

21  A   I was following the direction of my attorneys.

22  Q   Okay.  In other words, basically, you thought that

23  there was that much money in the company, or your

24  attorney thought?

25  A   They were collecting on the outstanding notes that

Ms. Hipple - Cross                              107

1    were not being repaid.

2    Q    Okay.  So you had no other reason other than the

3    advice of your attorney, correct?

4    A    That's correct.

5    Q    Okay.

6              MR. HIPPLE:  All right, I have no other

7    questions.  Reserve the right to bring her back if I

8    need to after I testify?

9              THE COURT:  Yes, as part of your case, yeah.

10             MR. HIPPLE:  Okay, thank you.

11             THE COURT:  Sure.  Mr. Berkowitz, you got any

12   redirect?

13             MR. BERKOWITZ:  Just one quick question.

14             THE COURT:  Sure.

15                    REDIRECT EXAMINATION

16   BY MR. BERKOWITZ:

17   Q    Ms. Concepcion, you were asked whether you knew

18   whether Clement Hipple had loaned money to SCIX, and I

19   think you said yes.  Did you know how much money was

20   loaned?

21   A    No.

22             MR. BERKOWITZ:  I have no other questions,

23   Your Honor.

24             THE COURT:  Mr. Hipple, any question just

25   limited to that question?  You have a right to ask

Ms. Hipple - Redirect                    108

1   follow up but just limited to that question though.

2                     RECROSS-EXAMINATION

3   BY MR. HIPPLE:

4   Q    Did you have any idea about how much it was -- did

5   you ever hear the figure 210,000?

6   A    No.

7   Q    Did you ever see a document that had that written

8   on it?

9   A    Not that I recall.

10  Q    Never saw a loan document that was produced by the

11  accountant?

12  A    That's not my recollection.  That's not what I

13  remember.

14  Q    Okay.  So you never -- don't remember seeing that

15  document in this case from the accountant stating the

16  amount of money, 210,000?

17  A    That's correct.

18               MR. HIPPLE:  No other questions.

19               THE COURT:  All right, you're excused, Ms.

20  Concepcion.

21               THE WITNESS:  Thank you.

22               (Witness excused.)

23               THE COURT:  Thank you.  Your next witness?

24               MR. BERKOWITZ:  Your Honor, I would call Mr.

25  Hipple to the stand.

109

1              THE COURT:  Mr. Hipple.

2              MR. BERKOWITZ:  Step right up here, sir.

3              MR. HIPPLE:  I'm going to have to bring a

4     tablet, is that okay, in case I want to cross-examine?

5              THE COURT:  Sure, you can, yes.

6              (Pause in proceedings.)

7              THE COURT:  You want your glasses?

8              (Pause in proceedings.)

9              CLEMENT HIPPLE, Defendant, Sworn.

10             THE WITNESS:  My first name is Clement,

11    C-L-E-M-E-N-T, middle initial, R, Hipple, H-I-P-P-L-E.

12             COURTROOM DEPUTY:  Thank you.

13             MR. BERKOWITZ:  I'm going to help you -- if I

14    could help the witness with some of the exhibits, if I

15    might?

16             THE COURT:  Sure.

17             (Pause in proceedings.)

18             MR. BERKOWITZ:  Your Honor, I'd like to

19    cross-examine --

20             THE COURT:  Yes.

21             MR. BERKOWITZ:  -- Mr. Hipple.

22             THE COURT:  Yes.

23                    <u>DIRECT EXAMINATION</u>

24    BY MR. BERKOWITZ:

25    Q    Mr. Hipple, do you see document, it's Exhibit 37

Mr. Hipple - Direct                110

1   and it has a page number on the bottom, Hipple 441?

2   A    That is correct.

3   Q    Now, on February 8th, 1999, you formed and owned a

4   company known as SCIX, LLC, is that it?

5   A    I owned a percentage of SCIX, LLC, yeah.

6   Q    Okay.  And the only -- I'm going to refer to it as

7   SCIX, okay?

8   A    Sure.

9   Q    It's only business was to sell a product, Steel

10  Seal, correct?

11  A    Yes, that's what it was originally incorporated

12  for.

13  Q    Okay.  And there were three patents for the

14  product, Steel Seal, isn't that correct?

15  A    Yes, that is correct.

16  Q    Okay.  And if you would like to look at them,

17  Exhibit 57 are the three patents, but I only have one

18  question for you.  You're listed as the inventor on one

19  of those patents?

20  A    That is correct.

21  Q    On January 1st, 2001, you transferred your

22  membership interest in SCIX to your son, Brian Hipple?

23  A    That is correct.

24  Q    And, thereafter, you had nothing to do with the

25  business of SCIX?

1   A    No, as I explained earlier, I would -- whenever I

2   would come up or whenever I'd see Brian I would go and

3   pick up the deliveries at Colonial Chemical.

4   Q    Okay.  Mr. Hipple. do you recall having filled out

5   an -- filed an affidavit in this case?

6   A    Sure.

7   Q    And it is Exhibit 25?

8        MR. BERKOWITZ:  And if I could, Your Honor,

9   just to facilitate that?

10       THE COURT:  Yes.

11       (Pause in proceedings.)

12  BY MR. BERKOWITZ:

13  Q    Do you see that?

14  A    Yes.

15  Q    And if you could turn to paragraph ten in that

16  affidavit.

17  A    Do you know what page?

18  Q    It is page -- the pages are not numbered.  It's

19  paragraph ten.  It must be the second page.

20  A    Okay.  You gave -- you said number 26, right?

21  Q    It's -- no, I'm sorry, it's Exhibit 25.

22  A    Okay.

23  Q    And we're looking at paragraphs ten through 14.

24  A    Exhibit 25, ten through 14.  Okay, I have it.

25  Q    Okay.  And in the affidavit, you said that "After

1   January 1, I no longer had any membership interest in

2   SCIX," correct?

3   A    I said number ten, although --

4             THE COURT:   It's paragraph 11 actually.

5             MR. BERKOWITZ:   Oh, I'm sorry.

6   BY MR. BERKOWITZ:

7   Q    Let me start at ten.  I'll go through 11.  "I no

8   longer had any membership interest," correct?  That's

9   11.

10  A    11 says, "I no longer have any membership interest

11  in SCIX as of January 1."

12  Q    And number 12 says, "I no longer served as an

13  officer or director of SCIX"?

14  A    Yes, that is correct.

15  Q    And number 13, "I no longer had any control over

16  SCIX, it's assets, or any decision-making related to

17  SCIX or its assets"?

18  A    That is correct.

19  Q    And number 14, "I had no involvement in running the

20  day-to-day operations of SCIX"?

21  A    That is correct.

22  Q    And number 15, "After January 1, Brian Hipple alone

23  operated and controlled SCIX," correct?

24  A    Yes.

25  Q    Okay.  And you didn't provide goods or services for

Mr. Hipple - Direct                                    113

1    the company, did you?

2    A    I don't understand the question.

3             (Pause in proceedings.)

4    Q    You were not a supplier to the company so that it

5    would owe you money for purchases of goods or the like?

6    A    Could you be more specific what goods you're

7    speaking about?

8    Q    Hang on.  I will tell you exactly.

9             (Pause in proceedings.)

10   Q    In your deposition, I asked you on page 12, if you

11   would like to look at it, but I'll read it to you if I

12   could.

13   A    Okay, wait, page 12 on what tab?

14   Q    It's not in that affidavit.  This is from your

15   deposition that we took.

16   A    Can I see it?

17   Q    Absolutely.

18            (Pause in proceedings.)

19   Q    I'll hand you a copy of your original deposition

20   transcript.

21   A    Okay.  Page 12?

22   Q    Page 12.

23   A    Got it.

24            (Pause in proceedings.)

25   Q    And I'm going to read to you on page 12 beginning

1   at line 21.  "Okay.  And after you no longer owned an

2   interest in SCIX" --

3   A   Okay.  All right.

4   Q   Okay, do you see that?

5   A   Yeah, I've got it.

6   Q   -- "did you continue to work for the company?"

7   Answer, "I don't think I did."

8   A   Right.

9   Q   Okay?

10  A   Yeah.

11  Q   Okay.  "And did you provide any services to the

12  company?"  "I may have.  I'm not certain."

13  A   What kind of services are you talking about?

14  Q   I'm just reading your deposition --

15  A   Oh, okay.

16  Q   -- to you.  I want to make sure we're on the same

17  page.

18  A   Okay.

19  Q   And you said, "Well, what kind of services would

20  you have provided?  That's the question."

21  A   Hold on, slow down for just a minute.

22  Q   Yep.

23  A   You're on line six or no?

24  Q   I'm at line five, "I'm not certain."

25  A   Okay, "I'm not certain." Go ahead.

Mr. Hipple - Direct                    115

1    Q    I just want to make sure we're on the same page

2    when I ask you --

3    A    Yeah, I'm following.

4    Q    -- if you provided any goods or service to the

5    company the answer before seemed to be --

6    A    Well, it doesn't say goods.  It said what kind --

7    "Well, what kind of services would you have provided?"

8    Q    Yeah.

9    A    It don't say anything about goods.

10   Q    So you're not certain, correct?  That's your

11   answer?

12   A    Yes, that's my answer, I'm not certain.

13   Q    Okay.  Mr. Hipple, I'm going to ask you if you

14   could in volume one, to turn to Exhibit 17.

15   A    Volume -- okay, the book?

16             (Pause in proceedings.)

17   Q    And do you see that, sir?

18   A    Yes, I see it.

19   Q    And you see at the bottom it says Hipple 00450?

20   A    That is correct, yes.

21   Q    And that is your signature?

22   A    Yes, that is my signature.

23   Q    Okay.  Let me read the second paragraph.

24   "Notwithstanding anything herein to the contrary,

25   assignor shall retain full voting rights with respect

Mr. Hipple - Direct                116

1   to the membership interest with respect to all matters

2   relating to the affairs of the company in which members

3   of the company may cast votes pursuant to the operating

4   agreement of the company." Did you follow that, sir?

5   A   No, I was never a member of the company.

6   Q   That's -- I'm just asking you did I read that

7   correctly?

8   A   Yes, I followed it.

9   Q   Okay.

10  A   And my -- do you want the answer or no?

11  Q   Now, after you transferred --

12  A   Can I answer that question?

13  Q   No, there was no question.  I just asked you if --

14          THE COURT:  He just asked you to --

15          THE WITNESS:  Oh, okay.

16          THE COURT:  -- follow along with the reading.

17  BY MR. BERKOWITZ:

18  Q   After you transferred your interest to your son,

19  Brian, you expected SCIX to repay the money that you

20  loaned to SCIX, correct?

21  A   Of course.

22  Q   Okay.  And you didn't keep track of how much money

23  was borrowed or repaid?

24  A   Correct.

25  Q   And you had no idea how much you loaned?

1    A    Well, I know how much I loaned, sure, I do.

2    Q    Well, when I asked you at your deposition you

3    didn't have any idea how much you had loaned --

4    A    What part of the deposition --

5    Q    -- but if you're telling me different, that's okay.

6    A    What part of the deposition did you say about

7    money?

8    Q    If you look at your deposition on page 22 -- well,

9    first let's start at page ten, line 15.

10             (Pause in proceedings.)

11   Q    And I'm going to -- let me read this to you.  See

12   that line 15?

13   A    Yes, I see it.

14   Q    "Before you sold your interest to your son, did

15   SCIX owe any money to you?"  Answer, "Yes."

16   A    Yes.

17   Q    Do you see that?

18   A    Yes.

19   Q    "How much money did it owe to you?"  Answer, "I

20   don't remember."

21   A    Remember.

22   Q    Now I'd ask you to turn to page 22 and look at line

23   13.

24   A    Hold on.

25   Q    And let me read the question.  "Okay.  So you have

1   no idea how much money -- how much you personally

2   loaned to SCIX?"  Answer: "Right."

3   A    Right.

4   Q    Okay.

5           (Pause in proceedings.)

6   A    If you look on the schedule of loans that you have,

7   you'll see money going in and out constantly.

8   Q    Mr. Hipple, you own several other companies in

9   addition to SCIX, isn't that correct?

10  A    Well, start naming them and I'll tell you whether I

11  own them.

12  Q    Well, let's turn to Exhibit 37 if you could in your

13  book.

14          (Pause in proceedings.)

15  Q    And if you could turn to page 456 on the bottom.

16  Do you see Hipple 456?

17          (Pause in proceedings.)

18  A    Nope, not here.

19  Q    Do you see that?

20  A    It's not here.

21  Q    Well, it should be in order.

22  A    445.

23  Q    Page 456.

24  A    And blank, blank, 458.  458, 447.

25  Q    It's in my book, it should be in your book, but --

1

2          THE COURT:  It's here, but it's not -- not in

3    order, sequential order.

4          MR. BERKOWITZ:  Yes, the --

5          THE COURT:  Right.  That's the Certificate of

6    Incorporation for Scientific Chemical?

7          MR. BERKOWITZ:  Scientific Chemical, Inc. is

8    one of them.  There are several of them.

9          THE COURT:  That's Hipple's 456.

10          MR. BERKOWITZ:  It is 456, but it's not in

11    order.  There it is.

