IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| TERESA HIPPLE<br>formerly known as<br>TERESA CONCEPCION,<br><br>　　　Plaintiff<br><br><br><br>　　　v<br><br><br><br><br><br>SCIX, LLC, et al,<br><br>　　　Defendants | : CIVIL ACTION NO. 12-1256<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: Philadelphia, Pennsylvania<br>: July 28, 2015<br>: 9:32 a.m. |

- - -

TRANSCRIPT OF BENCH TRIAL - DAY TWO
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For the Plaintiff:　　GERALD S. BERKOWITZ, ESQUIRE
　　　　　　　　　　　ROBERT A. KLEIN, ESQUIRE
　　　　　　　　　　　Berkowitz and Klein LLP
　　　　　　　　　　　629 Swedesford Road
　　　　　　　　　　　Swedesford Corporate Center
　　　　　　　　　　　Malvern, PA  19355


For Defendant　　　　CLEMENT HIPPLE
C. Hippel, et al:　　9206 Andover Road
　　　　　　　　　　　Philadelphia, PA  19114
　　　　　　　　　　　Pro Se

*Transcribers Limited*
*17 Rickland Drive*
*Sewell, NJ 08080*
*856 589-6100 • 856-589-9005*

2

Audio Operator:        Carl Hauger

Transcribed By:        Michael Keating

- - -

        Proceedings recorded by electronic sound
recording; transcript produced by computer-aided
transcription service.

- - -

3

1          (The following was heard in open court at

2     9:32 a.m.)

3          THE COURT:  All right, good morning,

4     everyone.

5          MR. HIPPLE:  Good morning, Your Honor.

6          MR. BERKOWITZ:  Good morning, Your Honor.

7          THE COURT:  Good morning.  Okay.  Are you

8     ready to proceed?  You can take your coats off.  I know

9     it's very hot in here.  I'm sorry about that.  We

10    turned it down to 60.

11         (Pause in proceedings.)

12         THE COURT:  Yes, we have the fans on high.

13         MR. BERKOWITZ:  Understand.

14         THE COURT:  You can take your jacket off.

15    Not a big deal.

16         MR. BERKOWITZ:  It will come off eventually I

17    think.

18         THE COURT:  All right.  Are we ready?  Mr.

19    Hipple, you have to resume the stand, okay?

20         (Pause in proceedings.)

21         THE COURT:  He's still under oath.  Good

22    morning, Mr. Hipple.

23         MR. HIPPLE:  Good morning.

24         THE COURT:  Good morning.

25         MR. BERKOWITZ:  Your Honor, there was a

4

1  question yesterday about some pages being out of order

2  in Exhibit 37 and I did put those pages in order --

3          THE COURT:  Okay.

4          MR. BERKOWITZ:  -- on the wit -- and I'd just

5  like to go back and straighten out just so that there's

6  no confusion --

7          THE COURT:  Fine.

8          MR. BERKOWITZ:  -- and we get the pages in

9  order.

10          THE COURT:  Okay.

11          CLEMENT HIPPLE, Defendant, Previously Sworn,

12  Resumes.

13                    DIRECT EXAMINATION

14  BY MR. BERKOWITZ:

15  Q   And, Mr. Hipple, the book on the ledge in front of

16  you, you see Exhibit 458?

17  A   Yes.

18  Q   You remember that's the company that's listed as

19  SCI, LLC?

20  A   Yes, that is correct.

21  Q   Okay.  And I think you told us that that was you

22  thought a typographical error or some mistake?

23  A   No, I thought -- no, that company was -- I'm not

24  certain of -- because these companies go back to 1999.

25  Alls I'm certain of is that there was a company called

Mr. Hipple - Direct                                    5

1    S -- Scientific Chemical, Incorporated, which would be

2    SCI --

3    Q    Right.

4    A    -- and another company called SCIX.

5    Q    Okay.

6    A    That I am certain of.

7    Q    Okay.  And now in front of you we have a document,

8    SS4, which is an application for employer

9    identification number, That's Exhibit 458.

10   A    That is correct.

11   Q    Okay.  And you see that that is for a company

12   that's called SCI, LLC?

13   A    Yes.

14   Q    All right.  And if you look down to line ten, it's

15   got the date of establishment of February 8, 1999?

16   A    Correct.

17   Q    Okay.  And that was the same date that SCIX was

18   formed?

19   A    I'm not certain of that.

20   Q    Okay.  Now, I would like you to turn to page --

21              THE COURT:  What is the number we're on

22   again?

23              MR. BERKOWITZ:  458, which is the --

24              THE COURT:  What exhibit though?

25              MR. BERKOWITZ:  That -- oh, I'm sorry,

                        Mr. Hipple - Direct                    6

1    Exhibit 37.

2            THE COURT:  All right, thanks.

3            MR. BERKOWITZ:  And, again, it's Ex -- Hipple

4    458 and at the top it's application for an employer

5    identification number, okay, and that's SCI, LLC.

6            THE WITNESS:  SCI, I guess comma, LLC,

7    February 8th, 1999.

8    BY MR. BERKOWITZ:

9    Q    Okay.  And let's go to page 459.  Okay, if you look

10   at the bottom, you'll see 459.  I didn't -- there was a

11   duplicate of the SS4 and I didn't --

12   A    Still is --

13   Q    -- want to remove anything.  They're the same.

14   A    I have two 458s.

15   Q    Go to the next one, 459.

16   A    458.  Okay, 459.

17   Q    Okay.  And we see that is the operating agreement

18   for a company called SCI, LLC?

19   A    That is correct?

20   Q    Correct?

21   A    That's what it says.

22   Q    Okay.  And if we go forward to page ten, Hipple

23   468, but it's ten of the agreement.

24   A    Okay.

25   Q    And that appears to be your signature on that page?

Mr. Hipple - Direct                                    7

1   A   Yes.

2   Q   And that appears to be Brian Hipple's signature on

3   that page?

4   A   Yes.

5   Q   Okay.  And let's go forward now --

6   A   And also --

7   Q   -- to Hipple --

8   A   -- the signature of Robert Barks.

9   Q   Yes.

10  A   Okay.

11  Q   Let's go forward to page Hipple 471, which is page

12  A2.

13  A   Yes.

14  Q   Do you see that?

15  A   Uh-huh.

16  Q   And look at paragraph 2.1.

17  A   Okay.

18  Q   All right?  And Scientific Chemicals, Inc., is the

19  tax matters number.

20              (Pause in proceedings.)

21  Q   Right?

22  A   I'm sorry?

23  Q   Paragraph 2.1, it lists Scientific Chemicals, Inc.,

24  as the tax matters --

25  A   Yes, it says that on there.  That is correct.

Mr. Hipple - Direct                    8

1   Q   Okay.  So it appears there may be another company,

2   SCI, LLC?

3   A   No.

4   Q   Okay.  All right.  Let's go back to where we

5   stopped yesterday.  We were looking at Exhibit 14,

6   Plaintiff's Exhibit 14.  The matter is the licensing

7   agreement, it's volume one.

8   A   Uh-huh.

9   Q   Do you remember we were looking at this yesterday?

10  A   Yes, I think so.

11  Q   Okay.  And this is the agreement where after you

12  had transferred all the assets that you repossessed

13  from SCIX, you transferred them to Complete Group, LLC?

14  A   Yes.

15  Q   The Nevis company that you owned with Ms. Domices?

16  A   Yes.

17  Q   And it transferred -- under the background, it says

18  "is the owner of certain assets including the

19  intellectual property described on Exhibit A."

20  A   Yes.

21  Q   Do you see that?

22  A   Uh-huh.

23  Q   And we have had some discussion about what is the

24  appropriate Exhibit A.  Do you recall that?

25  A   Yes.

1   Q    And one of them is the one that says physical

2   assets I have taken, correct?

3   A    I'm not certain, but --

4   Q    Well, we can go back and look at that just so we're

5   -- you're certain that we're talking about the same

6   thing.

7         (Pause in proceedings.)

8   Q    And I will get for you Plaintiff's Exhibit 130.

9         (Pause in proceedings.)

10  Q    And I'm handing you Exhibit 130.  And do you see at

11  the top it says, "SCIX physical assets I have taken"?

12  A    Yes.

13  Q    Okay, thank you.  Now, the license agreement refers

14  to intellectual property, and I think we agreed that

15  there's no intellectual property on the physical assets

16  I take it?

17  A    Again, define intellectual property to me.

18  Q    It's not something you could pick up and put in a

19  box, a logo --

20  A    I have nothing.

21  Q    -- a trade name?

22         (Pause in proceedings.)

23  A    Yes, these seems that there are no physical assets.

24  Q    Okay.

25  A    I mean no -- they are physical assets.

Mr. Hipple - Direct                     10

1   Q    Okay.  And the license agreements refers to

2   intangible assets, correct?  Do you see right --

3   A    That says --

4   Q    Including the intellectual property.

5   A    Of creating assets, including assets, so it's

6   creating assets.

7   Q    Okay.

8   A    Okay?

9   Q    I just want to --

10  A    What --

11  Q    -- make sure we're on the same page here.

12  A    What does that mean?

13  Q    And it says including the intellectual property,

14  right?

15  A    So it's two things, basically, right?

16  Q    Okay.  Now I'm going to show you --

17       MR. BERKOWITZ:  Your Honor, there is --

18       THE WITNESS:  So the creating assets could be

19  the physical assets?

20  BY MR. BERKOWITZ:

21  Q    We have an Exhibit A and I'm just trying to clarify

22  which one --

23  A    Well, that's not what my question is.

24  Q    Okay.

25  A    My question is --

Mr. Hipple - Direct                    11

1  Q   Well, you get to -- you get to do the questions

2  later.  Let me -- let me go ahead with my testimony.

3  I'm going to show you Defendant, this is your Exhibit

4  D, D-3.

5  A   Yeah.

6  Q   It's in the black binder.

7  A   Yep.

8  Q   D-3.

9  A   Okay.

10  Q   And, Mr. Hipple, you'll see -- D-3, recall we

11  looked at this before?

12  A   Yes.

13  Q   Okay.

14  A   UCC.

15  Q   This is the UCC 1 that was filed.

16  A   Correct.

17  Q   And it has a big Exhibit A, correct?

18  A   It says "List of assets."

19  Q   Yes.  Okay?

20  A   Uh-huh.

21  Q   And it lists the website and the 800 number --

22  A   Right.

23  Q   -- and it's got the Steel Seal logo --

24  A   Right.

25  Q   -- rights to the name, confidentiality agreement

1   with Colonial Chemical --

2   A    Right.

3   Q    -- and the formula --

4   A    And they're all --

5   Q    -- okay?

6   A    And --

7   Q    And that's in Exhibit A?

8   A    Well, it has more written in there than that.

9   Q    Yes, it does.  Yes, it does.  And we can look at

10  them all, but I'm just looking at the intellectual

11  property.

12           So it seems to me -- wouldn't it seem to you

13  that the Exhibit A that's referred to in the licensing

14  agreement is this Exhibit A from the security interest?

15  A    I'm not sure about that because I didn't draft the

16  language --

17  Q    Okay.

18  A    -- and I don't understand the language.

19  Q    Okay.  But it does say what we -- what I

20  represented that it said?

21  A    Well, it says what it says, but I -- like I said, I

22  never drafted the language.

23  Q    Okay.  Now, this license agreement is an exclusive

24  license to Steel Seal Pro, your son's company, Brian's

25  company?

Mr. Hipple - Direct                     13

1   A    Where does it say that?

2   Q    Well, it says that if you look under terms and

3   conditions, paragraph one.

4          THE COURT:  What number is that again?

5          MR. BERKOWITZ:  This is -- I'm sorry --

6   Exhibit -- Plaintiff's Exhibit 14 --

7          THE COURT:  Right.  Okay.

8          MR. BERKOWITZ:  -- in the white binder.

9          THE COURT:  Yes.

10  BY MR. BERKOWITZ:

11  Q    And let me just read this paragraph one,

12  "Licensor," that's Complete Group, LLC, "hereby grants

13  the licensee," which is Steel Seal Pro, "an exclusive

14  but conditionally revocable license to market and

15  collect proceeds from customers with respect to a

16  product known as Steel Seal," correct?

17  A    That's what it says.

18  Q    Okay.  And you understand what the word,

19  "exclusive," means?

20  A    I understand, "exclusive," but I don't understand

21  "collect" and "revocable."

22  Q    Okay.  That's okay.  Now, under this agreement, if

23  you look in paragraph three, what Steel Seal Pro got

24  was the right to -- they were going to be paid $10,000

25  a month, correct, for its services?

Mr. Hipple - Direct                              14

1   A    Yes, correct.

2   Q    And no more?

3   A    No.

4   Q    And all the rest of the money would go to you?  And

5   by you, I'm sorry, Complete Group?

6   A    Right.

7   Q    And the way it got to Complete Group would be

8   payments made to A&C Building --

9   A    And Maintenance.

10  Q    -- and Maintenance?

11  A    Yes, that's correct.

12  Q    Okay.  Now, I'd like you to look at the second

13  page.  And do you see the signatures there?

14  A    Yes.

15  Q    Now, that looks like Brian's signature, doesn't it?

16  A    Yes.

17  Q    And a matter of fact, in your affidavit, which is

18  Exhibit 25, at paragraph 58, and I'll read it to you if

19  you don't want to look at it.

20  A    Now, hold on, let me get there.  Paragraph what?

21  Q    Paragraph 58 of Exhibit 25.

22             (Pause in proceedings.)

23  A    Go ahead.

24  Q    Okay?  And you look at the last sentence and it's

25  referring to the license agreement, which we just

1   looked at.

2   A    58?

3   Q    Yes, paragraph 58.  Are you there?

4   A    I'm there now.

5   Q    Okay.  And you look at the last sentence, "I

6   recognize the handwriting on the license agreement as

7   belonging to Brian Hipple."

8   A    Oh, you want me to look at the last page?

9   Q    No, paragraph 58, the last sentence in paragraph

10  58.  Do you see that?

11  A    Yes.

12  Q    "I recognize the handwriting on the license

13  agreement as belonging to Brian Hipple."

14  A    Yes.

15  Q    Okay.  Now, yesterday, there was a question about a

16  letter and Brian Hipple's signature, and I'd like you

17  to turn to Exhibit 18, page two.

18          (Pause in proceedings.)

19  Q    And you had some concerns about the signature on

20  that letter.

21  A    No, I had no concerns about it.  I can't comment on

22  that letter because it's not --

23  Q    But that appears to be Brian's signature?

24  A    Well --

25  Q    Isn't that correct?

Mr. Hipple - Direct                    16

1   A    If you look at that signature -- what was -- where

2   were we just a minute ago?

3   Q    We were at Exhibit 14 and we looked at paragraph 58

4   of Exhibit 25.  We looked at the licensing agreement.

5   A    They look a little different to me.

6   Q    Okay.  So you can identify the signature on the

7   licensing agreement, but you can't identify --

8   A    I can't really identify the signature, okay?  I

9   mean I never actually saw Brian's signature that much.

10  Q    Okay.  You were able to identify it though in the

11  license agreement?

12  A    Well, I'm assuming it's Brian's signature, yes.

13  Q    Okay.  But -- and you've seen it?

14  A    Oh, yeah, I'm assuming it has to be on the

15  license -- on this, yes.

16  Q    Okay.

17  A    It has to be.

18  Q    Now --

19  A    It's the license agreement.

20  Q    -- back on Exhibit 14, the licensing agreement --

21  A    Right.

22  Q    -- after October 18th, Steel Seal was sold

23  exclusively by Steel Seal Pro, correct?

24  A    As of October 18th.

25  Q    Okay.  So that's correct?  And you did not own any

Mr. Hipple - Direct                                17

1   interest in Steel Seal Pro?

2   A    That is correct.

3           THE COURT:  What year was that, October 18th

4   what year?

5           MR. BERKOWITZ:  October 18th, 2010.

6           THE COURT:  All right.

7           THE WITNESS:  No, 2012.

8           MR. BERKOWITZ:  2010.  If you would like to

9   look at --

10          THE WITNESS:  Oh, I'm sorry, yeah, 2010.

11          MR. BERKOWITZ:  2010.

12          THE WITNESS:  I'm sorry.

13          THE COURT:  To current?  To present?

14          MR. BERKOWITZ:  Well, Steel Seal Pro has,

15  again, defaulted and disappeared from the face of the

16  earth, but we will deal with that --

17          THE COURT:  All right.

18          MR. BERKOWITZ:  -- soon.

19          THE COURT:  Okay.

20  BY MR. BERKOWITZ:

21  Q    So if we look at Exhibit 14, the license agreement,

22  you're transferring assets, including intellectual

23  property, right?

24  A    That's what it --

25  Q    That's what is says in the first thing.

Mr. Hipple - Direct                          18

1   A   What paragraph again?

2   Q   The first one under background.

3   A   Okay.

4   Q   And --

5   A   "Of certain assets, including intellectual

6   property."

7   Q   Okay, yes.  And in Exhibit 18, the second page,

8   Complete Group is the successor in interest to the

9   confidentiality agreement concerning the formula of

10  Steel Seal?

11  A   What number?

12  Q   That's para -- Exhibit 18, page two.

13  A   But what number?

14  Q   That's the letter we just looked at.

15  A   Yeah, I6 or what?

16  Q   There's only -- on Exhibit 18 there's only two

17  pages.

18  A   Oh, I'm sorry, I'm back -- I'm still on the license

19  agreement.  Okay.  Okay, Exhibit 18, what's your

20  question?

21  Q   Okay.  So you transferred -- the secret formula and

22  the confidentiality agreement is now owned by Complete

23  Group.  That's what these things say, correct?

24  A   Okay.  You're losing me.  You're bouncing, okay?

25  All right?  Let's take it a little slower.

Mr. Hipple - Direct                    19

1    Q    Sure.

2    A    All right.

3    Q    Let's look at -- we looked at the first paragraph

4    in the licensing agreement.

5    A    Again, what par --

6    Q    This is Exhibit 14, background.

7    A    Okay.  14 background, yes, it says that --

8    Q    It says, "Complete Group owns assets, including the

9    intellectual property described on Exhibit A."

10   A    Okay.  Under background, it says, "Complete Group

11   owns?"

12   Q    It says licensor, and if you look above --

13   A    Okay.

14   Q    -- Complete Group is the licensor.

15   A    Okay.  So then okay.  All right.

16   Q    Okay?

17   A    I'm in agreement with that, yes.

18   Q    Okay.  And if we look at Exhibit 18, the second

19   agreement, it says -- this is the letter with Brian's

20   signature that you -- here you dispute.

21   A    Right.

22   Q    "Clement Hipple's company, Complete Group, is the

23   successor in interest to the confidentiality agreement

24   executed between SCIX, LLC, and Colonial Chemical on

25   March 29, 1999, regarding the formula of a chemical

1   sealant now known as Steel Seal," correct?

2   A    That's --

3   Q    That's what it says?

4   A    That's what the letter says.

5   Q    Okay.  And we looked at that confidentiality

6   agreement yesterday.  Do you recall that?

7   A    But I can't verify the letter itself.

8   Q    Understand.  Understand that.  Now, after you

9   transferred the exclusive rights to sell Steel Seal to

10  Steel Seal Pro so that Steel Seal Pro would be the only

11  company that sold Steel Seal, the product, Steel Seal,

12  was sold in the same manner and for the same price as

13  SCIX sold the product?

14  A    Of course.

15  Q    And you said that as a result of selling that

16  product, it obtained $110,000?

17  A    Somewhere in that area, yes.

18  Q    Okay.  Well, we could look at paragraph --

19  A    Yeah, close enough, yes.

20  Q    I'm sorry.  All right, well, let's make sure we get

21  it right.  Exhibit 25, paragraph 67.

22               (Pause in proceedings.)

23  Q    Have you -- have you found that, Mr. Hipple?

24  A    Yes, I'm reading it right now.

25               (Pause in proceedings.)

Mr. Hipple - Direct                    21

1   A    That is correct.

2   Q    Okay.  And it says -- the second sentence in

3   paragraph 67, "As a result, I estimate that all the

4   SCIX assets that I repossessed were sold for a total of

5   $110,000."  That's what we just --

6   A    Right, that's correct.

7   Q    -- agreed to before?  Okay.

8        Now, Mr. Hipple, let's get Exhibit 130, and

9   that is in book number four.  Let me get that for you,

10  sir.

11  A    All right.

12  Q    Do you have book four there?

13  A    Well, here's 130.

14  Q    Yes, I'm going to get you a better number.

15       (Pause in proceedings.)

16  Q    Yes.  Now, let's look at Exhibit 130.  That's the

17  physical assets you obtained.  Now, I just want to make

18  sure I understand.  We saw that there seemed to be some

19  intellectual property taken because we talked about

20  that before, but if you look at the second page of

21  Exhibit 130, physical assets I've taken, do you see

22  there you took 353 cases of 16-ounce Steel Seal?

23  A    That is correct.

24  Q    Okay.  And there are 12 bottles per case?

25  A    That is correct.

Mr. Hipple - Direct                    22

1  Q   Okay.  So I did the math.  If you want to multiply

2  out 353 cases of 16-ounce bottles, you multiply 353 --

3  and I have a calculator if you want to do it, but I

4  have done the math.

5  A   Okay, continue.

6  Q   So I can do 353 times 12, that's 4,236 bottles.

7  I'm going to write it down so it's easy to follow.

8  A   Yeah, why don't you write it on the board there so

9  we can all see it?

10         (Pause in proceedings.)

11  Q   Okay?  And if you also look, it says you picked

12  up -- or you had an additional 80 cases of 16-ounce

13  bottles, correct?

14  A   Right.

15  Q   Okay, so if we multiply 80 times 12, that gives us

16  960?

17  A   That's correct.

18         (Pause in proceedings.)

19  Q   I don't want to embarrass myself with the math, but

20  I'll try and do it right here.  5,196 bottles, that's

21  the number of bottles that you picked up?

22  A   That is correct.

23  Q   Okay.  And you said you sold it for the same price

24  that SCIX sold it?

25  A   No, I said I sold --

Mr. Hipple - Direct                    23

1   Q   Well, you didn't sell it?   Steel Seal Pro sold it,

2   right?

3   A   Steel Seal Pro sold it, okay?

4   Q   Okay.

5   A   But, the point that you're missing, and if you

6   would have looked at the inventory, like more than half

7   of that was England, UK bottles.

8   Q   These are 16 -- we'll -- that's part of your case.

9   Let's carry the math out for --

10  A   Well --

11  Q   -- us here.

12  A   Okay.   Well, let's not --

13  Q   It says for the same prices as SCIX.   Now, what was

14  SCIX selling --

15  A   Well, I --

16  Q   -- 16-ounce -- excuse me -- 16-ounce bottles on the

17  internet for?   Do you know?

18  A   I'd like to change my previous statement that it's

19  all sold for the same price on the internet.   That is

20  not correct.   It was sold for -- some were sold for the

21  same price on the internet, and others were sold at $12

22  per bottle.

23  Q   Mr. Hipple, I'm going to ask you to look at Exhibit

24  D -- this is Defense Exhibit 50.

25              (Pause in proceedings.)

Mr. Hipple - Direct                                24

1    Q    And, Mr. Hipple, are you familiar with that

2    screenshot?

3    A    Not really, no --

4    Q    Okay.

5    A    -- but I understand.

6    Q    If you look here at the top --

7    A    Uh-huh.

8    Q    -- it says on May 22nd, 2010 --

9    A    Right.

10   Q    -- this is a screenshot of the SCIX.

11   A    That is correct.

12   Q    See that at the bottom?

13   A    That is correct.

14   Q    Now, what size bottle was the four cylinder?

15   A    16-ounce bottles.

16   Q    Okay.  So it has a price listed there of 44.95.

17            (Pause in proceedings.)

18   Q    Okay?  So if I multiply 44.95 times 5,196 bottles,

19   I did the math and I'm going to represent to you that

20   that comes out to $233,000.  Okay?

21   A    No.

22   Q    You --

23   A    I don't agree with --

24   Q    You don't agree with the math?

25   A    I don't agree with it, no.

Mr. Hipple - Direct                                    25

1   Q    I'll let you do the calculation yourself then.

2   A    No, I don't agree with --

3   Q    5,000 --

4   A    -- the price of 5,196 at 44.95.

5   Q    I hear you and you'll get to put on your case.

6   A    Okay.

7   Q    But I'm showing you the Steel Seal price --

8   A    Right.

9   Q    -- sold by SCIX and it was 44.95, correct?  That's

10  what is shows right in that exhibit, right?  So if I do

11  the math, when you sell those bottles that you picked

12  up --

13  A    Right.

14  Q    -- you didn't pay for them, they didn't cost you

15  anything, you sold it and you got $233,560.  Steel Seal

16  Pro got that.

17  A    Right.

18  Q    Correct?

19  A    No, not correct.

20  Q    Okay.  Now, in addition, if you look at the assets

21  I've taken, you picked up 22 cases of eight-ounce

22  bottles, am I correct?

23  A    Correct.

24  Q    Okay.  So that comes out, if you do the math, 528

25  bottles.  Does that sound right or would you like to do

Mr. Hipple - Direct                          26

1   the math?

2   A   No, that's incorrect.

3   Q   Do you mean 22 cases times 24 bottles per case --

4   A   Oh, you're doing 24 bottles.  That's what I wanted

5   to tell you, yeah.

6   Q   Well, that's -- these are the eight ounce cases.

7   A   Right, yeah.  I wanted to remind you there's 24 to

8   a case.

9   Q   Right.

10  A   Okay.

11  Q   So it's 528 bottles.

12  A   Okay.

13  Q   And would you agree with me that the internet price

14  is $25 a bottle for an eight-ounce bottle?

15          (Pause in proceedings.)

16  A   Yes.

17  Q   Okay.

18  A   Because they're sold as a six cylinder.

19  Q   Okay.  So if we multiply 528 bottles times $25 a

20  bottle, we get $13,200.

21          (Pause in proceedings.)

22  Q   And if I did the math correctly, and I think I did,

23  that comes out to $246,760 --

24  A   Again, I --

25  Q   -- correct?

1   A   No, again, I object to the format that you are

2   using.

3   Q   Okay.

4           THE COURT:  You disagree with the price,

5   right?

6           THE WITNESS:  I disagree with the --

7           THE COURT:  The price?

8           THE WITNESS:  -- price, yes, Your Honor.

9           THE COURT:  Right.

10          THE WITNESS:  Okay.

11          MR. BERKOWITZ:  All right.

12          THE COURT:  We'll talk about that later.

13          MR. BERKOWITZ:  Okay.

14  BY MR. BERKOWITZ:

15  Q   Mr. Hipple, if you could look at Exhibit D-51,

16  Defendant's Exhibit D-51?  It's the next page.  It's

17  right here.  I'm going to turn it for you.  It's

18  another screenshot.  Do you see that?  And at the

19  bottom on Exhibit D51, your exhibit, again, it's got

20  SCIX?

21  A   Right.

22  Q   Okay?  And this screenshot is December 7th, 2010?

23  A   Right.

24  Q   And do you see the prices are the same?

25  A   Yes.

Mr. Hipple - Direct                           28

1   Q    Okay.

2              (Pause in proceedings.)

3   Q    Now, in addition, you've got other assets, physical

4   assets, that you picked up, correct?

5   A    Yes.

6   Q    And one of them was a car?

7   A    That is correct.

8   Q    And you sold the car?

9   A    No, I did not sell the car.  Brian had to sell the

10  car.

11  Q    Okay.  And do you know how much he got for the car?

12  A    8,000.

13  Q    Okay.  So if I add 8,000 to this, now I got

14  254,000, correct?

15  A    That's what the number says, but I'm in

16  disagreement with it.

17  Q    Okay.  Understand.  And this was part of the

18  security for the $210,000 note in your security

19  agreement, correct?

20  A    Yes, it was part -- the material was part of it,

21  yes, but the numbers aren't correct.

22  Q    I hear that and you will get your opportunity to

23  establish that.  Now, I'd like you to look at

24  Plaintiff's Exhibit 137.

25             (Pause in proceedings.)

Mr. Hipple - Direct                    29

1   A    Mine is blank.

2   Q    I'm sorry?

3   A    Mine is blank.

4   Q    No, that's the --

5        THE COURT:  Mine is blank also.

6        MR. BERKOWITZ:  I got one.

7        (Pause in proceedings.)

8   BY MR. BERKOWITZ:

9   Q    Okay.  I'm going to stand and share with you, Mr.

10  Hipple.

11  A    Well, I would like to see a copy of it.

12  Q    Absolutely, here you go.

13  A    I think the Judge should have a copy of it also.

14  Q    You get the --

15       (Pause in proceedings.)

16  Q    So take a look at that.  Do you recall doing that

17  Exhibit D-52?  Oh, D-52.  That's where it will be.

18       THE COURT:  D-52?

19       MR. BERKOWITZ:  D.  Defense Exhibit 52.

20       THE WITNESS:  Here, Your Honor.

21       THE COURT:  I have a copy of it.

22       MR. BERKOWITZ:  That's where it is.

23       THE COURT:  Thank you.  I have D-52.

24       MR. BERKOWITZ:  Okay.

25  BY MR. BERKOWITZ:

Mr. Hipple - Direct                          30

1    Q    So let's look at D52.

2    A    Well, I'm looking at this.

3    Q    Yeah, but you can't have my notes.

4    A    Okay.

5    Q    Thank you.

6    A    Okay.

7    Q    You can look at D-52.  Mr. Hipple, do you --

8    A    Here?

9    Q    Can you find D-52?

10   A    Yes.

11   Q    Okay.  And you see that you list $8,000 for the

12   sale of the car?

13   A    That is correct.

14   Q    And you list 16-ounce bottles.  They have a price.

15   You see that USA?

16   A    Hold on, what are we talking -- okay, go ahead.

17   Q    The second --

18   A    Finished prod --

19   Q    -- to last line.

20   A    Finished product or --

21   Q    Second to last line, it says, "16" --

22   A    "Ounce bottles."

23   Q    -- "ounce bottles of Chemical USA"  Do you --

24   A    That is correct.

25   Q    -- see that?

Mr. Hipple - Direct                          31

1   A    Yes, I see that.

2   Q    And you have a price of 59.95 there.

3   A    Right.

4   Q    What is that price from?

5   A    That's what it was being sold for.

6   Q    By SCIX?

7   A    By Steel Seal Pro.

8   Q    Okay.  So Steel Seal Pro then sold 5,196 bottles at

9   59.95?

10  A    Right.

11  Q    Okay.  So if I do the math, 59.95, it comes out to

12  $311,500.  And, Mr. Hipple, on Exhibit 130 --

13  A    Of yours, P?

14  Q    Plaintiff's Exhibit 130, yes, the second page.

15           THE COURT:  D-130 or P-130?

16           MR. BERKOWITZ:  P, Plaintiff's --

17           THE COURT:  All right.

18           MR. BERKOWITZ:  -- 130.  The one that has --

19           THE COURT:  Right.

20           MR. BERKOWITZ:  -- the 353 cases and the 80

21  cases.

22           THE WITNESS:  130?

23  BY MR. BERKOWITZ:

24  Q    Yes, 130.

25  A    130 is (inaudible) on mine.

Mr. Hipple - Direct                          32

1   Q    Oh, you've looked at it already?

2        THE COURT:  This is the physical assets that

3   I have taken?

4        MR. BERKOWITZ:  Yes.

5        THE WITNESS:  Hold on one second.

6   BY MR. BERKOWITZ:

7   Q    Next page, "This is the physical assets I've

8   taken."

9   A    Okay.

10  Q    And if you look at that, "Picked up in Colonial

11  Chemical 353 cases" --

12  A    Right.

13  Q    -- "of 16-ounce" --

14  A    Correct.

15  Q    -- "and 80 cases of 16-ounce."

16  A    Correct.

17  Q    And you agree with me there's no designation of UK

18  product or USA product on this?

19  A    No.

20  Q    There's no designation, right?

21  A    Right, that is correct.

22  Q    Okay.  Now, on Exhibit D-2 --

23  A    Hold on, I need to be writing this stuff down.

24  Q    Defendant Exhibit 52.  It's in the black binder.

25  A    Well, my tablet --

Mr. Hipple - Direct                         33

1    Q    The one we just looked at.

2              (Pause in proceedings.)

3    Q    I'm sorry, do you have it, Mr. Hipple?

4    A    Well, I need to start writing these down.   Okay.

5    Q    Right here.

6    A    I got to write all this stuff down because I

7    (inaudible) come back to it for this.   Okay.

8              (Pause in proceedings.)

9    Q    Now, you would agree with me that you placed no

10   value on the assets -- on the assets that you took for

11   patents, the secret formula, the trade name, the

12   websites, the goodwill?   There's no value on that, on

13   your document?

14   A    I think we have to address each thing one thing at

15   a time.

16   Q    All right.   Just if you could follow me on my

17   questions, Mr. Hipple.

18   A    Okay.

19   Q    On the value that you ascribe to the assets that

20   you took of SCIX, you say in your affidavit, Exhibit

21   25, paragraph 67, that the assets that I repossessed

22   were sold for a total of $110,000, correct?

23   A    That is correct.

24   Q    And your exhibit there has a total number of

25   122,000, right, your Exhibit D?

Mr. Hipple - Direct                                    34

1    A    All right.  Within dollars.

2    Q    Okay.  Okay.  And that does not include any value

3    for patents, correct?

4    A    I never received any patents.

5    Q    Secret formula?

6    A    That belonged to me.

7    Q    Well, that's not what the other documents say, but

8    we can argue with that and you can put on your case.

9    But you didn't put a value on it, did you?

10   A    No, because it belonged to me.

11   Q    Okay.   Trade names?

12   A    Excuse me, it belonged to Scientific Chemical,

13   Incorporated.

14   Q    Well, we'll get there.

15   A    Sure.

16   Q    But you didn't put any value on these?

17   A    It belonged to Scientific Chemical, Incorporated.

18   Q    All right.  All right, I hear you.  So there's no

19   value on these?

20   A    It belonged to Scientific Chemical, Incorporated.

21   Q    And you would agree with me, wouldn't you, that the

22   name, Steel Seal, has a value, doesn't it?

23   A    It belonged to Scientific Chemical, Incorporated.

24   Q    The name, Steel Seal, has a value?

25   A    It belongs to Scientific Chemical.

Mr. Hipple - Direct                    35

1    Q    That's not the question though.   There's a value --

2    A    I don't know --

3    Q    -- to that name?

4    A    -- what value it has.

5    Q    It has a value though, right?

6              THE COURT:  Well, the question is does it

7    have any value?  We will talk about what the value is

8    later, but does it -- it has some value?

9              THE WITNESS:  I'm sure -- I don't -- I'm sure

10   it --

11             THE COURT:  That's all he's trying to elicit.

12             THE WITNESS:   -- has value, but I don't know

13   what the value is.

14             THE COURT:  Yes, right.

15   BY MR. BERKOWITZ:

16   Q    And, in fact, you registered the trademark, didn't

17   you?

18   A    I actually did not register the trademark.  Some --

19   I believe Brian registered the trademark.

20   Q    Well, someone registered --

21   A    Or maybe --

22   Q    -- a trademark, right?

23   A    Maybe Teresa registered the trademark.

24   Q    Okay, maybe Teresa registered it.  But you would

25   agree with me that there's value if there's a

Mr. Hipple - Direct                                      36

1    trademark?

2    A    Yes.

3              MR. BERKOWITZ:  Now, Your Honor, this was not

4    produced as an exhibit.  I'm using this for purposes of

5    impeachment.

6              THE COURT:  Okay.

7    BY MR. BERKOWITZ:

8    Q    Mr. Hipple, I'm going to show you --

9              THE COURT:  Why don't you mark it anyway, for

10   identification purposes.

11             MR. BERKOWITZ:  Yeah.  Let me go to my last

12   exhibit so I can distinguish it.  137.

13             THE COURT:  Yes, P-137.

14             THE WITNESS:  P-130?

15             MR. BERKOWITZ:  I'm sorry?

16             (Pause in proceedings.)

17             MR. BERKOWITZ:  Oh, I'm sorry.

18             THE COURT:  This is a new exhibit.  It's

19   marked --

20             MR. BERKOWITZ:  This is a new exhibit.

21             THE COURT:  -- 138.  It's not in your book.

22   This is the trademark registration?

23             MR. BERKOWITZ:  This is the trademark

24   registration.

25             THE COURT:  Right.

1          THE WITNESS:  So --

2          MR. BERKOWITZ:  I'm going to mark it 200 so I

3   don't overlap with any other numbers.

4          THE WITNESS:  Okay, P-200.

5   BY MR. BERKOWITZ:

6   Q   And I'm going to show this document to you, Mr.

7   Hipple, and just take your time and look at it.

8          (Pause in proceedings.)

9   A   Okay, I'm looking at it.  I don't understand it,

10  but I'm looking at it.

11         MR. BERKOWITZ:  Your Honor, I do have some

12  copies.

13         THE COURT:  Okay.

14         MR. BERKOWITZ:  I could provide one, this is

15  P-200.

16         THE COURT:  Right.

17         MR. BERKOWITZ:  P-200.

18  BY MR. BERKOWITZ:

19  Q   Do you see on the front page in big letters, "STEEL

20  SEAL?"

21  A   Yes.

22  Q   And that's the product you told us just a couple of

23  minutes ago is owned by --

24  A   Scientific Chemical, Incorporated.

25  Q   -- Scientific Chemical, Inc?

1   A    Uh-huh.

2   Q    Now, let's turn to page two.

3   A    Okay.

4   Q    And let's look at the filing date, May 24, 2013.

5   Do you see that?

6   A    Yes.

7   Q    Sir, you would agree with me Brian Hipple didn't

8   file this?

9   A    I would agree with you that Brian Hipple didn't

10  file it, but neither did I.

11  Q    Okay. Let's look down at the owner.

12  A    Okay.

13  Q    Do you see that if you go down the left side?  The

14  owner of the name, Steel Seal, B.B.B. Management Group,

15  LLC?

16  A    Right.

17  Q    Correct?

18  A    Yep.

19  Q    And that's your company?

20  A    That is correct.

21  Q    Okay.  And there is an attorney, John Gibbons?

22  A    Right.

23  Q    Do you know Mr. Gibbons?

24  A    No.

25  Q    So, Mr. Gibbons filed this out of the blue --

1   A    I think it's --

2   Q    -- for B.B.B. Management?

3   A    I think they're filed automatically when a company

4   changes.

5   Q    Well --

6   A    Same as the trademarks.  I think all that stuff

7   is -- when one thing changes everything changes.  It's

8   filed automatically.

9   Q    You will agree with me that on this document filed

10  with the United States Patent and Trademark Office, the

11  owner of the Steel Seal logo --

12  A    Right.

13  Q    -- the name is B.B.B. Management Group, LLC?

14  A    No, I believe that the own -- I believe, okay, that

15  when B.B. -- well, first of all, that's not the date it

16  was opened.  I believe how it works is that the

17  registration follows the company.  Now, this was

18  originally probably SCIX -- I mean Scientific Chemical.

19  Do you have the previous one?

20  Q    I'm showing you this document, Mr. Hipple.  I got

21  this off the internet --

22  A    Okay.

23  Q    -- from the United States Patent and Trademark

24  Office.

25  A    Okay.

Mr. Hipple - Direct                    40

1    Q    Okay?

2    A    Right.

3    Q    Now, if you look -- let's go to page one.

4    A    Go ahead.

5    Q    And let's look at if you see under the big word,

6    "Steel Seal," under goods and services --

7    A    Yeah.

8    Q    -- do you see, "First use?"  Do you see that?

9    A    Yes.

10   Q    Correct?  Do you see that?

11   A    Under goods and services.  Go ahead.

12   Q    And you see, "First use?"

13   A    Right.

14   Q    "1999."

15   A    Right.

16   Q    "02-28."

17   A    Right.

18   Q    Okay.  So that is 2-28 --

19   A    February 28th, 1999.

20   Q    Okay.

21              (Pause in proceedings.)

22   Q    And if you look on Exhibit 37, Hipple --

23   A    P or defendant?

24   Q    -- 00441.

25   A    P or defendant?

Mr. Hipple - Direct                    41

1  Q    Plaintiff.

2  A    Plaintiff?  37?

3  Q    Exhibit 37, page Hipple 441.  We've looked at this

4  before.

5              (Pause in proceedings.)

6  A    Okay.

7  Q    SCIX was formed on February 8th, 1999.

8              (Pause in proceedings.)

9  A    Okay.

10 Q    And you'll agree with me that B.B.B. Management

11 didn't exist then?

12 A    Yes, I agree with that.

13             (Pause in proceedings.)

14 A    Okay.  I'm going to have to slow down here.

15             THE WITNESS:  I have a question for Your

16 Honor, okay?

17             THE COURT:  Sure.

18             THE WITNESS:  All right.  And all the stuff

19 that he's saying I have to rebuttal is basically what

20 has to take place, is that correct, because he's

21 mentioned that it's SCIX, but he's not saying that

22 Scientific Chemical was also opened that date.

23             THE COURT:  As I told you yesterday, you

24 don't have to rebut everything he says.  You may decide

25 to --

Mr. Hipple - Direct                    42

1    THE WITNESS:  I only have to rebut what he

2  tries to get into evidence?

3    THE COURT:  Well, you have to rebut things

4  that you dispute.  There may be things that he's

5  bringing out that may be not be in dispute.

6    THE WITNESS:  Well, when do I --

7    THE COURT:  For example --

8    THE WITNESS:  This is in dispute.

9    THE COURT:  Well, okay.  I don't know what

10  facts you're talking about, but, for example, the fact

11  that Steel Seal is subject to a trademark.  That may

12  not be in dispute.

13    THE WITNESS:  Right.

14    THE COURT:  For example, so that fact you

15  wouldn't have to dispute.  But if there's other facts

16  that you dispute, yes, you should bring them out, and

17  you can bring them out two ways.

18    As I told you yesterday, if your attorney was

19  not discharged and your attorney was here, your

20  attorney would ask you questions, right, to bring out

21  facts that would rebut the things that Mr. Berkowitz is

22  bringing out now.  And I told you yesterday because you

23  fired your attorney, after he's finished, you can bring

24  out whatever you want to bring out to rebut.  For

25  example, if you have evidence to rebut a particular

Mr. Hipple - Direct                    43

1   fact, you can state that and give the basis for your

2   statement or -- and bring out documents to support it.

3           Let me just finish and then I'll -- and then

4   you can follow up, okay?  The other way you can rebut

5   it is after he's finished his case, you could call your

6   own witnesses, including yourself again, okay?

7           THE WITNESS:  Okay.

8           THE COURT:  So after he's finished, and I

9   don't know when he's going to finish.  Let's say it's,

10  you know, tomorrow or Thursday.  I'm not sure when he's

11  finished.  That's your chance to present your own case.

12  So, for example, you could call yourself back to the

13  stand --

14          THE WITNESS:  Right.

15          THE COURT:  -- okay, and bring out whatever

16  points you want to bring out.  You could call another

17  witness, but, you know --

18          THE WITNESS:  Okay.

19          THE COURT:  -- I'm not saying who.  You can

20  call an attorney or you can call whoever you want to

21  rebut those facts.  So there's two ways you can do it.

22          THE WITNESS:  Okay.

23          THE COURT:  Either you could do it in the

24  next hour or two through your own testimony or call

25  your own -- you know, you can call your other

Mr. Hipple - Direct                    44

1    witnesses.

2            THE WITNESS:  Unfortunately, I have not been

3    keeping track of the exhibits he's been showing, all

4    right?

5            THE COURT:  Right.

6            THE WITNESS:  So that's been my mistake so

7    far, all right?  So, basically, I would have to go

8    through every book and try to remember whether or not

9    he spoke about that exhibit.

10           THE COURT:  Yes.  Or --

11           THE WITNESS:  But as of right now --

12           THE COURT:  Or --

13           THE WITNESS:  -- I'm going to start keeping

14   track of them.

15           THE COURT:  Right.  Or you can rely on your

16   recollection of the facts that Mr. Berkowitz is trying

17   to bring out and then try to rebut each one of those

18   facts.

19           But I told you this.  I told you this that

20   you were not making a wise move in discharging your

21   attorney, but that's water over the bridge, but I told

22   you that.

23           THE WITNESS:  Right.

24           THE COURT:  It's very difficult, but you

25   decided to do this.  So yes, you should keep notes and

Mr. Hipple - Direct                    45

1    try to keep notes so you can remember the things that

2    you want to bring up either on your -- what we call

3    your cross-examination of yourself --

4                THE WITNESS:  Self, okay.

5                THE COURT:  -- or later on in your case in

6    chief, your own case.  You can call yourself again --

7                THE WITNESS:  Right.

8                THE COURT:  -- or you can call other

9    witnesses to rebut some of these facts, okay?

10               THE WITNESS:  So, basically, I'll just start

11   keeping track of every exhibit he talks about?

12               THE COURT:  I think you should.

13               THE WITNESS:  Okay.

14               THE COURT:  But I -- you know, I'm the Judge

15   here.  I'm not your lawyer --

16               THE WITNESS:  Right, right, okay.

17               THE COURT:  -- so you do whatever you want.

18               THE WITNESS:  Okay.

19               THE COURT:  Okay.

20               THE WITNESS:  Okay, thank you, Your Honor.

21   BY MR. BERKOWITZ:

22   Q   Mr. Hipple, if you could turn in volume one to

23   Plaintiff's Exhibit 10.

24   A   P-10.

25   Q   And that at the top says, "Security Agreement."

Mr. Hipple - Direct                    46

1              (Pause in proceedings.)

2    Q    Now, have you gotten to the exhibit?

3    A    Yes, I'm there.

4    Q    Now, we talked about this document I believe

5    yesterday.  This was what secured the $210,000 note.

6    And I don't recall whether we did it yesterday, but if

7    you look at page 13, which is Hipple 033.

8              (Pause in proceedings.)

9    A    P-10, page 13.  Go ahead.

10   Q    Do you see a signature there?

11   A    Yes.

12   Q    That appears to be your signature?

13   A    Yes.

14   Q    And the other signature?

15   A    It appears to be Brian's.

16   Q    Okay.  And, Mr. Hipple, I'd like you to turn to

17   page eight of this document.

18   A    P-8?

19   Q    Eight --

20   A    Oh, page eight --

21   Q    -- of this document.

22   A    -- on the same document.

23   Q    Actually, we're going to go -- we'll start at page

24   eight.

25   A    Okay, eight.

Mr. Hipple - Direct                           47

1          (Pause in proceedings.)

2    A    Go ahead.

3    Q    Now, do you see paragraph seven?

4    A    Right.

5    Q    It says "proceeds."  Do you see that?

6    A    "Proceeds."

7    Q    Okay, and it says, "Application of proceeds."

8    A    Yes.

9    Q    And it says, "The proceeds of the collateral shall

10   be applied by the creditor in the following order

11   unless a court of competent jurisdiction shall

12   otherwise direct."  Do you see that?

13   A    I see it, but I don't understand it.

14   Q    Okay.  All right.  No court of competent

15   jurisdiction gave you any instructions with respect to

16   this exhibit, did they?

17   A    I don't understand it.

18   Q    Okay.  Let's go -- I'm going to tell you A, B, and

19   C don't apply for purposes of this discussion.

20   A    Okay.  Where are we going now?

21   Q    We're going to go to the next page, page nine,

22   paragraph D.  And I'm going to read this.

23   A    Page?

24   Q    Fourth.  Do you see that?

25   A    Paragraph four?

Mr. Hipple - Direct                              48

1   Q    It's at the top of the page.

2   A    Okay.  All right, right.

3   Q    Fourth, "The balance, if any, after all of the

4   obligations," which I'm going to tell you is the note

5   that we've looked at, the $210,000 note, "had been paid

6   and satisfied in full shall be remitted to the account

7   of the debtor," and I'm going to represent to you on

8   this agreement the debtor is SCIX, "as the debtor shall

9   direct."  Do you understand what that means?

10  A    No particularly.

11  Q    What that means is that if the collateral that you

12  foreclose on has a value in excess of the promissory

13  note --

14  A    Right.

15  Q    -- the $210,000 note --

16  A    Right.

17  Q    -- that money is supposed to be paid back to SCIX.

18  A    Okay.

19  Q    And you're supposed to return all the collateral

20  because you've been paid in full.

21  A    Right, okay.

22           THE COURT:  Not all the collateral.  You mean

23  the remaining --

24           MR. BERKOWITZ:  The remaining collateral --

25           THE COURT:  Right.

Mr. Hipple - Direct                    49

1        MR. BERKOWITZ:  -- that has not been sold.

2        THE COURT:  Right.

3        THE WITNESS:  The money or the collateral?

4   BY MR. BERKOWITZ:

5   Q    Collateral.

6   A    So once I reach the limit of the 210, the

7   remaining --

8   Q    It all goes back to SCIX.

9   A    Okay.

10  Q    And you did not return anything to SCIX, did you?

11  A    Well, I never got above 210.

12  Q    Okay.  I hear your testimony.

13  A    But --

14  Q    We can disagree on that.

15  A    -- I didn't write down, in reference to paragraph

16  eight --

17  Q    We're talking about paragraph seven.

18  A    No, I missed one thing.  Hold on for one moment,

19  okay?  I wrote down 13.  Under P-10, 13 you talked

20  about, page 13.  What did we talk about on page eight?

21  Oh, 7.1?

22  Q    We talked about --

23  A    7.1?

24  Q    -- paragraph seven.

25  A    7.1?  Okay.  And on page 13 it was the signature,

Mr. Hipple - Direct                    50

1   right?   Okay.   And then the other one was 90 -- okay,

2   I'm up to date.

3              (Pause in proceedings.)

4   Q   Mr. Hipple, I'm going to ask you to look at volume

5   two, plaintiff's volume two.

6   A   Go ahead.

7   Q   Exhibit 39.

8              (Pause in proceedings.)

9   Q   Have you found that, Mr. Hipple?

10  A   Plaintiff's 39, yes.

11  Q   Okay.   It's volume two, Exhibit 39.   Now, do you

12  recall we talked about the license agreement between

13  Complete Group and Steel Seal Pro?   Do you recall

14  discussions about that?

15  A   Yes, correct.

16  Q   And we talked about the fact that Brian Hipple was

17  supposed to be paid $10,000, correct?

18  A   Correct.

19  Q   Okay.   Now, let's look at Exhibit 39.   And I'd like

20  you to -- do you see the first page, the -- it's --

21  A   Yeah.

22  Q   Do you see Steel Seal Pro, LLC?

23  A   Yes.

24  Q   And do you see at the top of the page, "The First

25  National Bank?"

Mr. Hipple - Direct                    51

1    A    Yes.

2    Q    Okay.  And that's where Steel Seal Pro had its

3    account, correct?

4    A    Yes.

5    Q    Okay.  Now, let's look down at this exhibit.

6              (Pause in proceedings.)

7    Q    I want you to go first to page 21, and we're going

8    to start there.

9    A    Okay, 39, page 21.  Okay.  000021, go ahead.

10   Q    And if you look at check number 123 --

11   A    Right.

12   Q    -- it has a payment to the U.S. Treasury.

13   A    Right.

14   Q    Now, it doesn't say that that's Brian's tax

15   payment, but do you know he paid his taxes out of the

16   Steel Seal Pro account?

17   A    I can't determine --

18   Q    Okay.

19   A    -- what that payment is for.

20   Q    Okay.  Let's look across the page to check number

21   137.  Do you see that?

22   A    Yes.

23   Q    And it's made payable to Brian Hipple?

24   A    Yes.

25   Q    And the date of the check is February 1, 2011.  Do

1   you see that?

2   A    Yes.

3   Q    And the amount is $3,500?

4   A    Yes.

5   Q    Okay.  And let's look at the next check, check 138.

6   Does that look like Brian's signature on that check?

7   A    I'm assuming it is.

8   Q    Okay.  And you see that's payable to Melissa

9   Moreno?

10  A    Uh-huh.

11  Q    And you know who Melissa is?

12  A    Of course.

13  Q    Okay.  And that's for $2,500?

14  A    Yes.

15  Q    And do you see the next payment?  Brian drove a

16  Volvo, right?

17  A    No.

18  Q    He didn't?  Okay

19  A    He --

20  Q    I'll tell you that Melissa said that he drove a

21  Volvo, but that's okay.

22  A    Or wait a minute.

23  Q    When I get to her --

24  A    I guess --

25  Q    -- I'll do that.

Mr. Hipple - Direct                        53

1   A    I guess maybe I'm not sure what he drove because he

2   had an Infiniti.   That was always in my mind, Infiniti.

3   Q    Okay.  Let's look at the next check, 141.

4   A    Right.

5   Q    And that's for $9,000 to Melissa?

6   A    Yes.

7   Q    Do you see that?

8   A    Uh-huh.

9   Q    And do you see the next check is to Keystone Volvo

10  for 2,498?  But you're not sure that Brian had a Volvo.

11  A    Well, I think maybe he did, yes.

12  Q    Okay.  Okay.  Okay.  Let's turn to the next page,

13  00022.  Do you see there's a payment for Brian, $5,000?

14  A    Can I object to this line of questioning because I

15  don't -- I don't know what -- you know, these

16  documents, I've never seen these documents.

17          THE COURT:  Yes, Mr. Berkowitz, you have to

18  lay a foundation that he has some familiarity with

19  these documents, he prepared them, he reviewed them.

20          MR. BERKOWITZ:  I've asked him to identify

21  the signature of Brian on the check.  I will use these

22  with Melissa Moreno.

23          THE COURT:  All right.

24          MR. BERKOWITZ:  She will be able to --

25          THE COURT:  So I'll sustain the objection.

Mr. Hipple - Direct                           54

1          MR. BERKOWITZ:  Okay.

2    BY MR. BERKOWITZ:

3    Q   Mr. Hipple --

4          THE COURT:  By the way, Mr. Hipple, you can

5    -- again, you can object, okay?  I mean, you know,

6    you're acting your client of the attorney here.  You

7    can object.  When you just said to me can I object, you

8    can object to all, you know --

9          THE WITNESS:  Okay.

10         THE COURT:  -- reasonable --

11         THE WITNESS:  I would --

12         THE COURT:  -- based on the law and the

13   evidence objections.  But, I want to make it clear, you

14   can object when you think you have to object.

15         THE WITNESS:  Right, I'm going to object

16   because, again --

17         THE COURT:  You did and I --

18         THE WITNESS:  -- I'm not familiar --

19         THE COURT:  -- sustained your objection,

20   which means that you --

21         THE WITNESS:  Okay.

22         THE COURT:  -- I agree with you.

23         MR. BERKOWITZ:  Okay.

24   BY MR. BERKOWITZ:

25   Q   Mr. Hipple, let's turn to page 00028.

Mr. Hipple - Direct                           55

1          (Pause in proceedings.)

2   Q    And then -- have you gotten to that?

3   A    Yes.

4   Q    Okay.  Now let's look in the bottom left column.

5   Do you see it dated -- a check from Steel Seal Pro?  Do

6   you see that?

7   A    What location?

8   Q    It's the bottom column -- the bottom of the page on

9   the left column.

10          THE COURT:  And what is your question?

11  BY MR. BERKOWITZ:

12  Q    Check number 158, do you see that?  And that's a

13  check made to A&C Building and Industrial Maintenance,

14  correct?

15  A    Yes.

16  Q    Okay.  And those are payments that were made to

17  Complete Group through your company, A&C Building?

18  A    Yes.

19  Q    And you got these checks?

20  A    Yeah.  I'm sure I got the check because it's in the

21  -- well, I don't know the verification of this

22  document, but, again, I know I got money from them.

23  Q    Okay.  And you see that signature looks like

24  Brian's?

25          THE WITNESS:  I'm going to have to object

Mr. Hipple - Direct                    56

1   again because, again, these are -- these are not my

2   documents, okay?

3          THE COURT:  No, they're not, but you did

4   testify your company is AC Building and Industrial

5   Maintenance, right?

6          THE WITNESS:  Yes, all right.  Well, then --

7          THE COURT:  So I think that's a legitimate --

8          THE WITNESS:  -- that one I can --

9          THE COURT:  -- question to ask you whether

10  you received that.

11         THE WITNESS:  All right, yes.

12         MR. BERKOWITZ:  Okay.

13         THE WITNESS:  I don't remember receiving it,

14  but yes, it's got my company name on it.

15         MR. BERKOWITZ:  Okay.

16  BY MR. BERKOWITZ:

17  Q   Mr. Hipple, I'm going to represent to you that in

18  February of 2011, Brian Hipple and Melissa Moreno took

19  $24,788 out of Steel Seal Pro.  Were you aware of that

20  fact?

21  A   No, I was not.

22  Q   Okay.  And under the agreement with you, they were

23  only supposed to take $10,000, correct?

24  A   That is correct.

25  Q   Okay.  And in March of the same year I'm going to

Mr. Hipple - Direct                    57

1   represent to you that they took out a total of $28,870.

2   And, again, they were only allowed to take 10,000,

3   correct, under the licensing agreement?

4   A    Under the license agreement was 10,000.

5   Q    And, as a matter of fact, I see that there were

6   some additional payments.  They actually took $39,140

7   out of Steel Seal Pro in the month of March 2011?  And,

8   again, that's above what the agreement provides for?

9   A    Yes.

10  Q    Okay.  And you are also aware, aren't you, that

11  there were American Express bills paid out of Steel

12  Seal Pro?

13  A    Yes.

14  Q    Okay.  And I'm going to ask you --

15  A    When you say "aware"--

16  Q    I'm going to ask you --

17  A    -- what do you mean "aware"?

18  Q    -- to look at Exhibit 61.

19          THE COURT:  Well, wait a minute.  He's asking

20  for a clarification, Mr. Berkowitz.

21          MR. BERKOWITZ:  I'm sorry.

22          THE COURT:  He wants to know when you say the

23  word "aware," what do you mean?

24  BY MR. BERKOWITZ:

25  Q    I'm asking did you know it before I told you today?

Mr. Hipple - Direct                           58

1    A    That what?

2    Q    That Brian and Melissa had taken out almost $50,000

3    in two months from Steel Seal Pro?

4    A    No, I did not know.

5    Q    Okay.  Now, I'm going to ask you to look at Exhibit

6    61 through 110.

7    A    61?

8              THE COURT:  That's a new volume.

9              MR. BERKOWITZ:  Yes.

10             THE WITNESS:  Where are we at?

11             THE COURT:  That's volume three.  Does he

12   have that, Mr. Berkowitz?  Does Mr. Hipple have that

13   volume?  Okay.

14   BY MR. BERKOWITZ:

15   Q    Have you got volume three yet, Mr. Hipple?

16   A    What page?

17   Q    Let's start with Exhibit 61.  Here we go.  I'm

18   going to put those aside because we're going to be

19   using this one for awhile.  Do you want to pick those

20   up so you have some room to work?

21             (Pause in proceedings.)

22   Q    Mr. Hipple, I would like you to look -- turn to

23   Exhibit 61.

24   A    Right.

25   Q    And do you see that -- do you know what this

1    document is?

2    A    No.

3    Q    Well, if you look at the top -- and let me make

4    sure we're looking at the same page.

5              (Pause in proceedings.)

6              MR. BERKOWITZ:  There are copies of this in

7    here, Your Honor.

8              THE COURT:  Okay.

9    BY MR. BERKOWITZ:

10   Q    Now, look -- I'm showing you the first page of

11   Exhibit 61, do you see that, of an American Express

12   account?

13   A    Yes, I see it.

14   Q    And would you read the name at the top of the

15   account?

16   A    Clement R. Hipple.

17   Q    Okay.  And under that?

18   A    Scientific Chemicals.

19   Q    Okay.  And do you recall --

20             THE COURT:  You said chemicals.  You meant

21   chemical, right?

22             THE WITNESS:  Chemical, yeah.  Take off the

23   "s."

24             THE COURT:  Right.

25             THE WITNESS:  Scientific Chemical.

Mr. Hipple - Direct                          60

1   BY MR. BERKOWITZ:

2   Q    And let's look at the address on this document.

3   A    Right.

4   Q    Do you see that?

5   A    Uh-huh.

6   Q    And 73 Old Dublin Pike, was that the SCIX address

7   at the time?

8   A    Yes.

9   Q    Okay.  So this bill is dated 1-20-09.  That's when

10  SCIX was in business?

11  A    1-20-09?  1-20-09?

12  Q    That's what the date of this bill is if you look at

13  the top.

14  A    I can't comment on anything about SCIX.

15  Q    Okay.  Because you don't know anything about it?

16  A    Right.

17  Q    Okay.  But let's look at this document, all right?

18          THE WITNESS:  I object.

19  BY MR. BERKOWITZ:

20  Q    Let's look at this document.

21          THE WITNESS:  I object.

22          THE COURT:  All right.

23          MR. BERKOWITZ:  Okay.

24          THE COURT:  What do you object?

25          THE WITNESS:  I object that I have no

Mr. Hipple - Direct                61

1   knowledge and this has nothing to do with me.  I never

2   seen this document.

3           THE COURT:  You mean the American Express

4   bill?

5           THE WITNESS:  Right.

6           THE COURT:  It is --

7           MR. BERKOWITZ:  Your --

8           THE COURT:  It is addressed to you thought.

9           THE WITNESS:  It's not addressed to me, Your

10  Honor.

11          THE COURT:  You're not Clement R. Hipple?

12          THE WITNESS:  Well, that's been since 1999,

13  Your Honor.  This American Express card has been

14  ongoing since the business opened up in 1999.

15          MR. BERKOWITZ:  Okay.

16  BY MR. BERKOWITZ:

17  Q   And let's look there.  It says, "Activity for

18  Clement Hipple."  Do you see that?

19  A   Well --

20  Q   Do you see that?

21          THE COURT:  Where are you -- where are you

22  pointing?

23          MR. BERKOWITZ:  I'm on the first page --

24          THE COURT:  Okay.

25          MR. BERKOWITZ:  -- Your Honor.

Mr. Hipple - Direct                    62

1    THE COURT:  You have to show me what --

2    BY MR. BERKOWITZ:

3    Q   Do you have the first page of the American Express

4    bill that says --

5    THE COURT:  It says, "Business card, Gold

6    card" --

7    MR. BERKOWITZ:  Correct.

8    THE COURT:  -- "open" --

9    MR. BERKOWITZ:  And then it's got -- yes.

10   THE COURT:  -- "card member snapshot of

11   Clement," is that where you are?

12   MR. BERKOWITZ:  Yes.

13   THE COURT:  Okay, I'm there.

14   BY MR. BERKOWITZ:

15   Q   And you see there there's activity for Clement

16   Hipple?

17   A   Hold on a minute.

18        (Pause in proceedings.)

19   A   That is not my card.

20   Q   I'm just asking you to look at the document first,

21   Mr. Hipple.

22   A   I can't comment on it.

23   Q   Well, it has your name on it.  It's --

24   A   Well, it has --

25   Q   -- addressed to your --

Mr. Hipple - Direct                    63

1   A    -- my name on it --

2   Q    -- company, Scientific Chemical.

3   A    -- but I cannot comment on the use of this

4   document.

5   Q    But you'll agree with me that your name is there?

6   A    Yes, of course I agree to that.  It says it.

7   Q    Okay.  And it shows charges under your name?

8             THE COURT:  I'm going to overrule the

9   objection.  There was an objection.  I think the fact

10  that it's addressed to you, I'll allow the question --

11            THE WITNESS:  Okay.

12            THE COURT:  -- just so the record is clear.

13  Go ahead.

14  BY MR. BERKOWITZ:

15  Q    Okay.  And you see that there's charges under your

16  name, right?

17            THE COURT:  What page are you going to?

18            THE WITNESS:  Where's my name?

19            MR. BERKOWITZ:  I'm -- first --

20            THE COURT:  Why don't you show him, Mr.

21  Berk --

22            MR. BERKOWITZ:  I'm on page one.

23            THE COURT:  All right, Mr. Berkowitz, why

24  don't you just show him?

25            MR. BERKOWITZ:  Yeah.

Mr. Hipple - Direct                              64

1     THE COURT:  Because I'm not sure what --

2 BY MR. BERKOWITZ:

3 Q    If you look --

4 A    No, it shows that there's charges here.

5 Q    Due in full for activity.  This is for Clement

6 Hipple.

7 A    Yeah, but --

8          MR. BERKOWITZ:  Do you see that, Your Honor.

9          THE COURT:  Right.  So he got --

10          MR. BERKOWITZ:  And then --

11          THE WITNESS:  Let's look --

12          THE COURT:  So he got --

13          MR. BERKOWITZ:  -- he's got a charge there.

14          THE WITNESS:  Let's look above that.

15 BY MR. BERKOWITZ:

16 Q    No, no, we're going to -- we're going to -- you can

17 look at whatever you want to --

18 A    I'll --

19 Q    -- when you get your chance.

20 A    Afterwards.  Okay.

21 Q    Okay?

22 A    All right.

23 Q    Do you see that?  It's got some activity.

24 A    61, right?

25 Q    Yep.

Mr. Hipple - Direct                    65

1   A    60, 61.  Hold on, slow it down.

2   Q    Yep.

3   A    All right, first page.  Go ahead.

4   Q    And if you go two pages further, it's got -- again,

5   it starts "Clement Hipple," okay?

6   A    That's Clement Hipple as the cardholder.

7   Q    No, this is activity for Clement Hipple.  We'll go

8   further in this.

9   A    Well --

10  Q    Okay?

11  A    -- that's because the card was in my name.

12  Q    Okay.  So you're saying you didn't use this card?

13  Is that your testimony?

14  A    Of course not.

15  Q    Okay.  So you didn't use the card?

16  A    No.

17  Q    Okay.  Let's go down -- if you're looking, it says,

18  "Due in full activity for Brian Hipple."  Do you see

19  that?

20  A    Where is that?

21  Q    It's on the second -- there's a big page of small

22  print, and it says at the top, "2 of 7."  If you go to

23  page 3 of 7, in small print on the top at the right it

24  says, "3 of 7."

25  A    Okay.

Mr. Hipple - Direct                    66

1    Q    Do you see that?

2    A    No, I have 2 of 7, 4 of 7.

3              THE COURT:  The next page.  It's out of

4    order.

5              THE WITNESS:  Oh, okay, 3 of 7.  Okay.

6    BY MR. BERKOWITZ:

7    Q    Do you see that?  There's a charge for you at

8    Sunoco in Hamilton Township, New Jersey.  Do you see

9    that?

10   A    Okay.  I guess I have to wait until my turn.  All

11   right.

12   Q    But you see that?

13   A    I see what's going on here now.

14             THE COURT:  Well, he's just asking a

15   question.

16             THE WITNESS:  Yeah, I -- yes, I see that.

17   BY MR. BERKOWITZ:

18   Q    Okay.  And now you see Brian Hipple is using the

19   card?

20   A    Hold on a minute.  Page three?  Now, where's it say

21   Brian Hipple?

22   Q    Do you see, "Due in full activity for Brian

23   Hipple"?

24   A    It says, "Due in full activity for Clement Hipple,

25   $108.47."

Mr. Hipple - Direct                    67

1   Q   Correct.  And let's go down the next line.

2   A   Okay.

3   Q   Okay?  "Due in full activity for Brian Hipple."

4   A   Okay.  All right.

5   Q   Now, I haven't heard that Brian Hipple was involved

6   with Scientific Chemical, was he?

7   A   No, he wasn't involved with Scientific Chemical.

8   Q   So he had no involvement with Scientific Chemical?

9   A   That is correct.

10  Q   None?

11  A   So you're talking page 3 of 7.

12  Q   Okay.  I just want to make sure I understand this.

13  Brian -- Brian had no involvement with Scientific

14  Chemical?

15  A   Uh-huh.

16  Q   But his -- there's charge activity under his name?

17  A   That's what it say.

18  Q   Okay.

19          MR. BERKOWITZ:  Your Honor, if I could have a

20  minute?

21          THE COURT:  Sure.

22          MR. BERKOWITZ:  I'd like to --

23          THE COURT:  Yes.

24          (Pause in proceedings.)

25          MR. BERKOWITZ:  Your Honor, if I just could

Mr. Hipple - Direct                          68

1    have a second?  I have a lot of pieces of paper and I

2    think it's important to get to this one.

3              THE COURT:  Let's take a ten-minute break.

4              MR. BERKOWITZ:  All right.

5              THE COURT:  Okay?  I'll see you in ten

6    minutes.

7              THE WITNESS:  Okay, thank you, Your Honor.

8              (Recess, 10:42 a.m. to 10:53 a.m.)

9              THE COURT:  Mr. Hipple?

10             MR. BERKOWITZ:  I broke down and took off my

11   jacket.

12             THE COURT:  I don't blame you.

13   BY MR. BERKOWITZ:

14   Q    Mr. Hipple --

15             MR. BERKOWITZ:  Oh, I'm sorry.  Are we ready?

16             THE COURT:  Go ahead.  Yes.

17   BY MR. BERKOWITZ:

18   Q    Mr. Hipple, before the break I asked you if Brian

19   Hipple had anything to do with Scientific Chemical,

20   Inc., and I think you told me no, he didn't?

21   A    That is correct.

22   Q    Okay.  He had nothing to do with it?

23   A    Right.

24   Q    Now --

25   A    Scientific Chemical, Inc., didn't --

Mr. Hipple - Direct                                    69

1   Q    Sci --

2   A    -- do anything.

3   Q    He had nothing to do with it?

4   A    Right, because the corporation didn't do anything.

5   Q    Okay.  Now, I would like you to turn in volume one

6   to Plaintiff's Exhibit Number 22.

7   A    22?  Okay.

8   Q    And I would like you to turn to page -- on the

9   bottom it's marked 33.  And let me see --

10  A    33.

11  Q    -- if these are in order.  I hope they are.  No,

12  they're not.

13  A    There's 20.

14  Q    No, they're not.

15  A    Start at 58.

16  Q    Now, let me help you find that.

17  A    No, I can find 33.  I got it.  Okay.

18  Q    Black letters on the bottom.  And I would like you

19  to look at that.

20  A    Yes.

21  Q    Now, do you see it says "Steel Seal"?

22  A    Yes.

23  Q    Okay.  And I want you to look down at -- it says

24  "Important."  Do you see that?

25  A    "Important?"  No.

1    Q    Do you see where it says -- under the label it says

2    "Important."  Do you see those words?

3    A    Oh, down the bottom the page --

4    Q    In block print --

5    A    At the bottom --

6    Q    -- at the bottom?

7    A    -- of the page.

8    Q    And it says "Customer," do you see that on the

9    left?

10   A    Wait, no.  It says, "Important.  Please check."

11   Q    Let's go down a few lines.  You'll see "Ticket

12   number."

13   A    "Ticket number."  Go ahead.

14   Q    And then it says "Customer"?

15   A    "Customer."

16   Q    And then you see it says "Scientific Chemicals,

17   Inc."?

18   A    Yes.

19   Q    And if you look to the right, "Authorized

20   signature."  Do you recognize that signature as Brian

21   Hipple?

22   A    That one's a little funny, but go ahead.

23   Q    Does that look --

24   A    I don't recognize it.

25   Q    -- like Brian's --

1    A    I'm sorry, that one don't --

2    Q    Okay.  You --

3    A    -- doesn't quite look like his.

4    Q    Okay.  Let's look at page 34, the next page.  It

5    should be the next page.  And, again, under the

6    "Important" banner, "Scientific Chemicals, Inc.," do

7    you see that?

8    A    I'm sorry?  Go again.

9    Q    Do you see it says "Scientific Chemicals, Inc.?"

10   A    Under?

11   Q    Under the "Important" banner --

12   A    Right, Scientific --

13   Q    -- on the left side?

14   A    Yeah, "Customer," right.

15   Q    And there's a signature?

16   A    Right.

17   Q    It's not your signature?

18   A    Right.

19   Q    Okay.  And I think you just told us you're the only

20   one that had anything to do with Scientific Chemicals,

21   Inc.?

22   A    That is correct.

23   Q    Okay.  But that's not your signature?

24   A    No, and I can't

25   Q    Okay.

Mr. Hipple - Direct                    72

1    A    -- verify this document because it's not my --

2    Q    Okay.

3    A    -- signature.

4    Q    Thank you.  Mr. Hipple --

5    A    Hold on for a minute, please.

6    Q    Yep.

7    A    22, page 33 and 20.  22, page 33.

8              (Pause in proceedings.)

9    A    Okay.

10   Q    Mr. Hipple, we looked at Exhibit 61 and you said

11   you had nothing to do with that, those charges?

12   A    I had the -- was that the American Express charges?

13   Q    The American Express charges.

14   A    What was my statement in reference to that?

15   Q    I think you said you didn't recognize the account

16   and you don't recognize making --

17   A    No, I --

18   Q    -- any charges?

19   A    I didn't say that.  I said it's the American

20   Express bill.  I said I didn't recognize the charges.

21   Q    Okay.  You don't recognize the charges under your

22   name?

23   A    Right.

24   Q    Okay.  Would it be fair to say that you didn't pay

25   the bill then?

Mr. Hipple - Direct                    73

1   A    I got to watch how I answer certain questions.

2   Yes, it would be fair to say I did not pay the bill.

3   Q    Okay.  Now, this entire binder --

4   A    Right.

5   Q    -- is filled with American Express bills.

6   A    Yeah, a lot of work.

7   Q    And if you would like to look through them and

8   satisfy yourself that they're the same, American

9   Express bills, just like the first one, has Clement

10  Hipple and Brian Hipple charges, please do that, and I

11  would like you to tell me whether you made any of these

12  charges or not.

13  A    I'm sorry?  What was the last -- just the last part

14  of your question.

15  Q    You just -- you said you didn't make any of the

16  charges on the first bill?

17  A    Well, wait a minute.  Let me -- let me just take a

18  look at that because I don't want to have a problem

19  later on when I question myself.  Let me see something

20  here for one minute.  Give me one minute, please.

21        (Pause in proceedings.)

22  A    I don't know what happened to it.

23        (Pause in proceedings.)

24  A    Are these out of order?  Oh, yeah, you're out of

25  order again.  Okay.  Hold on for one minute.  Let me

Mr. Hipple - Direct                    74

1   put the pages in order.

2   Q    Sure, put them in order.

3   A    Okay.  That's why I was getting confused, 3 of 7, 4

4   of 7, 5 of 7, okay.  Okay.

5           (Pause in proceedings.)

6   A    2 of 7 and 1 of 7.  Okay.  Yes, if you go to page

7   -- the beginning page --

8   Q    Exhibit 61?

9   A    Yeah, of the American Express bill, if you go to

10  the beginning page of the American Express bill, okay,

11  and if you read down under "Card member snapshot" --

12  Q    I'm sorry, where is that?

13  A    It's about quarter the way of the page, "Card

14  member" -- "Card member snapshot."

15  Q    Yep.

16  A    Okay?  And then you'll see "Clement R. Hipple" and

17  then you'll see "Brian Hipple."

18  Q    Right.

19  A    And then if you go across, you'll see card number

20  51009 ending --

21  Q    Okay.

22  A    -- which is my card, okay?  Then you'll see 56016

23  is the card Brian used.

24  Q    Okay.

25  A    And if you follow it over a little further, you'll

Mr. Hipple - Direct                    75

1  see -- yes.  I have to answer yes to your question.  I

2  charged $145.18.

3  Q    Okay.

4  A    Yes.

5  Q    And do you recall paying this bill or would this

6  come as a bill to Brian and his business?

7  A    I could have -- I could have paid it with Brian.

8  Brian was -- I did pay a lot of my own American Express

9  bills.

10 Q    Okay.

11 A    Yes.

12 Q    Okay.

13 A    No, I didn't pay a lot.  I paid them all.

14 Q    Oh, okay.

15 A    All my charges that were on American Express I

16 paid.

17 Q    Okay.  So when we go through the bank records we

18 won't see any records of these charges being paid from

19 you?

20 A    No, I paid them back to Brian or something.  I

21 don't remember how.

22 Q    Oh, so you paid them back to Brian?

23 A    Right.

24 Q    So we won't see your checks?  We'll see you paid it

25 to Brian separately?

Mr. Hipple - Direct                          76

1    A    I think so, yes.

2    Q    Okay.  And how did you pay him?

3    A    I don't -- I -- I'm not sure.

4    Q    Did you write a check?

5    A    You're going back to what, 2009?

6    Q    Yeah, I'm asking did you -- did you write a check

7    to him?

8    A    I don't know.  I'm not certain.

9    Q    Well, you told us --

10   A    I may have let them gang up and then write him a

11   check for them --

12   Q    Okay, well --

13   A    -- because they were minimal charges.

14   Q    Okay.  And you told us you didn't have a personal

15   checking account, so who would you write the check

16   from?

17   A    Probably A&C.

18   Q    A&C, okay.  Mr. Hipple, let's -- so there are

19   charges for you?

20        MR. BERKOWITZ:  And we can go through them

21   all, Your Honor?

22        THE WITNESS:  That's not necessary.

23   BY MR. BERKOWITZ:

24   Q    I'm going to represent to you then, Mr. Hipple,

25   that there are charges for you, and I'm going to

Mr. Hipple - Direct                    77

1    represent to you paid by SCIX, for $25,733.52 for the

2    period of January 20th, 2009, through 9-21-2010.

3    A    For one-year?

4    Q    Yes, 25,000.

5    A    Okay.  Then maybe we need to go through it.

6    Q    Okay, sure.  Let's go to 62.

7    A    Okay.  Okay, 62, 877.

8    Q    Okay.  Let's go to 63.

9    A    1,178.44.

10   Q    And 64.

11   A    2,125.

12   Q    Okay.

13   A    859.

14   Q    Yep.

15   A    Right.  510.30.  1,639.

16   Q    Exhibit 68?

17   A    77.27.

18   Q    Exhibit 69?

19   A    1,339.

20   Q    Exhibit 70?

21   A    Okay, that's far enough.  Are we good here yet?

22   Q    I'm going to -- I'm going to go through them all if

23   you want.

24   A    No, that's far enough.

25   Q    Okay.

1    A    I'm -- and I'm telling you I paid them.

2    Q    Okay.

3    A    I always paid my American Express charges.

4    Q    You didn't pay it to American Express though, you

5    paid it to Brian?

6    A    No, because Brian paid the whole bill.

7    Q    Okay.  So, Brian paid the whole bill out of the

8    business?

9    A    Out of SCIX?

10   Q    Yeah.

11   A    Yes.

12   Q    Okay.  Then it's your testimony that you paid Brian

13   back?

14   A    Yes.

15   Q    Okay.  I'm going to represent to you, Mr. Hipple,

16   that between -- from January 1 -- January 20th, 2009,

17   to November 21st, 2012 --

18   A    What was the second date?

19   Q    November 21, 2012.

20   A    All right.

21   Q    SCIX paid a total of 32 -- of $96,137.05 of

22   American Express bills for you?

23   A    Okay.

24   Q    Okay?  And you're telling us you repaid those to

25   Brian?

Mr. Hipple - Direct                          79

1    A    I always paid my American Express bills.

2    Q    Okay.  So -- but you repaid it to Brian, not back

3    to the company?

4    A    Right.

5    Q    Okay.  And so that's a period of about three years?

6    A    Three years.

7    Q    2009.  So about $32,000 a year of American Express

8    payments?

9    A    Yeah.  During that time period, yeah, about.

10   Q    Okay.

11   A    Probably Teresa and I expenses.

12   Q    Okay.  Thank you, Mr. Hipple.  That made it much

13   faster.  Now, we can put this exhibit away --

14   A    Okay.

15   Q    -- Mr. Hipple because this is all the American

16   Express bills.  Do you need some room there?

17   A    No, I'm good.

18   Q    Do you want me to move some of those for you?

19   A    I'm good.

20              (Pause in proceedings.)

21   Q    I'm going to ask you to look at Exhibit 39 now, and

22   that is in volume number two.

23   A    P-39?

24              (Pause in proceedings.)

25   Q    Mr. Hipple, I just want to clarify something.  We

1  talked about the American Express bills, 2009, 2010,

2  2011?

3  A    Correct.

4  Q    You signed your --

5  A    2012.

6  Q    2009, '10, and '11.

7  A    Oh, '11, okay.

8  Q    Yeah.  So that couldn't be Teresa Hipple, all of

9  those, because you were separated by then, weren't you?

10 A    No, no, no, I didn't say -- I said some of them

11 could have been.

12 Q    Okay.  Some of them.

13 A    Me and Teresa, not just Teresa.

14 Q    Okay.  Now, Mr. Hipple, I would like you to look --

15 let's look at Exhibit 39 and page 28, and I hope these

16 are in order.

17 A    All right, I'm there.

18 Q    You see page 28?

19 A    Uh-huh.

20 Q    And we see the 3-2-11, payment to A&C Building

21 Industrial Maintenance?

22 A    I thought we just went over that.

23 Q    Yeah.  And, again, I'm going to represent to you

24 that there are a lot of these checks.  And you'll agree

25 there are a lot of payments made to A&C?

Mr. Hipple - Direct                          81

1    A    Well, it depends on your interpretation of a lot.

2    Q    Okay.  We can go through them if you want.

3    A    No, I don't need to.

4    Q    Okay.  Well, let me tell you I can -- I'll read off

5    the page numbers for you and we can just skip through

6    the pages and show the A&C payments.  But I just want

7    to make sure I understand this.  Those were really

8    payments intended for Complete Group?

9    A    Paid to A&C.

10   Q    Correct.  So the Complete Group payments were made

11   to A&C?

12   A    Right.

13   Q    Okay.  And that came out of Steel Seal Pro?

14   A    At what date are you talking?

15   Q    Well, we are looking at --

16   A    Okay, yeah.

17   Q    -- on --

18   A    Yeah.

19   Q    -- 3-2-11.

20   A    Right.

21   Q    Okay?

22   A    That's correct.

23   Q    And we got a check on that page for $9,000 --

24   A    Uh-huh.

25   Q    -- correct?

Mr. Hipple - Direct                    82

1    A    Yes.

2    Q    Correct?  Okay.  Let's go to page 37.

3    A    All right.

4              (Pause in proceedings.)

5    Q    And you see the second check from the top on the

6    left?

7    A    Hold on.  Hold on.  What was the first page again?

8    Q    The first page was 28.  This is page 37.

9    A    And this is Exhibit 39.

10   Q    Exhibit 39.  These are all in Exhibit 39.

11   A    38?  37?  And now we're at what?

12   Q    Page 37.  Do you see the second check from the top

13   on the left?

14   A    Yes.

15   Q    To A&C?

16   A    Right.

17   Q    And do you recognize that signature?

18   A    Well, it's on his bank account, so I guess it's his

19   signature.

20   Q    Brian?

21   A    Yes.

22   Q    Okay.

23   A    But what was the first page?

24   Q    The first page was 28.

25   A    28.  Okay.

Mr. Hipple - Direct                    83

1    Q    And you can -- they're all in this exhibit.  Page

2    37, we just looked at that.  If you go to page 38 --

3    A    Right.

4    Q    -- you'll see there's a check above that to Brian.

5    There's three -- there's four checks listed on this

6    page, correct?

7    A    Okay, yeah.

8    Q    Okay.  And you see Brian's?

9    A    Uh-huh.

10   Q    And that signature, do you see that?  It looks like

11   Brian's signature on his check?

12   A    Yep.

13   Q    And the Steel Seal Pro bank account, do you see the

14   name there?

15   A    Yep.

16   Q    And at the top of the page, First National Bank?

17   A    Right.

18   Q    Okay.  And that's where they did their banking,

19   right?

20   A    Yes.

21   Q    Because that's where you garnished the money,

22   correct?

23   A    That's correct.

24   Q    Okay.  And then we see A&C, a check for $9,000?

25   A    Right.

Mr. Hipple - Direct                          84

1   Q   Do you see that?

2   A   Yes, correct.

3   Q   Now, Mr. Hipple, let me read off some page numbers,

4   if we could save some time.  Let me give you the page

5   numbers and write these down.

6   A   Go ahead.

7   Q   Okay.  Page 44.

8   A   In the same exhibit?

9   Q   All Exhibit 39.

10  A   Page 44.

11  Q   Check for 5,000.  Page 44, another check for --

12  A   Just give me the page numbers.

13  Q   -- 9,000.

14  A   Page what?

15  Q   These are still page 40 -- two checks on page 44.

16  A   Go ahead.

17  Q   5,000 and 9,000.

18  A   All right.

19  Q   Page 55, check for 9,000.

20  A   Uh-huh.

21  Q   Page 61, check for 7,000.

22  A   Uh-huh.

23  Q   Page 69, a check for 9,000.

24  A   Uh-huh.

25  Q   Page 71, a check for 5,000.

Mr. Hipple - Direct                          85

1   A   Uh-huh.

2   Q   Page 77, a check for 9,000.

3   A   Uh-huh.

4   Q   And let's go to page 77.

5           (Pause in proceedings.)

6   Q   Okay.  Do you see there are actually two checks on

7   that page?

8   A   What, paid to A&C?

9   Q   77, A&C, there's a check for 7,000 and actually a

10  check for 7,500.

11  A   Well, no, the top one is for 9,000.

12  Q   Correct, the top one is for 9,000 and the second

13  one is for 7,500.

14  A   Okay.

15  Q   Okay?

16  A   Yes.

17  Q   Sir, that's how you got paid by Complete Group --

18  for Complete Group?

19  A   That's how Complete Group got paid, not me, yes.

20  Q   Okay.  Now, Mr. Hipple, I would like you to go to

21  page 25.

22  A   You mean Exhibit 25 or page 25?

23  Q   No, page 25 in this exhibit.

24          (Pause in proceedings.)

25  A   Okay.

Mr. Hipple - Direct                    86

1    Q    And I would like you -- do you see -- do you

2    recognize what this paper is?

3    A    Well, I understand it's a bank statement.

4    Q    Okay.

5    A    I'm not --

6    Q    I would like you to look down to the bottom of the

7    second paragraph.

8    A    Okay.  To the bottom of the second paragraph.  Go

9    ahead.

10   Q    Do you see that?  It says a wire transfer from

11   Clement Hipple.

12   A    Okay.

13   Q    Do you see that?

14   A    Wait one minute.

15              (Pause in proceedings.)

16   A    Can you show me?

17   Q    I'm sorry.  Are you on page 26?

18   A    No, you said 25.

19   Q    Do you see that right there?

20   A    To Clement Hipple or from?

21   Q    Well, it says, "Wire transfer from Clement Hipple."

22   A    Okay.  And the amount -- the request was 7,945.  Is

23   that the amount on there?

24   Q    Yes, that's the amount there.

25   A    Okay, it's a credit.  So go ahead.

Mr. Hipple - Direct                           87

1   Q    Okay.

2   A    Yes.

3   Q    So you're familiar with the bank account?  It looks

4   like you wired money into it, correct?

5   A    Well, apparently there, I did.

6   Q    Yeah, okay.

7   A    Well, that's what it's saying, yes.

8   Q    Now --

9   A    I'm not familiar with this, but the paper says it,

10  but I don't recognize it.

11  Q    Now, let's --

12  A    Or I don't remember it.

13  Q    Okay.  Let's go -

14  A    Hold on.  Hold on.

15  Q    -- to page 19.

16  A    Hold on.

17  Q    Take your time.

18            (Pause in proceedings.)

19  Q    Page 19.

20            (Pause in proceedings.)

21  A    Go ahead.

22  Q    And I would like you to look at the bottom of the

23  first paragraph.

24  A    Wire transfers?

25  Q    Debit plus fee pay royalties.

Mr. Hipple - Direct                    88

1   A    Right.

2   Q    So that would have been paid to you, right?  You

3   got paid the royalties?  You told us that --

4   A    Yes.

5   Q    -- yesterday.

6   A    I guess that's what it is, yes.

7   Q    Okay.  So it looks like you got a debit card for

8   that?

9   A    Wire transfer -- I'm sorry, I don't understand

10  the -- and this is not my bank account, so I can't -- I

11  can't verify anything.

12  Q    Okay.

13  A    You're asking me to verify a bank account that is

14  not mine.

15  Q    I'm just asking you a question.

16  A    Therefore, I object.

17       THE COURT:  I'll overrule the objection.

18  He's just asking you if you --

19       THE WITNESS:  If I what?

20       THE COURT:  Well, he's asking you did you

21  receive this wire transfer --

22       THE WITNESS:  I don't remember.

23       THE COURT:  -- through a debit card?

24       THE WITNESS:  I don't know.

25       THE COURT:  And you answered you don't know,

                    Mr. Hipple - Direct                    89

1    right?

2              THE WITNESS:  I don't know.

3              THE COURT:  All right.

4    BY MR. BERKOWITZ:

5    Q    Now, you did tell us yesterday though that you got

6    the royalties?

7    A    Of course.

8    Q    Okay.  So if we turn to page --

9    A    This was page what, 19?

10   Q    -- 87.

11   A    Hold on.

12             (Pause in proceedings.)

13   A    87?

14   Q    Yep.

15             (Pause in proceedings.)

16   A    Go ahead.

17   Q    Okay.  And you see there's another -- it says "pay

18   royalties?"

19   A    Again, same thing, I don't understand, I don't know

20   it.

21   Q    Okay.  But I -- just -- I understand you're limited

22   with these accounts, but you did tell us you got the

23   royalties, you're the one who would receive the

24   royalties?

25   A    Yes, I told you that and that is true.

Mr. Hipple - Direct                    90

1    Q    Okay.

2    A    Page 87?

3              (Pause in proceedings.)

4    Q    And do you recall during your deposition I asked

5    you a question?  And I'm going to let you -- do you

6    have your deposition transcript up there, sir?

7    A    No, I don't think so.

8    Q    Let me get that for you.

9    A    Okay.

10             (Pause in proceedings.)

11   A    Oh, wait a minute.  There it is.

12   Q    Oh, there it is.  Okay, good.

13   A    Are we done with this big one, the other one, or

14   no?

15   Q    No, let's just hold on.

16   A    I thought maybe we were done with this one.

17             (Pause in proceedings.)

18   A    Okay.

19   Q    Now, I want you to turn to page 83 --

20   A    One moment.

21   Q    -- of your deposition.

22             (Pause in proceedings.)

23   A    Page what?

24   Q    83.

25   A    83.

1  Q   Okay, do you see that?

2  A   Nope, not yet.  Okay, I'm at 83.

3  Q   All right, I want you to go to line seven.  I'm

4  going to ask you a question.

5  A   Okay.

6  Q   And it says -- "Okay.  Now, I may have asked this.

7  Are there any employees of Complete Group?"  Answer,

8  "No."

9  A   No.

10 Q   Question, "Okay."  Answer, "A, me," and I think

11 you're referring to you?

12 A   Well, I wasn't an employee.  I was a member.

13 Q   Well, it says "me" when I asked if there --

14 A   Okay, well --

15 Q   -- were employees.

16 A   -- me, meaning me as a member --

17 Q   Okay.

18 A   -- of Complete Group.  I wasn't an employee.

19 Q   Okay.  Line 12, "Okay.  You're the sole employee of

20 Complete Group?"  Answer, "Yes."  Next question, line

21 15 --

22 A   No, hold on, that's not correct.  There was two

23 members of Complete Group, myself and Emily Domices.

24 Q   Okay.  Well, you answered -- when I asked you the

25 question you said --

Mr. Hipple - Direct                                    92

1    A    Well, I must have not --

2    Q    -- you were the only one.

3    A    -- understand the question.  I'm saying right now

4    that there were two members that you are aware of of

5    Complete Group, myself and Emily Domices.

6    Q    Okay.

7    A    So I made a mistake there.

8    Q    All right.  Now, line 15, "Okay.  How do you get

9    paid by Complete Group?"  Answer, "Debit card."

10   A    Correct.

11   Q    Correct?  Question, "So you buy things on a debit

12   card?"  Answer, "No, excuse me.  You asked how I got

13   paid."  Answer, "Yep."  Question, "Yes."  Answer, "No,

14   I buy -- I pay cash on the debit card."

15   A    What line are you again?

16   Q    I'm at line 20 now.

17   A    All right.  "No, I buy -- I take cash on the debit

18   card."

19   Q    So you --

20   A    Of Complete Group, right, we're talking about?

21   Q    Right.  Right.  So that's how you get your money

22   out of Complete Group?

23   A    Well, it wasn't really Complete Group because

24   Complete Group didn't have money.

25   Q    Well, I asked you these questions and --

Mr. Hipple - Direct                    93

1   A    Yeah, but, again --

2   Q    -- I'm just reading what we --

3   A    We -- I thought we had an understanding that the

4   money went to A&C.

5   Q    So you took the money out of A&C on a debit card?

6   A    Debit card, yeah, because Complete Group didn't

7   have a bank account.

8   Q    Okay.  Right, it didn't --

9   A    You knew that.

10  Q    -- have a bank account until October 2012?

11  A    Oh, I think 2000 -- early part of 2013.

12  Q    Well, it doesn't look like Complete Group really

13  needed a bank account, did it?

14  A    Well, it was unable to get it because it was not a

15  U.S. corporation and they have laws here in the U.S.

16  Q    You're familiar with the fact that Brian's company,

17  Steel Seal Pro, was a Nevis company?

18  A    I'm not certain about that.

19  Q    Okay.  All right.  Mr. Hipple, I hate to go here,

20  but I would like to deal with your son's death on

21  September 30th, 2012.

22  A    What -- where are you at?  What question?

23  Q    I'm not on an exhibit now.

24  A    You're what?

25  Q    I am not on an exhibit right now.

Mr. Hipple - Direct                    94

1    A    Okay, hold on.  Let me do this.  Let me -- give me

2    one --

3    Q    Sure.

4    A    Give me one minute.  In reference to the

5    deposition, you were talking about line -- can you give

6    them to me quick because I'm answering them and I keep

7    forgetting to write down the information?  What were we

8    talking about under my deposition, what lines?

9    Q    It was all from page 83 of your deposition.  You

10   can --

11   A    On about --

12   Q    -- cite the whole page.

13   A    -- 14 down or 15 down?

14   Q    I believe I started at line seven.

15   A    83.  Okay.  Line seven.

16   Q    And Brian died on September 30th, 2012?

17   A    I'm sorry?  Give me the -- I was doing something.

18   Q    I'm sorry, did you --

19   A    Go ahead.

20   Q    Okay.  Brian died on September 30, 2012?

21   A    That is correct.

22   Q    Okay.  Now, Mr. Hipple, do you have Exhibit book 2?

23   A    Yep, I got all four.

24   Q    Okay.  Let's -- let's see if we can find it.

25               (Pause in proceedings.)

Mr. Hipple - Direct                    95

1    Q    Okay.  And I would like you to turn to Exhibit 49.

2    A    49.  Okay.

3              (Pause in proceedings.)

4    Q    Do you see that?

5    A    Yes, I see it.

6    Q    And you're familiar with that check?  It's Steel

7    Seal Pro made payable to A&C Building and --

8    A    Yes, I'm --

9    Q    -- Industrial Maintenance?

10   A    -- very, very familiar with this check.

11   Q    Okay.  And you wrote the check out?

12   A    That is correct.

13   Q    That's your handwriting?

14   A    That is correct.

15   Q    Okay.  And you affixed Brian's signature stamp --

16   A    No, I did not.  I had an agreement with Brian

17   because Brian was a little problem child, that he would

18   leave a check signed for me in case something happened

19   to him, okay?

20             So after his death, I wrote this check.  And

21   if I was trying not to forge the check or whatever, I

22   would have typed it in and not put it in my

23   handwriting.  So there's no forgery here.  There's

24   no -- nothing illegal, okay?

25             And I know where you're going with this, but,

1  again, I had an agreement with Brian, okay?  I had

2  power of attorney with Brian, by the way, and we both

3  had power of attorney with each other, okay?  But I

4  didn't find out until Saturday that power of attorney

5  is no longer when somebody dies.  Power of attorney

6  stops.  I thought power of attorney continued on, okay?

7  Q   Okay.

8  A   So Brian was to leave me one -- well, actually, a

9  couple signed checks, okay?  If anything happened, if

10  he became incapacitated or whatever, I could go in and

11  write in the check.

12  Q   Okay.

13  A   So that's --

14  Q   You said Brian --

15  A   -- what I did.

16  Q   -- stamped --

17  A   Because if I was trying to hide something, I would

18  have typed this.

19  Q   Right, because that's your handwriting?

20  A   That's my handwriting, sure.

21  Q   Right.  And you said Brian stamped this, not you?

22  A   Brian stamped it, yeah.  It was in his house.

23  Q   Let's turn to page 143 in your deposition.

24  A   Okay.  What's the date of my deposition?

25  Q   Your deposition was on May 1st, 2013.

Mr. Hipple - Direct                    97

1   A   Okay, hold on.  Let me catch up, okay?  You got to

2   remember I'm playing two roles here, all right?  You're

3   flying along.  49.  P-49.

4           THE COURT:  Mr. Berkowitz, I don't need that,

5   but do I have a copy -- did you give me a copy of the

6   deposition?

7           MR. BERKOWITZ:  I don't know, but --

8           THE COURT:  No, it's okay.  I don't really

9   need it, but yes.

10          MR. BERKOWITZ:  It is in the defendant's

11  exhibit book.

12          THE COURT:  Oh, it is?

13          MR. BERKOWITZ:  It's listed as a defendant

14  exhibit.

15          THE COURT:  Okay.

16          MR. BERKOWITZ:  But we saw yesterday that

17  some of those exhibits might be missing.

18          THE COURT:  Okay.  It's in the def --

19          THE WITNESS:  Okay, what page are we having?

20  BY MR. BERKOWITZ:

21  Q   I want you to look starting with page 142.

22          (Pause in proceedings.)

23  A   All right.

24  Q   Okay?

25  A   No, no.  Hold on.  Page 142.  Okay, go ahead, I'm

Mr. Hipple - Direct                          98

1    there.

2    Q    Okay.  And I'm going to start on line 17.

3    A    17.

4    Q    And I'm going to read it to you, and just let me

5    know if I go too fast.

6    A    Okay.

7    Q    Question, "Did you have a signature stamp for

8    Brian's signature?"

9    A    I didn't have it.  There was a Brian -- yes, I did.

10   Okay, yeah.

11   Q    All right, did I read it correctly?

12   A    Yes, you read it correctly.

13   Q    Okay.

14   A    And I answered, "Yes, I did," but there was a

15   signature stamp that Brian had, yes.

16   Q    Okay.  I'm just reading your deposition testimony,

17   Mr. Hipple.

18   A    Okay.

19   Q    I just want to --

20   A    Go ahead.

21   Q    -- make sure I --

22   A    All right.

23   Q    -- read it into the record correctly.  Answer,

24   "Yes, I did."  Question, "Did you ever use it?"

25   A    What's the date of this deposition?

Mr. Hipple - Direct                    99

1    Q    Answer -- you asked that before.  It was May 1st,

2    2013.

3    A    Okay, go ahead.

4    Q    Answer, "Yes, I did."

5    A    Uh-huh.

6    Q    Line 22, "Okay.  And did you use it on this check?"

7    And I think we were referring there to check 0872.

8    Q    Right.  Okay.

9    A    Oh, maybe we're not.  Let me read on.

10   Q    Well, apparently, we are.

11   A    No, we're talking about this Lucy Cosgrove check,

12   but I'll get to your check.  "Did you use it on this

13   check?"  "I do not recall using it on this check," and

14   in this deposition we were referring to a check to Lucy

15   Cosgrove for 7,695, and that appears at line 23 --

16   Q    Okay.

17   A    -- on page 141.

18   Q    I said -- well, I don't know that that -- I don't

19   know if that's the check you showed me.

20   A    Okay.

21   Q    There's no identification.  I object to this.

22          THE COURT:  I'll overrule the objection.

23          THE WITNESS:  Okay.

24   BY MR. BERKOWITZ:

25   Q    Page 142, line 24, "Okay.  Is there any reason why

1    you would use it in particular?"  Answer, "Yes, I had

2    an authorization from Brian.  If I need to use this

3    stamp, I could use it."

4    A    That is correct.

5    Q    Question, "And how often did you use it?"  "I used

6    it once."

7    A    Okay.

8    Q    "Okay.  And is this it?"  And that refers to the

9    Lucy Cosgrove check.  "No," that's your answer.

10   A    Uh-huh.

11   Q    Do you see that?

12   A    Right.

13   Q    "Okay.  When did you use it?"  "After he passed

14   away."

15   A    Right.

16   Q    Question, "You -- okay.  What did you do?"  "I took

17   my -- some of my money and stamp -- used this stamp on

18   it."

19   A    Okay.

20   Q    Question, "Okay.  And that was after Brian's

21   death?"

22   A    Right.

23   Q    Okay?

24   A    Go ahead.

25   Q    Did I read that correctly?

Mr. Hipple - Direct                          101

1    A    Yes.

2    Q    And that's referring to this $40,000 check?

3    A    Yes.

4    Q    Okay, thank you.

5    A    But that check was stamped, but go ahead.

6              THE COURT:  But you backdated the check two

7    days before he died?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Okay.

10   BY MR. BERKOWITZ:

11   Q    Now, Mr. Hipple, after your son passed away,

12   Complete Group filed a lawsuit against Steel Seal Pro,

13   correct?

14   A    Yes.

15   Q    And, Mr. Hipple, I'm going to ask you to turn to

16   Exhibit 51.

17             (Pause in proceedings.)

18   A    Go ahead.

19             (Pause in proceedings.)

20   Q    Do you see Exhibit 51?

21   A    Yes, I'm right there.

22   Q    And that is a copy of the lawsuit that Complete

23   Group filed against Steel Seal Pro, your son's company?

24   A    Okay.

25   Q    Correct?

Mr. Hipple - Direct                    102

1   A    I don't know the document, but --

2   Q    Well, take your time and look at it.   It says --

3   A    Well, I've never seen the document, all right?

4   Q    Well, Mr. Hipple, let's go to the back of the

5   exhibit.

6   A    All right.

7   Q    And it should be the --

8   A    Yeah.

9   Q    -- the last page.

10  A    All right.

11  Q    Do you see that?

12  A    Yeah.

13  Q    Verification?

14  A    Yeah.

15  Q    Okay.   And you recall we looked at this yesterday.

16  It says you're the managing member of Complete Group?

17  A    Correct.

18  Q    And it says -- and you signed it?

19  A    Right.

20  Q    And you said everything in the lawsuit is true and

21  correct?

22  A    Right.

23  Q    Okay.

24  A    Because I was e-mailed this, okay, in Colombia,

25  okay, just the signature page.   I signed it and sent it

Mr. Hipple - Direct                      103

1    back to Ms. Hawthorne.

2    Q    Okay.

3    A    So I never saw the document, but go ahead.

4    Q    Okay.  You verified the document?

5    A    Yes, by signing it, I verified it, correct.

6    Q    Okay.  Now, Mr. Hipple, let's go to -- if you go a

7    couple pages, there are some state cover sheets that

8    you have and there's a notice to defend.  But I want to

9    get passed that.  I want to get to the page where it

10   says "complaint."

11   A    Okay.  What page?  Oh, "complaint."  Go --

12   Q    It says "complaint" on the front.

13   A    Go ahead.

14        (Pause in proceedings.)

15   Q    And you see the page where it says "complaint?"

16   A    Yes, I'm right there.

17   Q    Okay.

18   A    Okay.

19   Q    I want you to go to the second page of the

20   complaint, paragraph three.

21   A    Hold on.

22        (Pause in proceedings.)

23   A    Three.  Go ahead.

24   Q    Do you see that?

25   A    Yep.

Mr. Hipple - Direct                    104

1   Q   Now, it says "plaintiff," and that's Complete

2   Group, correct?

3   A   Right, plaintiff.  All right.

4   Q   -- "is the owner of certain assets including, but

5   not limited to a chemical formulation which is used to

6   seal leaks in the engines of older automobiles" --

7   A   Right.

8   Q   -- "(the product)," correct?

9   A   Uh-huh, it says that, yes.

10  Q   That's the Steel Seal product?  That's the

11  formulation --

12  A   Yes.

13  Q   -- for the Steel Seal product?

14  A   That's what it's saying, yes.

15  Q   Okay.  And it says in paragraph seven, "The URL and

16  intellectual property on the website are not owned by

17  Steel Seal Pro."  Do you see that?

18  A   Okay.  "Defendant market" -- number seven?

19  Q   Number seven.  "Defendant marketed the product,

20  Steel Seal, through the use of an internet website

21  which advertised the product."

22  A   Okay.

23  Q   And it says, "The URL and" --

24  A   What is URL?

25  Q   I don't know.  I'm just reading the complaint.

Mr. Hipple - Direct                     105

1    A    Okay.

2    Q    "The URL and the intellectual property on the

3    website are not owned by the defendant, correct?

4    A    Not owned by Complete Group.

5    Q    No, that's not what that says, "by the defendant."

6    A    Okay.

7    Q    Number eight says, "Customers purchase the

8    product" --

9    A    Okay, yes, that's correct.

10   Q    -- "on the website and used credit cards."

11   A    Okay.  What are you -- where -- you got a paragraph

12   again?

13   Q    Yeah, number eight.

14   A    Number eight?  Go ahead.

15   Q    And number nine --

16   A    "Customers to purchase" -- all right, number nine?

17   Q    Number nine, it says, "The merchant account which

18   received the credit card payments for the sale of the

19   product deposited the proceeds of the sale," that's

20   from the sale of Steel Seal?

21   A    That's correct.

22   Q    -- "in a deposit account nominally in the name of

23   the defendant maintained at the First National Bank

24   and --

25   A    Okay.

1    Q    -- Trust Company of Newtown."

2    A    Who is the defendant in this one?

3    Q    Steel Seal Pro, your son's company.

4    A    Okay.  All right.  Okay, go ahead.

5    Q    So you told us before you couldn't identify the

6    First National Bank --

7    A    No, I never said --

8    Q    -- trust company checks that we were looking at

9    before, but you knew that that's where the defendant's

10   bank was?

11   A    I didn't say that.  I said I knew the First

12   National Bank was his, okay?

13   Q    Now --

14   A    I received checks from it.

15   Q    -- paragraph ten, it says, "The license agreement

16   clearly provides that the proceeds are owned by the

17   plaintiff and not the defendant."  Do you see that?

18   A    Uh-huh, yeah.

19   Q    So you're saying there, if I understand that

20   correctly, that the money deposited in the Steel Seal

21   Pro account actually belonged to Complete Group?

22   A    That's absolutely correct.

23   Q    Okay.  Now, let's go to paragraph 14.

24   A    All right.

25   Q    It says, "Upon information and belief, the account

Mr. Hipple - Direct                    107

1    balance -- the account balance of the proceeds in the

2    trust account is $161,000."  That's a pretty specific

3    number.  You had to get that from somebody that had

4    access to the account?

5    A    No, I thought that the attorneys had got that

6    information.

7    Q    Okay.  So you don't -- you didn't get it?

8    A    I was in Colombia.

9    Q    Did you get it from Melissa?

10   A    Huh?

11   Q    You didn't get it from Melissa?

12   A    No, definitely not.

13   Q    Okay.  And it says, "Despite repeated demands,

14   defendant has failed to turn over the proceeds in the

15   account."

16   A    Well, again, I --

17   Q    Do you see that?

18   A    Yes, I see it, but I don't know what demands, but

19   go ahead.

20   Q    I would like you -- if you could just look at

21   Exhibit 39 for a second.

22   A    Exhibit 39?

23   Q    Yeah.

24            (Pause in proceedings.)

25   Q    Are you on page 189 of Exhibit 39?

Mr. Hipple - Direct                              108

1    A    No, I'll go there.  Hold on.

2            (Pause in proceedings.)

3    A    Okay.  I'm losing my spot.  189?

4    Q    Yeah.

5            (Pause in proceedings.)

6    A    I'm at 189.

7    Q    Okay.  And you see at the top it's the First

8    National Bank?

9    A    Right, correct.

10   Q    And you've identified that account in the

11   complaint?

12   A    Yes.  Yes.

13   Q    Okay.  And I would like you down to -- it says

14   under date -- under "Business First Account," it's got

15   "Date."  Do you see that?

16   A    Hold on.  189.  Okay, where?

17   Q    It says "Date."  Do you see that?

18   A    11-30-2012?

19   Q    No, it just says "Date."  Let's look at that first.

20   I want you to be in the right column.  Do you see

21   this --

22   A    Okay, "Date," yes.

23   Q    -- balance where it's got numbers?

24   A    Go ahead.  I got it.

25   Q    "Date."

Mr. Hipple - Direct                                109

1   A   Go ahead.

2   Q   And I want you to go down to 11-7.

3   A   Okay, 11-7.  Go ahead.

4   Q   Let's start at 11-6.  There's $160,878 in the

5   account.

6   A   Okay.

7   Q   And the next date, 11-7, there's $161,958 in the

8   account.

9   A   Right.

10  Q   Okay.  In your complaint, you say there's about

11  $161,000 in the account.

12  A   Right.

13  Q   So, it's pretty close to the numbers, correct?

14  A   Yeah, but I think the attorneys got that number

15  from the bank.

16  Q   Okay.  It appears that after Brian's death, money

17  continued to come into the account.

18  A   For almost three months.

19  Q   It continued to sell Steel Seal.

20  A   No, it didn't continue to sell Steel Seal.  The

21  processing, the merchant processing was still in Steel

22  Seal.

23  Q   Okay.  Now, let's go back to --

24  A   And we'll get to that later on.

25  Q   Let's go to the complaint.

1   A    Okay.  Let me finish here.  Page 39, 189.

2   Q    Yeah, write that down.

3   A    11-7 -- 11-6 and 11-7.  11-6 and 11-7.

4            THE COURT:  What's the number of the

5   complaint again?

6            MR. BERKOWITZ:  The complaint is Exhibit 50.

7            THE COURT:  Thank you.

8            (Pause in proceedings.)

9            THE WITNESS:  Okay.

10           THE COURT:  You said 50?

11           MR. BERKOWITZ:  Exhibit 50.

12           THE WITNESS:  50.

13           MR. BERKOWITZ:  Plaintiff's Exhibit -- I'm

14   sorry, Plaintiff's Exhibit 51.

15           THE COURT:  Thank you.

16           MR. BERKOWITZ:  It goes from 50 to the top of

17   the page.

18           THE COURT:  Right.

19           MR. BERKOWITZ:  I lost that one.

20           THE WITNESS:  51 now?

21           MR. BERKOWITZ:  Exhibit 51 is --

22           THE WITNESS:  Go ahead.

23           MR. BERKOWITZ:  -- your complaint.

24           THE WITNESS:  Okay, we're back at the

25   complaint, yes?

Mr. Hipple - Direct                    111

1   BY MR. BERKOWITZ:

2   Q   Yes, and we're at paragraph 14.

3   A   Paragraph 14.

4   Q   And it says --

5   A   Hold on.  Hold on.

6   Q   Okay.

7   A   Hold on.  Paragraph 14.  Okay.

8   Q   "Upon information and belief, the account balance

9   of the proceeds in the trust account is $161,000."

10  A   Yes.

11  Q   Right?  "And despite repeated demands, defendant

12  has failed to turn the proceeds in the trust account to

13  the plaintiff," right?  That's what it says?

14  A   That's what it says.

15  Q   So who were the repeated demands made upon?

16  A   I guess you'll have to talk to the attorneys about

17  that.

18  Q   Okay.  Do you know who was the administrator of

19  Brian Hipple's estate?

20  A   Of course I know.

21  Q   Okay.  And that was Melissa, correct?

22  A   Yes.

23  Q   Correct?

24  A   Yes.

25  Q   Okay.  And this complaint, in fact, was served upon

Mr. Hipple - Direct                    112

1  her?

2  A   Okay.  I'm not certain about that, but go ahead.

3  Q   Okay.  Well, let's turn to the next page, Exhibit

4  52, Plaintiff's Exhibit 52.

5  A   All right.

6  Q   And I'm going to represent to you -- and I have

7  here a certified copy of the docket entry.  You have a

8  copy there.

9          (Pause in proceedings.)

10  Q   And if you look --

11  A   Fleet versus Steel Seal Pro, okay.

12  Q   Okay.  This is the lawsuit, correct?

13  A   I'm assuming this is the law firm trying to

14  retrieve the money that was belonging to Complete

15  Group.

16  Q   And this is the docket I'm representing to you.

17  A   Okay.

18  Q   This is an official court paper.

19  A   Right, yes.

20  Q   And if you look at the second page of this --

21  A   Right.

22  Q   I'm going to represent to you the first line --

23  A   Wait a minute.  Give me a minute here.  I keep

24  forgetting -- you are confusing me.  Exhibit 52.  Okay,

25  52 and we're -- what are we at?  52?  Go ahead, 52.

Mr. Hipple - Direct                                113

1   Q   Right?  You see that?

2   A   52, the second page.

3   Q   Second page, right at the top.  The complaint was

4   served on Melissa Moreno.

5   A   Okay.

6   Q   Do you see that?

7   A   Hold on.  Hold on.

8            (Pause in proceedings.)

9   A   The very top?

10  Q   Yes, the very top line.

11  A   The top line?

12  Q   Dated 12-5-2012.

13  A   -- "Deputy marshal serves the defendant pursuant to

14  Steel Seal Pro.  4520, that's your address."  I don't

15  see -- oh, okay, yeah.  Okay, good.

16  Q   Okay?  Had to hand in the copy to Melissa Moreno?

17  A   Yes.

18  Q   Okay.

19  A   I guess because she was in charge of the estate.

20  Q   Okay.  Now, I would like you to turn the page to

21  Exhibit 53.

22  A   Okay.

23           (Pause in proceedings.)

24  A   Okay.

25  Q   And I'm going to represent to you that this is a

Mr. Hipple - Direct                    114

1   Pennsylvania form that's headed "Important Notice,"

2   and you see it's delivered to Steel Seal Pro, care of

3   Melissa Moreno?

4   A    I see.  Okay, yeah, right underneath there, yes.

5   Q    Okay.  And it says you were in default because you

6   have failed to enter a written appearance personally or

7   by an attorney?

8   A    Okay.

9   Q    Okay?  Do you see that?

10  A    Where's it say in default?

11  Q    You can -- right under "Important Notice."

12  A    Okay.  "You are in default because" --

13  Q    Okay?  And I'm going to represent to you that this

14  comes right out of the Pennsylvania Rules of Civil

15  Procedure, right out of the book.

16              (Pause in proceedings.)

17  A    Again, I don't understand, you know, what's --

18  Q    Okay.

19  A    -- the purpose.

20  Q    All right.  I'm just --

21  A    All right.

22  Q    -- asking you to take a look at these things.

23  A    These are things that the attorneys have done.

24  Q    All right.  Well, that's why your attorney is

25  coming in to testify.

1    A    Okay.

2    Q    So let's look at Exhibit 54.

3    A    Okay.  Nothing on page -- oh, yes, there is.  Go

4    ahead, 54.

5             (Pause in proceedings.)

6    Q    And you see it says "Precipe to enter default

7    judgment?"

8    A    Well, what's precipe?

9    Q    I'm just -- do you see that?  I'll tell --

10   A    Yes.

11   Q    -- you what it means.  I just want to make sure

12   we're looking at the same page.

13   A    Yes, we are.

14   Q    All right.  And this is your attorney, Mr.

15   Chevelle.

16   A    Mike Chevelle.

17   Q    He has been subpoenaed to testify, "To enter

18   judgment in favor of the plaintiff and against the

19   defendant in the amount of $198,377.88."  Do you see

20   that?

21   A    Yep.

22   Q    Okay.  That's a pretty specific number, isn't it?

23   A    Well, apparently they got the information from

24   somewhere.

25   Q    Okay.  You don't know where it came from?

Mr. Hipple - Direct                    116

1    A    No.  I'm in Colombia, okay?

2    Q    Mr. Hipple, let's look at your deposition

3    testimony.  Do you have that there in front of you?

4    A    Yes, certainly.  Go ahead.

5              (Pause in proceedings.)

6    A    What page?  I don't know --

7    Q    It's page 155.

8    A    Hold on.  Hold on.

9              (Pause in proceedings.)

10   A    What was the date of that complaint?

11   Q    The date of the entry of judgment?

12   A    Yeah, whatever the --

13   Q    1-21-13.

14             THE COURT:  What exhibit are you on, Mr.

15   Berkowitz, please?

16             MR. BERKOWITZ:  I'm sorry?

17             THE COURT:  What exhibit?  I'm sorry.

18             MR. BERKOWITZ:  I'm sorry, that's Exhibit 54.

19   That's the precipe to enter judgment.

20             THE COURT:  Right, I have that.  What -- do

21   you have a page number you want to give him?

22             MR. BERKOWITZ:  There's only one page --

23             THE COURT:  Oh.

24             MR. BERKOWITZ:  -- in that exhibit.

25             THE COURT:  Okay.

Mr. Hipple - Direct                    117

1           MR. BERKOWITZ:  It's only the first page.
2   The rest is just a --
3           THE COURT:  Right, okay.
4           MR. BERKOWITZ:  -- an affidavit of
5   non-military service.
6           THE COURT:  Right, I'm here.  Okay.
7           MR. BERKOWITZ:  These are state forms.
8           THE COURT:  Right.
9           THE WITNESS:  Okay, go ahead.  I have my
10  deposition in front of me.
11  BY MR. BERKOWITZ:
12  Q   Okay.  Page 155.
13  A   155, hold on.  Again, what was the date of my
14  deposition?
15  Q   I think it was May 1, 2013.
16  A   I got to write that down.
17  Q   Well, it's right in the front of your deposition,
18  so you don't have to worry about that.
19  A   Okay.  Well, because I'm trying to compare numbers
20  and time limits.
21  Q   And, Mr. Hipple, I'm going to read to you --
22  A   Hold on.  Hold on.  155, go ahead.
23  Q   Line two, "And what you wrote in the complaint
24  based on your information and belief was that $161,000,
25  that was owed to you, right?"

Mr. Hipple - Direct                          118

1   A    Yes.

2   Q    Do you see that?  Answer, "Yes, 161,000."

3   A    Because that's what they put in the complaint.

4   Q    Question, "Do you know how your attorney was able

5   to enter judgment for 198,377.88 based on that

6   complaint?"

7   A    Right.

8   Q    Answer, "Yes, this is my knowledge of what took

9   place, okay, is that this -- the credit charges, okay,

10  were continually being put into this account.  It took

11  me approximately two months for which I had to send the

12  chemical out and not receive any money, okay?  And I

13  think that's where that -- why that figure changed."

14  Okay?  Did I read that correctly?

15  A    Yeah.  Yeah, because the credit card processing

16  kept pushing the money into that account.

17         MR. BERKOWITZ:  And, Your Honor, you will see

18  again, when Mr. Chevelle testified, we'll go through

19  the Rules of Civil Procedure and point out why you

20  can't do that.  But that's for another day.

21  BY MR. BERKOWITZ:

22  Q    Mr. Hipple, so judgment was entered for the

23  198,000, and you can look back at the docket and see

24  that if you would like.

25  A    No.  I know --

Mr. Hipple - Direct                                    119

1   Q    Okay.

2   A    -- what's been in there.

3   Q    Now, let's turn to Plaintiff's Exhibit 55.

4   A    Plaintiff's Exhibit 55.

5              (Pause in proceedings.)

6              THE COURT:  What's the number again?  I'm

7   sorry?

8              MR. BERKOWITZ:  Plaintiff's 55.

9              THE COURT:  Thank you.

10             (Pause in proceedings.)

11  BY MR. BERKOWITZ:

12  Q    And do you see that it says, "Garnishee's answers

13  to interrogatories and attachment"?

14  A    Uh-huh.

15  Q    And you will recall yesterday, that's the type of

16  document I served on Wachovia Bank to execute on the

17  SCIX doc --

18  A    No, I --

19  Q    -- bank account?

20  A    No, I don't recall that.

21  Q    Okay.  Now, do you see in paragraph two, the bank

22  is saying that it has a -- it has $197,823.34 that

23  belongs to Steel Seal Pro?  That's the answer in

24  paragraph two?

25  A    That is correct.

1  Q   Okay.  And they're telling you that they're going

2  to deduct $425 as a service charge --

3  A   Big service charge.

4  Q   Yeah, the bank is charging for their getting

5  involved.

6  A   Yeah, go ahead.

7  Q   Which leaves $197,398.34 for you?

8  A   Correct.

9  Q   For -- I'm sorry, for Complete Group?

10 A   Complete Group, yes.

11 Q   Okay?  And that's the amount of money that the

12 First National Bank sent to Complete Group, correct?

13 A   And that would have been on February 13, 2013.

14 Q   So that's the date -- if you look at the docket on

15 page --

16 A   No, that's all right.

17 Q   -- 52 --

18         MR. BERKOWITZ:  Your Honor, there are trigger

19 dates in the Pennsylvania Rules of Civil Procedure that

20 prohibit you from entering a judgment before 30 days

21 after the interrogatories are served and the like, so

22 there's a time lag.  It's built into the system so that

23 the bank and everybody has a chance to challenge this

24 in case there's a problem.

25         THE COURT:  Right.

Mr. Hipple - Direct                    121

1          THE WITNESS:  But, I thought you did

2    challenge it.

3          MR. BERKOWITZ:  On -- and if you look at the

4    docket, Your Honor, that we looked at before, which is

5    Exhibit 52, the judgment --

6          THE WITNESS:  Okay, could we just -- could we

7    just back up a minute?

8          MR. BERKOWITZ:  I --

9          THE WITNESS:  The statement you made has --

10   in reference to this document that we're -- last

11   document we're looking at?

12   BY MR. BERKOWITZ:

13   Q    I'm just going to refer you to the -- to the

14   docket.

15   A    No, but I mean the statement that you just

16   explained to the Judge, are you referring to this

17   document?

18   Q    When you say this document, tell me which one

19   you're looking at.

20   A    The one -- the last one we looked at, 55, where

21   they took the $450 --

22   Q    Oh, yeah, that's the -- that's the bank's answers

23   to the interrogatories.  And you can see there is a

24   little block, that is the Bucks County filing system

25   block.

Mr. Hipple - Direct                                    122

1    A    Okay.  But --

2    Q    You can see it was recorded.  What happens is the

3    bank files this with the Court.  Do you see that, Mr.

4    Hipple, there's a block up there?

5    A    Right, okay.  But my question to you --

6    Q    Well, you don't get to do that now.  You get to do

7    that --

8            THE COURT:  Well, I think he -- I think he's

9    trying to prepare so --

10           MR. BERKOWITZ:  Okay.

11           THE COURT:  Okay?  Go ahead.

12           THE WITNESS:  I'm just trying to -- I'm

13    trying to --

14           THE COURT:  Right.

15           THE WITNESS:  The question that he had --

16           THE COURT:  Go ahead.

17           THE WITNESS:  -- approached or gave to you --

18           THE COURT:  Yes.

19           THE WITNESS:  -- about the law is in

20    reference to this document?

21           THE COURT:  I think he's trying to explain

22    that the reason there's a delay in the entry of

23    judgment is because the system gives notice and

24    opportunity for everybody to be heard.  The bank -- the

25    bank needs time to object or not object, to answer the

Mr. Hipple - Direct                    123

1    interrogatories.  Is that -- that's your point?

2           MR. BERKOWITZ:  Yeah, that's my point, Your

3    Honor.

4           THE COURT:  Yes.

5           THE WITNESS:  Okay.

6           THE COURT:  Yes.

7           THE WITNESS:  Fine.

8           MR. BERKOWITZ:  That's all.  It was --  it

9    just shows that it was on February 13th that the

10   interrogatories were filed with the Court.

11   BY MR. BERKOWITZ:

12   Q   And if you look at the docket, which is 52 --

13   A   Where we going, 52?

14   Q   Exhibit 52.  And if you look at 220 --

15          MR. BERKOWITZ:  Your Honor, I will get to a

16   good breaking point soon if --

17          THE COURT:  Okay.

18          MR. BERKOWITZ:  So I can replenish my fluids.

19          THE COURT:  We'll go to about 12:15.

20          MR. BERKOWITZ:  That's fine.

21          THE COURT:  All right.  It's about ten of

22   now.

23          THE WITNESS:  Okay, 52.

24   BY MR. BERKOWITZ:

25   Q   You see 52?  And I want you to look at the docket

Mr. Hipple - Direct                    124

1    entry on 2-20-2013.  It's about two-thirds or

2    three-quarters of the way down the page, February 20th,

3    2013.

4              (Pause in proceedings.)

5    Q    Do you see that?  Do you have that in --

6    A    Not yet.

7    Q    -- front of you?

8    A    Not yet.

9    Q    Then let me help you.

10             (Pause in proceedings.)

11   Q    You're on the wrong --

12   A    You said 52.

13   Q    Yeah.  Yeah, yeah, but you're --

14   A    Oh.

15   Q    -- looking for the date down here.

16   A    Oh.

17   Q    Do you see that?  First, you look at 2-13.  Do you

18   see that?  That's the bank's answers to the

19   interrogatories.

20   A    Okay.

21   Q    Do you see that?

22   A    All right.

23   Q    And then on 2-20, that's when the judgment is

24   entered against the bank, the garnishee.  Do you see

25   that?

1    A    Okay.

2    Q    Okay?  And that --

3    A    Now, this is the timeline, right?

4    Q    This -- well, this is -- this is the bank's -- this

5    is the court docket --

6    A    Yeah, okay.

7    Q    -- just showing when things happen.

8    A    The timeline.  All right.

9    Q    So we have certainty there.

10   A    Okay.

11   Q    And if you see 2-20 is the date the judgment's

12   entered.  And what takes place then is the bank is then

13   going to send the check that you got to your attorney.

14   A    That is correct.

15   Q    Okay.  And you'll look down a couple lines to March

16   15th.  Do you see that, 3-15 --

17   A    Yes

18   Q    -- 2013?

19   A    Yes.

20   Q    That's your attorney filing that to not -- to

21   notify the Court that the judgment has been satisfied.

22   A    Okay.

23   Q    The bank has paid the money for the judgment.  So

24   between --

25   A    No.

Mr. Hipple - Direct                    126

1  Q    -- February 20 and April 15th, the check was sent

2  to you?

3  A    Between February and April -- oh, about three

4  months.

5  Q    Okay?

6  A    Yeah.

7  Q    Now, after the check was delivered to your

8  attorney --

9  A    Right.

10  Q    -- I think you called Melissa Moreno --

11  A    Yes, I did.

12  Q    -- and asked her to pick up the check for you?

13  A    That is correct.

14  Q    Okay.  And she went to your attorney's office and

15  picked up the check made payable to Complete Group for

16  about the $197,000?

17  A    That is correct.

18  Q    Okay.  And she deposited that into the Complete

19  Group bank account with Bank of America?

20  A    Right, because we had a bank account at that point.

21  Right.

22  Q    Okay?  And then after she did that, you sent her

23  $5,000, correct?

24  A    I'm not sure, but go ahead.

25  Q    Okay.  Well, let's go to Exhibit 44.   Do you see

Mr. Hipple - Direct                          127

1    Exhibit 44, Mr. Hipple?

2    A    Yep, go ahead.

3    Q    Okay.  And I want you to go to page 52 at the

4    bottom.

5    A    All right.

6    Q    In mine it's the third page in.

7    A    All right, they might be out of order.  Okay, 50

8    what, 2?

9    Q    It says Hipple 00052.

10   A    Okay, go ahead.

11   Q    Okay?  And do you see on 3-29, there's an entry?

12   A    3-20 -- hold on, 3-29, yep, 5,000.  Yep.

13   Q    Okay.  And you sent that to Melissa?

14   A    No, I sent that to my grandchildren.

15   Q    Well, it says "To Melissa Moreno."

16   A    For my grandchildren.

17   Q    Okay.  All right.

18             (Pause in proceedings.)

19   A    You think I paid her 5,000 to pick up the check?

20   Q    No.  After Brian's death --

21             THE COURT:  What was Melissa Moreno's

22   relationship to Brian?

23             THE WITNESS:  She was not his wife, she was

24   his fiance, okay, for I don't know, six, seven years,

25   eight years.

Mr. Hipple - Direct                                    128

1   BY MR. BERKOWITZ:

2   Q    She is the mother of the grandchildren --

3   A    His -- my two children --

4   Q    -- that you have --

5   A    -- grandchildren.

6   Q    -- correct?

7   A    Yes.

8            THE COURT:  Okay, thank you.

9            THE WITNESS:  My fatherless two

10  grandchildren.

11  BY MR. BERKOWITZ:

12  Q    After Brian Hipple died, you transferred --

13  A    After Brian Hipple committed suicide.

14  Q    I'm sorry.

15  A    Let's use the right terminology.

16  Q    I'm sorry.  I'm sorry to hear that.

17  A    Yeah.

18  Q    And I'm sorry if I used --

19  A    Because he couldn't handle the pressure.

20  Q    He transferred -- you transferred the right to

21  manufacture, market, and sell Steel Seal from Steel

22  Seal Pro to your new company, B.B.B. Management Group,

23  LLC?

24  A    Right, Brian, Baylon, and Braydon, yes.

25  Q    Right.

Mr. Hipple - Direct                                        129

1   A   Uh-huh.

2   Q   And that's the company that sells it now?

3   A   That is correct.

4   Q   Okay.  And in the beginning, it together with

5   Complete Group were the companies that sold Steel Seal

6   through the internet?

7   A   At the same time?

8   Q   That's what --

9   A   No.

10  Q   -- you told me in your deposition.

11  A   Well, no.  Well, after Brian's death, I opened up

12  the new company because if it's an operating -- or

13  the -- not operating, the license agreement was voided.

14  Q   Okay.  And I'll represent to you that in your

15  deposition, unless you would like to go over it, you --

16  A   No.

17  Q   -- told me that Complete Group and B.B.B.

18  Management sold -- they were the companies that sold

19  Steel Seal.

20  A   Yeah, but I may refer to that as -- I'm not sure

21  how your question was, but yes, they both sold Steel

22  Seal, but not at the same time.

23  Q   Okay.  If you would like, let's --

24  A   Well, it can say whatever it wants in the

25  deposition, but that's what it is.

Mr. Hipple - Direct                    130

1    Q    Okay.  Let's --

2    A    I didn't have two companies selling at the same

3    time.

4              (Pause in proceedings.)

5    A    Okay.  We're back to the deposition or --

6    Q    Let's see.  I just want to make this easy.

7              (Pause in proceedings.)

8    Q    Let me start on page 64.

9    A    Start on 64.

10   Q    Line 21.

11             (Pause in proceedings.)

12   Q    I'll start on line 17.  "Did" --

13   A    Wait a minute.  What are we doing, 17 or 21?

14   Q    Let's start on 17.

15   A    I'm writing this down.  You got to remember that,

16   okay?

17   Q    Okay.  And it's page 64.

18   A    All right.  Hold on.  It's line 17, page 64.  All

19   right, I got that.  Go ahead.

20   Q    Question, "Did SCIX have any websites?"  Answer,

21   "Yes, I believe they do."

22   A    Yes.

23   Q    "Do you know how many they had?"  "No, I do not,"

24   answer.  Question, "Okay.  Do you know where those

25   websites are now or who controls those websites?"  You

Mr. Hipple - Direct                    131

1  respond, "Of SCIX's?"  Question, "Yes."  Answer, "I

2  have the websites."

3  A    Right.

4  Q    Next page, 65, "When you say 'I' are you saying you

5  personally?"  Answer, "No."  Question, "Complete

6  Group?"  Answer, "Complete Group has the websites."

7  Okay?  Did I read that correctly?

8  A    Yes.

9  Q    Okay.

10           (Pause in proceedings.)

11  A    And when you asked me that question you meant who

12  owned the website?  Is that what you were trying to get

13  at?

14  Q    Well, let me -- let me go on.

15  A    All right.

16  Q    We saw on Exhibit -- Defense Exhibit 2, the UCC 1,

17  do you recall we looked at that Exhibit A and it listed

18  the websites?

19  A    No.

20  Q    You want -- do you want to look at it?

21  A    Yeah.

22  Q    It's Defense Exhibit 2.

23           (Pause in proceedings.)

24  Q    I'm sorry, look at 3, it's easier.

25  A    What page are we at?

1    Q    We are on Exhibit 3.

2    A    Oh, mine.

3    Q    Defense Exhibit 3.

4    A    Oh.

5    Q    List of assets.

6    A    Okay, Defense Exhibit 3.  All right.

7    Q    Do you see that?  And it lists websites, correct?

8    A    Yes.

9    Q    Okay.  Now, I think you testified that Scientific

10   Chemical owned the website.

11   A    Scientific Chemical, yes.  If you would go back and

12   do a search, Scientific Chemical owned the website.

13   Q    Okay.

14   A    And then I think what happened -- all right, I'm

15   probably talking --

16   Q    Well, let's --

17   A    -- too much.

18   Q    No, that's okay.

19   A    No, I want to answer -- I want to answer the

20   question.

21   Q    Go ahead.

22            THE WITNESS:  Can I answer the question, Your

23   Honor?

24            THE COURT:  Sure.

25            THE WITNESS:  Okay.  All right.  Because see,

Mr. Hipple - Direct                    133

1   he's going down this little road here, okay?  All

2   right, my job with Complete Group, B.B.B. Management,

3   and all is to take care of the books, okay?  I hire

4   people, which are called SEO companies.  My nephew

5   worked for me for awhile, advertising companies,

6   website companies, okay, e-mail companies that handle

7   everything, all right?

8            My involvement is to take care of ordering

9   the supplies, paying the bills, and keeping the bank

10  account, and answering some e-mails, okay?  That's my

11  total involvement.

12           So, when you say the websites, the people

13  that work for me control the websites, okay.  I don't

14  control the websites.  If they do something with the

15  websites, that's something they do, all right?  I have

16  no -- I don't control what has to be done with the

17  website.  So if the website has to be changed from

18  Scientific Chemical to the new company name, they need

19  to make those changes.

20  BY MR. BERKOWITZ:

21  Q    Okay.  I just want to --

22  A    All right.

23  Q    I'm just trying to find --

24  A    I mean you --

25  Q    -- out who owns the website.

Mr. Hipple - Direct                    134

1    A    Well, again, but you're asking me questions that I

2    don't have the answer or I don't even control.

3    Q    Okay.  I would like you to look, if you could look

4    at volume one, Exhibit 38.

5    A    Your volume one?

6    Q    Yes, plaintiff's volume one.

7              (Pause in proceedings.)

8    A    Okay.  D what?  Or P what?

9    Q    It's Plaintiff's Exhibit 38.

10             (Pause in proceedings.)

11   A    Okay.

12   Q    And I would like you to look at page Hipple 636.

13   A    Well, they're not numbered.

14   Q    Yes, they are, at the bottom right of the page.

15   A    No, it's page one of four.

16   Q    On Plaintiff's Exhibit 38?

17   A    Okay.  Now, they're numbered, fourth page in.

18   Q    Okay.

19   A    Page what?

20   Q    636.

21   A    6 -- that's where I'm at, right?  Okay.

22   Q    Okay.  And if you look at the top of the page --

23   A    Right.

24   Q    -- it says the registrant --

25   A    Okay.

Mr. Hipple - Direct                    135

1  Q    -- Scientific Chemicals, Inc.?

2  A    Yeah.

3  Q    Okay.  That's what you told us before?

4  A    Right.

5  Q    Right.  Okay.  And that date above that is October

6  19th, 2001?

7  A    That it was still under Scientific Chemicals, Inc.

8  Q    Right.

9  A    2001, yes.

10  Q    Okay.  Now let's go to -- and these are out of

11  order pages in my book, so I assume they're out of

12  order in yours.

13  A    A little bit.

14  Q    Hipple 530.

15  A    530?

16  Q    530.

17  A    530.

18           (Pause in proceedings.)

19  A    Okay, go ahead.

20  Q    If you look at the top of the page, the date,

21  December 24th, 2010.

22  A    Right, okay.

23  Q    Okay.  Now it lists the registrant as Complete

24  Group?

25  A    Correct.  Yes, it does.

Mr. Hipple - Direct                    136

1  Q    Okay.  And you look under "Administrative contact,"

2  Brian Hipple, and then under that it says Complete

3  Group, LLC.

4  A    All right.  Because Brian Hipple was involved in

5  network solutions.

6  Q    Okay.  Okay.

7  A    Okay.  When he had SCIX I'm assuming.

8  Q    Okay.  Now --

9  A    Well, it certainly did -- oh, yeah, 2010?  Sure.

10 Q    Okay.  Now let's go to page 483.  I don't where

11 that is in the back.

12 A    483?  I got it.  Just keep going backwards.

13         (Pause in proceedings.)

14 A    Okay.  Now we're at steelseal.com.

15         (Pause in proceedings.)

16 A    Network solutions again.

17 Q    Okay.  The reg -- I'm sorry, which page are you on,

18 sir?

19 A    You said 483.

20 Q    483.  Okay.  Do you see the registrant now is

21 B.B.B. Management Group?

22 A    Right.

23 Q    Okay.  And that's your company?

24 A    That's because it's 2013.

25 Q    Okay.  And you are listed as the administrative

Mr. Hipple - Direct                                137

1   contact?

2   A    Who is it listing?

3   Q    You are.

4   A    Oh, yeah.  All right.

5   Q    Now, let's go to --

6   A    I guess we finally got around to taking Brian off.

7   Q    Okay.  Just going through the records and making

8   sure we're on the same page with these things, Mr.

9   Hipple.

10  A    Yeah, but you're going through the records that I

11  had no control over.  I shouldn't even be talking about

12  these records because I don't -- I never seen these

13  records.  Okay, that's where I'm going to start.  Okay.

14  Q    Okay.  Now --

15  A    Go to whatever page you want now.  Okay.

16  Q    Page --

17  A    I'm going to do it the right way.

18  Q    Page 479.

19  A    479?  Yes.

20  Q    Okay.  Do you see that, the owner is B.B.B.M?

21  A    I'm sorry, I don't recognize the page.

22  Q    Page 479?

23  A    I don't recognize --

24  Q    It's not there?

25  A    I've never seen the page.

Mr. Hipple - Direct                          138

1    Q    I'm asking you is it there?

2    A    Is what there?

3    Q    The page.

4    A    There's a page 479.   Yes, I see that.

5    Q    Okay.   And who does it list as the registered

6    owner?

7    A    The registered owner, Network solutions.

8    Q    Go to the line where it says B.B.B.M, do you see

9    that?

10            THE COURT:   You mean the top -- the B.B.B.

11   Management Group, Inc.?

12            MR. BERKOWITZ:   Yes.

13            THE WITNESS:   Where?   At the top?   Oh, right,

14   registered owner.

15   BY MR. BERKOWITZ:

16   Q    Do you see where it says --

17   A    Yeah.

18   Q    Registered owner, B.B.B. Management Group?

19   A    Right.

20   Q    Right?

21   A    But I have no knowledge of this.

22   Q    That's fine.

23   A    I've never seen this page and I have no knowledge

24   of it.

25   Q    Okay.   And it also says on there that it owns --

1   A   Okay?

2   Q   -- four other domains, correct?

3   A   I don't know.  I have no knowledge of it.

4   Q   But that's what the page said without regard?

5   A   Yes, that's what the page says.

6   Q   Okay.

7   A   But I have no knowledge of it.  I've never seen the

8   page.

9   Q   Okay.  So you -- but you are the sole owner of

10  B.B.B. Management Group?

11  A   Yes, I believe I am.

12  Q   Okay.

13          (Pause in proceedings.)

14  Q   Mr. Hipple, volume one, Exhibit 33.

15          (Pause in proceedings.)

16  Q   Do you see that?  Yes, Plaintiff's Exhibit 33.

17  A   Yes.

18  Q   Okay.  And do you recognize --

19  A   Hold on.

20  Q   Turn to page 00086.

21  A   All right, 0086, go ahead.

22  Q   Okay?  And do you see that?  It looks like a

23  Quickbooks record of the profit and loss of B.B.B.

24  Management Group, LLC from October 2012 to May 2013?

25  Do you see that?

Mr. Hipple - Direct                              140

1   A    They were the good years, yes.

2   Q    Okay.  And let's not -- I'm not going to go through

3   any detail with you.  Did you work on the detail of

4   this?  Did you put the Quickbooks entry in?

5   A    I just explained it to you.  Yes, I take care of

6   the books.

7   Q    Okay.  So the commissions there, are those

8   royalties paid to you?

9   A    Where's --

10  Q    If you look --

11  A    -- the commission?

12  Q    -- under cost of goods sold, it's got commission.

13  A    Commissions paid?  No.

14  Q    So who do you pay commissions to?

15  A    To Web -- okay, let me think of the name.  It's our

16  Cadillac division.

17  Q    Okay.  Okay.  And you've got under expense, you got

18  law office, $56,000.

19  A    Yeah.

20  Q    That's --

21  A    That's a nice sweet number, huh?

22  Q    That's for this litigation, right?

23  A    No.  It's for my -- yes, of course it's for this

24  litigation.

25  Q    Okay.  Well, I'm just saying if that's a

Mr. Hipple - Direct                    141

1   non-recurring expense, we could treat it different, but

2   let's --

3   A    Yeah, a non-recurring expense, yeah.  Sure.

4   Q    Let's look at the net income for this eight months.

5   A    Right, this was --

6   Q    It looks like almost $56,000 for the eight-month

7   period, correct?

8   A    That's correct.  That's what it says at the bottom.

9   Q    All right.  Now, let's go --

10  A    And also, let's look at something else that you're

11  missing, okay?  Do you see any officer salary or member

12  salary taken out?

13  Q    Mr. Hipple, I'm just looking at your records.

14  A    Oh, okay.  I got to do that on my side.  Okay,

15  sorry.

16  Q    That's right.

17  A    Hold on.  Hold on.  33, 086, my salary.

18  Q    And --

19  A    Okay.

20  Q    -- I would like you to look at Plaintiff's Exhibit

21  34.

22  A    Okay, 34.  Okay.

23  Q    And this is Complete Group, LLC, your company?

24  A    Right.

25  Q    And that's the profit and loss from October 2012 to

Mr. Hipple - Direct                     142

1    May 2013?

2    A    Right.

3            THE COURT:  What's the number again?  I'm

4    sorry.

5            THE WITNESS:  34.

6            MR. BERKOWITZ:  I'm sorry, 34.

7            THE COURT:  Exhibit 34.

8            MR. BERKOWITZ:  Exhibit 34.

9            THE COURT:  All right, I have it.  Thank you.

10   BY MR. BERKOWITZ:

11   Q    And you see that profit is $350,192?

12   A    Yes.

13   Q    Okay.  And these are all from the sale of Steel

14   Seal?

15   A    Oka.  So, I have to -- I have to deal with this one

16   also, P-34.

17           THE WITNESS:  I don't -- I don't deal with it

18   now, right, Your Honor?  Just when I come back on it,

19   right?

20           THE COURT:  Right.

21           THE WITNESS:  Okay.

22   BY MR. BERKOWITZ:

23   Q    Okay.  So between those, for the eight-month period

24   it shows profits of over $406,000?

25   A    If that's the calculation, yes.

1    Q    Okay.  Now, Mr. Hipple --

2              MR. BERKOWITZ:  Your Honor, it's 12:10.  I

3    can -- I think I can finish up with Mr. Hipple in just

4    a few minutes.

5              THE COURT:  Yes, sure, let's do that.

6              MR. BERKOWITZ:  Let's just move it along.

7              THE COURT:  Yes.

8              (Pause in proceedings.)

9              THE WITNESS:  We're not allowed to introduce

10   any document now, right, like Quickbook --

11             THE COURT:  Pardon me?

12             THE WITNESS:  I'm not allowed to introduce

13   any Quickbook documents now?

14             THE COURT:  No, you can -- when Mr. Berkowitz

15   is finished.

16             THE WITNESS:  No, I mean as part of evidence

17   in this case.

18             THE COURT:  Yes, you can introduce --

19             THE WITNESS:  I can bring my Quickbook

20   information now?

21             THE COURT:  Yes, sure you can.

22             THE WITNESS:  Oh, okay.

23             THE COURT:  As long as you --

24             MR. BERKOWITZ:  As long as it was produced

25   before.

1    THE COURT:  Yes, well, as long as you

2    produced it in the litigation before and you can

3    establish that it's admissible.  We will talk about

4    that later, okay?

5    THE WITNESS:  Okay.

6    BY MR. BERKOWITZ:

7    Q    Mr. Hipple, if you could turn to Exhibit 42.

8    A    Different book?

9    Q    It's -- this should be book two.

10    (Pause in proceedings.)

11    A    Okay, 42.

12    Q    Do you see -- and I would like you to look at -- it

13    says on the top, "Total Merchant Services."

14    A    Okay.

15    Q    Do you see that?

16    A    Yep.

17    Q    Okay.  And you're familiar, this is how you get the

18    credit cards --

19    A    No, I am --

20    Q    -- processed through the bank?

21    A    -- not familiar.

22    Q    You're not familiar with this?

23    A    Nope.  I don't even know the company.  I'm not

24    familiar with it and I know nothing about it.

25    Q    You know -- okay.  Okay.  Well, let's just look at

Mr. Hipple - Direct                    145

1    this for a second.  Do you see at the bottom of this

2    page --

3    A    Right.

4    Q    -- there's Brian -- it looks like there are

5    initials there.  They look like BMH to me.

6    A    I don't -- at the bottom of the page where?

7    Q    Yeah.

8    A    I'm not familiar with the document so I'm not even

9    going to answer the question.

10   Q    Okay.  Let's go two pages forward.

11   A    Two what?

12   Q    Two pages forward.  It says page three of 12.

13            THE COURT:  Mr. Berkowitz, if he's not

14   aware -- he's not familiar with it --

15            THE WITNESS:  I'm not familiar with --

16            MR. BERKOWITZ:  I understand.

17            THE WITNESS:  -- the document.

18            THE COURT:   -- we then generate -- I don't

19   think it's proper to ask him.

20            MR. BERKOWITZ:  I just want to ask him to --

21            THE WITNESS:  I object.

22            MR. BERKOWITZ:   -- to identify the signature

23   on it, Your Honor.

24            THE COURT:  All right.

25   BY MR. BERKOWITZ:

Mr. Hipple - Direct                    146

1   Q   Go two pages forward under "required signatures."

2   I'm not going to verify Brian's signature anymore.

3           THE COURT:  Well --

4           MR. BERKOWITZ:  Okay.

5           THE COURT:  Well, wait a minute.  You can't

6   just refuse to do that.

7           MR. BERKOWITZ:  Right.

8           THE WITNESS:  Oh.

9           THE COURT:  Mr. Berkowitz can ask you a

10  question if you can identify a signature.  And if you

11  say I can't, you can't.

12          THE WITNESS:  Okay.

13          THE COURT:  Wait, wait.

14          THE WITNESS:  I'm --

15          THE COURT:  You have to --

16          THE WITNESS:  Sorry.

17          THE COURT:  -- answer the questions.  You

18  just can't refuse to.  So, Mr. Berkowitz, ask it again,

19  please.

20  BY MR. BERKOWITZ:

21  Q   Mr. Hipple, on page three of 12, there are two

22  signatures that appear on the page.  And do you see it

23  says "Print name," and it says Brian Hipple?

24  A   I see where it says "Print name," Brian Hipple,

25  yes.

Mr. Hipple - Direct                              147

1   Q    And it says the date is 12-28-10?

2   A    Yes.

3   Q    Okay.  And there's a signature there?

4   A    Yes.

5   Q    And that appears to be the signature of Brian

6   Hipple?

7   A    Maybe it appears to be, yes.

8   Q    Okay.  Now, I would like you to go several pages

9   forward.  You'll just see a void check.

10               (Pause in proceedings.)

11   Q    And do you see it says Steel Seal Pro?

12   A    Yes.

13   Q    Okay.  And the date of this document where Brian

14   signed is 12-28-10?

15   A    The date of what, this document?

16   Q    When you look on the third page where Brian signed.

17   A    Okay.  12-28-10.

18   Q    Right?

19   A    All right.

20   Q    Okay.  So it looks like he had a checking account

21   by then?

22   A    You would have to ask Brian that question, okay?

23   Q    Well, I don't think I can do that.

24               THE COURT:  I'll sustain the objection, all

25   right?  He doesn't -- he didn't prepare this document.

Mr. Hipple - Direct                    148

1    He's not familiar with it.

2            MR. BERKOWITZ:  Okay.

3            THE COURT:  It's not proper, Mr. Berkowitz.

4            MR. BERKOWITZ:  Okay.

5    BY MR. BERKOWITZ:

6    Q    Now, you had a company, we've talked about it

7    before, called Steel Seal, LLC, and that's your

8    company?

9    A    100 percent.

10   Q    Okay.  And that's a company that, before this case,

11   defaulted, correct?

12   A    We -- oh, yeah, before the start of this case we

13   defaulted it.

14   Q    Okay.

15   A    Yes, that's correct.

16   Q    And I think you told me in your affidavit on

17   Exhibit 25, paragraph 70, Steel Seal never had any

18   assets --

19   A    Steel Seal, LLC --

20   Q    Yes, Steel --

21   A    -- Pennsylvania corporation, never had any assets.

22   Q    Never conducted any business?

23   A    Well, maybe $25.

24   Q    Okay.  Never conducted any business?

25   A    That is correct, never --

Mr. Hipple - Direct                    149

1    Q    Okay.

2    A    -- conducted any business.

3    Q    Would it be fair to say you're the only one who

4    would know anything about Steel Seal, LLC?

5    A    Yes, it would be very fair to say that.

6    Q    Okay.  Mr. Hipple, I would like you to turn to

7    Exhibit 47.

8    A    Okay.  All right.

9    Q    Do you recognize that writing?

10   A    Sure, that's my writing.

11   Q    That's your writing.  And you see it says "Merchant

12   Services" on the top?

13   A    Right.

14   Q    Okay.  And that's -- again, that's the credit card

15   processing company?

16   A    That's right.

17   Q    You see you got a name up there, Mike Zedzick (ph)?

18   A    Yes, I spoke with --

19   Q    And you got --

20   A    Yes.

21   Q    You got there it says "New Steal Seal, LLC," and

22   you got a federal ID number.  Do you see that?

23   A    Yes, of course.

24   Q    Okay.  So you had that?  Nobody else would have

25   that information?

1   A    This is all my information, yes, correct.

2   Q    Okay.  Let's turn to Exhibit 36 and that would be

3   in volume one.

4   A    Volume one?

5            (Pause in proceedings.)

6   Q    And this is Plaintiff's Exhibit 36.

7   A    Right.

8            (Pause in proceedings.)

9   Q    Now, at the top of Exhibit 47, you had a name,

10  Michael Zedzick?

11  A    Yes.

12  Q    Do you see that?  And let's look at this

13  application for merchant card processing.  Do you see

14  that name, sales rep, Michael Zedzick?

15  A    Okay.

16  Q    And do you see up there it says "Association

17  Number"?

18  A    Right.

19  Q    Do you see that?  You've got 105922?

20  A    Right.

21  Q    And if you turn to Exhibit 46, I'll represent to

22  you that that's the same association number.

23  A    46?

24  Q    Well, let's start with 42.

25  A    Okay.

Mr. Hipple - Direct                      151

1          (Pause in proceedings.)

2    Q   We looked at the merchant services agreement for

3    Steel Seal Pro, right, that was the one we looked at

4    before?

5    A   The merchants agreement for who?  Steel Seal Pro?

6    Q   Steel Seal Pro.

7    A   Right.

8    Q   And then if you go to Exhibit 46 --

9    A   Right.

10   Q   -- do you see that it says "Merchant Statement" and

11   it's got an associate, number 46?

12   A   I never seen this statement.  I don't --

13   Q   Okay.  Well, I'm just asking you -- we talked -- I

14   just want you to look at the association number at the

15   top of that.

16   A   105922.

17   Q   Okay.  Thank you.  And that's the one that appears

18   right at the top of this Exhibit 36, correct?

19   A   Yes.

20   Q   Okay.  Now, let's look down.  Do you see it says

21   "Contact Name"?

22   A   Which one was it that we were looking at?  37?

23   Q   We were looking at 36.

24   A   Where's it say "Contact Name"?

25   Q   If you look down the --

Mr. Hipple - Direct                    152

1    A    Oh.

2    Q    -- left-hand corner under number one, Brian Hipple.

3    A    Okay.

4    Q    Okay.  And if you look just about a line or so

5    above that on the right side it says "Length owned, 15

6    years?"  Do you see that?  It's on the right.

7    A    I've never seen this document.

8    Q    I'm just -- I'm just going through it with you.

9    A    Okay.  Length owned what?

10   Q    15 years.

11   A    Where?

12   Q    It's halfway down the first block on the right

13   side.

14   A    What does length own --

15   Q    Right there.

16   A    -- length own mean?

17   Q    Okay, it says -- do you see that it says 15 years?

18   A    Yes.

19   Q    Okay.  Now, let's look at -- do you see that W-9

20   information?

21   A    Where at?

22   Q    It's the next big block.  It says "Two. W-9

23   Information."

24   A    W-2 you mean?

25   Q    It's -- well, it's number two.  It says "W-9

Mr. Hipple - Direct                      153

1    Information."

2    A    No, I don't see it.

3           THE COURT:  Why don't you point it out to

4    him.

5    BY MR. BERKOWITZ:

6    Q    I know you haven't seen this, but let's -- right

7    there.

8    A    Okay.

9    Q    W-9.

10   A    All right, W-9 form.  Okay.  Information holding.

11   Go ahead.

12   Q    Okay.  And you see an EIN number, and could you

13   read that off?

14   A    753099885.

15   Q    Okay.  Now, I would like you to look at your

16   Exhibit 47 that you said was your writing.

17   A    Right.  Okay.

18   Q    And do you see under where it says "New Steel Seal,

19   LLC?"

20   A    Hold on.

21           (Pause in proceedings.)

22   A    In my handwriting, "New Steel Seal, LLC?"

23   Q    Yes.  And you'll agree with me that's the same EIN

24   number?

25   A    Yes, it is the same number.

Mr. Hipple - Direct                    154

1    Q    Okay.  And I think you testified you're the only

2    one with this information, correct?

3    A    No.  Oh, you mean with Steel Seal?

4    Q    Yeah, about Steel Seal.

5    A    Yeah, I'm the only one that has Steel Seal

6    information, yeah.

7    Q    Okay.  Now, it says "Owner and Officer

8    Information."  Do you see that?

9              THE COURT:  We're back to -- we're back to

10   36.

11   BY MR. BERKOWITZ:

12   Q    We are back to 36.

13   A    Okay.

14   Q    And do you see it says "Owner and Officer

15   Information?"

16   A    Yes.

17   Q    And you see it says Brian Hipple?

18   A    Yes.

19   Q    And you see it's a social security number?

20   A    Yes.

21   Q    Okay.  Now, let's go forward.  Let me get the page

22   for you.  It has a --

23   A    Now --

24   Q    It says "Guarantors."

25   A    Now I got this.

Mr. Hipple - Direct                               155

1   Q    You see "Guarantors?"

2   A    What's this?

3   Q    If you go forward several pages, it's some fine

4   print at the top of the page, and then it's got "12.

5   Merchant Signatures."  Do you see that?

6   A    "Merchant Signature," yeah.

7   Q    Yeah, do you see that?

8   A    Right.

9   Q    And you see there's a block?

10  A    Right.

11  Q    And it looks like it was typed in, the name, Brian

12  Hipple?

13  A    Right.

14  Q    Okay?

15  A    Okay.

16  Q    Now let's look at the next page.

17  A    Okay.

18  Q    Do you see that?  Now, let's look at the bottom of

19  the page.

20  A    Right, Steel Seal, LLC.

21  Q    Steel Seal, LLC.  And that's the address?

22  A    Right.

23  Q    Do you see it's typed in, "Brian Hipple?"

24  A    Yeah.

25  Q    Okay.  And you see "Printed Name of Owner/Officer,

Mr. Hipple - Direct                                    156

1    Brian Hipple?"

2    A    Right.

3    Q    And you see "Owner?"

4    A    Right.

5    Q    Now look at the bottom of the page on the right.

6    A    Okay.

7    Q    10-10-2012.

8    A    Yeah, well, Brian very well couldn't have signed

9    that back then.

10   Q    Well, that's right.  You submitted this with Brian

11   as the guarantor, isn't that correct?

12   A    I never submitted this form.  I never seen this

13   form, okay?

14   Q    You testified, sir, that you're the only one with

15   this information, with the EIN number.

16   A    No.

17   Q    And you own --

18   A    Mike had --

19   Q    -- Steel Seal, LLC.

20   A    No, Mike -- I'll cross -- I'll do that

21   cross-examine when I come up, okay?

22   Q    Okay.  But you'll agree with me --

23   A    I agree with you that --

24   Q    -- that whoever filled this out --

25   A    No.  What am I agreeing with you?

Mr. Hipple - Direct                    157

1    Q    That whoever filled this out --

2    A    Right.

3    Q    -- on 10-10-2012 --

4    A    Right.

5    Q    -- that had the information, the EIN number of

6    Steel Seal --

7    A    Right.

8    Q    -- whoever that was --

9    A    Right.

10   Q    -- just like on your handwritten page, wasn't Brian

11   Hipple?

12   A    No, because he wasn't around.

13   Q    Because Brian Hipple had -- was passed away by

14   then?

15   A    Right.  Yeah, right, correct.  Okay, I will take

16   this back when --

17            MR. BERKOWITZ:  This would be a good place to

18   break.

19            THE COURT:  Are you finished with him or --

20            MR. BERKOWITZ:  I would like to just review

21   my notes --

22            THE COURT:  Okay.

23            MR. BERKOWITZ:  -- before I say yes.  I think

24   I am.

25            THE COURT:  All right.  Okay.  All right.

1 We'll take a lunch break.  Let's come back at 1:00.

2 It's a little bit after 12:20.

3    THE WITNESS:  Come back at 1:00?

4    THE COURT:  No, I'm sorry, I apologize.

5 Let's come back at 1:30, give you an hour, little over

6 an hour.  All right?

7    MR. BERKOWITZ:  Thank you.

8    THE COURT:  See you at 1:30.

9    (Luncheon recess, 12:22 p.m.)

10      * * *

11     AFTERNOON SESSION

12      1:33 p.m.)

13    THE COURT:  Please be seated.  Mr. Hipple --

14    MR. BERKOWITZ:  Your Honor --

15    THE COURT:  Oh, you're done?

16    MR. BERKOWITZ:  -- I have finished with Mr.

17 Hipple.

18    THE COURT:  Oh, okay.

19    MR. BERKOWITZ:  And if I could raise a

20 procedural question for you.  First, Mr. Hipple, I

21 wanted to talk to you about --

22    THE COURT:  Yes.

23    MR. BERKOWITZ:  Would you like to talk to us

24 first or --

25    THE COURT:  Yes.  You want it on the record,

159

1   right?

2           MR. BERKOWITZ:  Do you want it on the record

3   or now?

4           MR. HIPPLE:  Yeah, it can go on the record.

5           THE COURT:  This is about the case, right?

6           MR. HIPPLE:  Yes.  No, it's about me

7   personally, my problem with reading.

8           THE COURT:  Oh, okay.  Yes, let's put it on

9   the record.  Go ahead, Mr. Hipple, do you want to go

10  first?

11          MR. HIPPLE:  Okay.  Basically, I have the

12  questions for the expert, okay?  And there's every word

13  in here that I don't understand.

14          THE COURT:  Okay.

15          MR. HIPPLE:  Okay?  Do you want to see it?

16          THE COURT:  All right, yes, let me see.  Now,

17  what -- so this is the expert?  What are you handing

18  me?

19          MR. HIPPLE:  This is the questions for the

20  expert.

21          THE COURT:  Okay.  Why don't you go back

22  there so he can hear you?

23          MR. HIPPLE:  It's --

24          THE COURT:  Oh, this is your questions,

25  right?

1          MR. HIPPLE:  It's my questions to the expert.

2          THE COURT:  All right, but --

3          MR. HIPPLE:  And I have two exhibits.

4          THE COURT:  All right.  Is the expert the

5    next witness?

6          MR. HIPPLE:  Yes.

7          MR. BERKOWITZ:  My expert, yes, Mr. Geisser

8    is going --

9          THE COURT:  Okay.

10          MR. BERKOWITZ:  -- to be the next witness.

11          THE COURT:  All right.  Now, let me ask you

12   this before we do that.  Do you want to present any

13   testimony now or you want to wait until --

14          MR. HIPPLE:  No, I want to do my testimony

15   later after he's done.

16          THE COURT:  In your case?  That's fine.

17   Okay.

18          MR. HIPPLE:  Yes, I need time to prepare.

19          THE COURT:  Yes.  Now, what's your problem

20   now?  Tell me what your problem is.

21          MR. HIPPLE:  A lot of it.

22          THE COURT:  Okay.

23          MR. HIPPLE:  Look at the wording.

24          MR. BERKOWITZ:  Your Honor, if I -- Mr.

25   Hipple asked me if it would be okay with me if his

1  expert witness sat with him at the table to help him

2  through the document, and I told Mr. Hipple I had no

3  objection, but it was --

4          THE COURT:  Yes, that's fine.

5          MR. BERKOWITZ:  -- not my decision.

6          THE COURT:  Your expert to help you with --

7          MR. HIPPLE:  The reading of the document.

8          THE COURT:  Fine.

9          MR. HIPPLE:  Can he read it or no?

10          THE COURT:  I'm not sure I understand.

11          MR. HIPPLE:  Can he just ask the questions

12  off the document?  It's very, very complicated.

13          THE COURT:  Okay.  Your expert ask the

14  questions of the other expert?

15          MR. HIPPLE:  Expert, yes.

16          MR. BERKOWITZ:  I have a problem with dueling

17  experts --

18          MR. HIPPLE:  It's the same wording.

19          MR. BERKOWITZ:  -- but maybe we should --

20          THE COURT:  Well, what I suggest is this.

21  I'll have your expert tell you what questions to ask.

22          MR. HIPPLE:  Well, no, we're going to ask all

23  of these questions.

24          THE COURT:  You're going to ask them?

25          MR. HIPPLE:  But we -- I cannot read these

162

1   questions.

2           THE COURT:  Well, your expert can tell you

3   and read it for you?  Is that all right with you, Mr.

4   Berkowitz?

5           MR. HIPPLE:  Yeah.

6           MR. BERKOWITZ:  Yeah, I have no objection to

7   that, Your Honor.

8           THE COURT:  If he whispers in your ear ask

9   him this, and you ask him this.

10          MR. HIPPLE:  No, he's going to -- he has to

11  tell me what the word is.

12          THE COURT:  Yes, that's fine, but you're

13  going to ask the question.

14          MR. HIPPLE:  Yeah, okay.

15          THE COURT:  We're not going to have another

16  expert --

17          MR. HIPPLE:  All right.

18          THE COURT:  He's not going --

19          MR. HIPPLE:  And I can't --

20          THE COURT:  -- to question the other expert.

21          MR. HIPPLE:  And I can't use one of these

22  young law clerks back there, right, to read it?

23          MR. BERKOWITZ:  No, they're not members of

24  the Bar.  They can't --

25          THE COURT:  No.

1          MR. BERKOWITZ:  -- represent you.

2          MR. HIPPLE:  No, no?

3          THE COURT:  No.

4          MR. HIPPLE:  Okay.

5          THE COURT:  You knew all this.  You shouldn't

6   have fired your lawyer.

7          MR. HIPPLE:  Well, I didn't think I was going

8   to have this kind of a --

9          THE COURT:  Well, maybe you should have

10  thought of that.

11         MR. HIPPLE:  Yes.

12         THE COURT:  Let me ask you both something.  I

13  mean you -- I don't want to get involved in settlement,

14  but did you -- did you -- would you think it would be

15  worthwhile for you two to talk again?

16         MR. BERKOWITZ:  We tried.

17         THE COURT:  You tried?

18         MR. BERKOWITZ:  I asked Mr. Hipple if he's --

19         MR. HIPPLE:  We're not -- we're not even

20  close.  Okay.

21         THE COURT:  Did Mr. Berkowitz give you the

22  number that he -- and I don't want to know the number,

23  but when he added up what he thinks he's owed on the

24  two notes -- not he, but his client, Ms. Concepcione,

25  is owed on the two notes, you know that number, right?

164

1            MR. HIPPLE:  Yeah, exactly.

2            THE COURT:  Okay.  He explained how he came

3    to that conclusion, right?

4            MR. HIPPLE:  Right.

5            THE COURT:  And did you respond to Mr.

6    Berkowitz and respond to those numbers?

7            MR. HIPPLE:  Yes.

8            THE COURT:  You don't have to tell me what.

9    Okay.

10           MR. BERKOWITZ:  he --

11           THE COURT:  You don't think it's worthwhile?

12           MR. BERKOWITZ:  Well, when we went to Judge

13   Hay, there was really no point in --

14           THE COURT:  Okay.  All right, that's fine.

15           MR. BERKOWITZ:  -- further discussion.

16           THE COURT:  I heard enough.

17           MR. HIPPLE:  Okay.  So he --

18           THE COURT:  Okay.

19           MR. HIPPLE:  -- can just help me with the

20   wording then, right?

21           THE COURT:  Right.  So, in other words,

22   your -- I'll allow your expert -- is he here?

23           MR. HIPPLE:  Yes.

24           THE COURT:  Your name, sir?

25           MR. PEDERSON:  William Pederson.

165

1              MR. HIPPLE:  William Pederson.

2              THE COURT:  All right, Mr. Pederson.  So Mr.

3    Pederson can sit with you, I'll allow him to tell you

4    what questions to --

5              MR. HIPPLE:  Not tell me.  He just needs

6    to -- there are certain words in there that I can't

7    read.

8              THE COURT:  Right, you need some help.  You

9    don't have a problem, Mr. Berkowitz?

10             MR. BERKOWITZ:  I don't.

11             THE COURT:  No.  Okay.

12             MR. HIPPLE:  Okay.

13             THE COURT:  So you want to call your witness

14   next, Mr. Berkowitz?

15             MR. BERKOWITZ:  Yes, Your Honor.  I would

16   like to call Wayne Geisser.

17             THE COURT:  Sure.

18             MR. BERKOWITZ:  And, Your Honor, Mr. Geisser

19   is going to be using his expert report.  And it appears

20   as Exhibit 41 -- I'm sorry, 31 in plaintiff's, but I

21   have a tabbed copy that's mine that you could use.

22             THE COURT:  Oh, great.  Thank you.

23             MR. BERKOWITZ:  I think it will facilitate --

24             THE COURT:  Good.

25             MR. BERKOWITZ:  -- the testimony.

166

 1          THE COURT:  Thank you.

 2          MR. BERKOWITZ:  I would just ask that --

 3          THE COURT:  Right.

 4          MR. BERKOWITZ:  -- if I get it back at the

 5   end --

 6          THE COURT:  Okay.  Good --

 7          MR. BERKOWITZ:  It's my only --

 8          THE COURT:  -- afternoon, Mr. Geisser.

 9          MR. GEISSER:  Good afternoon.

10          THE COURT:  Mr. Geisser, if you wish to take

11   your jacket off, you're not going to offend me.  It's

12   okay.  I know it's hot in here.  So it's totally up to

13   you.

14          MR. GEISSER:  I wouldn't mind doing that,

15   Your Honor.

16          THE COURT:  You absolutely can.

17          MR. GEISSER:  Okay.

18          THE COURT:  Okay?  And that goes also to Mr.

19   Pederson, if you wish to take your -- if you wish to

20   take your jacket off, you're permitted to do that.

21          MR. PETERSON:  Okay.

22          THE COURT:  Okay.

23          MR. GEISSER:  It's actually cooled down a lot

24   in here since this morning.

25          THE COURT:  All right, let's go.

167

1          WAYNE GEISSER, Plaintiff's Witness, Sworn.

2          COURTROOM DEPUTY:  State and spell your name

3    into the microphone for the record.

4                    DIRECT EXAMINATION

5    BY MR. BERKOWITZ:

6    Q    And I missed that.  Did you identify yourself for

7    the record yet?

8    A    Not yet.  Just -- I'm -- let me just adjust the

9    microphone here.  It's kind of falling down.  My name

10   is Wayne Geisser, G-E-I-S-S-E-R.

11   Q    And, Mr. Geisser, would you tell us first your

12   educational background and then your professional

13   experience?

14   A    Sure.  I'm a graduate of Temple University.  I have

15   a B.B.A. in Accounting.  I also took graduate courses

16   in Drexel University as well.  I began my career as an

17   IRS agent and spent about seven years with the IRS

18   examining federal corporate individual and partnership

19   tax returns.  And then I left the IRS and I joined the

20   United States Securities and Exchange Commission.

21          At the SEC, I started my career as a senior

22   accountant and I was eventually promoted to be a branch

23   chief in the SEC division enforcement.  We were

24   basically charged with investigating violations of the

25   federal securities laws.  A lot of my responsibility

Mr. Geisser - Direct                                        168

1    had to do with accounting fraud while I was there.

2            In 1986, I left the SEC and I joined a firm

3    called Nihill and Riedley, and I've been continuously

4    with that firm since 1986.  In 2010, the firm was sold

5    to Smart Divine.  So while it's the same corporate

6    entity, it's a different name.  So we're currently

7    trading under Smart Divine.

8            I currently serve as the managing director of

9    that firm, and prior to that, prior to selling my

10   equity interest, I was a partner at Nihill and Riedley.

11   Q    And could you tell me what certifications -- and

12   you're a CPA?

13   A    Sure, yes.  Just generally speaking, I have a

14   practice in forensic accounting, the way it's termed.

15   I have a -- I'm a certified public accounting since

16   1977.  I have -- I'm a certified fraud examiner.  I

17   have -- I'm certified in business valuations by the

18   Association of Certified Valuation Analysts.

19           I'm also certified by the American Institute

20   of Certified Public Accountants in two areas,

21   specifically business valuation and financial

22   forensics.

23   Q    And were you called upon to use some of your

24   forensic accounting skills in the context of this

25   engagement?

Mr. Geisser - Direct                                   169

1   A   Very much so.  This was a situation where we were

2   involved in essentially doing a reconstruction of books

3   and records and try and put pieces together so that

4   they make sense and tell a story, and that's what we do

5   as forensic accountants.

6           MR. BERKOWITZ:  Okay.  Your Honor, I would

7   like to offer Mr. Geisser as an expert witness to

8   testify on behalf of the plaintiff.

9           THE COURT:  Okay.  Any questions on his

10  qualifications?

11          MR. HIPPLE:  No, none.

12          THE COURT:  Okay.  All right, I find that Mr.

13  Geisser is an expert in the area he identified here

14  this morning, and I'll allow him to testify and

15  proceed.

16  BY MR. BERKOWITZ:

17  Q   Mr. Geisser, would you tell us the nature of your

18  engagement for the plaintiff in this case?

19  A   Sure.  Mr. Berkowitz, I think it would be easier if

20  I start to walk through my report a little bit so

21  help -- I think help everybody in the courtroom if I do

22  it that way.

23          But generally speaking, and I'm going to

24  direct everybody's attention to page one of my report.

25  I was retained essentially to analyze the available

Mr. Geisser - Direct                          170

1   financial records to estimate the distributable cash

2   flow available to the owners and insiders of the

3   subject companies and to prepare a calculation of value

4   for SCIX as of approximately October 13th, 2010, based

5   on the records that were available to me, October 13th,

6   2010, of course, was the date that the bank accounts

7   were garnished.

8   Q    Okay.  And you're here to tell us the value of the

9   assets that were transferred?

10  A    I'm here to tell you what the value of the cash

11  flows associated with the Steel Seal business was.

12  Q    Okay.

13  A    We have -- this is a case where we have an

14  expansive number of entities involved that we're going

15  to walk through, but the one thing that is continuous

16  throughout the entire story is that there's a single

17  product that's being sold, and that's Steel Seal.

18          And when we look at the records we see that

19  that is continuous from the beginning of the relevant

20  period of time right through the end of the period of

21  time that we looked at.  So we're looking at the cash

22  flows, what the product is making for the owners of the

23  business.

24  Q    And is that how you determined what the value of

25  the product, Steel Seal, is?

Mr. Geisser - Direct                          171

1   A    It's the -- it's the value of the cash flows

2   associated with the product.

3   Q    Okay.  And can you tell us what information you

4   used to derive the values that you will tell us about?

5   A    Sure.  This was a case that we were really working

6   with what I'll call fragmentary records.  We had some

7   schedules Cs, which schedule C is in connection with an

8   individual 1040.  It's where you report your business

9   income.

10          We had two or three pages of Quickbook

11  records, and we had bank records that I believe we

12  obtained and -- actually, you obtained through subpoena

13  to the various banks that are involved in this case.

14  So it was a matter of putting together those few

15  accounting records along with the bank records as well.

16          We had no formal financial statements that we

17  had available to us in terms of a typical financial

18  statement that you would see with an income statement,

19  a balance sheet, cash flow statements.  They didn't

20  exist.  We didn't have any underlying Quickbooks

21  records to take a look at.  And so it was a very --

22  very much a reconstructive process that we had to go

23  through in order to try and establish what the value of

24  the cash flows associated with the Steel Seal product

25  were.

Mr. Geisser - Direct                                    172

1   Q   And did you ever have an occasion to review the

2   American Express records?

3   A   I did.  They were produced to us, and we reviewed

4   those and analyzed the American Express records.

5   Q   And did you ever review financial records, balance

6   sheet, income statement, statement of cash flow, for

7   either SCIX or Steel Seal Pro?

8   A   Again, as I mentioned, we didn't have those types

9   of records available to us.  In order to do a classic

10  business valuation, you typically have a set of

11  financial statements you're dealing with.  Those kind

12  of records were not available to us so we had to do

13  this reconstructive process that I referred to earlier.

14  Q   And when you say they weren't available to you, how

15  did you know that they weren't available?

16  A   Well, Mr. Berkowitz, you told us that they weren't

17  available, that they had been requested through the

18  various parties and were not produced.

19  Q   Now, did the lack of the normal business records, I

20  don't know how else -- would you call the balance

21  sheet, income statement, and statement of cash flow to

22  be normal business records?

23  A   Very basically, they're called financial

24  statements.

25  Q   Okay.

Mr. Geisser - Direct                               173

1    A    That's -- and when you talk about a set of

2    financial statements you're typically talking about

3    those three specific documents, and they make up a set

4    of financial statements.

5    Q    And could I call those normal business records?

6    A    You can.  I would call them, more specifically,

7    financial statements.

8    Q    Okay.

9    A    Yeah.

10   Q    And did that affect how you performed your

11   engagement to issue your expert report?

12   A    It sure did.  When you don't have a good set of

13   records or a basic level of records, you have to work

14   with what you have, and that's exactly what I did in

15   this case.

16         I discussed with you specifically what

17   records were available.  I explained the nature of the

18   issues that came up with having what I described as

19   fragmentary records.

20         I described what we could do, what we

21   couldn't do, and that's how we ended up with the report

22   that we have in front of us today.  It was basically I

23   used the fragmentary records in the best way that I

24   thought was available to me.

25   Q    Now, in analyzing those records, did you act in

Mr. Geisser - Direct                                    174

1   accordance with the guidelines of the AICPA?

2   A    Yes, I did.

3   Q    And could you explain basically if you could the

4   AICPA methodology for calculating the value here of

5   what we're asking to determine, the value of the cash

6   flow from Steel Seal?

7   A    Sure.  The American Institute of CPAs has a

8   pronouncement called the Statement on Standards of

9   Valuation Number 1, and it's that statement on

10  valuation that kind of sets the standard in terms of

11  how you do these types of reports.

12         And it provides for two basic approaches to

13  doing a valuation-type calculation.  One is a process

14  ends up in an opinion of value.  It's a more

15  comprehensive view of trying to value an individual

16  business.

17         The second is called a calculation of value.

18  A calculation of value is where you look at it from a

19  more limited volume of records and try to produce a

20  meaningful result based on the records that are

21  available to you, and it's typically something that you

22  agree on with the client in terms of what the approach

23  is going to be because there is a limitation to the

24  scope of the records you're dealing with.

25  Q    So would it be fair to say that you were -- were

Mr. Geisser - Direct                          175

1  you able to issue an opinion of value based on the

2  records that you had?

3  A    I was able to issue an opinion of calculation of

4  value in connection with the records I looked at.

5  Q    And what were you not able to produce according to

6  the AICPA standards?

7  A    An opinion of value that's broader in scope.

8  Q    Okay.

9  A    So it's an opinion of value versus a calculation of

10 value.

11 Q    And you did the calculation of value?

12 A    I did.

13             THE COURT:  What's the difference?

14             THE WITNESS:  The --

15             THE COURT:  Could you explain the difference

16 in the terms?

17             THE WITNESS:  Sure.  Typically, when you do a

18 business valuation you're looking at a free standing

19 business that has a set of financial statements, it

20 sells a certain product or line of products, it has

21 expenses, it has income, it has a certain ownership

22 associated with it, it's got an economic environment

23 that it lives in, it has a supply chain, and there's

24 other risk dynamics associated with it.

25             And when you do a business valuation you

Mr. Geisser - Direct                    176

1  consider all those types of things in that valuation

2  process.  And so it's a very extensive process when you

3  consider all those factors.

4           And you also are obligated under the

5  standards to use basically three approaches to value.

6  One is the income approach, one is a market value

7  approach, and one is an asset-based approach.  But

8  being able to do that really is dependent upon having

9  records that allow you to do that.

10           THE COURT:  Right.

11           THE WITNESS:  If you do not have those

12  records --

13           THE COURT:  Right.

14           THE WITNESS:  In this case, we didn't have

15  balance sheets, very basic to the process.  So I

16  couldn't even begin to take and analyze a balance sheet

17  because none were produced.

18           THE COURT:  Okay.

19           THE WITNESS:  And so there's a fundamental

20  scope limitation on what was available to me in order

21  to be able to do that.  And so recognizing that, I

22  advised the client accordingly, specifically, in this

23  case, working with Mr. Berkowitz, and I said that there

24  was an alternative way that we could approach this, and

25  that was to use the available records, qualify the

Mr. Geisser - Direct                    177

1    opinion accordingly, and call it what it was, which was

2    a calculation of value --

3              THE COURT:  Right.

4              THE WITNESS:  -- which is what I felt we

5    could do under the circumstance in order to produce a

6    meaningful result.  And I will emphasize that I do feel

7    in this case that I produced a meaningful result that I

8    think is reliable within the scope of what I was able

9    to accomplish.

10             THE COURT:  Okay, thank you.

11   BY MR. BERKOWITZ:

12   Q    And in providing the calculation of value that you

13   performed, did you apply and follow the AICPA approved

14   methodology and standards?

15   A    I did, which is basically a disclosure of what

16   we're doing and how we're going about doing it, and

17   just being fully disclosed in terms of the approach

18   that we're using to come out with the calculation of

19   value.

20   Q    Would you tell us --

21   A    And that's embodied --

22   Q    I'm sorry.

23   A    -- in the report.  I'm sorry.  That's explained in

24   the body in the report.

25   Q    Okay.  Do you want to further explain that to us or

Mr. Geisser - Direct                    178

1   would you like to --

2   A   I think that will become more evident as we go

3   through things, but I think that's basically it.  And

4   to answer your question directly, yes, we followed the

5   AICPA standards for a calculation of value.

6   Q   Okay.  And what was your understanding of the

7   nature of the SCIX business?

8   A   Well, the SCIX business was the sale of Steel Seal,

9   and it's a -- it's an interesting product because it

10  has a certain unique quality to it, as I understand it,

11  that's very limited in terms of any other product.

12          As I understand it, there's basically no

13  other product that does exactly what Steel Seal does,

14  and because of that, it's a very profitable product

15  according to my analysis, and a very valuable product

16  and a very valuable business because of those

17  attributes that make it rather unique and very

18  profitable, and we can go through that.

19  Q   And what are certain things that -- things like

20  patents and secret formulas, do those affect the value

21  that you find in a business?

22  A   They sure do.  When you're doing --

23          MR. HIPPLE:  Objection.  Or am I not allowed

24  to object yet?

25          THE COURT:  Yes, you can object.  What's the

Mr. Geisser - Direct                      179

1   basis of your objection?

2          MR. HIPPLE:  Your Honor --

3          THE COURT:  You have to speak up.

4          MR. HIPPLE:  The basis is on his last

5   question where he made a statement that this is a

6   unique product and it's like it's the only one out

7   there.  Does he have knowledge that that's the only one

8   out there?  I mean has he been to an auto part stores,

9   because there's five or ten different ones out there.

10         THE COURT:  All right, I'm going to overrule

11  the objection.  I think he said he's going to talk

12  about that as he progresses.

13         MR. HIPPLE:  Okay.

14         THE COURT:  Is that right, Mr. Geisser, are

15  you going to talk about that a little bit later in

16  your --

17         THE WITNESS:  I am, but I --

18         THE COURT:  Okay.

19         THE WITNESS:  -- can also just address is

20  directly --

21         THE COURT:  Sure.

22         THE WITNESS:  -- right now.

23         THE COURT:  Go ahead.

24         THE WITNESS:  I mean my understanding is

25  there's a uniqueness to the product.  When you go onto

Mr. Geisser - Direct                    180

1    the internet and you look at the Steel Seal website,

2    and it describes itself as a rather unique product.

3    It's specific to accomplish a very specific purpose in

4    terms of correcting an engine block problem.

5              And -- but I think by its own hype, if you

6    will, on the internet, it presents itself as a rather

7    unique solution to a unique type problem.  So in my

8    view, it's unique in that sense.

9              THE COURT:  You can ask him further about

10   this when it's your chance for cross-examination.

11             MR. HIPPLE:  Okay.

12             THE COURT:  Go ahead, Mr. Berkowitz:

13   BY MR. BERKOWITZ:

14   Q    Now, does something like a secret formula affect

15   how you view the business and the cash flow that's

16   generated from a product?

17   A    Sure.  Any business that has a particular

18   uniqueness to it has typically a higher value just as a

19   general proposition, so that if -- you know, using the

20   classic example, if you're CocaCola and have the

21   CocaCola formula, it's a very valuable thing to have

22   the CocaCola formula, and that's not necessarily a

23   patented product, but it's a secret formula and it's

24   been a secret formula for many years.

25             So it's easy to understand that just having

Mr. Geisser - Direct                    181

1    that type of secret formula that accomplishes a very

2    specific task has the impact of increasing the value of

3    that company or any company, and it kind of applies

4    across the board in terms of when you look at the

5    valuation of a company.

6         So, you do look at the intangible assets that

7    are associated with it.  Something like, for example, a

8    hot dog stand that has nothing particularly unique

9    associated with it and, therefore, the values would be

10   relatively low.

11        But, as you deal with more sophisticated

12   companies with more sophisticated products and so

13   forth, the value of those companies would be increased

14   accordingly, you know, depending on the number of

15   patents and technologies they have and so forth.

16        In this particular company, we're dealing

17   with what I'll describe as somewhat of a unique product

18   that has several patents associated with it.

19   BY MR. BERKOWITZ:

20   Q   Could you tell us your view of, I'll call it for

21   lack of a better term, the business model?  How would

22   you classify the business model that SCIX conducted?

23   A   The business model here is really very simple, and

24   that's the certain beauty of having this type of

25   product.  There's no physical location that retails

Mr. Geisser - Direct                        182

1   this product.  As I understand it, it's almost

2   completely sold over the internet.

3           So nowadays, when we have e-commerce like

4   that we do, it doesn't require a physical space to have

5   to be able to distribute the product.  They don't

6   manufacture the product because that's done by Colonial

7   Chemical, so that's done on a subcontract basis.  So

8   you don't need -- you don't need a factory that has

9   vats and chemicals and things like that.  That's all

10  done off-site.

11          So, what you have is just a point of

12  distribution that receives the orders off the internet,

13  packages the bottles, and ships them around the world

14  presumably, to whoever needs this particular product.

15          So, the business model is very simple and

16  straightforward, and the point of distribution is also

17  very simple.  You go on the internet, you put in your

18  credit card number, or you have a -- I guess you can

19  also do it with a remotely-created check I imagine and,

20  therefore, the money comes directly to a bank account

21  which we can see in the bank account records that we

22  have available to us.  The product gets shipped and

23  everybody is presumably satisfied with the product.

24          So, it's a very simple business model.  It

25  requires very little capital to keep it going other

Mr. Geisser - Direct                     183

1   than just the initial acquisition cost of the product.

2   Q    And the initial acquisition cost, what are you

3   referring to there?

4   A    Well, I heard -- I heard yesterday during the

5   course of Mr. Hipple's testimony that he paid something

6   like $2 million in order to obtain the formula for the

7   Steel Seal product.  So, I understand that to say that

8   there was a value of at least $2 million on the product

9   at one point in time --

10  Q    Okay.

11  A    -- such that it would justify paying $2 million for

12  that process.

13  Q    And could you categorize the profitability of this

14  product by profit margin?

15  A    I can.  Can I use my report to do that?

16  Q    Please do.

17  A    Okay.  Let me -- let me direct your attention to

18  Exhibit B, if I could.

19  Q    I'm sorry, did you say B?

20  A    B, as in boy.  And if I could just take a minute to

21  explain to the Court exactly how this is laid out.  And

22  if I could, I think it would facilitate understanding

23  on several different points that we're going to talk

24  about.

25  Q    I would appreciate if you would do that because I

Mr. Geisser - Direct                          184

1   gave up my copy so it will help me catch up.

2   A    Okay, it's --

3   Q    Go ahead.  I'm --

4   A    It's Exhibit B and it's an exhibit called "Combined

5   Vertical Analysis," and it includes "Brian Hipple,

6   federal schedule C, which is SCIX and Steel Seal Pro

7   for the period from 2006 to 2011, B.B.B. Management,

8   and Complete Group, LLC, 2012 to 2013, Fragmentary."

9   That's the title of the exhibit.

10          And what this does is this lays out the

11   available records that we had -- we were provided with

12   to take a look at in connection with trying to

13   understand what was going on here.

14          There's two basic braces of information that

15   are available in this particular schedule.  And if you

16   look at the top, it says "Brian Hipple, Schedule C."

17   And then over to the right-hand side, it says,

18   "Quickbooks Profit and Loss," and under that is

19   "Complete Group and B.B.B. Management Group, LLC"

20   combined.

21   Q    Mr. Hipple, would those be the two exhibits we

22   looked at just before the break that showed B.B.B.

23   Management and Complete Group's profitability?

24   A    Yes, it is.  And if I recall correctly, you

25   specifically made reference to the numbers that appear

Mr. Geisser - Direct                        185

1   at the bottom of the page, net profit of 350,193,

2   55,967, for a total of 406,160.

3   Q    And that is for how long a period?

4   A    That is for an eight-month period of time between

5   October 2012 and May 2013.

6   Q    So you could annualize that number if you spread it

7   out?

8   A    Yeah.  So we did that in another -- different

9   schedule.

10  Q    Okay.

11  A    Yeah.  But if I could just come back to the

12  schedule C analysis, this information, again, came from

13  a Form 10 -- a schedule C from a Form 1040.  So when

14  you have an individual business, that's the way you

15  report on a Form 1040.

16        And it's more limited in its information

17  because when you have to file a 1040 you don't have a

18  balance sheet, so you basically have the revenues and

19  you have the expenses associated with the business and

20  you produce a bottom line, which is -- forms the basis

21  for what you pay taxes on basically.

22        Let me come back to the original question you

23  asked in terms of the profitability of the company.  If

24  you look at the top line which says "Gross Receipts" --

25  and I'm just going to read these off so we're all on

Mr. Geisser - Direct                              186

1    the same page, literally.

2         You can see back in 2006, they reported gross

3    receipts of 466,602; 2007, 412,085; 2008, 524,942;

4    2009, 786,604; 2010, 868,545; and 2011, 1,249,065.  So

5    that you can see that there's a steady progression

6    upward in terms of the volume of sales that's going

7    through this particular business, the Steel Seal sales

8    that are going through this business.

9         Now, Mr. Berkowitz, you asked me earlier, you

10   know, talk about the profitability of the product.

11   When we talk about the profitability of the product the

12   typical calculation you go through is the selling value

13   of the product and what it costs to manufacture that

14   product or produce that product.

15        So in this case, the primary cost of the

16   product becomes the chemical cost when they buy product

17   from Colonial Chemical.  I believe that is the next

18   line.  I say believe because we don't have the

19   underlying detail, so when we're looking at these

20   documents we're -- I'm trying to make a reasonable

21   inference about what that cost would be.  So imagining

22   the cost, it would probably be the cost of the product

23   that's being purchased.

24        So when we back out the cost of the product

25   from the sales we see the gross profit that derives

Mr. Geisser - Direct                                    187

1    from that.  And if we go across the gross profit line,

2    we can see that back in 2006, it was 416,000, I'm going

3    to round these off, 349,000, 399,000 in 2008, in 2009,

4    574,000, in 2011, 586,000, and -- excuse me, 2010,

5    586,000, 2011, 646,000, and then when we get to what

6    I'll call the combined numbers after 2011, which is the

7    Complete Group and B.B.B. Management and, again it is

8    only for an eight month period of time, we're at

9    616,000.

10             There's also another number that appears next

11   to those gross profit lines and it shows the gross

12   profit margin.  And if you look across that same line,

13   you see the numbers 89 percent, 85 percent, 76 percent,

14   73 percent, 67 percent, and 52 percent, and 53 percent.

15             So that says to me that it's -- they're

16   selling a product that has a relatively high profit

17   margin associated with it, again, the difference being

18   between the cost of goods sold and what it is being

19   sold for.

20   Q    Mr. Geisser --

21   A    So it's a profitable product.

22   Q    I'm sorry.

23   A    It's a highly -- has a high gross margin to the

24   product.

25   Q    So if I told you that it costs $1.50 a bottle for

Mr. Geisser - Direct                    188

1    SCIX to buy the Steel Seal, the 16-ounce bottle, and it

2    sold it somewhere between $44.95 and 59.95, that we

3    went through that calculation with Mr. Hipple, would

4    that be what you would call a high profit margin?

5    A    I would say that's a very high profit margin.

6    Q    I'm sorry, I didn't mean to interrupt you.

7    A    No, the only other thing I would add to that would

8    be the cost of the packaging associated with it, you

9    know, because you have to put it in a bottle, which

10   costs something, or a can, whatever it's packaged in,

11   and then you have the packaging costs associated with

12   that.  That's all costs of goods sold to deliver it to

13   the end customer.

14   Q    Okay.

15            THE COURT:  That's included in your numbers

16   here in costs of goods sold, that packaging?

17            THE WITNESS:  These are the numbers that were

18   produced to us.

19            THE COURT:  Right.

20            THE WITNESS:  So when you say they're my

21   numbers, it's the information that was derived --

22            THE COURT:  I didn't mean your numbers.  I

23   meant --

24            THE WITNESS:  Yeah.

25            THE COURT:  -- the numbers on your chart.

Mr. Geisser - Direct                         189

1          THE WITNESS:  Yes.

2          THE COURT:  Yes.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  That includes the costs of goods

5   packaging --

6          THE WITNESS:  Yes.

7          THE COURT:  -- yes.  Okay.

8   BY MR. BERKOWITZ:

9   Q   Did you produce any other types of calculations

10   with these numbers?

11   A   I did.  Let me -- let me direct your attention now

12   to the next exhibit in the report, which is Exhibit C.

13   And Exhibit C is sort of a transitional document.  The

14   upper section of this essentially compresses what was

15   on the prior exhibit in terms of showing the gross

16   profits, excuse me, the gross receipts and the gross

17   profit and the expenses that are associated with the

18   business.  And it shows net profit across the bottom

19   line.  Again, I'm just compressing down the prior

20   exhibit, essentially.

21          Now, this document for the first time shows

22   one other element, which will be key to the valuation

23   that we did.  And if you look at the bottom, it says

24   "Information from Selected Analysis of Bank Records."

25   And when you go across the bottom you see the number,

Mr. Geisser - Direct                           190

1   558,534 in 2010, 608,542 in 2011, and 690,563 in 2012.

2   Q    And what are you referring to when you say

3   distributions?

4   A    Okay.  Now, what we did is -- we're kind of

5   shifting gears a little bit to look at the valuation

6   elements that are implicit in the business.  One of the

7   key things when you try to value a business that you're

8   looking at is how much can the owners take home?  It's

9   sort of a fundamental process -- analysis of profit.

10  How much can I take home?  Why -- if I have this

11  business and I operate it, what am I taking out of the

12  business?  And that's considered a distribution to the

13  owners, essentially.

14  Q    And where did you get these numbers for 2010, 2011,

15  and 2012?

16  A    These numbers came from our analysis of the banking

17  records.

18  Q    And could you tell us, and I don't want to get

19  ahead of where you are, what did you do in terms of an

20  analysis of the banking records?

21  A    We were presented with records from Wachovia Bank

22  and from FNB Bank -- I think it's FNB Bank, Newtown, if

23  I'm not mistaken, and we took those records and we

24  analyzed those records in good detail in order to

25  ascertain what were the distributions that were being

Mr. Geisser - Direct                    191

1    taken out of it?

2           Let me apply another term here, if I could,

3    and that's a term that we find in the valuation world.

4    It's called seller's -- it's called discretionary

5    earnings, seller's discretionary earnings.

6           In other words, what is the profitability

7    that's accruing to the business by the amount of the

8    withdrawals that are being taken out of the company.

9    And, ultimately, that's what we're working toward

10   trying to determine, what is the distributions out of

11   the company?

12   Q    Now, the Wachovia Bank records, those were

13   SCIX's --

14   A    Correct.

15   Q    -- records?

16   A    Yes, SCIX records.

17   Q    And then you mentioned the First National Bank of

18   Newtown, FNB?

19   A    FNB.

20   Q    And that would be the Steel Seal Pro records?

21   A    The SCIX records -- let me just set the stage here

22   just a little bit.  The SCI records at Wachovia, the

23   Wachovia bank account was used up until the time there

24   was the garnishment of the account.  And it was after

25   that time that the business seemed to shift over to the

Mr. Geisser - Direct                    192

1    FNB account.  So if I could direct your attention to

2    Exhibit D in my report, and I'm going to -- I'm going

3    to start by looking at the bottom line first, because

4    these numbers at the bottom line because important in

5    terms of what the valuation is going forward.

6              So, I'm going to start by pointing out if you

7    look at the bottom of -- with 2010, you see the number

8    558,534, which is the same number we had seen on the

9    prior page.  In 2011, again, 608,542, and in 2012,

10   517,922, but when we analyze that, in other words, take

11   that eight-month period of time and project over

12   another four-month period of time, the number becomes

13   690,563.  So these numbers are very important in terms

14   of our calculation of value.

15   Q    And just to connect the two exhibits that we looked

16   at, the 558 and 534, those were the distributions that

17   you showed on the prior exhibit?

18   A    Yes, and these -- the distributions are broken down

19   into greater detail on this specific exhibit here.

20   Q    And is this number based on your or your firm's,

21   your view of the actual bank records?

22   A    Yes, absolutely.

23   Q    And what did you do?  Did you go through check by

24   check?

25   A    We used the bank records, we went through the

1  deposits, we went through the withdrawals, and came up

2  with these numbers.

3  Q    Okay.  Tell us again what we're seeing, for

4  example, in 2010 under SCIX.

5  A    Okay.  Let me first -- before I go into that

6  detail, let me just point out the footnotes, which I

7  think help the reader get through this.  Under 2010, we

8  have the footnote A which says, "The 2010 information

9  is based on the summary prepared by the client from the

10 Wachovia records account for October 2009 through

11 September 2010.  This 12-month period is used as a

12 surrogate for the calendar 2010."

13        In other words, again, we only had for 2010

14 everything stopped after the garnishment.  So we went

15 back to a period of 2009 to pick up a 12-month period

16 of time.

17        For 2011 and '12, the information is based on

18 the detailed analysis of the transactions from the

19 Steel Seal Pro FNB account from December of 2010

20 through February of 2011.

21        And then, you know, footnote C also notes

22 that we had to analyze the period of time because we

23 only had nine months of information available.  So

24 that's the way we produced it is it was putting

25 together those sets of records that were available to

Mr. Geisser - Direct                    194

1   us, the bank records, and that's what's scheduled out

2   in this particular -- this is what's summarized in this

3   Exhibit B that we have before us right now.

4   Q    Did you subsequently when you reviewed the B.B.B.M.

5   Quickbook records and the Complete Group Quickbook

6   records that we saw earlier today in the exhibit, the

7   profit you talked about in your prior exhibit where you

8   annualized it, is it consistent with the distribution

9   numbers here in terms of profitability?

10  A    Well, these numbers tend to be higher because

11  there's elements here that are not -- they're not quite

12  the same.  For example, when a loan gets paid off, a

13  loan that gets paid off is not necessarily an expense

14  of the company because it's capital.  You know, so you

15  have a different -- you have different elements that

16  appear in the schedule.

17  Q    Okay.  On your I think it was Exhibit B you talked

18  about the Complete Group profit of 350,000.  Do you see

19  that on the first page?  You've got a $406,000 profit

20  for eight months?

21  A    Yes.

22  Q    And if you annualize that, what would the annual

23  profit be from that if you were to project it out?

24  It's two-thirds of a year, right?

25  A    Yeah, I would have to do the math, but it's

Mr. Geisser - Direct                           195

1   two-thirds of a year.

2   Q    So --

3   A    So you divide that number by --

4   Q    So it would be about --

5   A    -- you know, .66.

6   Q    -- $600,000?

7   A    It would put the number somewhere around the

8   $600,000 level.

9   Q    And is that consistent with the numbers that you're

10  seeing from the reproduced records that you made?

11  A    Yes, it is consistent.

12  Q    Okay.

13  A    Generally, yeah.  Generally.

14  Q    Okay.  I'm sorry, I didn't mean to interrupt you if

15  you were in the middle of something.

16  A    That's okay.

17  Q    Okay.

18  A    So I'm going to go back to Exhibit D and talk about

19  that some more if I could.

20  Q    I'm sorry, did you say D?

21  A    D, as in dog.

22  Q    Okay.

23  A    So when we went through the bank records, the

24  detailed bank records, we identified those elements

25  that we thought were distributions to the principals

Mr. Geisser - Direct                196

1  that are involved, the insiders, if you will, the

2  officers, directors, and that included Brian Hipple and

3  Clement Hipple and expenses that they were incurring on

4  their personal account.

5  Q    And how about Melissa Moreno?  Did you see checks

6  for her?

7  A    I did, and that's listed in the schedule here.  If

8  you look about halfway down the schedule here, you can

9  see that Melissa Moreno is also listed.  She is the --

10  you know, the mother -- I don't know how to describe

11  it.  She was Brian Hipple's --

12  Q    Significant --

13  A    -- common law wife or significant other, whatever

14  you want to say.

15  Q    And do you see --

16  A    So she was getting distributions out of --

17  Q    I'm sorry.

18  A    -- the company as well.

19  Q    Okay.  And you see Teresa Hipple in 2010 also

20  received money?

21  A    Right.  And why that appears is because that's a

22  loan, okay?  And when you look at a company's expenses,

23  the loan is not necessarily an expense.  The interest

24  portion of a distribution would be an expense, but it's

25  not an -- it's not an operating expense for the company

Mr. Geisser - Direct                          197

1   in terms of the way we're doing this particular

2   analysis because you can operate a company that has no

3   loans associated where it's complete equity where you

4   don't -- so it's not an operating expense of the

5   company in that sense.

6           So that if you have -- if you were fully

7   capitalized and didn't need any loans, you wouldn't

8   have that as a deduction from the company.  So in terms

9   of valuing the product and the company, you would

10  typically back that out.

11  Q   Can you tell us how you determined what were the

12  distributions?  If you look under the column "payee,"

13  are those what you consider checks or the like to

14  someone as a distribution of free cash flow?

15  A   Yes, these are the dis -- these are the items that

16  we identified as being distributions to the principals

17  of Steel Seal.

18  Q   And could you go down the list and tell us what

19  they are and how they were -- why they were classified

20  as distributions?

21  A   Sure.  The first item here is A&C Building and

22  Industrial Maintenance, and I think you've heard Mr.

23  Hipple testify that that's his company and that he was

24  receiving payments from these companies, the Steel Seal

25  companies, to his company, A&C Building and Industrial

Mr. Geisser - Direct                                   198

1    Maintenance.

2    Q    If it were a royalty, would that make any

3    difference?

4    A    Well, if it was a royalty, it would be an expense

5    of the company that's paying the royalty.

6    Q    But is it still a discretionary -- is it free cash

7    flow for the company?

8    A    Well, it's cash flow -- it depends on how you

9    perceive this company, who owns the company.  And in

10   this particular case, we've seen a situation that it

11   appears that Mr. Hipple is largely in control of many

12   aspects of this company.  So from that standpoint, it

13   was a distribution that he's receiving.

14            Yes, it's -- he said it's a royalty.  The

15   records that we looked at did not -- do not identify it

16   as a royalty.  And I can refer you back to Exhibit B

17   that we looked at earlier.  There's not -- if you look

18   at Exhibit B, which is the schedule C's, you don't see

19   the word, "royalty," anywhere throughout that document.

20            So the fact that he's describing it now as a

21   royalty is somewhat news to me because I've never seen

22   royalty being used in the accounting records before.

23   So in terms of the way we looked at it, it would be

24   simply checks that were going to Clement Hipple, or

25   actually, more specifically, to A&C Building and

Mr. Geisser - Direct                        199

1    Industrial Maintenance, which he's identified as

2    largely being checks to himself.

3    Q   And how about the rest of them on the "payee"

4    category?

5    A   Okay, let me take the next one.  The next one is

6    American Express and it's a rather large category.  And

7    it's -- you have to keep in mind when we look at this

8    category it's very important to understand that this --

9    this is not an expense of this company because the

10   credit cards are in the name of Scientific Chemical.

11            I believe you introduced a number of exhibits

12   this morning into the record which show specifically

13   that if you look at the top of the American Express

14   records, they all say Scientific Chemical.  So that's

15   what's being run through this -- these companies, SCIX,

16   Steel Seal Pro.  It's a rather strange situation, quite

17   frankly.

18   Q   Did you see the business receipts or records which

19   change your view that any of the American Express

20   payments were, you know, business payments for SCIX?

21   A   No.  As we look at the records, the American

22   Express records, there's a heavy preponderance of those

23   expenditures that appear to be personal in nature.  It

24   looks like the principals are largely living out of the

25   American Express records for the most part, and that --

1  that's another reason why they call it a discretionary

2  distribution to the owners.

3          The next item, if I could go down.  Checks to

4  Brian Hipple, I think that speaks for itself.  The

5  Buckingham Friends School, my understanding is that is

6  Melissa Moreno's children.

7          Clement Hipple A and C, these were checks

8  that were drafted to Clement Hipple.  Doylestown

9  Hospital, Dr. Bob Myson (ph), Dr. Reisenberg (ph), Elk

10  Mountain, Flemington Infinity, these we identified as

11  being primarily personal in nature.  They're not --

12  they don't make up the bulk of the expense.  They're

13  relatively small.

14          HAB is the Burkheimer Tax Service.  It's a --

15  so it's a personal tax payment to the Burkheimer

16  Service.  Again, that's not an expense of the company

17  per se.  Keystone Volvo, Melissa Moreno, we've talked

18  about earlier, she's getting checks for something.  And

19  let me emphasize with respect to Melissa Moreno and all

20  these checks, none of these checks are W-2 checks.

21  These are not W-2 checks.  These are just checks for

22  round amounts, you know, 1,000, 2,000, $3,000.

23  Q    When you say W-2, are you referring to a payroll

24  check?

25  A    A payroll check.  In other words, if somebody was

Mr. Geisser - Direct                    201

1   working for a company and like money was due, right, we

2   get a -- we get a payroll check and it's a -- and you

3   get a W-2 at the end of the year.  And, typically, it's

4   an odd amount, you know, our paycheck.

5   Q    Okay.

6   A    These are round amounts that we're talking about

7   now.

8                (Pause in proceedings.)

9   A    Nevis Administrative Services, I don't know exactly

10  what it was, but I understand that Mr. Hipple has some

11  business in Nevis.  PA Department of Revenue I believe

12  is a tax payment.  PA Department of Transportation is

13  small.  It's probably a car payment.  Prudential we

14  believe is a life insurance policy.

15           The Queen Oak (ph) Bank I understand is a

16  mortgage on Brian's home, as I understand it.

17  Sovereign Bank is a loan that was related to Brian and

18  Melissa, so it's a personal item.  The payments to

19  Teresa Hipple that we talked about earlier, these are

20  loan payments.  These are not expenses that are

21  associated with producing profits for the company.  And

22  the United States Treasurer, these are personal tax

23  payments were made out of the accounts, IRS-type

24  payments.

25  Q    Sir, could you tell us what did you do with these

Mr. Geisser - Direct                              202

1  numbers?

2  A   Okay.  So once we identified these discretionary

3  earnings, which is the terminology that's used in the

4  valuation world, I then know that there's databases

5  that I can use where I can take these elements and I

6  can apply other metrics to these elements to come up

7  with a valuation.  And if we flip back to Exhibit F, as

8  in Frank this is where we do that application.

9  Q   Do you want to take us through that?

10 A   Sure.  This is -- this is entitled, "Summary of

11 Valuation Methodologies as of October 13th, 2010."  And

12 if you look at the top line there, it says, "Seller's

13 discretionary earnings measured by distributions," and

14 that's the numbers that we just looked at in Exhibit D.

15 So it's exactly the same going across the bottom of the

16 page, 558,000, 608,000, 690,000, and we did a

17 three- year average of those numbers and we come up

18 with 619,000.

19           Now, I have to explain a little bit about the

20 database.  There's a database that's available to the

21 valuation world call BizComps (ph), and this is a

22 standard database that's used by many people in the

23 valuation world.  It's typically smaller businesses

24 that are involved in the database.  The database gives

25 you information on actual business transactions, in

Mr. Geisser - Direct                              203

1   other words, actual sales of businesses, and it's

2   categorized by business code.

3           So, that if we have a particular type of

4   business, whether it's a manufacturing company or a

5   barbershop or internet sales, we can go to a particular

6   business code and we can look for businesses that are

7   similar in nature in terms of their profile, the

8   business profile, and that's exactly what I did in this

9   particular case.

10          Let me refer you to now -- let me just ask

11  you to flip to Exhibit G for just a second if I could.

12  And the process that I'm describing is shown in Exhibit

13  G, and that's labeled "Comparable Sales Information,

14  Source BizComps."

15          So what we're trying to do here is to come up

16  with essentially a fair market value valuation for a

17  substantial equivalent value that's market-based.  So

18  when we look at companies that are similar in their

19  coding system, and that coding system is shown under

20  the SIC code.

21          If you look at the column that's second from

22  the left.  It says "SIC."  That's Standard Industrial

23  Classification code.  Then there's a coding system

24  called the NAICS, which is North American Industrial

25  Classification System.

Mr. Geisser - Direct                    204

1        So we're trying to get businesses that are

2   similar in their profile.  And we also take a look at

3   the revenues that are being generated.  In this case, I

4   identified four businesses that were right around a

5   million dollars in revenue.

6        And this has a number of metrics that are

7   useful in doing a business valuation, and one of those

8   metrics is SDE, price to SDE.  And if you look sort of

9   on the right-hand side of the page, you're going to see

10  "Price to SDE."  And there's a number of numbers that

11  go down that page.  And you see the number 292.  Now,

12  what that means is that if a business -- let me give

13  you an example.  If a business is sold --

14        THE COURT:  Let me stop you.  I'm sorry.

15  Where's this 292?  This is on G?

16        THE WITNESS:  It's on G, yeah.

17        THE COURT:  Where is that?

18        THE WITNESS:  Your Honor, see the column

19  where it says "Price SDE?"  It's about just to the

20  right of the middle of the page.

21        THE COURT:  Yes, I see it.

22        THE WITNESS:  Okay.  And if you go down that

23  column --

24        THE COURT:  Okay, I have it.

25        THE WITNESS:  Do you see --

Mr. Geisser - Direct                                            205

1        THE COURT:  Thanks.

2        THE WITNESS:  -- the number 292?

3        THE COURT:  It's the average.

4        THE WITNESS:  It's the average.

5        THE COURT:  Okay.

6        THE WITNESS:  So I took an average of the

7    four transactions that I was --

8        THE COURT:  Right.

9        THE WITNESS:  -- able to identify.

10       THE COURT:  Okay, thank you.

11       THE WITNESS:  So this is a way of equating

12   the selling price, in other words, the value of the

13   business, with the seller's discretionary earnings.  So

14   to give you a simple example, if the selling price is

15   $1,000 and the owner of the business were to take out

16   $300, it would be, you know, ten -- it would be three

17   divided by -- three divided by ten, so it's a little

18   bit -- so it would be a little bit over three.

19            If I may make it easier, okay?  Let me -- if

20   the selling price is $900, you can take out $300, it

21   would be a factor of three.  So in this case, the

22   number we come up with using that methodology is 2.92.

23            So in other words, these businesses,

24   comparable businesses, are being sold at 2.92 times the

25   seller's discretionary earnings or the distributions in

1    this case.  It's kind of an earnings per share kind of

2    calculation if you can think of it that way.

3           So in simple terms, if you have, you know,

4    $100 profits and you're trying to sell the business,

5    you would be selling it for approximately three times

6    that number or $300.  So that's the same kind of

7    methodology we're using here.

8           So we're saying how much did -- how much was

9    taken out of the company in terms of distributions and

10   how much would that be worth on the open market?  And

11   the answer that we came up with was 2.92.  Again, it

12   rounds to approximately three times.  So it's selling

13   for an earnings multiple of about three.  That's the

14   way you can think of it.

15   BY MR. BERKOWITZ:

16   Q    Then can you tell us how you then applied this

17   multiplier factor to the discretionary cash flow

18   generated by the sale of Steel Seal?

19   A    Sure, then let me flip back to Exhibit F now at

20   this point.

21           (Pause in proceedings.)

22   A    Okay.

23           THE COURT:  I'm with you.

24           THE WITNESS:  Okay.  If you look at Exhibit

25   F, you can see that we take that 2.92, the earnings

Mr. Geisser - Direct                    207

1    multiple, the SDE --

2              THE COURT:  Right.

3              THE WITNESS:  -- and we apply it to the

4    distributions for the company.  And we do that for each

5    respective year, 2010, '11, '12, and we come up with a

6    three-year average, and so that's our valuation

7    estimate, and so my conclusion, after having reviewed

8    the composite numbers that we come up with for three

9    years, I put a value on this company of $1,750,000 for

10   the cash flows that were being generated from the Steel

11   Seal product.  $1,750,000 is the key number here.

12   BY MR. BERKOWITZ:

13   Q    And are there any other types of adjustments that

14   you would make?  I take it that that's your opinion of

15   the value of the cash flow generated by the sale of

16   Steel Seal?

17   A    Correct.  This -- these are the cash flows of the

18   underlying business.  There's other adjustments that

19   can be made, and one of those adjustments is to add the

20   inventory on as a separate item.  And, typically, when

21   you look at these calculations they're adjusted for --

22   if a business -- when you're buying or selling a

23   business, you typically take out the excess cash

24   because there's no point in buying cash.

25              Same thing with inventory.  Inventory -- if

Mr. Geisser - Direct                           208

1   there's an excess amount of inventory, that's also

2   added to the value of the business because that becomes

3   an immediately saleable product, so you can immediately

4   sell that and turn it into cash.  So, typically, that's

5   added on to the value of the cash flows.

6          So in this particular case, it was not until

7   after I issued this report that I became aware that

8   there was significant amount of inventory that had been

9   taken by Mr. Hipple when he took the cases of product

10  that we talked about earlier this morning.

11  Q   And were you here when this, my scribble that's up

12  on the board, the calculations of the value of

13  inventory?

14  A   I was here, yes.

15  Q   And do you see there's about $250,000 of inventory

16  depending on how you calculated it?

17  A   I see the number 246,000 is up on that board, and I

18  believe you added another element which brought it up

19  to about $300,000 in inventory.

20  Q   That was a question of price between 44.95 and

21  59.95?

22  A   Well, I think you added on another level of bottles

23  onto this calculation if my --

24  Q   Correct, they were --

25  A   -- recollection serves.

Mr. Geisser - Direct                          209

1  Q    -- eight-ounce bottles?

2  A    These are the 16-ounce bottles that are up on the

3  board, and I think you added on the eight-ounce bottles

4  as well.

5  Q    Yes, I did.

6  A    So I think when you came back I think it came to a

7  number something just north of $300,000.

8  Q    Okay.

9  A    So to summarize, what we're trying to communicate

10 here is that there's a value to the cash flows, that's

11 the $1,750,000.  But in addition to the cash flows,

12 there's also a value to inventory or any other, you

13 know, hard assets that are taken at that point in time

14 that are separate and apart from the operating

15 business.

16         In this case, it would be my opinion that

17 that $300,000 of additional inventory should be added

18 to this $1,750,000 to come up with the value of the

19 business.

20 Q    So on --

21 A    Calculated value of the business.

22 Q    In October of 2010, when Clement Hipple foreclosed

23 on all of the assets that comprised Steel Seal before

24 we lose the patents and the business, what is your

25 opinion of the value of those assets at the time he

Mr. Geisser - Direct                      210

1   took them?

2   A    My opinion is that the value of those assets would

3   be the $1,750,000, which appears on Exhibit F, plus the

4   value of the inventory that was taken that was an

5   immediately saleable product, so approximately, in

6   round number, about $2 million.

7   Q    Now, did you notice anything in the records as of

8   the time of the garnishment?  The records go from

9   Wachovia Bank to First National Bank when the business

10  transitions from SCIX to Steel Seal Pro.  Is there

11  anything you saw in reviewing the bank records?

12  A    Well, what was remarkable about that was that --

13  more the continuation of the business more than

14  anything else because when the Wachovia record -- when

15  the Wachovia bank account ceased operation, then the

16  FNB bank account opened up operations almost just

17  shortly thereafter beginning, and there was just -- it

18  looked almost like the same account going from Wachovia

19  over to the FNB account in terms of the cash flows that

20  were coming into the operation, types of expenses and

21  distributions.

22  Q    Could you say that the only difference was the bank

23  account into which the money flowed?

24  A    That's what it appeared to be from my -- yes.  The

25  answer is yes.

Mr. Geisser - Direct                    211

1  Q    So when this transition took place, when it was

2  Wachovia Bank before the garnishment, the cash flowed

3  into Wachovia Bank?

4  A    Yes.

5  Q    And then after the garnishment, the cash just

6  flowed into another bank?

7  A    Correct.

8  Q    And that was the First National Bank?

9  A    That's correct.

10           (Pause in proceedings.)

11  Q    And did you look to see if there was any change

12  after Brian Hipple passed away in terms of the

13  transition of the business then?  Do your records go

14  that far?

15  A    They do.  Brian Hipple passed away in September of

16  2012, and -- just give me one second.  I just want

17  to --

18           (Pause in proceedings.)

19  A    Mr. Berkowitz, let me direct your attention to

20  Exhibit E-3.

21  Q    Okay.

22           (Pause in proceedings.)

23  Q    Still looking.  I don't have tabs.

24           (Pause in proceedings.)

25  A    E-3 is labeled "FNB Business First Trust

1  Account" --

2  Q    Got it.

3  A    -- "2012 Transactions."

4  Q    Okay, got that.

5  A    Okay.  So when we looked at this account we saw

6  that there were the normal Steel Seal transactions,

7  certainly up through the time of his death.  And then

8  there was a period of time after September of 2012

9  where we saw the credits continue to flow into the

10  account.  I think Mr. Hipple talked about that earlier

11  today.

12         And we got to -- our records, our bank

13  records, only went up through the end of December 2012.

14  And at the end of 2012, according to the records that

15  we have, we see that there was about $197,725 in the

16  account as of December 31st, 2012, and I'm picking that

17  number up just so we are on the same page, literally.

18         If you look at the bottom of Exhibit 3, E-3,

19  you can see that number, 197,725.  So that was cash

20  that was sitting in the bank at the end of December

21  2012, and I believe it's the money was eventually taken

22  by I want to say B.B.B. Management.  I'm not quite

23  sure.

24  Q    Of Complete Group?

25  A    The Complete Group --

Mr. Geisser - Direct                    213

1  Q    You're saying this is the garnishment of the

2  Complete Group --

3  A    I believe that that's --

4  Q    -- on Steel Seal Pro?

5  A    I can say that that was the money that was left in

6  the account at that time, and I believe that was what

7  was eventually taken.

8  Q    By Complete Group?

9  A    By Complete Group.

10  Q    Okay.  Would that affect your valuation at all?

11  A    Not directly because the valuation that we're

12  looking at is really back as of October of 2010, you

13  know, the point of valuation.

14        But, it gives an indication of the overall

15  value that we're dealing with here in the sense that

16  we're dealing with a profitable company that's got

17  money and cash in the bank at a given point in time.

18        So it's more significant from the standpoint

19  of just showing there's a significant amount of money

20  at that point -- that very point in time.  It's not

21  directly related to the valuation per se.

22  Q    Thank you.  Mr. Geisser, did you ever have an

23  opportunity to review an expert report prepared on

24  behalf of Mr. Hipple, the defendant?

25  A    I did.

Mr. Geisser - Direct                    214

1   Q    And could you tell me what did you find in that

2   report?

3   A    Well, that report takes a lot of -- a lot of the

4   focus of that report has to do with my failure to use

5   an opinion of value approach.  And my direct answer to

6   that is that it's just -- it wasn't possible to do an

7   opinion of value in this case.  We simply did not have

8   the records that would make that doable.  So it was not

9   an option that was available to me, and I did the best

10  that I could with the available records.

11  Q    And that's why you did the calculation of value?

12  A    And that's why I did the calculation of value.  If

13  I did an opinion -- if I tried to do an opinion of

14  value, it would have so many caveats all over the place

15  and disclosures about what information was not

16  available, it would become meaningless in terms of what

17  I was trying to convey.

18          So, I felt that I was being more -- producing

19  a more effective product, if you will, and a more

20  realistic product using this approach, the calculation

21  of value, and just saying these are the records that

22  were available, and if you apply these methodologies,

23  this is what you come up with in terms of the valuation

24  for the stream of income associated with the Steel Seal

25  businesses.

Mr. Geisser - Direct                    215

1   Q    And if I could just summarize your opinion, you

2   were of the conclusion that it was worth somewhere just

3   in excess of $2 million in October of 2010?

4   A    Correct.

5   Q    And that was a calculation of value?

6   A    That's a calculation of value.

7   Q    And that's done in accordance with the standards of

8   the AICPA?

9   A    It's done in accordance with the AIC standards for

10  statements on valuation standards number one.

11  Q    Now, could the defendants have done a calculation

12  of value or an opinion of value to provide a number

13  different than yours?

14  A    Sure, absolutely.  They had access to certainly the

15  same records that I had.  They could have asked the

16  defendant for additional records.  They could have

17  interviewed the defendant.  They could have -- they had

18  access to much more information than I had available to

19  myself.

20  Q    Do you have any view as to why they didn't do a

21  number to compete with your number?

22  A    In my opinion, the reason why they didn't, it would

23  be a number that would be a big number and it would not

24  work to their client's benefit, basically.  That's my

25  opinion.

Mr. Geisser - Direct                                216

1   Q    Thank you, Mr. Geisser.  I have no further

2   questions.

3                THE COURT:  Let's take a break.  I'll give

4   you a ten minute break before you begin

5   cross-examination, okay.  Thanks.

6                (Recess, 2:41 p.m. to 2:49 p.m.)

7                THE COURT:  Please be seated.  Thanks.  You

8   may proceed, Mr. Hipple.

9                MR. HIPPLE:  Thank you, Your Honor.  I'm just

10  looking for one report, Your Honor.

11               THE COURT:  All right.

12               (Pause in proceedings.)

13               MR. HIPPLE:  (inaudiblkee) waste of time,

14  Your Honor, I'll give you the copy of what I have

15  outside of the books.  This is a copy of his report.

16               THE COURT:  Oh, okay.

17               MR. BERKOWITZ:  Mr. Hipple's?

18               MR. HIPPLE:  Yeah, mine.

19               MR. BERKOWITZ:  I'm sorry, Mr. Geisser's?

20               THE WITNESS:  Yeah.

21               MR. BERKOWITZ:  The Judge has --

22               THE COURT:  I have a copy.

23               MR. BERKOWITZ:  -- Mr. Geisser's report.

24               MR. HIPPLE:  Oh, you already have one?

25               THE COURT:  Thank you very much, yes.

Mr. Geisser - Direct                    217

1    MR. HIPPLE:  Okay.  We're ready to go then.

2    (Pause in proceedings.)

3                  CROSS-EXAMINATION

4    BY MR. HIPPLE:

5    Q    Hello, Mr. Geisser.

6    A    Good afternoon, Mr. Hipple.

7    Q    Bill Pederson will be helping me and assisting me

8    in the language, okay?

9    A    Could you speak up a little bit?  I just want to

10   make sure I hear you.

11   Q    How about now?  Can you hear it if I talk into the

12   mike?

13   A    Thank you very much.  Thank you.

14   Q    Okay.  He'll be helping me with the language and

15   the spelling, okay, as far as the cross-examination is

16   concerned.  Okay.

17            The first question is the opinion you provide

18   in your report is in conclusion in my opinion based on

19   the records available and the statements assumptions

20   reason equity equivalent value for the transaction of

21   SCIX assets as of October 13th, 2010, would have been

22   1,750,000, is that correct?

23   A    If I understand your question, my opinion is the

24   reasonable equivalent value would be $1,750,000.

25   Q    All right.  All right.  Directing your attention to

Mr. Geisser - Cross                                218

1   page four of your CV --

2   A    You said my CV?  Did I hear that correctly?

3   Q    Yeah, CV.

4              THE COURT:  Is that attached to your report?

5              MR. HIPPLE:  That's your --

6              THE WITNESS:  There's an old CV --

7              MR. HIPPLE:  -- report.

8              THE WITNESS:  -- attached to my report, yes.

9              THE COURT:  Oh, that's at the end.  Okay.

10  BY MR. HIPPLE:

11  Q    Under Exhibit 1?

12  A    Exhibit I.

13  Q    Exhibit I.

14             THE COURT:  On page four?  What page did you

15  say, Mr. Hipple?

16             MR. HIPPLE:  It's actually the last page,

17  Your Honor.

18             THE COURT:  Next to the last page?

19             MR. HIPPLE:  The last.

20             THE COURT:  The last page.

21             MR. HIPPLE:  Page four, the last page of it.

22             THE COURT:  Okay.

23  BY MR. HIPPLE:

24  Q    Those are the cases in which you have given

25  testimony as an expert witness, correct?

Mr. Geisser - Cross                    219

1   A    Those are the cases where I've given expert

2   testimony since 2008 up through the date of this

3   report.

4   Q    Most of the testimony you have been has been by

5   deposition, right?

6   A    I think you would have to take it one at a time.

7   There's deposition testimony.   There's also trial

8   testimony there as well.

9   Q    I mean prior to trial testimony.

10  A    I'm sorry, I couldn't hear you.

11  Q    Prior to the trial testimony.   Most of your

12  testimony has been by deposition, correct?

13  A    Mr. Hipple, I've testified 60 or 70 times in

14  different cases.

15  Q    No, I mean this case.   I'm speaking of this case.

16  A    In this case, I was deposed.   In this case, yes.

17  Q    Is it true that in none of these cases you provided

18  an expert opinion as to whether a transfer was made in

19  exchange for reasonably equivalent value, right?   Let

20  me go -- let me go to your deposition, 132-20.

21  A    You're directing me to page 132?   Is that what I

22  heard?

23  Q    Yeah, 132-20.   Page 132.

24            (Pause in proceedings.)

25  A    I have it.

Mr. Geisser - Cross                    220

1   Q    I don't.

2            (Pause in proceedings.)

3   Q    Question, "What other time before this engagement

4   -- what other time before this engagement have you ever

5   been asked to provide an expert opinion as to whether

6   the transfer was in exchange for a reasonable equity

7   value?"  Your answer?

8            (Pause in proceedings.)

9   Q    Could you read your answer, please?

10  A    I'm sorry, I was looking at the wrong page.

11  Q    Okay.  I'm sorry.

12  A    You're on page 132, line?

13  Q    Okay, 132.  It starts on line 20, okay?

14           (Pause in proceedings.)

15  A    I see it.  My answer on page 133 at line two, "It

16  doesn't come to mind right now for me.  I have done

17  some bankruptcy work.  I'm trying to think back over

18  those issues, and I just don't have that particular

19  narrow focus in terms of what I'm thinking about right

20  now."

21  Q    So, basically, that's a no, right?

22  A    It meant I didn't recall that -- it was a very

23  narrow question that was asked, and I did not recall

24  something that was responsive to that narrow question.

25  Q    Do you have an answer now?

Mr. Geisser - Cross                    221

1  A   My answer would not change.

2  Q   So, basically --

3  A   It's the same answer.

4  Q   Okay.  Also, 133, line 22?

5  A   Page 133, line 22 --

6  Q   Line 22.  Let me see.

7              (Pause in proceedings.)

8  Q   Okay.  It's the one that starts with line 16.

9  "Fair enough.  Do you recall ever providing an opinion

10  in the court on the issue of whether there was an

11  exchange of reasonable equity value?"  Your answer?

12  A   "No, I don't recall that."

13  Q   Now, you agree that notwithstanding, your opinion

14  on page four of your report, you do not actually define

15  reasonably equity value -- reasonably equivalent value

16  anywhere in your report, do you?

17  A   No, I do not.  I use that terminology, which was

18  the same terminology that was used I believe in the

19  complaint in various pleadings that I read.  So I

20  was -- I was responding to the valuation in that

21  context.

22  Q   In fact -- and, in fact, the definition of that

23  term is something beyond your expert, right --

24  expertise, right?

25              (Pause in proceedings.)

Mr. Geisser - Cross                    222

1   A    Mr. Hipple, that is a statutory term.  I discussed

2   that with Mr. Berkowitz, who is the lawyer in this

3   in this case.  I explained -- we discussed the nature

4   of what was required.  I explained what I could do and

5   I explained what the end product was going to be in

6   terms of the opinion that I was going to render that

7   was going to be in the nature of a fair market value

8   type opinion which would equate the value of what was

9   taken in October of 2013.  And he indicated to me that

10  that would meet the reasonably equivalent standard that

11  was delineated in the Pennsylvania statutes or the

12  appropriate statutes.  A   So that's as far as I went

13  with it.

14              I understand that it's something that's open

15  to some definition and some interpretation, and again,

16  I explained what I was doing and how I was doing it,

17  and I understood that this was the appropriate way to

18  go about it.

19  Q    Okay.  But is the answer yes or no?  Is expertise

20  above that?

21              THE COURT:  What's the question?  I'm sorry?

22              MR. HIPPLE:  Okay.

23  BY MR. HIPPLE:

24  Q    And, in fact, the definition of that term is

25  something beyond your expertise, correct?  It is beyond

1    your expertise?

2    A    It's a legal term.  I was relying on Mr. Berkowitz

3    to -- when I gave him -- explained to him what I could

4    do and how I could do it and what the end product was

5    from a valuation standpoint.

6             He indicated to me that it was responsive to

7    the statute the way it was written.  I didn't feel like

8    I needed to undertake a legal analysis of that, which

9    is beyond the scope of what -- I'm not a lawyer.

10   Q    So, basically, what you're saying is Mr. Berkowitz

11   told you what to do?

12   A    That's certainly not what I'm explaining.  I'm

13   explaining to you that we're dealing with a legal term,

14   a statutory term.  There's case law that stands behind

15   statutory terms.  I explained from a valuation

16   standpoint what I could do, the procedures that I would

17   apply, and the end result that I would come up with.

18            My understanding was that that was

19   appropriate for reasonably equivalent value.  It was a

20   fair market value type valuation because we are using a

21   market approach.  When we use comparables like I used,

22   it's essentially saying there were transactions in the

23   marketplace that occurred.

24            And if we apply that same standard to those

25   market-based transactions, to the transactions that are

Mr. Geisser - Cross                    224

1   involved in this particular case, the Steel Seal case,

2   that you -- the equivalent is essentially a fair market

3   value standard because I'm using a market approach to

4   valuation.  My understanding is that that's what was

5   appropriate to be responsive to the statutory language.

6              (Pause in proceedings.)

7   Q    Could you give me the definition of "reasonable

8   equivalent" -- "fair market value?"

9   A    "Fair market value" has many definitions.  The most

10  classically defined standard of "fair market value" is

11  in revenue ruling 5960, which speaks to a willing buyer

12  and willing seller not under a compulsion to buy or

13  sell.

14             (Pause in proceedings.)

15  Q    All right.  In your deposition, page 150, number

16  ten.

17             (Pause in proceedings.)

18  A    Page 150, line ten, I have it.

19             (Pause in proceedings.)

20  A    It starts off in the middle of the question.

21  Q    Okay.

22             MR. HIPPLE:  Would it help if he read the --

23  would it be more helpful because of my reading?  No?

24             THE COURT:  No, you have to do it.

25             MR. HIPPLE:  Okay.

Mr. Geisser - Cross                    225

1  BY MR. HIPPLE:

2  Q   All right.  "Was that an assumption that you were

3  asked to make, that whatever number you came up with

4  was going to be reasonably equivalent value to the

5  transaction that was made?"  Mr. Berkowitz objected.

6           MR. BERKOWITZ:  Your Honor, there was an

7  objection made as to the form of the question at the

8  deposition.

9           THE COURT:  What's the -- what's the problem

10  with the form?  It's leading?

11           MR. BERKOWITZ:  I don't even remember at this

12  point.

13           THE COURT:  All right, I'll overrule the

14  objection.  I'll permit it.

15           MR. BERKOWITZ:  Okay.

16           THE COURT:  You can answer it.  Do you want

17  it repeated, Mr. Geisser?

18           THE WITNESS:  Let me go back because --

19           THE COURT:  Yes.

20           THE WITNESS:  -- he's taking it out --

21           THE COURT:  It's the deposition.

22           THE WITNESS:  -- Well, it's out of context

23  too, so I --

24           THE COURT:  All right, go ahead.

25           THE WITNESS:  -- need to pick up the context

Mr. Geisser - Cross                    226

1    here.

2              (Pause in proceedings.)

3    BY MR. HIPPLE:

4    Q    151, eight.

5              (Pause in proceedings.)

6    A    Mr. Hipple, let me direct your attention to my

7    answer.  Let me back up and state the question in its

8    totality so we avoid a little bit of confusion.

9              "Question:  I don't want to know any

10   conversation between you and Mr. Berkowitz.  Was that

11   an assumption that you were asked to make that whatever

12   number you came up with was going to be reasonably

13   equivalent to the transfer that was made?"

14             "Mr. Berkowitz, "Objection to the form."

15             I responded, "I'll repeat what I already

16   said.  I was asked to come up with a value for the

17   income stream.  The context for that assignment was to

18   establish reasonably equivalent value as a legal

19   concept.  I'm not a lawyer, so my reliance on whether

20   to fit the bill to accomplish the goal was something

21   that Mr. Berkowitz, as counsel, had to decide."

22   Q    So, again, Mr. Berkowitz basically told you what he

23   wanted?

24   A    No, he simply explained to me the concept.  And

25   what we do as forensic accountants, there's oftentimes

Mr. Geisser - Cross                    227

1    that we come across issues that cross into the type of

2    work that we do.  It's not an uncommon thing that we

3    would go to counsel and say explain to me the standard

4    that we need to use here.  Explain to me the underlying

5    law that we need to apply.

6            And that's all that happened here is that

7    this is a term, statutory term, it's a statutory term

8    that has a specific meaning presumably under the

9    statutory law and under case law.

10           Mr. Berkowitz is in a much better position as

11   a lawyer to be able to explain to me what was needed

12   under the circumstances.  I explained to him the

13   process that I was going to use and there was going to

14   be a -- I was going to come up with essentially a fair

15   market value appraisal of the SCI business as of

16   October 2013.

17           He said that that -- he indicated to me that

18   that was appropriate to meet the standard under the

19   statute.  And that's -- so it was no an assumption.  It

20   was based on an explanation of the law that was given

21   to me.

22           If you have a different understanding of the

23   law, then, you know, we can talk about that.  But my

24   understanding was that what I did was appropriate to

25   apply a fair market value standard of value to the

Mr. Geisser - Cross                 228

1    assets and income stream as of October 31st -- as of

2    October 2013.

3            THE COURT:  You meant '10?

4            THE WITNESS:  Excuse me.

5            THE COURT:  You meant '10?

6            THE WITNESS:  '10.  I meant '10.

7            THE COURT:  Right.

8            THE WITNESS:  Thanks.

9            THE COURT:  Right.

10   BY MR. HIPPLE:

11   Q   All right.  And do you not -- okay.  Do you not

12   even know whether the concept of reasonably equivalent

13   value ever takes fair market value into consideration?

14   Your deposition, 151-15.

15           Question, "Do you know whether the concept of

16   reasonable equivalent value takes into consideration

17   fair market value?"  Mr. Berkowitz objects, and your

18   answer?

19   A   What's your question?  I'm sorry.

20   Q   The question is on page 151 -- 151-10.

21           THE COURT:  Do you want him to read his

22   answer to the question in the deposition?

23           MR. HIPPLE:  Yeah.  It was 151-15 was the --

24           THE COURT:  Why don't you -- Mr. Geisser, why

25   don't you read the question and give him your answer?

Mr. Geisser - Cross                        229

1        THE WITNESS:  Sure.

2        THE COURT:  And if you want to explain, you

3   can further if you want.

4        THE WITNESS:  I understand.  Question, "Do

5   you know whether the concept of reasonably equivalent

6   value takes into consideration fair market value?

7        "Mr. Berkowitz, Objection to the form of the

8   question to the extent that you are asking a legal

9   conclusion."

10       By Ms. Bowman, "Question:  "Do you know one

11   way or the other?"  Answer, "I would say I'm not sure."

12   "Okay.  I don't" -- answer, "I don't want to answer

13   that."

14       "Question:  Can I direct your attention to

15   the first page of your report under the introduction

16   and the background section in the third paragraph, and

17   I'm looking for the second sentence which states, 'The

18   complaint also alleges that Brian Hipple permitted

19   Clement Hipple to repossess SCIX assets based on the

20   debt purportedly owed to Clement Hipple, and the

21   Complete Group is now in possession of those assets,

22   which were made without the exchange of reasonable

23   equivalent value,' and the phrase, 'were made without

24   the' -- the phrase 'remained without the exchange of

25   reasonably equivalent value,'" ends the sentence.

Mr. Geisser - Cross                    230

1          "That section in the quotations, is there a

2     reason why it's in quotes?"  Answer, "I was quoting

3     directly from the complaint."

4               (Pause in proceedings.)

5     Q    And you would agree that the fair market value of

6     any particular asset would be what a willing buyer and

7     a willing seller would agree is the price, correct?

8     And that's your deposition, 224-20.

9     A    Deposition page 224?  Is that what I heard you say?

10    Q    Yeah, 224, 20.

11              MR. HIPPLE:  I guess I should just go to the

12    deposition first, Your Honor, right?  That would be

13    better?

14              THE COURT:  Yes.

15              MR. HIPPLE:  Oh, okay.  Sorry, Your Honor.

16              THE COURT:  No problem.

17              THE WITNESS:  I'm looking at page 224.  Could

18    you just point me to a line, please?

19              MR. HIPPLE:  20.

20              THE COURT:  You want him to read the question

21    and his answer?  Okay, why don't you do that, Mr.

22    Geisser, please?  Read your -- read the question and

23    your answer.

24              THE WITNESS:  Sure.  Page 224, line 20,

25    "Question:  "Okay.  Can those -- if just assets are

Mr. Geisser - Cross                    231

1  transferred, are there ways to determine the fair

2  market value of just those assets?

3          "Answer:  Sure."

4  BY MR. HIPPLE:

5  Q   Keep going, 225-17, keep going.

6  A   "Question:  "Okay.  And would one consideration be

7  the demand for those particular assets in the open

8  market?

9          "Answer:  Sure could be.

10         "Question:  And what a willing buyer -- what

11 somebody would be willing to pay and what somebody

12 would be willing to sell for those particular assets,

13 would there be another way to put a fair market value

14 on those -- on the assets?

15         "Answer:  The definition of 'fair market

16 value.'

17         "Question:  Would that be the fair market

18 value of the assets?"  Excuse me.

19         "Question:  Would that be the fair market

20 value of those assets, correct?

21         "Answer:  Willing buyer, willing seller,

22 neither being under compulsion to buy or sell."

23 Q   Okay, that's good.  Okay, this is a tough one.  All

24 right.

25         (Pause in proceedings.)

Mr. Geisser - Cross                    232

1           MR. HIPPLE:  Objection to testimony.  Ask

2      that opinion be struck.  Cannot give an opinion to

3      reasonable degree of professional certification --

4      certain failure to provide such opinion in report.

5      Nowhere in the report does say that any opinion offered

6      is given to reasonable degree of professional

7      certainty, nowhere in the report.

8           THE COURT:  Mr. Berkowitz, do you want to

9      respond to that objection?

10          MR. BERKOWITZ:  Your Honor, I think Mr.

11     Geisser has testified with professional certainty as to

12     the value of the assets that were transferred.  I don't

13     recall whether those particular magic words were used,

14     but I will on cross-examination or redirect, see if

15     those words need -- want to be in the record, I put

16     them in the record.

17          THE COURT:  Okay.  So I'll defer ruling on

18     that objection until after the conclusion of Mr.

19     Geisser's testimony.  You may proceed.  Go ahead, Mr.

20     Hipple.  Any other questions?  We're going to rule on

21     that later.

22          MR. HIPPLE:  Okay.  Cannot extrapolate that

23     to a reasonable degree of professional certainty.  Use

24     the term REV, reasonable equivalent value, and option

25     -- opinion and admits does not know what the term means

Mr. Geisser - Cross                          233

1   and admits that the documents that relies on our

2   fragmentary.  Not only does not certain, but

3   inclusive -- includes a CYA in the report.  Okay?

4               THE COURT:  Do you understand that?

5               MR. HIPPLE:  Objection to any assumptions.

6               THE COURT:  Mr. Pederson --

7               MR. PEDERSON:  Yes?

8               THE COURT:  -- I'll permit you to read that.

9   Why don't you start --

10              MR. PEDERSON:  Do you want me to back up?

11              THE COURT:  Start from the beginning, yes,

12  please.

13              MR. PEDERSON:  Yes, Your Honor.  Further,

14  cannot extrapolate that to a reasonable degree of

15  professional certainty that --

16              THE COURT:  Yes, speak up, Mr. Pederson.

17              THE WITNESS:  Speak up and slow down

18  because --

19              THE COURT:  Yes.

20              THE WITNESS:  -- I can't understand you.

21              (Pause in proceedings.)

22              THE COURT:  Go ahead.  Take your time.

23              MR. PEDERSON:  Certain cannot extrapolate

24  that to a reasonable degree of professional certainty,

25  use of the term, REV, an opinion, and admits does not

Mr. Geisser - Cross                          234

1    know what that term means and admits that documents

2    that relies on are fragmentary.

3            THE COURT:  I think there's a compound

4    question there.  Why don't you do one at a time?

5            MR. PEDERSON:  Okay.

6            THE COURT:  There's multiple thoughts or

7    questions there.

8            MR. PEDERSON:  There are two.

9            MR. BERKOWITZ:  Was that an objection?

10           THE COURT:  Well, let -- I made my own

11   objection.

12           MR. BERKOWITZ:  Okay.

13           MR. PEDERSON:  Okay.

14           THE COURT:  I'm just telling him that it

15   should be -- I want to --

16           MR. PEDERSON:  There are two parts of this,

17   Your Honor.

18           THE COURT:  There's many parts to that, so

19   let's do one at a time and then if you want to object,

20   you can.

21           MR. BERKOWITZ:  I wasn't objecting.

22           THE COURT:  No.

23           MR. BERKOWITZ:  I thought that was an

24   objection.

25           THE COURT:  Yes, I'm not sure if it's a

Mr. Geisser - Cross                           235

1  question or an objection.  Is it a question?

2         MR. PEDERSON:  It follows the objection, Your

3  Honor.

4         THE COURT:  All right.  Then why don't you

5  state the objection then again?

6         MR. PETERSON:  Okay.  "Objection to

7  testimony.  Ask that opinion be struck.  Cannot give an

8  opinion to a reasonable degree of professional

9  certainty.  Failed to provide such opinion in report.

10 Nowhere in report does it say that any opinion is

11 offered given to a reasonable degree of professional

12 certainty.  Further" --

13        THE COURT:  All right, we already covered

14 that.  We're going to defer on that until after his

15 testimony.  Go ahead.

16        MR. PETERSON:  "Further, cannot extrapolate

17 that to a reasonable degree of professional certainty

18 use of the term REV, reasonably equivalent value, an

19 opinion and admits does not know what that term means."

20 I'll stop there.

21        THE COURT:  Mr. Berkowitz?

22        MR. BERKOWITZ:  Your Honor, if I could

23 respond to --

24        THE COURT:  Sure.

25        MR. BERKOWITZ:  -- the objection, we'll deal

Mr. Geisser - Cross                    236

1  with the reasonable uncertainty --

2          THE COURT:  Right.

3          MR. BERKOWITZ:  -- issue.  But with respect

4  to the term, reasonably equivalent value, I would

5  represent to the Court that that is a statutory term

6  and that will be the Court's job to determine whether

7  the transfer of the SCIX assets from SCIX to Clement

8  Hipple in exchange for a $210,000 note was reasonably

9  equivalent value.  That is, I believe, a legal

10  conclusion for the Court.

11          THE COURT:  All right.  I'll overrule the

12  objection.

13          MR. PEDERSON:  All right, the second part of

14  that --

15          THE COURT:  Is this an objection or a

16  question?

17          MR. PEDERSON:  It's part of the objection.

18          THE COURT:  All right.

19          MR. PEDERSON:  "And further, that the expert

20  admits that the documents that it relies on are

21  fragmentary."

22          THE COURT:  Go ahead.

23          MR. BERKOWITZ:  Could I respond, Your Honor?

24          THE COURT:  Right.

25          MR. BERKOWITZ:  I believe the testimony of

Mr. Geisser - Cross                    237

1  the witness was that the records produced by the

2  defendants was fragmentary, but that he relied on more

3  than just those records.  He had relied on a

4  substantial quantity of bank records from Wachovia Bank

5  and First National Bank --

6           THE COURT:  Right.

7           MR. BERKOWITZ:  -- and he applied his

8  forensic accounting skills to rebuild the financial

9  records that weren't produced.

10           THE COURT:  Right.  I'll overrule the

11  objection.  I mean the standard is the defendant can

12  object that the -- excuse me, the plaintiff can object

13  that the -- the defendant can object that the

14  plaintiff's expert only relied on fragmentary records,

15  and that's really because the defendant produced

16  fragmentary records.  In that situation, an expert

17  never could give an opinion.

18           So he did the best he could based on all the

19  records that were provided by the defendant.  So I'm

20  going to overrule the objection.  If anything, that

21  goes to the weight of his testimony.

22           (Pause in proceedings.)

23           MR. HIPPLE:  Your Honor, I'm going to

24  introduce something now that Mr. Berkowitz received,

25  okay, and in plenty of time?

Mr. Geisser - Cross                    238

1      THE COURT:  Why don't you show it to Mr.

2  Berkowitz?

3          (Pause in proceedings.)

4      MR. BERKOWITZ:  I do remember this letter.

5      MR. HIPPLE:  Should I give a copy to Your

6  Honor?

7      MR. BERKOWITZ:  Oh, if you would like to see

8  it, Your Honor.

9      THE COURT:  Yes.  Let's mark it as Exhibit D

10  what?  What do you want to mark it?  Do you have a

11  number you want to put on this, Mr. Hipple?

12      MR. HIPPLE:  Yeah, let's start -- we'll start

13  at the 500s.  He's at the 200s.

14      THE COURT:  All right.

15      MR. HIPPLE:  D-500.

16      THE COURT:  D-500, all right.

17      MR. HIPPLE:  That's my last copy of that.

18          (Pause in proceedings.)

19      MR. BERKOWITZ:  Your Honor, I do recall

20  receiving this letter.  On May 15th, 2014, a number of

21  Quickbooks records were produced well after the

22  discovery cut off and almost a year after Mr. Geisser's

23  report.  They were never presented as a potential

24  exhibit in the case and I would --

25      THE COURT:  This was well after the discovery

Mr. Geisser - Cross                    239

1   deadline was passed?

2        MR. BERKOWITZ:  Oh, a year passed that time

3   Mr. Geisser produced his report.

4        THE COURT:  Right.  Okay.

5        MR. BERKOWITZ:  And they were not put in the

6   exhibit binders, and I would have objected to them had

7   they been offered at that point, and I would object to

8   any use of them.

9        THE COURT:  Mr. Hipple, this is a letter from

10  Ms. Bowman, your former attorney.  Mr. Berkowitz has

11  represented that these documents were turned over to

12  him on May 15th, 2014, well passed the discovery

13  deadline and well passed the submission of expert

14  reports.

15       Mr. Berkowitz said it's over a year between

16  the time that the expert reports were filed with the

17  Court or at least -- not filed, but at least served on

18  the opposing side and the time that these documents

19  were produced.  Is that right, do you know?

20       MR. HIPPLE:  Yes, that is correct.  I believe

21  that is correct, Your Honor, okay, because the -- yes,

22  that is correct.

23       THE COURT:  All right.  Well, we have

24  deadlines and discovery deadlines and deadlines for

25  expert reports and production of documents.  I find

Mr. Geisser - Cross                    240

1   that these documents were produced well beyond the

2   deadline and I'm going to preclude the use of those

3   documents?

4            MR. HIPPLE:  Even though his documentation

5   was fragile?

6            THE COURT:  Well, he --

7            MR. HIPPLE:  Fragmented.

8            THE COURT:  I understand, based on his

9   testimony that he relied on all the documents that the

10  defendants produced prior to the deadline.  And that

11  was proper for him to do that and he did the best he

12  could based on the documents produced by the defendant.

13           The fact that a year later, after the expert

14  reports were already submitted, further documents came

15  to light, it's beyond the rules established by the

16  judge in this case, Judge DuBois, and it's not in

17  compliance with his order, scheduling order, or with

18  the Rules of Civil Procedure, and we can't operate in

19  that way, so I'm going to preclude that.

20           (Pause in proceedings.)

21           MR. PEDERSON:  Am I reading, Your Honor?

22           THE COURT:  Sure.

23           MR. PEDERSON:  All right.

24           THE COURT:  Read loudly, please.  Is this an

25  objection or is this a question?

Mr. Geisser - Cross                           241

1          MR. PEDERSON:  No, we're moving on.

2          THE COURT:  Okay

3          (The questions are being read by Mr.

4  Pederson.)

5  BY MR. HIPPLE:

6  Q    I'm showing you your report.  This is the report

7  your prepared in connection with this litigation?  You

8  already have the report.  Okay.  And it's dated June

9  25, 2013?  Sorry, that was a question.

10  A    Yes.

11  Q    It's more than two years ago, correct?

12  A    Correct.

13  Q    Since June 25, 2013, you have not issued any

14  amended report, is that correct?

15  A    Correct.

16  Q    Do you recall being deposed in March of 2014?

17  A    Correct.

18  Q    Even after you were deposed, you did not issue any

19  amended reports, is that correct?

20  A    Correct.

21  Q    I'm showing you a document marked as Exhibit D-38.

22  Is this the fee engagement letter between you and Mr.

23  Berkowitz?  It's in that black book, the binder up

24  there.

25          (Pause in proceedings.)

Mr. Geisser - Cross                           242

1    THE COURT:  Mr. Berkowitz, do you know what

2    number it is?

3         MR. BERKOWITZ:  I'm sorry, it's D-38?

4         MR. PETERSON:  Correct.

5         THE COURT:  Maybe we can speed it up here.

6    Okay.

7         MR. BERKOWITZ:  Your Honor, I would like --

8    first I would like to see it.

9         MR. HIPPLE:  Well, it's in the binder.

10        MR. BERKOWITZ:  Oh.  I'll object to the

11   introduction and use of the document.  It is a fee

12   agreement between myself and Mr. Geisser's firm.  It is

13   what it says it is.

14        THE COURT:  Why would that -- why would this

15   not be admissible?  It goes to --

16        MR. BERKOWITZ:  I don't think it goes to

17   relevance and I don't think --

18        THE COURT:  Well --

19        MR. BERKOWITZ:  He was engaged and I'm just

20   not sure how it's pertinent to the inquiry.

21        THE COURT:  I'll overrule the objection.  You

22   may proceed or question him on this document or if you

23   want to introduce it into evidence, you're permitted to

24   attempt to do so. Go ahead.

25   BY MR. HIPPLE:

Mr. Geisser - Cross                    243

1   Q   Do you have the document in front of you now, Mr.

2   Geisser?

3   A   I do.

4   Q   All right.  Showing you document marked as Exhibit

5   D38.  This is the fee engagement letter between you and

6   Mr. Berkowitz, is that correct?

7               (Pause in proceedings.)

8   A   Correct.

9   Q   You were retained to perform a calculation of

10  value, is that correct?

11  A   Correct.

12  Q   And, specifically, you were retained to analyze

13  available financial records and to estimate the

14  distributable cash flow available to the owners,

15  insiders, of the subject companies and prepare a

16  calculation of value of SCIX as of approximately

17  October 13, 2010, based on those records?

18  A   Mr. Pederson, you --

19  Q   I think you can cross-ref --

20  A   -- were reading from the letter and then I think

21  you went off --

22  Q   Exactly.  I was going to say this cross-references

23  a report to section two.

24  A   I'm just going to ask you to repeat the question

25  because it's --

Mr. Geisser - Cross                                    244

1   Q    Sure.  And, specifically, you were retained --

2   A    Slow down just a little bit.

3   Q    Okay, sorry.

4   A    Thanks.

5   Q    And, specifically, you were retained to analyze

6   available financial records and to estimate the

7   distributable cash flow available to the

8   owners/insiders of the subject companies and prepare a

9   calculation of value of SCIX, LLC, as of approximately

10  October 13, 2010, based on those records?  And this

11  references your report, section two.

12          THE COURT:  So your question is that's what

13  the letter says?

14          MR. PEDERSON:  Yeah.

15          THE WITNESS:  Let me respond by saying you're

16  not quoting from the letter.  You're confleeting (sic)

17  the letter and the report.  I would agree that I was

18  retained to provide a calculation of value as of

19  October of 2010.  That's -- if that's --

20  BY MR. HIPPLE:

21  Q    Yeah, that's it.

22  A    I think that's responsive to your question.

23  Q    And you described the financial records in your

24  report as fragmentary, is that correct?

25  A    Correct.

Mr. Geisser - Cross                    245

1   Q    And you admit that you did not know or have

2   personal knowledge as to who the owners/insiders of

3   each of the subject companies were at the relevant time

4   frame, is that correct?

5   A    That's not correct.

6   Q    Okay.  You had personal knowledge as to who the

7   owners/insiders of each of the subject companies were

8   at the relevant time?

9          THE COURT:  When you say "personal knowledge"

10  what do you mean by that?  You mean knowledge based on

11  his review of all the documents in this case and

12  depositions?

13         MR. HIPPLE:  Their names.  The people -- the

14  names of the insiders and everything.

15         THE COURT:  He said he does have knowledge,

16  but the question was does he have "personal knowledge."

17  What do you mean by that?

18         MR. HIPPLE:  Did he know at the time he did

19  the report the names of the people involved that are --

20  names of the people?

21         THE COURT:  Of what people?

22         MR. HIPPLE:  Brian, Melissa, myself.

23         THE WITNESS:  Let me respond by saying that

24  when we get involved in a case one of the first things

25  that we do is we pick up the basic pleadings in the

Mr. Geisser - Cross                    246

1   case.  In this particular instance, probably the first

2   place I would go would be to the complaint.  The

3   complaint typically lays out the parties in the case.

4              So that's the starting point for us learning

5   the people that are relevant to the case.  Then we

6   certainly sat down with Mr. Berkowitz.  We discussed

7   the case, the nature of the case, the people whose

8   names we would begin to see in the records.  He

9   certainly sat down and explained, you know, who those

10  parties were, and we began to take a look at the

11  records and understand them at that level, and so

12  that's how we became familiar with the parties to the

13  case.

14  BY MR. HIPPLE:

15  Q   You were told to make assumptions as to who these

16  insiders and owners were, is that correct?

17  A   I think it probably mischaracterizes it as an

18  assumption.  If somebody says, you know, for example,

19  Melissa Moreno is related to Brian Hipple a certain

20  way, I accepted that information as fact in the sense

21  that she was related and had two children by Brian

22  Hipple.

23              I understood Brian Hipple was Clement

24  Hipple's son.  I mean I understood those basic

25  relationships that I felt were relevant to determine

Mr. Geisser - Cross                    247

1   who the insiders were in the case.

2          As names came up in the records, I looked for

3   information or I had additional conversations with Mr.

4   Berkowitz to confirm what the nature of the information

5   was.

6          So that was the approach that we used.

7   That's the approach we use in virtually every case we

8   get involved in.  There's certainly a learning curve to

9   understanding who the parties are.

10         Sometimes we begin to see names in records

11  that we say, you know, Mr. Berkowitz, for example, do

12  you know who this party is?  Do we think this party is

13  relevant?  So we begin to develop a story around the

14  underlying financial records and we start to connect

15  the dots, if you will.

16         But, there's a learning process to

17  understanding who the relevant parties are in the case.

18  But we -- I -- yes, to answer your question directly, I

19  think we understood the primary insiders in the case.

20         (Pause in proceedings.)

21  Q   With the engagement letter, you reference the AICPA

22  statement of standards for valuations as your source

23  for definition of calculation of value, is that

24  correct?

25  A   Correct.

Mr. Geisser - Cross                           248

1    Q    And is the AICPA statement for valuations

2    recognized in your industry as authoritative?

3    A    Yes, it is.

4    Q    I'm showing you a document marked as D-37.

5                THE COURT:  That's the black binder, Mr. --

6                MR. BERKOWITZ:  Do you have it?

7                THE WITNESS:  I have it.

8                (Pause in proceedings.)

9                MR. HIPPLE:  I think it's missing pages.

10               MR. PEDERSON:  Yeah, Your Honor, we noticed

11   earlier that D-37 seems to only have odd number pages

12   in it.

13               MR. HIPPLE:  So I have one copy of the

14   original --

15               THE COURT:  Okay.

16               MR. HIPPLE:  -- that I can give to him.

17               THE COURT:  Well, that's your exhibits.

18   That's not -- that's your exhibits, D-37, right?

19               MR. HIPPLE:  Yes.

20               THE COURT:  Okay.  So do we have a full copy?

21               MR. HIPPLE:  Yes.

22               THE COURT:  All right.  Why don't you show it

23   to the witness if you wish?

24               (Pause in proceedings.)

25   BY MR. HIPPLE:

Mr. Geisser - Cross                    249

1  Q    And the question here, is that a fair and accurate

2  depiction of the AICPA standards -- statement on

3  standards for valuation?

4             (Pause in proceedings.)

5  A    Without flipping through every page, yes, it

6  appears to be.

7  Q    You are a member of the AICPA?

8  A    Yes, I am.

9  Q    And as a member of the AICPA, you're obligated to

10 follow the standards set forth in D-37?

11 A    Yes, I am.

12 Q    Can you read the definition for calculation of

13 value?

14 A    Can you point me to the paragraph real quick?

15 Q    I think it's going to be around page 12 and 13.

16 I'm sorry, pages 12, 13.

17            (Pause in proceedings.)

18 A    Paragraph 21 under subheading entitled "Types of

19 Engagement."  "There are two types of engagement to

20 estimate value, a valuation engagement and a

21 calculation engagement.  The valuation engagement

22 requires more procedures than does the calculation

23 engagement.  The valuation engagement results in a

24 conclusion of value.  The calculation engagement

25 results in a calculated value.  The type of engagement

Mr. Geisser - Cross                           250

1    is established in the understanding with the client

2    (paragraphs 16 and 17)."  Do you want me to continue?

3    Q    Yes.

4    A    ": A, valuation engagement, a valuation analyst

5    performs a valuation engagement when one, the

6    engagement calls for a valuation analyst to estimate

7    the value of a subject interest, and two, the valuation

8    analyst estimates the value (as outlined in paragraphs

9    23 through 45) and is free to apply the valuation

10   approaches and methods he or she deems appropriate in

11   the circumstances.  The valuation analyst expresses the

12   results of the valuation as a conclusion of value.  The

13   conclusion may either be a single amount or a range.

14        "Paragraph B, calculation engagement, a

15   valuation analyst performs a calculation engagement

16   when one, the valuation analyst and the client agree on

17   the valuation approaches and the methods the valuation

18   analyst will use and the extent of the procedures the

19   valuation analyst will perform in the process of

20   calculating the value of a subject interest. (These

21   procedures will be more limited than those of the

22   valuation engagement.)

23        "And two, the valuation analyst calculates

24   the value in compliance with the agreement.  The

25   valuation analyst expresses the results of these

Mr. Geisser - Cross                    251

1  procedures as a calculated value.  The calculated value

2  is expressed as a range or a single amount.  A

3  calculation engagement does not include all of the

4  procedures required for a valuation engagement

5  (paragraph 46)."

6  Q    Thank you.  So an opinion of value or valuation

7  engagement is a more comprehensive engagement, is that

8  correct?

9  A    Correct, as stated in the standards.

10  Q    Now, the methods that you used to come by to a

11  conclusion of value, evaluation depend on the nature of

12  the engagement, is that correct?

13  A    I'm sorry, could you restate your question, please?

14  Q    Sure.  The methods that you used to come to a

15  conclusion of value, they depend upon the nature of the

16  engagement, is that correct?

17          (Pause in proceedings.)

18  A    I would say generally, yes.

19  Q    And if a conclusion of value engagement -- I'm

20  sorry.  And if it is a conclusion of value engagement,

21  then there is a rather comprehensive list of different

22  factors that should be considered, is that correct?

23  A    If it's a conclusion of value engagement, it's a

24  more expansive analysis, yes.

25  Q    These factors include looking at the business as a

Mr. Geisser - Cross                          252

1   whole, is that correct?

2   A    Yes.

3   Q    And looking at the nature of the products?

4   A    Yes.

5   Q    The capital structure?

6   A    Yes.

7   Q    The economic conditions, externally and internally?

8   A    Yes.

9   Q    And you would agree that a calculation of value

10  engagement does not include all the procedures required

11  for a valuation engagement, is that correct?

12  A    That's correct.

13  Q    And this -- and in this instance, you did not

14  perform an opinion of value or calculation -- I'm

15  sorry -- or an opinion of value, but you did a

16  calculation of value, is that correct?

17  A    Correct.

18  Q    And when performing a calculation of value, you and

19  your client agree upon exactly how you are going to

20  calculate the value of an asset or a business, is that

21  correct?

22  A    When I was approached about this engagement we

23  talked about the nature of the records that were

24  available and the type of procedures that could be

25  applied under the circumstances realizing that we were

Mr. Geisser - Cross                    253

1   dealing with fragmentary records.  I explained that to

2   Mr. Berkowitz.

3          That's also documented in the engagement

4   letter that we talked about a few minutes ago because I

5   recognized that I couldn't do an opinion of value.  If

6   that was an option, then we could have talked about

7   that option.  But, because of the constraints put on

8   the records that were available, to me, that was not a

9   viable option and I couldn't do that.

10          I couldn't do that because I didn't have

11  records, and I certainly didn't have access to the

12  client to review this very complicated ownership

13  structure that's been discussed over the course of the

14  last two days.

15  Q   Do you agree on the mathematical formula you were

16  going to use?

17  A   I can't -- I can't respond to your question.  I

18  don't -- what do you mean by "mathematical formula"?  I

19  know I'm not supposed to ask the questions here, but

20  I --

21          THE COURT:  Not, that's okay.

22          THE WITNESS:  -- I don't understand the

23  question.

24          THE COURT:  You're asking for clarification.

25          THE WITNESS:  I'm clar --

Mr. Geisser - Cross                    254

1          THE COURT:  Right.

2          THE WITNESS:  You need to clarify what you

3    mean --

4          THE COURT:  Right.

5          THE WITNESS:  -- by the calculation or --

6    BY MR. HIPPLE:

7    Q    Well, for example, the SDE approach.

8    A    The SDE approach was something that I was aware of.

9    Mr. Berkowitz wasn't aware of that.  I explained to him

10   that, you know, this was something that we used in the

11   valuation world and that these databases were

12   available, and based on the nature of the case and what

13   I understood needed to be addressed in the case, I felt

14   that this was the most appropriate methodology that was

15   available to me and, in fact, probably was among the

16   only methodologies that were available to me.

17          For example, you know, we didn't have a

18   balance sheet, so we couldn't even use an asset

19   approach to the valuation process, and I just use that

20   as a point of example.

21   Q    Just for some clarification on the mathematical

22   formula, SDE was the only approach?

23   A    Seller's discretionary earnings, SDE, was the

24   methodology that I felt was most appropriate.  We were

25   dealing with looking at bank records.  I could see that

Mr. Geisser - Cross                    255

1  there were distributions that were coming out of the

2  bank records.

3          It occurred to me that this was a methodology

4  that could address the fundamental question of

5  substantially equivalent value that we needed to --

6  that was being addressed -- that we needed addressed in

7  terms of what the issues were before the -- in the

8  case.

9  Q   Okay.

10  A   And so I felt that this was the most effective way

11  to address that question given the bank records that we

12  had, which did show distributions, and this metric that

13  we had in the BizComps which had to do with seller's

14  discretionary earnings.  And it was because of that

15  circumstance that I chose that, among methodologies, to

16  use that method.

17          And as we talked about earlier, as the

18  standards we just read, a valuation analyst has the

19  ability to choose among the various methodologies that

20  is used.  This is the one I felt was the best

21  methodology to use under the circumstances I found

22  myself.

23  Q   All right.  From what you're describing, it's not

24  the only method, is that correct?

25  A   There are many different methodologies that are

Mr. Geisser - Cross                          256

1    used.  There are volumes of books that are written

2    about this.  I'm sure you're aware of that.

3    Q    I'm just asking the questions.

4              (Pause in proceedings.)

5    Q    In this instance, you and the plaintiff's counsel

6    agreed that you would calculate the value of cash flow

7    based upon seller's discretionary earnings, is that

8    correct?

9    A    Yes, that was what I recommended that we do.

10   Q    And that would be seller's discretionary -- sorry

11   -- earnings times a multiplier, is that correct?

12   A    Correct.

13   Q    And, in fact, you and Mr. Berkowitz made the

14   specific decision that you were not going to get

15   involved in performing a valuation of what was on the

16   inventory prepared by Clem Hipple after he took the

17   SCIX assets, is that correct?

18   A    Well, let me explain that.  I initially asked

19   whether there was information that was available as to

20   the assets that were taken.  My recollection is the

21   response I got back was that there was a representation

22   made by Mr. Hipple that there was nominal value to the

23   assets that were taken.

24              And when I heard the response that there was

25   nominal value to the assets that were taken, it seemed

1    to me that the more important measure of value here was

2    the income stream.

3            I subsequently learned after I prepared the

4    report there was, in fact, this inventory of assets,

5    physical assets that were taken, that Mr. Hipple had

6    represented in an affidavit I believe that the value of

7    those assets were in the range of I want to say

8    $110,000.

9            When we looked at that more closely after the

10   report was prepared I realized that it was really an

11   understatement of what the value that was taken.   I

12   mean we're talking over 5,000 bottles of material.   We

13   started to do the math on it.   I said this is much more

14   than $110,000.   And so that's why it came out during

15   the course of my deposition, I explained that during --

16   excuse me -- during the course of my deposition it came

17   up with an estimate of that number.

18           And had I known that information at the time

19   of the report, I would have certainly added that to the

20   overall value, which we have done today in the

21   courtroom.

22   Q    Did you ever receive an inventory from Colonial

23   Chemical stating what type of bottles were at the

24   location?

25   A    I don't recall seeing any inventory from Colonial

Mr. Geisser - Cross                    258

1   Chemical.  My recollection is that I saw the inventory

2   that we talked about already today during the course of

3   the deposition.

4   Q    Again, but all Colonial records were subpoenaed,

5   okay, and there was an inventory showing there was

6   bottles for the UK and bottles for the United States.

7          MR. BERKOWITZ:  Your Honor, if I could.  I

8   don't mean to interrupt, but if I could just make a

9   brief objection.  I don't have a problem with Mr.

10  Pederson's reading the questions, but I don't think

11  it's fair for them to be able to go back and forth.  If

12  Mr. Geisser could respond to one or the other?

13         THE COURT:  Well, let me -- this is really

14  unusual.  I agree.  I understand -- it appears that

15  someone prepared questions for Mr. Hipple to use in the

16  cross-examination of Mr. Geisser.

17         It was clear to me that Mr. Hipple was having

18  difficulty reading those questions and, initially, I

19  wasn't permitting Mr. Pederson to read those questions,

20  but it became apparent he was having difficulty reading

21  that, and in order to, which I think everybody's

22  interested, speed this along, I let Mr. Pederson read

23  those questions.  I'm looking at your resume, Mr.

24  Pederson, I notice you're also a lawyer, too.

25         MR. PETERSON:  Yes, sir.

Mr. Geisser - Cross                      259

1    THE COURT:  You're a member of the Maryland

2  bar and also the Louisiana bar.  So that's why I

3  permitted him to do so, and I stand by that ruling.

4    But there are some questions, apparently, Mr.

5  Hipple has thought of that are not prepared questions

6  but he thought about it, is that right, in the course

7  of this examination?

8    MR. HIPPLE:  Yes, because --

9    THE COURT:  There's some other --

10    MR. HIPPLE:  -- the numbers --

11    THE COURT:  -- additional questions.

12    MR. HIPPLE:  -- are on the board there, Your

13  Honor.

14    THE COURT:  So I'm going to overrule your

15  objection.  I'll permit him to do it.

16    MR. BERKOWITZ:  I have no objection to Mr.

17  Hipple asking questions.  My objection was more to

18  bouncing back and forth so that --

19    THE COURT:  Right.  All right.

20    MR. BERKOWITZ:  -- Mr. Geisser --

21    THE COURT:  I don't --

22    MR. BERKOWITZ:  -- doesn't have to bounce

23  back and forth.

24    THE COURT:  I don't anticipate Mr. Pederson

25  asking any further questions because I think the

Mr. Geisser - Cross                    260

1    written, prepared cross-examination has already been

2    completed?

3              MR. HIPPLE:  Yes, it's all completed.

4              THE COURT:  Okay.  So Mr. Hipple is going to

5    be the only one to finish the cross-examination.

6              MR. HIPPLE:  All right.

7              THE COURT:  Go ahead --

8              MR. HIPPLE:  This --

9              THE COURT:  -- Mr. Hipple.  Any other

10   questions you have?

11   BY MR. HIPPLE:

12   Q   Again, did you have any knowledge from Mr.

13   Berkowitz or from anybody, from Col -- any information

14   from Colonial Chemical that we sold chemical to the UK,

15   United Kingdom?

16   A   I have a vague recollection of something along

17   those lines, but only really only the vaguest, and I

18   think that may be influenced by what I've heard over

19   the last two days more than anything else.

20   Q   Okay.  But then --

21   A   I --

22   Q   -- you were examining the bank statements, did you

23   not see deposits from the UK or wire transfers?

24   A   You're going to have to point that out to me.  I

25   mean we looked at the bank records.  We're talking

Mr. Geisser - Cross                    261

1   about thousands of transactions.  It's possible that,

2   you know, I saw some of those transactions, it's

3   possible that my staff person saw some of those

4   transactions.  I'm not sure I understand what the

5   relevance of that is.

6   Q   Well, the relevance is that the bottles going to

7   the UK were for $12 a bottle, okay?  And it has a large

8   relevant here, okay, that the majority of the bottles

9   that were in stock in the warehouse in Colonial

10  Chemical were $12 bottles, not 49 or 59 or whatever the

11  price was, okay?  So the valuation that's gone on the

12  chart there is totally incorrect, which I will clear up

13  tomorrow, you know, when I go on the stand myself.

14          But in other words, when you were doing the

15  sales forecasts, okay, you mean to tell me you didn't

16  see any large numbers coming in as sales?  You must

17  have.

18          THE COURT:  I think your question is a little

19  bit unclear.

20          MR. HIPPLE:  Okay.

21          THE COURT:  So I --

22          MR. HIPPLE:  Okay.  Do you --

23          THE COURT:  Let me just -- let me -- I do

24  understand there's something in the record, I agree

25  with you, that the UK price was at one point at $12 a

Mr. Geisser - Cross                   262

1   bottle.  I saw that.  I don't know if you had a chance

2   to see it, Mr. Geisser.  It's somewhere in the record.

3            And I do understand your point that these

4   calculations are based on the US price.  That's your

5   point.  Okay, we got that.  So what's your next

6   question?  Do you have another one, Mr. Hipple, beyond

7   that?

8            MR. HIPPLE:  No, other than whether or not he

9   saw any large revenue coming in when he was doing the

10  sales forecast, sales forecast that he has -- well, he

11  had to do a sales --

12           THE COURT:  During a particular -- during a

13  particular period?  I mean an unusual --

14           MR. HIPPLE:  For every -- for each year.

15           THE COURT:  Okay.

16           MR. HIPPLE:  For the years.

17  BY MR. HIPPLE:

18  Q   You had to see a sales forecast.  You did a sales

19  forecast, correct?

20  A   Let me clarify what I think you're asking if I

21  could.  I took bank records and we analyzed the bank

22  records.  The bank records that we had available to us

23  are debits and credits.

24  Q   Right.

25  A   The debits are things like (indiscernible), right?

Mr. Geisser - Cross                              263

1  The credits are the monies --

2  Q   Well, excuse me --

3  A   -- that come through credit card processing and the

4  like.  So you can see the money being deposited into

5  the account, the merchant processing, the credits going

6  into the account.  There's hundreds of those types of

7  transactions that we saw in the bank records.

8          I can't -- I can probably go back now and try

9  to identify maybe something coming from the UK, but

10  that was not something that we performed as a

11  fundamental part of our analysis however.

12  Q   Well, it would have been --

13  A   From my standpoint, there were dollars in.  I

14  looked at it as dollars in, dollars out, dollars into

15  the bank account, dollars out of the account.  Where it

16  came from was really of no relevance to my analysis.

17  Q   Okay.  But it would have been -- it would have been

18  very obvious, okay, because the credit card was

19  everyday, okay, in small amounts like what, 1,600,

20  1,800, 1,200, and the UK had to be in the thousands,

21  maybe 12,000, 13,000, and that didn't ring a bell to

22  you?

23  A   Again, it was dollars into the account.  It was

24  sale of product that we were accounting for as dollars

25  into the account.

Mr. Geisser - Cross                    264

1   Q    All right.  I'll deal with the UK at -- when I go

2   on the stand.  Hold on for one minute.

3                (Pause in proceedings.)

4   Q    Okay.  When you -- this is your report, okay, on

5   page 12.  E3.

6   A    Just give me a second to do some housekeeping here.

7                (Pause in proceedings.)

8                THE COURT:  Page 12 in?

9                MR. HIPPLE:  Mr. Geisser's report, I believe

10  it's E-3.  E-3.

11               THE WITNESS:  Exhibit E-3.

12  BY MR. HIPPLE:

13  Q    E-3, page 12.

14  A    I have Exhibit E-3.

15  Q    Page 12.  At the bottom, at the very -- I'll wait

16  for Your Honor.

17               (Pause in proceedings.)

18  Q    At the bottom of the page, on April 12th, 2000,

19  wire transfer, $10 fee from Steel Seal in the amount of

20  27,066.00.  I know that's certainly not a credit card

21  deposit.  Plus, it was a wire transfer from Steel Seal,

22  Ltd., UK.  And I don't understand how you could have

23  missed that.

24               MR. BERKOWITZ:  I'm sorry.  Could you give me

25  the page number?  I'm having a little difficulty.

                    Mr. Geisser - Cross                265

1              MR. HIPPLE:  Yeah, 12.

2              MR. BERKOWITZ:  12?  I want to make sure I'm

3    on the right page.

4              MR. HIPPLE:  E-3.

5              MR. BERKOWITZ:  And I'm sorry, it's --

6              MR. HIPPLE:  On 4-12-2012.

7              MR. BERKOWITZ:  2012?

8              MR. HIPPLE:  Right.  E-3 on April 12th, 2012,

9    at the bottom towards -- about five up from the bottom,

10   amount credited of 27,066,90, from Steel Seal, Ltd.,

11   UK.

12   BY MR. HIPPLE:

13   Q   I don't understand how you could have missed that.

14   A   What's the question?  I'm not sure I understand the

15   question.

16   Q   My question is that you did all these bank records

17   and this is your report, okay?  All right?  But yet,

18   you didn't realize that in your evaluation of the

19   report that it's possible that the bottles were -- the

20   chemical was being sold for a lesser amount?

21   A   Well, if you want me to respond, this is analysis

22   of bank records.  We didn't miss anything.  We recorded

23   it just as we saw it in the bank records.  There's

24   nothing in that entry that has anything to do with the

25   value of the bottles being sold.  That's an aggregate

Mr. Geisser - Cross                                    266

1   deposit from something, a wire transfer from Steel

2   Seal, Limited, UK.

3   Q   Coming in from a different country?

4   A   It poss -- it's possibly a different company, and

5   if it's a different company, maybe there's more records

6   out there we should be looking about Steel Seal UK that

7   weren't turned over.  I don't know the answer to that.

8   I can only saw what was deposited in the account.

9           And, frankly, it causes me to ask the

10  question about whether there were additional records

11  outside of what we were provided with that may relate

12  to Steel Seal UK.

13  Q   Well, wouldn't that have thrown a flag up to you at

14  one point in time when you looked at the records or

15  if -- or questioned Mr. Berkowitz in reference to it?

16  A   I don't know what flag you're talking about.

17  Again, we were looking at an analysis of cash in and

18  cash out.  This to us, the way we viewed this, this was

19  cash into the bank account which gave the basis for

20  distribution out.  What was important for our analysis

21  was to establish the dist -- the seller's discretionary

22  earnings, the distributions that were going to the

23  insiders of this --

24  Q   Yeah, you --

25  A   -- enterprise.

Mr. Geisser - Cross                              267

1  Q    -- were concentrating more on the insiders.

2  Basically -- okay.  Now, you saw this go on the board

3  today, right?

4  A    Yes.

5  Q    Okay.  Same section, 3E, if you turn to the first

6  page after E-3, and read the second line of --

7           MR. BERKOWITZ:  I'm sorry, which page?  Do

8  you have a page number?

9           MR. HIPPLE:  First page.  Don't have a page

10 number.  Right?  After the Exhibit E-3.

11          MR. BERKOWITZ:  Yep.

12          MR. HIPPLE:  Second line of revenue.

13 BY MR. HIPPLE:

14 Q    What does it -- can you read that to me, please?

15 A    It says "Revenue UK."

16 Q    How much.

17 A    $186,826.30.

18 Q    So, again, when this was being put up on the board,

19 this is your report and Mr. Berkowitz saw this report,

20 had knowledge of this report, and yet you won't accept

21 the fact that there's a bottle being sold for $12 and

22 -- you won't accept the fact?

23          THE COURT:  Well, your report, it didn't

24 address the value of the inventory, did it?

25          THE WITNESS:  No.

Mr. Geisser - Cross                    268

1          THE COURT:  No.

2          MR. HIPPLE:  No, this isn't inventory.  This

3   is --

4          THE WITNESS:  As I explained --

5          MR. HIPPLE:  -- actual sales, Your Honor.

6          THE COURT:  No, but your point is that in the

7   valuation of the inventory on the chart, it didn't take

8   into account that some of those sales may have been

9   from people in the UK.

10         MR. HIPPLE:  Well, my --

11         THE COURT:  But his evaluation --

12         MR. HIPPLE:  My cost evaluation, which was

13  also part of the report, shows how many bottles were

14  UK, okay?

15         THE COURT:  Okay.

16         MR. HIPPLE:  And that was -- and that was in

17  my affidavit and, again, so --

18         THE COURT:  So this affects your cost?

19         MR. HIPPLE:  Well, it affects -- it affects

20  the number that he put up there, but he took it from

21  1.75 to a million because of this great number.

22         THE COURT:  Right, I understand that.

23         MR. HIPPLE:  Right?  Which is in there.

24         THE COURT:  But how does it affect his

25  analysis of cash in, cash out and a multiple that he

Mr. Geisser - Cross                    269

1   used to come to his valuation, whether the income came

2   from the UK or it came from the US, on the way he

3   calculated the value.

4          MR. HIPPLE:  Well, because it would have

5   affected in the area of the actual sales based on the

6   amount of sales that would be going out to the UK.  So

7   it's got to be considered that we're selling the

8   bottles at a cheaper price or so than the price that --

9          THE COURT:  Would that have affected your

10  valuation of the value of the business as of October

11  2010?

12         THE WITNESS:  Not really.  No, again, it was

13  a cash in, cash in analysis.  We were calculating based

14  on the value of the distributions to the insiders, if

15  you will.

16         THE COURT:  What the bottom line is what they

17  took out of it.

18         THE WITNESS:  What the bottom line is.

19         THE COURT:  Right.

20         THE WITNESS:  What they took out.

21         THE COURT:  Right.

22         THE WITNESS:  It was a dollars analysis.

23  Just to come back, I wasn't aware of that inventory

24  until after this report was done and --

25         THE COURT:  You testified to that.

Mr. Geisser - Cross                    270

1       THE WITNESS:  Right.  I already --

2       THE COURT:  Yes.

3       THE WITNESS:  -- testified to that.  So there

4  was no way I would have considered that.  To me, it

5  doesn't really make any difference in terms of the

6  opinion that I've rendered, and I just -- it's just --

7       THE COURT:  It may affect your opinion from

8  the 1.75 to 2 million.  Maybe you might concede that

9  might --

10      THE WITNESS:  Yeah.

11      THE COURT:  -- be something you would --

12      THE WITNESS:  I would --

13      THE COURT:  -- you need to -- you need to

14  consider?

15      THE WITNESS:  I would agree.

16      THE COURT:  Right.

17      THE WITNESS:  I would agree.  But just based

18  on the information that was available to me in terms of

19  what we saw in the selling price on the internet,

20  extending the math accordingly, that's the answer.

21      THE COURT:  Right, I understand.

22      THE WITNESS:  And, you know, we didn't get a

23  response report back at any time that would have

24  clarified that issue.

25      THE COURT:  Right.

Mr. Geisser - Cross                         271

1    THE WITNESS:  That issue certainly came out

2    during the course of my deposition.  Had we gotten a

3    supplemental report, we could have addressed it in due

4    course, but we didn't get any supplemental report or

5    any way to address it in that fashion.

6            THE COURT:  Thank you.  Mr. Hipple --

7            MR. HIPPLE:  Okay.

8            THE COURT:  -- go ahead.  Any other

9    questions?

10           MR. HIPPLE:  No, Your Honor, just that it

11   affects that number that is on the board.

12           THE COURT:  I understand.

13           MR. HIPPLE:  Okay.

14           THE COURT:  I do understand your point.

15           MR. HIPPLE:  Okay.  Thank you, Your Honor.

16           THE COURT:  Mr. Berkowitz?

17           MR. BERKOWITZ:  Your Honor, if I could just

18   have a brief redirect?

19           THE COURT:  Sure.

20                  REDIRECT EXAMINATION

21   BY MR. BERKOWITZ:

22   Q   Mr. Geisser, I'll direct your attention to E-3, the

23   exhibit that you were just speaking about with Mr.

24   Hipple.  At the top of the page it says "Steel Seal

25   Pro."  Would you tell us what year that is?

Mr. Geisser - Redirect                        272

1   A    2012.

2   Q    Okay.  So this is UK sales for the year 2012,

3   correct?

4   A    Correct.  Well, to be more precise about it, they

5   were the deposits in 2012.

6   Q    Okay.  And the transaction between SCIX and Steel

7   Seal Pro and Complete Group and the transfer of the

8   assets happened in October 2010?

9   A    Correct.

10  Q    Okay.  So this UK issue may not -- may or may not

11  involve or be implicated in the year 2010, is that

12  correct?

13  A    That's correct.

14  Q    Now, on page 12 of the same exhibit, Mr. Hipple

15  points out that 27,066.90 came in in US dollars from

16  the UK.

17  A    Correct.

18  Q    Would it matter if it came in from Australia or

19  some place that takes the euro?  Would it matter where

20  the money comes from?

21  A    Not really, as long as we're accounting for the

22  sales for this particular entity.  If there's some

23  entity that sits outside of this entity, they would --

24  it would sort of peak my curiosity in terms of are we

25  missing an entity out there.

Mr. Geisser - Redirect                    273

1      But, in terms of -- assuming that the sales

2  went through Steel Seal Pro, which is -- this is the

3  Steel Seal Pro bank account, then it really doesn't

4  make a different, you know, where the money comes

5  from.

6  Q    US cash is US cash no matter where it comes from?

7  A    That's correct.

8  Q    Okay.  Now, let me ask you about whether your

9  opinion was rendered with a reasonable degree of

10  certainty in the field of accounting.

11      Can you state that your analysis, based on

12  what you explained to us and your opinion is based to a

13  reasonable degree of certainty, as that term applies in

14  the accounting field?

15  A    Yes, all the opinions that I have rendered today

16  and in my report are to a reasonable degree of

17  accounting/valuation certainty, and I believe are in

18  accordance with the standards that apply.

19  Q    Okay.  And just to clarify something, and I think

20  we just dealt with it, you came up with a $1.75 million

21  valuation of the cash flow from the sales of Steel

22  Seal, correct?

23  A    Correct.

24  Q    And the value of the inventory is on top of that?

25  A    That's correct.

Mr. Geisser - Redirect                    274

1   Q    So if the value of this inventory is 500,000, you

2   add 500,000 to the 1.7?

3   A    Correct.

4   Q    And if the value of the inventory is 100,000, you

5   add 100,000 to the 1.75?

6   A    Well, the idea here is to get any excess inventory,

7   right, because in the statistical information that

8   comes from BizComps, it doesn't include inventory.  It

9   specifically doesn't  So yes, it's added.  Yes, it's

10  added in there.

11  Q    And you were asked questions about I think it was

12  certain assumptions that were made.  You and I had had

13  discussions.  Have you and I worked before on other

14  matters, other accounting assignments?

15  A    I had one other accounting assignment, one or two I

16  think before this.

17  Q    Okay.  And you know I've worked with people in your

18  firm since the '80s?

19  A    Yes.

20  Q    And do you rely if I provide you some assumptions

21  that you list in your report, do you consider them to

22  be accurate?

23  A    I do, sure.

24  Q    Okay.  Now --

25  A    I mean we test the assumption.  We just don't

Mr. Geisser - Redirect                    275

1  accept assumptions necessarily for -- because Mr.

2  Berkowitz said these are the assumptions, but, you

3  know, if we think that require -- they require testing,

4  we'll test those assumptions.

5  Q   Now, you also -- I think you heard -- I think you

6  testified to this.  You heard that Mr. Hipple paid $2

7  million for the patent rights and formula?

8  A   I did hear that, yes.

9  Q   Okay.  And that would indicate to you that there is

10  some value to this product?

11  A   Yes.

12  Q   And you were asked about reasonably equivalent

13  value, and I don't want to use that in the technical

14  term because that's a term the Judge will decide.

15  Would you consider it a fair exchange if somebody

16  trades $210,000 and gets in return a $1.75 million

17  asset?  Would that be a fair exchange?

18  A   No, it's not a fair exchange.

19  Q   Okay.

20            (Pause in proceedings.)

21            MR. BERKOWITZ:  I have no other questions,

22  Your Honor.

23            THE COURT:  Okay.  Mr. Hipple?

24            MR. HIPPLE:  Can we have a five minute break,

25  Your Honor?

Mr. Geisser - Redirect                              276

1    THE COURT:  Yes, I'm ont going to leave the

2    courtroom.  You can talk among yourselves because we're

3    going to end at 4:30, okay?

4         MR. HIPPLE:  Okay.

5         THE COURT:  So why don't you -- if you need

6    some time to confer, that's fine.

7         (Pause in proceedings.)

8                    RECROSS-EXAMINATION

9    BY MR. HIPPLE:

10   Q    Okay.  I want to go back to, basically, the

11   statement of value of the corporation at 1.75 million,

12   right, and then trying to add in another 300,000 to

13   bring it up to the 2 million, correct?

14   A    Correct.

15   Q    Okay.  In your -- well, I don't know what page

16   number, but Exhibit C.  If you look at Exhibit C?

17        (Pause in proceedings.)

18   A    I have it.

19   Q    At 2011, the total sales there, I'm going to use a

20   terminology that only I basically know.  I would call

21   this double dipping, okay, because that inventory,

22   right, that Mr. Berkowitz put up on the board was sold

23   in 2011.  So if you want to add it back in, you already

24   got it in the sales of 2011.  Where can you justify

25   bumping it up another 300,000?  That's double dipping,

Mr. Geisser - Recross                    277

1   isn't it?

2   A    No, it's not.

3   Q    Okay.  Well, okay.  It's not the sales of the

4   inventory in this figure?

5   A    Can I explain?

6   Q    Go ahead.

7   A    The valuation is as of October 2013.  The valuation

8   that we're doing is looking at the ability of this

9   business, the Steel Seal business, to produce cash flow

10  over an extended period of time.  Any valuation is

11  based on the forward ability of that company to make

12  earnings.

13          So, while we have three years that are spread

14  out, really what we're doing is we're averaging that

15  out to get an overall view of what is the -- answering

16  the question, what is the ability of this business to

17  generate earnings and cash flow going forward.  That's

18  why we only apply it to a single year at the end.

19  Truly, we only apply it really to a single year.

20          So the valuation is as of October 2013.  So

21  what we're saying is based on the cash flow as of

22  October 2013, the value of that company on that date is

23  $1.7 million, based on cash flow alone.

24          But, there's an additional asset that sits

25  out there.  If there were another $200,000 sitting on

Mr. Geisser - Recross                278

1    the books as cash, we would say that you need -- you're

2    buying cash, so we would say we -- you have to add in

3    $200,000 cash.

4            In this particular case, you have excess

5    inventory.  You have inventory that was fresh unsold

6    inventory that is an additive asset to the cash flow

7    stream, and for that reason, those things are added

8    together.

9            So, while that may have been sold in a later

10   period of time, as of October 2013, when we're talking

11   about equivalent value as of that date, that's why it's

12   additive at that point in time, not in 2011.  So

13   there's no double dipping involved here whatsoever.

14   Q   But, again, but the goods were sold in 2011 and

15   it's in the sales figure here.  I don't understand what

16   inventory you're talking about.  What inventory are you

17   talking -- we're talking about the inventory that I

18   took, is that not correct?

19   A   Absolutely.

20   Q   Okay.  If I took the inventory in 2010 and it was

21   sold in 2011 and this sales number is in 2011, it's

22   gone.  There is no inventory.  There's no inventory.

23   It's gone.  It's, you know, vanished.  Discretionary

24   earnings, right, would change?

25   A   It's a little difficult to explain because we're

Mr. Geisser - Recross                    279

1  involved in talking about valuation concepts here a

2  little bit -- actually, more than a little bit.  But

3  when we're doing this value, again, I'll repeat myself.

4  We're putting a value on this enterprise, this Steel

5  Seal enterprise, as of a point in time.

6          That value, that calculated value is based on

7  its ability to generate cash flow going forward.

8  That's not -- that's not a single year that -- that's

9  multiple years going forward.  So when you're talking

10 about --

11 Q   I understand all that part.

12 A   Let me finish.

13 Q   That's not the part I'm talking --

14         MR. BERKOWITZ:  I would object.

15         THE WITNESS:  Let me finish.

16         MR. BERKOWITZ:  Your Honor, the witness is

17 answering the question.

18         THE COURT:  Yes, I'll --

19         MR. HIPPLE:  Okay.

20         THE COURT:  -- sustain the objection.

21         THE WITNESS:  So when you're doing this

22 calculation I agree that that may have been sold in

23 2011.  There's no dispute on that.  But it has to do

24 with this ability -- the ability of this company, this

25 enterprise, if you will, to generate cash flow and

Mr. Geisser - Recross                    280

1   distributions to the owners, the insiders.  That's what

2   we're talking about.

3           So, it's additive in the sense that at that

4   moment in time, it was free, it was additional capital

5   that was available that was unrelated to the cash flow

6   stream directly.

7   BY MR. HIPPLE:

8   Q   Okay.  But then that takes care of this?  This is

9   gone, is that correct, the 300,000 that you're trying

10  to add on the top of --

11  A   No.

12  Q   -- the 1.7?

13  A   No, it's additive.

14  Q   I don't know.

15          MR. HIPPLE:  I'm not an accountant, Your

16  Honor, but from my standpoint, if the inventory was

17  sold, it's in the -- and it's in the sales figures,

18  okay, this would no longer exist, okay.  So where would

19  it come back in if you already got it in the sales?

20  I'm just totally confused.  I mean --

21          THE COURT:  Well, let me just say I do

22  understand your point, Mr. Hipple.  I'm not saying I

23  agree or disagree obviously, but I understand your

24  point.  Your point is that in the 2011 sales figures,

25  it's 1.249 -- 1.2 million in excess, you're saying

Mr. Geisser - Recross                  281

1    included in those sales figures is the inventory that

2    was taken?

3              MR. HIPPLE:  That's correct.

4              THE COURT:  And that Mr. Geisser used those

5    figures to come up with his calculations, and you're

6    saying it's double counting.  I understand that.  I

7    think you made your point.

8              MR. HIPPLE:  Okay.

9              THE COURT:  You know, I need to consider the

10   whole picture here.  And, obviously, I'll hear from Mr.

11   Pederson.  I'm sure he'll address that.  And, you know,

12   we'll hear argument on that, but I'm not sure you need

13   to go any further on this.

14             MR. HIPPLE:  Okay.  Thank you, Your Honor.

15             THE COURT:  No more -- no, we only go direct,

16   cross, redirect, and recross.  So if there's no more

17   questions -- are you finished your questions?

18             MR. HIPPLE:  Yes.

19             THE COURT:  Okay.  All right, you're excused,

20   Mr. Geisser.

21             THE WITNESS:  Thank you.

22             THE COURT:  Thank you very much.

23             MR. HIPPLE:  No, I mean I'm not finished my

24   questions.

25             THE COURT:  Oh, I thought --

1          MR. HIPPLE:  No.

2          THE COURT:  -- you said you were.

3          MR. HIPPLE:  I thought you meant that

4    question --

5          THE COURT:  Oh.

6          MR. HIPPLE:  -- there I'm finished.

7          THE COURT:  Oh, go ahead.

8          MR. HIPPLE:  No, I'm not finished my

9    questioning.

10         THE COURT:  I thought you were.

11         MR. HIPPLE:  Your Honor, I have 39 pages and

12   we're on page five.

13         THE COURT:  Okay.  Go ahead.

14   BY MR. HIPPLE:

15   Q    All right, we're going to go back to the fee

16   engagement letter.

17         MR. BERKOWITZ:  I'm sorry, if I could raise

18   an objection.

19         THE COURT:  Yes.

20         MR. BERKOWITZ:  They went through, completed

21   their testimony, I did a redirect.

22         THE COURT:  Right.

23         MR. BERKOWITZ:  Their recross should be

24   limited to the couple of points I raised in my

25   redirect, and I don't think there's 39 pages worth of

Mr. Geisser - Recross                    283

1    questions there.

2             THE COURT:  Right.  So, Mr. Hipple, the rules

3    are you're entitled -- you're on what's called recross,

4    okay?  We had the direct examination, we had your

5    cross-examination, we had redirect from Mr. Berkowitz.

6    He had a limited number of questions.

7             There may have been five questions I think,

8    five or six questions, certain discrete areas.  You're

9    limited in now your questions to only those areas that

10   he touched upon.  So this is not another time to open

11   up the whole thing.  You had your chance.  So what

12   questions do you --

13            MR. HIPPLE:  Where did I lose my chance, Your

14   Honor?  I don't understand.

15            THE COURT:  Well, because the rules are you

16   had -- you cross-examined him probably for about an

17   hour, okay.  And then Mr. Berkowitz had some redirect,

18   which was limited to the points that you brought up on

19   cross.  Do you understand?  So you're limited to the

20   points that he brought up on recross.

21            MR. BERKOWITZ:  Redirect.

22            THE COURT:  On redirect.  Excuse me, on

23   redirect, thank you.

24            MR. HIPPLE:  Well, then why did I allow him

25   to redirect then?  I mean what's the --

Mr. Geisser - Recross                    284

1      THE COURT:  You don't allow.  The rules

2  permit that.  So what questions do you have?  What

3  areas do you want to get into?

4      MR. HIPPLE:  Well, there's a lot of areas,

5  Your Honor.  There's a lot of areas in reference to the

6  American Express bills, there's a lot of areas into my

7  royalties.  There's a lot of different areas that

8  really need to be touched on because --

9      THE COURT:  But you -- but you -- but the

10  problem is with the American Express bills, they

11  weren't brought up by Mr. Berkowitz on his redirect.

12      MR. HIPPLE:  But I --

13      THE COURT:  Why didn't you bring it up

14  earlier?

15      MR. HIPPLE:  Because then I was going down

16  the list.  I haven't gotten to that yet.

17      THE COURT:  All right, go ahead.  Start, ask

18  your questions.

19  BY MR. HIPPLE:

20  Q   All right, back to the fee engagement letter.

21      THE COURT:  Wait a minute, no.  You had --

22  Mr. Pederson --

23      MR. PEDERSON:  I'm sorry, you said go back to

24  your questions.  I thought you meant --

25      THE COURT:  No, Mr. Pederson, I made --

Mr. Geisser - Recross                                285

1           MR. PEDERSON:  -- go back to the list.

2           THE COURT:  -- a ruling.  You're done.

3           MR. PETERSON:  Okay.

4           THE COURT:  You read your prepared list.

5           MR. PETERSON:  I didn't prepare it, Your

6    Honor.

7           THE COURT:  Well, somebody prepared a list.

8           MR. HIPPLE:  Okay.

9           THE COURT:  Let's go over this again.

10          MR. HIPPLE:  Yes, I have a list here.

11          THE COURT:  And Mr. Hipple had difficulty

12   reading it.  And I, in order to allow him to -- someone

13   to articulate those questions, I allowed you to read

14   them.  You finished reading them.

15          Then Mr. Hipple thought of some additional

16   questions.  Do you remember we had an objection from

17   Mr. Berkowitz about that?  I said well, Mr. Pederson

18   has finished his -- his prepared questions were -- they

19   were finished.  And I'm not going to permit you to read

20   anymore questions.

21          MR. HIPPLE:  Him?

22          THE COURT:  Him.

23          MR. HIPPLE:  Okay, so I can --

24          THE COURT:  But you are limited to what he

25   only brought up.  You're not -- you can't open up this

1  whole thing again.  What questions do you have that

2  relate to what he just asked?

3            (Pause in proceedings.)

4            THE COURT:  You look like you're reading from

5  a list of questions, is that right?

6            MR. HIPPLE:  Yes.

7            THE COURT:  Well, why didn't you read from

8  those questions earlier?

9            MR. HIPPLE:  That's what we've been doing.

10            THE COURT:  No, but you had an opportunity to

11  cross-examine him and you were reading the questions,

12  and I let Mr. Pederson assist you and I let him read

13  those questions.  Why didn't you finish that at the

14  time that you had the opportunity to do it?

15            MR. HIPPLE:  What do you mean, just read all

16  the questions first?  Is that how it was --

17            THE COURT:  Yes, it's your opportunity for

18  cross-examination, yeah.

19            MR. HIPPLE:  Well, that's what I thought we

20  were doing.

21            THE COURT:  Yes, but you finished your

22  questions.  You told me you were finished.

23            MR. HIPPLE:  No, no, I said I was finished

24  with that question and I just asked him about --

25            THE COURT:  No, no, no.  No.

1    MR. HIPPLE:  This --

2    THE COURT:  A half an hour ago you told me

3  you were finished your questions and then Mr. Berkowitz

4  had a chance --

5    MR. HIPPLE:  No, that was a mistake, Your

6  Honor, okay?

7    MR. PEDERSON:  I think that your confusing is

8  because we were going back and forth.  So he was

9  finished the questions.  He had interjected himself

10  that we're not here, and I was going to continue

11  reading the questions.  So when he said he's finished

12  he was finished his own questions that were not on this

13  list and I was going to start reading again.  That's

14  what happened.

15    THE COURT:  Well, you're a lawyer.  You

16  understood this.  Why didn't you speak up?

17    MR. PEDERSON:  I don't practice law, Your

18  Honor.

19    THE COURT:  Well, you went to law school.

20  You should know that.  All right, go ahead.  Let's

21  finish your questions.  Go ahead.  I want to give you

22  every opportunity to present your case.  Go ahead.

23    MR. HIPPLE:  Yeah, I need that.

24    THE COURT:  When you answer me and say you're

25  finished you got to realize there's consequences.

Mr. Geisser - Recross                    288

1          MR. HIPPLE:  Okay.

2          THE COURT:  The next time --

3          MR. HIPPLE:  I didn't understand that part.

4          THE COURT:  The next time you got to be aware

5     of that.

6          MR. HIPPLE:  All right, I will be, Your

7     Honor.  Okay.

8     BY MR. HIPPLE:

9     Q    Back to your fee engagement letter, it is fair to

10    say that you provided a report that is consistent with

11    the scope of the engagement set forth in that letter?

12              (Pause in proceedings.)

13    A    Is that a question?

14    Q    The question -- okay.  I'll read it again.  Back to

15    your fee engagement letter, is it fair to say that you

16    provided a report that is consistent with the scope of

17    the engagement set forth in the letter?

18    A    Yes.

19    Q    Is it fair to say that you were not retained to

20    determine the fair market value of any particular list

21    of assets, right?

22              (Pause in proceedings.)

23    A    Can you tell me what exhibit the engagement letter

24    is because I closed up the binder.  I apologize, but I

25    thought --

1   Q    30 --

2   A    -- we were done with this.

3   Q    38.

4              (Pause in proceedings.)

5   A    The engagement letter reads, in the second

6   paragraph, "You have engaged us to perform a

7   calculation of value of SCIX, LLC/Steel Seal, LLC/Steel

8   Seal Pro, LLC.  Our procedures will include analysis of

9   several bank accounts directed toward estimating the

10  cash flow distributed to the owners/insiders of the

11  subject companies."

12  Q    But, basically the bank accounts?

13  A    Well, the focus was on the cash flows because, as I

14  testified earlier --

15  Q    Could you read the next sentence also?

16  A    Can I finish my response?  As I testified earlier,

17  I was operating under the impression that there was

18  minimal tran -- minimal assets that were transferred at

19  the time, physical assets.  It was really more of a

20  cash flow situation.

21              We subsequently became aware of this list of

22  assets.  At the time I drafted this engagement letter,

23  I was not aware of that.  So in drafting the engagement

24  letter, my focus was on the cash flows.

25  Q    All right.  Can you read the second after that,

Mr. Geisser - Recross                        290

1   read on "After determination"?

2   A    "After determining the distributions of the

3   companies, we will apply an estimated capitalization

4   rate or other metric typically used to value small

5   businesses to produce an indicated value.  It is

6   understood that our opinion will be limited to the

7   available records and the calculation will be used

8   exclusively in connection with the above captioned

9   matter."

10  Q    An estimated capitalization rate, where did you

11  come up with that?

12  A    One of the methodologies that you can use in

13  valuing a business is called the income approach.  The

14  income approach uses something called a capitalization

15  rate.

16          When I was considering this engagement at an

17  early stage I didn't know all the parameters of what I

18  was dealing with at that time.  So, in describing

19  generally what we were going to do, I was trying to say

20  in the engagement letter we're generally going to use

21  these valuation methodologies that may be available to

22  us.

23          As I started to drill down and understand

24  better what was going on, it became apparent to me that

25  a capitalization rate was no an appropriate methodology

1  to use, or certainly a less preferred methodology, and

2  that there was a more direct, more appropriate, better

3  way to estimate value.  And that was I eventually came

4  to use a market valuation approach using the seller's

5  discretionary earnings metric.  And that's what I refer

6  to here, "or other metric."  That's what that refers

7  to.  When I said, "other metric," those are database

8  metrics that are commonly used in doing valuation work.

9            (Pause in proceedings.)

10  Q   Well, the phrase, "fair market value" does not

11  appear anywhere in your fee engagement letter, right?

12  A   Agreed.

13  Q   And a standard of measures of the fair market value

14  of assets would include what demand of -- on the open

15  market for such assets would be, right?

16  A   Assets meaning what?  What do you mean "assets"?

17  What are you referring to?

18  Q   Sales.  Assets.

19  A   Well, the objective here is to value an income

20  stream.  That's what -- that's what they did and the

21  letter says.  So we're not valuing sales.

22  Q   So, basically, your projections are -- naturally,

23  I'm going to go to 2012, okay?  Correct?  As far as

24  what's going on with the company now, you have no

25  idea --

Mr. Geisser - Recross                    292

1   A    It's --

2   Q    -- basically?

3   A    Our valuation is an estimate as of October 2010

4   when the -- when the value -- when the exchange took

5   place for what we conclude was not reasonably

6   equivalent value.  It's at that moment in time that we

7   needed to address.

8   Q    And the standard of measures of the fair market

9   value of assets would include what the demand on the

10  open market or such assets would be, correct?

11  A    Again, I ask -- I have to ask you to clarify.  What

12  assets are you referring to?

13  Q    All right, let me have you look at 224-20.

14        (Pause in proceedings.)

15  Q    224-20.

16  A    I have it.

17  Q    Would you read it, please?

18  A    "Question:  Can those -- if just assets are

19  transferred, are there ways to determine the fair

20  market value of just those assets?

21        "Answer:  Sure."

22  Q    225-17.

23        MR. BERKOWITZ:  I'm going to raise an

24  objection here, Your Honor, to the last question.  It's

25  a little late, but on page 22, it seems that that

1  question that was just asked pertains to the 528 cases

2  of Steel Seal.

3          Mr. Geisser had a question about what assets

4  are we talking about, and I guess my question -- my

5  objection is we need a clarification if that's the

6  asset we're talking about?

7          THE COURT:  Is that the asset, Mr. Hipple,

8  that --

9          MR. HIPPLE:  No.

10         THE COURT:  That's right.  In the deposition,

11 that's what he was talking about, right?

12         MR. HIPPLE:  No, he said okay.

13         THE COURT:  Let me ask you, Mr. --

14         MR. HIPPLE:  Oh, yeah, the assets?  Yes.

15         THE COURT:  Yeah.  The assets, the inventory.

16         MR. HIPPLE:  The assets that I took.

17         THE WITNESS:  Yes.  If -- Your Honor, can I

18 interject?

19         THE COURT:  Yes.

20         THE WITNESS:  If you look back on page 222,

21 it refers to the 528 cases of material.  I'm just --

22 I'm kind of skimming it right now, but --

23         THE COURT:  So that's what you were referring

24 to when you answered the question?

25         THE WITNESS:  I'm just -- as I look over the

Mr. Geisser - Recross                    294

1    pages, it looks to me like that's what we were talking

2    about.

3              THE COURT:  Okay.

4              THE WITNESS:  I'm looking at page 221, and

5    for Exhibit O, "Somebody had to pay for this inventory

6    that was purchased here, correct?  Answer:  Correct."

7              THE COURT:  Okay.

8              THE WITNESS:  And it's making reference to

9    the value of that inventory that's being discussed

10   throughout those pages.  So that's -- I'm addressing

11   the question, "Is there a way to value that inventory."

12             THE COURT:  Right.

13             THE WITNESS:  And based on just that little

14   response that I gave there, the answer is "Yes."  It's

15   the --

16   BY MR. HIPPLE:

17   Q    "Sure."

18   A    It's the same as --

19   Q    You said "Sure," right.

20   A    Sure.  And it's the way that we walked through it

21   this morning on this board up here.

22   Q    All right.  But, would you agree now that we talked

23   about the England and the UK that perhaps this could be

24   a mistake?

25   A    We used the information that was available to us at

Mr. Geisser - Recross                                    295

1    the time.  If there's -- if that information and those

2    was incorrect, certainly I stand to hear that

3    correction.

4            But, all I can say was based on what was

5    available to me at the time I was giving this

6    deposition, I was just doing the same kind of

7    extrapolation like we did on the board this morning,

8    multiplying the cases, the bottles, the number of

9    bottles per case, the selling price per bottle, to come

10   up with a number, because that's the way you would

11   value it.  It's valued at the selling price of the

12   material.

13           So, what we're trying to derive is simply

14   answer the question, if you took physical possession of

15   these bottles of material, what were they sold for?

16   What was the value of those bottles that you took

17   possession of?

18   Q   So, basically, you never saw the sheet that was in

19   the exhibits that -- with the cost analysis of what I

20   received?

21   A   I'm sorry, I don't know what you're referring to.

22   If you want to --

23   Q   Okay.

24   A   -- show me that exhibit --

25   Q   There's --

Mr. Geisser - Recross                     296

1   A   -- I'll be happy to take a look at it.

2   Q   I don't know what exhibit.

3                MR. HIPPLE:  Do you know the exhibit?

4                THE COURT:  I think we went over this

5   already.

6                MR. HIPPLE:  What?

7                THE COURT:  We went over this already.

8                MR. HIPPLE:  No, this is my cross exhibit

9   that has --

10               THE COURT:  Well, you showed us the UK sales

11  and --

12               MR. HIPPLE:  No, no, this is an exhibit, Your

13  Honor, showing exactly what I received for the assets.

14               THE COURT:  All right.  Go ahead.  What

15  exhibit are you talking about?

16               (Pause in proceedings.)

17               THE COURT:  We're going to stay until you're

18  finished.  You know, you don't want him to come back

19  tomorrow, do you?  No.

20               MR. HIPPLE:  We're going to have to, Your

21  Honor.

22               THE COURT:  Well, we're staying because I'm

23  sure he has other things to do and he's being paid by

24  the hour here, so let's try to get him finished.

25               MR. BERKOWITZ:  Your Honor, I have three

Mr. Geisser - Recross                    297

1    witnesses tomorrow, which will be the end --

2              THE COURT:  Yes.

3              MR. BERKOWITZ:  -- for me.

4              THE COURT:  We'll start at 9:00 tomorrow,

5    9:00 to 1:00, because --

6              MR. BERKOWITZ:  They're subpoenaed --

7              THE COURT:  -- we have a half day tomorrow.

8              MR. BERKOWITZ:  -- to be here.  I think when

9    I issued the subpoenas we didn't have the renewed

10   schedule.  I think they will be here -- I think the

11   subpoenas were for 9:30, although I think I contacted

12   them.

13             THE COURT:  All right.  Well, when they --

14   when they come you can start it because I -- you know,

15   I'm going until 1:00 tomorrow.

16             MR. BERKOWITZ:  Yes.  And I should be --

17             THE COURT:  All right.

18             MR. BERKOWITZ:  I assume that I will be done

19   well before 1:00.

20             THE COURT:  Right.

21             (Pause in proceedings.)

22             MR. HIPPLE:  Do you remember?  It was an

23   exhibit.  I know it --

24             (Pause in proceedings.)

25             MR. HIPPLE:  D-52.

Mr. Geisser - Recross                    298

1       THE COURT:  The black binder.

2       (Pause in proceedings.)

3       MR. BERKOWITZ:  Your Honor, I don't want to

4   interrupt him during his questioning, but I would like

5   to raise an objection.  I believe this exhibit was

6   produced and prepared in conjunction with the motions

7   for summary judgment, I believe, and it was after Mr.

8   Geisser's report.

9       MR. HIPPLE:  Well --

10      MR. BERKOWITZ:  I believe that's --

11      MR. HIPPLE:  No, I think this --

12      MR. BERKOWITZ:  -- correct.

13      MR. HIPPLE:  This was --

14      THE COURT:  Why don't you ask Mr. Geisser,

15  Go ahead, ask your question.

16      MR. HIPPLE:  Okay.

17  BY MR. HIPPLE:

18  Q   Are you familiar with this report?

19  A   I don't believe I've seen this document before.

20  Q   So, therefore, it had no part of your evaluation?

21  A   Correct.

22  Q   But you -- basically, you did look through all of

23  the documentation, right?

24  A   I --

25  Q   Before you did your report?

Mr. Geisser - Recross                    299

1    A    Mr. Hipple, the documents that I considered are

2    specifically delineated in one of the exhibits to the

3    report.  Under the Federal Rules, we're required to

4    list the documents that we relied upon, and there's a

5    list.  I can cite to the exhibit, but there's an

6    exhibit which delineates what documents we had

7    available to us.

8    Q    Again, the other question I had here is now you are

9    aware that Clement Hipple prepared an inventory of the

10   SCI access -- assets you foreclosed on?  This is a very

11   important report because this is what I foreclosed on.

12   I can't understand why -- I know it was in the -- prior

13   to your -- prior to you redoing your report.  All

14   right, hold on for one minute.

15              (Pause in proceedings.)

16   Q    So, basically, you're saying you did not see it

17   before you did your report, is that correct?

18   A    If you're referring to Exhibit D52, the first time

19   I've --

20   Q    Yes.

21   A    -- ever seen that is --

22   Q    No?

23   A    -- two minutes ago.

24   Q    Fine.  You would agree with me that one of the

25   issues is -- in this case is how much Mr. Hipple

Mr. Geisser - Recross                    300

1    realized out of the assets that he took possession of

2    October 10 -- October 2010, correct?

3    A    Yes.

4    Q    And the answer to that question is that he took the

5    equivalent cash value of those assets, right, cash

6    value?

7    A    Generally, yes.

8    Q    Going back to the inventory, you and Mr. Berkowitz

9    made the specific decision that you would -- you were

10   not going to get involved in performing an evaluation

11   of what was on the inventory, is that correct?

12   A    Let me back up.  At the time I did my report, I was

13   not aware of that inventory sheet.  That's the way I

14   testified.  That's the way I testified at my

15   deposition.  I was not aware of that.  Had I been aware

16   of that, I would have incorporated it into the report,

17   and I was not aware of that inventory and, therefore,

18   did not include it.

19   Q    This is a very important document.  All right.

20   Let's go to 30-21 of your deposition.

21            (Pause in proceedings.)

22   A    Page 30?

23   Q    Yeah, page -- yeah, 30-21.  Let me -- let me see it

24   first.

25            (Pause in proceedings.)

Mr. Geisser - Recross                301

1   A    I have it.

2   Q    Okay.  Can you read it?

3        (Pause in proceedings.)

4   Q    Go ahead.  I'll read it.  "Well" --

5   A    I can read it.  I wasn't clear what --

6   Q    Okay.

7   A    Question -- and you just tell me where to stop.

8   Line 21.  "Question:  "Well, did Mr. Berkowitz tell you

9   that?

10       "Answer:  "I have a general recollection that

11  we had a discussion about what to include in the

12  calculation of value at the time we did it, and because

13  there was a representation from your client that it was

14  a relatively small amount of inventory that had been

15  transferred, that we decided not to get involved in

16  trying to do a separate valuation of the inventory as

17  part of the calculation of value.

18       "Question:  Prior to preparing your report,

19  did you have any conversations with Teresa Hipple

20  directly?

21       "Answer:  No."

22  Q    No further.  Okay.  So, basically, you knew about

23  -- I mean Mr. Berkowitz knew that the report was there?

24       MR. BERKOWITZ:  Your Honor, objection.

25       THE COURT:  Sustained.  Okay.

Mr. Geisser - Recross                    302

1               (Pause in proceedings.)

2    BY MR. HIPPLE:

3    Q    Okay.  And you were never, ever provided the

4    inventory before preparing your report, correct?

5    A    Correct.

6               (Pause in proceedings.)

7    Q    Okay, here we go.  Now, the opinion -- the opinion

8    you give in this action is that based on the records

9    available and the stated assumptions, a reasonable --

10   reasonably equivalent value for the transfer of SCIX

11   assets as of October 13th, 2010, would have been 1.75

12   million?

13   A    Correct.

14   Q    Okay.  Your opinion explicitly references SCIX

15   assets as of October 13th, 2010, right?

16   A    Yes.

17   Q    These would have been assets belonging to SCIX as

18   of the date -- of that date, right?  The date of

19   October 13th, 2010?

20   A    Yes.

21   Q    But at the time you prepared your report, you had

22   no understanding of what the hard assets SCIX had just

23   prior to the transfer that is the subject of this

24   litigation, main subject of this litigation?

25   A    You'll recall my earlier discussion, okay.  I had

1   no balance sheet.  We had no balance sheet information,

2   so when you talk about assets and liabilities, as the

3   case may be, the place that you look in the financial

4   statements is the balance sheet.  We had no balance

5   sheet, so it was not possible for me to begin to

6   evaluate a balance sheet.

7              There were no Quickbooks produced, there were

8   no financial statements including a balance sheet.  The

9   only thing that we had back in 2010 period, as

10  reflected on Exhibit A and B of my report, was Brian

11  Hipple's schedule C, which is in the form of an income

12  statement used for tax purposes.

13             (Pause in proceedings.)

14  Q   You did not know how much inventory SCIX had as of

15  the date, right?  Correct?

16  A   Correct.  At the time -- and I'll refer you back to

17  the passage that we just read out of my deposition that

18  there was a representation to me that there was a very

19  small amount of physical assets that were taken at that

20  time.  And because that was a representation I

21  understood to be the case, we put that aside and said

22  hey, let's focus on the cash flows that are being

23  generated out of this enterprise.

24             It was only later that I became aware that

25  there was a list of assets that were actually

Mr. Geisser - Recross                304

1  transferred at the time -- at that time in October of

2  2010, and at that point in time, I said this is

3  relevant to the overall evaluation process, most

4  particularly when you're dealing with readily saleable

5  inventory.

6  Q    Right.  And you keep using the terminology in your

7  mind, "small amount of inventory," is that correct?

8  I've heard you say it quite a few times.

9  A    That was what I understood to be the case and

10 that's why I wasn't particularly concerned about it at

11 the time we approached it using the cash flows.  I

12 didn't think there was information available that would

13 be useful.  I didn't have a balance sheet.  I'm

14 repeating myself, but I didn't have a balance sheet.

15 Q    And you did not know what SCI account receivables

16 were as of October 13th, is that correct?

17 A    That's correct.

18          MR. HIPPLE:  I'm going as fast as I can, Your

19 Honor.

20          THE COURT:  Okay.

21          MR. HIPPLE:  All right?  Because these are

22 just -- I just want to get these questions into the

23 record.

24 BY MR. HIPPLE:

25 Q    And you did not know the fair value -- market value

Mr. Geisser - Recross                    305

1    of the equipment, computers, furniture, packing

2    material, and/or any car SCIX had in its possession as

3    of October 13, correct?

4    A    Correct, because I had no balance sheet.  I had no

5    list of assets, and that's why we went to the cash flow

6    process.

7              MR. HIPPLE:  I know Your Honor wants to get

8    out of here, so if it's just a yes or no answer, we'll

9    go yes or no, okay?

10   BY MR. HIPPLE:

11   Q    Are you -- and you never saw a customer list,

12   correct?

13   A    Correct.

14   Q    And you do not know what, if any, liens existed on

15   the assets of SCIX as of October 13th, correct?

16   A    Correct, because we had no balance sheet.

17   Q    And you did not perform any UCC search for SCIX

18   prior to preparing your report, correct?

19   A    Correct.

20   Q    And you did not perform any judgment search for

21   SCIX prior to preparing your report, correct?

22   A    Correct.

23   Q    And you did not take into consideration that

24   Clement Hipple claimed he had a security interest in

25   the assets of SCIX, correct?  Or no, once -- okay.

1  Correct?

2  A    Correct, and I would have expected if that was

3  going to be an issue, that I would have seen that in a

4  rebuttal report, but there was nothing in the rebuttal

5  report that addressed that.

6  Q    Okay.  And prior to coming to you opinion in this

7  case, you did not know the circumstances surrounding

8  the security interest Clement Hipple took in SCIX

9  assets, fair?

10 A    Correct, that was not something that I took into

11 consideration.

12 Q    And with respect to the debt owed by SCIX to

13 Clement Hipple that is the subject of this litigation

14 and any opinion as to whether that debt was valid or

15 invalid would fall outside the scope of your

16 engagement, correct?

17           MR. BERKOWITZ:  I'm going to object to the

18 question, but I --

19           THE COURT:  Okay.

20           MR. BERKOWITZ:  -- think --

21           THE COURT:  I'll sustain the objection.

22           MR. HIPPLE:  No?

23           THE COURT:  I'm sure the plaintiff is going

24 to say, I believe, that your debt is not the subject of

25 this litigation.  It may be an issue, but it's not the

Mr. Geisser - Recross                    307

1    subject.   Is that part of your objection?

2            MR. BERKOWITZ:  Yes.

3            THE COURT:  All right.

4            MR. BERKOWITZ:  Sure, Your Honor.

5            THE COURT:  So I'll sustain the objection.

6            MR. HIPPLE:  What's that mean?  I --

7            THE COURT:  That means he can't answer that

8    question unless you rephrase it in some way.

9            MR. HIPPLE:  Okay.  All right, let's see if I

10   can try to rephrase it.

11   BY MR. HIPPLE:

12   Q   All right, go to the -- yeah, 49-16.  Page 49-16.

13           (Pause in proceedings.)

14   A   Do you want me to read the question?

15   Q   Yeah, 16.

16   A   "Questions:  With respect to whether or not the

17   debt owed by SCIX to Clem Hipple was valid or invalid,

18   is it fair to say that providing an opinion on that

19   issue was outside the scope of your assignment?"

20           "Answer:  I agree, correct."

21   Q   Okay.  Now go to 50-4.  Keep going.  I'm sorry.

22   I'm sorry, keep going until you get to 50-4.

23   A   "Question:  Is it fair to say you have no opinion

24   on that particular issue?

25           "Answer:  It's outside the scope of my

1    assignment.  I have no opinion, correct."

2  Q    Okay.

3          (Pause in proceedings.)

4  Q    Now, you knew at the time that you attributed a

5  $1.75 million valuation of the assets of SCIX as of

6  October 13th, 2010, you understood that SCIX had three

7  patents in its name, right?  Correct?

8  A    I had a general understanding there was a patented

9  product.  I did not do a separate evaluation of what

10  patents were in place.

11  Q    In other words, you didn't know that -- you were

12  never told that there were three patents when you were

13  doing a valuation of the corporation?

14  A    I believe my report makes specific reference to it

15  being a patented product.  I don't think I put the

16  number three next to it.

17  Q    But if I told you it was originally three, you

18  don't remember that part?

19  A    I think I answered the question.

20  Q    Okay.  Mr. Berkowitz told you -- told you that,

21  right, about the patents?

22  A    Yes, I believe the complaint and the pleadings talk

23  about the patents.  So this was general -- this was

24  information that was in the -- within the information I

25  considered.

1  Q    And you relied upon the statement that Mr.

2  Berkowitz told you, correct?

3  A    What statement are you referring to?

4  Q    That there were patents.

5  A    I think I just answered that question.  I think it

6  was in the pleadings.

7  Q    And those three patents are documented, listed on

8  the documents -- considered page of your report, right,

9  your Exhibit H, item N.

10            MR. HIPPLE:  I'm moving, Your Honor, as best

11  as I can.

12            (Pause in proceedings.)

13            THE WITNESS:  I'm looking at Exhibit H to my

14  report, which is entitled "Documents Considered."

15  There's nine items that are listed.  I don't see any

16  reference to patents in that list, specifically.

17  There's certainly reference to pleadings in that list,

18  but it doesn't reflect patents, the word, "patents."

19  BY MR. HIPPLE:

20  Q    If you go down to item N, it says SCIX patents,

21  with an S.

22  A    Did you say item N, as in Nancy?

23  Q    N, as in Nancy, yes.

24            MR. BERKOWITZ:  Your Honor, if I could help?

25            THE COURT:  Sure.

Mr. Geisser - Recross                          310

1              MR. BERKOWITZ:  I think there's a page in

2      front of that, Mr. Geisser.  The documents --

3              THE WITNESS:  Oh, I'm sorry.  Thanks.

4              MR. BERKOWITZ:  -- considered -- these were

5      the documents --

6              THE WITNESS:  Yeah.

7              MR. BERKOWITZ:  -- you considered.

8              THE WITNESS:  Right.  Oh, I see, I'm sorry.

9      There was two pages.  I was looking at the first page

10     only.

11     BY MR. HIPPLE:

12     Q   And it has an S on it, meaning more than one

13     patent, is that correct?

14     A   Well, to be -- to be clear about it, the document

15     that I'm looking at is "Exhibits in Support of

16     Plaintiff's Motion for Injunctive Relief," and there's

17     exhibits listed from one through item Q.  Those

18     documents were provided to me as a group.

19     Q   Right.  But you would have read -- you would have

20     read them, correct?

21     A   I certainly went through them or my staff went

22     through them, one of the two of us.

23     Q   So then you would have had knowledge that there was

24     more than one patent because this says "patents,"

25     correct?

Mr. Geisser - Recross                        311

1  A   I don't remember what I knew at the time I did my

2  report.

3  Q   Okay.  But you do remember reading that, right?

4  A   Remember reading what?

5  Q   That section where it says "patents."

6  A   I had those documents.  I don't have a specific

7  recollection of reading those documents right now, two

8  years after the fact.

9  Q   So, basically, there's a possibility you did not

10 read the documents?

11          MR. BERKOWITZ:  Objection.  I'm going to

12 object to the relevance of this --

13          THE COURT:  All right.

14          MR. BERKOWITZ:  -- line of questioning.

15          THE COURT:  I'll sustain the objection.

16          MR. HIPPLE:  What was that?

17          THE COURT:  Sustained.  He has to ask a new

18 question.

19          (Pause in proceedings.)

20 BY MR. HIPPLE:

21 Q   In fact, you assumed that Steel Seal Pro was using

22 the patent when you considered the company's cash flow

23 in 2011, correct?

24 A   It was not really important to my analysis.  I was

25 doing a calculated value based on the cash flows and

Mr. Geisser - Recross                    312

1   distributions that were being taken out by the

2   controlling principals.

3   Q    82-22.

4            (Pause in proceedings.)

5   Q    To 83.4.

6   A    Page 82, line 22?

7   Q    Yes, right, all the way up to 83.4.

8   A    Page 82, line 22:  "Okay.  So when you were looking

9   at the cash flow in 2011 when the business is being

10  operated under Steel Seal Pro, are you assuming that

11  the business is using those patents?

12           "Answer:  Yes, by virtue of the product being

13  sold.  We have a continuous stream of products being

14  sold here, uninterrupted stream of product sales,

15  whether it was with SCIX or Steel Seal Pro or Complete

16  Group or Triple D Management" -- I think she means

17  Triple B Management -- "we had a continuous revenue

18  derived from the sale of the same product.  My

19  understanding is further that the product had patent --

20  a patent -- four patents associated with it."

21  Q    Thank you.  And for the purposes of determining

22  fair market value of a business, the fact that the

23  product is patent would be a factor considering,

24  correct -- considered, correct?

25  A    If I was doing an opinion of value, it's a factor I

Mr. Geisser - Recross                    313

1   may consider, sure.

2              (Pause in proceedings.)

3   Q    And it is fair to say that you placed additional

4   value on the Steel Seal product to the extent it had

5   patents because that shut out other sellers of the

6   Steel Seal product, correct?

7   A    I used the information about patents as background

8   material only in the sense I was trying to get an

9   understanding of what the nature of the business was.

10  From my standpoint, in doing a calculated value, what

11  was important to me was what is the cash flow that's

12  been generated out of this business.

13             Whether it had a patent or not is only

14  relevant to the amount of cash flow that it generates

15  and, also, it's being sold at a higher profit margin

16  than we're talking about.  Typically, when you have

17  patents you have high profit margins.

18             That's -- let me give you a classic example,

19  like in the drug industry.  You know you can have a

20  very high profit margin in the drug industry because

21  you have patents that have a given useful life to them,

22  and that justifies that high margin.

23             And so that when I'm looking at the numbers

24  associated with this particular product I see that

25  there's a very high profit margin, which says to me

Mr. Geisser - Recross                           314

1   that there's probably a limited number or no other

2   competing products in this particular space that we're

3   dealing with.

4   Q   All right, I just have one more question before we

5   go to the deposition.  Basically, and from a company

6   standpoint, right, and I can understand any company can

7   have a high profit margin, as long as it has sales that

8   can cover its overhead and its expenses, correct?

9   A   Correct.

10  Q   Okay.  All right, let's go to 86.19, 86-19.

11  A   Page 86, line 19.

12  Q   19.

13  A   "Question:  So is it fair to say that there is an

14  enhanced value to the Steel Seal product because it is

15  patented, as compared to if it wasn't patented?

16          "Answer:  To the extent other sellers are

17  shut out of that -- the ability to sell that product,

18  there's additional value associated with that."

19  Q   Okay.  And you took that -- you took enhanced value

20  into consideration in your evaluation, correct?

21  A   Mr. Hipple, again, I'll repeat myself that it's

22  reflected in the cash flows, which was at the focus of

23  the evaluation that we did.  We did not separately

24  value the patents that are involved in this matter.

25  Q   Okay.  Let's go to 87-4.

1  A    I have it.

2  Q    Question?

3  A    "Question:  Okay.  And did you take that into

4  consideration in your valuation?

5           "Answer:  I valued the stream of income that

6  was associated with that."

7           THE COURT:  Do you know you're doing this

8  improperly?  You're asking questions, you're getting

9  the answer you want, and then you're reading the

10  deposition where he previously said the same thing.

11           There's nothing inconsistent.  You only use

12  the deposition if he says something inconsistent than

13  what he's saying today.  But he's telling you -- he's

14  giving you the answer that you expect, and then you're

15  just reading the deposition which is just reaffirming

16  what he said here today.

17           MR. HIPPLE:  Well --

18           THE COURT:  So, only if he says something

19  different in the deposition than what he says today can

20  you read the deposition.

21           MR. HIPPLE:  Okay.  But I can just go

22  directly to the deposition if I want?

23           THE COURT:  Well, to speed things up, I'll

24  let you do that, yeah.  Typically, you can't do that,

25  but I'll allow you to do that.

1           MR. HIPPLE:  Okay.

2           (Pause in proceedings.)

3    BY MR. HIPPLE:

4    Q   And that -- and that the enhancement value would

5    assume that the patents were active as of October 13,

6    2010, correct?

7    A   I'm repeating myself.  We evaluated the cash flow

8    stream.  We did not separately evaluate the patents.

9    Q   But if a patent is expired, it has no value,

10   correct?

11   A   I can't speak to that issue.

12   Q   But, you did not investigate whether any of the

13   three SCIX patents you referred to in your report were

14   active or expired as of the date -- never mind, let me

15   just go to the deposition.  Excuse me.  80.7.

16           (Pause in proceedings.)

17   A   Page 80, line seven.

18   Q   Seven.  To 81-9.

19           MR. BERKOWITZ:  I'm going to object.  I

20   believe this question has been asked before.  It's

21   talking about Exhibit H, which I believe then refers to

22   item N, which are the documents on the list --

23           THE COURT:  That were produced --

24           MR. BERKOWITZ:  -- that were previously asked

25   that Mr. --

Mr. Geisser - Recross                    317

1          THE COURT:  They came after --

2          MR. BERKOWITZ:  -- Geisser used.

3          THE COURT:  It was on the sum -- it was

4    attached to the summary judgment motion?

5          MR. BERKOWITZ:  Yes.

6          THE COURT:  Yes, I'm going to sustain the

7    objection.

8          MR. HIPPLE:  Okay, we'll go on, Your Honor.

9          (Pause in proceedings.)

10         MR. HIPPLE:  All right.

11         (Pause in proceedings.)

12   BY MR. HIPPLE:

13   Q   I direct your attention to Exhibit E-3, page four,

14   dated 2-01-12, check 531, SCIX expense.

15         MR. BERKOWITZ:  I'm sorry.

16         THE WITNESS:  You got to tell --

17   BY MR. HIPPLE:

18   Q   Okay, this is complicated, okay?  E-3, the section

19   E-3 -- I mean --

20   A   E-3 of my report?

21   Q   Yes.  Page four.  Page four dated February 1st,

22   2012, check number 531.

23         (Pause in proceedings.)

24         THE COURT:  All right, do you have a

25   question?

MR. HIPPLE: I think it says 537.

MR. BERKOWITZ:  What page of the grid? THE COURT:  Page four.

MR. BERKOWITZ:  Page four?

THE COURT:  I think it's entry 2-1-12. What's your question.

MR. HIPPLE:  It's 537.  No, but I'm sorry, I gave you the wrong number.

THE COURT:  What's your question.

MR. HIPPLE:  Well, it's gone to this disbursements -- distributions I mean.

MR. BERKOWITZ:  I'm sorry, which -- I don't see the check we're talking about.

MR. HIPPLE:  537 on 2-1 for $300 down towards the bottom, SCIX expenses.

MR. BERKOWITZ:  Check 537?

MR. HIPPLE:  Yep.

MR. BERKOWITZ:  For $300?

MR. HIPPLE:  Yep.

THE COURT:  What's the question?

MR. BERKOWITZ:  Eastern and Grey, is that --

THE COURT:  What's the question?

MR. BERKOWITZ:  -- what you're saying?

MR. HIPPLE:  It's in distribution, yes.

THE COURT:  What's the question?  What's the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Mr. Geisser - Recross                          319

1    question?

2              MR. HIPPLE:  It shouldn't be in distribution.

3              THE COURT:  Okay.  Mr. Geisser?

4              THE WITNESS:  Check -- just to be clear about

5    this, check 537 for $300 has a designation on it, it

6    says "Payee SCIX Expense," and we have it classified as

7    a distribution.  I would have to take a look at the

8    check itself to be able to answer that directly.

9              I suspect that probably Bob Heit (ph), my

10   associated who prepared this, probably looked at the

11   check and made a determination that it was not an

12   expense item, that it was in the nature of a

13   distribution.  I don't know without looking at the

14   check.  It's possible that it went into a personal bank

15   account.  I just don't know why it was classified as a

16   distribution.

17             MR. BERKOWITZ:  Your Honor, can I raise an

18   objection --

19             THE COURT:  Yes.

20             MR. BERKOWITZ:  -- just to help move these

21   things along?  Mr. Geisser, if you look at the top of a

22   page, this is a Steel Seal Pro bank account and you

23   list -- that appears to be an SCIX expense.  Now, is

24   that a business expense for Steel Seal if it's an SCIX

25   expense?

Mr. Geisser - Recross                     320

1          THE WITNESS:  Facially, it would seem not to

2     be.

3          MR. BERKOWITZ:  So you treated that $300 as a

4     distribution because it paid an SCIX bill?

5          THE WITNESS:  I don't know right now as I sit

6     here.  I -- you know, if we pulled the check out, I

7     physically looked at it, I might be in a position to

8     answer the question better.

9          I know the process that we used that.  I work

10    closely with Bob Heit from my often who did these

11    underlying schedules.  Bob is pretty careful about the

12    way he classifies things.  We probably talked about it,

13    and there was probably a reason why we classified this

14    as such, because if you look at that page, I'm looking

15    at page four now, of all the items that are listed on

16    that page, there's only two items that are listed as

17    distributions, one is to A&C Builders for $9,000, the

18    other is the $300 check.

19         So in terms of the classification process

20    that Bob Heit went through, and he's the person who

21    physically did this under my supervision, 95 percent of

22    these are classified as expense.  It was only those two

23    items that are classified as distributions.

24         So I can't -- right now as I sit here, I

25    can't give you an answer to that, but I know the

Mr. Geisser - Recross                   321

1   process is looking at the check, looking at the

2   information that appears on the check, and making a

3   judgment about whether it's expense or not expense.

4              THE COURT:  Next question, please.

5   BY MR. HIPPLE:

6   Q    You are not aware -- you are not aware as to

7   whether SCIX, LLC, was formally dissolved after October

8   13th, 2010?

9              MR. BERKOWITZ:  Objection, relevance.

10             THE COURT:  Overruled.  Go ahead.

11             THE WITNESS:  I'm not aware of the corporate

12  restructuring that went on.  My perspective, as I said

13  in the report, is that I have one continuous business

14  from the beginning of my study to the end of my study,

15  it's selling the same product, and it's making

16  distributions, and that's the approach that I took.

17  BY MR. HIPPLE:

18  Q    And that's your -- that's your opinion then?

19  A    Yes, sir, that's my opinion.

20  Q    Okay.  Again, you don't know one way or another --

21  well, that's the same question, right, so you did

22  answer that.

23             You are not aware of any agreement that would

24  have precluded SCIX, LLC. from continuing to sell Steel

25  Seal product after October 13th?

1    A    I'm sorry, can you repeat the question, please?

2    Q    Okay.  It says and you are not aware of any

3    agreement that would have precluded SCIX from

4    continuing to sell the Steel Seal product after October

5    13th, 2010?

6    A    No.

7    Q    We were -- you were not provided any agreement

8    containing a restricted covenant precluding either SCIX

9    or Brian Hipple from marketing or selling the Steel

10   Seal product, correct?

11   A    Correct.

12              (Pause in proceedings.)

13   Q    Are you aware of any or all entities that may have

14   licensing rights to sell the patented Steel Seal

15   product?

16   A    No.

17   Q    You do not know one way or another if Scientific

18   Chemical has any license for SCIX or another entity to

19   market or manufacture the Steel Seal product?

20   A    No, that's not something I considered.

21   Q    Okay.  And, in fact, you have not seen any

22   exclusivity agreement or other document granted Mr.

23   Hipple, B.B.B., Complete Group, or Steel Seal, LLC, the

24   exclusive right to sell the Steel Seal product -- I'm

25   sorry, wait a minute.  Don't answer that.  To the

Mr. Geisser - Recross                    323

1   deposition, if we --

2          MR. BERKOWITZ:  I'm going to object to the

3   question, Your Honor.  Plaintiff's Exhibit 14, which

4   Mr. Hipple testified to, is the license agreement from

5   his company, Complete Group, to his son's company,

6   Steel Seal Pro, which is an exclusive license between

7   the two pertaining to the sale of Steel Seal.

8          THE COURT:  All right, I'll overrule the

9   objection.  Go ahead, you can answer the question.  Go

10  ahead.

11  BY MR. HIPPLE:

12  Q    Okay.  Deposition 226-6, 17.

13         (Pause in proceedings.)

14  A    Page 226, line 17.

15  Q    No, I -- no, line six, I'm sorry.

16  A    Line six.

17  Q    To line 17.

18  A    "Question:  Sure.  Let me ask you a different

19  question.  Have you seen an exclusivity agreement or

20  any other document that grants Mr. Hipple or Triple B

21  or Complete Group or Steel Seal, LLC, or Steel Seal Pro

22  the exclusive right -- strike that -- not Steel Seal

23  Pro, the other defendants, the exclusive right to

24  manufacture, market, and sell the Steel Seal

25  product?

Mr. Geisser - Recross                        324

1          "Answer:  No."

2  Q   And you have not seen any information that would

3  evidence that any of those entities have the exclusive

4  right to market, manufacture, or sell the Steel Seal

5  Product -- sorry again.

6          MR. HIPPLE:  I'm sorry, Your Honor.

7          THE COURT:  Well, you asked the question, so

8  let's see what he says.

9          MR. HIPPLE:  Okay.

10          THE COURT:  You may not have to read the

11  deposition.

12          THE WITNESS:  Well, I think he's continuing

13  with --

14          THE COURT:  Oh.

15          THE WITNESS:  -- line 18.

16          THE COURT:  Go ahead.

17          THE WITNESS:  Is that correct, Mr. Hipple,

18  just to clarify?  Line 18 --

19  BY MR. HIPPLE:

20  Q   No, this is information.  This is different.  I'm

21  asking you, and you have not seen any information that

22  would evidence that any of those entities have the

23  exclusive right to market, manufacture, or sell the

24  Steel Seal Product?

25  A   As I said on line 24, "Answer:  "I haven't seen any

Mr. Geisser - Recross                           325

1   documentation like that, no."

2   Q    Thank you.

3         (Pause in proceedings.)

4   Q    Taking a quick look at those individuals and the

5   entities on page -- Exhibit D to your report,

6   identifying as payees, they include A&C Building and

7   Industrial Maintenance, American Express, Brian Hipple,

8   Cash, Chase, Credit Card, Citizen Card, Clement Hipple,

9   Friends School, Harrison Law Firm, American Honda

10  Finance, Corporate" --

11        THE COURT:  You don't have to read it all.

12  We know what the exhibit is.

13        MR. HIPPLE:  Okay.  I'm sorry, Your Honor.

14  BY MR. HIPPLE:

15  Q    Did I read that correctly?

16  A    No.

17  Q    Now for the purpose of your calculation of seller's

18  discretionary earnings, you included as seller's

19  earnings, discretionary earnings each and every payment

20  made to all of these entities from October 2009 to

21  February 2013, correct?

22  A    I included the items that are listed in Exhibit D

23  and supported by the underlying documents that define

24  that in Exhibits D-1, 2, and 3.  That's the answer to

25  the question.

Mr. Geisser - Recross                    326

1  Q   All right.  Now for the purpose of your

2  calculations, you were told to do that by Mr.

3  Berkowitz, right?

4  A   "That," meaning what?

5  Q   In other words, Mr. Berkowitz told you to identify

6  all of these separately, all of these entities?

7  A   Well, it's something we certainly talked about.  We

8  talked about going through and identifying the items

9  that would be considered distributions in nature, and

10  we talked about various specific ones.

11  Q   Let me rephrase the question, okay?  Did Mr.

12  Berkowitz specifically give you names in reference to

13  this paragraph?

14  A   In reference to Exhibit D?

15  Q   The names I just read that you have on this page,

16  did Mr. Berkowitz specifically give you those names to

17  sort?

18  A   We certainly discussed these names because in the

19  beginning, I didn't know who A&C Building and

20  Industrial Maintenance was.

21  Q   Okay.  So --

22  A   He explained that to me, certainly.

23  Q   So then, basically, he gave you the names?

24  A   He gave me some of the background names, and what

25  we typically do when we analyze a bank account, we have

1   that in digital format, so we'll sort that, right, and

2   once it gets sorted, then there's names that fall out

3   alphabetically and we can group them.

4           And then I would sit down with my staff

5   member, Mr. Heit, probably sat down with Mr. Berkowitz,

6   and we said these are the names that are in the

7   checking account.  Tell -- you know, let's talk about

8   the ones that are relevant to the distribution process.

9   And we probably went through that type of a process and

10  came out with names and we talked about why they were

11  included or excluded as the case may be.  So it's a

12  process of iteration -- it's an iterative process.

13  We're going step-by-step-by-step to come up with the

14  final answer.

15  Q   Okay.  Question, prior to looking at the bank

16  accounts, okay, can you identify on this sheet which

17  names Mr. Berkowitz told you?

18  A   He probably -- we probably talked about ones like

19  A&C Building and Industrial Maintenance.

20  Q   Okay, that's one.  Hold on for a minute.  Go ahead.

21  Did you talk about American Express?

22  A   Sure.

23  Q   Brian Hipple?

24  A   Sure, he was certainly involved in this.

25  Q   Buckingham Friends School?

Mr. Geisser - Recross                    328

1    A    Yes.

2              THE COURT:  What does this matter, the fact

3    that Mr. Berkowitz spoke to him about this?

4              MR. HIPPLE:  Well --

5              THE COURT:  What's the point of this?  You're

6    going to go through all of this.  What's the point?

7              MR. HIPPLE:  The point is that he was told

8    what to look for.

9              THE COURT:  What's your response to that?

10             THE WITNESS:  Well, yeah, I mean we can -- we

11   have discussion about things that are relevant.  Mr.

12   Berkowitz has the advantage of having sat through a

13   number of depositions.  He can begin to identify people

14   like I'll just say by way of example, Melissa Moreno,

15   probably sat down and explained to me what the

16   connection of Melissa Moreno was to this picture.

17   Those are the kinds of things that we would typically

18   talk about.

19             MR. HIPPLE:  Okay.  But the other reason,

20   Your Honor, is that a lot of -- a lot of these costs

21   here and all are actually expenses, okay?  And I can

22   explain that as we go on, okay?

23             THE COURT:  Okay.

24             MR. HIPPLE:  That's the purpose of the

25   question.  They're not what to call -- give away money

Mr. Geisser - Recross                    329

1    or whatever the word, seller's discretionary --

2             THE COURT:  All right, well, you'll have a

3    chance in your case to show that.

4             (Pause in proceedings.)

5    BY MR. HIPPLE:

6    Q    You did not deem payments made to the employer of

7    SCIX and Steel Seal Pro as SDE earnings, correct?

8    A    I'm sorry, you're going to have to repeat that

9    question.

10   Q    Okay.  You did not deem payments made to the

11   employees of SCIX and Steel Seal Pro as SDE earnings?

12   A    Payments that were made to employees were not part

13   of SDE, in other words, distributions, that's correct.

14   Q    SDE earnings.

15   A    That would be an operating expense.

16   Q    Correct?

17   A    Correct.

18           (Pause in proceedings.)

19   Q    Because worked performed by them necessary to

20   operate -- operation of the business, correct?

21   A    Typically, a business has employees that perform

22   services and are paid wages, correct.

23   Q    And you did not talk to any of the employees of

24   SCIX or Steel Seal about their work they performed or

25   the reason for the checks they received, correct?

Mr. Geisser - Recross                     330

1    A    Correct.

2    Q    Similarly, a reimbursement of a business expense

3    also would be legitimate business expense and not SDE,

4    right?

5    A    If it was a legitimate expense of the business,

6    it's an expense.

7    Q    Okay.  If I own a business and I drive my car for

8    business, I have to make deliveries with my car, okay,

9    that's a business expense, is that not correct?

10   A    Based on the way you described it, yes.

11   Q    Yes.  So the Volvo you put down here, did you

12   consider that maybe Brian made deliveries every day and

13   needed a car for business expense?

14   A    My understanding was that that was -- that that was

15   a personal car.

16   Q    Where did you get that understanding?

17   A    Probably from Mr. Berkowitz.

18   Q    Oh, Mr. Berkowitz told you that that was a personal

19   car?

20   A    I'm imagining that's the case, yeah.  I believe

21   that to be the case.  I mean there may have been

22   something else at the time, but I don't have anything

23   that comes to mind right now.  And keep -- I have to

24   keep in mind in this case that what you -- what you

25   said is important, is it used in the delivery process?

Mr. Geisser - Recross                331

1  This is a product that is shipped, right?

2  Q   No, it's --

3  A   You take -- let me finish.  You take orders over

4  the internet and there's a process where they're pretty

5  into the mails, I understand it, and shipped around the

6  world.

7  Q   Right.

8  A   That -- so it's not some kind of a home delivery

9  operation that we're talking about.

10  Q   Well --

11  A   So, you know, when we automatically -- there's a

12  lot of people that automatically make assumption that

13  if I drive my car from my house to the business, that

14  that's a business car.  That can be a point of some

15  discussion, but I don't -- I'm not suggesting that I

16  went through that level of analysis.  My understanding

17  was that it was a personal expense and I classified it

18  accordingly.

19  Q   Right.  But, again, supposing that car was used to

20  take the packages everyday to the post office and to go

21  to the post office to pick up different things and

22  products, and to go to the Staples to get different

23  products for -- to do the packing, would that not be a

24  business expense?

25  A   Hypothetically, yes.

Mr. Geisser - Recross                    332

1   Q    Okay.

2            (Pause in proceedings.)

3   Q    And you would agree that where money borrowed was a

4   normal business expense needed for the business to

5   operate, financial receivables, that such payments on

6   that loan would be non-discretionary?  I'm sorry.  Is

7   that correct?

8            Would you agree that where money borrowed was

9   a normal business expense needed for the business to

10  operate, financial receivables, that such payment on

11  the loan would be non-discretionary, right?

12  A    If it's a part of a business, there's lines of

13  credit that are used to finance things on an ongoing

14  basis, and it's part and parcel of the normal flow of

15  the product and of the business.  That could be

16  considered an operating expense.

17           Now, I differentiate that from

18  capitalization.  If we have debts on the books that are

19  non-operating, non-operating debt, that's totally

20  different because you have to keep in mind what we're

21  valuing here.  The valuation that we're doing is the

22  ability of this product to generate a revenue stream.

23           As I said earlier in my testimony, you could

24  have a company that has a lot of debt on the books on

25  it that has nothing to do -- that's nothing to do with

Mr. Geisser - Recross                333

1    the operation of that product.  That's excluded from

2    the SDE considerations.

3           If you're talking about something more

4    limited that's fundamental to the way the business

5    operates, and let me give you an example.  If we're

6    talking about you have to incur bank fees in order to

7    process things through credit cards, that's a normal

8    operating expense.  There's a certain finance charge

9    that's associated with that.  That's certainly not --

10   that's an operating expense.  That's not what we're

11   talking about here.

12          But if we're talking about debt that sits

13   apart from the business itself, that is -- a

14   distribution like that is -- can be considered SDE

15   because it's financing the underlying capital of the

16   business.

17   Q    Okay.  Give me one moment, please.

18          (Pause in proceedings.)

19   Q    And what about payments to use a website.  If a

20   product is sold on the website, but website owned by

21   another, and payment to use the website would be a

22   legal business expense, a legitimate business expense?

23   All right, let me read it again.

24          And what about payments to use a website?  If

25   product sold on a website, but website owned by

Mr. Geisser - Recross                              334

1   another, and payments to use the website would be

2   legitimate expense, correct?

3   A    Yes.

4   Q    Well, assuming that without the payment and no

5   right to use the website?  In other words, if there was

6   no payment, they wouldn't have no right to use the

7   website, right?

8   A    Presumably.

9   Q    No -- if needed a -- if needed website to advertise

10  and sell the product, payments to use the website would

11  be a business expense and not SDE, right?

12  A    Correct.

13  Q    Okay.

14             MR. HIPPLE:  This is all going somewhere,

15  Your Honor.

16  BY MR. HIPPLE:

17  Q    And payments made to marketing companies to help

18  the business, marketing companies, okay, improve hits

19  on the internet, paid ads for this website businesses,

20  those would not constitute seller discretionary

21  earnings, is that correct?

22  A    You're describing a business expense that sounds

23  like it's a legitimate business expense.

24  Q    Right.  In other words, if I have to pay for paid

25  ads to get my name of Steel Seal on the site, that's a

Mr. Geisser - Recross                    335

1   business expense, right?

2   A    Agreed.   Yes.

3   Q    If I have a company, SEO Company, and they do let's

4   web site business for me, that's a business expense,

5   correct?

6   A    SEO?

7   Q    I forget what SEO stands for, but it's a company

8   that helps out for supporting of the website.   That's a

9   business expense.

10  A    If you say it's a business expense, it's a business

11  expense.

12               (Pause in proceedings.)

13  Q    Testify that -- testified that deemed each of

14  Teresa, Clement, Brian, and Melissa and any companies

15  owned by them as insiders, but you have no personal

16  knowledge as to how -- as to who owned each of the

17  various corporation -- corporate defendants during 2009

18  through 2012?   Did I read that right?

19               (Pause in proceedings.)

20  A    I'm sorry, that's a -- that's a complex question.

21  I'm not sure I can answer it.

22  Q    All right.   Let me take a little bit of it, all

23  right?   Testified that deemed each of Teresa, Clement,

24  Brian, and Melissa, and any company owned by them as

25  insiders, that's half of the question.

Mr. Geisser - Recross                    336

1   A    Agreed.

2   Q    But you have no personal knowledge as to owners --

3   who owned each of the various corporations -- corporate

4   defendants during 2009 through 2012?

5   A    Other than what was in the pleadings.

6   Q    And what was that?

7          THE COURT:  Well, he's not going to recite

8   the whole pleadings, but whatever is in the pleadings,

9   that's what he relied upon.

10  BY MR. HIPPLE:

11  Q    And, in fact, you also did not perform any

12  investigation to determine who owned or where the

13  offices or directors of the various corporations --

14  corporate defendants, correct?

15  A    I don't understand that question.  You're going to

16  have to read it back.

17  Q    Well, it's better if he reads.  Okay.  And, in

18  fact, you also did not perform any investigation to

19  determine who owned or where the offices or directors

20  of the various corporation -- corporate defendants?  In

21  other words, did you do an investigation on any of the

22  corporate defendants?

23  A    No.

24  Q    Okay.

25  A    Other than to know that they were insiders, they

Mr. Geisser - Recross                    337

1   were related parties.  What's important here is this

2   is -- this is a series of company that have a lot of

3   related parties.  And, as accountants and valuators,

4   we're sensitized to related parties.

5           Now, that's an important factor when we

6   address a valuation project or forensic accounting

7   project.  So we -- as a basic step in terms of what

8   we're doing, we try to identify who are the related

9   parties.

10  Q   You did not speak with any of the employees of any

11  of the corporate defendants, right?

12  A   Correct.

13          MR. BERKOWITZ:  Objection, asked and

14  answered.  I'm sorry.

15          THE COURT:  I'll overrule the objection.

16  BY MR. HIPPLE:

17  Q   And you did not have any conversation with the

18  plaintiffs -- plaintiff, Ms. Concepcione, right?

19  A   Correct.

20  Q   And you did not review plaintiff's deposition prior

21  to preparing your report, right?

22  A   Correct.

23  Q   And you did not review and depose -- all right.

24  And you did not review the deposition of Mr. Clement

25  Hipple before preparing your report?

Mr. Geisser - Recross                    338

1   A    Correct.

2   Q    And you did not review Melissa Moreno's deposition,

3   right?

4   A    Correct.

5   Q    And you did not consider the answers to plaintiff's

6   complaint, right?

7              (Pause in proceedings.)

8   A    Referring to my Exhibit H, documents considered, I

9   would say no.

10  Q    Okay.

11             (Pause in proceedings.)

12  Q    And what about the defendants' response to

13  plaintiff's interrogatories or requests for admission?

14  Did you consider any of that discovery?

15             (Pause in proceedings.)

16  A    Yes.

17  Q    You did?

18  A    It's in the list of documents considered.  I'm

19  looking at Exhibit H, item B, exhibits in support of

20  motion for plaintiff's for injunctive relief, item B,

21  "Response of Clement Hipple, Complete Group, Steel

22  Seal, Plaintiff's Interrogatories."

23  Q    Thank you.  Just the two, right?

24             (Pause in proceedings.)

25  Q    Regardless, you were told by counsel for plaintiff

1    to assume that Brian Hipple, Clement Hipple, Melissa

2    Moreno, were all owners or insiders of the various

3    corporation -- corporate defendants, right?

4    A    Yes.

5    Q    Yes?

6    A    Yes.  But that was not inconsistent with the facts

7    as I understood them.

8    Q    With no factual basis?

9    A    Well, I -- there's a lot of pleadings here.  I mean

10   we use -- we use the pleadings as a basis for, you

11   know, writing the report and developing the analysis.

12   So I think -- and a lot of these are done under oath,

13   so the answer is no, we considered -- in the context of

14   the documents we looked at, we consider that to be

15   accurate representations.

16              (Pause in proceedings.)

17   Q    Directing your attention to the document entitled

18   "Documents Considered" attached to your report, agree

19   that this document -- and I'll wait until you get to

20   the document.

21   A    I have it.

22   Q    Okay.  Agree that this document set forth the

23   universe of documents and information you considered in

24   preparing your report and coming to your opinion,

25   correct?

Mr. Geisser - Recross                340

1   A    Agreed, unless there was something it inadvertently

2   overlooked.

3   Q    Number five on your list of documents, "Documents

4   Considered," makes reference to summaries of checks,

5   items from bank statements prepared by client, right,

6   and that's what you considered?

7   A    Yes.  When we were initially approached by Mr.

8   Berkowitz, he had done some preliminary work that I

9   believe were in Excel spreadsheets, and we took those

10  Excel spreadsheets and we incorporated them after our

11  own review of the data into our report.

12              We listed it that way simply because that's

13  the way it was delivered to us, but that doesn't mean

14  we didn't review it and manipulate the data in a way we

15  thought was appropriate.  In fact, I know that we did.

16  We expanded our review much beyond what was initially

17  given to us.  So the --

18  Q    So, basic --

19  A    The answer to your question is yes, we received

20  those initial Excel spreadsheets from the client

21  because there's a lot of data entry that's involved in

22  this process.  There was no reason not to take that.

23  And then we reviewed it, we edited it, and we

24  manipulated it to a condition that we felt was

25  appropriate.

Mr. Geisser - Recross                    341

1   Q    So, basically, you received Excel spreadsheets from

2   Mr. Berkowitz that he prepared?

3   A    My recollection is that we did initially receive

4   documentation in that form.

5   Q    Okay.  Do you know how many sheets you received?

6   A    My recollection from two years ago was it was

7   probably some of the Wachovia documents, but I don't

8   remember beyond that.  I think that we had to take the

9   other documents and we had them scanned into our

10  systems.  We had to manipulate them to derive the

11  information out of the documents in order to be able to

12  digitally manipulate the data.

13  Q    All right.  Do you remember the nature of the

14  documents?

15  A    Well, we had bank statements from Wachovia and we

16  had bank statements from First National Bank of

17  Newtown, so we had the physical documents.  My

18  recollection is we had the underlying checks to go with

19  those as well.

20         The fact that we had received an initial

21  spreadsheet from Mr. Berkowitz was just preliminary

22  work that he had done.  There was no need for us to

23  re-key the same data, so we utilized that to the extent

24  that we could in trying to make the process more

25  efficient.

Mr. Geisser ~ Recross                    342

1  Q   So, basically, what he did, he gave you information

2  that he kind of wanted you to follow?

3  A   He gave us information to consider.  He had a

4  certain feeling about the case, a case theory if you

5  will, and it's his case to prove.  He pointed out

6  certain things to us.  We accepted that information for

7  what it was.  We did our own analysis and we came to

8  our own conclusions.

9  Q   And you found nothing wrong with the information

10 that he submitted?

11 A   Absolutely, I will not say that.  You know, we --

12 in fact, we had conversations where I said to Mr.

13 Berkowitz, you know, we don't -- we don't think this is

14 sufficient to accomplish what we need to do here, we

15 need to do additional work, and we did.

16 Q   Is that -- is that a normal process for the

17 attorney to give the expert witness information?

18 A   Absolutely.

19 Q   It is?  Okay.

20 A   Yeah.

21 Q   I just didn't realize it.

22           (Pause in proceedings.)

23 Q   Did you ever have any communication with Teresa

24 Hipple about these summaries?

25 A   No.

Mr. Geisser - Recross                    343

1    Q    Did you know that she prepared them?

2    A    Let's back up.  What summaries are we talking

3    about?

4    Q    I guess the interest summaries, the payment

5    summaries, bank statements.

6    A    As far as I was concerned, it was information that

7    came through Mr. Berkowitz.  I had no idea whether he

8    had -- whether he did it or a paralegal did it or --

9    Q    Okay.  So --

10    A    -- whoever did it.  It was really irrelevant as

11    long as we could rely on it.  We determined the

12    accuracy of the information because we looked at the

13    bank statements.

14         If you look at the supporting documentation

15    that's in this report, you're going to see that we go

16    through month-by-month and we tie out beginning

17    balance, pluses, minuses, ending balance, and that we

18    repeat that process through every one of the bank

19    statements so that we know that we were dealing with a

20    complete set of records and we've considered everything

21    in that universe.

22    Q    So, basically, the answer is you didn't know that

23    Teresa prepared it, right?

24    A    Correct.

25              (Pause in proceedings.)

Mr. Geisser - Recross                    344

1    A    Accepting that as fact.

2    Q    I think you answered this question, but I'm --

3              THE COURT:  Well, if he answered it, I don't

4    want to hear it again.

5              MR. HIPPLE:  Your Honor, this document cost

6    me about $400,000.

7              THE COURT:  I'm not stopping you.  You can

8    read it.

9              MR. HIPPLE:  Okay.

10             THE COURT:  You just said you think you asked

11   it before.  I don't want to have you ask the same

12   question.

13             MR. HIPPLE:  All right.

14             THE COURT:  Now --

15             MR. HIPPLE:  Okay.

16             THE COURT:  -- go ahead.  I'm not inhibiting

17   you in any way.

18             MR. HIPPLE:  All right.

19             THE WITNESS:  Your Honor, I just -- can we

20   take a bathroom break?

21             THE COURT:  All right, we'll take a five

22   minute break.  How much longer do you have?  Just tell

23   me.

24             MR. HIPPLE:  Truthfully, Your Honor, I'm on

25   page 13.

1    THE COURT:  And how many pages is there --
2  are there?
3    MR. HIPPLE:  39.  And the good stuff is
4  towards the end I believe.
5    THE COURT:  Okay.  Well, look, we're going to
6  break then because it sounds like you're going to be at
7  least another hour.  I'm on a train schedule, so I have
8  to -- I'm limited on when I can get home.
9    MR. HIPPLE:  I can drive you home, Your
10 Honor.
11   THE COURT:  No, you're not driving me home.
12 All right, I'll see you tomorrow at 9:00, all right?
13 We'll just take it from there.  I have -- I'm leaving
14 at 1:00 tomorrow.
15   MR. HIPPLE:  I realize that, Your Honor.
16   THE COURT:  We're only staying until 1:00.
17 Okay.
18   MR. BERKOWITZ:  And I've got the three
19 witnesses under subpoena that have to be through by
20 1:00 also.
21   THE COURT:  Right.  Is one the attorney?
22   MR. BERKOWITZ:  Yes.
23   THE COURT:  All right, so we'll need to
24 discuss that, too, because I haven't ruled on that.
25 And I got a letter that was copied to you from the law

Mr. Geisser - Recross                    346

1   firm objecting.

2          MR. BERKOWITZ:  Your Honor, and they have not

3   raised a single reason that was not included in the

4   motion in limine that they filed with Judge DuBois.

5          THE COURT:  All right, well, we got to have a

6   hearing -- we're going to have to hear a hearing

7   tomorrow.  I want to also hear Mr. Hipple's position as

8   to what his position is too, which he hasn't really

9   voiced since he's representing himself now.

10         MR. HIPPLE:  Okay.

11         THE COURT:  But I'm not going to do that now.

12   We'll do that tomorrow.

13         MR. HIPPLE:  As far Michael, the attorney?

14         THE COURT:  Yes.

15         MR. HIPPLE:  Yes, I think it's -- oh, you

16   don't want to hear it now.

17         THE COURT:  No, go ahead.  What?

18         MR. HIPPLE:  You don't want to hear it now,

19   do you?

20         THE COURT:  No, go ahead.

21         MR. HIPPLE:  I think it -- I think it's

22   outrageous and ridiculous.

23         THE COURT:  So you oppose him being a

24   witness?

25         MR. HIPPLE:  Well, because he's just trying

Mr. Geisser - Recross                    347

1   to bring him in because he gave directions to Melissa,

2   okay, and he spoke with Melissa or somebody gave

3   direct -- or he gave -- told somebody to give

4   directions to Melissa to pick up my check, who was the

5   only person that I could trust.

6           THE COURT:  All right, we're going to have a

7   hearing tomorrow.  I'm not going to hear it now.

8           MR. HIPPLE:  Okay.  I just want to say that

9   you told me, Mr. Berkowitz, that you're not going to

10  elicit attorney/client privilege.

11          MR. BERKOWITZ:  That's correct.

12          THE COURT:  All right.  So then all I want to

13  know tomorrow is what you're going to ask him and

14  what's the nature or the offer of proof.

15          MR. HIPPLE:  Okay.

16          MR. BERKOWITZ:  And there was a letter in

17  the --

18          THE COURT:  Because then we'll hear -- and I

19  want to hear from the attorney for the law firm too.

20  Okay, thanks.  See you tomorrow at 9:00.

21          (Proceedings adjourned, 5:43 p.m.)

22                    * * *

23

24

25

348

1                              I N D E X

2    PLAINTIFF'S WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

3    Clement Hipple

4      By Mr. Berkowitz        4

5

6    Wayne Geisser

7      By Mr. Berkowitz      167                271

8      By Mr. Hipple                217                276

9

10                            *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6                    <u>CERTIFICATION</u>

7
8         I, Michael Keating, do hereby certify that the

9    foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12
13

14   10/4/15
15   _____                    _____
     Date                                   Michael Keating
16
17
18
19
20
21
22
23
24
25