IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| TERESA HIPPLE,<br>formerly known as<br>TERESA CONCEPCION, | : CIVIL NO. 12-01256<br>:<br>: |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| | : |
| v | : |
| | : |
| | : |
| | : |
| | : |
| SCIX, LLC, et al, | : |
| | : Philadelphia, Pennsylvania |
| | : July 29, 2015 |
| Defendants. | : 8:50 a.m. |

- - -

TRANSCRIPT OF TRIAL - DAY THREE
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:


For the Plaintiff:     GERALD S. BERKOWITZ, ESQUIRE
                       ROBERT A. KLEIN, ESQUIRE
                       Berkowitz and Klein, LLP
                       629 B Swedesford Road
                       Swedesford Corporate Center
                       Malvern, PA   19355-1530


For the Defendant      CLEMENT HIPPLE
Clement Hipple,        9206 Andover Road
et al:                 Philadelphia, PA   19114
                       Pro Se


*Transcribers Limited*
*17 Rickland Drive*
*Sewell, NJ  08080*
*856-589-6100 - 856-589-9005*

Audio Operator:        Carl Hauger

Transcribed by:        Donna M. Anders

- - -

          Proceedings recorded by electronic sound
recording, transcript produced by computer-aided
transcription service.

- - -

1          (The following was heard in open court at 8:50

2     a.m.)

3          MR. SULLIVAN:  Good morning, Your Honor.

4          MR. BERKOWITZ:  Good morning, Your Honor.

5          MR. HIPPLE:  Good morning, Your Honor.

6          THE COURT:  Okay.  I understand Mr. Sullivan

7     from the law firm of Hill Wallack is here and wants to

8     address this issue of the subpoena.

9          MR. SULLIVAN:  Good morning, Your Honor.

10          THE COURT:  Mr. Sullivan.

11          MR. SULLIVAN:  For the record, Francis J.

12     Sullivan.  I am an attorney and I am a member of the law

13     firm of Hill Wallack and I'm here on behalf of Michael

14     J. Shavel who is also a member of the law firm of Hill

15     Wallack.

16          Mr. Shavel was served with a subpoena to

17     appear this morning in connection with the matter before

18     the Court --

19          THE COURT:  Right.

20          MR. SULLIVAN:  -- seeking to have him testify

21     with regard to collateral litigation that is not I

22     believe the subject matter of this particular case.

23          With respect to that collateral litigation, we

24     have filed with respect to the subpoena that has been

25     served upon Mr. Shavel, we had filed a motion to

1      quash --

2                    THE COURT:  Right.

3                    MR. SULLIVAN:  -- which I understand in

4      pretrial proceedings Your Honor had indicated that you

5      were not going to rule upon it but we -- you held it in

6      reserve.

7                    THE COURT:  Yes.  Actually, Judge DuBois

8      denied it without prejudice.

9                    MR. SULLIVAN:  Without prejudice.

10                   THE COURT:  Right.  And Ms. Bowman of your

11     firm also reargued it and I again deferred ruling until

12     I -- I had a little bit more testimony, but, go ahead,

13     Mr. Sullivan --

14                   MR. SULLIVAN:  Yes.

15                   THE COURT:  -- but, yes, it is -- it is an

16     open question.

17                   MR. SULLIVAN:  The issue that is presented

18     before the Court is Mr. Shavel acted as an attorney for

19     Mr. Hipple and that with regard to anything that Mr.

20     Shavel could testify to, it is either covered by the

21     privilege, the attorney/client privilege or it is

22     protected by the work product doctrine.

23                   In reviewing the memorandum of law filed in

24     opposition to our motion to quash the subpoena by the

25     plaintiff, Teresa Hipple, and counsel, there are three

1    areas that counsel claims that he wants to speak to Mr.

2    Shavel or examine him with respect to his position as a

3    fact witness, and he claims in his response to our

4    motion to quash that he will not be asked any questions

5    which would cause the invocation of the attorney/client

6    privilege.

7              However, if you take a look at the allegations

8    of -- or the basis upon which Mr. Berkowitz seeks to

9    call Mr. Shavel with regard to the three items

10   identified in his papers, it is clear that with respect

11   to the first one, the issue is Mr. Shavel took a

12   verification on a petition to intervene in an action

13   that was present before -- that was presented to the

14   Court in Bucks County.

15             In that case, Teresa Hipple had filed a

16   petition for the appointment of a receiver, and the

17   owner of the company at the time, which is SCIX was a

18   Brian Hipple who is a son of Mr. Hipple who is deceased.

19             THE COURT:  Correct.

20             MR. SULLIVAN:  And in the papers filed in

21   opposition to that petition to -- petition for the

22   appointment of a receiver, there are all allegations

23   that all of these assets are owned by another company

24   that Mr. Hipple had, Mr. Clem Hipple had, called

25   Complete Group.  That was the answer by Brian Hipple on

1      behalf of SCIX saying these assets are owned by somebody

2      else, another creditor.

3              And, in fact, what you have before the Court

4      at that time was a fight between two competing creditors

5      to get the assets that allegedly were owned by SCIX or

6      owned by somebody else.  The verification by Mr. Shavel

7      is as to certain legal conclusions with regard to the

8      ownership of the assets as well as the issue as to what

9      -- how the assets were or were not conveyed.

10              Mr. Hipple is present before the Court.  Mr.

11      Hipple, my understanding is, is to testify as of cross-

12      examination by Mr. Berkowitz.  Mr. Hipple can be shown

13      that document and he can be asked each and every

14      question with respect to the allegations set forth in

15      that petition --

16              THE COURT:  Right.

17              MR. SULLIVAN:  -- to intervene which, by the

18      way, was never acted upon by the Court of Common Pleas

19      of Bucks County.  He's the one who can testify as to the

20      facts --

21              THE COURT:  Right.

22              MR. SULLIVAN:  -- because he is the moving

23      party, not Mr. Shavel.  Mr. Shavel is strictly an

24      attorney.  Not only that, but with regard to the

25      petition to intervene, the issue was the appointment of

1    a receiver, and the asset, if you will, that was at

2    issue and why they wanted a receiver was with regard to

3    patents.

4              And in the petition itself to intervene at

5    paragraph 27, it is clearly stated that the patents have

6    not been transferred by SCIX to Complete Group.  And

7    that was the whole focus of that action in Bucks County

8    was to have a receiver appointed so that they could get

9    the patents and then force SCIX to get them transferred

10   to -- transferred to the receiver so the receiver could

11   sell -- so this is a fight between two creditors.

12             Mr. Hipple can't -- I'm sorry -- Mr. Shavel

13   certainly can't testify as to any of that, and anything

14   that he did with regard to that petition to intervene

15   clearly is testimony that can be obtained from Mr.

16   Hipple.  And, therefore, there's nothing that Mr. Shavel

17   can testify to unless he violates the attorney/client

18   privilege or the work product doctrine is found not to

19   be applicable.

20             The arguments with regard to the subpoena are

21   circulative on Mr. Berkowitz.  He claims that this

22   petition or the verification of this petition is the

23   reason why, in his second argument against the quashing,

24   that the -- the verification as to certain legal

25   conclusions in the petition to intervene, that the words

1        that were used were that Complete Group "owned" assets.

2                What happens is that, in the second part of

3        his argument, is that the -- there was a litigation

4        instituted by a company -- by Complete Group, separate

5        entity, nothing to do with SCIX, and that there was

6        litigation instituted against a company called -- and

7        I'll have to say this slowly -- Steel Seal Pro, LLC, a

8        Delaware limited liability company.

9                The allegation is that if the verification in

10       the petition to intervene said -- was that there was the

11       patents at issue were allegedly "owned," then how could,

12       according to the theory of Mr. Berkowitz, how could

13       there be a lawsuit filed by Complete Group, Inc.,

14       against Steel Seal Pro, LLC?

15               At issue in the Steel Seal Pro, LLC, matter is

16       that Steel Seal Pro, LLC, had a bank account with money

17       in it.  Mr. Hipple is the owner of Complete Group, had a

18       lawsuit against Steel Seal Pro because, as I understand

19       it, he believes that that money belongs to -- from Steel

20       Seal Pro was owed to Complete Group, totally different

21       entities.

22               A complaint was filed, and this is all a

23       matter of record.  The complaint was served.  The time

24       passed for the entry of an answer.  A default judgment

25       was taken, and a -- the praecipe was filed and the bank

1    account was garnished.  That's all a matter of record.

2                    THE COURT:  Right.

3                    MR. SULLIVAN:  Mr. Berkowitz is saying, well,

4    we want to inquire of Mr. Shavel as a fact witness why

5    it is a praecipe was filed in a dollar amount and the

6    garnishment was issued.  Well, if he's arguing that

7    there was something improper with respect to that,

8    that's a legal argument.  That is not an issue with

9    relationship -- with respect to Mr. Shavel's mindset

10   work product.  It has nothing to do with the SCIX

11   litigation.

12                   The connection of the two is made by Mr.

13   Berkowitz as a matter of his papers, but it is a

14   factually incorrect connection because the litigation in

15   the second instance was by Complete Group against Steel

16   Seal Pro, LLC.  So those two aren't connected.

17                   As to the issue of -- and I think Mr.

18   Berkowitz says that --

19                   THE COURT:  Is this the second issue?

20                   MR. SULLIVAN:  The second issue.

21                   THE COURT:  Right.

22                   MR. SULLIVAN:  -- that there was an abuse of

23   the Pennsylvania Rules of Civil Procedure because --

24                   THE COURT:  The amount was greater than --

25                   MR. SULLIVAN:  -- the amount was a certain

1    dollar amount which happened to be what was in that

2    account, but Mr. Hipple can testify as to that, not --

3    not Mr. Shavel.

4              THE COURT:  Right.

5              MR. SULLIVAN:  And if there was --

6              THE COURT:  A violation --

7              MR. SULLIVAN:  -- a violation --

8              THE COURT:  -- I can look at the Rule.

9              MR. SULLIVAN:  -- that's for the Court to

10   decide --

11             THE COURT:  Right.

12             MR. SULLIVAN:  -- as a matter of law and maybe

13   for the Court to decide or maybe Mr. Hipple should not

14   have gotten all of it, but it's clear in those pleadings

15   as Mr. Berkowitz says in his papers that the lawsuit was

16   for $161,000 plus interest and legal fees.  So --

17             THE COURT:  I think the judgment was an amount

18   greater and it said judgment plus legal --

19             MR. SULLIVAN:  It was 198,000 and change.

20             THE COURT:  -- plus interest and attorney

21   fees.

22             MR. SULLIVAN:  Right.

23             THE COURT:  And I don't think that was

24   inclusive of that amount --

25             MR. SULLIVAN:  Right.

1          THE COURT:  -- if I recall the testimony.

2          MR. SULLIVAN:  That's right.  So -- so it's --

3          THE COURT:  Yes.  But I can look at the Rule.

4    I understand your argument.

5          MR. SULLIVAN:  And so Your Honor can decide

6    whether or not maybe that judgment should not have been

7    in that amount, but it's clear it should have been

8    $161,000 plus interest.

9          THE COURT:  Right.

10          MR. SULLIVAN:  So it's an argument as to the

11    delta, if you will, and that's a legal argument.  It has

12    nothing to do with Mr. Shavel.

13          The third argument, and I just do not

14    understand this.  The third argument is that there's a

15    company by the name of JCC -- I'll call it Enterprises

16    because I forget the last name.  JCC had four notes, and

17    this is also an entity that Mr. -- I believe Mr. Hipple

18    owned, I'm not sure.  But JCC as a separate entity years

19    ago filed -- had four notes and judgments were entered

20    on those notes, and I haven't seen the notes.

21          But it's my understanding from just reading

22    Mr. Berkowitz's papers that there's an allegation that

23    in the notes there was the right to take a judgment in

24    the event of a default.  And Mr. Berkowitz claims that

25    at the time the Rules of Civil Procedure in Pennsylvania

1   existing at the time the notes -- or the judgments were

2   entered required that there be an averment in a

3   complaint in confession of judgment that there was a

4   default as a predicate in order to take the judgment.

5         He claims that there was an execution by this

6   JCC on these notes that had a default.  He doesn't

7   connect any of that.  He just throws it down on paper

8   and says execution but the notes required a declaration

9   or allegation of an event of default and he didn't do

10   that.  Well, again, that's a legal argument.  Again,

11   that's a question for the Court to decide, but -- but

12   notwithstanding all of that, Mr. Berkowitz then says in

13   his -- in his papers that JCC filed execution.  These

14   notes were bad, but then he admits no execution was ever

15   had.

16         So I'm -- I'm at a loss to understand why Mr.

17   Shavel who had nothing to do with any of that is being

18   asked to testify as a fact witness to those statements.

19   So I believe, Your Honor, that, given the totality of

20   all of this, that Mr. Shavel cannot be called as a fact

21   witness.  If there are any facts in issue, Mr. Hipple is

22   here to testify.

23         THE COURT:  And I know this is clear, but just

24   to make sure the record's clear.  Hill Wallack's client

25   at all time was Clement Hipple --

1          MR. SULLIVAN:  Correct.

2          THE COURT:  -- among the -- in addition to the

3     corporate entities?

4          MR. SULLIVAN:  The corporate entities in -- I

5     believe in this case.

6          THE COURT:  Right.  And Mr. Clement Hipple

7     who's representing himself here during this trial has

8     told me yesterday, and I just want to reaffirm this

9     fact, that you're unwilling to waive any attorney/client

10    privilege.  You oppose the calling of your lawyers as

11    witnesses in this case.  You're not waiving any work

12    product privilege, although that really is the

13    attorney's right to assert that, is that right?

14         MR. HIPPLE:  That is correct, Your Honor.

15         THE COURT:  Right.  Okay.

16         MR. SULLIVAN:  And, Your Honor, if I may, this

17    is a matter of general argument.  The attorney/client

18    privilege is the foundation of the relationship of our

19    legal system between an attorney and his client.

20         THE COURT:  Right.

21         MR. SULLIVAN:  This is beyond the pale.  I --

22    we strenuously object to it, some -- some of the

23    specific statements being made in these papers, that

24    somehow Mr. Shavel who I've known for a long time who I

25    respect highly, has been engaging in fraud, we take

1    offense to that.  We take serious offense to that, and I

2    want the Court to be aware of that.

3                  THE COURT:  Yes.

4                  MR. SULLIVAN:  Thank you very much, Your

5    Honor.

6                  THE COURT:  All right.  Thank you, Mr.

7    Sullivan.  Mr. Berkowitz.

8                  MR. BERKOWITZ:  Your Honor, if I could

9    approach this first in a purely legalistic way.  There

10   was a motion in limine filed with Judge DuBois.

11                 THE COURT:  Right.

12                 MR. BERKOWITZ:  And the same arguments that

13   you just heard were presented in that motion in limine.

14   There was no new evidence presented here.  And under the

15   law of the case doctrine, they are not allowed to re-

16   raise this issue on the same exact arguments to overturn

17   -- basically, they're asking you to overturn Judge

18   DuBois' motion in limine.

19                 THE COURT:  But, Mr. Berkowitz, I don't --

20   respectfully, I don't think that's correct.  I don't

21   have his order in front of me, but -- wait a minute, I

22   might have it here.  Right, I have it right here.

23                 MR. BERKOWITZ:  It's without prejudice.  They

24   can re-raise arguments --

25                 THE COURT:  Right.  So it was --

1        MR. BERKOWITZ:  -- at the testimony.

2        THE COURT:  -- January 26th, 2015, he denied

3   it without prejudice, the defendant's right to object at

4   trial to any questions or other evidence deemed to be

5   inadmissible by defendant.  So he just deferred that

6   ruling until trial, and now I'm the Trial Judge, and

7   this is an issue for me to decide.  So I -- you know,

8   this is not the law of the case.

9        MR. BERKOWITZ:  What he --

10       THE COURT:  So we're here today.  I'm here to

11   decide it, but go ahead.

12       MR. BERKOWITZ:  Understood.  What he says is,

13   "in response to questions in testimony," and I'd agree.

14   When the witness is on the stand -- right at the end you

15   read that, Your Honor.  The witness is going to be put

16   on the stand and you can respond to objections to

17   particular questions.

18       THE COURT:  Well, I -- I disagree.

19       MR. BERKOWITZ:  Okay.  With respect to the

20   attorney/client privilege, I had told you before and I

21   will tell you again, I am not going to impose upon the

22   attorney/client privilege.  There was --

23       THE COURT:  What are you -- what are you -- if

24   he asked -- what are you going to ask Mr. Shavel?

25       MR. BERKOWITZ:  You have heard testimony from

1    Mr. Hipple, and he has said -- and in his affidavit,

2    it's Exhibit 25 -- he has stated that he never executed

3    or intended to take the patents.  And if you recall,

4    that was one of the reasons Judge DuBois did not enter

5    summary judgment because there was a question about what

6    assets were taken.  In this litigation, Mr. Hipple and

7    his attorneys had taken the position, the patents

8    weren't taken.

9            THE COURT:  Well, that's a matter of public

10   record, and that's all that's -- all those public

11   documents, whether filed in this Court or in the Court

12   of Common Pleas for Bucks County, are admissible.

13   They're public documents, and, fine, they're admissions

14   and I'll consider that, but why you need Shavel to --

15   you don't need him to authenticate it.  They're already

16   authenticated.

17           MR. BERKOWITZ:  First, Mr. Shavel signed the

18   verification.  He says what's in the petition to

19   intervene that he filed, these statements are true and

20   correct.  And they -- first of all, that information

21   must have come to Mr. Shavel through his client.

22   However, there was no intention of that information to

23   be confidential.

24           It was put in the petition, publicly filed

25   with the Court, and public information is clearly not

1     protected by the attorney/client privilege.  It does not

2     apply.  This is not attorney/client communication,

3     strategy and the like.  This is information that was

4     conveyed to Mr. Shavel by Mr. Hipple for inclusion in a

5     petition to intervene.

6           THE COURT:  But I don't understand it.  He's

7     an agent for his client, Mr. Hipple.  He made this

8     statement in a pleading.  It's attributable to Mr.

9     Hipple because he's the agent.  Now, whether it's -- you

10    know, maybe it's an inconsistent statement, and I'll

11    take it as such.  But why do you need Shavel to say,

12    yeah, my client told me this and I put it down on paper?

13          MR. BERKOWITZ:  There are several reasons, and

14    you'll only see when the testimony comes out, there --

15    and there are many -- many paragraphs in this petition.

16    It is not as it was just represented to you.

17          This petition -- the reason the petition was

18    filed, first of all, was because Judge Baldi had ordered

19    the patents to be sold.  The petition to intervene was

20    then filed by Clement Hipple and Complete Group.  They

21    come to Judge Baldi after he issues the order and they

22    say, hey, we own these patents.  You can't sell them,

23    they belong to us.

24          THE COURT:  Right.

25          MR. BERKOWITZ:  Now, at the time the order was

1    issued by Judge Baldi, this case had begun, and Judge

2    Baldi didn't act on their petition to intervene but he

3    stayed the sale of the patents pending the outcome of

4    this litigation.

5              THE COURT:  Right.

6              MR. BERKOWITZ:  I have these statements that

7    Mr. Shavel verified that clearly state what the status

8    -- what Clement Hipple and Complete Group maintained was

9    the status of the patents, that they were clearly owned

10   by Clement Hipple and Complete Group.  Call it an

11   inconsistent statement --

12             THE COURT:  But you're -- you really are --

13             MR. BERKOWITZ:  I'm not using attorney/client

14   privileged information.

15             THE COURT:  Yes, you are.  You're going to ask

16   Mr. Shavel what his client told him before he prepared

17   that document.

18             MR. BERKOWITZ:  No, I am not.

19             THE COURT:  What are you going to ask him

20   then?

21             MR. BERKOWITZ:  I am going to ask him if this

22   information, number one, that he put in here is true and

23   correct.  And, number two, I can ask him is this the

24   result of attorney/client communication without asking

25   him what that communication was and that he believed at

1    the time he filed this, that this was accurate.  I have

2    a right to ask him those questions.

3              THE COURT:  Okay.

4              MR. BERKOWITZ:  And it -- again, nothing in

5    the petition is attorney/client privilege, it is not

6    confidential.  It's filed of public record.  That's --

7    that's with respect to the petition to intervene.

8              The second issue is the JC Consultant

9    execution.  You have heard about these notes.  They're

10   listed as -- they're referred to constantly as

11   judgments.  Hill Wallack produced -- or Mr. Hipple -- a

12   letter showing an execution on these JC Consultant

13   notes.  And as Mr. Sullivan correctly pointed out, there

14   are no judgments.  They have -- Mr. Hipple has argued

15   all through the case and all through the years that

16   precede this that he had judgments against SCIX that

17   allowed him to do what he did.

18             And I am just going to demonstrate to the

19   Court that there are no judgments.  That's all.  No

20   attorney/client privilege.  I have to --

21             THE COURT:  Well, I think it's --

22             MR. BERKOWITZ:  -- I have to have somebody to

23   put evidence in.

24             THE COURT:  -- but there is no -- there is no

25   judgments.  Is that -- it's not disputed, there is no

1    judgments.

2              MR. BERKOWITZ:  It is disputed.  They -- they

3    continuously say they have judgments.

4              THE COURT:  Well, where -- if it's -- where

5    are they -- why can't you just --

6              MR. BERKOWITZ:  I have -- if they want to

7    stipulate that I can submit unauthenticated documents

8    and the like, that's fine, but I need witnesses to put

9    my documents into evidence.

10             THE COURT:  What -- what documents do you need

11   to get into evidence?

12             MR. BERKOWITZ:  I have, number one, a letter

13   from Hill Wallack.  I have a list of documents they

14   filed, writs of execution, interrogatories, an

15   attachment.  They say they sent a check to the

16   prothonotary.

17             You look at the dockets in the prothonotary's

18   office, those things never happened.  The reason those

19   things never occurred, there was no execution was

20   because there's no judgment.  I am trying to establish

21   for the Court --

22             THE COURT:  Well, all those documents that

23   were filed of public record will be admissible.  They're

24   public documents.

25             MR. BERKOWITZ:  In those --

1          THE COURT:  So you don't need Mr. Shavel to

2     authenticate that.  The letter from Hill Wallack, I

3     don't think Mr. Hipple's going to object to that as long

4     as he can look at it, and he's not going to dispute that

5     it's some kind of forgery.

6          MR. BERKOWITZ:  I'm -- I'm going to show Mr.

7     Shavel the notes, and I'm going to ask him to, as Mr.

8     Sullivan said, look at the notes and see that in order

9     to confess judgment on a promissory note under

10    Pennsylvania law, it's still the law, it's always been

11    the law for as long as I've been practicing, to confess

12    judgment on a promissory note that requires the

13    occurrence of a default, the only way you can get a

14    judgment is to file a complaint in confession of

15    judgment.

16          THE COURT:  Why don't you give me the Rule and

17    the case law?  I can look at that, and I --

18          MR. BERKOWITZ:  I -- I have that.

19          THE COURT:  Wait a minute.  I completely

20    accept your representation as to the law in

21    Pennsylvania.  I'll take judicial notice and I'll agree

22    with you.  I don't think we need Mr. Shavel to --

23          MR. BERKOWITZ:  But --

24          THE COURT:  -- to talk about the law, and,

25    respectfully, I think I can read it just as well as he

1    and you.

2              MR. BERKOWITZ:  I'm -- I am -- probably --

3              THE COURT:  Well, that's --

4              MR. BERKOWITZ:  -- probably better.

5              THE COURT:  -- you don't have to compliment

6    me, but, I mean, I don't think it's -- you know, it

7    doesn't sound like it's a matter of --

8              MR. BERKOWITZ:  Your Honor, I come to trial

9    and I have evidence that I have to get in.

10             THE COURT:  Right.

11             MR. BERKOWITZ:  And I have promissory notes

12   and I have dockets that I need authenticated, and I have

13   things that I have to do to establish my record --

14             THE COURT:  Right.

15             MR. BERKOWITZ:  -- to establish our case.  I

16   am trying to establish under PUFTA, Pennsylvania Uniform

17   Fraudulent Transfer Act, that we are entitled to

18   equitable relief and punitive damages.  And I need to

19   satisfy the Court that what went on here was outrageous,

20   and I need to show the Court that what happened here was

21   outrageous.  And I want to use Mr. Shavel for that

22   purpose, again, no attorney/client privilege.  Here's an

23   outrageous thing that occurred.

24             During the pendency of this case, while this

25   case was being litigated, Brian Hipple died.  We were

23

1    told -- I learned yesterday that it was a suicide.  At

2    the time he died, Steel Seal Pro had about 150 or 60

3    thousand dollars in the bank.  That money was frozen

4    there.  It wasn't going anywhere.

5         Mr. Hipple, you heard yesterday, wrote a check

6    for himself, stamped with his son's stamp after his

7    death, back-dated it, for $40,000, he took 40,000 out of

8    the account.  Again, while this case is pending, money

9    continues to come into the company, Steel Seal Pro, and

10   by the time the execution occurs, there's almost

11   $200,000 in the account plus the 40,000 that Mr. Hipple

12   had already taken.

13        That money was taken out by pure violation of

14   the Pennsylvania law, and I need a witness to deal

15   particularly with the praecipe.  In the demand for

16   relief in the Complete Group complaint, he demands the

17   proceeds, that's all.  That's the demand for relief, no

18   dollar amount.  Judgment is entered by praecipe prepared

19   by Mr. Shavel.

20        I'm not going to ask him where he got the

21   number, although you heard Mr. Hipple testify about

22   where the number came from.  It came right out of the

23   bank records of Steel Seal Pro.  He filed a praecipe for

24   about $197,000, and remember, there's nobody to complain

25   here.  There's no adversary that knows about this.

1              When I found out that this occurred, I filed a

2      motion for injunctive relief to immediately get that

3      money paid back into the corp, because I didn't find out

4      till after the fact, because the depositions had been

5      pushed back methodically until the money was gone.  I

6      got to depose my first witness, Melissa Moreno, a month

7      after -- about a month after the money was stripped out

8      of the account.

9              As soon as I found out about it, I filed for

10      an injunction.  That was money that belonged to Steel

11      Seal Pro which you have heard was owned by Brian Hipple

12      alone.  And, you know, I'm going to show you with

13      Melissa Moreno that she didn't include Steel Seal Pro

14      that had $200,000 in its bank account as an asset of

15      Brian Hipple nor did she include SCIX as an asset of

16      Brian Hipple, which we say they -- they intended to

17      transfer the patents but they didn't do it effectively,

18      and we recorded the --

19              MR. HIPPLE:  Your Honor, am I allowed to

20      object?  Object.

21              MR. BERKOWITZ:  -- I'm making oral argument.

22      I don't think it's appropriate for an objection at this

23      point, Your Honor.

24              THE COURT:  Right.

25              MR. BERKOWITZ:  It didn't include Steel Seal

1    Pro nor did she include SCIX on Brian Hipple's inventory
2    of assets at the time of his death.  At the time of
3    Brian Hipple's death, he owned Steel Seal Pro and there
4    was at least $150,000 in the bank on that day.  And he
5    owned SCIX and I had judgments recorded against the
6    patents at that point.  They don't appear on the
7    inventory.

8         Melissa Moreno gets her million dollar life
9    insurance policy.  Brian Hipple's estate gets closed out
10   with no assets.  I've now got SCIX that purportedly owns
11   a patent that's been leapfrogged by a new formula, and
12   you've heard a lot of testimony about that, and Steel
13   Seal Pro has no assets.  That's why we have all these
14   defaults of even Brian Hipple.  Melissa Moreno
15   defaulted.  She is a party to this case.  She defaulted.
16   Why?  Because SCIX has nothing.  We've been chasing SCIX
17   for five years.

18        Steel Seal Pro has nothing because she gave
19   all that money and you'll see that and you heard
20   yesterday a bit about what happened to that money, and
21   you'll hear the rest of it today.  We heard Complete
22   Group, you know, that's all gone.  They defaulted.
23   Steel Seal, you heard yesterday about Steel Seal, well,
24   they defaulted.  All of these corporate entities and
25   even the estate of Brian Hipple evaporated to air as a

1    result of -- no other than concerted action.

2                Mr. Shavel represented Complete Group in that

3    litigation.  He was actually counsel to Clement Hipple

4    and Complete Group and Steel Seal in this case when he

5    did what he did in the Complete Group case in Bucks

6    County.

7                Any attorney that's practiced for a while and

8    Mr. Shavel has practiced for a while, you know these

9    rules, and you also know the holes in the rules.

10   There's nobody in the clerk's office, the prothonotary's

11   office that's going to challenge things upon a filing of

12   an attorney unless somebody else complains.  But there

13   was nobody to complain here.  That's why Mr. Shavel

14   needs to testify, Your Honor.  No attorney/client

15   privilege at all.

16               THE COURT:  Mr. Sullivan, do you wish to be

17   heard before I rule?

18               MR. SULLIVAN:  No, Your Honor.

19               THE COURT:  Okay.  Mr. Hipple, do you wish to

20   be heard before I rule?

21               MR. HIPPLE:  Yes, Your Honor.  I believe that

22   his statement in reference that the money did not belong

23   to Complete -- Complete Group is incorrect, okay?  That

24   money --

25               THE COURT:  Well, we're getting -- we're

1    getting into the merits of the case.

2                    MR. HIPPLE:  Okay.

3                    THE COURT:  I mean -- no, I -- I know you

4    disagree with a lot of the things he said, but, really,

5    I think we're getting a little far afield of what the

6    issue is.  The issue is whether Mr. Shavel should

7    testify.  We -- a lot of it was argument as to the

8    merits of the case which, obviously, I'm going to decide

9    at a later point.  But go ahead, I didn't mean to cut

10   you off.  But I --

11                   MR. HIPPLE:  Oh, no, that's --

12                   THE COURT:  -- I know you disagree with a

13   lot --

14                   MR. HIPPLE:  Basically, the point is that that

15   money belonged to me under the license agreement, right?

16                   THE COURT:  Right.  I understand your point.

17                   MR. HIPPLE:  And it's clear on its face, Your

18   Honor.

19                   THE COURT:  All right.  Well, look, there are

20   two doctrines that I think are implicated by the motion

21   that's been filed by Hill Wallack for a protective order

22   or to quash the subpoena under Rule 45, and that is the

23   work product doctrine and also the attorney/client

24   privilege.

25                   I'm going to grant the motion to quash because

1    I believe that what is being sought here by the

2    plaintiff here are the mental impressions, conclusions,

3    opinions and legal theories of an attorney who

4    represented Mr. Hipple, and it's -- I think it's related

5    litigation.  The litigation that Mr. Shavel represented

6    Mr. Hipple in the State Court, in the Court of Common

7    Pleas of Bucks County is directly related to all the

8    issues that are in front of me today.

9          The work product doctrine protects not only

10   tangible documents but intangible opinion, work product

11   opinion, and -- and that is the subject of what I

12   believe the plaintiff is seeking here, the opinions of

13   Mr. Shavel.  To the extent that he's asking what, if

14   any, information was conveyed to him by Mr. Hipple, that

15   is conveyed to Mr. -- by Mr. Hipple to Mr. Shavel, that

16   implicates the attorney/client privilege.

17         And I'm not going to allow any testimony into

18   that area even though I understand Mr. Berkowitz is

19   telling us that he's not going to ask Mr. Shavel about

20   attorney/client privileged information, I believe that

21   that's going to be implicated in the matter of the

22   testimony.

23         The only thing that's left in my view is the

24   need to authenticate certain documents that either were

25   generated or signed by Mr. Shavel and most of them were

1    public documents that were filed in the Court of Common

2    Pleas, in other words, Court documents which under our

3    Rules of Evidence, are admissible and are authenticated

4    because they're public documents.

