IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

TERESA HIPPLE,                  : CIVIL NO. 12-01256
formerly known as              :
TERESA CONCEPCION,             :
                               :
                               :
          Plaintiff,           :
                               :
                               :
                               :
     v                         :
                               :
                               :
                               :
                               :
SCIX, LLC, et al,              :
                               : Philadelphia, Pennsylvania
                               : July 30, 2015
          Defendants.    : 8:59 a.m.

- - -

TRANSCRIPT OF TRIAL - DAY FOUR
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:


For the Plaintiff:    GERALD S. BERKOWITZ, ESQUIRE
                      ROBERT A. KLEIN, ESQUIRE
                      Berkowitz and Klein, LLP
                      629 B Swedesford Road
                      Swedesford Corporate Center
                      Malvern, PA   19355-1530


For the Defendant     CLEMENT HIPPLE
Clement Hipple,       9206 Andover Road
et al:                Philadelphia, PA   19114
                      Pro Se


*Transcribers Limited*
*17 Rickland Drive*
*Sewell, NJ  08080*
*856-589-6100 - 856-589-9005*

Audio Operator:        Carl Hauger

Transcribed by:        Donna M. Anders

                           - - -

          Proceedings recorded by electronic sound
recording, transcript produced by computer-aided
transcription service.

                           - - -

1                    (The following was heard in open court at 8:59

2        a.m.)

3                    MR. BERKOWITZ:  Good morning, Your Honor.

4                    MR. HIPPLE:  Good morning, Your Honor.

5                    THE COURT:  Please be seated.

6                    MR. BERKOWITZ:  May I take off my jacket, Your

7        Honor?

8                    THE COURT:  Oh, yes, please.

9                    MR. BERKOWITZ:  Thank you.

10                   THE COURT:  It's never gotten better in here

11       unfortunately.  Okay.

12                   MR. BERKOWITZ:  Your Honor, could I address a

13       couple of housekeeping issues --

14                   THE COURT:  Sure.

15                   MR. BERKOWITZ:  -- from the exhibits that we

16       discussed yesterday --

17                   THE COURT:  Yes.  Yes.

18                   MR. BERKOWITZ:  -- and a couple of things with

19       regard to the testimony of Mr. Shavel that -- that

20       didn't come in.

21                   THE COURT:  Okay.

22                   MR. BERKOWITZ:  The first on Mr. Shavel, there

23       were a couple of issues that would have come up just to

24       identify Rules of Civil Procedure that were implicated,

25       and I would have brought that out on his testimony.  And

1    if I could just cite to the Court a couple of rules.

2              THE COURT:  Yes.  Sure.  I'll tell you what.

3    Why don't -- why don't you do this?  Well, you could do

4    it now if you want, but --

5              MR. BERKOWITZ:  It's very simple, Your Honor.

6              THE COURT:  -- but I was going to say if you

7    want to submit copies of that to me at a later time or

8    just cite them -- that's fine, go ahead.

9              MR. BERKOWITZ:  Okay.  One was the JCC

10    notes --

11              THE COURT:  Right.

12              MR. BERKOWITZ:  -- that they contend were

13    judgments, and Pennsylvania Rule of Civil Procedure

14    2951(c) is the rule that was effective in 2003.

15              THE COURT:  Okay.

16              MR. BERKOWITZ:  And those rules were changed

17    in 2008.  The numbering was changed.  The new rule is

18    2952(a)(6).  Again, they both require when there's a

19    default required under the instrument that a complaint

20    in confession of judgment be filed to enter a judgment,

21    and the docket will reflect --

22              THE COURT:  Okay.

23              MR. BERKOWITZ:  -- the rest of it.

24              The other was with regard to the Complete

25    Group judgment amount where a judgment was entered, you

1    recall, for that $197,000, very specific number.   And

2    the Rule that requires a hearing before a judgment in

3    the amount of money can be answered, without a sum

4    certain demanded in the complaint is Rule 1037(b)(1).

5    And you'll see in the complaint they demanded -- there's

6    no demand for a sum certain nor is there any way to

7    calculate it based on the complaint.

8              THE COURT:   Is this something Judge Baldi may

9    -- should have been maybe aware of?  Not to criticize

10   Judge Baldi, but --

11             MR. BERKOWITZ:   No, no, no, no, no.   This --

12   this happened after Judge Baldi was no longer involved.

13             THE COURT:   Oh.

14             MR. BERKOWITZ:   This happened during --

15             THE COURT:   Who entered the judgment?

16             MR. BERKOWITZ:   -- this case where that

17   judgment was entered.

18             THE COURT:   Oh, it was a different Judge who

19   entered it.

20             MR. BERKOWITZ:   Yes, there's no Judge on it.

21   When --

22             THE COURT:   Oh, that's right.   It was only --

23   it was suspended until this --

24             MR. BERKOWITZ:   -- when there's a -- well,

25   when there's a default, there's no Judge.   It's all done

1    through -- you file papers with the prothonotary.

2              THE COURT:  Okay.  Right.

3              MR. BERKOWITZ:  And --

4              THE COURT:  Well, unlike a Federal procedure,

5    I mean, there's an entry of default, but then there's a

6    hearing for the amount.

7              MR. BERKOWITZ:  Correct.

8              THE COURT:  Right.

9              MR. BERKOWITZ:  And there was none because of

10   the way the filing is done in Bucks County.

11             THE COURT:  Okay.

12             MR. BERKOWITZ:  It's just a paper the attorney

13   filed and it's recorded.

14             THE COURT:  Different procedure, okay.

15             MR. BERKOWITZ:  Correct.

16             THE COURT:  All right.

17             MR. BERKOWITZ:  And I just wanted to point

18   that out.

19             THE COURT:  All right.

20             MR. BERKOWITZ:  A couple of things with

21   respect to the exhibits, and I just wanted to make sure.

22   We used -- and Mr. Geisser used all the Wachovia checks,

23   and I just wanted to make sure that in terms of the

24   evidence that was admitted that we didn't

25   unintentionally exclude any of the Wachovia Bank checks.

1      And to the extent we did, I just want to make sure that

2      the Court admits all of the Wachovia checks.  There were

3      -- I've seen --

4            THE COURT:  Have they been identified?

5            MR. BERKOWITZ:  Yes.  They were identified.

6            THE COURT:  As an exhibit?

7            MR. BERKOWITZ:  Yes.  As a matter of fact --

8            THE COURT:  But I did admit them, didn't I?

9            MR. BERKOWITZ:  Well, here's the one I'm

10     concerned with, Exhibit 125, Wachovia Bank checks for

11     business payments.

12           THE COURT:  Oh, that's right.  You withdrew

13     that.

14           MR. BERKOWITZ:  Yes, I wasn't sure if that

15     was --

16           THE COURT:  All right.  So now you want that

17     to be admitted.

18           MR. BERKOWITZ:  I would -- I would like that

19     to be included.

20           THE COURT:  125.  Any objection, Mr. Hipple,

21     to 125?

22           MR. HIPPLE:  I'll have to look at that, Your

23     Honor.

24           THE COURT:  Sure.

25           MR. HIPPLE:  Give me a minute.

1      MR. BERKOWITZ:  Again, and those were all used

2   by Mr. Geisser.

3      MR. HIPPLE:  Well, I don't have 125.  I

4   thought this was out.

5      THE COURT:  It was in the books.  Yes, but

6   he --

7      MR. BERKOWITZ:  It's right over there, Mr.

8   Hipple, or it's in your 125.

9      THE COURT:  Why don't you -- do you mind

10   getting them and showing them to Mr. Hipple, Mr.

11   Berkowitz?

12      MR. BERKOWITZ:  Sure.

13      THE COURT:  Thank you.

14      MR. BERKOWITZ:  These are all the business

15   expense checks from Wachovia.

16      MR. HIPPLE:  You originally took these all

17   out.

18      THE COURT:  Right.  But Mr. Geisser used some

19   of those checks in the preparation of his report.

20   That's what Mr. Berkowitz is telling us.

21      MR. HIPPLE:  No objection, Your Honor.

22      THE COURT:  All right.  So they'll be

23   admitted.  That would be Plaintiff's Exhibit 125.

24      (Plaintiff's Exhibit Number 125, Wachovia Bank

25   checks, business expenses, is admitted into evidence.)

1          MR. BERKOWITZ:  Your Honor, Exhibit 42, the

2     Merchant Card processing agreement, my Exhibit 42.  It

3     was used as an exhibit when Mr. Hipple and --

4          MR. HIPPLE:  It's not in my book.

5          MR. BERKOWITZ:  -- it's also Defendants'

6     Exhibit --

7          THE COURT:  Right.

8          MR. HIPPLE:  27.

9          THE COURT:  We went over this -- we went over

10    this yesterday.

11         MR. BERKOWITZ:  Okay.  Was that admitted or

12    not?

13         THE COURT:  No, not admitted.

14         MR. HIPPLE:  Not admitted.

15         MR. BERKOWITZ:  Okay.  So that --

16         THE COURT:  Yes.  Yes, I did not admit that.

17         MR. BERKOWITZ:  No, it was 36 that we didn't

18    admit.  That was the one that was --

19         THE COURT:  That's not admitted also.

20         MR. BERKOWITZ:  Right.  But 42 was the -- was

21    Defendants' Exhibit 27.

22         THE COURT:  It's not admitted because you

23    didn't lay the proper foundation in my view --

24         MR. BERKOWITZ:  In terms of the

25    authentication, the signatures?

1          THE COURT:  Yes.

2          MR. BERKOWITZ:  Okay.  Let's see.  I think I

3  just have -- also I believe and I don't think this is a

4  problem.  It was --

5          THE COURT:  In addition, it's a hearsay

6  document.  You didn't -- you didn't establish it as a

7  business record, but go ahead.

8          MR. BERKOWITZ:  Okay.  All of the Steel Seal

9  Pro checks were also used by Mr. Geisser, and I think

10  they're all admitted.  I don't have any that aren't

11  admitted on my records.  I just want to make sure that

12  we're clear on that.

13          MR. HIPPLE:  What number?

14          MR. BERKOWITZ:  They are Exhibit 39.  That was

15  admitted.  I just want to make sure we didn't --

16          THE COURT:  39 was admitted.

17          MR. BERKOWITZ:  Yes.  Those are the Steel Seal

18  Pro bank records.  I just want to make sure --

19          THE COURT:  All right.

20          MR. BERKOWITZ:  -- they're all included.

21          THE COURT:  Right.

22          MR. BERKOWITZ:  And that's all I have, Your

23  Honor.

24          THE COURT:  Okay.  All right.  Mr. Hipple --

25          MR. HIPPLE:  Yes, Your Honor.

 1              THE COURT:  -- yes.  Well, we're ready to

 2      proceed.  Mr. Hipple, I also want to state on the record

 3      I'm not rushing you in any way.  I mean --

 4              MR. HIPPLE:  I always feel rushed, Your Honor.

 5              THE COURT:  No.  Well --

 6              MR. HIPPLE:  I don't know why.  Okay.

 7              THE COURT:  -- yes, well, you're -- you know,

 8      if --

 9              MR. HIPPLE:  I'm at a fast-paced --

10              THE COURT:  -- you were an attorney, you would

11      be quicker, but that's okay.  I'm trying to -- but, you

12      know, we're -- I'd like to get this case tried --

13              MR. HIPPLE:  We should be --

14              THE COURT:  -- done this week and I hope we

15      can, but I'm not rushing you and please take whatever

16      opportunity you need to put on your case.

17              MR. HIPPLE:  Okay.

18              THE COURT:  Okay.

19              MR. HIPPLE:  All right.  Okay.  I would like

20      to call for my first witness Ira Krassan.

21              THE COURT:  Pardon me?

22              MR. HIPPLE:  I would like to call Ira Krassan

23      as my first --

24              THE COURT:  Yes.  Sure.  Is Mr. Krassan here?

25      Yes.  Sir, would you come forward?  Thank you.  Good

1    morning, sir.

2                THE WITNESS:  Good morning.

3                THE COURT:  Sit right over here, please.

4                COURTROOM DEPUTY:  Please raise your right

5    hand.

6                IRA KRASSAN, Defendants' Witness, Sworn.

7                COURTROOM DEPUTY:  Please state and spell your

8    last name for the record.

9                THE WITNESS:  Ira Krassan, K-R-A-S-S-A-N.

10               COURTROOM DEPUTY:  Thank you.

11                         <u>DIRECT EXAMINATION</u>

12   BY MR. HIPPLE:

13   Q    Good morning, Ira.

14   A    Good morning.

15   Q    Okay.  Where -- where is your residence?

16   A    I reside in Cherry Hill, New Jersey.

17   Q    Okay.  And your occupation?

18   A    CPA.

19   Q    How long have you been a CPA?

20   A    Since 1995.

21   Q    And you have a license as a CPA?

22   A    Yes, sir.

23   Q    After you obtained your license, did you go to work

24   as a CPA?

25   A    Yes, I did.

1    Q    Okay.  Where?

2    A    In a practice in Cherry Hill, New Jersey.

3    Q    Okay.  Did you ever have your own firm?

4    A    Yes, I did.

5    Q    And the name of that firm was?

6    A    Ira Krassan and Associates.

7    Q    Do you still have that firm?

8    A    No.

9    Q    Did you sell it?

10   A    Yes, I did.

11   Q    When?

12   A    December 27th, 2012.

13   Q    Do you continue to have any ownership interest?

14   A    Yes.

15   Q    How much?

16   A    One percent.

17   Q    Do you still perform any accounting work?

18   A    Yes, I do.

19   Q    What firm do you perform that work through?

20   A    Krassan and Glauser, P.C.

21   Q    Where are you currently employed?

22   A    I have -- Hydraulics Products, Incorporated.

23   Q    And what does that entity do?

24   A    We sell hydraulic products to the agriculture

25        industry.

1        MR. BERKOWITZ:  Your Honor, I don't mean to

2    interrupt, but we agree Mr. Krassan is an accountant and

3    he can testify.  He's not here as an expert witness.  So

4    I -- I don't know that we need to go through his

5    qualifications.

6        MR. HIPPLE:  Okay.  Fine.

7        THE COURT:  That's fine.  Do you want to move

8    that microphone down a little bit?  That's great.

9    Thanks.

10       MR. HIPPLE:  I'm not used to microphones.

11   BY MR. HIPPLE:

12   Q   Okay.  So I'm going to skip all that, okay?

13       Do you know Clement Hipple?

14   A   Yes.

15   Q   Did Clement Hipple become a client of yours?

16   A   Yes.

17   Q   At -- and at the time, was your firm Ira Krassan

18   Associates?

19   A   Yes.

20   Q   Do you recall when Clement Hipple became a client of

21   yours?

22   A   I don't recall the exact year.

23   Q   Approximately?  Ten years, five years?

24       THE COURT:  Do you want to suggest a date to

25   him?  You can suggest a date.  Do you remember when it

1    was?

2              MR. HIPPLE:  I don't know the date either,

3    Your Honor.

4              THE WITNESS:  I -- I would probably say in the

5    early 2000s.

6              MR. HIPPLE:  Okay.  Thank you.

7    BY MR. HIPPLE:

8    Q   What about any business he owns as far as any

9    business -- all right.  Okay, wait a minute.

10             Okay.  What about any business he owns that

11   you would have done work for him?

12   A   Yes.

13   Q   Are you familiar with a company called SCIX?

14   A   Yes.

15   Q   Did you ever -- did you ever perform any accounting

16   service for SCIX?

17   A   Yes, I did.

18   Q   And when would that have been, upon forming of the

19   business?

20   A   Upon forming -- upon formation, yes.

21   Q   Okay.  So basically you performed the -- all of

22   SCIX's work from when you became --

23   A   Yes, I did.

24   Q   Sorry about that.  Now, is it fair to say that you

25   were still performing accounting work for SCIX in the

Mr. Krassan - Direct                        16

1    summer of 2010?

2    A    Yes.

3    Q    And were you still providing accounting services to

4    Brian Hipple through the summer of 2010?

5    A    Yes.

6    Q    And from 2006 through 2010, was it Ira Krassan and

7    Associates who was performing the accounting services

8    for Brian -- SCIX?

9    A    Yes.

10   Q    Did you prepare Brian Hipple's personal tax returns

11   from 2006 through 2010?

12   A    Yes.

13   Q    For the tax returns you prepared for 2006 to 2010

14   for Brian Hipple, was the income from SCIX reflected on

15   a Schedule C?

16   A    Yes, it was.

17   Q    Does that reflect that SCIX was a single member LLC

18   owned by Brian Hipple alone?

19   A    Yes.

20   Q    When you -- when would -- yes.  When you would

21   perform accounting work for SCIX, would you travel to

22   SCIX's office?

23   A    Yes.

24   Q    And would you travel to Brian's home?

25   A    Yes.

1    Q   And approximately how many times between 2006 and

2    2010 did you travel to Brian's home?

3    A   At least four.

4    Q   And when you were at Brian's home or the SCIX

5    office, who did you observe operating SCIX?

6    A   Brian Hipple.

7    Q   Did you ever see Clement Hipple involved in the

8    operation of SCIX?

9    A   No.

10   Q   To the best of your knowledge, who owned SCIX from

11   2006 to 2010?

12   A   Brian Hipple.

13   Q   What about Clement?

14   A   He was not an owner.

15   Q   To the best of your knowledge, who operated SCIX

16   from 2006 to 2010?

17   A   Brian Hipple.

18   Q   What about Clement?

19   A   No.

20   Q   How is it that you know Brian alone owned and

21   operated SCIX from 2006 through the summer of 2010?

22   A   All the conversations that I had regarding the

23   preparation of the tax returns were with Brian Hipple

24   and --

25             MR. BERKOWITZ:  I'm sorry.  I'm going to

1    interpose an objection.  It's classic hearsay, Your

2    Honor.  He's talking about conversations with Brian

3    Hipple to prove the truth of the matter asserted.  We

4    have issues of hearsay and the dead man's rule.

5              MR. HIPPLE:  I can rephrase --

6              THE COURT:  I'll overrule the objection.  You

7    may proceed.

8              MR. HIPPLE:  Okay.

9              THE COURT:  You can -- go ahead, would you

10   finish your answer, sir.

11             THE WITNESS:  I --

12             THE COURT:  How do you know that Brian Hipple,

13   was it, ran the business --

14             MR. HIPPLE:  Yes, yeah.

15             THE COURT:  -- operated the business?

16             MR. HIPPLE:  Alone.

17             THE WITNESS:  I worked with Brian directly.  I

18   received all the accounting data from Brian, the backups

19   from Brian.  Any questions I had regarding the

20   preparation of the tax returns were with Brian and only

21   Brian.

22   BY MR. HIPPLE:

23   Q    And is it possible that Brian alone owned the

24   operations of SCIX?

25   A    Yes.

1    Q    Did you ever see any board agents or board meetings

2    for SCIX?

3    A    No.

4    Q    During the time that you were performing accounting

5    service for SCIX, did SCIX owe any money to Clement

6    Hipple?

7    A    Yes.

8    Q    Do you know what the purpose of those loans were?

9    A    The initial start-up money, purchase the

10   intellectual property, inventory, to start the website.

11   Q    Okay.  That would have been my next question, okay,

12   and you already answered it.

13            Do you know when SCIX was first formed?

14   A    I do not.

15   Q    Okay.  In performing accounting service for SCIX,

16   did you have access to SCIX's books and records?

17   A    Yes, I did.

18   Q    Did -- did SCIX use QuickBooks?

19   A    Yes.

20   Q    And who kept the books for SCIX?

21   A    Brian Hipple.

22   Q    And in performing accounting services for SCIX,

23   would you be provided access to QuickBooks?

24   A    Yes.

25   Q    And did you ever see any reference to any loans made

1    to Clement Hipple -- or made by Clement Hipple to SCIX

2    in SCIX's QuickBooks?

3    A    Yes.

4    Q    What about the loans to Teresa, did you ever see

5    those referenced in SCIX's QuickBooks?

6    A    Yes.

7    Q    And for accounting purposes, did you treat the loan

8    for Clement the same as you did the loan for Teresa

9    Hipple --

10   A    Yes.

11   Q    -- or Concepcion?  Did you review any financial

12   references to these loans for purposes of preparing

13   Schedule C of Brian Hipple's personal tax returns after

14   he became the sole member of SCIX?

15   A    I don't quite understand the question.

16   Q    Yeah, I figured it.  I'm not -- I'm not reading it

17   properly.  All right.  Give me another shot.

18            All right.  Did you review any financial --

19   financial references --

20            THE COURT:  Any records?

21            MR. HIPPLE:  Records.  I guess reference is

22   records.

23   BY MR. HIPPLE:

24   Q    -- to those loans for purposes of preparing Schedule

25   C to Brian Hipple's personal tax returns and after he

Mr. Krassan - Direct                         21

1     became the sole owner of SCIX?

2     A    Yes.

3     Q    Two more pages.  And did you include interest on

4     Schedule C of Brian's tax returns each year for loans

5     made to SCIX by Clement Hipple?

6     A    Yes.

7     Q    And how did you determine the interest paid each

8     year?

9     A    We prepared an amortization schedule for each of the

10    loans.

11    Q    Okay.  That was my next question.  My next question:

12    Did you prepare that amortization schedule?

13    A    Yes, we did.

14    Q    Okay.  And who updated these schedules in your firm?

15    A    My assistant accountant.

16    Q    Okay.  And who maintained the schedules?

17    A    My firm.

18    Q    All right.  I'm going to show you a document.  The

19    document is D-9.

20             MR. BERKOWITZ:  I'm sorry.  Was that D-9, sir?

21             MR. HIPPLE:  David-9.

22             MR. BERKOWITZ:  Thank you.

23    BY MR. HIPPLE:

24    Q    Do you recognize this document?

25    A    I don't know if I recall seeing it or not.

1    Q    Okay.  Then we'll get away from that and close that.

2    I wonder if I gave you the wrong document, because it

3    says three pages.

4    A    This is only a two-page licensing agreement.

5    Q    Yeah.  No, that's not the right document.

6              MR. HIPPLE:  I'm sorry.  Wrong document.

7              MR. BERKOWITZ:  That's okay.

8              MR. HIPPLE:  D-14.

9              MR. BERKOWITZ:  D-14.

10   BY MR. HIPPLE:

11   Q    Do you recognize this document?

12   A    Yes, I do.

13   Q    Can you tell the Court what it is?

14   A    Aside from my subpoena, it is a copy of the

15   amortization schedule that we prepared and maintained on

16   behalf of Clement Hipple.

17   Q    So this is your response to the subpoena?

18   A    Yes.

19   Q    And can you tell the Court what the last three pages

20   of this document represent?

21   A    The amortization schedule that my firm prepared and

22   maintained on behalf of the loans from Clement Hipple.

23   Q    Okay.  And is this the running balance of the loan

24   owed by SCIX to Clement Hipple?

25   A    Yes.

1    Q    Okay.

2                   MR. HIPPLE:   I can put that away.   Hold on a

3    moment.

4                   (Pause in proceedings.)

5    BY MR. HIPPLE:

6    Q    And is this amortization schedule that you testified

7    above in response to my earlier questions?

8    A    Yes.

9    Q    And this amortization schedule was updated yearly,

10   right?

11   A    Yes.

12   Q    And in the amortization schedule, that would include

13   payments made on this loan?

14   A    Yes.

15   Q    And the payments that were made on this loan, where

16   did you get that information from to include on this

17   document?

18   A    From the QuickBooks database.

19   Q    Can you -- can you please tell the Court what's the

20   balance of the loan owed by -- owned by SCIX to Clement

21   -- owed by SCIX to Clement Hipple as of September 30th,

22   2010?

23   A    $210,187.36.

24                   THE COURT:   As of what date?   I'm sorry.

25                   THE WITNESS:   September of 2010.

1          THE COURT:  Thank you.

2     BY MR. HIPPLE:

3     Q   Did you ever speak with Clement Hipple about this

4     loan?

5     A   Yes.

6     Q   Okay.  Would I -- no, I can't say me -- would he

7     reach out to you every now and then to find out what the

8     balance was?

9     A   Yes, he did.

10    Q   And would you tell him the balance?

11    A   Yes.

12    Q   And did you have permission from SCIX to do that?

13    A   Yes.

14    Q   And what, if any, did you rely upon to answer his --

15    these questions about the balance of the loan from SCIX?

16    A   The company's records and my amortization schedule.

17          MR. HIPPLE:  See, this is a little tricky,

18    this next question.  I have to rephrase it.

19    BY MR. HIPPLE:

20    Q   Did you -- did you receive a subpoena upon Ira

21    Krassan and Associates in this matter?

22    A   Yes.

23    Q   Okay.  Do you recall that Mr. Berkowitz's office

24    also served you with a subpoena in this matter?

25    A   I believe so.

Mr. Krassan - Cross                          25

1    Q    And in response to those subpoenas, did you perform

2    a search for documents --

3              THE COURT:  Related?

4              MR. HIPPLE:  R-E -- R-E-S-P-O-N-S-I-V-E.

5              THE COURT:  Responsive.

6    BY MR. HIPPLE:

7    Q    -- responsive to that subpoena?

8    A    Yes.

9    Q    And did you search in all the places that you

10   believe responsive documents could have been found --

11   located?

12   A    Yes.

13   Q    And did you search on your computer for responsive

14   documents?

15   A    Yes.

16   Q    And did you produce any -- any of the documents that

17   were responsive to the subpoena served on you in this --

18   A    Yes, we did.

19   Q    Okay.

20             MR. HIPPLE:  This is going pretty good.  Okay.

21             (Pause in proceedings.)

22             MR. HIPPLE:  No further questions, Your Honor.

23             THE COURT:  Thank you.  Mr. Berkowitz.

24                      CROSS-EXAMINATION

25   BY MR. BERKOWITZ:

1      Q    Good morning, Mr. Krassan.

2      A    Good morning.

3      Q    Mr. Krassan, if you look at Defendants' Exhibit 14,

4      it looks like you responded by fax?

5      A    Yes.

6      Q    Okay.  And you see at the top it's got one of eight

7      pages?

8      A    Yes.

9      Q    Okay.  If we could go to -- first, you see the

10     subpoena page.  I think it's three or four pages in.

11     A    Yes.

12     Q    Do you see that?  That's the subpoena that was

13     served on you?

14     A    Yes.

15     Q    Okay.  And the next page is Exhibit A?

16     A    Yes.

17     Q    And it asked you to produce all the documents you

18     had relating to SCIX, LLC, from January 1 through

19     January 10?

20     A    Yes.

21     Q    Okay.  And you produced all those documents?

22     A    We produced everything we had.

23     Q    Okay.  And let's look at number two, "Any and all

24     documents reflecting and/or evidence of any credit

25     extended by Clement Hipple or any agent or affiliate or

Mr. Krassan - Cross                           27

```
 1      a company owned by Clement Hipple to SCIX during the

 2      period of January 1, 1999, through January 1, 2010."

 3              Did you review your records?

 4      A   Yes.

 5      Q   And did you produce any records?

 6      A   Everything we had.

 7      Q   Okay.  So there's nothing that was subpoenaed that

 8      you didn't produce?

 9      A   Right.

10      Q   Okay.  And let's look at number three, if you can

11      just read it?

12      A   "Any and all documents reflecting any" --

13      Q   You don't have to read it out loud.

14      A   Oh, sorry.

15      Q   I'm sorry.

16      A   Yes, we -- we did.

17      Q   Okay.  So this reflects all of the loans of all of

18      the companies that Clement Hipple owns -- this is all

19      the debt owed --

20      A   Yes.

21      Q   -- to Clement Hipple and all his companies?

22      A   Yes.

23      Q   Okay.  And there's no other records?

24      A   Not that I'm aware of.

25      Q   Okay.  And number four, do you see that, "Any and
```

1    all documents" --

2    A    Yes.

3    Q    -- "relating to any payments" --

4    A    Yes.

5    Q    Okay.  And, again, we have all of those?

6    A    Yes.

7    Q    Okay.  Now, let's look at the next three pages.

8    Those are all the records you had?

9    A    Yes.

10   Q    Okay.  Mr. Krassan, I'd like you to look at --

11            MR. BERKOWITZ:  Plaintiff's Exhibit 6, Your

12   Honor.

13   BY MR. BERKOWITZ:

14   Q    Do you recognize that document?

15   A    Yes.

16   Q    Okay.  And -- and if you look up in the left-hand

17   corner, you see a number of entities raised or names?

18   A    Yes.

19   Q    Okay.  And it says Teresa, Clem, JC, and this is

20   Teresa?

21   A    Yes.

22   Q    Okay.  So this was Teresa Hipple's loans --

23   A    Yes.

24   Q    -- to SCIX?

25   A    I believe so.

1    Q    Okay.  Just asking.  If you would turn, sir, to

2    Exhibit 17, Plaintiff's Exhibit 17 in that document.

3                THE COURT:  That -- it's -- are you in defense

4    book, right?

5                THE WITNESS:  Wrong book?

6                MR. BERKOWITZ:  Oh, I'm sorry.  It's the

7    white --

8                THE COURT:  Oh, you're in there.  Okay.

9                MR. BERKOWITZ:  -- yes, you're in the right

10   book, you're in the right book.

11               THE COURT:  Okay.

12               MR. BERKOWITZ:  We have a lot of books here.

13               THE COURT:  Right, I saw a black book there.

14   BY MR. BERKOWITZ:

15   Q    Mr. Krassan, have you ever seen that document

16   before?

17   A    Not that I'm aware of.

18   Q    Okay.  And do you see, it's the assignment of Mr.

19   Hipple's interest in SCIX to his son, Brian?

20   A    Yes.

21   Q    And this is the transaction that you're familiar

22   with?

23   A    Yes.

24   Q    And did you know that Mr. Hipple retained all his

25   voting rights in SCIX?

1          MR. HIPPLE:  Objection, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  No.

4     BY MR. BERKOWITZ:

5     Q    Okay.  Thank you.  Are you -- you mentioned that you

6     had a lot of familiarity with Brian?

7     A    Yes.

8     Q    And you would go into the office and do work for the

9     business?

10    A    Yes.

11    Q    And are you familiar with how the business collected

12    its money from its Internet sales?

13    A    Yes.

14    Q    And how was that?

15    A    I believe it was all through electronic payments.

16    Q    Okay.  And do you know whether they had agreements

17    with companies that process electronic transactions so

18    that the credit card of a customer ends up in the bank

19    account of SCIX?

20    A    I never saw any of those documents, but being

21    familiar with how these things happen, there would have

22    to be agreements set up to be able to receive those

23    moneys.

24    Q    Okay.  And that's a normal business record that

25    somebody might have, an agreement with a --

1              MR. HIPPLE:  Objection, Your Honor.

2              MR. BERKOWITZ:  -- credit card processing

3      company?

4              MR. HIPPLE:  It has nothing --

5              THE COURT:  I'll overrule the objection, but

6      he's not the custodian of the records.

7              MR. BERKOWITZ:  Yes.  I --

8              THE WITNESS:  Nor do I believe that that is a

9      document that somebody would normally keep.

10     BY MR. BERKOWITZ:

11     Q    Over the years did you have occasion to see Brian

12     Hipple's signature?

13     A    I would not be able to pick it out --

14     Q    Okay.

15     A    -- if you asked me to.

16     Q    Okay.  If you saw it, would you -- would you

17     recognize it?

18     A    No.

19     Q    Okay.  Now, I'd like you to look at -- it's D-14,

20     but in the book, the white book that you have, it's

21     Plaintiff's Exhibit 9.  It's the calculation --

22             MR. HIPPLE:  D-14?

23             MR. BERKOWITZ:  Yes, D-14 which is also

24     Plaintiff's Exhibit 9.

25             THE WITNESS:  Yep.

1   BY MR. BERKOWITZ:

2   Q    And do you see, if we look in the middle -- well,

3   first at the top it says you calculated interest on this

4   loan at eight percent, correct?

5   A    Yes.

6   Q    And could you tell me where did you get that eight

7   percent interest?

8   A    It was provided to me by the company.

9   Q    Okay.  So you never saw a promissory note or

10  anything?

11  A    Not that I recall.

12  Q    Okay.  And if you look at the calculation of

13  interest in the center column, could you tell me is that

14  compounded interest?

15  A    Yes.

16  Q    Okay.  And do you know why you compounded the

17  interest?

18  A    On a monthly basis.

19  Q    Yes, but do you know why it was compounded as

20  opposed to being calculated as simple?

21  A    I cannot answer that.

22  Q    Okay.  You know the difference between simple

23  interest and compound?

24  A    Yes, I do.

25  Q    Okay.  Now, if you look in the category, the

1     heading, principal?

2     A    Yes.

3     Q    And you see the first entry, $130,000 --

4     A    Yes.

5     Q    -- right?  And that is money that Clement Hipple

6     paid in to the company?

7     A    Yes.

8     Q    Okay.  And did you have an opportunity to verify

9     bank statements and the like to show it was paid in?

10    A    Yes.

11    Q    Okay.  And the next line shows repayments.  That's

12    what the negatives are?

13    A    Yes.

14    Q    Okay.  Thank you.

15              MR. BERKOWITZ:  No further questions, Your

16    Honor.

17              THE COURT:  Thank you.  Anything else, Mr.

18    Hipple?

19              MR. HIPPLE:  Yes, Your Honor.  I'm not certain

20    but he didn't mention about Teresa's note, right,

21    correct?

22              THE COURT:  Why don't you come on up here.

23    You can ask him questions.

24              MR. BERKOWITZ:  Yes, he did, Your Honor.  That

25    was one of the documents we addressed.

Mr. Krassan - Cross                              34

1          MR. HIPPLE:  This is Teresa's note.  It's been

2     re-done, okay?  I remember seeing the original note from

3     Mr. Beck's (ph) office, okay.  And on the -- when she

4     foreclosed in 2010, she received three payments of

5     $6,000 instead of the 3,000, and that has been adjusted

6     out of the original note.

7          THE COURT:  Why don't you ask him those

8     questions.

9          MR. HIPPLE:  Okay.

10         THE COURT:  Do we -- do we have an exhibit

11    number on that?  I know he did show him that --

12         MR. BERKOWITZ:  Which one, the --

13         THE COURT:  -- Ms. Hipple's --

14         MR. HIPPLE:  Note.

15         THE COURT:  -- the amortization schedule.  I

16    think he did --

17         MR. BERKOWITZ:  Their -- their calculation.

18         MR. HIPPLE:  Your calculation.

19         MR. BERKOWITZ:  My calculation?

20         MR. HIPPLE:  The one in the book, whatever

21    one's in the book.

22         MR. BERKOWITZ:  Well, there's -- there's

23    Plaintiff's Exhibit 6.  Is that the one we're talking

24    about?

25         THE COURT:  Right, right, P-6, I believe.

1          MR. BERKOWITZ:  Well, he -- Mr. Krassan looked

2     at that.

3          THE COURT:  Right.  That one -- Mr. Krassan,

4     this is something you prepared, right?

5          THE WITNESS:  It looks like it is, yes.

6          THE COURT:  Okay.  So what -- you want to ask

7     him about P-6, Mr. Hipple?

8          MR. HIPPLE:  Yes.

9          THE COURT:  You can approach and -- and talk

10    to him.

11                  REDIRECT EXAMINATION

12    BY MR. HIPPLE:

13    Q    Well, first of all, this doesn't go -- let's see.

14    What was -- was that the last payment in 2009?  I

15    thought the last payment was after that?  Do you have a

16    copy of the note with you?

17    A    No.

18    Q    No?  But you have a copy in your office, correct?

19    A    Yes.

20          MR. BERKOWITZ:  Object, Your Honor.  He

21    testified he produced all the records that he had with

22    him and now he's saying he's got a note that wasn't

23    produced in response to the subpoena.

24          MR. HIPPLE:  No.  I'm saying this -- this is

25    not the document I think he originally produced.

1            THE COURT:  Well, okay.  Now, you mentioned a

2       note.

3            MR. HIPPLE:  If you look at the top of the --

4            THE COURT:  This is an amortization schedule,

5       right?

6            MR. HIPPLE:  Right.  Yes, I'm saying -- Your

7       Honor.

8            THE COURT:  Okay.  So are you asking him does

9       he have another amortization schedule other than the one

10      that's in P-6?

11           MR. HIPPLE:  There's -- there's another loan,

12      because if you look at the top of this note, it says --

13           THE COURT:  Right.  There's two loans, right.

14           MR. HIPPLE:  -- it says, Teresa, Clem and

15      JC --

16           THE COURT:  Right.

17           MR. HIPPLE:  -- correct?

18           THE COURT:  Right.

19           MR. HIPPLE:  Okay.  Now, this isn't the

20      individual note that I believe that was produced.  Now,

21      he produces another note -- let me see if I can find the

22      other document --

23           THE COURT:  Right.  Do you know -- do you

24      know, sir, is this one -- there were two -- there were

25      two loans by Teresa Hipple.  Are you aware of that?  Or

1    does this reflect the consolidated -- the amount?

2              THE WITNESS:  I don't recall.

3              THE COURT:  Do you know what this reflects?

4              MR. BERKOWITZ:  Well, are we talking about the

5    promissory notes to Teresa Hipple?

6              MR. HIPPLE:  P-133.

7              THE COURT:  Right.  There were two --

8              MR. BERKOWITZ:  Are we talking about the notes

9    to Teresa Hipple?

10             THE COURT:  That's what I think he's talking

11   about, yes.

12             MR. BERKOWITZ:  Are those -- is that what

13   you're referring to?

14             MR. HIPPLE:  Let me get there, P-133.

15             MR. BERKOWITZ:  P-133.

16             MR. HIPPLE:  132 it looks like now.

17             MR. BERKOWITZ:  Oh, 132, Your Honor, is --

18   this is the exhibit that --

19             THE COURT:  Okay.

20             MR. BERKOWITZ:  -- we used previously.  Do you

21   want me to --

22             THE COURT:  Yes, why don't you put it up.

23   Perhaps the witness -- it will help the witness.

24             MR. HIPPLE:  Okay.

25             THE COURT:  Go ahead, Mr. Hipple.

 1            MR. HIPPLE:  Well, I have it in the book also.

 2     Maybe in the book it would be easier for him to see.

 3            THE COURT:  All right.

 4     BY MR. HIPPLE:

 5     Q    What I'm trying to explain is that -- okay, this is

 6     not your document, correct?  You didn't do an

 7     amortization schedule all the way out to -- to there?

 8     A    No.

 9     Q    No.  So, basically, this schedule -- this

10     amortization schedule that he has on the board was not

11     produced by Ira Krassan, okay?  And I want to bring your

12     attention to something but I'm not certain because I

13     thought I had it this morning, but apparently I didn't

14     have.

15            When the payments stopped from Brian Hipple to

16     Teresa, her last three payments she received were in the

17     amount of $6,000, okay.  In other words, her normal

18     payment would have been 3,000 but he gave her six, six

19     and six.  Now, this has gotten changed, and I can't

20     question the attorney about that, so -- and --

21            THE COURT:  Where does it say the last three

22     payments were six?  It just seems it's consistent.

23            MR. HIPPLE:  It doesn't show it.

24            THE COURT:  Oh.

25            MR. HIPPLE:  That's what I'm saying, Your

 1    Honor.

 2                    THE COURT:  Oh, okay.

 3                    MR. HIPPLE:  It's been -- it's been changed or

 4    however -- whatever word you want to use, but this is

 5    not original -- this is not the notes from Mr. Krassan.

 6    He identifies that this is not his --

 7                    THE COURT:  Okay.

 8                    THE WITNESS:  The amortization schedule in P-6

 9    references the last few payments as 6,000.

10                    MR. HIPPLE:  Oh, it is in there?  Okay.  All

11    right.  That's what I'm trying -- the point I'm trying

12    to get at.  I missed that.  I know I just found that

13    document.

14                    See, Your Honor, what I'm -- what I'm trying

15    to point out is someone, whoever prepared the note in

16    the plaintiff's book, okay --

17                    THE COURT:  The 132?

18                    MR. HIPPLE:  Right -- took it and doctored it

19    -- I don't know if I'm using the correct word -- and

20    changed it.

21                    THE COURT:  Okay.

22    BY MR. HIPPLE:

23    Q   Okay?  So I'm showing that this document is not the

24    correct document.

25    A   This document -- our document ends in 2009.  This

1   document continues well beyond that.

2   Q    Okay.  Let's go back to 2009 where our document

3   ends, okay?

4   A    Which is right there -- right there with that --

5   with that principal payment of $6,040.68.  That's where

6   our documents ends.  Up to that point in time it appears

7   to be -- the balance of the loan does not agree but the

8   principal payments seem to match.

9   Q    Okay.  But the balance don't match your schedule,

10  right?

11  A    Correct.  Because the starting balance of the loan

12  does not match.  There was additional loans to the

13  company.  Their -- their note begins in August I believe

14  of 2002, referencing the $350,000 and ours includes some

15  additional loans that theirs, that this schedule does

16  not.

17  Q    So -- okay.  So basically the schedules don't match

18  the original schedule?

19  A    The schedules do not match the schedule which

20  appears to be the schedule prepared by my office.

21  Q    Okay.  Thank you.

22          MR. BERKOWITZ:  I'm sorry.  Is that --

23          MR. HIPPLE:  Oh, no thanks.

24          MR. BERKOWITZ:  Okay.  I'm sorry.

25  BY MR. HIPPLE:

1    Q   So basically which schedule -- in my opinion, I

2    believe we should go by the schedule of the accountant,

3    his schedule.

4              THE COURT:  Well, 132's admitted into evidence

5    and so is -- well, I don't know if we moved D-6 in, but

6    you'll move it into evidence, and that's for me --

7              MR. HIPPLE:  That's --

8              THE COURT:  -- the fact finder, to consider.

9              MR. BERKOWITZ:  I believe D-6 is also in as

10   one of plaintiff's exhibits.

11             THE COURT:  It's admitted.  So they're both

12   into evidence.  We can have argument at a later time of

13   which one is more accurate based on the testimony you've

14   heard -- I've heard, so we don't need to decide that

15   now.

16             MR. HIPPLE:  Okay.  All right.  Okay.  No

17   further questions, Your Honor.

18             THE COURT:  Okay.  Anything else, Mr.

19   Berkowitz, of the witness?

20             MR. BERKOWITZ:  If I could just quickly go --

21             THE COURT:  Sure.  Right.

22             MR. BERKOWITZ:  -- through a couple of things.

23                    RECROSS-EXAMINATION

24   BY MR. BERKOWITZ:

25   Q   Just I'd like to clarify something.  Are you

1    familiar with the fact that Teresa Hipple at the time

2    had two promissory notes totaling $350,000?

3    A   I am aware based upon the accounting records that

4    she loaned $350,000 to the business.

5    Q   Okay.  In your record -- I'll call it your record --

6    the spreadsheet that you did, I think it's 6 or 9.

7    A   Six.

8    Q   Six.  That shows other loans that she made?

9    A   Yes.

10   Q   So this document is less than on your document?

11   A   Yes.

12   Q   It doesn't includes other things?

13   A   Correct.

14   Q   Okay.  And so we start -- our document starts with

15   350?

16   A   Yes.

17   Q   Okay.  And would you agree with me that if

18   additional payments were made to Teresa Hipple, the

19   amount due on those loans would be reduced?  If she

20   received payments that aren't reflected on your exhibit

21   which claims that she is owed less than you're claiming

22   she's owed --

23   A   Correct.

24   Q   -- she received other payments?

25   A   If that's the case.

1    Q    Okay.  And if you could -- I'm going to show you

2    Exhibit 114.

3              THE COURT:  Plaintiff's 114?

4              MR. BERKOWITZ:  Plaintiff's 114, Your Honor.

5              MR. HIPPLE:  114?

6              MR. BERKOWITZ:  Yes, the Teresa one.

7    BY MR. BERKOWITZ:

8    Q    Would you tell us, sir, on Exhibit D-9, when's the

9    last payment that you had reflected for Teresa?

10   A    June of 2009.

11   Q    2009.  So if Teresa received payments after June of

12   2009, that would reduce the value of the loan?

13   A    Yes.

14   Q    Okay.  Now, I'm going to show to you Plaintiff's

15   Exhibit 114, and I'm going to represent to you that

16   these are all checks payable to Teresa Hipple, and if

17   you would like to look through that --

18              MR. HIPPLE:  What was the number?  I'm sorry.

19              MR. BERKOWITZ:  114.

20              MR. HIPPLE:  The plaintiff?

21              MR. BERKOWITZ:  Yes.

22              (Pause in proceedings.)

23              THE WITNESS:  Okay.

24   BY MR. BERKOWITZ:

25   Q    So when you reflect on this chart those payments --

 1     A    Yes.

 2     Q    -- we're making the amount that we claim to be due

 3     from SCIX to be less, correct?

 4     A    Correct.

 5     Q    Okay.  So we're being fair in our analysis here?

 6     We're including payments you didn't have the records to

 7     include?

 8     A    That's correct.

 9     Q    Okay.  Now, let's look at the interest on -- I'm

10     sorry, you're looking at -- on the --

11     A    Teresa loan.

12     Q    -- the Teresa loan on yours.

13     A    Yes.

14     Q    And did you compound that interest?

15     A    Yes.

16     Q    Okay.  And if you look at our calculation, and I'll

17     tell you that that's simple interest, correct?

18     A    Yes.

19     Q    That's less than the compound interest would be,

20     correct?

21     A    Yes.

22     Q    Because compound puts interest on interest?

23     A    Yes.

24     Q    And we didn't do that?

25     A    Correct.

1   Q    So that our calculation of how much is due is less

2        than what would come from your record?

3   A    Correct.

4   Q    Okay.  And if we had applied a 12 percent interest

5        to our records upon the occurrence of a default, you

6        would agree with me that when we confess judgment, and

7        I'm going to represent to you that we did, we could have

8        calculated 12 percent interest.

9   A    If that's what the note called for.

10  Q    Sure.  Okay.  And that we did not start compounding

11       interest until November, 2010.  So that if we had

12       compounded it before when the confession of judgment was

13       entered in 2003, we would have come up with a bigger

14       number at the end of the day?

15  A    Yes.

16  Q    Substantially bigger?

17  A    Yes.

18  Q    Okay.

19            MR. BERKOWITZ:  I have no further questions,

20       Your Honor.

21            THE COURT:  Anything else?

22            MR. HIPPLE:  No further questions, Your Honor.

23            THE COURT:  Okay.  Thank you, sir.  You're

24       excused.

25            THE WITNESS:  You're welcome.

1          THE COURT:  Thank you for coming.

2          (Witness excused.)

3          THE COURT:  Let's take a five-minute break,

4     all right?  Okay.  I'll see you in five minutes.

5          (Recess, 9:50 a.m. to 9:57 a.m.)

6          THE COURT:  All right.  Please be seated.  Mr.

7     Hipple, who's your next witness?

8          MR. HIPPLE:  We have a question, Your Honor.

9          THE COURT:  Sure.

10          MR. HIPPLE:  Then -- having to do with my

11     reading part.  I -- we agreed that I can read so far and

12     then when it gets to the technical reading part, that

13     we're in agreement that Mr. Pederson can read his own

14     questions.

15          MR. BERKOWITZ:  Your Honor, I said I had no

16     objection.  Mr. Geisser had a lot of leeway, and I don't

17     want to make things --

18          THE COURT:  Right.

19          MR. BERKOWITZ:  -- more complicated than they

20     need to be.

21          THE COURT:  Right.  I have an intern.  Would

22     you want my intern to help you?

23          MR. HIPPLE:  Certainly.

24          THE COURT:  Okay.  Ms. Lemmo, why don't you

25     come up?  Mr. Pederson, you can take the stand.  Do you

```
 1      have a problem with that?

 2                  MR. BERKOWITZ:  No.

 3                  THE COURT:  Yes.  Okay.

 4                  MR. HIPPLE:  Thank you, Your Honor.

 5                  MR. BERKOWITZ:  I think this would be her

 6      first courtroom appearance so she -- we should make a

 7      note of that for her.

 8                  THE COURT:  Right.  Go ahead, Mr. Pederson.

 9                  MR. HIPPLE:  I didn't know she was your

10      intern.  I asked her, I'll pay you to read today.

11                  THE COURT:  No, we don't -- you're not paying

12      her.

13                  MR. HIPPLE:  Okay.

14                  THE COURT:  Go ahead.

15                  COURTROOM DEPUTY:  Please raise your right

16      hand please.

17                  WILLIAM PEDERSON, Defendants' Witness, Sworn.

18                  COURTROOM DEPUTY:  Please state and spell your

19      full name for the record.

20                  THE WITNESS:  Sure.  My name is William

21      Pederson, P-E-D-E-R-S-O-N.

22                  THE COURT:  You may proceed, Mr. Hipple.

23                  MR. HIPPLE:  You may -- what is your first

24      name?

25                  MS. LEMMO:  Ann.
```

1           MR. HIPPLE:  Ann?  Okay.  You may --

2                    DIRECT EXAMINATION

3           (Questions being read by Ms. Ann Lemmo, intern

4      for Judge Rueter.)

5      BY MR. HIPPLE:

6      Q    What type of firm is EisnerAmper?

7      A    It's a public accounting, tax and financial services

8      firm.

9      Q    And what is your position there?

10     A    I'm a director with EisnerAmper.

11     Q    How long have you been employed by EisnerAmper?

12     A    Just over six years.

13     Q    Were you always a director there?

14     A    No.  Prior to being a director, I was a senior

15     manager when I first came on board.

16     Q    Do you have a particular area of work on which you

17     focus?

18     A    I focus on bankruptcy and litigation.

19     Q    Before we get into your duties and responsibilities

20     at EisnerAmper, I'd like to ask you about your education

21     and employment history.

22     A    Sure, go ahead.

23     Q    First, are you a certified public accountant?

24     A    Yes, I am.

25     Q    And for how long have you been a CPA?

1    A    I've been a CPA for approximately 30 years in

2    Maryland and a few years in Pennsylvania.

3    Q    Where did you go to college?

4    A    Undergraduate, I went to Roanoke College down in

5    Salem, Virginia.

6    Q    And what degree did you obtain there?

7    A    I obtained a Bachelor of Business Administration.

8    Q    When did you receive your Bachelor's?

9    A    1978.

10   Q    Did you get -- did you do any post-graduate work?

11   A    Yes.  I attended the University of Baltimore and

12   earned an MBA degree in 1985 and then I also earned a

13   Masters of Finance -- I'm sorry, Masters of Science in

14   Finance in 1992.  I also attended law school at Loyola,

15   New Orleans and earned a JD.

16   Q    Did you take the bar exam?

17   A    Yes.

18   Q    Did you ever practice law?

19   A    I clerked for a bankruptcy firm in New Orleans, so I

20   was under the supervision of a Judge -- I'm sorry, of a

21   Judge -- of an attorney for a couple years while I was

22   in law school, but no, I've not actually practiced law.

23        THE COURT:  Would you keep your voice up, Mr.

24   Pederson, please.

25        THE WITNESS:  Sure.  I'm trying to get this --

1          THE COURT:  Yes, move that down.  Thank you.

2     BY MR. HIPPLE:

3          (Questions being read by Ms. Ann Lemmo, intern

4     for Judge Rueter.)

5     Q    What practice area?

6     A    In his practice, it was bankruptcy and there was

7     some tort litigation involving accounting malpractice.

8     Q    Other than being a CPA and a JD, do you hold any

9     other designations?

10    A    Yes.  I hold a number of designations under the

11    AICPA.  I'm accredited in business valuation.  I'm also

12    certified in financial forensics.  I am a CIRA, which is

13    certified in insolvency and restructuring.  I'm also a

14    certified fraud examiner and I'm certified in distressed

15    business valuation.

16    Q    For each designation, can you tell the Court what is

17    -- what it means and how long you have held it?

18    A    I do have to look at my notes, because it -- the

19    years sometimes get confusing.  I've been an ABV since

20    2007.  I've been a CFF since 2008.  CIRA I passed in

21    2005.  CDBV was 2007 and the CFE was in 2004.

22    Q    And please describe in detail for the Court the

23    scope of the work that you perform for clients of

24    EisnerAmper?

25    A    Well, I work primarily in bankruptcy and litigation

1    support.  With regard to bankruptcy, I've worked for

2    both debtors and creditors committees.  I do work as a

3    financial analyst and I do budget work.  I've helped

4    them file schedules.  I look at claims, I do feasibility

5    and I do liquidation analysis.  I also evaluate

6    potential claims against D&Os, lenders and other

7    parties.

8              In terms of litigation support, I'm usually

9    working on adversarial proceedings that are coming out

10   of a bankruptcy litigation but not always.  Sometimes

11   they're just plain proceedings, and it -- and it also

12   involves various valuation issues and analysis.

13   Q    And for how long have you been providing these types

14   of services to clients?

15   A    About 15 years.

16   Q    Do you serve as a consulting expert for clients in

17   bankruptcy or other litigation?

18   A    Yes, sometimes I'm a named expert, but other times,

19   I'm a consulting expert and I work in the background and

20   either parallel a case or actually do the background

21   work, and another analyst or adviser will come in and

22   pick up the work.

23   Q    Have you ever served as a testifying expert?

24   A    I have testified in deposition as well as for the

25   American Arbitration Association.

1    Q    How would you break down on a percentage basis the

2    amount of work you have performed as a consulting expert

3    versus a testifying expert?

4    A    I am kind of split.  It just will vary from year to

5    year, but perhaps -- it's really evenly split, 40/50

6    percent per year, and the other part of the year will be

7    devoted to the other side of it.

8    Q    About how many times have you been proffered as an

9    expert in court, to provide evaluation of a business or

10   asset?

11   A    I've been proffered a number of times.  I would say

12   somewhere between five and ten.

13   Q    Prior to this case, have you been asked to provide

14   evaluation of assets, a business or an ownership

15   interest in a business in matters involving a claim of

16   fraudulent transfer?

17   A    Yes, several times.

18   Q    And in any of these cases involving claims of

19   fraudulent transfer, were you asked to provide an

20   opinion as to the valuation of assets or a business?

21   A    Yes.  I have provided opinions and I've worked with

22   others in our firm to provide an opinion.

23   Q    And can you describe for the Court your involvement

24   in the matters involving claims of fraudulent conveyance

25   and the status of each?

1    A    Well, I research issues, I gather documents, draft a

2         report.  If there are other staff involved, I'll

3         supervise the staff.  I'll work with other members of

4         the firm and we'll -- we'll move forward preparing a

5         report and running through discovery.

6    Q    In connection with work you have done in the context

7         of bankruptcy, have you ever been retained by a

8         bankruptcy trustee to provide valuation services?

9    A    Yes, I have.

10                  MR. BERKOWITZ:  Your Honor, we'll stipulate to

11        the expert use of this witness.

12                  THE COURT:  Mr. Hipple, do -- okay.

13                  MR. HIPPLE:  Yeah, Your Honor.  Yeah.

14                  THE COURT:  I do find Mr. Pederson is an

15        expert in the area of business evaluations and I'll

16        allow him to testify as to that area.  Do you want to

17        ask further questions on this area --

18                  MR. HIPPLE:  No, we're just --

19                  THE COURT:  -- or do you want to move to the

20        substance?

21                  MR. HIPPLE:  -- we're just about done this

22        anyway, so we --

23                  THE COURT:  Okay.  Fine.  All right.

24                  MR. HIPPLE:  That's fine.

25                  THE COURT:  Well, then finish him up, Ms.

1        Lemmo, go ahead.

2                    THE WITNESS:  Well, if we're finished, you

3        could skip to page six.

4                    THE COURT:  Okay.

5                    MS. LEMMO:  Yes.

6        BY MR. HIPPLE:

7                    (Questions being read by Ms. Ann Lemmo, intern

8        for Judge Rueter.)

9        Q   I'm showing you a document marked as Exhibit D-39A.

10       Do you recognize it?

11                   MR. HIPPLE:  Black book.

12                   MR. BERKOWITZ:  Your Honor, I believe it's the

13       witness' CV --

14                   MR. HIPPLE:  Yeah, it's the --

15                   MR. BERKOWITZ:  -- to which we stipulate.  We

16       have no objection to it.

17                   THE COURT:  39.

18                   MR. HIPPLE:  39A, Your Honor.

19                   THE COURT:  Okay.  39A.

20                   THE WITNESS:  Your Honor, I think we're headed

21       to 39, are we not?

22                   THE COURT:  39 is your CV.

23                   MR. BERKOWITZ:  39A, Your Honor, is the CV.

24                   THE COURT:  Is the CV.  39 is the report.

25                   THE WITNESS:  Correct.

1          THE COURT:  Okay.  Do you want him to go to

2      the report, Mr. Hipple?

3              MR. HIPPLE:  Yes.  Yes, Your Honor.

4              THE WITNESS:  Yes, I recognize this document.

5      BY MR. HIPPLE:

6              (Questions being read by Ms. Ann Lemmo, intern

7      for Judge Rueter.)

8      Q   Tell the Court what it is.

9      A   This is the defendants' expert report.

10     Q   Did you prepare this document?

11     A   I did.

12     Q   Can you tell the Court if it is an accurate

13     depiction of your education and experience?

14     A   It is.

15     Q   In reference to employers identified on Exhibit D-

16     39A other than EisnerAmper, can you give the Court a

17     brief description of your duties and responsibilities

18     you performed for each employer?

19     A   I think you're skipping around a little bit.

20             THE COURT:  Yes.

21             MR. HIPPLE:  Yeah, we'll skip that part,

22     right?

23             MS. LEMMO:  Okay.

24             THE COURT:  Right.

25             THE WITNESS:  I think we're at the top of page

1    seven.

2              THE COURT:  Page what?

3              THE WITNESS:  This is not a document, Your

4    Honor.

5              THE COURT:  Oh.

6    BY MR. HIPPLE:

7              (Questions being read by Ms. Ann Lemmo, intern

8    for Judge Rueter.)

9    Q   And did you prepare this document?

10   A   Yes.

11   Q   And did you prepare that in connection with your

12   engagement by defendants as an expert in this action?

13   A   Yes.

14   Q   Can you tell the Court what the scope of that

15   engagement is?

16   A   I was engaged to review the plaintiff's expert

17   report and provide a rebuttal analysis.

18   Q   And what did you do in order to prepare your report?

19   A   Well, I read Mr. Geisser's report, I looked at his

20   document listing.  I reviewed documents provided by

21   counsel.  I performed research on PUFTA.  I looked at

22   valuations, patents, competitors and reviewed the

23   SSVS-1.

24   Q   And did you review Mr. Geisser's report and all of

25   its attachments before preparing your opinion?

1    A    Yes, I did.

2    Q    And were you present in the courtroom when Mr.

3    Geisser testified in this case?

4    A    Yes, I was.

5    Q    And were you present when Mr. Geisser was deposed in

6    March, 2013?

7    A    He was actually deposed in March of 2014 as I

8    recall, but, yes.

9    Q    Having sat through that deposition, having read Mr.

10   Geisser's opinion and then having been present in the

11   courtroom when Mr. Geisser testified, is it clear to you

12   what the subject of his purported valuation is?

13   A    No.  He actually didn't define the premise of value

14   and he wasn't clear as to what he was trying to value.

15   Q    What is a premise of value?

16   A    When we talk about a premise of value we're

17   referring to what the assumption's going to be with

18   regard to the business on a go-forward basis that could

19   include going concern or liquidation.

20   Q    What is the standard of value?

21   A    The standard of value is -- is something a little

22   bit different, and that is where we try to zero in on

23   what really the purpose of the report is.  And the

24   standard of value would be -- fair market value would be

25   obviously one very well understood, or fair value or

Mr. Pederson - Direct                    58

1    market value.  There's a lot of variations on it, but

2    that's what a standard of value is.

3    Q    What is the identity of subject interest?

4    A    The identity of subject interest is the subjects

5    that's actually being valued.  It could be the assets,

6    it could be the company as a whole.  It could be a

7    specific group of assets.

8    Q    Why do you say that Mr. Geisser's -- Mr. Geisser is

9    unclear or that he is confused about what he is valuing?

10   A    Well, within his report he makes references to a

11   number of different subjects, and I do not have a copy

12   of Mr. Geisser's report in front of me.

13             THE COURT:  Here you go.

14             THE WITNESS:  Thank you, Your Honor.

15             But within his report, he at different points,

16   and we can get into the detail if we need to, but he

17   talks about valuing 100 percent interest of SCIX.  I

18   think he does that in Section 5, so this is an example

19   of some of his opinions.

20             "I prepared a calculation of value for 100

21   percent interest in the business formerly known as

22   SCIX."

23             100 percent interest really relates to assets

24   minus the liabilities, and it would be the equity

25   holding that somebody would have in an interest.  And he

1    doesn't do that here, but he, nonetheless, tells us that

2    that's what's going on here.

3          In other places he talks about he valued SCIX

4    which one would presume means the whole company, and

5    this is in Part 2, he indicates, "preparing a

6    calculation of value of SCIX, LLC."

7          When we normally look at a full entity and

8    we're looking at the value of an entity, we'll take a

9    look at assets minus liabilities to give you the actual

10   value of the entity.

11         Elsewhere he talks about the transferred

12   assets of SCIX, and he doesn't tell us what those are,

13   but he -- he brings that up.  So we've actually got

14   three points of reference here in terms of what he's

15   valuing, but it's -- it's not clear as to what he's

16   doing with them.  So that's why there is -- we bring up

17   the issue that there's an identity of the subject

18   interest at issue here.

19   Q    What is the effect of the subject of Mr. Geisser's

20   purported valuation being unclear?

21   A    Well, if he's going to value the entire business,

22   then he's going to need to know what the liabilities

23   are.  This is simply assets minus liabilities equals

24   equity, and the equity would be the 100 percent

25   interest.  Likewise, if we're going to value a business,

1    we need to look at its liabilities.

2            Now, it's very clear, Mr. Geisser didn't do

3    that here.  He doesn't know what the liabilities are and

4    he doesn't indicate that he did when he -- in his

5    report.  So he's talking about doing valuations of 100

6    percent interest but it's just the components aren't

7    here to do that.

8            So it's important to know what your -- what

9    your frame of reference is so that you can look at the

10   right components and come up with a value that -- that

11   lines up with what your subject is.

12   Q   When you read Mr. Geisser's ultimate opinion in his

13   report, did you note that he qualified the word "assets"

14   in any way?

15   A   The only point he really qualified it is he did

16   mention at one point the transfer of assets but he

17   didn't define what those assets were.

18   Q   And in Mr. Geisser's report, is there any reference

19   to a list of the assets transferred?

20   A   No, there isn't.

21   Q   In Mr. Geisser's report, does he ever define which

22   assets were, in fact, conveyed or what the book value of

23   those assets were, either before or after the transfer?

24   A   No, he did not do that.

25   Q   Having reviewed Mr. Geisser's report, attended his

1    deposition and listened to his testimony at trial, can

2    you tell the Court whether Mr. Geisser was retained by

3    plaintiff to perform a valuation engagement?

4    A    No, he was not retained to perform a valuation

5    engagement.

6    Q    And what is your understanding to the scope of his

7    engagement?

8    A    Well, he was -- and from his report, he was retained

9    to analyze financial records and to estimate

10   distributable cash flow available to owners and insiders

11   of the subject companies.  So that's a little bit

12   different than -- than what we have been discussing in

13   terms of valuation of an entity or a valuation.  He was

14   apparently using financial records to estimate

15   distributable cash flow.

16   Q    And did Mr. Geisser perform services using a

17   calculation of value methodology?

18   A    Yes, he did.

19   Q    And is there an authoritative treatise in your

20   industry which sets forth the definition of calculation

21   of value methodology?

22   A    Yes.

23   Q    And what is that authoritative source?

24   A    It is the AICPA standards -- statement of standards

25   on valuation services.

1    Q   What does the AICPA stand for?

2    A   I'm sorry, American Institute of Certified Public

3    Accountants.

4    Q   Would you agree that a shortcut name for this

5    authoritative source is SSVS Number 1?

6    A   Yes.

7    Q   Can you explain the scope of what the SSVS Number 1

8    covers?

9    A   It actually covers the conduct of a CPA involved

10   with a valuation assignment or engagement.

11   Q   And who, if anyone, is bound to use the method set

12   forth in SSVS Number 1?

13   A   Well, it's very specific.  It actually applies to

14   all accountants performing valuations of assets or a

15   business.

16   Q   As a CPA, is Mr. Geisser, plaintiff's expert, bound

17   to follow these standards?

18   A   Yes, he is.

19   Q   Are you?

20   A   Yes.

21   Q   And according to the SSVS Number 1, what is the

22   definition of calculation of value referenced in that

23   definition, that in performing a calculation of the

24   value --

25   A   I think you're supposed to stop there.

Mr. Pederson - Direct                    63

1    Q    Yeah, okay.  I'm a little confused.

2    A    That's all right.  In my report in footnote three, I

3    actually describe what a calculation engagement is and

4    it's taken from SSVS-1.

5              "A valuation now" -- sorry -- "a valuation

6    analyst performs a calculation when the valuation

7    analyst and the client agree on the valuation approaches

8    and methods the valuation analyst will use and the

9    extent of procedures the valuation analyst will perform

10   in the process of calculating the value of a subject

11   interest.  (These procedures will be more limited than

12   those of a valuation engagement.)

13             "And, two, the valuation analyst expresses the

14   result of these procedures as a calculated value.  The

15   calculated value is expressed as a range or a single

16   amount.  A calculation engagement does not include all

17   the procedures required for a valuation engagement."

18   Q    You reference in that definition that in performing

19   a calculation of value, the valuation analyst and client

20   agree on the valuation approaches and methods the

21   valuation analyst will use.  Can you explain the effect

22   of that on the end result of such an engagement?

23   A    Well, because he's doing a calculation of value, he

24   doesn't have to follow -- follow all the guidance that

25   one would normally use in a conclusion of value.

1    Q    And is that what occurred here?

2    A    Yes.

3    Q    The definition of calculation of value as you read

4    it provides that such engagement does not include all of

5    the procedures required for a valuation engagement.   Is

6    there -- is there such a methodology?

7    A    Yes, a conclusion of value.

8    Q    Does the SSVS Number 1 define conclusion of value?

9    A    Yes, it does.

10   Q    Can you provide that definition?

11   A    Yes.   And, again, I'm -- I'm reading from my own

12   report, footnote four.

13           "A valuation analyst performs a valuation

14   engagement when the engagement calls for a valuation

15   analyst to estimate the value of a subject interest and

16   the valuation analyst estimates the value as outlined in

17   paragraphs 23 through 45" -- which are in SSVS-1 and are

18   very specific -- "and is free to apply the valuation

19   approaches and methodologies he or she deems appropriate

20   in the circumstances.   The valuation analyst expresses

21   the result of the valuation as a conclusion of value.

22   The conclusion of value may be either a single amount or

23   a range."

24   Q    When you say conclusion of value, is that the same

25   as an opinion of value?

1    A    Yes.

2    Q    And can the two be used interchangeably?

3    A    Yes.

4    Q    Do you use the same interchangeably?

5    A    Yes.

6    Q    And can you tell the Court which methodology, if

7    any, when applied, results in an actual valuation of

8    assets or a business?

9    A    Sure.  The conclusion of value or an opinion of

10   value is what provides an actual amount for a value of a

11   business.

12   Q    As a general matter, how does a calculation of value

13   engagement differ from a conclusion of value engagement?

14   A    Well, a conclusion of value encompasses a full range

15   of recognized valuation methodologies, procedures and

16   techniques that provide the expert with information and

17   tools to formulate an educated opinion of value.

18            A calculation of value is a limited scope

19   methodology whereby specifically chosen data is

20   evaluated in a specific and agreed-upon method.  It is a

21   limited procedure engagement which allows the expert to

22   short cut and altogether ignore standard valuation

23   techniques.  It is a myopic and often distorted

24   perspective as it is confined to the specific procedures

25   and documents agreed to in the engagement letter.

1          It is not a valuation and cannot by itself

2     lead to a conclusion of value.

3     Q    You mentioned that the calculation of value

4     methodology does not incorporate any of the standard

5     valuation techniques.  What are the three most common

6     valuation techniques?

7     A    Well, the income approach, the market approach and

8     the asset approach.

9     Q    Can you briefly explain each technique?

10    A    Sure.  When you take a look at an income approach,

11    you'll take a look at the earnings of the company.

12    You'll look at the historical earnings and you'll

13    usually project them out and try to determine where the

14    company is going in a future period.  You can then apply

15    either a capitalization rate or you can apply a

16    discounted cash flow.

17          Under a market approach, it actually -- there

18    are two avenues on the marketing approach, and one is to

19    look at similar companies doing business.  The other is

20    to take a look at transactions involving similar

21    companies, in other words, where a company was bought or

22    sold.

23          And under the last methodology, that would be

24    the asset approach, you go ahead and take a look at the

25    individual assets of the company and try to value them

1    as they appear on the balance sheet, but you can bring

2    them up to fair market value or whatever your -- your

3    standard of value is.

4    Q   And what is the purpose of using these techniques?

5    A   Well, the idea behind using the three methodologies

6    is to reconcile between them and try to get a good feel

7    for how the numbers are running and whether or not they

8    make sense.  They kind of act as cross-checks between

9    one another.

10   Q   And what does SSVS Number 1 state, if anything,

11   about the consideration of these three most common

12   standard valuation techniques in performing a valuation

13   engagement?

14   A   Well, SSVS-1 indicates that these should be

15   considered in any valuation.

16   Q   Do you normally use more than one?

17   A   We usually try to use two or three methods, and if

18   we're not able to use it, we detail why it can't be

19   used.

20   Q   Is it possible that one standard valuation technique

21   can result in a valuation that is different than the

22   result of a different standard valuation technique?

23   A   Yes.

24   Q   And what do you do in such circumstances?

25   A   Well, you reconcile the results.  If they're

1    inconsistent, you need to figure out why and figure out

2    how that needs to be addressed.

3    Q   And is there an obligation to reconcile these

4    results?

5    A   Yes, there is.

6    Q   Where is that obligation found?

7    A   It's actually in SSVS Number 1, paragraph 42.  I can

8    read -- read it for you because it's also in my report.

9          Yeah.  Paragraph 42, "For a conclusion of

10   value calls for the reconciliation of results from

11   different approaches and methodology and assess the

12   reliability of the results under different approaches."

13   Q   What does that reconciliation represent?

14   A   It actually represents the valuation.

15   Q   When performing a calculation of value, do you also

16   have to utilize any standard valuation techniques?

17   A   Not per se, no.  You're not required to do them,

18   and, therefore, you don't have to reconcile the results.

19   Q   In performing his calculation of value, did Mr.

20   Geisser ignore these standard valuation techniques?

21   A   Yes, he did.

22   Q   What effect, if any, does this have on the product

23   of calculation of value engagement?

24   A   It makes the -- his determination less reliable.

25   Q   Why do you say this?

1   A   It's not cross-referenced to anything.  Mr. Geisser

2   used a single approach and it doesn't seem to fit with

3   anything else.  And, again, it's because -- part of the

4   problem is we're not clear as to what he's valuing.  So

5   it's difficult to figure out how to reconcile what he's

6   doing.

7   Q   Are you familiar with the term fair market value?

8   A   Yes.

9   Q   And can you tell the Court what your understanding

10  of that term is?

11  A   I think that's also located in my report.

12              "It's the price at which property would have

13  changed hands between a hypothetical, willing and able

14  buyer and a hypothetical, willing and able seller acting

15  at arm's length in an open and unrestricted market when

16  neither is under a compulsion to buy or sell and when

17  both have reasonable knowledge of the relevant facts."

18  Q   And is that the definition of fair market value used

19  by others in your profession?

20  A   Yes.

21  Q   And where does this -- where does that definition

22  come from?

23  A   This actually came from the certified valuation

24  analyst website which is what they're using, but it also

25  really relates back to Revenue Ruling 59-60, which is

1    also kind of a cornerstone for -- for how valuation or

2    for how fair market value is defined.

3    Q   Are you familiar with the term reasonably equivalent

4    value?

5    A   Yes.

6    Q   And what is the source or sources of your

7    understanding of that term?

8    A   Actually, there are two sources.  One, I did take a

9    look at the Pennsylvania Uniform Fraudulent Transfer Act

10   and then I also looked at what was in plaintiff's motion

11   for summary judgment.

12   Q   And do you recall how plaintiff defined that term in

13   her motion for summary judgment?

14   A   Yes.  "Reasonably equivalent value is assessed based

15   upon totality of the circumstances test considering a

16   variety of factors such as fair market value compared to

17   the actual price paid and the arm's length nature of the

18   transaction."

19   Q   Did Mr. Geisser's report include any analysis of the

20   totality of the circumstances relating to the assets

21   transferred by SCIX to Clement Hipple?

22   A   No, he did not.

23   Q   Did Mr. Geisser ever determine the fair market value

24   of assets transferred by SCIX to Clement Hipple on

25   October 13th, 2010?

1    A    He did not.

2    Q    Do you see anywhere in Mr. Geisser's report where he

3    performed an analysis of what a willing buyer would have

4    paid for the assets that were transferred or what a

5    willing seller would have sold the assets for?

6    A    No, he did not.

7    Q    Have -- having reviewed Mr. Geisser's report, does

8    it even reference the term fair market value?

9    A    No.   Fair market value does not appear in his

10   report.

11   Q    Are there factors that would be properly considered

12   in determining fair market value of a business or a 100

13   percent interest in a business?

14   A    Yes.

15   Q    What might some of those factors be?

16   A    Well, as we already talked about, the liabilities

17   are certainly something you need to take a look at.  You

18   need to look at judgments against the business.  You

19   would want to take a look at the current economy, the

20   quality of the work force, whether the company had

21   equity in it, pending litigation, liens on assets,

22   ability to get credit.  There are a number of factors

23   you would be taking a look at when you enter into a fair

24   market valuation.  Those are just some of them.

25   Q    Any others?

1    A    Actually, there are always more, because each case

2    is a little bit unique, so you need to get into it

3    really deep to figure out what has an impact, what does

4    not.

5                One of the interesting things about this case

6    is that when we did some patent research, we found that

7    there's a new patent out there for this -- a similar

8    product, and so that would be something you would

9    consider when you take a look at -- at where this

10   company is going, what its prospects might be.

11   Q    Did Mr. Geisser consider any of the factors in

12   performing his calculation of value?

13   A    No, he did not.

14   Q    Are any of those factors analyzed in his report?

15   A    No, they're not.

16   Q    Is the calculation of value methodology used by Mr.

17   Geisser the appropriate methodology to determine the

18   fair market value of assets, a business, or the fair

19   market value of 100 percent interest in a business?

20   A    No.

21   Q    In this case, does Mr. Geisser's calculation of

22   value equate to fair market value?

23   A    No, it doesn't.

24   Q    In Mr. Geisser's report, does Mr. Geisser at all

25   address or explain why the defendants or any individuals

Mr. Pederson - Direct                              73

1   would be interested in acquiring the assets of SCIX as

2   of October 13th, 2010 for $1.75 million?

3   A    No, he does not.

4   Q    Now, are you familiar with the term reasonably

5   equivalent value?

6   A    Yes.

7   Q    What is the source or sources of your understanding

8   of that term?

9   A    As we discussed a little while ago, I took a look at

10  the Pennsylvania Uniform Transfer Act as well as the

11  plaintiff's motion for summary judgment.

12  Q    According to P-U-F-T-A, how is that term defined to

13  your knowledge?

14  A    As a regular --

15           MR. BERKOWITZ:  Objection as -- I'm sorry,

16  P-U-S-T-A, I'm --

17           MS. LEMMO:  P-U-F-T-A.  Sorry.

18           THE WITNESS:  I think she said P-U-F-T-A,

19  PUFTA.

20           MR. BERKOWITZ:  I'm sorry?

21           THE WITNESS:  PUFTA.

22           MR. BERKOWITZ:  Oh, okay.

23           THE WITNESS:  That's all right.

24           MS. LEMMO:  I'm sorry.

25           MR. BERKOWITZ:  I'm sorry, I'm sorry.

1      MR. HIPPLE:  Imagine if I was reading.

2      THE COURT:  You go -- go ahead.

3      THE WITNESS:  Okay.  When we're referring to

4  PUFTA, we're talking about, under its terms, a regularly

5  conducted, non-collusive sale.

6  BY MR. HIPPLE:

7      (Questions being read by Ms. Ann Lemmo, intern

8  for Judge Rueter.)

9  Q   And according to plaintiff, how did she define the

10  term in her memo of law in support of motion for summary

11  judgment?

12  A   We went through it, but "Reasonably equivalent value

13  is assessed based on the totality of the circumstances,

14  considering a variety of factors such as fair market

15  value compared to the actual price paid and the arm's

16  length nature of the transaction."

17  Q   And did Mr. Geisser perform an REV assessment based

18  upon either of the two definitions you have referenced?

19  A   He did not.  And for the record, REV is reasonably

20  equivalent value.

21  Q   Does Mr. Geisser provide any definition in his

22  report for the term reasonably equivalent value?

23  A   No, he does not.

24  Q   Now, in this case, could the calculation of value

25  methodology as applied by Mr. Geisser result in any

1    actual valuation of assets or a 100 percent interest in

2    the business?

3    A    No.

4    Q    Does Mr. Geisser's application of the calculation of

5    value methodology result in a determination of

6    reasonably equivalent value?

7    A    No, it does not.

8    Q    Assuming Mr. Geisser's intent was to value a 100

9    percent interest in the business of SCIX, does Mr.

10   Geisser's methodology consider the requisite totality of

11   the circumstances to determine whether there was an

12   exchange of REV?

13   A    No, there's nothing in his report that he analyzed

14   or even considered fair market value.

15   Q    Why not?

16   A    Because the value of -- his calculation of value

17   methodology doesn't equate to fair market value.  It

18   doesn't incorporate a lot of the standard valuation

19   techniques which we would use to determine a fair market

20   value.

21   Q    What is the effect, if any, of Mr. Geisser's failure

22   to determine the fair market value of the assets

23   transferred by SCIX to Clement Hipple on October 13th,

24   2010?

25   A    He actually -- the effect is that he can't conclude

1    with any level of certainty that the reasonably

2    equivalent value of the transfer of SCIX assets as of

3    October 13 would have been 1.75 million.  The requisite

4    totality of the circumstances test demands that he

5    consider all aspects of the transfer, including fair

6    market value, and he fails to do this.

7    Q    What is the proper methodology to be used to

8    determine the fair market value of assets or a business?

9    A    Conclusion of value or an opinion of value.

10   Q    Why do you say that?

11   A    The valuation -- I'm sorry, the valuation engagement

12   approach allows for the requisite work to develop the

13   foundation on which to opine the fair market value.  In

14   other words, going back to the three methodologies and

15   reconciling them and also taking a look at the other

16   potential impacts of, for example, the economy, just the

17   general market in terms of which he's operating with,

18   the patents, for example.

19   Q    Was that foundation developed here?

20   A    No, it was not.

21   Q    Was Mr. Geisser's conclusion as to reasonably

22   equivalent value -- it cuts off --

23   A    Yeah.

24   Q    Does the application of calculation of value

25   methodology allow for any shortcuts?

1    A   Yes, absolutely.

2    Q   Did Mr. Geisser engage in any shortcuts in applying

3    his calculation of value methodology?

4    A   Yes, in terms of not being a conclusion of value,

5    yes.

6    Q   Were there any factors -- facts or factors that Mr.

7    Geisser failed to consider which would be considered in

8    a fair market value analysis of the business?

9    A   Yes.

10   Q   What would be such factors or facts that he failed

11   to consider?

12   A   Well, he didn't do an analysis of the assets, the

13   liabilities, the competitors, customers, industry,

14   suppliers, raw materials, the ability to borrow funds,

15   just non-financial information, economy and patents.

16   Q   Why do you say that?

17   A   Well, because he -- he's making a lot of assumptions

18   when he goes to an earnings approach.  He's assuming

19   everything is in place and it continues forever without

20   any -- doing any underlying analysis to really determine

21   if that's the case.

22          Also it's not clear whether or not he knew

23   that the website wasn't owned by SCIX.  And so there's

24   some question as to those.  The website which was

25   certainly being utilized to sell the product is kind of

Mr. Pederson - Direct                    78

1    built into the numbers in the way he did his

2    methodology, but it may not have been an asset.  It's

3    also not clear that that was transferred.  So there are

4    issues that really need to be investigated, and if they

5    have some conclusion, he could bring that out in his

6    report.

7    Q    Are there any other facts or factors Mr. Geisser

8    failed to consider?

9    A    Well, I did some research on the patents, and I

10   found that there were actually three patents and two of

11   them had expired.  In Mr. Geisser's report, he

12   references that it's a unique patented product.  I think

13   he makes another reference to it as well, and he

14   apparently wasn't aware that the patents had actually

15   expired at the time of the transfer or at least two of

16   them had.

17   Q    In his report, does Mr. Geisser attribute some value

18   to SCIX based upon the facts that it had patents?

19   A    As I just described, he called it a unique patented

20   product, so he actually was considering that the patent

21   was in place.

22   Q    And does he disclose anywhere in his report that one

23   of the patents had expired less than a year before the

24   subject transaction?

25   A    No, he did not.

1    Q    Did you investigate as to whether any of the patents

2    were expired?

3    A    Yes, I did.

4    Q    And what did you do?

5    A    I was actually able to go on to the U.S. Patent

6    website and with information I had with regard to patent

7    numbers, it wasn't too hard to -- to kind of delve into

8    this a little bit and determine which patents were out

9    there related to this product, and as I alluded to

10   earlier, there's actually a new patent out there by a

11   different company.

12   Q    What were the results of that investigation?

13   A    I think I just touched on that.

14   Q    Under a valuation engagement, for how long do you

15   attribute value to the -- to such intangible property

16   such as patents?

17   A    It will vary a little bit, but certainly you do want

18   to look at when a patent expires, and so at that point

19   in time, you do need to question whether or not there's

20   ongoing value associated with the product, and sometimes

21   there is; sometimes there isn't.  It just depends.

22   Q    And what effect does expiration of this patent have

23   on the valuation of SCIX or an ownership interest in

24   SCIX assuming that is what Mr. Geisser purports to

25   value?

1   A   Well, it fails to consider that SCIX might not have

2   the exclusive right to sell the Steel Seal product at

3   October 13, 2010, the day of the transfer, and that some

4   of these patents had actually expired.  One of the other

5   things he failed to consider when he was kind of looking

6   at this part of the analysis is that Scientific Chemical

7   had the confidentiality agreement with Colonial

8   Chemical.

9          So it was actually an outside or a different

10  company than SCIX that had the ability to order up

11  product.  Also that Clem Hipple was not an owner of SCIX

12  so with his understanding of the formula and with the

13  expired patents, he could go out in the marketplace and

14  order up from Colonial Chemical and start a business.

15  Q   And what effect, if any, does the existence of that

16  confidentiality agreement have on the value of SCIX as

17  of October 13th, 2010?

18  A   Well, as I started to get into, Mr. Hipple has the

19  ability to -- to order more product.

20  Q   Do you know if Mr. Geisser considered this in coming

21  to his purported valuation?

22  A   He did not.

23  Q   Assuming Mr. Geisser's intent was to value SCIX as a

24  going concern or a 100 percent ownership interest in

25  SCIX as of October 13th, 2010, would a valuation of

1    either require consideration of the liabilities of SCIX

2    as of that date?

3    A   Yes.  As we described earlier, you'd have to know

4    what the liabilities are to determine the value of the

5    company and certainly 100 percent interest in the

6    company.

7    Q   Why do you say that?

8    A   Because simply assets minus liabilities is going to

9    equal equity and that's what we're talking about when we

10   talk about 100 percent interest.

11   Q   In reviewing Mr. Geisser's report, did you see where

12   he took into consideration the liabilities of SCIX as of

13   October 13th, 2010?

14   A   No, he did not.

15   Q   Is the failure to consider the liabilities of SCIX

16   consistent with utilizing even a calculation of value

17   methodology?

18   A   Not entirely.  But, again, we're not clear as to

19   what he's valuing.  If he's doing a calculation of

20   value, which is a limited procedure, he would still need

21   to form some basic calculations.  And so if he's really

22   trying to value 100 percent interest in SCIX, he's going

23   to need to know what the liabilities are.

24   Q   As to the assets -- as to the assets of SCIX, what,

25   if anything, did he fail to consider?

1    A    He didn't seem to consider that -- that all the

2    assets were not transferred to Clem Hipple.

3    Q    What assets were not transferred?

4    A    As I understand it, the patents were not transferred

5    and the website was not transferred.

6    A    Now, with respect to the data used to perform a

7    valuation, does SSVS Number 1 provide any guidance?

8    A    Yes.  And Mr. Geisser read the -- or he actually

9    read it to himself yesterday -- under SSVS-1, it's

10   paragraph 43, and in my footnote 24, it relates to

11   subsequent events.  And what I have in my footnote is,

12   "Generally the valuation analyst should only consider

13   circumstances existing at the valuation date and events

14   occurring up to the valuation date."

15           Now, of course, Mr. Geisser used a lot of data

16   from 2011 and 2012 which is obviously subsequent to the

17   transfer date.  Now, yesterday after reading that

18   paragraph, Mr. Geisser indicated that he was not bound

19   by that paragraph.  However, paragraph 46 which is

20   related to calculation of value, specifically indicates

21   that a calculation of value is subject to this

22   requirement.

23   Q    Do you have an understanding as to why data existing

24   at the valuation date and events occurring up to the

25   valuation date are to be considered?

1    A    Yes.

2    Q    What is that understanding?  Data occurring after

3    the transfer date is generally -- oh, I'm sorry.

4    A    That's all right.  What we're getting at here is if

5    you're using data post-transaction, you're no longer

6    within the realm of market value, because as we also

7    read yesterday from Shannon Pratt, that when you're

8    dealing with market value, you can only look at

9    information up to the date of the transfer which is

10   known or knowable.

11            When you go past that date, then you're really

12   outside the realm of fair market value and really you're

13   just doing some other type of analysis, a back-flow

14   analysis, however you want to refer to it, and you're no

15   longer in the realm of fair market value.  So this is

16   one of the reasons that his calculation of value just

17   can't fit the mold because fair market value, by

18   definition, doesn't include subsequent information.

19   Q    And why is that?

20   A    It's because this is not information that's

21   available to anybody at the time of the transfer.  You

22   can only use information that you know at the time or up

23   to the time of the transfer.  Anything after that is

24   hindsight.

25   Q    And is -- and is there a way to get around using

1    data existing at the valuation date and events occurring

2    up to the valuation date.

3    A    Hang on a second.  Well, what's going on here is Mr.

4    Geisser was obviously aware of the garnishment that took

5    place in September and up to October 13.  It's not clear

6    how he used that information in his analysis.  When

7    we're talking about subsequent events, this is actually

8    a contemporaneous event and I think we're going to get

9    into this in a minute anyway as to what's going on with

10   -- he doesn't perform a solvency analysis.  He doesn't

11   know if the entity is a going concern.

12             I'm sorry, I'm getting off track.  Why don't

13   you go ahead and continue.

14   Q    The next question I have is, "What is that?"

15   A    All right.  I'm at the top of 25, "Is SSVS Number 1,

16   paragraph 43" --

17   Q    Okay.

18   A    -- "required to be considered even when a

19   calculation of value is conducted?"

20             And I indicate, "Yes," and that's paragraph

21   46.

22   Q    Can you identify or explain the approach Mr. Geisser

23   used to come to his calculation of value?

24   A    He utilized information for the 12-month period

25   ending October, 2010, and then -- for SCIX -- and then

1    he used Steel Seal Pro for 2011 and 2012.  He actually

2    only had what he called nine good months of data for

3    2012 so he ended up annualizing that to come up for a

4    full year of 2012.

5    Q    What is seller's discretionary earnings?

6    A    It's a valuation methodology used for smaller

7    businesses based on the earnings of the company and they

8    usually come up with a multiplier.  Generally, it's the

9    historic three to five years of a company is what you

10   look for.

11   Q    For what years does Mr. Geisser purport to determine

12   seller's discretionary earnings?

13   A    His calculation uses the years 2010, 2011 and 2012.

14   Q    How is SDE different from a business expense?

15   A    SDE really relates to what the compensation might be

16   to a potential owner, and so a buyer might look at that

17   and try to determine what the value is to a particular

18   buyer.  SDE kind of has an issue with that because each

19   buyer's requirements are going to be different.  So

20   that's also what pulls this away from fair market value

21   because it's not a hypothetical buyer.  It's a specific

22   buyer.

23            A buyer needs to be able to operate this

24   business and step into this business.  If he had

25   somebody interested in this business who didn't want to

1   step into it, then that person would adjust the SDE

2   downward to account for, for example, a manager or a

3   person in the company.  And so it's going to vary a

4   little bit as to what the circumstances are when you get

5   into what SDE is.

6             But it's essentially the income and perks that

7   can be spun off a small business for generally just one

8   person.

9   Q   How is seller's discretionary earnings different

10  from a liability?

11  A   Again, here we're talking about earnings and

12  contributions.  Liabilities, of course, would be a note

13  or other -- even accounts payable would be considered a

14  liability, and those weren't looked at here.

15  Q   And would that loan itself constitute a liability?

16  A   A loan would certainly be a liability and it

17  wouldn't be part of SDE.

18  Q   And in performing his calculation of value, did Mr.

19  Geisser deem payments to any particular entities as

20  seller's discretionary earnings?

21  A   Yes, he did.

22  Q   Do you recall what those entities were?

23  A   I think these are from Exhibit D of his report, and

24  I think yesterday we started to go through the list and

25  had found that it wasn't necessary, but I'll start with

1    the first three or four:  A&C Building, American

2    Express, Brian Hipple, Buckingham Friends School and so

3    forth as they appear in his report.

4    Q   In his report, does Mr. Geisser discuss how it was

5    he determined that all payments made to these entities

6    constituted SDE and not business expenses?

7    A   No, he doesn't do that in his report.

8    Q   Does Mr. Geisser include any explanation as to how

9    he justifies his assumption that every use of the

10   business credit card for a period of three years

11   constituted SDE and was not for a single business

12   expense?

13   A   No, he does not.

14   Q   And is this -- and is that problematic?

15   A   Certainly.  If any of the expenses that he has

16   listed or contributed to his SDE analysis turn out to be

17   legitimate business expenses, then they shouldn't appear

18   there.  If that's the case, then they're serving to

19   inflate his -- his calculation of value.

20   Q   And having reviewed Mr. Geisser's report, did you

21   note whether he considered the existence of a license

22   agreement between Complete Group and Steel Seal Pro?

23   A   His documents considered listing includes it but I

24   don't think he had it anywhere in his report.

25   Q   And what is the effect of that on his opinion?

1   A   It differentiates Steel Seal Pro from SCIX, and that

2   difference should have been vetted out and considered

3   because they are not identical companies, but he

4   essentially uses Steel Seal Pro as a surrogate for SCIX.

5   Q   And the payments to Ms. Moreno, did you note whether

6   those all were deemed SDE by Mr. Geisser?

7   A   He did.

8   Q   And do you have an opinion as to that decision on

9   his part?

10  A   Yes.

11  Q   What is that opinion?

12  A   It appears inappropriate because within Ms. Moreno's

13  deposition, she indicated that she actually worked for

14  SCIX and later for Steel Seal Pro.

15  Q   And on the bottom line of his number, what effect,

16  if anything, did his decision to deem all payments to

17  Melissa Moreno as SDE have on his calculation of SDE?

18  A   It would inflate it.

19  Q   Once Mr. Geisser determined what he calculated as

20  the average seller's discretionary earnings for these

21  three -- for those three years, how did he use that

22  figure to come to his ultimate opinion?

23  A   He ended up developing this -- this factor and then

24  he applied it to the various discretionary earnings by

25  year and then he averaged those up to determine his

1      1,750,000.

2      Q    Did Mr. Geisser provide an opinion in his report as

3      to purported value for those businesses of SCIX as a

4      going concern?

5      A    He didn't provide a value in terms of what the

6      businesses were worth, no.

7      Q    And what analysis of the appropriateness of this

8      particular 2.92 multiplier did Mr. Geisser include in

9      his report?

10     A    He did very little analysis with regard to the

11     actual components of his SDE calculation in terms of

12     these -- these ratios that were used.

13     Q    Can you explain?

14     A    Sure.  There are a couple issues going on.  He

15     grabbed four companies from Bizcomps but he doesn't know

16     what the companies do specifically.  He didn't list the

17     names of the company.  He didn't list what the companies

18     are selling.  We also noticed that several of these

19     companies are kind of pre-recession and he doesn't

20     explain why a company pre-recession should be used to

21     value a company post-recession.  We don't know how -- go

22     ahead.

23     Q    Is that significant?

24     A    Yeah, it -- things are different, and he needs to

25     vet those out.  Typically when we look at the Bizcomps

1    statistics or other database statistics, we need to line

2    them up.  We'll address each one of the entities, say

3    why it's similar, why it's different, why we're

4    including it, why we might exclude it, and we might even

5    adjust it in some way.

6    Q    Did Mr. Geisser identify any other multiplier in his

7    report?

8    A    Yes.  On Exhibit G of his report where he determines

9    an SDE factor, the column that appears next to it is

10   also a ratio.  It's called price revenue.  That's also a

11   valuation technique to take a look at what the price

12   actually of the entity sold for and then -- over

13   revenue.  So what this means is you could use these

14   factors which looks like sum to the .63 and apply to the

15   revenue numbers and also get the value for the entity.

16           MR. HIPPLE:  So basically what you're saying,

17   he took the highest value estimate instead of the --

18           THE WITNESS:  There are only two values here,

19   but, yes, it turns out to be a much higher number, and I

20   believe that's also listed in my report.

21           MR. HIPPLE:  So basically he could have done a

22   0.63, correct?

23           THE WITNESS:  Yes.  And he would have applied

24   that against revenue and he would not have even looked

25   at discretionary earnings and done all the various

1    calculations.

2    BY MR. HIPPLE:

3              (Questions being read by Ms. Ann Lemmo, intern

4    for Judge Rueter.)

5    Q    And what were some of the liabilities of SCIX as of

6    October 13th, 2010?

7    A    Well, we're aware that there were claims not only

8    from Mr. Hipple and the plaintiff but also that A&C

9    Consultants I thought had a lien out there.

10   Q    And does Mr. Geisser reconcile this with his

11   reported value of 1.75 million that he ultimately

12   provides as his opinion?

13   A    No, he ignores liabilities.

14   Q    And if he -- using a conclusion of value

15   methodology, could he ignore this discrepancy?

16   A    No, he couldn't.

17   Q    In performing his calculation of value, did Mr.

18   Geisser discount his 2012 and 2011 calculated values to

19   2010 dollars as he determined the averages appearing on

20   his Exhibit F?

21   A    No, he did not.

22   Q    And is this problematic?

23   A    It is.  It's just fundamental that if you're going

24   to use dollars in the future that you're going to need

25   to discount them to -- at value for today.  So if he's

1    looking at a 2012 dollar, it's not going to be worth the

2    same thing in 2010.  And so he should have discounted

3    his numbers for 2012 and 2011 at the very least just

4    conceptually to bring him into 2010 dollars and -- and

5    he didn't do that.

6    Q   What effect, if any, would this have on his ultimate

7    opinion of $1.75 million?

8    A   It would serve to inflate it.

9    Q   In reviewing Mr. Geisser's report and attached

10   exhibits, can you tell if he took into consideration

11   inventory acquired in prior periods and sold in 2011?

12   A   No, he did not.

13   Q   Can you show the Court an example of this?

14   A   Sure.  If we go to Mr. Geisser's report, Exhibit E-

15   2, and I believe we started to look at this yesterday,

16   in E-2, the cost of goods sold on the first page is

17   $187,000.  And it would not appear that that's a full

18   year's worth of cost of goods sold.

19           So -- and as Mr. Geisser, I believe, testified

20   as he went through this yesterday, on page one, there

21   are lots of revenue numbers over to the right, but there

22   are no cost of goods sold numbers.  Page two, no cost of

23   goods sold numbers.  Page three, there is a cost of

24   goods sold number but it's for $127.  Page four, again,

25   revenue numbers, no cost of goods sold.  Page five,

1    revenue numbers, no cost of goods sold.

2            Page six, there's a revenue number -- I'm

3    sorry -- a cost of goods sold number of $167, and,

4    again, lots of revenue numbers.  Page seven, again, lots

5    of revenue numbers, no cost of goods sold.  Page eight,

6    lots of revenue numbers, no cost of goods sold.  Page

7    nine, lots of revenue numbers, cost of goods sold of

8    $114.

9            It's not until page ten in April that we see a

10   cost of goods sold for Colonial Chemical of $17,550.  So

11   you have no inventory coming into this business at least

12   through these checks until April.

13           So all the sales from January, February and

14   March are from inventory that's presumably already on

15   site.  And so you've got a lot of revenue numbers and

16   for the first quarter this thing is extremely

17   profitable, Your Honor, because there's no cost of goods

18   sold, there are no appreciable cost of goods sold.  And

19   it --

20           THE COURT:  Those costs were incurred prior to

21   that time, that's the assumption I guess you can make?

22           THE WITNESS:  The assumption is that there's

23   inventory there, and I think Mr. Geisser agreed that

24   it's getting sold off.

25           THE COURT:  It was paid -- it was paid for

1        earlier -- in an earlier year.

2                    THE WITNESS:  Yes.  And that's one of the

3        problems with this analysis is that it's -- because it's

4        just a check analysis, you don't know what's already on

5        the balance sheet.  You don't know what's already

6        inventory.  And it's very clear from just looking at

7        these for the first three months, they didn't buy

8        anything, but there's lot of revenue numbers here.

9                    THE COURT:  But couldn't you figure that out

10       if you just knew the number of units that were sold and

11       we know the prices of the -- I think someone said it was

12       $1.50 per bottle.

13                   THE WITNESS:  You could back into it.

14                   THE COURT:  But for what -- I don't know

15       whether it was a 16-ounce or eight-ounce bottle but --

16                   THE WITNESS:  Right.  I understand that

17       that's --

18                   THE COURT:  -- but you could figure it out, I

19       guess.

20                   THE WITNESS:  You could figure it out, but

21       it's not figured out here.  I think the analysis is just

22       strictly with reviewing the checks, and that's what he

23       saw for the checks.  This has a big impact because if

24       the cost of goods sold, they're only 178 -- I'm sorry --

25       $187,000, then you could have more distributions for

1    that period of time because your inventory is already

2    sitting there.

3              You've already paid for it and now you -- you

4    have the potential for overstating your distributions

5    again, because you've -- you've sold inventory you

6    already had, so, yes, he has more cash.  But this is

7    going to go to his 1.75 million.

8              THE COURT:  Okay.  Thanks.

9    BY MR. HIPPLE:

10             (Questions being read by Ms. Ann Lemmo, intern

11   for Judge Rueter.)

12   Q   And what is the effect, if any, of this?

13   A   I think we kind of just ran through that.

14   Q   Okay.  In reviewing Mr. Geisser's report, did you

15   discover any internal inconsistencies or discrepancies

16   among the exhibits he attaches to his report?

17   A   Yes.

18   Q   Directing your attention to Exhibits B and E-2 of

19   Mr. Geisser's report, do you agree with me that Exhibit

20   E-2 is a summary of the 2011 transactions of Steel Seal

21   Pro according to the records of its account with First

22   National Bank?

23   A   Yes.

24   Q   According to that particular exhibit, what is the

25   cost of goods identified?

1    A    We did this, 187,000.   Okay.

2    Q    Now moving to Exhibit B under the column entitled

3    Steel Seal Pro, LLC, 2011, is there an entry for the

4    cost of goods sold?

5    A    Yes.   I'm sorry.   We're talking about 2011.

6              MR. HIPPLE:   B or D?

7              THE WITNESS:   I think we're going to B.   On D

8    -- I'm sorry, on E-2, we have cost of goods sold of

9    187,682.   On B for 2011, cost of goods sold, about five,

10   six lines down for 2011 is 602,280.

11   BY MR. HIPPLE:

12             (Questions being read by Ms. Ann Lemmo, intern

13   for Judge Rueter.)

14   Q    And do both those entries purport to reflect the

15   cost of goods sold for Steel Seal Pro in 2011?

16   A    Under each of their methodologies, yes.

17   Q    Now directing your attention to Exhibit E-2 under

18   revenues, what is the figure listed for Steel Seal Pro's

19   total revenue in 2011?

20   A    2011 revenues, 1,153,389.66.

21   Q    And now back to Exhibit B attached to Mr. Geisser's

22   report --

23   A    Yes.

24   Q    -- according to that document, what were the total

25   revenues for Steel Seal Pro in 2011?

1    A    1,249,065.

2    Q    Sticking with Exhibit E-2 and B, can you take a look

3    at the expenses for Steel Seal Pro in 2011 according to

4    Exhibit E-2 and tell the Court what that figure is?

5    A    Okay.  The expenses for 2011 are 256,414 as

6    determined by Mr. Geisser.

7    Q    And what are the expenses for Steel Seal Pro in 2011

8    according to Mr. Geisser's Exhibit B?

9    A    518,353.

10   Q    And would you consider these three differences

11   between Mr. Geisser's Exhibit B and E-2 significant

12   discrepancies?

13   A    Yes.

14   Q    And does he address any of these discrepancies

15   anywhere within his report?

16   A    No.

17   Q    What effect, if any, do these discrepancies have on

18   Mr. Geisser's calculation of value?

19   A    Well, it draws into question how reliable the

20   numbers are.

21   Q    I'd like to direct your attention to Exhibit B to

22   Mr. Geisser's report and directing your attention to the

23   column under SCIX, LLC, for the year 2010.

24   A    Yes.

25   Q    Can you tell the Court what figure represents the

1    gross profit of SCIX for 2010?

2    A    Sure.  According to this exhibit, $586,120.

3    Q    And what does gross -- gross profit represent?

4    A    It's going to be revenues minus cost of goods sold.

5    Q    Now going to Exhibit C.

6    A    Okay.

7    Q    And directing your attention to the figure

8    representing distributions for SCIX for 2010, what is

9    that figure?

10   A    558,534.

11   Q    And according to Mr. Geisser's report, does that

12   figure represent the total discretionary spending of

13   SCIX for 2010 or SDE for that year?

14   A    Yes.

15   Q    And if we were to take the gross profit for SCIX for

16   2010 as represented in Exhibit B and subtract the SDE

17   for SCIX for 2010 as calculated by Mr. Geisser on

18   Exhibit C, what amount would that leave us?

19   A    So we're talking about taking the gross profit for

20   2010 on Exhibit C, which is 586,000 and subtracting out

21   the distributions that were determined for 2010 of

22   558,534, so that's going to leave you a balance of

23   approximately $27,000.

24   Q    And what would that 2,000 -- sorry, $27,000

25   represent?

1   A    That's apparently all that's left to operate the

2   business for all of 2010, and that means all the

3   payroll, all the expenses you've seen here, so you've

4   got -- he's only got gross profit of 586 but

5   distributions of 558, so that leaves him $27,000 to

6   operate the business.  And I'll point out something

7   else, because when you go to E-2, you'll see that Mr.

8   Geisser determined that expenses are 256,000.

9            MR. BERKOWITZ:  Sorry.  Was that B-2?

10           THE WITNESS:  No, that's E-2.

11           MR. BERKOWITZ:  E-2.

12           THE WITNESS:  So --

13           THE COURT:  How much were the expenses?

14           THE WITNESS:  256,000 is what Mr. Geisser

15   determined on E-2 for 2011, so apparently when he did

16   his analysis it cost 256,414.  But when you apply his

17   numbers in 2010, there's only $20,000 left to operate

18   the business.  I think also on E-3, his expenses are

19   282,234 for the year.  So it doesn't seem reasonable

20   that you would be able to operate this business for

21   $27,000.

22   BY MR. HIPPLE:

23           (Questions being read by Ms. Ann Lemmo, intern

24   for Judge Rueter.)

25   Q    And looking at the far left of Exhibit B under the

1    word expenses, are those all the items that SCIX would

2    have had to pay for expenses with this 2,000 -- $27,000?

3    A    Yes.

4    Q    And according to Exhibit B, what is the total

5    expenses that SCIX incurred in 2010?

6    A    485,251.

7    Q    Which left a profit or a loss according to Mr.

8    Geisser's Exhibit B?

9    A    100,869.

10              MR. HIPPLE:  Profit or loss?

11              MR. BERKOWITZ:  I'm going to object.

12              THE WITNESS:  I believe it says profit --

13              MR. BERKOWITZ:  If one of them or the other

14   can ask the questions.

15              THE COURT:  All right.  I'll overrule the

16   objection for now.

17              MR. HIPPLE:  Thank you.

18              THE WITNESS:  100,869 appears on Exhibit B.

19              THE COURT:  But is it a profit or loss?

20              THE WITNESS:  It's a profit.

21              THE COURT:  Okay.

22   BY MR. HIPPLE:

23   Q    So which is it, did SCIX have only $100,000 in 2010

24   to pay an SDE or did SCIX somehow pay for all of its

25   business expenses with $27,000?

Mr. Pederson - Direct                    101

1    A    We don't know the answer to that.  It's just an

2         inconsistency in the report.

3    Q    Please turn to Exhibit D of Mr. Geisser's report.

4              THE COURT:  Exhibit what?

5              MS. LEMMO:  D.

6              THE COURT:  Okay.

7              THE WITNESS:  All right.

8    BY MR. HIPPLE:

9              (Questions being read by Ms. Ann Lemmo, intern

10        for Judge Rueter.)

11   Q    On the -- on the first line of his exhibit, A&C

12        Building and Industrial Maintenance, what is the amount

13        listed under Steel Seal Pro for 2012?

14   A    The amount is 160,600.

15   Q    And what is the amount listed under 2012 annualized?

16   A    214,133.

17   Q    Did you look at this calculation performed by Mr.

18        Geisser?

19   A    Yes, I did.

20   Q    What did you find?

21   A    I found that Mr. Geisser indicated and he testified

22        that with Column B, what he's doing is an annualization

23        determination, and what he does is divide by nine for

24        the nine months of the year it would represent and

25        multiply by 12.  But what I, in fact, found is that the

1    160,600 that's listed here for 2012 before annualization

2    includes amounts past September 30.  In fact, the

3    payment was early October for $40,000.

4            And so what's happened here is he's not

5    annualized that in the methodology that he described

6    here, but, instead, he's included amounts in the fourth

7    quarter even though it was cut off at 9-30.  Now, what

8    this is doing is, it's -- it's getting double counted

9    because it's already in the 160,600 and then he's

10   dividing that by nine and multiplying by 12.  So his

11   annualized number is 214,133.  But the actual number

12   should be 160.

13           And what's happening is, the 40 is getting

14   added in, and then the 40 is getting annualized.  So

15   there's growth in there.  And the reason this jumped out

16   is because in 2011, the amount is 160, and in 2012

17   through September, if you stuck with the annualization

18   and only cut -- and cut this off at September 30, the

19   amount would be 120,000.  If you annualize 120,000, in

20   other words, divide by three and multiply by four, you

21   get 160,000.

22           So what's happened here is, this annualization

23   has overstated the amount that's getting paid under the

24   A&C Building Industrial Maintenance.  And so this is

25   flowing all the way through the schedule and it gets

1    multiplied by 2.92 and has an impact on his

2    determination of 1.75 million.

3    Q    Were you present when Mr. Geisser testified as to

4    information upon which he based his opinion?

5    A    Yes.

6    Q    And were you present when Mr. Geisser testified that

7    he did not have sufficient information for a valuation

8    engagement?

9    A    Yes.

10   Q    Given the information available to him, and, in

11   particular, the 2006 to 2010 tax returns for SCIX's

12   Schedule C, in your opinion he could have performed a

13   conclusion of value?

14   A    He could have done a lot more.  Without having done

15   the full analysis, I can't really definitively say he

16   could have done that.  But, certainly, he could have

17   done a lot more.

18        The tax returns are actually a great source of

19   information, and we actually prefer them in an analysis

20   because QuickBook files, if they're not being audited,

21   are sometimes, I won't say questionable, but you always

22   kind of look at them.  But tax returns are signed under

23   the penalty of perjury, so as valuation guys, we love to

24   see tax returns.  You can do a lot with them.

25        Also we learned yesterday that it's

1    potentially possible that the bank records for SCIX for

2    2007, '08, '09 were available but they were never

3    requested.  We don't really know -- and Mr. Geisser

4    apparently never asked for that, so we don't really know

5    the full -- what's completely behind that.  But there

6    are things that could have been done.

7    Q    Would that have been an ideal amount of information

8    from which to do that?

9    A    The tax returns by themselves, no.  But there is

10   also more market data available, so I think there are

11   other things that could have been done.  Also just

12   looking at the assets, there don't seem to have been a

13   whole lot of assets in this company anyway, so I don't

14   know that it would have helped in terms of creating a

15   value because what he really seems to be looking for is

16   income related.  But you can still take a look at the

17   historical information and head towards some value that

18   -- that you could reconcile and try to make sense of.

19   Q    In your expert opinion, did Mr. Geisser perform

20   under a valuation engagement?

21   A    No.

22   Q    In your expert opinion, did Mr. Geisser determine a

23   conclusion of value of the assets of SCIX as of October

24   13th, 2010?

25   A    No.

1   Q   In your expert opinion, did Mr. Geisser determine a

2   conclusion of value of SCIX as of October 13th, 2010?

3   A   No.

4   Q   In your expert opinion, did Mr. Geisser determine a

5   conclusion of value of 100 percent interest in SCIX as

6   of October 13th, 2010?

7   A   No.

8   Q   In your expert opinion, did Mr. Geisser determine a

9   conclusion of value of anything in accordance with SSVS

10   Number 1?

11   A   No, he didn't perform a conclusion of value.

12   Q   In your expert opinion, did Mr. Geisser perform the

13   requisite work to develop the foundation upon which to

14   opine as to the fair market value of the assets of SCIX

15   as of October 13th, 2010?

16   A   No, he did not.

17   Q   In your expert opinion, did Mr. Geisser perform the

18   requisite work to develop the foundation upon which to

19   opine as to the fair market value of a 100 percent

20   interest in SCIX as of October 13th, 2010?

21   A   He did not.

22   Q   In your expert opinion, did Mr. Geisser perform the

23   requisite work to develop the foundation upon which to

24   opine as to the fair market value of the assets of SCIX

25   as of October 13th, 2010?

1    A    No, he did not.

2    Q    In your expert opinion, did Mr. Geisser perform the

3    requisite work to develop the foundation upon which to

4    opine as to the fair market value of SCIX as of October

5    13th, 2010?

6    A    No, he did not.

7    Q    In your expert opinion, did Mr. Geisser perform the

8    requisite work to develop the foundation upon which to

9    opine as to the fair market value of a 100 percent

10   interest in SCIX as of October 13th, 2010?

11   A    No, he did not.

12   Q    In your expert opinion, did Mr. Geisser perform the

13   requisite work to develop the foundation upon which to

14   opine as to the reasonably equivalent value of the

15   transfer of SCIX's assets from SCIX to Clement Hipple

16   which occurred on October 13th, 2010?

17   A    No, he did not.

18   Q    In your expert opinion, did Mr. Geisser perform the

19   requisite work to develop the foundation upon which to

20   opine as to a reasonably equivalent value for any

21   purported transfer of SCIX -- from SCIX to Clement

22   Hipple on October 13th, 2010?

23   A    No, he did not.

24   Q    In your expert opinion, did Mr. Geisser perform the

25   requisite work to develop the foundation upon which to

1    opine as to a reasonably equivalent value for any

2    purported transfer of a 100 percent interest in SCIX to

3    Clement Hipple on October 13th, 2010?

4    A    No, he did not.

5    Q    Do you have an opinion as to whether Mr. Geisser's

6    opinion is in accordance with the standard valuation

7    techniques used in your industry?

8    A    No, it is not.

9    Q    And have you -- have you offered all of your

10    statements and opinions today with a reasonable degree

11    of professional certainty?

12    A    Yes.

13              THE COURT:  Is that all the written questions?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Okay.  Mr. Hipple, any questions

16    other --

17              MR. HIPPLE:  Yes.

18              THE COURT:  -- than those that were just read?

19              MR. HIPPLE:  Yes, I do, Your Honor.

20    BY MR. HIPPLE:

21    Q    Okay.  Let's go to Mr. Geisser's report, D-31.

22              THE COURT:  D-31?

23              MR. HIPPLE:  D -- yeah, D-31, David-31.

24              MR. BERKOWITZ:  Sorry.  Do you have a page

25    number in your exhibit?  I don't have the tabs.  He has

1    my tabbed report.

2              THE WITNESS:  Do you want this one?

3              MR. BERKOWITZ:  Sure.

4              THE WITNESS:  Okay.

5              THE COURT:  Do you have your own report?

6              THE WITNESS:  I'll look for it here.

7              THE COURT:  Okay.

8              THE WITNESS:  Sorry.  It's --

9              MR. BERKOWITZ:  And which one are we looking

10   at?

11             MR. HIPPLE:  The report of Mr. Geisser which

12   starts at D-31, and go to Exhibit A.  Do you have it up

13   there?  No, it's the white -- white binders.  D as

14   defendant.

15             THE COURT:  What number is it?

16             MR. HIPPLE:  D-31.

17             THE COURT:  P-31?  Thanks.  P-31, Mr.

18   Pederson.  I have Exhibit D and what was the number

19   again?  I'm sorry.

20             MR. HIPPLE:  Sorry.  D-31 --

21             THE COURT:  D?

22             MR. HIPPLE:  -- Exhibit A.

23             THE COURT:  Exhibit A?

24             MR. HIPPLE:  D-31, Exhibit A.

25             THE COURT:  Oh, okay.  I'm sorry.  All right.

1    All right.  We're with you, I believe.

2              THE WITNESS:  Exhibit A, yes.

3    BY MR. HIPPLE:

4    Q    Okay.  Basically, my question to you is, the actual

5    years that have been used in this analysis, okay, are

6    not the standard of what the years would -- would have

7    been used, is that correct?

8    A    That's how I understand Mr. Geisser's report, yes.

9    Q    In other words, he should have used different years,

10   earlier years, in his report?

11   A    If I'm understanding you correctly, and normally

12   when you conduct a fair market value, you take a look at

13   historical information and not prospective information,

14   because in theory it wouldn't exist at the time of the

15   transfer.

16   Q    Right.  And those -- and those years would have been

17   available, the bank statements and information for him

18   to give his opinion on?

19   A    As we discussed yesterday, I believe those bank

20   records would be available, at least for some of the

21   years.

22   Q    Okay.  And if you would turn to Exhibit D.

23             MR. BERKOWITZ:  I'm sorry.  Is that D?

24             MR. HIPPLE:  D as in David.  I'm sorry.

25             THE WITNESS:  I have Exhibit D.

1    BY MR. HIPPLE:

2    Q   Okay.  And under -- under American Express, okay --

3    A   Yes.

4    Q   -- if you would go to -- hold on for a minute -- if

5    you would go to tab 107, 108 and 109 of that and take a

6    look at that.

7    A   Okay.  Are we --

8              MR. BERKOWITZ:  Are you in plaintiff's

9    exhibits?

10             MR. HIPPLE:  That -- P-107, yes.  I'm sorry,

11   108.

12             (Pause in proceedings.)

13             THE WITNESS:  I have 108.

14   BY MR. HIPPLE:

15   Q   Okay.  And under the name, under detail, Craig Huck

16   (ph) on the American Express bill --

17   A   Yes, that's a few pages back.

18   Q   -- could we just -- could we just start looking down

19   like Yahoo, Google, U.S. Post Office, okay, Google, U.S.

20   Post Office, Yahoo --

21   A   Yes, I see those entries.

22   Q   -- Google, U.S. Post Office, U.S. Post Office, U.S.

23   Post Office, Yahoo, Google -- all the way down?

24   A   Yes.

25   Q   Okay.  National Physician again is also a company

1      that does website work, okay?

2                  MR. BERKOWITZ:  I'm going to object.  If Mr.

3      Hipple wants to testify, that's fine.

4                  THE COURT:  Right.

5                  MR. BERKOWITZ:  This is a witness that did not

6      include this in his report.  I assume he's never seen it

7      before today, and I would object to him using any

8      expertise to tell us what anything in this document is.

9      To the extent that there's underlying records, those

10     would be business records that weren't produced.

11                 And on top of that, Your Honor, I'd like to

12     point out that right at the top of the page, this is the

13     card for Scientific Chemical.  And we know SCIX is gone.

14     This is -- this is 2012.  We don't even know what

15     company this could possibly apply to.

16                 THE COURT:  But didn't Mr. Geisser when he

17     projected the value of the business go forward to -- one

18     was Scientific Chemical or -- tell me if I'm wrong.

19                 MR. BERKOWITZ:  He -- he used forward-going

20     years, yes, he did.

21                 THE COURT:  Right, right.  All right.  I'll

22     overrule the objection.  But don't -- don't -- you're

23     telling us what various entries are.  You can't do that.

24                 MR. HIPPLE:  Okay.

25                 THE COURT:  You can ask him questions.

1          MR. HIPPLE:  All right.  Then maybe this is

2     something I --

3          THE COURT:  No, but go ahead, you ask him

4     about --

5          MR. HIPPLE:  -- maybe I should save this for

6     when I testify.

7          THE COURT:  -- Yahoo and Google, but once you

8     started talking about National Physicians, you started

9     telling us what that was, you really need to ask a

10    witness that.  Okay?  So go ahead.

11         MR. HIPPLE:  All right.

12    BY MR. HIPPLE:

13    Q   Well, then that -- another familiar name is Verizon,

14    okay?

15         THE COURT:  What's your question?

16         MR. HIPPLE:  The question is that they're

17    saying that in the report that these are not business

18    expenses, okay?  And, basically, all the names that I

19    have mentioned on this page are certainly business

20    expense through my experience --

21         THE COURT:  Do you agree with that, Mr.

22    Pederson?  I think that's the question.  Do they appear

23    to be business expenses?

24         THE WITNESS:  Your Honor, it's difficult for

25    me to tell --

1          MR. HIPPLE:  Yeah.

2          THE WITNESS:  -- if they're business expenses

3     or not, but it would have the pattern of a business

4     expense.

5          THE COURT:  Okay.

6     BY MR. HIPPLE:

7     Q   All right.  And, again, those -- those last three

8     years are all similar, okay.  And, again, the point I'm

9     trying to make is that these were all excluded from

10    business expenses, and that goes throughout all the

11    American Expresses.  If you would look at all of them,

12    you will find these different names that are business

13    expenses.

14         MR. HIPPLE:  But I could testify to that

15    myself also, Your Honor.

16         THE COURT:  All right.

17         MR. HIPPLE:  Because I have familiarity when I

18    took over, okay, after my son --

19         THE COURT:  Right.

20         MR. HIPPLE:  -- Brian passed away so I know,

21    again, similar, he always used the same companies,

22    Google, so I can testify to that on my own.

23         MR. BERKOWITZ:  My objection may be a little

24    late, but Mr. Geisser's testimony was there was no way

25    of knowing whose business expenses were being paid

1    through this account, there's no business records, even

2    going forward for the ones Mr. Hipple is going to

3    testify to, those records weren't produced.

4              THE COURT:  But did Geisser have these

5    American Express records?

6              MR. BERKOWITZ:  Yes.  Yes.

7              THE COURT:  Okay.  But I think the point Mr.

8    Hipple is making is that some of these entries on the

9    American Express records show legitimate business

10   expenses, and I think what he's suggesting is Mr.

11   Geisser, in calculating the -- the expenses, didn't

12   include these.  Is that your point?

13             MR. HIPPLE:  Yes.  My point is he put

14   everything as if it was not a business expense.

15             THE COURT:  Not -- not a legitimate expense?

16             MR. BERKOWITZ:  Correct.  And he testified

17   that he didn't have any business records to know which

18   business to charge.  There are expenses that look like

19   business expenses.

20             THE COURT:  Oh, but he couldn't verify it?

21   Couldn't verify it?  He couldn't tell which --

22             MR. BERKOWITZ:  Yes.  There was no -- there

23   were no underlying records.

24             THE COURT:  All right.  Okay.

25             MR. HIPPLE:  Okay.  When I get up on --

1          THE COURT:  You could explain that.

2          MR. HIPPLE:  -- then I'll testify.  I'll

3    explain that.  Okay.

4          THE COURT:  Okay.

5    BY MR. HIPPLE:

6    Q   In the same area, okay, which she testified, Melissa

7    Marone (sic), yeah, Marone, okay, that she did work for

8    SCIX and then Steel Seal Pro.  But that -- I don't think

9    that was taken into consideration here.

10   A   I noted in my report that in her deposition that she

11   indicated that she had worked for SCIX and subsequently

12   worked for Steel Seal Pro.

13   Q   All right.

14   A   I don't know what she testified to.  I wasn't here

15   when she testified.

16   Q   And also as far as the $64,000 to Clement Hipple

17   would have been royalties, okay, on tax returns of 2009

18   and 2010, they were royalties.

19         MR. BERKOWITZ:  Object, Your Honor.  There's

20   been no discussion of royalties.

21         MR. HIPPLE:  That's right.  This is --

22         MR. BERKOWITZ:  There's been no discussion of

23   tax returns.

24         MR. HIPPLE:  -- these aren't questions for

25   him.  These are questions for myself.

Mr. Pederson - Direct                    116

1              THE COURT:  Right.

2              MR. HIPPLE:  All right.  Disregard that.  Let

3      me go someplace else.  They're not his questions.  Okay.

4      This is his question, okay?

5      BY MR. HIPPLE:

6      Q   Again, I would like for you to go back to Exhibit G

7      as in George --

8              MR. BERKOWITZ:  Is this in Mr. Geisser's

9      report?

10             MR. HIPPLE:  Yes.

11             THE WITNESS:  I have Exhibit G.

12     BY MR. HIPPLE:

13     Q   Yeah.  And I just want to bring up again exactly

14     what you talked about that -- that there are different

15     factors to base a percentage on when you're putting a

16     value on the business, anywheres from .693 to 2.92,

17     okay.

18     A   Well, actually, to clarify, these are multipliers.

19     Q   Multipliers, that's what I meant, multipliers.

20     A   And so they're multiplied against different values.

21     This 2.92 would be applied to discretionary earnings.

22     Q   Right.

23     A   The first one at .693 would be applied against

24     revenues.

25     Q   Revenues, okay.  And was that done in this case?

1   A   The revenues, no.

2   Q   Oh, okay.  All right.

3           MR. HIPPLE:  Now, Your Honor, I have an

4   exhibit here, okay, and it -- let me see how I can

5   explain it.  It's an exhibit that has Plaintiff's 26,

6   Plaintiff's 27, Plaintiff's 28, everything on this

7   exhibit is in these books, okay?

8           THE COURT:  Okay.  It's a summary or

9   calculation?

10           MR. HIPPLE:  It's a summary, yes, Your Honor.

11           THE COURT:  Why don't you show it to Mr.

12   Berkowitz.  Is this something that you prepared or -- or

13   who prepared it?

14           MR. HIPPLE:  I prepared it, Your Honor.

15           MR. BERKOWITZ:  It's listed as Defense Exhibit

16   501, and Mr. Hipple prepared it.  I have no idea what it

17   is.  I've never seen it before.  It was never included

18   in the list of exhibits.  I don't know that --

19           THE COURT:  It's not in the --

20           MR. BERKOWITZ:  -- this witness can

21   authenticate this, tell us what this is.

22           MR. HIPPLE:  No, I'm not asking him to

23   authenticate them.  I'm asking just to put this in the

24   record.

25           MR. BERKOWITZ:  I'm going to object to putting

1    anything in the record that you have no idea what it is.

2              MR. HIPPLE:  Well, you do.  It's all -- it's

3    all our exhibits in the record.

4              THE COURT:  Okay.  Let me stop.  That

5    document, is that included in the defendants' exhibits?

6              MR. HIPPLE:  Every one of them exists.

7              THE COURT:  No, but the summary, it's a

8    summary?

9              MR. HIPPLE:  Oh, the summary isn't, but it --

10   it's every one of their -- every one of the plaintiff's

11   documentation, P-26, P-27, P-28, P-29, okay?  And then

12   it goes on to P-31.

13             THE COURT:  All right.  Mr. Hipple, the best

14   way to do that would be not through this witness because

15   he didn't prepare it.

16             MR. HIPPLE:  Oh, no.  Okay.  I'm not doing it

17   with his witness.

18             THE COURT:  Okay.

19             MR. HIPPLE:  I'm just trying to get it in.

20             THE COURT:  So if you want to -- if you want

21   to take the stand and attempt to introduce it, there

22   might be an objection, but at least you could say this

23   is how I prepared it.  These are the records I used to

24   prepare it.  This is my summary and this is what it

25   shows.

1          We'll hear if Mr. Berkowitz has an objection.

2     But if Mr. Pederson had nothing to do with it, it's --

3     it's not proper to use this.

4          MR. HIPPLE:  Okay.  So it's something I should

5     just try to introduce --

6          THE COURT:  Right.

7          MR. HIPPLE:  -- on my own.

8          THE COURT:  Right.

9          MR. HIPPLE:  Right, later.

10         THE COURT:  Right.

11         MR. HIPPLE:  Okay.

12         THE COURT:  Do you have anything else of Mr.

13    Pederson?

14         MR. HIPPLE:  Yes, I do.  I have a few more

15    things, okay?

16    BY MR. HIPPLE:

17    Q   All right.  In reference to -- let's go to the --

18    now, this is under defendant.  20 -- D -- David-20,

19    David-21 and David-22.

20    A   I have D-20.

21    Q   Yes.  And I believe I heard you say, and I believe I

22    heard Mr. Geisser say that -- that the -- that there

23    were three patents and that there was a value to the

24    three patents, correct?  Or Mr. Geisser made a statement

25    that there was a value to the three patents?

1          MR. BERKOWITZ:  I'm going to object to the

2     characterization of Mr. Geisser's testimony.  It was

3     what it was --

4          THE COURT:  All right.

5          MR. BERKOWITZ:  -- and Mr. Pederson was here.

6          THE COURT:  Do you recall Mr. Geisser saying

7     anything of that sort?

8          THE WITNESS:  Mr. Geisser indicated that he

9     was aware of patents in his report.  He called it a

10    unique patented product.

11    BY MR. HIPPLE:

12    Q   Right.

13    A   And elsewhere I thought he also called it a patented

14    product.

15    Q   And a unique patented product?

16    A   Yeah.

17    Q   In other words, very unique --

18    A   In one case he did say unique patented --

19    Q   -- on its own?  Correct.

20    A   That's what's in his report.

21    Q   Okay.  All right.  Let's look at the -- we'll go to

22    D-20 first, okay?

23    A   Yes.

24    Q   All right.  United States patent, dated December 12,

25    2000, okay?

Mr. Pederson - Direct                    121

1    A    Yes.

2    Q    Now, this patent itself says -- below that it says,

3    "Seal -- sealer system for combustion engines and the

4    like," okay?

5    A    Yes.

6    Q    Now, this patent basically is the chemical formula

7    patent.

8              MR. BERKOWITZ:  Objection, Your Honor.  I

9    object to Mr. Hipple testifying as to what the patent

10   is.  It is what it is.

11             MR. HIPPLE:  Okay.  Well, I'm -- I'm

12   testifying what it says.

13             THE COURT:  I'll overrule the objection.  You

14   may proceed.

15             MR. HIPPLE:  Okay.

16   BY MR. HIPPLE:

17   Q    And, basically, this is the chemical formula patent

18   which has lapsed and is in the public domain?

19   A    Yes.

20   Q    Okay.  All right.  The next exhibit, 21, okay, dated

21   December 4th, 2001.  Method of repairing an engine

22   cooling system, okay.  Now, this patent is the original

23   method and Robert Barks is the inventor on this, okay?

24   And this is how the repair was supposed to be done,

25   okay?

Mr. Pederson - Direct                    122

1    A    Right.

2    Q    Now, this patent has lapsed and is also in the

3    public domain --

4    A    Yes, that's what my research showed.

5    Q    -- is that right?  That's what's I was getting at.

6         Now, the next patent, okay, on page 20 -- D-

7    22, dated November 18th, 2003, later on --

8    A    Yes.

9    Q    -- and we spoke about this patent before, repairing

10   an engine cooling system.  And if you look down below,

11   I'm part of the inventor on this patent, okay, myself

12   and Robert Barks.  Okay.  And what this is, this is

13   actually a patent, how to repair the cooling system,

14   okay, with one exception that it -- it has additional

15   language in there to deal with a back pressure problem

16   by removing the sparkplug, okay?  And by the way, in

17   reference to that, and this is my knowledge, everybody

18   copied it when it went on the Internet --

19   A    Right.

20   Q    -- okay, all the other companies.  All right.  So

21   basically this is the patent that is still in force,

22   okay.  So my point is, is that Mr. Geisser thought that

23   there were three good patents out there --

24        MR. BERKOWITZ:  I'm going to object.  If

25   there's a question for the witness, I'll --

1              MR. HIPPLE:  Okay.  Yeah.

2              MR. BERKOWITZ:  -- I'd like to hear it, but I

3      don't think it's proper for --

4              MR. HIPPLE:  All right.  I keep forgetting

5      that part.  All right.  Okay.

6              THE COURT:  All right.  He's going to ask a

7      question.  Go ahead.

8      BY MR. HIPPLE:

9      Q   My question to you is that under Mr. Geisser's

10     statement, he projected that there were three good

11     patents out there.

12     A   I don't know, and he wasn't clear in his testimony

13     whether or not there were three, but in his documents

14     relied upon listing, he did have the patent word plural,

15     patents, and he did indicate --

16     Q   I'm sorry?

17     A   Patents.  But I don't know that he said that he had

18     three, but it seemed to be more than one.  Although,

19     again, in his report, I thought he said unique patent,

20     so I have to go back and take a look whether or not that

21     was singular or plural, but clearly he was thinking of a

22     patent in terms of his calculation of value.

23             MR. BERKOWITZ:  Object to -- discussion of

24     what Mr. Geisser was thinking.

25             THE COURT:  I'll overrule the objection.

1    That's his understanding of his report, his testimony,

2    is that right?

3                THE WITNESS:  Yes, sir.

4                THE COURT:  Okay.

5    BY MR. HIPPLE:

6    Q    But he did -- he did mention, and I -- I'm almost

7    positive, I heard him very clearly mention that -- that

8    these patents were unique, okay, and that they were, I

9    guess, valuable and unique.  Do you remember him saying

10   that part?

11   A    He indicated that it was a unique patented

12   product --

13   Q    Okay.

14   A    -- and he did indicate that this had value and

15   certainly he talked about the high profit margin on the

16   product.

17   Q    All right.  So -- and, again, the -- Mr. Geisser

18   never did any investigation as far as the -- the website

19   is concerned, is that correct, in his report?

20               MR. BERKOWITZ:  I object, Your Honor.  This is

21   not something within this witness' expertise.  We all

22   sat through the testimony.  Mr. Geisser said what he

23   said.  For this witness to come back and try and repeat

24   for us what Mr. Geisser testified I don't believe is --

25               MR. HIPPLE:  I'll rephrase the question.

1              THE COURT:  Well, he did -- Mr. Pederson is --

2       his testimony is a critique of Mr. Geisser's report, and

3       I believe one of his critiques is that the website was

4       owned by another company, et cetera, et cetera.  So I'm

5       going to allow him to testify.  Go ahead.

6              Do you understand the question?

7              THE WITNESS:  No.  Could you repeat it,

8       please?

9       BY MR. HIPPLE:

10      Q    Okay.  Mr. Geisser never put a value or never knew

11      that the website did not belong to SCIX in his report?

12      A    He doesn't disclose that anywhere in his report, no.

13      Q    And, therefore, he could not have put a value on it,

14      correct?

15      A    He didn't put a value on it specifically.  He

16      included it in his seller's discretionary earnings

17      because this was part of the whole business process.  So

18      it's kind of inane in the numbers.  So the assumption is

19      that it has its own website and it belongs to SCIX,

20      because he uses it in calculating his 1.75 million.

21      Q    Also as far as the chemical formula, all right, did

22      he take that into consideration in his report?

23      A    I'm not sure I understand the question.

24      Q    Okay.  The Steel Seal chemical -- secret chemical

25      formula --

1    A    Yes.

2    Q    -- did he identify that, value it or mention it at

3    all in his report?

4    A    Not other than indicate that it was a unique

5    patented product.

6              MR. BERKOWITZ:  Object, Your Honor.  That is

7    just not what Mr. Geisser testified, and if I could

8    remind you, Mr. Geisser gave the example of Coca Cola

9    being a non-patented product based on a secret formula

10   with significant value.

11             THE COURT:  All right.  Hold on.  I mean, it's

12   my recollection of what the testimony is, so I'll -- you

13   know, I'll go through and recollect to my best ability

14   what the testimony was.  I'm not accepting necessarily

15   what one witness recollects or what Mr. -- what you

16   represent -- you recollect or Mr. Hipple recollects.  So

17   I'll overrule the objection.  Go ahead.

18             MR. HIPPLE:  Yeah.  And I think Mr. Geisser

19   used Kentucky Fried Chicken.

20             MR. BERKOWITZ:  I stand corrected if it wasn't

21   Coca Cola.

22             MR. HIPPLE:  All right.  I think he used

23   Kentucky Fried Chicken.

24             MR. BERKOWITZ:  I thought it was Coca Cola,

25   but I could be wrong.

1          THE COURT:  Somebody used Coca Cola.

2     BY MR. HIPPLE:

3     Q    Okay.  From -- from an expert in reference to

4     companies that have unique products, okay, chemical

5     formulas and websites and are operating without the

6     ownership of those entities, okay, how can the --

7     shouldn't that be something that should be taken into

8     consideration when you're doing a valuation?

9     A    It would be because normally a company would pay for

10    a website, either to start it up or whether there would

11    be an ongoing fee associated with it.  Likewise, if

12    there's a unique product that they have to license,

13    there would be a fee associated with that.  And, again,

14    that would be a company expense.

15    Q    Okay.  As far as a company that has the use by

16    paying royalty fees for a website and -- and using the

17    chemical formula that they no longer have a patent on,

18    okay, and it's under a different company name anyway

19    belonging to someone else, for instance, in our case,

20    five years ago I could have went and said okay, I want

21    my website back, I want my -- you no longer can use my

22    chemical formula.  What would the value of that company

23    be if something like that took place in your opinion?

24    A    I think what you're asking is, how this impacts an

25    SDE calculation, and if this business had to function

1   going forward, it would need to pay a royalty or

2   licensing fee, and that would be a deduction to the

3   business.  So there would be less in the way of the

4   seller's discretionary income.  Likewise, just as you

5   would have to pay rent on a building, you have to pay

6   rent on a website, that would be a deduction and

7   certainly less available for seller's discretionary

8   earnings.

9   Q    Now, let me take that question a little further.  My

10  question to you was, I -- or the person that owned the

11  website and the manufacturing of the formula said to you

12  -- said to SCIX five years ago, you can no longer use

13  it.  What would the value of that company be?

14  A    Well, certainly the value of the company would

15  decline.

16  Q    Massive -- massive decline, would you say?

17  A    Yes, correct.

18  Q    Put him out of business almost?

19  A    Yes.

20  Q    Okay.

21           MR. HIPPLE:  No further questions, Your Honor.

22           THE COURT:  Yes.  Thank you.  Yes, Mr.

23  Berkowitz.

24           MR. BERKOWITZ:  Let me bring my -- a lot of

25  information to bring up here.  There's a note pad up

Mr. Pederson - Cross                    129

1    here, Mr. Hipple.  I don't know if it's -- I believe

2    it's yours.  It looks --

3            MR. HIPPLE:  You're reading my notes now.

4            MR. BERKOWITZ:  -- it looks like your

5    handwriting.  My handwriting is as bad as yours, so I

6    can read it.

7            MR. HIPPLE:  That's what I was looking for a

8    minute ago.

9                    CROSS-EXAMINATION

10   BY MR. BERKOWITZ:

11   Q   Mr. Pederson, you're aware that the business of SCIX

12   was the sale of a product called Steel Seal?

13   A   Yes, I'm aware of that.

14   Q   And the sale of this product, Steel Seal, generated

15   all the profits?

16   A   I believe that's true.

17   Q   And all the income?

18   A   Yes.

19   Q   And all the money that was taken out by Mr. Hipple

20   and everybody else that we've seen?

21   A   I'm not aware of any other product that they were

22   selling.

23   Q   Okay.  So Steel Seal, the product, you would agree

24   with me has a value?

25   A   The product?  Yes.

1    Q    Okay.  And you can value that product, can't you?

2                MR. HIPPLE:  Objection, Your Honor.

3                THE COURT:  Overruled.

4                THE WITNESS:  When we talk about valuing a

5    product, are you talking about its cost or are we going

6    to talk about its retail value?

7    BY MR. BERKOWITZ:

8    Q    I'm talking about the cash flow that that product

9    generates.

10   A    All right.  So you're going to need some assumptions

11   as to what this product sells for --

12   Q    But you --

13   A    -- and how you're going to sell it.

14   Q    -- but you can generate -- you can create and

15   calculate a value for the Steel Seal product based on

16   the amount of money the owners get to take out of the

17   business --

18               MR. HIPPLE:  Objection to the word owner.

19               MR. BERKOWITZ:  -- from solely the sale of

20   that product?

21               THE WITNESS:  No, I disagree.

22               THE COURT:  What's the objection?

23               MR. HIPPLE:  To the word owners.

24               THE COURT:  All right.  Overruled.  Go ahead,

25   Mr. --

Mr. Pederson - Cross                          131

```
 1              THE WITNESS:  No, I would disagree.  If the
 2     company is borrowing money, then that's potentially cash
 3     that's available to take out of the business, and it has
 4     nothing to do with sales.
 5     BY MR. BERKOWITZ:
 6     Q    I'm talking about only the money that goes to the
 7     owners.  Forget all the business expenses.
 8     A    I don't know where the owner -- the money is --
 9     Q    It all is generated from the sale of Steel Seal,
10     right?
11     A    In this hypothetical we're talking about there, all
12     we're talking about is the income related to it, and
13     there's no other source of cash.
14     Q    No.  Yes.  The only income that comes into this
15     company is from the sale of the product, Steel Seal.
16     A    Okay.  I'm sorry, I have to stop you again.  I said
17     something different.  I said the only source of cash.
18     Q    I'm asking you my questions not what you talked
19     about.
20     A    I don't understand your question.
21     Q    Okay.  There's a product called Steel Seal.  You'll
22     agree with me on that?
23     A    Yes.
24     Q    And that product generates revenue from its sale on
25     the Internet?
```

1    A    And to the U.K., yes.

2    Q    It -- okay.

3    A    From wherever it comes from --

4    Q    Okay, wherever it comes from --

5    A    -- but we're just being very clear.

6    Q    -- if it comes from outer space, it generates income

7    in U.S. dollars that are reflected for the company?

8    A    Yes.

9    Q    And then the company pays all its business expenses,

10   right, out of that money that comes in?

11   A    There you go again.  They could be borrowing

12   money --

13   Q    I'm not talking about borrowing money.

14   A    -- to pay their expenses.

15   Q    I'm talking about business expenses.  Phone -- you

16   talked about a phone record.

17   A    You could use --

18   Q    You talked about the product -- excuse me, let me

19   ask my question.

20   A    Certainly.

21   Q    You talked about the acquisition cost of the product

22   from Colonial Chemical.  You talked about all the other

23   expenses that a business has.  I'll put them all in that

24   universe, expenses, okay?  You've got the revenue

25   generated from the sale of Steel Seal on the Internet,

1    and then you have all the whole universe of expenses.

2    And then you have the leftover money that all goes to

3    the owners, okay?  Are you on the same place now?

4    A    I understand your question and your statement.

5    Q    Okay.

6    A    You're right, there's no question pending.  I

7    understand your statement.

8    Q    And there is a value to the owners of the right to

9    sell that Steel Seal, correct?

10   A    There's a value to the owners to sell the Steel Seal

11   product?  Yes, there's going to be a value to the

12   owners.

13   Q    Okay.  And the value to the owners is the amount of

14   cash they get out of it.

15   A    When we're doing an earnings approach --

16   Q    Oh, no, no, no.

17   A    -- or an income approach?  Yes.

18   Q    I'm not talking about an earnings approach.  I'm

19   saying -- and I'm not asking you to define what that is.

20   There's a value to the owners?

21   A    In its continuing sales, there would be some value,

22   yes.

23   Q    Okay.  And the value to the owners has a

24   relationship to the amount of profit they get out of the

25   business, not profit in the technical sense, the amount

1    of cash they put in their pocket?

2    A   With regard to the sale of the product, yes.

3    Q   Okay.  So that the product, Steel Seal, has a value,

4    and it generates money that comes to the pocket of the

5    owners?

6    A   It has that potential, yes.

7    Q   It has the potential.  And the owners get that

8    money, they put it in their pocket, and they're pretty

9    happy?

10   A   They may be happy; they may be unhappy.  I don't

11   know.

12   Q   Okay.  Okay.  If it's a lot of money, they're very

13   happy.

14   A   I would agree, they probably would be.

15   Q   Okay.  So if they pay 89.95 -- if they sell the

16   product for 89.95 on the Internet and they pay $1.50 a

17   bottle for it, and they put a lot of money in their

18   pockets --

19              MR. HIPPLE:  Objection, Your Honor.

20              MR. BERKOWITZ:  -- they're happy?

21              THE COURT:  Overruled.

22              THE WITNESS:  We haven't described it, the

23   expense structure, but if there's money left over after

24   the expenses, you're right, they're probably happy.

25   BY MR. BERKOWITZ:

1    Q    Okay.  And there's a value to them?

2    A    Yes.

3    Q    Okay.  Now, you heard Mr. Hipple testify that he

4    spent $2 million to get this right to Steel Seal, right?

5    A    No, I wasn't involved with that testimony.

6    Q    Okay.  You weren't here for that?  Okay.  That's

7    fine.  You saw -- I believe you heard yesterday that the

8    name, Steel Seal, has a value, correct?

9    A    I don't think we valued the name of Steel Seal.

10   Q    Well, you saw that Steel Seal spent money and hired

11   a lawyer -- I'm sorry, BBB Management, the current

12   company that has it, spent money and registered a

13   trademark?

14   A    I'm not aware of that.

15   Q    Okay.  I'll be glad to show you the exhibit, unless

16   you want to accept the representation that there is a

17   trademark that BBB Management has?

18             THE COURT:  Can we agree to that, Mr. Hipple?

19             MR. HIPPLE:  Agree to what, Your Honor?

20             THE COURT:  That there's a trademark for Steel

21   Seal.

22             MR. HIPPLE:  Yeah, except that Mr. Hipple

23   didn't spend any money for the trademark.  It gets done

24   automatically, I believe, Your Honor.

25             THE COURT:  All right.

1          THE WITNESS:  Sure.  Okay.  BBB has a

2    trademark.

3              THE COURT:  A trademark, right.

4              MR. HIPPLE:  Steel Seal trademark.

5              THE WITNESS:  A Steel Seal trademark.

6    BY MR. BERKOWITZ:

7    Q   And -- and I'm going to just show you -- it's

8    Exhibit P-200 --

9              THE COURT:  Right.

10   BY MR. BERKOWITZ:

11   Q   -- can you see that?  I'm going to you, attorney of

12   record, John A. Gibbons?

13   A   I don't know Mr. Gibbons.

14   Q   I'm not asking if you know him.  Do you see that

15   right there on the record?

16   A   I do.

17   Q   Okay.  And the attorneys you work with, they

18   generally get paid for what they do?

19   A   Some do, some don't.

20   Q   Okay.  And you would agree with me, sir, that assets

21   can be intangible?

22   A   Absolutely.

23   Q   And you can't pick them up and put them in your

24   pocket and take them with you in your car, right?

25   A   I think you mean they are intangible, yes.

1     Q    No, I'm saying you can't pick them up, they're

2     intangible.  I guess that's right.

3     A    Okay.

4     Q    Right?

5     A    That's correct.

6     Q    Okay.  Now, let's talk about liabilities.  You

7     talked about liabilities and that Mr. Geisser didn't

8     take account of liabilities in his report, correct?

9     A    That's correct.

10    Q    Okay.  And you heard Mr. Geisser testify that he did

11    not have a balance sheet, he did not have an income

12    statement nor did he have a statement of cash flow from

13    these businesses?

14    A    He indicated that he had no financial statements,

15    yes.

16    Q    Okay.  So he didn't have that information to use in

17    his report?

18    A    Yes.  That's what he testified to.

19    Q    Because it wasn't produced by the defendants?

20    A    I don't know if it -- I wasn't involved with

21    discovery.

22    Q    I didn't ask you if you were involved.

23    A    Okay.

24    Q    I asked you if you were listening.  And you -- you

25    used the term --

Mr. Pederson - Cross                    138

1          MR. HIPPLE:  I'm sorry.  Could you rephrase

2     it.

3     BY MR. BERKOWITZ:

4     Q   -- in your testimony, book value?

5     A   Yes.

6     Q   And book value comes from the books and records of

7     the company, doesn't it?

8     A   It does.

9     Q   Okay.  And you talked about a conclusion of value.

10         MR. BERKOWITZ:  I want to make sure I get the

11     terms correct, Your Honor.

12    BY MR. BERKOWITZ:

13    Q   A conclusion of value?

14    A   Yes.

15    Q   And that's an extensive engagement?

16    A   It's a standard valuation engagement.

17    Q   It's an extensive engagement?

18    A   It can be extensive, yes.  It depends on the subject

19    matter.

20    Q   And you have to have -- in order to do a conclusion

21    of value, you're required to have certain records?

22    A   There are not a set -- set of records that you're

23    required to have.

24    Q   You would need the books and records of the company,

25    wouldn't you?

Mr. Pederson - Cross                              139

1    A    You don't need all the books and records of the

2    company, no.

3    Q    I didn't say all the books and records.  You need

4    books and records of the company?

5    A    You can form a valuation with a set of audited

6    financial statements.

7    Q    Audited financial statements?

8    A    Yes.

9    Q    Okay.  I consider that books and records.  I'm sorry

10   if I did not --

11   A    Well, when you say books and records --

12   Q    -- speak properly technically.

13   A    -- I'm thinking transaction reports, general

14   ledgers, a lot of data that's not necessary.

15   Q    Okay.  But you -- you talked about audited financial

16   statements?

17   A    Yes.

18   Q    Okay.  That's something you can use in a conclusion

19   of value?

20   A    Yes, you would use that.

21   Q    And if you don't have that, you're now missing

22   something that you might need for a conclusion of value?

23   A    You might, but you could also disclose that some of

24   these records aren't available and try some alternate

25   means.

Mr. Pederson - Cross                         140

1    Q    Okay.  Give -- give me some idea of some alternate

2    means.

3    A    Sure.  You can go into the marketplace and see who

4    else is selling products to the automotive world.   In

5    fact, I did that and I found that there are other

6    companies out there doing a product --

7    Q    Okay.

8    A    -- like Steel Seal.

9    Q    Okay.

10   A    You can get information on those companies and kind

11   of see how they're doing.

12   Q    Okay.

13   A    You can also -- you can back into a balance sheet

14   and you can take a look at what assets they had at the

15   time.

16   Q    So you can back into a balance sheet?

17   A    You can attempt it.

18   Q    Which means you need records to back into it, right?

19   A    You need some records, yes.

20   Q    You need underlying records to reconstruct?

21   A    You need some records, absolutely.

22   Q    And you know that those records were requested in

23   this case.  You heard there was -- a subpoena was

24   delivered to their accountant to produce -- and these --

25   this was by the defendant.  He produced nothing,

1    notwithstanding that he produced less than nothing for

2    me.  You've got to get the records somewhere, right?

3    A    You do have to get the records somewhere.

4    Q    Okay.

5    A    There were records here, though, and Mr. Geisser had

6    them for 2011, 2012.  He could have worked with those

7    records and actually gone a little bit backwards.

8    Q    Okay.

9    A    He also had tax returns.

10   Q    Now, a calculation of value is what Mr. Geisser

11   testified that he performed?

12   A    Yes.

13   Q    And that's a limited -- a limited valuation?

14   A    Yes.

15   Q    And it's approved by the AICPA?

16   A    As a limited valuation technique, yes.

17   Q    Yes.  Okay.  And Mr. -- okay.  Now, you talked a bit

18   about patents.

19   A    Yes.

20   Q    You said they expired.  You talked about the patents

21   having expired?

22   A    Yes.

23   Q    Yes?

24   A    Yes.

25   Q    Have you read Judge Baldi's order in the Bucks

Mr. Pederson - Cross                        142

1    County case where SCIX was ordered to reinstate the

2    patent that was in front of him at the time, and they,

3    in fact, reinstated that patent?  Had you read the

4    order?

5    A    No.

6    Q    Okay.  So you didn't know the patent was reinstated?

7    A    Which patent?  There are three.

8    Q    You didn't know that one of the patents was

9    reinstated?

10   A    I knew one of the patents was still valid.

11   Q    Okay.  It was reinstated at the insistence of Judge

12   Baldi.

13   A    So the other two are still invalid and the one --

14   Q    And do you know there's a motion pending with Judge

15   Baldi to reinstate those two patents in the Bucks County

16   case that had to be stopped?

17   A    No, I wasn't aware of that.

18   Q    Okay.  Thank you.  Now --

19           THE COURT:  When you say reinstate, what do

20   you mean by that?

21           MR. BERKOWITZ:  They went in and Judge Baldi

22   required SCIX, which was the owner of the patent, to

23   reinstate the patent that expired.

24           THE COURT:  You mean reinstate with the Patent

25   Office?

1          MR. BERKOWITZ:  Yes.  And they did.

2          MR. HIPPLE:  Your Honor, I object, because I

3     don't see any documentation that states that here today

4     in the courtroom.

5          THE COURT:  All right.  Well, I think it's an

6     exhibit, right?

7          MR. BERKOWITZ:  Judge Baldi's opinion is in --

8     in front of the Court.

9          MR. HIPPLE:  It is my opinion and my

10    understanding that it never got reinstated.

11         THE WITNESS:  Your Honor, I'll also interject

12    that this is all subsequent information.

13         MR. BERKOWITZ:  I'm going to object to the

14    witness testifying.

15         THE COURT:  All right.

16         MR. BERKOWITZ:  There's no question before the

17    witness.

18         MR. HIPPLE:  Well, first, I'm not done.  It's

19    also my understanding that the patents never got --

20    what's the word -- put back in --

21         THE COURT:  Reinstated.

22         MR. HIPPLE:  -- reinstated because of the fees

23    and also because of the Patent Office would refuse --

24    because you have to have a special, special

25    circumstances.  It's very hard to reinstate a patent.

1          THE COURT:  All right.  Well, I'll look at

2     this.

3          MR. BERKOWITZ:  You'll be able to see Judge

4     Baldi's order.

5          THE COURT:  Right.

6     BY MR. BERKOWITZ:

7     Q   Now, you -- you would agree with me that a secret

8     formula has value?

9     A   It could.

10    Q   Okay.  Coca Cola has a secret formula, right?

11    A   I believe they do.

12    Q   Right?  And they generate a whole lot of money,

13    don't they?

14    A   I think they do.

15    Q   And nobody's been able to copy their product, have

16    they?

17    A   They've tried.

18    Q   Okay.  And the same with Kentucky Fried Chicken,

19    they've got a secret formula, right?

20    A   They do.  I'm familiar with it.

21    Q   So -- so am I -- but, yes.

22    A   Yes.

23    Q   And there's -- there's a lot of value to a secret

24    formula?

25    A   There can be.

1    Q   Yes, and it could be more than a patent, because you

2        don't have to lay out what's out there, right?  Nobody

3        has to know what's in the secret formula.

4    A   I suppose --

5    Q   It's secret, right?

6    A   -- it could.

7    Q   Okay.  Now, you -- you talked about the fact that

8        there was a confidentiality agreement.  You saw

9        testimony about a confidentiality agreement?

10   A   Yes, that's right.

11   Q   Okay.  And that pertained to the formula, and if you

12       would like to look at it, we can -- it's in Exhibit 37,

13       Plaintiffs' Exhibit 37.

14   A   I may have it.

15               MR. HIPPLE:  One moment, please.  37?

16               MR. BERKOWITZ:  It's in 37.  I'm just looking

17       for the page because I know --

18               MR. HIPPLE:  Of Defendants' 37, right?

19               MR. BERKOWITZ:  No, Plaintiffs' -- here we go.

20               THE WITNESS:  No, this is Plaintiffs' 37.

21               MR. HIPPLE:  Plaintiffs' 37?

22               MR. BERKOWITZ:  Read the bottom number.

23               THE WITNESS:  The Bates number, H --

24               MR. HIPPLE:  I'm sorry.  I'm lost.

25               THE COURT:  P-37, the white book.  P-37.

Mr. Pederson - Cross                        146

1                    THE WITNESS:  The Bates number, Hipple-00453.

2                    MR. HIPPLE:  Well, P-37 to me is an

3          application for --

4                    THE COURT:  What number is it?

5                    MR. BERKOWITZ:  There's many pages.  It's P-

6          37.  He just read off the Bates number at the bottom.

7                    THE WITNESS:  00453.

8                    MR. BERKOWITZ:  We've seen this before.

9                    THE WITNESS:  It's probably six pages back,

10         seven pages back.

11                   MR. HIPPLE:  Here's my P-37.

12                   MR. BERKOWITZ:  It's in there -- they're all

13         in there -- here it is.

14                   MR. HIPPLE:  Okay.

15                   MR. BERKOWITZ:  It's here.  Too many yellow

16         flags in here.  Okay.  There you go.

17         BY MR. BERKOWITZ:

18         Q   And that pertains to the formula?

19         A   Yes, it does.

20         Q   Okay.  Secret formula, right?  And read the name at

21         the -- on the top that's got the secret formula?

22         A   You're referring to Colonial Chemical and Scientific

23         Chemical, Inc.?

24         Q   Yes, that's Scientific Chemical without an S,

25         correct?

Mr. Pederson - Cross                    147

1    A    Scientific Chemical, Inc.

2    Q    Without an S?  It's not Scientific Chemicals?

3    A    Correct.

4    Q    And look in the parentheses right next to that.

5    A    It indicates SCIX.

6    Q    Indicates SCIX.  Okay.  Now --

7              THE COURT:  What's the date of that anyway?

8              MR. BERKOWITZ:  That is in --

9              MR. HIPPLE:  '99 -- '99.

10             MR. BERKOWITZ:  -- 1999.

11             THE COURT:  Thank you.

12   BY MR. BERKOWITZ:

13   Q    And there was a patent in 1999, right?

14   A    I believe there was, yes.

15   Q    Okay.  So what this is, Mr. Hipple is taking his

16   patent on this product and splitting it from the patent

17   that's owned by SCIX to separate the formula that's

18   patented and the patent.  Wouldn't that be correct?

19             MR. HIPPLE:  Objection, Your Honor.  That's

20   not --

21             THE COURT:  Overruled.

22             THE WITNESS:  I'd have to read through the

23   document.  I do recall seeing this, but I don't recall

24   what you described.

25             (Pause in proceedings.)

Mr. Pederson - Cross                        148

1              THE WITNESS:  All right.  Can you repeat your

2      question, please?

3      BY MR. BERKOWITZ:

4      Q    Sure.  This confidentiality applies to -- and it

5      talks about, if you look in the first paragraph, "CCC

6      and SCIX" --

7      A    Yes.

8      Q    -- "agreed to furnish to one another access to

9      certain confidential information relating to the affairs

10     of the company solely for the purposes of acknowledging

11     concepts provided by CCC and SCIX for processing of

12     specialty chemicals for the ultimate use as a head

13     gasket sealant."

14     A    Yes.

15     Q    Okay.  And those are the -- that's what they're

16     protecting?

17     A    Yes.

18     Q    And you heard -- they talked about a secret formula?

19     A    Yes.

20     Q    Okay.  And if you look at Exhibit 18 --

21     A    This is Plaintiffs' 18?

22     Q    Plaintiffs' Exhibit 18.  Do you see that, the first

23     page?

24     A    Yes.  This is --

25     Q    And I'm going to go --

1    A    -- December 26, 2010?

2    Q    Correct.  And that's a letter from Complete Group

3    signed by Clement Hipple?

4    A    Okay.

5    Q    And it says, "My company, Complete Group, LLC, is

6    now the successor in interest to the confidentiality

7    agreement executed between SCIX, LLC, and Colonial

8    Chemical on March 29, 1999, regarding the formula of a

9    chemical sealer now known as Steel Seal."

10   A    Yes, I read that.

11   Q    Do you see that?

12   A    Uh-huh.

13   Q    Okay.  So whatever was in that confidentiality

14   agreement, now this secret formula again split from the

15   patent, is now in the hands of Complete Group, correct?

16   That's what that says?

17   A    By this agreement, yes.

18   Q    Okay.  And let's read the next sentence.  "I

19   understand that there has been a recent modification to

20   the formula, so I need to receive a copy of the latest

21   version."

22   A    Yes, I -- I read that.

23   Q    Okay.  So it looks like that secret formula was

24   changed, correct?

25   A    By -- by indication of this letter, it's changed,

1    yes.

2    Q    Okay.  Thank you.  Now, you indicate in your report

3    that not all of the assets were conveyed by the transfer

4    of Steel Seal from SCIX to Steel Seal Pro?

5    A    I don't think I stated that all of Steel Seal was

6    transferred.

7    Q    You said all of the assets were not conveyed with

8    the transfer?

9    A    Correct, that's what I said.

10   Q    Okay.  So -- so there were assets reserved to SCIX

11   that he didn't transfer?

12   A    No, that doesn't mean what that says.

13   Q    Say -- say again?  I'm sorry.

14   A    No, that's not correct.

15   Q    Okay.  Tell me what you said.  I don't want to put

16   words in your mouth.

17   A    Okay.  From my understanding of the case, there are

18   certain assets that were not transferred.  These include

19   the patents and the website, but I don't know that the

20   website was ever in the name of SCIX.

21   Q    Okay.  I'm going to ask you to turn to Exhibit 32.

22   Do you have 32 there?

23   A    I think I do.

24             MR. HIPPLE:  P-32, right?

25             MR. BERKOWITZ:  P-32.

1          THE WITNESS:  I have 32.

2     BY MR. BERKOWITZ:

3     Q    Okay.  And I'd like you to go to the back of that

4     document and look at the date.  I think it's in there.

5     A    Under the rule to show cause?

6     Q    No, go to the last page -- the -- I'm sorry, it's

7     probably the verification page.

8     A    Okay.  The certificate of service is dated June 12,

9     2012.

10    Q    And you -- you would agree with me that you did your

11    expert report after that date?

12    A    I did the report after June 12, yes.

13    Q    Okay.  And in your report, you assumed that certain

14    assets were not transferred and that SCIX retained

15    assets, correct?

16    A    I assumed that certain assets were not transferred,

17    and, yes, SCIX may have retained some of those assets,

18    not necessarily all of them as I indicated, the website

19    may not have been in there.

20    Q    I'd like you to turn to paragraph six of this

21    petition to intervene filed by Clement Hipple and

22    Complete Group.  Do you see that in this Bucks County

23    case?

24    A    I am at paragraph six.

25    Q    Okay.  And I'm going to read it to you.  It says,

1    "Petitioners" -- and that's Clement Hipple and Complete

2    Group -- "and respondent" -- and that's Teresa Hipple --

3    "are creditors of SCIX but petitioners believe and

4    therefore aver that they are the sole owners of the

5    assets, including the patents formerly owned by SCIX and

6    that respondent's receiver petition is a back door

7    attempt to levy upon assets no longer owned by SCIX."

8           Do you see that?

9    A   I'm reading along with you, yes.

10   Q   Did I read it correctly?

11   A   I think that you did.

12   Q   Okay.  Now, go to paragraph 21.

13   A   I'm at paragraph 21.

14   Q   You see paragraph 21.  "Petitioners believe and,

15   therefore, aver that prior to the time of filing of the

16   receiver petition by respondent, SCIX no longer owned

17   assets, including patents, which were covered by the

18   security interest of individual petitioner and turned

19   over to the individual in accordance with 13 PA CSA

20   9622."

21          Do you see that?

22   A   Yes.

23   Q   Okay.  Now, let's go to paragraph 22.

24   A   I'm at 22.

25   Q   I'm going to read that again.

1          "Subsequent to taking possession of the assets

2     of SCIX in satisfaction of the indebtedness owed to him,

3     individual petitioner" -- which is Clement Hipple --

4     "did form corporate petitioner, Complete Group, LLC, in

5     which entity individual petitioner is an owner and

6     current managing member and did transfer all of the

7     assets formerly owned by SCIX, including the rights to

8     its patents to Complete Group."

9          Did I correctly read that?

10    A    Yes, I believe you did.

11          MR. BERKOWITZ:  And, Your Honor, these are in

12    -- in record if -- I don't want to read them all unless

13    you believe it's necessary.

14    BY MR. BERKOWITZ:

15    Q    I'd just like you to look quickly at paragraph 23.

16    A    Yes, I'm at 23.

17    Q    Okay.  You see that includes the patents?

18    A    I see it says, "in addition to the patents."

19    Q    Okay.  And 24 they took manufactured product --

20    chemical products manufacturers, pursuant to SCIX's

21    patents?

22    A    To liquidate the inventory of chemical products

23    manufactured pursuant to SCIX's patents, yes.

24    Q    Okay.  And let's look at 25.  I'm going to read

25    that.

Mr. Pederson - Cross                    154

1          "Subsequent to the foregoing, on or about the

2    9th day of June, 2011, respondent did file the receiver

3    petition, seeking to have a receiver appointed over SCIX

4    and its alleged assets, all of which were owned by

5    individual petitioner and corporate petitioner prior to

6    the filing of such receiver petition by respondents."

7          Do you see that?

8    A    Yes.

9    Q    Okay.  And I'm going to represent to the Court that

10   there was never a receiver petition.  That's what they

11   had defined it as, it was a petition asking the Court to

12   enforce the sale of the patents.

13          Do you see that?

14   A    Yes.

15   Q    Now, let's go to 27.  "Petitioners believe and

16   therefore aver that they are the owners of the patents,

17   which patent is still registered in the name of SCIX."

18   A    Yes.

19   Q    Okay.  So you didn't know this when you issued your

20   report?

21   A    When I did my patent search, it indicated SCIX, and

22   then I looked for an assignment of the patent, and it

23   had gone to the plaintiff.

24   Q    Well, that assignment you saw was a recording of her

25   Bucks County judgments, but --

1    A    Okay, so I was aware of that, yes.

2    Q    Okay.  Her -- her filing with the patent office

3    indicated that there was a patent, and it had a lien by

4    Teresa Hipple?

5    A    I didn't see that in the patent office.  What they

6    indicated is who the patent had been assigned to.

7                MR. HIPPLE:  Objection, Your Honor.

8                THE COURT:  On what grounds?

9                MR. HIPPLE:  On the grounds that he is not

10   identifying -- there's three patents here, and he has to

11   identify which patent he is speaking about.

12               THE COURT:  All right.  I'll --

13               MR. BERKOWITZ:  Your Honor, I'm cross-

14   examining the --

15               THE COURT:  -- I'll overrule the objection.

16               MR. BERKOWITZ:  -- witness.

17               THE COURT:  Overruled.

18   BY MR. BERKOWITZ:

19   Q    Now, I would like you to look at, I believe it's --

20   I'll make it easy.  I think it's a plaintiff's exhibit,

21   but it's also a defense exhibit.  I would like you to

22   look at Exhibit 11.

23   A    All right.  P-11.

24               THE COURT:  Plaintiff's exhibit?

25               MR. BERKOWITZ:  Plaintiff's Exhibit 11.

Mr. Pederson - Cross                    156

1           THE COURT:  Yes.

2     BY MR. BERKOWITZ:

3     Q    Do you see that?

4     A    Yes.

5     Q    And are you familiar with that document?  Have you

6     ever seen that before?

7     A    Let's take a look.  I've certainly seen UCCs before.

8     I don't know that I've seen this one though.

9     Q    Okay.  Well, that's a Pennsylvania form.  You may

10    not have seen that.  I'd like you to look at the second

11    page.  And, well, first, let's look at the first page.

12    A    Sure.

13    Q    Do you see right at the top, he's -- he's

14    encumbering general intangibles?

15    A    Yes.

16    Q    Okay.  And general intangibles, you talked about

17    before?

18    A    Yes.

19    Q    Things you can't put in your pockets?

20    A    That's correct.

21    Q    Okay.  And that might be a patent?

22    A    Yes.

23    Q    It might be a secret formula?  Could be a website?

24    A    I don't know if it would include a secret formula,

25    quite frankly, because I don't know how you protect it.

1    Q    You don't know if you can sever --

2    A    Exactly.

3    Q    -- a patent from a secret formula?

4    A    Well, the value of a secret formula is in its

5    secrecy, and I don't know if you can sell a secret.  I

6    suppose you can.

7    Q    If I sold you Coca-Cola for $100, would you gladly

8    buy it?

9    A    I'm sorry.  I just have to pause about it.  I

10   haven't seen a secret getting sold, per se, certainly --

11   Q    A secret formula, not a secret --

12   A    Okay, a secret formula?  Yes, I'll go along with

13   that.

14   Q    Okay.  And now, let's look at the next page, the

15   Exhibit A that's attached to that.

16   A    Yes.

17   Q    Let's look at the assets that they encumbered --

18   A    Okay.

19   Q    -- that Clement Hipple encumbered.  Do you see that,

20   websites?

21   A    Yes.

22   Q    Okay.  An 800 number?

23   A    Yes.

24   Q    You would agree with me that's kind of hard to pick

25   up?

1    A    It is.

2    Q    Okay.  Steel Seal logo?

3    A    Yes, that's what this indicates.

4    Q    The rights to the names?

5    A    Rights to the name.

6    Q    Confidentiality agreement with Colonial Chemical?

7    A    Yes.

8    Q    And the formula?

9    A    And the formula, yes.

10   Q    Okay.  Then I'm going to represent to you that that

11   is what Clement Hipple foreclosed upon.

12              MR. HIPPLE:  Is that on page two?

13              MR. BERKOWITZ:  It's in the UCC-1.  It's the

14   second page.

15              THE COURT:  It's Exhibit A, right?

16              MR. BERKOWITZ:  It's Exhibit --

17              MR. HIPPLE:  I don't see it.

18              MR. BERKOWITZ:  Yes, it is Exhibit A to

19   Exhibit 11.  It's the UCC-1 with the attachment.

20              THE WITNESS:  This doesn't have it then, I

21   guess.  I'm not seeing what --

22              MR. BERKOWITZ:  It's in your exhibits, also,

23   Your Honor.

24              THE COURT:  I could show you my copy if you

25   wish.

1          Why don't you show it to Mr. Berkowitz and

2     make sure it's the right document?

3              MR. BERKOWITZ:  It's -- I'll get it for in the

4     D exhibits.

5              THE COURT:  Is this the right one?

6              MR. BERKOWITZ:  It's D-3.  Yes, that is it.

7              MR. HIPPLE:  Look under D-3?

8              THE COURT:  It might have become detached from

9     that because we were taking those out, so --

10             MR. HIPPLE:  Okay, and this is part of this

11    UCC filing, correct?

12             MR. BERKOWITZ:  Yes.  This is the Defendant's

13    Exhibit D-3.  I have it as a separate exhibit, as well.

14    BY MR. BERKOWITZ:

15    Q   Okay.  So -- I'm sorry.  In your critique of Mr.

16    Geisser's report where it says, "Omission, not all

17    assets were conveyed with the transfer", you weren't

18    aware of the information you just saw?

19    A   I'm looking at this information indicates websites,

20    but it doesn't say --

21    Q   I'm sorry.  I'm not talking about the websites.  I'm

22    talking about the petition to intervene that you looked

23    at.  You weren't aware of that?

24    A   No, I was not.

25    Q   Okay.  And that was filed by Mr. Hipple?

1   A   Yeah, if you say so.

2   Q   And you would have liked to have seen that before

3   you issued this report, wouldn't you?

4   A   I was doing a rebuttal of Mr. Geisser.

5   Q   Well, you said that not all the assets were

6   transferred.  Wouldn't you have wanted to know that all

7   of the assets were transferred?

8   A   If that's, in fact, what happened.  As I said, I

9   looked at the patent site, and it clearly showed who the

10   assignee was.

11   Q   I'm not asking you about the patent site.

12   A   Okay.

13   Q   I'm asking you, wouldn't you have wanted to know

14   before you put in your report, "Omissions, not all

15   assets were conveyed with the transfer", you would have

16   liked to have seen that petition to intervene that

17   contradicts what you put in your report?

18   A   I'm looking to see what contradicts.

19   Q   I'm sorry.  Would you like to go over that exhibit

20   again?  That's the one we just --

21   A   Yes, the website.

22   Q   -- looked at, Exhibit 32.

23   A   We were referring that there were two assets that

24   weren't transferred, websites and patents, and you just

25   told me, no, don't worry about the patents, so it leaves

1    the website.  A UCC-1 indicates that there's an

2    attachment on the website.

3    Q   I'm sorry.  You're not --

4    A   But SCIX doesn't have a website.

5    Q   -- you're not listening to my question.  Excuse me,

6    don't answer the question you want to answer.  Answer

7    the question I ask you.

8            There's a petition to intervene.  You just

9    looked at Exhibit 32, correct?

10   A   I'm looking at Exhibit 11.  I'll go back to 32.

11   Q   Now, go back to 32.

12           (Pause in proceedings.)

13   A   I'm back at 32.

14   Q   Okay.  Now, in your report, it says, "Omission, not

15   all assets were conveyed with the transfer."  Now, the

16   transfer you're talking about is the transfer of the

17   SCIX assets from SCIX to Clement Hipple, correct?

18   A   That's correct.

19   Q   And that petition says all of the assets were

20   transferred, doesn't it?

21           Do you want to go through it again?

22   A   Yes.

23   Q   I'll go through it again.

24   A   I'm not trying to be difficult, but I want to be

25   very careful --

Mr. Pederson - Cross                    162

1    Q    Sure.

2    A    -- and make sure I answer accurately.  You started,

3    I think, at 17, "take possession of assets", but it

4    never tells us what the assets are.

5              THE COURT:  Later on, there's some other

6    paragraphs that refer to the patents.

7              THE WITNESS:  I'm -- I'm going to 22.

8    BY MR. BERKOWITZ:

9    Q    Look at 22.  Read the last few lines.

10   A    "All the assets formerly owned", but again, we don't

11   know what those assets are.

12   Q    But it says, all, right?

13   A    It does say all.

14   Q    And it doesn't say, some, right?

15   A    That's correct.

16   Q    And you know the difference, right?

17   A    Yes, sir, I do.

18   Q    So before you said, not all the assets were

19   transferred, you would have liked to have seen the

20   petition filed by Mr. Hipple in Bucks County?

21             MR. HIPPLE:  Objection, Your Honor.   He --

22             THE WITNESS:  I would have reviewed --

23             MR. HIPPLE:  -- he's talking about something

24   that I -- I never levied on the patents.  Okay?  So that

25   all of the assets were not transferred.

1          THE COURT:  All right.  I -- I can --

2          MR. HIPPLE:  I never levied on them, Your

3     Honor.

4          THE COURT:  -- well, I can read also.  I

5     understand the point that Mr. Berkowitz is saying about

6     the representation that were made in the Bucks County

7     Court --

8          MR. HIPPLE:  But again --

9          THE COURT:  -- by the lawyers and by --

10          MR. HIPPLE:  -- but again, I never -- I never

11     levied.  There's no documentation.

12          MR. BERKOWITZ:  I'm going to object to Mr.

13     Hipple testifying --

14          THE COURT:  Right.

15          MR. BERKOWITZ:  -- right now.

16          MR. HIPPLE:  He cannot produce any

17     documentation.

18          THE COURT:  I'll overrule the objection.  Go

19     ahead.

20     BY MR. BERKOWITZ:

21     Q   Now, under the next omission in your report -- and

22     there are no pages -- page numbers on your report.

23     A   No, paragraph numbers.

24     Q   This is under paragraph 11.

25     A   Certainly.  Yes?

Mr. Pederson - Cross                                  164

1   Q   And it says, "Another factor that was not addressed

2   in plaintiff's expert report is the fact that SCIX did

3   not own the website it used to sell its product,

4   Scientific Chemical, Inc."

5           SCI owned the website, correct?

6   A   I'm sorry.  You said paragraph 11, and I'm in the

7   wrong place.

8   Q   I'm sorry, the second -- well, there's a second

9   omission, not all assets.

10  A   Okay.  So that's paragraph 12.  Yes?

11  Q   Okay.  And you read, before, Exhibit 18.  It talks

12  about the transfer of the confidentiality agreement,

13  correct?

14          MR. HIPPLE:  I object to that, Your Honor,

15  because there is no signature on that -- that Colonial

16  Chemical had acknowledged or accepted that letter in

17  order to keep the confidentiality agreement.

18          THE COURT:  I'll overrule the objection.

19          THE WITNESS:  All right.  We are at Exhibit

20  18.

21  BY MR. BERKOWITZ:

22  Q   You see, it talks about, you know, he's got the

23  confidentiality agreement, right?

24  A   Okay, but --

25  Q   It was transferred?

1    A    -- instead of 12, I thought -- I thought we were

2    talking about paragraph 12 and the website?

3    Q    No.

4    A    We've -- we've moved on?

5    Q    If I'm going too fast, that's okay.  I -- I -- we

6    just went to Exhibit 18.

7    A    Okay, I'm sorry.

8    Q    Okay?

9    A    I'm behind.  Yes, I'm looking at Exhibit 18.

10   Q    Okay.  You see that confidentiality agreement

11   somehow got somewhere else, right?

12   A    These are letters to Colonial Chemical?

13   Q    Yes.

14   A    One from Complete Group; the other, SCIX.  Yes,

15   okay.

16   Q    Okay.  All right.  Now, you talked about, in your

17   testimony, the effect of the garnishment of Teresa

18   Hipple on the bank account at Wachovia Bank, do you

19   recall that?

20   A    Yes.

21   Q    And you said that that sort of stuck the business?

22   Was that -- I don't want to put words in your mouth.

23   A    I think so.  I would refer to Mr. Geisser's report.

24   I think it had a negative $35, although, I'd need to

25   look.

1    Q    It garnished the account.  It took the money out of

2    the account?

3    A    Yes.

4    Q    Okay.  You're familiar with a garnishment?  You're

5    an attorney.

6    A    Yes.

7    Q    You work with UCCs?

8    A    I've worked with UCCs.

9    Q    Okay.  Now, so there is nothing, is where, that

10   would prevent SCIX from opening a new bank account with

11   a garnishment, is there?

12   A    No.

13   Q    Okay.  So the money from the sale of Steel Seal

14   could have just as easily flowed into a new bank

15   account, correct?

16   A    It could have moved to a new bank account --

17   Q    Sure.

18   A    -- yes.

19   Q    And just like after the death of Brian Hipple, we

20   saw, after his death, money continued to flow into the

21   Steel Seal Pro bank account, right?

22   A    It did.

23   Q    Because the sales on the Internet continued,

24   correct?

25   A    Yes, they did, for at least some period of time.

1    Q    And the garnishment -- the garnishment did nothing

2    to interfere with the business of Steel Seal, other than

3    emptying the bank account at Wachovia Bank?

4    A    What they kept in the bank account is -- it's

5    relevant.

6    Q    And you have no idea, nor do I, whether they had

7    another bank account, do you?

8    A    No.

9    Q    Okay.  And they could have opened a new one, right?

10   That's pretty easy.

11           MR. HIPPLE:  Objection, Your Honor, projection

12   on his part.

13           MR. BERKOWITZ:  I'm cross-examining an

14   expert --

15           THE COURT:  Overruled.

16           MR. BERKOWITZ:  -- Your Honor.

17           THE COURT:  Overruled.

18   BY MR. BERKOWITZ:

19   Q    So a business existed, right?  Steel Seal was still

20   being sold?

21   A    At what point in time?

22   Q    When the garnishment took place.

23   A    Yes.

24   Q    And a new bank account could have been opened?

25   A    Yes, it could have been.

1    Q    And business would have gone on as usual, right?

2    A    There was probably a point in time where there was

3    little or no money, even if they reopened and turned

4    this thing around quickly, they went from $53,000 to

5    negative 35.

6    Q    $35, not 35,000, correct?

7    A    Yes, correct, $35.

8    Q    A bank service charge, because their account has no

9    money in it, right, and checks might bounce --

10   A    Probably right.

11   Q    -- when a garnishment takes place, correct?

12   A    Yes, that's probably correct.

13   Q    Okay.  So we're not talking about a lot of money,

14   right, $35?

15   A    Well, we're talking about a business that had

16   $53,000, and now has negative 35, so you could --

17   Q    And -- and it has --

18   A    -- restart the accounts, but it could take awhile

19   before you have any sizable money, and -- and we don't

20   know what the bills looked like at that point in time,

21   and --

22   Q    You have no idea, do you?

23   A    We know they're out $53,000.

24   Q    Yes, we do, but you don't have any idea what the

25   bills are, right?

1    A   I do not.

2    Q   You, personally, don't?

3    A   No.

4    Q   And neither do I because they never turned them

5    over.  They could have turned them over, right?

6    A   I don't know.

7    Q   And do you know, in fact, that there is only one

8    creditor of the company that didn't get money from SCIX?

9    A   No, I'm not aware of that.

10   Q   Okay.  So every other creditor that they might have

11   had got paid.  You heard -- you were here yesterday when

12   the witness from Colonial Chemical testified, as far as

13   he knew, there was no problem.  Everybody was getting

14   paid?

15   A   As far as he knew, he was getting paid, yes.

16   Q   Yeah, okay.  Now, you're familiar with the Steel

17   Seal Pro business?

18   A   You're going to tell me what you're asking in terms

19   of familiar?

20   Q   I'm asking, you've heard of Steel Seal Pro?

21   A   Yes.

22   Q   And you know what Steel Seal Pro did?

23   A   It sold the Steel Pro product, yes.

24   Q   The Steel Seal product?

25   A   Yes.

1    Q    And Brian Hipple sold the Steel Seal product?

2    A    That's what I understand, yes.

3    Q    And he -- well, he didn't testify.  They -- Steel

4    Seal Pro used the same website, the same 800 phone

5    number, the same logo, the same product, everything,

6    when it continued the business, right?

7    A    I don't know all of the details of how it moved on,

8    but they continued the business, yes.

9    Q    And you heard Mr. Geisser testify that from his

10   examination of the bank records, he saw a continuous

11   flow of business and the same pattern of activity?

12   A    I don't know how specific he was being with that.

13   Q    Well, you heard that, though?

14   A    Well, what I am pausing on is, for example, we saw

15   no costs of goods sold go in for several months in 2011,

16   so I think if you're referring to just, generally, it's

17   the same business or it's doing business as SCIX, then,

18   I would have to agree.  But with it, specific, no, I

19   don't think that that would be the case.

20   Q    I'm going to show you an exhibit -- an exhibit, if

21   you give me a --

22             MR. BERKOWITZ:  I believe it's Plaintiff's

23   Exhibit 136.

24             (Pause in proceedings.)

25             THE WITNESS:  I think we took that out.

1        MR. BERKOWITZ:  No, it was not offered,

2    because I hadn't used it yet.  I'm going to use it now.

3        MR. HIPPLE:  I don't have it in my book.

4        THE WITNESS:  Because you took it out

5    yesterday.

6        MR. BERKOWITZ:  It was in the book.

7        MR. HIPPLE:  And we took it out yesterday.

8        THE WITNESS:  No, he took it out yesterday.

9        THE COURT:  Here, you can have my copy.

10       THE WITNESS:  I'm sorry, Your Honor.

11       THE COURT:  No, here, it's no problem.

12   BY MR. BERKOWITZ:

13   Q   And I'm going to --

14           (Off the record discussion.)

15   BY MR. BERKOWITZ:

16   Q   May I represent to you, sir, that I went through --

17   I'm going to ask you to look at Exhibit 21.  The

18   gentleman from Colonial Chemical authenticated all of

19   the invoices for the product.

20           Do you see that?  They produced the inventory?

21   They produced the Colonial Chemical product?

22       MR. HIPPLE:  I object, because you would have

23   to identify with these the invoices to make sure that

24   it's correct.

25       THE COURT:  Sir, he's just using it right now

1    for impeachment.  I'm going to overrule the objection.

2    He is not, at this point, introducing it into evidence.

3    He's just trying to use it to cross-examine.  Go ahead.

4              I'm sorry, your last question?

5    BY MR. BERKOWITZ:

6    Q   You see, in 2011 --

7    A   What page are you on?

8    Q   I'm sorry.  You can start with Exhibit 21.  That is

9    the invoices we looked at yesterday.

10   A   These -- are these out of order intentionally?  So

11   I'm just --

12   Q   I did them by year, and there's a reference in the

13   column next to it that shows what exhibit they come

14   from.

15   A   I'm looking for 21.

16   Q   Exhibit 21 --

17   A   Oh, no, I'm sorry, I meant, Exhibit 21 -- I'm

18   looking for your page number down the bottom right-hand

19   side.

20   Q   I'm sorry?

21   A   The page number.  Do you have a specific invoice you

22   want me to look at?

23   Q   I'm sorry.

24   A   I'm sorry.  If there a specific page number you want

25   me to look for?

Mr. Pederson - Cross                                 173

1    Q    You look here, Exhibit 21, page number.

2    A    Okay, thank you.

3    Q    All right?  And --

4    A    53.

5    Q    -- you just line those up.

6              (Pause in proceedings.)

7              MR. HIPPLE:  Your Honor, also, it's showing

8    16-ounce bottles sold.  This -- bills are in with them.

9              MR. BERKOWITZ:  I'm not using that, Your

10   Honor.

11             THE COURT:  Let's wait until we ask some

12   questions about it.  Okay?  And then, if you want to

13   object, you can object.

14             (Pause in proceedings.)

15             THE WITNESS:  All right.  This reference page

16   is 52.

17             BY MR. BERKOWITZ:

18   Q    And that's in Exhibit 21?

19   A    I'm on page 52 in Exhibit 21.  It seems to be a

20   different --

21   Q    Is that the invoice dated 3/11/11?

22   A    It is dated 3/11/11.

23   Q    And is it -- does it have --

24   A    But the quantity shipped is 975, not 11,700.

25   Q    Hang on.  Let me take a look at what you're looking

1     at --

2     A    Sure.

3     Q    -- and make sure I'm on the --

4     A    Page 52.

5     Q    Let me -- let me -- can I -- no, I can't see that.

6     A    Oh, that's right.

7                    (Pause in proceedings.)

8                    THE COURT:  He's said he's on Exhibit 21,

9     right?

10                   THE WITNESS:  Yes, Your Honor.

11                   MR. BERKOWITZ:  Exhibit 21, page number 52.

12                   THE WITNESS:  Page 52.

13    BY MR. BERKOWITZ:

14    Q    Do you see that?  And here's the discrepancy.  I've

15    translated cases into bottles.

16    A    Okay, so --

17    Q    You're looking at invoices.

18    A    Yes.

19    Q    This is an invoice?

20    A    Yes, sir.

21    Q    And it shows a dollar extension?  I translated this

22    on this, into bottles.  If you look in the right column,

23    16-ounce bottles sold.  If you'd like to go through the

24    math, the gentleman from Colonial Chemical testified

25    yesterday that there are 12 bottles in each case of 16-

1    ounce?

2    A    Okay.  So that's 975 cases.

3    Q    Times 12.

4    A    And so that's where they got the 11,700.  I'm sorry.

5    You don't have dollars on this.  Okay.

6    Q    Okay.  So what I'm showing there, they don't get

7    product every week, do they?

8    A    No, they don't.

9    Q    They get it spread out through the year?

10   A    That's correct, but they --

11   Q    Those are yearly purchases.

12   A    -- they're not constant purchases.  Sometimes, they

13   seem to be buying more; other time, less, but yes,

14   through the year.

15   Q    Okay, right.  So that this is not a product that

16   comes in every day, is invoiced every day and goes --

17   goes out every day.  It comes in in bulk?

18   A    Yes.

19   Q    Okay.  Now, as a matter of fact, let's look at that.

20   We're on Exhibit 136.

21   A    Yes, 136.

22   Q    I don't know where my 136 went.

23              (Off the record discussion.)

24              MR. BERKOWITZ:  Thank you.  Thank you.

25   BY MR. BERKOWITZ:

1    Q    I'm going to help you out with my --

2    A    Solar calculator, good for you.

3    Q    I paid $1.50 at Staples in 1983, and it still works.

4              Let's look at the total number of bottles

5    purchased in 2011.

6    A    Okay.

7    Q    All right.  And you can add them up, if you want.

8    I'm representing to you they come right off the

9    invoices.

10   A    Yeah, it -- I --

11   Q    These are nine -- these are 16-ounce bottles.

12   A    Okay.

13   Q    Okay.  Now, I'd like you to multiply the number of

14   bottles.

15   A    For 2011?

16   Q    Yes, by $44.95, which I'm going to represent to you

17   is the Internet price of the product.

18   A    All right.  I get just over $204,000.

19   Q    No.  I think you're missing a decimal point there.

20   A    Oh, you're right.  Two million-oh-four.

21   Q    Okay.  And this is 2011?

22              MR. HIPPLE:  That's the total number?

23              THE WITNESS:  Oh, you're right.  Okay.

24              THE COURT:  What's the total number, there?

25              THE WITNESS:  Two million-oh-four-zero-zero-

1    one-one.

2    BY MR. BERKOWITZ:

3    Q   And I'd like you to look, if you could, look at Mr.

4    Geisser's report --

5    A   Hm-hmm?

6    Q   -- Exhibit B -- do you have Mr. Geisser's report?  I

7    know you --

8    A   I did.

9    Q   I -- I think it's in --

10        THE COURT:  Well, you can approach him, if you

11   want, and show him --

12        (Off the record discussion.)

13        MR. BERKOWITZ:  It's D-38 and 39; P-31.

14        (Pause in proceedings.)

15        THE WITNESS:  All right.  I have P-31.

16   BY MR. BERKOWITZ:

17   Q   All right.  If -- let's just write these things

18   down, so we don't forget.  We multiplied 45,000 --

19   A   384.

20   Q   384 times the Internet price of $44.95, right, and

21   you got two million --

22   A   $2,040,011.

23   Q   Zero-one-one, right?

24   A   Yes.

25   Q   Okay.

1            MR. HIPPLE:  I object to that, Your Honor, on

2      the basis that --

3            MR. BERKOWITZ:  I'm asking the witness a

4      question about some --

5            THE COURT:  Well, let's see what his objection

6      is.  Go ahead.

7            MR. HIPPLE:  On the basis that you don't know

8      how much of this is in the storeroom inventory.  He's

9      putting it all for sale, like it's all disappeared.

10            THE COURT:  Well, I'll overrule the objection,

11      and we'll see where we go with this.

12      BY MR. BERKOWITZ:

13      Q    Okay, so that's the sale of those number of bottles?

14      A    Yes.

15      Q    And I'd like you to look at Mr. Geisser's Exhibit B.

16            THE COURT:  It's probably less than that,

17      because you have to pay the credit card company, right?

18            MR. BERKOWITZ:  I'm not talking about

19      expenses.  I'm just talking about gross revenue.

20            THE COURT:  No, no, but the credit card

21      company takes a portion of that, don't they?

22            MR. BERKOWITZ:  Yes.

23            THE COURT:  Yeah, right.

24            MR. BERKOWITZ:  This is gross revenue.  The

25      credit card company sort of comes below that line --

1          THE COURT:  Okay.

2          MR. BERKOWITZ:  -- all of it comes above.

3     There's a slight adjustment for that, Your Honor.

4          THE COURT:  Right.  All right.

5          MR. BERKOWITZ:  I had a different point I was

6     trying to make.

7          THE COURT:  All right.  Okay.  Thank you.

8          THE WITNESS:  I have a schedule -- his Exhibit

9     B?

10    BY MR. BERKOWITZ:

11    Q    It's -- it's Exhibit B, you said that?

12    A    Yeah, okay.

13    Q    And do you see the Schedule C?  That was from Mr.

14    Brian Hipple's tax records?

15    A    Yes.

16    Q    Do you see that under Steel Seal Pro for 2011?

17    A    Yes.

18    Q    Do you see what the revenue is, the top line, sales,

19    $1,249,065?

20    A    Yes.

21    Q    Okay.  And we showed that we purchases enough

22    bottles for $2,000,000 of revenue, correct?

23    A    I would say that's the -- is that the maximum?

24    Q    That's the -- that was the Internet price on the

25    number of bottles.

Mr. Pederson - Cross                    180

1    A    You're using your price.  I don't know how you

2    derived your price.

3              MR. HIPPLE:  Your Honor, again, I object,

4    because again, there's no determination whether these

5    are UK bottles or United States' bottles.  They sell for

6    a different price.

7              THE COURT:  You can bring that out later, when

8    you request him.  Okay.  Overruled.

9    BY MR. BERKOWITZ:

10   Q    And -- and, you know, inventory is running, right,

11   you get some from the prior year that you have, and you

12   sell it in the next year?  If I buy inventory -- for

13   example, they bought inventory for 11 -- if you're

14   looking on Exhibit --

15   A    Yeah.

16   Q    -- 136?  They bought inventory on 11/10/11?

17   A    Yes.

18   Q    And the next time they bought inventory was in

19   February?

20   A    Yes.

21   Q    So there is carry-over from one year to the next?

22   A    There probably is.

23   Q    Okay.  And if you look at the first purchase in

24   2011, that is in March?

25   A    Yes, we saw that check that was actually issued for

Mr. Pederson - Cross                    181

1    that in April.

2    Q   Okay.  So inventory carried over from the prior

3    year?

4    A   Yes, something had to have carried over.

5    Q   Okay.  I'm just looking at gross numbers now.

6    A   Hm-hmm?

7    Q   Let's look at the Schedule C.  It shows 1.249

8    million?

9    A   Yes.

10   Q   All right.  You would agree with me that there is a

11   significant difference between the $2,000,000, based on

12   the number of bottles purchased and the revenue reported

13   on the Schedule C?

14   A   There is.

15   Q   And we could do it for the next year, if you would

16   like.

17            MR. BERKOWITZ:  But that, we don't have a

18   Schedule C for, Your Honor.  I'm just using the tax

19   return.

20            THE COURT:  Okay.

21   BY MR. BERKOWITZ:

22   Q   We could do the same analysis, couldn't we, on the

23   next year, 63,900 bottles?

24   A   Yes, you could.

25   Q   Okay.  And we had to cobble together 2013, because

Mr. Pederson - Cross                    182

1    we didn't have records, right?

2    A   I -- I don't know.

3    Q   Okay.  You had testified that on Mr. Geisser's

4    Exhibit E-2.

5    A   Yes, on E-2.

6    Q   Okay.  And if you look for 2011, based on Mr.

7    Geisser's review of the bank records, there were no UK

8    sales, do you see that?

9    A   Yes, I see, he has a zero for UK revenue.

10   Q   Okay.  And that was -- again, he only worked with

11   the bank records, right?

12   A   That's my understanding, yes.

13   Q   Okay.  And you have no knowledge whether there are

14   any other bank accounts, do you?

15   A   I do not have any information on any other bank

16   accounts.

17   Q   Okay.  Now, there was -- you had mentioned that if

18   we look at Schedule -- Exhibit E-2, and then we go to

19   the second page, and it's a grid that's listed as page

20   one?

21   A   Yes.

22   Q   And you see down the right side, Mr. Geisser

23   classified, P & L classification?

24   A   Yes, he did.

25   Q   And he took these off the bank statements, and most

1    of them are revenue, right?

2    A    Yes, they are.

3    Q    Okay.  So that's showing the credit card payments

4    and the income coming in through the Internet?

5    A    Yes.

6    Q    Okay.  And the first one we got OffNet Gateway

7    billing, do you see that?

8    A    No.  The first one I have is Google deposits.

9    Q    I'm -- I'm -- those are deposits.  I'm going down to

10   the expense on the classifications.

11   A    Okay.

12   Q    Okay?  And he put down an expense for that?  He took

13   what he could take right off of the bank statements, and

14   I think he testified that they went through them in

15   their office to determine what was on the list of non-

16   personal distribution expenses and the others were

17   expenses?  Do you recall that?

18   A    Actually, I don't.

19   Q    Okay.

20   A    I think he -- he said he looked at payees, and he

21   had some discussions with you, and that's how he

22   determined who fits in the expense category versus the

23   distribution category.

24   Q    Okay.  And let me see if I can find this exhibit

25   here.  Let's go to Exhibit D.

1           (Pause in proceedings.)

2     A    I'm at Exhibit D.

3     Q    You see that?

4     A    Yes.

5     Q    Okay.  And Mr. Geisser testified that those payees

6     are listed as people receiving distributions.

7     A    I'm sorry, those payees are people?  American

8     Express isn't --

9     Q    Those are considered, in his report, distributions?

10    A    The amounts considered here are considered, yes, his

11    distributions.

12    Q    Okay.  So anything to A&C Building was considered a

13    distribution?

14    A    Yes.

15    Q    Because that's Mr. Hipple's company.  You understand

16    that?

17    A    I understand he owns it.  I don't know that this

18    doesn't relate to a royalty, license agreement or

19    something else, so --

20    Q    Okay.  You -- you also heard Mr. -- or maybe you

21    didn't hear Mr. Hipple testify that he doesn't have a

22    personal bank account, and that all --

23    A    I was not here for his testimony.

24    Q    -- payments to him came of to A&C.

25    A    I did not hear that --

1    Q    Okay.

2    A    -- testimony.

3    Q    All right.  Well, I'm going to tell you that that's

4    what was said, that the record will reflect that.  And

5    Mr. Geisser explained that he treated American Express

6    as a distribution?

7    A    Yes, he did.

8    Q    Okay.  And we went through, in some of the

9    testimony, I believe, with Melissa Moreno and Mr.

10   Hipple, and we looked at American Express, and there

11   were a lot of things we could identify and Ms. Moreno

12   identified as clearly personal expenses.

13   A    I did attend that testimony, but I --

14   Q    I believe --

15   A    -- if that's what you're telling me.

16   Q    -- oh, I thought you were here for that yesterday

17   morning.  I'm sorry.

18   A    Ms. Moreno?  No.

19   Q    Okay.  Well, she testified yesterday about a lot of

20   personal expenses on the American Express bill.

21   A    Okay.

22   Q    And you also -- Mr. Geisser testified we had no

23   records underlying to show what could have been a

24   business expense for SCIX?

25   A    I think he said he did review American Express

1    statements.

2    Q    Yes.   And do you know the name of the American

3    Express account?

4    A    No.

5    Q    Do you know the fact that it is not an SCIX account?

6    A    No, I don't know that.

7    Q    Okay.   So it's -- it's not listed as an SCIX account

8    so Mr. Geisser did not include it as an expense --

9              MR. HIPPLE:   Objection, Your Honor.

10   BY MR. BERKOWITZ:

11   Q    -- for SCIX.

12             MR. HIPPLE:   Objection, Your Honor.   One

13   moment, may I please?

14             THE COURT:   Sure.

15             THE WITNESS:   That's what he did, yes.

16             MR. HIPPLE:   First of all, he said --

17             THE COURT:   Wait a minute.   Hold on.

18             MR. HIPPLE:   He's saying that, okay, these are

19   personal charges to Melissa, Brian, and they're using it

20   for their car, for their home, but yet, it's not an SCIX

21   card.   It's not being used for the business.   Okay.   So

22   I -- he's going both ways with it.   All right.   He's

23   saying, okay, they went to the movies; they bought food.

24   Okay.   Okay.   But then Google is on there.   Stamps is on

25   there.   UPS is on there.   Okay.   So again, and then he

1    comes -- when it's convenient, he comes back and says

2    the card is in SCIX's name.  That card has been in that

3    name since 1976, Your Honor.

4              THE COURT:  Okay.  Well, then, I'll  --

5              MR. HIPPLE:  But he just keeps assuming back

6    that that card was not part of the business.

7              THE COURT:  All right.  I'll overrule the

8    objection.  You may proceed.

9    BY MR. BERKOWITZ:

10   Q    Now, you will see, also, when he has the American

11   Express number, Mr. Geisser picks those right up off of

12   the bank account records.

13   A    I don't have copies of the checks, so, but I believe

14   that's what he did.

15   Q    It's in his report actually.  He lists all of the

16   checks.  We are just looking for a grid of checks.

17   A    He lists the checks, but I don't have the check to

18   figure out what his --

19   Q    Correct.  You don't have the check.

20   A    Exactly.  That --

21   Q    Let -- let me --

22   A    -- that's all I was getting at.

23   Q    All right.  I'll give you an example.  I'll see if

24   I can quickly pull one off here.  If you would go to

25   Exhibit E-2, page one.

1          MR. HIPPLE:  Wait a minute.  E-2, page one.

2          THE WITNESS:  I'm at E-2, page one.

3    BY MR. BERKOWITZ:

4    Q    Okay.  And now, I would like you to go down under

5    the debit.  Those are the charges, correct?

6    A    Yes.

7    Q    And go to 1/4/2001 on -- it's about ten lines down?

8    A    Yes, I see it.

9    Q    American Express, $10,142.83?

10   A    Yes.

11   Q    And I will represent to you those were electronic

12   transfers right out of the account?

13   A    That's fine.

14   Q    Okay.  And he treated that as a distribution?

15   A    He did.

16   Q    Okay.  And he had no underlying data showing it was

17   a business expense?

18   A    I don't know what underlying data he had, but if

19   that's what you're representing, I can understand that.

20   Q    Okay.

21   A    I think that's what he indicated.

22          MR. HIPPLE:  Objection, Your Honor, there was

23   data.

24          THE COURT:  I'm sorry, what?

25          MR. HIPPLE:  I said, objection.  There is data

1       for that bill.

2                   MR. BERKOWITZ:  Your Honor, we asked for that

3       data to be produced, and it was --

4                   MR. HIPPLE:  You have it.

5                   MR. BERKOWITZ:  -- not --

6                   MR. HIPPLE:  It's American Express.  You've

7       got the American Express bills.

8                   MR. BERKOWITZ:  I have the American Express

9       bill for Scientific Chemical, Clement Hipple --

10                  MR. HIPPLE:  Here we go with names, again,

11      Your Honor.

12                  MR. BERKOWITZ:  -- Brian Hipple.  We have

13      Melissa Moreno's testimony of all the personal expenses

14      that were on these cards.  We had no -- we had the

15      testimony of Melissa Moreno that Brian Hipple had other

16      business interests.  If you recall, the Muay Tai

17      business, and actually, you'll see in his Estate Return,

18      he received a large check from that.  I don't know much

19      about that business.  I never had the opportunity to

20      depose Mr. Hipple, but there were other business

21      interests, and we had no basis to conclude that any

22      expense was an SCIX expense, and they were treated as

23      distributions.

24                  THE COURT:  All right.  I'm going to overrule

25      the objection.  You may proceed.

Mr. Pederson - Cross                    190

1    BY MR. BERKOWITZ:

2    Q   And if you look --

3                MR. HIPPLE:  I'll get to that when I get up.

4                THE COURT:  It doesn't mean I'm accepting

5    this.  It's just that he's allowed to question --

6                MR. HIPPLE:  Yeah, I know.

7                THE COURT:  -- the witness about this.

8                MR. HIPPLE:  Well, so am I.  I have to prove

9    that part.

10               THE COURT:  Right.

11               MR. HIPPLE:  That's all right.  No problem,

12   Your Honor.  He can use all of the names he wants.

13   BY MR. BERKOWITZ:

14   Q   Now, in reviewing Mr. Geisser's report, you had the

15   checks there to review?

16   A   I don't have the checks, no.

17   Q   Well, you have a -- I'm sorry.  You didn't have the

18   check.  You have a summary of the checks?

19   A   I have Mr. Geisser's exhibits, yes, from his

20   documents.

21   Q   Yes.

22   A   Yes.

23   Q   Okay.  And no request was ever made for the

24   production of the checks although they are all here

25   today.

1    A   I didn't aks for production of the checks, no.

2    Q   Okay.  And they could have had the bank records,

3    because the electronic payments, there are no checks,

4    right?

5    A   No, there are not.

6    Q   Okay.  Now, let's look down this payee list again.

7    Brian Hipple --

8    A   Are we still on page one?

9    Q   We are on Exhibit --

10   A   E-2?

11   Q   -- D.

12   A   Oh, we've moved?  Okay.

13   Q   I'm sorry.  I -- I may jump from exhibit to exhibit,

14   and I apologize if I don't tell you first.

15           MR. HIPPLE:  Really, cause we were on E-2.

16           MR. BERKOWITZ:  No, we're on D.

17           THE WITNESS:  I am on Exhibit D.

18           MR. BERKOWITZ:  We're on D.  We're looking

19   at --

20           MR. HIPPLE:  Hold on.

21           MR. BERKOWITZ:  -- personal distributions.

22           MR. HIPPLE:  Hold on.  D, go ahead.  D, what?

23   BY MR. BERKOWITZ:

24   Q   Brian Hipple, he was considered somebody receiving

25   seller's discretionary income?

Mr. Pederson - Cross                      192

1    A   Yes, that's correct.

2    Q   Okay.  Buckingham Friend's School.  Ms. Moreno

3    testified that her children with Brian go to a private

4    school.  You'll agree with me, that's not a business

5    expense?

6    A   If that's what she represented, no, it would not be.

7    Q   Okay.  And Clement Hipple, again, A&C?

8    A   I don't know what these are.

9    Q   Okay.

10   A   So I can't tell you whether or not they're an

11   expense --

12   Q   Okay.

13   A   -- or not, but --

14   Q   And you see there's doctors and the like.  Mr.

15   Geisser testified that HAB is H.A. Berkheimer.  People

16   that are local know that that's personal taxes,

17   personal, local taxes?

18   A   I'm sorry --

19   Q   Melissa --

20   A   -- personal, local taxes?

21   Q   Yes.  There's a company called H.A. Berkheimer.

22   A   Okay?

23   Q   If you lived here, you'd be paying money to them --

24   A   Okay.

25   Q   -- probably.  Not in Philadelphia, but in the

1    suburbs.  All right.  And, Melissa Moreno, she received

2    -- anything paid to her was considered seller's

3    discretionary income?

4    A   Well, as I --

5              MR. HIPPLE:  Objection, Your Honor.

6              THE WITNESS:  -- indicated in my report, she

7    -- in her deposition, she indicated that she had worked

8    at SCIX and Steel Seal Pro, but yes, that's listed on

9    here.

10   BY MR. BERKOWITZ:

11   Q   And did you hear Mr. Geisser testify that he did not

12   see any payroll checks for her?

13   A   I did hear him testify to that, that there was no

14   W-2.

15   Q   And if you would like to --

16   A   That doesn't preclude her from being a --

17   Q   -- look through the checks for Melissa Moreno, I

18   think I'll be able to convince you that those were not

19   payroll checks.

20             MR. HIPPLE:  Objection, Your Honor.

21   BY MR. BERKOWITZ:

22   Q   There were some very substantial checks that are not

23   payroll.  And -- and she testified that those were for

24   her personal expenses.

25             THE COURT:  What's the objection?

1          MR. HIPPLE:  The objection is, she actually

2     worked for the company, but they were more or less on

3     the basis of a subcontractor, which Brian had done with,

4     I believe, most of the people that worked for him.

5          THE COURT:  All right.  I'll overrule the

6     objection.

7     BY MR. BERKOWITZ:

8     Q    So you see Melissa Moreno?  She was considered

9     distribution?

10    A    She was considered distribution, yes.

11    Q    Okay.  Nevis Administrative Services, we were unsure

12    about that.  There's a disposal -- these are small ones.

13    PA Department of Revenue, personal taxes?

14    A    PA Department of Revenue could be --

15    Q    These were personal taxes --

16    A    Okay.

17    Q    -- that Mr. Geisser, I think, talked about.  We

18    looked at some checks, with Melissa Moreno, that went to

19    the Pennsylvania Department of Revenue with Brian

20    Hipple's social security number on them.

21    A    Okay.

22    Q    So you would agree those are personal distributions?

23    A    I don't have the check, but I would certainly

24    understand why he funneled them the way he did.

25    Q    Okay.  And let's look at Prudential.  You see that?

Mr. Pederson - Cross                          195

1    A   Yes.

2    Q   Ms. Moreno testified yesterday that she received a

3    million dollar life insurance policy from Prudential

4    from Brian Hipple's death, so we treated what looks like

5    a premium payment, as a distribution to her.

6    A   And the company was --

7    Q   To the company.

8    A   -- not a beneficiary?

9    Q   Correct, the company was not the beneficiary, as far

10   as I know.

11            MR. BERKOWITZ:  If the company was the

12   beneficiary, I'd like to get a hand at that money, Your

13   Honor.

14   BY MR. BERKOWITZ:

15   Q   Quaint Oak Bank.  Ms. Moreno testified that that was

16   a second mortgage on the home she lived in with Brian?

17   We considered that a distribution.  You would agree with

18   that, wouldn't you?

19   A   If that's what it is, absolutely.

20   Q   Okay.  And she testified that, if you look down a

21   couple of lines, Sovereign Bank was the first mortgage

22   on the home she lived at with Brian Hipple?  And if that

23   is the case, which she testified to, you would agree

24   that's a -- that's a distribution to the owner?

25   A   Yes, it would be.

Mr. Pederson - Cross                     196

1    Q   That's what we categorized as a distribution to the

2    owner.  Correct?

3    A   It would be.

4    Q   Okay.  And you see there, Teresa Hipple?

5    A   Yes.

6    Q   We treated that as a distribution to the owner as

7    part of calculating the seller's discretionary income?

8    A   I see that, yes.

9    Q   Okay.  Now, I would just like you to look up a

10   little bit, you see there's SCIX expense, do you see

11   that?  A small amount of money?

12   A   SCI expense, yes.

13   Q   You see that?  A small amount of money.  It has $95

14   one year; $300 the next, and that was on a check stub.

15   So that's Steel Seal Pro paying a bill for SCIX, and I

16   believe it was -- well, I don't want to --

17              MR. BERKOWITZ:  I'm sorry.  I don't remember,

18   Your Honor.

19   BY MR. BERKOWITZ:

20   Q   It was paying an SCIX bill.

21   A   Well, it says the payee is SCIX.

22   Q   Well, that's not what the check was, but that -- it

23   was -- it says, payee, "SCIX expense".  It doesn't say

24   it's the payee of a check.

25              And if you look down, United States Treasury,

1    you see that?

2    A    You said, it's not a payee?

3    Q    I'm sorry.  Let's move on to the -- under the payee,

4    United States Treasury.

5    A    I'm looking at United States Treasury.

6    Q    You see that 30 -- in 2011, $30,344?

7    A    Yes.

8    Q    I'm going to represent to you that we went through

9    with Melissa Moreno and identified checks paid for Brian

10   Hipple's taxes.  Okay.  And that -- that would be fair

11   to consider these discretionary expense, or we called

12   them distributions?

13   A    Right.

14   Q    Okay.  So Mr. Geisser, based on this and my

15   assumptions we made together, if there were any payments

16   to other businesses or people there weren't on this

17   list, they were treated as expenses.  So if you take all

18   the checks that you send out, and you categorize them by

19   defined distributions, and then everything else defaults

20   to expense, that would give you business expense, cost

21   of goods sold and distributions.

22   A    We talked about this before that there are timing

23   issues with how the checks are --

24   Q    I'm not talking about --

25   A    -- being issued.

1    Q    -- timing issues, sir.

2    A    I am.  If you want to get to what --

3    Q    All right.  I'm talking -- I'm --

4    A    -- distributions are --

5              THE COURT:  Answer his question.  Just, to the

6    best of your ability, answer his question.

7              THE WITNESS:  If you want to take a look at

8    what distributions are, you do have to look at how

9    inventory is depleted.

10             THE COURT:  Ask your question again.

11             THE WITNESS:  I'm sorry.  I thought I was

12   being responsive.

13   BY MR. BERKOWITZ:

14   Q    My question was, if you take every check that's

15   written, the whole universe of payments out of the bank,

16   which is all we had to work with, and you categorized

17   clearly, in your report, what are considered

18   distributions, and everything else is either income,

19   because it's a debit or expense, because it's a credit,

20   that's a fair way to analyze how much money is coming

21   out to the discretionary earnings?

22   A    No, I disagree.

23   Q    Well, there's only one universe of money, right?

24   A    Yes, but you didn't distribute all of it.  You said

25   there are income, expense --

1    Q   I'm -- I'm not talking about sending a dividend

2    check out.   That's not how this business operated.

3    A   But you could have cash --

4    Q   I'm --

5    A   -- left over that you haven't distributed, that you

6    don't have a check for.

7    Q   I'm talking about -- we're not talking about cash

8    left over.

9    A   Okay.

10   Q   We're talking about --

11   A   But you have revenue coming in.   You're going to

12   pull out expenses from check.   You're going to pull out

13   distributions from checks, but you could still have a

14   balance left over.

15   Q   Okay.   And that would be profit to the owners,

16   right?

17   A   Potentially, yes.

18   Q   Okay.   So we could have more to go back to the

19   owners than what we show as distributed.

20   A   But that's why -- is why it gets back to timing

21   issues, because maybe they had less the year before.

22   And so you have to look at the whole picture and not

23   just try and do this.

24   Q   Oh, so we -- we went through, and we looked at the

25   bank records from all the years we had.   Now, you

Mr. Pederson - Cross                     200

1   criticized Mr. Geisser because we went back and only got

2   records for two years, right?

3              We could have gone back and recreated their

4   books and records from the beginning, couldn't we?

5   A   I don't know if you could have gone back to the

6   beginning, but you could have gone back further than you

7   did?

8   Q   Well, you could have gone back and gotten more --

9   more business records?

10  A   Yes.

11  Q   Okay.  And you could have gotten them, too?

12  A   As a rebuttal witness, I didn't need them.

13  Q   Your -- the defendant could have subpoenaed the same

14  records for the bank, couldn't they?

15  A   I would assume they could.

16  Q   Yeah, they could have, and they didn't, as far as

17  you know?

18  A   As far as I know, they did not.

19  Q   And as far as I know, too, they didn't.

20             MR. BERKOWITZ:  I don't know if this is a good

21  time to stop, Your Honor, or --

22             MR. HIPPLE:  I would like to ask a few

23  questions, and then --

24             MR. BERKOWITZ:  I'm not done.

25             THE COURT:  Yes, let's take a break.

1          MR. BERKOWITZ:  I'm not done.

2          THE COURT:  Yes, let's take a break.  It's

3     almost five of 1:00, so I'll see everybody back at 2:00.

4     Okay?

5          MR. BERKOWITZ:  Thank you.

6          THE COURT:  That one exhibit that we gave you

7     out of my book, 136, if you give it back to my law

8     clerk, Denise, she'll make a copy for you so I have it

9     back in my book, okay?  Thanks.

10          I'll see you at 2:00.

11          MR. BERKOWITZ:  Thank you, Your Honor.

12          (Luncheon recess, 12:52 p.m.)

13                  AFTERNOON SESSION

14                    (2:04 p.m.)

15          COURTROOM DEPUTY:  All rise.

16          THE COURT:  Good afternoon, everyone.

17          ALL:  Good afternoon, Your Honor.

18          THE COURT:  Proceed.  Mr. Pederson?

19          (The witness retakes the stand.)

20     BY MR. BERKOWITZ:

21     Q   You all set, Mr. Pederson?

22     A   Pederson, yes.

23     Q   Pederson.  I'm sorry.  I -- I recall this morning

24     that you testified that Melissa Moreno worked for Steel

25     Seal Pro, and the pay that she received was reflected as

1    a distribution and not as an expense?

2    A   I think what I indicated was, in her deposition, she

3    indicated she was working for SCIX and at Steel Seal

4    Pro.

5    Q   Okay.  Let me -- I would like to read from her

6    deposition.  If you would like to read along, there may

7    be a copy somewhere, but I'll --

8    A   I don't think that's necessary.

9    Q   -- I'll show it to you after I read it.

10             This is my question to her, "Where was the

11   office of Steel Seal?"

12             "Answer: Kellers Church Road in Pipersville, I

13   believe."

14             "What did they do there?"

15             "That was where they ran the business."

16             "Question: Did you ever work there?"

17             "Answer: No."

18   A   All right.  Can I reference my report, and I'll see

19   if I --

20   Q   Yeah.  I -- just a small point.  I just wanted to

21   show you the deposition --

22   A   Oh, certainly.

23   Q   -- because I believe you had testified that she had

24   worked there.

25   A   I'll have to see which businesses she is referring

Mr. Pederson - Cross                              203

1    to.

2    Q    Steel Seal Pro, in the question.

3    A    Okay.

4    Q    All right.  So your testimony that your recollection

5    was that she worked for Steel Seal Pro would be

6    incorrect?

7    A    I -- I don't know that.

8              MR. HIPPLE:  Your Honor, I object.

9              THE WITNESS:  I mean, let's see if I can

10   find --

11             THE COURT:  Go ahead.

12             MR. HIPPLE:  I object to the -- he's not

13   giving any time limits or anything as far as the

14   location is concerned in Pipersville.  I think that that

15   was only a period of over three months.  Other than

16   that, they worked out of the house, which Ira Krassan

17   verified earlier that would see them at the house --

18             THE COURT:  You can --

19             MR. HIPPLE:  -- all the time.

20             THE COURT:  -- you can bring that up in your

21   case, when you testify.  I'll overrule the objection.

22   BY MR. BERKOWITZ:

23   Q    Mr. Pederson --

24   A    Yes?

25   Q    -- you also, I believe -- I'm sorry.  Were you

1   looking at your report?

2   A   I am.

3   Q   I don't want to cut you off.

4          (Pause in proceedings.)

5   A   I have deposition references.  I didn't see where

6   you were.  I've got page 24, line 20.

7   Q   Okay.  That was page 11, line 15, and 24/20 is what

8   you're referring to?

9   A   Yes.

10  Q   Sorry, I don't -- I don't see what you're referring

11  to, but let's move on.

12  A   I'll be happy to take a look.

13  Q   No, that's okay.  Now, you had mentioned before, and

14  again, I don't know if you misspoke with this, an A&C

15  lien?  Do you recall that?  I wrote that down in my

16  notes.

17  A   I may have been -- there's A&C, and there is OVER-

18  THE-COUNTER, as I recall.  I'm trying to --

19  Q   JC -- yeah.

20  A   I'm sorry.  I may have confused them, if it was JC.

21  Q   JC Consultants, is that the one?

22  A   Oh, I'm sorry, I'll have to take a look for it.  I

23  think we were in the area of liabilities, were we not,

24  when we were discussing that?

25          (Pause in proceedings.)

1    A   I apologize.  I'm still looking for it, because I

2    recall it in the report.

3              (Pause in proceedings.)

4    A   JC Consulting and Leasing Corporation.

5    Q   And you considered those liens?

6    A   Yes, and I -- my reference is Teresa Hipple's

7    deposition from September 18th, 2013.

8    Q   Okay.  So it's your understanding that JC

9    Consultants had liens on --

10   A   SCIX.

11   Q   -- SCIX?

12   A   Yes, sir.

13   Q   And you consider that to be a detriment to the

14   business value?

15   A   If your valuing the business on a 100 percent

16   ownership interest, it would, yes.

17   Q   Okay.  But Mr. Geisser didn't value it on 100

18   percent ownership interest.  He valued it based on the

19   cash flow generated by the sale of Steel Seal, isn't

20   that correct?

21   A   Not entirely.  I don't think he valued it.  I think

22   what he tried to do is determine what their earning

23   stream was.

24   Q   He -- he determined the distributable cash flow?

25   A   That's what he attempted to do, yes.

Mr. Pederson - Cross                                206

1     Q    Okay.  So he wasn't talking about selling 100

2     percent ownership interest, if I were to buy a business,

3     and you were to be selling a business?  That's not what

4     he was doing --

5     A    Well, the 100 percent --

6     Q    -- because we didn't have a buyer and a seller here,

7     did we?

8     A    The 100 percent interest is from his report.  That's

9     what he's describing he's doing, but that's not what he

10    did, that's right.

11    Q    He was valuing the revenue generated by Steel Seal,

12    wasn't he?

13    A    I -- I am reluctant --

14    Q    And the distributable cash flow?

15    A    -- to use the word, value, but he was measuring the

16    distributable cash flow, yes.

17    Q    From the sale of Steel Seal?

18    A    Yes.

19    Q    Okay.  Now, and you talked about the fact that the

20    liabilities would affect the sale price of a business

21    like that?

22    A    If we're talking about the sale of the business,

23    yes, it would.  It's the presumption being that the

24    liabilities would go with the rest of the business.

25    Q    Okay.  So if I were buying the business, and I were

1    buying the assets and liabilities, the liabilities would

2    be --

3    A    Right.  You were buying 100 percent interest.

4    Q    Right.  It would be a deduction?

5    A    Yes, it would.

6    Q    Okay.  I'm going to ask you to pardon my poor

7    drawing, but I'm not much of an artist.

8              MR. BERKOWITZ:  Your Honor, that's a house.

9    Okay?  Not a very good one, but I'm going to give you

10   some information that I would like you to play along

11   with.

12   BY MR. BERKOWITZ:

13   Q    This house is worth $100,000.  Okay?

14   A    Okay.  So we're just going to say it's worth --

15   Q    This house is worth $100,000.

16   A    Okay.

17   Q    And I come along, and I buy this house for $100,000.

18   All right.  That $100,000 goes to the owner of the

19   house, right, he'd get it all?

20   A    Yes, as I understand your situation.  Yes.

21   Q    Okay.  Now, we have owner two.  I own the same exact

22   house, but I have a $5,000 mortgage on the house, small

23   mortgage, and a home equity loan to put a new roof on or

24   whatever.  The house is still worth $100,000, right?

25   A    If you put a new roof on it, it actually might be

1    worth more.

2    Q    Okay.  In my example, it's worth $100,000, right?

3    A    I understand, yes.

4    Q    And, now, I come along, and I buy the house.  I pay

5    $100,000 for it.  The house is still worth $100,000,

6    even though there's a $5,000 mortgage?

7    A    Yes.

8    Q    So when the settlement takes place on the sale of

9    the house, the owner of the house now gets $95,000,

10   correct?

11   A    Presumably, that's what's going on.

12   Q    The bank gets the $5,000.  They're due the rest of

13   the money.

14   A    Right, and that's consistent with the value of a

15   business, sure.

16   Q    Right.  So that the fact that a business has

17   liabilities doesn't necessarily affect the value of the

18   asset being transferred?

19   A    It affects the value of the overall entity.

20   Q    The house is still worth $100,000?

21   A    I agree with that.

22   Q    Okay.  So the fact that the house had a mortgage

23   didn't decrease the value of the house.  It only

24   decreased the value of the money the owner was getting.

25   A    So, but the value of your equity did change.

                              Mr. Pederson - Cross                    209

1    Q    I'm not talking about equity.

2    A    Okay.

3    Q    The house --

4    A    Yes.

5    Q    -- is still worth $100,000?

6    A    Yes.

7    Q    Even though I had a mortgage.  So that, because you

8    have debt doesn't necessarily undermine the value of the

9    asset transferred.

10             MR. HIPPLE:  Your Honor --

11             THE WITNESS:  In your example, that would be

12   true.

13             MR. BERKOWITZ:  Thank you.

14             MR. HIPPLE:  -- we're taking a lot of time

15   here, and I -- and I know we're on a time limit as of

16   Friday, okay, and drawing houses and things of this

17   nature.  I -- I need to talk to Teresa, and I need all

18   day tomorrow for myself.  Okay.  If Mr. Berkowitz could,

19   you know, get to the point of everything, it would be

20   helpful.

21             THE COURT:  Okay.  Go ahead.

22   BY MR. BERKOWITZ:

23   Q    I would like you to look at Mr. Geisser's report.

24   You had --

25   A    I'm sorry, that's --

Mr. Pederson - Cross                          210

1    Q    Yeah.  31 -- hang on.  I think it's over here.

2    Right here.  Thank you.  Here it is.  And this is

3    Exhibit D, and I'm going to go to Exhibit E, if you

4    could?

5              MR. HIPPLE:  E, what?

6              THE WITNESS:  I'm sorry, E-2?

7              MR. BERKOWITZ:  Yes.

8              (Pause in proceedings.)

9              THE WITNESS:  I have E-2.

10   BY MR. BERKOWITZ:

11   Q    Okay.  And I -- I want you to go to the chart of the

12   checks.

13   A    Okay.

14   Q    I think it's the third page.

15   A    Yes.

16   Q    And, by the way, I think you said that you didn't

17   have access to the underlying checks?

18   A    We didn't have the checks, no.

19   Q    Did you ever ask the attorney for the defendant for

20   the checks?

21   A    No, I did not.

22   Q    Okay.  Because I subpoenaed them and provided them

23   copies.  You could have gotten them, if they had it,

24   right?

25   A    I presume I could have.

Mr. Pederson - Cross                    211

1    Q   So if you had asked for it, if you needed that
2    information, you could have got it?
3    A   I could have gotten it.
4    Q   Okay.  Now, you were critical of this particular
5    Exhibit E-2.
6    A   I'm sorry.  Are we on page three for E-2?
7    Q   Yes.  We're starting at the chart, because you said
8    that there are no expenses reflected until later on.
9    A   I think I was referring to cost of goods sold.
10   Q   All right.  Well, we'll get to that.  And we saw --
11   by the way, you saw those exhibits showing when the
12   shipments of Steel Seal from Colonial Chemical were
13   made, and you saw they were on an interim basis, right?
14   A   Interim basis, I'd say they were --
15   Q   They weren't coming in daily?
16   A   No.
17   Q   They'd come in big blocks?
18   A   Correct.
19   Q   Large amounts.  Now, let's -- let's go through -- as
20   I quickly look down the first page, if you look --
21   A   I'm sorry.  I thought we were on page three.
22   Q   Yes.  It's the -- it's page one.
23   A   Oh, okay.
24   Q   It's -- it's page one of the grid, and it's page
25   three of the exhibit, I believe.

Mr. Pederson - Cross                    212

1    A    Fine.  Okay, I'm with you.

2    Q    All right.  Now, the first expense you see is OffNet

3    Gateway billing, right?

4              MR. HIPPLE:  We've been there, Your Honor.

5              THE COURT:  All right.  Go ahead.

6    BY MR. BERKOWITZ:

7    Q    Do you see that?

8    A    I think the first expenses is -- yes --

9    Q    Okay.

10   A    -- OffNet Gateway billing, $10.97.

11   Q    Because I previously told you that, and you looked

12   at the exhibit that Mr. Geisser had done of all the

13   payments that were considered distributions, right?

14   A    Yes.

15   Q    And then everything else defaulted to another

16   category, expense, cost of goods sold, revenue, correct?

17   A    It didn't default.  He's actually classified them.

18   Q    Yes, okay.

19   A    Okay.

20   Q    And if it wasn't a distribution to one of those

21   named parties identified, it fell into another category?

22   A    Yes, you could look at it that way or vice versa.

23   Anything that wasn't revenue, cost of goods sold or

24   expense, fell into distributions.

25   Q    Well, only the distributions listed on Mr. Geisser's

1    Exhibit -- I think it is, B.   We -- we went through
2    this before.  I don't want to belabor the point.
3    A   Except I don't know what the order was, whether or
4    not you had the list first and then did the
5    distributions or did the distributions, then came up
6    with the list.
7    Q   No, no, it's -- we're going -- you get to do it my
8    way here.
9    A   Okay.
10                 MR. HIPPLE:  B?
11   Q   We -- we saw --
12                 THE WITNESS:  Exhibit D, yes.
13                 MR. BERKOWITZ:  Exhibit D.
14   BY MR. BERKOWITZ:
15   Q   We saw the exclusions.  Anything that fell into that
16   category, on Exhibit D, was a distribution, correct?
17   A   Well, I think and --
18   Q   That was the default category for distribution?
19   A   I agree. I think it was a default, but I believed D
20   probably came from E and not vice versa.
21   Q   That's fine.  I didn't ask you where they cam from.
22   I just asked you that that's the list of people or
23   checks that were considered distributions to the owner,
24   correct?
25   A   Yes.

1    Q    Okay.  And if it wasn't a check to one of those

2    parties, it was treated otherwise, correct?

3          And we're going to look at those now.

4    A    Well, again, I don't know if they were treated

5    otherwise or it was identified.

6    Q    All right.  Well, then, we'll go through this.

7    A    Okay.

8    Q    Let's look at 1/4/2001.  You see it's the first

9    expense on this OffNet Gateway billing.  Do you see the

10   categorization?

11   A    Yes.

12   Q    Expense, right?

13   A    Yes.

14   Q    Okay, because it wasn't on the list of

15   distributions, and somebody in Mr. Geisser's office

16   determined that that was a legitimate business expense,

17   right?

18   A    I assume that's how it worked.

19   Q    Okay.  And the next one you see is American Express,

20   and you saw how we treated that as a distribution,

21   correct?

22   A    I'm sorry.  I'm looking for American Express.

23   Q    The next one.  It is the next one in line.

24   A    Oh, sorry.  Yes, that's as a distribution.  Sorry, I

25   was looking for expense.

1    Q    Okay.

2    A    Yes.

3    Q    And if you -- if you go down to the next

4    distribution, check to Brian Hipple?

5    A    Yes.

6    Q    Okay.  And then, you'll go, and you'll see a line of

7    expenses, after Mr. Hipple's distribution, you see that,

8    Verizon?

9    A    Yes.

10   Q    Okay.  You took that as business expense.  And do

11   you see there's another Verizon?

12   A    Yes.

13   Q    You see that?  Two different checks written on the

14   same day, right?

15   A    I don't know if this is the day the check was

16   written or the day the check was cashed.

17   Q    That really doesn't matter for the purposes of this

18   examination.

19   A    Okay.

20   Q    You see that right next to each other?

21   A    Okay.  I'm just trying to be clear as to your

22   explanations.  I see the two checks, both marked January

23   6th, 2011 to Verizon.

24   Q    Okay.  And we didn't know whether those were for

25   personal phones or business phones, right?  You wouldn't

Mr. Pederson - Cross                216

1   know that from this entry?

2   A   I wouldn't know, no.

3   Q   You wouldn't know?

4   A   No, I would not know.

5   Q   So we put up all of his business expense, right?

6   A   It is appearing in business expenses.

7   Q   So even if it was Melissa Moreno's private cell

8   phone, we still gave it a business expense?

9   A   I don't know if it was Verizon's -- or, I'm sorry,

10  Ms. Moreno's personal number or if it was the 800-

11  number.

12  Q   Right.

13  A   I -- I don't know.

14  Q   Neither do I.

15  A   Okay.

16  Q   So we gave it a business expense.  Okay?

17  A   Yes.

18  Q   And if you look at Robert Costello, do you see that?

19  A   Sorry, I'm looking for Robert Costello.

20  Q   It's the next --

21  A   Oh, there you go.

22  Q   -- expense after the Quaint Oak Bank distribution.

23  A   Yes.

24  Q   All right.

25          MR. HIPPLE:  Your Honor, objection.  Can we

1      see the check of Robert Costello.  He was an employee.

2                      MR. BERKOWITZ:  Your Honor, it's irrelevant to

3      the questioning.

4                      MR. HIPPLE:  Well, he's --

5                      MR. BERKOWITZ:  The checks are in the books.

6      They have the checks.

7                      THE COURT:  Overruled.  You can bring it up if

8      you want to bring up the check.

9      BY MR. BERKOWITZ:

10     Q    And I'm going to ask you, let's go forward to page

11     three.

12     A    Yes.

13     Q    And do you see -- now, you see a cost of goods sold.

14     Do you see that?

15     A    Yes.

16     Q    About half-way down?

17     A    $127, Colonial Chemical.

18     Q    Right.  So Colonial Chemical sent them the bill for

19     something, and they put it down as a cost of goods sold,

20     right?

21     A    Yes.

22     Q    All right.  Let's look down to the next expense,

23     UPS.

24     A    Yes.

25     Q    A legitimate business expense.  Put it as expense,

Mr. Pederson - Cross                    218

1    correct?

2    A    That's what Mr. Geisser did, yes.

3    Q    Okay.  And then look down to the next distribution,

4    U.S. Treasury?

5    A    Yes.

6    Q    And we saw that that was a payment for Brian

7    Hipple's taxes.  We put that down as a distribution.

8    That's correct?

9    A    If that's what you did, that's -- I'm following you,

10   yes.

11   Q    Okay.  And we've got the OffNet Gateway, again,

12   another expense.  I would like you to go to page four.

13   A    I have page four.

14   Q    You see page four?

15   A    Yes.

16   Q    Okay.

17          MR. BERKOWITZ:  So this is Exhibit E-2, page

18   four of Mr. Geisser's report.

19   BY MR. BERKOWITZ:

20   Q    And I would like you to go to the expense line.  You

21   see Verizon, Verizon again and PECO.  PECO is the local

22   electric company?

23   A    Yes.

24   Q    Okay.  All expense?

25   A    They're all classified as expenses.

1    Q    Okay.  And then, Melissa Moreno, distribution?

2    A    Yes.

3    Q    And this is what Mr. Geisser said he did, right, in

4    terms of classifying things as revenue or expense or

5    distribution or cost of goods sold?

6    A    Yes, this is what he said he did.

7    Q    Okay.  Now, let's look at, under Melissa Moreno,

8    drop to the next line under payee?

9    A    Yes.

10   Q    You see that XM-Satellite Radio?

11   A    No.  Oh, I'm sorry.

12   Q    You see that?  Paid by check --

13   A    XM-Sat Radio?

14   Q    -- $159.83?

15   A    Yes.

16   Q    Okay.  And do you see that that was listed as an

17   expense for the business?

18   A    Yes.

19   Q    And perhaps that could have been somebody's

20   satellite radio in their car, but we treated --

21   A    I --

22   Q    -- it as a business expense because it wasn't on the

23   list of things to be included in distributions?

24   A    -- I see it's expenses.

25   Q    Now, I'd like you to go to page five.

Mr. Pederson - Cross                    220

1    A   I'm at page five?

2    Q   Yes.

3            (Pause in proceedings.)

4    Q   Are you on page five, sir?

5    A   Yes.

6    Q   Okay.  Now, if you go and look down the payee

7    column?

8    A   Yes.

9    Q   Under -- you'll see, revenue; revenue; Melissa

10   Moreno; then invoice?

11   A   Yes.

12   Q   You see the next one, royalties?

13   A   Yes.

14   Q   Now, you've heard Mr. Hipple testify that he

15   received the royalties?

16   A   I don't think I heard him testify to that.

17   Q   Okay.  If he received the royalties, we could have

18   put that in distribution, correct?

19   A   I don't know that to be the case.

20   Q   Well, we would have had we known, all right, but we

21   treated it as an expense.

22   A   Okay.

23   Q   Okay?

24   A   It does say expense.

25   Q   It does say expense.  And if you look at the bottom,

1    there's Comcast Cable?

2    A    Yes, as an expense.

3    Q    And we -- again, we treated it as an expense.  We

4    didn't know if it was the home cable.  Treat it as an

5    expense.

6              Now, if you'll go to the next page, page six?

7    A    Yes, page six.

8    Q    Again, you'll see the same, revenue; revenue; cost

9    of goods sold; distributions?

10   A    Right, cost of goods sold, $167.

11   Q    Right.  Distributions?

12   A    Distributions, $820.

13   Q    Same breakdown?

14   A    And, yes, there are expenses here, as well.

15   Q    And if you go to page eight?

16   A    I'm at page eight.

17   Q    By the way, in checking these out, in order to do

18   your report, to critique Mr. Geisser's work, did you

19   ever, at any point, look at things that were classified

20   as expense or revenue or cost of goods sold and think or

21   ask whether they may be misclassified?

22   A    Yes.

23   Q    Okay.  So did you look at the Sirius XM Radio or the

24   XM-Radio invoice and question whether that's legitimate

25   or not?

Mr. Pederson - Cross                 222

1    A   No, I didn't.  And there was just nowhere to go with

2    it.  I don't know if he's paying advertising with it or

3    if it's related to something entirely else.  I just

4    don't have any information with it.

5    Q   Okay.  And you didn't ask either?

6    A   No, I didn't.

7    Q   Okay.  Because I have that in my car, and I don't

8    consider it a business expense.  It's in my personal

9    car.

10            Right?

11   A   I understand, yes.

12   Q   These are things you could have checked?

13   A   I could have, but they were in the expense category,

14   and they were not part of the SDE calculations --

15   Q   Right.

16   A   -- so I wasn't concerned with them, yeah.

17   Q   Okay.  So you could have checked.  You're critiquing

18   the report, but there are things in here that you chose

19   to ignore, because they were listed as expenses.  And if

20   we categorized them wrong, for example, the royalties,

21   that would operate the other way, correct?

22   A   It could.

23   Q   That would be more distribution.

24   A   I'd have to add up all the royalties and see whether

25   or not the agreement was valid, because a royalty could

Mr. Pederson - Cross                    223

1    be an expense.

2    Q    It could be.

3    A    Yes.

4    Q    And then, maybe, again, you said you're going to

5    validate the agreement, the royalty agreement?

6    A    No, no, the numbers.  I would have to go through to

7    see what the total royalties were --

8    Q    Sure.

9    A    -- listed on here, and we'd have to do more analysis

10   with it.

11   Q    We could do that, though.  We had all the bank

12   statements and everything, right?

13   A    I'm told that you had these bank statements, yes.

14   Q    Okay.

15   A    And the checks, yeah.

16   Q    We could have checked it.

17   A    That's right.

18   Q    Okay.  And we could have -- if -- if you had seen a

19   royalty -- did you ever see a royalty agreement?

20   A    I don't recall right now.

21   Q    Okay.  Well, neither did I, so I'm just wondering if

22   you had seen one that I hadn't seen.

23             Now, let's look at -- let's go forward.  I

24   don't want to belabor this anymore.  If we could go to

25   page ten?  And I would like you to look down the right-

1    hand column, P&L Classification?

2    A    Yes.

3    Q    And you see a cost of goods sold?

4    A    Yeah, I see it.

5    Q    Okay.  And -- and I think that's the first big

6    invoice that -- that I saw during the year for the cost

7    of goods sold.  I may be wrong, but that's --

8    A    Are we referring to the invoice or the paid check?

9    Q    Well, I'm talking about the paid check.

10   A    Okay.

11   Q    Okay?

12   A    Yeah.

13   Q    So you were criticizing the fact that there were no

14   costs of goods sold earlier in the year, and maybe they

15   weren't -- they weren't anything that would fall into

16   that category before that, correct?

17   A    There doesn't seem to be any large costs of goods

18   sold prior to this point, yes.

19   Q    Okay.  And I'd like you to look at Exhibit 21.

20   A    Okay.  I have Exhibit 21.

21   Q    And if you turn -- let me make sure I've got the

22   right page here -- on page 52.

23   A    I have 52.

24            MR. HIPPLE:  What exhibit?  I'm sorry.  I

25   missed the exhibit.

1          MR. BERKOWITZ:  21.  I want to make sure I get

2     to the right page.

3          MR. HIPPLE:  We're coming back to this

4     section?

5          (Pause in proceedings.)

6     BY MR. BERKOWITZ:

7     Q    Page 52?

8     A    Yes, I'm at page 52.

9     Q    Okay.  And do you see there's an invoice?

10         MR. HIPPLE:  Hold on for one minute, please?

11    25?  What exhibit?

12         MR. BERKOWITZ:  Exhibit 21, page 52.

13         MR. HIPPLE:  21, page 52.

14    BY MR. BERKOWITZ:

15    Q    And do you see the date on that invoice?

16    A    The invoice date is March 11th, 2011.

17    Q    Okay.  And we looked at that other invoice, showing

18    the shipments, where they -- where I had it by the

19    bottles.  And I'm going to tell you it was dated 3/11/11

20    as our first number of bottles we got for the year, and

21    you see the amount of that invoice?

22    A    $17,550.

23    Q    And if you look at the check under the costs of

24    goods sold on 4/4/2011, check number 181, a check in the

25    same amount?

1    A    Yes.

2    Q    So the first shipment that they got in the year was

3    paid on 4/4?

4    A    Yes.

5    Q    Under 30 days from the date of the invoice, and it's

6    listed as cost of goods sold?

7    A    Yes.

8    Q    So there would be nothing nefarious in not having a

9    Steel Seal charge under costs of good sold before the

10   invoice came in, correct?

11   A    Not necessarily.  Well --

12   Q    Okay.

13   A    -- it wasn't nefarious.  We're just talking about

14   the timing of inventory --

15   Q    Okay.  And it --

16   A    -- that even if this -- this invoice, which is dated

17   3/11, and don't know when it was actually arrived or

18   delivered -- but its running off inventory from the

19   prior year, because this is your only invoice --

20   Q    That's not the point I'm making, sir.

21   A    Okay.

22   Q    The point is that this was the first invoice of the

23   year.  We saw that on the record of shipments.  And it

24   was paid on 4/4/2011, and that's the first large cost of

25   goods sold entry?

Mr. Pederson - Cross                      227

1    A   Yes, I agree.

2    Q   Okay.  Thank you.  I -- I could go through the rest

3    of these exhibits and -- and establish the same thing.

4    That was the methodology that Mr. Geisser described,

5    isn't it?

6    A   As to, he reviewed the payees and classified the

7    various checks into the various buckets, and this is

8    where they appeared, yes, that's what he said he did.

9    Q   Okay.  And that's how he got his distribution -- the

10   distributions by gong through every check?

11   A   Yes, that's what he indicated, and I believe that's

12   what he did.

13   Q   Okay.  Now, you were critical -- let's go the

14   Exhibit E-2, to the front.

15              MR. HIPPLE:  E-2?

16              MR. BERKOWITZ:  E-2.  Make sure I have the

17   right one?  Yes.

18              THE WITNESS:  I am at E-2.

19   BY MR. BERKOWITZ:

20   Q   Okay.  And you pointed out the revenue for the year

21   was $1,153,389 -- I don't know if I got that --

22   $153,389.66, right?

23   A   That's correct.

24   Q   And you critiqued the report because you said that

25   number that Mr. Geisser got from the bank records was

1    different than in Exhibit B?

2    A    Yes, I believe I made that statement.

3    Q    Now, Exhibit B --

4    A    I'm sorry.

5              (Pause in proceedings.)

6              THE WITNESS:   I have Exhibit B.

7    BY MR. BERKOWITZ:

8    Q    Okay.  And that's from the tax return?

9    A    Yes, it is.

10   Q    So that is the tax return listing of revenue,

11   correct?

12   A    It's how it's scheduled, Schedule C.

13   Q    Right.  And we have no backup behind that to prove

14   whether that's right or wrong, do we?  That's just self-

15   reported?

16   A    It is -- I mean, there's a signed return.  I thought

17   they had a tax preparer, but, yes, it's --

18   Q    It's just from the report.  That's all we know?

19   A    That is correct.

20   Q    And Mr. Geisser's numbers came from the checks?

21   A    Yes, that's correct.

22   Q    Okay.  And there's a slight variance between what's

23   on the tax return and what Mr. Geisser found on the

24   checks, correct?

25   A    Yes.

1    Q   And looking at this, you can't tell if the Steel

2    Seal Pro record of a tax return is correct, can you?

3    A   Can I tell from this?

4    Q   Yeah.

5    A   No.

6    Q   Okay.  And at least on Mr. Geisser's, you can see

7    every entry that constituted revenue?

8    A   I can see every entry, that's right.

9    Q   That's right.  So, yeah, maybe one's right; maybe

10   one's wrong.  Mr. Geisser's is based on the tax return.

11   A   Well, one's also cash basis, and I'm not clear as to

12   what one it is.

13   Q   Well, we're not talking about any cash basis, and

14   we're not talking about a different year period.

15   A   Well, it is relevant.

16   Q   We're talking about tax year.

17          THE WITNESS:  Your Honor, can I answer this

18   question?

19          MR. BERKOWITZ:  There's no question.

20          THE COURT:  Okay.  You can answer it.

21          THE WITNESS:  All right.  What Mr. Geisser did

22   was take a look at the bank statements, so he had cash

23   records, so it's on a cash basis.  The tax returns could

24   be on an accrual basis.

25   BY MR. BERKOWITZ:

1    Q   You don't know?

2    A   I don't know.

3    Q   Okay.

4    A   But I know there could be receivables.  I know that

5    there could be open invoices.  There could be a bunch of

6    things going on.  There could be some deposits in

7    transit.  There are things that are going on here.  So

8    before it really gets discounted, when you say there's

9    no difference, because this is cash, and it's absolute,

10   it's not.

11   Q   No, it's not.

12   A   Okay.

13   Q   But -- but there's nothing nefarious nor unusual in

14   there being a slight variance, is there?

15   A   A slight variance, no.

16   Q   Okay.  And as a matter of fact, I think we saw, in

17   2011 from our analysis of the number of bottles they

18   purchased, that they should have been -- well, it could

19   have been $2,000,000 in revenue, correct?

20   A   That's what the math indicates, yes.

21   Q   And we have -- we only have bank records from one

22   bank.  We don't know what else is out there, correct?

23   A   That's correct.

24               MR. BERKOWITZ:  Your Honor, I think I'm almost

25   done, if I could just have a couple of minutes to just

Mr. Pederson - Cross                    231

1       look through my notes?

2                   THE COURT:  Sure.

3                   (Pause in proceedings.)

4       BY MR. BERKOWITZ:

5       Q   Now, you would agree with me that Mr. Geisser dealt

6       with all the information that he was provided with?

7       A   I don't know if he used all the information he was

8       provided.

9       Q   Well, he told you he was provided with the bank

10      records --

11      A   Yes, that's correct.

12      Q   -- and the checks?

13      A   Yes, that's correct.

14      Q   And he used those?

15      A   Yes.  Apparently he did, yes.

16      Q   Okay.  And he used them on the Wachovia Bank when we

17      subpoenaed the records, correct?

18      A   Yes.

19      Q   And he worked from the First National Bank for Steel

20      Seal Pro?

21      A   I believe for Wachovia, he relied on -- and I'll

22      read his footnote.

23      Q   Well, that's okay.  He relied on the checks he got.

24      That's what he stated, isn't it?

25      A   No, he didn't say that.  He said he relied on -- I

1    thought it was in D.  2010 information is based on a

2    summary prepared by the client from records for

3    Wachovia.

4    Q    That was not all he testified to.  He said, I

5    provided him a summary, and he didn't consider that

6    adequate, and he went and reviewed all the bank records.

7    A    I think he did review the bank records, but --

8    Q    All the bank records.

9    A    -- he didn't prepare part of this, so --

10   Q    No.  No, I -- I provided a summary of checks that

11   were paid, all the checks that are in these binders

12   here.

13   A    Okay.  And that's why --

14   Q    It was not adequate for --

15   A    -- the format of E-1 is different than --

16   Q    -- what he does, right?

17   A    I'm sorry?

18   Q    It's not adequate for what he needed to do?

19   A    Well, E-1 is different than E-1 and E-3, the way the

20   format is, even though he's trying to accomplish the

21   same thing, and I assume that that's what had happened

22   that the format was different, because this was --

23   Q    He used all the records he had.

24   A    I believe he used all the records that he had.

25   Q    And he -- he could have done a better job -- I don't

1    want to say better -- but had he gotten business

2    records, he would have had more complete information,

3    correct?

4    A    Business records, as in?

5    Q    Business records.  Invoices, receipts, things that

6    every business keeps?

7    A    Yes, he would have --

8    Q    Okay.

9    A    -- more information.

10   Q    Yeah, he'd have more information.

11   A    Yes.

12   Q    You could have got that information from your

13   client, couldn't you have?

14   A    I may have, but I didn't ask for it.

15   Q    Okay.  You could have.

16   A    I was -- I'm a rebuttal witness.  I didn't need it.

17   Q    So they didn't -- well, so you decided you didn't

18   need it to be a rebuttal witness?

19   A    That's correct.

20   Q    Okay.  And in your report, would it be fair to say,

21   yours is just a critique of Mr. Geisser's report?

22   A    It is a critique of Mr. Geisser's report.

23   Q    Okay.  And you critiqued Mr. Geisser for doing a --

24   I want to make sure I get this right -- a calculation of

25   value, instead of an opinion of value, is that right?

Mr. Pederson - Cross                              234

1    A    Yes.

2    Q    Okay.  And the opinion of value is the one that

3    requires more extensive records?

4    A    Yes, it does.

5    Q    Okay.  Now, you could have done an opinion of value,

6    couldn't you?

7    A    I didn't try to do an opinion of value, so I don't

8    know if I could have done one or not.

9    Q    You could have asked for records and done it if you

10   wanted.

11   A    I can't make that assessment from here.

12   Q    Well, you know how to do it, right?

13   A    Absolutely.

14   Q    You're qualified as an expert to render an opinion

15   of value?

16   A    Yes, sir.

17   Q    And you're also qualified as an expert to provide a

18   calculation of value?

19   A    Yes.

20   Q    Under the Guidelines of the AICPA?

21   A    Correct.

22   Q    So what you could have done is, you could have come

23   back -- Mr. Geisser gave us a value of Steel Seal --

24            MR. HIPPLE:  Objection, Your Honor.  He was --

25            MR. BERKOWITZ:  -- the product --

1          MR. HIPPLE:  -- he was hired for this specific

2     job, okay, to counteract their expert witness.  Okay.

3     Now, we're going down a totally different road.

4          THE COURT:  Overruled.

5          MR. BERKOWITZ:  I wish I had a court reporter

6     so I could ask her to read it back, but I'll try and

7     figure out where I was.

8          THE COURT:  He -- he could have calculated an

9     opinion of value.

10    BY MR. BERKOWITZ:

11    Q   You could have done, based on all of the information

12    Mr. Geisser provided and had, you could have done your

13    own calculation of value?

14    A   I don't have a use for a calculation of value.

15    Q   You could have done it.  Whether you have a use for

16    it or not, you could have done it?

17    A   I could have done it.

18    Q   You could have.  And Mr. Geisser came up with a

19    value, he said, "Steel Seal, the product, generates this

20    amount of money, and this amount falls into the pockets

21    of the owners.  And I value that stream of revenue from

22    the product, Steel Seal, at 1.75 million dollars plus

23    the value of the inventory that Mr. Hipple got."

24          That's what he testified to, correct?

25    A   I think he testified that he would add the value of

1   the inventory, but his report doesn't reflect that.

2   Q   Right.  And he did it during his deposition

3   testimony.  You heard it when we talked about it.  We

4   did a calculation.  I think we did this with Mr. Hipple

5   -- this is Exhibit P-31 -- that the inventory had a

6   value that Mr. Hipple got of $246,000 that you add on

7   top of the 1.75 million.

8   A   Well, I think we disagreed, because on E-2, he's

9   already capturing the sale of this inventory in 2011.

10  Q   He's doing a valuation?

11  A   He is.

12  Q   And he's doing a valuation as of October 13th, 2010,

13  when the transfer took place.  Now --

14  A   No, sir, he's going past October 10th, 2013.

15  Q   Yes.  So that he can go and say, this is the value,

16  because he had the same business.  You heard him testify

17  that the pattern of activity in SCIX was identical to

18  the pattern of activity in Steel Seal Pro, and it was

19  sold by the same people, on the same website, doing the

20  same exact thing, how money just went into a different

21  bank account.  That's what he testified to.  Yeah, it

22  went past the date, because we had no information from

23  before.  He valued it as of that date, and he said, when

24  you value as of that date, this gets added on top.  That

25  was the value of the stream of revenue, and this gets

1    added on top of it.

2    A   I heard him testify to that; I disagree.

3    Q   That's fine.  You can disagree.

4    A   An SDE calculation is backward looking.  It looks to

5    a three to five year history.

6            And so you avoid the problem of this inventory

7    double-counting, but when you go forward, as he did do,

8    he looked at 2011/2012, his inventory sales were

9    captured, and they're in there.

10   Q   So you could have done that and come up with a

11   number.  Instead of Mr. Geisser's 1.75 million, you

12   could have done your own evaluation, come back and done

13   a better job and come in here today and testified, no,

14   that stream of income is not worth 1.75 million; it's

15   only worth $5,000.  You could have done that?

16   A   I wasn't asked to do that.

17   Q   You weren't asked to do that.  Okay.  Did you hear

18   Mr. Hipple testify he paid $2,000,000 for the patent?

19   A   No, I was not present for his testimony.

20           MR. BERKOWITZ:  I have no further questions.

21           THE COURT:  Thank you.

22           MR. HIPPLE:  I have rebuttal?  I --

23           THE COURT:  Redirect.

24           MR. HIPPLE:  Oh, redirect.  Okay.  I'm not so

25   certain about a question, but I'm going to ask it.

1                    REDIRECT EXAMINATION

2    BY MR. HIPPLE:

3    Q    Okay.   In reference to cost of goods, right, okay?

4    A    Yes.

5    Q    Is that something that should be identified all the

6    way through, if there are costs of goods?

7    A    I'm sorry.   I'm not following your question.

8    Q    In other words, my impression of costs of goods are

9    up here, okay, after -- after the revenue.

10   A    Yes.

11   Q    And then we get a number, and then we go from there,

12   right?

13   A    Yes.

14   Q    Okay.   So they only show cost of goods -- oh, and

15   there goes my page -- in an area of buying chemicals,

16   correct?

17   A    Yes.

18   Q    If I remember correctly, that's what he did.   So

19   magically, somehow or other, the bottles came into

20   Colonial Chemical by some magical form and nobody paid

21   for them, correct?

22   A    I'm sorry.   I'm not following you.

23   Q    Okay.   If we're selling chemicals, right, and his

24   opinion is, the only cost of goods is, is what we pay

25   for Colonial Chemical.   That is for the chemical,

Mr. Pederson - Redirect                    239

1    itself.

2    A    Right.

3    Q    There's bottles; there's caps; there's boxes;

4    there's inserts; there's tapes; there's labels.   Okay.

5    They're all a part of cost of goods, correct?

6              MR. BERKOWITZ:  I'm sorry.  I'm going to

7    object.  There is cost of goods sold, and there was

8    expenses.  And I think accountants differentiate between

9    the two.  They all wash out, Your Honor.  Some people

10   consider cost of goods sold when you sell a product like

11   Steel Seal, the cost to acquire the bottle.   The other

12   things are treated as expenses.

13             THE COURT:  So what are you objecting to, the

14   way he's phrasing -- you're objecting to the way he is

15   phrasing the --

16             MR. BERKOWITZ:  I mean, I'm objecting to the

17   characterization of the report that it doesn't include

18   those other expenses.  They're included as expenses in

19   the report.

20             THE COURT:  Overruled.  You may ask it.

21             MR. HIPPLE:  What?  What --

22             THE COURT:  Re-ask the question.

23             MR. HIPPLE:  A new question or he answers?

24             THE COURT:  Do you know the question?  Do you

25   understand, Mr. Pederson?

1          THE WITNESS:  I'm sorry.  I'm a little bit

2    lost.  I understand where I think you're going.

3    BY MR. HIPPLE:

4    Q    Under cost of goods, there's more than just the

5    chemical cost?

6    A    Yes, there can be more than just the raw material

7    cost, correct.

8    Q    That the $1.50 -- the $1.50 that's been expressed

9    here, okay?

10   A    Yes.

11   Q    What about the bottle caps, the labels, the bottles,

12   the boxes, the insert, the tape, okay, the shipping, the

13   freight, okay, to bring all this stuff in and also to

14   send it out is part of cost of goods, correct?

15   A    Part of it's cost of goods sold; part of it is

16   expenses from what you just described.

17   Q    Okay.  Then --

18   A    For example, shipping would not normally --

19   Q    -- the freighting -- the freight would be the

20   expense part, correct?

21   A    Your shipping out would normally be an expense.

22   Q    No, I'm not talking about shipping out.  I'm talking

23   about shipping four skids to England, okay?  That would

24   be shipping, cost of goods?

25   A    Shipping, if -- if you're drop-shipping to England,

1    that would still be an expense of shipping for you.

2    Q   Okay.  Fine.  All right.  But the other things are

3    cost of goods?

4    A   They can be.

5    Q   Okay.

6    A   It -- it just depends on a couple different things.

7    Q   All right.  Did you notice anywhere in here that

8    there was any Federal tax paid or any FICA paid or any

9    Social Security?  In any of these checks, anywhere,

10   throughout this whole --

11   A   I didn't actually review --

12   Q   -- two years?

13   A   -- the checks, but I did take a look at Mr.

14   Geisser's exhibits, and there are checks to the U.S.

15   Treasury.

16   Q   Okay.  But I mean, you know, I'm talking more about

17   checks that are paid out to the Federal Government for

18   Federal taxes that are taken from people's wages every

19   two weeks or something of that nature --

20   A   No, I didn't see that.

21   Q   -- that are paid on a monthly basis?

22   A   No, we didn't see the recurring every two weeks or

23   -- or monthly.

24   Q   Okay.  Sir, that -- would that, then, benefit that

25   the employees -- "employers", not employees, but the

Mr. Pederson - Redirect                    242

1    workers are subcontractors?

2    A    They could easily be subcontractors.

3    Q    Somebody's doing the work, right?

4    A    Presumably, so.

5    Q    You don't see any Federal taxes going out, do you?

6    A    Not of the nature you're describing.

7    Q    Okay.  So therefore, somebody must be subcontracting

8    in order to get the job done, correct?

9    A    The job seems to be getting done.  The revenues are

10   coming in.

11   Q    Well, yeah, yeah.  I mean, I'm -- I'm sure that SCIX

12   or Steel Seal Pro didn't have one employee, Brian.  I'm

13   sure Brian didn't do all the work.  Okay.  So basically,

14   there's subcontractors in here, right?

15   A    There could be subcontractors --

16   Q    Right.

17   A    -- in here, yes.

18   Q    Okay.  So, like, Robert Costello, would be a

19   subcontractor?

20   A    I think he was listed in Exhibit E-2.

21   Q    Melissa would be a subcontractor?

22   A    If she was working, then --

23   Q    Well, apparently, she says she was working.  The

24   only point I think she said that she wasn't working was

25   when the company moved from the house to the office.

1    A   If she was working, then she would be an expense to

2    the business.

3    Q   Pardon me?

4    A   I said, if she was working for the business, she'd

5    be an expense to the business and not a distribution.

6    Q   She would be an expense?

7    A   Yes.

8    Q   Yeah, he put her in another category.

9    A   Yeah, he put her in distributions.

10   Q   As distributions?

11   A   Yes.

12   Q   He put her under distributions, correct?

13   A   Yes.

14   Q   But it could possible -- very possible -- Melissa,

15   because we don't have her tax returns in front of us.

16   We don't know how she filed or if she filed the taxes

17   for the money she received and paid taxes on the money

18   afterwards, similar to what, I believe, Brian did.

19   Okay.  So nobody has the answer to that, but again,

20   assuming somebody was doing the work, we had to have

21   workers, right?

22   A   I would assume you had to have workers.

23   Q   All right.  Let me bring your attention to these,

24   and to me, this is documentation that he has in his

25   books, and that his expert witness had.  And I think

1   maybe you're familiar.

2            MR. HIPPLE:  I could be totally, wrong, Your

3   Honor, okay?

4            THE COURT:  Okay.

5   BY MR. HIPPLE:

6   Q   So let's start with judgment notes, P-26.

7            MR. BERKOWITZ:  I'm sorry, that was?

8            MR. HIPPLE:  P, Paul-26.

9            MR. BERKOWITZ:  P-26.

10           MR. HIPPLE:  27, 28 and 29.

11           (Pause in proceedings.)

12           MR. HIPPLE:  I'm about to be as fast as I can,

13  Your Honor.  I'm not going to take hours.

14           THE WITNESS:  I am at P-26.

15  BY MR. HIPPLE:

16  Q   Okay.  And can you tell me what that is?

17  A   It indicates, judgment note, $88,000.

18  Q   And that's a loan basically, right, correct, a

19  liability to the corporation?

20  A   I'll have to take a look.  I haven't read through

21  it.

22           (Pause in proceedings.)

23  A   Yeah, it appears to be a demand note from JC

24  Consulting --

25  Q   All right.

Mr. Pederson - Redirect                 245

1   A   -- I'm sorry, Consultant and Leasing Corporation.

2   Q   And then there is three more notes that equal,

3   probably, somewhere in the area of $500,000 total, which

4   would be a liability, is that correct?

5   A   It would be a liability.

6   Q   Okay.  So Mr. -- what's his name, the other expert?

7   Excuse me for my --

8           MR. BERKOWITZ:  Mr. Geisser.

9   BY MR. HIPPLE:

10  Q   Mr. Geisser never addressed that issue, is that

11  correct?

12  A   No, he -- he did not.

13  Q   He didn't address it?  It was in the books.

14  A   It does not appear in his report.

15  Q   But, I mean, it's in the books.  The documents are

16  here.  Okay.  He never addressed it, right.  Okay.  How

17  about, let's go to P-127 and P-128.  Or no, skip that

18  one for right now.

19          Okay.  Let's go to P-9.

20          MR. BERKOWITZ:  P-9.

21          MR. HIPPLE:  I believe P-9.

22          THE WITNESS:  I'm at P-9.

23  BY MR. HIPPLE:

24  Q   Is that -- what is that document?

25          (Pause in proceedings.)

Mr. Pederson - Redirect                    246

1    A    I have P-9.

2    Q    Is -- is that a loan document?

3    A    It's not a loan document.  It's a -- it looks like

4    an amortization schedule.

5    Q    Okay, an amortization --

6    A    So it might be part of an exhibit to a loan

7    document.

8    Q    -- of -- of dollars, right?

9    A    I'm sorry?

10   Q    Okay.  But, basically, that is a loan document in

11   the amount of $210,000, correct, or 200 and --

12   A    The principal starts off at 130.

13   Q    This is on the books of --

14   A    And then it looks like in November --

15   Q    The third page.  Could you just hold onto the third

16   page?

17   A    -- there's an additional -- oh, I'm sorry.  I see,

18   yes, the last number reflected in November of 2010 is

19   $211,588.61.

20   Q    Okay.  Now, again, this information was in the book,

21   and this is a liability.  And nothing was done with it?

22   A    No, Mr. Geisser did not include it in liabilities.

23   Q    So, now, we're up to $700,000, a little over

24   $700,000, right?

25   A    Yes, the 500 earlier, and the 211, here.

Mr. Pederson - Redirect                    247

1    Q    Yeah, yeah, so now, we're up to around $700,000.

2    Okay.   Now, we want to look at P-132.

3              MR. BERKOWITZ:   P-132.   That -- that's the

4    chart?

5              MR. HIPPLE:   I'm not sure.

6              MR. BERKOWITZ:   I think it is.

7    BY MR. HIPPLE:

8    Q    And it's off of an amortization schedule of a loan

9    to Teresa?

10   A    Yes, I have P-132.

11   Q    And I think -- if you would look at the date,

12   October -- what would it have been, 2012?   Is this where

13   we're -- when did this lawsuit start, 2010?   October,

14   2010.

15             THE COURT:   The lawsuit started in '12.   You

16   filed in '12.

17             MR. HIPPLE:   Okay.   The lawsuit --

18             THE COURT:   This Federal lawsuit.

19             MR. HIPPLE:   Huh?

20             MR. BERKOWITZ:   The Federal lawsuit.

21             THE COURT:   This Federal lawsuit was 2012.

22             MR. HIPPLE:   Okay.

23   BY MR. HIPPLE:

24   Q    So if you go to 2012 --

25   A    Yes?

Mr. Pederson - Redirect                    248

1    Q   Okay.  What is the balance there?

2    A   Sorry.  I'm trying to read through this, because

3    there's an entry here that follows.  But in September of

4    2012, $389,520.53.

5    Q   Well, skip that, because they got $53,000.

6    A   Exactly.

7    Q   Add the $53,000 back into it, okay?

8    A   Well that'll put you pretty close to that.

9    Q   Almost $400,000, would you agree?

10   A   About 390.

11   Q   Okay.  So we were at $700,000 -- a little over

12   $700,000.  Now, we've got another $400,000?  That puts

13   us at $1.1?

14   A   Yes.

15   Q   Liability on the books that nobody paid attention

16   to?

17   A   It doesn't appear in Mr. Geisser's report.

18   Q   They just looked at the good side, and they didn't

19   look at the bad side, basically, right?

20   A   That was his approach.

21   Q   Okay.  That's the point I'm trying to make is, his

22   approach was what he was told to look at, and he wasn't

23   told to look at liabilities, and the liabilities are

24   there.  I mean, they're clear on their face.  They're in

25   the -- they're in the documents.

1          So what kind of report would you consider

2     that, when a person knows that there's liabilities, and

3     he completely ignores them?  Shouldn't that report be

4     thrown out?

5     A    Well, I think he --

6     Q    I mean, a million-two?

7     A    I think we all concluded he did not value 100

8     percent interest in the company or the company as a

9     whole.

10    Q    But I mean, yeah, he looked at the company to get it

11    up to one point -- $1,175,000 using the highest

12    calculator possible, okay, that the book -- that the

13    industry allowed to get it up to that, okay?  All right.

14          Okay.  Let's go to American Express.

15    A    Do you have an exhibit reference?

16    Q    Yeah, let me give you one.  Okay.  Okay.  Volume

17    III, let's go to P-109.

18          MR. BERKOWITZ:  I'm sorry, Exhibit 109?

19          MR. HIPPLE:  Exhibit P-109 -- P-109.

20          (Pause in proceedings.)

21          MR. HIPPLE:  I think I do better sitting down,

22    because there's not much room here.

23          THE WITNESS:  P-109?

24          MR. HIPPLE:  Yeah.  I'm going to have to do

25    this, okay, so I can read.

 1              THE COURT:  You can sit down, if you want.

 2              MR. HIPPLE:  I think I can do it.  I get too

 3     theatrical up here.

 4              THE WITNESS:  I'm at P-109.

 5     BY MR. HIPPLE:

 6     Q   Pardon me?

 7     A   I said, I am at P-109.

 8     Q   Okay.  If you look under the name -- after the name,

 9     half-way down the page, Craig Huck.  Okay.  Okay.  And

10     if we start --

11     A   Yes.

12     Q   Okay.

13              MR. HIPPLE:  And, Your Honor, this is -- I

14     have personal knowledge of what I'm about to say.  So if

15     I --

16              THE COURT:  You can't do it now.  You have to

17     testify.

18              MR. HIPPLE:  Okay.

19              THE COURT:  Okay?

20              MR. HIPPLE:  All right.  Okay.

21              THE COURT:  That's like if you were the

22     lawyer, and you're lawyer came up and said, I want to

23     testify; I want to say something.  He can't do that --

24              MR. HIPPLE:  All right.

25              THE COURT:  -- or she can't do that.

1    BY MR. HIPPLE:

2    Q    If you look -- if you look after his name, you'll

3    see, stamps, press guard --

4    A    Yes.

5    Q    -- U.S. postage --

6    A    Yes.

7    Q    -- U.S. postage, Google.  You understand what Google

8    is in a business, to advertise through Google?

9    A    One can advertise through --

10   Q    With the website?

11   A    -- Google, yes.

12   Q    Pardon me?  Websites -- all websites go through

13   Google, correct, a majority of them anyway?

14   A    I don't know if all -- okay, I would agree.

15   Q    Grasshopper could be a phone system.  Okay.  Yahoo,

16   another one similar to Google, okay, U.S. Post Office,

17   okay.  Well, this National Position, if they would have

18   looked it up on the Internet or taken the time to see

19   what the company is, they would see that that's a --

20   like an SEO company that does Internet, takes care of

21   your Internet.  Google, post office.  Okay.  Now, I'm on

22   the next page?

23   A    Yes.

24   Q    Yahoo, USP, Google, USP, Google. XFax, that's a

25   business expense.  Okay.  Yahoo.  Earth Skater.  I

Mr. Pederson - Redirect                    252

1   happen to know -- I think that if we had looked it up on

2   the Internet, you would out that that is a person that

3   takes care of e-mails.  Google, post office, post

4   office, Google.  Okay, and up.  So therefore, all of the

5   records of American Express have been classified, how?

6   I forget what the word --

7   A   I believe they've put all of these into

8   distributions.

9   Q   Distributions.  Okay.  What I've shown you so far,

10  just in that set of American Express records, where

11  would you put them, from the knowledge you just

12  received?  Would you take them out of distribution?

13  A   I would question these, because of the amounts, and

14  because of the headings here.

15  Q   But, again, if you found out that they were

16  legitimate expenses, okay, advertising expenses and

17  things like that.  You would definitely take them out of

18  distribution, right?

19  A   I'd -- in terms of an SDE calculation or a

20  determination, these would be considered -- if they were

21  business expenses, they would not be distributions.

22  Q   Right.  That's what -- okay.  So basically, you're

23  answering my question that they would not be

24  distributions.  Okay.

25          If you can turn to Exhibit B in the -- oh,

Mr. Pederson - Redirect                    253

1    God, I don't know what page that -- I'm sorry --  31,

2    P-31, Exhibit D.

3              MR. BERKOWITZ:  Is that Mr. Geisser's report?

4              MR. HIPPLE:  Yes.

5              (Pause in proceedings.)

6              THE WITNESS:  I'm at Exhibit D.

7    BY MR. HIPPLE:

8    Q    Okay.  Now, I'm not certain, but A&C was -- you

9    know, that money was paid to me, so that goes back in,

10   is that correct, even though it was money that belonged

11   to Complete Group or the sale of the products?  Does

12   that go back into distribution?

13   A    I need to understand more about A&C Building before

14   I could tell you that.

15   Q    Okay.  Well, A&C Building was just a -- at the time,

16   it -- Complete Group did not have a checking account.

17   Okay.  So the money that was being generated from profit

18   was going into A&C Building and Industrial Maintenance.

19   Now, would that be distribution or would that be

20   expense.

21   A    Was that by agreement?

22   Q    Yes, by a license agreement.

23   A    So this is a license fee?

24   Q    Pardon me?

25   A    This is a license fee to sell the product?

1   Q   Yes.  It's a licensing fee.

2   A   If it's a license fee to sell the product, then it

3   would no longer be a distribution, because any buyer

4   would have to pay this fee.

5   Q   So it would go into --

6   A   So it's a business expense.

7   Q   -- distribution or it would not?

8   A   It would not.  It's a business expense.

9   Q   It would not, right?  Well, he had showed you the

10  licensing fee earlier today.  Okay.  And the license fee

11  was between Steel Seal Pro and Complete Group.  Complete

12  Group didn't have a bank account, for which they know,

13  and they agreed to -- if there is any objection, let me

14  know -- that they agreed to --

15  A   Well, the real underlying --

16  Q   -- that A&C, it was okay to put the money in A&C

17  because that's the only account that I had.

18  A   Well, let me be clear, if someone were to acquire

19  SCIX or Steel Seal Pro, and if they would be obligated

20  to pay this fee on an ongoing basis, then, yes, it

21  wouldn't be a distribution, because anybody stepping

22  into your --

23  Q   No, it wasn't a distribution.  It --

24  A   -- your shoes --

25              MR. BERKOWITZ:  He's got to let the witness

1    answer the question you just asked him.

2              THE WITNESS:  Anybody stepping into your

3    shoes, it would be an expense --

4              MR. HIPPLE:  They weren't step --

5              THE WITNESS:  -- because they would have to

6    pay it, as well.

7    BY MR. HIPPLE:

8    Q   Okay.  It wasn't being stepped into the shoes, okay?

9    Basically, they were Steel Seal Pro --

10   A   No, no, that was an analogy.  If -- if --

11   Q   Okay.

12   A   -- you were to sell the business.

13             THE COURT:  He's supporting your position.

14             MR. HIPPLE:  Oh, okay.  All right.  Then I'll

15   stop.

16             THE COURT:  He's saying it would be an

17   expense.

18             THE WITNESS:  Correct.

19             MR. HIPPLE:  It would be an expense.

20             THE COURT:  And a new buyer -- a new buyer

21   would have to pay the licensing fee.

22             THE WITNESS:  Exactly.

23             MR. HIPPLE:  All right.  Okay.

24   BY MR. HIPPLE:

25   Q   Okay.  So we know, today, that that's an expense.

Mr. Pederson - Redirect                256

1    Okay.  The two $160,000 and $160,000.  Okay.  We also

2    know that a majority, a large, large majority of

3    American Express is an expense.  Okay.  All right.

4              MR. BERKOWITZ:  I'm going to object to the

5    conclusion in the testimony.

6              MR. HIPPLE:  What's your objection?  I just

7    went through it.

8              THE COURT:  All right.  I'll sustain the

9    objection.  That's really for me the fact-finder to make

10   that decision.

11             MR. HIPPLE:  Okay.  Okay.

12   BY MR. HIPPLE:

13   Q   But what I'm saying is that the records that we have

14   in front of us, the American Express records, should be

15   taken as a whole because it has a different name on the

16   credit card, okay, even though that credit card has been

17   in effect forever, since 1974, and being used the same

18   way.

19             MR. HIPPLE:  And, Your Honor, basically, it

20   has to do with the points.  Okay?  Go ahead?  That's

21   neither here nor there.  Okay?

22   BY MR. HIPPLE:

23   Q   Even though the credit card has a different name, it

24   was the expense for Steel Seal Pro, using the credit

25   card?

Mr. Pederson - Redirect                257

1   A   If it's an expense of Steel Seal Pro, then it would

2   not belong in distributions --

3   Q   Okay, fine.

4   A   -- and it would belong in expenses.

5   Q   Thank you.  Okay.  All right.  And then we talked

6   about the fact of subcontractors.  Okay.  Because there

7   was no Federal payroll taxes ever paid.  Okay.  No FICA,

8   nothing.  You never saw no -- no checks going out to

9   FICA?

10  A   We -- we saw a couple checks to the U.S. Treasury,

11  but not --

12  Q   Yeah, the Treasury.  I'm talking --

13  A   -- every two weeks or a month, no.

14  Q   I'm talking about checks that are -- you're required

15  to make on a monthly basis?

16  A   Right.

17  Q   Okay.  Pay FICA and pay the Federal tax that you

18  deduct from your employees.  Okay.  You didn't see that,

19  right?

20  A   I did not.

21  Q   I didn't see it.  Okay.  Then if we go down to

22  Melissa, it's a possibility that she could have been a

23  subcontractor, being paid less to subcontract, but

24  because that, I guess, would eliminate Steel Seal Pro

25  worrying about workman's comp, general liability

1    insurance, matching FICA.

2                 So if he would hire everybody as a

3    subcontractor, that would be the person's

4    responsibility, not the company?

5    A    It would be, yes.  That's right.

6    Q    Is that correct?

7    A    That's correct.

8    Q    Okay.  All right.  So the possibility, okay, more

9    than a possibility, but that Melissa could have been a

10   subcontractor.  So what we've got, we've got A&C;

11   American Express; Melissa, okay; and Brian's salary does

12   -- would belong in this category, correct?

13   A    Yes, it would be.

14   Q    Okay.  And then, as far as Teresa, her interest

15   would also belong in this category, correct?

16   A    As I understand it, yes.

17   Q    All right.  Okay.  And I'm not disputing these other

18   things as far as Sovereign Bank is concerned and all,

19   because Melissa made a statement on the stand that, yes,

20   they were her mortgage companies.  But what I am

21   disputing is the things that I just said here, plus the

22   one-million-two of liability that was right -- which is

23   the most important part, okay, right in front of the

24   expert witnesses.  And he just totally ignored it, one-

25   million-two of liability, clear -- very clear on it's

1    face liability.  Okay.  You agreed it's the liability,

2    what I showed you?

3    A   Yes.

4    Q   Okay.  Okay.

5              MR. HIPPLE:  If you want to redirect, I'm sure

6    you do, but I --

7              THE COURT:  Recross.

8              MR. HIPPLE:  Cross, okay.

9              THE COURT:  And then he's -- then, we are

10   finished with Mr. Pederson.

11             MR. HIPPLE:  And then I can't, if you don't?

12             THE WITNESS:  Thank you.

13             MR. HIPPLE:  We're going to be here -- just

14   4:00 for him today.

15                    RECROSS-EXAMINATION

16   BY MR. BERKOWITZ:

17   Q   I would like you, sir, to pick up Mr. Geisser's

18   report again, Exhibit --

19   A   I have it.

20   Q   -- E-2.

21             (Pause in proceedings.)

22             MR. HIPPLE:  E-2?

23             MR. BERKOWITZ:  E-2, correct.

24             THE WITNESS:  I'm at E-2.

25   BY MR. BERKOWITZ:

Mr. Pederson - Recross                    260

1    Q    Do you see that, sir, and at page three of the grid?

2    A    Page three --

3             MR. HIPPLE:  Page three?

4             THE WITNESS:  -- of the grid.

5             All right.

6             MR. HIPPLE:  Page three, go ahead.

7             THE WITNESS:  I am at page three of the grid.

8    BY MR. BERKOWITZ:

9    Q    You see under payee, if you go down, UPS?

10   A    Yes.

11   Q    Do you see it was characterized as an expense?

12   A    Yes.

13   Q    Okay.  Expenses are deductible, costs of goods sold

14   are deductible.  In terms of the bottom line, it doesn't

15   matter which category you're in, does it?

16   A    No, it would not.

17   Q    Okay.  And again, I'm not going to waste your time

18   on this, if you'll go to page ten?

19   A    I'm at page ten.

20   Q    And you look under Pinnacle Freight Line?

21   A    Yes.

22   Q    Do you see that?

23   A    Pinnacle Freight Line.

24   Q    And -- and you see that's treated as an expense?

25   A    Yes.

1   Q    Now, you're an accountant.  You're familiar with the

2   fact that if somebody classifies someone as a

3   subcontractor --

4   A    Yes?

5   Q    -- the employer does not pay a FICA contribution for

6   that?

7   A    Not normally, no.

8   Q    Okay.  So it's less money out of his pocket?

9   A    It depends because sometimes contractors want more

10  money.

11  Q    But a subcontractor is going to pay his own FICA.

12  And Social Security, FICA, other taxes that the employer

13  might pay, as a result of the employment, aren't

14  incurred by the employer?

15  A    That's correct.  That's a responsibility of the

16  subcontractor.

17  Q    Correct.  And you also know that when you have an

18  employee on your payroll, at least in Pennsylvania, you

19  are required, once you have one employee, to pay

20  worker's compensation?

21  A    I'll take your word for it.

22  Q    Okay.  And that's another expense that an employer

23  has?

24  A    Potentially, yes.

25  Q    And I am sure, as an accountant, you are familiar

1    with tests that the IRS has to determine who is an

2    employee and who is a subcontractor?

3    A   Yes, I'm aware of that.

4    Q   And you are aware of the fact that often, people who

5    are employees in every respect, they work; they report

6    to work at given times at a certain place to do a

7    specific job on a 40-hour week?

8    A   Yes.

9    Q   52 weeks a year?  Some employers consider treat them

10   as subcontractors, right?

11   A   They try to, yes.

12   Q   Yes.  And you would agree with me, the IRS does not

13   agree with that, all of the time?

14   A   That is correct.

15   Q   And they'll treat them as -- they'll say, these are

16   really employee, and you should be deducting their

17   payroll during the W-2s, the W-4s and all the rest of

18   it, correct?

19   A   I think it's not only the IRS, but yes.

20   Q   Okay.  You are required to do that.  And it's more

21   expensive for a business to do that?

22   A   It is.

23   Q   It's a cost of doing business?

24   A   Yes.

25   Q   And when you obey the laws, you incur the cost.  You

 1    pay the worker's comp?

 2    A    Yes.

 3    Q    Okay.  So if any of these people that are treated --

 4    let's -- let's look at Robert Costello.  He's on page

 5    ten, so I can look at that.  You see that, he's got a

 6    check of $1,120?

 7    A    1120, yes.

 8    Q    And it's treat as an expense?

 9    A    Yes.

10    Q    Okay.

11              MR. HIPPLE:  $1,200.

12              THE WITNESS:  No, 1,100 --

13              MR. BERKOWITZ:  #1,120.

14              THE WITNESS:  Yes.

15    BY MR. BERKOWITZ:

16    Q    If he were an employee -- let's say he worked -- he

17    -- his name appears many, many times in this set of

18    documents.

19    A    Yes, I believe so.

20    Q    You saw that?

21    A    Yes.

22    Q    And if this is his job, working for Steel Seal Pro,

23    and he's being paid as an expense, he -- he, then, may

24    really be an employee?

25    A    I don't have enough information, if he's working

1    five hours a week or 40 hours a week or anything else?

2    A    He has a regular job.  He's there every day.  He's

3    gotta be there, gotta work on the employer's terms,

4    gotta follow the employer's instructions, doesn't get

5    the chance to decide his hours, and all the tests that

6    the IRS has.  If that is, in fact, what Mr. Costello

7    does, he might be an employee?

8    A    He might be.

9    Q    And, in fact, you would expect to see, for

10   employees, paychecks?

11   A    This is a very small business.  It's hard to say --

12   I can't guarantee that you're going to see W-2s and

13   payroll, because this -- this could be a little bit more

14   casual.  Maybe one week, they're very busy.  Another

15   week, nothing for around Christmastime.  I don't what

16   the cycle of this product is, quite frankly, but --

17   Q    You don't know?

18   A    No, I don't know.

19   Q    You don't know.  But, we've seen nothing for

20   employees, in the financial records that we've had

21   access to.

22   A    That's what I understand, other than these payments

23   to individuals which you've identified.

24   Q    And if we had gotten underlying records, we would

25   have had that information?

1    A    I don't know what you would have had, because if

2    these individuals are working on a contract basis, they

3    just may be issued checks.

4    Q    And if they were employees being paid payroll, we

5    would have gotten payroll records?

6    A    That's right.

7    Q    Okay.  And we don't have it?

8    A    I don't think you have any payroll records.

9    Q    So -- so we took Mr. Costello, and we treated him as

10   an expense.  We didn't challenge that he wasn't working

11   for the company.

12   A    I see that.

13   Q    He was treated as an expense?

14   A    Yes.

15   Q    Okay.  And at the end of the day, it's not

16   distributable cash flow?

17   A    That's correct.  It went to Mr. Costello, and it's

18   flowing through the business as an expense.

19   Q    Okay.  So maybe we don't have a problem; somebody

20   else might have a problem with the characterization of

21   them as subcontractors or employees?

22   A    Somebody may have an issue with it.

23   Q    Yeah.

24   A    It depends on the circumstances.

25   Q    Right.  And -- and of course, subcontractors would

1    be issued 1099s?

2    A    They might be.

3    Q    If they're a subcontractor on a regular basis,

4    receiving a substantial amount of money?

5    A    Yes.

6    Q    They would be required to issue a 1099?

7    A    That's correct.

8    Q    And if we had gotten underlying records, we could

9    have seen those.

10   A    If -- if there were 1099s, you would have been able

11   to see them, yes.

12   Q    Okay.  Now, you heard the accountant.  He was here

13   this morning.

14            He said he gave us all of the business

15   records?

16   A    I did hear him say that, yes.

17   Q    Okay.  And I'm going to tell you, I didn't get any

18   employment records or 1099s or anything else.

19            You heard the same thing?

20   A    I heard him say that he produced all the records.  I

21   haven't seen any 1099s.

22   Q    Okay.  Mr. Hipple asked you about the J&C notes.  He

23   asked you to look at those Exhibits 26, 27, 28 and 29?

24   A    Yes.

25   Q    You, personally, have no idea whether those are

1    judgments, correct?  I think you said that?

2    A    I believe you're correct.

3    Q    Okay.

4    A    I was just reading from the notes.

5    Q    And you have no idea whether they're valid notes?

6    A    We were aware of the $211,000 that were appearing as

7    an amount due on their books.  I believe that came up in

8    one of the depositions.

9    Q    And -- and the accountant testified to the $210,000?

10   A    And he testified to it today, as well.  I'm trying

11   to think back in terms of the preparation of the report,

12   though.

13   Q    Okay.  Now, Mr. Hipple asked you to look at

14   Plaintiff's Exhibit 9.  If you could just, for a second,

15   pull that out?

16   A    Yes, the amortization schedule.

17   Q    Well, Exhibit 9, I -- okay.  I'll call it -- I'll

18   take that, an amortization schedule.

19              That's the one for Clement Hipple?

20   A    Yes.

21   Q    And you saw, we talked about that.  And that's the

22   one that shows the $210,000 due?

23   A    211 -- oh, yes, 210,187 at the end of September.

24   Q    And that was the -- that was the amount that was the

25   basis for the October 5th promissory note --

Mr. Pederson - Recross                      268

1    A    I believe --

2    Q    -- that SCIX gave to Clement Hipple?

3    A    -- I believe so, yes.

4    Q    Okay.  Now, I would like you to go to Exhibit 6.

5    A    P-6?

6              (Pause in proceedings.)

7    A    I'm at P-6.

8    Q    Okay.  You see P-6, and do you recall hearing the

9    accountant testify that he also did this -- I'll call

10   this -- you called it an amortization?

11             MR. HIPPLE:  Objection, Your Honor.  The

12   accountant never told us Exhibit 6.

13             THE WITNESS:  I was going to say, he had some

14   documents up here, and it seemed there was some

15   confusion as to which one he prepared, and which one

16   somebody else prepared, and I couldn't see what he was

17   looking at.

18             MR. BERKOWITZ:  This -- I will tell you, this

19   is the one I showed him, and he said, this was his

20   record.

21             THE WITNESS:  Okay.

22             THE COURT:  Mr. Hipple, is there an issue with

23   this?

24             MR. HIPPLE:  Yes, because this is not the one

25   the accountant was shown.  He was shown my personal one,

Mr. Pederson - Recross                    269

1    and the one that they -- they created to carry forward.

2                THE COURT:  Mr. Pederson?

3                MR. HIPPLE:  No, the accountant --

4                THE COURT:  Mr. Geisser's?

5                MR. HIPPLE:  -- this morning.  We're talking

6    about Ira Krassan.

7                THE COURT:  Oh.

8                MR. HIPPLE:  He was shown two.

9                THE COURT:  Right.

10               MR. HIPPLE:  He was not shown this one.

11               MR. BERKOWITZ:  I showed him this one, Your

12   Honor, when I came back on cross-examination.

13               MR. HIPPLE:  I disagree.

14               MR. BERKOWITZ:  He identified it as --

15               MR. HIPPLE:  I object.

16               MR. BERKOWITZ:  -- done at the same time when

17   he did the other one.

18               THE COURT:  All right.  I'll overrule the

19   objection.  Go ahead.

20   BY MR. BERKOWITZ:

21   Q   Now, look at the top of this.  You see it says,

22   Teresa, Clem, JC.

23               Do you see that?

24   A   Yes.

25   Q   And this is Teresa?

1    A    And this is Teresa, yes, I -- I read that.

2    Q    Now, he gave us all his records that he had.  He

3    said he'd been doing the business for several years.  He

4    gave us all of them.  And he had this one.  This is

5    Teresa, right?

6    A    Yes, that's how it reads.

7    Q    And he gave us Number 9; this is Clem?

8    A    Number 9, does it say, this is Clem?  It doesn't

9    say, this is Clem, but it says --

10   Q    No, this just says Clem Hipple.  It's a little

11   different.

12   A    Yes.

13   Q    Okay.  And this -- this is a lot of information he

14   had recorded over a long time, right?

15   A    It's a different format, but if you're telling me it

16   came from the same person, at the same time --

17   Q    He testified that it was his document.

18   A    Okay.  I'm just -- just asking.

19   Q    Yeah, one -- one was faxed, and one is not a fax.

20   A    No, actually, that's not --

21            MR. HIPPLE:  I still disagree.

22            THE WITNESS:  -- what distinguishes them, but

23   if you tell me they're fine, I'm --

24            THE COURT:  Well, he didn't --

25            THE WITNESS:  -- I'm not going to --

1            THE COURT:  I remember the testimony.  He

2    was comparing this one to one that, I guess, Mr.

3    Berkowitz --

4            MR. HIPPLE:  This one here is the one that --

5            THE COURT:  No, no.

6            MR. HIPPLE:  -- that's Teresa's note.

7            THE COURT:  This is the one I believe he

8    prepared, but he was comparing it or there was some

9    discussion with the one that Mr. Berkowitz prepared,

10   130.

11           MR. HIPPLE:  Because he prepared his own.

12           MR. BERKOWITZ:  Your Honor, if you recall, he

13   talked about the fact that he compounded the interest.

14           THE COURT:  Right.

15           MR. BERKOWITZ:  And we didn't compound --

16           THE COURT:  You did simple, right.

17           MR. BERKOWITZ:  -- the interest.  And he

18   showed more money loaned than we showed.

19           THE COURT:  You went to a -- he went to a

20   longer -- he went to a longer date or a more recent

21   date.  He stopped at '09.

22           MR. BERKOWITZ:  Correct.

23           THE COURT:  Right.

24           MR. BERKOWITZ:  Because he didn't have more

25   recent payments; we did.

1          THE COURT:  Right.  Okay.

2     BY MR. BERKOWITZ:

3     Q   Now, it says here, JC, do you see that?

4     A   We're back to P-6?

5     Q   Yes.

6     A   Teresa, Clem, JC, yes.

7     Q   Okay.  And he didn't produce one of these for JC.

8     A   Okay.

9     Q   Okay.  Do you have any personal knowledge that there

10    is any money due to JC Consultants other than those

11    notes?

12    A   Other than the notes?

13             (Pause in proceedings.)

14             MR. HIPPLE:  Objection, Your Honor.  They're

15    part of the documentation that they submitted.  They

16    submitted the notes in their -- in their documentation

17    that the notes were notes.  They talked about the notes.

18             THE COURT:  All right.  Overruled.

19             THE WITNESS:  Nothing's coming to mind.

20    BY MR. BERKOWITZ:

21    Q   Okay.  So the accountant doesn't have a record of

22    it, and you don't know anything about it?

23    A   Other than what I've described in my report, no.

24    Q   Okay.  You looked at Exhibit 109, the American

25    Express bill.

Mr. Pederson - Recross                         273

1           Do you have that?

2      A    I can get it.

3           (Pause in proceedings.)

4      A    I am at 109.

5      Q    Okay.  And you see that's an American Express bill

6      dated 1/23/2013?  You see at the top?

7      A    Yes, I'm just kind of looking at this thing.

8      Q    It says, business gold card.  It's the one that Mr.

9      Hipple just showed you.

10     A    Yes, I'm looking at it right now.  I'm just making

11     sure I'm lined up with your dates.  I've got the please

12     pay by.

13     Q    And if you look at the page number on the top, it

14     says 3 or 9.

15     A    Oh, okay.

16     Q    Are we on right pages?

17     A    No.

18     Q    I'm sorry.

19     A    Now, I'm on 3 of 9.  There you go.

20     Q    Go -- go to page 3 of 9.

21     A    Okay.  I am on page 3 of 9.

22     Q    Okay.  And you see at the top, it says, Scientific

23     Chemical?

24     A    Yes, it says Scientific Chemical.

25     Q    And then, it says Clement Hipple?

1    A    Yes.

2    Q    And then you see Craig Huck?

3    A    Yes.

4    Q    And you see of these entries that are listed,

5    stamps, press guard, USPS postage, Google and the like?

6    A    Yes.

7    Q    I want you to assume for a second, but just for

8    purposes of this question, that these are legitimate

9    business expenses.  Okay.  Just for purposes of this

10   question?

11   A    Okay.

12   Q    Based on this document, whose business expenses are

13   they?  Are these for SCIX?

14   A    We don't know whose business expenses these are,

15   from looking at this document.

16   Q    Are they for Steel Seal Pro?

17   A    I don't know.

18   Q    Are they for Scientific Chemical?

19   A    I don't know.

20   Q    Are they for -- well, this wouldn't be Brian's Muay

21   Tai business, because that ended before.  Are they for

22   BBB Management Group?

23   A    I don't know.

24   Q    Are they for Complete Group?

25   A    I don't know.

1    Q    Are they for Steel Seal, LLC?

2    A    Could be, but I don't know.

3    Q    You have no idea, from this documentation, whose

4    expenses they are, do you?

5    A    Not from this document, no.

6    Q    Did -- did you hear -- I believe he was sitting with

7    Mr. Hipple, when he was -- when you were doing the

8    questions with Mr. Geisser, he expressed some

9    frustration that these questions cost him $400,000?

10   A    I heard him make a remark like that, yes.

11   Q    Okay.  And if he was saying he had spent $400,000 on

12   this litigation, would that surprise you?

13   A    I don't know.

14   Q    Your firm is expensive?

15   A    Our firm -- I --

16   Q    Reasonably priced for what you do --

17   A    -- I was going to say --

18   Q    -- but expensive?

19          MR. HIPPLE:  Yeah, can we get him out of here,

20   by the way, as soon as possible?

21          THE WITNESS:  Actually, I'm involved with a

22   large case right now, and we are the cheapest one in the

23   bunch, so -- I'm sorry.  I'm not following your

24   question.

25   BY MR. BERKOWITZ:

1    Q    But if I told you that that's -- that's an amount

2    commensurate with my client's legal fees?

3    A    I've only been a part of this litigation so I can't

4    comment to how much and how much has been going on in

5    the background, that clearly a lot has happened.

6    Q    Mr. Hipple had you look at this note, this -- this

7    document 132?

8    A    If you need me to read that, it's going to be a

9    problem.

10   Q    It's actually Exhibit 132 in the book.

11   A    Okay.

12   Q    Can you see that?  I think you looked at this one?

13   A    Yes, with Mr. Hipple.  We just looked at it.

14   Q    And if you look at the date of default, the amount

15   of money that's due is $338,600.29?

16   A    You're pointing at November.  The default date is

17   November?

18   Q    Well, it's actually October.

19   A    That's what I thought.

20   Q    That's when the default begins.  The interest is

21   calculated at default.

22   A    At $350,000, yes.

23   Q    Right.  So Mr. Hipple spent $400,000 defending a

24   $338,000 note at the time.  Would that be your

25   understanding of what we just read here?

1          MR. HIPPLE:  Objection, Your Honor.  I don't

2     know what that has to do with the case --

3          THE COURT:  I'll sustain the objection.

4          MR. HIPPLE:  -- what I spent --

5          THE COURT:  I sustained the objection.

6          MR. BERKOWITZ:  No further questions, Your

7     Honor.

8          THE COURT:  All right.  You're excused, Mr.

9     Pederson.  Thank you.

10         THE WITNESS:  Thank you.

11         (Witness excused.)

12         THE COURT:  Mr. Hipple, it's 3:30, so we have

13    another hour.  Next witness.  Do you need a break?  I'm

14    ready to go.

15         MR. HIPPLE:  I could use a five-minute break.

16         THE COURT:  All right.  We'll take a five-

17    minute break.

18         (Recess taken, 3:27 p.m. to 3:39 p.m.)

19         THE COURT:  Please be seated, everybody.  Mr.

20    Hipple.

21         MR. HIPPLE:  Yes.  I'd like to call Teresa

22    Concepcion.

23         THE COURT:  Okay.

24         MR. BERKOWITZ:  Your Honor, could I ask for an

25    offer of proof?  Not that he doesn't have a right to

1      examine her, but she testified in her direct testimony

2      that she had no knowledge of the fraudulent transaction

3      that took -- that underlies this case.

4              THE COURT:  I'm not --

5              MR. BERKOWITZ:  And it was in her deposition

6      -- not -- I mean, he's free to --

7              THE COURT:  -- I'm not going to -- I'm not

8      going to ask for an offer of proof.  You may proceed.

9      Go ahead.

10             MR. HIPPLE:  All right.  Thank you, Your

11     Honor.

12             COURTROOM DEPUTY:  Raise your right hand.

13             TERESA CONCEPCION, Plaintiff, Sworn.

14             COURTROOM DEPUTY:  Please state and spell your

15     last name for the record.

16             THE WITNESS:  Concepcion, C-O-N-C-E-P-C-I-O-N.

17             THE COURT:  You may proceed.  Go ahead.

18                     DIRECT EXAMINATION

19     BY MR. HIPPLE:

20     Q   Can you hear me?  Ms. Concepcion, can you hear me?

21     A   I can hear.

22     Q   Okay.  All right.  I need you to -- tab D-33 in the

23     black books.  No, in our books, the defendant.

24     A   Yes.

25     Q   Okay.  Could you please turn to page 65.5.

1    A   I have page 65.

2    Q   Oh, is she ready?

3            THE COURT:  Yes.

4            MR. HIPPLE:  Okay.

5    BY MR. HIPPLE:

6    Q   Yes.  I'll read the question.  "Who created the

7    demand note?"

8    A   Henry Van Blunk.

9            THE COURT:  I think he wants you to read your

10   answer at the deposition.

11           MR. HIPPLE:  Answer.

12           THE COURT:  Ms. Concepcion, so read the --

13   page 65 --

14           THE WITNESS:  Oh, number five.

15           THE COURT:  -- so, "Who created the demand

16   note," and your answer is?

17           THE WITNESS:  "An attorney in Pennsylvania."

18   BY MR. HIPPLE:

19   Q   No, it says here -- okay, right.  Okay.  Fine.

20   Thank you.

21           And go to 65.5 -- wait a minute.  I'm sorry.

22   We have -- we need to go from there to 66.4.  So it

23   would be -- the next question is, "And who is that,"

24   number nine and yours is ten.

25   A   I don't know where you are.

Ms. Concepcion - Direct                    280

1    Q   65, ten.

2              THE COURT:  65, line ten?

3              MR. HIPPLE:  Yes.

4              THE COURT:  The question is, "Who is that?"

5              And your answer is?

6              THE WITNESS:  "I don't remember his name."

7    BY MR. HIPPLE:

8    Q   Okay.  All right.  Question 12 -- all right, 66,

9    one.

10             Okay.  "What was it, here in Bucks County?"

11   A   "Yes."

12   Q   "Was it in the Newtown area?"

13   A   "I don't really know.  I know it was here in

14   Pennsylvania."

15   Q   "Is -- is it Henry Van Blunk?"

16   A   "Yes, there is the name."

17   Q   "And who -- did Henry Van Blunk represent you?"

18   A   "Yes."

19             MR. BERKOWITZ:  I'm going to object.  Reading

20   the deposition is not eliciting questions at trial.

21             THE COURT:  Right.

22             MR. BERKOWITZ:  We have the deposition.  We

23   can read it.  If you want to impeach, that's fine.

24             THE COURT:  Right.  So, you have to ask your

25   witness a question, and then if she says something

1  different in a deposition, you can read the deposition.

2  Okay?

3              MR. HIPPLE:  Okay.  Right.  Okay.

4              THE COURT:  We kind of went over this before,

5  but go ahead.

6  BY MR. HIPPLE:

7  Q   "And Mr. Van" --

8              THE COURT:  Why don't you just ask her some

9  questions and then --

10             MR. HIPPLE:  Okay.

11             THE COURT:  -- you know, if she says something

12  that's not -- you feel is not what she said in the

13  deposition, then you can ask her about the deposition.

14             MR. HIPPLE:  Okay.  Well, I'm going to just go

15  back a little bit then.

16  BY MR. HIPPLE:

17  Q   "And Mr. Van Blunk represented you?"

18  A   "Yes."

19  Q   "And you met him with -- in connection with the two

20  judgment notes, right?"

21  A   "That's correct."

22  Q   "So the judgment notes are payable on demand,

23  correct?"

24  A   "Yes."

25  Q   "Now, you have delivered that to Brian Hipple?"

1    A    "No."

2    Q    "And this letter in" -- I don't have the letter,

3    that's the problem.  Okay.  You did have a letter from

4    your attorney, is that correct?

5    A    I don't know what you're referring to.

6    Q    A letter that stated that Brian to sign the -- that

7    he was in agreement with the promissory notes?

8    A    I don't know what letter you're referring to.

9    Q    The demand letter.

10              MR. BERKOWITZ:  Your Honor, I'm going to

11   object.

12              MR. HIPPLE:  I'll pass.  I'll go by it.

13              MR. BERKOWITZ:  I'd like my objection to be

14   heard.  The notes and the judgments are recorded.  They

15   are docketed.  We have the dockets in the court.  We've

16   had testimony and we have the dockets that show these

17   notes have never been challenged.

18              To go back and recreate what happened before

19   the notes is irrelevant.  These notes are 12 years old.

20   They're part of the record.  Payments have been made.

21   There has never been a challenge to the judgments.  That

22   is not an issue that is relevant to these proceedings.

23              THE COURT:  What point are you trying to make?

24              MR. HIPPLE:  I'm trying -- I'm trying to get

25   the point that she had the notes done by an attorney,

Ms. Concepcion - Direct                      283

1    okay?  So she had legal counsel.

2              THE COURT:  Right.

3              MR. HIPPLE:  She went to Brian, had Brian sign

4    the notes without the other creditors knowing, okay?

5    All right.  Of Brian -- of SCIX, the other creditors

6    never knew that these notes were signed, okay?  And, you

7    know, that --

8              THE COURT:  Well, at the time of the divorce,

9    you knew about the notes?  They were listed in the

10   distribution of the property, right?

11             MR. HIPPLE:  Her notes, yes.

12             THE COURT:  Yes, her notes.  I mean, you -- I

13   won't -- I'm sure that I'll get this wrong, but there

14   was a list of some property that she kept and some

15   things that you kept, and --

16             MR. HIPPLE:  Well, there are some reasons,

17   Your Honor --

18             THE COURT:  No, but -- but as far as the --

19   there's no -- I mean, you're not -- I don't think I've

20   heard this up till today -- you're not challenging --

21             MR. HIPPLE:  No.

22             THE COURT:  -- that she had these notes and

23   there's a --

24             MR. HIPPLE:  Well, there's --

25             THE COURT:  -- at least with respect to SCIX,

Ms. Concepcion - Direct                    284

1    they're valid debts --

2              MR. HIPPLE:  Okay.  Let me get to this next

3    question then --

4              THE COURT:  -- of the company -- the

5    corporation was the one that she lent the money to,

6    right?

7              MR. HIPPLE:  Pardon me?

8              THE COURT:  She lent the money to SCIX?

9              MR. HIPPLE:  That is correct.

10             THE COURT:  So you're not disputing that -- at

11   least, you have to admit that SCIX at one point owed

12   this money to her?  Now, we're fighting about everything

13   else beyond that, but that's not in dispute, right?

14             MR. HIPPLE:  Okay.  Well, the things that --

15   that are in dispute that once she had Brian sign the

16   note, she never proceeded with the note and that's --

17   these are some of my questions I want to find out why.

18             MR. BERKOWITZ:  Your Honor, these are

19   questions that you raise in State Court, challenge the

20   validity of the confession of judgment and the

21   legitimacy of the note.  When they came in and

22   intervened on behalf of Clement Hipple and Complete

23   Group in the Bucks County case, even there they didn't

24   challenge the legitimacy of the judgments, and I don't

25   think it's proper to challenge those here.

1          MR. HIPPLE:  Well, I disagree.  I'm sorry.

2          THE COURT:  Well, let me ask you.  In the

3     pleadings, was there -- in the pleadings filed in this

4     Federal case, was there any challenge to the validity of

5     the debt -- of your client's?

6          MR. BERKOWITZ:  No.

7          THE COURT:  No.  So I'm going to sustain the

8     objection, Mr. Hipple.  I think we're beyond that.

9     There's issues now relating to plaintiff's allegations

10    of fraudulent transfer, et cetera, but as far as

11    challenging the validity of her debt, we're past that,

12    and that wasn't challenged by your previous attorneys in

13    this case as far as I understand it.

14          And I did read Judge DuBois' opinion and also

15    read the pleadings and trial memos of both -- the trial

16    memo you filed or your attorney filed and the one Mr.

17    Berkowitz filed, and that was never raised as an issue

18    in the case.  I mean, you can tell me otherwise, I don't

19    want you just yessing me, but --

20          MR. HIPPLE:  Well, no, I'm going to go into a

21    different area, Your Honor.

22          THE COURT:  All right.  Okay.  Fine.

23          MR. HIPPLE:  Okay.  All right.

24    BY MR. HIPPLE:

25    Q    Okay.  We know that they're based on the lawsuit.

1    Okay.  "And, in fact, the two judgment note -- judgments

2    and the fact that you have not been paid in full,

3    therefore, is the sole basis for" -- I don't know this

4    word, A-S-S-E-R-T-I-N-G --

5              MR. BERKOWITZ:  Asserting.

6    BY MR. HIPPLE:

7    Q   -- "asserting your claim in this case, correct?"

8    A   Not correct.

9              MR. BERKOWITZ:  And --

10             THE COURT:  Are you -- are you reading from

11   prepared questions?

12             MR. HIPPLE:  Pardon me?

13             THE COURT:  Are you reading from prepared

14   questions?

15             MR. HIPPLE:  Yes.

16             THE COURT:  Do you need some help?

17             MR. HIPPLE:  Yeah, sure.  Yeah.

18             THE COURT:  All right.  Go ahead.  Now, what's

19   -- I'm sorry, Mr. Berkowitz, you objected to something

20   here?

21             MR. BERKOWITZ:  Again, I thought we were going

22   back and raising issues that just are not germane --

23             THE COURT:  All right.

24             MR. BERKOWITZ:  -- to the reason we're here.

25             THE COURT:  Okay.  Why don't you point out

1    what questions you want to ask.

2    BY MR. HIPPLE:

3              (Questions being read by Ms. Ann Lemmo, intern

4    for Judge Rueter.)

5    Q    And, in fact, the two judgments and the fact that

6    you have not been paid in full therein is the sole basis

7    for asserting your claims in this case, right?

8              MR. BERKOWITZ:  Objection.  Your Honor,

9    there's a complaint that contains two counts, and that

10   is the basis for the complaint.

11             THE COURT:  All right.

12             MR. BERKOWITZ:  I don't believe the witness

13   would be capable of answering that, Your Honor.

14             THE COURT:  Well, your -- the obligations that

15   you're trying to get satisfied here are represented by

16   the two notes?  There's no other obligations, right?

17   There's no other notes out there?  No.  Okay.  Is that

18   -- I think -- is that right?

19             THE WITNESS:  There are just the two notes.

20             THE COURT:  Just the two notes.

21             THE WITNESS:  That's correct.

22             THE COURT:  And the interest and the attorney

23   fees, et cetera, but there's no other notes out there,

24   any other obligations that you're asserting, is that

25   correct?

1           THE WITNESS:  That's correct.

2           THE COURT:  Right.  Okay.

3           MR. HIPPLE:  Okay.  Next question.

4           THE COURT:  Right.

5     BY MR. HIPPLE:

6           (Questions being read by Ms. Ann Lemmo, intern

7     for Judge Rueter.)

8     Q   Now, after the two judgments were entered in 2003,

9     you did not take any action then to execute on those

10    judgments, right?

11    A    Correct.

12    Q   You did not execute on either of the judgments at

13    any point in 2004 through 2009, right?

14    A    Correct.

15    Q   And you did not take action at any point in time to

16    SCIX into involuntary bankruptcy, correct?

17    A   I'm not sure how to answer that question.

18           MR. HIPPLE:  Explain to her about the

19    bankruptcy.

20           THE COURT:  No.  She said she's -- she's not

21    sure she can answer that --

22           MR. HIPPLE:  Okay.

23           THE COURT:  -- I assume because she's not a

24    lawyer and she doesn't know the procedure, is that

25    right?

1           THE WITNESS:  That's correct.

2      BY MR. HIPPLE:

3                (Questions being read by Ms. Ann Lemmo, intern

4      for Judge Rueter.)

5      Q    And, in fact, SCIX was making payments to you on

6      those judgments, right?

7      A    Irregularly, yes.

8      Q    And you accepted those payments, right?

9      A    Yes.

10                (Pause in proceedings.)

11           MR. HIPPLE:  May I approach, okay?

12           THE COURT:  Yes.

13           MR. HIPPLE:  Do you want to read the question?

14           MS. LEMMO:  Sure.

15           THE COURT:  Why don't -- you want to show that

16      to Mr. Berkowitz?

17           MR. BERKOWITZ:  Your Honor, I'm sorry.  This

18      is Exhibit 132.  She can get it right out of the binder.

19           THE COURT:  Okay.  Would you go to 132, Ms.

20      Concepcion, please.

21           THE WITNESS:  Plaintiff?

22           THE COURT:  Plaintiff's, yes.

23           MR. BERKOWITZ:  Plaintiff's 132.  That is the

24      blow-up, Your Honor, if you want me to put it up there.

25           THE COURT:  Sure.  It's up there now.

1          MR. BERKOWITZ:  Oh, okay.

2          THE WITNESS:  If I could see it a little bit

3    better, it would help me.

4          MR. BERKOWITZ:  I wouldn't be able to see it

5    from there either.  This is page three of four.

6          THE WITNESS:  Okay.  I'm going to find it in

7    the book.  It's still not very clear.

8          THE COURT:  All right.  Go ahead, Mr. Hipple.

9          MR. HIPPLE:  Okay.

10   BY MR. HIPPLE:

11          (Questions being read by Ms. Ann Lemmo, intern

12   for Judge Rueter.)

13   Q    Is that a check made payable to you for $3,000 from

14   SCIX?

15          THE COURT:  Is there a date or --

16          MR. HIPPLE:  Yes.  The date is September,

17   2010.

18          THE WITNESS:  Okay.  I found the exhibit.

19   What is it you're referring to?

20          MR. HIPPLE:  It's the last page of that

21   exhibit, or no, September, 2010, the last page, $3,000

22   check.  Under -- below it's the 53,000 garnish.

23          THE WITNESS:  I see a check number listed for

24   $3,386.30.

25          MR. HIPPLE:  No.  That's not the right check.

1    No, it's December -- I mean, not December -- September,

2    2010.

3            THE WITNESS:  September, 2010, I see a check

4    there for 3,000.

5            MR. HIPPLE:  Okay.  Next.

6    BY MR. HIPPLE:

7            (Questions being read by Ms. Ann Lemmo, intern

8    for Judge Rueter.)

9    Q   Two weeks later you filed a -- I don't know how to

10   say that word --

11           THE COURT:  Praecipe.

12   BY MR. HIPPLE:

13           (Questions being read by Ms. Ann Lemmo, intern

14   for Judge Rueter.)

15   Q   -- praecipe for writ of execution, and writ of

16   execution was issued to you to garnish the bank account

17   for SCIX, right?

18   A   That was done without my knowledge.  I had -- I

19   didn't direct that.  That was done by the collectors

20   trying to collect on my debt.

21           MR. HIPPLE:  But it -- it was two weeks after,

22   correct?

23           THE WITNESS:  I have no reason to think it was

24   two weeks or not.  I don't know when -- when it was

25   done.

1    BY MR. HIPPLE:

2              (Questions being read by Ms. Ann Lemmo, intern

3    for Judge Rueter.)

4    Q    And for months you had been meeting with SMS for the

5    purpose of trying to locate Clement Hipple's assets,

6    right?

7    A    I did not meet with SMS for months.  They took the

8    contract and worked it.

9              MR. HIPPLE:  So you -- you never met with them

10   in reference to Clement Hipple?

11             THE WITNESS:  I did not say I never met with

12   them.  I contracted with them.  From there I got phone

13   calls and updates.

14             MR. HIPPLE:  And in reference to Clement

15   Hipple?

16             THE WITNESS:  Of course.

17   BY MR. HIPPLE:

18             (Questions being read by Ms. Ann Lemmo, intern

19   for Judge Rueter.)

20   Q    Already identified him as the target, right?

21   A    The notes were against SCIX, LLC.

22             MR. HIPPLE:  But when you met with them, you

23   did have me as the target, correct?

24             THE WITNESS:  False.

25             MR. HIPPLE:  False.

Ms. Concepcion - Direct                    293

1    BY MR. HIPPLE:

2            (Questions being read by Ms. Ann Lemmo, intern

3    for Judge Rueter.)

4    Q   Well, you had already planned to go after Clem

5    Hipple's assets for the debt owed by SCIX, right?

6    A   False.

7            (Pause in proceedings.)

8    Q   Isn't it true that during your divorce proceedings,

9    your divorce attorney referred to you as -- referred to

10   you SMS, a financial recovery group in Arizona?

11           MR. BERKOWITZ:  Objection.  Irrelevant.

12           THE COURT:  All right.  I'll sustain the

13   objection.

14           MR. HIPPLE:  That mean -- that mean go or not?

15           THE COURT:  No.  It means --

16           MR. HIPPLE:  Is it go?

17           THE COURT:  No.  I'm -- she doesn't have to

18   answer that question.

19           MR. HIPPLE:  Well, there's a -- there's a

20   deposition here.  I have to take her to the deposition.

21           THE COURT:  Okay.  Not -- not for that area of

22   questioning, but for some other area.

23           MR. HIPPLE:  Well, that's where I get

24   confused, okay?  You don't want me to go to the

25   deposition, right, where she answered different than she

Ms. Concepcion - Direct                    294

1    just did now.

2            THE COURT:  What did she -- what did she

3    answer now that you think is contrary -- what area --

4    what subject?

5            MR. HIPPLE:  Apparently they put the

6    deposition there so let me just check it and see why.

7    89, one.

8            MR. BERKOWITZ:  Your Honor, if I might be

9    heard while --

10            THE COURT:  Sure.

11            MR. BERKOWITZ:  Mr. Hipple I think was warned

12    at the beginning that he would be at a disadvantage

13    without an attorney, and I think you were pretty clear

14    in your advice.  And, you know, the use of the

15    deposition, attorneys know how to use them.  That's not

16    what's happening here.  There was a question, an

17    objection that was sustained.

18            THE COURT:  Well, I'm not sure that he's

19    trying -- I'm not sure he's trying -- I hope he's not

20    trying to get back to the same question with the

21    deposition.  He can't do that.  But I don't know if

22    there's -- he said there was something she said

23    contradictory, so he -- I think --

24            MR. HIPPLE:  Oh, well, that's what I was going

25    to -- it had a deposition number alongside of it.  So

1      what I will do, Your Honor --

2                THE COURT:  What happened, the lawyer probably

3      -- whoever prepared those questions --

4                MR. HIPPLE:  And then the deposition alongside

5      of it.

6                THE COURT:  -- had referred to the deposition

7      in the event that the witness said something contrary,

8      she could just refer to the deposition page quickly.

9                MR. HIPPLE:  Well, that's what the lawyer

10     would do, right?

11               THE COURT:  Right.  But she -- I don't think

12     she said anything contradictory to what --

13               MR. HIPPLE:  What was her answer to that

14     question?

15               THE COURT:  Well, I sustained it, which means

16     the objection, which means she doesn't have to answer

17     it.  Because Mr. Berkowitz is right, I mean, there's

18     been judgments entered on the notes, right?  For better

19     or worse, there's judgments.  And now this is an action

20     to collect on those judgments.  So what happened for the

21     most part prior to those judgments is irrelevant.

22               Except it goes maybe perhaps to your intent of

23     evading -- or not your intent but the corporation's --

24     your intent.  I guess if you were paying regularly, and

25     it shows maybe -- maybe you could argue it shows you

1   didn't have intent to evade, so we'll see.

2                MR. HIPPLE:  All right.  Then --

3                THE COURT:  But her actions are irrelevant.

4   BY MR. HIPPLE:

5                (Questions being read by Ms. Ann Lemmo, intern

6   for Judge Rueter.)

7   Q    And you met with SMS before garnishing the SCIX bank

8   account, right?

9   A    That's correct, I did meet with SMS before the

10  account was garnished.

11               MR. HIPPLE:  Let me look at this.

12               (Pause in proceedings.)

13               MR. HIPPLE:  If it's not important, I'm just

14  going to bypass them, but I've got to read it, okay?

15  I've got to take a minute and read it.

16               THE COURT:  Okay.

17               MR. HIPPLE:  If it's not important, I'm just

18  going to bypass.

19               (Pause in proceedings.)

20               MR. HIPPLE:  I guess the attorney was just

21  trying to get different things on the record.  That's

22  what a lot of this is.

23               (Pause in proceedings.)

24               MR. HIPPLE:  Maybe this one is important, Your

25  Honor.  Okay.  I have to bring her attention to the

Ms. Concepcion - Direct                    297

1    deposition, 94.3 till 90 -- till 10, 94.10.  I'll ask

2    the question and --

3                    MR. BERKOWITZ:  I'm sorry.  There's no

4    question pending for use of the deposition.

5                    MR. HIPPLE:  Okay.  Let me --

6                    MR. BERKOWITZ:  I guess that was an objection.

7                    THE COURT:  Why don't you just ask the

8    question.

9                    MR. HIPPLE:  Okay.

10   BY MR. HIPPLE:

11   Q    "Do you remember if you gave them the other

12   documents?"

13                   THE COURT:  Gave who?

14                   MR. HIPPLE:  SMS.

15                   THE COURT:  What documents?

16                   MR. HIPPLE:  Oh, the documents were up

17   earlier, I bypassed it.  Okay.  Let me go on.

18                   "No, I don't remember," was her answer.

19                   "Okay.  You mentioned that you talked

20   strategy.  Was that the strategy?"

21                   MR. BERKOWITZ:  I object.

22                   THE COURT:  But here's the problem, again.

23   Mr. Hipple, this is all that happened pre-judgment,

24   okay.  So this -- what effort she made in trying to

25   collect the judgment or collect on the debt pre-judgment

Ms. Concepcion - Direct                     298

1    really is not relevant to this case.

2            MR. HIPPLE:  Well, the answer -- the answer to

3    this question -- the answer -- I'm going to read the

4    answer to this question.

5            "To try to find out where Clement's assets

6    were hiding."

7            This is the -- the direction I'm going.  It

8    has nothing to do with the notes, Your Honor.  It's more

9    about her coming after me and not going after SCIX.  So

10   it's a totally different issue.  I feel that I should be

11   at least allowed to get that in the record.

12           THE COURT:  Well, why do you think it's

13   relevant?  Why do you think that is relevant to this

14   case?

15           MR. HIPPLE:  Well, because it shows that --

16   that I was the target and not SCIX, and she had the note

17   with SCIX.  And there's a lot of stuff in here that she

18   said during her deposition.

19           MR. BERKOWITZ:  Object, Your Honor.  I'm not

20   even sure how to object to the question.  But the fact

21   of the matter is the execution was done against SCIX.

22   That Mr. Hipple is in this suit is what happened as a

23   result after the garnishment was in place.

24           THE COURT:  Right.

25           MR. HIPPLE:  Well, again, Your Honor, I --

1    again, these are -- okay, I'll ask this next question.

2             "Okay.  I hear what you are saying.  Do you

3    know if he had any other interest in SCIX?"  That was

4    the question to her.

5             And her answer is, "I don't know anything

6    about his ownership interest."

7             I'll just -- stop me, Your Honor, when you

8    want.

9             "Okay.  Do you know when he -- he would have

10   had an ownership interest, if ever in SCIX" --

11            MS. LEMMO:  "All along."

12            MR. HIPPLE:  -- "all along?"  Okay.  So now --

13   now, she's saying that in her mind I own SCIX all along.

14            MR. BERKOWITZ:  I'm going to object, Your

15   Honor.

16            THE COURT:  Well, it doesn't really matter

17   what's in her mind and why she thinks this.  It's what

18   she can prove here in court.

19            MR. HIPPLE:  No, but she --

20            THE COURT:  Now, you -- you have gone -- you

21   have gone through lengths to show that your son, Brian

22   Hipple, was the owner and operator of SCIX --

23            MR. HIPPLE:  Yes.

24            THE COURT:  -- and you -- you know, you've

25   argued that you have had nothing to do with that

Ms. Concepcion - Direct                    300

1    company.

2              MR. HIPPLE:  And that's been proven basically,

3    yes.

4              THE COURT:  Right.  But the fact that she may

5    have some beliefs that you were -- that you had a

6    control or some effort in running that company or

7    controlling its assets, that may be her belief, but that

8    doesn't advance your defense here at all, or -- it

9    doesn't even advance the plaintiff's case because it's

10   not evidence.  She may believe it, but she's got to

11   prove it.

12             MR. HIPPLE:  Yeah, but it would go into the

13   record --

14             THE COURT:  Well, maybe -- I'm not saying her

15   proof -- they're required to prove that, but that may be

16   one point they may be trying to make.

17             MR. HIPPLE:  But I can't get anything in the

18   record of what her real intentions were.

19             THE COURT:  Well, her intentions really are

20   irrelevant, what her intention is.  She's trying to

21   collect on the note that she signed with SCIX.

22             MR. HIPPLE:  Well, then, I don't understand

23   why the attorney took the time to write this up.

24             THE COURT:  Well, I'm not sure either, but --

25             MR. HIPPLE:  I mean, it must have been

1    relevant as far as the attorney was concerned.

2                   THE COURT:   Yes, but a lot of attorneys ask

3    questions -- you know, Mr. Berkowitz asked some

4    questions and you --

5                   MR. HIPPLE:   No, no, he doesn't ask questions,

6    does he?

7                   THE COURT:   Well, you objected and I sustained

8    it.   So he thought, you know, he thought these were

9    proper questions, I didn't think they were, so lawyers

10   always do that.   And Judges don't get it right all the

11   time either, so -- we try to do our best, but --

12                  MR. HIPPLE:   All right.   Can I ask her a

13   couple questions about SCIX that she stated?

14                  THE COURT:   Sure.   She may have some

15   knowledge.   She worked for them, right, or she did some

16   work for them, right?

17                  MR. HIPPLE:   Yeah.

18                  THE COURT:   Okay.   Sure.

19                  MR. HIPPLE:   That's part --

20                  THE COURT:   All right.   Go ahead.

21                  MR. HIPPLE:   -- that's part of it in here,

22   okay.

23                  THE COURT:   Yes.   Go ahead.

24   BY MR. HIPPLE:

25   Q    All right.   Well, this is one question.   "You have

1    no facts or support" --

2              MR. HIPPLE:  Go ahead.

3    BY MR. HIPPLE:

4              (Questions being read by Ms. Ann Lemmo, intern

5    for Judge Rueter.)

6    Q    You have no facts to support the notion that Clement

7    Hipple was controlling SCIX in September or October of

8    2000 --

9              MR. HIPPLE:  '10.

10   BY MR. HIPPLE:

11             (Questions being read by Ms. Ann Lemmo, intern

12   for Judge Rueter.)

13   Q    -- okay, 2010?

14   A    I have no facts to support it.

15             MR. BERKOWITZ:  Object, Your Honor.  And --

16   and this was when I asked the offer of proof, and it was

17   dealt with on Ms. Concepcion's direct testimony, all of

18   the investigation into the fraudulent transaction was

19   done by me.

20             THE COURT:  All right.  Well, her answer

21   stands.  I understand that.  Her answer stands.

22             Go ahead, Mr. Hipple.

23   BY MR. HIPPLE:

24             (Questions being read by Ms. Ann Lemmo, intern

25   for Judge Rueter.)

Ms. Concepcion - Direct                    303

1   Q   Other than the patents and the customer list, you

2   did not know if SCIX even had any assets or what those

3   assets might be in September, 2010?

4   A   I would have no way of knowing.

5                   MR. HIPPLE:  And that's the same question --

6                   (Pause in proceedings.)

7                   MR. HIPPLE:  Okay.  This is a question I need

8   to ask.

9                   MS. LEMMO:  Okay.

10  BY MR. HIPPLE:

11                  (Questions being read by Ms. Ann Lemmo, intern

12  for Judge Rueter.)

13  Q   And, in fact, you don't even know if you even have a

14  lien on any -- on any assets of SCIX?

15  A   I know what my attorney tells me.  I don't -- I

16  don't have any reason to know anything about that.

17  Q   After you garnished the SCIX Wachovia bank account

18  and discovered there was only $53,000, you never took

19  any steps to put SCIX into involuntary bankruptcy?

20  A   That was in the hands of SMS to accomplish.

21                  MR. HIPPLE:  This one's just verifying

22  something.  This one.

23  BY MR. HIPPLE:

24                  (Questions being read by Ms. Ann Lemmo, intern

25  for Judge Rueter.)

Ms. Concepcion - Direct                    304

1    Q   And, ultimately, you and Mr. Hipple came to an

2    agreement as far as distribution of your -- I'm sorry --

3    marital property rights?

4    A   Yes.

5    Q   And you agreed that the loan from SCIX to him would

6    be awarded to Mr. Hipple?

7    A   If that's what the divorce document says, I'd have

8    no reason to state otherwise.

9            (Pause in proceedings.)

10   BY MR. HIPPLE:

11   Q   You are aware that there was a property disbursement

12   between you and mine and that on my side SCIX was on

13   there?

14   A   Again, if that's what the divorce documents say, I'd

15   have no reason to dispute it.

16   Q   And, in fact, throughout your marriage, Clement

17   Hipple told you that he had made loans to SCIX, correct?

18   A   Yes.

19   Q   And you have no evidence to suggest that the debt

20   owed by SCIX to Clement Hipple was not valid, right?

21   A   I have no reason to think that, no.

22            MR. HIPPLE:  Do you want this one?  The

23   notion?  You --

24            MS. LEMMO:  Okay.

25   BY MR. HIPPLE:

(Questions being read by Ms. Ann Lemmo, intern for Judge Rueter.)

Q Other than your personal feelings toward your ex-husband, Mr. Hipple, you have no facts to support the notion that the debt owed by SCIX to Clement Hipple was not valid, correct?

A I already answered that.

MR. HIPPLE: Okay. Add that in, did she -- she had reason that -- okay. This one --

(Pause in proceedings.)

BY MR. HIPPLE:

(Questions being read by Ms. Ann Lemmo, intern for Judge Rueter.)

Q And would you agree that if the loans from Mr. Hipple had made to SCIX were, in fact, valid, Mr. Hipple had every right to protect his financial interest as they relate to those loans, right?

A As the law requires, yes.

MR. HIPPLE: I wish the attorney was here for this. You don't know how much we're passing over, okay? Kind of like how he beat up my expert witness.

That was answered, right? I'm going to need a minute with this one, okay? I can't find this document.

(Pause in proceedings.)

MR. HIPPLE: We're looking for a document,

1    Your Honor.  It says first amended complaint.

2              THE COURT:  Has that been marked as an

3    exhibit, do you know?  What's the first amended

4    complaint say?

5              MR. HIPPLE:  "You filed in this action on

6    September" --

7              THE COURT:  Why don't you read it.

8    BY MR. HIPPLE:

9              (Questions being read by Ms. Ann Lemmo, intern

10   for Judge Rueter.)

11   Q   I'm showing you the first amended complaint you

12   filed in this action on September 17th, 2012, directing

13   your attention to paragraph nine.

14             Upon information and belief, SCIX, Steel Seal

15   Pro, Steel Seal and Complete Group are related by common

16   ownership, officers, directors, employees and places and

17   methods of operation and on information and belief,

18   Brian Hipple is the president of SCIX, Steel Seal and

19   Steel Seal Pro, and Clement Hipple is the president or

20   managing director of Complete Group.

21             That was paragraph nine.

22             MR. HIPPLE:  I can't find the document it says

23   on that.

24             THE COURT:  Well, it's of record.  Do you want

25   me to look at that?  I mean, I'm going to have that.  Do

Ms. Concepcion - Direct                    307

1      you want --

2                  MR. HIPPLE:  You have it?

3                  THE COURT:  Oh, well, it's somewhere in the

4      record here, yes.  It's filed of record.  So do you want

5      to ask --

6                  MR. HIPPLE:  It's not in my book.

7                  THE COURT:  Pardon me?

8                  MR. HIPPLE:  It's not in my --

9                  THE COURT:  No, no, it's in -- it's filed in

10     -- it's filed in the Clerk's Office electronically.

11                 MR. BERKOWITZ:  It does sound like an accurate

12     representation of the allegation in the complaint.

13                 THE COURT:  Right.  So what's your -- do you

14     want me to look at that or do you want to ask this

15     witness --

16                 MR. HIPPLE:  No, no.  If that -- if the

17     writing says what it says, then that's fine, right?

18                  THE COURT:  Yes.  I mean --

19                 MR. HIPPLE:  Okay.  I believe what's happening

20     here, Your Honor, is that my attorney wants to get

21     certain things into the record.  I am assuming that's

22     what's taking place here, right?

23                 THE COURT:  Right.  That's his job.

24                 MR. HIPPLE:  Her job.

25                 THE COURT:  Oh, your job.  I'm sorry.  Yes.

1          MR. HIPPLE:  Okay.  We're just going to --

2     this is just a statement, okay?

3          MR. BERKOWITZ:  I'm going to object to a

4     statement.

5          MR. HIPPLE:  It's not a statement.

6          MR. BERKOWITZ:  It's got to be a question.

7          MR. HIPPLE:  It's a question, it's a question.

8     It has -- it has a thing to it.  Let me read this first.

9     Hold on.  Then I'll tell you where we'll go from there.

10          (Pause in proceedings.)

11          MR. HIPPLE:  I know what her answer's going to

12     be.  It says -- her answer is going to be that her

13     attorney advised her, so -- I'll read the question.

14          THE COURT:  Go ahead.

15     BY MR. HIPPLE:

16          (Questions being read by Ms. Ann Lemmo, intern

17     for Judge Rueter.)

18     Q   We now are in February, 2015.  Isn't it true that --

19     isn't it true that sitting here today you still have no

20     actual facts to substantiate your allegation that SCIX,

21     Steel Seal Pro, Steel Seal, LLC, and Complete Group are

22     the same or somehow related, right?

23     A   Repeat that, please.

24     Q   We now are in February, 2015.  Isn't it true that

25     sitting here today you still have no actual facts to

Ms. Concepcion - Direct                    309

1      substantiate your allegation that SCIX, Steel Seal Pro,

2      Steel Seal, LLC, and Complete Group are the same or

3      somehow related, right?

4      A    That's correct.

5                  MR. HIPPLE:  We can read it but we can't -- we

6      can't direct her attention.

7      BY MR. HIPPLE:

8                  (Questions being read by Ms. Ann Lemmo, intern

9      for Judge Rueter.)

10     Q    Directing your attention to paragraph 37 of the

11     first amended complaint, it states, "Upon information

12     and belief Brian Hipple and Clement Hipple are the

13     officers and directors of the corporate defendants and

14     alone or together, with each other and perhaps others

15     unknown to the plaintiff, caused SCIX to become

16     insolvent by fraudulently transferring assets of SCIX to

17     themselves, the other defendants and perhaps others

18     without adequate consideration, thereby rendering SCIX

19     unable to satisfy Teresa Hipple's judgments against

20     SCIX.

21     A    What's the question?

22                  THE COURT:  Is that -- was that in the

23     complaint?

24                  MR. HIPPLE:  What's that?  Yeah.

25                  THE COURT:  That was in the amended complaint?

Ms. Concepcion - Direct                    310

1    Do you have any reason to --

2              MR. HIPPLE:  You don't have to answer it,

3    right?

4              THE COURT:  -- disagree with that?  That was

5    in your complaint?

6              THE WITNESS:  No, I have no reason to disagree

7    with something that's in my complaint.

8    BY MR. HIPPLE:

9              (Questions being read by Ms. Ann Lemmo, intern

10   for Judge Rueter.)

11   Q    You don't know who owned SCIX in September or

12   October --

13             MR. HIPPLE:  2010.

14   BY MR. HIPPLE:

15             (Questions being read by Ms. Ann Lemmo, intern

16   for Judge Rueter.)

17   Q    -- 2010?

18   A    No.

19   Q    You have no facts to support the notion that Clement

20   Hipple was controlling SCIX in September or October of

21   2010?

22   A    I have no facts.

23   Q    And, in fact, you have no idea of the goings on at

24   SCIX since you left there in August, 2000, right?

25   A    What I knew of SCIX after my termination, I learned

Ms. Concepcion - Direct                    311

1    by virtue of Clement Hipple.

2    Q    You don't know who owns or owned Steel Seal Pro?

3    A    No, I do not.

4    Q    Also true that you have no knowledge of the identity

5    of the officers and directors of Steel Seal Pro at any

6    point in time?

7    A    That's correct.

8    Q    You don't have any facts to support the notion that

9    Clement Hipple controlled Steel Seal Pro?

10   A    That's correct.

11   Q    In this action, you allege that assets were

12   fraudulently transferred by SCIX to one or more of the

13   -- other defendants, right?

14   A    I did not allege that.  My attorney did.

15   Q    When, in fact, you don't even know what assets were

16   allegedly transferred?

17   A    Again, all work on my -- on behalf of my attorney.

18   Q    And, in fact, you don't have personal knowledge that

19   Clement Hipple ever actually received any assets of

20   SCIX?

21   A    Given.

22   Q    And you don't know if Clem Hipple ever took any

23   assets of SCIX, right?

24   A    I have no personal knowledge of that.

25   Q    And you don't know if Complete Group ever received

1    any assets of SCIX?

2    A    Again, I have no knowledge of any of that

3    personally.

4    Q    You don't know if Steel Seal Pro ever received any

5    assets or proceeds of assets of SCIX?

6    A    That's correct.

7    Q    You don't know if Steel Seal, LLC, ever received any

8    assets of SCIX or proceeds of any assets of SCIX?

9                MR. BERKOWITZ:  Objection.  Your Honor, if I

10   could -- I believe Ms. Concepcion may be a little

11   confused.

12                I had instructed her on the attorney-client

13   privilege.  All the information and facts that she has

14   are the result of attorney-client communications, and

15   she's trying to preserve her right to her attorney-

16   client privilege.  So when she says she has no facts,

17   she has information -- she may have information, it

18   comes from me, it all comes from me.

19                THE WITNESS:  That's correct.

20                THE COURT:  So you don't -- when you say you

21   don't have any facts, you mean facts independent of

22   whatever Mr. Berkowitz told you?

23                THE WITNESS:  That's correct, sir.

24                THE COURT:  All right.  So what she's saying,

25   if I understand what she's saying, is that the only --

Ms. Concepcion - Direct                    313

1    all the information she has received regarding the

2    companies and who controls them, et cetera, is through

3    the attorney.

4              MR. HIPPLE:  Right.  But she's the one that

5    brought the lawsuit, Your Honor.

6              THE COURT:  Right.

7              MR. HIPPLE:  She should have some knowledge of

8    what -- what she's suing for or why she's suing.

9              THE COURT:  Well, she's -- she's saying she

10   doesn't have independent knowledge other than what the

11   attorney told her.

12             MR. HIPPLE:  So what does that mean to us on

13   this side?

14             THE COURT:  It means what I just said it

15   means.

16             MR. HIPPLE:  You haven't -- she didn't have no

17   knowledge of anything then basically.

18             THE COURT:  Other than what her attorney told

19   her.

20             MR. HIPPLE:  So every question would be the

21   same -- answer would be the same?

22             THE COURT:  I don't know that, but I -- you

23   can ask -- I don't know what your questions are.

24             MR. HIPPLE:  Well, that -- well, that part was

25   all about that knowledge of the loan.  Okay.  We're

1    going to go into a different area now.

2              THE COURT:  So we have -- we have like three

3    minutes before I'm going to end today, okay?  I'm not

4    saying you have to finish Ms. Concepcion today, but I'm

5    just saying --

6              MR. HIPPLE:  Oh, it's not going to happen,

7    it's never going to happen.

8              THE COURT:  No.  You can continue tomorrow.

9              MR. HIPPLE:  Yeah, why don't we just continue

10   tomorrow.

11             THE COURT:  All right.  So after you finish

12   with Ms. Concepcion, what -- who else -- you're going to

13   call yourself.

14             MR. HIPPLE:  Myself.

15             THE COURT:  And then you'll be finished?

16             MR. HIPPLE:  Right.  And then I'll do -- I'll

17   try and get through myself tomorrow --

18             THE COURT:  Okay.

19             MR. HIPPLE:  -- after I'm done with Ms.

20   Concepcion.  And from what I understand, I have to

21   prepare a closing statement, correct?

22             THE COURT:  Right.  But we can -- we can talk

23   about -- we can do that another day.  I'm okay.  I want

24   an agreement among both of you, but if we finish the

25   testimony tomorrow and you need time to do a closing

1    statement, we can come back another day.  I know you

2    live overseas.  But, you know, we would have to see what

3    everybody's schedule is.

4          I mean, I could do it next week.  I know

5    people are on vacation, but I can fit people in next

6    week.  But if we can work out a date, I've done that

7    before.  I've done cases where they're non-jury, people

8    who have ordered the transcript, you know, then they

9    submit some submission and they come back two, three

10   weeks later, a month later, and they have closing

11   arguments.  So we can work all that out.

12          MR. HIPPLE:  All right.  That would probably

13   work.

14          THE COURT:  The bottom line is, I want to tell

15   you, I'm not -- believe me, I'd like to get this over

16   with, but I'm not rushing you, okay?  I want to give you

17   an opportunity to be heard, okay?  So, you know, don't

18   -- don't feel that I'm rushing you or don't --

19          MR. HIPPLE:  Yeah, because that's how --

20          THE COURT:  -- I don't want you ever claiming

21   that I --

22          MR. HIPPLE:  I always feel that way here.

23          THE COURT:  Well --

24          MR. HIPPLE:  I'm sorry, but I know -- I know

25   it --

316

1          THE COURT:  But if you were an attorney, I

2   would -- you would feel the same way, because we're all

3   trying to get through this.

4          MR. BERKOWITZ:  Your Honor, I --

5          THE COURT:  I'm sure Mr. Berkowitz feels that

6   way, too.

7          MR. HIPPLE:  Yeah, but he draws pictures of

8   houses, Your Honor.

9          THE COURT:  Right.  I know.

10          MR. BERKOWITZ:  Not very well.

11          THE COURT:  Right.

12          MR. BERKOWITZ:  Your Honor, I do have my

13   vacation coming up, and Mr. Klein has a fraudulent

14   conveyance trial coming up, and I'm going to be

15   assisting him.

16          THE COURT:  When is your -- when do you come

17   back from vacation?  You're leaving Saturday?

18          MR. BERKOWITZ:  I'm leaving Saturday.  Two

19   weeks, I hope I have -- although I've got to go to

20   Superior Court in the middle of the second week in

21   Harrisburg, so I'm trying to get as much vacation in as

22   I can.  And then Mr. Klein has a trial on the Chester

23   County trial list that I'm going to back him up on.

24          THE COURT:  Okay.

25          MR. BERKOWITZ:  So I don't know exactly what

317

1    the schedule is for the rest of the month.

2              THE COURT:  All right.  Let -- what I would

3    suggest, let's see where we are tomorrow, how much we

4    get done tomorrow, okay?  And if you're finished

5    tomorrow, then we can pick a time to do closing

6    arguments.  We can -- you can even do them by writing if

7    you want.  We can -- I'm flexible.

8              MR. HIPPLE:  In other words, we can just send

9    them in to you?

10             THE COURT:  You can send them in.

11             MR. HIPPLE:  Would that be all right with you?

12             MR. BERKOWITZ:  I have no -- I would prefer to

13   do my closing in person.

14             THE COURT:  Right.  We could do it by -- if

15   you're -- we could do it by Skype.  If you -- you know,

16   if you feel like you're --

17             MR. HIPPLE:  I don't think I -- I do have

18   Skype by the way, because naturally where --

19             THE COURT:  Right.

20             MR. HIPPLE:  -- I live in South America.

21             THE COURT:  Well, I know that, but if you

22   wanted to -- if you consented to this and we can have it

23   here live in court and you could participate by Skype or

24   video-conferencing.  We have some video-conferencing.

25   You would have to --

1              MR. HIPPLE:  I think I would rather send it.

2              MR. BERKOWITZ:  You mean, by --

3              MR. HIPPLE:  No.

4              MR. BERKOWITZ:  Your Honor, the only objection

5    I would have is it should not be done by an attorney for

6    Mr. Hipple.  The Third Circuit and the District Courts

7    have limitations, strong limitations against ghost

8    writing and things like that, and --

9              THE COURT:  Right.

10             MR. BERKOWITZ:  -- I don't think it would be

11   appropriate for an attorney to prepare a closing summary

12   for Mr. Hipple.

13             MR. HIPPLE:  There's not many attorneys in

14   Colombia that speak English, Your Honor.

15             THE COURT:  All right.  Well, let's -- we'll

16   talk about this tomorrow, okay?  I'll see you -- see you

17   tomorrow at 9:00.

18             MR. BERKOWITZ:  Thank you, Your Honor.

19             THE COURT:  Okay.

20             MR. HIPPLE:  All right.  Thank you, Your

21   Honor.

22             (Proceedings concluded at 4:30 p.m.)

23                         *  *  *

24

25

1                             <u>I N D E X</u>

2

3        <u>DEFENDANTS' WITNESSES</u>        <u>DIRECT</u> <u>CROSS</u> <u>REDIRECT</u> <u>RECROSS</u>

4

5        Ira Krassan

6           By Mr. Hipple            12              35

7           By Mr. Berkowitz               25                    41

8

9        William Pederson

10          By Mr. Hipple            48              238

11          By Mr. Berkowitz              129                   260

12

13       Teresa Concepcion

14          By Mr. Hipple            278

15

16                              * * *

17

18       <u>PLAINTIFF'S EXHIBITS</u>                <u>ADMITTED INTO EVIDENCE</u>

19

20       P-125    Wachovia Bank checks - business         8

21                expenses

22

23                              * * *

24

25

CERTIFICATION

I, Donna Anders, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

10/4/15
Date

Donna Anders
Donna Anders