12          THE WITNESS:  Okay.

13    BY MR. BERKOWITZ:

14    Q    Do you see that Scientific Chemical thing?

15    A    Okay, Scientific Chemical?

16    Q    Right?  That was a company that you owned?

17    A    Yes, but I believe -- I believe -- I'm not certain,

18    all right, that Mr. Barks owned one percent of that.

19    I'm not sure.

20    Q    Okay.  Now, I'd like you to turn to --

21    A    Mr. Barks was the inventor.

22    Q    -- Hipple 447, and it's a stock certificate.

23    A    Okay.  It's out of -- out of order.  447.

24    Q    Do you see that page?

25    A    Yep.

Mr. Hipple - Direct                    120

1   Q    Okay.  And you look at the top, you see SCIX, LLC?

2   A    Yeah.

3   Q    Okay.  Do you see that?

4   A    Yeah, I do see it.

5   Q    And this certifies that there's a typed name,

6   Scientific Chemicals, Inc., is a member of the above

7   named limited liability company.  Do you see that?

8   A    Yeah, I see it, but I don't -- I don't know what

9   it's in reference to.  What are you referring to?

10  Q    Okay.  Well, let's look at the bottom of the page.

11  You see there's a signature there.  Does that appear to

12  be your signature?

13  A    Yes, it seems it -- yeah, no, that's my signature,

14  yes.

15  Q    Okay.  So -- and right above your signature it's

16  typed in --

17  A    Scientific Chemical?

18  Q    -- Scientific Chemicals, Inc.

19  A    Right.

20  Q    Okay.  And this is a share certificate for SCIX,

21  LLC?

22  A    Yes.

23  Q    Okay.

24  A    And --

25  Q    Just want to --

Mr. Hipple - Direct                    121

1  A    And Brian Hipple is on this also.

2  Q    Okay.  Yeah, we'll get to that.  That's your son's

3  name and signature --

4  A    So --

5  Q    -- on the left side.

6  A    I don't understand.  Are you saying this is an SCIX

7  document?

8  Q    I'm just asking you to look at this.

9  A    Okay.

10  Q    This says it's SCIX, LLC, right?

11  A    That's what it says, yeah.

12  Q    And it says Scientific Chemical is a shareholder,

13  right?

14  A    It says Scientific Chemical.  There it is.

15  Q    And on the bottom where it's signed it says

16  Scientific Chemicals, Inc., above your signature,

17  Clement Hipple?

18  A    Correct, yeah.

19  Q    Okay.  Now, if you look at the next page, 448.

20  A    All right.

21  Q    I hope that's the next page in your exhibit.

22  A    Okay.

23  Q    Do you see that?

24  A    Yep, confidentiality agreement.

25  Q    Okay.  And do you see at the top SCIX, LLC?

Mr. Hipple - Direct                    122

1   A    No, I see Scientific Chemical, Incorporate, and

2   then I see in parentheses, SCIX, is what I'm seeing.

3   Q    Okay.  And where do you see that, sir?

4   A    Right at the top of the page.  It says, "Agreement

5   acknowledged between Colonial Chemical, COC" --

6   Q    No, no, I think we're on the wrong page, 448.

7            THE COURT:  I don't have a 448 after 447.

8            MR. BERKOWITZ:  They may not be in order.

9            THE COURT:  Okay.

10           MR. BERKOWITZ:  It's another stock

11  certificate.

12           THE COURT:  I have 448 before it.

13           MR. BERKOWITZ:  It's another --

14           THE COURT:  Right.

15           MR. BERKOWITZ:  -- membership certificate.

16           THE COURT:  It's before 447, Mr. Hipple.

17           THE WITNESS:  Okay.

18  BY MR. BERKOWITZ:

19  Q    Do you see that's your name, Clement Hipple?

20  A    No, I'm -- I haven't gotten the page yet.

21           MR. BERKOWITZ:  Okay.

22           THE COURT:  Why don't you help him?

23           THE WITNESS:  Yeah.  Yeah, help me out here.

24           (Pause in proceedings.)

25           MR. BERKOWITZ:  Are they in your book, Your

Mr. Hipple - Direct                               123

1   Honor?

2              THE COURT:  Yes, I have them, thank you.

3              (Pause in proceedings.)

4              MR. BERKOWITZ:  I'll tell you what.  I'm

5   going to show you my book because I know they're in

6   there.  I'm looking at them.

7              THE COURT:  Mine was right before 447.

8              THE WITNESS:  I didn't take it.

9              MR. BERKOWITZ:  No, no, no.

10             THE COURT:  Do you want to show him a copy of

11  mine?  That's fine.

12             MR. BERKOWITZ:  Thank you.

13             (Pause in proceedings.)

14  BY MR. BERKOWITZ:

15  Q   Do you see that, Mr, Hipple, SCIX stock

16  certificate?

17  A   Right.

18  Q   And that's for --

19  A   We just looked at this.

20  Q   -- Clement Hipple?  No, that was Scientific

21  Chemical, Inc., was the shareholder.

22  A   Okay.

23  Q   Okay.  This is a different one?

24  A   Yeah.

25  Q   This is your share certificate.

Mr. Hipple - Direct                          124

1    A    Okay.

2    Q    Okay?  And, again, it says Scientific Chemical at

3    the bottom?

4    A    Right.

5    Q    Okay.  And it's --

6    A    Okay.

7    Q    -- signed by you?

8    A    Right.

9    Q    And that's your signature and the signature of your

10   son, Brian?

11   A    Right.

12   Q    Okay.  And, again, here's the one we looked at,

13   Scientific Chemical, Inc.?

14   A    Right.

15   Q    And I'm showing you a third one that's Hipple 449.

16   A    Brian Hipple.

17   Q    And this is Brian Hipple?

18   A    Scientific Chemical.

19   Q    SCIX?

20   A    Right.  Okay.

21   Q    Okay?  And it's, again, Scientific Chemical, Inc.

22   A    Okay.

23   Q    Okay?  It's just --

24   A    But they're two separate corporations.  They've

25   been incorporated separately.

Mr. Hipple - Direct                    125

1   Q    Okay.  This is SCIX's share certificates, right?

2   A    That's what it looks like, yes.

3   Q    Okay.  So Scientific Chemical, Inc., is a

4   shareholder of this LLC?

5   A    No.

6   Q    Isn't that what it appears to be?

7   A    That's what it appears to be, but I'm not certain

8   about them being a shareholder, okay?

9            (Pause in proceedings.)

10           THE COURT:  I have it.

11           THE WITNESS:  You know, these are -- all this

12  stuff is done by attorneys, okay, especially in the

13  beginning of this.

14  BY MR. BERKOWITZ:

15  Q    Now, I hope this page is in your book.  If you can

16  find 458, again, same exhibit number.

17  A    456, 459.

18  Q    Do you have a 458?

19  A    465, 461, 459, 458, got it.

20  Q    Do you see that?

21  A    There you go.

22  Q    Okay.  Now, do you see this?  This is an

23  application for a EIN?

24  A    Employment, yes, I see.

25  Q    Okay?  And look at the name of this company, SCI,

Mr. Hipple - Direct                    126

1   LLC.

2   A   Scientific Chemical, Incorporate, LLC --

3   Q   Well, that's -- no, no, no, that's not what it

4   says.  And then this one is SCI, LLC.  Do you see that?

5   A   It's -- yeah, S -- okay, S stands for Scientific, C

6   for Chemical, I for Incorporation.

7   Q   Okay.  Well, this one, SCI, LLC, says it was formed

8   on February 8 if you look at line I believe it's ten,

9   February 8, 19 --

10  A   1999, right.

11  Q   Right.  And Scientific Chemical was not filed on

12  that date.  It was filed on February -- December 22nd,

13  1998.  SCIX was filed on February 8th, 1999.

14  A   Okay.  But they're still two separate corporations.

15  Q   Okay.  So this one that you call SCI, LLC, it has a

16  mistake on it then, that is has the date --

17  A   No, I think you would have to ask Mark Cohen, the

18  signature at the bottom, what that -- what this is and

19  not me.

20  Q   Okay.  But this is -- these are for your companies,

21  right?  This is a document --

22  A   Well, yeah, of course.

23  Q   -- you produced?

24  A   But these are documents that were produced by

25  attorneys, not by me.

Mr. Hipple - Direct                               127

1    Q    And if you look at line 14, it's the manufacture

2    and sale of a gasket sealant, right?

3    A    Right.

4    Q    And that's what SCIX sold, the Steel Seal product.

5    A    Well, that's also what originally SCI, Scientific

6    Chemical, bought.

7    Q    Let's turn, if we could --

8    A    You got to remember, the chemical was bought from

9    the chemist from Scientific Chemical, Incorporate.   The

10   attorneys then, for protection purposes I believe, said

11   we got to incorporate SCIX.   Now, if the dates are

12   wrong or the things are wrong, that -- you'd have to go

13   talk to Mark Cohen --

14   Q    Okay.

15   A    -- because I don't have any idea.

16   Q    Okay.   If you could turn to page 459, you'll see an

17   operating agreement.

18   A    Okay.   Another thing that was done by the

19   attorneys.   Go ahead.

20   Q    Can you see that, 459?

21   A    Okay.

22   Q    And it's got --

23   A    Now, who -- now, who do you think this one's for?

24   Q    And if you see this agreement is entered February

25   1, 1999, by and among SCI, LLC, the company, right?

Mr. Hipple - Direct                             128

1   A    Well, what company do you think that is?

2   Q    And if you look at the back on page ten, it says

3   Scientific Chemicals, Inc.  Do you see that?

4   A    Okay, ten, yeah.  So I guess the letter SCI stands

5   for Scientific Chemical --

6   Q    Okay.

7   A    -- Incorporated?

8   Q    And it's also --

9   A    I'm sorry, I just don't know where you're going

10  with this.

11  Q    And it's also a one -- Scientific Chemical is also

12  an owner in SCIX?

13  A    I don't believe so.

14  Q    Well, you just saw share certificates for them.

15  A    Yeah, but it may have been a share, but that's

16  something that was just put in front.  The object was

17  to keep them totally separate.  The purpose of -- Your

18  Honor, the purpose of the two companies were to keep

19  them totally separate.

20  Q    Do you see -- you saw -- you're looking at page

21  468?

22  A    Yep.

23  Q    Turn to the next page.

24  A    Well, on 468, you'll see the signature there is

25  Robert Barks, Clement Hipple, and Brian.

Mr. Hipple - Direct                         129

1   Q   And if you could turn to the next page --

2   A   Right.

3   Q   -- 469, the next sequential page.

4   A   Oh, there's that one percent I've been trying to

5   talk about.

6   Q   Now, there's that one percent.  Now, Scientific

7   Chemical, Inc., can't own one percent of itself, can

8   it?

9   A   Itself, right.

10  Q   Okay.  So SCI perhaps is a different company?

11  A   No, it is not a different company.

12  Q   Well, we saw different dates before, didn't we?

13  A   I don't care, but it's not a different company.

14  Q   Okay.

15  A   You can check the records in Delaware I'm sure.

16  Q   Okay.  Now, there was also a company called Steel

17  Seal, LLC.

18  A   Yes.

19  Q   You talked about that today.

20  A   That is correct.  That's the company I incorporated

21  to get the name into Pennsylvania, but I didn't like --

22  excuse me, but I didn't like opening corporations in

23  Pennsylvania.

24  Q   Okay.  And that was formed in January of 2003?

25  A   That is correct.

Mr. Hipple - Direct                     130

1   Q    Okay.  And I think you testified --

2   A    I don't know what date it was formed, I'm sorry.

3   Q    Okay.

4   A    I don't know.

5   Q    That's okay.  But it didn't do anything, as I

6   recall?

7   A    No, it stayed dormant.  I kept the name.  I tried

8   to reserve the name.

9   Q    Okay.

10  A    Well, no, at one point in time, I opened a bank

11  account with it, okay?

12  Q    Okay.

13  A    Way back in around 2012 for one day and I never

14  used it.

15  Q    Okay.  But it didn't do anything else?

16  A    No, because I was advised not to use it --

17  Q    Okay.

18  A    -- by legal counsel.

19  Q    You also own a company called B.B.B. Management

20  Group, LLC?

21  A    Yes, Brian, Baylon (ph), and Brydon (ph).

22  Q    And it's Management Group?

23  A    Right.

24  Q    We can call it B.B.B.M. Group.

25  A    It's my deceased son and his two children.

Mr. Hipple - Direct                         131

1   Q    Okay.  And you owned 100 percent of that?

2   A    Oh, God, let me think.  Yes, I owned 100 percent of

3   that.

4   Q    Okay.  And that was also -- that company sold Steel

5   Seal?

6   A    Not did, does.

7   Q    It does?  It still --

8   A    Yes.

9   Q    It's the company that sells --

10  A    Yes.

11  Q    -- Steel Seal on the --

12  A    It's the --

13  Q    -- internet now?

14  A    -- company that sells Steel Seal for which I own

15  the website and I have the chemical formula which

16  belongs to me, yes.

17  Q    Okay.

18  A    No one else.

19  Q    Now, I think you also testified that you own a J.C.

20  Consulting and Leasing Corporation, correct?

21  A    Correct, yes.

22  Q    Okay.  And you also had an interest in a J.C.

23  Consulting and Leasing, LLC, correct?

24  A    Yes, that was -- that was with Teresa and myself.

25  Q    Okay.

Mr. Hipple – Direct                    132

1    A    Yeah.

2    Q    So you had that, too?

3    A    Yeah.

4    Q    Okay, so one --

5    A    I can see where you can get confused.

6    Q    Okay.  Okay.  And you also -- you -- we talked

7    about it before, Complete Group?