5         Letters that came from the Hill Wallack firm,

6    yes, I could see the need to authenticate them.  But

7    prior attorney for Mr. Hipple, Ms. Bowman, represented

8    at least by putting these exhibits in the defense binder

9    that she wasn't going to object or she wasn't going to

10   challenge the authenticity of letters that were sent by

11   the Hill Wallack firm.  I don't believe Mr. Hipple is

12   going to challenge that when an attorney wrote a letter

13   on his behalf that that's a fake document or an

14   authentic document.  You're going to agree they're

15   authentic, right?

16        MR. HIPPLE:  Yes, I am, Your Honor.

17        THE COURT:  So I don't see there's any need to

18   call Mr. Shavel for the plaintiff to proceed and prove

19   her case.  I think that testimony would be duplicative

20   and cumulative in that regard.

21        With respect to the work product document --

22   work product doctrine, the Court of Appeals has said

23   that, "The work product opinion doctrine receives

24   greater protection than the ordinary work product and is

25   discoverable only upon a showing of rare and exceptional

1    circumstances."

2              And that's the case of <u>Cendant</u>, C-E-N-D-A-N-T,

3    <u>Corporation Securities Litigation</u> at 343, F.3d, 658,

4    Third Circuit, 2003.

5              I find that the plaintiff has not made a

6    showing of rare and exceptional circumstances to

7    dispense with the protection of the work product

8    doctrine and specifically the opinions, thoughts, legal

9    theories and mental impressions of Mr. Shavel.

10             That's my ruling.  Okay?  You're excused, Mr.

11   Sullivan and Mr. Shavel.

12             MS. SULLIVAN:  Thank you very much, Your

13   Honor.

14             THE COURT:  Okay.  All right.  Let's proceed

15   with the trial, Mr. --

16             MR. HIPPLE:  Geisser.

17             MR. BERKOWITZ:  Geisser.

18             THE COURT:  Thank you.

19             MR. BERKOWITZ:  Your Honor, while Mr. Geisser

20   is getting up there, I would just -- I don't want to

21   belabor any points, but I would like to renew the

22   objection that the questions being asked go well -- well

23   beyond the scope of the direct, the redirect and the

24   cross.  They've all been asked in the cross.

25             And I would like to point out to the Court

1      that Ms. Bowman, myself and the Court, we all planned

2      for this trial to be completed in five days.  I'm going

3      on vacation.  Ms. Bowman discussed with me the fact that

4      she's going on vacation on Saturday.

5              And I understand the indulgence that a pro se

6      defendant is entitled to, but I don't think it's

7      unlimited.  And I think -- I can complete my case today.

8      I no longer have Mr. Shavel, but you have agreed that

9      the evidence that I need is admitted.  I'm okay with

10     that.  I have two witnesses left.

11             THE COURT:  Who are your two witnesses?

12             MR. BERKOWITZ:  I have subpoenas out for

13     Melissa Moreno and Mr. Berghof and I am done.  I am

14     ahead of my schedule.  I will be done today assuming Mr.

15     Geisser finishes.

16             THE COURT:  Who is Mr. Berghof?  Who is that?

17             MR. BERKOWITZ:  Colonial Chemical.

18             THE COURT:  Oh, Colonial Chemical.  Right,

19     that's right.  Okay.  All right.  Well, listen, I'm very

20     upset, you know, there was a representation to me

21     yesterday that there were no more questions, and that's

22     why we proceeded with your redirect.  That's the way I

23     understood it, but because he's acting pro se, I'm going

24     to allow him to ask these questions.

25             But, Mr. Hipple, you've got to get to the

1    point, please.

2                   MR. HIPPLE:  Yes, Your Honor.  I intend to --

3                   THE COURT:  Okay.  You've been at this for a

4    long while.

5                   MR. HIPPLE:  -- eliminate the majority of the

6    questions today, okay?

7                   THE COURT:  All right.  Let's -- let's finish

8    it up.

9                   MR. HIPPLE:  I have maybe ten questions and a

10   few exhibits and that's it.  I'm done.  Okay.

11                  THE COURT:  All right.

12                  MR. BERKOWITZ:  Your Honor, one housekeeping

13   matter.

14                  THE COURT:  Sure.

15                  MR. BERKOWITZ:  I had mentioned and it's on

16   the docket, Judge Baldi's decision.  Can I hand that

17   up --

18                  THE COURT:  Sure.

19                  MR. BERKOWITZ:  -- and ask the Court to take

20   judicial notice of the opinion issued by Judge Baldi?

21                  THE COURT:  Okay.

22                  (Pause in proceedings.)

23                  MR. HIPPLE:  Your Honor, if we may, again, it

24   would speed up the process if Mr. Pederson could just do

25   the reading part.

1           THE COURT:  All right.  I'll allow him to do

2      the reading.

3           MR. HIPPLE:  Good morning, Mr. Geisser.

4           WAYNE GEISSER, Plaintiff's Witness, Previously

5      Sworn, Resumes.

6                        CROSS-EXAMINATION

7      BY MR. HIPPLE:

8      Q   Good morning, Mr. Geisser.  Can you go to Exhibit D

9      of your report?

10     A   Good morning.  I sure can.  I have it.

11     Q   Under the column marked 2012, what is the amount of

12     the expense for A&C, and I presume that's A&C Building

13     and Industrial Maintenance, the first row.

14     A   That is correct.  The amount under the 2012 column

15     is $160,600.

16          MR. BERKOWITZ:  Can I just ask which exhibit?

17          MR. PEDERSON:  Exhibit D.

18          MR. BERKOWITZ:  D.  Okay.

19     BY MR. PEDERSON:

20     Q   And are there actually two amounts listed here for

21     2012?

22     A   No.  There's -- you asked -- I'm sorry.  The answer

23     is yes because we annualized the 2012 amount which

24     became $214,133.  So to clear that up is --

25     Q   Okay.  Well, I was going to --

1    A    -- the nine-month period of time is $160,600.  The

2    annualized amount is $214,133.

3    Q    Okay.  Can you explain how the annualization method

4    works?

5    A    The annualization method, we simply took the nine-

6    month period of time and said that was 75 percent of the

7    year and did the math and came out with the numbers that

8    appear on the right-hand side.

9    Q    Okay.  Can you go to Exhibit E-3?

10   A    I have it.

11   Q    Do the payments to A&C on Exhibit D come from this

12   section of your report?

13   A    I'm sorry.  Could you repeat that?  I couldn't quite

14   hear you.

15   Q    Sure.  Do the payments to A&C on Exhibit D come from

16   this section of your report?

17   A    That's correct, yes.

18   Q    Can you go to October 4, 2010, on E-3, which I think

19   is page 31?

20   A    Correct.  Got it.

21   Q    Is there a payment reflected to A&C on this date?

22   A    Yes, there's a $40,000 payment on October 4th, 2012.

23   This is the one we were talking about the other day that

24   was taken out after Mr. Hipple's -- Brian Hipple's

25   death.

1    Q    Was this payment included in the determination of

2    payments to A&C appearing on Exhibit D?

3    A    Yes, it was.

4    Q    Which column was it included in?

5    A    Well, it was initially included in the nine-month

6    period because the -- the exhibit is constructed from

7    the detail that appears in Exhibit E-3.

8    Q    So the amount -- if the payment of $40,000 was

9    included in the 2012 amount before annualization, what

10   would the impact of annualization have been on this

11   amount?

12            I think the point is that this expense is

13   after September 30.  You indicated earlier that when you

14   did an annualization, you went through September 30 and

15   then divided by nine and multiplied by 12.

16            (Pause in proceedings.)

17   A    I believe I explained this in Exhibit -- excuse me

18   -- Footnote C to Exhibit D.  Let me direct your

19   attention to that --

20   Q    Oh, actually, why don't I ask the question again.

21            MR. BERKOWITZ:  Objection.  Mr. Geisser is

22   answering the question.

23            THE COURT:  Right.

24            MR. BERKOWITZ:  He should be allowed to

25   answer.

1                THE COURT:  Sustained.

2                THE WITNESS:   Footnote C to Exhibit D reads as

3     follows:  "Although the FNB statements include months

4     after September, 2012, the activity in the account is

5     very limited after Brian Hipple's death on September

6     30th, 2012.  So we have annualized amounts shown above

7     based on the nine months of available data and divided

8     by 12."

9     BY MR. PEDERSON:

10    Q    All right.  I'll ask the question again.  If the

11    payment of $40,000 which was made after the nine months

12    was included in the 2012 amount before annualization,

13    what would the impact of annualization have on this

14    amount?

15                MR. BERKOWITZ:   Object.  The question was just

16    asked and just answered.

17                THE COURT:  All right.  I'll sustain the

18    objection.  You have to ask something different.

19    BY MR. PEDERSON:

20    Q    Is the $40,000 included in your distribution for the

21    annualized 2012?

22    A    Yes, it is.

23    Q    And the $40,000 was actually paid after September of

24    2012?

25    A    That's correct.

Mr. Geisser - Cross                                    37

1    Q    But you don't see the $40,000 as being counted

2    twice?  That being -- it's being counted in 2012 as

3    $160,000 and again expanded to $214,133 when it's been

4    annualized?

5    A    Well, when we did the annualization, we -- we used

6    the methodology that's described in Exhibit -- excuse me

7    -- Footnote C.  The fact that it was taken after the

8    fact is -- that's true, but we're trying to get a sense

9    of what a full annual period would be.  So the fact that

10   he took that money out after Brian Hipple's death in

11   September of 2012, it's true, we don't -- we don't

12   challenge that.

13            But we -- by the same token, it could have

14   probably -- but for Brian Hipple's death, it may have

15   been taken out before that.  So in terms of trying to

16   develop an annual period of time, we included that as

17   part of the annualization process.

18   Q    What was the annual amount for 2011?

19   A    The annual amount for what?

20   Q    A&C Building and Industrial Maintenance, yes.

21   A    $160,000.

22   Q    And the amount before you annualized for 2012?

23   A    $160,000.

24   Q    The 2012 annual distribution is used in your SDE

25   calculation?

1    A    I'm sorry.  I had trouble hearing you.

2    Q    Sorry.  Are the 2012 annualized distributions

3    included in your SDE calculation?

4    A    Yes.  They're considered as a part of the overall

5    calculation.  But we, if you look at Exhibit F, you'll

6    recall that Exhibit F which is where we show the three

7    years of distributions, namely $558,000 in 2010; 608 in

8    2011; 690 in 2012, was reduced and averaged over that

9    period of time.

10          So the point of this is that we're not trying

11   to get absolute precision with any given year, but to

12   give an overall view of what was being taken out on an

13   annual basis.  And so that it gets -- it gets averaged

14   down if you will as part of that process, because my

15   conclusion, if you look at the conclusion in Exhibit F,

16   we say the three-year average is 619,000.  The

17   calculation that derives from that, multiplying by 2.92

18   is 1.8 million.  Well, we didn't use 1.8 million.  We

19   used 1,750,000.  So I was trying to be conservative by

20   pushing the overall valuation calculation and conclusion

21   down to a lower number.

22          So the point of what I'm trying to convey here

23   is that we're trying to give an overall view of what the

24   ability of this enterprise -- the Steel Seal enterprise,

25   had the ability to produce over an extended period of

1    time.  So there's a blending and averaging process

2    that's going on, and that's -- that's what we did.

3    Q    If you had calculated the A&C expense through only

4    September 30 for 2012, what would the amount be?

5              MR. BERKOWITZ:  Objection.  I believe he

6    answered that question already.

7              THE COURT:  I'll overrule the objection.  Go

8    ahead.

9              THE WITNESS:  If -- you're going to have to

10   repeat the question.

11   BY MR. PEDERSON:

12   Q    Sure.

13   A    Speak into the mike, I'm really having trouble

14   hearing you.

15   Q    Sorry.  A&C Building and Industrial Maintenance for

16   2012 on Schedule D is listed at $160,600.  If you have

17   excluded -- if you were to exclude the payments that

18   were actually made after September 30, what would the

19   total be?

20   A    That would --

21   Q    A single payment of $40,000?

22   A    -- well, that would take a little bit of calculation

23   to go through because we're --

24   Q    It's a $40,000 payment.  You just looked at it on

25   E-3.

1    A    Yeah, but it's -- the impact is not $40,000.  We'd

2    have to go -- we'd have to run the calculation through a

3    number of different --

4    Q    I was just asking for what number would appear on

5    Exhibit D instead of 160,600?

6              MR. BERKOWITZ:  Objection.  Your Honor, Mr.

7    Pederson has been allowed to read --

8              THE COURT:  Right.

9              MR. BERKOWITZ:  -- questions, he is --

10             THE COURT:  I'll sustain the -- Mr. Pederson,

11   you're going beyond -- your role is to read the

12   questions.

13             MR. PEDERSON:  Yes, sir.  These are related to

14   this issue.

15             THE COURT:  But you're now -- you're now going

16   beyond that and asking your own questions.  I'm not

17   going to permit that.  So I'll sustain the objection.

18   Just read the questions.  If there's any follow-up, Mr.

19   Hipple has to do that.

20             MR. PEDERSON:  Yes, Your Honor.

21             THE COURT:  Otherwise, we have the unusual

22   situation of one expert cross-examining another expert

23   which --

24             MR. PEDERSON:  I understand.

25             THE COURT:  -- we're not going to permit.

1    BY MR. PEDERSON:

2    Q    In testimony --

3              THE COURT:   Because otherwise I'll have to let

4    their expert cross-examine you, and I don't think you'll

5    be happy with that.   So go ahead.

6    BY MR. PEDERSON:

7    Q    In testimony yesterday, you indicated that bank

8    records were subpoenaed from various banks, is that

9    correct?

10   A    Yes.

11   Q    Who determined which accounts to subpoena?

12   A    Clearly Mr. Berkowitz subpoenaed the accounts.   I

13   believe he tried to get all the records that were

14   available, and he was able to obtain these particular

15   accounts.

16   Q    Okay.   Did you request bank accounts for 2007 and

17   2009 to be subpoenaed?

18   A    I did not make any requests for any specific

19   documents to be subpoenaed.   Mr. Berkowitz was

20   aggressive, as I understand it, trying to get the

21   information because -- indirectly because he couldn't

22   get it directly.   And so he was -- he was using

23   subpoenas to the extent that he thought was appropriate,

24   and I'm sure he was trying to be as inclusive as

25   possible.

1           MR. PEDERSON:  You can ask questions any time.

2           MR. HIPPLE:  Yeah.

3    BY MR. HIPPLE:

4    Q   But you could have gotten the records for that time

5    period, correct?

6    A   Just to be clear about what you're asking, you're

7    asking about the bank records --

8    Q   Yes.

9    A   -- for 2007 and '08?

10   Q   Right.

11   A   Is that what I heard in the question?

12   Q   What the question is to you is that you would have

13   had the availability to -- you filed for the bank

14   records.  It was within a seven-year period, okay?

15   Therefore, you would have had the availability to get

16   the bank records back to 2007?

17           MR. BERKOWITZ:  Objection.  He's asking this

18   witness to answer a question about what records I could

19   have subpoenaed.  Mr. Geisser can't answer that.

20           MR. HIPPLE:  All right.  Let me rephrase the

21   question, Your Honor.

22           THE COURT:  Right.

23   BY MR. HIPPLE:

24   Q   As far as your knowledge is concerned, okay, is the

25   -- or does a bank allow you to go back seven years for

1     their records?

2     A    If you're asking my general understanding of bank

3     record retention policies, as enumerated by the bank

4     regulators, yeah, seven years sounds like --

5     Q    Okay.

6     A    -- the typical period of time that we talk about,

7     yes.

8     Q    So, therefore, the date that he filed for the bank

9     records would have fell under -- we could have gotten

10    the bank records back to 2007, correct?

11    A    Mr. Hipple, I don't know when he subpoenaed the

12    records.  That was something that was done outside of my

13    responsibility.

14    Q    Hold on for a minute.

15         MR. PEDERSON:  I'm next going to have you read

16    from SSVS Number 1, paragraph 43.

17         MR. BERKOWITZ:  I'm sorry, that was SSVS?

18         MR. PEDERSON:  Yes.

19         MR. BERKOWITZ:  What is that?

20         MR. PEDERSON:  Statements on standards for

21    valuations.

22         MR. BERKOWITZ:  Oh, okay.  Is that one of the

23    exhibits that you introduced before?

24         MR. HIPPLE:  Yes, he has.

25         THE WITNESS:  I have it from yesterday.  It's

1    not marked as an exhibit, but, again, paragraph --

2              MR. HIPPLE:  Well, it was an exhibit in the

3    book but we didn't have all the pages.  You have the

4    full copy.

5              THE WITNESS:  Understood.  Thank you.  The

6    paragraph, Mr. Pederson?

7              MR. PEDERSON:  I think this indicates

8    paragraph 43.

9              THE COURT:  And what do you want him to do,

10   read it?  Do you want to point something out to him?

11             MR. PEDERSON:  Yes.  No, read paragraph 43,

12   Your Honor.

13             THE COURT:  Read it to himself?

14             MR. PEDERSON:  Read it out loud.

15             THE COURT:  Why don't -- what -- I'm not going

16   to have him just read things into the record.  Do you

17   have a question for him?  You know, did he read that?

18   Does he agree with it?  I'm okay with that.

19             MR. PEDERSON:  We'll ask him to read it and

20   then whether or not he agrees with it.

21             THE COURT:  Okay.  Why don't you read it to

22   yourself, Mr. Geisser, and then just see if you -- tell

23   us whether you agree with it, were you aware of it?

24             (Pause in proceedings.)

25             THE WITNESS:  I agree with it.

Mr. Geisser - Cross                          45

1    BY MR. PEDERSON:

2    Q   All right.  And then we have one other reading from

3    Shannon Pratt, page 29.  I don't think that's an

4    exhibit.

5              THE COURT:  Who's Shannon -- Shannon Pratt,

6    what's that or who is that?

7              MR. PEDERSON:  This is from a treatise for

8    valuation experts.

9              MR. BERKOWITZ:  I object to this question.  I

10   think it's not in evidence.  It has nothing to do with

11   this case.  There's no question presented.

12             THE COURT:  Right.

13             MR. BERKOWITZ:  I don't think it's proper for

14   Mr. --

15             THE COURT:  He doesn't have it either.  He

16   doesn't have it in front of him.

17             MR. PEDERSON:  We have a copy, Your Honor.

18             THE COURT:  All right.  I'll overrule the

19   objection.  Why don't you show it to him?

20             THE WITNESS:  Your Honor, just before we go

21   on --

22             THE COURT:  Yes.

23             THE WITNESS:  -- can I just make a comment

24   about this paragraph?

25             THE COURT:  Sure.

1          THE WITNESS:  This paragraph does not pertain

2     to calculation of value necessarily.  This pertains to

3     an opinion of value.

4          THE COURT:  Okay.

5          THE WITNESS:  So it's -- it's a paragraph

6     that, while it has some -- some meaningfulness in terms

7     of what I did in terms of the calculation of value, it's

8     actually in the context of an opinion of value, which we

9     did not do.

10          THE COURT:  Right.

11          THE WITNESS:  So I just want to make that

12     clear for the record.

13          THE COURT:  All right.  Why don't you show him

14     the book or paragraph?

15          MR. PEDERSON:  Yes, Your Honor.

16          THE COURT:  Yes.  You can -- you can approach.

17          MR. PEDERSON:  Thank you.

18          THE COURT:  So why don't you identify -- what

19     are you showing him?  What is it?

20          MR. PEDERSON:  This is from -- evaluation

21     authoritative literature that's considered in the

22     valuation industry.

23          THE COURT:  Okay.

24          MR. PEDERSON:  Shannon Pratt actually is a

25     very well-known author, and she's written many books on

 1    valuing businesses.

 2              THE COURT:  All right.  Are you familiar with

 3    this book, Mr. Geisser?

 4              THE WITNESS:  I'm certainly with Shannon

 5    Pratt.  I don't know about this book.  We have many

 6    books on valuation --

 7              THE COURT:  Okay.

 8              THE WITNESS:  -- in our library.  I don't know

 9    if we have this one specifically.

10              MR. PEDERSON:  And I think we're going to read

11    this one paragraph, the concept of share market value.

12    Can you read that one out loud?

13              THE WITNESS:  You're asking me to read

14    paragraph --

15              MR. PEDERSON:  Yes.

16              THE WITNESS:  "The concept of fair market

17    value also assumes prevalent economic and market

18    conditions at the date of the particular valuation.  You

19    have probably heard someone say, 'I couldn't get

20    anywhere near the value of my house if I put it on the

21    market today,' or 'The value of XYZ Company stock is

22    really much more (or less) than the price it's selling

23    for on the New York Stock Exchange today.'

24              "The standard of value that those people have

25    in mind is some standard other than fair market value,

1      since the concept of fair market value means the price

2      at which the transaction could be expected to take place

3      under conditions existing at the valuation date."

4      BY MR. PEDERSON:

5      Q    Do you agree with that statement?

6      A    Yes.

7              THE COURT:  Yes, you can get -- you can get

8      the book.

9              MR. HIPPLE:  I can do this one.

10             MR. PEDERSON:  Okay.

11     BY MR. HIPPLE:

12     Q    New business, what would it cost for myself, Mr.

13     Hipple, to start a business like Steel Seal Pro?

14             MR. BERKOWITZ:  Object to the question.  It's

15     beyond the scope of the expert report and the engagement

16     that Mr. Geisser has testified to.

17             THE COURT:  Repeat the question, Mr. Hipple,

18     again.

19             MR. HIPPLE:  Yes.  I was -- I was asking his

20     opinion of what it would cost for me to go out and just

21     start a new business with inventory, advertising,

22     website, which I already own, packaging and other

23     expense.

24             THE COURT:  I'll sustain the objection.  It is

25     beyond the scope --

1          MR. HIPPLE:  Okay.

2          THE COURT:  -- of his opinion and his

3     testimony here.

4          MR. HIPPLE:  Part of the question was, would

5     it cost more than 1.75 million.

6          THE COURT:  I sustained the objection.

7     BY MR. PEDERSON:

8     Q   Go to Exhibit E-2.

9     A   I have it.

10    Q   All right.  And I think here it says, "Please review

11    the detail beginning on page one of the support

12    schedules and please note if there are any cost of goods

13    sold entries."

14         MR. BERKOWITZ:  I'm going to object to the

15    form of the question.  I'm not sure there was a question

16    there.

17         MR. PEDERSON:  Actually, I don't think there

18    is.

19         Well, actually, "please note if there are any

20    cost of goods sold entries," so there is a question

21    here, Your Honor.

22         THE COURT:  All right.  I'll permit it.

23    BY MR. PEDERSON:

24    Q   We're going to take a look at page one.

25    A   I'm looking at page one, and by way of explanation

1    as I said yesterday, the categorization we used appears

2    in the far right-hand column, and it's -- it tracks

3    whether the item is a debit or credit and it uses a

4    categorization system, for example, revenues, expenses,

5    distributions.  It looks like that's the three

6    categories that appear on that page.

7    Q   Okay.  So on this page -- I'm sorry, I didn't mean

8    to interrupt there.  On this page --

9    A   So -- so that's -- that's the process that we use.

10   So if something is recorded as expense, that's a -- that

11   we would consider that to be an expense of the Steel

12   Seal Enterprise.

13   Q   Okay.  So there are no cost of goods sold entries on

14   this page, is that your response?

15   A   Well, there's a number of items that are classified

16   as expense.  I -- because --

17   Q   Actually, I think the question --

18            MR. BERKOWITZ:  Objection.

19            MR. PEDERSON:  -- is are there any cost of

20   goods sold entries.

21            MR. BERKOWITZ:  The witness is answering the

22   question.

23            THE COURT:  Yes.  Let him finish.

24            THE WITNESS:  I want to finish because --

25   BY MR. PEDERSON:

1    Q    Certainly.

2    A    -- you'll recall that we had the discussion

3    yesterday about the lack of QuickBook records.  We've

4    never been provided with the underlying detailed

5    accounting records.  If we had the underlying detailed

6    accounting records, then we could -- we could look at a

7    given track or a given disbursement and we could see

8    exactly how it was charged in the accounting records.

9         This is a reconstruction that we did, it's a

10   reconstruction based on the bank records that were

11   available.  So we went through there and we classified

12   things as being either revenue or expense or

13   distributions.  They're the general categories that

14   appear at least on this page.

15        So it was not really important to us to say

16   whether something was a cost of goods sold, something

17   what I'll describe as above the line or an expense below

18   the line.  So whether it was a telephone expense or it

19   was a disbursement to Colonial Chemical was of no

20   consequence to us in terms of what we were trying to

21   identify which were the distributions in this particular

22   context.

23        It was simply accounting for every -- every

24   piece of -- every revenue source.  We're accounting for

25   every disbursement source at the same time.  So this --

1    this analysis goes through each and every item in that

2    fashion.  But the focus of what we were trying to

3    accomplish was to identify those items that were

4    distributions in nature and then put everything else off

5    to the side because it doesn't really enter into the

6    calculations that we went through.

7    Q   All right.  Does that mean that there is or is not a

8    cost of goods sold entry on page -- on the first page of

9    this exhibit?

10             MR. BERKOWITZ:  Objection.  That's a cross-

11   examination question and not something for --

12             MR. PEDERSON:  No, it's the same question

13   we've been asking.

14             THE COURT:  All right.  Sustained.  You can't

15   cross-examine him.  You can -- you're the reader here

16   today.

17             MR. PEDERSON:  Yes, sir.  And the question was

18   are there any cost of goods sold entries.

19             MR. BERKOWITZ:  There's been an objection,

20   Your Honor.

21             THE COURT:  All right.  I'll sustain the

22   objection.  I'll sustain the objection.  You may

23   proceed.  Go with a new question.

24             MR. PEDERSON:  Well, Your Honor, this line of

25   questioning relates to identifying where the cost of

Mr. Geisser - Cross                      53

1   goods sold first appear.

2                MR. BERKOWITZ:  Objection.  He's arguing as a

3   lawyer right now, Your Honor.

4                MR. PEDERSON:  No, Your Honor.

5                THE COURT:  Why don't you --

6                MR. PEDERSON:  But we're trying to read the

7   document.

8                THE COURT:  -- why don't you read it, Mr.

9   Hipple.  Is there --

10               MR. HIPPLE:  Okay.  "Note.  Are there any

11   cost" --

12               MR. PEDERSON:  Actually, this is where the

13   sentence starts.

14               MR. HIPPLE:  Okay.  I'm going right -- right

15   back here because it's not showing any cost of goods

16   sold.

17   BY MR. HIPPLE:

18   Q   Okay.  "Therefore you never identified any costs of

19   good sold on your report."

20   A   I disagree.

21   Q   Where are the -- identify it.

22   A   If you go back and look on Exhibit E-2, there's a

23   summary sheet that appears on the first page of Exhibit

24   E-2.

25               THE COURT:  Third line from the top, is that

1    right, Mr. Geisser?

2              THE WITNESS:  That is correct, Your Honor.

3              So we went through that process that I just

4    described and we -- we used these classifications.  So

5    our conclusion was, after having gone through that

6    process, there was $187,682.60 in cost of goods sold

7    that appeared in the -- in the disbursements.

8    BY MR. HIPPLE:

9    Q   All right.  If I -- if I look at the breakdown, it

10   doesn't show any cost of goods sold until April on the

11   summary.

12   A   I would have to go through that and look in detail.

13   Q   Well, it's the first time it says cost of goods

14   sold.  Everything else is revenue, expenses.

15             MR. PEDERSON:  I think he's on page ten of

16   your --

17             MR. HIPPLE:  Page ten.

18             MR. PEDERSON:  -- detail analysis.

19   BY MR. HIPPLE:

20   Q   And -- a little bit more.

21   A   I would agree that on page ten there's a

22   disbursement, check number 181, in the amount of $17,550

23   to Colonial Chemical.

24             If I go through the pages that appear before

25   that, page nine, there's a disbursement on 3-21-2011,

1    check number 171, for $114 to Colonial Chemical.  It's

2    classified as cost of goods sold.

3          If I go to page six of the schedule, on 2-22-

4    2011, there's a check, number 151, for $167 to Colonial

5    Chemical.  It's classified as cost of goods sold.

6          If I go to page three of the -- the check

7    disbursements, on 1-26-2011, check number 124, for $127

8    to Colonial Chemical charged to cost of goods sold.

9          So I just -- I just covered the period of time

10   that we just talked about, and I think I just related

11   there were quite a few items that were charged in our --

12   in our classification system to cost of goods sold.

13   Q    Okay.  But what I was trying to get at, the point I

14   was trying to make was that the first time cost of goods

15   appear is in 4 -- 4-4-2011, nothing prior to that.

16          MR. BERKOWITZ:  Object, Your Honor, to this

17   line of questioning.  Mr. Geisser testified that he

18   worked from bank records.  He didn't have the company's

19   books to tell which date things might have been for --

20   for a particular invoice or the like.  He's got a

21   benefit from the fact that they didn't produce the

22   records.

23          THE COURT:  I'll overrule -- I'll overrule the

24   objection.  Mr. Geisser can answer the question.

25          THE WITNESS:  Mr. Hipple, the bank records for

1    the FNB account ending in 512 begin in January of 2011.

2    The Wachovia records that we had available to us, if you

3    look on Exhibit -- if you look on Exhibit E-1, E-1 of

4    the Wachovia records.  Let me direct your attention to

5    the first page of E-1, it's a summary sheet.

6    BY MR. HIPPLE:

7    Q    Hold on a minute.

8    A    You can see that on that summary sheet -- I'll just

9    give everybody a minute to get there -- that those

10   records cover a period from September of 2009 up through

11   September 30th, 2010.  If you look over in the balance

12   column, the balance goes to zero.  In fact, there's a

13   negative number there.  That's because, as we've all

14   talked about, the account was garnished in that period

15   of time.  So that account ceased to be used.

16          I don't have records between the period of

17   time that this Wachovia account was closed and when the

18   FNB account was opened.  So there's -- admittedly there

19   was a gap in that record system.  So we don't know

20   exactly what happened during that period of time.

21   That's why when we prepared Exhibit D, there's a number

22   of footnotes there that explain the missing documents,

23   the gaps in the information and how we tried to close up

24   that gap -- information by estimating or imputing the

25   transactions for certain periods of time.

1           But we didn't have -- we didn't -- I didn't

2    have the bank records before that period of time nor did

3    I have the accounting records for that period of time,

4    so I have difficulty in trying to answer your question.

5    Q    Okay.  The other question I have is that, okay, you

6    had all the bank records, right, basically, all the

7    checks for the period -- period that you have here,

8    right, is that correct?

9    A    If you -- if you --

10   Q    You had a list of all the checks and the names on

11   the checks, correct, of all the checks?  Of all the bank

12   records?

13   A    Of those accounts that we had that we have analyzed,

14   we had that information --

15   Q    Right.

16   A    -- yes.

17   Q    Okay.  And you took the time naturally to analyze

18   all the Brian Hipple, the Melissa, the Clement Hipple,

19   the automobile and all those names, but you've never

20   taken any time or any consideration to look at the check

21   -- the other checks that were written, whether they were

22   payroll checks, whether they were for material.

23           I mean, you never -- you never looked at the

24   -- any facts of the names of the checks other than the

25   ones that you were told to look at to identify the

1    amounts?  So everything else is a broad statement

2    basically except for the -- what you were actually told

3    by Mr. Berkowitz to look for?

4              THE COURT:  That last -- I'm going to strike

5    that last sentence because I think it's more --

6              MR. HIPPLE:  Broad statement.

7              THE COURT:  -- more argument --

8              MR. HIPPLE:  Okay.  Let me rephrase the

9    question.

10             THE COURT:  -- but I think what you're asking

11   he only looked at limited bank accounts.  Are some other

12   bank accounts out there he should have looked at?  Is

13   that what you're suggesting?

14             MR. HIPPLE:  No, no.  I'm saying that he

15   received all the checks, what the checks -- each check

16   had a name on it, Your Honor, okay?