8    A    Yes.

9    Q    Okay.  And A&C Building and Industrial Maintenance?

10   A    That was the monumental company.

11   Q    Okay.

12   A    That was the main company in my life.

13   Q    And that was yours?

14   A    Yes.

15   Q    Okay.  And you also had an --

16   A    No, that was mine.  I sold that to my non-children

17   back in 1999 for --

18   Q    You sold --

19   A    -- for $5 million --

20   Q    -- A&C Building and Industrial Maintenance?

21   A    For $5 million, yes.

22   Q    In 1999?

23   A    A&C Building and Industrial Maintenance.

24   Q    You sold that in 1999?

25   A    '98 or '99.

Mr. Hipple - Direct                      133

1    Q    Okay.  And then you don't own any interest in it?

2    A    Wait a minute.  Which company are we talking about?

3    Now you got me confused company-wise.

4    Q    A&C Building and Industrial Maintenance.

5    A    No, I didn't sell him the company.  I sold him the

6    business.  What the hell did I sell him?  I can't

7    remember now.  No, different company, I'm sorry.

8    Different company, never mind.  Restrict that.  I sold

9    them --

10             THE COURT:  This is the company that --

11             THE WITNESS:  ANC --

12             THE COURT:  -- provides maintenance for --

13             THE WITNESS:  The janitor --

14             THE COURT:  Right.

15             THE WITNESS:  -- for your office in there.

16             THE COURT:  Right.

17   BY MR. BERKOWITZ:

18   Q    You also owned Steel Seal, Limited, correct, a UK

19   company?

20   A    No, that's not correct.

21   Q    Mr. Hipple, I'm going to ask you to look at Exhibit

22   45.

23             (Pause in proceedings.)

24   A    This can be confusing.

25             (Pause in proceedings.)

Mr. Hipple - Direct                      134

1   Q    Do you have Exhibit 45?  Do you see that?

2   A    Not in this book.  Volume two?

3   Q    Volume two.  It's right here.

4             (Pause in proceedings.)

5             MR. BERKOWITZ:  I'll request a bigger stand

6   to put my documents if I --

7             THE WITNESS:  Okay.  All right.

8   BY MR. BERKOWITZ:

9   Q    Now, I asked you if you owned a company called

10  Steel Seal, Limited, and you testified no.

11  A    No.

12  Q    Okay.  Now, I'd like you to look at Exhibit 45, the

13  first page.  Do you see that Bank of America account?

14  A    Wait a minute.  Is it page 002 you're looking at or

15  what?

16  Q    Well, start 001 --

17  A    001.

18  Q    -- just so we can identify which --

19  A    Okay.

20  Q    -- document this is.

21  A    Complete Group, Incorp -- LLC.

22  Q    Okay.  That was the company that defaulted this

23  morning?

24  A    No, it didn't default this morning.

25  Q    Well --

Mr. Hipple - Direct                    135

1   A   Oh, yeah, yes, it did.  It defaulted, yes.

2   Q   And let's look at the second page.

3   A   Go ahead.

4   Q   On October 30, 2012, do you see there's a wire into

5   the account --

6   A   Yes.

7   Q   -- from Steel Seal, Limited --

8   A   Yes.

9   Q   -- for 23,620?

10  A   Right, that is correct.

11  Q   Okay.  So that is not your company, the Steel Seal,

12  Limited?

13  A   No, it is not.

14  Q   Whose -- who owns that?

15  A   Adam Waverly (ph).

16  Q   And does he have rights from you to use the name?

17  A   Yes.

18  Q   Okay.  So you granted rights to use the name?

19  A   Yes.

20  Q   And what does he do?

21  A   He sells about 12 different chemicals.

22  Q   Okay.

23              (Pause in proceedings.)

24  Q   And there are probably some companies I haven't

25  mentioned that you own or have interests in?

Mr. Hipple - Direct                            136

1   A    At one time or another?

2   Q    Yes.

3   A    Yes.

4   Q    Okay.

5   A    Yes.

6   Q    Now, you own a lot of companies.  Do you recall you

7   were deposed on May 1st, 2013?

8   A    No.

9   Q    You remember we had a deposition?

10  A    Oh, yeah, you and I, I remember.

11  Q    And --

12  A    I don't remember the date, but I know you and I sat

13  down, yes.

14  Q    Okay.  And you told me you didn't have a personal

15  bank account as of that date?

16  A    Right, and I still don't have a personal bank

17  account.

18  Q    Okay.  Now, we've talked about it before.  On

19  September 21, in that area, SCIX's Wachovia Bank

20  account was garnished, correct?

21  A    Well, if -- I'm not sure, but --

22  Q    You had a conversation with your son that Teresa

23  had garnished that account, correct?

24  A    What date again?

25  Q    Around September 21st, September 23rd, 2010.

Mr. Hipple - Direct                         137

1   A   I thought it was Oct -- all right, go ahead.  Is

2   that when --

3   Q   Well, there was the date -- there's -- there are

4   different dates.  There is the date when the sheriff

5   delivers the garnishment and then there's the date when

6   the money is paid.  Different dates in the sequence

7   occur.

8   A   Well, I don't -- I'm not familiar with the dates,

9   okay?

10  Q   Okay.  But you remember when that happened?

11  A   I remember the bank account being garnished, yes.

12  Q   And you decided to act in response to the

13  garnishment?

14  A   No, I decided to call my attorney and he decided

15  for me to act.

16  Q   Okay.

17  A   Who is a witness in this case, by the way.

18          (Pause in proceedings.)

19  Q   Okay.  And on October 5th, SCIX that your son

20  owned, executed a note payable to you, correct?

21  A   What page?

22  Q   Exhibit 8.

23  A   What number?

24  Q   8.

25  A   8?

Mr. Hipple - Direct                    138

1   Q   Yes.

2           (Pause in proceedings.)

3   Q   It's in volume one.  Do you have volume one there?

4           (Pause in proceedings.)

5   Q   Are you familiar with that document?

6           (Pause in proceedings.)

7   A   Yes, it looks familiar.

8   Q   Okay.  And you had mentioned before 210,000, that's

9   what your accountant told you was owned by the company?

10  A   Well, that's what the summary came out to be, yes.

11  Q   Okay.  And you relied on what your accountant told

12  you?  You were owed 210,000, that's why your son signed

13  the $210,000 note?

14  A   Yes.

15  Q   Okay.  Now, if you look in the first paragraph, it

16  says, "In consideration of substantial credit

17  extended" --

18  A   Whoa, whoa, whoa.

19  Q   It's the -- it begins the third line of the note.

20  A   All right, go ahead.

21  Q   Okay?  "In consideration of substantial credit

22  extended to previously by Clement Hipple," and that's

23  you, the creditor, right?

24          THE COURT:  This is on D-8?

25          MR. BERKOWITZ:  Yes, this is -- on, P-8.

Mr. Hipple - Direct                    139

1          THE COURT:  Oh, P-8.

2          MR. BERKOWITZ:  Plaintiff's Exhibit 8.

3          THE COURT:  P-8.

4          MR. BERKOWITZ:  I'm sorry.

5          (Pause in proceedings.)

6    BY MR. BERKOWITZ:

7    Q    Correct, you're the creditor?

8    A    I don't know what the document says, okay?

9    Q    Okay.

10   A    I signed it, all right?

11   Q    Okay.

12   A    It's delivered by Kevin Fogarty to Brian or

13   whatever?

14   Q    I'm just -- I want to make sure we're --

15   A    Gave it to me, I didn't read it, I assumed that

16   Kevin knows what he's doing, and I gave it to Brian.

17   Q    Okay.  And let's look down to the next paragraph,

18   and I'm going to read the repayment terms, okay?

19   A    Okay.

20   Q    And on the third line after the word, "creditor,"

21   it --

22   A    Third line?

23   Q    -- says, "All such principal and interest being due

24   and payable immediately upon creditor," that's you,

25   "incurring, sustaining, or expending monies whatsoever

1   in connection with or on account of the Loan," with a

2   capital L, although there's no other definition of

3   that.  Did you -- did you see that in the note, sir?

4   A    I'm seeing it now.

5   Q    Okay.  So those are the repayment terms?

6   A    Well, I don't know.

7   Q    Well, that's --

8   A    I never --

9   Q    -- what it says though, okay?

10  A    Okay.  So I've seen it now, yes.

11  Q    Okay.

12  A    If that's what you're saying that's what it says,

13  yes.

14  Q    Now, let's look at the last sentence in parentheses

15  at the bottom of the second paragraph.

16  A    Second paragraph in parentheses?

17  Q    The last sentence is in parentheses.

18  A    All right, go ahead.

19  Q    You see that?  "Creditor waiving all previously

20  accrued interest in connection with monies loaned by

21  creditor to debtor."

22  A    I don't understand it.

23  Q    Okay.  But you'll agree it's in there?

24  A    I agree because you're reading it. Sure, it's in

25  there.

Mr. Hipple - Direct                                    141

1   Q    Okay.

2   A    You can ask Kevin about it when he gets on the

3   stand.

4   Q    Okay.

5             (Pause in proceedings.)

6   Q    And the note, if we go to the last page, Hipple

7   020.

8   A    Yes.

9   Q    There is your son's signature?

10  A    Yes, it looks like my son's signature.

11  Q    Okay.  Now --

12  A    It doesn't look like one of his good signatures,

13  but it looks like his signature.

14  Q    Okay.  You expected the $210,000 note to be repaid

15  to you immediately upon Brian's signature, is that

16  correct?

17  A    No, I expected whatever Kevin decided to do to be

18  done.

19  Q    Mr. Hipple, if you could look at your deposition.

20  A    Okay.

21  Q    On page 54.  Have you -- have you got that open,

22  Mr. Hipple?

23  A    Not yet.  Not yet.  Not yet.

24  Q    Okay.  Take your time.

25  A    What paragraph and what number?

Mr. Hipple - Direct                          142

1   Q   It's line 25.

2   A   All right, go ahead.

3   Q   Do you see that?  It says --

4   A   Yeah.

5   Q   -- "Okay, when -- this is the question, "Okay, when

6   did you expect SCIX to repay this $210,000 note?"

7   Answer --

8   A   "Immediately."

9   Q   -- "Immediately."  And if you go down to line five,

10  "Okay.  So, you intended for SCIX to pay this money to

11  you the day it was signed?"  Answer:  "Yes."

12  A   Yes, because I believe it was a demand note, is

13  that correct?

14  Q   I'm just asking you if I --

15  A   I know, but I'm --

16  Q   -- if I got the --

17  A   -- asking you a question.

18  Q   -- testimony.

19  A   It's not a demand note?

20  Q   You -- well, I'll tell you it's not -- no, it's not

21  a demand note.

22  A   Okay.

23  Q   You knew Brian didn't have the money to pay?

24  A   Yeah, because she took all the money.

25  Q   Okay.  Now, I'd like you to turn to Exhibit 9 in

1   volume one.

2   A    Okay, Exhibit 9 in volume one.  So, basically, if I

3   loaned him money and then -- go ahead.  Go ahead, I'm

4   there.

5   Q    Okay, do you see that?

6   A    Right.

7   Q    And you see at the top of the page --

8   A    Right.

9   Q    -- it says Ira Kratz (ph) and Associates?

10  A    Right.

11  Q    That was your accountant, right?

12  A    That is correct.

13  Q    And he's the one who told you that you were owed

14  210,000?

15  A    He's the one that did this calculation, yes.

16  Q    Okay.  And if you go to page three of this

17  document --

18  A    Which document?  This --

19  Q    This is Exhibit 9.

20  A    Page -- the last page?

21  Q    Yeah, the last page of the document.

22  A    All right.

23  Q    Do you see that in September 2010, the figure --

24  A    Wait a minute.

25  Q    -- loan balance?  Do you see that?

Mr. Hipple - Direct                    144

1   A    September 2010.  Go ahead.

2   Q    Okay?  It says SCIX owes you $210,187.36.  Do you

3   see that?

4   A    Yeah.

5   Q    And the exhibit notice for $210,000.

6   A    Okay.

7   Q    Okay?  And can we rely on this as accurate?

8   A    You would have to speak with Ira Kratz in reference

9   to that.

10  Q    Okay.  But you had no idea how much money was owed?

11  You testified to that before.

12  A    Yes, you're correct.

13  Q    Okay.  Now, if you look at Exhibit 6, it looks like

14  the same type of document.  That was the one we looked

15  at with Teresa --

16  A    Right.

17  Q    -- that shows the money that she had loaned.

18  A    Right.

19  Q    You see there it says Teresa, Clem, and J.C. at the

20  top --

21  A    Right.

22  Q    -- and this is Teresa?

23  A    Right.

24  Q    And if you look at yours, it looks like the same

25  kind of system printing and everything else?