17             THE COURT:  Okay.

18             MR. HIPPLE:  Naturally, to a payee, okay?

19             THE COURT:  Right.

20             MR. HIPPLE:  They directed their attention

21   only to the payees that Mr. Berkowitz told him to.

22             THE COURT:  All right.  Is that true or not?

23             THE WITNESS:  No, it's absolutely not true.

24   If you look at Exhibit E-2 and E-3, you can see there's

25   a column that says payee and we list the payee.  So to

1    say that we didn't pay attention to that, I'm looking at

2    page one of Exhibit E-2 and I see American Express, I

3    see Verizon, I see Quaint Oak Bank.  I see Robert

4    Dasillo (ph).  I see Melissa Moreno.  I see World Wide

5    Web Communications.  I see Roland Nelson (ph).  I see

6    Verizon.  We listed every check.

7    BY MR. HIPPLE:

8    Q    Okay.

9    A    We listed every check, and we classified every check

10   that we had available to us in one of those categories

11   that appear on the summary sheets before the -- E-2 and

12   E-3.

13   Q    Okay.  On the summary sheet number one, okay, under

14   the payee column, let's go there.

15              MR. PEDERSON:  It's on E-2.

16              MR. HIPPLE:  E-2.

17              MR. PEDERSON:  Page one of the --

18              THE WITNESS:  Okay.  I'm looking at Exhibit

19   E-2.

20   BY MR. HIPPLE:

21   Q    Under payee.

22   A    Page one.

23   Q    Under column payee.

24   A    Okay.  I have it.

25   Q    What -- what is -- you know, why are not all the

1   payees listed?

2   A   I think they are listed.  I don't understand why

3   you're saying payees are not listed.  Let me -- let me

4   try to help you --

5   Q   The name of the payee.

6   A   -- let me finish if I can, sir.

7   Q   I'm sorry.

8   A   Let me try and help you here.  There's -- there's

9   blanks under the payees in some cases, right, and you

10   can see that.  And you're saying the payees aren't

11   listed.

12        But if you look in the column to the left of

13   that, those are credits that are going into the account.

14   They're not debits.  That's money that's going into the

15   account.  So there's no reason to have a payee for a

16   credit.  That's money that's being accounted for, it's

17   revenue into the account.

18        Every -- every other item that I see on this

19   sheet has a payee identified with the disbursement to

20   the extent that it was available.

21   Q   Okay.  Okay.  All right.  And I'll finish up.  All

22   right.  Okay.

23        Could you turn to -- in Plaintiff's P-127, the

24   white book, keep going, Volume I, I believe.  Or not --

25   not --

1              THE COURT:  127 or 27?

2              MR. HIPPLE:  127, Volume II.  127.

3              MR. KLEIN:  That should be Volume IV.

4              MR. BERKOWITZ:  Your Honor --

5              THE COURT:  Yes.

6              MR. BERKOWITZ:  -- I'd like to object to this

7    question as Mr. Geisser was not asked to analyze Mr.

8    Hipple's personal tax returns.  Exhibit 127 is Mr.

9    Hipple's 2009 tax return.  It goes beyond the scope of

10   the engagement, beyond the scope of the direct, beyond

11   the scope of the cross, the redirect.  I don't think

12   it's proper in this context to have Mr. Geisser review

13   Mr. Hipple's tax return.  He can do that himself in his

14   case.

15             MR. HIPPLE:  The reason I was asking the

16   question to him, Your Honor, because under his

17   credential, he said he was an IRS agent at one point in

18   time, okay?

19             THE COURT:  Right.

20             MR. HIPPLE:  And that he's very familiar with

21   tax returns and things of that nature, and I only have a

22   simple question to that tax return.

23             THE COURT:  What's your question?

24             MR. HIPPLE:  My question is if he could tell

25   me whether or not there was royalty payments on that tax

1    return as a --

2                    THE COURT:  All right.  I'll -- I'll sustain

3    the objection.  You can't -- I'm not going to allow that

4    question.

5                    MR. HIPPLE:  Okay.

6    BY MR. HIPPLE:

7    Q   Okay.  Let's go -- all right, could you turn to page

8    P-20?

9                    MR. BERKOWITZ:  So is that Exhibit P-20?

10                   MR. HIPPLE:  No.  I'm sorry, yeah, P-20,

11   Exhibit P-20.

12                   MR. BERKOWITZ:  I'm going to object to the

13   line of questioning.  This is not something that Mr.

14   Hipple used -- I'm sorry, Mr. Geisser used.  It was

15   never provided to him within the scope of his

16   engagement, and he is probably seeing this for the first

17   time.  It hasn't been authenticated.  It has never been

18   used and Mr. Geisser can't testify to this document with

19   respect to his engagement.

20                   MR. HIPPLE:  Your Honor, I'm not asking him to

21   verify or -- or anything of the document.  What I wanted

22   to ask him is basically is this -- is this the type of

23   document and the interest, the way it is calculated,

24   would that be a normal procedure?

25                   MR. BERKOWITZ:  Object.  Well -- well beyond

1     the scope.

2              THE COURT:  All right.  I'll allow it.  Go

3     ahead.  I'll allow it.  Do you have it -- do you have 20

4     in front of you, Mr. Geisser?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.

7              THE WITNESS:  What I have in front of me is,

8     it's entitled Clement Hipple loans and repayment with

9     interest.

10             THE COURT:  All right.  The question is, is

11    this something that --

12             MR. HIPPLE:  Yes.  My question is that, is

13    this actually prepared correctly as far as the interest

14    payments are concerned?

15             THE COURT:  Well, we're not going to have him

16    check all the --

17             MR. HIPPLE:  No, no, just the --

18             THE COURT:  -- the math.

19             MR. HIPPLE:  -- just by looking at it.  No,

20    no, not the math.  Is this -- is this the way it should

21    be prepared?

22             MR. BERKOWITZ:  I'm going to object, Your

23    Honor.

24             THE COURT:  Yes.  I'm going to sustain the

25    objection.

1        MR. HIPPLE:  Okay.

2    BY MR. HIPPLE:

3    Q    Okay.  P-33.

4        MR. BERKOWITZ:  Did you say P-38?

5        MR. HIPPLE:  No, P-33.

6        THE COURT:  That's the BBB Management Group

7    profit and loss statement --

8        MR. HIPPLE:  Yes, that's correct, Your Honor.

9        THE COURT:  -- October 12 through May 13.

10       THE WITNESS:  I have it.

11   BY MR. HIPPLE:

12   Q    Okay.  Any -- anywhere in this statement, do you see

13   any distribution to members or any salary to a member,

14   management member or any -- any money taken out, which

15   would have been my -- Clement Hipple, by the way?

16       (Pause in proceedings.)

17   A    I don't see anything on this document identified as

18   a distribution.

19   Q    Right.  And, just an opinion -- your opinion,

20   management that's working approximately 16 to 18 hours a

21   day -- a day, would be entitled to compensation,

22   correct?

23       MR. BERKOWITZ:  Objection.

24       THE COURT:  Sustained.  I'll sustain the

25   objection.

1     BY MR. HIPPLE:

2     Q   All right.  The 55 -- or the $55,000 there at the

3     bottom of the page, net profit, if -- if I would have

4     paid myself, would you say that -- that would have been

5     a reasonable amount for me to receive based on the

6     amount of the sales of the corporation?

7                 MR. BERKOWITZ:  Objection.  Same question,

8     just in a different format.

9                 THE COURT:  Right.  I'll sustain the

10    objection.

11                MR. HIPPLE:  Okay.

12    BY MR. HIPPLE:

13    Q   All right.  Would you turn -- turn to page --

14    Exhibit Number 34.

15    A   I have it.

16    Q   Okay.  In reference to Exhibit Number 24, it looks

17    like it's just a -- it's under Complete Group by the

18    way, the corporation, Complete Group -- it looks like it

19    has no expenses, correct?  And it has 400 and some

20    thousand dollars in sales, $480,000 in sales?

21    A   Well, just using it facially, I see that there's

22    $124,681 --

23    Q   That's cost of goods.

24                MR. BERKOWITZ:  Objection.

25                THE COURT:  Yes, let him finish.

1          THE WITNESS:  -- in subcontracted services.  I

2     would presume that's an expense based on the way it's

3     handled and it's under cost of goods sold.  And then

4     there's another -- several, you know, half a dozen

5     others listed here that total up to about 5,796.  So

6     this little fragment here of information does contain

7     some indication of some expense for Complete Group.

8     BY MR. HIPPLE:

9     Q   Okay.  But based on that -- okay.  $480,000 in sales

10    and expenses of $5,700?

11          MR. BERKOWITZ:  Objection.  That's not a

12    question.

13          MR. HIPPLE:  That is not a question?

14          THE COURT:  That -- yes, you didn't finish

15    with a question.

16          MR. HIPPLE:  Okay.

17          THE COURT:  I think you were trying to, but go

18    ahead.

19          MR. HIPPLE:  Okay.  I'll try and rephrase it

20    in a proper way.

21    BY MR. HIPPLE:

22    Q   Okay.  If you have saw a company that $480,000 in

23    sales, what -- what percentage would you think would be

24    generated as an expense?

25          MR. BERKOWITZ:  Objection.

1          MR. HIPPLE:  No?

2          MR. BERKOWITZ:  He's asking this witness --

3          MR. HIPPLE:  All right.

4          MR. BERKOWITZ:  -- to speculate with no

5     information.

6          THE COURT:  I think what you want to ask him

7     is you're trying to say the --

8          MR. HIPPLE:  I'm trying to say, Your Honor --

9     okay.

10         THE COURT:  -- the ratio between the income

11    and the expenses is -- is much greater, the amount of

12    income dwarfs the amount of expenses, and isn't that --

13    is that unusual, right?

14         MR. HIPPLE:  Yes, Your Honor --

15         THE COURT:  Okay.

16         MR. HIPPLE:  -- that's what I'm trying to get

17    at, because this document was part of the --

18         THE COURT:  Right.

19         MR. BERKOWITZ:  If I could just --

20         THE COURT:  Let --

21         MR. BERKOWITZ:  -- supplement my objection?

22         THE COURT:  Yes, go ahead.

23         MR. BERKOWITZ:  This is a document Complete

24    Group prepared and produced for us.  It has a Hipple

25    number on it.  It is what it is.

Mr. Geisser - Cross                          68

1              THE COURT:  Right.  Right.  Does that seem

2    unusual to you, that --

3              THE WITNESS:  Your Honor, I -- we took this

4    information and we included it in Exhibit A and B to our

5    report.  So this is information we did have available to

6    us.

7              THE COURT:  Right.

8              THE WITNESS:  And we considered it as a kind

9    of a combined period of time, and if you look at Exhibit

10   A, it does, in fact, try to combine them because when we

11   looked at it, it just didn't seem to -- to fit together,

12   quite honestly.

13             And so that's one of the reasons why we didn't

14   put a lot of credence in the -- in these QuickBook

15   records because we were concerned about the integrity of

16   the -- the accuracy and the way they were maintained.

17   And so we went to -- we defaulted to the bank records --

18             THE COURT:  Right.

19             THE WITNESS:  -- because we said, here's what

20   we -- we do know.  We're using third-party records.

21   Here's what came into the bank account, here's what went

22   out of the bank account.  To us, these were -- we took

23   them for what they were.  We -- we included the

24   information in the report and we said, okay, that's --

25   that's what it is.

1           But you know what, we're going to -- we're

2      going to go back and look at the bank records because we

3      don't have a great deal of faith in what these -- these

4      accounting records or these purported QuickBook records

5      have behind them.  And, again, we weren't provided with

6      the QuickBooks.  So we had no way of testing them or

7      otherwise looking at the -- at this data.

8      BY MR. HIPPLE:

9      Q    Okay.  But if you would also look at the dates on

10     the both exhibits.

11           THE COURT:  The October 12 through May 13 date

12     you mean?

13           MR. HIPPLE:  Right, Your Honor.

14           THE COURT:  Okay.  Go ahead.

15     BY MR. HIPPLE:

16     Q    They're the same, is that not correct?

17     A    True.

18     Q    Now, is it possible in your mind that the sales of

19     Complete -- yeah -- Complete Group are the same sales of

20     BBB Management?

21           MR. BERKOWITZ:  Objection.  He's asking this

22     witness to speculate.

23           THE COURT:  I'll overrule the objection.

24           THE WITNESS:  Well, if -- is it possible?  I

25     would say that it would be very strange if it was the

1    same sales.

2              You have -- you're supposed to have two

3    different companies that are in play here.  Now, are you

4    telling me that the sales in Company A are the same as

5    sales in Company B, it doesn't really make a great deal

6    of sense to me from an accounting perspective.  My

7    understanding was that -- that there's two separate

8    companies, although controlled by the same person,

9    yourself specifically.

10             So we could do no more than take the

11   information as it appeared on the document.  We -- we

12   transcribed that information onto our Exhibits A and B,

13   we took it for what it was worth.  Everything that

14   appears on these -- these two documents that you just

15   pointed out appears on our Exhibits A and B.

16             So this was information that we considered,

17   and as I said earlier, it's why we went back to the bank

18   records, because we were not comfortable with the

19   integrity of the accounting records that we were

20   provided with.  These -- we have to be cognizant this

21   could be just numbers on a page, and we don't know, you

22   know, who -- who prepared them, how they were prepared

23   or anything like that.  Just -- they're just two pieces

24   of paper for us.

25   BY MR. HIPPLE:

1    Q   Okay.  But --

2    A   So I don't -- I don't know.  Is it possible?  Yeah,

3    it's -- it's possible, but I would suggest that that

4    would be a strange situation.

5    Q   November, December, January.  Okay.  So, basically,

6    over seven -- a seven-month period, all right, if we add

7    them both together, it would equal well over a million

8    dollars, is that correct?

9    A   Correct.  And that's exactly what I show in Exhibit

10   A and B of our report.

11   Q   All right.  That's what I'm saying, it shows on your

12   report?

13   A   Yes.

14   Q   But if I was to say to you today that they were the

15   same sales, okay, just transferred over to BBB

16   Management Group, because that was the operating company

17   at the time?

18   A   Well, that would be new information to me, number

19   one.  Number two, I would have expected your -- your own

20   expert to point that out, which was not in the expert

21   report.  So we have no reason to think that they are the

22   same sales.  We just don't have any basis to do that.

23   That's why we defaulted back to the bank records.

24   Q   Okay.  All right.  A few more questions.  Is it

25   true, Mr. Geisser, that in preparing your report, you

1     did not at all consider any part of the Pennsylvania

2     Uniform Fraudulent Transaction --

3                  MR. PEDERSON:  Transfer.

4     BY MR. HIPPLE:

5     Q     -- Transfer Code --

6                  MR. PEDERSON:  Act.

7     BY MR. HIPPLE:

8     Q     -- Act, right.  I'm reading it.  He won't ask any

9     questions, have him just read.

10                  THE COURT:  Well, I think we went through this

11     already.  I mean, I know there's not an objection, but

12     we got into the terminology that the Act says versus

13     what his task was, and I think he explained what his

14     task was and it's really for me to decide what that Act

15     says and what the requirements of the Act.  So I'm going

16     to -- well, I'll let you answer it, but I'm just want to

17     tell you, I think we went down this road.

18                  There's no objection, so go ahead.  Did you

19     consider that, Mr. Geisser?  Do you want to --

20                  THE WITNESS:  Can I have the full question?

21                  THE COURT:  Yes.  Sure.

22                  THE WITNESS:  It was -- I'm --

23                  THE COURT:  Read it again.

24                  THE WITNESS:  -- I'm sorry.

25                  MR. PEDERSON:  Here, I'll try to read it for

1    you.

2    BY MR. PEDERSON:

3    Q   It's true, Mr. Geisser, that in preparing your

4    report, you did not at all consider any part of the

5    Pennsylvania Uniform Transfer Act -- I'm sorry --

6    Fraudulent Transfer Act, is that correct?

7    A   Mr. Pederson, your very description of that, it

8    would seem to be it's a legal document.  That would seem

9    to be more in the area of something that Mr. Berkowitz

10   should be considering rather than myself.

11           What was relevant to me is just the -- the

12   standard that's enumerated in that Act which is the

13   reasonably equivalent value language which we discussed

14   before, which does not appear in any valuation

15   literature, so it's -- it's something that's unique to

16   the statute that I would presume would be decided by the

17   Court in terms of how that's to be interpreted.

18   Q   And the totality of the circumstances, that's

19   something you would consider when determining the fair

20   market value of a company, correct?

21           THE COURT:  I think that was asked and

22   answered, but perhaps I'm wrong.

23           MR. BERKOWITZ:  I'll object then.  Asked and

24   answered.

25           THE COURT:  Yes, I believe it was.  So I'll

Mr. Geisser - Redirect                    74

1    sustain the objection.

2              MR. HIPPLE:  Okay.  That's all, Your Honor.

3              THE COURT:  Anything for you, Mr. Berkowitz?

4              MR. BERKOWITZ:  If -- if I can have -- I have

5    one question.  I don't want it to open Pandora's Box.

6              THE COURT:  No, we're not going to have -- you

7    know, you can ask the question.  Go ahead.

8                      REDIRECT EXAMINATION

9    BY MR. BERKOWITZ:

10   Q   Mr. Geisser, before you came to testify today, did

11   you have an opportunity to look at the BBB Management

12   website as part of your preparation for the testimony?

13   A   I did.

14             THE COURT:  Go ahead.

15   BY MR. BERKOWITZ:

16   Q   And I'm going to hand you this document and ask you

17   to look --

18             MR. BERKOWITZ:  -- I have a copy for you, Your

19   Honor.

20             THE COURT:  Do you want to mark it?

21             MR. BERKOWITZ:  Yes.  I've marked these as

22   Plaintiff's Exhibit P-201.

23             THE COURT:  Okay.

24   BY MR. BERKOWITZ:

25   Q   If you just tell us the second page first, if you

Mr. Geisser - Redirect                                75

1    could look at that?  Do you recall that as being the

2    front page of this exhibit?

3    A    Just to be clear about this, the second page is --

4    has a picture of a racing car on the front of it, and it

5    says, "Does your car have a blown head gasket?"  That's

6    the second page you're referring to?

7    Q    Yes.

8    A    Okay.  And your question is?

9    Q    Did you -- do you recall seeing this?

10   A    Yes, I did.

11   Q    And didn't you mention to me that it says right at

12   the top, 15 years?

13   A    I did.  I -- back when I went onto the website, it

14   struck me as an indication that this is one continuous

15   company for 15 years.  And that -- that's from a

16   consumer's standpoint, if I read 15-year history, I'm

17   thinking this is one company over 15 years.

18   Q    I'd like you to look at the second page, which is

19   the page that says P-201 on it.

20   A    I have it.

21   Q    And you see at the top there's a date on this?  It's

22   hard to read I think.

23   A    Yeah, it's dated 7-21-15 at 1:55 p.m.

24   Q    Can you see under product description?

25   A    I do.

1    Q    Can you see three bullet points?

2    A    I do.

3    Q    And can you read that, the second bullet point?

4    A    The bullet point under product description says,

5    "Steel Seal has three patents from U.S." -- I believe

6    it's Government, but it's cut off.

7              MR. BERKOWITZ:  No further questions.

8              THE COURT:  Any questions just regarding this

9    exhibit, Mr. Hipple?

10             MR. HIPPLE:  Yes, Your Honor.

11                   RECROSS-EXAMINATION

12   BY MR. HIPPLE:

13   Q    Basically, I don't think I have any -- well, let me

14   see.

15             THE COURT:  Just about this exhibit, that's

16   it.

17   BY MR. HIPPLE:

18   Q    But, basically, the website, certain things on the

19   website don't get changed, run -- run forever.  Do you

20   agree with that?

21   A    I really can't speak to that.  I mean, websites

22   change, they stay the same.

23             MR. HIPPLE:  All right.  I'll deal with this

24   on my side.

25             THE COURT:  All right.  You're excused, Mr.

1    Geisser.  Thank you.

2                 THE WITNESS:  You're welcome.

3                 (Witness excused.)

4                 THE COURT:  Do you want to break now?  It's up

5    to you.  I'm okay.

6                 MR. BERKOWITZ:  I'm ready to go.

7                 THE COURT:  All right.  Let's go.  Okay.

8                 MR. BERKOWITZ:  Call Mr. Berghof to the stand.

9                 THE COURT:  Mr. Berghof.

10                 MR. BERKOWITZ:  I believe he's here.  Come on

11   up, sir, take a seat right up there, right up to the

12   witness stand.

13                 THE COURT:  Good morning, sir.

14                 THE WITNESS:  Good morning.  How do you do?

15                 COURTROOM DEPUTY:  Raise your right hand.

16                 LOUIS BERGHOF, Plaintiff's Witness, Sworn.

17                 COURTROOM DEPUTY:  Please state and spell your

18   last name for the record.

19                 THE WITNESS:  Spell the last name?

20                 COURTROOM DEPUTY:  Yes, please.

21                 THE WITNESS:  My name's Louis Berghof.  Last

22   name's B-E-R-G-H-O-F.

23                 MR. BERKOWITZ:  And, Your Honor, if I could

24   have a little leeway with the witness, I think I could

25   get him through his testimony --

Mr. Berghof - Direct                                78

1              THE COURT:  Fine.

2              MR. BERKOWITZ:  -- much more efficiently.

3              THE COURT:  Okay.

4                     DIRECT EXAMINATION

5    BY MR. BERKOWITZ:

6    Q    Thank you for coming, Mr. Berghof.  Tell us by whom

7    you're employed.

8    A    Colonial Chemical Company.

9    Q    And how long have you been employed by them?

10   A    Since 2001.

11   Q    And are you familiar with a company called SCIX?

12   A    I've seen the letters before.

13   Q    You've heard the name before?

14   A    Yeah, I've heard the name before.

15   Q    Okay.  And --

16   A    I know it as Steel Seal.

17   Q    Okay.

18   A    Okay.

19   Q    That's the product -- that's the company that bought

20   the Steel Seal from you?

21   A    Right.

22   Q    And the --

23   A    Yeah, we package it for --

24   Q    Right.  You manufacture it and package it?

25   A    Yes.

Mr. Berghof - Direct                              79

1    Q   Okay.  And you know Mr. Hipple, Clement Hipple?

2    A   Yes.

3    Q   Okay.  How long have you known Mr. Hipple?

4    A   Since Brian passed away.

5    Q   Okay.  So before Brian passed away, you interacted

6    with Brian Hipple?

7    A   Yes.

8    Q   And did you start interacting with Brian in 2001?

9    A   No.  Back then I was only a forklift operator.

10   Q   Okay.

11   A   Okay.  So -- I've kind of had promotions through the

12   years so --

13   Q   Okay.  And you interacted with him through his

14   death, though?

15   A   At that time, I was, yes.

16   Q   Yes.  And at the time you interacted with him, did

17   his role ever change?

18   A   No.

19   Q   You have to --

20   A   Oh.

21   Q   -- when you shake your head, the --

22   A   Oh, okay.  No.

23   Q   -- the system won't pick up the speech.

24           Mr. Hipple, I'm going to show you an exhibit.

25   It's Exhibit 37 at 453.  I will get it for you.  It's

1    exhibit book one.  Do you have book one?  Yes, you do.

2    Let me help you with that.

3    A    Okay.

4    Q    Mr. Hipple -- Mr. Berghof --

5              MR. HIPPLE:  37?

6    BY MR. BERKOWITZ:

7    Q    -- I'm going to refer you to page Hipple 453 and ask

8    you to read that document.

9              MR. HIPPLE:  Hold on a minute, please?  Hold

10   on one minute till I get there.

11             THE WITNESS:  It's a confidentiality

12   agreement.

13             MR. HIPPLE:  Hold on a moment.

14             THE COURT:  What document -- does he know what

15   exhibit number?

16             MR. HIPPLE:  I need the --

17             MR. BERKOWITZ:  It's -- I'm sorry?

18             THE COURT:  What exhibit?

19             MR. BERKOWITZ:  It's Exhibit 37 --

20             MR. HIPPLE:  Right.

21             MR. BERKOWITZ:  -- page -- I think it was 459.

22   Could you tell us the page number, sir, from the bottom

23   right?

24             THE WITNESS:  453.

25             MR. BERKOWITZ:  453.

1        MR. HIPPLE:  They're out of order again, okay?

2   Hold on one moment.  I object, Your Honor.

3        THE COURT:  What ground?

4        MR. HIPPLE:  On the grounds that this witness

5   has no idea of this documentation.

6        THE COURT:  Well, let's ask -- let's see what

7   he knows and then we'll -- you can object again if he

8   says he doesn't know anything about it.

9   BY MR. BERKOWITZ:

10  Q    Have you ever seen this document before?

11  A    No, I have not.

12  Q    Okay.  And do you know who Mr. Szafara is?

13  A    Yeah, Steven Szafara, yes.

14  Q    And who is he?

15  A    He's the owner of the company I work for.

16  Q    Okay.  All right.  So you -- you don't recall ever

17  seeing this?

18  A    No.

19  Q    Okay.  I'd like you -- let's turn to Exhibit 21 in

20  that book that you have, and if you could look on the

21  bottom right of the page in bold numbers, there are

22  numbers, and I'd like you to look at page 72.

23  A    Okay.  I got it.

24  Q    And I would represent to you that these are

25  documents that your company produced pursuant to a

1    subpoena.

2    A    Okay.

3    Q    And can you tell us what this document is?

4    A    It's an invoice that we sent to SCIX for packaging

5    that we did.

6    Q    Okay.  And the date of this invoice is 3-31-2009?

7    A    Yes.

8    Q    Okay.  And if you look under the line ordered by, it

9    looks, "verbal, Brian Hipple"?

10   A    Yes.  Yes.

11   Q    Okay.  And -- and that would be sometimes how he

12   ordered things?

13   A    Yes.

14   Q    Okay.  Now, the Steel Seal product --

15            MR. HIPPLE:  I object, Your Honor.  He -- he

16   wasn't at -- at the company in 2009.

17            THE COURT:  All right.  Hold --

18            MR. HIPPLE:  He's verifying a document that he

19   didn't even work for the company back in --

20            THE COURT:  And your question is what, Mr.

21   Berkowitz?  I'm sorry.

22            MR. BERKOWITZ:  All I asked him, it says

23   "verbal, Brian Hipple."  I'm asking him to look at the

24   order --

25            MR. HIPPLE:  And it's a document he -- he

1    didn't even work for the company at the point.

2              THE COURT:  All right.  Wait a minute, hold

3    on.  Let him finish.  Go ahead.

4              MR. BERKOWITZ:  I believe Mr. Berghof

5    testified that he has been working at the company since

6    at least 2001.

7              THE WITNESS:  Yes.

8              THE COURT:  All right.  Overrule the

9    objection.

10   BY MR. BERKOWITZ:

11   Q    If you see in the first line of the invoice, it's

12   got 9-26.  Do you see that?

13   A    Yes.

14   Q    And would that be the number of cases?

15   A    Yes, it is.

16   Q    Okay.  And then you see a couple blocks over --

17   well, the first block over, Steel Seal, 16?

18   A    Yes.

19   Q    Does that mean 16 ounce?

20   A    That's a 16 ounce product, yes.

21   Q    And slash case?

22   A    Case, yes.

23   Q    Okay.  So when we look at this, it appears to me

24   that there are 12 bottles per case of 16 ounce Steel

25   Seal?

Mr. Berghof - Direct                           84

1    A    Yes.

2    Q    Okay.  And you extend the price out?

3    A    Correct.

4    Q    So if we could do the quick math, it says $18 per

5    unit.  That would be the per case price?

6    A    Yes.

7    Q    So if I can do the math in my head, and I still -- I

8    think I can still do this one -- it's $1.50 a bottle?

9    I'm sorry, I didn't mean to put you on the spot.  That's

10   the --

11   A    Yeah.  I don't know offhand without a calculator.

12   Q    Okay.  I am --

13   A    Sounds close.

14   Q    Okay.

15   A    Yeah.

16   Q    And I'd like you now to turn to -- hopefully it is

17   the next page -- 85 on the bottom, same exhibit, Number

18   21.

19   A    Okay.

20   Q    And would it be correct, this is an invoice dated 9-

21   30-2009?

22   A    Yes.

23   Q    Okay.  And again an SCIX order?

24   A    Yes.

25   Q    Okay.  And do you see under the ordered by, it's got

1     a 0909?

2     A    Yes.

3              MR. HIPPLE:  I'm sorry.  I'm missing that part

4     you're talking about.

5              MR. BERKOWITZ:  It's on Exhibit 85 --

6              MR. HIPPLE:  Right.

7              MR. BERKOWITZ:  -- under the address of Steel

8     Seal -- I'm sorry --

9              MR. HIPPLE:  Oh, 0909, I got it.  Go ahead.

10             MR. BERKOWITZ:  -- SCIX, LLC, 0909.

11             MR. HIPPLE:  Right.

12    BY MR. BERKOWITZ:

13    Q    Now, if you could just hold this page for a second

14    and go to Exhibit 22, page 86.

15             MR. HIPPLE:  All right.  Wait a minute.

16    BY MR. BERKOWITZ:

17    Q    Exhibit 22, page 86 on the bottom right.

18    A    Okay.

19    Q    And do you see that document?

20    A    Yes.

21    Q    And I'd like you if you -- it looks like it's a --

22    it says a fax cover sheet?

23    A    Right.

24    Q    It's from Brian Hipple to you?

25    A    Yes.

Mr. Berghof - Direct                          86

1    Q    Dated 9-11-2009?

2    A    Okay.

3    Q    And it's a Steel Seal order?  Do you see that?

4    A    Yes.

5    Q    And our PO is 0909?

6    A    Yes, I see that.

7    Q    And is that a typical way that orders were placed?

8    A    Not all the time.

9    Q    Okay.  But -- but it did happen frequently?

10   A    Yeah, it happened, yes.

11   Q    Okay.  I could show you through and maybe we'll have

12   to go through a couple.

13            MR. BERKOWITZ:  I don't want to go through

14   them all, Your Honor.

15   BY MR. BERKOWITZ:

16   Q    Now, I'd like you to look at Exhibit 22 again.  This

17   is Exhibit 22, page 68.

18            MR. HIPPLE:  Okay.  They're out of order.

19   Could you hold on for a minute, please?

20            MR. BERKOWITZ:  Yes, they are out of order.

21   They came with numbers on them.  I tried to put them in

22   sequential order by date.

23            MR. HIPPLE:  Give me a moment.

24            MR. BERKOWITZ:  It's -- in mine, it's the

25   second or third one in.

1          MR. HIPPLE:  68 you said?  I got a 67, 154,

2     57.

3               THE COURT:  It is the third one.

4               MR. HIPPLE:  Not on my -- not in my book, Your

5     Honor.

6               MR. BERKOWITZ:  All the books should be the

7     same, but if yours -- there, you see it, sir?

8               THE WITNESS:  Yes, I have it, yes.

9               MR. BERKOWITZ:  Okay.

10              MR. HIPPLE:  Hold on for a minute.  I don't --

11     okay, 68 you said?

12              THE COURT:  Right.  Try the third document,

13     just go back and see if it's the third document.

14              MR. HIPPLE:  Mr. Berkowitz, if you could find

15     it here for me?

16              MR. KLEIN:  You skipped the third page.

17              MR. HIPPLE:  That's 67.

18              THE COURT:  Mr. Klein, could you help him,

19     please?  See if you could find it.

20     BY MR. BERKOWITZ:

21     Q   Okay.  And --

22              MR. HIPPLE:  Hold on, Mr. Berkowitz.  I don't

23     have the page.