Mr. Hipple - Direct                                145

1   A    Is mine in here?

2   Q    Yeah, you're Exhibit 9 and Teresa's is --

3   A    Oh.

4   Q    -- Exhibit 6.

5   A    6 and 9.  Okay.  No, one's prepared by Ira Kratz.

6   I don't know what the other one is though.

7   Q    Okay.  Well, I'm going to tell you this came from

8   Mr. Kratz also, but that's okay, we can --

9   A    But there's no --

10   Q    -- say that --

11   A    There's no name.  There's nothing on this.

12   Q    Okay.

13   A    I cannot verify --

14   Q    We'll get to that.

15   A    -- this came from him.

16   Q    Now --

17   A    I'd like to go on record with that.

18   Q    So, just as of October 2010, you own no interest in

19   SCIX?

20   A    October?  No.

21   Q    Right?  October -- as of October 2010?

22   A    That is correct.

23   Q    You had nothing to do with the management of SCIX?

24   A    That is correct.

25   Q    And your only involvement with SCIX was that it

Mr. Hipple - Direct                    146

1   owed you $210,000?

2   A    No, that's not true.  I told you I used to go pick

3   up the supplies.  At one point in time, I helped them

4   out with a back pressure problem for the patent.  So I

5   had involvement there.

6   Q    Okay.  Now, Mr. Hipple, if we look at the third

7   page of this document, Exhibit 9 --

8   A    Go ahead.

9   Q    -- do you see as of April 2009, do you see that on

10  the last page?

11  A    4-29, yep.

12  Q    Okay.  Do you see that?  There are no payments

13  reflected on there, are there?

14  A    What date?  What date again?

15  Q    October 2009.

16  A    October --

17  Q    I'm sorry, April 2009.

18  A    April.

19  Q    Do you see that?  There's a big blank?

20  A    Well, yeah, there's a big blank space here, but not

21  2009 --

22  Q    Okay.

23  A    -- 2007.

24  Q    Okay.  Let's -- first --

25  A    Are we looking at --

Mr. Hipple - Direct                          147

1   Q   -- let's go back to the first page.

2   A   -- the same document?

3   Q   Let's go back to the first page.

4   A   Go ahead, back to the first page.

5   Q   All right?  Do you see on the first line, March

6   1999, it says -- it looks like you put $130,000 into

7   the business.

8   A   Which -- okay.  Are you still working on 6 or 9?

9   Q   I'm on 9.

10  A   Okay, hold on.  Go ahead, yep.

11  Q   Do you see that?

12  A   Uh-huh.

13  Q   And then it calculates interest at eight percent.

14  A   Right.

15  Q   And then the third column is a loan balance.

16  A   Correct.

17  Q   And then if you look at the next line, it has a

18  negative 25 --

19  A   Right.

20  Q   -- 25.72.

21  A   Right.

22  Q   So it repaid money to you?

23  A   Yep.

24  Q   So it sort of worked like a line of credit?

25  A   Well, sort of, yeah, you --

Mr. Hipple - Direct                    148

1   Q    Okay.

2   A    -- could say it worked like a line of credit or it

3   worked like (indiscernible) or --

4   Q    Okay.

5   A    When I needed money I asked for it.

6   Q    Okay.  You advanced money to the company and it

7   repaid money to you?

8   A    Well, yeah, that was back in 1999.

9   Q    Okay.

10  A    I owned the company then.

11  Q    Okay.  And you look at the principal there.  If you

12  look down, there are negatives and positives all down

13  the way.

14  A    All the way through, yep.

15  Q    For example, in January of 2000, it looks like you

16  loaned it $99,000.

17  A    Yeah, probably --

18  Q    And then in February you got 19,000 back.

19  A    Probably got a check for 99,000 for something and I

20  put it in here.

21  Q    Okay.  And if you look at January '01, it looks

22  like you put 73,000 in.

23  A    January of '01?

24  Q    Yeah.

25  A    Hold on.  Yep, 73,5.

Mr. Hipple - Direct                    149

1   Q    And if you look at the loan balance, you see in

2   December you were owed 244,000, and in January --

3   A    320,000.

4   Q    Correct, because you would put money in.  So that's

5   how this operates.  The negatives are payments to you,

6   and the --

7   A    Yes.

8   Q    -- positives, the non-negatives, are advances that

9   you made to the company.

10  A    Right.

11  Q    Okay.

12  A    Debits and credits.

13  Q    Okay.  I'm not that good with the debits and

14  credits, but --

15  A    Come on.  Who are you kidding?

16  Q    -- I know what you mean.  So now if we look at

17  April '09 and we go down to --

18  A    Same exhibit?

19  Q    Yes, same exhibit.  You'll see under the principal

20  on March '09 it looks like you repaid $1,178, correct?

21  A    No, I took out $1,178.

22  Q    Okay.  And there are no more entries in there?

23  A    Right.

24  Q    Correct?

25  A    Uh-huh.

Mr. Hipple - Direct                 150

1   Q    So that if you had been paid money in any of those

2   months, we should reduce the note, the balance due,

3   right?

4   A    Yeah, but, you know, because in, let's see, March

5   of '09, I believe -- I believe I was in Colombia maybe.

6   Q    Okay.  But you would agree with me if you got paid

7   money and it's not reflected here, it would reduce the

8   loan if we filled those in?

9   A    Yeah, if you put a minus in there, it --

10  Q    Yeah.

11  A    -- would reduce the loan.

12  Q    Okay.  Okay, so good.  I'd like you to look at

13  Exhibit 19.

14  A    Go ahead.

15           (Pause in proceedings.)

16  Q    And do you see that at the top there it says SCIX,

17  LLC?

18  A    Yep, September 30th, 2009.

19  Q    Okay.

20  A    Yep.

21  Q    And it's Steel Seal, that's the product?

22  A    Yeah, (indiscernible).

23  Q    Okay.  And you see Wachovia Bank?

24  A    Yes.

25  Q    And that's the account we garnished, right?

1   A    Right.

2   Q    And there's a payment to A&C Building and

3   Industrial Maintenance?

4   A    For 5,000.

5   Q    Correct?

6   A    Yes.

7   Q    But we don't see that reduced -- and now, money

8   paid to ANC was money paid to you?

9   A    That is correct.

10  Q    Okay.  So we should reduce this from the --

11  A    No, you should not.

12  Q    -- from the balance due on the note?

13  A    No, you should not because this is royalties.

14  Q    This is royalties?

15  A    This is not interest or loans.

16  Q    This -- so this is a separate payment?  So you

17  got --

18  A    Separate payment.

19  Q    -- money through royalties?

20  A    Royalties.  Ten percent of the royalty -- of the

21  gross sales, yes.  That's what all -- that's royalty,

22  that's royalty, royalty, royalty, royalty.  Yeah, these

23  are all royalties here.

24  Q    So all these payments to you are royalties?

25  A    If they don't show up on the other side, they're

1   royalties.

2   Q    Okay.  And you testified that there was a royalty

3   agreement, but I will tell you there was never a

4   royalty agreement produced.

5   A    Right, because we could not find it.

6   Q    Okay.

7   A    Because it was back in 2001.

8   Q    Now, I'm going to --

9   A    Brian wasn't --

10  Q    I'm going to --

11  A    -- a very good keeper of records, and I was all

12  over the place so --

13  Q    I'm going to represent to you that the checks here

14  represent payments.  And let's -- I want to go back

15  to -- I'll give you the check number.

16  A    Same area, right?

17  Q    We're in Exhibit Number 19.

18  A    Okay.

19  Q    And I want you to go to check number 8136.

20  A    Okay.  Give me the amount, it's easier.

21  Q    Well, it's a -- it's a $3,000 check.

22  A    All the way in the back?  Up front?

23  Q    Sort of in the middle.  It's check number 8136.

24  A    Well, they're not in order, but 3,000.

25                (Pause in proceedings.)

Mr. Hipple - Direct                    153

1   A    8163?

2   Q    8136.

3           THE COURT:  Before it.

4           THE WITNESS:  Okay, got it.

5   BY MR. BERKOWITZ:

6   Q    Do you see that for $3,000?

7   A    That's correct, yep.

8   Q    To the Harriman (ph) Law Firm?

9   A    Yes.

10  Q    That was a law firm -- that was a payment made for

11  you?

12  A    That is correct.

13  Q    Okay.  Because it has in the memo, "Clem Hipple

14  dissolution."

15  A    That's correct.

16  Q    That's not a royalty payment.

17  A    That is a royalty payment.

18  Q    So that's a royalty payment also?

19  A    Of course it is.  He was paying me a royalty

20  payment so I could pay my divorce attorney.

21  Q    Okay.

22  A    The Harrison Law Firm is the divorce attorney

23  between me and Teresa.

24  Q    Okay.  So, let's go forward to check number 8168.

25  A    They're all the same.

1   Q   They're not all the same.

2   A   I'm pretty sure they are, but go ahead.

3   Q   Do you see that?  That one's payable to you.

4   A   Right.

5   Q   8168?

6   A   Yep.

7   Q   That's to Clement Hipple for $500?

8   A   Right.

9   Q   And what was that for?

10  A   Royalty.

11  Q   Okay.  And the next check, 8181, that's the

12  Harriman Law Firm again?

13  A   Royalties.

14  Q   Okay.  So who was the royalty owed to?  You

15  personally?

16  A   Yes.

17  Q   Okay.

18  A   But, again, I didn't have a personal account, so

19  everything was paid to A&C Building and Industrial,

20  Inc.

21  Q   Okay.

22  A   Personal checking account.

23  Q   Now --

24  A   I know it sounds confusing, but if you look at

25  the -- that's how it is.

Mr. Hipple - Direct                           155

1   Q    I want to show you, Mr. Hipple, Exhibit --

2   A    Okay.  Are we done with this one?

3   Q    No, you're going to need Exhibit 9.

4              (Pause in proceedings.)

5   A    Okay.  One of the royalty checks get in this

6   payment somehow?

7   Q    No, I'm looking at -- I want to look at this.

8   A    Okay.  I should have I guess looked at everything

9   more closely.

10  Q    You've got Exhibit 9 --

11  A    Right.

12  Q    -- right?  And I want you to look at Exhibit 135

13  and make sure that the payments and the balance are

14  accurately reflected.  The balance isn't going to be

15  different --

16  A    I object.

17  Q    -- because you recall in the note --

18  A    I object.

19  Q    -- that you waived all interest?

20  A    I object.

21  Q    That's okay.

22              THE COURT:  Why do you object?

23              THE WITNESS:  I object because there's no

24  name or anything on the document.  How --

25              THE COURT:  What document?

Mr. Hipple - Direct                    156

1     THE WITNESS:  This document he's showing me.

2     THE COURT:  Which one's he showing you?

3     MR. BERKOWITZ:  Exhibit 135.  I'm going to go

4  through and explain what it is.

5     THE WITNESS:  I'm not going to verify the

6  document.

7     THE COURT:  Well, wait a minute.

8     THE WITNESS:  And I'll --

9     THE COURT:  Hold on, everybody, please.

10     (Pause in proceedings.)

11     THE COURT:  Okay, I have 135.  So what's 135,

12  Mr. Berkowitz?

13     MR. BERKOWITZ:  Your Honor, that is -- that

14  is Exhibit 9 that shows the advances and the

15  repayments.

16     THE WITNESS:  Well, yeah, it's just numbers

17  somebody put.

18     MR. BERKOWITZ:  Yes, and we're going to go

19  make sure that that is the same as Exhibit 9.

20     THE COURT:  Now, this is the one you

21  stipulated that you didn't dispute the balances or the

22  amount owed, right?

23     MR. BERKOWITZ:  Well, this -- no, this is a

24  different one.  That was 132.  That was the Teresa --

25     THE COURT:  Oh, okay.

Mr. Hipple - Direct                    157

1       MR. BERKOWITZ:  -- Hipple judgment amount,

2   535,000.

3       THE COURT:  Oh, okay.

4       MR. BERKOWITZ:  This is based on Exhibit 9.

5   If you will recall in the promissory note, there was a

6   waiver of all accrued interest.  That's what it says on

7   the promissory note.

8       THE COURT:  This is a Clement Hipple loan,

9   right?  Okay, this --

10      MR. BERKOWITZ:  Correct.

11      THE COURT:  -- is not Teresa?

12      MR. BERKOWITZ:  Correct.

13      THE COURT:  Okay.

14      MR. BERKOWITZ:  This is the note from SCIX to

15  Clement Hipple.

16      THE WITNESS:  Again, I object.  It's just a

17  document without any proof of where it came from.

18  Where did it come from?

19      MR. BERKOWITZ:  Now, I'm going to go through

20  that now.  Your Honor, could I take him through the

21  exhibit?

22      THE WITNESS:  No, I object, Your Honor.

23  This -- it doesn't say.  It could -- he could have did

24  this document.

25      THE COURT:  Well, hold on for a minute.

1   Okay, please.  So Exhibit 135 is what you want him --

2   you want to take him through, right?

3           MR. BERKOWITZ:  I would like to take him

4   through that.

5           THE COURT:  All right, what is 130 -- is this

6   something you prepared?

7           MR. BERKOWITZ:  Yes, this is something I

8   prepared.

9           THE COURT:  Okay.  And what's the -- it's

10  based on what?

11          MR. BERKOWITZ:  It is based on Exhibit 9, the

12  payments, the principal and repayments.  In the

13  promissory note, if you recall, I read that the

14  creditor waives all accrued interest.

15          THE COURT:  Right.

16          MR. BERKOWITZ:  So this is a calculation of

17  the amount due based on Exhibit 9 with a waiver of all

18  the interest.  It's just all stripped out.