24              THE COURT:  Pardon me?

25              MR. KLEIN:  It doesn't appear to be in this.

1                    THE COURT:  Are you in 22?

2                    MR. HIPPLE:  Pardon me?

3                    THE COURT:  Are you in --

4                    MR. KLEIN:  No, he's not.  He was in 21.  I'm

5         sorry.  You're in the wrong exhibit.

6                    MR. HIPPLE:  Okay.

7                    MR. KLEIN:  Page 67?

8                    MR. BERKOWITZ:  68.

9                    THE COURT:  68.

10                   MR. BERKOWITZ:  Exhibit 22, page --

11                   MR. KLEIN:  We have it.  Thank you.

12                   MR. HIPPLE:  Okay.  Thank you.  Sorry about

13        that.

14                   THE COURT:  Go ahead.

15        BY MR. BERKOWITZ:

16        Q    And do you see this -- this is dated 2-22-2010,

17        again to you from Brian Hipple?

18        A    Yes.

19        Q    And you look down and you see PO is 0310?

20        A    Yes.

21        Q    Okay.  Now, I'd like you to go back to Exhibit 21,

22        page 67.

23                   MR. BERKOWITZ:  And there is a reason I'm

24        doing this, Your Honor.

25                   THE COURT:  I'm sure there is.

1        MR. BERKOWITZ:  Yes.

2    BY MR. BERKOWITZ:

3    Q   Do you see page 67?

4    A   Yes, I do.

5    Q   Now, this is a new invoice?  This is the Colonial

6    Chemical invoice?

7    A   Yes.

8    Q   Okay.  And it looks like the format has changed, and

9    that's why I wanted to get to this exhibit.

10   A   Yeah, we had switched software around that period.

11   Q   Okay.  And, again, it does what the -- the prior

12   invoice did?

13   A   Yeah.

14   Q   And if you see, this has the purchase order number,

15   0310?

16   A   Yes.

17   Q   Okay.  And that's the document we just saw in the

18   other order?

19   A   Correct.

20   Q   So you just had a form -- a format switch with your

21   computer?

22   A   Yes.

23   Q   And I'd like you to look in the upper right-hand

24   corner of this document.  And do you see that where it

25   says SCIX 001?

1    A    Yeah, it's a code they put in for a customer.

2    Q    Okay.  That's your customer number?

3    A    Yes.

4    Q    Okay.  Unremarkable, they have a customer number on

5    it, correct?

6    A    Yes.

7    Q    Okay.

8    A    Every customer has one.

9    Q    Now, I'd like you to go to Exhibit 22, page 58.

10   A    Okay.

11   Q    And you see it's dated 10-22-2010?

12   A    Yes.

13            MR. BERKOWITZ:  And, Your Honor, I'd like to

14   point out to the Court that that is after the transfer

15   date of October 13th and that is why we are looking at

16   this document.

17   BY MR. BERKOWITZ:

18   Q    And do you see the purchase order, number 1010?

19   A    Yes.

20   Q    Okay.  Now, I'd like you now -- this is 58 -- and

21   this order format is the same as we had been looking at

22   before.  It hadn't changed?

23   A    No.

24   Q    Now, let's go to Exhibit -- back to Exhibit 21, and

25   now I want you to look for page 57 --

1     A    Which page?

2     Q    -- 57 in the bottom right --

3     A    57?

4     Q    Yes, and this is Exhibit 21 again.

5     A    Okay.  Got it.

6     Q    Do you see that?  And that is an invoice dated 11 --

7     it looks like 28-2010?

8                MR. HIPPLE:  29?

9                THE WITNESS:  29, yes.

10    BY MR. BERKOWITZ:

11    Q    I'm sorry.

12    A    Yeah.

13    Q    I have to get thicker glasses.  And if you look at

14    the customer number, still SCIX 0001?

15    A    Correct.

16    Q    And the purchase order is 1010?

17    A    Correct.

18    Q    Right, that's the one we just looked at, and the

19    billing is to SCIX, LLC?

20    A    Yes.

21    Q    I assume this invoice was paid?  Do you -- do you

22    have any reason --

23    A    I presume -- I'm not into that, so --

24    Q    -- do you have any reason to believe it wasn't paid?

25    A    No.

Mr. Berghof - Direct                           92

1   Q    Okay.

2              MR. HIPPLE:  I object to it, Your Honor.

3              THE COURT:  All right.  Overruled.

4              MR. HIPPLE:  Basically, we don't know how --

5              MR. BERKOWITZ:  Object.  There's no question

6   pending right now.

7              THE COURT:  I overruled the objection.

8   BY MR. BERKOWITZ:

9   Q    Mr. Berghof, I would like you to look at Exhibit 18.

10  Have you found that, sir?  There's two pages in there.

11  I want to make sure we're on the first page.

12             MR. HIPPLE:  Hold on.  Wait till I get there,

13  please.  Thanks.

14             THE COURT:  Go ahead.  Go ahead, Mr.

15  Berkowitz.

16  BY MR. BERKOWITZ:

17  Q    Do you see that, Mr. Berghof?

18  A    Yes.

19  Q    And do you see at the top it's Complete Group, LLC?

20  A    Yes.

21  Q    Are you familiar with that company?

22  A    No, I'm not.

23  Q    Okay.  And you see the date, December 26, 2010?

24  A    Yes.

25  Q    Okay.  Now, it's addressed to you, "Dear Lou"?

Mr. Berghof - Direct                               93

1    A    Yes.

2    Q    Okay.  Do you recall having received this?

3    A    I remember it.

4    Q    Okay.  And -- and if you look at the second sentence

5    towards the right of the page, it says, "Per our

6    conversation last week."  So it looks like this confirms

7    a phone call that you had with Mr. Hipple?

8    A    Yes.

9    Q    Okay.  It's telling you, "On October 13th I acquired

10   all the assets of SCIX."

11          Do you see that?

12   A    Yes.

13   Q    And he said, "including but not limited to all the

14   labels, caps, bottles, boxes, inserts, completed bottles

15   in Colonial's warehouse."

16          Do you see that?

17   A    Yes.

18   Q    And it says, "My company, Complete Group, is now the

19   successor in interest to the confidentiality agreement

20   executed between SCIX, LLC, and Colonial Chemical on

21   March 29 -- March 29, 1999."

22          Do you see that?

23   A    Yes, I do.

24   Q    And that's the confidentiality agreement that --

25   A    Yeah, that --

1    Q    -- we looked at?

2    A    -- that first page, yeah.

3    Q    Okay.  And it also says here, "I understand that

4    there has been a recent modification to the formula so I

5    need to receive a copy of the latest version."

6              Do you know what that's referring to?

7    A    No.

8    Q    Okay.  So you don't know whether the formula for the

9    product changed?

10   A    No, I do not, no.

11   Q    Okay.  So that wouldn't be part of what you do?

12   A    No.

13   Q    Okay.  I mean, I was given a formula and I broke it

14   down to what was needed to do it.

15   Q    Okay.  So it looks like, even though he's telling

16   you that the business has changed, the company has

17   changed, did anything change with respect to the

18   ordering and production and delivery of Steel Seal?

19   A    No.

20   Q    If you hadn't received that letter, would you have

21   known that there had been any change?

22   A    No.

23   Q    Okay.  I'd like you to turn to the next page in this

24   exhibit.  This is again Exhibit 18, and there should be

25   a second page there.  Do you see that?

1    A    Yes.

2    Q    And you see at the top it says, SCIX, LLC?

3    A    Yes.

4    Q    Okay.  And it looks like a very similar letter to

5    the prior one in terms of type and look?  And do you see

6    it's addressed to you on December 26, 2010?

7    A    Yes.

8    Q    Now, did you deal with Brian a lot?

9    A    Yeah, yeah.  He would call periodically.

10   Q    Okay.  And do you remember seeing his signature or

11   handwriting?

12   A    I never really paid attention to it.

13   Q    Okay.  No problem.  And in this, he says to you, if

14   you look down the third line from the bottom.

15            "I will continue to place orders, pick up and

16   ship Steel Seal as I did formerly with SCIX, LLC."

17            Do you see that, where it says that?  It's the

18   third line from the bottom of that paragraph.

19   A    Okay.  Yes.

20   Q    Okay.  And is that, in fact, what happened, business

21   continued?

22   A    Yeah, it was business as usual.

23   Q    Okay.  Now, I'd like you to -- let's turn to Exhibit

24   21 and now I want you to go to page 56.

25   A    Okay.

1    Q   And that is the invoice, the new invoice format that

2    we saw before?

3    A   Yes.

4    Q   And the date of this invoice is 12-31-2010?

5    A   Yes.

6    Q   And the customer number is still SCIX 001?

7    A   Yes.

8    Q   And the bill for this was sent to SCIX --

9    A   Yes.

10   Q   -- LLC?  And do you have any reason to believe that

11   that bill wasn't paid?

12   A   I wouldn't know.

13   Q   Okay.  I'd like you to turn to the next page, and I

14   just -- this is now 55?

15   A   Yes.

16   Q   Okay.  And you see again this is an invoice dated

17   1-31-2011?

18   A   Yes.

19   Q   Customer, SCIX, 001?

20   A   Yes.

21   Q   Invoiced still to SCIX, LLC?

22   A   Yes.

23   Q   Okay.  Now, I'd like you to turn to Exhibit 22, page

24   53, and, again, that is a fax cover sheet.  It looks

25   like the ones we previously saw, correct?

1      A    Correct.

2      Q    Okay.  And it's from Brian Hipple to you?  Do you

3      see that?

4      A    Yes.

5      Q    Okay.  And it's dated February 23rd, 2011, and it's

6      got the purchase order number 0211, just like we saw

7      previously?

8      A    Yes.

9      Q    And do you see on the bottom it says -- he wants you

10     to bill to now a new company, Steel Seal Pro?

11     A    Okay.

12     Q    Do you see that?

13     A    Yes.

14     Q    Okay.  Now, this order looks the same.  Had anything

15     changed again that you would recognize in the ordering

16     and processing --

17     A    No.

18     Q    -- and delivering?  Okay.

19     A    No.

20     Q    So you were just told to deliver -- to invoice

21     somebody else?

22     A    Yeah, yeah.  Our accounts receivable would have to

23     set it up to pay somebody else.

24     Q    Okay.  And you wouldn't really care if that's not

25     your department?

Mr. Berghof - Direct                                98

1    A    No, no, that wasn't my realm, so --

2    Q    Okay.  Now, I'd like you to go to Exhibit 21, page

3    54, and do you see at the top of that page this is an

4    invoice dated 2-28-2011 --

5    A    Yes.

6    Q    -- correct?  And the customer number is still SCIX

7    001?

8    A    Yes.

9    Q    And now this is a bill to Steel Seal Pro?

10   A    Yes.

11   Q    So it looks like the people in the billing office

12   got the memo?

13   A    Yes.

14   Q    Okay.  Now, I'd like you to go to on Exhibit 22, and

15   I'd like you to look at page 45.

16             MR. HIPPLE:  Hold on.

17             MR. BERKOWITZ:  It's Exhibit 22.

18             THE WITNESS:  Okay.

19   BY MR. BERKOWITZ:

20   Q    And do you see on this, again, it looks like the

21   same as the other ones we've looked at?

22   A    Yes.

23   Q    Okay.  And it's got a P.O. number 0611?

24   A    Yes.

25   Q    And if you look at the date, 06 looks like the month

 1       and '11 is the year?

 2       A    Yeah.

 3       Q    Now, this one says under re, new Steel Seal U.K.

 4       order?

 5       A    Yes.

 6       Q    Okay.  And I'm going to represent to you that that's

 7       the first time in any of these documents I've seen a

 8       U.K. order.  Do you know what that means?

 9       A    Yeah.  The product -- a different label and then

10       Brian had a container come to our facility and pick it

11       up and it got shipped overseas.

12       Q    Okay.  So this is in 2011 then, there's a new label

13       that's put on?

14       A    Yeah.  It was a different label than what we

15       previously used.

16       Q    Okay.  And I'd like you to -- do you see 45, do you

17       see that on the bottom of the -- I want you to turn

18       forward to page 33.

19                 MR. HIPPLE:  I'm sorry.

20                 MR. BERKOWITZ:  It should be in the same

21       exhibit --

22                 MR. HIPPLE:  Where?

23                 MR. BERKOWITZ:  -- number 22.

24                 MR. HIPPLE:  22?

25                 THE WITNESS:  33?

1                 MR. BERKOWITZ:  Exhibit 22, page 33.

2                 THE WITNESS:  Okay.  Yes.

3                 MR. HIPPLE:  Hold on, hold on.  33, right.

4      BY MR. BERKOWITZ:

5      Q   And do you see that?

6      A   Yes.

7      Q   Okay.  And is that -- that, to me -- is that the

8      U.K. label?  And the reason I ask, if you look under, it

9      says save hundreds of pounds.

10     A   Yes.

11     Q   It has the pound symbol instead of the dollar?

12     A   Yes.

13     Q   Okay.  So would that be the new label?

14     A   Yes.

15     Q   Okay.  And you see this is dated 12-9-2011?

16     A   Yes.

17     Q   Okay.  Do those labels now look familiar to you?

18     A   Yes, they do.

19     Q   Okay.  And those are the labels now they put on the

20     U.K. product?

21     A   Yes.

22     Q   Now, is -- is Steel Seal still being ordered?

23     A   Yes.

24     Q   Okay.  And do you know whether anybody else produces

25     Steel Seal?

1    A    I don't know.  I don't recall.

2    Q    Okay.  Now, let's go to Exhibit 22, page 39, and it

3    may be back.

4               MR. HIPPLE:  Okay.  Hold on.

5               MR. BERKOWITZ:  Yes, it's back after page 45.

6               MR. HIPPLE:  Hold on.  It's out of order.

7               THE WITNESS:  Okay.

8               MR. HIPPLE:  I don't have it yet.  Hold on,

9    Mr. Berkowitz.

10              THE COURT:  39?

11              MR. BERKOWITZ:  39, yes, Your Honor.

12              MR. HIPPLE:  Still don't have it.  Okay.  I

13   have it.

14   BY MR. BERKOWITZ:

15   Q    This is -- again, this is the same kind of fax we've

16   seen all along?

17   A    Yes.

18   Q    Okay.  And, again, from Brian to you, and this one

19   is dated October 18, 2011.  Do you see that?

20   A    Yes.

21   Q    Now, it's got a P.O. number just like we've seen on

22   the other ones, right --

23   A    Yes.

24   Q    -- 1011?

25   A    Yes.

1    Q    Now, let's look at this one.  This is a request for

2    an order of 8,000 of the U.S. Steel Seal?

3    A    Yes.

4    Q    So when the new labeling came in, you had to now

5    distinguish between whether you labeled for the U.S. or

6    the U.K.?

7    A    Yes.

8    Q    Okay.  And if we -- if we were to look at Exhibit

9    21 --

10              MR. BERKOWITZ:  And I don't want to belabor

11   this point, Your Honor.

12   BY MR. BERKOWITZ:

13   Q    -- Exhibit 21, page 38, and, again, these are --

14   there they are.  Okay.  Let's look at -- this is an

15   invoice dated 11-10-2011?

16   A    Yes.

17   Q    And the customer is still SCIX, 001?

18   A    Yes.

19   Q    And the bill to is Steel Seal Pro?

20   A    Yes.

21   Q    And the purchase order number is 1011, the same we

22   saw in the last fax?

23   A    Yes.

24   Q    And if you look under -- it says in the description,

25   this now shows U.S. Steel Seal.

Mr. Berghof - Direct                    103

1    A    Correct.

2    Q    So that's how you would distinguish between whether

3    they were requesting U.K. Steel Seal or U.S. Steels --

4    A    Correct.

5    Q    -- I'm sorry -- U.S. Steel Seal?  Now, are we in

6    Exhibit 21?  If we could just go to page 30 which

7    hopefully is the next --

8    A    Yes.

9    Q    -- page.

10              MR. HIPPLE:  Back to 20?

11              MR. BERKOWITZ:  Exhibit 21.

12              MR. HIPPLE:  Page 30?  Hold on.  Okay.

13   BY MR. BERKOWITZ:

14   Q    Okay.  And you see that, that's dated 2-14-2012?

15   A    Yes.

16   Q    Okay.  And, again, this is a Steel Seal Pro invoice?

17   A    Yes.

18   Q    And it still identifies the customer as SCIX, 001?

19   A    Yes.

20   Q    And you see there's no designation of U.K. or U.S.?

21   A    Correct.

22   Q    Do you know why that would be?

23   A    No, I don't.

24   Q    Okay.  Do you know whether the price is different

25   for 16 ounces in the U.K. or 16 ounces in the U.S.?

Mr. Berghof - Direct                    104

1    A    I don't know.

2    Q    Okay.  That wouldn't be something you would be

3    involved in?

4    A    No.

5    Q    Okay.  Thank you.  I'd like you to look at Exhibit

6    22.  By the way, we're doing very well.  I'll have you

7    finished soon, sir, so you can go back and do what you

8    like to do.  And I'd like you to go to page 28.

9    A    Okay.

10   Q    Do you see that?  And the reason I'm bringing this

11   to your attention -- this looks different than the other

12   faxes that we've seen to order, but it looks like this

13   one's an email to you dated February 28th, 2012?

14   A    Yes.

15   Q    Okay.  And you see he said, "I'd like to get ready

16   to do another run for the Steel Seal for the U.S."

17   A    Correct.

18   Q    Again, and he has to tell you that so you can get

19   the right label on the product?

20   A    Correct, yes.

21   Q    Okay.  Thank you.  Okay.  Now, I'd like you to go to

22   Exhibit 21 and I want you to look for -- I have the

23   wrong exhibit.  I'm looking at 22, can't find it.  21,

24   page 12.

25              MR. HIPPLE:  Hold on.

Mr. Berghof - Direct                    105

1                 THE WITNESS:  Okay.

2       BY MR. BERKOWITZ:

3       Q    Again, this is another invoice from Steel Seal?

4       A    Yes.

5       Q    And this one is dated 10-11-2012?

6       A    Yes.

7       Q    And you see the customer is still SCIX?

8       A    Yes.

9       Q    And were you aware --

10                MR. HIPPLE:  Hold on, hold on.  Customer is

11      Steel Seal, LLC.  Number 12 you said?

12                MR. BERKOWITZ:   Page 12.

13      BY MR. BERKOWITZ:

14      Q    Are you aware of the fact that Brian Hipple passed

15      away on September 30th, 2012?

16      A    I don't recall the exact date.

17      Q    Okay.  Okay.  Now, if you look at this bill to, do

18      you see that?

19                MR. HIPPLE:  Your Honor, I object -- object to

20      the name -- the name on this is not -- he identified the

21      name incorrectly.

22                THE COURT:  All right.  Overrule the

23      objection.

24      BY MR. BERKOWITZ:

25      Q    Do you see this is an invoice now to Steel Seal,

Mr. Berghof - Direct                          106

1    LLC?

2    A    Correct.

3    Q    Okay.  So it's got a different name.  And now it

4    says Attention:  Clement Hipple?  Do you see that?

5    A    Yes.

6    Q    Okay.  And I'm going to represent to you that's the

7    first invoice I saw for Steel Seal.

8    A    Okay.

9    Q    Now, I'd like you to go to Exhibit 22, page 108.

10   A    Okay.

11              MR. HIPPLE:  Hold on.  108, 22?

12              MR. BERKOWITZ:  22, 108.

13              MR. HIPPLE:  Okay.  I have it.

14   BY MR. BERKOWITZ:

15   Q    Do you see that in the subject -- now, that's an

16   email to you from Clement Hipple?

17   A    Yes.

18   Q    And do you recall receiving emails from Mr. Hipple?

19   A    Yes.

20   Q    Okay.  And the subject is help?

21   A    Yes.

22   Q    And you see the date of that is October 22, 2012?

23   A    Yes.

24   Q    Do you recall getting this email?  Just another

25   email?

1    A    It's just another email with -- with an inventory to

2    me, so --

3    Q    Okay.  And he's -- he's, again, distinguishing

4    between U.S. Steel Seal and U.K. Steel Seal?

5    A    Correct.

6    Q    Okay.  Now, I'd like you to go to Exhibit 21 and

7    we're going to look for page 11 which should be near the

8    back.

9              THE COURT:  What number?

10             MR. BERKOWITZ:  Page 11 --

11             THE COURT:  Thank you.

12             MR. BERKOWITZ:  -- Exhibit 21.

13             THE COURT:  Right.  Thanks.

14             THE WITNESS:  Okay.

15   BY MR. BERKOWITZ:

16   Q    Now, do you see the --

17             MR. HIPPLE:  I'm not there, I'm not there.

18   Hold on.  Go ahead.

19   BY MR. BERKOWITZ:

20   Q    Do you see there, the invoice date, 10-31-2012?

21   A    Yes.

22   Q    Okay.  You see the customer number is still SCIX,

23   001?

24   A    Yes.

25   Q    And you see now it's billed to BBB Management Group,

1    LLC?

2    A    Yes.

3    Q    Attention:  Clement Hipple?

4    A    Yes.

5    Q    Okay.  Now, again, is that something you were aware

6    of or is that something just the office would become

7    aware of?

8    A    I don't recall being -- seeing anything about it.

9    Q    Okay.

10   A    Okay.  Knowing me, if I did get something, it would

11   go right to the office.

12   Q    Okay.

13   A    Okay.

14   Q    Because they would have to change the --

15   A    Yeah, they have to change everything in the system.

16   Q    Okay.  Thank you, Mr. Berghof.  I have no other

17   questions.

18                        CROSS-EXAMINATION

19   BY MR. HIPPLE:

20   Q    Good morning, Lou.

21   A    Good morning.

22   Q    How are you?

23   A    Good.  How do you do?

24   Q    Okay.  I just want -- I have just three questions

25   for you basically, okay?  What was the first time you

Mr. Berghof - Cross                              109

1    saw me?

2    A    After Brian had passed away.

3    Q    Right.  Have -- have you heard from me or had I

4    called you or had you ever seen me prior to that?

5    A    I don't recall seeing you.

6    Q    Okay.  So you had --

7                THE COURT:  Mr. Hipple, move that microphone a

8    little closer to you.  Thank you.

9    BY MR. HIPPLE:

10   Q    So you had done no -- no business with me at all,

11   correct --

12   A    Not that I recall, no.

13   Q    -- until after Brian passed away, right?  And is it

14   possible that maybe your company, because the product is

15   the same name, Steel Seal, that they may keep the same

16   customer number?  Is that a possibility?

17   A    It's the same customer number.  They just edited the

18   information for that customer number.

19   Q    Right.  And as far as the billing is concerned,

20   sometimes it takes a little bit of time maybe for your

21   company to get the name change?

22   A    Yes, it's --

23   Q    Okay.

24   A    -- yes.

25   Q    Okay.  So as of now, that customer number has been

1    since 1999, 001, more than likely?

2    A    Oh, I'm sure, yeah.

3    Q    Yeah.  Right.  No matter who put the order in the

4    Steel Seal, correct?

5    A    Correct.

6    Q    Okay.  All right.  And, again, you can verify that

7    you never heard from me at any point in time, that you

8    dealt directly with Brian --

9    A    Correct.

10   Q    -- until his death, is that correct?

11   A    Yes.

12   Q    Okay.  That's all.

13   A    All right.

14            MR. BERKOWITZ:  No questions, Your Honor.

15            THE COURT:  Okay.  Thank you.  You're excused,

16   sir.

17            THE WITNESS:  Okay.  Thank you.

18            (Witness excused.)

19            THE COURT:  Let's take a break, okay, a ten-

20   minute break.  I'll see you in ten minutes.

21            (Recess taken, 10:57 a.m. to 11:07 a.m.)

22            THE COURT:  Please be seated.  Your next

23   witness, Mr. Berkowitz.

24            MR. BERKOWITZ:  Your Honor, I'm going to call

25   Melissa Moreno.

1          THE COURT:  Okay.

2          MR. BERKOWITZ:  And, Ms. Moreno, if you could

3    just take a seat right up there.  Your Honor, for

4    purposes of housekeeping, this is my last witness, and

5    I'd like to, at the conclusion of her testimony, move

6    all of the exhibits into evidence and then maybe reserve

7    argument till tomorrow if there is any on any of the

8    documents.

9          There's a lot of pages.  And there are also

10   certain documents that -- I'm not sure -- may not have

11   been put in front of the Court, but pertain to Mr.

12   Shavel --

13         THE COURT:  Okay.

14         MR. BERKOWITZ:  -- complaints and the like.

15         THE COURT:  All right.

16         MR. BERKOWITZ:  They are part of the exhibits

17   that I would like to include in evidence.

18         THE COURT:  Right.  Well, we'll talk -- let's

19   talk after this witness has testified -- we'll talk

20   about scheduling.

21         COURTROOM DEPUTY:  Raise your right hand.

22         MELISSA MORENO, Plaintiff's Witness, Sworn.

23         COURTROOM DEPUTY:  Please spell your last name

24   for the record, please.

25         THE WITNESS:  Moreno, M-O-R-E-N-O.

1          COURTROOM DEPUTY:  Thank you.

2                    <u>DIRECT EXAMINATION</u>

3     BY MR. BERKOWITZ:

4     Q    And, Ms. Moreno, you know you're a defendant in this

5     case, correct?

6     A    As the administratrix.

7     Q    Well, you're -- yes, you are the party that was

8     added by the Court.  You're familiar with that?

9     A    Yes.

10    Q    Okay.  And you had two children with Brian Hipple?

11    A    Correct.

12    Q    And -- but you were not married to him?

13    A    Correct.

14    Q    Okay.  And you and Brian and the children lived

15    together at 3761 Cold Spring Creamery Road in

16    Doylestown?

17    A    Correct.

18    Q    Okay.  And you lived there with Brian until

19    September, 2012?

20    A    Yes.  Yes.

21    Q    Okay.  Now, Brian ran the Steel Seal business, is

22    that how you knew of it, how you referred to the

23    business as the Steel Seal business?

24    A    Yes.

25    Q    Okay.  And when -- when did your relationship with

1    Brian Hipple begin?

2    A    I met him in college, so I -- I knew him for quite

3    some time, but our partnership -- I moved in with him in

4    2004.  So we were dating I guess starting in 2003.

5    Q    Okay.  And during that entire time, was it your

6    understanding that he was running the Steel Seal

7    business?

8    A    Correct.

9    Q    Okay.  Now, the mortgage for the Cold Spring

10   Creamery Road property, the primary mortgage was with

11   Sovereign Bank?

12   A    I believe so, yes.

13   Q    And there was a second mortgage with Quaint Oak

14   Bank?

15   A    Correct.

16   Q    Okay.  Now, you currently reside at 4250 Old Oak

17   Road, Doylestown?

18   A    4520 Old Oak Road.

19   Q    I'm sorry, I reversed the numbers.  Now, you bought

20   that house, I believe, just before your deposition, you

21   bought it on Friday, April 19th, 2013?

22   A    That sounds correct, yes.

23   Q    Okay.  And you paid for the house because you had

24   received a million dollars in proceeds from a life

25   insurance policy with Prudential?

Ms. Moreno - Direct                    114

```
1    A    Correct.

2    Q    Okay.  Did you, by the way, ever live at 278 Paine

3    Street?

4    A    No.

5    Q    Okay.  Thank you.  Now, you're familiar with SCIX

6    and the Steel Seal product?

7    A    Yes.

8    Q    Okay.  And you had heard the name SCIX?

9    A    Yes.

10   Q    Okay.  Did you get involved in the corporate names

11   and the like?  Do you have familiarity with that?

12   A    No.

13   Q    Okay.  Are you familiar with Brian's signature?

14   A    Yes.

15   Q    Okay.  I'd like you to look at in Volume I which

16   should be in front of you Exhibit 18.  Well, let's start

17   with Exhibit 18, the first page.  Do you see that?  It's

18   a Complete Group letter.  Do you recognize the signature

19   there?

20   A    Yeah, it looks like it's Clem's -- Clement's.

21   Q    Clement Hipple, the defendant in the case?

22   A    Right.

23   Q    Now, let's look at the next page.  Do you see that,

24   under SCIX?

25   A    Hm-hmm.
```

Ms. Moreno - Direct                    115

1    Q   Do you recognize that signature?

2    A   That looks like Brian's signature.

3    Q   Okay.  Thank you.  Now, I'd like you to go to

4    Exhibit 22, the same book, and let me help you, because

5    as I've heard, the pages are out of order.

6             MR. HIPPLE:  What page?

7             MR. BERKOWITZ:  Page 33 and 34.

8    BY MR. BERKOWITZ:

9    Q   I'd like you to look first at Exhibit 22, page 33.

10   Do you see the signature there?

11   A   Yes.

12   Q   And do you recognize that signature?

13   A   It looks like Brian's.

14   Q   And the date of the document?

15   A   12-9-11.

16   Q   Okay.  Now, let's look at page 34.  Do you see that

17   document?

18   A   Yes.

19   Q   Do you see the signature there?

20   A   Yes.

21   Q   Do you recognize that signature?

22   A   It looks like Brian's as well.

23   Q   Okay.  And the date?

24   A   12-9-11.

25   Q   Okay.  Thank you.  Now, let's look at page 34.  Do

Ms. Moreno - Direct                     116

1    you see that document?

2    A    Yes.

3    Q    Do you see the signature there?

4    A    Yes.

5    Q    Do you recognize that signature?

6    A    It looks like Brian's as well.

7    Q    Okay.  And the date?

8    A    12-9-11.

9    Q    Okay.  Now, you received money from SCIX, isn't that

10   correct?

11   A    Yes.

12   Q    Okay.  And I'm going to show you some checks.  We

13   had looked at these before I think at your deposition?

14   A    Right.

15   Q    I'm going to start with Exhibit 112 and I'm going to

16   get that for you.

17   A    Okay.  Thank you.  Can I close this one?

18   Q    You can close it.  We'll probably come back to it a

19   little later.  If we can see which one is which.  Okay.

20   This is Exhibit 112.  And are you familiar with -- it

21   isn't a document, it's a check from Wachovia Bank.  It

22   says SCIX, LLC, on it?

23   A    Yes.

24   Q    Okay.  And does that appear to be Brian Hipple's

25   signature?

1    A    Yes.  It looks like it's the signature stamp.

2    Q    The signature stamp, okay.  And it looks like the

3    check was endorsed.  Does that appear to be your

4    endorsement?

5    A    Yes.

6    Q    Okay.  And this is a $2,000 check you got on October

7    1st, 2009?

8    A    Correct.

9    Q    Okay.  Now, let's --

10             MR. BERKOWITZ:  And at the top of these pages,

11   Your Honor, by the way, there are check numbers and

12   there are page numbers.

13   BY MR. BERKOWITZ:

14   Q    This -- the first check is 7880, and then there's

15   7881.  And this appears to be the same date.  Do you see

16   that?

17   A    Yes.

18   Q    And this is now $2,500?

19   A    Correct.

20   Q    So on that date, you got $4,500 from SCIX?

21   A    Correct.

22   Q    All right.  And let's go to the next page, check

23   7916.  Do you see that, 11-2-2009?

24   A    Correct.

25   Q    Okay.  And that's another check for $2,500 from

1    SCIX?

2    A    Correct.

3    Q    Okay.  And let's go to check -- the next page --

4    7917, and to save some time, Ms. Moreno --

5    A    Hm-hmm.

6    Q    -- I would just ask if you look through these.

7    These appear to be all checks made payable to you at

8    different dates in different amounts, and I want you to

9    just go through up to check number 8129, which on the

10   top of the page, it says page 273 of 550.  Do you see

11   that?

12             MR. HIPPLE:  What was that number again, sir?

13             MR. BERKOWITZ:  It's check 8129.

14             MR. HIPPLE:  No, the top of the page.

15             MR. BERKOWITZ:  Page 273.

16   BY MR. BERKOWITZ:

17   Q    And you see that check payable to you --

18   A    Yes.

19   Q    -- for $500?

20   A    Correct.

21   Q    And you see in the memo --

22   A    Yes.

23   Q    -- it says mom's car repair.

24   A    Right.

25   Q    Whose car was that?

1    A    That probably refers to my mother's car.

2    Q    Okay.  So that was a check for the repair of your

3    mother's car?