19          THE COURT:  Right, but he didn't prepare this

20  document, right?

21          MR. BERKOWITZ:  No, I did, and I am going

22  to --

23          THE COURT:  Well, I think --

24          MR. BERKOWITZ:  I'll -- he will be able to

25  look at this and I'll go through line-by-line with him,

Mr. Hipple - Direct                          159

1    Your Honor, so that --

2              THE WITNESS:  I'm not going to --

3              MR. BERKOWITZ:  -- we can --

4              THE WITNESS:  -- accept a document that he --

5              THE COURT:  All right, hold on for a minute.

6    Just hold on, please.  So go ahead.  You're going to go

7    what?

8              MR. BERKOWITZ:  I'm going to go line by line

9    and show him that --

10             THE COURT:  Of 9, right?

11             MR. BERKOWITZ:  -- the payments in -- I'm

12   sorry?  Yes, based on 9.

13             THE COURT:  Okay.

14             MR. BERKOWITZ:  The first column is the money

15   in.  It starts with the $130,000.

16             THE COURT:  Right.

17             MR. BERKOWITZ:  Do you see that?

18             THE COURT:  Right.

19             MR. BERKOWITZ:  And then there are pluses and

20   minuses all along the way --

21             THE COURT:  Right.

22             MR. BERKOWITZ:  -- repayments.

23             THE COURT:  Right.

24             MR. BERKOWITZ:  And the note, the October 5th

25   note, waives all interest.

Mr. Hipple - Direct                            160

1           THE COURT:  Right.

2           MR. BERKOWITZ:  And this is just a simple

3    calculation showing how much is owed on this document

4    after the interest is waived.

5           THE COURT:  Okay, I'll allow it.

6    BY MR. BERKOWITZ:

7    Q    So, Mr. Hipple --

8    A    6,000, is that --

9    Q    If you look at Exhibit 9, the first entry is

10   $130,000, correct?

11   A    Correct.

12   Q    Okay.  And then the next line shows a repayment of

13   $2,525.72?

14   A    Yes.

15   Q    Okay?  And we're starting to calculate a balance.

16   A    Well, what are you doing with the interest?

17   Q    A running balance.  Mr. Hipple, let me go through

18   the exhibit.

19   A    All right.

20   Q    Okay, I'm just taking your document because you

21   waived the interest, and I'm going to go through this,

22   and I want to just go through the document with you.

23   A    When you say I waived interest I don't understand

24   that part.

25   Q    Okay.  But that's what the note says and I just

Mr. Hipple - Direct                    161

1   want to go through.  Look down at the Exhibit 135 and

2   just satisfy yourself that all of these numbers are

3   identical.

4           THE COURT:  The numbers are identical without

5   the interest.  He just deleted the interest.

6   BY MR. BERKOWITZ:

7   Q   The interest in the center column disappears.

8           THE COURT:  And you deleted the interest

9   because the way Mr. Berkowitz reads the note, there's

10  the waiver of interest.

11          MR. BERKOWITZ:  That's --

12          THE WITNESS:  But the note was not signed

13  until 2012 or 2010.

14          MR. BERKOWITZ:  Your Honor, I'm just reading

15  the documents --

16          THE COURT:  Right.

17          MR. BERKOWITZ:  -- they produced.

18          THE WITNESS:  Okay.  But, that document was

19  produced at what date?  2010?

20  BY MR. BERKOWITZ:

21  Q   Now --

22  A   These -- this money was due interest before that

23  document was produced.

24  Q   Mr. Hipple, we have a $210,000 note dated October

25  5th, 2010, executed two weeks after Teresa Hipple

1   executed on the bank account.  And you have a document

2   here that shows that you're owed $210,000, and that's

3   what you based the note on.  And I'm going to go

4   through this --

5   A   No, you don't have to go through it.

6   Q   -- and establish that you're not owed anything.

7   A   I disagree that the --

8   Q   That's -- we can argue about that, but I want to

9   verify that my numbers are correct.

10  A   Well, I'm going to verify that the note was signed

11  in 2010 and all these calculations go all the way back

12  to 1999.

13          MR. BERKOWITZ:  Your Honor, if I --

14          THE WITNESS:  So you're saying I wasn't

15  entitled to the interest in 1999 before the docket was

16  submitted?

17          MR. BERKOWITZ:  Your Honor, I don't want to

18  engage in argument now.

19          THE WITNESS:  I'm just asking you a question.

20          THE COURT:  Well, let me just say this, Mr.

21  Hipple.  I think all Mr. Berkowitz wants to do is

22  establish that if you delete or remove the interest

23  requirement, these would --

24          THE WITNESS:  Okay, if --

25          THE COURT:  -- this is what -- this is what

Mr. Hipple - Direct                            163

1    the number --

2              THE WITNESS:  -- he removes it, this is --

3              THE COURT:  Right.  Now, we can argue whether

4    that was proper of Mr. Berkowitz to do that or what the

5    evidence shows, you know, at some time.  You're not --

6              THE WITNESS:  Okay.

7              THE COURT:  I'm not accepting this, that this

8    is the facts, that --

9              THE WITNESS:  Fine.

10             THE COURT:  -- you waived interest or when

11   you waived interest.  All we're just -- Mr. Berkowitz

12   is trying to say, if you compare Exhibit 9 to Exhibit

13   135 and you deleted the interest, this is what the

14   calculation would be.

15             THE WITNESS:  Fine.

16             THE COURT:  Is that right, Mr. Berkowitz?

17             MR. BERKOWITZ:  That's correct, Your Honor.

18             THE COURT:  All right.

19             THE WITNESS:  Okay.  I'll accept it that way.

20   BY MR. BERKOWITZ;

21   Q    If you --

22   A    No, I don't need to go through it.

23   Q    Again, I want you to satisfy --

24   A    I'm --

25   Q    -- yourself that my numbers --

Mr. Hipple - Direct                    164

1   A    I'm sure you did a good job.

2   Q    -- are correct.  Now, I showed you some Wachovia

3   checks, Exhibit I think it was 19, and you received

4   those during this period where it shows you received no

5   money.

6            THE COURT:  This is the ones he said were for

7   royalties?

8            MR. BERKOWITZ:  Yes.

9            THE WITNESS:  Right.

10           MR. BERKOWITZ:  But, again, that's for

11  argument because --

12           THE COURT:  Yes, that's --

13           MR. BERKOWITZ:  -- there's no royalty --

14           THE COURT:  -- a disputed issue.

15           MR. BERKOWITZ:  -- agreement.

16           THE COURT:  Right.

17  BY MR. BERKOWITZ:

18  Q    And I have included these checks against this note.

19  A    Now, I owe SCIX money.

20  Q    And if you carry this down, yes, it shows that in

21  October of 2010, when you got a note for $210,000 based

22  on the money owed to you, there was no money owed to

23  you.

24  A    Fine.

25  Q    Okay?

Mr. Hipple - Direct                    165

1   A    That's your project -- that's your determination.

2   If you want, I'll give you back everything I took if

3   you would like, and we can leave here today.

4   Q    Now, Mr. Hipple, I'd like you to look at Exhibit

5   10.  It's in volume number one.  Do you -- I'm sorry,

6   do you see that?

7   A    Yeah.

8   Q    Let me get these other ones out of your way.

9   A    No, that's all right, I'm good.

10   Q    Okay.

11   A    I'm good.

12   Q    Do you see that, Mr. Hipple?

13            (Pause in proceedings.)

14   A    Okay.

15   Q    Okay?  And you -- I saw you going through to the

16   end of this.

17   A    That's correct.

18   Q    And if you go to page 33, and it's a security

19   agreement page, it looks like 13.

20   A    Hold on, I need to start making some notes.  I'm

21   sorry, I forgot all about making notes, all right.

22   What was the -- where was the document located that

23   says I shouldn't have been paid interest?

24   Q    That's the note.  I believe that's Exhibit 8.

25   A    8, Number 8, no interest.

Mr. Hipple - Direct                               166

1  Q    Yes.

2  A    Language drawn up by an attorney and no interest.

3  Q    Yes.

4  A    All right.  8, no interest, okay.  Okay, go ahead.

5  And this is Exhibit --

6  Q    This is Exhibit 10.

7  A    10.  Okay, what's wrong with 10?

8          THE COURT:  10 is a security agreement.

9  BY MR. BERKOWITZ:

10 Q    It's a security agreement.

11 A    Okay.

12 Q    Okay?  And if you look at the date, it's October

13 5th, 2010, the same date as the note?  Do you see that?

14 A    I see the date, yes.

15 Q    Okay.  And that's the same date as the note.

16 A    Okay.

17 Q    Okay?

18 A    What was --

19 Q    And this goes with the note.

20 A    Let me get back to 8 for one moment just to double

21 check that.  October 5th, note and security agreement.

22 Q    Okay?  This is between you, Clement Hipple, the

23 creditor, and SCIX.  And this is how you secured that

24 $210,000 note, like a mortgage?

25 A    Yes, you could say that, yes.

Mr. Hipple - Direct                         167

1   Q   And if you look at page 13 --

2   A   Tab 13?

3   Q   No, not -- it would be Hipple 033.

4   A   Okay, I see it.

5   Q   Okay?  And you see signatures?

6   A   Yes.

7   Q   That's your signature?

8   A   Right.

9   Q   Okay.  And that appears to be Brian's signature?

10  A   It appears to be, yes.

11  Q   Okay.  And if you see the next page in Exhibit A,

12  do you see that?

13  A   Right.

14  Q   First, if you look on the front page, it has

15  collateral and it says Exhibit A.

16  A   What front page.

17  Q   Of Exhibit 10, of the security agreement.

18  A   It says security agreement?

19  Q   Yeah.  And then if you look under collateral --

20          THE COURT:  Why don't you help him out?

21          THE WITNESS:  Oh, I see it.  Collateral on

22  the first page down?

23  BY MR. BERKOWITZ:

24  Q   Right.  And you see that it refers to an Exhibit A?

25  Do you see that?

Mr. Hipple - Direct                    168

1    A    Oh, yeah, okay.

2    Q    Okay.  And if you go to the back page, let's look

3    at the Exhibit A.

4    A    Okay.

5    Q    And what it lists are the assets that you encumber,

6    websites, product cart, Quickbooks, a 1-800 number,

7    computer and office furniture and equipment, the Steel

8    Seal logo --

9    A    Uh-huh.

10   Q    -- ads, rights to the name, confidentiality

11   agreement with Colonial Chemical, and the formula.  Do

12   you see that?

13   A    Yeah.

14   Q    And then it's this Steel Seal inventory?

15   A    Uh-huh.

16   Q    Bottles, boxes, inserts, caps --

17   A    Right.

18   Q    -- receivables, I guess a tape machine, and a car.

19   Those are the assets that you encumbered to secure

20   repayment of the $210,000 note?

21   A    I think there's a different sheet than this with

22   assets on it.

23   Q    Okay.  Well, let's turn to the next exhibit.

24   A    What page?

25   Q    This is 11.

Mr. Hipple - Direct                    169

1   A    11, okay.

2   Q    Let's look -- do you -- if you're -- are you

3   familiar with the UCC financing statement?

4   A    No.

5   Q    Okay.  I'm going to represent to you that this was

6   something that was filed.  If you see right at the

7   top -- you were represented by Kevin Fogarty, correct?

8   A    That is correct.

9   Q    Okay.  And that's who filed this?

10  A    I believe he filed it, yes.

11  Q    Okay.  The debtor is -- excuse me -- SCIX, LLC?

12  A    That is correct.

13  Q    Okay.  And this was filed on 10-7-2010?  Do you see

14  that at the top, it's stamped by the state?

15           (Pause in proceedings.)

16  Q    In the top, right-hand corner you'll see the date

17  it was filed.

18  A    All right, 10-7.

19  Q    Okay?

20  A    And then under here it says, "All business assets

21  included, but not limited to, equipment, fixtures,

22  general," and what's that next word?

23  Q    General intangibles.

24  A    General -- well, what's general intangibles?

25  Q    Well, we'll go on.  I want you to look at the last

Mr. Hipple - Direct                              170

1   line, and it says, "And assets listed on Exhibit A

2   attached hereto."

3   A    Oh, so this has an Exhibit A too?

4   Q    And this has an Exhibit A.

5   A    No, it don't have an Exhibit A.

6   Q    You don't have Exhibit A in your book?

7   A    No.

8            THE COURT:  I don't have one in my book

9   either.

10           MR. BERKOWITZ:  I'm sorry.  We'll make sure

11   everybody gets Exhibit As.

12           THE WITNESS:  Because they're all in your

13   book.

14           MR. BERKOWITZ:  Well, I can also show you

15   they're in the defendant's exhibit books also, Your

16   Honor.

17           THE COURT:  Okay, thank you.  Well, is this

18   the same -- this is the same Exhibit A?

19           THE WITNESS:  It's the same.

20           MR. BERKOWITZ:  Correct.

21           THE COURT:  Right.

22           MR. BERKOWITZ:  This was what was filed with

23   the UCC 1 with the state, and it is the same Exhibit A

24   that appears on the security agreement.

25               (Pause in proceedings.)

Mr. Hipple - Direct                    171

1       MR. BERKOWITZ:  And I can show you, Your

2   Honor, Exhibit D-3 is the same thing and it includes

3   the Exhibit A, the defendant's exhibits.