4                 MR. HIPPLE:  Objection, Your Honor.

5                 THE COURT:  On what ground?

6                 MR. HIPPLE:  On the grounds that she don't

7    know for sure that that statement is correct.

8                 THE COURT:  All right.  Overruled.

9    BY MR. BERKOWITZ:

10   Q    All right.  And, again, I don't want to belabor

11   this, but if you would just look through and see if

12   there are -- these are all checks in Exhibit 112 payable

13   to you.  They all appear to be except until we get to

14   8280 to be typewritten.

15                 MR. HIPPLE:  What number?

16   BY MR. BERKOWITZ:

17   Q    And then on page 433 of 550, it's check number 8280.

18   A    Correct.

19   Q    Do you see that?  That's a check that looks like

20   it's handwritten.

21   A    Correct.

22   Q    Do you recognize the handwriting?

23   A    It looks to be Brian's.

24   Q    Okay.  And that's for $3,000?

25   A    Right.

Ms. Moreno - Direct                                    120

1    Q    Okay.  Ms. Moreno, I'm going to ask you to look, if

2    you could, in Volume I, Exhibit 24 --

3              MR. HIPPLE:  Your Honor, could he slow down a

4    little bit because I'm not --

5              THE COURT:  All right.  We'll make sure he

6    doesn't start until you get to the exhibit.  So we're

7    Volume I, Exhibit 24.

8              MR. BERKOWITZ:  Exhibit 24.

9              MR. HIPPLE:  34?

10             THE COURT:  24.

11             MR. BERKOWITZ:  24.

12             MR. HIPPLE:  I'd like to look at it before he

13   asks a question.

14             THE COURT:  Okay.

15             MR. BERKOWITZ:  Do you have it, Mr. Hipple?

16             MR. HIPPLE:  Yes, go ahead.

17   BY MR. BERKOWITZ:

18   Q    Do you recognize the handwriting?

19   A    It looks like Brian's handwriting.

20   Q    Sorry.

21   A    That's okay.

22   Q    Okay.  Have you had a chance to get through 112?

23   There's another handwritten check.  Do you see that,

24   8281?

25   A    Correct.

Ms. Moreno - Direct                         121

1      Q   And --

2                  MR. HIPPLE:  Wait, I -- I put that away.  Hold

3      on.

4                  THE COURT:  What number do you -- what number

5      do you --

6                  MR. HIPPLE:  What exhibit?

7                  MR. BERKOWITZ:  It's check number -- this is

8      Exhibit 112.

9                  THE COURT:  We're back -- okay.

10                 MR. BERKOWITZ:  Yes, this is the checks.

11                 MR. HIPPLE:  Hold on.

12                 MR. BERKOWITZ:  I just want to get through

13     these because there are a couple of handwritten --

14                 THE COURT:  Yes.  Which number?

15                 MR. BERKOWITZ:  It's check number 8281.  It's

16     almost at Exhibit 113.  It's --

17                 MR. HIPPLE:  Not there yet.  Okay.  Exhibit

18     112?

19                 MR. BERKOWITZ:  Eight --

20                 MR. HIPPLE:  No, exhibit number?

21                 MR. BERKOWITZ:  Exhibit 112.

22                 MR. HIPPLE:  Hold on.  Bear with me.

23                 THE COURT:  We were just on it a moment ago.

24                 MR. HIPPLE:  I know.  What booklet is it?

25                 MR. BERKOWITZ:  It's book four I believe.

Ms. Moreno - Direct                        122

1      Yes, it is.

2                  THE COURT:  Right.  And your check number

3      again, 82 --

4                  MR. BERKOWITZ:  8281.

5                  THE COURT:  -- 81.

6      BY MR. BERKOWITZ:

7      Q    Again, do you recognize the handwriting?

8                  MR. HIPPLE:  Hold on a second.  What's the

9      number at the top?

10                 MR. BERKOWITZ:  The page is 453 of 550.

11                 MR. HIPPLE:  453.

12                 THE COURT:  I'm not sure I have that one.

13                 MR. HIPPLE:  I'm out of order.  I don't have

14     it either.

15                 MR. BERKOWITZ:  Do you have it, Ms. Moreno?

16                 THE WITNESS:  Yes.

17                 THE COURT:  453?

18                 MR. HIPPLE:  I don't have it.  I see that.

19     Number 453.  I'm sorry.

20                 THE COURT:  Yes.  It's 475 --

21                 MR. BERKOWITZ:  It's check number 8281.

22                 THE COURT:  All right.  I have it.

23                 MR. HIPPLE:  Hold on.  No, I do not have a

24     copy.  I'm sorry.  I need a copy.

25                 THE COURT:  Well, wait -- wait -- Exhibit 112.

1                    MR. BERKOWITZ:  It's Exhibit 112.

2                    MR. HIPPLE:  Yeah, I'm right there.

3                    MR. BERKOWITZ:  Page 453 of 550 and it's check

4      number 8281.

5                    THE COURT:  I have it.  Thanks.

6                    (Pause in proceedings.)

7                    THE COURT:  Make sure you're in Exhibit 112

8      because the preceding at 111 is also checks.  Make sure

9      you're in 112.

10                   MR. HIPPLE:  I am, Your Honor.

11                   THE COURT:  Okay.

12                   (Pause in proceedings.)

13                   MR. BERKOWITZ:  There we go, right there.

14                   MR. HIPPLE:  All right.

15                   MR. BERKOWITZ:  See that.

16                   MR. HIPPLE:  Yes.

17     BY MR. BERKOWITZ:

18     Q   Ms. Moreno, check number 8281, do you recognize the

19     handwriting?

20     A   Yes.

21     Q   And whose handwriting is that?

22     A   It appears to be Brian's.

23     Q   Okay.  And the signature also appears to be Brian's?

24     A   Yes.

25     Q   Okay.  And the rest of the checks appear to be all

1    computer generated, payable to you?

2    A    Correct.

3    Q    And you received -- you regularly received money

4    from SCIX --

5    A    Correct.

6    Q    -- correct?

7    A    Yes.

8    Q    These were household expenses and things you had to

9    live on?

10   A    Correct.

11   Q    Okay.  Now, I'd like you to turn to Exhibit 115?

12   A    In the same book?

13   Q    Same book.  And do you see that?

14             MR. HIPPLE:  Hold on.  I'm there.

15             THE WITNESS:  Do I see what?  I'm sorry?

16             MR. BERKOWITZ:  You have to wait.

17             THE WITNESS:  Okay.

18             MR. HIPPLE:  I'm there.

19   BY MR. BERKOWITZ:

20   Q    Do you see those -- that's a check to Sovereign Bank

21   for $2,980.41?

22   A    Yes.

23   Q    And you told us before that Sovereign Bank held the

24   mortgage?

25   A    Correct.

Ms. Moreno - Direct                    125

1    Q   And there's a loan number.  Do you see that's

2    handwritten in?

3    A   Yes.

4    Q   Does that appear to be Brian's writing?

5    A   It does appear to be his writing.

6    Q   And does that look like the mortgage payment for

7    your house?

8    A   I would assume that it is.

9    Q   Okay.  And I'm going to represent to you that all of

10   the checks in this exhibit are payable to Sovereign Bank

11   and they are in that amount or an amount -- a couple

12   dollars more -- it looks like a late fee might have been

13   added in.  But if you'd like to satisfy yourself, I'd

14   like you to do that, but that all the checks in Exhibit

15   115 are to Sovereign Bank?

16   A   Yes.

17   Q   Okay.  Now, let's go to Exhibit 116, and that again

18   is a check -- this is check number 7889 from SCIX, LLC,

19   to Quaint Oak Bank, correct?

20   A   Correct.

21   Q   And you told us before that they had the second

22   mortgage on the property where you lived with Brian?

23   A   Correct.

24   Q   Okay.  And I'd like you to just go through and

25   verify that these are all checks to Quaint Oak Bank.

Ms. Moreno - Direct                    126

1    The first one is dated 10-14-09 and the last one is

2    dated 9-9-2010.

3    A    Yes.

4    Q    Okay.  And did -- first, let's go to 117 quickly.

5    Do you have that, 177, first page, check number 7894?

6    A    Yes.

7    Q    Do you see that to the U.S. Treasury?

8    A    Yes.

9    Q    And do you see a Social Security number at the

10   bottom?

11   A    Yes.

12   Q    And do you know whose Social Security number that

13   is?

14   A    In context of the check, I would assume that it's

15   Brian's.

16   Q    Okay.

17            MR. HIPPLE:  Your Honor, I object to her

18   assuming.

19            THE COURT:  All right.  I overrule the

20   objection.

21   BY MR. BERKOWITZ:

22   Q    And let's go to the next page, check 8087.  Do you

23   see that, payable to the Pennsylvania Department of

24   Revenue?

25   A    Yes.

1    Q   And it's payment for Brian Hipple?

2    A   Yes.

3    Q   Okay.  And if we go to check 8375, the next check,

4    to the U.S. Treasury, do you see that?

5    A   Yes.

6    Q   And you see on the bottom for Brian Hipple?

7    A   Yes.

8    Q   Okay.  And the next one is the Department of Revenue

9    for Brian Hipple?

10   A   Yes.

11   Q   And the next -- the last check in this exhibit from

12   Wachovia Bank is payment for Brian Hipple to the United

13   States Treasury --

14   A   Yes.

15   Q   -- check number 8086?

16   A   Yes.

17   Q   Did you or Brian drive a Honda?

18   A   I drove -- I drive a Honda, yes.

19   Q   Okay.  And do you recall whether payments for that

20   Honda were made from the company?

21   A   They could have been made from him or from myself.

22   Q   Okay.  Do you know who the leasing company was?  Was

23   it Martin Leasing?

24   A   I don't recall.

25   Q   Okay.  Would it have been American Honda Finance?

1    A    That sounds familiar, yes.

2    Q    Okay.  I'd like you to turn to Exhibit 119.  Did

3    Brian drive a Honda?

4    A    Not regularly, no.

5    Q    Okay.

6    A    I mean, he drove a Honda at times.

7    Q    Your Honda?

8    A    I'm not sure if -- honestly, I don't remember if it

9    was leased in my name or his name at the time.

10   Q    Okay.

11   A    I'm sorry.

12   Q    All right.  But that was the car you drove?

13   A    Right, but I --

14   Q    Okay.  It wasn't a business car.  It was for you to

15   use?

16   A    Right.

17   Q    Okay.  So all these checks in Exhibit 119 are paid

18   to American Honda Finance Corp. or Honda Financial

19   Services?  If you would just like to go through and --

20   and just satisfy yourself that that's what this exhibit

21   is?

22   A    Yes.

23   Q    Okay.  Ms. Moreno, if we could go to Exhibit 122,

24   same book.  Did Brian pay for a lot of things with

25   credit cards?

1     MR. HIPPLE:  Objection, Your Honor.

2     THE COURT:  Overruled.

3     THE WITNESS:  Yes, I would say.

4 BY MR. BERKOWITZ:

5 Q   Okay.  And if you see here, we have again checks to

6 credit card companies.

7     MR. BERKOWITZ:  And this will, Your Honor, be

8 explained as we go along.

9 BY MR. BERKOWITZ:

10 Q   Do you see that?  Do you see the first one is to

11 Chase Card Member Services?

12 A   Yes.

13 Q   Okay.  And if you go to check 8169, you see it says

14 Citi Cards?  That's page 316 of 550.

15 A   Yes.

16 Q   I don't think we have any other different banks

17 here.  I have many credit card banks and I can't keep

18 them straight either.  I just want to -- if you just

19 want to go through and make sure these are all credit

20 card payments.

21 A   Yes.

22 Q   Now, I'd like you to turn to Exhibit 123 and I would

23 like you to look at check 8191.

24 A   Yes.

25 Q   And that's to the Buckingham Friends School?

Ms. Moreno - Direct                      130

1    A    Yes.

2    Q    Is that yes?

3    A    Yes.  I'm sorry.

4    Q    Okay.  And could you tell me what that was for?

5    A    That's my son's school.

6    Q    Okay.

7    A    So --

8    Q    So these are tuition payments?

9    A    -- tuition, right, like a deposit to hold his space.

10   Q    Okay.  And if we go to the next page, check 8131, it

11        looks like another one?

12   A    Right.

13   Q    A small check?  And let's go to page 8275, same

14        Exhibit 123, it says National American Miss and it's got

15        on the memo Madison Moreno?  Is that your daughter?

16   A    Yes.  Sorry.

17   Q    Okay.  Now, at a certain point, did you stop

18        receiving money from SCIX?

19   A    Yes.

20   Q    And do you recall that you started then receiving

21        the same types of checks from a company called Steel

22        Seal Pro?

23   A    Yes.

24   Q    Okay.  And did you understand why that was

25        happening?

Ms. Moreno - Direct                    131

1    A    Yes.

2    Q    Okay.  What was your understanding?

3    A    That Brian was -- like, that -- when he was running

4    the business and it was his company, it was SCIX, but

5    then everything changed when all of the legal stuff

6    started happening, and he was still working doing the

7    Steel Seal but it was under Steel Seal Pro or he was

8    doing it through Steel Seal Pro.

9    Q    Okay.  And did you get checks signed by Brian, the

10   same type of checks, just for -- with a different check

11   now?

12              MR. HIPPLE:  Objection, Your Honor.  What --

13   what type of -- what checks is he speaking of?

14              THE COURT:  Overruled.

15              THE WITNESS:  Yes.

16   BY MR. BERKOWITZ:

17   Q    Okay.  That didn't change?

18   A    Correct.

19   Q    Okay.  Same types of payments?

20   A    Right.

21   Q    Okay.  And --

22   A    I mean, to me specifically you're saying?

23   Q    Yes.

24   A    Yeah.

25   Q    Okay.  And Brian still ran the business, though,

1   right, when the -- when the checks stopped coming from

2   SCIX and they started coming from Steel Seal Pro,

3   Brian's job didn't change?

4   A   My understanding is he was no longer the owner, but

5   that he was still doing the daily work, yes.

6   Q   Okay.  So it was your understanding he -- he no

7   longer owned Steel Seal Pro?

8   A   Right.

9   Q   Who did you think owned Steel Seal Pro?

10  A   At the time, I didn't know.  I mean, it was after he

11  passed that we found out that that was --

12  Q   Okay.  And do you recall which bank Steel Seal Pro

13  was doing business with?

14  A   Oh, there were a lot of banks.  I believe that was

15  The First National.

16  Q   The First National Bank of Newtown?

17  A   Yes.

18  Q   Okay.  And, in fact, didn't you open an estate

19  account at that bank?

20  A   Yes.

21  Q   And if you look at Exhibit 40 in binder one, I'm

22  just going to represent to you that that's your estate

23  account that you opened with The First National Bank.

24          MR. HIPPLE:  One moment.

25          THE WITNESS:  Is that this book?  Is that --

Ms. Moreno - Direct                              133

1              MR. BERKOWITZ:  Yes, it would be book one, tab

2     number 40.  So that would be book two, tab number 40.

3              MR. HIPPLE:  No, it's not book one.  Hold on.

4     Is that tab 40?

5              MR. BERKOWITZ:  40.

6     BY MR. BERKOWITZ:

7     Q   Do you see that?  I'm sorry.

8     A   Is that this?

9     Q   That's the wrong -- I'm sorry.

10    A   It's not this.

11    Q   You're not familiar with the fact that when you have

12    a different color binder --

13    A   It doesn't mean --

14    Q   -- it's a whole new different thing.  Let me take

15    that away.

16    A   Okay.

17    Q   This is Exhibit 40, and if you could just take a

18    look at that.

19    A   Okay.

20    Q   All right.  And you're familiar with that?

21    A   Yes.

22    Q   Okay.  And could you tell me what that is?

23    A   A bank statement from the estate account.

24    Q   Okay.  And that's what a bank statement from The

25    First National Bank of Newtown looks like?

Ms. Moreno - Direct                    134

1    A    Correct.

2    Q    Okay.  And it shows the activity that occurred

3    through the estate for payment of expenses and the like?

4    A    Correct.

5    Q    Okay.  Now, I'd like to go back -- and let's --

6    let's look at Exhibit 39, if you could go to the first

7    page.  Do you have that?

8    A    Checks, yes.

9    Q    Yes.

10   A    Yes.

11   Q    Do you see that?  And the page number on this

12   exhibit is 015?

13           MR. HIPPLE:  Hold on.

14           THE WITNESS:  Yes.

15           MR. HIPPLE:  Hold on.  Not there yet.

16   BY MR. BERKOWITZ:

17   Q    Do you see that?

18   A    Yes.

19   Q    Okay.  And if you look there, you see in the first

20   column there's a check to you for 2,500?

21   A    Correct.

22   Q    Okay.  And you go right next to it, there's another

23   one for 820?

24   A    Correct.

25           MR. HIPPLE:  Hold on.  I'm not at the right

Ms. Moreno - Direct                     135

1    page then.  You said 015?

2               MR. BERKOWITZ:  Exhibit 39.  It's the first

3    page.

4               MR. HIPPLE:  Oh, the first page of Exhibit 39?

5    Well, I'm on it, please.  Okay.  Page -- page one,

6    right, 007 -- 17?

7               THE COURT:  That's Exhibit 39, and the first

8    page has a number on the left-hand top, 000015.

9               MR. HIPPLE:  I don't have it.  I have --

10              MR. BERKOWITZ:  And it has the same number on

11   the bottom.

12              MR. HIPPLE:  -- I have 0017.

13              MR. BERKOWITZ:  I have no idea what might have

14   happened but that looks like 0015.

15              MR. HIPPLE:  Where?

16              MR. BERKOWITZ:  I'm sorry, I'm looking upside

17   down.  No, here it is.  It looks like somebody took it

18   apart.  I provided those books to your attorney many

19   months ago.

20              MR. HIPPLE:  0015, go ahead.

21   BY MR. BERKOWITZ:

22   Q   Okay.  So you see there are checks.  These are just

23   like the checks you received before --

24   A   Correct.

25   Q   -- when it was SCIX?  And now, you can see these are

1    coming from Steel Seal Pro?

2    A    Correct.

3    Q    And these also appear to be signed by Brian Hipple?

4    A    Correct.

5    Q    And if you look at the top right, you see Quaint Oak

6    Bank?

7    A    Yes.

8    Q    Okay.  And let's go to the next page.  It's 0016.

9    And you can see the second check on the left is to A&C

10   Building and Industrial Maintenance?

11   A    Yes.

12   Q    You see that?  And you know that -- do you know to

13   whom that money is paid?

14   A    I believe that that was a company of Clem's.

15   Q    Of?

16   A    Of Clement Hipple's.

17   Q    Clement Hipple's.  Okay.  And then you see two

18   checks to Brian?

19   A    Yes.

20   Q    Okay.  And I would like you to look at the -- on the

21   right, the last check on the right?

22   A    Yes.

23   Q    And if you could just read for us the memo.  Can you

24   make that out?

25   A    "SCIX, returning"?

Ms. Moreno - Direct                           137

1    Q    Retainer?

2    A    It could be.  That's --

3    Q    Okay.

4    A    Yeah, retainer.

5    Q    And it's made payable to Eastburn and Gray?

6    A    Correct.

7    Q    And you know they're a law firm in Doylestown?

8    A    Correct.

9    Q    And this is a Steel Seal Pro check?

10   A    Correct.

11   Q    Okay.  I would like you to go forward to page 00021,

12   and it's -- again, it's more checks.

13            MR. HIPPLE:  31?

14            MR. BERKOWITZ:  21.

15   BY MR. BERKOWITZ:

16   Q    Do you see -- have you been able to find the page

17   now?

18   A    Yes.

19   Q    Okay.  If you see the second check, U.S. Treasury,

20   2,500?

21   A    Correct.

22   Q    Okay.  And that's signed by Brian?

23   A    Yes.

24   Q    And if you go directly across the page, you see a

25   check to Brian, 137 for 3,500?

1    A    Correct.

2    Q    And then a check to you for 2,500?

3    A    Yes.

4    Q    And then you see a $1,000 check to Keystone Volvo?

5    A    Correct.

6    Q    Brian drove a Volvo, correct?

7    A    Yes.

8    Q    Okay.  And there's a -- the next check in the

9    sequence is a $9,000 check to you?

10   A    Correct.

11   Q    And then the next check is another check to Keystone

12   Volvo?

13   A    Correct.

14   Q    So the first one looks like a deposit, and the

15   second one looks like a payment of some kind?

16           MR. HIPPLE:  I object, Your Honor.

17   Speculation.

18           THE WITNESS:  Yeah, I wouldn't know.

19           THE COURT:  I'll overrule the objection.

20           (Pause in proceedings.)

21   BY MR. BERKOWITZ:

22   Q    I'm going to show you Exhibit 86.

23           MR. HIPPLE:  What book?

24           MR. BERKOWITZ:  Book number three.

25   BY MR. BERKOWITZ:

Ms. Moreno - Direct                          139

1    Q    I'm going to represent -- it's piling up.  I'm not

2         going to be able to see you anymore.

3    A    Right.  Okay.

4    Q    I'm going to represent to you that that's the

5         document that was reviewed previously in this trial --

6         you got it?  And do you see the date?  It says closing

7         date, 2-18-2011?

8              Do you see that?  It's at the top under that

9         block of writing.  Do you see that Scientific Chemical,

10        Clement R. Hipple?

11   A    Yes.  Okay.

12   Q    Okay?  With closing date, 2-18-11?

13   A    Yes.

14   Q    Okay.  Now, do you see -- I want you to go down

15        almost to the bottom of the page where it says Brian

16        Hipple?

17   A    Yes.

18   Q    Now, the last entry on the page, Regal Cinemas?

19   A    Yes.

20   Q    In Warrington?  Did you and Brian go to the movies?

21   A    Yes.

22   Q    And is that a theater that you went to?

23   A    Yes.

24   Q    Okay.

25              MR. HIPPLE:  What page are you on?

1          MR. BERKOWITZ:  I'm on page three of eight, in

2     Exhibit 86.

3          MR. HIPPLE:  Okay.

4     BY MR. BERKOWITZ:

5     Q    And go to the next page, four of eight.  You see the

6     second entry is Regal Cinemas?

7     A    Correct.

8     Q    Okay.  Same one?

9     A    Yes.

10    Q    Okay.  And then you go down about four or five

11    entries, NB Liebman?

12         Do you see that?

13    A    Yes.

14    Q    That's a furniture company, right?

15    A    I believe so.

16    Q    Yes.  Do you buy -- did you buy furniture there?

17    A    I honestly don't recall.

18    Q    Okay.  That's fine.

19    A    I don't know.

20    Q    Let's go down to 1-27-11.  Do you see that, Netflix?

21    A    Yes.

22    Q    Did you use Netflix?

23    A    Personally, I don't, but I believe we had it --

24    Q    Okay.

25    A    -- at the time, yeah.

Ms. Moreno - Direct                            141

1    Q    Okay.  And if you go down to the bottom of the page,

2    Gaylord National Reserve.  Do you see it says, lodging?

3    It looks like it's someplace in Maryland?

4              MR. HIPPLE:  I'm sorry, what number?

5              MR. BERKOWITZ:  It's the last entry on page

6    four of eight.

7              MR. HIPPLE:  Gaylord?  Oh, okay.

8              THE COURT:  Gaylord.

9              THE WITNESS:  I see it, yes.

10   BY MR. BERKOWITZ:

11   Q    Okay.  And let's go to the next page, five of eight?

12             MR. HIPPLE:  Your Honor, is he -- is he

13   verifying this information or is he just telling her

14   that information?

15             THE COURT:  Well, on that last one, you didn't

16   really ask a question.  You just pointed it out --

17             MR. HIPPLE:  Right.

18             THE COURT:  -- to her.  I don't know if you

19   wanted to ask her if she stayed there or --

20   BY MR. BERKOWITZ:

21   Q    I -- is that a place you recall staying?

22   A    No, it is not.

23   Q    Okay.

24             THE COURT:  Okay.

25             MR. HIPPLE:  Thank you, Your Honor.

Ms. Moreno - Direct                    142

```
1    BY MR. BERKOWITZ:

2    Q   Let's go to the next page, five of eight.

3            MR. HIPPLE:  Five of eight, okay.

4    BY MR. BERKOWITZ:

5    Q   And let's look down at 1-31-11, Pep Boys Store in

6    Warminster.

7    A   Okay.

8    Q   Someplace where you might shop or you know Brian

9    might shop?

10           MR. HIPPLE:  Objection, Your Honor.

11           THE COURT:  Yes.  I think you have to be more

12   specific.

13   BY MR. BERKOWITZ:

14   Q   Do you recall ever going to the Pep Boys Store there

15   or Brian going to the Pep Boys Store there?

16   A   I do not.

17           MR. HIPPLE:  Objection, Your Honor.  She could

18   have went to Pep Boys at any point in time in her life.

19           THE COURT:  No, I think she -- no, I think

20   he's being more specific.  He's asking whether she --

21           MR. HIPPLE:  On this date, did she go to the

22   Pep Boys Store would be the proper way of the question,

23   I think, Your Honor.

24           THE COURT:  All right.  Why don't you rephrase

25   it?
```

Ms. Moreno - Direct                     143

1    BY MR. BERKOWITZ:

2    Q   Did you or Brian, to the best of your knowledge,

3    ever go to the Pep Boys Store in Warminster, PA?

4    A   I did not.

5              MR. HIPPLE:  Objection, again, Your Honor.

6              THE COURT:  All right.

7              MR. HIPPLE:  He's not giving the date.

8              THE COURT:  I'll overrule the objection.  I'll

9    overrule the objection.  He can -- go ahead.  Do you

10   ever recall going to Pep Boys in Warminster?

11             THE WITNESS:  No.

12   BY MR. BERKOWITZ:

13   Q   Okay.

14   A   No.

15   Q   Let's go down to two -- that's February 2, 2011,

16   Borders Books.  Do you ever recall --

17             MR. HIPPLE:  I'm talking -- what?  Borders?

18   Okay.

19             (Pause in proceedings.)

20             THE COURT:  Do you have a question on that?

21   BY MR. BERKOWITZ:

22   Q   Do you recall ever going to Borders Books?

23   A   Yes, I have been to Borders Books.

24   Q   And the one in Warrington?

25   A   Yes.

Ms. Moreno - Direct                              144

1    Q    Okay.  And if you look at 2-4-11, again, Regal

2    Cinemas.  I think you testified about that already?

3    A    Correct.

4    Q    Now, let's go to page six of eight.

5              MR. BERKOWITZ:  And, Your Honor, I'm not going

6    to go through each of these American Express bills,

7    although we could.  I just want to go through a couple

8    of them.

9    BY MR. BERKOWITZ:

10   Q    You see the 2-4, and now, we're on page six of

11   eight?

12   A    Yes.

13   Q    Do you recall whether Brian used to buy things from

14   Amazon?

15   A    Yes.

16   Q    Okay.  And you see a charge on 2-8-11 for Amazon

17   Marketplace?

18   A    Yes.

19   Q    Okay.  And if you would go down to 2-8-11, you see

20   ProFlowers.com?

21   A    Yes.

22   Q    Do you ever recall getting flowers from ProFlowers?

23   A    Yes.

24   Q    Okay.  And 2-9-11, there's -- it says an event in

25   Jenkintown.  Do you ever recall attending an event -- I

1    know it's a long time ago, and it's not very specific.

2    A   I -- I do not -- right, I do not.

3    Q   Okay.  That's all right.  2-9-11, the next, there's

4    a Genuardi's Store in Doylestown?

5    A   There was.

6    Q   Yes.  Did you shop there?

7    A   Occasionally.

8    Q   Okay.  Let's go down to the next one, 2-9-11,

9    Domino's Pizza, Doylestown?

10   A   Yes.

11   Q   Did you ever get pizza from Domino's?

12   A   Sure, yes.

13   Q   Okay.  Look at the bottom of the page, 2-15-11.  It

14   looks like a pest control.  Do you ever recall using a

15   pest control company?

16   A   Yes.

17   Q   Okay.  And let's just go to seven of eight, and on

18   2-15-11, you see there's an E-ZPass?

19   A   Yes.

20   Q   Do you have E-ZPass in the car?

21   A   Yes, we did.

22   Q   Okay.  Thank you.

23            MR. HIPPLE:  Your Honor, I think we

24   established that Brian had used the American Express

25   card for his personal use.  Okay?  Can we move onto

1    something else?

2             MR. BERKOWITZ:  If -- if he is willing to

3    stipulate that Brian Hipple used --

4             MR. HIPPLE:  Yes, I am willing to stipulate --

5             MR. BERKOWITZ:  -- the --

6             MR. HIPPLE:  -- that Brian used his card for

7    personal use.

8             THE COURT:  His corporate card?

9             MR. HIPPLE:  The corporate card, yes.

10            MR. BERKOWITZ:  The corporate card.

11            THE COURT:  Right, right.  Okay.

12            MR. HIPPLE:  You could have just asked that

13   question up front.  It's undeniable.

14   BY MR. BERKOWITZ:

15   Q   Now, you recall Brian passed away on September the

16   30th, 2012?

17   A   Yes.

18   Q   Okay.  And you became the administrator of Brian's

19   estate?

20   A   Correct.

21   Q   Okay.  And so you, by default, I guess, or by virtue

22   of that position, had control of his assets?

23            MR. HIPPLE:  Your Honor, I would like a chance

24   to hear his question before she answers.  Okay?

25            THE COURT:  Sure.

1           MR. HIPPLE:  Okay.

2           THE COURT:  Well, are you having problems --

3           MR. HIPPLE:  So, Melissa, please don't --

4           THE COURT:  -- are you having problems hearing

5      him?

6           MR. HIPPLE:  No, but if she answers the

7      question too fast, I -- yes, I have to process it a

8      little bit.  Okay?

9           THE COURT:  All right.

10          MR. HIPPLE:  Give me a few seconds afterwards.

11     The question again, Mr. Berkowitz.

12          THE COURT:  Go ahead, Mr. Berkowitz.

13     BY MR. BERKOWITZ:

14     Q   You became the administrator of Brian's estate?

15     A   Yes.

16     Q   And by virtue of that position, you had control over

17     his assets and business interests?

18     A   I believe so.

19     Q   Okay.  And you testified before that he owned SCIX,

20     LLC?

21     A   Correct.

22     Q   And I think you said you found out, subsequently,

23     that he owned Steel Seal Pro?

24     A   Correct.

25     Q   And he also had an interest in the Muay Thai

Ms. Moreno - Direct                    148

1    business?

2    A    Correct.

3    Q    Okay.  And you are also familiar with the fact that

4    on November 8th, 2012, Teresa Hipple filed a claim

5    against Brian's estate --

6              MR. HIPPLE:  Objection, Your Honor.

7              THE COURT:  On what grounds?

8              MR. HIPPLE:  On the grounds that she is not

9    familiar with Brian's business.

10             THE COURT:  Well, that wasn't the question, so

11   I'll overrule the objection.

12   BY MR. BERKOWITZ:

13   Q    You're aware of the fact that Teresa Hipple filed a

14   claim against the estate for $460,000?

15   A    I am aware that there were legal filings going on,

16   yes.

17   Q    Okay.  And let me see if I can get the right exhibit

18   here.

19             MR. BERKOWITZ:  This is also in with the

20   defendants' exhibit book, but I would just like to show

21   her --

22             MR. HIPPLE:  What book?

23             MR. BERKOWITZ:  It's in the defendants'

24   exhibit book.  I don't know the number.

25             MR. HIPPLE:  What number --

1          MR. BERKOWITZ:  What I am going to show is a

2     copy of the claim.  It's a public filing, and it's --

3          MR. HIPPLE:  What book are you in?

4          MR. BERKOWITZ:  It's in defendants' exhibit

5     books.