4       THE WITNESS:  Okay.

5       THE COURT:  Okay.

6   BY MR. BERKOWITZ:

7   Q    Now, if you could turn to Exhibit 12.

8            (Pause in proceedings.)

9   Q    And have you found that, Mr. Hipple?

10  A    Uh-huh.

11  Q    Okay.  And do you see that that has your name at

12  the top of this letter?

13  A    That's correct.

14  Q    Okay.  And this letter is your formal demand to

15  your son, to Brian, and to SCIX, for the repayment in

16  full of the $210,000 note.

17  A    Okay.

18  Q    Okay?  Do you recall sending that?

19  A    I believe so, yes.

20  Q    Okay.  And you sent this because of a non-payment

21  after a demand was made?

22  A    Is that what it says?

23  Q    Well, that's what you said in an answer to

24  interrogatory about --

25  A    "According to the terms of the security agreement,

Mr. Hipple - Direct                              172

1    you have two days in which to repay the loan or you

2    will be in default of our agreement."

3                (Pause in proceedings.)

4    A    Is that not proper?  I don't know

5                MR. BERKOWITZ:  Your Honor, if --

6                (Pause in proceedings.)

7                MR. BERKOWITZ:  I'd like to read him his

8    admission if I could from the response of Clement

9    Hipple, Complete Group, and Steel Seal, LLC, to

10   plaintiff's first set of interrogatories?

11               THE COURT:  Okay.  Do you have a copy of that

12   you can show him?

13               THE WITNESS:  May I see it before we start?

14               MR. BERKOWITZ:  I do have copies.  Let me get

15   those out.

16               (Pause in proceedings.)

17               THE COURT:  Thank you.

18               (Pause in proceedings.)

19   BY MR. BERKOWITZ:

20   Q    And I'll direct your attention to interrogatory

21   number six.

22   A    Okay.

23               (Pause in proceedings.)

24   Q    And the question that was posed in the

25   interrogatory, "Identify every event of default that

Mr. Hipple - Direct                              173

1  occurred pursuant to the judgment note dated October 5,

2  2010, between SCIX and Clement Hipple (the judgment

3  note) and the security agreement dated October 5th,

4  2010, between Clement Hipple and SCIX (the security

5  agreement), and state when and how any notice of

6  default was conveyed by the creditor to the debtor."

7  Did you -- do you follow that, Mr. Hipple?

8  A   Yes, I do.

9  Q   Okay.  Did I read that correct?

10  A   Uh-huh.

11  Q   Okay.  And the response is, "Non-payment after

12  demand was made."  So that's why you demanded repayment

13  on Exhibit 12?

14  A   I assume that's why.

15  Q   Okay.

16  A   Again, I was following my attorney's instructions.

17  Q   I understand.

18            (Pause in proceedings.)

19  Q   Now, according to Exhibit 8, the promissory note,

20  "The balance becomes due and payable" -- and we read

21  this before.

22  A   Yeah, we read it before.

23  Q   -- "when all principal and interest being due and

24  payable immediately upon creditor incurring,

25  sustaining, expending monies whatsoever in connection

Mr. Hipple - Direct                                     174

1  with or on account of the loan."

2            Now, between October 5th and October 8, there

3  were no expenses incurred in connection on account --

4  or on account of a loan, were there?

5  A   I don't understand it.

6  Q   Well, just -- the principal on the note was due.

7  You demanded it --

8  A   On October 5th.

9  Q   -- on October 8th --

10 A   Right.

11 Q   -- three days after it was signed.  And the note

12 says that it's due and payable upon creditor, which is

13 you, incurring, sustaining, or expending monies

14 whatsoever in connection with or on account of the

15 loan.

16 A   I'm sorry, I don't understand the language, I

17 didn't write the language, so whatever it says, it

18 says, okay?

19 Q   Okay.  But you'll agree with me between October 5th

20 and October 8th, you didn't incur any new expenses?

21 A   Well, room and board, car.

22           THE COURT:  What paragraph are you on, again?

23           MR. BERKOWITZ:  I -- in the note, Your

24 Honor --

25           THE COURT:  Yes, I'm here.

1    MR. BERKOWITZ:  -- it's paragraph two, and it

2  is the repayment terms in the note.  And it says,

3  starting on the third line--

4          THE COURT:  Right.

5          MR. BERKOWITZ:  -- at the end, "All such

6  principal and interest being due and payable

7  immediately upon creditor incurring, sustaining, or

8  expending monies whatsoever in connection with or on

9  account of the loan."  And I asked the witness if any

10 of those triggers were pulled, and I believe the answer

11 was no.

12         THE COURT:  No.

13         THE WITNESS:  Well, no, I --

14         THE COURT:  Well, he didn't say that.  He

15 said the lawyers drafted it, he didn't understand it.

16         MR. BERKOWITZ:  Okay.  Okay.

17         THE COURT:  Okay.

18         THE WITNESS:  And what kind of expenses?

19 Would my room and travel to get here be expenses or no?

20 And rent a car?  Would that be expenses as far as how

21 that reads?

22         MR. BERKOWITZ:  I guess I'd have to ask your

23 lawyer --

24         THE WITNESS:  Okay.

25         MR. BERKOWITZ:  -- what he intended.

Mr. Hipple - Direct                    176

1       THE COURT:  Well, at the time that the note

2  was executed was SCIX -- were they current on the loan?

3  I mean they would be behind in payments or --

4       THE WITNESS:  Yeah, they had -- yeah.

5       MR. BERKOWITZ:  There was no document, Your

6  Honor.

7       THE COURT:  There wasn't any documents.

8  There was --

9       MR. BERKOWITZ:  In our records --

10       THE COURT:  There was an -- his testimony,

11  there was an obligation that preceded --

12       MR. BERKOWITZ:  Right.

13       THE COURT:  -- the note.

14       MR. BERKOWITZ:  And our records indicate

15  there was no money due, so that the loan --

16       THE COURT:  Right, with the interest.

17       THE WITNESS:  Yeah, if we go by your letter

18  -- or the -- Kevin's letter.

19       THE COURT:  Without the interest.  Okay.  All

20  right, go ahead.  I understand.

21       THE WITNESS:  But, again, I mean you can see

22  that the money was put in the account and taken out of

23  the account and it should have had some interest back

24  in 1999.

25  BY MR. BERKOWITZ:

Mr. Hipple - Direct                    177

1   Q    Okay.  Now, Exhibit 13 --

2   A    So, all of a sudden, we go back 12 years.

3   Q    Mr. Hipple, if you could look at Exhibit 13.  It's

4   in volume one.

5   A    Go ahead.

6   Q    And it says, "Repossession of collateral and

7   satisfaction of debt."

8   A    Okay.

9   Q    Do you see that?

10  A    Uh-huh.

11  Q    Okay.  Now, it says you're coming to take all the

12  assets.  Do you see that?

13  A    It says this --

14  Q    In the second paragraph, "I will be coming to any

15  locations to take possession of that collateral in

16  satisfaction of the debt."

17  A    Right.

18  Q    Okay?

19  A    Yeah.

20  Q    And that's the note that -- the letter you sent to

21  Brian?

22  A    The what?

23  Q    This is the letter you sent to Brian that you're

24  taking the --

25  A    Yes.

Mr. Hipple - Direct                              178

1  Q    -- assets?

2  A    This is the letter Kevin drafted up that I sent to

3  Brian, yes.

4  Q    Okay.  And Brian signed it?  He turned over all the

5  assets to you?

6  A    That is correct.

7  Q    Okay.  And that would make his response to the

8  interrogatories that we saw before that SCIX had no

9  assets correct?  He turned everything over to you,

10 right?

11 A    Well, yes, he turned the assets over to me.

12 Q    Okay.  So at this point, you have personally all of

13 the assets owned by SCIX are now your assets?

14 A    I believe I have all of them, yes.

15 Q    All of them.

16 A    Unless Brian was hiding something, yeah.

17 Q    Okay.  And you are now the sole owner of the

18 patents and the formula and everything else, correct?

19 A    Well, what do you mean the patent and the form --

20 well, formula I was always owner of, okay?  Let's --

21 let's be very, very clear about something, okay?

22       I bought -- I personally bought the formula

23 for $2 million, so, therefore, the formula always

24 belonged to me.  It never belonged to SCIX even though

25 they had the patent.  It belonged to me first, okay?  I

1  owned the formula.

2  Q   Okay.

3  A   All right?   Then there were -- then they told us to

4  put patents on the formula, and SCIX put patents on the

5  formula.

6  Q   Okay.

7  A   All right?

8  Q   All right.

9  A   But as far as the other stuff, I owned everything.

10  I owned the website, I owned the formulas, okay?

11          THE COURT:  When you say "you" do you mean

12  individually --

13          THE WITNESS:  Yeah, that's --

14          THE COURT:  -- or another --

15          THE WITNESS:  -- where I got a problem, okay?

16          THE COURT:  -- or another corporation?

17          THE WITNESS:  KG --

18          THE COURT:  Another corporation other --

19          THE WITNESS:  KGI --

20          THE COURT:  -- than SCIX?

21          THE WITNESS:  -- Scientific Chemical,

22  Incorporated --

23          THE COURT:  Right.

24          THE WITNESS:  -- owned -- let me -- I told

25  you I would have a problem with that, okay?  Scientific

Mr. Hipple - Direct                    180

1   Chemical owned, all right, the chemical formula back in

2   1999, and then once the page -- the website page went

3   up, Scientific Chemical, Incorporated owned the

4   website, the name, everything, the website, the logo,

5   the name.

6   BY MR. BERKOWITZ:

7   Q   Okay.  Now, Mr. Hipple, I would like you to look at

8   Exhibit 18 if you could.

9               (Pause in proceedings.)

10  Q   Do you see that, Mr. Hipple?

11  A   Yeah.

12  Q   Okay.  And it looks like you signed the letter on

13  behalf of Complete Group, LLC?

14              (Pause in proceedings.)

15  A   Yes, it looks like -- yes, under (inaudible).

16              (Pause in proceedings.)

17  Q   Okay?

18  A   And I'm looking at the next page and there's --

19  Q   Okay.

20  A   Yeah.

21  Q   Now, it says -- and I want to pick up in the

22  middle.

23  A   Okay.

24  Q   I guess Colonial Chemical is the company that

25  manufactured Steel Seal for you?

Mr. Hipple - Direct                    181

1   A    That is correct.

2   Q    Okay.  And you're sending a letter on behalf of

3   Complete Group, and it looks like you had spoken to him

4   on the phone on October 13th, 2010?

5   A    Let's see.  Let me read the whole thing.

6   Q    Sure, take your time.

7   A    Because I know you got something in mind here.

8             THE COURT:  We're going to end at 4:30.  It's

9   4:10 now, okay?

10            THE WITNESS:  Okay.

11            (Pause in proceedings.)

12  BY MR. BERKOWITZ:

13  Q    Have you had a chance -- sorry, Mr. Hipple.

14  A    No.

15  Q    I didn't mean to interrupt you.

16  A    No, I'm just three lines down.

17            (Pause in proceedings.)

18  A    Okay.  The last word on line three, "October 13,

19  2010, I," what?

20  Q    "I acquired."

21            (Pause in proceedings.)

22  A    That's interesting.

23            (Pause in proceedings.)

24  A    Okay, I read it.

25            (Pause in proceedings.)

Mr. Hipple - Direct                          182

1   Q   Okay.  Now, in here you say, and I'd like to read

2   it, "On or about October 13th, 2010, I acquired all the

3   assets of SCIX, LLC," correct?

4   A   Yep.

5   Q   And then you list, "Including, but not limited to,

6   all the bottles, all the labels, caps, bottles, boxes,

7   inserts, completed bottles in Colonial warehouse."

8   A   Uh-huh.

9   Q   And now you go on, "My company, Complete Group, is

10  now the successor in interest to the confidentiality

11  agreement" --

12  A   That's a mistake.

13  Q   -- "executed between SCIX, LLC, and Colonial

14  Chemical on March 29th, 1999, regarding the formula of

15  a chemical sealer now known as Steel Seal."

16  A   Yeah, mistake.

17  Q   Did I -- I read it correctly though?

18  A   Yeah, but it's a mistake.

19  Q   Okay.

20  A   Because it -- Scientific Chemical, Incorporated,

21  (inaudible).

22  Q   And I'd like to look at the next sentence.

23  A   SCIX was not even incorporated when the document

24  with Colonial Chemical took place.

25  Q   Mr. Hipple, let me finish and then I'll take you to

Mr. Hipple - Direct                      183

1    another document.  We'll look at the confidentiality

2    agreement.

3    A    Okay.

4    Q    Okay.  You say, "I understand that there has been a

5    recent modification to the formula, so I need to

6    receive a copy of the latest version."  Do you see

7    that?

8    A    Right.

9    Q    So you didn't know the formula at that point?

10   A    Sure, I knew the formula.

11   Q    Well, you didn't have a copy of it.  You said there

12   had been a modification to the formula so I need to see

13   a copy --

14   A    I didn't have a copy of it in the United States.

15   Q    Okay.  Okay.  Mr. Hipple --

16   A    This letter is incorrect.  Go ahead.

17   Q    Now, first, let's look at Exhibit 130, if we could,

18   and that is in volume four, Mr. Hipple.