6          MR. HIPPLE:  Okay.  So you don't happen to

7     know what book?

8          MR. BERKOWITZ:  It's -- it's not in my book as

9     an exhibit.

10          THE COURT:  He's looking for it.  He's trying

11     to find it.

12          (Pause in proceedings.)

13          MR. BERKOWITZ:  If you look, you have a list

14     of the defendants' exhibits.

15          MR. HIPPLE:  And what is it you're looking

16     for?

17          MR. BERKOWITZ:  I'm looking for the claim

18     against the estate of Brian Hipple.

19          (Pause in proceedings.)

20          MR. HIPPLE:  147?

21          MR. BERKOWITZ:  That's in my book.

22     BY MR. BERKOWITZ:

23     Q   It was also an exhibit, you'll recall, we looked at

24     that at your deposition, correct?

25     A   I --

1          THE COURT:  I think we looked at that during

2     the trial, too.

3          MR. BERKOWITZ:  Yes.  There was a claim filed.

4     BY MR. BERKOWITZ:

5     Q    You recall that Teresa Hipple -- you just maybe --

6     A    Yes.

7     Q    -- don't remember the amount?

8     A    Right.

9     Q    And all I want to do, I'm going to show you this

10    document.

11              (Pause in proceedings.)

12          THE COURT:  I have it.  It's D-40, Teresa

13    Hipple's notice of claim against the estate of Brian

14    Hipple.

15              Is that what you want?

16          MR. BERKOWITZ:  Yes, Your Honor.

17          THE COURT:  So it's D-40, Mr. Hipple.

18    BY MR. BERKOWITZ:

19    Q    And I would just like to help you.  You said you

20    couldn't remember the amount?

21    A    Correct.

22    Q    Take -- you see here, it's got an amount?

23    A    Okay, yes.

24    Q    Have you had your recollection refreshed?

25    A    Many of the documents I got at that time, I don't

Ms. Moreno - Direct                    151

1    have -- this was a very -- a very stressful time, but

2    yes --

3    Q   Sure.

4    A   -- I can say that, you know, I'm sure I received it

5    and took it to the estate attorney.

6    Q   Okay.  And it's -- it's filed?  It's stamped filed

7    in Orphan's Court?

8    A   Okay.  Yes.

9    Q   And that was Buck's County?

10   A   Right.

11   Q   Thank you.

12            MR. HIPPLE:  Your Honor, is he going to -- to

13   -- is this question in reference, because she's the head

14   of the estate --

15            THE COURT:  Yes.

16            MR. HIPPLE:  -- of Brian Hipple?  Okay.

17            THE COURT:  Yes, she's --

18            MR. HIPPLE:  So --

19            THE COURT:  -- she's the administrator or

20   administratrix of the estate.  So these are proper

21   questions.

22            MR. HIPPLE:  Okay.

23   BY MR. BERKOWITZ:

24   Q   And do recall that you were added as a party to this

25   lawsuit, on behalf of Brian, since --

1    A    My understanding is, the administratrix of the

2    estate, yes.

3    Q    Yes.  And now the complaint reads, "Teresa Hipple,

4    administrator of the estate of Brian Hipple."  You may

5    not have seen that.

6              THE COURT:  In that capacity.  You're -- in

7    that capacity, that's why you're a defendant.

8              THE WITNESS:  Okay.

9              THE COURT:  That's your understanding, right?

10             THE WITNESS:  Right.

11             THE COURT:  I think everyone agrees, not

12   individually, it's -- you're an administrator.

13             MR. HIPPLE:  The administrator.

14   BY MR. BERKOWITZ:

15   Q    And you chose not to defend this case, correct?

16   A    Correct.

17   Q    You allowed it to default?

18   A    Correct.

19   Q    Okay.  And you also allowed SCIX to default?

20   A    Correct.

21   Q    And did you know at the time, at least according to

22   the U.S. Patent Office, SCIX owned a patent?

23   A    No.

24   Q    Okay.  So you didn't know that?

25   A    I thought -- no, I did not.

1    Q    Okay.  And you also allowed Steel Seal Pro to

2    default?

3    A    Correct.

4    Q    Now --

5              MR. HIPPLE:  Objection.  She was not the

6    administrator of Steel Seal Pro.

7              Oh, yes, she was.  I'm sorry, Your Honor.

8    BY MR. BERKOWITZ:

9    Q    Now, if you look -- I think that this would be

10   Defendants' Exhibit 41.  It's -- I have it.

11             (Pause in proceedings.)

12   BY MR. BERKOWITZ:

13   Q    You completed an inventory of the estate of Brian

14   Hipple, correct?

15   A    My attorney did, the estate attorney.

16   Q    Do you recall that an inventory was filed with the

17   State?

18             THE COURT:  An inventory is a list of the

19   assets that were in the estate.  So when your husband --

20   when Mr. Brian Hipple died, there were certain assets

21   that were in this estate.

22             Do you remember there was a list that was

23   filed by your attorney?

24             THE WITNESS:  I -- I honestly don't.

25             THE COURT:  Well, maybe Mr. Berkowitz --

Ms. Moreno - Direct                    154

1              THE WITNESS:  I mean, I kind of remember

2     the --

3              THE COURT:  -- will show you.

4              MR. HIPPLE:  Where are you at?

5              THE WITNESS:  -- the tax -- it was, like, a

6     tax return?

7              MR. BERKOWITZ:  Again, I don't know where it

8     is in the --

9              THE WITNESS:  Okay.

10              THE COURT:  All right.

11              MR. BERKOWITZ:  -- defendants' exhibits.  It's

12     in my trial notebook.  I'm going to -- I'm going to show

13     her a copy of the inventory, Your Honor.

14              THE WITNESS:  Okay.

15              MR. HIPPLE:  Could you tell me what book

16     you're in?

17              MR. BERKOWITZ:  I'm in my -- it's not in their

18     books.  This is in my books.

19              THE COURT:  Do you have a number at all on it?

20              MR. BERKOWITZ:  I -- I don't, Your Honor,

21     because it was in the defendants' exhibits, I thought,

22     but I put them all in my book.

23              MR. HIPPLE:  May I at least see it first

24     before you show it to her?

25              MR. BERKOWITZ:  Absolutely.

Ms. Moreno - Direct                           155

1           THE COURT:  Is this the inventory of SCIX's

2      assets?

3           MR. BERKOWITZ:  No.

4           THE COURT:  Oh.

5           MR. BERKOWITZ:  This is the inventory of --

6           MR. HIPPLE:  I would like to see it, please?

7           MR. BERKOWITZ:  -- Brian Hipple's assets with

8      the --

9           THE COURT:  Okay.

10          MR. BERKOWITZ:  -- estate.

11          Let me show Mr. Hipple the document.

12          THE COURT:  Yes.  I don't see it in the

13     defense exhibits.

14          MR. BERKOWITZ:  I thought it was going to be

15     in the defendants' exhibits.  It is also -- in the

16     defense exhibits, they had listed Teresa Hipple's

17     deposition as an exhibit.  And the deposition has these

18     documents attached as exhibits to the deposition.  So I

19     didn't include them.

20          THE COURT:  Deposition of who, again?

21          MR. BERKOWITZ:  Of -- of Melissa Moreno.

22          THE COURT:  Oh, Melissa Moreno.  Yes, all

23     right.  That's D-35 -- D-35.

24          MR. BERKOWITZ:  Yes.  I'm not sure it's there.

25     I mean, I'm not sure the exhibits are there, but I have

1    the originals here.

2              THE COURT:  Yes.  It doesn't look like the

3    exhibits are attached to that deposition.

4              All right.  So we can just mark this or you

5    can mark it later, mark it -- give it a number, and then

6    we can -- you can make copies of it later.

7              MR. BERKOWITZ:  I have them right here, Your

8    Honor.

9              THE COURT:  Okay.

10             MR. BERKOWITZ:  Here's the original

11   exhibits --

12             THE COURT:  Oh, okay.

13             MR. BERKOWITZ:  -- as part of the deposition.

14             THE COURT:  Right.  Okay.

15             Do you have that, Mr. Hipple?

16             MR. HIPPLE:  I have this document here, yes.

17             THE COURT:  Okay.  So go ahead.

18             MR. BERKOWITZ:  I -- I need the book.

19             MR. HIPPLE:  Okay.  But I -- I object to the

20   information that the -- at line seven on this document.

21             THE COURT:  What's line seven?

22             MR. BERKOWITZ:  Here you go.

23             MR. HIPPLE:  It says, Cold -- well, first of

24   all, I'm wrong as to that, but that, "Cold Spring

25   Creamery Road, Doylestown, $418,000."

Ms. Moreno - Direct                    157

1          That's part of the estate.

2               THE COURT:  All right.  Well, let's -- let's

3     let Mr. Berkowitz proceed with this, and then you can

4     object, if he asks about it.  Okay?  We're kind of

5     getting ahead of ourselves here.  Let's see what -- what

6     -- he may not -- he may not even ask about it.  I don't

7     know what he's going to ask about.

8     BY MR. BERKOWITZ:

9     Q   I'm going to show you --

10              MR. HIPPLE:  I was just saying the document is

11    incorrect.

12              THE COURT:  All right.  Well, he's going to

13    show it to her.

14    BY MR. BERKOWITZ:

15    Q   I'm going to show you --

16              MR. BERKOWITZ:  Your Honor, this is

17    the document that I'm going to want to admit into

18    evidence --

19              THE COURT:  Yes.  All right.

20              MR. BERKOWITZ:  -- just so we have it as --

21    this is Exhibit 5 to Ms. Moreno's deposition.

22              THE COURT:  Okay.  You can give a number to it

23    later on.

24              MR. BERKOWITZ:  Okay.

25    BY MR. BERKOWITZ:

1    Q   And I would like you, Ms. Moreno, to look at these

2    documents.

3    A   Yes.

4           (Pause in proceedings.)

5           MR. BERKOWITZ:  And -- can I --

6           THE COURT:  Yes.

7    BY MR. BERKOWITZ:

8    Q   Ms. Moreno, do you see the document that has a tab

9    on the bottom, Exhibit 5, from your deposition that we

10   took?

11   A   Yes.

12   Q   Okay.

13   A   I mean, this right here?

14   Q   Yes.

15   A   Yes.

16   Q   You're pointing to the exhibit tab?

17   A   Yes.  Okay.

18   Q   Okay.  And it says at the top of this, Donald

19   Petrille, Jr., Register of Wills at Bucks County,

20   Pennsylvania, Inventory.  Do you see that?

21   A   Yes.

22   Q   And do you see -- you can look down the side, on

23   the top, and it shows that it was filed, although you

24   can't --

25           MR. HIPPLE:  Can I have the --

Ms. Moreno - Direct                    159

```
 1              THE COURT:  Sure.
 2       BY MR. BERKOWITZ:
 3       Q   -- you can't really read the numbers well -- that
 4       well?
 5              THE COURT:  Mr. Hipple is going to look at it
 6       with you.
 7              MR. BERKOWITZ:  Sure.
 8       BY MR. BERKOWITZ:
 9       Q   And do you see the signature line?
10       A   Yes.
11       Q   And it says, in typed face, Melissa J. Moreno, and
12       there's a signature?
13       A   Yes.
14       Q   Okay.  And that is your signature?
15       A   Correct.
16       Q   And Peter Thompson is your lawyer?
17       A   Correct.
18       Q   Okay.  Now, let's look at the inventory, which is at
19       the bottom of the page.  Do you see that?
20       A   Yes.
21       Q   Okay.  And it lists Wells Fargo Bank, three --
22       $3,300.  And it says -- what it says, here, there is a
23       U.S. tax refund, and there is a commission payment of
24       $9,234 from the Muay Thai Gym?
25       A   Correct.
```

1    Q    Okay.  Miscellaneous tangible property?

2    A    Right.

3    Q    And the residence in Doylestown?

4    A    Correct.

5    Q    The -- the Cold Spring Creamery Road?

6    A    Yes.

7    Q    Now, and it's totaled up, correct?

8    A    Correct.

9    Q    And there are no other entries on this?

10   A    Correct.

11   Q    And --

12              MR. HIPPLE:  I object to the total.

13              MR. BERKOWITZ:  Okay.

14              THE COURT:  Well, it was filed of record.  I

15   mean, the fact that you object to the total -- that's

16   what was filed of record, right, so I'm going to

17   overrule the objection.

18              Go ahead, Mr. Berkowitz.

19   BY MR. BERKOWITZ:

20   Q    Ms. Moreno, there is no entry in this inventory of

21   SCIX, correct, Brian's company?

22   A    Correct.

23   Q    Okay.  And there is no entry for Steel Seal Pro, as

24   an asset of the estate?

25   A    Correct.

Ms. Moreno - Direct                    161

```
 1    Q   And as of the date Brian died, the last bank record
 2    we have shows that on 9-28-2012, there was $147,692.43
 3    in the Steel Seal Pro bank account with First National
 4    Bank?
 5    A   Yes.
 6    Q   Okay.  And --
 7               MR. HIPPLE:  When you say yes, you --
 8               MR. BERKOWITZ:  I'm -- I'm --
 9               THE COURT:  You can't --
10               MR. HIPPLE:  Okay.  I'm sorry.  Go ahead.
11               THE COURT:  You'll have a turn to ask her
12    questions.
13    BY MR. BERKOWITZ:
14    Q   And you know that money continued to come in to the
15    Steel Seal Pro bank account, didn't you?
16    A   Yes.
17    Q   Okay.  And did you know that Mr. Hipple, Clement
18    Hipple, had taken $40,000 out of that account after
19    Brian's death?
20    A   No.  I --
21    Q   Okay.  And you didn't list Steel Seal Pro which was
22    owned by Brian as an asset?  It's not on the list?
23    A   Right.
24    Q   Okay.  Let me see if I can clear up a couple of
25    those books so we can get through this.  I'm almost
```

1    done.

2              MR. BERKOWITZ:  Your Honor, can we have a copy

3      of this made --

4              THE COURT:  Sure.  Yes.

5              MR. BERKOWITZ:  -- so that I can keep the

6      deposition --

7              THE COURT:  Well, can we do it after we're

8      finished here?

9              MR. BERKOWITZ:  Oh, yes.  Sure.

10             THE COURT:  Yes.  I'll make one for Mr.

11     Hipple, too.

12             MR. BERKOWITZ:  I think that would be

13     Plaintiff's Exhibit 202 --

14             THE COURT:  Okay.

15             MR. BERKOWITZ:  -- I think.

16             THE COURT:  That's the inventory, right?

17             MR. BERKOWITZ:  Correct.

18             THE COURT:  Right.

19             MR. BERKOWITZ:  If we don't keep it neat,

20     everything gets lost.  All right.  Let's see if we can

21     find Volume II.  Yes, this is the one, just hold on to

22     this for a second.

23             THE WITNESS:  Sure.

24             MR. BERKOWITZ:  I'm going to take this one out

25     of your way and take this one out of your way.

Ms. Moreno - Direct                    163

1    BY MR. BERKOWITZ:

2    Q    And I would like you to turn in Volume I to Exhibit

3    -- I'm sorry -- this is Volume II, Number 54.  I'm

4    sorry, Number 51.  Have you found that?  Do you see

5    that?

6    A    I didn't -- should it be --

7    Q    Do you see that document --

8              THE COURT:  We're in Defendants' --

9              MR. BERKOWITZ:  Plaintiff's --

10             THE COURT:  Plaintiff's --

11             MR. BERKOWITZ:  -- Plaintiff's Exhibit 51.

12             THE COURT:   Thank you.

13             MR. BERKOWITZ:  We have seen this before.

14   This is the complaint that Complete Group filed against

15   Steel Seal Pro, Plaintiff's Exhibit -- I'm sorry, 50 --

16   no, 51.  I had the same problem last time.

17             MR. HIPPLE:  What was your question?

18   BY MR. BERKOWITZ:

19   Q    Do you see the complaint?

20   A    Yes.

21   Q    And do you remember -- you were served with this

22   lawsuit on December 5th, 2012?

23   A    If that -- I don't remember the exact date, but yes.

24   Q    Okay.  But you remember being served?

25   A    I was served a lot at that time, so, yes.

1    Q    Okay.  You were served by a sheriff?

2    A    Right.

3    Q    Okay.  And if we could -- I don't want you to look

4    at --

5              MR. BERKOWITZ:  We saw, Your Honor, in

6    previous testimony Document 52 as the certified docket

7    of the Court --

8              THE COURT:  Right.

9              MR. BERKOWITZ:  -- which shows the service on

10   Ms. Moreno.

11   BY MR. BERKOWITZ:

12   Q    Now, you didn't respond to the lawsuit, did you?

13   A    Right.

14   Q    Even though there was -- it became over $200,000 in

15   the account, correct?

16   A    Correct.

17   Q    So you knew there was a lot of money there?

18   A    Yes.

19   Q    Okay.  You knew it was -- at a certain point, you

20   knew it was Brian's company?

21   A    Yes.

22   Q    Okay.  And you also knew, if you look at this

23   lawsuit, I think you told us that this was Clement

24   Hipple's company suing Brian's company?

25   A    Yes.

Ms. Moreno - Direct                    165

1    Q    Okay.  And you knew that as a result of a default,

2    the money in the account could go to Mr. Hipple?

3    A    I wouldn't say that I knew that, no.

4    Q    Okay.  But you didn't -- you allowed -- you didn't

5    answer it?

6    A    Correct.

7    Q    Okay.  And you had an attorney, Mr. Thompson?

8    A    Correct.

9    Q    Okay.  And after the default took place, do you

10   recall that you were called to Mr. Shavel's office in

11   February of 2013 to pick up money for Complete Group?

12   A    Correct.

13   Q    Okay.  And you knew it was the Steel Seal money?

14   A    Yes.

15   Q    Okay.  And it was a check that you picked up for

16   almost $198,000?

17   A    I don't remember the amount, but I picked up the

18   check for it, yes.

19   Q    Okay.  And you deposited that money into Clement

20   Hipple's bank account?

21   A    Correct.

22   Q    Okay.  And on March 29th, Clement Hipple provided to

23   you $5,000.  Do you recall that?

24   A    I don't know the exact date.

25   Q    But you did get the 5,000.  You don't recall the

1    date?

2    A    Correct.

3    Q    Okay.

4              MR. BERKOWITZ:  I have no further questions,

5    Your Honor.

6              THE COURT:  Okay.

7              MR. BERKOWITZ:  This is where I would move my

8    exhibits, but I --

9              THE COURT:  Well, you've got to wait --

10             MR. BERKOWITZ:  -- I guess I'll allow him to

11   cross-examine.

12             THE COURT:  Let him cross-examine first, yes.

13             MR. HIPPLE:  I have a great blunder.  I have

14   lost the questions for Melissa from my attorney, okay?

15   So I'll limit it to what I can ask her.  For some

16   reason, it's not available, right?

17                     CROSS-EXAMINATION

18   BY MR. HIPPLE:

19   Q    Okay.  During the time of SCIX, okay, that Brian

20   owned SCIX, all right, did you -- did you ever see me

21   with any involvement with SCIX?

22   A    No.

23   Q    All right.  Did you see me used to pick up the

24   supplies for SCIX in the truck, the cases --

25   A    Right.

Ms. Moreno - Cross                    167

1   Q   -- I would go and pick up cases and deliver them?

2   A   Maybe once or -- like when you were in town, you

3   would help with that, yes.

4   Q   Okay.  Right.  Only when I was in town --

5   A   Right.

6   Q   -- because I lived in Columbia, correct?

7   A   Or Arizona.

8   Q   Okay.  But to your knowledge, you never saw me make

9   any decisions or do anything as far as Brian's company

10  was concerned?

11  A   Correct.

12  Q   Okay.  All right.  Now, during the time SCIX was in

13  business, did you not pack boxes, answer phones, print

14  labels, okay?

15  A   Yes.

16  Q   All right.  So basically you were part of the

17  business with Brian, is that correct?

18  A   Right.

19  Q   And you received compensation for that, correct?

20  A   Correct.

21  Q   Okay.  All right.  In reference to Brian's credit

22  cards, right, do you know what he actually used?  I'm

23  talking about his individual credit cards that he had

24  himself, okay?  Do you know at this point in time what

25  the uses of those credit cards were for?  Could they

1    have been business, could they have been personal, could

2    they have been --

3    A    Right, they would have -- could have been either.

4    Q    Anything, right?

5    A    Correct.

6    Q    You didn't have no knowledge of what those credit

7    cards were used for?

8    A    Correct.

9    Q    Okay.  Okay.  Steel Seal Pro, right, basically, you

10   knew that was developed, okay, right, Steel Seal Pro?

11   A    Correct.

12   Q    During the -- the lawsuit period?  Okay.  From SCIX

13   to Steel Seal Pro, correct?

14   A    Right.  I didn't know much about Steel Seal Pro

15   until after he passed, so --

16   Q    Okay.

17   A    -- other than it was the -- the bank account name

18   changed.

19   Q    Right.  So you didn't know that he actually owned

20   Steel Seal Pro?

21   A    Right.

22   Q    Okay.  All right.  As far as the lawsuit against

23   you, okay, you had an attorney basically, right?

24   A    Yes.

25   Q    Peter Thompson, okay.  And he advised you on

Ms. Moreno - Cross                      169

1    everything you did, is that correct?

2    A    Correct.

3    Q    And you took his advice?

4    A    Correct.

5    Q    Right.  As -- as far as -- did he also advise you

6    not to fight the lawsuit?

7    A    Correct.

8    Q    Okay.  So that wasn't your decision.  It was Peter

9    Thompson's decision?

10              MR. BERKOWITZ:  Objection.

11              MR. HIPPLE:  Objection --

12              THE COURT:  I'll overrule the objection.

13              MR. BERKOWITZ:  Anything like that --

14              THE COURT:  I know he's leading him, but go

15   ahead.

16              MR. HIPPLE:  Rephrase it?

17              THE COURT:  No, you can go ahead.  You can

18   answer it.

19   BY MR. HIPPLE:

20   Q    Basically, your attorney advised you on what to do?

21   A    Correct.

22   Q    Okay.  All right.  Now, let's go into the -- the

23   conversation with Mike Shaffer (sic).  I believe you

24   called Mike Shaffer or you called his law firm after I

25   had called you?

Ms. Moreno - Cross                          170

1     A    Yes.

2     Q    Okay.

3               THE COURT:  Shaffer or Shavel?

4               MR. HIPPLE:  I think Shaffer.  Shaffer --

5               MR. BERKOWITZ:  It's Shavel.

6               MR. HIPPLE:  -- Shavel.  Okay.  Again, it

7     comes back to that other problem, okay?

8     BY MR. HIPPLE:

9     Q    Okay.  I called you, right, correct, from Columbia?

10    A    Correct.

11    Q    All right.  And I asked you if you could do

12    something for me, correct?

13    A    Correct.

14    Q    And what was that I asked you to do?

15    A    To pick up the check for you and deposit it in the

16    bank account.

17    Q    Right.  Okay.  Do you know why I asked you to do it?

18    A    Because you trusted me.

19    Q    Okay.  All right.

20    A    And I would have done the same had Teresa called me.

21    Q    Right.  Okay.  Is it true that I give you $5,000 a

22    month?

23    A    Yes.

24    Q    Okay.  So that 5,000 payment he was talking about is

25    the 5,000 I give you after Brian passed away, is that

1    correct?

2    A    Correct.

3    Q    Okay.  Fine.  It wasn't a $5,000 bribe --

4    A    No.

5    Q    -- for you to pick up the check and take to the

6    bank, right?

7    A    No.

8    Q    Okay.  Okay.

9              MR. HIPPLE:  No further questions, Your Honor.

10                   REDIRECT EXAMINATION

11   BY MR. BERKOWITZ:

12   Q    Did Mr. Hipple refer you to or recommend Mr.

13   Thompson as an attorney for the estate?

14   A    No.

15   Q    Okay.

16             MR. BERKOWITZ:  No further questions, Your

17   Honor.

18             THE COURT:  Anything else, Mr. Hipple?

19             MR. HIPPLE:  Not -- no, I'm done with her.

20             THE COURT:  Okay.  Ms. Moreno, thank you.

21   You're excused.

22             THE WITNESS:  Thank you.  I don't have to

23   clean up the books or anything.

24             MR. HIPPLE:  That was easy.  I lost the

25   questions.  There was probably 30 questions -- 35

1    questions, so it made it real simple.

2                 (Witness excused.)

3                 THE COURT:  Okay.  So I understand the

4    plaintiff is resting subject to the admission of these

5    exhibits, right?

6                 MR. BERKOWITZ:  Correct, Your Honor.

7                 THE COURT:  Okay.  Do you want to go over

8    them?  So what we're going to do now, Mr. Hipple, is Mr.

9    Berkowitz is moving into evidence the various exhibits

10   that were identified throughout the trial --

11                MR. HIPPLE:  Right.

12                THE COURT:  -- okay?  So he's going to read

13   them out, read the numbers out, and then you have an

14   opportunity to object and then if there's no -- if

15   there's no objection, they're going to be admitted into

16   evidence.  If there's an objection, I'll have to rule on

17   it.

18                MR. HIPPLE:  Okay.  How do we -- how do we

19   start this, through the books?  Book one?

20                THE COURT:  Well, what -- we'll start

21   sequentially, I hope?

22                MR. BERKOWITZ:  Yes.

23                THE COURT:  Good.

24                MR. BERKOWITZ:  You should have an exhibit

25   list.  I've provided an exhibit list to everybody and I

1    probably have more copies.

2              MR. HIPPLE:  Okay.  I'm going to try to follow

3    it through the book instead of the list, Your Honor.

4              THE COURT:  Okay.

5              MR. HIPPLE:  It would be easier for me to

6    understand.

7              THE COURT:  I have the exhibit list.

8              MS. MORENO:  May I be excused, Your Honor?

9              MR. BERKOWITZ:  Yes, you're free to leave.

10             MR. HIPPLE:  Yes, you're free to leave.

11             (Pause in proceedings.)

12             MR. BERKOWITZ:  You have -- you have the list,

13   Your Honor?

14             THE COURT:  Pardon me?

15             MR. BERKOWITZ:  You have the list?

16             THE COURT:  I do have the list, yes.

17             MR. BERKOWITZ:  Okay.  I'm going to go right

18   now --

19             MR. HIPPLE:  And we're going to do this kind

20   of in the -- so I can follow it, please.

21             MR. BERKOWITZ:  My intention is to move for

22   the admission of every exhibit that was presented into

23   evidence --

24             THE COURT:  Okay.

25             MR. BERKOWITZ:  -- and discussed.

```
1                    THE COURT:  Right.
2                    MR. BERKOWITZ:  And to include documents that
3       Mr. Shavel would have used, they mainly constitute
4       public records, but to the extent that there's something
5       that isn't a public record -- I don't even know if there
6       are any --
7                    THE COURT:  Right.  There may not be.
8                    MR. BERKOWITZ:  Yes.
9                    THE COURT:  Right.
10                   MR. BERKOWITZ:  I will start with Plaintiff's
11      Exhibit 1, the accident photos.
12                   THE COURT:  Any objection?
13                   MR. HIPPLE:  Yes, I object.  There are no
14      bearing on the case, Your Honor.
15                   THE COURT:  All right.  I'll overrule the
16      objection.  Admitted.
17                   (Plaintiff's Exhibit Number 1, Teresa Hipple
18      accident photos, is admitted into evidence.)
19                   MR. HIPPLE:  You overrule.  That means no,
20      right?
21                   THE COURT:  Yes.  I'm going to admit it.  I'll
22      say admitted.
23                   MR. HIPPLE:  Okay.
24                   MR. BERKOWITZ:  Exhibit Number 2 --
25                   THE COURT:  But if I -- let me stop you.  I'm
```

1    sorry, Mr. Berkowitz.  So, Mr. Hipple, if I don't hear

2    you object, they're going to be admitted.  So after we

3    go through each one of these, if you object, say object,

4    okay?

5              MR. HIPPLE:  Okay.

6              THE COURT:  So go ahead, Number 2 is the

7    judgment --

8              MR. BERKOWITZ:  Number 2, SCIX $250,000

9    judgment note.  Exhibit 3, SCIX --

10             THE COURT:  That's admitted.  3.

11             (Plaintiff's Exhibit Number 2, SCIX $250,000

12   judgment note, is admitted into evidence.)

13             MR. BERKOWITZ:  $100,000 judgment note.

14             THE COURT:  Admitted.

15             (Plaintiff's Exhibit Number 3, SCIX $100,000

16   judgment note, is admitted into evidence.)

17             MR. BERKOWITZ:  4, Bucks County docket for

18   Case 972.

19             THE COURT:  Admitted.

20             (Plaintiff's Exhibit Number 4, Bucks County

21   docket for Case 972, is admitted into evidence.)

22             MR. BERKOWITZ:  5, Bucks County docket, Case

23   974.

24             THE COURT:  Admitted.

25             (Plaintiff's Exhibit Number 5, Bucks County

1    docket for Case 974, is admitted into evidence.)

2              MR. BERKOWITZ:  Exhibit 6, Teresa --

3              MR. HIPPLE:  One moment.  I want to check it,

4    okay?  No, go ahead.

5              MR. BERKOWITZ:  Exhibit 6, the SCIX accounting

6    record.

7              MR. HIPPLE:  I object to this record, Your

8    Honor, because he has another record similar to this.

9              THE COURT:  I'll admit it.

10             (Plaintiff's Exhibit Number 6, SCIX accounting

11   record, is admitted into evidence.)

12             MR. BERKOWITZ:  Number 8, the October 5

13   promissory note from SCIX to Clement Hipple.

14             THE COURT:  You're skipping 7 then?

15             MR. BERKOWITZ:  Yes.  7 is out.  I did not use

16   that.

17             THE COURT:  Okay.  8.

18             MR. BERKOWITZ:  8 is the October 5 promissory

19   note, SCIX to Clement Hipple.

20             THE COURT:  Admitted.

21             (Plaintiff's Exhibit Number 8, October 5

22   promissory note from SCIX to Clement Hipple, is admitted

23   into evidence.)

24             MR. BERKOWITZ:  9, Clement Hipple loan, the

25   SCIX accounting record.

1           THE COURT:  Admitted.

2           (Plaintiff's Exhibit Number 9, SCIX accounting

3       record of the Clement Hipple loan, is admitted into

4       evidence.)

5           MR. BERKOWITZ:  10, the security agreement,

6       that is, the UCC-1 -- oh, I'm sorry.

7           MR. HIPPLE:  I'm sorry.

8           MR. BERKOWITZ:  No, that's the security

9       agreement.

10          MR. HIPPLE:  Agreement, right.

11          THE COURT:  Admitted.

12          (Plaintiff's Exhibit Number 10, security

13      agreement, is admitted into evidence.)

14          MR. BERKOWITZ:  11 is the UCC-1 financing

15      statement.

16          THE COURT:  Admitted.

17          (Plaintiff's Exhibit Number 11, UCC-1

18      financing statement, is admitted into evidence.)

19          MR. BERKOWITZ:  October 8, 2010 demand letter.

20          THE COURT:  Number 12 you mean, right?

21          MR. BERKOWITZ:  I'm sorry, Number 12.

22          THE COURT:  Admitted.

23          (Plaintiff's Exhibit Number 12, October 8,

24      2010 demand letter, is admitted into evidence.)

25          MR. BERKOWITZ:  Number 13, the October 13th

1      demand to repossess the collateral and Brian Hipple's

2      consent.

3                THE COURT:  Admitted.

4                (Plaintiff's Exhibit Number 13, October 13th

5      demand and Brian Hipple's consent, is admitted into

6      evidence.)