19   A    Okay.  Oh, the other exhibit.

20   Q    Do you see -- do you see that?

21   A    Yeah, contradicting.

22   Q    Okay?  And it says, "Physical assets that I have

23   taken."  Do you see that?

24   A    Uh-huh.

25   Q    So this is the stuff, the physical assets, you

Mr. Hipple - Direct                    184

1   picked up --

2   A    This --

3   Q    -- correct?

4   A    For some reason, there seems to be a difference

5   between the written attachment and the assets, okay?

6   Yes, I agree, you're right.

7   Q    Okay.

8   A    You're 100 percent right.

9   Q    Okay.

10  A    Okay.  There's a contradiction between the two.

11  Q    Okay.

12  A    But I still took the assets.

13  Q    Okay.  Now, you'll agree with me the

14  confidentiality agreement that we're talking about is

15  not on the list of physical assets you took?

16  A    No, because the confidentiality agreement, which I

17  stated earlier, was purchased by -- the formula was

18  purchased by me and it was owned by Scientific

19  Chemical, Incorporated before SCIX was even

20  incorporate.

21  Q    Okay.  Mr. Hipple, I'd like you to turn to, in

22  volume one --

23  A    Go ahead.

24  Q    -- Exhibit 37.

25  A    All right.  Let me take a minute/  Go ahead.

Mr. Hipple - Direct                                185

1          (Pause in proceedings.)

2    A    All right.

3          (Pause in proceedings.)

4    A    Oh, was it incorporated back in 1999?

5    Q    Now, do you see -- I would like you to look at,

6    it's on the bottom of the page, Hipple 00453.

7    A    I only have 441.

8    Q    And at the time it says --

9    A    453?

10   Q    -- it says confidentiality agreement.  Yeah, it's

11   453.

12   A    Here we go again.  Hold on.

13          (Pause in proceedings.)

14   A    Okay, 453.  Okay.  I'm wrong with that, you got me

15   again.  My dates -- sorry, I can't remember 12 years

16   ago.

17   Q    Believe me, I can't either.

18   A    Yeah, well --

19   Q    But let's look --

20   A    Okay.

21   Q    -- at the confidentiality agreement --

22   A    Right.

23   Q    -- okay?

24   A    Yes.

25   Q    Now, let's look at the first line.

Mr. Hipple - Direct                                    186

1   A    Right.

2   Q    "Agreement and acknowledgement between Colonial

3   Chemical Company (CCC)" --

4   A    Right.

5   Q    -- "and Scientific Chemical," not with an S, but

6   Chemical.

7   A    You can go back and forth with this all day, okay?

8   Q    And then it says in parens next to it, "(SCIX),"

9   correct?

10  A    All right, we can go back and forth with all these

11  typographical errors and all this typographical stuff,

12  okay, but S -- Scientific Chemical, Incorporated, owned

13  it, owned it, okay?  SCIX was set up to sell it, okay?

14          Now, this is done by attorneys, okay, to

15  protect the website and the formula.  But you keep

16  going okay, yeah, they're -- yeah, Colonial Chemical

17  wrote up a document that's incorrect.  I didn't read it

18  properly and I signed it, okay?

19  Q    I'm just reading your documents, Mr. Hipple.

20  A    Well, I'm just telling you what's in the document.

21  I did not read the document properly and I signed it.

22  Q    Okay.

23  A    All right?

24  Q    Now, I think you --

25  A    The purpose of this document is that Scientific

Mr. Hipple - Direct                         187

1   Chemical, Incorporated, owns it.

2   Q   Well, if we look at the doc -- the company that you

3   incorporated, and it's at page 456 --

4   A   What -- in the same tab?

5   Q   In the same Exhibit Number 37, it's Scientific

6   Chemical -- Scientific Chemical's --

7   A   Wait until I get there.  Okay, the same tab.

8   Q   Okay, I'm sorry.

9   A   The same tab.

10  Q   Yeah, 456 is the page.

11  A   456, go ahead.  Certification of Scientific

12  Chemical.

13  Q   With an S, Scientific Chemicals, Inc.

14  A   Now we got --

15  Q   Do you see that?

16  A   Now we got another misspelling.

17  Q   Okay?  Well, that's the certificate of

18  incorporation with the state.

19  A   Yes.

20  Q   All right?

21  A   Okay.

22  Q   So Scientific Chemicals, Inc.

23  A   So and then this one says --

24  Q   If we go to the confidentiality agreement, it's

25  Scientific Chemical with no S, and then we have the

Mr. Hipple - Direct                          188

1   parens (SCIX), correct?

2   A    Poor Colonial Chemical.    That poor secretary there

3   must have made quite a few mistakes.

4   Q    Now, you said before --

5   A    But they drafted this document, by the way.

6   Q    You said you thought that SCIX --

7   A    No, no, no, I want to answer this question, okay?

8   I want to be clear on the record here, okay?   So give

9   me two minutes to answer the question.   Scientific --

10  Q    I'm not sure what the question is, but you are --

11  A    Well, I'm --

12  Q    -- free to answer it.

13  A    The question -- the question you just asked me

14  about Scientific Chemicals with an S, okay, is --

15  you're claiming is different than Scientific Chemical,

16  Incorporated, and it isn't.   It's the same corporation.

17  It had the right, owned the patent, okay?   But because

18  there was an S and because -- Colonial Chemical drafted

19  the confidentiality agreement, okay, and I just signed

20  it, okay, I didn't read it word for word.   I mean I

21  read it word for word, but I didn't focus on anything.

22  I thought it was fine.   So yes, you got me.

23  Q    I'm not trying to get anybody, Mr. Hipple.   I'm

24  just reading the documents that I have.

25  A    Yeah, well -- okay, yeah, but you're reading them

because it doesn't have an S.
Q You just said Scientific Chemical, Inc. owned the patent. I'd like -- let's look at Exhibit 57 --
A Yeah.
Q -- if we could.
A What makes you --
Q That would be Exhibit 2. It's down at the bottom of the pile here.
(Pause in proceedings.)
Q 57.
A Oh, God. I hope this is spelled right.
(Pause in proceedings.)
Q All right, do you have 57?
A Yep.
Q Okay.
A Right on there.
Q And if you look through, you'll see there are three patents in this one exhibit.
A Okay.
Q Now, I think you told us that Scientific Chemicals, Inc. owned the patents.
A No, I never said that.
Q I'm sorry, I thought that's what you said.
A No, you're incorrect. I said --
Q SCIX owns the --

FORM 2094 PENGAD • 1-800-631-6989 • www.pengad.com

Mr. Hipple - Direct                    190

1   A   SCIX --

2   Q   -- patents, correct?

3   A   Yep.  Again, the attorneys said, okay, we're going

4   to set up Scientific Chemical to own the website, the

5   name, and the formula.  We were going to sell the

6   product through SCIX, so in case there's a lawsuit

7   against SCIX, everything is protected.  I think that's

8   how attorneys work.  I'm not sure.  Well, patent

9   attorneys and corporate attorneys.  I don't know how it

10  works in your world, but I think that's what they tried

11  to do.

12  Q   Now, I would like -- let's look at in volume one --

13  A   Are we done with the patents?

14  Q   Yes, we're done with the patents.

15  A   Well, you didn't ask any questions.

16  Q   Well, I asked you that Scientific Chemical, Inc.

17  didn't own the patents.  Maybe you misspoke.

18  A   No, SCIX owned the patents.

19  Q   Owned the patents.

20  A   Yeah, I agree with you there.

21  Q   Okay.

22  A   It says it right here, LLC.  Go ahead.  Where are

23  you going now?

24  Q   All right.  Now, let's go to Exhibit 18, the second

25  page.

1   A   18.

2           (Pause in proceedings.)

3   A   What book?

4   Q   I'm sorry, do you -- it's volume one.

5   A   Okay.

6   Q   Yeah, that's it.

7           (Pause in proceedings.)

8   A   18?

9   Q   Exhibit 18 and it's page two.

10          THE COURT:  The D exhibits or P, plaintiff's

11  or defendants'?

12          MR. BERKOWITZ:  Plaintiff's Exhibit 18.

13          THE WITNESS:  Yeah.

14          MR. BERKOWITZ:  And it's page two.

15  BY MR. BERKOWITZ:

16  Q   And you see that is the letter on December 26th --

17  A   The same as the letter in the front.  The letter --

18  I believe they're both the same, correct?

19  Q   Right.  Well, they're not the same, so let's look

20  at them.

21  A   All right.

22  Q   This one, if you look at the top of the page, it's

23  from SCIX, LLC --

24  A   All right.

25  Q   -- to Lou Berghof at Colonial Chemical.

Mr. Hipple - Direct                      192

1   A    Right.

2   Q    And, again, it says, "On October 13th, 2010,

3   Clement Hipple acquired all of the assets of SCIX, LLC,

4   including all of the Steel Seal then completed and any

5   future orders.  Clement Hipple's company, Complete

6   Group, LLC, is the successor in interest to the

7   confidentiality agreement executed between SCIX, LLC,

8   and Colonial Chemical on March 29, 1999, regarding the

9   formula of a chemical sealer now known as Steel Seal."

10  I correctly read that?

11  A    Yeah.  Yes.

12  Q    Okay.

13  A    But I object to it because I can't do anything with

14  the letter.  That's Brian's name on it.  So what -- I

15  can't acknowledge it.  I don't know anything about it.

16  Q    After you took all the assets --

17              THE COURT:  All right, wait a minute.  Hold

18  on, he's objected.  Have you ever -- you never seen

19  this letter before?

20              THE WITNESS:  No.  I saw --

21              THE COURT:  All right.

22              THE WITNESS:  -- it the other day.

23              THE COURT:  We'll deal -- when he moves --

24  he's not moving it into evidence at this point, but

25  when he does make an objection.  Go ahead.

Mr. Hipple - Direct                    193

1   BY MR. BERKOWITZ:

2   Q   Mr. Hipple, could you look at the signature on

3   Exhibit 18, the letter from SCIX?  Does that appear to

4   be Brian's signature?

5   A   It appears to be, but I can't --

6   Q   Okay.

7   A   I'm -- I never seen the letter.

8   Q   But you've seen his signature before?  You've seen

9   it often?

10  A   Yeah.

11  Q   Okay.  And that looks like his signature there,

12  doesn't it?

13  A   Oh, yeah.  Yeah.  It changes kind of, but yeah.

14  Q   Okay.

15  A   Uh-huh.

16  Q   Now --

17  A   But I object to this, okay?

18  Q   Yes, the Judge has --

19  A   Okay.

20  Q   -- noted the objection.

21          THE COURT:  Right.  Make sure when he moves

22  this or if he tries to move this into evidence that you

23  object.  I put a note here, but --

24          THE WITNESS:  Oh, I'm not -- that's right, he

25  has to go through a process while it's going into

Mr. Hipple - Direct                              194

1  evidence?

2          MR. BERKOWITZ:  Yes.

3          THE COURT:  Yes.

4          THE WITNESS:  Okay.

5          THE COURT:  What he's got to do, he's got to

6  go through each exhibit and move, give you an

7  opportunity to look at it and object if you want, okay?

8          THE WITNESS:  Okay.

9          MR. BERKOWITZ:  What we've done is we've

10 tried to authenticate the document, that it is what it

11 is.

12         THE WITNESS:  Okay.

13         MR. BERKOWITZ:  We'll argue about whether

14 it's admissible --

15         THE WITNESS:  Okay.

16         MR. BERKOWITZ:  -- at another time.

17         THE WITNESS:  Then that -- okay.

18 BY MR. BERKOWITZ:

19 Q    Now, after you took all of the assets of SCIX, you

20 transferred everything you took from SCIX to Complete

21 Group, correct?

22 A    Yes, on the authority of -- on the -- nevermind.

23 Yes.

24         THE COURT:  On the advice of your lawyer?

25         THE WITNESS:  Yes, on the advice of my

Mr. Hipple - Direct                    195

1    lawyer.

2    BY MR. BERKOWITZ:

3    Q    And Complete Group, we discussed before that, was a

4    Nevis company?

5    A    That is correct.

6    Q    Okay.  And that was a new company you formed?

7    A    Yes, that is correct.

8    Q    Okay.  Now --

9    A    On the advice of my lawyers.

10   Q    -- let's look at Exhibit 15.

11   A    Okay.  The license agreement.

12   Q    Well, let's start -- we are at Exhibit 15, the

13   purchase agreement.

14   A    Wait a minute, I don't see a purchase -- I -- oh,

15   I'm at --

16   Q    I'm sorry.

17   A    I'm sorry.

18   Q    You are correct.

19   A    Okay, 15.

20   Q    I'm on the wrong page.

21   A    I'm on the wrong one.  All right, go ahead,

22   purchase agreement.

23   Q    15 is the purchase agreement.

24   A    Yeah, that's what you want to look at, the purchase

25   agreement?

Mr. Hipple - Direct                    196

1   Q    Yeah.

2   A    Wow.

3   Q    Okay.  Now, that's the agreement dated October 29,

4   2010, correct?

5   A    I believe that's the date on it, yes.

6   Q    Okay.  And it says, "Whereas seller is the owner

7   and is willing to sell each of the assets shown on the

8   attached Exhibit A upon the terms and conditions set

9   forth below."