7                MR. BERKOWITZ:  Number 14, the licensing

8      agreement with Steel Seal Pro --

9                THE COURT:  Admitted.

10               MR. BERKOWITZ:  -- only Steel Seal Pro.  The

11     other one is not a plaintiff exhibit.  I don't even

12     think it's a defendant exhibit anymore.

13               MR. HIPPLE:  Which other one are you talking

14     about?

15               MR. BERKOWITZ:  If you look on my --

16               THE COURT:  Well, I'm admitting 14.

17               (Plaintiff's Exhibit Number 14, licensing

18     agreement with Steel Seal Pro, is admitted into

19     evidence.)

20               MR. HIPPLE:  Admitting 14, right.

21               MR. BERKOWITZ:  Number 15, October 29th

22     purchase agreement, Clement Hipple and Complete Group.

23               THE COURT:  Admitted.

24               (Plaintiff's Exhibit Number 15, October 29th

25     purchase agreement, Clement Hipple and Complete Group,

1        is admitted into evidence.)

2                    MR. BERKOWITZ:   16, October 18 Complete Group

3        certificate of formation.

4                    THE COURT:   Admitted.

5                    (Plaintiff's Exhibit Number 16, October 18

6        Complete Group certificate of formation, is admitted

7        into evidence.)

8                    MR. BERKOWITZ:   17, that's the assignment of

9        Clement Hipple's SCIX interest to Brian Hipple.

10                   THE COURT:   Admitted.

11                   (Plaintiff's Exhibit Number 17, assignment of

12       Clement Hipple, is admitted into evidence.)

13                   MR. BERKOWITZ:   Number 18 are the two letters

14       to Colonial Chemical.

15                   THE COURT:   Admitted.

16                   MR. HIPPLE:   I object --

17                   THE COURT:   Go ahead.

18                   MR. HIPPLE:   -- I object to the second letter

19       being admitted.

20                   THE COURT:   Why?

21                   MR. HIPPLE:   Well, Brian Hipple's not here and

22       nobody can prove this is a document from Brian Hipple.

23                   THE COURT:   I'll overrule the objection.   It's

24       admitted.

25                   (Plaintiff's Exhibit Number 18, two letters to

1    Colonial Chemical, is admitted into evidence.)

2              MR. BERKOWITZ:  Exhibit 19, Wachovia checks to

3    A&C.

4              THE COURT:  Admitted.

5              (Plaintiff's Exhibit Number 19, Wachovia Bank

6    checks to A&C, is admitted into evidence.)

7              MR. BERKOWITZ:  Exhibit 20, I believe are SCIX

8    loan repayments to Clement Hipple.  I believe those are

9    Wachovia checks but I'm not positive of that, Your

10   Honor.

11             MR. HIPPLE:  All right.  20 is fine.

12             THE COURT:  Admitted -- admitted.

13             (Plaintiff's Exhibit Number 20, SCIX loan

14   repayments to Clement Hipple, is admitted into

15   evidence.)

16             MR. BERKOWITZ:  Number 21 are the Colonial

17   Chemical invoices.

18             THE COURT:  Admitted.

19             (Plaintiff's Exhibit Number 21, Colonial

20   Chemical invoices, is admitted into evidence.)

21             MR. BERKOWITZ:  Number 22 --

22             MR. HIPPLE:  Hold on.  Okay.  Go ahead.  Go

23   ahead, yes.

24             THE COURT:  Go ahead.

25             MR. BERKOWITZ:  Number 22 is the Colonial

1      Chemical communications.

2                 THE COURT:  Admitted.

3                 (Plaintiff's Exhibit Number 22, Colonial

4      Chemical communications, is admitted into evidence.)

5                 MR. BERKOWITZ:  Number 23 is the U.S. Patent

6      Office recording of the judgment of Teresa Hipple, the

7      official document.

8                 THE COURT:  23 -- 23, right?

9                 MR. BERKOWITZ:  Yes.

10                 THE COURT:  Admitted.

11                 (Plaintiff's Exhibit Number 23, U.S. Patent

12      Office recording of judgment, is admitted into

13      evidence.)

14                 MR. BERKOWITZ:  24 are the SCIX responses to

15      interrogatories in aid of execution.

16                 THE COURT:  Admitted.

17                 (Plaintiff's Exhibit Number 24, SCIX responses

18      to interrogatories, is admitted into evidence.)

19                 MR. BERKOWITZ:  Number 25 is the affidavit of

20      Clement Hipple.

21                 THE COURT:  Admitted.

22                 (Plaintiff's Exhibit Number 25, affidavit of

23      Clement Hipple, is admitted into evidence.)

24                 MR. BERKOWITZ:  Number 26, 27, 28 and 29 and

25      30 are all the JC Consultant records.  Those are the

 1    notes --

 2              MR. HIPPLE:  Judgment notes.

 3              MR. BERKOWITZ:  -- and the Bucks County

 4    dockets showing the status on the docket.  Those are

 5    documents that I would have used with Mr. Shavel, and we

 6    discussed the fact that those documents require the

 7    filing of a complaint and confession of judgment.

 8              THE COURT:  Right.  Okay.  Any objection?

 9    They're admitted.

10              (Plaintiff's Exhibit Numbers 26 to 29, JC

11    Consultant records, is admitted into evidence.)

12              (Plaintiff's Exhibit Number 30, Bucks County

13    dockets, is admitted into evidence.)

14              MR. BERKOWITZ:  Exhibit 31, Mr. Geisser's

15    expert report.

16              THE COURT:  Admitted.

17              (Plaintiff's Exhibit Number 31, Mr. Geisser's

18    expert report, is admitted into evidence.)

19              MR. BERKOWITZ:  Number 32, the petition to

20    intervene in the Bucks County litigation.  Again, that

21    goes to Mr. Shavel.  That's the answer -- I'm sorry.

22              MR. HIPPLE:  Now, wait.  31 was the expert --

23    okay, the expert report.  And then 32 -- I'm not --

24    okay.

25              MR. BERKOWITZ:  Petition to intervene.

1          MR. HIPPLE:  Okay.

2          THE COURT:  Yes, typically people don't

3     introduce the reports, but I assume you're both going to

4     have the reports and that's fine.  It's a non-jury case.

5     Usually in a jury trial we don't get the reports, but --

6          MR. BERKOWITZ:  It was referred to extensively

7     also.

8          THE COURT:  Yes, that's right.  It's admitted.

9     And I'll admit Mr. Pederson's report.  I'm sure you

10    won't have an objection to that.

11         (Plaintiff's Exhibit Number 32, petition to

12    intervene, is admitted into evidence.)

13         MR. BERKOWITZ:  Exhibit 33 is the profit and

14    loss for BBB Management Group.

15         THE COURT:  Admitted.

16         (Plaintiff's Exhibit Number 33, profit and

17    loss for BBB Management Group, is admitted into

18    evidence.)

19         MR. BERKOWITZ:  34 is the profit and loss for

20    Complete Group.

21         THE COURT:  Admitted.

22         (Plaintiff's Exhibit Number 34, profit and

23    loss for Complete Group, is admitted into evidence.)

24         MR. BERKOWITZ:  35 is the letter from Hill

25    Wallack --

1           MR. HIPPLE:  Hold on.

2           MR. BERKOWITZ:  -- that would have -- that Mr.

3    Shavel would have testified to about the JC Consultant

4    execution.

5           MR. HIPPLE:  One minute, Your Honor, please.

6    I object to this because it has nothing to do with me.

7           THE COURT:  All right.  I'll admit it.  It's a

8    public record.  It's filed with the Prothonotary.  The

9    letter is filed with the Prothonotary, so -- you're

10   doing on relevance, but I find it is relevant.  You're

11   objecting on relevance grounds, but I find it is

12   relevant, so, all right, go ahead.

13          (Plaintiff's Exhibit Number 35, letter from

14   Hill Wallack, is admitted into evidence.)

15          MR. HIPPLE:  Okay.

16          MR. BERKOWITZ:  Number 36, the Steel Seal,

17   LLC, Master Card processing application.

18          MR. HIPPLE:  I object to that, Your Honor.  I

19   have never seen that document.

20          THE COURT:  What number again?  I'm sorry.

21          MR. BERKOWITZ:  Number 36.  Your Honor, that's

22   the document where Steel Seal applied for credit card

23   processing with Brian Hipple's name on it --

24          MR. HIPPLE:  I object to that document.

25          MR. BERKOWITZ:  -- submitted after Brian

1    Hipple's death, and it had all the information of Steel

2    Seal on Mr. Hipple's letter.

3                THE COURT:  The problem is that you showed

4    this to one witness, and I forget who it was --

5                MR. BERKOWITZ:  I showed it to Mr. Hipple.

6                MR. HIPPLE:  And I never --

7                THE COURT:  -- and Mr. Hipple said he never

8    saw it.

9                MR. HIPPLE:  -- I never saw it and I object to

10   it.

11               MR. BERKOWITZ:  Your Honor, on the letter that

12   Mr. Hipple identified as his and you'll see --

13               MR. HIPPLE:  No, that's not true.

14               MR. BERKOWITZ:  -- where we get to that, it

15   had on it the EIN number of Steel Seal, LLC --

16               MR. HIPPLE:  But anybody could have copied the

17   EIN number.

18               MR. BERKOWITZ:  -- and he testified that that

19   was his letter --

20               THE COURT:  Let him finish.

21               MR. BERKOWITZ:  -- and he was the only one

22   with that information and that appeared on the document

23   submitted after Brian's death.  It could not have come

24   from any other place.

25               MR. HIPPLE:  I object to it, Your Honor.  I

1   have never seen the document.  I never filled out the

2   document.  I don't -- I don't know how the document ever

3   took place.

4            THE COURT:  I'll sustain the objection.  I'm

5   not going to admit it.  You haven't authenticated it

6   properly in my view.

7            MR. HIPPLE:  That comes out?

8            THE COURT:  It comes out.  That number is 36,

9   right?

10           MR. BERKOWITZ:  I would take exception to

11   that, Your Honor.

12           THE COURT:  Yes.  Sure.  Okay.

13           MR. BERKOWITZ:  Exhibit 37 lists the --

14           MR. HIPPLE:  Hold on, hold on, hold --

15           MR. BERKOWITZ:  -- Clement Hipple's companies.

16           MR. HIPPLE:  Okay.  One minute now because I

17   got all these papers here.  Hold on.  Give me one

18   minute.  Where are you at now, 37?

19           MR. BERKOWITZ:  37.

20           MR. HIPPLE:  Hold on for a minute.  I think I

21   took out the number.  Just give me a little break here,

22   because this is my first time at this.

23              (Pause in proceedings.)

24           MR. HIPPLE:  Quickly looking through it.

25   Okay.

1              THE COURT:  Okay.  37 is admitted.

2              (Plaintiff's Exhibit Number 37, list of

3     Clement Hipple's companies, is admitted into evidence.)

4              MR. BERKOWITZ:  38, we saw that, that's the

5     website registration information for Steel Seal.

6              MR. HIPPLE:  I'm not sure about this

7     information, Your Honor, whether it's correct or

8     incorrect.

9              MR. BERKOWITZ:  Your Honor, it was the

10    defendants' exhibit produced to me.

11             MR. HIPPLE:  Oh, okay.

12             THE COURT:  All right.  No objection.  38 is

13    admitted.

14             MR. HIPPLE:  38.

15             (Plaintiff's Exhibit Number 38, website

16    registration information for Steel Seal, is admitted

17    into evidence.)

18             MR. BERKOWITZ:  39 --

19             MR. HIPPLE:  Hold on, hold on, hold on.  Okay.

20             MR. BERKOWITZ:  37 was in, I believe.

21             THE COURT:  Yes.  Right.  Yes.

22             MR. HIPPLE:  All right.  39.

23             MR. BERKOWITZ:  First National Bank records.

24             MR. HIPPLE:  And, Your Honor, these records --

25    give me a second.  I'm sorry.

1          THE COURT:  I'm smiling, not at you, just

2     because all this -- all my documents just fell on the

3     ground.  Go ahead.  What number are we on, 39?

4          MR. BERKOWITZ:  39.

5          THE COURT:  39.  All right.  Hold on.

6          MR. HIPPLE:  Again, these records are

7     basically -- have nothing to do with the lawsuit

8     presently, okay?  These have to do with Steel Seal Pro

9     and that is no longer attached to this lawsuit.  The

10    lawsuit is between just myself, okay, and these records

11    have nothing to do with me.

12         MR. BERKOWITZ:  Your Honor, a lot of the

13    records --

14         THE COURT:  I'll overrule the objection.

15    They're admitted.  That's 39, right?

16         MR. BERKOWITZ:  Correct.

17         (Plaintiff's Exhibit Number 39, First National

18    Bank records of Steel Seal Pro, is admitted into

19    evidence.)

20         MR. BERKOWITZ:  40 is the First National Bank

21    records --

22         MR. HIPPLE:  Same objection.

23         MR. BERKOWITZ:  -- for the estate of Brian

24    Hipple and Ms. Moreno just used that today.

25         THE COURT:  They're admitted.

1                    (Plaintiff's Exhibit Number 40, First National

2          Bank records of the estate of Brian Hipple, is admitted

3          into evidence.)

4                    MR. BERKOWITZ:  41, the Wachovia Bank records.

5                    MR. HIPPLE:  Same objection.  These are really

6          an objection because they go all the way back to SCIX,

7          Your Honor.

8                    MR. BERKOWITZ:  Yes, exactly.

9                    THE COURT:  They're admitted.

10                   (Plaintiff's Exhibit Number 41, Wachovia Bank

11         records, is admitted into evidence.)

12                   MR. BERKOWITZ:  Number 42 was the Merchant

13         Credit Card processing agreement for Steel Seal Pro.

14                   MR. HIPPLE:  Again --

15                   MR. BERKOWITZ:  And, Your Honor, that was a

16         defense exhibit, Number 27.

17                   MR. HIPPLE:  I guess we got to admit it then.

18                   THE COURT:  Right.  What number again are we

19         on?

20                   MR. BERKOWITZ:  42.

21                   MR. HIPPLE:  43 -- 42.

22                   THE COURT:  I know -- it doesn't matter,

23         though, Mr. Berkowitz, even though it was marked as an

24         exhibit, this is your case.  You have the obligation to

25         properly lay the foundation and introduce some evidence,

1    and you haven't with respect to 41 -- 42, excuse me.

2              MR. BERKOWITZ:  Your Honor, Mr. Hipple

3    identified what these documents were.  My interest is --

4              MR. HIPPLE:  No, I never seen this document.

5              MR. BERKOWITZ:  Your Honor, my --

6              THE COURT:  I don't think he -- I mean, he

7    said he -- if I recall correctly, he did not see this.

8    He wasn't -- I believe he said he wasn't involved in --

9    because Brian Hipple signed it.

10             MR. HIPPLE:  I never saw this.

11             MR. BERKOWITZ:  Your Honor, he was familiar

12   with the fact that to get credit cards purchased and

13   into his bank account, it's the Merchant Card processing

14   agreements.

15             MR. HIPPLE:  No, no.

16             MR. BERKOWITZ:  He was familiar with that,

17   just like he filled out Number 36 for his son after he

18   passed away.

19             THE COURT:  Well, he didn't fill out 42.  It

20   was Brian Hipple, and I believe you didn't -- either he

21   never identified or adopted it as his own or talked

22   about.  You really had to bring in the Merchant --

23             MR. BERKOWITZ:  Your Honor, there were also --

24             THE COURT:  -- custodian of records if you

25   wanted to get that in.

1          MR. BERKOWITZ:  There were initials on it that

2   I believe were identified of Brian Hipple's on it.

3          MR. HIPPLE:  But, again, Your Honor --

4          THE COURT:  Well, Brian Hipple's not --

5          MR. HIPPLE:  -- Your Honor, nothing to do with

6   me.

7          THE COURT:  -- 42, I'm not -- I'm not

8   admitting it.  You haven't authenticated it and you

9   haven't laid the proper foundation.

10          MR. HIPPLE:  Is it out?

11          THE COURT:  So 42 is out.

12          MR. BERKOWITZ:  Your Honor, on Exhibit 42, we

13   had the signature of Brian Hipple authenticated several

14   times.  It appears --

15          THE COURT:  Who authenticated it?

16          MR. BERKOWITZ:  I -- I believe Mr. Hipple did.

17          MR. HIPPLE:  I don't believe I identified this

18   document at all.

19          MR. BERKOWITZ:  Your Honor, there's -- his

20   signature appears there several times.

21          THE COURT:  I don't recall Mr. Hipple

22   authenticating that.  My recollection is that whenever

23   he was confronted with an application for Merchant

24   Credit Card processing, he said I don't have any

25   knowledge of this agreement.

1          MR. HIPPLE:  And I don't have any knowledge of

2     that.

3          THE COURT:  Right.

4          MR. BERKOWITZ:  He did look -- he did look at

5     these signatures, Your Honor, and he -- he was able to

6     authenticate every signature on a document that he

7     wanted to use and he was unable to authenticate the same

8     exact signature on a document he didn't want to use.

9          THE COURT:  I stand by my ruling.  I'm not

10     going to admit it.

11          MR. BERKOWITZ:  Okay.  What's the next one,

12     Your Honor, that we're up to?  I'm sorry.  45.

13          MR. HIPPLE:  43.

14          MR. BERKOWITZ:  Yes.  I'm not moving to admit

15     that.

16          THE COURT:  43 is out.

17          MR. BERKOWITZ:  Yes, 43 is out.

18          MR. HIPPLE:  Hold on.

19          THE COURT:  All right.  43 is admitted.

20          MR. BERKOWITZ:  Not 43.

21          THE COURT:  Oh, sorry.

22          MR. BERKOWITZ:  43 is not offered.

23          THE COURT:  Which, 44?

24          MR. BERKOWITZ:  44.

25          THE COURT:  You don't have any objection,

1    right, to that one?

2                    MR. HIPPLE:  44?

3                    THE COURT:  Right.

4                    MR. HIPPLE:  Let me take a quick look.  It's

5    mine, yes.

6                    THE COURT:  All right.  Admitted.  It's

7    admitted.

8                    (Plaintiff's Exhibit Number 44, Bank of

9    America records -- BBB Management Group, is admitted

10   into evidence.)

11                   MR. BERKOWITZ:  I believe the next one, Your

12   Honor, is 49.

13                   MR. HIPPLE:  What happened to 45?

14                   MR. BERKOWITZ:  We admitted that.  Oh, I'm

15   sorry.  I'm -- I --

16                   THE COURT:  No, no.  You skipped.  Yes.

17                   MR. BERKOWITZ:  -- I don't.  What is 45?  If I

18   could --

19                   THE COURT:  45 is the bank -- bank records of

20   Complete Group, Bank of America.

21                   MR. BERKOWITZ:  Yes, we looked at 45.  Mr.

22   Hipple looked at 45.  It's a bank statement from --

23                   THE COURT:  Any objection?

24                   MR. HIPPLE:  No.

25                   THE COURT:  All right.  45 is admitted.

1    (Plaintiff's Exhibit Number 45, Bank of

2    America records for Complete Group, is admitted into

3    evidence.)

4        MR. BERKOWITZ:  46 was the Merchant -- and you

5    said that was out.

6        MR. HIPPLE:  Your Honor, again, I --

7        MR. BERKOWITZ:  I'm just making sure I cover

8    all these.  You said that was not in.

9        THE COURT:  Well, we didn't get to 46, but --

10       MR. HIPPLE:  I object to it because the

11   document --

12       THE COURT:  -- right, 36 and 43 we talked

13   about.  No, excuse me, 36 and 42 I wouldn't allow you,

14   and you heard my reasoning, and you have an exception to

15   that.  47, my -- the same reasoning would apply.  I

16   don't think this has been identified and --

17       MR. BERKOWITZ:  I don't think so either, Your

18   Honor.

19       THE COURT:  Right.  So 47 -- you're not moving

20   in 47?

21       MR. BERKOWITZ:  I'm not going to move that in.

22       THE COURT:  All right.  Okay.

23       MR. BERKOWITZ:  I'm not moving 48.  49.

24       MR. HIPPLE:  I don't know whether there's a --

25   my 47 is the paperwork handwritten from me in my

1       document, this document is.  Are you taking that out?

2                    MR. BERKOWITZ:  Oh, wait, hang on, let me look

3       at 47 before I speak too quickly.  Oh, yes, 47, Your

4       Honor, I'd like 47 to be in.  That's the document that

5       Mr. Hipple identified, it's his writing.

6                    THE COURT:  Right.

7                    MR. BERKOWITZ:  With the EIN number that

8       appears on the document you're not allowing it?

9                    THE COURT:  Right.

10                   MR. BERKOWITZ:  It shows, and I think he

11      testified he's the only one that had that number.

12                   MR. HIPPLE:  That's not correct.  I never

13      testified to that.

14                   THE COURT:  Right.  All right.  Do you have

15      any objection to 47?

16                   MR. HIPPLE:  No, it's handwriting on it.

17                   THE COURT:  All right.  47 is in.

18                   MR. HIPPLE:  It's my handwriting.

19                   THE COURT:  Right.

20                   (Plaintiff's Exhibit Number 47, Merchant

21      service notes - Clement Hipple, is admitted into

22      evidence.)

23                   MR. BERKOWITZ:  And now we're at 49.  That is

24      the check that --

25                   MR. HIPPLE:  How did we get --

1        MR. BERKOWITZ:  -- Mr. Hipple testified that

2   he backdated and stamped.

3        THE COURT:  He's not admitting -- he's not

4   moving 48.  That's your expert report.  You can do that

5   in your own case in chief, Mr. Hipple.

6        MR. HIPPLE:  What do you mean, as far as

7   admitment?

8        THE COURT:  Yes.  He's not going to admit it

9   in his case, your expert's report.

10       MR. HIPPLE:  All right.  Let me -- let me do

11  this.

12       THE COURT:  So he's not moving 48.  Now, we're

13  up to 49.

14       MR. HIPPLE:  He doesn't want to put anything

15  in for me, is that what you're saying?

16       THE COURT:  Well, you're going to have that

17  opportunity.

18       MR. HIPPLE:  Okay.  49.  Okay.

19       THE COURT:  You're going to have that

20  opportunity.  He's -- it's not his job to move into your

21  evidence --

22       MR. HIPPLE:  Okay.

23       THE COURT:  -- your documents.  Okay.  49, any

24  objection?

25       MR. HIPPLE:  I have objections, but it is in

1        my handwriting, Your Honor.

2                    THE COURT:  All right.  So I'll overrule the

3        objection and that will be admitted.

4                    (Plaintiff's Exhibit Number 49, First National

5        Bank check number 0872, is admitted into evidence.)

6                    MR. BERKOWITZ:  I'm not moving for 50.

7                    MR. HIPPLE:  Okay.  So 50 you're not moving to

8        put in?

9                    MR. BERKOWITZ:  Yes.  51 --

10                   MR. HIPPLE:  Hold on.  51?

11                   MR. BERKOWITZ:  51, 52, 53, 54, 55 are all the

12       public records of the Complete Group litigation against

13       Steel Seal Pro.

14                   THE COURT:  51 through 55?

15                   MR. HIPPLE:  Take out.

16                   THE COURT:  Okay.  They're admitted.

17                   MR. HIPPLE:  Oh, admitted or taken out?

18                   THE COURT:  Admitted.  He's moving into

19       evidence those documents --

20                   MR. HIPPLE:  Okay.  Hold on.

21                   THE COURT:  -- but they're documents that have

22       been filed with the Court of Common Pleas of Bucks

23       County, no dispute.  They're public records.  They're

24       going to be admitted.

25                   (Plaintiff's Exhibit Numbers 51 through 55,

1    Complete Group litigation documents, are admitted into

2    evidence.)

3              MR. HIPPLE:  One moment.  Your Honor, the

4    document 50 --

5              THE COURT:  Right.

6              MR. HIPPLE:  Okay.  That's not -- that has

7    something to do with --

8              THE COURT:  50 he's not moving into evidence.

9              MR. HIPPLE:  Oh, he's not moving.

10             THE COURT:  He's withdrawing 50.

11             MR. HIPPLE:  Pardon me?

12             THE COURT:  He's withdrawing it.

13             MR. HIPPLE:  Okay.

14             THE COURT:  He's not moving that.

15             MR. HIPPLE:  And then he goes to 51.  Okay.

16             THE COURT:  51 through 55, which are all these

17   litigation documents.  Okay.  50 -- we're up to 56.

18             MR. BERKOWITZ:  Yes.  56 I'm not going to use.

19             THE COURT:  56 is withdrawn.

20             MR. BERKOWITZ:  Subject to if I use it later.

21             THE COURT:  Right, right.

22             MR. BERKOWITZ:  Number 57, the patents, the

23   SCIX patents, and I would point out that they're Exhibit

24   D-20, 21 and 22 of defendants' exhibits.

25             MR. HIPPLE:  No objection to the patents.

```
 1                    THE COURT:  Admitted.  Okay.

 2                    (Plaintiff's Exhibit Number 57, SCIX patents,

 3          is admitted into evidence.)

 4                    THE COURT:  I don't remember this 58 at all

 5          being --

 6                    MR. BERKOWITZ:  I don't remember 58.

 7                    MR. HIPPLE:  It's not really necessary.

 8                    MR. BERKOWITZ:  Yes, I don't recall 59.

 9                    THE COURT:  So they're withdrawn for now?

10                    MR. BERKOWITZ:  Nor 60.  Yes.

11                    THE COURT:  For now, okay.  58 through 60,

12          you're --

13                    MR. HIPPLE:  60 is the Merchant statements --

14                    MR. BERKOWITZ:  Now, I'm going to move to

15          admit the American Express bills --

16                    MR. HIPPLE:  Okay.  Hold on -- hold on a

17          minute.

18                    MR. BERKOWITZ:  -- Number 61 through 110.

19                    MR. HIPPLE:  Come on, we have till 1:00.

20          Okay.  Give me one moment, please, because I do want all

21          the American Express bills in, but I want to make sure

22          of something.  They're binder three, right?  Volume III?

23                    MR. BERKOWITZ:  Yes, I think it's binder

24          three.

25                    MR. HIPPLE:  Okay.  Well, if -- 61, what do
```

1    you want to do with that?

2         MR. BERKOWITZ:  61 through 110, all of the

3    American Express bills, Your Honor.

4         THE COURT:  Mr. Hipple said he didn't -- he

5    wants them in also, right?  You don't object to that?

6         MR. HIPPLE:  No, I want them in.

7         THE COURT:  You want them in.  All right.

8    They're admitted then.

9         MR. HIPPLE:  Because I've got to deal with

10   them myself.  Okay.

11        THE COURT:  Right.  They're admitted.

12        (Plaintiff's Exhibit Numbers 61 through 110,

13   American Express bills,  are admitted into evidence.)

14        THE COURT:  What about 111?

15        MR. BERKOWITZ:  111, 112 --

16        MR. HIPPLE:  Hold on, hold on.  Okay.

17        MR. BERKOWITZ:  I believe 111 through 119 were

18   all used, Your Honor.

19        MR. HIPPLE:  Okay.  These are the checks,

20   Brian Hipple to -- they're Brian.  Okay.  Do we want to

21   allow this Steel Seal -- SCIX stuff in or -- I really

22   object to it.  It has no bearing against me, Clement

23   Hipple.

24        THE COURT:  All right.  If that's your

25   objection, I overrule the objection.  So 111 through

1          125 --

2                    MR. HIPPLE:  Oh, is that what he's saying, 111

3          through 125?

4                    MR. BERKOWITZ:  Not 120, Your Honor.

5                    THE COURT:  120 is out?

6                    MR. BERKOWITZ:  120 is out.  That was 278

7          Paine Street.  I asked Ms. Moreno if she recognized that

8          address and she didn't.

9                    THE COURT:  Okay.

10                   MR. HIPPLE:  But -- just, please.

11                   THE COURT:  All right.  Let's do it -- let's

12         do it one at a time.

13                   MR. HIPPLE:  Okay.

14                   THE COURT:  111, Brian Hipple, no problem?

15                   MR. HIPPLE:  Well, no, I did object -- object

16         to it.

17                   THE COURT:  All right.  That's admitted.  I

18         overruled your objection.

19                   MR. HIPPLE:  Okay.

20                   (Plaintiff's Exhibit Number 111, Wachovia Bank

21         checks - Brian Hipple, is admitted into evidence.)

22                   THE COURT:  112?

23                   MR. HIPPLE:  Same thing, objection because it

24         has nothing to do with me.

25                   THE COURT:  All right.  Admitted.

1          MR. HIPPLE:  Okay.

2              (Plaintiff's Exhibit Number 112, Wachovia Bank

3      checks - Melissa Moreno, is admitted into evidence.)

4          THE COURT:  Clement Hipple, 113.

5          MR. HIPPLE:  Again, A&C Industrial

6      Maintenance, that one I don't have objection --

7      objection to.

8          THE COURT:  You don't have an objection?

9          MR. HIPPLE:  No.

10         THE COURT:  All right.  That's admitted.

11         MR. HIPPLE:  All right.

12             (Plaintiff's Exhibit Number 113, Wachovia Bank

13     checks - Clement Hipple, is admitted into evidence.)

14         THE COURT:  114, Teresa Hipple.

15         MR. HIPPLE:  No objection.

16         THE COURT:  Admitted.

17             (Plaintiff's Exhibit Number 114, Wachovia Bank

18     checks - Teresa Hipple, is admitted into evidence.)

19         THE COURT:  Sovereign Bank.

20         MR. HIPPLE:  I have objection.  It has nothing

21     to do with me in this case, I'm not --

22         THE COURT:  What was the Sovereign --

23         MR. BERKOWITZ:  Your Honor --

24         THE COURT:  Oh, that -- they're the payments

25     -- payments for the mortgage.

1           MR. BERKOWITZ:  Correct.

2           THE COURT:  Admitted.

3           (Plaintiff's Exhibit Number 115, Wachovia Bank

4      checks - Sovereign Bank, is admitted into evidence.)

5           THE COURT:  116, Quaint Oak Bank.

6           MR. BERKOWITZ:  Same thing, second mortgage.

7           MR. HIPPLE:  Same --

8           THE COURT:  Do you --

9           MR. HIPPLE:  I disagree.

10          THE COURT:  All right.

11          MR. HIPPLE:  I'm going to have to --

12          THE COURT:  I overrule the objection.  It's

13     admitted.

14          (Plaintiff's Exhibit Number 116, Wachovia Bank

15     checks - Quaint Oak Bank, is admitted into evidence.)

16          THE COURT:  117, Brian Hipple taxes.

17          MR. HIPPLE:  Same.

18          THE COURT:  All right.  It's admitted.

19          MR. HIPPLE:  Object.

20          THE COURT:  Overrule the objection.

21          (Plaintiff's Exhibit Number 117, Wachovia Bank

22     checks - Brian Hipple taxes, is admitted into evidence.)

23          THE COURT:  118, Martin Leasing.

24          MR. HIPPLE:  I object.

25          THE COURT:  Overrule the objection.  That's

204

1      admitted.

2                    (Plaintiff's Exhibit Number 118, Wachovia Bank

3      checks - Martin Leasing, is admitted into evidence.)

4                    THE COURT:  119, Honda Leasing.  Do you object

5      to that?

6                    MR. HIPPLE:  I object, yeah.

7                    THE COURT:  I overrule.  That's admitted.

8                    (Plaintiff's Exhibit Number 119, Wachovia Bank

9      checks - Honda Leasing, is admitted into evidence.)

10                   MR. BERKOWITZ:  120 is not offered.

11                   THE COURT:  Right.  Now we get to the Harriman

12     Law Firm.

13                   MR. BERKOWITZ:  121, the Harriman Law Firm --

14                   MR. HIPPLE:  Hold on, hold on.

15                   MR. BERKOWITZ:  -- the Wachovia checks, we saw

16     those.