10  A    Right.

11  Q    Do you see that?

12  A    Yeah, but it -- okay.

13  Q    Okay?  And if you look, the Exhibit A is the

14  physical assets, correct?

15  A    Maybe a different version.  That's the second

16  version, right?

17  Q    Okay.

18  A    We have two versions of Exhibit A?

19  Q    Yes, we have --

20  A    Okay.

21  Q    -- one the physical assets I've taken --

22  A    No, one -- both are physical assets.

23  Q    Well, this one says physical assets right --

24  A    I know, but --

25  Q    -- at the top, correct?

Mr. Hipple - Direct                                      197

1   A    -- the other one has physical assets in it also.

2   Q    Well, I --

3   A    There's a little confusing between assets.

4   Q    Okay.

5   A    Okay.

6   Q    I don't want to argue with you.  The UCC 1 says

7   what it says.

8   A    Okay, fine.

9   Q    That's the one that says websites and logos --

10  A    Okay.

11  Q    -- and all that.

12  A    All right, go ahead.  So, again, you --

13  Q    Okay.  So, you are selling to Complete Group all of

14  the assets that you have?

15  A    I'm put -- yes, I'm turning over the assets I

16  believe -- let me see if I can phrase it the way the

17  attorney told me to.  I am turning over all the assets

18  for 50 percent ownership in Complete Group.

19  Q    Okay.

20  A    I believe that was the terminology.

21  Q    And now let's look at --

22  A    Well, wait a minute.  Don't you want to talk about

23  the date?  Because I know you have an issue with the

24  date.

25  Q    Well, no, I -- we saw the date.  It's 10-29-2010.

Mr. Hipple - Direct                    198

1   A    Yeah, but you had an issue with that before.  I

2   would --

3   Q    Well --

4   A    -- like to explain that now why.

5   Q    Sure.

6   A    I realize why.  Because if you look at the last

7   page, the last page --

8                THE COURT:  Of what?

9                THE WITNESS:  Of -- I'm sorry, Your Honor, 7-

10  15 purchase agreement.

11               THE COURT:  Right.

12               THE WITNESS:  If you look at the second page,

13  okay --

14               THE COURT:  Not the Exhibit A.

15               THE WITNESS:  Pardon me?

16               THE COURT:  The second page where you signed?

17               THE WITNESS:  Yes.

18               THE COURT:  Right.

19               THE WITNESS:  Do you see that signature?

20               THE COURT:  That's Hipple 16?

21               THE WITNESS:  Right.  Yeah, Hipple 16.  Do

22  you see the signature there?

23               MR. BERKOWITZ:  Yeah.

24               THE WITNESS:  I could not get that signed

25  until I got back to Colombia, Your Honor.  That's why

Mr. Hipple - Direct                                    199

1   it stayed at that date.  If I would have dated it the

2   18th and I was still here and her signature would have

3   shown up, he would have went in the opposite direction.

4   BY MR. BERKOWITZ:

5   Q    Okay, that's fine.

6   A    All right?

7   Q    I see that.

8   A    See there's a lot of -- there's a lot of little,

9   you know, nooks and crannies here.

10  Q    All right.  Now, let's look at the --

11  A    Okay.

12  Q    -- licensing agreement, okay?

13            THE COURT:  What number is that?

14            MR. BERKOWITZ:  That is Exhibit 14,

15  Plaintiff's Exhibit 14.

16            THE COURT:  All right.  And what's -- this

17  will be our last inquiry because it's almost 4:30.

18            THE WITNESS:  Okay.

19            MR. BERKOWITZ:  People say that we don't

20  work, but they are wrong.

21  BY MR. BERKOWITZ:

22  Q    Do you see that this is the licensing agreement

23  dated October 18 between Complete Group, the company we

24  just talked about, and Steel Seal Pro --

25  A    All right.

Mr. Hipple - Direct                                    200

1   Q    -- correct?

2   A    Go ahead.

3   Q    Okay.  And Complete Group, that's the company we

4   had discussed before, your company that you were the

5   managing director of eventually.

6   A    Yes.  This is the company that now has possession

7   of the assets and is trying to figure out what is the

8   best way to get rid of these assets and get the most

9   money for them.

10  Q    Okay.

11  A    So, I entered into a license agreement with the

12  only person I knew that would be able to take those

13  assets and get me the most money for them.

14  Q    Okay.  And that was the Steel Seal Pro, Brian's

15  company?

16  A    That is correct, yes.

17  Q    Okay.

18  A    Which would be a normal thing if he wasn't my son,

19  if it was another person other than my son, okay, I

20  would have done the same thing.

21  Q    He was the best person to sell --

22  A    He was the best person --

23  Q    -- Steel Seal?

24  A    -- to sell Steel Seal --

25  Q    Because he had been doing it for years?

Mr. Hipple - Direct                    201

1   A   -- to get me the most money.  What?

2   Q   He had been doing it for years.

3   A   Right, exactly.

4   Q   Okay.  Now --

5   A   Well, let's take him out of the father/son picture

6   though, okay?

7   Q   Okay.

8   A   Go ahead.

9   Q   Now, Complete Group is identified as the licensor.

10  A   Well, okay, again, I didn't draft this document.

11  Q   No, no, that's just --

12  A   Okay.

13  Q   Those are -- those are lawyer quotation marks on

14  that --

15  A   Quotation marks.

16  Q   -- as a defined term.  Now, all of the assets from

17  SCIX, you got all the assets from SCIX?

18  A   That is correct.  We went over that, yes.

19  Q   And you transferred everything you had to the

20  licensor, Complete Group?

21  A   Yes, for a 50 percent interest in Complete Group.

22  Q   And that's how Complete Group got these rights?

23  A   Right, exactly.

24  Q   Okay.  And it says licensor if you look under

25  background.

Mr. Hipple - Direct                           202

1   A   Licensor is me or the other person?

2   Q   It's Complete Group.

3   A   Okay.

4   Q   "Complete Group, LLC, is --

5   A   Go ahead.

6   Q   -- the owner of certain assets, including the

7   intellectual property (the property)"?

8   A   "Properties" I guess it should have been.  Did we

9   miss an S there?  Yeah.

10  Q   Well, that I don't know.  It's described on Exhibit

11  A.  So the licensor is transferring to Steel Seal Pro

12  the right to use intellectual property, patents,

13  formulas, and the like?

14  A   I'm not certain.

15  Q   Okay.  And if you --

16           THE COURT:  I don't have Exhibit A on mine.

17           MR. BERKOWITZ:  Nor do I have Exhibit A on

18  mine, Your Honor, because there is a question --

19           THE COURT:  All right.

20           MR. BERKOWITZ:  -- of whether it is the one

21  on --

22           THE COURT:  Oh.

23           THE WITNESS:  There's two Exhibit As.

24           MR. BERKOWITZ:  -- the UCC 1 --

25           THE COURT:  Right.

Mr. Hipple - Direct                 203

1          MR. BERKOWITZ:  -- which includes the

2    intangible assets --

3          THE COURT:  Right.

4          MR. BERKOWITZ:  -- or the physical assets

5    taken.

6          THE COURT:  Okay.  All right.

7          MR. BERKOWITZ:  However, this document

8    transfers intellectual property, and none of that

9    appears on the physical assets taken --

10         THE COURT:  Right.

11         MR. BERKOWITZ:  -- because you can't pick

12   up --

13         THE COURT:  Right.

14         MR. BERKOWITZ:  -- in a box intellectual

15   property.

16         THE WITNESS:  You can't take the website and

17   put it in a box, right?

18         MR. BERKOWITZ:  Correct.

19         THE WITNESS:  Right.  Okay.  I'm glad we're

20   straight on that.

21   BY MR. BERKOWITZ:

22   Q   Now, under the terms of this agreement, Brian

23   Hipple and his company, Steel Seal Pro, is the

24   exclusive party that can sell Steel Seal?

25   A   I gave him that right.

Mr. Hipple - Direct                    204

1   Q   Well, that's what it says.

2   A   Exclusive rights, yeah.

3   Q   Licensee, which is defined as Steel Seal Pro, an

4   exclusive but conditionally revocable license to market

5   and collect proceeds from customers with respect to a

6   product known as Steel Seal.

7   A   Okay, let me write this one down.

8   Q   The product.  Yeah, this is --

9   A   14?

10  Q   -- Exhibit 14, Mr. Hipple.

11  A   Okay, 14.  I'm sure, because I don't understand the

12  language there at all that you just read.

13          THE COURT:  Why don't we end on that note?

14          MR. BERKOWITZ:  That's --

15          THE COURT:  You can come back to 14 tomorrow.

16          THE WITNESS:  Okay.

17          THE COURT:  All right.  So after Mr.

18  Berkowitz finishes his direct examination of you, you

19  have the right to get back on the stand -- and

20  obviously you don't -- there's no one here to question

21  you like --

22          THE WITNESS:  Right.

23          THE COURT:  -- a lawyer would be questioning

24  you.

25          THE WITNESS:  I have to question myself.

Mr. Hipple - Direct                          205

1       THE COURT:  Well, you don't have to do that.

2  You can just make your points and say look, I -- in

3  response to this point, I'd like to say this, okay?

4       THE WITNESS:  A little bit about what I did

5  in the beginning I guess is basically what --

6       THE COURT:  Right, but this would be

7  testimony under oath which --

8       THE WITNESS:  Yeah, testimony under oath.

9       THE COURT:  Okay?

10      THE WITNESS:  Okay.

11      THE COURT:  So you were just standing up

12 there --

13      THE WITNESS:  Right.

14      THE COURT:  -- giving us an outline of what

15 you --

16      THE WITNESS:  And I'll explain what my

17 intentions --

18      THE COURT:  This is under oath --

19      THE WITNESS:  Okay.

20      THE COURT:  -- so this is, you know, a

21 little -- well, a lot more serious.

22      THE WITNESS:  Right.

23      THE COURT:  So you can get up there and you

24 can say look, in -- with respect to this exhibit, I'd

25 like to point out this, with respect to this exhibit,

Mr. Hipple - Direct                        206

1   respect to this point.

2           And then, you know, there -- he can object if

3   you try to rely on inadmissible evidence.  For example,

4   if you say, you know, Brian told me this, there might

5   be an objection that that's hearsay.

6           THE WITNESS:  All right, I won't use that.

7           THE COURT:  Well, just --

8           THE WITNESS:  Yeah.

9           THE COURT:  -- an example.  I'm not saying

10  that would be inadmissible, but that may be an example.

11  So that's the way we'll do it, okay?  So that will be

12  -- you're almost -- you're at cross-examination of

13  yourself.  That will be your --

14          THE WITNESS:  So, basically, anything I want

15  to say I have to -- I have to go through all these

16  exhibits tonight and mark them?

17          THE COURT:  Yes, or you can just make your

18  statement and say, you know, I looked over Exhibit 14

19  and I would like to explain Exhibit 14.

20          THE WITNESS:  Yeah, without looking at the

21  exhibits though, I wouldn't know that.

22          THE COURT:  Well, you're going to have --

23          MR. BERKOWITZ:  You have a whole set, Mr.

24  Hipple, right there.

25          THE COURT:  Yes, you have the whole thing.

Mr. Hipple - Direct                    207

1          THE WITNESS:  Yeah, I know I do.

2          THE COURT:  Okay, so --

3          MR. BERKOWITZ:  We got a box if you want --

4          THE COURT:  -- in other words, I would think

5     tonight, try --

6          MR. BERKOWITZ:  -- take that.

7          THE COURT:  -- to get yourself organized as

8     to what points you want to make because no one will be

9     there questioning you and organizing for --

10         THE WITNESS:  Right, okay.

11         THE COURT:  -- you, okay?

12         THE WITNESS:  Yeah, but he still has to

13    finish my --

14         THE COURT:  Oh, yes, he has --

15         THE WITNESS:  -- testimony here?

16         THE COURT:  -- to finish your testimony.  And

17    then -- but I just wanted to forewarn you that you have

18    that opportunity.

19         THE WITNESS:  Okay.

20         THE COURT:  Okay?

21         THE WITNESS:  Yep.

22         THE COURT:  I'll see you tomorrow at 9:30.

23         THE WITNESS:  Okay.

24         MR. BERKOWITZ:  Can I leave --

25         THE WITNESS:  Thank you, Your Honor.

208

1          MR. BERKOWITZ:  Can we leave some things in

2    place?

3          THE COURT:  Yes, you can leave everything

4    here.  Thanks.

5          (Proceedings adjourned, 4:34 p.m.

6                    *  *  *

209

I N D E X

PLAINTIFF'S OPENING STATEMENT                    PAGE NUMBER

  By Mr. Berkowitz                                   24


DEFENDANTS' OPENING STATEMENT                    PAGE NUMBER

  By Mr. Hipple                                      35


PLAINTIFF'S WITNESS    DIRECT   CROSS   REDIRECT   RECROSS

Teresa Concepcion

  By Mr. Berkowitz       54              107

  By Mr. Hipple                  91                  108


Clement Hipple

  By Mr. Berkowitz      109

* * *

1
2
3
4
5
6                     <u>CERTIFICATION</u>
7
8        I, Michael Keating, do hereby certify that the
9   foregoing is a true and correct transcript from the
10  electronic sound recordings of the proceedings in the
11  above-captioned matter.
12
13
14  10/2/15
15  Date                        Michael Keating
16
17
18
19
20
21
22
23
24
25