17                   MR. HIPPLE:  Wait a second.  120 --

18                   MR. BERKOWITZ:  Is not offered.

19                   MR. HIPPLE:  -- is not admitted, right?

20                   THE COURT:  So now we're up to 121.  Who is

21     the Harriman Law Firm again?

22                   MR. BERKOWITZ:  That was --

23                   MR. HIPPLE:  That was our divorce.

24                   THE COURT:  Okay.

25                   MR. BERKOWITZ:  Right.

1              MR. HIPPLE:  That was in Arizona.

2              MR. BERKOWITZ:  And those were bills paid by

3        SCIX.

4              MR. HIPPLE:  That's correct.

5              THE COURT:  Any objection?

6              MR. HIPPLE:  For what?

7              THE COURT:  To the Harriman Law Firm.

8              MR. HIPPLE:  Is 121?

9              THE COURT:  Checks.

10             MR. HIPPLE:  No, I have no objection to them.

11             THE COURT:  Admitted.

12             (Plaintiff's Exhibit Number 121, Wachovia Bank

13       checks - Harriman Law Firm, is admitted into evidence.)

14             THE COURT:  122 is the Brian Hipple credit

15       card --

16             MR. BERKOWITZ:  -- credit card payments.  We

17       did that with Ms. Moreno.

18             MR. HIPPLE:  Now, this is something that I --

19       I have objection to, because, again, this is a credit

20       card.  This could have been done, you know, anything.

21             THE COURT:  I'll admit that.  I'll overrule

22       the objection.  122 is admitted.

23             MR. HIPPLE:  I don't know what you need it

24       for, but -- okay.

25             (Plaintiff's Exhibit Number 122, Wachovia Bank

1        checks - Brian Hipple credit card payments, is admitted

2        into evidence.)

3                MR. BERKOWITZ:  123, those were the --

4                MR. HIPPLE:  But there's no supporting

5        document, Your Honor, to that -- say where the charges

6        or what the charges were for.  That's -- I mean, you

7        know, it's --

8                THE COURT:  I understand your objection, and

9        I'm overruling your objection.  123 is admitted.

10               (Plaintiff's Exhibit Number 123, Wachovia Bank

11       checks - Moreno children payments, is admitted into

12       evidence.)

13               MR. HIPPLE:  All right.

14               THE COURT:  124.

15               MR. BERKOWITZ:  124, those were -- we admit

16       that those were business expenses and we didn't offer

17       them, so I'm not going to move for that.

18               THE COURT:  All right.  124 is not being

19       admitted at this time.  Do you understand that, Mr.

20       Hipple?

21               MR. HIPPLE:  I want that one in.

22               THE COURT:  You want that in?

23               MR. HIPPLE:  Yes.

24               THE COURT:  Well, you'll have to do it in your

25       own case.

1              MR. HIPPLE:  Oh, come on.

2              THE COURT:  Unless you agree to it now.  Do

3       you want them in?

4              MR. HIPPLE:  Okay.  There it goes.

5              MR. BERKOWITZ:  No, I didn't move them.

6              THE COURT:  No.  Okay.  125 --

7              MR. HIPPLE:  You don't want anything that's

8       good for me, right?  He takes out.

9              THE COURT:  All right.

10             MR. BERKOWITZ:  That's not my job.

11             THE COURT:  Yes, 125.

12             MR. BERKOWITZ:  Again, I don't think I offered

13      those, Your Honor.

14             THE COURT:  All right.  That's with --

15             MR. HIPPLE:  Okay.  125?

16             THE COURT:  -- they're withdrawn.

17             MR. HIPPLE:  This goes back all the way to

18      SCIX bills that were paid by Verizon Wireless and all.

19             THE COURT:  Well, he's not admitting them.

20      He's withdrawing 125.  126.

21             MR. HIPPLE:  Hold on, hold on a minute.

22             MR. BERKOWITZ:  I don't think I admitted 126.

23      I think that's just a record of the $40,000 check --

24             MR. HIPPLE:  So I've got to put these in mine.

25             MR. BERKOWITZ:  -- being deposited.

1          THE COURT:  All right.  126 is withdrawn.

2          MR. HIPPLE:  Hold on.

3          THE COURT:  Did we talk about the Hipple tax

4     returns?

5          MR. BERKOWITZ:  No, we did not.

6          THE COURT:  No.

7          MR. BERKOWITZ:  I did not move to admit those.

8          THE COURT:  All right.  127 and 128 are

9     withdrawn.

10          MR. BERKOWITZ:  129 is also withdrawn.

11          MR. HIPPLE:  127 --

12          THE COURT:  Withdrawn.  130.

13          MR. HIPPLE:  Hold on, hold on, hold on.  Can't

14     go as quick as you.  Okay.  129 is the accountant.

15          THE COURT:  That's withdrawn.

16          MR. HIPPLE:  You're admitting that?

17          THE COURT:  No, it's withdrawn.  That's why

18     I'm going fast.  These are withdrawn, so there's no

19     issue.  He's not seeking to admit them.

20          MR. HIPPLE:  130?

21          THE COURT:  So we're up to 130.

22          MR. BERKOWITZ:  130 is the "physical assets I

23     have taken" document.

24          THE COURT:  Okay.  That's --

25          MR. HIPPLE:  Oh, I object on the grounds that

1    there's quite a few copies of physical assets.

2                    THE COURT:  All right.

3                    MR. BERKOWITZ:  That's --

4                    THE COURT:  I understand your objection.

5    That's overruled.  130 is admitted.  Okay.

6                    (Plaintiff's Exhibit Number 130, "Physical

7    assets I have taken" document, is admitted into

8    evidence.)

9                    MR. BERKOWITZ:  If I could look at just 131, I

10   want to see if that's one I used.

11                   MR. HIPPLE:  I definitely would object to

12   that.  There's no basis, Your Honor, okay, there's --

13   there's no proof of these numbers, and there's no basis

14   for them.

15                   THE COURT:  Let me look at it, okay?

16                   MR. BERKOWITZ:  Where's my 131?

17                   MR. HIPPLE:  Yeah, well, we -- we cleared that

18   up with the U.K. the other day, as far as the --

19                   THE COURT:  Oh, this is what you put on the

20   chart, right?

21                   MR. HIPPLE:  Yeah, that's talking about the

22   U.K., that's what this is.

23                   THE COURT:  Right.

24                   MR. HIPPLE:  I totally disagree with it, and I

25   would like it taken from the record.

1              MR. BERKOWITZ:  Your Honor, if I might,

2        actually, I would ask that we admit this as --

3              THE COURT:  Do you want to substitute --

4              MR. BERKOWITZ:  -- 131 --

5              THE COURT:  -- substitute that one?

6              MR. BERKOWITZ:  Yes.

7              THE COURT:  Yes.

8              MR. HIPPLE:  I object to that, too, Your

9        Honor, because the expert witness, the Colonial Chemical

10       guy testified that the U.K. product was there, okay.  On

11       the inventory, it shows the U.K. product, okay, and he's

12       using numbers for -- strictly for Steel Seal product.

13             THE COURT:  All right.  Well, let me -- okay.

14       I overrule the objection.  131 is admitted.  That goes

15       -- your arguments go to the weight of it or whether I

16       should accept it.

17             (Plaintiff's Exhibit Number 131, chart of

18       revenue for sale of inventory, is admitted into

19       evidence.)

20             MR. HIPPLE:  Okay.  So --

21             THE COURT:  By admitting these exhibits, I'm

22       not saying I believe, you know, everything's true about

23       it.

24             MR. HIPPLE:  Okay.  So --

25             THE COURT:  I'm just -- he's allowed to

1    present them and for me to consider it.

2              MR. HIPPLE:  -- so what are we admitting this

3    document, 131?

4              THE COURT:  Well, I'm going to admit that

5    chart, not the document -- not the --

6              MR. HIPPLE:  So 131 comes out?

7              THE COURT:  Yes, but we're going to substitute

8    it for this chart.  This is going to be the new 131.

9    Because this is the -- the expert's testimony is

10   reflected on that chart.  That's what Mr. Berkowitz did,

11   he --

12             MR. HIPPLE:  So I take this part out, right?

13             THE COURT:  You take that part out, but that's

14   the new one that's in.

15             MR. BERKOWITZ:  I believe Mr. Hipple needs

16   this also.

17             MR. HIPPLE:  Hold on, just let me -- just let

18   me make one note.  Paper on wall or whatever.

19             THE COURT:  Right.  We'll see if we can

20   somehow get a copy of that for you.

21             MR. HIPPLE:  Yeah, spell it.

22             MR. BERKOWITZ:  My writing's not that good.  I

23   don't want to preserve it for posterity.

24             MR. HIPPLE:  That's good enough, yes.  Got it.

25   Got it.

1          THE COURT:  Okay.  So --

2          MR. HIPPLE:  132.

3          MR. BERKOWITZ:  132, Your Honor --

4          MR. HIPPLE:  Hold on.

5          MR. BERKOWITZ:  -- was the chart that we used

6    with Ms. Concepcion to establish that the amount due on

7    the notes as of the different dates --

8          MR. HIPPLE:  You know, hold -- hold on -- hold

9    on one minute, Your Honor, okay?  I'm looking at this,

10   and no where on this -- hold on, let me just see

11   something.  Give me just one second.  This document is

12   incorrect, Your Honor, okay?  And this is why I'm

13   objecting, okay?

14          During the last time periods of the payments

15   that she received, okay, in 2010 and '11, they were --

16   there were some payments up for $6,000 and it's not

17   being demonstrated on this document.

18          THE COURT:  All right.  Well, I'm -- I

19   understand your point.  I'm not -- it doesn't really

20   affect the admissibility of it.  I'm going to allow it

21   to be admitted into evidence, but you can bring it out

22   later.

23          MR. HIPPLE:  Okay.

24          THE COURT:  You can -- you can show that this

25   is incorrect.

1          MR. HIPPLE:  But he had the document -- he had

2     the document that showed that.

3          THE COURT:  All right.  Well, you can bring it

4     out.

5          MR. BERKOWITZ:  Your Honor, if you -- if you

6     recall, we went some checks and in some months there

7     were two payments, so I had to add -- this goes by month

8     -- so I had to add the checks together.  So when you add

9     up something that doesn't correspond with the check,

10    it'll correspond with a multiple check number.

11         THE COURT:  All right.

12         MR. BERKOWITZ:  That was, again, a

13    mechanical --

14         THE COURT:  All right.  Well, you can bring

15    out whatever -- whatever deficiencies or faults you find

16    in this 132, you can bring that out, but I'm going to

17    admit it at this point.

18         MR. HIPPLE:  Okay.

19         (Plaintiff's Exhibit Number 132, Teresa Hipple

20    loan, interest, payments, balance due, is admitted into

21    evidence.)

22         THE COURT:  Go ahead, Mr. Berkowitz.

23         MR. BERKOWITZ:  135 is the next one.

24         MR. HIPPLE:  No, I have 133.

25         MR. BERKOWITZ:  I -- Mr. Hipple, I don't think

1      I'm going to offer the other ones.  Okay.

2                 THE COURT:  133 and 134 are out?

3                 MR. BERKOWITZ:  Yes.  I didn't -- I didn't use

4      those.

5                 THE COURT:  Okay.

6                 MR. BERKOWITZ:  I used 135, Your Honor.

7                 MR. HIPPLE:  Oh, they're mine in there.  135

8      he's looking at?  Okay.  This is me.  This is where I

9      owe you money.  I object to it, Your Honor.

10                 THE COURT:  On what ground?

11                 MR. HIPPLE:  On the grounds that there were

12      never any bases established that -- that -- it should

13      not have interest in it.

14                 THE COURT:  All right.  I'll overrule the

15      objection.  135 is admitted.

16                 (Plaintiff's Exhibit Number 135, Clement

17      Hipple's loan with Wachovia Bank, is admitted into

18      evidence.)

19                 MR. HIPPLE:  You're going to give me a lot of

20      work, right?

21                 MR. BERKOWITZ:  No.  The exhibit in paper --

22      there's paper exhibits on that.  We don't need to use

23      the foam boards.  I just used those to demonstrate when

24      we were talking about it.

25                 THE COURT:  The what?

1          MR. BERKOWITZ:  In the exhibits, there are

2      paper exhibits.  These are just blow-ups.

3          THE COURT:  Yes.  This is a summary chart,

4      correct?

5          MR. BERKOWITZ:  Correct.

6          THE COURT:  Right.

7          MR. BERKOWITZ:  I didn't intend to introduce

8      the physical blow-up board because you have a paper --

9          THE COURT:  But he had access to them, right?

10         MR. BERKOWITZ:  Oh, yes, they're in --

11         THE COURT:  The defense had access?

12         MR. BERKOWITZ:  -- they're in -- yes.

13         THE COURT:  Yes.

14         MR. HIPPLE:  They're in the book.

15         MR. BERKOWITZ:  They've been in the exhibit

16     books --

17         THE COURT:  He had a chance to review those

18     underlying documents?

19         MR. BERKOWITZ:  Oh, they've been there for a

20     long time.

21         THE COURT:  All right.

22         MR. HIPPLE:  We've got 136 left.

23         MR. BERKOWITZ:  136 I didn't offer, I don't

24     believe.  Let me -- let me just make sure.

25         MR. HIPPLE:  And I don't have anything on 137

1    at all.  Is there anything in there?

2              THE COURT:  We're on 136.  He's deciding --

3              MR. HIPPLE:  Oh, yeah, I've taken that out,

4    but I don't have any -- nothing behind 137.

5              MR. BERKOWITZ:  Your Honor, I did not use 136.

6              THE COURT:  All right.  That's withdrawn then.

7              MR. BERKOWITZ:  Your Honor, 137 as I think I

8    represented to you, those are not exhibits.  Those were

9    defendants' exhibits that I put in my book because I was

10   going to use them.

11             MR. HIPPLE:  What?

12             MR. BERKOWITZ:  137 is Exhibit D-52.  If I

13   used 138 and I don't recall whether I did or didn't,

14   that's D-50 and 51.  U.K. shipment invoices is my 139.

15   I don't even know if you have it, but it's D-53 and D-

16   56, and --

17             MR. HIPPLE:  Hold on.  Can somebody just give

18   me one minute, okay?  Because I'm --

19             THE COURT:  We will, we will.  Take your time.

20             MR. HIPPLE:  I'm totally lost there.

21             THE COURT:  Take your time.  So let me just

22   stop.  Are you moving in these exhibits in evidence?

23             MR. BERKOWITZ:  Yes, I used them.  They were

24   defendants' exhibits.

25             THE COURT:  All right.  So let's --

1            MR. HIPPLE:  I don't remember seeing them.

2       That's what I'm --

3            THE COURT:  All right.  Let's -- let's go over

4       them.  The first one is 137 which is -- wait a minute --

5       which is D-52.  So go to your D -- go to the D book --

6            MR. HIPPLE:  All right.

7            THE COURT:  -- the defendant -- the black

8       books --

9            MR. HIPPLE:  Okay.

10           THE COURT:  -- your exhibits.

11           MR. HIPPLE:  Oh, my exhibits.

12           THE COURT:  Go to D-52.

13           MR. HIPPLE:  Okay.  D-52?

14           THE COURT:  Right.  So what Mr. Berkowitz is

15      asking is that exhibit, which is marked as D-52, but he

16      has marked it as his exhibit as 137, be admitted in his

17      case.  Do you object to that?

18           MR. HIPPLE:  No.

19           THE COURT:  All right.  That's admitted.

20           (Plaintiff's Exhibit Number 137 (same as

21      D-52), calculation of fair market value of inventory, is

22      admitted into evidence.)

23           THE COURT:  138 is D-50, right?

24           MR. BERKOWITZ:  Let me -- let me see --

25           THE COURT:  You said it was D-50?

1          MR. BERKOWITZ:  Yes.  D-50 and 51.

2          MR. HIPPLE:  Hold on for a minute.  Let me see

3     this.  I got it right on here.  Okay.  So the -- 53 is

4     his 137?

5          THE COURT:  138 --

6          MR. HIPPLE:  138?

7          THE COURT:  -- is your D-50 and 51, which is

8     -- it looks like it's from the website for Steel Seal.

9          MR. BERKOWITZ:  Yes, we used those with --

10         THE COURT:  Just some information about the

11    prices.

12         MR. HIPPLE:  Okay.  So 50 and 51 are P-37.

13         THE COURT:  Right.  No.

14         MR. BERKOWITZ:  No, they don't have a P-37 on

15    them.

16         THE COURT:  No.

17         MR. BERKOWITZ:  They were defendants' exhibits

18    that I used.  I just put them in my book --

19         THE COURT:  Right.

20         MR. BERKOWITZ:  -- so I would have access to

21    them.

22         THE COURT:  And he's now marked them --

23         MR. HIPPLE:  I'm lost.  Okay.

24         THE COURT:  Okay.  Go to your 50 and 51.

25         MR. HIPPLE:  I'm there, 50 and 51.

1            THE COURT:  Right.  He wants to introduce them

2       into evidence.

3            MR. HIPPLE:  Okay.

4            THE COURT:  And he has marked them as his

5       exhibit, 138.

6            MR. HIPPLE:  So I just mark them both 138?

7            THE COURT:  Yes, mark them 138.  And do you

8       have any objection to that?  They're the snapshots from

9       the website.

10            MR. HIPPLE:  Okay.

11            MR. BERKOWITZ:  Right.  They're Exhibits D-50

12       and 51, and I think we used the defendants' exhibits.

13            MR. HIPPLE:  Right.  All right.  Fine.

14            THE COURT:  Okay.  They're admitted.

15            (Plaintiff's Exhibit Number 138 (same as D-50

16       and D-51, snapshots of website for Steel Seal, is

17       admitted into evidence.)

18            MR. HIPPLE:  52 is the --

19            THE COURT:  52 is now marked as 137.  I

20       already admitted that.

21            MR. HIPPLE:  137.

22            MR. BERKOWITZ:  Which one?

23            MR. HIPPLE:  Okay.  53.

24            THE COURT:  Now, let's go to 53 --

25            MR. BERKOWITZ:  No, I'm not --

1          THE COURT:  Oh, you're not there?

2          MR. BERKOWITZ:  -- I'm not moving -- I'm not

3     moving those.

4          THE COURT:  All right.  So we're stopped at

5     138.  Go ahead.

6          MR. HIPPLE:  Hold on.  So 53 is not going in?

7          THE COURT:  Now wait.  Now, he --

8          MR. BERKOWITZ:  I'm not moving that in.

9          THE COURT:  -- he's not moving it in.

10         MR. HIPPLE:  Hold on.  Okay.

11         THE COURT:  So we stopped at 138.  We're

12    waiting to hear from Mr. Berkowitz as to what, if

13    anything else, he wants to do.

14         MR. HIPPLE:  Okay.

15         MR. BERKOWITZ:  D-40 we just used.  That's

16    Teresa Hipple's claim against the estate of Brian

17    Hipple.

18         MR. HIPPLE:  Hold on.  Let me go to D-40.

19         MR. BERKOWITZ:  D-40.

20         THE COURT:  Right.  Do you want to make that a

21    new number for you or --

22         MR. BERKOWITZ:  I --

23         MR. KLEIN:  It was referred to, Your Honor, as

24    D-40 during the testimony.

25         MR. BERKOWITZ:  D-40, yes.  It was D-40.  We

221

1     can call it 140.  I don't --

2                 THE COURT:  All right.  We'll keep it as D --

3     we'll keep it as D-40, keep it clear.  Do you have a

4     problem with D-40, Mr. Hipple?

5                 MR. HIPPLE:  I'm there right now, Your Honor.

6     No.

7                 THE COURT:  All right.  That's admitted.  D-40

8     is admitted in the plaintiff's case.

9                 (Defendants' Exhibit Number 40, Teresa

10    Hipple's notice of claim, is admitted into evidence.)

11                MR. BERKOWITZ:  Your Honor, the next were a

12    couple of loose sheets that we put in.

13                THE COURT:  Right.

14                MR. BERKOWITZ:  One was P-200.

15                THE COURT:  Which was what?

16                MR. BERKOWITZ:  And that was the trademark --

17                THE COURT:  Right.  This is --

18                MR. BERKOWITZ:  -- registration --

19                MR. HIPPLE:  Hold on, hold on.  We didn't -- I

20    didn't think we went to P-200.  Oh.  Oh, that's the --

21    okay, that's the one he submitted --

22                THE COURT:  Is that with the number 19990228?

23    Yes.

24                MR. HIPPLE:  Can I get a copy of that?

25                THE COURT:  Sure.  P-200?

1           MR. HIPPLE:  Yes.

2           THE COURT:  Sue, can you make a copy?  We'll

3    make a copy for you, give it to you before you leave

4    today.

5           MR. HIPPLE:  Okay.

6           (Plaintiff's Exhibit Number 200, trademark

7    registration number 19990228, is admitted into

8    evidence.)

9           MR. BERKOWITZ:  P-201 was Mr. Geisser's

10   identification of the -- the current website for the

11   sale of Steel Seal.

12          MR. HIPPLE:  Can I get a copy of that also,

13   please?

14          THE COURT:  Okay.  That's admitted.

15          (Plaintiff's Exhibit Number 201, Mr. Geisser's

16   identification of the website, is admitted into

17   evidence.)

18          MR. BERKOWITZ:  And P-202 was the inventory

19   that came out of Melissa Moreno's deposition transcript.

20          MR. HIPPLE:  I know you want to admit that,

21   but I -- yeah, I'll deal with the --

22          THE COURT:  He wants to admit it.  I don't --

23          MR. HIPPLE:  I object to it because it's

24   incorrect.

25          THE COURT:  All right.

1          MR. HIPPLE:  The information on it is

2     incorrect.

3          THE COURT:  All right.  It's not that I want

4     to admit anything.  I'm just a neutral --

5          MR. HIPPLE:  Right.

6          THE COURT:  -- person here, just a gatekeeper.

7     All right.  I'm going to overrule the objection.  I'll

8     admit 202.

9          (Plaintiff's Exhibit Number 202, inventory

10    from Melissa Moreno's deposition transcript, is admitted

11    into evidence.)

12         MR. HIPPLE:  And I would also need a copy,

13    too.

14         THE COURT:  Yes.  We'll get you a copy.

15         MR. HIPPLE:  Five minutes, Your Honor.

16         MR. BERKOWITZ:  Just I want to make sure, D-52

17    is -- I called it 137 --

18         MR. HIPPLE:  B-52?

19         MR. BERKOWITZ:  -- but it was D-52.

20         MR. HIPPLE:  D-52.

21         MR. BERKOWITZ:  Yes, Defense 52.  I just want

22    to make sure -- yeah, I called it 137.

23         THE COURT:  I already admitted that.

24         MR. HIPPLE:  Yeah, we got that, 137.

25         THE COURT:  That's admitted.

1           MR. BERKOWITZ:  Okay.  Anything else?

2           Your Honor, if I could just move all of those

3     into evidence, we've done that, and just reserve -- just

4     till I get back tomorrow so I can check and see if

5     there's any others that I might have forgotten, although

6     I think we've been pretty thorough in this.

7           MR. HIPPLE:  I object.

8           THE COURT:  Well, let's see what happens.  He

9     has -- he always can ask to reopen it, and I have the

10    discretion to reopen it.  So we'll see -- it may be a

11    moot point, so we don't need to rule on this yet.

12          MR. HIPPLE:  I just want on the record --

13          THE COURT:  I understand, but I'm not -- I'm

14    not ruling on it.  Let's see what he asks -- he may not

15    ask for anything.  Okay.  He did go through his entire

16    list.

17          MR. HIPPLE:  Okay.

18          THE COURT:  I'm pretty sure we got everything,

19    but he just wants to make sure.

20          MR. HIPPLE:  All right.  I just --

21          THE COURT:  And I'll -- you know, I want to

22    give him an opportunity at least if he wishes to try to

23    say he forgot something, I'm going to listen to him,

24    okay?

25          MR. HIPPLE:  Okay.  So basically now tomorrow

1    is my -- my side, right?

2              THE COURT:  Right.

3              MR. HIPPLE:  Okay.  And then after that

4    myself.

5              THE COURT:  Tomorrow it's your opportunity to

6    present whoever you want, yourself, any other witnesses

7    you want.

8              MR. HIPPLE:  I'd like -- I have two witnesses

9    I have -- I have for tomorrow and then I'm going to go

10   on the stand, and I'm going to be on Friday, Your Honor.

11             THE COURT:  That's fine, whatever you have.

12   Now, how about if we meet tomorrow at 9:00 till we

13   started?  Everybody okay?

14             MR. HIPPLE:  That would be fine.

15             THE COURT:  9:00.  And so you have three

16   witnesses so far.  That's what you anticipate --

17             MR. HIPPLE:  Yes.

18             THE COURT:  -- including yourself.  Okay.

19   Well, let's see how much time we get tomorrow.  What

20   time is -- when is your vacation?  Let's talk about

21   that.

22             MR. BERKOWITZ:  Well, Saturday.

23             THE COURT:  Okay.

24             MR. BERKOWITZ:  I'm --

25             THE COURT:  All right.  Well, I don't want

1    anybody to miss their vacation.

2               MR. HIPPLE:  Oh, I have to go on vacation

3    tomorrow, Your Honor.

4               THE COURT:  Well, you knew that we had this

5    trial.

6               MR. HIPPLE:  I'm kidding, Your Honor.

7               THE COURT:  All right.  So -- okay.  Let's see

8    how -- let's cross that bridge when we get to it.  I

9    don't want to disturb anybody's vacation.  If we have to

10    continue at another day --

11               MR. HIPPLE:  No, I will be finished by --

12               THE COURT:  -- we'll continue at another day.

13               MR. HIPPLE:  -- I'll be finished by Friday.

14               THE COURT:  Okay.

15               MR. HIPPLE:  Are you going on vacation over

16    the weekend or are you going -- or more than the

17    weekend?

18               THE COURT:  Well, I'm not working on Saturday,

19    so that's kind of a moot point.  He's going -- he won't

20    be here on Monday because he's on vacation, right?

21    Okay.

22               MR. HIPPLE:  You won't be here Monday?

23               THE COURT:  I'll be here Monday, but

24    unfortunately, I'll be dealing with other cases.

25               MR. HIPPLE:  I thought we had Monday as our --

227

1      our day -- our last day.

2                   THE COURT:  No.  We only anticipated a week.

3      I'm on -- I'm on what's called criminal duty on Monday,

4      so I have criminal cases, but let's see what happens,

5      okay?

6                   MR. HIPPLE:  All right.

7                   THE COURT:  Let's see where we are.  All

8      right.

9                   MR. HIPPLE:  Okeydoke.

10                  THE COURT:  Okay.  Thanks.  I'll see you

11     tomorrow, 9:00.  Thank you.

12                  (Proceedings concluded at 12:54 p.m.)

13                              *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

```
1                             I N D E X

2      PLAINTIFF'S WITNESSES          DIRECT CROSS REDIRECT RECROSS

3      Wayne Geisser

4        By Mr. Hipple with                33              76

5        Mr. Pederson reading

6        the questions

7        By Mr. Berkowitz                          74

8

9      Louis Berghof

10       By Mr. Berkowitz           78

11       By Mr. Hipple                    108

12

13     Melissa Moreno

14       By Mr. Berkowitz          112           171

15       By Mr. Hipple                    166

16

17                            * * *

18     PLAINTIFF'S EXHIBITS              ADMITTED INTO EVIDENCE

19     P-1      Teresa Hipple accident photos      174

20     P-2      SCIX $250,000 judgment note        175

21     P-3      SCIX $100,000 judgment note        175

22     P-4      Bucks County docket - Case 972     175

23     P-5      Bucks County docket - Case 974     175

24     P-6      SCIX accounting record             176

25     P-8      October 5, 2010 promissory note    176
```

```
 1    INDEX: (continued)

 2    PLAINTIFF'S EXHIBITS                ADMITTED INTO EVIDENCE

 3    P-9      SCIX accounting record of Clement    177

 4             Hipple loan to SCIX

 5    P-10     Security agreement                   177

 6    P-11     UCC-1 financing statement            177

 7    P-12     October 8, 2010 demand letter        177

 8    P-13     October 13, 2010 demand and Brian    178

 9             Hipple consent

10    P-14     October 18 licensing agreement       178

11    P-15     October 29 purchase agreement        178

12    P-16     October 18, 2010 Complete Group      179

13             certificate of formation

14    P-17     Assignment of Clement Hipple         179

15    P-18     Two letters to Colonial Chemical     179

16    P-19     Wachovia Bank checks to A&C          180

17    P-20     SCIX loan repayments to Clement      180

18             Hipple

19    P-21     Colonial Chemical invoices           180

20    P-22     Colonial Chemical communications     181

21    P-23     U.S. Patent Office record            181

22    P-24     SCIX response to interrogatories     181

23    P-25     Affidavit of Clement Hipple          181

24    P-26-29  JC Consultant records                182

25    P-30     Bucks County docket                  182
```

1      <u>INDEX</u>: (continued)

2      <u>PLAINTIFF'S EXHIBITS</u>                  <u>ADMITTED INTO EVIDENCE</u>

3      P-31     Wayne Geisser's expert report      182

4      P-32     Petition to intervene             183

5      P-33     Profit and loss for BBB Management   183

6      P-34     Profit and loss for Complete Group   183

7      P-35     Hill Wallack execution letter     184

8      P-37     List of Clement Hipple's companies   187

9      P-38     Website registration information   187

10     P-39     First National Bank records - Steel   188

11              Seal Pro

12     P-40     First National Bank records -     189

13              Estate of Brian Hipple

14     P-41     Wachovia Bank records             189

15     P-44     Bank of America records -- BBB    193

16              Management Group

17     P-45     Bank of America records - Complete   194

18              Group

19     P-47     Merchant services notes - Clement   195

20              Hipple

21     P-49     First National Bank check number   197

22              0872

23     P-51-55  Complete Group litigation documents   197

24     P-57     SCIX patents                      199

25     P-61-110 American Express bills            200

```
 1    INDEX: (continued)

 2    PLAINTIFF'S EXHIBITS              ADMITTED INTO EVIDENCE

 3    P-111    Wachovia Bank - Brian Hipple        201

 4    P-112    Wachovia Bank - Melissa Moreno      202

 5    P-113    Wachovia Bank - Clement Hipple      202

 6    P-114    Wachovia Bank - Teresa Hipple       202

 7    P-115    Wachovia Bank - Sovereign Bank      203

 8    P-116    Wachovia Bank - Quaint Oak Bank     203

 9    P-117    Wachovia Bank - Brian Hipple        203

10             taxes

11    P-118    Wachovia Bank - Martin Leasing      204

12    P-119    Wachovia Bank - Honda Leasing       204

13    P-121    Wachovia Bank - Harriman Law Firm   205

14    P-122    Wachovia Bank - Brian Hipple        205

15             credit card payments

16    P-123    Wachovia Bank - Moreno children     206

17             payments

18    P-130    "Physical assets I have taken"      209

19             document

20    P-131    Chart - revenue from sale of        210

21             assets

22    P-132    Teresa Hipple loan, interest,       213

23             payments and balance due

24    P-135    Clement Hipple's loan with          214

25             Wachovia Bank with interest
```

1    INDEX: (continued)

2    PLAINTIFF'S EXHIBITS                    ADMITTED INTO EVIDENCE

3    P-137    (Same as D-52) Calculation of        217

4             fair market value of inventory

5    P-138    (Same as D-50 and D-51) Snapshots    219

6             of Steel Seal website

7    D-40     Teresa Hipple's notice of claim      221

8    P-200    Trademark registration number        222

9             19990228

10   P-201    Mr. Geisser's identification of the  222

11            current website for the sale of

12            Steel Seal

13   P-202    Inventory from Melissa Moreno's       223

14            deposition transcript

15

16                              *  *  *

17

18

19

20

21

22

23

24

25

## CERTIFICATION

    I, Donna Anders, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.


10/4/15
Date

Donna Anders