IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

TERESA HIPPLE            : CIVIL ACTION NO. 12-1256
formerly known as      :
TERESA CONCEPCION,      :
                  :
       Plaintiff       :
                  :
                  :
                  :
                  :
                  :
        v            :
                  :
                  :
                  :
                  :
                  :
                  :
SCIX, LLC, et al,       : Philadelphia, Pennsylvania
                  : July 31, 2015
       Defendants      : 9:12 a.m.

- - -

TRANSCRIPT OF BENCH TRIAL - DAY FIVE
BEFORE THE HONORABLE THOMAS J. RUETER
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For the Plaintiff:      GERALD S. BERKOWITZ, ESQUIRE
                      Berkowitz and Klein LLP
                      629 Swedesford Road
                      Swedesford Corporate Center
                      Malvern, PA  19355

For Defendant        CLEMENT HIPPLE
C. Hippel, et al:      9206 Andover Road
                      Philadelphia, PA  19114
                      Pro Se

*Transcribers Limited*
17 Rickland Drive
Sewell, NJ 08080
856-589-6100 • 856-589-9005

2

1 Audio Operator:   Brian Johnson
            Inna Goldshteyn
2            Chris Kurek

3 Transcribed By:    Brad Anders

4           - - -

5    Proceedings recorded by electronic sound
 recording; transcript produced by computer-aided
6 transcription service.

7           - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        (The following was heard in open court at

2   9:12 a.m.)

3        THE COURT:  Good morning.  I'm sorry I'm

4   late.

5        ALL:  Good morning, Your Honor.

6        THE COURT:  I'm ready to go.

7        MR. BERKOWITZ:  Your Honor, a couple of quick

8   issues.

9        THE COURT:  Sure.

10       MR. BERKOWITZ:  One, since we are at the last

11  day, I need an address for service of documents on Mr.

12  Hipple.  I am sure he is not part of the electronic

13  filing system, and I don't have a U.S. address for

14  filing and I just ask that at some point I be provided

15  with that.

16       THE COURT:  Yes.  We are going to need that

17  too, Mr. Hipple.

18       MR. HIPPLE:  I basically don't have a U.S.

19  address.  I mean, I can give you an address of someone.

20       THE COURT:  Okay.  And you will be notified

21  and you will be able to receive documents?  Like, for

22  example, if I issue an order, a court order or notice

23  of a hearing --

24       MR. HIPPLE:  Oh, okay, yeah.

25       THE COURT:  -- you're going to need --

4

1          MR. HIPPLE:  A physical address.

2          THE COURT:  Mr. Berkowitz is right, there is

3   nothing on the docket with your address.

4          MR. HIPPLE:  Okay.

5          THE COURT:  It will automatically go to your

6   lawyer, your former lawyer.

7          MR. HIPPLE:  No, we don't want that, Your

8   Honor.  Should I give that to him now?

9          THE COURT:  Yes.  Can you give it to us now?

10          MR. HIPPLE:  9206 Andover, I think it's

11   A-N-D-O-V-E-R Road, Philadelphia, PA 19114, and that is

12   my cousin, Robert Costello.

13          THE COURT:  Okay.  So, anything addressed to

14   you will be received by him?

15          MR. HIPPLE:  That's correct.

16          THE COURT:  Okay.

17          MR. BERKOWITZ:  Thank you.

18          THE COURT:  Fine.

19          MR. BERKOWITZ:  I don't know if it would help

20   to have an e-mail, I don't know if that is required.

21          MR. HIPPLE:  Yes, I have e-mail.

22          THE COURT:  Do you have an e-mail?

23          MR. HIPPLE:  Yes, Your Honor.  I would

24   probably prefer a lot by e-mail if there is anything.

25          THE COURT:  Sure.

1          MR. HIPPLE:  It's hipple828@hotmail.com.

2          THE COURT:  Okay.  Good.  Thank you.  Is

3    there a phone number at all?

4          MR. HIPPLE:  There is a Skype number, but I

5    don't have it with me.

6          THE COURT:  All right.  Maybe later on you

7    can supply it to us.

8          MR. HIPPLE:  Yes, yes, I can.

9          THE COURT:  All right.  Good.

10          MR. HIPPLE:  Because once I am out of the

11    country, this phone is no good.

12          THE COURT:  All right.

13          MR. BERKOWITZ:  Your Honor, the only other

14    point, my client, Teresa Concepcion, was on the stand

15    and after we left I drove her home.  I did not talk to

16    her about the testimony, but I did advise her again of

17    her attorney/client privilege, and I explained it to

18    her again, and she wants to preserve it.

19          THE COURT:  All right.

20          MR. HIPPLE:  Before we get started, Your

21    Honor, I have two exhibits that I would like to try and

22    get into evidence that were just given to me.  But,

23    unfortunately I don't have a copier machine, so I would

24    like this --

25          THE COURT:  All right.  We will make a copy

6

1   for you.

2          MR. BERKOWITZ:  My only question is, is this

3   for Ms. Concepcion or for yourself?

4          MR. HIPPLE:  No, this is for myself.

5          THE COURT:  Why don't we wait until after we

6   are finished.

7          MR. HIPPLE:  Okay.  Fine.

8          THE COURT:  Make sure that you hold on to

9   that.  Okay.  Why don't you give them to us and we will

10  make copies.

11         MR. BERKOWITZ:  Can I see them?

12         THE COURT:  We won't do it now,  but maybe

13  whenever you have a break, Denise, we'll make a copy.

14  We will make copies for you right now.

15         MR. BERKOWITZ:  Okay.

16         (Pause in proceedings.)

17         THE COURT:  Do you still want to question Ms.

18  Concepcion?

19         MR. HIPPLE:  Yes.

20         THE COURT:  All right.  Why don't you come up

21  here then.

22         MR. HIPPLE:  I won't be very long, Your

23  Honor, but I still do have a few questions.

24         TERESA CONCEPCION, Plaintiff, Previously

25  Sworn, Resumes.

7

1          THE COURT:  You may proceed.

2          MR. HIPPLE:  Yes.

3                    DIRECT EXAMINATION

4    BY MR. HIPPLE:

5    Q    Throughout the trial you basically said that you

6    had no knowledge of the Fraudulent Transfer Act that

7    has been brought against me, is that correct?

8    A    Any knowledge I have of that is through my

9    attorney.

10   Q    When you say "through your attorney," does that

11   mean that he explained everything to you?

12   A    No.

13   Q    Does that mean that you explained things to him?

14          MR. BERKOWITZ:  Objection, Your Honor,

15   attorney/client privilege.  It flows both directions.

16          THE COURT:  Right.

17          MR. HIPPLE:  All right.  Let me rephrase the

18   question.

19   BY MR. HIPPLE:

20   Q    As far as the Fraudulent Transfer Act in this case,

21   did you personally have any knowledge of how to -- how

22   that came about?

23   A    My attorney pieced that together.

24   Q    The second question is, do you believe that Clement

25   Hipple is responsible to pay you the money?

Ms. Concepcion - Direct                                        8

1           MR. BERKOWITZ:  Object to the question.  He

2    is asking this witness to draw a legal conclusion.

3           THE COURT:  Overruled.

4           MR. HIPPLE:  All right.

5           THE COURT:  You can answer that.  She can

6    answer it.

7           THE WITNESS:  Okay.  Restate the question.

8           MR. HIPPLE:  Yes.

9    BY MR. HIPPLE:

10   Q    Do you believe that Clement Hipple is responsible

11   to pay you your money?

12   A    I am not sure about that.

13   Q    All right.  The next question is, could you tell me

14   what percent you were receiving for interest on your

15   loan from SCIX?

16   A    The demand note stipulates eight percent interest.

17   Q    I'm sorry?

18   A    The demand note stipulated eight percent interest.

19   Q    Okay.  Fine.  And do you currently know as of this

20   day what the bank interest is here in the United

21   States?

22   A    I only know the demand interest rate that was on

23   the document that was signed and agreed to.

24           THE COURT:  You have to speak into the

25   microphone here.

Ms. Concepcion - Direct                            9

1          MR. HIPPLE:  I'm sorry, I can't --

2          THE COURT:  Yes.  Can you speak into the

3    microphone.

4          THE WITNESS:  I do.  I have it right in front

5    of me.

6          THE COURT:  Well, then speak up if you don't

7    mind, please.

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.

10   BY MR. HIPPLE:

11   Q    Could you repeat that, please.

12   A    Repeat the question.

13   Q    Okay.  Do you know at the current -- as of today

14   what the banks are giving for investors interest on

15   their money?

16   A    No.

17   Q    All right.

18          MR. HIPPLE:  Why do my documents always

19   disappear?  This is your document that you introduced.

20          MR. BERKOWITZ:  I don't believe it's an

21   exhibit.  I'm sorry.  You're showing me the timeline of

22   events that I used in my opening that was presented to

23   the Court.  It's not an exhibit.

24          THE COURT:  Right.

25          MR. BERKOWITZ:  It was something I used.

Ms. Concepcion - Direct                    10

1    THE COURT:  All right.  That's right.  He can

2    use it.  You don't have a problem with that, do you?

3    You don't have a problem with that, do you?

4    MR. BERKOWITZ:  No, I don't know what it is

5    going to be used for.

6    THE COURT:  Okay.

7    MR. HIPPLE:  Just the timeline.

8    MR. BERKOWITZ:  Okay.

9    BY MR. HIPPLE:

10   Q   This is a copy of the timeline that your attorney

11   spoke about at the beginning of the trial.

12   THE COURT:  So, let's just mark that for

13   identification purposes.

14   MR. HIPPLE:  Then let's put it as Defendant

15   504.

16   THE COURT:  Okay.  That's the timeline, okay.

17   Go ahead.

18   MR. HIPPLE:  Okay.

19   BY MR. HIPPLE:

20   Q   If you look at number three on the timeline, can

21   you read me the date that the wages were -- that the

22   bank account was garnished?

23   A   September 21, 2010.

24   Q   Right, okay.  Now, are you aware that the date that

25   I -- I'm not supposed to say I.  Are you aware that the

                        Ms. Concepcion - Direct                    11

1   date that Mr. Hipple started his procedures in

2   reference to the physical assets of SCIX?

3   A   I have no knowledge of that.

4   Q   Okay.  Well, I will tell you the date.  The date is

5   October 5th, 2010 was the first correspondence in

6   reference to the physical assets of SCIX.

7               Next question.  So, between September 21st,

8   2010 and October 5th, 2010 there was 18 days between

9   that time frame.  During those 18 days between that

10  time frame why did you not have the sheriff go to

11  Ryan's (ph) and seize the assets?

12  A   I was not in control of those actions.

13  Q   Okay.

14              MR. BERKOWITZ:  I would like to object just

15  to the number of days.  I don't believe it was 18 days.

16              MR. HIPPLE:  All right.  I miscalculated.

17              MR. BERKOWITZ:  I think it was --

18              THE COURT:  How many days was it?

19              MR. BERKOWITZ:  I think it was nine and five,

20  14 days.

21              MR. HIPPLE:  Oh, you don't count the

22  weekends?

23              MR. BERKOWITZ:  30 days in September, from

24  9-21 would be nine days and then five days in October,

25  nine and five is 14 days.

1          MR. HIPPLE:  Okay.

2          MR. BERKOWITZ:  That includes weekends.

3          THE COURT:  Okay.  All right.

4    BY MR. HIPPLE:

5    Q    Okay.  14 days, okay.  I'm sorry, your answer to

6    that question?

7    A    Repeat the question.

8    Q    Okay.  There were 14 days between the time that you

9    levied on the bank account of SCIX and the first

10   document that Mr. Hipple produced to SCIX, there was 14

11   days between that time frame, are you aware of that?

12   A    I can see that there are 14 days in between the two

13   dates, yes.

14   Q    Okay.  Could you tell why you did not have the

15   sheriff levy on the assets between that 14 days?

16   A    I was not in control of the actions.

17   Q    Okay.  At any point in time from anyone were you

18   told that you had the option to send the sheriff to

19   SCIX and seize the assets?

20   A    I do not remember that.

21          MR. BERKOWITZ:  I'm going to object, Your

22   Honor.  That is attorney/client communications.

23          MR. HIPPLE:  No, I didn't say attorney.  I

24   said "anybody."  I didn't say --

25          THE COURT:  All right.  I will overrule the

Ms. Concepcion - Direct                    13

1   objection.

2          MR. HIPPLE:  I didn't say -- I said

3   "anybody."

4          THE COURT:  That's fine.

5          MR. HIPPLE:  All right.

6          THE COURT:  I will let the question stand.

7   She said she didn't have any conversations.  All right.

8   BY MR. HIPPLE:

9   Q   Why did you not take the assets after the bank

10  account was frozen?

11  A   I can't answer that, I don't -- again, I wasn't the

12  one dictating actions.

13  Q   Okay.  Did you understand that you had the right to

14  seize the assets?

15  A   I wasn't in control of those actions.

16  Q   I'm sorry?

17  A   I said I was not in control of the actions they

18  took.

19  Q   And who was in control of the action?

20  A   SMS I believe at that time.

21  Q   Are you saying that SMS was the one that filed the

22  garnishment or Mr. Berkowitz?

23  A   To the best of my recollection that garnishment was

24  done under SMS.

25              (Pause in proceedings.)

Ms. Concepcion - Direct                          14

1   Q    Do you remember the date that you engaged with Mr.

2   Berkowitz?

3   A    No, I do not.

4   Q    Can you give me an approximate?

5   A    No.

6   Q    Was it ten days after the garnishment?

7   A    I don't have a memory of that date.

8   Q    So, your statement here today is that was a -- what

9   was the company name again?

10  A    I don't know what you are referring to?

11  Q    That you -- the company that you hired to levy on

12  the bank account?

13  A    SMS.

14  Q    SMS, okay.  So, basically you had no conversation

15  with SMS in reference to seizing the assets?

16  A    They notified me.

17  Q    What did they notify you of?

18  A    The account was garnished.

19  Q    Okay.  I understand that part.  But, I am talking

20  about the physical assets.  Did they tell you anything

21  in reference to the physical assets to be seized?

22  A    No.

23  Q    And you had no knowledge that you had the right to

24  seize the physical assets, correct?

25  A    SMS was in charge of managing the collection.

Ms. Concepcion - Direct                    15

1   Q    I'm sorry.

2   A    SMS was in charge of the collection.

3   Q    Okay.  Would you consider the assets as part of the

4   collection?

5   A    I would have no knowledge of that.

6           MR. HIPPLE:  Am I allowed to do "assuming"?

7           THE COURT:  Sure.

8           MR. HIPPLE:  Okay.

9   BY MR. HIPPLE:

10  Q    Assuming that you have seized the physical assets

11  of SCIX when you garnished the wages, what would you

12  have done with the physical assets?

13  A    I have no idea.

14  Q    Well, would you have tried to sell them?  Would you

15  have kept them?

16  A    I have no idea.

17  Q    In other words, you're saying you would not even

18  have tried to sell them, right, because your attorney

19  here today in this courtroom put a value of $242,760

20  just alone on the chemical assets, not counting the

21  other physical assets?  So, you don't know what you

22  would have done with them?

23  A    That is my statement.

24  Q    Considering that the attorney, your attorney put a

25  price of 242,760 not counting the car and the other

Ms. Concepcion - Direct                    16

1  physical assets, that could have been in the area of

2  250,000 that you would have received.

3  A    What is the question?

4  Q    The question is that would you not have -- would

5  have wanted the $250,000 if you would have seized the

6  assets?  It would have went to you?

7  A    I'm not sure how to answer that.

8  Q    All right.  Let me rephrase the question.

9          If you had an opportunity to receive $250,000

10 by seizing the assets, what would you have done?

11 A    I don't know.

12         MR. HIPPLE:  Your Honor, that's not a proper

13 answer.

14         THE COURT:  Well, she's stating --

15         MR. HIPPLE:  It's either a yes or no answer,

16 Your Honor.

17         THE COURT:  No, I think it is a proper

18 answer.  I am not saying -- she's answered that she

19 doesn't know.  That's what she's saying.

20         MR. HIPPLE:  She don't know if she wanted

21 money.

22         THE COURT:  Right.  Why don't you move on.

23 That is her answer.

24         MR. HIPPLE:  Okay.

25 BY MR. HIPPLE:

Ms. Concepcion - Direct                    17

1   Q   Okay.  So, it's basically your answer you don't

2   know whether you wanted to receive $250,000?

3          THE COURT:  That's what she said.

4          MR. HIPPLE:  Okay.  Okay.  This is a little

5   bit repeatable, but I would like to get this in, okay?

6   BY MR. HIPPLE:

7   Q   Did you have any conversation with anybody in

8   reference to the sheriff seizing the physical assets?

9   A   No.

10  Q   Or is it true that you didn't want to be bothered

11  with the physical assets and you were only looking for

12  the cash?

13  A   False.

14  Q   And is it your statement today that you have no

15  knowledge of any part of anything in this lawsuit?

16  A   I wouldn't say anything.

17  Q   Well, could you tell us what?

18  A   What is the question?

19  Q   Okay.  I'll rephrase the question.  I won't

20  rephrase it, I will repeat it.

21          And in your statement today you're saying

22  that you have no knowledge of any part of anything in

23  this lawsuit?

24          MR. BERKOWITZ:  Objection, Your Honor.  Ms.

25  Concepcion has sat here through the entire trial and I

Ms. Concepcion - Direct                    18

1    would assume that she knows what happened in the trial.

2           MR. HIPPLE:  All right.  Let me rephrase it.

3    BY MR. HIPPLE:

4    Q    Prior to the court date which was on Monday, is it

5    your statement that you have no knowledge of any part

6    or anything that went on in this lawsuit?

7    A    Not independently.

8    Q    I'm sorry?

9    A    Not independently.

10   Q    When you say "independently" what do you mean?

11   A    Attorney/client privilege.

12          MR. HIPPLE:  I object to the question, Your

13   Honor -- the answer.

14          THE COURT:  I will overrule the objection.

15          MR. HIPPLE:  Does that mean she has to

16   answer?

17          THE COURT:  No.  It means she doesn't have to

18   answer.  She answered it.

19          MR. HIPPLE:  Your Honor, that's all the

20   questions I have.

21          THE COURT:  Okay.  Mr. Berkowitz, do you have

22   any questions?

23          MR. BERKOWITZ:  No questions, Your Honor.

24          THE COURT:  All right.  Thank you, Ms.

25   Concepcion.  You're excused.

1          THE WITNESS:  Thank you.

2          (Witness excused.)

3          THE COURT:  All right.  Mr. Hipple, your next

4   witness.

5          MR. HIPPLE:  I would like to call Mr. Hipple.

6          THE COURT:  Yourself, okay.

7          MR. HIPPLE:  Yes, myself.  How do we do this,

8   Your Honor, as far as when I --

9          THE COURT:  Well, you could take --

10          MR. HIPPLE:  -- address myself here on the

11   stand?

12          THE COURT:  Well, you could use "I," it

13   doesn't matter.  You need to take the stand here.  You

14   can say this is what I did or didn't do, whatever.

15          MR. BERKOWITZ:  Your Honor, I know it's not

16   my decision.  I don't mind if he doesn't follow the

17   question and answer format.  I think it would be sort

18   of awkward and unusual in this circumstance.

19          THE COURT:  Right.

20          MR. BERKOWITZ:  I don't know what the proper

21   procedure is, but I have no objection to some

22   accommodation for the circumstance.

23          THE COURT:  Okay.  All right.  Just come on

24   up here --

25          MR. HIPPLE:  Before I start, I would like to

20

1   get these exhibits -- these two exhibits in.

2            THE COURT:  Sure.

3            (Pause in proceedings.)

4            THE COURT:  Mr. Hipple, are you going to

5   refer to some exhibits when you're up -- when you are

6   going to testify?  I assume you are, right?

7            MR. HIPPLE:  Yes, Your Honor.

8            THE COURT:  Okay.  We have all the books up

9   there, so you're okay?

10           MR. HIPPLE:  Yes.

11           THE COURT:  Okay.

12           MR. HIPPLE:  We're missing one, but I think

13  it's on the stand.

14           MR. BERKOWITZ:  Are these for me?

15           MR. HIPPLE:  Yes.

16           MR. BERKOWITZ:  I would like to reserve any

17  objection until they are used, so I can understand what

18  they are --

19           THE COURT:  Okay.

20           MR. BERKOWITZ:  -- and how they are being

21  used.

22           THE COURT:  All right.  Okay.

23           (Pause in proceedings.)

24           THE COURT:  You have been previously sworn,

25  Mr. Hipple, so we don't need to swear you in again.

1          THE WITNESS:  Okay.  Thank you, Your Honor.

2          CLEMENT HIPPLE, Defendant, Previously Sworn.

3          (Pause in proceedings.)

4                    DIRECT EXAMINATION

5          THE WITNESS:  Now, because this is unusual,

6   how do we want to handle --

7          THE COURT:  I think what you should do is,

8   you know, just go in, say you know, I want to make this

9   point or I want to make --

10          THE WITNESS:  Question and then answer?

11          THE COURT:  No, no, you don't have to

12   question.  Just say I want to talk about this, and then

13   state what you want to say, okay?

14          THE WITNESS:  Okay.

15          THE COURT:  It might be good if you just have

16   some introductory just to -- I want to talk about the

17   notes, or I want to talk about this security interest

18   or whatever and then talk about it if that's the point

19   you want to make.  Okay?

20          THE WITNESS:  Okay.  So, there is some fair

21   warning to me and to Mr. Berkowitz as to what you are

22   going to talk about because that way there is an

23   opportunity for Mr. Berkowitz to object.

24          Like, if there was a question, we kind of

25   would know what area you're going to get into.  So, I

Mr. Hipple - Direct                         22

1   wouldn't want you to do a question.  I would just say,

2   look, I want to talk about my relationship with this

3   company and then go ahead and talk about it.

4               THE WITNESS:  Yes.

5               THE COURT:  Okay?

6               THE WITNESS:  Okay.

7               THE COURT:  Is that all right?  You're okay

8   with that?

9               THE WITNESS:  Yes, I can do it that way.

10  Yes.  Okay.  I would like to talk about SCIX, not SCIX,

11  Scientific Chemical, Incorporated.

12              THE COURT:  Okay.

13              THE WITNESS:  All right.  Basically I formed

14  Scientific Chemical, Incorporated in 199 -- 1999.  I

15  was also the original owner of SCIX, with a 75 percent

16  interest.  I was the only owner of Scientific Chemical.

17  That never changed as of this date.

18              Scientific Chemical never operated as a

19  business.  Scientific Chemical never sold the Steel

20  Seal Product.  SCIX started to sell to Steel Seal

21  Product in or about 2000.  The product was manufactured

22  from 1999 to the present by Colonial Chemical, product

23  meaning Steel Seal.

24              Clement Hipple personally provided the

25  formula to Com -- Colonial -- I mean to Colonial

Mr. Hipple - Direct                    23

1    Chemical.  Again, let me rephrase that.  Clement Hipple

2    personally provided the formula to Colonial Chemical.

3           The formula came from an inventor named

4    Robert Barks (ph), which it was sold to Scientific

5    Chemical, Incorporated.  Colonial Chemical had a

6    confiant (sic) -- confi -- confiden --

7           THE COURT:  Confidential?  Confidentiality?

8           THE WITNESS:  Confidentiality agreement with

9    Scientific Chemical.

10          (Pause in proceedings.)

11          THE WITNESS:  I am going to look at Exhibit

12   D-13, David 13.  Under Exhibit D-13 there are two

13   pages, a fax sheet and a confidentiality agreement.

14   Under the confidentiality agreement in the first

15   paragraph it states it's between "Colonial Chemical"

16   and "Scientific Chemical, Incorporated," and then there

17   are parentheses (SCIX).

18          The agreement is signed by me and I recognize

19   my signature, and it also signed by a gentleman, Steve

20   Cefari (ph), I believe, and the date of the signatures

21   are March 29th, 1999.

22          If you would turn to page one and read the

23   name of who the fax was sent to.  The fax was sent to

24   Scientific Chemical, Attention Clement Hipple, from

25   Steve Cefari, and there are some remarks at the bottom

Mr. Hipple - Direct                    24

1   of the page --

2            THE COURT:  What exhibit number are you on,

3   again?

4            MR. BERKOWITZ:  D-13, Your Honor.

5            THE COURT:  What is it?

6            THE WITNESS:  D-13.

7            THE COURT:  I thought you said that.  Okay.

8   Go ahead.

9            THE WITNESS:  No, D, D.

10           MR. BERKOWITZ:  D-13, the dark binder.

11           THE COURT:  D-13.  Yes, I'm looking at "P"

12   and I didn't see it.

13           MR. BERKOWITZ:  It's P-37 in plaintiff's, one

14   of those pages, but it doesn't have the fax cover.

15           (Pause in proceedings.)

16           THE COURT:  Okay.  Go ahead.  Go ahead, Mr.

17   Hipple.

18           THE WITNESS:  Okay.  There are some footnotes

19   under remarks.  "Clement:  The confidentiality

20   agreement" and blank word I cannot understand --

21           THE COURT:  Formula.

22           THE WITNESS:  "Formula we executed and

23   received," I can't read that word.

24           THE COURT:  Back.

25           THE WITNESS:  -- "back in March of 1999

Mr. Hipple - Direct                               25

1    following we have --

2              THE COURT:  One step.

3              THE WITNESS:  -- "one step to finish your

4    bottle.  It looks like we will finish by early next

5    week.  Let me know if this is a problem."  Okay.

6              (Pause in proceedings.)

7              THE WITNESS:  I have already identified that

8    that is my signature on the security agreement.

9              MR. BERKOWITZ:  I'm sorry, are we talking

10   about a different --

11             THE WITNESS:  I'm sorry.  Again, there was a

12   question here.  Okay.  D-13, the security -- the

13   confidentiality agreement, I'm sorry, has my signature

14   and I can identify that.

15             (Pause in proceedings.)

16             THE WITNESS:  And this is a true and accurate

17   copy of the confidentiality agreement between

18   Scientifical -- Scientific Chemical and Colonial

19   Chemical.

20             MR. BERKOWITZ:  Your Honor, the plaintiff

21   will stipulate to the authenticity.  It has been

22   already admitted as an exhibit.

23             THE COURT:  Okay.

24             THE WITNESS:  Reference to patents.  "It's my

25   understanding" -- how do I do that?  It's my --

1        THE COURT:  What's that?

2        THE WITNESS:  I mean the wording.

3        THE COURT:  I'm sorry, what?

4        THE WITNESS:  It's the wording.  I can't say

5    it's my understanding.  Of course I know.  I am

6    reference to the patents.

7        THE COURT:  Just say "To my knowledge this is

8    it."

9        THE WITNESS:  Okay.  My knowledge that Steel

10   Seal Product is manufactured according to a secret

11   former -- formula where three patents issued related to

12   Steel Seal Product.  I was not the invent -- the

13   inventor on those patents.  I was a co-inventor on the

14   last patent.  Who was the -- see, I got to do it the

15   other way.  The inventor was Roberts Barks, which

16   Roberts Barks was the inventor on all three patents.

17        Those patents were issued -- the first two

18   patents were issued in early 2000.  Exhibit D-20 is

19   Patent Number 6159276 dated December 12th, 2000,

20   inventor, Robert Barks, assignee, SCIX, LLC, filed

21   January 8th, 1999.

22        Exhibit 21, Patent Number 6324 --

23        MR. BERKOWITZ:  We will stipulate to the

24   admissibility of the patents.  We have no question

25   about that, if that is what we are doing, and I believe

1    the patents have already been admitted, Your Honor, in

2    the plaintiff's case.

3            THE COURT:  So, there is no need to read the

4    patents since they are already admitted into evidence.

5    Do you want to point something out, you know, or talk

6    about them, that's fine.

7            THE WITNESS:  All right.  Let me just point

8    out something on the third patent.

9            THE COURT:  Yes, sure, absolutely, go ahead.

10           THE WITNESS:  All right.  Tab 22 --

11           THE COURT:  Right.

12           THE WITNESS:  -- Patent Number 6647522 dated

13   November 18th, 2003, the heading is "Repairing and

14   engine cooling system."  The inventor is listed as

15   Clement R. Hipple of Newtown, PA and Robert Barks of

16   New Castle, Delaware.  Assignee is SCIX, LLC, filed

17   November 30th, 2001.

18           Now, this patent I had an idea of how to

19   illuminate the problem of back pressure with the

20   chemical called Steel Seal being used.  I came up with

21   the idea to remove the spark plug to eliminate the back

22   pressure, and that was my involvement with SCIX.

23           (Pause in proceedings.)

24           THE WITNESS:  Also the purpose of the patent

25   was to update the procedure of the repair.  I never

Mr. Hipple - Direct                    28

1    received any funds for the update of that patent from

2    SCIX.

3              In reference to the three patents, I believe

4    that one of the patents have been transferred to Teresa

5    Concepcione.  It is also my belief that the other two

6    patents had lapsed I believe back in 2006.

7              THE COURT:  Did you say one of the patents

8    were --

9              THE WITNESS:  Transferred.

10             THE COURT:  -- transferred?

11             THE WITNESS:  To Teresa.

12             THE COURT:  Which one?

13             THE WITNESS:  The last one.

14             THE COURT:  And how did that happen?  Like

15   what was -- how did that --

16             THE WITNESS:  I believe her attorney made a

17   request to --

18             THE COURT:  To Judge Baldi (ph)?

19             THE WITNESS:  I'm not sure how it happened,

20   yeah, but I think it did happen in the Doylestown --

21             THE COURT:  Okay.

22             THE WITNESS:  Or no, Judge Baldi?  That was

23   here.

24             THE COURT:  You're not sure how it happened,

25   but why do you -- why -- what's the basis for your

Mr. Hipple - Direct                              29

1   belief?

2           THE WITNESS:  I believe that Mr. Berkowitz

3   also said that it was transferred, and I know that they

4   were trying to transfer it into her name.

5           THE COURT:  Okay.  All right.

6           THE WITNESS:  And that would have been patent

7   number 6324757.

8           THE COURT:  What exhibit number is that?

9           THE WITNESS:  Oh, I'm sorry.  No, I'm wrong.

10          THE COURT:  No, 22 you admit.

11          THE WITNESS:  Yeah.

12          THE COURT:  Which is the 647622.

13          THE WITNESS:  That's the one of the

14   co-inventor.

15          THE COURT:  That's the one you're the

16   co-inventor.  Okay, that's D-22.  So you think that's

17   been already transferred to Ms. Hipple?

18          MR. BERKOWITZ:  Your Honor, in plaintiff's

19   case, I believe the exhibit where the lien against the

20   patent was recorded in the patent office has been

21   admitted already.  I believe that's what he's referring

22   to.

23          THE COURT:  Right.  Well, that's different

24   than being transferred though.

25          MR. BERKOWITZ:  I don't -- I can't testify,

1    but that's what happened.

2            THE COURT:  Okay.

3            MR. BERKOWITZ:  Just the language of it under

4    the patent office --

5            THE COURT:  Is that lien still valid and

6    current -- I mean current?

7            MR. BERKOWITZ:  Yes, it's still --

8            THE COURT:  Okay.

9            MR. BERKOWITZ:  -- current.

10           THE COURT:  All right.

11           (Pause in proceedings.)

12           THE WITNESS:  These patents have always

13   stayed in the name of SCIX, at least two of them.

14           (Pause in proceedings.)

15           THE WITNESS:  "What was your role in SCIX?"

16   My role in SCIX was that I owned, back in 1999, 75

17   percent of SCIX, and as -- well, let me back up.

18           And my role between 1999 and 2001 was to be

19   the financial backer and to check on Teresa Concepcion

20   and Brian Hipple, who were employees of mine, to see

21   how they were doing with the sales, website, and

22   selling of the product.

23           (Pause in proceedings.)

24           THE WITNESS:  I turned my ownership of SCIX

25   over to my son, Brian Hipple, on January 1, 2001.

Mr. Hipple - Direct                          31

1   Steel Seal was being sold on a web page -- on a web

2   page that was owned by Scientific Chemical,

3   Incorporated, starting around 2000.  The name of the

4   website was www.steelseal.com.  Again, the website was

5   owned by Scientific Chemical, Incorporated.  At no time

6   as of this date did SCIX ever own the website.

7             During 2000, through January 1, 2001, Steel

8   Seal was sold in three packages: a four cylinder, which

9   was a 16 ounce bottle; a six cylinder, which was a

10  16-ounce bottle and an eight-ounce bottle; and an eight

11  cylinder, which was two 16-ounce bottles.  The reason

12  for the three different sized bottles had to do with

13  the capacity of the coolant system.  The most popular

14  sized bottle was the six cylinder.

15            (Pause in proceedings.)

16            THE WITNESS:  Teresa Concepcion worked for

17  SCIX from 1999 through 2000.

18            (Pause in proceedings.)

19            THE WITNESS:  Brian owned 100 percent of

20  SCIX, but there seems to be a question if Scientific

21  Chemical, Incorporated, owned one percent, or Robert

22  Barks, and I'm not certain.

23            (Pause in proceedings.)

24            THE WITNESS:  There was really a lot more

25  questions.  I'm just going -- this has also been

Mr. Hipple - Direct                    32

1   established, but I'm going to establish it again.

2   D-48, David-48.

3           I recognize this document and I verify my

4   signature, dated January 1, 2001.

5           MR. BERKOWITZ:  We stipulate to the document.

6   It has already been admitted, Your Honor.

7           THE COURT:  Okay.

8           (Pause in proceedings.)

9           THE WITNESS:  I transferred SCIX to Brian

10  Hipple so that he could have his own business on

11  January 1, 2001.  At that point, I had no interest in

12  SCIX or did any business for SCIX.

13          THE COURT:  So let me -- let me interject

14  myself.  I'm interested in this.  So, as of January

15  2001, what did SCIX owe you, Clement Hipple, as far as

16  money?

17          THE WITNESS:  Nothing.

18          THE COURT:  What indebtedness did they have

19  to you?

20          THE WITNESS:  Nothing, Your Honor.

21          THE COURT:  Well, isn't there some

22  outstanding loans that you had made --

23          THE WITNESS:  Oh, yes, I'm sorry.

24          THE COURT:  -- for some related companies?

25          THE WITNESS:  That's right, yeah.

Mr. Hipple - Direct                    33

1       THE COURT:  Tell me about that, both you

2    individually and any other companies that you owned,

3    SCIX owed them money.  Tell me what the picture looked

4    like back then.

5       THE WITNESS:  The picture back then, Your

6    Honor, and I -- to the best of my knowledge is that my

7    personal loan to SCIX was still part of SCI's books.

8       THE COURT:  All right.  And what was that

9    about?

10       THE WITNESS:  That was a loan that I kept

11    putting money in and taking -- that's the loan that we

12    produced here as evidence --

13       THE COURT:  Right.

14       THE WITNESS:  -- of the 210,000.

15       THE COURT:  Okay.  All right.  Anything else?

16    Was there any other -- any other loans owed by SCIX to

17    any other company that you -- any other companies that

18    you know of that you controlled or were involved in?

19       THE WITNESS:  I'm not sure, Your Honor, at

20    this.  I'd have to look at the documentation.  But

21    I'm -- oh, yes, I can.  I can tell from here.

22       THE COURT:  Well, these management companies,

23    J --

24       THE WITNESS:  Well, that's what I'm going to

25    look at.

1    THE COURT:  Right.

2    THE WITNESS:  Yes, there was a -- there was a

3  loan made by JC Consulting Leasing Corporation in 1999

4  for 88,000, which would have been P-26.

5    MR. BERKOWITZ:  Your Honor, P-26, 27, 28, and

6  29, those have already been admitted.

7    THE COURT:  Thank you.  All right.

8    (Pause in proceedings.)

9    THE WITNESS:  Back to the document of the

10  transfer of the ownership to Brian Hipple of SCIX.   In

11  the document in mentions reference to me having a

12  membership interest with respect to voting rights.

13    I never had or was part of any members

14  meeting.  I never had any voting rights to my

15  knowledge.  In reference to this document, I believe

16  Ira Kratz (sic), present yesterday, stated that he

17  never knew of SCIX ever having any member meetings or

18  board meetings or me having any voting rights in SCIX,

19  that it was totally controlled and owned by Brian

20  Hipple.

21    It was not my intent when I signed this

22  document to have any voting rights or affiliate --

23  A-F-F-A-I-R-S of SCIX.  The only involvement I had in

24  SCIX after 2001, January, that I would go to Colonial

25  Chemical and pick up supplies and bring them to Brian

Mr. Hipple - Direct                    35

1    Hipple's house, and other than the other thing I

2    already stated in reference to the patent.

3              After January 1, I had no involvement in

4    hiring or firing of the employees of SCIX.  From 2001

5    through September 2010, I had no involvement in the

6    sale of Steel Seal product.

7              (Pause in proceedings.)

8              THE WITNESS:  During that period, 2001

9    through 2010, I never ordered any product from Colonial

10   Chemical.  Through the same period, I never had any

11   contact with Lou B-E-R-G-O-F-F at Colonial Chemical.

12   My first contact with Lou B-E-R-G-O-F-F was after

13   Brian's death, and that was after the lawsuit was

14   commenced by the plaintiff.

15             After I sold my interest to Brian Hipple in

16   2000 -- January 2001, I don't know whether or not Brian

17   ever had any board meetings.  I was never invited to

18   any meetings.  After January 1, 2001, I never voted or

19   made any decisions of the business of SCIX.  I never

20   was involved in any ownership interest of SCIX.  I

21   never served as an officer or a director of SCIX.

22   E-X-E-R-T -- E-X-E-R-T --

23             THE COURT:  E-X --

24             THE WITNESS:  Yeah, E-X-E-R-T.

25             THE COURT:  Exert?

Mr. Hipple - Direct                    36

1        THE WITNESS:  Exert?

2        THE COURT:  Exert.  Why don't you -- why

3    don't you read it and see what -- in the context?

4        THE WITNESS:  I did not exert any decision

5    making authority related to SCIX.  I never attempted to

6    exert any decision-making authority related to SCIX.  I

7    was never involved in any decision-making related to

8    SCIX and/or any of its assets or liabilities.

9        Okay.  We're going on to royalties.

10       (Pause in proceedings.)

11       THE WITNESS:  After January 2001, SCIX

12   continued to use steelseal.com website owned by

13   Scientific Chemical, Incorporated.  The reason that I

14   allowed SCIX to use the website after I no longer had

15   ownership, I had an agreement with Brian to pay ten

16   percent royalty fees on the gross sales.

17       If I wanted to and if he did not pay me the

18   royalty fees, I had the option to take away the

19   website, which was owned by me.  There was an agreement

20   between Brian and myself in reference to royalty fees,

21   but I could not find the document.

22       (Pause in proceedings.)

23       THE WITNESS:  The name, A&C Building and

24   Industrial Maintenance Company, was a janitorial

25   company that I owned or that I operated for 25 years

Mr. Hipple - Direct                 37

1   and that I still own as of this date.

2           A&C Building and Industrial Maintenance did

3   strictly nothing but government janitorial work, like

4   federal buildings, naval bases, Air Force bases, GSS --

5   GSS, yeah, buildings, every type of government building

6   out there.  No one else other than me personally owns

7   A&C Building but for me.

8           (Pause in proceedings.)

9           THE WITNESS:  Exhibit P, P, as in Peter, 113.

10  I recognize some of the documents.

11          THE COURT:  You mean these checks, right?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  All right.

14          THE WITNESS:  Documents are checks payable to

15  A&C Building and Industrial Maintenance, and I believe

16  there's a couple payable to Clement Hipple directly.

17  Yes, there is.

18          (Pause in proceedings.)

19          THE WITNESS:  The purpose of these checks

20  were paid to A&C and Clement Hipple in reference to the

21  royalty agreement.

22          (Pause in proceedings.)

23          THE WITNESS:  P-121.  These are checks made

24  out to the Harrison Law Firm in Arizona.

25          THE COURT:  I think you meant Harriman.

Mr. Hipple - Direct                              38

 1          THE WITNESS:  Harriman Law Firm --

 2          THE COURT:  Right.

 3          THE WITNESS:  -- in Arizona.  There are SCIX

 4   checks sent directly to that law firm.  And I note that

 5   these checks were sent to that law firm and the purpose

 6   of these checks were for me -- to pay for my divorce,

 7   and they were charged to my royalties.  Rather than pay

 8   the royalty directly to me and then me have to pay the

 9   law firm, I found it to be easier just to send the

10   checks to the law firm.

11          Okay.  We're going to go into loans next.

12   Throughout the years, I had made loans to SCIX starting

13   in 1999.  I had made personal loans and loans from JC

14   Consulting and Leasing Corporation.  At that time, 1999

15   through 2001, I had a membership interest in SCIX and I

16   was also doing some work for SCIX.

17          (Pause in proceedings.)

18          THE WITNESS:  And the purpose of the loans

19   were for working capital, inventory, pay employees,

20   operate the business, marketing, and we put out 80,000

21   videos to automotive and used car dealers throughout

22   the United States.  I did receive some payments from

23   SCIX on my personal loan only.  As of this date, I

24   never received a payment for any of the loans made to

25   JC Consulting and Leasing Corporation.

1          (Pause in proceedings.)

2          THE WITNESS:  The interest payments were made

3      on the principal amount of my personal loan.  I -- in

4      reference to the testimony of the accountant, Ira, he

5      kept a schedule for the loans that I made to SCIX and

6      also for Teresa Concepcion loans.

7          (Pause in proceedings.)

8          THE WITNESS:  It was my understanding that

9      Brian Hipple and his accountant, Ira, kept track of the

10     books and the records of the loans.  I knew who was the

11     accountant for SCIX, Ira Krassan.

12          From January 1, 2001, through September 2010,

13     I had access to the loan document through Ira Krassan

14     with the approval of Brian Hipple.  I did not need to

15     get permission from Brian Hipple because he had already

16     given it to the accountant.  I spoke with Ira Krassan

17     in reference to the interest that was accrued each year

18     or which was paid each year to me for the purpose of my

19     income tax.

20          (Pause in proceedings.)

21          THE WITNESS:  Okay.  We're going into the

22     garnishment.  I believe I first had knowledge of the

23     garnishment around October 4th, 2010.  Prior to that, I

24     did know that Teresa had loans with SCIX.

25          (Pause in proceedings.)

Mr. Hipple - Direct                    40

1       THE WITNESS:  I did not know that Teresa

2  entered a judgment against SCIX.  At the time she

3  entered a judgment, I was her husband.  I believe I

4  learned of the garnishment by Brian giving me a call or

5  I had just called him, which I did occasionally,

6  weekly.

7       He explained to me that Teresa had garnished

8  the wages and taken all of the money out of the bank

9  account.  After I had discovered that I called my

10 attorney, Kevin Fogerty, to get his advice.  Kevin

11 Fogerty is a lawyer that I have been using for 15 years

12 or more.  I contacted Kevin Fogerty I believe on

13 October 4th or 5th.

14      I contacted Mr. Fogerty to find out what my

15 option was because I was also personally owed money by

16 SCIX, and my corporation, JC Consulting, also had loans

17 with SCIX.

18      (Pause in proceedings.)

19      THE WITNESS:  One of the questions Mr.

20 Fogerty asked me was did Teresa send the sheriff to

21 Brian's house to levy on --

22      THE COURT:  The assets?

23      THE WITNESS:  Yeah.  What kind of assets are

24 there though?  I forget.

25      THE COURT:  Tangible?  Intangible?

Mr. Hipple - Direct                    41

1    THE WITNESS:  No, no.

2    THE COURT:  Okay.

3    THE WITNESS:  The boxes and the chemicals.

4    THE COURT:  Oh, okay.

5    THE WITNESS:  The assets.

6    THE COURT:  The assets --

7    THE WITNESS:  Right.

8    THE COURT:  -- of SCIX?

9    THE WITNESS:  The assets of SCIX.  And I

10   explained to him no, as far as I knew, she had not

11   levied or sent the sheriff to take all the assets of

12   SCIX.

13   There was never any point in time that Brian

14   and myself had decided to hide the assets from Teresa

15   Concepcion so that she could not execute on them.

16   Teresa Concepcion had plenty of time to execute on the

17   assets prior to my execution on the assets.  I then

18   asked Mr. Fogerty to start the process for me to levy

19   on the assets for the personal loan I had with SCIX.  I

20   then flew into the United States.

21   (Pause in proceedings.)

22   THE WITNESS:  I'm going to take my time

23   (inaudible), Your Honor.

24   THE COURT:  All right.  Let's take a

25   ten minute-break.  All right.

Mr. Hipple - Direct                          42

1        THE WITNESS:  All right.

2        THE COURT:  I'll see you in ten minutes.

3        (Recess, 10:39 a.m. to 10:53 a.m.)

4        THE COURT:  Please be seated.  Thanks.  You

5   may proceed.  Go ahead.

6        THE WITNESS:  Okay.  We're going to go

7   through Exhibit D-1 in the black book.

8        MR. BERKOWITZ:  I'm sorry, the --

9        THE WITNESS:  David 1.

10        MR. BERKOWITZ:  Okay, thank you.

11        (Pause in proceedings.)

12        MR. BERKOWITZ:  Your Honor, we'll

13   authenticate, it's already been admitted.

14        THE COURT:  Okay.  Thank you.

15        THE WITNESS:  Yeah, that's good.  But there's

16   one question I need to explain in this document, okay?

17   So it's already authenticated, everything on it.

18        THE COURT:  Right.

19        THE WITNESS:  All right.  Under the second

20   paragraph where it states, "Creditor waives all

21   previous accrued interest in connection with monies

22   loaned by creditor to debtor."  What happened, this

23   document was written as if I just lent the $210,000 to

24   SCIX.  That's why that paragraph says what it was or

25   what it -- or what it says.

Mr. Hipple - Direct                              43

1        THE COURT:  What par -- point out the

2   paragraph is it again?

3        THE WITNESS:  Okay.  It's the second

4   paragraph at the bottom of the parentheses.  It says,

5   "Creditor waivers all previous accrued interest in

6   connection with monies loaned by creditor to debtor."

7        THE COURT:  Right.  I'm at the judgment owed.

8   What page?

9        THE WITNESS:  It's on the first page.

10       THE COURT:  First page, okay.

11       THE WITNESS:  Judgment owed, the second

12   paragraph down.

13       THE COURT:  Wait a minute.  This is D-1?

14       THE WITNESS:  At the bottom --

15       THE COURT:  This is D-1?

16       THE WITNESS:  What?

17       THE COURT:  D-1?

18       THE WITNESS:  Yeah, the second -- yeah.  And

19   at the bottom of the second paragraph after the word

20   "note," and it's in parentheses.

21       THE COURT:  Oh, okay.  Go ahead.  Yeah, I got

22   you.

23       THE WITNESS:  It says, "Creditor waives all

24   previous accrued interest in conjunction with monies

25   loaned by creditor to debtor."

Mr. Hipple - Direct                    44

1        THE COURT:  Okay.

2        THE WITNESS:  And Mr. Berkowitz the other day

3   assumed well, I don't -- we -- if we take that

4   approach, then I'm not owed -- I'm not owed anything.

5   But I'm -- my explanation for this document and the

6   wording in this document, which was drafted by Kevin

7   Fogerty, is that the 210 was treated as a one lump sum

8   loan, okay, not the amortization schedule of the loan.

9   Does that make sense or not?

10       THE COURT:  I'm not sure.  Why don't you

11   explain that fully?

12       THE WITNESS:  Okay.  When he -- when he

13   drafted up the loan --

14       THE COURT:  Right.

15       THE WITNESS:  -- the loan document, I called

16   him and he said well, what are you owed?  I said I'm

17   owed $210,000.  He was under the assumption, okay, that

18   I just lent them $210,000.

19       THE COURT:  Right.

20       THE WITNESS:  Okay.  He didn't realize the

21   loan went all the way back to 1999.  So, therefore, he

22   drafted the document as if it was just a loan.

23       THE COURT:  Right.  He didn't reflect all the

24   accrued --

25       THE WITNESS:  Right.

Mr. Hipple - Direct                                    45

1    THE COURT:  Any interest.

2    THE WITNESS:  He would have never put that

3    paragraph definitely in there.  That paragraph would

4    have never went in there if he had known that that that

5    was in place.

6    THE COURT:  Okay.

7    THE WITNESS:  And actually common -- and even

8    from a common sense standpoint, okay, I'm somewhere --

9    I don't read every document that I see, okay, and if I

10   did read it, I would not have understand it anyway,

11   okay?  So, I had Brian sign it and we all agree that

12   that's all been done.

13   So, the point I'm just trying to bring out,

14   this document was treated as if it was a loan as of

15   that date given for $210,000.

16   THE COURT:  All right.  I understand your

17   point.

18   (Pause in proceedings.)

19   THE WITNESS:  There's a lot of questions, but

20   I'm skipping through a lot of them.  D-2, which has

21   already been in evidence, okay, and everything's been

22   agreed on that, is that correct?  We're all in

23   agreement?

24   MR. BERKOWITZ:  Your Honor, that's already

25   been admitted as one of plaintiff's exhibits.

Mr. Hipple - Direct                    46

1           THE COURT:  Right.

2           THE WITNESS:  And we're agreed that the

3    document -- to the document?

4           THE COURT:  Well, he's --

5           MR. BERKOWITZ:  Yes, it's already been

6    admitted.

7           THE COURT:  -- agreeing it's authentic and

8    it's --

9           THE WITNESS:  Okay.

10          THE COURT:  -- the actual document.

11          THE WITNESS:  And also, that it was prepared

12   by Kevin Fogerty?  Let me see.

13          THE COURT:  And you won't agree to that, Mr.

14   Berkowitz, that this was prepared by the lawyer, Kevin

15   Fogerty?

16          MR. BERKOWITZ:  I will agree that Mr. Hipple

17   just said that.

18          THE COURT:  Okay.

19          MR. BERKOWITZ:  I have no personal knowledge

20   that it was, but I hear the testimony.

21          THE COURT:  Okay.

22          (Pause in proceedings.)

23          THE WITNESS:  And I believe that this

24   document was produced to tie up the physical assets of

25   SCIX, or the assets of SCIX, for collateral to my loan

Mr. Hipple - Direct                    47

1   of SCIX in the amount of $210,000.  Okay.

2          (Pause in proceedings.)

3          THE WITNESS:  Okay.  D-3, the CC -- or the

4   UCC financial statement that already have been

5   introduced.

6          MR. BERKOWITZ:  That has been admitted, Your

7   Honor.

8          THE COURT:  Yes.

9          THE WITNESS:  It -- and it's -- and it's been

10  prepared by Kevin Fogerty on my behalf.  And the

11  purpose of it is to complete the process for the lien

12  on SCIX assets.  4 --

13         (Pause in proceedings.)

14         THE WITNESS:  -- is a letter from me, which

15  Brian signed, as a demand for the money.

16         MR. BERKOWITZ:  Already admitted, Your Honor.

17  We have that.

18         THE COURT:  What number is that again?

19         THE WITNESS:  4, Your Honor.

20         THE COURT:  All right.

21         THE WITNESS:  D-4.

22         THE COURT:  Right.

23         MR. BERKOWITZ:  It was also P-11 from

24  plaintiff's exhibits I believe -- or I'm sorry --

25         THE WITNESS:  Yeah, it is.  It's been --

Mr. Hipple - Direct                    48

1        MR. BERKOWITZ:  It's one of the numbers.  I

2   think P-13 maybe.  No, it's actually -- D-4 is P-12.

3        THE WITNESS:  Again, D-5 is the letter

4   drafted by Mr. Fogerty who actually drafted the

5   language.  And in this letter there seems to be a

6   question about why it is on Mr. Fogerty's letterhead

7   and not mine.  And the only answer I can give to that,

8   Your Honor, is that he probably -- when he e-mailed me

9   this letter he probably put a note that, you know, copy

10   and paste it onto my letterhead, and I missed it or

11   ignored it.  Okay.

12        (Pause in proceedings.)

13        THE WITNESS:  Oh, the other question is Brian

14   did sign this letter in the presence of me for

15   D-5.  Okay, we seem to be going into "foreclosing of

16   collateral inventory."

17        (Pause in proceedings.)

18        THE WITNESS:  In reference to those

19   documents, I had no intention of stopping Brian Hipple

20   or SCI restriction or preventing Brian Hipple or SCI

21   from continuing to sell or market Steel Seal product or

22   starting company or a website of his own to sell the

23   Steel Seal product.  The answer to that question is no,

24   I did not.

25        (Pause in proceedings.)

1          THE WITNESS:  When I took the assets of SCIX

2     it was my intention to sell the assets for the most

3     money I could get for them to make myself whole.  I did

4     accept the collateral that was transferred to me in

5     satisfaction of the debt owed by SCIX to me.  These are

6     questions to me, so they're a little different.

7          (Pause in proceedings.)

8          THE WITNESS:  I think I'm going to have to

9     start asking the questions and then answering them,

10    okay?

11         THE COURT:  That's fine.

12         THE WITNESS:  Okay.  "Was it ever your

13    intention to prevent" -- "to prevent or hide Teresa's

14    ability to execute on her judgment?"  The answer, "No.

15    I did not think about Teresa."

16         (Pause in proceedings.)

17         THE WITNESS:  She had every right to look out

18    for herself by garnishing the bank account and had had

19    the option to levy on the assets through the sheriff's

20    department, and I believe that I had every right to

21    protect myself.  It wasn't about hurting her.  It was

22    about protecting my financial position.

23         "Let's talk about the assets that you

24    foreclosed on.  Did you ever prepare an inventory on

25    the physical assets of SCIX?"  The answer to that is

Mr. Hipple - Direct                    50

1    "Yes, but during all the confusion, there seems to be

2    three different versions of the assets out there."

3              (Pause in proceedings.)

4              THE WITNESS:  Exhibit D-6

5              MR. BERKOWITZ:  Your Honor, D-6 is Plaintiff

6    130.  It's already been admitted.

7              THE COURT:  Okay.

8              THE WITNESS:  Okay.  I guess the question

9    is -- the question -- the question is did I prepare

10   this, and the answer is yes.

11             MR. BERKOWITZ:  I'm sorry?

12             THE WITNESS:  The question is did I prepare

13   this, and the answer is yes.  "Does this document

14   represent all of the physical assets of SCIX that you

15   foreclosed on?"  I'm not certain.

16             (Pause in proceedings.)

17             THE WITNESS:  "With respect to the patents

18   that were in SCIX's name at that time, what was your

19   understanding as to your interest, if any, in those

20   patents as of October 13th, 2010?"  I had a lien and I

21   believe I had the right to have them put into my name,

22   but I never exercised that right.

23             THE COURT:  What was that last -- what was

24   the last statement you made?  You believe -- about the

25   patent.  Go ahead.  Tell me that -- read that again.

1           THE WITNESS:  "With respect to the patents

2    that were in SCIX's name at the time, what was your

3    understanding as to your interest, if any, in those

4    patents as of October 13th, 2010?"  Basically, he's

5    asking me what was my -- and I had a lien and I believe

6    I had the right to have them put into my name, but I

7    never levied on them.

8           "Did you believe you owned them?  I believe I

9    was the only one who could have them reassigned into my

10   name, yes.

11          "Did you ever take them?"  No, because I

12   learned that two of the patents were expired.

13          (Pause in proceedings.)

14          THE WITNESS:  But on the UCC 1, all of the

15   three patents were listed, even though two of them had

16   lapsed.  I never had any interest to take over the

17   business of SCIX.  I never had any interest to obtain

18   any ownership interest in SCIX.

19          (Pause in proceedings.)

20          THE WITNESS:  Brian Hipple of SCIX never

21   executed any documents by which he assigned any or all

22   of his membership interest in SCIX to me.  I don't know

23   what happened to SCIX after the assets were taken.

24          (Pause in proceedings.)

25          THE WITNESS:  "Was SCIX dissolved?"  I have

1  no idea.

2           "Did Brian ever use SCIX as a business

3  venture?"  I have no idea.

4           Now we're heading into Steel Seal, LLC.

5           (Pause in proceedings.)

6           THE WITNESS:  I am the sole member of Steel

7  Seal, LLC.  I believe that was incorporated around 2003

8  or '4.  Steel Seal, LLC, never operated any business,

9  but it did open up a bank account for one day.  Steel

10  Seal, LLC, did not receive any assets or proceeds of

11  assets that had previously belonged to SCIX.

12           (Pause in proceedings.)

13           THE WITNESS:  Steel Seal, LLC, never

14  transferred any assets or prop --

15           THE COURT:  Property?

16           THE WITNESS:  P-R-O-C-E-E-D-S?

17           THE COURT:  Process?

18           THE WITNESS:  -- process of any assets --

19           MR. BERKOWITZ:  Proceeds.

20           THE COURT:  Proceeds.

21           THE WITNESS:  -- proceeds of any assets that

22  previously belonged to SCIX to any other entity or

23  individual.  Okay.  Sale of assets and license

24  agreement with Steel Seal Pro.

25           (Pause in proceedings.)

Mr. Hipple - Direct                    53

1      THE WITNESS:  "Prior to Brian Hipple selling
2  his car, did you do any research to get the current
3  value?"  Yes, I went to a couple car sites, but I don't
4  remember the name, and they seem to be around the price
5  -- a little higher than the price for what he got for
6  it.  He had received $8,000, and I sold them for
7  $9,000, $8,700, somewhere within the area, but like
8  $1,000 higher than what he actually got.
9           (Pause in proceedings.)
10      THE WITNESS:  In reference to the other
11  inventory, caps, bottles, and other inventory, I
12  transferred that into Complete Group for a 50 percent
13  interest in the company.  Complete Group was formed
14  October 18th, 2010.
15           "Who owned Complete Group?"  I owned 50
16  percent of Complete Group, and Emily Domices owned the
17  other 50.
18      THE COURT:  What did you transfer to Complete
19  Group or what did --
20      THE WITNESS:  Emily Domices.
21      THE COURT:  What did Steel Seal transfer to
22  Complete Group?
23      THE WITNESS:  Not Steel Seal.  I did, my --
24      THE COURT:  All right.  And --
25      THE WITNESS:  Clement Hipple transferred

Mr. Hipple - Direct                    54

1   the -- I owned the assets.

2          THE COURT:  Right.

3          THE WITNESS:  So --

4          THE COURT:  Okay.  What did you transfer?

5          THE WITNESS:  The chemicals, the bottles, the

6   caps, the boxes, everything but the car.

7          THE COURT:  Okay.  And what's the status at

8   that point of the secret formula?  Where did --

9          THE WITNESS:  I still --

10         THE COURT:  Who owned that?

11         THE WITNESS:  I still owned that under SCIX

12  under --

13         THE COURT:  But --

14         THE WITNESS:  -- Scientific Chemical,

15  Incorporated.

16         THE COURT:  But you didn't transfer that to

17  Complete Group?  What did you have a royalty agreement

18  or some kind of arrangement?

19         THE WITNESS:  No.  What happened eventually,

20  and it's part of the process, okay, which I'm not

21  familiar with, where the people that control the

22  website and all, when a new company comes on they

23  automatically -- I think they automatically transfer

24  the website over to the new corp -- the corporation.

25         THE COURT:  Right.

1      THE WITNESS:  But the chemical formula I

2  believe stayed under Scientific Chemical, Incorporated

3  at Colonial Chemical.

4      THE COURT:  Okay.

5      THE WITNESS:  But there was a letter that I

6  had sent back in December which told them to transfer

7  the --

8      THE COURT:  Confidentiality agreement?

9      THE WITNESS:  -- confidentiality agreement.

10  And then I spoke with them the other day, and the

11  letter --

12      MR. BERKOWITZ:  Objection, it's hearsay if he

13  spoke --

14      THE WITNESS:  Okay.

15      THE COURT:  Right.

16      MR. BERKOWITZ:  -- to them the other day.

17      THE COURT:  All right, I'll sustain the

18  objection.  So what was the arrangement?  Complete

19  Group, what arrangement did they have with -- who did

20  they have the arrangement with to use the secret

21  formula?

22      THE WITNESS:  With me.

23      THE COURT:  With you?

24      THE WITNESS:  Right.

25      THE COURT:  You as an individual, right?

1    THE WITNESS:  Yes, well, me as the individual

2 owner of --

3    THE COURT:  Right.

4    THE WITNESS:  -- Scientific Chemical.

5    THE COURT:  And was there some kind of

6 royalty or licensing agreement of any kind?  Was

7 anything formalized between you and Complete Group on

8 legal paper, on some type of document?

9    THE WITNESS:  I don't believe so.

10    THE COURT:  Okay.

11    THE WITNESS:  I don't believe so.  Okay.

12    THE COURT:  So what was the arrangement?

13 What is it an oral arrangement or just -- was there any

14 arrangement or you just allowed them to use it?

15    THE WITNESS:  No, I allowed to use them -- I

16 allowed them to use it because I was receiving the

17 proceeds from the sale into Complete --

18    THE COURT:  Because you were a 50 percent

19 owner?

20    THE WITNESS:  Yes, into --

21    THE COURT:  All right.

22    THE WITNESS:  -- Complete Group.

23    THE COURT:  Okay.

24    THE WITNESS:  So the basis was that they

25 could use the chemical formula because they were paying

Mr. Hipple - Direct                                    57

1   me --

2          THE COURT:  Right.  Okay.

3          THE WITNESS:  -- for the sales of the

4   chemical that I was allowing them to use.

5          THE COURT:  Okay.  Go ahead, continue.  I

6   didn't mean to break your thought.

7          THE WITNESS:  No, that's all right.  That's

8   fine because it straightens out (indiscernible).

9          (Pause in proceedings.)

10          THE WITNESS:  In reference to the inventory

11   that I took, the bottles, the caps, the chemical, as

12   far as the Steel Seal products were concerned, for what

13   I received I could have reproduced the same amount of

14   bottles, caps, and chemical for approximately $12,000

15   on my own.

16          So, basically, what I took I could have went

17   to Colonial Chemical because I owned the chemical

18   formula, okay.  At one point in time, I knew where

19   everything was being bought and purchased, and I could

20   have just purchased everything for approximately

21   $12,000.  And that was what that would have cost to

22   reproduce.  And that calculation is based on the

23   knowledge that I had when I owned SCIX and was

24   purchasing the chemical from Colonial Chemical.

25          (Pause in proceedings.)

Mr. Hipple - Direct                    58

1    THE WITNESS:  Again, this is repetitive, but

2    my intentions of the SCI chemical and inventory was to

3    sell it for the highest price that I could get for it.

4                (Pause in proceedings.)

5          THE WITNESS:  "How did Complete Group plan to

6    sell SCIX inventory?"  Because I lived in South

7    America, I needed someone local to Colonial Chemical to

8    assist with the marketing, selling, and packing of the

9    product on behalf of Complete Group, and also to

10   collect proceeds from the sale of the product, and I

11   considered that Brian Hipple would be the best person

12   to do that job.

13          I did not live in the United States,

14   therefore, I felt comfortable with my son, Brian

15   Hipple, performing that function for me.  So, I decided

16   to enter into a license agreement with Steel Seal Pro

17   allowing Steel Seal Pro to sell the inventory and keep

18   a piece of the profit for its efforts and return the

19   bulk back to Complete Group.

20          All right, we're going into Steel Seal Pro

21   now, as far as no involvement in company by Clement.

22   Steel Seal Pro was a company that was formed by Brian.

23   I had no involvement in the forming of that business.

24   I never held any ownership interest in Steel Seal Pro.

25   I had no control over or decision-making power over

Mr. Hipple - Direct                    59

1   Steel Seal Pro.

2          I did not get involved in the day-to-day

3   operation of Steel Seal Pro.  I did not get involved in

4   the hiring or firing of Steel Seal Pro employees.  I

5   did not get involved in the marketing of the product by

6   Steel Seal Pro.  Exhibit D-9 has already been put in

7   the record I believe?

8          MR. BERKOWITZ:  Yes, that's the licensing

9   agreement.  It's Plaintiff's Exhibit P-14.

10          THE WITNESS:  And it's under D-9 under --

11          MR. BERKOWITZ:  Yep, D-9 is the Steel Seal

12   Pro, Complete Group licensing agreement.

13          THE WITNESS:  The question is do I recognize

14   the signature.  Yes, it seems to be Brian's signature.

15          (Pause in proceedings.)

16          THE WITNESS:  I believe this license

17   agreement was prepared by Kevin Fogerty with some

18   blanks.  The second paragraph under "background"

19   describes an Exhibit A, but there is no Exhibit A

20   attached to the document.

21          (Pause in proceedings.)

22          THE WITNESS:  "What was Complete Group's

23   intention with the license agreement?"  To have Steel

24   Seal Pro market and sell the inventory and would get

25   paid something for its work.

Mr. Hipple - Direct                    60

1      The compensation under the license agreement

2   to Steel Seal Pro was 10,000 per month.  At the time of

3   the license agreement with Steel Seal Pro, Complete

4   Group did not have a bank account.  Complete Group

5   didn't have a bank account until October 2012.

6          (Pause in proceedings.)

7          THE WITNESS:  Oh, I see.  That's two years

8   later.  Steel Seal Pro did not make any payments to

9   Complete Group between October 2010 and October 2012.

10         MR. BERKOWITZ:  I'm sorry, that was -- '10 --

11         THE WITNESS:  October --

12         MR. BERKOWITZ:  -- until October 2000 --

13         THE WITNESS:  October 2010 to October 2012

14   when they finally got the bank account with Complete

15   Group, two years later.  Steel Seal Pro made the

16   payments to A&C Building and Industrial Maintenance, a

17   company that I owned for approximately 30, 35 years.

18   No, more than that, maybe 40.  And that was acceptable

19   to Steel Seal Pro to make payments to A&C Industrial

20   Maintenance -- Building and Industrial Maintenance

21   until Complete Group was able to open a bank account.

22         It was the intention for Steel Seal Pro to

23   sell the inventory via www.steelseal --

24         MR. BERKOWITZ:  Your Honor, I'm going to

25   object.  Mr. Hipple just stated it was the intention of

Mr. Hipple - Direct                    61

1  Steel Seal Pro.  I --

2          THE WITNESS:  Yeah, I can't speak for them.

3          MR. BERKOWITZ:  Stop for a second.  But, he

4  can't speak to the intention of Steel Seal Pro.

5          THE WITNESS:  Right.

6          MR. BERKOWITZ:  He's told us he had nothing

7  to do with the business.

8          THE WITNESS:  Right.

9          THE COURT:  Right.

10         MR. BERKOWITZ:  I don't think it would be

11 proper for him --

12         THE COURT:  I'll sustain the objection.

13         THE WITNESS:  All right.  Steel Seal Pro sold

14 the inventory --

15         MR. BERKOWITZ:  Objection.

16         THE WITNESS:  No?

17         MR. BERKOWITZ:  Same objection, Your Honor.

18 He can't tell us how Steel Seal Pro sold --

19         THE COURT:  Well --

20         MR. BERKOWITZ:  -- the inventory if he

21 doesn't know anything about what it did, as he

22 testified.

23         THE COURT:  Well --

24         THE WITNESS:  Well, I have the knowledge with

25 the license agreement.

Mr. Hipple - Direct                    62

1    THE COURT:  Yes, all right.  You -- I'll

2  overrule the objection.  Just tell us how you know that

3  though.

4    THE WITNESS:  Well, because --

5    THE COURT:  You can answer.

6    THE WITNESS:  -- I had a license agreement

7  with them.

8    THE COURT:  Okay, go ahead.  What did they

9  do?

10    THE WITNESS:  They sold the inventory on the

11  website, www.steelseal.com, which was owned by

12  Scientific Chemical or me, I'm not certain.

13    (Pause in proceedings.)

14    THE WITNESS:  Steel Seal Pro never paid any

15  royalties to Complete Group.

16    (Pause in proceedings.)

17    THE WITNESS:  Okay.  The next heading is

18  "Steel Seal website packing, pricing, and product."

19  Wait, I keep going over the same thing.

20    (Pause in proceedings.)

21    THE WITNESS:  We covered this.

22    (Pause in proceedings.)

23    THE WITNESS:  David 52.

24    (Pause in proceedings.)

25    THE WITNESS:  I'm going to walk through each

Mr. Hipple - Direct                              63

1    item.  It's all right.  Take your time.

2              MR. BERKOWITZ:  D-52.  Okay, thank you.

3              THE WITNESS:  This is --

4              MR. BERKOWITZ:  Your Honor, this has already

5    been admitted as I think D-52.

6              THE COURT:  Okay.

7              MR. BERKOWITZ:  We've used this previously.

8              THE WITNESS:  On my side.

9              THE COURT:  All right.

10             THE WITNESS:  Okay.

11             THE COURT:  Okay, go ahead.

12             THE WITNESS:  All right.  Which I explained

13   earlier, the Infiniti sold for $8,000, and I could not

14   sell it.  Brian had to sell it because it was in his

15   name, but then he gave me the money.  Office stuff,

16   cabinets, phones and all.

17             Let's go down to the -- where it starts with

18   the inserts, 16-ounce inserts.  They were priced at 84

19   cents.  16-ounce bottles, 35 cents, caps, four cents,

20   front labels, four cents, back labels, four cents,

21   eight-ounce bottles, 20 cents, eight-ounce caps, four

22   cents, eight-ounce boxes, 28 cents, taping machines,

23   $50 each, bubble wrap, ten dollars a case, eight-ounce

24   bottles of chemical USA --

25             MR. BERKOWITZ:  Your Honor, I'm going to

1    object to testimony by Mr. Hipple.  He testified, first

2    of all, that all of this inventory was sold by Steel

3    Seal Pro and that he didn't have anything to do with

4    the operation on the business, and for Mr. Hipple to

5    tell us that a number of bottles were sold at a certain

6    price by Steel Seal Pro, there's no foundation for

7    that.

8              THE COURT:  Well, weren't they purchased by

9    Complete Group?

10             THE WITNESS:  Pardon me?

11             THE COURT:  Who purchased them?

12             THE WITNESS:  No, this was the inventory that

13   I took.

14             THE COURT:  Right.

15             THE WITNESS:  This is the actual physical

16   inventory that I took, therefore, I knew what was

17   there.

18             THE COURT:  Right.  But who sold them?

19             THE WITNESS:  Okay.  I collected them, okay?

20             THE COURT:  Right.

21             THE WITNESS:  I knew what inventory I took.

22             THE COURT:  Correct.

23             THE WITNESS:  And then I had them sold.

24   Steel Seal Pro sold them.  I'm not talking about the

25   price they were sold for.  I'm talking about -- well,

Mr. Hipple - Direct                               65

1   yes, I am.  I'm talking about -- but I physically know

2   what inventory was there.  I personally, physically

3   know.

4              THE COURT:  Steel Seal Pro sold them to whom?

5              THE WITNESS:  They sold to the UK and on the

6   website.

7              MR. BERKOWITZ:  Your Honor, and I have to

8   object to him telling us --

9              THE WITNESS:  Well --

10             MR. BERKOWITZ:  -- where they were sold.  If

11  they were sold by Steel Seal Pro, he certainly may know

12  what was delivered, but I don't think he can tell us

13  what they were sold -- how -- where they were sold and

14  what they were sold for.

15             THE COURT:  All right.  How do you know that?

16  How do you know that?

17             THE WITNESS:  Well, because they were labeled

18  "UK," Your Honor.  They had "UK" labels on them, which

19  they showed us an exhibit earlier in reference to the

20  name of Scientific Chemical being on the UK label.

21  That was allowed.

22             So, again, I'm telling you personally I knew

23  about the containers, the boxes that had -- Colonial

24  Chemical had two separate areas, one for Steel Seal USA

25  and --

Mr. Hipple - Direct                          66

1    THE COURT:  I understand that.

2    THE WITNESS:  -- one for Steel Seal UK.

3    THE COURT:  Two different prices?

4    THE WITNESS:  Right.

5    THE COURT:  One was 12 -- one was $12, the

6  UK.

7    THE WITNESS:  Yeah, exactly.

8    THE COURT:  All right, so --

9    THE WITNESS:  We're not --

10    THE COURT:  But Seal Pro -- Steel Seal Pro

11  was operated by your son, Brian?

12    THE WITNESS:  That is correct, yes.

13    THE COURT:  So Brian was the one who

14  actually, through Steel Seal Pro, sold these?

15    THE WITNESS:  Right.

16    THE COURT:  So Mr. Berkowitz's objection is

17  that how -- and you I think testified you had nothing

18  to do with Steel Seal Pro.

19    THE WITNESS:  No, I had nothing to do with

20  the day-to-day operations.

21    THE COURT:  So then how would you know what

22  Seal -- Steel Seal Pro and/or Brian Hipple sold -- what

23  amount --

24    THE WITNESS:  Well, that was the price --

25    THE COURT:  -- of money they received.

Mr. Hipple - Direct                    67

1      THE WITNESS:  -- that was put on them by

2  Brian Hipple.  Those were the prices that we discussed.

3      THE COURT:  So you're not -- what you did was

4  you -- in other words, you're not certain what he sold

5  them for, but what you did is you just multiplied the

6  number of cases times the price and this is how you

7  came up with this?

8      THE WITNESS:  Yes, I knew how many -- how

9  many bottles of UK were there, how many eight-ounce

10  bottles were there, and how many 16-ounce bottles were

11  there.

12      After the license agreement with Steel Seal

13  Pro, Brian and I went over this, okay, we knew what we

14  had as far as UK labels.

15      MR. BERKOWITZ:  Objection, Your Honor.  He's

16  now talking about his communications with Brian.  It's

17  hearsay and --

18      THE COURT:  All right, I'm going to overrule

19  the objection.  I'll allow you to testify to it.  Go

20  ahead.

21      THE WITNESS:  Okay.

22      THE COURT:  As long as you give us an

23  explanation of how you came up with these numbers.

24      THE WITNESS:  Okay.  Basically, I came up

25  with these numbers because I knew what inventory I

Mr. Hipple - Direct                              68

1    took.  I knew what the sale price was for the -- for

2    the product, okay.  All right.

3              The only thing I don't know, okay, and he's

4    right with that, is I'm not sure that Brian kept to the

5    pricing that is listed here.

6              THE COURT:  Okay.

7              THE WITNESS:  I have to admit that that is

8    correct, all right?

9              THE COURT:  So this is an estimation based on

10   the --

11             THE WITNESS:  Well, it's an estimation, but

12   I'm sure the UK prices didn't change and the website

13   price didn't change.

14             THE COURT:  All right.  Okay.

15             THE WITNESS:  Okay?

16             (Pause in proceedings.)

17             THE WITNESS:  And I'd also like to say that

18   my note was well over the grand total of what was

19   written here.  And also, I don't have the figures, but

20   if you take into consideration this was the price that

21   was received, there is an expense in order to do this,

22   to sell this product, okay, which would be a general

23   administration expense, okay?  And that has never been

24   taken into consideration of what was the cost for the

25   advertisement, what whys the cost for the running of

Mr. Hipple - Direct                    69

1    the website, what was the cost for the shipping of the

2    product.  And none of those numbers are reflected

3    anywhere in the amount that I received or the inventory

4    that I took.

5            So I had an investment of 210,000.  It

6    brought gross sales in of 102 -- 122,000, less whatever

7    expenses were incurred, which I don't know.  But I know

8    it didn't generate 122,000.  I'm sure -- I'm sure of

9    that.

10           I don't know a number, but, again, like I

11   said earlier, you had the cost of shipping, you had the

12   cost of packing, you had the cost of advertising on

13   Google and Yahoo, you had -- there was a lot of G and A

14   costs involved in this also.  Okay, I'm going to move

15   on.

16           (Pause in proceedings.)

17           THE WITNESS:  Also, my understanding, if I

18   received more than $210,000 for the product that I

19   took, that I had to give back the balance to SCIX.  I

20   did not receive more than $210,000, therefore, there

21   was nothing left for me to give back to SCIX.

22           (Pause in proceedings.)

23           THE WITNESS:  I would next like to talk about

24   D-503, the American Express bill.

25           THE COURT:  53?

Mr. Hipple - Direct                    70

1      THE WITNESS:  No, the bill I gave Your Honor.

2  I want to --

3      MR. BERKOWITZ:  It's the new one, Your Honor.

4      THE COURT:  Oh.  Oh, okay.  Thank you.  Okay,

5  I have it.

6      THE WITNESS:  I'd like to turn to B-109 -- or

7  P-109, I'm sorry.  P, Paul, 109.

8      (Pause in proceedings.)

9      THE WITNESS:  Are you okay?

10      MR. BERKOWITZ:  Yes.

11      THE WITNESS:  Oh, I'm sorry.

12      MR. BERKOWITZ:  Yes.

13      THE WITNESS:  I was waiting for you.  I seen

14  you kept writing.  Okay.

15      MR. BERKOWITZ:  No, no, no, I'm --

16      THE WITNESS:  Okay.  D-503, if you would look

17  at that and compare it to P-109, the first page, it's

18  pretty similar, okay?  It's business gold card,

19  Scientific Chemical, Clement Hipple.  Naturally, the

20  dates are a little bit different.  The closing date on

21  that was 1-20 -- 1-23-13.  The D-503 closing date is

22  7-23-15, a couple -- a couple years different, okay.

23      Do you see at the bottom it's still Clement

24  Hipple, Scientific Chemical?  Naturally, the address

25  has changed because it has to be sent to a different

Mr. Hipple - Direct                    71

1  address, but everything else is pretty much identical I

2  would say.  Okay?

3          Page two we're going to skip.  Let's go to

4  page three.

5          THE COURT:  What exhibit?

6          THE WITNESS:  Same exhibit.

7          THE COURT:  Which one, 109 or 503?

8          THE WITNESS:  109 and yeah, 504.

9          THE COURT:  Oh, go simultaneously, okay.

10          THE WITNESS:  Simultaneously, yes.

11          THE COURT:  All right.

12          THE WITNESS:  I'm sorry, simultaneously.

13          MR. BERKOWITZ:  Page -- up in the right-hand

14  corner on P --

15          THE WITNESS:  It says three of 11.

16          MR. BERKOWITZ:  Three of 11?

17          THE WITNESS:  Yeah.  No, on the -- okay, one

18  says 309 on your exhibit.

19          MR. BERKOWITZ:  Okay, 309 in the plaintiff

20  exhibit.

21          THE WITNESS:  Plaintiff.  And 311 in the --

22          MR. BERKOWITZ:  Okay.

23          THE WITNESS:  -- P-50 -- I'm sorry.

24          MR. BERKOWITZ:  Thank you.

25          THE WITNESS:  Okay.  Again, we're talking

1    pretty much the same details, the same type of

2    balances, the same information, other than under

3    "detail," the P exhibit has the name, Craig Hock.   The

4    504 or whatever, the 504 exhibit, has the name, Clement

5    Hipple.

6              THE COURT:  I think you mean 503.

7              THE WITNESS:  503.  503 has Clement Hipple.

8              THE COURT:  Oh, wait.  Who is Craig Hock?

9              THE WITNESS:  Craig Hock was an employee, an

10   employee of Brian Hipple.

11             THE COURT:  Okay.

12             THE WITNESS:  Okay.  So, basically, now you

13   can see everything is identical to that point except

14   the names changing, okay?  Same name on the card,

15   different dates, two years later, okay?

16             Now, if you start looking down after --

17   actually, Craig Hock's name still is on this because

18   he's still on this card, okay?  I never changed him

19   even though he's no longer there.  And that's what

20   small businesses that aren't large corporations do.  We

21   don't cross our Is or Ts totally.  As you can see,

22   Craig Hock is still on this 503.

23             Okay.  The point I'm trying to make here is

24   if you look at -- let's look at the post-USPS, 6-22-15,

25   $200 on the 503.  By the way, that has changed because

1   the post office came out with what is called flat rate

2   boxes, and I believe it's not actually operated by the

3   post office.  It's operated by stanch.com, where you

4   get a box and you -- whatever you can fit in it,

5   whatever the weight is, they will ship it for a certain

6   amount, and I have knowledge of that, okay?

7          I just want to point out though -- but that

8   -- you know, post -- this is buying postage, okay?  On

9   the 503, we bought postage for $200.  On the Exhibit

10  109, postage was bought for $250.

11         So, therefore, it takes away the theory that

12  all these American Express bills are strictly not a

13  business expense.  And we can go to the next one, which

14  is Google.  On the 503, it's 6-24, okay?  And then the

15  first Google on the 109 is 12-24 in the -- oh, in the

16  amount of $500.  Look at that, they're both the same.

17         Google charges for advertisement, okay?

18  They'll bill you and sync -- they'll bill you -- as

19  soon as your account gets up to $500, they send out a

20  bill.  And how that is being billed is because of your

21  advertisement.

22         So what you pay for advertisement on Google

23  by how many people hit the site on the website.  Every

24  person that comes in costs a certain amount of money

25  depending on the time of day and how long they stay on

Mr. Hipple - Direct                    74

1   the site.  So Google charges you for that purpose.  You

2   actually bid for it actually.  You have companies that

3   take care of that for you that they take bids.  They

4   say okay, we're willing to pay ten dollars so that

5   we're first.

6            THE COURT:  Right.

7            THE WITNESS:  Okay.  And that's basically how

8   this system works, which I have gotten a learning curve

9   since my son has passed away, and that's how I have

10  knowledge of this, personal knowledge, okay.

11           So, basically, again, there's another charge,

12  which is Google on Exhibit 109, which was not

13  considered a cost of doing business.  And we could go

14  down and down and down, Your Honor, through each one,

15  okay.

16           Okay.  If we go back to even 503, if we go to

17  6-25-15, Live Help Now it's called, okay, nobody knows

18  what that is, right?  Looking at it, and I'm sure his

19  expert wouldn't know what that is unless he looked it

20  up on the internet.

21           But Live Help Now is the chat window on the

22  website, which a lot of websites have, Live Help --

23  Live Help Now.  Would you like to chat with somebody?

24  We never had it back at the time when Teresa was

25  involved in the business.  Okay.

Mr. Hipple - Direct                    75

1      Turn to page of Exhibit 503 to 4-11, and turn

2   on Exhibit 109 to page four of nine.  So we'll be on

3   page four of nine and page four of 11.  Oh, yeah, it

4   even showed up on four of nine, I'm sorry.  Page four

5   of nine, Live Help even back then.  Okay.  Now -- I'm

6   moving too quickly, Your Honor, because I see Mr.

7   Berkowitz flipping around.  I'll give him a minute.

8           THE COURT:  You --

9           MR. BERKOWITZ:  Four of nine and four of 11?

10          THE WITNESS:  Right.

11          MR. BERKOWITZ:  I'm there.

12          THE WITNESS:  Okay.  If you look at four of

13   nine, the first entry, it's the one I just talked about

14   in Exhibit 503, Live Help Now, which is a website

15   charge for people to talk, okay, to chat on the

16   website.  You can ask questions.  Will it fix my car?

17   What's going on?  How does the product work?  Does it

18   really work, and things of that nature, okay?

19          The next thing I really wanted to point out

20   on this page, on 503, on 6-28-15, you'll see the name

21   Yahoo, okay, for $200.  Now, Yahoo is a little less

22   site than what Google is for advertisement, okay,

23   because they're not as grand and greatest as Google, so

24   they charge a little less and we get less hits on --

25   what's called hits on Yahoo, hits meaning you coming in

Mr. Hipple - Direct                    76

1   and looking at the site.  Every time you do that it

2   would cost me money if you don't buy, okay?

3          Now, if you look at page four of nine, you'll

4   see the same amount, $200, okay, on 12-28-2012.  And

5   here, on 6-28, three years later, 2015, it's identical.

6   Everything is identical.  The basis and the reasons

7   that they're identical, Your Honor, they go by the

8   actual website itself.  The website never changed, even

9   though I turned it over to Brian in 2001, okay, I took

10  it back in 2010, the website itself never changed, the

11  IP address or whatever you want to call it, never

12  changed.  So that's why even on both these bills, it

13  still seems like the same problem we had with Colonial

14  Chemical that said vendor -- customer number one.

15         If you look at Yahoo on both pages, the

16  customer -- I'm assuming that's the customer number

17  because they match.  They match identically.  So,

18  therefore, all these charges -- all these charges that

19  we're looking at all the way down these pages -- okay,

20  let's go to another one that is identical also.

21         Well, E-Fax is a -- E-Fax, that's a business

22  charge they didn't disagree with.  Let's go to on

23  Exhibit 503, Earth Skater, Incorporated, okay, on 503

24  dated 7-1, and this will be my last one, Your Honor.

25  And then on page four of nine, on 1-1-2013, there's

1   Earth Skater, okay?  On 7-1-15 on 503 or 502?

2          THE COURT:  503.

3          THE WITNESS:  Okay?  Oh, same amount of

4   money, 49.95, three years later.  Same vendor, same

5   amount of money, and I believe -- nope.  Well, it looks

6   like maybe the number had changed.

7          Earth Skater is a company that takes care of

8   our e-mails.  They monitor the e-mails, make sure that

9   the e-mails are up and running and that there's no

10  problem with them.  In other words, all the e-mails

11  that come into steelseal.com are processed through

12  Earth Skater, okay?  It's a company that provides a

13  service, and they store or whatever e-mails come in.

14         Okay.  So I guess my point is that I have

15  been able to identify the majority of the similarity

16  between the companies between 2012 versus what is going

17  on now in 2015, which would explain that these American

18  Express bills are companies' expenses, the majority of

19  them.  Yes, Brian did use it for his personal use, and

20  I can go through and identify on the expert's report

21  which ones they are, that I would be in agreement if

22  you want me to or if Mr. Berkowitz would like me to.  I

23  can bring out that report and tell him which ones I am

24  in agreement with.

25         But the ones that I am in disagreement with

Mr. Hipple - Direct                    78

1   was, naturally, A&C Building, American Express, and

2   slightly with Melissa Moreno because she did work as a

3   subcontractor.

4            THE COURT:  Before you go into a new subject,

5   we'll take our break, okay?  If you're still on the

6   same subject, we'll finish up, but --

7            THE WITNESS:  No, I think we're kind -- if

8   Mr. Berkowitz is okay with what I've given here as

9   evidence --

10            THE COURT:  Well, that's completely up to

11   you.

12            THE WITNESS:  Oh, okay.

13            THE COURT:  Yes.

14            THE WITNESS:  Okay.  I feel that I matched up

15   what I needed to match up.  I mean the main companies,

16   the stamps, the Google, the Yahoo --

17            THE COURT:  Right.

18            THE WITNESS:  -- Earth Skater.  I mean, as

19   you can see, they just keep repeating themself all the

20   way down the pages as the charges go on.  The charges

21   are the same for Yahoo, the charges are the same for

22   Google, okay?  And the Earth Skater charges are the

23   same.  So I would like to add this exhibit, to submit

24   it.

25            THE COURT:  Okay.  503?

Mr. Hipple - Direct                    79

1          THE WITNESS:  Yes, 503.

2          THE COURT:  Any objection?

3          MR. BERKOWITZ:  No objection.

4          THE COURT:  All right, that's admitted.  503

5    is admitted.

6          (Defendant's Exhibit 503, credit card

7    statements, is admitted into evidence.)

8          THE WITNESS:  Okay.  And --

9          THE COURT:  And we'll talk about all your

10   other --

11         MR. BERKOWITZ:  That was 5 -- I'm sorry, that

12   was 503.  I don't now if there is a 502.

13         THE WITNESS:  No, I have --

14         THE COURT:  No.

15         THE WITNESS:  I have another one, 502.

16         THE COURT:  This is 503.  That's what I'm

17   admitting now.

18         MR. BERKOWITZ:  Okay, this is 503.

19         THE COURT:  All right, well, look, let's take

20   a lunch break, all right?

21         THE WITNESS:  Right.  Okay, great.

22         THE COURT:  So it's about 12:10.  Let's come

23   back at 1:15.

24         THE WITNESS:  Sounds great, Your Honor.

25         THE COURT:  See you at 1:15.  Thanks.

1                            * * *

2                    AFTERNOON SESSION

3                         1:18 p.m.

4           THE WITNESS:  The D-31, the expert's report.

5      P-31.  P-31.  P-31.

6           (Pause in proceedings.)

7           THE WITNESS:  It's Exhibit B.

8           MR. BERKOWITZ:  I'm sorry, Exhibit?

9           THE WITNESS:  Exhibit Beta, Beta.

10          MR. BERKOWITZ:  B, okay.

11          (Pause in proceedings.)

12          THE WITNESS:  Okay.  In reference to Exhibit

13     B, the summary of distribution, okay, again, as far as

14     what I explained three years later with the American

15     Express report that the expenses are there.  I mean

16     they are expenses.

17          They're still expenses that they were back in

18     all the American Express bills that are listed here,

19     and I guess -- I don't know if this is an aggregate

20     total.  No, it's not an aggregate total.  It's 185,000

21     in 2010, 277,000 in 2011, 250,000 or 333,000

22     amortization in 2012, okay?

23          My statement is that maybe a percentage of

24     that, okay, maybe ten to 15 percent of them numbers

25     would have been non-related expenses since we have now

Mr. Hipple - Direct                          81

1    looked at the current 2015 American Express bill.

2           So, I would say that this report, as far as

3    the American Express expenses are concerned, is not

4    valid, okay.  I would also say as far as A&C Building

5    and Industrial Maintenance is concerned, this report it

6    not valid.  I would also say as far as Clement Hipple

7    is concerned, this report is not valid.

8           So -- and I am in agreement that the other

9    charges, the Volvo, the house, the life insurance

10   policies and things of that nature, are charges that

11   probably Brian did on his own.  Okay.

12           (Pause in proceedings.)

13           THE WITNESS:  I'd like to turn to -- oh,

14   also, I'm sorry, we have to (inaudible) as far as this

15   report is concerned.  If you turn to the second --

16   third page, "Introduction and Background," of the

17   report, and in the first paragraph, the report reads,

18   "According to the first amended complaint (the

19   Complaint), Teresa Hipple loaned more than $400,000 to

20   SCIX.  Teresa Hipple had two judgments entered against

21   her, SCIX, to secure the loan."

22           Okay.  So, basically, what he's saying here,

23   and he's got all the documentation in his hands, first

24   of all, he's making a statement that she owed -- was --

25   owed more than $400,000 on the two notes, okay?

Mr. Hipple - Direct                    82

1          The two notes consisted of 250,000 on July

2    3rd, right, and the other note consisted of 100,000 on

3    August 23.  Now, if you would turn to the next page

4    under "Nature of SCIX Business," at the very bottom of

5    the page, he talks about, "Steel Seal -- Steel Seal

6    sold the Steel Seal product primarily through direct

7    sales/shipping to consumers that were" -- I don't know

8    this word -- "organizing through a website."

9          THE COURT:  Originating.

10         THE WITNESS:  -- "originating through a

11   website," okay?  And, therefore, that means that he --

12   in his mind, okay, as an --

13         MR. BERKOWITZ:  Objection to him testifying

14   what was in Mr. Geisser's mind.

15         THE WITNESS:  Okay.  All right, sorry about

16   that, Your Honor.  Okay.  The report shows me that the

17   person that prepared the report is showing that all the

18   revenue --

19         MR. BERKOWITZ:  Objection, Your Honor, I

20   think this is argument, not testimony.

21         THE WITNESS:  No, it's testimony.

22         THE COURT:  I'll overrule the objection.  Go

23   ahead.

24         THE WITNESS:  Okay.  It -- in his mind, is

25   shows that most of the revenue came through the

1  website, but not at any point in time did this expert

2  witness go to see who owned the website.  He made an

3  assump -- no, I'm not supposed to say that.

4        Someone made an assumption that SCIX owned

5  the website, which was an incorrect assumption and

6  would have a large bearing on the outcome of the

7  expert's report.  That's number one.

8        (Pause in proceedings.)

9        THE WITNESS:  The other part, again, which he

10  also knew at the time of this report, that the product

11  being sold was a chemical product.  He never took it

12  upon himself to check whether or not -- who had the

13  rights to the chemical product, which are the major,

14  big issues -- well, there's three major, big issues

15  with this report.

16        First of all, nobody told him to go check to

17  see who owned the chemical formula and how the chemical

18  was being produced.  No one told him or asked him to go

19  check to see who owned the website and where most --

20  not where most, where all the revenue was coming

21  through.

22        And number three, later on as we go on, is he

23  had all the documentation he needed, and yet he never

24  addressed any of the issues, including Teresa's loan,

25  which he was fighting for as a liability, okay?  So

1  they are three serious, main issues that I think should

2  be considered.

3         (Pause in proceedings.)

4         THE WITNESS:  Again, I know we all make

5  little mistakes as things go on, myself and including

6  everybody else.  So I'm going to go to P-132.

7         (Pause in proceedings.)

8         THE WITNESS:  It should be Teresa's loan

9  documents.  I believe it is anyway.

10        (Pause in proceedings.)

11        THE WITNESS:  Okay.  And, again, it's the

12  same as the chart that's up there on the board.  If you

13  notice on the loan document, it starts in August of

14  $350,000.  Now, you know, it's basically -- it's just a

15  minor issue, but, again, I'm just trying to bring out a

16  point that, you know, everybody makes little mistakes,

17  okay.  The actual loan was for $250,000 and the other

18  loan was for 100,000.

19        Now, Mr. Berkowitz prepared this report

20  without any expert or anybody saying that, you know,

21  it's correct on its face or whatever.  But, again, as

22  you can see, he starts it out with $350,000, and

23  according to the notes and we can turn to the notes and

24  it will demonstrate that the notes were July 3rd for

25  250,000 and another note in August for 100,000.  Do we

Mr. Hipple - Direct                                    85

1  need to go to the notes?

2          MR. BERKOWITZ:  No, you said the first note

3  was in July?

4          THE WITNESS:  Yeah, according to the books,

5  yeah, July.

6          MR. BERKOWITZ:  And the second one was in

7  August?

8          THE WITNESS:  August, yes.

9          MR. BERKOWITZ:  Okay.

10         THE WITNESS:  Okay.  So I just wanted to

11  point out that, you know, it's just a minor, minor

12  mistake, but, again, we all make mistakes.

13         (Pause in proceedings.)

14         THE WITNESS:  Okay.  I'm going to ask myself

15  a couple of questions, Your Honor, okay?  Mr. Hipple,

16  if you had a chance, would you purchase SCIX after you

17  looked at their books and records?  Okay.

18         Okay.  Now, I'm not saying I'm an expert,

19  okay, but in the last three years I've been working at

20  this business, okay, and I understand the business,

21  okay.

22         So the first thing I would ask if SCI was up

23  for sale to me, okay, considering the type of business

24  that it is, all right, a web-based business and that

25  relies on the chemical, okay, first of all, I would --

Mr. Hipple - Direct                    86

1    first questions out of my mouth would be who owns the

2    website for this business that I want to buy for 1.7

3    million?  That would be the first question out of my

4    mouth, who owns the business -- I mean who owns the

5    website?

6               Oh, I don't own the website, I just own the

7    business.  Well, who owns the chemical formula that

8    produces this Steel Seal?  Well, there is a

9    confidentiality agreement that is owned by Scientific

10   Chemical, Incorporated.  I once had a patent on it, but

11   the patent has lapsed.  And yet you tell me -- well,

12   what am I buying from you for $1,750,000?  What is your

13   liabilities for this corporation?

14               Well, it could be somewheres close to $2

15   million.  Okay.  Well, I'm sorry, I don't see where

16   this business would be worth 1,750,000.  First of all,

17   you don't own the website.  Second of all, you don't

18   even have the rights to the chemical formula.

19               When you're looking at a business to purchase

20   it, the first thing you look at is the mainstream of

21   the revenue and how that revenue is -- okay.  When I

22   look at a business --

23               MR. BERKOWITZ:  Objection.  I believe Mr.

24   Hipple is now offering opinion.

25               THE WITNESS:  Okay.  I'm going to --

Mr. Hipple - Direct                                    87

1      MR. BERKOWITZ:  That is the --

2      THE WITNESS:  I'm going to rephrase it.

3      MR. BERKOWITZ:  That is the purview of an

4  expert and I don't believe he's qualified himself as an

5  expert, nor issued an expert report.

6      THE WITNESS:  I can rephrase.

7      THE COURT:  All right.  Why don't you

8  rephrase it?

9      THE WITNESS:  Okay.  Could you read back how

10 I said it?

11      (No response heard.)

12      (Pause in proceedings.)

13      THE WITNESS:  When you look at a business --

14 all right, when I -- when I would look at a business,

15 okay, one of the main things I would go to first is how

16 is the revenue generated?  What are your sales?  That's

17 where I go first.  My second place is what is your net

18 profit, okay?

19      But my first question would be well, what are

20 your sales over the last five years and what is your

21 net profit over the last five years?  In this case of

22 this business, okay, they had very good sales and very

23 good net profit.

24      But, the problem is where the sales were

25 generated, they did not own the website and it could

Mr. Hipple - Direct                          88

1   have been taken away from him at any point in time,

2   which I explained earlier.

3           I had the right and the ability if I was

4   going to try and do something, I could have pulled the

5   website from SCIX at any point in time and I could have

6   also stopped SCIX from producing the chemical because

7   even though -- even though SCIX had the patent, they

8   never, ever, never, ever had the actual chemical

9   formula because in the patent, Your Honor, and this is

10  a protection based on all patents, they put a range,

11  like 30 to 40 percent of 40 to 50 percent or 30 to 80

12  percent of sodium silicate, okay, 50 to 80 percent of

13  potassium silicate, water, ethylene glycol, okay.  All

14  right?  But they don't give the precise quantity --

15          THE COURT:  Right.

16          THE WITNESS:  -- of how much -- how many

17  ounces of this, how many ounces of that, and how many

18  ounces of this.  This is something that I was the only

19  one that received, okay.  I received this in

20  confidentiality between Mr. Barks and myself, and then

21  I passed in on in the confidentiality agreement.  Only

22  I know the actual formula.  SCIX never knew the actual

23  formula.

24          THE COURT:  Colonial knows it?  Colonial?

25          THE WITNESS:  Colonial Chemical did.

Mr. Hipple - Direct                    89

1          THE COURT:  They did.

2          THE WITNESS:  Yes, a confidentiality

3    agreement --

4          THE COURT:  Right.

5          THE WITNESS:  -- we had between Colonial

6    Chemical and myself.

7          THE COURT:  Right.

8          THE WITNESS:  So, basically, again, to get

9    back to the value of SCIX, these are things that were

10   never taken into consideration in the expert's report,

11   okay.

12         And as far as the fraudulent transfer, I

13   don't see how anything could be fraudulent when I am

14   the only one that knows the actual chemical formula and

15   I own the website.  SCIX owns nothing, the name and ran

16   and operated the business.  That's all they own.  They

17   had -- they had nothing, okay, and that's basically --

18         (Pause in proceedings.)

19         THE WITNESS:  Okay.  Now, as far as -- this

20   is a question to you, Your Honor.  As far as my

21   testimony is concerned so far was basically on the

22   information I received, okay?

23         Now -- and I guess this is a question I have

24   for you, is that there are certain documents that

25   were -- that aren't in these books that were allowed

Mr. Hipple - Direct                    90

1   into evidence, okay, and the ones -- all the ones that

2   are left in the books are allowed into evidence, okay.

3   Do I have the right to go right now and say -- not that

4   I'm going to question it, okay -- look at tab two, tab

5   three, tab four, tab five, and then when I become upon

6   something that I want to speak about ask myself a

7   question and give an answer?  Is that the proper way?

8   Is that my right?

9            THE COURT:  Yes, you could do that.  It's

10  going to take a while though because you want to go

11  through each and every one of these exhibits until you

12  come up with --

13           THE WITNESS:  Well, it --

14           THE COURT:  -- until you reach one that you

15  want to talk about, right?

16           THE WITNESS:  It would really take that long,

17  Your Honor.  It would just --

18           THE COURT:  It would be helpful if you knew

19  which ones you wanted to talk about.

20           THE WITNESS:  I'm just -- I'm just looking

21  for pacific.  I think the ones I want to talk about are

22  the ones that questions were asked to me about.

23           THE COURT:  All right.  Let me ask you this.

24  There's a lot of defense exhibits here.

25           THE WITNESS:  Yeah.

Mr. Hipple - Direct                    91

1      THE COURT:  Okay?  Are there some of those

2  defense exhibits that you want to introduce into

3  evidence that are not duplicative of the plaintiff's

4  exhibits, because you know Mr. Berkowitz, he said

5  that --

6      THE WITNESS:  Yeah.

7      THE COURT:  -- some of the exhibits overlap.

8      THE WITNESS:  They do overlap.

9      THE COURT:  Okay.

10      THE WITNESS:  And he'll know --

11      THE COURT:  And that's fine.

12      THE WITNESS:  -- which ones they are.

13      THE COURT:  And then he's okay -- you know,

14  he's okay with that.  But there may be some in this

15  book that are new exhibits that are different than the

16  plaintiff's exhibits.

17      THE WITNESS:  Yeah, which we would have to

18  look at also.

19      THE COURT:  So maybe my suggestion is if you

20  want to do what you want to do, is go through each

21  exhibit and see if you want to comment, why don't we

22  start on the defense exhibits --

23      THE WITNESS:  Okay.

24      THE COURT:  -- and then if -- go ahead, Mr.

25  Berkowitz.

Mr. Hipple - Direct                    92

1          MR. BERKOWITZ:  Your Honor, I would object to

2    the defense exhibits.  They haven't been offered yet.

3    I would object if Mr. Hipple's intent is to go back and

4    argue the admissibility or inadmissibility --

5          THE COURT:  Oh, yes.

6          MR. BERKOWITZ:  -- of plaintiff's exhibits.

7          THE COURT:  No, no, we're --

8          THE WITNESS:  No, I'm not -- I'm not going to

9    argue.

10         THE COURT:  Yes, we're beyond that.

11         MR. BERKOWITZ:  Yes.

12         THE COURT:  We're not --

13         THE WITNESS:  I'm not looking to argue.

14         THE COURT:  No, we're beyond that.  That's

15   already been decided.

16         THE WITNESS:  Yeah, I'm not looking for that.

17         THE COURT:  But if there are some new

18   exhibits, and if there are some exhibits that are in

19   evidence that you want to make a point or two about,

20   that's fine too.  So is that -- is that --

21         THE WITNESS:  That's basically what I'm

22   doing.

23         THE COURT:  All right.

24         THE WITNESS:  And I could do it very quickly,

25   Your Honor.

Mr. Hipple - Direct                    93

1          THE COURT:  Let's go through the defense ones

2     first --

3          THE WITNESS:  Okay.

4          THE COURT:  -- because that may -- that way

5     you'll cover with the ones that --

6          THE WITNESS:  Yeah, that may be in the other

7     book.

8          THE COURT:  They're -- they may not be in

9     evidence and you may want to get them in.  So you want

10    to start with Defense Exhibit 1 first and go through

11    that?

12         THE WITNESS:  Yes.  Yes.

13         THE COURT:  Volume one?

14         THE WITNESS:  Volume one.

15         MR. BERKOWITZ:  Your Honor, I may be able to

16    go through it more quickly than Mr. Hipple if --

17         THE COURT:  Sure.

18         MR. BERKOWITZ:  -- I could tell you which I

19    object to and which are duplicates, for the most part.

20         THE COURT:  Okay.  Well, why don't we do

21    this?  Why don't we go one-by-one through each exhibit?

22    Mr. Berkowitz, if you could tell us, you know, it's

23    already been in evidence, then we can get passed that.

24    And then if you want to comment on any of this, then

25    just say I want to say something about this.

1        THE WITNESS:  Okay.

2        THE COURT:  Why don't you sit down?  Okay.

3        MR. BERKOWITZ:  D-1, the judgment note, is

4   already in, the October 5 judgment note for --

5        THE WITNESS:  You can just say 1, 2, 3.

6        MR. BERKOWITZ:  The SCIX.

7        THE WITNESS:  I can deal with them that way

8   if you would like to make it easier.

9        MR. BERKOWITZ:  Yeah, I'm just saying I can

10  go through it more quickly.  I know which ones have

11  already been admitted.

12       THE COURT:  All right.

13       MR. BERKOWITZ:  But that's up to you, Your

14  Honor.

15       THE COURT:  You know, let's go through it,

16  but then let's give him -- Mr. Hipple, we'll give you

17  some time to -- Mr. Berkowitz to say this is already

18  into evidence.  I'll give you some time if you want to

19  say anything about it.

20       THE WITNESS:  Okay.

21       THE COURT:  And if I don't hear from you,

22  we're going to pass.  We're going to go to --

23       THE WITNESS:  Okay.

24       THE COURT:  Mr. Berkowitz will --

25       THE WITNESS:  Fine.

Mr. Hipple - Direct                    95

1          THE COURT:  -- go to the next one.  Go ahead.

2   D-1 has been admitted?

3          MR. BERKOWITZ:  Yes, that's the --

4          THE COURT:  Okay.

5          MR. BERKOWITZ:  -- October 5 note.

6          THE COURT:  D-2 is the security agreement.

7          MR. BERKOWITZ:  Already admitted.

8          THE COURT:  D-3 is the financing statement.

9          MR. BERKOWITZ:  Yes, the UCC 1 is already

10  admitted.

11         THE COURT:  5 is Mr. Brian Hipple's --

12         MR. BERKOWITZ:  4, that letter is already in.

13         THE COURT:  Okay.

14         MR. BERKOWITZ:  5, the letter is already in.

15         THE COURT:  Okay.

16         MR. BERKOWITZ:  D-6 I believe is Plaintiff's

17  Exhibit 130.

18         THE COURT:  Okay.  That's admitted.  That's

19  been admitted.

20         MR. BERKOWITZ:  D-7, certificate of

21  formation, I believe it's in plaintiff's exhibits and I

22  have no objection to it.

23         THE COURT:  All right, D-7 is admitted.  I'll

24  admit that, okay?  Do you want that admitted?

25         MR. BERKOWITZ:  I believe it's in, Your

1    Honor.

2              THE WITNESS:  Yes.

3              THE COURT:  All right, well, I'll admit it

4    anyway even if it's duplicative.

5              (Defendants' Exhibit 7, certificate of

6    formation, is admitted into evidence.)

7              THE COURT:  Because you weren't quite sure.

8    That's why --

9              MR. BERKOWITZ:  Yeah.

10             THE COURT:  You didn't sound --

11             MR. BERKOWITZ:  I --

12             THE COURT:  You sounded a little equivocal on

13   that one so I'll let it in.

14             MR. BERKOWITZ:  I'm working out of memory,

15   but --

16             THE COURT:  I know you are.

17             MR. BERKOWITZ:  -- I believe it's close.

18             THE COURT:  And you're doing a good job at

19   it.  Go ahead.

20             MR. BERKOWITZ:  D-8 is already admitted.  D-9

21   is admitted.  D-10 is admitted.  D-11 is admitted.

22   D-12 is admitted.  D-13 is admitted.

23             THE WITNESS:  D -- no, just one minute on

24   D-13.  D-13 has to be admit -- we're talking about mine

25   because his only had one page.  Mine has two pages.

Mr. Hipple - Direct                               97

1        THE COURT:  All right, I'll admit D-13.

2        MR. BERKOWITZ:  No objection, Your Honor.

3        (Defendants' Exhibit 13, document, is

4  admitted into evidence.)

5        THE COURT:  You don't have an object --

6        MR. BERKOWITZ:  No objection, Your Honor.

7        THE COURT:  You don't have an objection,

8  right?

9        MR. BERKOWITZ:  No objection.

10       THE WITNESS:  No, it's important because it

11  has critical information.

12       THE COURT:  All right, D-13 is admitted into

13  evidence.  All right.  What about 14?

14       MR. BERKOWITZ:  D-14, no objection.  It's

15  already admitted.

16       THE COURT:  Okay.

17       MR. BERKOWITZ:  D-15, no objection.  I

18  believe it's already admitted in plaintiff's.  That's

19  the consent decree for the marriage.  D-16, 17, 18 are

20  already admitted in plaintiff's exhibits.

21       THE WITNESS:  Just one minute on that.  I

22  agree with that, but there should be four notes.

23       MR. BERKOWITZ:  Well, there were four notes

24  admitted by the plaintiff.

25       THE WITNESS:  Yeah, but that's only three.

Mr. Hipple - Direct                              98

1      MR. BERKOWITZ:  I understand.

2      THE WITNESS:  You said 17, 18, and 19, and

3  that's all that's in my book.  There is actually four

4  notes.

5      MR. BERKOWITZ:  I agree, and they're admitted

6  already, Your Honor.

7      THE WITNESS:  Oh, in your book?

8      MR. BERKOWITZ:  Correct.

9      THE COURT:  For some reason, your attorney

10  didn't put it in the book.

11      THE WITNESS:  Okay.

12      THE COURT:  All right.

13      THE WITNESS:  Thank you.

14      MR. BERKOWITZ:  D-19, let me just see what

15  that is, make sure I know.

16      THE WITNESS:  JC Consultants, (inaudible)

17  loans.

18      MR. BERKOWITZ:  D-19 has not been used and

19  it's not been admitted.

20      THE WITNESS:  I would like to admit it, Your

21  Honor.

22      THE COURT:  All right, do you want to -- do

23  you want to talk about it?  What is it?

24      THE WITNESS:  It's a -- it's a -- it's part

25  of the promissory notes.  If any question comes up

Mr. Hipple - Direct                99

1   later on as far as something being contrary, okay.  And

2   it actually has JC Consultant, Clement and Teresa on

3   it, so I would like to get that admitted because of JC,

4   because it shows that no interest was paid to JC.

5           THE COURT:  Do you know who prepared this?

6   Was this your accountant or --

7           THE WITNESS:  I believe so.  Yeah, this is

8   from Ira Krassan.

9           MR. BERKOWITZ:  Your Honor, I don't believe

10  Mr. Krassan used it or authenticated it.

11          THE WITNESS:  I don't think --

12          MR. BERKOWITZ:  I have seen it before.

13          THE WITNESS:  Yeah.

14          MR. BERKOWITZ:  I don't know where it comes

15  from.

16          THE WITNESS:  I don't think it was

17  authenticated either, Your Honor.  Let me just look at

18  it real quick at something.  I don't remember --

19          THE COURT:  Well, there's a number of

20  exhibits with 19 so --

21          THE WITNESS:  Yeah, but there are --

22          THE COURT:  There's B -- A, B, C.  Mr.

23  Berkowitz, why don't you look through these and see if

24  you have any problems with them?

25          MR. BERKOWITZ:  Your Honor, these documents

Mr. Hipple - Direct                          100

1   and -- if you're looking at D-19A it --

2          THE WITNESS:  19A?

3          MR. BERKOWITZ:  Yeah, December --

4          THE WITNESS:  I don't have --

5          MR. BERKOWITZ:  -- 1, 2002.  They're very old

6   and they pre-date Teresa Hipple's judgment.

7          THE COURT:  But they do show the validity.

8   His point --

9          MR. BERKOWITZ:  They --

10         THE COURT:  -- is he had these -- he voided

11  the JC Consulting loans.  And I mean you made some

12  inference they were made up and --

13         MR. BERKOWITZ:  These are here.

14         THE COURT:  These are here.

15         MR. BERKOWITZ:  These are here, Your Honor.

16         THE COURT:  And it shows that they -- he's

17  going to argue that it shows that they're longstanding

18  loans.

19         MR. BERKOWITZ:  Yes.

20         THE WITNESS:  They are.  We do go back to

21  2001, so let's admit this.

22         THE COURT:  Do you have a problem with A?

23  19A?

24         THE WITNESS:  I have it as 19, but --

25         MR. BERKOWITZ:  Again, yeah, these show loans

Mr. Hipple - Direct                              101

1   to Mr. Hipple and JC Consulting going back to 1999 and

2   2000.  Again, there's another document.  Never been

3   authenticated but I guess it is what it is.  It's a

4   very old business record, for what it's worth.

5              THE WITNESS:  All right, so we'll just admit

6   it.

7              THE COURT:  Okay.  I'll admit -- I'll admit

8   19A.

9              (Defendants' Exhibit 19A, loan information,

10  is admitted into evidence.)

11             THE COURT:  What about B?  These are these

12  Quickbooks of SCIX.  Any objection to that, Mr.

13  Berkowitz?

14             MR. BERKOWITZ:  I'm sorry, 19B?

15             THE COURT:  B, as in boy, yes.  It looks like

16  it's a Quick --

17             MR. BERKOWITZ:  Yeah, from -- yeah, I

18  received --

19             THE COURT:  I --

20             MR. BERKOWITZ:  -- that document, Your Honor.

21             THE COURT:  All right, B is admitted.

22             (Defendants' Exhibit 19B, Quickbooks

23  information, is admitted into evidence.)

24             THE COURT:  C?

25             MR. BERKOWITZ:  I also received that

1   document.

2           THE COURT:  All right, C is admitted.

3           (Defendants' Exhibit 19C, document, is

4   admitted into evidence.)

5           MR. BERKOWITZ:  Same thing, I received D.

6           THE COURT:  D is admitted.

7           MR. BERKOWITZ:  It says what it says I guess.

8           THE COURT:  D is admitted.

9           (Defendants' Exhibit D is admitted into

10  evidence.)

11          MR. BERKOWITZ:  E, I also received E.

12          THE COURT:  Okay, E is admitted.

13          (Defendants' Exhibit E, document, is admitted

14  into evidence.)

15          MR. BERKOWITZ:  And F, I also received F,

16  Your Honor.  There's -- I'm sorry, yeah.  I have no

17  idea where it's from, but it says what it says.

18          THE COURT:  Okay.  F is admitted.

19          (Defendants' Exhibit F, document, is admitted

20  into evidence.)

21          THE COURT:  And G?  Let's go through G, H, I,

22  J are all records of SCIX.

23          THE WITNESS:  Way back in the day, 1999.

24          MR. BERKOWITZ:  Your Honor, some actually

25  don't say SCIX at the top.  If you look at G, it says

Mr. Hipple - Direct                       103

1   CR Hipple Register.  I don't know what that --

2            THE COURT:  I'm looking at G at the top.  It

3   says SCIX, LLC.

4            THE WITNESS:  It's SCIX.

5            MR. BERKOWITZ:  Oh, I'm sorry.  Mine has got

6   a hole punched through it.

7            THE COURT:  Oh, yes.

8            MR. BERKOWITZ:  I don't know if --

9            THE COURT:  It says "SCIX, LLC, Account Quick

10  Report, January Through December '99."

11           THE WITNESS:  Right.

12           MR. BERKOWITZ:  I'm sorry, I don't see it.

13  E, F, G?

14           THE COURT:  G and H.

15           MR. BERKOWITZ:  G and H?  Mine does not say

16  that.

17           THE WITNESS:  Do you want to look at -- here,

18  I can show you a copy.

19           MR. BERKOWITZ:  Mine says "Clement Hipple

20  Register."

21           (Pause in proceedings.)

22           MR. BERKOWITZ:  Oh, the Quickbooks?  That is

23  not the G I have.  The G in my book is a different

24  exhibit.  It's got the stamp -- the exhibit label of

25  the defendant on it.  I have seen Mr. Hipple's G.

1    THE WITNESS:  There's H, SCIX.

2    MR. BERKOWITZ:  And I have seen Mr. Hipple's

3  H, but that is not the Exhibit --

4    THE WITNESS:  How about that.

5    MR. BERKOWITZ:  -- G, H in my book.  I have

6  seen those, Your Honor.

7    THE COURT:  Okay.

8    THE WITNESS:  And my --

9    MR. BERKOWITZ:  The ones in my book are not

10  the same.

11    THE WITNESS:  All right.

12    THE COURT:  All right, well, why don't you --

13  we'll get copies of those for Mr. Berkowitz.

14    THE WITNESS:  Just take them out?

15    THE COURT:  Take them out and why don't you

16  give them to my clerk if you don't mind.

17    MR. BERKOWITZ:  Do you want the ones that I

18  have that are --

19    THE COURT:  No, I don't need yours.  You want

20  a copy of this, right?

21    MR. BERKOWITZ:  Yes, I have seen those

22  before, yes.

23    THE COURT:  Do you want another copy?  We'll

24  make it for you?

25    MR. BERKOWITZ:  Yeah, I got these with the

Mr. Hipple - Direct                    105

1   original stickers.  You don't want to -- they don't --

2   yeah, I'd like a copy.

3              THE COURT:  Okay.

4              MR. BERKOWITZ:  I've seen them before, Your

5   Honor.

6              THE COURT:  All right, we'll make you a copy.

7   19, all of 19.

8              MR. BERKOWITZ:  I think we're -- are we

9   through 19?

10             THE COURT:  Yeah, so I'll admit all of 19,

11  all right, Mr. Hipple?

12             THE WITNESS:  Okay.

13             (Defendants' Exhibit 19, documents, is

14  admitted into evidence.)

15             THE COURT:  Let's go through 20.  20 is --

16             MR. BERKOWITZ:  20, 21, and 22 are the

17  patents, Your Honor.  They've been admitted --

18             THE COURT:  Right.

19             MR. BERKOWITZ:  -- with plaintiff's and

20  there's no objection.

21             THE WITNESS:  I have no problem.

22             THE COURT:  23 is the -- 23 is a different

23  patent document.  I don't remember seeing it.

24             MR. BERKOWITZ:  Your Honor, that is I believe

25  my letter --

Mr. Hipple - Direct                                    106

1            THE WITNESS:  Right.

2            MR. BERKOWITZ:  -- of February 11th, 2011,

3     where I file the liens against the patents.

4            THE COURT:  Do you have an exhibit?

5            THE WITNESS:  You have it in yours, right?

6            MR. BERKOWITZ:  D-23.  Yeah, D-23, it's not a

7     letter in mine.  It is the actual filing.  There's no

8     letter.  Oh, okay, it is a letter.  I'm sorry.  It is

9     from the patent office, a notice of recordation of

10    assignment of document.

11           THE COURT:  All right.

12           THE WITNESS:  Okay.

13           MR. BERKOWITZ:  And that is --

14           THE COURT:  Do you want --

15           MR. BERKOWITZ:  -- the document that --

16           THE COURT:  Do you want --

17           MR. BERKOWITZ:  -- I received.

18           THE COURT:  Do you want 23 in?

19           THE WITNESS:  If he wants it in, that's fine.

20    It's already in I thought.

21           MR. BERKOWITZ:  I believe it's in, but I

22    think --

23           THE COURT:  All right.

24           MR. BERKOWITZ:  -- we should put it in again

25    just in case.

Mr. Hipple - Direct                    107

1          THE COURT:  All right, D-23 is in, admitted.

2          (Defendants' Exhibit 23, letter, is admitted

3    into evidence.)

4          THE WITNESS:  Your Honor, I think that's

5    actually P-23 as well.

6          MR. BERKOWITZ:  Yeah, it could be.

7          THE COURT:  All right.  Well --

8          THE WITNESS:  I believe that it's the same.

9    It's P in ours.

10          THE COURT:  I'll let D-23 in.

11          MR. BERKOWITZ:  Yeah.

12          THE COURT:  Let's go to 24 to the assignment.

13          MR. BERKOWITZ:  Assignment.

14          THE COURT:  Probably a related document here.

15          MR. BERKOWITZ:  Yeah, that is -- D-24 is --

16    yes, that, again, is the patent office notice of

17    recording.

18          THE COURT:  All right, D-24 is admitted.

19          (Defendants' Exhibit 24, patent notice of

20    recording, is admitted into evidence.)

21          THE COURT:  25?

22          MR. BERKOWITZ:  D-25, Your Honor, is in my --

23    it says --

24          THE WITNESS:  United States of America.

25          MR. BERKOWITZ:  D-25 --

Mr. Hipple - Direct                           108

1     THE WITNESS:  This has to do with a patent.

2     MR. BERKOWITZ:  D-25 says it has to do with a

3  patent, but D-25 here is -- these are our Exhibits 21

4  and 22, P-21 and 22.  These are the faxes to Mr. Lou

5  Berghof and Brian Hipple.

6     THE COURT:  All right, they --

7     MR. BERKOWITZ:  It is not, as it indicates

8  here, a certified --

9     THE WITNESS:  And it's got Teresa's notes in

10  it so --

11     MR. BERKOWITZ:  I believe D-25 --

12     THE WITNESS:  Those are her notes.

13     MR. BERKOWITZ:  -- refers to our Exhibit P-4

14  and P-5, which are the certified copies of the dockets.

15     THE COURT:  I'll admit D-25.  It's a public

16  record.

17     MR. BERKOWITZ:  Yes.

18     THE COURT:  Right.  It may be duplicative,

19  but we'll admit that.

20     (Defendants' Exhibit 25, certified copies of

21  dockets, are admitted into evidence.)

22     THE WITNESS:  D-25.

23     THE COURT:  What about 26, domain reports,

24  Steel Seal?

25     MR. BERKOWITZ:  That's been admitted as

1   Plaintiff's 38.

2           THE WITNESS:  Okay.

3           THE COURT:  Okay.  27, withdrawn.  28?

4           MR. BERKOWITZ:  No, 27 wasn't withdrawn

5   actually.  I have 27 here and I believe we used it.

6           THE COURT:  Okay.

7           MR. BERKOWITZ:  And I believe it is -- it was

8   I believe --

9           THE WITNESS:  What was it?  What number?

10          MR. BERKOWITZ:  I believe it's 42,

11  Plaintiff's 42.

12          THE COURT:  Okay.  Well, if it's in, it's in.

13          THE WITNESS:  Okay.  If you say if it's in,

14  it's in.

15          THE COURT:  I don't -- my -- I don't know

16  even what it is because it just says "withdrawn" on

17  mine.  All right, 29 appears to be a complaint.  This

18  is in evidence already, right?

19          MR. BERKOWITZ:  Yes, it is, Your Honor.

20          THE COURT:  Right.

21          MR. BERKOWITZ:  That's 51 through --

22          THE COURT:  Right.  How about 29, Rule 236

23  notice?

24          MR. BERKOWITZ:  Again, that is part of

25  plaintiff's exhibits for Complete Group that's in.

Mr. Hipple - Direct                     110

1    THE COURT:  Okay.  31 is a precipe for writ

2    of execution.

3            MR. BERKOWITZ:  Yeah, it's in already.  Your

4    Honor, I would object to the admission of deposition

5    transcripts as evidence.

6            THE WITNESS:  Okay.  What's that, 32?

7            THE COURT:  I'm up to 31.

8            MR. BERKOWITZ:  Oh, I'm sorry.

9            THE COURT:  31 is a garnishee's answers.

10           MR. BERKOWITZ:  It's in, Your Honor.

11           THE COURT:  Okay.  32 is --

12           MR. BERKOWITZ:  And that's Plaintiff's 55.

13           THE COURT:  -- Rule 236 notice.  This may be

14   the Michael Chevelle document.

15           MR. BERKOWITZ:  No, no, no, these -- yes,

16   these are in.  It's --

17           THE COURT:  Right.

18           MR. BERKOWITZ:  I have no objection.

19           THE COURT:  Deposition of Teresa Concepcion,

20   right.

21           MR. BERKOWITZ:  I have --

22           THE COURT:  There's been portions read into

23   the record, and obviously that's something I'll

24   consider, but the transcript itself, are you seeking

25   that into evidence?

Mr. Hipple - Direct                    111

1        THE WITNESS:  What's that?

2        THE COURT:  Ms. Concepcion's entire

3   deposition?

4        THE WITNESS:  Her transcript?

5        THE COURT:  Right.

6        THE WITNESS:  Yes.

7        MR. BERKOWITZ:  Your Honor, I object to

8   the --

9        THE COURT:  Right.  I'll over -- I'll sustain

10   the objection.  If you want to read portions of it --

11   well, you really can't do that.  You already passed

12   that.  You questioned Ms. Concepcion about certain

13   portions of those depositions.  They will be admitted.

14   You can -- those portions have been actually

15   transcribed in part of our record here.

16        THE WITNESS:  Right.

17        THE COURT:  I'm not going to admit the entire

18   deposition.

19        THE WITNESS:  Because it's all nos, nos, nos.

20        THE COURT:  Right.  And your deposition has

21   not been admitted, your entire deposition.

22        THE WITNESS:  Okay.  Okay.

23        THE COURT:  Okay.  Let's go to the second

24   volume.

25        (Pause in proceedings.)

Mr. Hipple - Direct                    112

1       THE WITNESS:  Don't we have to swear him in

2  first, Your Honor, before he admits that these

3  documents are in?

4       THE COURT:  What do you mean?

5       THE WITNESS:  Swear him in?

6       THE COURT:  Well, he's acting as a lawyer and

7  he's just objecting or not objecting.

8       THE WITNESS:  I'm kidding, Your Honor.

9       THE COURT:  Don't kid.

10       THE WITNESS:  Okay.

11       THE COURT:  Because everything you say means

12  something here.  All right, 34.

13       MR. BERKOWITZ:  Transcript.  Again, I object

14  to -- there are four transcripts.

15       THE COURT:  All right.  That's a deposition,

16  your deposition.  We're not going to admit that.

17       THE WITNESS:  Okay.

18       THE COURT:  35 is also deposition of Melissa

19  Moreno.

20       THE WITNESS:  All right.

21       THE COURT:  Object to that?

22       MR. BERKOWITZ:  Object to that.

23       THE COURT:  Okay, that won't come in.  36.

24       MR. BERKOWITZ:  Same objection.

25       THE COURT:  Deposition of Wayne Geisser.

Mr. Hipple - Direct                    113

1  That won't -- that won't come in.  31 is the standards,

2  AICPA standards.  We did talk about these.

3              MR. BERKOWITZ:  That's 37.  That's -- I have

4  no objection, Your Honor.

5              THE WITNESS:  37.  I jumped to 37.

6              THE COURT:  All right, 37 is admitted ---

7              MR. BERKOWITZ:  No objection.

8              THE COURT:  -- into evidence.

9              (Defendants' Exhibit 37, AICPA standards, is

10  admitted into evidence.)

11              MR. BERKOWITZ:  38, no objection.

12              THE WITNESS:  Hold on, let me -- okay.  37.

13              (Pause in proceedings.)

14              THE WITNESS:  Oh, these are mine so I can't

15  object to them.

16              THE COURT:  No, your --

17              THE WITNESS:  Yeah, that's his response.

18              THE COURT:  Right, he's agreeing to them.

19              THE WITNESS:  Yeah.

20              THE COURT:  So 37 and 38 are admitted into

21  evidence.

22              (Defendants' Exhibit 38, document, is

23  admitted into evidence.)

24              THE COURT:  These are -- the expert report of

25  Mr. Peterson, no objection to that?

Mr. Hipple - Direct                    114

1            MR. BERKOWITZ:  No objection.  And you

2     allowed --

3            THE COURT:  39?

4            MR. BERKOWITZ:  -- Mr. Geisser report.

5            THE COURT:  Right.  39 is in evidence.  Okay.

6     Mr. Hipple, are you with us?

7            THE WITNESS:  Yes.  Yes.  Uh-huh.

8            THE COURT:  Okay.  39 is Mr. Pederson's

9     resume.  No objection to that I don't think, right?

10           MR. BERKOWITZ:  No objection.

11           THE COURT:  That's admitted.

12           (Defendants' Exhibit 39, Mr. Pederson's

13     resume, is admitted into evidence.)

14           THE COURT:  40?

15           MR. BERKOWITZ:  No objection.  We've used it.

16     It's been admitted I believe.

17           THE COURT:  Okay, 40 is admitted, notice of

18     claim against the estate.

19           (Defendants' Exhibit 40, notice of claim

20     against the estate, is admitted into evidence.)

21           THE COURT:  41.

22           MR. BERKOWITZ:  That I object to.  It hasn't

23     been authenticated.  I don't know what it is.  It

24     hasn't been used.  It's a letter to me from plaintiff's

25     counsel.

Mr. Hipple - Direct                          115

1        THE WITNESS:  That's --

2        MR. BERKOWITZ:  Defendants' counsel.

3        THE WITNESS:  This is just about my

4   deposition, is that correct?  I was in Peru at the

5   time?

6        (Pause in proceedings.)

7        THE WITNESS:  Oh, no, "The assets would

8   include that which is set forth in the document and

9   produced in discovery had batch range of '09 to '10,

10  including the" -- I don't know about this.  It has --

11  it talks about product, 450 cases.

12       MR. BERKOWITZ:  I'm sorry, which exhibit is

13  this?

14       THE WITNESS:  This is --

15       THE COURT:  We're talking about 41.

16       THE WITNESS:  41, right?

17       THE COURT:  This is this letter to you.

18       THE WITNESS:  The third paragraph down it

19  talks about 450 cases.

20       MR. BERKOWITZ:  Your Honor, it's a letter

21  from defendants' -- it's never been introduced,

22  authenticated, and I can't imagine what it's for.

23       THE WITNESS:  I think she was offering you

24  back the product.

25       MR. BERKOWITZ:  You mean it was a settlement

1  offer?

2          THE WITNESS:  Yeah, for you to take --

3          MR. BERKOWITZ:  Then it's not admissible,

4  Your Honor.

5          THE WITNESS:  I believe it was for you to --

6  we would give you everything back that we took.

7          MR. BERKOWITZ:  My car works well, so I think

8  the offer was rejected.

9          THE WITNESS:  I would like to leave this in

10  if we could, Your Honor.

11         THE COURT:  I'm going to sustain the

12  objection.  It does look like -- well, there's some

13  jargon about when a deposition is going to take place,

14  but there's also -- it appears --

15         THE WITNESS:  Product.

16         THE COURT:  -- to be some kind of offer.

17         THE WITNESS:  Yeah.

18         THE COURT:  Generally offers of compromise,

19  there's a Federal Rule of Evidence, it's 408 that says

20  that offers of compromise, offers of settlement are not

21  admissible.

22         THE WITNESS:  Okay.

23         THE COURT:  Okay.  So I won't allow that to

24  come in.

25         THE WITNESS:  All right.

Mr. Hipple - Direct                117

1          THE COURT:  42 is another letter.  Again, it

2  looks like it's --

3          MR. BERKOWITZ:  Your Honor --

4          THE COURT:  -- about discovery.

5          MR. BERKOWITZ:  -- it's lawyers bickering.

6  43.

7          THE WITNESS:  Lawyers bickering?

8          MR. BERKOWITZ:  Yeah, I guess I would put

9  that under the same category, not admissible.  I would

10  object to it.

11          THE WITNESS:  Let me just read it real --

12  possibly as fast as I can.  Confirm availability -- oh,

13  this is talking about the dates.  No, this is talking

14  about judgment notes.  Your Honor, this is talking

15  about (inaudible) conveyance and --

16          THE COURT:  See, these are letters between

17  the lawyers prior to trial regarding scheduling of

18  depositions.

19          THE WITNESS:  Something you wouldn't look at

20  anyway, right?

21          THE COURT:  No, they're just -- no, this

22  is not evidence.  It's just lawyers talking to one

23  another --

24          THE WITNESS:  Okay, fine.

25          THE COURT:  -- and complaining about one

Mr. Hipple - Direct                    118

1   another.  So I'm not admitting those.  Let me go over

2   those numbers again.  So that's -- if I understand,

3   it's 41 through and including --

4            THE WITNESS:  43.  41, 42, and 43.

5            THE COURT:  Through 45 I think.  No, through

6   44.  There's some letters from Mr. Berkowitz's firm to

7   Ms. Bowman.

8            MR. BERKOWITZ:  Talking about depositions.

9            THE COURT:  Right.  So I'm not going to admit

10  them.  Let's go to 45, which is responses to

11  interrogatories.

12           THE WITNESS:  I think you let that in, right?

13           THE COURT:  Any objection?  That's part of

14  the record.

15           MR. BERKOWITZ:  I mean it looks like I signed

16  them and served them, so I can't contest.  They say

17  what they say.

18           THE COURT:  All right, 45 is admitted.

19           (Defendants' Exhibit 45, responses to

20  interrogatories, is admitted into evidence.)

21           THE COURT:  46 are, again, response --

22           THE WITNESS:  Responses.

23           THE COURT:  -- to documents, plaintiff's

24  response to defendant's request for production of

25  documents.  47 is response to interrogatories.  How

Mr. Hipple - Direct                    119

1    about 46 and 47?  They seem like they're just discovery

2    responses.  They're admissible.

3            MR. BERKOWITZ:  Actually, Teresa Hipple's

4    personal responses to defendants' interrogatories, we

5    admitted those I believe, so we have no objection.

6            THE COURT:  All right, 46 and 47 are

7    admitted.

8            (Defendant's Exhibit 46 and 47, responses to

9    interrogatories, are admitted into evidence.)

10           THE COURT:  49 is a judgment note.

11           THE WITNESS:  48.  I have that 48.

12           THE COURT:  48.

13           MR. BERKOWITZ:  Oh, that's the missing JCC

14   note from -- Mr. Hipple mentioned before there were

15   only three notes.  This is the fourth one.  It's in.

16   It's just out of order.

17           THE COURT:  All right.

18           THE WITNESS:  No, in mine it says "Assignment

19   and separation for certification."

20           THE COURT:  All right, he's talking about 49.

21   Let's go -- I'm sorry, let's go back to 48.

22           THE WITNESS:  Okay.

23           THE COURT:  48, that's admitted into

24   evidence, but we can allow D-48 in.

25           (Defendants' Exhibit 48, document, is

                         Mr. Hipple - Direct                    120

1    admitted into evidence.)

2            THE WITNESS:  That's the -- yeah, that has to

3    be --

4            THE COURT:  D-48, okay?  That's okay?

5            MR. BERKOWITZ:  Yeah.  Yes, Your Honor.

6            THE COURT:  D-48 is in.  49 is that fourth

7    judgment note you were talking about?

8            THE WITNESS:  That's it, right.

9            THE COURT:  That's admitted.

10           (Defendants' Exhibit 49, judgment note, is

11   admitted into evidence.)

12           THE WITNESS:  Okay.

13           THE COURT:  50 is it looks like snapshots

14   from the website.  Any objection?

15           MR. BERKOWITZ:  No objection.  We used that,

16   Your Honor.

17           THE COURT:  50 is in.

18           (Defendants' Exhibit 50, snapshots from

19   website, is admitted into evidence.)

20           THE COURT:  51 is the same thing.  That's --

21   that will be admitted.

22           (Defendants' Exhibit 51, snapshots from

23   website, is admitted into evidence.)

24           MR. BERKOWITZ:  Same thing.

25           THE COURT:  52.

1          THE WITNESS:  Definitely admitted and it's --

2          MR. BERKOWITZ:  That's in, Your Honor.

3          THE COURT:  52.  Hold on.

4          MR. BERKOWITZ:  Mr. Hipple just used that.

5          THE COURT:  We just used that.  You have a

6    problem with that?

7          MR. BERKOWITZ:  No objection.

8          THE COURT:  52 is in.

9          (Defendants' Exhibit 52, document, is

10   admitted into evidence.)

11         THE COURT:  53.

12         MR. BERKOWITZ:  I object to 53.

13         THE WITNESS:  Hold on.  Okay, the ticket.

14         (Pause in proceedings.)

15         THE WITNESS:  The only thing, Your Honor,

16   this is -- well, I don't even know where this -- how

17   this came about, okay?  It was never a company doing

18   business.  If anything, it shows that -- no, that could

19   come out.

20         THE COURT:  All right, so we're not admitting

21   53.  54 is the same type of invoice it looks like.

22         THE WITNESS:  Okay.  What these are, these

23   are shipments to the UK.

24         MR. BERKOWITZ:  I would object, Your Honor,

25   to -- you can't even get passed the authentication of

1   these documents.

2            THE WITNESS:  Okay.  Your objection, but

3   you do -- you do realize there was chemical made for

4   the UK, correct?

5            MR. BERKOWITZ:  Your Honor, if you look at

6   Exhibit 53, up in the left-hand corner --

7            THE WITNESS:  Yeah.

8            MR. BERKOWITZ:  -- it indicates an Griffin

9   Enterprises --

10            THE WITNESS:  Enterprises, yeah.

11            MR. BERKOWITZ:  -- and if you look at the

12   invoice date, it's 1-17-2001.

13            THE WITNESS:  No, 2011.

14            MR. BERKOWITZ:  2011, that was when there was

15   the license agreement with Steel Seal Pro that was

16   exclusive.  And you look under what was shipped, it

17   says "Case, Steel Seal," no size, no nothing.

18            THE WITNESS:  Well, 12 bottles.  90 cases.

19            MR. BERKOWITZ:  It's not probative of

20   anything, Your Honor.

21            THE WITNESS:  A unit price.  Well, if the UK

22   is an issue as far as whether or not we ship there,

23   even though it has the wrong -- the wrong documentation

24   name at the top, it has the right place gone to the UK

25   on that date.  I would like to try to keep these in if

1    we can.

2             THE COURT:  Well, you have 53, 54, 55.

3             THE WITNESS:  Now, there it goes back.

4    That -- same thing, and if --

5             THE COURT:  All right, so I'm not going to

6    admit 51 through -- wait, I'm sorry.

7             THE WITNESS:  53 and 54?

8             THE COURT:  I'm not going to admit 53, 54

9    because they're Griffin Enterprises.

10            THE WITNESS:  But you will do 55?

11            THE COURT:  But I will admit 55.

12            MR. BERKOWITZ:  Your Honor, if I could

13   comment on 55?

14            THE COURT:  Yes.

15            MR. BERKOWITZ:  If you would look at the date

16   it is 10-4 before the transfer and it does say SCIX.  I

17   would just point out it doesn't tell us anything about

18   what's being sold.

19            THE WITNESS:  Yes, it -- Your Honor, I

20   disagree.  The quantity is 90.  He knows that the

21   cases -- there's 12 bottles to a case.  He knows.  It's

22   his knowledge.  He said it in his testimony many, many

23   times, okay?

24            MR. BERKOWITZ:  I haven't testified.

25            THE WITNESS:  This thing is on the board 12

Mr. Hipple - Direct                    124

1    times, you know.

2         THE COURT:  I'm going to admit 55 over --

3         THE WITNESS:  Okay, thank you.

4         THE COURT:  -- his objection.

5         (Defendants' Exhibit 55, document, is

6    admitted into evidence.)

7         MR. BERKOWITZ:  55 is now SCIX after the

8    transfer of all its assets.

9         THE WITNESS:  Again?

10        MR. BERKOWITZ:  Oh, I'm sorry, D-56.  I'm

11   sorry.

12        THE COURT:  Yes, 56 --

13        MR. BERKOWITZ:  I'm sorry, did we get 55?

14        THE COURT:  55 I admitted.

15        MR. BERKOWITZ:  Okay.

16        THE COURT:  56 --

17        THE WITNESS:  It's the same thing, Your

18   Honor.  It's like a little mistake, not enough time

19   limit to change the name, okay, on the invoice or the

20   Quickbooks.  It's just a matter of a small company

21   operating with a person that doesn't do very good with

22   bookkeeping work.

23        THE COURT:  Well, I think he's -- 56, again,

24   I mean --

25        THE WITNESS:  It's the same as --

1    THE COURT:  -- I'm speaking for Mr. Hipple,

2  but I think his point is that he wants to establish

3  that the company, SCIX, did sales in the UK.  I don't

4  know if that's in dispute.  I don't think it is.

5    MR. BERKOWITZ:  Your Honor, actually, it is

6  in dispute.

7    THE COURT:  It is?  Well --

8    MR. BERKOWITZ:  You may recall from Mr.

9  Geisser's testimony that there were no UK sales before

10  2012, and you also heard Mr. Berghof authenticate the

11  UK labels in 2011.

12    So documents that are showing the UK sales

13  before they had labels and before there's any revenue,

14  and also Mr. Berghof testified that there were no UK

15  orders before mid-2011, yes, I have --

16    THE WITNESS:  I don't remember --

17    MR. BERKOWITZ:  -- I have a problem.

18    THE WITNESS:  -- that testimony.

19    THE COURT:  All right, I'm going to allow it

20  in, 55 and 56.

21    (Defendants' Exhibit 56, document, is

22  admitted into evidence.)

23    THE COURT:  57 is the --

24    THE WITNESS:  We can take that out.

25    MR. BERKOWITZ:  57 is out.

1      THE COURT:  57 is out?  Okay.  58.

2      THE WITNESS:  58, okay, Steel Seal Pro -- is

3  this the incorporation?

4      MR. BERKOWITZ:  Yeah, I have no problem with

5  that, Your Honor.

6      THE WITNESS:  Hold on, let me just look at

7  this for one minute because I know there -- I saw

8  something in dealing with this, okay?  Your Honor, if

9  you turn to page four, okay, of this document --

10      THE COURT:  Right.

11      THE WITNESS:  -- you'll see under item number

12  two, halfway down the page --

13      THE COURT:  Why do I have page three of this?

14      THE WITNESS:  Oh, P-3, I'm sorry.  I'm sorry,

15  Your Honor, P-3.

16      THE COURT:  Right.

17      THE WITNESS:  Item number 2.

18      MR. BERKOWITZ:  I'm sorry, which one are we

19  on?

20      THE COURT:  We're on --

21      THE WITNESS:  P-3.

22      THE COURT:  We're on, actually, Exhibit 58,

23  but page three.  It says page P-3.

24      THE WITNESS:  At the top of the page.  And if

25  you notice down under number two appears the name,

Mr. Hipple - Direct                    127

1  Griffin Enterprise, crossed out and Steel Seal Pro,

2  LLC, put in?

3          THE COURT:  Right.

4          MR. BERKOWITZ:  I have no objection to these,

5  Your Honor.

6          THE COURT:  Okay, that's admitted.  58 is

7  admitted.

8          (Defendants' Exhibit 58, document, is

9  admitted into evidence.)

10          THE COURT:  Let's go to 59.  I've seen this

11  document before.

12          MR. BERKOWITZ:  Your Honor --

13          THE WITNESS:  Yeah, these are --

14          MR. BERKOWITZ:  -- this is public record.

15          THE WITNESS:  These are already in.

16          MR. BERKOWITZ:  It may be in.  If it isn't,

17  it should be in.  Those are the documents I believe Ms.

18  Concepcion identified as the verification and the

19  complaint --

20          THE COURT:  All right.

21          MR. BERKOWITZ:  -- and confession of

22  judgment.

23          THE WITNESS:  One minute.

24          THE COURT:  59 is admitted.

25          (Defendants' Exhibit 59, documents, is

Mr. Hipple - Direct                          128

1   admitted into evidence.)

2            THE COURT:  How about --

3            MR. BERKOWITZ:  It was filed in 2003.

4            THE COURT:  59 is admitted.  How about 60?

5   It looks like --

6            THE WITNESS:  Same thing, Your Honor.

7            MR. BERKOWITZ:  Same thing, Your Honor.

8            THE COURT:  60 is admitted.

9            (Defendants' Exhibit 60, documents, is

10  admitted into evidence.)

11           THE COURT:  60 is admitted.  61 is --

12           MR. BERKOWITZ:  It's already been admitted.

13  We have no objection.

14           THE COURT:  All right, 61 is admitted.

15           (Defendants' Exhibit 61, document, is

16  admitted into evidence.)

17           THE WITNESS:  Oh, that's (inaudible) going

18  all the way back.  Okay.

19           MR. BERKOWITZ:  And 62, if you have a 62

20  again.

21           THE WITNESS:  I don't think that, yeah.

22           THE COURT:  62 --

23           MR. BERKOWITZ:  I got a 62.

24           THE COURT:  62 is admitted.

25           (Defendant's Exhibit 62, document, is

Mr. Hipple - Direct                    129

1   admitted into evidence.)

2           THE COURT:  Okay.  So, Mr. Hipple, I think

3   what you -- you're almost finished now and I think what

4   you want to do is go through the other exhibits?

5           THE WITNESS:  I just want to take a quick --

6           THE COURT:  Sure, go ahead.  Why don't --

7           THE WITNESS:  -- quick review, Your Honor,

8   okay?

9           THE COURT:  I'll tell you what.  Why don't we

10  take --

11          THE WITNESS:  You can take a break while I

12  work.

13          THE COURT:  Let's take a break and come back

14  in --

15          THE WITNESS:  And I'll sticker what I need.

16          THE COURT:  Yes, look at what you look -- why

17  don't you look at it and we'll come back, okay?

18          THE WITNESS:  Okay.

19          THE COURT:  Let's take a ten-minute break to

20  let him look at that?  All right.

21          MR. BERKOWITZ:  Yes, and, Your Honor, I have

22  -- I can wait until the end.  I have some additional

23  exhibits to move in.

24          THE COURT:  All right.  Okay.

25          THE WITNESS:  So do I.  I still have one

Mr. Hipple - Direct                    130

1    more.

2              THE COURT:  Fine.  Okay.  I'll be back in ten

3    minutes.  See what you can do to identify it.

4              THE WITNESS:  Okay.  Speed it up you mean.

5              (Recess, 2:05 p.m. to 2:21 p.m.)

6              THE COURT:  Okay.  Please be seated.  Just

7    before we continue, so Mr. Hipple, I'm just trying to

8    figure out a schedule.

9              THE WITNESS:  Okay.

10             THE COURT:  So how much more time do you

11   think you need on your direct?

12             THE WITNESS:  Okay, I have four or five

13   questions there, very simple questions, okay?

14             THE COURT:  Fine.  Okay.

15             THE WITNESS:  I don't know whether you want

16   to wait until I'm done.  I would like to get this

17   document, this D-105 --

18             THE COURT:  All right.

19             THE WITNESS:  -- put in.

20             THE COURT:  Okay.

21             THE WITNESS:  Okay?  And I'm basically done.

22             THE COURT:  Okay.  And you --

23             THE WITNESS:  And that's direct.

24             THE COURT:  You have some cross?

25             THE WITNESS:  I don't know how long it's

1    going to take.

2            THE COURT:  Do you have some

3    cross-examination?

4            MR. BERKOWITZ:  Yes, I do, Your Honor.

5            THE COURT:  Do you think it's very extensive?

6    I'm just trying -- I have to figure out our schedule.

7            MR. BERKOWITZ:  My goal is to finish today

8    and do a closing.

9            THE COURT:  Okay.

10           MR. BERKOWITZ:  I can't tell you when Mr.

11   Hipple will finish, if I'll get there, but I intend to

12   get there if we can.

13           THE WITNESS:  And I intend to do a closing

14   also.

15           THE COURT:  Okay.  So I'm just trying to see

16   if we need a court reporter after 5:00 so --

17           MR. BERKOWITZ:  I don't know when Mr. Hipple

18   will end --

19           THE COURT:  Yes.

20           MR. BERKOWITZ:  -- and how long my cross will

21   be.

22           THE COURT:  I think we should get somebody at

23   least until 6:00.

24           THE WITNESS:  Yeah, because I think my

25   cross-examination from him is going to be a long time.

1              THE COURT:  All right.

2              THE WITNESS:  All right?

3              THE COURT:  Your cross-examination of who?

4              THE WITNESS:  He's going to cross-examine me

5    and --

6              MR. BERKOWITZ:  Well, he thinks the

7    cross-examination will be --

8              THE WITNESS:  -- it will be a long time.

9              THE COURT:  No, I don't think it will be.

10             MR. BERKOWITZ:  I don't think.

11             THE COURT:  I'm hoping.

12             THE WITNESS:  All right.  I have --

13             THE COURT:  All right.

14             THE WITNESS:  I have a document, D-105, which

15   I think I gave you a copy of this.

16             THE COURT:  D-105?

17             THE WITNESS:  Yes.

18             MR. BERKOWITZ:  It's 501, Mr. Hipple.

19             THE WITNESS:  Oh, God.

20             MR. BERKOWITZ:  I think you inverted the

21   numbers.

22             THE WITNESS:  I keep doing it again.  I

23   invert numbers, Your Honor.

24             THE COURT:  All right.

25             THE WITNESS:  You'll have to excuse me.

1          MR. BERKOWITZ:  Your Honor, it hasn't been

2    offered yet --

3          THE COURT:  Yes.

4          MR. BERKOWITZ:  -- and as long as I get to

5    cross-examine him on this document at some point, I --

6          THE WITNESS:  I didn't cross --

7          MR. BERKOWITZ:  I think you have to wait

8    until it's cross-examination to determine whether it

9    can be admitted.

10          THE COURT:  Okay.  All right.

11          MR. BERKOWITZ:  I know what it is.

12          THE COURT:  So you can talk about it.  Now,

13    it's 105 is the number?

14          THE WITNESS:  Yes.

15          MR. BERKOWITZ:  No, it's 501.

16          THE COURT:  Well, there is two numbers on

17    here.

18          MR. BERKOWITZ:  Oh, I'm sorry.

19          THE WITNESS:  Yeah, that's the number I

20    started it out with, then I --

21          THE COURT:  You want to make it 501?

22          THE WITNESS:  No, I think it has to be 5 --

23    what is it, 501?

24          THE COURT:  501.

25          MR. BERKOWITZ:  501.

1          THE WITNESS:  Yeah, okay.

2          THE COURT:  All right, 501, fine.  All right,

3    go ahead, Mr. Hipple.  You can sit down.

4          THE WITNESS:  I keep forgetting that.

5          THE COURT:  So what's 501?

6          THE WITNESS:  Okay.  So 501 is a document

7    that I prepared, Your Honor, okay, Your Honor?

8          THE COURT:  Okay.

9          THE WITNESS:  It has no certification.  It's

10   an informational document, okay?

11         THE COURT:  Okay.

12         THE WITNESS:  And here's what -- but it does

13   apply to the case, okay, because if you can notice --

14   and it's not spelled correctly, by the way, plaintiff's

15   report at P-26.

16         THE COURT:  Right.

17         THE WITNESS:  Then P-27, these are the JC

18   notes, P-28, P-29, are JC notes.  Then when I

19   foreclosed on JC notes, I changed it to the 12 percent

20   according to the note, simple interest, okay?

21         THE COURT:  Okay.

22         THE WITNESS:  Okay.  And then we go back.

23   I'm going to need his copy for a minute, Your Honor,

24   because mine only has three pages.  Mr. Berkowitz, can

25   I borrow your copy?

Mr. Hipple - Direct                              135

1          MR. BERKOWITZ:  You certainly can.  You gave

2     it to be.  Just as long as I get them all back.

3          THE WITNESS:  Yeah.  I have it on the

4     computer, but I don't have it here.  Okay.  And then on

5     the last page, okay, it says "Total interest paid as of

6     September 30th," okay?

7          THE COURT:  Right.

8          THE WITNESS:  To the JC, that's what would

9     have been due.  And then total principal of JC and then

10    the total amount of JC.  And then if you go down, it

11    says "Clement Hipple's loan," P-9, for 210,000, I carry

12    that out to the right-hand column.

13         THE COURT:  Right.

14         THE WITNESS:  And then as you go down, as far

15    as my royalties are concerned, and what I did is SCIX's

16    gross sales receipts from 2001 to 2005.  Now, I put

17    them in at a low number of 400,000, okay, time five,

18    comes to two million, all right?

19         MR. BERKOWITZ:  I'm sorry, I don't

20    understand.  I understood that this was a calculation

21    of the JCC notes --

22         THE COURT:  Plus he added --

23         MR. BERKOWITZ:  -- plus the interest and you

24    carried it out.

25         THE WITNESS:  No, this is a calculation of

1   everything, Teresa's note --

2           MR. BERKOWITZ:  But, to go back and, you

3   know, look at the revenue of --

4           THE WITNESS:  It's an --

5           MR. BERKOWITZ:  -- of SCIX and to now want to

6   say that it owes me -- are you saying it owes me all?

7           THE WITNESS:  No, no, no.

8           MR. BERKOWITZ:  It's saying it's paid you the

9   royalties?

10          THE COURT:  Let him finish.  Go ahead.  Why

11  don't you sit down?  Sit down, Mr. Hipple.  Let's do

12  this properly.  Sit down.  Okay.  Finish your

13  explanation.

14          THE WITNESS:  Okay.  What I did is I went

15  back to SCIX's records, okay?

16          THE COURT:  Right.

17          THE WITNESS:  Not records -- I went back to

18  2001 when I turned the company over to Brian.

19          THE COURT:  Okay.

20          THE WITNESS:  I had personal knowledge, okay,

21  at that point in time that it was doing over $400,000

22  in sales, and I believe Teresa had personal knowledge

23  of that also.  Okay.

24          So, I took the low number, times it by five

25  years, for five years, okay, which comes to two

                        Mr. Hipple - Direct                    137

1    million.   Then under Exhibit Report P-31, which is his

2    exhibit, 2006 he said the sales were 466, 2007, 412,

3    2008, 524, 2009, 768, 2010, 868, bringing the total

4    sales to 5,078,000 from 2001 to 2010, okay.

5              Then I took that number to be used by the

6    royalties and timed it by ten percent and came up with

7    505,878, okay?  I added in Teresa's loan effective

8    2010, not now, just what was effective at the time of

9    2010 of 389,000.   Then I minused out the royalty

10   payments that I received, $255,191, and it brought me

11   to a total of 1,920,000.

12             THE COURT:  So this is what you're saying

13   SC --

14             THE WITNESS:  X owes me.

15             THE COURT:  -- IX owes you?

16             THE WITNESS:  No, it owed everybody.  This is

17   the --

18             THE COURT:  Everybody.

19             THE WITNESS:  -- total liability of SCIX --

20             THE COURT:  Okay.  All right.

21             THE WITNESS:  -- in 2010.

22             THE COURT:  As far as loans?

23             THE WITNESS:  Right, as far as loans in 2010.

24             THE COURT:  Right.  Okay.

25             MR. BERKOWITZ:  I have to cross-examine him

1    on it.

2              THE COURT:  I know, but he's not finished.

3              MR. BERKOWITZ:  Okay.

4              THE COURT:  All right.  Go ahead.  All right.

5    Fine.

6              THE WITNESS:  Okay.  Well, he can

7    cross-examine me.

8              THE COURT:  Yes.  What else do you have?

9              THE WITNESS:  Okay, quick stuff, okay?  Here

10   I go speeding -- speed demon here.  Okay.  P-22, Your

11   Honor.

12             THE COURT:  Okay.

13             THE WITNESS:  Okay.  If you turn back quite a

14   few pages to the Steel Seal label, it's the last two

15   pages of that article.  It's the last two pages.

16             (Pause in proceedings.)

17             THE WITNESS:  Now, these labels have been

18   manufactured, okay, and this is -- not that I don't

19   know because I'm manufacturing there now, from Valley

20   Forge Label Company since 1999, okay.  At one point in

21   time, Valley Forge Label Company -- I don't know where

22   they got it, but it seems like they had Scientific

23   Chemical, Incorporated on the label at the bottom,

24   okay, under "customer."

25             And this is one of those things that we were

Mr. Hipple - Direct                    139

1    talking about earlier that, you know, small companies

2    make mistakes and they never bother to change them,

3    okay?  So that's basically all I'm saying about this

4    document.

5             THE COURT:  No, we're looking at 22, right?

6             THE WITNESS:  Yeah, 22, the last two pages,

7    it looks like that.

8             THE COURT:  Okay.

9             (Pause in proceedings.)

10            THE WITNESS:  And there's two sheets, there's

11   front and the back.

12            THE COURT:  That's what I'm trying to find.

13   Hold on.  This -- okay, I see it.  Page 34 on the

14   bottom and page --

15            THE WITNESS:  Oh, I'm sorry, 33 and 34.

16            THE COURT:  Right.  Okay.  "Customer" says

17   Scientific Chemicals, Inc.

18            THE WITNESS:  Correct.

19            THE COURT:  And you think -- what should it

20   have said?

21            THE WITNESS:  Well, what's the date of this?

22   12-9?  It should have said SCIX.  Wait, 12-9?  Would

23   that say SCIX?

24            THE COURT:  Well, it says it's -- the

25   authorized signature --

1          THE WITNESS:  Is Brian Hipple.

2          THE COURT:  It says December of '11 on 33.

3   December '11, so as of December of '11 -- December 6th,

4   2011.

5          THE WITNESS:  Yeah.  It should have probably

6   said -- well, I don't know.  It could have --

7          MR. BERKOWITZ:  Objection, Your Honor.  We

8   have a document and it's not what it could have said or

9   should have said.  All it is is what it says.

10         THE COURT:  Well, wait a minute.  Mr.

11  Berkowitz, he's saying this is a mistake, it shouldn't

12  have said this.  I just want to know what should it

13  have said?

14         THE WITNESS:  I believe that it should

15  probably -- being it was ordered -- this -- Steel Seal

16  Pro was in town at that time, right?  2011 to '12?

17  Yeah.  Yeah, it should have said Steel Seal Pro as

18  customer.

19         THE COURT:  All right.

20         THE WITNESS:  Okay?  And we've been dealing

21  with them since 1999, Your Honor.

22         THE COURT:  Okay.

23         THE WITNESS:  Okay.

24         (Pause in proceedings.)

25         THE WITNESS:  I'm just going to ask myself a

                    Mr. Hipple - Direct                    141

1    question, all right, on P-127.

2              (Pause in proceedings.)

3              THE WITNESS:  Your Honor, I don't think this

4    was verified, but I'm not sure.  That's the one from

5    Ira Krassan.

6              THE COURT:  So, this is a tax return for

7    Clement Hipple dated --

8              THE WITNESS:  2009 and 2010.  You have P-20

9    -- 127 and 128.  But I'm just sitting here thinking I

10   think Ira Krassan verified these the other day.

11             MR. BERKOWITZ:  Objection, Your Honor, he did

12   not.  They were never offered.

13             THE COURT:  I don't recall him talking about

14   your returns.  I think Mr. Berkowitz is right.

15             THE WITNESS:  He didn't talk --

16             THE COURT:  No, I don't think he did.

17             THE WITNESS:  Okay.

18             THE COURT:  Not to my -- I don't recollect

19   that.

20             THE WITNESS:  All right.

21             THE COURT:  So what do you want to say about

22   it?

23             THE WITNESS: I want to turn to page number --

24             THE COURT:  These aren't -- are these in

25   evidence?

Mr. Hipple - Direct                    142

1          THE WITNESS:  Yes.

2          MR. BERKOWITZ:  No, they're not, Your Honor.

3          THE COURT:  They're not.

4          MR. BERKOWITZ:  They haven't been offered

5     yet.

6          THE COURT:  All right.

7          MR. BERKOWITZ:  They haven't been used.

8          THE WITNESS:  I thought we put these in

9     evidence the other day.

10          THE COURT:  No, he apparently didn't move

11     them into evidence.  I could check, I have my list.

12          MR. BERKOWITZ:  No, I didn't because I never

13     used them.

14          THE COURT:  Right.

15          THE WITNESS:  Well, I can't put them into

16     evidence?  He has to, right?

17          THE COURT:  Well, if they're your returns.

18     You want them in and they're your returns, you identify

19     your signature, you can --

20          THE WITNESS:  All right.  These are my

21     returns.  I can identify my signature and I'd like to

22     have P-127 and P-128 put in the -- put in the record.

23          THE COURT:  Any objections?

24          MR. BERKOWITZ:  No objections.

25          THE COURT:  They're admitted.

Mr. Hipple - Direct                    143

1       (Plaintiff's Exhibits 127 and 128, Clement

2    Hipple's tax returns, are admitted into evidence.)

3           THE WITNESS:  Okay.  All right.  If you would

4    turn to the last page of 2009 return.

5           THE COURT:  Okay.

6           THE WITNESS:  And you'll see there a payment

7    for royalties received, 117,991.

8           THE COURT:  Okay.

9           THE WITNESS:  Okay.  And if you turn to 128,

10   which also goes into evidence, and I offer that's my

11   signature.  If you turn to the last page -- well, next

12   to the last page, and same situation, royalties

13   received, 137,200.

14          MR. BERKOWITZ:  I'm sorry, could you read

15   that number again?

16          THE WITNESS:  137,200.

17          MR. BERKOWITZ:  137,200.  And that was what

18   year?

19          THE WITNESS:  '10.

20          (Pause in proceedings.)

21          THE WITNESS:  Okay.  Okay.  I believe I'm --

22   that it is for me.

23          THE COURT:  All right.  So you are finished

24   your --

25          THE WITNESS:  Okay.  I'm ready for

Mr. Hipple - Direct                          144

1    cross-examination.

2              THE COURT:  Okay.

3              MR. BERKOWITZ:  Mr. -- I'm sorry.

4              THE WITNESS:  Do you want to do this one

5    first?

6              MR. BERKOWITZ:  I will need that one, yes.

7                    CROSS-EXAMINATION

8    BY MR. BERKOWITZ:

9    Q    Now, Mr. Hipple, how many companies do you collect

10   royalties from?

11   A    None now.

12   Q    Well, in 2010, when we looked at your tax return --

13   A    Right.

14   Q    -- how many companies did you collect royalties

15   from?

16   A    One.

17   Q    And that was?

18   A    SCIX.

19   Q    So if we look at your Exhibit 128, your tax

20   returns, your royalties that year were 137,200?

21   A    That is correct.

22   Q    That's correct.  Okay.  Now, I'd like you to look

23   at Exhibit 31, I believe that's Mr. Geisser's tax --

24   Mr. Geisser's expert report.

25   A    Okay.

Mr. Hipple - Cross                    145

1    Q    I believe it's Plaintiff's Exhibit 31.  Yes, it is.

2    Then I'm going to ask you to turn to Exhibit B.

3              (Pause in proceedings.)

4    Q    Okay.

5    A    B?

6    Q    B.  There you go.  Do you --

7              MR. BERKOWITZ:  Your Honor, do you have

8    Exhibit B?

9              THE COURT:  I have it.  You can go ahead.  I

10   have it.

11   BY MR. BERKOWITZ:

12   Q    All right, Mr. Hipple, do you see that Exhibit B of

13   Mr. Geisser's report --

14   A    Yes, I do.

15   Q    -- uses Schedule C from Brian Hipple's tax return?

16   A    Yes, I do, Your Honor.

17   Q    And -- I'm not Your Honor.

18   A    Oh, well, yes, I do.

19   Q    And you see under SCIX, LLC, 2010?  Do you see that

20   year?

21   A    Yes, I do.

22   Q    And you see the sales for that year, gross receipts

23   for 2010?

24   A    Right.

25   Q    $868,000.

Mr. Hipple - Cross                                    146

1    A    That is correct.

2    Q    Okay.  And your royalty was ten percent of the

3    revenue?

4    A    No, my royalty was ten percent from 2001 forward.

5    I never -- I -- these were the first two royalty

6    payments where he was able to pay me something.

7    Q    Mr. Hipple, please.  You're trying to confuse

8    things.  I'm just trying --

9    A    I'm not trying to confuse things.

10   Q    -- to look at the tax return.  The tax return shows

11   revenue of $868,000.  Do you see that?

12   A    You're absolutely correct, it does.

13   Q    And you told us that in 2010 you received 137,200

14   in royalties, correct?

15   A    That is correct.

16   Q    And that is not ten percent of the revenue, is it?

17   A    That is correct.

18   Q    Okay.  It's not --

19   A    Now let me explain why.

20   Q    -- ten percent of the revenue.  No, you're not

21   going to explain why.  I get to ask you the questions

22   now, sir.  I have to unravel all this information, Mr.

23   Hipple.

24            THE COURT:  You can explain -- after he's

25   finished, you can explain why.

Mr. Hipple - Cross                    147

1        THE WITNESS:  Okay, fine.

2        THE COURT:  Make a note of that.  Do you have

3   a piece of paper?

4        THE WITNESS:  Yeah, let me go get -- I have

5   one.

6        THE COURT:  Here.

7        MR. BERKOWITZ:  Okay.  Exhibit 128.

8        THE COURT:  Write a note, "explain 2010

9   royalty."  That's what I would suggest you do.

10        (Pause in proceedings.)

11   BY MR. BERKOWITZ:

12   Q   Now, Mr. Hipple, you looked at your -- Plaintiff's

13   Exhibit 127, your 2009 tax return, correct?

14   A   Correct, yes.

15   Q   Okay.  And on that tax return you received

16   $117,991?

17   A   That is correct.

18   Q   And let's look at Mr. Geisser's report on Schedule

19   C of --

20   A   786.

21   Q   -- Brian Hipple's tax return that shows $786,000 of

22   revenue.  Do you see that?

23   A   That is correct.

24   Q   And $117,991 is not ten percent of that, is it?

25   A   That is correct.

1    Q    It's far greater?

2    A    Much greater.

3    Q    Thank you.

4    A    Now can I explain?

5    Q    Nope.

6    A    Not yet?

7    Q    Now, do you have that exhibit -- your Exhibit 501?

8    A    Yes.

9    Q    Now, you told me, sir, that you based this Exhibit

10   501 on Teresa Hipple's spreadsheet that I did?

11   A    No, I didn't tell you that.  I said that I did the

12   spreadsheet myself.

13   Q    Right.  Right?

14   A    Right.

15   Q    And it's got the loan and you calculated the

16   interest and you carried it out?

17   A    Right, correct.

18   Q    Okay.  Let's look at this.  The first heading on

19   this -- on the first page is 6-30-99.  You got $88,000,

20   right?

21   A    I loaned the $88,000, correct, yes.

22   Q    Okay.  And so the second column, it's got 639, and

23   in the second column is the amount of the loan --

24   A    Correct.

25   Q    -- 88,000?

Mr. Hipple - Cross                    149

1    A    Yes.

2    Q    And the third column is the interest?

3    A    Right, at ten -- yes.

4    Q    All right.  And you --

5    A    No, that's not interest.  Royalty at ten percent.

6    Q    I'm sorry.  Oh, on --

7    A    Or no, this is the note.

8    Q    On these promissory notes it's royalty?

9    A    I'm sorry, you're talking about a different thing

10   here.  I'm sorry.  These are JC Consulting notes.

11   Q    Correct, that's right.

12   A    Okay.  These are notes of JC Consulting.

13   Q    Correct.  And you've got interest in the third

14   column?

15   A    That is correct.

16   Q    Okay.  Now let's look at the fourth column on the

17   Exhibit 132 we used.  Do you see that "payments

18   received?"

19   A    Who --

20   Q    Do you see that?

21   A    Who are you talking about?  Teresa?

22   Q    On this one.

23   A    Yeah.  What about it?

24   Q    The payment received.  Show me the payment received

25   on that invoice -- on that document.

Mr. Hipple - Cross                    150

1   A    There is no payment received.  I never got paid

2   from JC.

3   Q    So you -- it's your testimony then that you never

4   received a single payment from JCC Consulting?

5   A    It is my testimony, and true testimony, and if you

6   look at all the documentations that you produced in

7   this report, point out one check that was paid to JC

8   Consulting.

9            THE COURT:  I'm a little confused because 132

10  is Teresa Hipple's loans.

11           THE WITNESS:  No, he's saying --

12           MR. BERKOWITZ:  Your Honor, I was --

13           THE WITNESS:  He's saying I didn't put none

14  in --

15           MR. BERKOWITZ:  -- pointing out the fact that

16  Exhibit 105 does not include any payment.  Now, Mr.

17  Hipple has just testified he didn't receive any

18  payments.

19           THE WITNESS:  That's right.

20           MR. BERKOWITZ:  Okay.

21           THE WITNESS:  I am testifying that, yes.

22           THE COURT:  Okay.

23           MR. BERKOWITZ:  Okay.

24           THE COURT:  All right.

25  BY MR. BERKOWITZ:

1   Q    Now, I'd like you to pick up --

2   A    Now, I'm going to take that one step further.

3   Q    No, you don't have a question.

4   A    Let me go one step further.  Let me answer the

5   question.

6           MR. BERKOWITZ:  He doesn't have a question in

7   front of him, Your Honor.

8           THE WITNESS:  I want to answer it.

9           THE COURT:  All right.  Go ahead, you can

10  answer it.

11          THE WITNESS:  Okay.  I did not receive any

12  payments, and if Mr. Berkowitz would go to his expert

13  report and point out out of all these years that he

14  went to 2006 and find one check paid to me, Clement

15  Hipple, for JC Consulting loans.

16  BY MR. BERKOWITZ:

17  Q    Well, you told us, sir, didn't you, you didn't have

18  a bank account and everything that was paid to you came

19  to A&C, isn't that right?

20  A    Well, it would still be here, a disbursement here.

21  Q    It came to A&C --

22  A    No, no?

23  Q    -- isn't that what --

24  A    You're not going to let me finish?

25  Q    -- you told us?

1   A    All right.  All right.  That's your question?  Is

2   that what I told you?

3   Q    That's what you told us?

4   A    Yes, I told you that.

5   Q    Thank you.

6   A    But, therefore --

7            THE WITNESS:  Your Honor, can I finish the

8   question?

9            THE COURT:  Go ahead.

10            THE WITNESS:  Therefore, A&C would be on

11   here, okay?

12   BY MR. BERKOWITZ:

13   Q    A&C would be on here where for payments?

14   A    For royalties payment, yes.

15   Q    Mr. Hipple, let's look at Mr. Geisser's Exhibit B,

16   and I'd like you to look down the left-hand column

17   where it says "expenses."

18   A    Right, go ahead.

19   Q    All right.  And I would like you to tell me where

20   you see that Brian Hipple paid royalties.

21   A    I don't see it anywhere.

22   Q    Okay.  So these 2009, 2010 royalty payments on your

23   document, on your tax returns, aren't really reflected

24   on Mr. Hipple's tax returns, are they?

25   A    I believe they are reflected on his tax returns.

Mr. Hipple - Cross                    153

1   Q   Well, you don't see any royalty entry, do you?

2   A   Let me put it this way.

3   Q   Do you see a royalty entry, sir?

4   A   Okay.  I know --

5   Q   Do you see a royalty entry?

6   A   No, I don't see a royalty entry.

7   Q   Okay.  Now, you testified that it's ten percent,

8   your royalty, correct?

9   A   It's my royalty -- now, let me finish, is ten

10  percent because I gave Brian a company that cost me

11  over $3 million.

12  Q   Well, I thought it was two, but that's okay.  It's

13  a lot of money.

14  A   Well, no, about the years that I operated.  You

15  think we operated for nothing, I put nothing in?

16  Q   Mr. Hipple, let's look down the 2010 column.  Do

17  you see that?

18  A   All right.  I see it, yes.

19  Q   On the -- and let's look at -- we're looking for

20  ten percents.

21  A   Right.

22  Q   And you see the percentages on the right?

23  A   Right.

24  Q   And you go down to -- through the expenses, about

25  seven expenses down.

Mr. Hipple - Cross                                154

1   A   Right.

2   Q   Do you see the ten percent?

3   A   No.

4   Q   You don't see ten percent?  I see one.

5   A   I see one, yeah.

6   Q   Do you see it there?

7   A   Yeah.

8   Q   Interest.  You paid interest of ten percent.  You

9   made him loans and there's interest payments here,

10  right?

11  A   That's not interest payment.

12  Q   Well, I'm sorry.  Am I reading this incorrectly?

13          THE COURT:  What number are you on again?

14  I'm sorry.

15          MR. BERKOWITZ:  I'm on Mr. Geisser's exhibit,

16  which is 31.

17          THE COURT:  Okay.

18          MR. BERKOWITZ:  Exhibit B to that.

19          THE COURT:  Thank you.

20          THE WITNESS:  Showing an exhibit expenses,

21  okay?

22  BY MR. BERKOWITZ:

23  Q   I am looking at Mr. Geisser's Exhibit B.

24  A   Yeah, which is under --

25  Q   And that --

1   A    Yeah.

2   Q    And that is based on Brian Hipple's tax return for

3   SCIX, LLC, the Schedule C.

4   A    Well, it says it's under -- I see it listed under

5   "shipping."

6   Q    I'm looking at a ten percent entry and it's under

7   "interest."  Do you see that?

8   A    Yeah, but the category is under "shipping."

9   Q    I'm sorry.  I'm sorry.  I'm looking at the category

10  that says "interest," right under "expenses."  One,

11  two, three, four, five, sixth one down, "interest."  Do

12  you see that?

13  A    Slow down.  Slow down.  Slow down.  Okay.  Calm

14  down, all right?  Go ahead.  Let's start all over.

15  Where do you want me to go?

16  Q    Do you see that?  It says "interest."

17  A    I don't see "interest," first of all.  Where's the

18  interest?

19  Q    Let's look at "expenses."  Do you see that on

20  Exhibit B?

21  A    I'm looking to the far left-hand corner of the

22  itemized categories.  Is that where you're telling me

23  to look?

24  Q    That's where I want you to look down.

25  A    Okay.  Take your time.  Okay, I'm going down, down,

1   down, down.  I see "Expenses for business use, your

2   home."  What --

3   Q    Do you see where it says "interest?"

4   A    "Interest?"

5              THE COURT:  The first number is 28,422?

6              MR. BERKOWITZ:  Correct.

7              THE COURT:  2006.

8   BY MR. BERKOWITZ:

9   Q    And just walk that across.

10  A    Oh, "interest."  Yes, I see "interest."

11  Q    Do you see that?

12  A    Okay.

13  Q    And that's the loans to you?  There's no bank

14  interest.  We have no bank records showing any

15  interest.  You said you loaned the company all this

16  money.  There's payments of interest reflected here.

17  A    There's no payments of interest reflected there.

18  Q    I'm going to have to --

19             MR. BERKOWITZ:  Could -- Your Honor, can I

20  read it to him?

21             THE WITNESS:  Oh, so these are probably more

22  payments of interest to Teresa, not me.

23  BY MR. BERKOWITZ:

24  Q    Let's look at it.

25  A    Okay, let's look at it.

Mr. Hipple - Cross                    157

1    Q    I'll -- and we can go through Teresa's payments if

2    you would like to show it's not --

3    A    I would like to.

4    Q    -- interest to her.  Let's look at that.

5    A    Okay.

6    Q    This interest, right, look at 2010.

7    A    Right.

8    Q    There's a ten percent entry.  That's what you say

9    is your royalty?

10   A    That's not a ten percent entry.  That's not --

11   Q    That doesn't say ten percent --

12   A    It does.

13   Q    -- in the far column --

14   A    But it's not --

15   Q    -- under 2010?

16   A    It's not ten percent of 868,000 if I --

17   Q    It actually is of the adjusted gross sales.

18   A    What are the adjusted gross sales?

19   Q    You're right, it's rounded.  I'm sorry.  It is

20   not -- it says ten percent interest.

21   A    It's a little bit more than rounded, okay?

22   Q    Okay.  Well, I don't have the program that does it.

23   It says ten percent right there, right?

24   A    So what is your point?

25              MR. BERKOWITZ:  Your Honor?

Mr. Hipple - Cross                    158

1   BY MR. BERKOWITZ:

2   Q    Now, in your exhibit, your D-105, you show -- I'm

3   sorry, D-501, D-105, I'm not sure --

4          THE COURT:  501.

5          THE WITNESS:  501.

6          MR. BERKOWITZ:  -- which one it is now.

7   BY MR. BERKOWITZ:

8   Q    You show no payments, correct?

9   A    For JC Consulting and Leasing Corporation, that's

10  correct.

11  Q    And you never received a payment for them?

12  A    That is correct.

13  Q    SCIX never made a payment for J --

14  A    Never made one payment.

15  Q    I'd like you to look at that Exhibit D-19D, which

16  was just admitted.

17  A    D-19 where?

18  Q    D-19D.

19          THE COURT:  That's in the book I presume?

20          MR. BERKOWITZ:  Yes, it's in the book.

21          THE COURT:  D-19.

22          (Pause in proceedings.)

23          THE WITNESS:  D-19.  That's not what they

24  want.

25          (Pause in proceedings.)

Mr. Hipple - Cross                    159

1        THE WITNESS:  I don't have anything in D-19.

2        THE COURT:  Yes.  They're the ones that we

3   gave -- made copies for Mr. Berkowitz.

4        MR. BERKOWITZ:  Yes.

5        (Pause in proceedings.)

6        THE COURT:  Do you want to look at -- is it

7   B?

8        MR. BERKOWITZ:  I'm looking at D-19 --

9        THE COURT:  Yes.

10        MR. BERKOWITZ:  -- D.

11        THE COURT:  D, okay.

12        MR. BERKOWITZ:  D-19D.

13        (Pause in proceedings.)

14        THE WITNESS:  Go ahead.

15   BY MR. BERKOWITZ:

16   Q    Do you see that?

17   A    Yes.

18   Q    Okay.  Now, I'd like to get you to a page that on

19   the top says 5-1-2001.  I don't know if they all say

20   that.

21   A    5-1 --

22   Q    5-1-2002.

23   A    The date?

24   Q    Yep.

25   A    All right.  I'm looking at a page that says "JC

1    Consulting, Clem Hipple and Teresa's loans."

2    Q    D-1D.   That's D-1A.

3              (Pause in proceedings.)

4    Q    Yes, we're on the right page now.   It's dated --

5    the first date, the first entry on the top, do you see

6    that?

7    A    Right.

8    Q    3-15-1999?

9    A    Yes, I do.

10   Q    Now, I'd like you to go down to -- you'll see a

11   number reference column, the second column.

12   A    Correct.

13   Q    And I'd like you to go down to 11-30.   Do you see

14   that?

15   A    It doesn't go to 11 --

16   Q    Under the number reference column it goes to 11-30.

17   A    Hold on.   11-30, JC Consulting.

18   Q    JG Consultants.

19   A    Accounts payable.

20   Q    Do you see that entry, accounts payable?

21   A    Okay.

22   Q    Do you see that next to it $2010.63?

23   A    That is correct.

24   Q    And then you see the next entry, 12-30 for 2010.

25   A    Right.

1  Q   All right?  Those are entries into accounts payable

2  to pay a bill, right?

3  A   Hold on.  Where's the -- oh, shoot.

4         (Pause in proceedings.)

5  A   Well, they wouldn't have been there to pay for JC

6  because the interest was only due at 586 --

7  Q   I'm just asking you to look at the document, sir.

8  You admitted this document.

9  A   Yes.

10 Q   And it shows accounts payable and it shows

11 payments --

12 A   Yeah.

13 Q   -- for 1-30, 12-30, 1-30-01, 12-28, 1-30 -- I'm

14 sorry, 3-30, 4-30, 5-30.  Do you see that?

15 A   Yeah.

16 Q   Okay.  And those were payments?

17 A   That's correct.

18 Q   Those are accounts payable?

19 A   Right.

20 Q   You told us two seconds ago -- you swore to us

21 several times you did not receive a single payment for

22 JC Consulting, and on your Exhibit D-105 or 501, it

23 doesn't show as receiving a single payment.

24 A   Right.

25 Q   Now, these start at 6-30-1999, correct?

1  A    That is correct.

2  Q    And they don't show a single payment on it?

3  A    And this starts at --

4  Q    They don't show a single payment, sir, is that

5  correct?

6  A    That is correct.

7  Q    And this document, your Exhibit D-19D, shows

8  accounts payable checks issued to JC Consultant?

9  A    Yes.

10 Q    And you want us to accept D-501 as an accurate

11 record of the payments in interest for --

12 A    Yes, I do, because --

13 Q    -- JC Consultants?

14 A    -- apparently these were made and I forgot that

15 they were made.  And you got any other payments that

16 were made?

17 Q    You forgot, I know.  My foot slipped on the rock,

18 too.  Now, I don't have all four pages of this Exhibit

19 501 or 105.

20          MR. BERKOWITZ:  And I'm going to object to

21 its entry anyway, Your Honor, but if I could have the

22 fourth page to it, I'd like to -- because he discussed

23 the summary.

24          (Pause in proceedings.)

25          MR. BERKOWITZ:  I'm sorry, Your Honor, this

Mr. Hipple - Cross                              163

1   exhibit is gobbly-gook.  I object to its use.

2               THE WITNESS:  One other thing you --

3               MR. BERKOWITZ:  It is incorrect, Your Honor.

4   He testified that it doesn't include any payments.  It

5   does include payments in its other exhibits.

6               THE WITNESS:  Your Honor, there's nowhere in

7   these documents that --

8               MR. BERKOWITZ:  And this exhibit should not

9   be admitted into evidence.

10               THE WITNESS:  All right, let him finish and

11   then I'll talk.

12               THE COURT:  All right, go ahead, Mr. Hipple.

13   Go ahead.

14               THE WITNESS:  There's nowhere in any of these

15   documents that he has here from 2006 on, okay -- all

16   right, maybe back in the beginning of time, 11 -- or

17   what?  15 years ago?

18               THE COURT:  Well, the time period does

19   overlap with your Exhibit 501.  In other words, these

20   payments --

21               THE WITNESS:  Okay.  All right.

22               THE COURT:  It says May 25th, 2001, to

23   3-29-2002, there were payments made to JC Consulting.

24               THE WITNESS:  That is correct.

25               THE COURT:  And that's the same time period

Mr. Hipple - Cross                          164

1  as your chart 501.

2           THE WITNESS:  I see that, Your Honor.  But,

3  again, I assumed that Brian never made any payments to

4  me because I never remember receiving payments in

5  reference to JC Consulting.

6           And, again, there's not one payment in all

7  these documents, in all these checks, going back to

8  2006.  So if you would like, Your Honor, I will move

9  that document up to 2006 and go from there, from 1999

10 to 2006, and admit it because there's more important

11 other things on there than the JC Consulting loan,

12 okay?  There's a lot more different things on there

13 that are more important.

14          THE COURT:  All right.  Look, I'll consider

15 501, but also, I'm going to consider D-19D, which

16 apparently shows that you didn't include all these

17 numbers.

18          THE WITNESS:  I know, Your Honor.

19          THE COURT:  So it casts doubt on the accuracy

20 and correctness of your exhibit.

21          THE WITNESS:  Well, Your Honor, I did that

22 late at night.  Again, I didn't have documentation --

23          THE COURT:  All right, I'll admit 501, but

24 I'm also going to consider the testimony, your

25 testimony, and also the Exhibit D-19 and --

1          THE WITNESS:  Okay.  Even if it's --

2          THE COURT:  -- Mr. Berkowitz's argument that

3   it's inaccurate.

4          (Defendant's Exhibit 501, document, is

5   admitted into evidence.)

6          THE WITNESS:  Even if you want to take it

7   just to 2006 and include the interest from 2006 because

8   we have document here, Your Honor, from --

9          THE COURT:  You mean from 2006 onward you

10  mean?

11         THE WITNESS:  Yeah, so do -- alls I'm asking,

12  Your Honor, place it in a 2006 forward.  Take

13  everything out from 1999.

14         THE COURT:  I'll consider it with everything

15  else.

16         THE WITNESS:  Okay, thank you.

17         MR. BERKOWITZ:  Your Honor, if you would look

18  at those -- Exhibit D-19.

19         THE COURT:  Right.

20         MR. BERKOWITZ:  These documents end at 2002.

21         THE COURT:  Correct.

22         MR. BERKOWITZ:  We have no idea what payments

23  might have been made after 2002 based on these.

24         THE WITNESS:  Well, what's --

25         MR. BERKOWITZ:  And we saw that the ones that

1   we did have a record of payments received, they're not

2   reflected on the exhibit.

3          THE COURT:  All right.  Well, this doesn't go

4   to admissibility as much as it goes to the weight I

5   should give this document, okay?

6          THE WITNESS:  Okay.

7          THE COURT:  And you're making a good case

8   that I shouldn't give it a lot of weight.  But whether

9   it's admissible or not, I think it's admissible.

10          MR. BERKOWITZ:  Okay.

11          THE COURT:  I made my ruling.  But I

12   completely understand your argument.

13   BY MR. BERKOWITZ:

14   Q   Now, Mr. Hipple, if you look at Plaintiff's Exhibit

15   6.

16   A   Okay.  P-6?

17          (Pause in proceedings.)

18   A   P-6.  P-6.

19   Q   It's the white binder.

20   A   Yeah, I got it.  Let me get some stuff moved out of

21   the way here, okay?

22          (Pause in proceedings.)

23          THE WITNESS:  Your Honor, should we go back

24   to the royalty issue before he continues?

25          MR. BERKOWITZ:  Your Honor, I'm asking him --

Mr. Hipple - Cross                                    167

1

2           THE COURT:  No, he has -- you got to ask --

3    you got to follow his directions right now while he's

4    questioning you.  You can always go back to something

5    later.  So we want to go to P-6 you said?

6           MR. BERKOWITZ:  P-6.

7           THE WITNESS:  Yes.

8           MR. BERKOWITZ:  Briefly, Your Honor.

9    BY MR. BERKOWITZ:

10   Q    See P-6?

11   A    Yep.

12   Q    Do you see it up -- in the upper, left-hand corner

13   where it says "Teresa, Clem, JC?"

14   A    That is correct.

15   Q    And you recall there's no JC from your account,

16   correct?

17   A    Excuse me?

18   Q    There is no document similar to P-6 or P-9 for JC

19   Consulting?

20   A    No.

21   Q    Now, Mr. Hipple, you testified about when you buy a

22   business, you look at a business to buy.

23   A    Yes.

24   Q    You look at the books and records, don't you, when

25   you're going to buy a business?

1    A    Yes.

2    Q    Okay.

3    A    Of course.

4    Q    And in this litigation, nobody produced any books

5    and records, right?

6    A    I wasn't talking about that.

7    Q    I'm not asking you what you talked about.  You told

8    me you looked at the books and records and we didn't

9    have any books and records, did we?

10   A    I don't know what was produced.

11   Q    Okay.  Well, you got all sorts of exhibits.  I'll

12   represent to you there are very few books and records

13   produced.  You heard Mr. Geisser testify to that,

14   didn't you?

15   A    Yes, (inaudible).

16   Q    Now, you talked about the formula.

17   A    That's right.

18   Q    Now, the formula, you said D-90 -- I'm sorry, let

19   me -- D-20 --

20   A    (Inaudible).

21   Q    That's the patent for the Steel Seal product,

22   right?

23   A    Not -- oh, D-20.

24   Q    D-20.

25             (Pause in proceedings.)

                          Mr. Hipple - Cross                    169

1    A    Yes, you're correct, the patent.

2    Q    And that's the -- that's the patent for the Steel

3    Seal?

4    A    Yes, and --

5    Q    It mentioned that it shows ranges of components,

6    right?

7    A    That's correct.

8    Q    And you know they do that so somebody can't just

9    use the patent and duplicate the formula?

10   A    I think that's what I said, yes.

11   Q    Well, that's not what you said.  You said that only

12   you owned the formula, right?

13   A    No, I said the --

14   Q    You said.

15   A    I'll have to verify.

16   Q    You said -- I wrote this down -- SCIX never had the

17   formula.  You had the formula and you put it in your

18   company, Steel -- Scientific Chemical, Inc., right?

19   A    That is correct, yes.

20   Q    So you took the patented formula of SCIX and you

21   put it in another company, right?

22   A    Let me know when you're done.

23   Q    You put it in another company?  That's a question.

24   Right?

25   A    No, that's incorrect.

Mr. Hipple - Cross                    170

1   Q    You didn't put it in Scientific Chemical?

2   A    That's --

3   Q    I thought you told us you put the formula in

4   Scientific Chemical?

5   A    Okay.  Slow --

6           THE WITNESS:  Can you slow him down?

7   BY MR. BERKOWITZ:

8   Q    You can hear my question.

9   A    I don't understand your question.  Now ask me one

10  question at a time.

11  Q    I'll ask you the questions --

12  A    Okay.

13  Q    -- the way I want to ask you the questions, Mr.

14  Hipple.

15          THE COURT:  Repeat the -- repeat the

16  question.  Let's -- everybody calm down.

17          THE WITNESS:  One question.

18  BY MR. BERKOWITZ:

19  Q    You testified that you took the formula because you

20  knew the micro details of the formula and it wasn't in

21  the patent that was owned by SCIX --

22  A    That in inc --

23  Q    -- and you put it in Scientific Chemical, Inc.?

24          THE COURT:  Answer.

25          THE WITNESS:  That is incorrect.

Mr. Hipple - Cross                                   171

1          THE COURT:  Why is it incorrect?

2          THE WITNESS:  Because the patent formula, the

3   actual formula, I didn't take.  It was -- my testimony

4   was that Robert Barks, after I paid him, gave me the

5   actual ingredients.

6          I took those actual ingredients before SCIX

7   even started to produce chemical, and took it to

8   Colonial Chemical under a confidentiality agreement

9   before SCIX even sold a bottle.

10  BY MR. BERKOWITZ:

11  Q    So the patent --

12  A    Ask your --

13  Q    The patent that SCIX owned doesn't pertain to the

14  product, Steel Seal?

15  A    Of course it does.

16  Q    Okay.  And that's the formula for Steel Seal that's

17  patented?

18  A    No, it isn't.  That's --

19  Q    That's not what the patent is?

20  A    Well --

21  Q    That's your testimony?

22  A    My testimony is that the patent is the patent for

23  the chemical formula, but it has ranges.  What don't

24  you understand about the part of ranges?

25  Q    The patent that's recorded in the patent office

1   shows ranges, but the product that you patented was

2   Steel Seal?

3   A    In 1999 --

4   Q    The product that you patented was Steel Seal?

5            THE COURT:  You have to answer that.  Was

6   that yes or no?

7            THE WITNESS:   The product that I patent,

8   yes --

9   BY MR. BERKOWITZ:

10  Q    Thank you.

11  A    -- was Steel Seal.

12  Q    And you took that formula that's covered by the

13  SCIX patent and you stripped the formula out and put it

14  in your Scientific Chemical Company, right?

15  A    No, incorrect.

16  Q    I'm sorry.  Let's look at --

17  A    Can I answer the question?

18  Q    No, you answered it.  Now I'm going to ask you to

19  go look at that --

20  A    No, I mean I have further answer --

21  Q    -- Exhibit 37.

22           MR. BERKOWITZ:  Your Honor --

23           THE WITNESS:  Wait a minute.

24           MR. BERKOWITZ:  -- I'm cross-examining the

25  witness.

Mr. Hipple - Cross                    173

1      THE WITNESS:  Don't I have to (indiscernible)
2  answer to the question?
3      THE COURT:  Wait a minute.  Just please stop,
4  both of you.  All right, so you said it's incorrect.
5      THE WITNESS:  But I want to explain why it's
6  incorrect.
7      THE COURT:  All right, tell us why it's
8  incorrect.
9      THE WITNESS:  Okay.  It's incorrect because I
10  received the actual formula in 1999, which I took to
11  Colonial Chemical, which you see under the
12  confidentiality agreement, okay.  Steel Seal did not
13  start selling actual chemical until I don't know when,
14  the end of '99?
15      THE COURT:  Go ahead.
16      THE WITNESS:  So, therefore --
17      MR. BERKOWITZ:  I'm listening.
18      THE WITNESS:  -- the patent is just the
19  patent of what the attorneys drew up, okay?  This is
20  the way an attorney draws up a patent.  They don't give
21  you -- they don't -- they don't say it's two ounces of
22  sodium silicate and four ounces of potassium silicate.
23  Nobody knows that information but me.
24  BY MR. BERKOWITZ:
25  Q   Mr. Hipple, I'm going to ask you to look at Exhibit

Mr. Hipple - Cross                          174

1   D-20.

2   A    What am I looking at?

3   Q    That is the patent for the Steel --

4   A    P or D?

5   Q    D.

6   A    D-20?

7   Q    Yes.

8   A    I am at D-20.

9   Q    Okay.  Let's look at the date the patent was filed.

10  Do you see that?

11  A    Yeah, December 12, 2000.

12  Q    No, let's go down where you see it says "inventors,

13  Robert Barks?"

14  A    Right.

15  Q    "Assignee, SCIX, LLC?"

16  A    Correct.

17  Q    And the date it's filed, January 8th, 1999?

18  A    That is correct.

19  Q    Now, I'd like you to turn to the confidentiality

20  agreement.  It's in my Exhibit 37.  I don't know which

21  defendant exhibit it is.

22  A    Your exhibit 30 what?

23          THE COURT:   37.

24  BY MR. BERKOWITZ:

25  Q    37.  It's in there with several other documents.

Mr. Hipple - Cross                          175

1   Confidentiality agreement is D-13.

2               (Pause in proceedings.)

3   A   What's the number at the -- okay.

4   Q   2-13, do you see that?

5   A   Okay, March 29th, 2000 -- '99.

6   Q   I want you to -- March 29th, 2000.

7   A   I meant 1999.

8   Q   Okay.  So it was patented in January of 1999?

9   A   No, it was submitted as a patent in January of

10  1999.  It was submitted.  That's the day it was --

11  Q   Oh.  It --

12  A   -- filed.

13  Q   The document said it was filed as a patent at that

14  time.

15  A   Yeah, but the date of the patent was December 12th,

16  2000.

17  Q   And so you submitted it to the patent office,

18  right?

19  A   Well, I didn't submit it.  The attorneys submitted

20  it.

21  Q   The attorney submitted it?

22  A   Right.

23  Q   And then -- you submitted it in January for the

24  Steel Seal product.  And then in Sep --

25  A   Wait a minute.  What do you mean January?

Mr. Hipple - Cross                    176

1    Q    And March 29th -- well, you just said the patent

2    was filed in January.

3    A    Okay, the patent was filed on January 8th, 1999.

4    Q    Okay.

5    A    We're all in agreement there.

6    Q    So now, on March 29th then you're telling us you

7    stripped the patented formula out from SCIX?

8    A    No, the patent formula was never in the patent.

9    What part of that do you not understand?

10           MR. BERKOWITZ:  I'm sorry, Your Honor.  It's

11   been a long week and this is ridiculous.

12           THE COURT:  Is your position that the owner

13   of the patent doesn't own the formula?

14           THE WITNESS:  What's that?

15           THE COURT:  Is your position that the owner

16   of the patent is not the owner of the formula?

17           THE WITNESS:  Correct, that's my --

18           THE COURT:  There's two different elements?

19           THE WITNESS:  That's right.

20           THE COURT:  So what --

21           THE WITNESS:  The object was --

22           THE COURT:  In your view, what is the value

23   of the patent?

24           THE WITNESS:  The patent has no value.  It's

25   been expired anyway.  That's why (indiscernible).

1           THE COURT:  No, but you had one patent that's

2   active.

3           THE WITNESS:  Yeah, but that's just a

4   procedure patent, Your Honor.

5           THE COURT:  All right, but the ones -- the

6   patents prior to expiration, you're saying they were of

7   no value?

8           THE WITNESS:  No, they didn't have no value

9   unless you knew the actual formula.  SCIX never knew

10  it.

11          THE COURT:  Okay.

12          THE WITNESS:  It had no value.  You can sell

13  a patent, Your Honor.  What are you going to sell,

14  okay?  Now let me talk for just a minute, okay?

15          MR. BERKOWITZ:  Your Honor, there's no

16  question in front of him.  I know we've been a little

17  flexible, but I'm trying to cross-examine the witness.

18          THE WITNESS:  Well, I'm not finished my

19  answer yet.

20          MR. BERKOWITZ:  You have finished your

21  answer, sir, and --

22          THE COURT:  All right, why --

23          MR. BERKOWITZ:  -- there's no question in

24  front of you.

25          THE COURT:  Mr. Hipple, let him ask the next

1  question.

2          THE WITNESS:  Okay.

3          THE COURT:  You answered my questions.

4          THE WITNESS:  Okay.

5  BY MR. BERKOWITZ:

6  Q    You also talked about the fact that you had the

7  website, correct?  It was your website?

8  A    Yes.

9  Q    And that was owned in your Scientific Chemical

10 Company, Inc.?

11 A    Correct.

12 Q    Okay.  And then what you did was you sold to Brian

13 Hipple, you assigned your interest to SCIX to him,

14 correct?

15 A    That is correct.

16 Q    And you retained your voting rights according to

17 the document you signed?

18 A    That's incorrect.

19 Q    Well, let's --

20         THE COURT:  Well, I know that.  According to

21 the document, it says it, but you've said that was a

22 mistake, right?

23         MR. BERKOWITZ:  It --

24         THE COURT:  Right, Mr. Hipple?

25         THE WITNESS:  Right, exactly.

Mr. Hipple - Cross                                    179

1      THE COURT:  Okay.  We've been over that.

2   BY MR. BERKOWITZ:

3   Q    And you testified you never saw any board meetings

4   or anything else with SCIX?

5   A    Of course I testified to that, yes.

6   Q    Correct?

7   A    Yes.

8   Q    Okay.  Now, you said you own the website, you say

9   you own the formula, you transfer it to your son's

10  company, SCIX?

11  A    No.

12  Q    No, you transferred SCIX to your son, right?

13  A    That is correct.

14  Q    Okay.  So now he has SCIX that doesn't have a

15  website and doesn't have a formula and he's selling

16  this product on the internet and getting money?

17  A    That is correct.

18  Q    Okay.  And we saw many checks payable to A&C from

19  the money generated from the sale of Steel Seal, didn't

20  we?

21  A    No, that --

22  Q    We --

23  A    Those checks were paid under a license agreement.

24  Q    Yeah, they were a license agreement that we haven't

25  produced.

1          MR. BERKOWITZ:  Your Honor, it's not the --

2

3          THE WITNESS:  It had nothing to do --

4          MR. BERKOWITZ:  -- royalty this time.

5          THE WITNESS:  Right.

6    BY MR. BERKOWITZ:

7    Q    But there are a lot of checks in there payable to

8    A&C?

9    A    Under the license agreement.

10   Q    Yes, those are under the license agreement and the

11   others are the royalty.  I understand that, Mr. Hipple.

12   So your son has a company that doesn't have a product

13   that it owns and doesn't have a website to sell, and

14   you come to him on October 5th, 2010, after Teresa

15   Hipple has garnished the bank account and you say to

16   him here, sign a $210,000 note that you can't pay back

17   and I'm going to foreclose upon, correct?

18   A    That's what I was advised to do, yes.

19   Q    Okay.  And so your son, who doesn't own a formula

20   and thinks he doesn't have a website, he signs the

21   note.  And it's your testimony you had no control over

22   what he could do?

23   A    Could you give me that early part of that sentence?

24   My son?  Yes.

25   Q    Brian Hipple, yes.

Mr. Hipple - Cross                                    181

1   A    Yes.  Okay.

2   Q    You understand that.

3   A    Because -- yeah.

4   Q    Don't try and interfere with --

5   A    And I'm his father.

6   Q    -- my questions.

7   A    You understand that, right, or was his father.

8   Q    Now, so we have a company that you say you have

9   absolutely no control over.  I never worked there, I

10  never did anything, even though the documents say that

11  I retained all my voting rights and I control the

12  formula that it sells and I control the website that it

13  sells.  I'm not an insider to SCIX, but my son

14  basically gave me everything that the company owned,

15  correct?

16  A    Okay.  Are we -- are we done with the theatrical

17  part, okay?

18              MR. BERKOWITZ:  I'm asking if that was --

19              THE WITNESS:  Now, can you just --

20              MR. BERKOWITZ:  -- correct, Your Honor.

21              THE COURT:  Was it correct?

22              THE WITNESS:  I don't know what you're

23  saying.  I need you to repeat the question.

24              MR. BERKOWITZ:  I'm sorry, Your Honor.  I'm

25  asking questions that he can understand.

Mr. Hipple - Cross                    182

1          THE COURT:  All right.  Just ask it again for

2    me --

3          MR. BERKOWITZ:  He's interfering with this.

4          THE COURT:  -- will you, please, help me out.

5    Just let's speed this up.

6          MR. BERKOWITZ:  Sure.

7          THE WITNESS:  Because I can't understand.

8          MR. BERKOWITZ:  Sure.

9          THE WITNESS:  What's the question?

10   BY MR. BERKOWITZ:

11   Q    Mr. Hipple, I'll go slow.  You own -- according to

12   you, SCIX, which held the patent, got nothing.  It

13   didn't own the formula, right?

14   A    That is correct.

15   Q    It didn't own the formula, correct?

16   A    They owned the patent with the formula that was in

17   the patent, yes.

18   Q    But, not the real formula to produce Steel Seal?

19   A    Because there's never a real formula --

20   Q    That --

21   A    -- in the patent.

22   Q    Okay.

23   A    Because anybody can go online and open up any

24   patent.

25   Q    Just like if I were to get a copyright on a

Mr. Hipple - Cross                    183

1  computer program, I don't have to put my computer

2  program in its entirety on the copyright --

3  A    Oh, yes, you --

4  Q    -- do I?

5  A    Yes, you do because you're trying --

6  Q    Oh, no, you --

7  A    -- you're trying --

8  Q    -- don't, sir.

9  A    -- to use it.

10           THE COURT:  All right, we're arguing with one

11  another.

12           MR. BERKOWITZ:  Oh, no you don't.

13           THE COURT:  We're arguing with one another.

14  Come on.  Just ask the questions.

15  BY MR. BERKOWITZ:

16  Q    Now, if you own the formula and you tell us you own

17  the website, and you also -- the documents show you

18  own --

19  A    You're asking too many questions at one time.

20           THE COURT:  No, he's not.  He's not.  Just

21  listen to him.

22  BY MR. BERKOWITZ:

23  Q    And you had transferred to your son your ownership

24  in SCIX, with a document that says you still control

25  the voting rights, correct?

Mr. Hipple - Cross                              184

1    A    We've been over that 14 times, okay.

2    Q    That's not my question.  My question was --

3    A    That's incorrect.

4    Q    That's not correct?

5    A    That's --

6    Q    That is not correct?

7    A    I never had voting rights.  I never held any

8    meetings, okay.  I've said that over and over.  I

9    testified that under oath over and over.  Ira Katz

10   (sic) the other day also testified to the fact that we

11   never held any meetings, okay, he never knew of me

12   having any voting rights.

13             (Pause in proceedings.)

14   Q    Let's look at Plaintiff's Exhibit 17.

15   A    I'll find it.

16             (Pause in proceedings.)

17             MR. BERKOWITZ:  Your Honor, I hate to keep

18   going over this, but I can't get an answer.

19             THE WITNESS:  I've given you an answer three

20   times.

21             MR. BERKOWITZ:  Yeah, I know that.  I'm

22   looking for a truthful answer, sir.

23             THE WITNESS:  Yeah.  No, you're looking for

24   your answer you -- what you want to hear.

25             THE COURT:  Please don't argue.  We're

Mr. Hipple - Cross                          185

1  wasting a lot of time.  Come on.  Let's get this over

2  with.  So look at the document.  Your question, Mr.

3  Berkowitz, please?

4  BY MR. BERKOWITZ:

5  Q   Let's look at the second paragraph of this 17.  Do

6  you see that?  It begins, "Notwithstanding"?

7  A   Uh-huh.

8  Q   "Notwithstanding anything herein to the contrary,

9  assignor," that's you, correct?

10  A   Yes, assignor.  I believe that's me.

11  Q   And that's your -- that's your signature at the

12  bottom?

13  A   Yes, I identify that signature.

14  Q   -- "shall retain full voting rights with respect to

15  the membership interest with respect to all matters

16  relating to the affairs of the company in which the

17  company may cast votes pursuant to the operating

18  agreement of the company."  Did I read that correctly?

19  A   Yes, you did.

20  Q   Thank you.  So on October 5th, you come to your son

21  and you ask him to sign 100 -- a $210,000 promissory

22  note, right?

23  A   Yes.

24  Q   All right.  And in this promissory note, drafted I

25  think you said by was it Mr. Fogerty?

1   A    Yes.

2   Q    Okay.  And just turn to Exhibit 8.

3            (Pause in proceedings.)

4   Q    And I would like you -- are you at Exhibit 8?

5   A    Yes, I am.

6   Q    I would like you to look at the second -- bottom of

7   the second paragraph.

8   A    Which we just discussed earlier, yes.  Go ahead.

9   Q    Mr. Hipple, just let me ask my questions.

10            Do you see in parentheses, "(Creditor waiving

11   all previously accrued interest in connection with

12   monies loaned by creditor to debtor)"?  Do you see

13   that?

14   A    Yes, I do.

15   Q    Did I read that correctly?

16   A    Yes.

17   Q    And it says "previously accrued," right?

18   A    Previously, yes, it does.

19   Q    Before?

20   A    Before, yes.

21   Q    Before this was signed, all the interest before is

22   waived?

23   A    Yes.

24   Q    Okay.  And this was drafted by your attorney?

25   A    That is correct.

Mr. Hipple - Cross                    187

1   Q    Okay.

2   A    Can I answer the question now.

3   Q    You just did.

4           THE COURT:  No, you did.  You answered it.

5           THE WITNESS:  All right.  I can give an

6   explanation?

7           THE COURT:  Well, you'll have to wait until

8   after he's finished.

9           (Pause in proceedings.)

10  BY MR. BERKOWITZ:

11  Q    You criticized Mr. Geisser's report a few minutes

12  ago.  You said he stated that Teresa Hipple was owed

13  more than $400,000, correct?

14  A    Correct.

15  Q    Do you recall that?

16  A    Yes, I did to explain that people --

17  Q    I don't need you to tell me --

18  A    -- make mistakes.

19  Q    -- why.  Just tell --

20          THE COURT:  All right.

21          MR. BERKOWITZ:  Just answer the question.

22          THE COURT:  Just -- okay.  He's right.  He's

23  right.  You just have to answer it, and you have an

24  opportunity after he's finished to go over these points

25  again and give your point of view.

Mr. Hipple - Cross                          188

1      THE WITNESS:  Well, how am I going to
2  remember that?
3      THE COURT:  Well, that's --
4      THE WITNESS:  I have to write this down?
5  Okay.
6      THE COURT:  You write it down.  Write it
7  down.
8      THE WITNESS:  Where are we at?  We're working
9  on D-8?  Hold on for a minute.  Okay.  Now, where are
10  we at now?
11      THE COURT:  Well, he's talking about Mr.
12  Geisser's report.
13      THE WITNESS:  What number is this Mr.
14  Geisser's report?
15      THE COURT:  Well, it's 31.
16      MR. BERKOWITZ:  I'm asking you a question.
17      THE COURT:  Right.
18  BY MR. BERKOWITZ:
19  Q   You testified criticizing him because he said Mr.
20  Concepcion was owed more than $400,000.  It wasn't that
21  long ago.  I remember that testimony.  Do you recall
22  that?
23  A   I'm sorry.  Could you repeat the question?
24  Q   No.  You heard the question, sir.
25      THE COURT:  Mr. Geisser talked about how much

1  Ms. Concepcion is owed.

2           THE WITNESS:  Right.

3           THE COURT:  You remember that.

4           THE WITNESS:  In his report.

5           THE COURT:  Okay.  So go ahead.

6           THE WITNESS:  Yes.

7  BY MR. BERKOWITZ:

8  Q   And do you want to look at the date of the report?

9  I'll represent to you it's June 25th, 2013.

10  A   Okay.

11  Q   All right.  Now, I'm going to show you January 2013

12  on this chart that's been admitted into evidence that

13  shows the debt that's owed to Ms. Concepcion.  January

14  2013, $430,059 -- let me do that again, $430,059.75.

15  Do you see that?

16           (Pause in proceedings.)

17  A   Yes.

18  Q   Mr. Geisser's report is not wrong then, is it?

19  A   Maybe I read it wrong.  Let's see.  "Loan more than

20  four" -- okay.  All right, according to my first

21  amended complaint, Teresa --

22           MR. BERKOWITZ:  Your Honor, that is --

23  there's no question now.  He answered the question.

24           THE COURT:  Well, I'm not sure he answered.

25  I'm not sure he did answer to tell you the truth.

Mr. Hipple - Cross                              190

1   Maybe this -- what he's saying is not responsive, but

2   I'm not sure he actually answered it.

3   BY MR. BERKOWITZ:

4   Q   Mr. Hipple, if you could look over here, this chart

5   that has been admitted into evidence, showed that

6   Teresa Hipple-Concepcion was owed about $430,000 in

7   January of 2013 when Mr. Geisser's report was issued?

8   Do you see that?

9   A   I see it.

10  Q   That's all I'm asking you to look at.

11              THE COURT:  That's what Mr. Geisser's -- and

12  it's consistent with Mr. -- what Mr. Geisser is saying.

13              THE WITNESS:  His --

14              MR. BERKOWITZ:  That's right.

15              THE WITNESS:  His report was June 25th.

16  BY MR. BERKOWITZ:

17  Q   Of 2013?

18  A   Yes.

19  Q   Okay, good.  Let's go to June 2013.  So in June of

20  2013, Ms. Concepcion was owed $446,000?  So he was

21  wrong.  He only said 400,000.  It was actually more.

22  A   I assumed he was talking about the note.

23  Q   I'd like you to look at --

24  A   11?

25  Q   -- Plaintiff's Exhibit 11.

Mr. Hipple - Cross                                    191

1   A    All right.

2              (Pause in proceedings.)

3   A    Where we going?

4   Q    Plaintiff's Exhibit 11.

5   A    Okay.

6              (Pause in proceedings.)

7   A    Go ahead.

8   Q    Do you see that?  And that, you testified, is the

9   UCC 1 prepared?  It says right up at the top, "Kevin

10  Fogerty," your lawyer?

11  A    That is correct.

12  Q    And let's look at the next page.

13  A    I didn't understand --

14  Q    So your --

15  A    -- this page last time.

16  Q    So your lawyer put on the list of assets

17  "websites," right?

18  A    I'm --

19  Q    It's right there at the top, sir.  Did I read that

20  right?

21  A    I'm trying to find it because I -- you talked about

22  this last time and I didn't understand what we were

23  talking about.

24  Q    Look at the first listing under "list of assets."

25  It says "website," correct?

Mr. Hipple - Cross                              192

1    A    Could you show me on this?

2    Q    You're looking at the wrong exhibit.  This is --

3    we've seen this book.  I can't tell you why it's

4    missing.  I'll show you in my book.  We have used

5    this -- this is your Exhibit D-3.

6    A    You asked me that last time.  I didn't understand

7    it.

8    Q    Let's look at your Defense Exhibit 3.  Do you see

9    that, Mr. Hipple?  Here's Defense Exhibit 3, yours,

10   right?

11   A    Okay.  This only has two pages.

12   Q    Yeah, prepared by your attorney, right?

13   A    Yes, of course.

14   Q    And look at the assets.  "Websites?"

15   A    Right.

16   Q    "Quickbooks?"

17   A    Right.

18   Q    So you got all the Quickbooks records from SCIX,

19   right?

20   A    No, I never did.

21   Q    Oh, so you got the Quickbooks, but you didn't get

22   the records that come with it?

23   A    No, I didn't get the Quickbooks either.

24   Q    You didn't get the Quickbooks?  Well, we'll take a

25   look at the office equipment that you took and the

Mr. Hipple - Cross                               193

1   computers and the like that you took.  An 800 number,

2   right?

3   A    Yes.

4   Q    Okay.  Computers and office furniture?

5   A    Yes.

6   Q    So the Quickbooks wasn't in the computer?

7   A    I thought you meant the Quickbooks itself.

8   Q    Mr. Hipple, you knew what I was talking about.  You

9   didn't have to look at the source code, did you?  It

10  was in the -- you see you got the computers, too?

11  A    Yes, I got the computers, office furniture and

12  equipment that was all junk.

13  Q    And now let's look at the Steel Seal logo.

14  A    Right.

15  Q    You got that, right?

16  A    Well, it was mine, but yes, go ahead.

17  Q    You got -- yes, I know, because your attorney put

18  it on here by mistake.

19  A    Well --

20  Q    Because everything was yours even though --

21  A    -- what's the paperwork say?

22  Q    -- even though you don't have a personal bank

23  account and everything flows from A&C and you got the

24  formula, you took it out of the patent and put it into

25  Scientific Chemicals.  You also took the

Mr. Hipple - Cross                    194

1   confidentiality agreement with Colonial Chemical,

2   right?  You filed a security interest in that?

3   A    What exhibit is the confidentiality agreement?

4   Q    Just look at this exhibit, Mr. Hipple.  It says

5   right here "Confidentiality agreement with Colonial

6   Chemical," right?

7   A    This list of assets?

8           THE COURT:  That's what it is attached to the

9   security agreement -- financing statement.

10  BY MR. BERKOWITZ:

11  Q    UCC 1.

12  A    Oh, look at UCC 1 now?

13          THE COURT:  No, Exhibit A to Exhibit 3.  He

14  wants to know whether you took the --

15          THE WITNESS:  Exhibit A says --

16          THE COURT:  -- confidentiality agreement with

17  Colonial Chemical.

18          THE WITNESS:  Right.  Okay, yes.

19  BY MR. BERKOWITZ:

20  Q    And the formula?

21  A    Yes.

22  Q    Okay.  The formula for Steel Seal?

23  A    Yes.

24  Q    Okay.  You took that, too?  That was on one of the

25  assets you secured that was owned by SCIX?  That's what

Mr. Hipple - Cross                               195

1   this is, right?

2   A    No.  Well, no.

3   Q    That's not what this is?

4   A    No.

5   Q    So this is not a UCC 1 that lists the assets that

6   you placed a security interest in prepared by your

7   attorney?  That's not what this is?

8   A    It's what is says, but it's not what it is.

9   Q    It's what it says, but it's not what it is.  Okay.

10  And you took the Steel Seal inventory.  You took

11  receivables, tape machines, bubble wrap, a car.

12  That's the stuff you were securing?

13  A    Well, there seems to be a lot of other stuff --

14  Q    Mr. Hipple, please just answer the question.

15  That's what -- this says what it says, right?  We can

16  agree on that?

17  A    We'll get back to this.  Okay.

18  Q    No, we won't.  We're going to look at it right now.

19  A    No.

20  Q    This Exhibit A says what it says.

21          THE COURT:  Well, I can -- it does say what

22  it says.

23          MR. BERKOWITZ:  Thank you.

24          THE WITNESS:  Yes, it says what it says.

25          THE COURT:  In black and white.

Mr. Hipple - Cross                    196

1              MR. BERKOWITZ:  Thank you.

2              THE WITNESS:  Right.

3              THE COURT:  All right, so I'll take notice of

4    that.

5              THE WITNESS:  Defendant --

6    BY MR. BERKOWITZ:

7    Q    Now, let's look at Exhibit 18 again.

8              THE COURT:  P-18?

9              MR. BERKOWITZ:  P-18.

10             (Pause in proceedings.)

11   BY MR. BERKOWITZ:

12   Q    Do you see that?

13   A    Yes, sir.

14   Q    Now let's look in the first paragraph.  You recall

15   this letter?  We looked at it before.

16   A    Yes.

17   Q    Okay.  "My company, Complete Group, is now the

18   successor in interest to the confidentiality agreement

19   between SCIX, LLC, and Colonial Chemical on March 29,

20   1999, regarding the formula of the chemical sealer now

21   known as Steel Seal," right?  You wrote that to Mr. --

22   A    That is correct.

23   Q    -- Berghof?

24   A    Yes.

25             THE COURT:  Wait, we're on 18?

1    MR. BERKOWITZ:  18, yes, Your Honor.

2    THE COURT:  Oh, I'm sorry.

3    MR. BERKOWITZ:  There are two pages to 18.

4    THE COURT:  I have D's book, I'm sorry.  You

5  did say P.  Yes, I remember these documents.  Yes, I'm

6  with you.  Go ahead.

7    MR. BERKOWITZ:  Okay.

8  BY MR. BERKOWITZ:

9  Q    You got a lot of -- Complete Group got all this

10  stuff from SCIX, right?

11  A    That is correct.

12  Q    Okay.  And SCIX had to get it somewhere that

13  Complete Group could get it from SCIX.  So, SCIX had

14  the formula and it had the confidentiality agreement.

15  That's what this says, isn't it?

16  A    Yes, that's what it says.

17  Q    Okay.

18         (Pause in proceedings.)

19  Q    And the next letter from Brian Hipple says the same

20  thing?

21  A    I don't know about a next letter from Brian Hipple.

22  Q    The next -- go ahead.  Well, you can take your time

23  and read it.

24  A    Well, I don't --

25  Q    I'll read it.

Mr. Hipple - Cross                         198

1   A    I object.

2   Q    Just let me read this.

3   A    I object --

4   Q    "Clement Hipple" --

5   A    -- to that and I --

6   Q    -- "has acquired" --

7           THE COURT:  I'll overrule the objection.  Let

8   him read it.

9   BY MR. BERKOWITZ:

10  Q    "Clement Hipple has acquired all of the assets of

11  SCIX, LLC, including all of the Steel Seal then

12  completed and any future orders.  Clement Hipple's

13  company, Complete Group, is the successor in interest

14  of the confidentiality agreement executed between SCIX,

15  LLC, and Colonial Chemical on March 29, 1999, regarding

16  the formula of a chemical sealer now known as Steel

17  Seal."  I read that correctly?

18  A    Yes.

19  Q    Okay.  Now, do you have the confidentiality

20  agreement with you?

21  A    No, what page?

22  Q    There's many pages.

23           (Pause in proceedings.)

24  A    I believe it's in the back, 37?

25           (Pause in proceedings.)

Mr. Hipple - Cross                              199

1   A   Well, I would like our confidentiality agreement

2   and my agreement because it has (inaudible).

3   Q   Sure.  You take the one in your book.

4            (Pause in proceedings.)

5            THE COURT:  It's D-13.

6   BY MR. BERKOWITZ:

7   Q   D-13.  Let's look at D-13.

8   A   This book is all messed up.  Go ahead.

9            (Pause in proceedings.)

10  Q   D-13, this is your exhibit, sir.  Let's go to the

11  second page of D-13.  That's the confidentiality

12  agreement.  Do you see that?

13  A   Yes, I do.

14  Q   Now, it's got the word -- let's read that top line.

15  It's between Colonial Chemical Company, CCC, right, and

16  Scientific Chemical, Inc.?

17  A   Correct.

18  Q   Correct?

19  A   Yes.

20  Q   No S?

21  A   We've been over this, yes.

22  Q   All right.  There's no S?

23  A   Five times, yes.

24  Q   Okay, good.  And in parentheses, "(SCIX)?"

25  A   Correct.

Mr. Hipple - Cross                        200

1   Q   Okay.  And in your letters now -- well, that's the

2   agreement, the SCIX agreement, that went from SCIX to

3   you to Complete Group, right?

4   A   Yes.

5               (Pause in proceedings.)

6   Q   Let's go to Exhibit -- Plaintiff's Exhibit 51.

7               (Pause in proceedings.)

8               THE COURT:  P-51?

9               MR. BERKOWITZ:  P-51, Your Honor.

10              (Pause in proceedings.)

11  BY MR. BERKOWITZ:

12  Q   P-51.

13              (Pause in proceedings.)

14  Q   Do you see that?  That's your complaint?  See that

15  that's the Complete Group complaint they filed against

16  Steel Seal Pro?  Do you see that?

17  A   This is the first time I'm seeing this complaint.

18  Q   No, it's not, Mr. Hipple.  You verified it.  Now, I

19  would like you to turn --

20  A   Well, I mean I --

21  Q   I would like you to turn to page three --

22  A   Okay.

23  Q   -- under "factual background."  It should be the

24  fourth page, I'm sorry, in this exhibit.

25  A   Okay.  We went over this before?

Mr. Hipple - Cross                        201

1   Q    Mr. Hipple, look at paragraph three, please.

2   A    Okay.

3   Q    "Plaintiff is the owner of certain assets,

4   including, but not limited to, a chemical formulation

5   which is used to seal leaks in the engines of older

6   automobiles or end product," correct?  That's what it

7   says?

8   A    On 351.  Okay, it says "Plaintiff," meaning Teresa,

9   right?

10  Q    Mr. Hipple, it says "Plaintiff," and that's

11  Complete Group.  This is your complaint that you

12  verified.

13  A    Oh, okay.  All right.

14  Q    -- "is the owner of certain assets," I read that

15  correctly, didn't I?

16  A    Yes, you did.

17  Q    Okay.  So they owned the formula, right, because

18  they got it from you, right?  Then you conveyed it to

19  Steel Seal Pro because you transferred intellectual

20  property to them, and that's in your license agreement,

21  right?

22  A    Not that I'm aware of.

23  Q    Not that you're aware of.  Okay, well, we'll make

24  you aware of it.

25  A    Make me aware of it.

Mr. Hipple - Cross                    202

1   Q   Go to Plaintiff's Exhibit 14.

2            THE COURT:  Is this the licensing agreement?

3            MR. BERKOWITZ:  Yes.

4            THE COURT:  It's actually attached to a copy

5   of this complaint.

6            MR. BERKOWITZ:  Oh, okay.

7            THE COURT:  Yes, you were just on 51.  It's

8   attached.

9            MR. BERKOWITZ:  Okay.

10           THE COURT:  Because it makes reference to it

11  in the next paragraph.  I don't want to steal your

12  thunder, but I'm just -- you know, it says here --

13  paragraph five of the complaint says, "The terms and

14  conditions of the contractual relationship were set

15  forth in certain license agreement by and between

16  plaintiff and defendant dated October 18th, 2010.  A

17  copy of that license agreement is attached hereto as

18  Exhibit A."  That's the same licensing agreement,

19  right?

20           MR. BERKOWITZ:  Yes.

21           THE WITNESS:  Yes.

22           THE COURT:  Okay.

23  BY MR. BERKOWITZ:

24  Q   And, in fact, Complete Group got from you

25  intellectual property, correct?

Mr. Hipple - Cross                    203

1   A    If that's what it says, yes.

2   Q    Yeah.  So it got intellectual property.  Now, you

3   talked about before intellectual property is not stuff

4   you can pick up and put --

5   A    Right, it's anything --

6   Q    -- in your pocket, right?

7   A    -- you can't pick up, right.  I understand that.

8   Q    And you testified before the -- Teresa -- do you

9   know how to execute on the judgment?

10  A    I took ones to Doylestown, yes.  I took them to the

11  prothonotary office.

12  Q    Are you aware of the procedures involved in

13  executing on judgments?

14  A    No, the only thing I ever done with a judgment is

15  recorded in a prothonotary office.

16  Q    And you know that a sheriff can't go and pick up

17  intellectual property and levy on intellectual

18  property, right?  You know that?

19  A    Right, but it can pick up --

20  Q    You know it can't collect and pick up and levy on

21  intellectual property, correct?

22  A    That is correct.

23  Q    Now, you said Teresa Hipple --

24  A    Where we at?  What number --

25  Q    -- could have levied --

Mr. Hipple - Cross                          204

1   A    -- are you talking about?

2   Q    Excuse me, Mr. Hipple, I'm asking you a question.

3              THE COURT:  He's not on a document.  He's

4   just asking you some questions.

5              THE WITNESS:  Well, how am I going to rebut

6   it later.

7   BY MR. BERKOWITZ:

8   Q    Mr. Hipple, you said Teresa Hipple --

9              THE WITNESS:  I object because I don't

10  understand it.  I'm sorry.

11             MR. BERKOWITZ:  Your Honor --

12             THE COURT:  No, let him ask the question.

13  You have to answer the question.  You can make a note.

14  It's not about a document.  He's asking you a question.

15  So he's not referring to a document.  He's asking you a

16  question.

17             THE WITNESS:  All right.  What is the

18  question?

19             THE COURT:  Make a mental note of this

20  question.  Go ahead.

21             THE WITNESS:  Well, I can't spell the note,

22  but go ahead.

23  BY MR. BERKOWITZ:

24  Q    You said that Teresa Hipple could have executed on

25  her judgment before you took all the assets of SCIX.

1  Do you recall that?

2  A    No, that's not exactly what I said.  I said Teresa

3  Hipple could have levied -- sent the sheriff out and

4  picked up the Steel Seal and the products, yes, I said

5  that.

6  Q    Could have picked up the Steel Seal and the

7  product?

8  A    Right.  Yes, that's what I said.

9  Q    Okay.  But he couldn't have picked up the logo?

10 A    No, I don't think so.

11 Q    And he couldn't have picked up the intellectual

12 property that you got?

13 A    Right.  Wait a minute.

14 Q    And he couldn't pick up the patent --

15 A    Okay.

16 Q    -- because it took me a long time to get the

17 patent?

18 A    Okay, here we go.  Hold on.  Let me see if I can do

19 this.  Logo, Teresa --

20              (Pause in proceedings.)

21 A    -- intellectual -- no idea -- properties.

22              (Pause in proceedings.)

23 Q    Mr. Hipple, I'm now going to ask you to look at

24 Exhibit 130.

25              (Pause in proceedings.)

Mr. Hipple - Cross                                          206

1   Q   Did you have a chance to look at Exhibit 130?

2   A   No, hold on a second.

3   Q   Well, Mr. Hipple, please look at Exhibit 130.

4   A   I'm looking at it right now, yes.

5   Q   Okay.  Now let's look at the second page.  You

6   talked about the fact that Teresa Hipple could have

7   picked up the inventory, the Steel Seal inventory,

8   right?

9   A   Yes, that is correct.

10  Q   Okay.  Now let's look at the second page of "the

11  physical assets I have taken."  You're the "I,"

12  correct?

13  A   Yes, I'm the "I."

14  Q   All right.  Now let's look at that, the number of

15  cases from Colonial Chemical.  Would you read those to

16  me?

17  A   Yes, Colonial Chemical, 353 cases.

18  Q   You picked up 353 cases at Colonial Chemical,

19  right?

20  A   No, that's incorrect.

21  Q   What does it say?

22  A   I said --

23  Q   It says, "Picked up from Colonial Chemical 353

24  cases," right?

25  A   Right.

Mr. Hipple - Cross                    207

1   Q    Colonial Chemical is in New Jersey, right?

2   A    That's correct.

3   Q    And the Bucks County sheriff can't go levy on

4   assets, we don't even know where they are, right?

5   A    You don't know where Colonial Chemical is?

6   Q    So the Bucks County sheriff can't go to New Jersey

7   and levy on assets and we don't know they are there, do

8   we?

9   A    I don't know what you know.

10  Q    Okay.  Let's look at Plaintiff's Exhibit 24.

11           (Pause in proceedings.)

12           MR. BERKOWITZ:  Your Honor, I would like to

13  -- I only have one copy.  I would like to read this as

14  P-205.

15           THE WITNESS:  Can I see that, please?

16           THE COURT:  He'll make a copy for you.

17           THE WITNESS:  Where do you want me to go?

18           THE COURT:  We'll make a copy.  P-205?

19           MR. BERKOWITZ:  Asked and delivered,

20  Plaintiff's Exhibit 24.

21           (Pause in proceedings.)

22  BY MR. BERKOWITZ:

23  Q    Do you see that?

24           THE WITNESS:  I object to this document.

25  BY MR. BERKOWITZ:

1  Q   Do you see the document?

2           THE WITNESS:  I object to it.

3  BY MR. BERKOWITZ:

4  Q   Do you see the document?

5           THE COURT:  You have to at least identify it.

6  Do you see it?

7           THE WITNESS:  I see it.  I see it.  I object.

8           MR. BERKOWITZ:  It's been admitted into

9  evidence, Your Honor.

10          THE WITNESS:  But, again, it's SCIX --

11 BY MR. BERKOWITZ:

12 Q   Do you see this?

13          THE WITNESS:  It's SCIX.  I object.  It has

14 nothing to do with me.

15 BY MR. BERKOWITZ:

16 Q   Okay.  Now --

17          THE COURT:  Wait a minute.  P-24, right?

18          THE WITNESS:  Yes.

19          MR. BERKOWITZ:  P-24.

20          THE COURT:  Okay.

21 BY MR. BERKOWITZ:

22 Q   Do you know what this is?  I'll tell you what it

23 says.  It's "Interrogatories in aid of execution

24 pursuant to PARCP --

25          THE WITNESS:  I object to the document.

Mr. Hipple - Cross                          209

1   BY MR. BERKOWITZ:

2   Q   -- 3117A.

3          THE COURT:  It's been admitted into evidence

4   so you --

5          THE WITNESS:  But, again, it's not -- it's a

6   SCIX document.

7          MR. BERKOWITZ:  Yes, because we're trying

8   to --

9          THE WITNESS:  I'm not SCIX.

10          MR. BERKOWITZ:  -- execute on a judgment

11   against SCIX.

12          THE COURT:  Well, you have to answer the

13   question.  So he just said do you see the document?

14   You see it, right?

15          THE WITNESS:  I said yes to that.

16          THE COURT:  It's been admitted into evidence,

17   so he's going to ask you some questions about it.

18          THE WITNESS:  Okay.

19   BY MR. BERKOWITZ:

20   Q   Do you know what this is?

21   A   No.

22   Q   I'm going to tell you this is a pretty standard

23   document in Pennsylvania to collect on judgments.  You

24   asked the debtor, SCIX, tell me where your assets are

25   so I can execute on them.

1    THE WITNESS:  This is my document?

2    THE COURT:  No.

3    MR. BERKOWITZ:  This is my document.

4    THE COURT:  Well, it's a document that was

5  submitted to SCIX, so I think the testimony is that

6  Brian Hipple filled out the answers.

7    MR. BERKOWITZ:  Correct.

8    THE COURT:  Right.

9    MR. BERKOWITZ:  And I am going to the letter,

10  is my October 6th letter sending to Brian Hipple these

11  documents, the transmittal with the interrogatories

12  attached.

13    THE COURT:  Okay.

14    MR. BERKOWITZ:  Now --

15    THE COURT:  I think his -- I think Monica,

16  his common law --

17    MR. BERKOWITZ:  She's copying that, yeah.

18    THE COURT:  -- wife, identified this writing

19  as his.

20    MR. BERKOWITZ:  As his, yes.

21    THE COURT:  Right.

22    MR. BERKOWITZ:  And I just want to show that

23  it was sent to Brian Hipple as soon as the bank

24  answered the interrogatories and attachment.

25    THE COURT:  Okay.

Mr. Hipple - Cross                          211

1  BY MR. BERKOWITZ:

2  Q   Now, you criticized Ms. Hipple, you said she could

3  have levied on the assets.  You would agree with me she

4  can't levy on the assets when she doesn't know where

5  they are?

6  A   I guess the question is did she try to levy on

7  them.

8  Q   No, that's not the question.  You got to answer my

9  question.

10  A   Okay.

11        THE COURT:  She doesn't know where --

12        MR. BERKOWITZ:  Don't --

13        THE WITNESS:  And that's in reference to this

14  paragraph here, right?

15  BY MR. BERKOWITZ:

16  Q   You got to answer my question, sir.

17  A   I know.  Well, I'm going to ask you a question.

18  Q   No, you're not.  You're going to answer my

19  question.

20        THE COURT:  Wait.  Please.

21        THE WITNESS:  Well --

22        THE COURT:  I'm going to tell you what to do,

23  and here's what you got to do.

24        THE WITNESS:  P-24?

25        THE COURT:  Wait.  He's asking --

Mr. Hipple - Cross                    212

1          THE WITNESS:  He's still on P-24.

2          THE COURT:  If Ms. Hipple didn't know where

3    the assets were or if there were any assets, the

4    question is could she have executed?  That's the

5    question.  Yes or no?

6          THE WITNESS:  All right, the question is Ms.

7    Hipple --

8          (Pause in proceedings.)

9          THE WITNESS:  Okay.

10         THE COURT:  Your answer?

11         THE WITNESS:  I'm assuming --

12         THE COURT:  Your answer?

13         THE WITNESS:  -- Ms. Hipple did not know

14   where the assets were.

15         THE COURT:  Right.  That's your assumption.

16   Your answer is?  She wouldn't have been able to

17   execute, right, because she wouldn't have known --

18         THE WITNESS:  I would assume -- yeah, right,

19   she did not know where they are.

20         THE COURT:  All right.

21   BY MR. BERKOWITZ:

22   Q   Right.  So she couldn't execute on them, right?

23   A   Yeah.

24   Q   She couldn't execute on the assets until she knows

25   where they are, correct?

Mr. Hipple - Cross                              213

1   A    Well, you --

2            THE COURT:  He agrees with that.

3            MR. BERKOWITZ:  I --

4            THE WITNESS:  I agree with that.

5   BY MR. BERKOWITZ:

6   Q    Now, Mr. Hipple, on October 5th, you got a

7   promissory note from SCIX, correct?

8   A    What --

9   Q    You don't have to look at it.  You got a promissory

10  note from SCIX?  Do you remember that, for $210,000?

11  A    Hold on.  Hold on.

12  Q    The one we've been talking about since Monday.

13  A    Well, let me get the tab.

14           (Pause in proceedings.)

15  A    Do you know the tab offhand?  Let's assume that I

16  have an attorney here, okay?  My attorney would wait to

17  show me the tab, okay?

18           MR. BERKOWITZ:  Your Honor, Mr. Hipple

19  voluntarily and knowingly waived the right to an

20  attorney, and if he had an attorney, we wouldn't be

21  going through this nonsense, as you know.

22           THE WITNESS:  Okay.  What tab?

23           MR. BERKOWITZ:  He waived it and he ought to

24  have to deal with the fact that he waived it, and he

25  doesn't --

Mr. Hipple - Cross                    214

1          THE COURT:  All right.

2          MR. BERKOWITZ:  -- have the requisite

3    background sometimes.

4          THE COURT:  Yes.  Do you know the number of

5    the promissory note?

6          MR. BERKOWITZ:  The promissory note is P-8.

7          THE COURT:  Look at P-8.

8          THE WITNESS:  Judgment note.

9          (Pause in proceedings.)

10         THE WITNESS:  I -- mine says judgment note.

11   BY MR. BERKOWITZ:

12   Q    And that's fine.  It's the judgment note for

13   $210,000, the one we've been talking about since

14   Monday, right?

15   A    The one we just had a few minutes ago, yes.

16         THE COURT:  And the date of that is October

17   5th, 2010.

18         MR. BERKOWITZ:  Right.

19         THE COURT:  That was the question, right?

20         MR. BERKOWITZ:  Yes.

21   BY MR. BERKOWITZ:

22   Q    It is the one where you waived all the interest,

23   and it says it's due when -- any monies -- you expend

24   or sustain or incur any fees in connection with or on

25   account of the loan.  That's when it was due.  We

Mr. Hipple - Cross                              215

1    talked about that before, right?

2    A    Yes.

3    Q    Okay.  And this was on October 5th, correct?

4    A    That's the date on the letter, yeah.

5    Q    And on the same date you got your security

6    interest.  We've already seen that, where you secured

7    the website --

8    A    What tab?

9    Q    -- and the formula and everything, right?

10   A    What tab?

11   Q    I'm not talking about a tab, sir.  I'm not asking

12   you to look at it.

13   A    Well, I -- you asked three questions there.

14   Q    I'm going to walk through all those questions.

15   Let's look at Exhibit 12.

16            THE COURT:  P-12?

17            THE WITNESS:  P-12?

18   BY MR. BERKOWITZ:

19   Q    Yep.

20   A    Okay.

21   Q    All right?

22   A    Yep.

23   Q    You got it?

24   A    I got it.

25   Q    Three days after the note was issued you made a

Mr. Hipple - Cross                    216

1   full demand for payment, right?  That's what Exhibit 12

2   says?

3   A    Yes, on the advice of my attorney, exactly.

4   Q    I just asked you if that's what the document says,

5   Mr. Hipple.

6   A    Yes.

7   Q    That's what it says, right?

8   A    Yes, that's what --

9   Q    Okay.

10  A    -- it says.

11  Q    Now let's look at Exhibit 13.

12  A    All right.

13  Q    On October 13th, do you see that, you had taken all

14  the assets on October 13th?  Everything.

15  A    Let me read it, okay?  You're just going too

16  quickly again for me.  I will --

17              (Pause in proceedings.)

18  A    Now, I'm going to slow you down if you don't mind,

19  Your Honor, because this is his way of confusing me,

20  okay?

21  Q    All right.

22              THE COURT:  Well, he's not abusing you.  He's

23  just --

24              THE WITNESS:  No.

25              THE COURT:  -- asking questions.

Mr. Hipple - Cross                    217

1           THE WITNESS:  Confusing me.

2           THE COURT:  But, if you need him to go slower

3    now, he will.

4           THE WITNESS:  Confusing me.

5           THE COURT:  All right, go ahead.

6           THE WITNESS:  Okay.

7           (Pause in proceedings.)

8           THE WITNESS:  Yes, it identifies some

9    sections of the code, and yes, it says I'm collecting

10   the assets.

11   BY MR. BERKOWITZ:

12   Q    Took all the -- and your son at the bottom consents

13   to taking all the collateral, right.  See that bottom

14   paragraph?

15          (Pause in proceedings.)

16   A    Yes, he agrees.

17   Q    All the collateral, right?  All that stuff we saw

18   in the UCC 1?

19   A    Yeah, I believe it's the UCC 1, yes.

20   Q    Yeah.  All the -- all those invoices.  So on the

21   13th of October, you had everything, correct?

22   A    Yeah.  Yes, that would be correct according to this

23   letter, yes.

24   Q    Okay.  And then you entered the licensing

25   agreement, you did the purchase agreement.  You sold

Mr. Hipple - Cross                              218

1   everything you got from SCIX, everything, to Complete

2   Group?

3   A    Correct.

4   Q    Right?

5   A    Yes.

6   Q    And then Complete Group gave it all to Brian Hipple

7   to use, correct?

8   A    No, he gave him a license agreement, correct.

9   Q    But everything.  All the intellectual property and

10   everything that was on Exhibit A?

11   A    I believe so.

12   Q    Yeah.  It says right in the agreement that your

13   attorney wrote?

14   A    Right.

15   Q    Right?

16   A    I believe so, that's correct.

17   Q    Okay.  So as of the license agreement, what we have

18   is if I'm correct, we have Steel Seal being sold to

19   Steel Seal Pro.

20   A    That is correct.

21   Q    Using all of the assets of SCIX?

22   A    That is correct.

23   Q    And Brian Hipple is selling it?

24   A    The best person to sell it, yes.

25   Q    Absolutely.

Mr. Hipple - Cross                    219

1   A    Right.

2   Q    And Brian Hipple was the owner of SCIX, right?

3   A    He was -- or he is the owner, yes.

4   Q    Okay.  He was the owner and he was the owner at the

5   time of his --

6   A    Right.

7   Q    -- demise.  And it didn't appear on his inventory,

8   but he was the owner, right?  There was no -- you

9   weren't aware of any change in the corporate status,

10  right?

11  A    I don't know much about SCIX, right.

12  Q    Okay.  So now Steel Seal Pro is being sold by Brian

13  Hipple, right?

14  A    Correct, yes.

15  Q    And it's using all of SCIX's assets?

16  A    Yes, that is correct.

17  Q    Okay.

18  A    I gave him that right.

19  Q    That's right.  So Steel Seal -- SCIX --

20  A    Because he couldn't sell them if I didn't give him

21  that right.

22  Q    SCIX could not conduct any more business, could it?

23  A    No, it could not.

24  Q    Because it didn't have anybody working for it,

25  right?

Mr. Hipple - Cross                    220

1    A    That is correct.

2    Q    Because your son signed these notes and you took

3    all the assets, right?

4    A    Yes, Teresa took the money, I took the assets.

5    Q    You took all the assets.  That's right.  You took

6    them all?

7    A    Every one.

8    Q    Correct.

9    A    Right.

10   Q    And we saw that when SCIX was collecting the money

11   from the sale of Steel Seal, the money went into

12   Wachovia Bank, right?

13   A    Yes, that is correct.

14   Q    And that's how Teresa Hipple was able to garnish

15   money?

16   A    That is correct.

17   Q    She knew what the bank account was?

18   A    The 50,000, yes.

19   Q    Okay.  So now we have Steel Seal Pro using all the

20   assets of SCIX, and you're getting money from Steel

21   Seal pro, right?

22   A    That is correct, yes.

23   Q    And Melissa Moreno is getting money from the sale

24   of Steel Seal through Steel Seal Pro?

25   A    Well, what Melissa was getting I haven't --

Mr. Hipple - Cross                      221

1   Q   Melissa testified that she received checks from

2   Steel Seal Pro, didn't you hear that?

3   A   I wasn't involved in the day-to-day operations.   I

4   heard --

5   Q   You were sitting here when --

6   A   I heard her testify.

7   Q   -- she testified.

8   A   Yes.

9   Q   Okay.   Nobody questioned her testimony.

10  A   Right.

11  Q   And Brian received money from SCIX and Steel Seal

12  Pro?

13  A   Might have received money from -- which time

14  period?

15  Q   First, SCIX, and then he got it from Steel Seal

16  Pro?

17  A   That is correct.

18  Q   So Melissa, Brian, and you got it from it SCIX?

19  You got money from SCIX?

20  A   That's correct.

21  Q   You call it whatever kind of payment you want.   You

22  got all the money?

23  A   Right.   That is correct.

24  Q   And Steel Seal Pro got it.   You still got all the

25  money --

Mr. Hipple - Cross                    222

1   A    Right.

2   Q    -- and Brian got all the money and Teresa got all

3   the money, right?  I'm sorry, not Teresa, Melissa?

4   A    Yes, correct.

5   Q    Okay.  Okay.  Now, you knew that Teresa could not

6   execute on the bank account of Steel Seal Pro, right?

7   A    I didn't know that.

8   Q    Oh, you didn't know that?  You didn't know that her

9   judgment was against SCIX and she couldn't execute

10  against assets owned by --

11  A    You'll --

12  Q    -- a different company?

13  A    You'll have to talk with Brian about that, sorry.

14  Q    I'm not talking to Brian.  I'm talking to you, sir.

15  A    Okay.  What's your question?

16  Q    You didn't know then that Teresa could not execute

17  against a separate company?

18  A    I don't know if she could have put a judgment

19  against that company.

20  Q    You knew she didn't have a judgment against Steel

21  Seal Pro, didn't you?

22  A    But I didn't know whether she could.

23  Q    You didn't -- you knew she didn't have a judgment

24  against Steel Seal Pro?

25  A    At that time, she did not, but there was nothing

Mr. Hipple - Cross                      223

1    stopping her from putting a judgment I'm sure.

2    Q    Yeah, that's why we're here today, sir.

3    A    All right.

4    Q    But too late.  Everything's gone, right?

5    A    Actually, everything is gone, yes.

6    Q    You got all the money from Steel Seal Pro, right?

7    We went through the execution proceedings.

8    A    Right, everything is gone.

9    Q    And you picked up over $240,000 from that?

10   A    No, 100 -- okay, yeah, around 240.

11   Q    You got a $40,000 check.

12   A    Right.

13   Q    And you got $197,000 at the completion of the

14   execution.

15   A    That is correct.

16   Q    That's pretty good.

17   A    Yeah, that's pretty good.

18   Q    As a matter of fact, it exceeds the $210,000 note.

19   A    But that's a different (indiscernible).

20   Q    I -- it's -- right, $240,000 is more than 210,000,

21   you'll agree with me, sir?

22   A    It's from two different entities.

23   Q    You'll agree with me, sir, that 240,000 exceeds

24   210,000?

25              THE COURT:  I'll take notice.  I --

Mr. Hipple - Cross                    224

1          MR. BERKOWITZ:  Thank you.

2          THE COURT:  I'll take judicial notice --

3          MR. BERKOWITZ:  Thank you, Your Honor.

4          THE COURT:  -- that it is 30,000 more.

5    BY MR. BERKOWITZ:

6    Q    Mr. Hipple, I'm going to show you a document that's

7    been marked for identification as Plaintiff's Exhibit

8    P-205 and I'm going to ask you to look at that

9    document.

10   A    This is the new one?

11             (Pause in proceedings.)

12   A    This is from what attorneys?

13   Q    Do you see the addresses?  Do you see it's to

14   who -- to who it is addressed?

15             (Pause in proceedings.)

16   A    It's addressed to two addresses, yes.

17   Q    Yes.

18   A    97 Pearl Drive, Southampton, PA, and 3761 Coles

19   Spring Road.

20   Q    Okay.

21   A    Yep.

22   Q    It was sent to Brian Hipple and SCIX, right?

23   A    I don't think -- I don't believe SCIX was at 97

24   Pearl Drive.

25   Q    Okay.  But Brian was at that address?

Mr. Hipple - Cross                              225

1    A    He was at 3761 Coles Spring Road.

2    Q    Okay.  Brian was at that address?

3    A    That is correct.

4    Q    Okay.  And I'm going to tell you the mail didn't

5    come back.  Can I have that back, sir?

6    A    Well, can I see what it is?

7    Q    Sure, absolutely.

8    A    This mail came back to you?

9              THE COURT:  You're just establishing when it

10   was sent to him?

11             MR. BERKOWITZ:  Correct.

12             THE WITNESS:  Okay.

13   BY MR. BERKOWITZ:

14   Q    And you see what that is?  Those are the

15   interrogatories in aid of execution.

16   A    I never saw the document, but okay, whatever you

17   say the document is, I'm sure it is, but I never saw

18   it.

19             MR. BERKOWITZ:  We move for the admission of

20   Plaintiff's Exhibit 205.

21             THE WITNESS:  I object, Your Honor.  I never

22   saw that document.  It has nothing to do with me.  This

23   law case is against me personally, and I object of any

24   document going in in reference to Brian Hipple.

25             THE COURT:  Fine.  I'll overrule the

Mr. Hipple - Cross                      226

1   objection.  I'll admit it.

2              THE WITNESS:  All right.

3              (Plaintiff's Exhibit 205, document, is

4   admitted into evidence.)

5   BY MR. BERKOWITZ:

6   Q   And Brian responded to that.  Of course, I had a

7   right to them again, right?  Do you recall I talked

8   about that in the time line?

9   A   I --

10  Q   He said I sent it again and that's when I got it

11  back --

12  A   No, I don't recall.

13  Q   -- in January, right?

14  A   I don't recall the time line.

15  Q   Well, I sent this out on the 6th and you had all

16  the assets by the 13th, right?

17  A   I think that's correct, yes.

18  Q   13th of October, that's when you got them all?

19  A   Right.

20  Q   Now --

21             THE COURT:  I believe he wrote back and said

22  he never received a copy.

23             MR. BERKOWITZ:  Correct.

24             THE COURT:  And he asked for another copy be

25  sent --

Mr. Hipple - Cross                                227

1          MR. BERKOWITZ:  Okay.

2          THE COURT:  -- and I think Mr. Berkowitz sent

3   him another copy.

4          MR. BERKOWITZ:  Yes.  And he did respond to

5   it --

6          THE COURT:  Right.

7          MR. BERKOWITZ:  -- in January.

8   BY MR. BERKOWITZ:

9   Q    Mr. Hipple, you saw Teresa Hipple went through this

10  process through the sheriff's office, right?

11  A    Excuse me?

12  Q    To execute on her garnishment, she had to use the

13  sheriff?  Just like you did in Complete Group when

14  Complete Group sued Steel Seal Pro to get the money.

15  A    Okay.

16  Q    You know --

17  A    Yeah.

18  Q    -- $240,000.

19  A    You mean me personally, not Complete Group?

20  Q    Complete Group was the plaintiff in that case.

21  That's who the money was issued to.

22  A    Oh, okay.  You're talking about the funds in the

23  bank?

24  Q    Yeah.

25  A    Yeah.

Mr. Hipple - Cross                          228

1   Q    You had to go through the sheriff's office?

2   A    Yes.

3   Q    And there's a lot of procedure you have to go

4   through?

5   A    I don't know what procedure took place.  I was -- I

6   was in Colombia.

7   Q    Oh, you -- well, I'm going to tell you.  There's a

8   lot of procedure you have to go through, just like what

9   we did to garnish the money in the bank.

10           Now, you, sir, took those assets by passing a

11  few sheets of paper between you and your son between

12  October 5th and October 13th, correct?

13  A    I passed the papers that was given to me by my

14  attorney, yes, correct.

15  Q    Between October 5th and October 13th?

16  A    That is correct, yes.

17  Q    Okay.  So at that point, Teresa Hipple had nobody

18  to recover from, right?

19  A    I don't know.

20  Q    Okay.  Well, you knew SCIX was out of business,

21  right?

22  A    No, it wasn't out of business.

23  Q    You knew SCIX was no longer selling Steel Seal?

24  A    Yes, but it was not out of business.

25  Q    Okay.  So the corporation exists.  It wasn't

Mr. Hipple - Cross                           229

1   selling Steel Seal, right?

2   A    Right.

3   Q    And there was no more money going into the bank

4   account?

5   A    That's -- I think that's correct.

6   Q    Okay.

7   A    I'm not sure about that --

8   Q    Now --

9   A    -- so I'm not going to answer it.

10  Q    -- Mr. Hipple, you actually complained a bit that

11  after Steel Seal Pro was no longer in business, money

12  continued to pour in to the Steel Seal Pro bank

13  account, right?

14  A    That is correct.

15  Q    Okay.  And it took you all the process to get that

16  money out?  It took you from whenever you filed the

17  case in December until the end of March or February to

18  get the money, right?

19  A    I know it was a long time period.

20  Q    Yeah.

21  A    That's all I remember.

22  Q    It takes a long time.

23  A    Right.

24  Q    You switched the credit cards to stop them -- the

25  money from going into the Steel Seal Pro account,

Mr. Hipple - Cross                    230

1   right?

2   A    Eventually, I got somebody to put -- go put on the

3   application so that I could have a credit card

4   application, yes.

5   Q    Yeah, with the Merchant Services?

6   A    Yes.

7   Q    Okay.  And those are the -- those are the people

8   that process the credit cards?

9   A    Right, yes.  That was unacceptable to them.

10  Q    And let's take a look at Exhibit 47.

11           (Pause in proceedings.)

12  A    Now I see how this is done.  My -- we take notes

13  and then I -- we rebut, right?

14           (Pause in proceedings.)

15  A    Okay.

16  Q    Your Exhibit 47, you testified that this was your

17  handwriting?

18  A    That is correct.

19  Q    Right.  And Merchant Services, those are the people

20  that process the credit cards?

21  A    That is correct.

22  Q    And they process the credit cards for B.B.B.

23  Management Group?

24  A    They do now, yes.

25  Q    Yeah, because you switched it over from --

Mr. Hipple - Cross                          231

1   A    Complete Group.

2   Q    -- Steel Seal Pro?

3   A    No, I didn't switch it over from Steel Seal Pro.

4   Q    Well, Steel Seal Pro was selling the Steel Seal,

5   right?

6   A    But I didn't --

7   Q    He had an exclusive --

8   A    I had nothing --

9   Q    -- license.

10  A    I had nothing to do with Steel Seal Pro and

11  Merchant Services.

12  Q    I understand that, sir.  But you had something to

13  do with B.B.B. Management Group establishing an account

14  with Merchant Services because that's how the money

15  gets paid now, correct?

16  A    Of course.  Yes, I had something to do with that,

17  yes.

18  Q    Okay.  And these are your notes, right?

19  A    Right.

20  Q    And Mike Zedzick is a guy that works for Merchant

21  Services?

22  A    I believe that's correct, yes.

23  Q    Right?  The people that process the credit cards?

24  A    Uh-huh.

25  Q    Okay.  And you see there, by the way, there's --

Mr. Hipple - Cross                          232

1    you got all sorts of steelsealpro.net, .com.  Those are

2    some of the other websites, right?

3    A    No, there's -- there were two websites,

4    steelsealpro and steelsealpro2.

5    Q    Okay.  And the B.B.B. Management Group now owns the

6    websites, right?

7    A    I'm not certain if it automatically changed over.

8    I think it did.  I'm not certain.

9    Q    Nothing happens automatically, Mr. Hipple.  You got

10   to make a change.

11   A    Well --

12   Q    You know that.

13   A    No, I never made changes.  The people that run the

14   operation make the changes.

15   Q    The people that work for you?

16   A    No, the people that I -- yeah, the other businesses

17   that I pay for their services, yes.

18   Q    Okay.

19   A    Okay.

20   Q    And that's --

21   A    They don't work directly for me.

22   Q    Okay.  So they, these other people that work for

23   you, these other businesses?

24   A    Businesses, yes.

25   Q    Okay.  They do these applications for you?

Mr. Hipple - Cross                           233

1    A    I think they do them automatically, yes.

2    Q    Well, when you say automatically, they don't go

3    automatically.  You got to go online and do them,

4    right?

5    A    Yes, but, again, I mean without me knowing, they

6    just follow the trail or whatever.

7    Q    You give them the information, right?  You got to

8    give them the information.

9    A    When you set up the Merchant Services -- you're

10   talking about two different things, okay?

11   Q    You go online and you provide information,

12   including Mr. Zedzick's name, and you have an

13   association number, and you got a guarantor and an

14   applicant, right?

15   A    Yes, there is a guarantor and an applicant, yes.

16   Q    And this was done for B.B.B. Management?

17   A    Right, yes.

18   Q    And who did it?

19   A    Craig Hock.

20   Q    Craig Hock did it.  And did he do it at your

21   direction?

22   A    No, he did it in his direction.

23   Q    Okay.  So did you help him and give him any

24   information?

25   A    I'm not certain how that went, but the actual

Mr. Hipple - Cross                     234

1   credit card processing company is under Craig Hock.

2   Q    Okay, it's Craig Hock.  So he did this for you?

3   A    Yeah, because I didn't have any credit.

4   Q    You didn't have any credit.

5   A    I didn't have a bank account.

6   Q    You didn't have a bank account.

7   A    I didn't have any credit.  I don't have any credit

8   cards.  I don't own any property.  So, basically, they

9   would not accept me.  So he put it in his name.  And as

10  of today, Your Honor, he's no longer employed with me,

11  but it's still in his name, you know, one of those

12  things we have a problem with.

13  Q    So I want to make sure I understand.  Mr. Hock is

14  responsible.  He was, at the time, in around I guess it

15  would have been October of 2012 to do the B.B.B.

16  Management Group to get them onto the system?

17  A    Well, no, I set up the corporation for B.B.B.

18  Management.

19  Q    To the Merchant Services agreement?

20  A    Yes, he handled the Merchant Service agreement.

21  Q    And you didn't do any?

22  A    No.

23  Q    And he did them all?

24  A    He did the one for B.B.B. Management Group, yes.

25  They put his name down.

Mr. Hipple - Cross                        235

1   Q   Did he -- did anybody else do any for you?

2   A   Any what?

3   Q   Any applications for Merchant Card Services.

4   A   No, he was accepted by Merchant Card Services.

5   Q   He -- okay.  So he used his credit to establish it?

6   A   Yes.

7   Q   Okay.

8   A   And he still on.

9   Q   And he's --

10  A   And he no longer works for me.

11  Q   -- the only one who did it for you at that time?

12  A   Pardon me?

13  Q   He's the only one who did this for you at that

14  time?

15  A   As far as the Merchant Services getting a credit

16  card approval, yes.

17  Q   And going online and filling out all the forms and

18  stuff?

19  A   No, I don't know how he did it, basically.

20  Q   Okay.  Well, let's --

21          MR. BERKOWITZ:  We've seen this one before,

22  Your Honor, but let's look at Exhibit 36.  This is the

23  application, and it's go Mr. Zedzick's name at the top

24  of it.

25          THE WITNESS:  What, 36?

Mr. Hipple - Cross                                              236

1   BY MR. BERKOWITZ:

2   Q    Plaintiff's Exhibit 36.

3            (Pause in proceedings.)

4   A    There's nothing under 36.  It was thrown out I

5   believe.

6            MR. BERKOWITZ:  Your Honor --

7            THE COURT:  It wasn't admitted.

8            MR. BERKOWITZ:  It was not admitted.

9            THE COURT:  Yes.

10           MR. BERKOWITZ:  I want to look at it.

11           THE COURT:  But you can show it to him again.

12           THE WITNESS:  I object, Your Honor.  It was

13   not admitted.

14           THE COURT:  Well, maybe he's trying to admit

15   it again, I don't know.  We'll see.

16   BY MR. BERKOWITZ:

17   Q    Can I take your book from right here?

18   A    Sure.

19   Q    Unless you removed it.

20           THE COURT:  Well, I don't think he has -- he

21   removed it I believe.  You can look at my book if you

22   want.

23           MR. BERKOWITZ:  No, here it is.

24           (Pause in proceedings.)

25           THE WITNESS:  Okay.

Mr. Hipple - Cross                           237

1    BY MR. BERKOWITZ:

2    Q    I think you said you didn't do any of these.

3    somebody did them for you, right?

4    A    I never saw this application.  I explained that

5    earlier.

6    Q    Right, okay.  But just let's look down --

7    A    I don't even think --

8    Q    This is the Steel Seal --

9    A    -- I was in the United States when --

10   Q    This is the Steel Seal, LLC, right?

11   A    Yes.

12   Q    That's one of your companies?

13   A    That is correct.

14   Q    That's actually one of them that defaulted at the

15   beginning of the week?

16   A    Yes, that is -- that is a company that never did

17   any business.  It was a one-day business and that was

18   it.

19   Q    Okay.  And the contact name was Brian Hipple,

20   right?

21   A    Where?

22   Q    Under "contact name" under section one.

23   A    Okay, yes.

24   Q    Do you see that?

25   A    Uh-huh.

Mr. Hipple - Cross                         238

1  Q   And let's go down to number 2, "W-9 taxpayer

2  identification number."  Do you see that?

3  A   Yes, I see it.

4  Q   And that's number 75-3099885, right?

5  A   Right.

6  Q   Okay.  And if you look at your Exhibit 47, that's

7  the federal ID number for Steel Seal, LLC, right?

8  A   Yes, they match.

9  Q   And you testified that nobody else would know that

10  information or have that information, right?

11  A   I don't remember testifying that, but go ahead.

12  Q   Well, that was my recollection.

13  A   All right.

14  Q   So you're saying somebody else might have that

15  information?

16  A   Yes, somebody else might have had the information.

17  Q   Okay.  And who might that person be?

18  A   Craig Hock.

19  Q   Craig Hock might have had it, okay.  So Craig Hock

20  might have put this information in?

21  A   That is correct, he could have.

22  Q   Okay.  So would it be --

23  A   It's a possibility.  I don't know for sure.

24  Q   Okay .  And did Craig Hock have Brian Hipple's

25  social security number, too --

1    A    Yeah.

2    Q    -- where we look at owners and officers?

3    A    Yeah, he had all the information for Brian Hipple.

4    Q    So Craig Hock had all this information.  And then

5    we go to --

6    A    Yes, Craig Hock had all this.

7    Q    -- the signature page, four of four, right?  Do you

8    see on the guarantors?

9    A    Yep.

10   Q    Do you see on the guarantors it's typed in, "Brian

11   Hipple?"

12   A    Yes, I see it.

13   Q    So I guess Craig Hock did that?

14   A    Apparently.  I'm not saying he did or I'm not

15   saying -- because I don't know for sure if he did or

16   not so --

17   Q    Well, sir, to the best of your knowledge, has --

18   A    To the best of my knowledge, I don't know if he did

19   or didn't.

20   Q    Okay.  So let me ask you this question.  To the

21   best of your knowledge, who would have access to Brian

22   Hipple's social security number and Steel Seal, LLC's

23   EIN number?  Every person you can think of with access

24   to both that piece of information.

25   A    Well, I know Craig Hock had access to Brian's

Mr. Hipple - Cross                          240

1   social security number, but I don't believe he had

2   access to my ID number.

3   Q    Okay.  So who had access to your ID number?

4   A    It would have been me.

5   Q    You.  Anyone else?

6   A    He may have had it, Craig Hock.  I --

7   Q    So Craig Hock may have had it?

8   A    I may have given this piece of paper to Craig Hock,

9   okay?

10  Q    Okay.  You may have given this to Craig to

11  complete?

12  A    To complete an application online.

13  Q    Okay.  Now let's go to the last page.

14          THE COURT:  When you say that piece of paper,

15  that document --

16          THE WITNESS:  The --

17          THE COURT:  The handwritten document?

18          THE WITNESS:  Yeah, I'm saying --

19          THE COURT:  Which is -- what number is that?

20          THE WITNESS:  -- that document 47, okay, has

21  information about -- just give me a second, all right?

22          THE COURT:  All right.

23          THE WITNESS:  He's always going too fast for

24  me.  It says about Steel Seal, L --

25          THE COURT:  All right.

Mr. Hipple - Cross                                    241

1        THE WITNESS:  -- LLC, okay?

2        THE COURT:  You --

3        THE WITNESS:  What happened --

4        THE COURT:  You prepared that in anticipation

5   for --

6        THE WITNESS:  I prepared that --

7        THE COURT:  -- this application?

8        THE WITNESS:  -- because I was going to open

9   up Steel Seal, LLC.

10        THE COURT:  All right.

11        THE WITNESS:  And the confidentially I was

12   told what are you doing, that is under the lawsuit, why

13   would you open up Steel Seal, LLC?  So it was open a

14   bank account with $25 for one day.  The information was

15   gathered, okay, and that's as far as it went.

16        THE COURT:  And you --

17        THE WITNESS:  Because I was told by

18   confidentiality that I should not use Steel Seal, LLC,

19   because it was under the lawsuit.

20   BY MR. BERKOWITZ:

21   Q    Okay, that's fine.

22   A    All right?

23   Q    But who --

24   A    But yet, this --

25   Q    -- had access --

1  A    Yes, this information was --

2             THE COURT:  You directed --

3             THE WITNESS:  -- produced to Craig --

4             THE COURT:  Excuse me.

5             THE WITNESS:  -- Craig Hock.

6             THE COURT:  You directed Craig Hock to

7  prepare it using the information on that piece of

8  paper?  Is that what happened?  You prepared a piece of

9  information in handwritten notes that you put down?

10            THE WITNESS:  Yeah, this is information that

11 I had given --

12            THE COURT:  Did you give that to --

13            THE WITNESS:  -- to Craig Hock that he would

14 have needed to open up for Steel Seal.

15            THE COURT:  All right.  Okay.

16 BY MR. BERKOWITZ:

17 Q    Okay.  So Craig Hock did this then at your

18 direction?

19 A    Yes.

20 Q    Okay.  And he didn't have the Steel Seal

21 information without getting it from you?

22 A    No, he had -- he had the Steel Seal Pro

23 information, yes.

24 Q    Steel Seal, LLC, that's whose on --

25 A    No, I gave him --

Mr. Hipple - Cross                    243

1   Q   -- the top of this application.

2   A   -- the Steel Seal, LLC.

3   Q   You gave him the EIN number, correct?

4   A   Yes.  Yeah, because you needed that.

5   Q   Okay.

6   A   And I gave him the bank account number also.

7   Q   Okay.  That's right.

8   A   Yeah.

9   Q   So he wouldn't have that information by himself?

10  A   Without me, right.  That is correct.

11  Q   So when we look at the last page here, the

12  signature page --

13          THE COURT:  This is on 36 you mean, right?

14          MR. BERKOWITZ:  36.

15  BY MR. BERKOWITZ:

16  Q   Under "merchant information," do you see -- do you

17  have the page where it's signed?

18  A   Right.

19  Q   Do you see that it says "signature of owner or

20  officer?"  Do you see that?

21  A   Yeah, I see it.

22  Q   And it's typed in, right?  It's handwritten -- no,

23  handwritten -- it's hand-typed in, right?  You've seen

24  those forms.

25  A   Yeah, I see it.

Mr. Hipple - Cross                             244

1    Q    We all fill them out now.

2    A    No, I never seen this form.  I explained that to

3    you --

4    Q    No, no, no.

5    A    -- in the beginning.

6    Q    This was all done for you by Craig Hock?

7    A    Well, no, I'm not certain if Craig Hock did this

8    form.  I explained that to you earlier.

9    Q    Well, you had the information pertaining to Steel

10   Seal, LLC.

11   A    No, my information that I gave to Craig Hock, he

12   was supposed to put the credit card under his

13   application, okay?

14   Q    He didn't get the information -- you mean so he was

15   lucky in filling in the Steel Seal EIN number?  He

16   guessed that number?

17   A    No, I --

18   Q    He didn't get it from you?

19   A    No.  No, back up.

20   Q    It just happens by coincidence --

21   A    No, I told you --

22   Q    -- to be on the front page of this exhibit?

23   A    I gave him this information.  I told you that,

24   okay?

25   Q    Okay.  So Craig Hock filled this in at your

Mr. Hipple - Cross                    245

1    instructions?

2    A    I gave him, yeah, the -- yeah.

3    Q    Okay.

4    A    Right.

5    Q    Because nobody else had this information.

6    A    Correct.

7    Q    Okay.  And we're on the page of the signature page

8    now.  And the signature of the owner, which is the same

9    as on the front page is Brian Hipple?

10   A    You're right.

11   Q    Right?

12   A    On the application that's who it says.

13   Q    Yep.

14   A    Yes.

15   Q    And the date is 10-10-2012, right?

16   A    That would have been after Brian's death, yes.

17   Q    Right.  So Brian didn't do this?

18   A    No, without a doubt.

19   Q    Absolutely.

20           MR. BERKOWITZ:  Your Honor, I move for the

21   admission of Plaintiff's Exhibit 36.

22           THE WITNESS:  No, I disagree.  I've never saw

23   this document, okay?  I have --

24           MR. BERKOWITZ:  Your Honor, he just test --

25           THE WITNESS:  -- no knowledge of this

Mr. Hipple - Cross                    246

1  document.

2          THE COURT:  All right, I'm going to admit the

3  document.  I think there's sufficient foundation laid

4  that this document is authentic and it's a business

5  record of Steel Seal, LLC, so --

6          THE WITNESS:  Okay.

7          THE COURT:  -- I'll admit it.  So that's 36.

8          (Plaintiff's Exhibit 36, document, is

9  admitted into evidence.)

10         (Pause in proceedings.)

11         THE COURT:  I just want to interrupt you for

12 a minute.  So it's 4:05.  I'll stay to 6:00, but I have

13 to leave after 6:00, okay?  So just for scheduling --

14         THE WITNESS:  Yeah, we're right back in the

15 same situation.  He takes up all the time.

16         THE COURT:  Well, I'm not saying anyone's

17 taking up the time.  It's just reality.  So go ahead,

18 Mr. Berkowitz.

19 BY MR. BERKOWITZ:

20 Q   Mr. Hipple, we looked at a document that you

21 prepared, and it was Exhibit -- admitted as one of your

22 exhibits, showing what you -- what you say the assets

23 were sold for.

24 A   That's correct.

25 Q   Right?  You recall seeing that?

Mr. Hipple - Cross                    247

1    A    I don't remember.  I remember the document, but I

2    don't remember the number.

3            (Pause in proceedings.)

4    A    Do you have the number?

5            THE COURT:  We need to take a break.  Our

6    court reporter needs a break, okay?

7            MR. BERKOWITZ:  I could use --

8            THE COURT:  Oh, it's still working?

9            AUDIO OPERATOR:  Yes.

10           THE COURT:  Oh, okay, good.

11           (Pause in proceedings.)

12           MR. BERKOWITZ:  I'm sorry, Your Honor.

13           (Pause in proceedings.)

14   BY MR. BERKOWITZ:

15   Q    D-52.

16   A    D or P?

17   Q    D, as in David.  Do you see that, D-52?

18           (Pause in proceedings.)

19   Q    Do you see --

20   A    I have it.

21   Q    -- that, Mr. Hipple?

22   A    Yep.

23   Q    Now, this is what you said you sold all of the

24   assets that you took from SCIX, correct?

25   A    This is -- this is what I said the revenue --

Mr. Hipple - Cross                                        248

1  Q    All right.  Just to be certain so that we

2  understand each other, you did not put a value on the

3  formula or the websites or the I'll call it

4  intellectual property, correct?

5  A    Right, because I owned that personally.

6  Q    Right.  This is just the physical assets?

7  A    Well, physical assets, right.

8  Q    Okay.

9           (Pause in proceedings.)

10  A    Are you looking now?

11          (Pause in proceedings.)

12          MR. BERKOWITZ:  Your Honor, if I could have a

13  minute just to go through my notes?

14          THE COURT:  Sure.

15          MR. BERKOWITZ:  I think we've covered a lot,

16  but I -- it hasn't been as smooth as I might have

17  preferred.

18          (Pause in proceedings.)

19          MR. BERKOWITZ:  We're making good progress,

20  Your Honor.  I think I've covered a lot of it.  I just

21  want to --

22          THE COURT:  Okay.

23          MR. BERKOWITZ:  I have a lot of notes.

24          THE COURT:  It's okay.

25          (Pause in proceedings.)

Mr. Hipple - Cross                   249

1    THE COURT:  So, Mr. Hipple, while he is doing

2    that, if he finishes his what's called

3    cross-examination, then you have an opportunity to

4    present on redirect again further evidence in response

5    to what he asked.  If you do that -- you're free to do

6    that, but if you do that, then he has a chance to

7    recross you on whatever you bring up now, okay?

8              THE WITNESS:  Okay.  And then it ends, huh?

9              THE COURT:  Right.

10             THE WITNESS:  Okay.

11             (Pause in proceedings.)

12             THE COURT:  Let's just take a five-minute

13   break, all right, while you're doing that?

14             (Recess, from 4:13 p.m to 4:23 p.m)

15             MR. BERKOWITZ:  I'm almost done.  If I could,

16   so I don't forget, I Just would like to move the

17   admission, if I haven't, of Plaintiff's Exhibit 136,

18   which Mr. Pederson used.  That was the accumulation of

19   the number of bottles of Steel Seal that were purchased

20   each year by --

21             THE COURT:  Is that in the book?

22             MR. BERKOWITZ:  -- Steel Seal Pro.  Yes, it's

23   in Plaintiff's 136, and Mr. Pederson used that.

24             THE COURT:  Well, is that something he

25   prepared?

Mr. Hipple - Cross                    250

1           MR. BERKOWITZ:  No, that was something that I

2  had prepared.

3           THE COURT:  I thought that.

4           THE WITNESS:  I object to it, Your Honor.  It

5  has no expert witness.  It's just a calculation made

6  and there's no supporting documentation to it.

7           MR. BERKOWITZ:  Yes, it is.  It's listed in

8  there, and it's actually supported by documents that

9  have already been admitted.

10           THE WITNESS:  It's speculation, Your Honor.

11           THE COURT:  You questioned him about this,

12  right?

13           MR. BERKOWITZ:  Yes.  I think it's actually

14  -- well, I think it's one of the --

15           THE WITNESS:  I object on the fact that it

16  consists of documents that are in there that this

17  should not be used.

18           MR. BERKOWITZ:  Right here, Your Honor, this

19  was (inaudible).  I marked it P-04 (inaudible).  What

20  he did was he multiplied out the number of bottles

21  purchased by the internet web price --

22           THE COURT:  Right.

23           MR. BERKOWITZ:  -- when he compared the

24  revenue that we were discussing whether we had records

25  of all the revenue.

Mr. Hipple - Cross                    251

1    THE WITNESS:  Your Honor, we had an objection

2    to it due to the fact that (inaudible) UK bottles --

3    THE COURT:  Right.

4    THE WITNESS:  -- or US bottles.

5    THE COURT:  But this document 136 is not

6    really -- doesn't have the prices.  This just is --

7    MR. BERKOWITZ:  Correct, it's a --

8    THE COURT:  -- a summary of the amount of

9    bottles that were --

10    MR. BERKOWITZ:  Correct, that's in the other

11    exhibits.

12    THE COURT:  -- that were purchased, right?

13    MR. BERKOWITZ:  Correct.

14    THE COURT:  Sold by Colonial?

15    MR. BERKOWITZ:  Right, and he used it to do

16    that math.

17    THE COURT:  Yes.  Right.  I don't have a

18    problem with this.  It's just --

19    THE WITNESS:  As long as we don't use the

20    math, I don't have a problem with it.

21    THE COURT:  All right.

22    THE WITNESS:  But, again, because these

23    orders --

24    THE COURT:  This --

25    THE WITNESS:  -- are to the UK and the United

1   States.

2            THE COURT:  Right.  Okay.  All right, I'll

3   admit it.  Now, all he's --

4            THE WITNESS:  Make note --

5            THE COURT:  -- asking you to do is admit 136

6   and I'm going to admit it.

7            (Plaintiff's Exhibit 136, document, is

8   admitted into evidence.)

9            MR. BERKOWITZ:  And 204.  This is his

10  application.

11           THE WITNESS:  But I do have an objection to

12  this because this is used in all Steel Seal 16-ounce US

13  bottles.

14           THE COURT:  All right, I'll -- I'm not going

15  to admit that.  It'll be in the record as testimony.

16  He talked about, it's going to -- I don't need the

17  chart.

18           MR. BERKOWITZ:  Okay.

19           THE COURT:  Okay.  All right.  So I'll admit

20  136.

21           MR. BERKOWITZ:  Can I admit 203, my artwork,

22  Mr. --

23           THE WITNESS:  Yeah, you can admit that.

24           MR. BERKOWITZ:  -- Pederson --

25           THE COURT:  All right, 203 is admitted.

Mr. Hipple - Cross                      253

1          (Plaintiff's Exhibit 203, document, is

2   admitted into evidence.)

3          MR. BERKOWITZ:  I'd like to have my artwork

4   preserved.

5          THE WITNESS:  And I actually don't have a

6   copy.  I don't need it.  Never mind.

7          MR. BERKOWITZ:  Of the house?  I can try to

8   draw another one for you.

9          THE WITNESS:  No, the first sheet there with

10  the numbers on it.  Okay.

11         THE COURT:  Well, we're not --

12         MR. BERKOWITZ:  Now --

13         THE COURT:  We're not admitting that anyway.

14         THE WITNESS:  Oh, okay.

15  BY MR. BERKOWITZ:

16  Q   Mr. Hipple, you showed us D-503, which was the

17  American Express record?

18  A   Yes.

19  Q   And I believe your testimony was that only ten to

20  15 percent of the American Express bills were personal

21  expenses?

22  A   That was just a guess estimate without any facts.

23  Q   Okay.

24  A   All right.

25  Q   All right.  I'd like you to turn to, and I will get

Mr. Hipple - Cross                                        254

1   it for you, Plaintiff's Exhibit 91.

2              (Pause in proceedings.)

3   Q    Mr. Hipple, if you would like to take a look

4   through that before I ask you any questions.

5   A    Well, why don't you just give me the questions and

6   I'll look at the questions?

7   Q    Sure.  If you go to page three of 11.

8   A    All right, three -- no, it's three of 15.

9   Q    You are correct.

10  A    All right, I'm at three of 15.

11  Q    Three of 15.  And let's look under the summary, new

12  charges summary.

13  A    Right, correct.

14  Q    Okay.  And you see there are $12,537 of charges for

15  you?

16  A    Right.

17  Q    Okay.  And the total charges are 37,000?

18  A    Yeah, these are the big ones that you usually pick

19  out, yes.

20  Q    Yeah.  Well --

21  A    I mean --

22  Q    Okay.

23  A    -- this is not a whole summary.

24  Q    You -- now let's -- I'll be glad to go through them

25  all if you would like, but I don't think the Judge

Mr. Hipple - Cross                    255

1   would be too happy with that, and neither would my

2   wife.

3   A    Well, I would appreciate it if you would have done

4   a summary of them all.

5   Q    Let's see.  So let's go through your charges.

6   A    Okay.

7   Q    I think you testified you didn't do any work for

8   Steel Seal Pro.  Do I have that correct?

9   A    Yes, you -- yeah, you have that correct.

10  Q    Okay.  So, these are charges that were paid by

11  Steel Seal Pro, right?

12  A    This is Steel Seal Pro's?

13  Q    Well, the date is 7-22-11.

14  A    Where are you looking?

15  Q    And I can show you the First National Bank

16  payments for these invoices.

17  A    Oh, you agree that these were paid by the business?

18  Q    Absolutely.

19  A    Oh, you didn't the other day.

20  Q    No, no, these were paid by the business.

21  A    Oh, okay, fine, you finally agree to that.

22  Q    Yeah.

23  A    Okay, good.

24  Q    Do you see that?

25  A    I thought these were just Brian's -- all of Brian's

1   charges?

2   Q    Do you see that, "Brian online payment, $42,240?"

3   A    Yeah, I see that.

4   Q    Okay.  Now let's look at your charges.  You would

5   agree with me that those $12,000 of charges, let's see,

6   you got a beach vacation, rent in Pompano Beach,

7   Florida, for $8,500?

8   A    Yes.  At that point in time, I took my brother, who

9   was dying, and my son rented me a vac --

10  Q    Okay.

11  A    Let me finish.  He rented an apartment in Pompano

12  Beach for three months because my brother was dying.

13  Q    Okay.

14  A    And I took care of him for nine months until he

15  died.

16  Q    Would you agree with me, sir, that all of the

17  charges that appear under your name are personal?

18  A    During this time period, I would have to agree.

19  Enterprise Rent-a-car, yep, Shell Oil, hotels, oil,

20  Shell Oil, UPS maybe, LA Fitness is mine, Amazon, Best

21  Buy, Chevrolet, Best Buy, US Airway, Miami to

22  Philadelphia, US Airway to Phoenix, Arizona where my

23  brother lived, okay, Philadelphia to Miami.  Yeah,

24  there's a lot of traveling going on here.

25  Q    Yeah.

Mr. Hipple - Cross                                    257

1   A    Yeah.

2   Q    You would agree with me these are personal charges?

3   A    Yeah, but the biggest charge here is the $8,000 --

4   Q    I agree with you.

5   A    -- for the three months that -- when I was taking

6   care --

7   Q    But it is a personal trip.

8   A    When I picked him up in Arizona he was -- he was

9   half dead.

10  Q    It's a personal charge?

11  A    Right, it's a personal charge.

12  Q    You'll agree with me?

13  A    Yeah, I agree with you.

14  Q    So this entire bill is personal charges for you.

15  Now let's go to Brian Hipple's charges.

16  A    Okay.

17  Q    All right?

18  A    Uh-huh.

19  Q    And let's start -- do you see that?  That's on page

20  six of 15?

21  A    Oh, six of 15?

22  Q    Yeah.  Do you see that it says under Brian Hipple?

23  A    Hold on.  Okay, go ahead, six of 15.

24  Q    Do you see Brown Fields Trading --

25  A    Right.

Mr. Hipple - Cross                                    258

1   Q    Apparel --

2   A    No idea.

3   Q    -- and Accessories?  Do you see that?

4   A    I have no idea what that is.

5   Q    Yeah, that's a personal expense, right?

6   A    Well, if you say so.

7   Q    Well, let's look at Ed's Cantina and Grill in --

8   A    I don't want to make any decisions --

9   Q    -- Colorado.

10  A    -- on Brian or what Brian did.

11  Q    That's fine.

12  A    Okay?  So I don't --

13  Q    Let's look at that.

14  A    -- want to be questioned on Brian or what Brian

15  did.

16         THE WITNESS:  I object to the question of

17  what Brian --

18         MR. BERKOWITZ:  That's fine.

19         THE WITNESS:  -- or Brian did.  These are

20  Brian's American Express charges.

21         THE COURT:  Your objection is sustained.

22  BY MR. BERKOWITZ:

23  Q    That's -- this entry is for Ed's Cantina and Grill

24  in Colorado, correct?

25  A    Which one are you talking?

Mr. Hipple - Cross                           259

1    Q    6-21-11.

2    A    All right.

3    Q    Let's look at the next entry, Doylestown Fitness,

4    correct?

5    A    Well --

6    Q    That says Doylestown Fitness?

7    A    I kind of lost you there for just a minute.  Okay,

8    give me the amounts.  That will help better.

9    Q    You want to do that amounts?  67.

10   A    67, okay, now I -- now I know what -- that's ABC

11   Financial.  6-22-11, ABC Financial for $67.  Let's

12   follow from there.

13   Q    Yeah, look at the next line, Doylestown Fitness.

14   A    No.

15   Q    Do you see that?

16   A    I must be on -- I'm on 6-15?

17   Q    6-22.

18   A    No, page 615.

19   Q    Six of 15, the date is 6-22.  We're just going

20   right down the list.

21   A    I'm looking down the list.  6-22, I see ABC

22   Financial and the US Post Office on my sheet.

23   Q    You don't see under AB Fin -- ABC Financial,

24   Doylestown Fitness?

25   A    No.  You want to come take a look?

Mr. Hipple - Cross                    260

1   Q   Absolutely.

2   A   Unless I'm missing something.

3   Q   Right there.

4   A   Oh.

5   Q   Do you see that?

6   A   I thought you were talking a separate charge.

7   Q   Doylestown -- Doylestown Fitness.

8   A   ABC Financial, Doylestown Fitness, correct.

9   Q   Okay, let's go to the next page.

10  A   Okay.  We have UPS, UPS, Google.

11  Q   No, no, no, we'll go to - we'll go to the next

12  page.  I see --

13  A   Well, I'm just telling you what's on the next page.

14  Q   I see what's on there.  You can certainly go back

15  to these and look at them.  We got that Ed's Cantina

16  again, right?

17  A   Hold on.  91.  P-91.

18  Q   Page seven of 15.

19  A   What?  Okay, I'm sorry, I got distracted here.  Go

20  ahead.

21  Q   Page seven of 15.

22  A   That is correct.

23  Q   6-23-11, Ed's Cantina.

24  A   Yes, go ahead.

25  Q   Two down, AVA Colorado Raft?

Mr. Hipple - Cross                                    261

1   A    Right.  Yep.

2   Q    Amusement recreation --

3   A    Yep.

4   Q    -- in Colorado?

5   A    Uh-huh.

6   Q    The next one, the Stanley Hotel --

7   A    Uh-huh.

8   Q    -- in Colorado?

9   A    Right.

10  Q    Two down, Smokin' Davy's BBQ?

11  A    Yep.

12  Q    B-B-Q?

13  A    Right.

14  Q    About five down, Washington Sports Bar?  Do you see

15  that?

16  A    Colorado.

17  Q    Yeah.

18  A    Apparently, Brian was on vacation in Colorado, yes.

19  Q    Okay.

20  A    During this month.

21  Q    All right.

22  A    Okay?

23  Q    Okay.

24  A    So he used his American Express, yes.  I agree with

25  you, so you don't have to go any further.

1   Q    Okay.  So there are --

2   A    You're just taking up time.

3   Q    So that there are a lot of personal charges in

4   this?

5   A    Well, you're picking on one month, so --

6   Q    There are a lot of personal charges, right?

7   A    Yes.

8   Q    You'll agree with me?

9   A    Yeah, if you look at that month.

10  Q    You look --

11  A    Sure.

12  Q    Okay.

13  A    Yeah.

14  Q    Now, you criticized Mr. Geisser's report for not --

15  for taking these as distributions, correct?

16  A    No, I did not.  I said that most of these charges

17  throughout this huge amount of American Express, and

18  when I went through the charges they matched up with

19  the same charges that are going on in 2015.  So I

20  assume over an overall picture, not one month -- you're

21  focusing on one month, okay, which you always do, you

22  always pick the big month, okay?

23  Q    I could pick --

24  A    That's your job.

25  Q    -- many months, Mr. Hipple.

1    A    That's your job.

2    Q    I picked this one.

3           THE COURT:  Come on.  We're arguing.  We are

4    wasting a lot of time here.

5           THE WITNESS:  Okay.  I said to you that over

6    the whole spectrum of all these American Express

7    charges that yes, Brian used it for his personal use.

8    That's not my problem, okay?  Brian used it for his

9    personal use, okay?

10   BY MR. BERKOWITZ:

11   Q    Right.

12   A    But a majority of these charges were business

13   charges.

14   Q    You --

15   A    Okay?

16   Q    You would agree with me, however, that Mr. Geisser,

17   when he did this report in 2000 -- in June 2013 I think

18   you told me --

19   A    Go ahead.

20   Q    -- he wouldn't have been able to look at your --

21   the latest American Express bill that you gave us?

22   A    No, but he could have went online and checked out

23   the names on some of the larger amounts in here.

24   Q    So he could see Google --

25   A    But --

Mr. Hipple - Cross                                    264

1   Q    -- and US postage?

2   A    No, he could have went in anything that repeated

3   itself, like Google, US Post Office, Yahoo, and all

4   like that, repeated over and over and over again --

5   Q    Right.

6   A    -- throughout every report would be a flag to say

7   oh, wait a minute.

8   Q    So --

9   A    These don't look like personal charges.

10  Q    So Mr. Geisser would know that with this credit

11  card in the name of Scientific Chemical --

12  A    Right.

13  Q    -- and no underlying record and no ability to

14  depose Brian Hipple --

15  A    Right.

16  Q    -- he would be able to tell us that these were

17  business expenses of first SCIX, then Steel Seal Pro?

18  A    If he would have did a little research, yes, he

19  would have been able to do that, yes.

20  Q    And would he be able to tell that it wasn't for

21  Brian' Muoy Thai business?

22  A    Yes, he would have been able to tell that.

23  Q    Okay.  So, the Muoy Thai business wouldn't use

24  postage?

25  A    No.

Mr. Hipple - Cross                                265

1    Q    And they don't use Google?

2    A    By the way, Brian didn't have a Muoy Thai business.

3    He did the advertisement for the Muoy Thai business.

4    He didn't own the Muoy Thai business.

5    Q    Okay.

6    A    Okay?

7    Q    He did the advertising for them?

8    A    No, he promoted --

9    Q    I thought you --

10   A    -- so that that guy got more customers.

11   Q    Right.  Okay.

12   A    Brian was good in that area.

13   Q    Okay.  Okay.

14   A    He didn't own the Muoy Thai business.

15   Q    But you would agree with me that without underlying

16   documentation, looking at this document alone, you

17   couldn't tell which business incurred the charge, SCIX,

18   Steel Seal Pro, Steel Seal?

19   A    Well, what --

20   Q    You just know it's a business-like charge, right?

21   A    Well, it depends on what month it was will tell

22   what business the charges were for, okay?

23   Q    So Mr. Geisser would look at this and look at the

24   month and know what business it's for?

25   A    Yeah, because what business was running in 7-22-11?

Mr. Hipple - Cross                    266

1    I think Steel Seal Pro, correct?  The documents would

2    be Steel Seal Pro.

3    Q    And so he would not -- he would be able to tell

4    that that's a Steel Seal Pro --

5    A    Well, if he would take the time and gather the

6    information -- I mean you are doing an investigation,

7    right, basically?

8    Q    Okay.

9    A    Other than investigating the principals and do a

10   little investigation.  I would have said okay, this is

11   Steel Seal Pro.  Oh, this repeats over and over on each

12   statement, Google, US Post Office, Yahoo, Earth Skater,

13   you know, different things like.

14   Q    Okay.

15   A    Okay?

16   Q    Okay.

17   A    And, again --

18   Q    So you're telling me that --

19   A    -- that would -- that would throw some kind of

20   flags especially if all the numbers are the same.

21   Q    So you're telling me that an expert with access to

22   this information could ferret out the specific expenses

23   of either SCIX or Steel Seal Pro?

24   A    Yes, I would think an --

25   Q    Okay.

1  A    -- expert could.

2  Q    Okay.  And as a matter of fact, your expert could

3  have?  Mr. Pederson could have done that?

4  A    Yes, that is true, but --

5  Q    And he could have done it with your assistance,

6  couldn't he?

7  A    If he had come to Colombia, yes.

8  Q    Okay.  He could have come to Mr. Hock.  He could

9  have looked at the credit card bills.  Let's see where

10  these credit card -- do you have that -- this comes

11  to -- let me see this address.  It comes to Clement

12  Hipple at Scientific Chemical, 2417 Welsh Road,

13  Philadelphia, PA.  That's where the bill goes?

14  A    That's where this bill goes anyhow.

15  Q    And it gets paid from there?

16  A    No, it gets paid from Colombia.

17  Q    Okay.  But this is where the bill goes?

18  A    Right.  No, the bill don't go anywhere.  It's

19  e-mailed to me.

20  Q    It's e-mailed to you.  Okay.

21  A    I do everything electronic.

22  Q    Okay.  So your expert could have electronically

23  communicated with you and gone over each and every one

24  of these charges that we're looking at here and figured

25  out okay, Doylestown Fitness, personal expense?  Then

Mr. Hipple - Cross                                           268

1   he could have looked at Google --

2   A    I think he --

3   Q    -- and said business expense?  He could have done

4   that?

5   A    I think he stated the other day he wasn't engaged

6   to do that.  He was engaged to rebut your expert

7   witness I believe.

8   Q    So you could -- your testimony then is you couldn't

9   have engaged him to do his own valuation of the value

10  of the assets that were transferred?

11  A    I never met him until yesterday, okay?  So I didn't

12  engage him for anything.  It was all done by our

13  attorneys.

14  Q    So your attorneys -- your attorneys did no --

15  A    Yeah, they could have, yes.

16  Q    Yeah, and they --

17  A    I can hold my --

18  Q    They understand how --

19  A    -- attorneys responsible for that, yes.

20  Q    Okay.  And they --

21  A    But, again, as far as me getting involved in that

22  area, I --

23  Q    But they didn't do it?

24  A    They didn't do it.

25  Q    Right?

1   A   No.

2   Q   Okay.

3   A   Of course not.

4   Q   They could have?

5   A   Just like you didn't do certain things.

6   Q   Right.

7   A   Right.

8   Q   Because --

9   A   Exactly --

10  Q   -- he could have done it.

11  A   Yeah.

12  Q   Can't do everything, right?

13  A   Right, exactly.

14          THE COURT:  We're wasting a lot of time here.

15          MR. BERKOWITZ:  I'm --

16          THE COURT:  These questions and answers are

17  stupid.

18          THE WITNESS:  Yeah, that's what I think.

19          THE COURT:  You know, you could do this and I

20  can't do this.  Come on.  Let's move on, will you?  Do

21  you want to finish this by 6:00?

22          MR. BERKOWITZ:  I'm -- Your Honor, I'm almost

23  done.

24          THE WITNESS:  Well, I'm --

25          THE COURT:  I don't care.  We'll be back

Mr. Hipple - Cross                    270

1   another day.  We'll be back and we'll finish this --

2              THE WITNESS:  On Monday.

3              THE COURT:  -- and then --

4              THE WITNESS:  That's how I'm looking at it,

5   Your Honor, because, again, I have --

6              THE COURT:  Well, he's on vacation, so we'll

7   have to talk about that.

8              MR. BERKOWITZ:  Now --

9              THE WITNESS:  All right.

10             MR. BERKOWITZ:  This -- Your Honor, I'm

11  almost done.

12             THE COURT:  All right.

13             THE WITNESS:  Yeah, but you used up all the

14  time.

15  BY MR. BERKOWITZ:

16  Q   Do you know whether Brian or Mr. Fogerty ever tried

17  to call me as the attorney who did the execution on the

18  judgment?

19  A   No, not that I recall, never.

20  Q   Okay.  Do you know I represented SMS in Phoenix for

21  a long time?

22  A   No, I did not know that.

23  Q   And did you know that I can't think of one occasion

24  where they would not agree to a payment program when

25  somebody had a judgment.  They would have agreed to a

Mr. Hipple - Cross                    271

1   program.

2   A    Well, that's --

3   Q    Do you know they could have called me?

4   A    I guess the answer to that is Teresa should have

5   called Brian and explained the situation --

6   Q    Yeah, I understand.

7   A    -- if she wanted her money.

8   Q    I hear what you're saying.

9            MR. BERKOWITZ:  I have no further questions,

10  Your Honor.

11           THE COURT:  All right.

12           THE WITNESS:  Okay.

13           (Pause in proceedings.)

14                REDIRECT EXAMINATION

15           THE WITNESS:  All right, I would like to

16  start.  I'll have to show you this because we only have

17  one copy of this, okay?

18           (Pause in proceedings.)

19           MR. BERKOWITZ:  Let me -- let me just clean

20  up some -- oh, I guess you're not standing.  I can get

21  this out of your way.

22           (Pause in proceedings.)

23           MR. BERKOWITZ:  Okay.

24           THE WITNESS:  What I've done is I've taken

25  out all the years prior to 2006 of JC Consulting.  I

Mr. Hipple - Redirect                     272

1    said nothing -- no interest was due to me, okay?  And I

2    changed the numbers and --

3               MR. BERKOWITZ:  I see that.

4               THE COURT:  Do you want a copy of that?

5               THE WITNESS:  No, I --

6               MR. BERKOWITZ:  Yes, I would need a copy,

7    Your Honor.

8               THE COURT:  All right, let's make a copy of

9    it.

10              MR. BERKOWITZ:  That was the previous

11   exhibit.  What was the number?  I'm sorry, is that --

12              THE WITNESS:  501.

13              MR. BERKOWITZ:  -- 501?  I would just renew

14   my arguments and you make --

15              THE COURT:  Right.

16              MR. BERKOWITZ:  -- your decision with respect

17   to that.

18              THE WITNESS:  Right.

19              THE COURT:  Well, I admitted 501, but we also

20   understand your criticism of it.

21              THE WITNESS:  Right, but when the document

22   comes I'll explain what I did.

23              THE COURT:  All right, fine.  Okay.

24              THE WITNESS:  I'll wait until I get the copy.

25              THE COURT:  I thought you had a copy of 501.

Mr. Hipple - Redirect                          273

1   Is it redone or something?

2             MR. BERKOWITZ:  It was -- it was --

3             THE WITNESS:  Yeah, I recalculated it.

4             MR. BERKOWITZ:  He just re-did it.

5             THE COURT:  Oh, okay.

6             THE WITNESS:  Okay.

7             (Pause in proceedings.)

8             THE WITNESS:  One thing I didn't write down,

9   do you have the tab for my tax returns?

10            MR. BERKOWITZ:  Yeah, I think --

11            THE WITNESS:  I forgot to put that number.

12            MR. BERKOWITZ:  109?  Is that it?  I'm sorry,

13  I don't have them all memorized.

14            THE WITNESS:  It's the only one I didn't put

15  down.  The rest I put --

16            MR. BERKOWITZ:  Although I know them better

17  than I --

18            THE WITNESS:  You explained to me to start

19  writing the numbers passed that time period.

20            (Pause in proceedings.)

21            MR. BERKOWITZ:  Thank you.

22            THE WITNESS:  Is it 109?

23            MR. BERKOWITZ:  I don't know.

24            THE WITNESS:  All right.  Let me look in the

25  front.

Mr. Hipple - Redirect                274

1          MR. BERKOWITZ:  That was off the top of my

2     head.

3          THE WITNESS:  They're in your book, right?

4          MR. BERKOWITZ:  Yes.  No, they're not one of

5     mine.

6          THE WITNESS:  While you're looking I --

7          MR. BERKOWITZ:  127 and 128.

8          THE WITNESS:  Okay.

9          (Pause in proceedings.)

10         THE WITNESS:  Your Honor, if I can bring your

11    attention to the last page of 501?

12         THE COURT:  Okay.  I'm going to make this

13    501A, right?

14         THE WITNESS:  Okay.

15         THE COURT:  Because you've changed it.

16         THE WITNESS:  Right.

17         THE COURT:  It's 501A.  All right.

18         THE WITNESS:  Okay.  Let me just do that,

19    501A.

20         (Pause in proceedings.)

21         THE WITNESS:  What I went in and did, Your

22    Honor, if you go down to where I talked about the five

23    years at 400,000 on the last page --

24         THE COURT:  Right.

25         THE WITNESS:  -- I crossed out the two

Mr. Hipple - Redirect                    275

1    million there, okay, and I only kept the exhibits that

2    he actually has in evidence, 2006, '7, '8, '9, and

3    '10 --

4                 THE COURT:  Right.

5                 THE WITNESS:  -- that show no royalty

6    payments, okay, and I reduced the amount, and I'm

7    pretty sure my math is -- my math is correct.  I used

8    his 30-year-old calculator.

9                 THE COURT:  Okay.

10                THE WITNESS:  Okay?  And these would be the

11   new numbers, okay?

12                THE COURT:  All right.

13                THE WITNESS:  And all -- everything in here

14   is correct.

15                THE COURT:  All right.

16                THE WITNESS:  So I took all that out, okay?

17   So let me go P-127.

18                (Pause in proceedings.)

19                THE WITNESS:  Okay.  Back to P-127, Your

20   Honor, which he brought up in reference to the tax

21   returns where the tax returns did not match the actual

22   sales of ten percent.  All right.

23                So, what had taken place is that there was so

24   much royalties owed that wasn't paid, but I can't prove

25   that right now, but the document from 2006 will prove

Mr. Hipple - Redirect                    276

1   it.  And when Brian gave me over the amount of what was

2   on the sales, the sales figure, that and more was owed

3   to me.

4           So, these numbers that are on these tax

5   returns is still less than was actually owed to me over

6   the number of years, okay.   According to his schedule,

7   or his expert schedule from 2006 on.  We'll just

8   calculate from 2006 on.  So as far as the over amount

9   not matching the actual sales amount, I was due more

10  than what I actually even received here.

11          (Pause in proceedings.)

12          THE WITNESS:  Okay.  I would like to go to D-

13  20, Your Honor, Exhibit D-20.

14          (Pause in proceedings.)

15          THE COURT:  Go ahead.  Go ahead.

16          THE WITNESS:  You got it?  Okay.  Again,

17  we're talking about the patent, January 8th, 1999,

18  before the agreement with Colonial Chemical, and

19  patentized on December 12th, 2000, again, all right?.

20  How it works, and I'd like to explain in detail one

21  more time, if we turn to page -- well, let's just --

22  yeah, let's try that.

23          Let's go to page four of seven, and it's the

24  one, two, three, four, five, sixth paragraph down says,

25  "The silicate of the percentage compound are comprised

Mr. Hipple - Redirect                277

1  of potassium silicate and sodium silicate.  The

2  silicates are high grade silicates and may be mixed in

3  special" -- something or other.

4         "For example, sodium silicate may be present

5  in ten to 90 percent based on the total amount of the

6  silicate.  More preferably, 50 to 80 percent based on

7  the total amounts of silicates.  The balance of the

8  silicates being comprised of potassium silicate, the

9  total amount of silicates comprised of 40 to 50

10  percent."

11        So what they're basically doing is what I

12  talked about earlier, is this -- in order to get a

13  patent, naturally, you have to submit it, okay, with

14  some type of information on what is actually in the

15  patent, okay, and the ranges.  You have to give a

16  range, okay?

17        And as I explained before, when I received

18  the actual formula, actual formula from Mr. Barks,

19  okay, the actual written formula, which I can't discuss

20  here because it's the same as Kentucky Fried Chicken,

21  okay, but when I received the actual formula I'm the

22  only one that received that, Your Honor.

23        Then I went to the attorneys to have them

24  patent, okay, and they made up the ranges that are in

25  this patent in order to get a patent to protect the

Mr. Hipple - Redirect                    278

1    actual formula, okay?

2          Then I took the actual formula, and I don't

3    remember the date or time, so it had to be after March

4    of 1999, okay?  Actually, it still was prior to this

5    patent becoming effective, okay?  But even -- it don't

6    matter because December 12th, 2000, I owned SCIX, so I

7    don't know where the problem is here, okay.  I owned

8    it.  If I wanted to keep the patent, the actual

9    formula, confidential, that was my discretion, not

10   Brian's, okay?

11         I owned it.  Brian had nothing to do with it.

12   The patent was given on December 12th, 2000.  So Brian

13   didn't own the patent, SCIX didn't own the patent,

14   okay?  I owned it.

15         I owned SCIX at that time.  He was trying to

16   come across well, I stole the patent and I did this and

17   that.  Well, I actually owned the company.  I didn't

18   turn the company over to Brian until 2001, okay,

19   January 1st, 2001.  So I don't know where he was going

20   with this line of questioning and he never gave me an

21   opportunity to explain, but that is the explanation.

22         Brian did not own the patent.  I owned SCIX,

23   okay?  Therefore, it was my patent, it was my decision

24   what to do, it was my decision who to tell it to and

25   who to give it to.

Mr. Hipple - Redirect                    279

1        I never, ever actually gave it to Brian,

2   okay?  I'm the only one that actually knows the secret

3   formula, okay?  And when -- and when I received the

4   formula I owned the company.  Brian didn't own the

5   company until 2001, Your Honor.

6        So, therefore, anything he had to do or say

7   in reference to the patent I totally disagree with,

8   okay, as far as stealing the patent from Brian or

9   keeping the information hidden from Brian because I

10  owned the patent during the time I gave it to Colonial

11  Chemical under the confidentiality agreement.

12        (Pause in proceedings.)

13        THE WITNESS:  He can rebut that if he wants,

14  and then we'll go from there.

15        THE COURT:  Well, he's pointed to some

16  documents that indicate that at one point, SCIX -- it

17  suggests that they were the owner of the secret formula

18  and the patent --

19        THE WITNESS:  They were the owner --

20        THE COURT:  -- and then you executed on that.

21  That's what his point is.

22        THE WITNESS:  Well, they -- they were the --

23        THE COURT:  You filed documents requesting

24  security in those assets, and you listed that as some

25  of the assets of SCIC --

Mr. Hipple - Redirect                    280

1      THE WITNESS:  Well, basically, Your Honor --

2      THE COURT:  -- SCIX.

3      THE WITNESS:  -- you got to remember I owned

4  it.  I owned SCIX.  I gave it to Brian, okay?  I turned

5  SCIX over to Brian, okay?  Sure, when I turned SCIX

6  over to Brian, Brian was the owner of the patents,

7  okay?

8      But, I never turned the actual chemical

9  formula over to Brian because he didn't need it because

10 I allowed him still to use Colonial Chemical when I

11 turned it over to him, just the same as I allowed him

12 to use the website, the same as I allowed him to use

13 the Steel Seal name, and the logo, and the 800 number,

14 okay?

15     All right, I may have put information on

16 these forms that maybe is incorrect, but in 1999 or

17 2000, I owned the 800 number, I owned the website, I

18 owned the Steel Seal name, I owned the domain name, I

19 owned the patent, okay.  I owned everything, all right.

20     So, basically, I don't know what the

21 situation is or what he's trying to go with as far as I

22 stole all the stuff from Brian or whatever because it

23 was on the UUC forms, intellectual properties.  Okay.

24     You know, this was a time where things were

25 rushed and things were trying to get done, okay?  And I

Mr. Hipple - Redirect                    281

1   didn't read every document.  I relied on the attorney.

2   And, again, there's three -- there's three documents

3   out there, three exhibits, okay, Exhibit A, Exhibit A,

4   and then the UU -- UCC form that all are totally

5   different.  Not deliberately, but they're just totally

6   different.

7           THE COURT:  Okay.

8           (Pause in proceedings.)

9           THE WITNESS:  There's no collusion, me

10  stealing something from Brian or SCIX.

11          (Pause in proceedings.)

12          THE WITNESS:  He talked about the purchase

13  agreement, but I don't remember what he talked about,

14  but the purchase agreement speaks for itself on its

15  face.

16          I explained earlier in my testimony the

17  reason the date is 10-29 on the purchase agreement is I

18  waited until I got to Colombia for Emily Domices to

19  sign it, and I testified that in my earlier testimony.

20  So the document speaks for itself.

21          (Pause in proceedings.)

22          THE WITNESS:  Okay, D-31.

23          (Pause in proceedings.)

24          THE WITNESS:  Okay.  This has to do with I

25  guess the recovery of the garnishment of the money that

Mr. Hipple - Redirect                    282

1    was in the bank.  That belonged to Complete Group, or a

2    company that I owned.  So I don't know what the

3    question or what it -- what it is, but let me reiterate

4    that this was a process by my attorneys, okay.

5              All right.  He keeps talking about 240,000.

6    Yes, I received 240,000.  I never denied that I did

7    receive that money, okay?  And this money was basically

8    -- the money kept going into that account, by the way,

9    for I think two to three months, all right, until I was

10   able to get Craig Hock to get a credit card and get

11   everything up and running, all right.

12             So I don't understand where he was going with

13   that, but it's my statement that that money belonged to

14   Complete Group and I was entitled to it.  And my

15   attorneys filed the documents for me in reference to

16   that, and everything was done legally.  So there's

17   nothing to do with that part.

18             (Pause in proceedings.)

19             THE WITNESS:  I'm just trying to get this on

20   the record.  Okay, D-3 is the UCC filing, okay, and,

21   again, we're back to the same situation about

22   intellectual properties and properties and this don't

23   match and that don't match and everything don't match,

24   okay?

25             Kevin, basically, I sent him a sheet that I

Mr. Hipple - Redirect                    283

1    thought was the intellectual properties -- I mean the

2    assets and the -- okay, and then he drew up this.  I

3    guess he had to protect in reference to the

4    intellectual property or he didn't know that I owned

5    the intellectual properties.

6           Again, I'm saying that I'm not sure whether I

7    communicated with my attorney correctly, which I know I

8    didn't with the promissory note.  So, apparently, I

9    didn't do the proper communication with the UCC 1 form.

10   But at all times, I owned the rights to all the

11   intellectual properties.

12          (Pause in proceedings.)

13          THE WITNESS:  Okay, Your Honor, next is P-18.

14   This is a letter that I wrote to Colonial Chemical

15   telling them that Complete Group, LLC, is now the

16   successor, okay, to the confidentiality agreement.

17          Now, the successor to the confidentiality

18   agreement, this letter would not do what it needs.

19   They would have to write a new confidentiality

20   agreement and have me sign it.  So I am more than

21   likely going to withdraw this letter and keep SCI as it

22   is with the confidentiality agreement with Colonial

23   Chemical.

24          I'm going to request Colonial Chemical to

25   take this letter from their file after these

Mr. Hipple - Redirect                    284

1   proceedings because Scientific Chemical is the owner of

2   the confidentiality agreement, which I demonstrated

3   earlier by the facts that were sent to me -- or sent to

4   Scientific Chemical.

5            (Pause in proceedings.)

6            THE WITNESS:  And that's where I'm going

7   right now, D-13.  Okay, under his submission of D-13,

8   it did not have the fax cover sheet, okay, and the

9   information down talking about that they'll have the --

10  a bottle ready within one week.

11           But at the top of it, the company name is

12  Scientific Chemical.  It is not SCIX.  And, again, they

13  drafted this document.  The original document was

14  drafted by them, okay, and not me, so I am not the

15  drafter of this document.  And they have Scientific

16  Chemical and we had SCIX.  At that point in time, I

17  believe it was incorporated.

18           So it had something to do -- my belief and my

19  understanding, okay, on thinking about 1999 was that we

20  would be ordering the chemical under SCIX because SCIX

21  was the one that was going to use the chemical, not

22  Scientific Chemical, Incorporated.

23           But the actual confidentiality agreement was

24  with Scientific Chemical, Incorporated, not SCIX.  That

25  much I know for sure.  I'm making a statement as far as

Mr. Hipple - Redirect                    285

1   that's concerned.  The fax that is attached to it also

2   verifies the fact of who they were dealing with,

3   Scientific Chemical.

4              (Pause in proceedings.)

5              THE WITNESS:  Okay, I'm at P-51.  Switching

6   back again to P-51.  And I'm not totally sure what the

7   document was, but I think he was going back to the

8   license agreement.  I remember you directing him back

9   to the license agreement, or no, he talked about this

10  document, okay.  And this document has something to do

11  with Mike Schaeffer receiving the money, is that

12  correct?  I'm asking a question, I know.  I know what

13  this document is.

14             (Pause in proceedings.)

15             THE COURT:  Well, the point I think he was

16  trying to make is that the plaintiff in this lawsuit,

17  Complete Group, LLC, made an averment in paragraph

18  three that it is the owner of certain assets, including

19  the chemical formulation which is used to seal the

20  leaks in the engine.

21             THE WITNESS:  Oh, okay.

22             THE COURT:  And the suggestion I think is

23  that that contradicts what you're saying, that --

24             THE WITNESS:  Right, yes.

25             THE COURT:  -- you're the owner of it.

Mr. Hipple - Redirect                    286

1     THE WITNESS:  And it definitely contradicts
2  what I'm saying, and I don't think that date of that
3  letter to -- what's the date of this document?
4     THE COURT:  Well, this is a complaint.  It's
5  not a letter.  And this was filed by your attorneys,
6  Mr. Sullivan.
7     THE WITNESS:  It doesn't get -- Sullivan?
8     THE COURT:  And Mr. Chevelle.
9     THE WITNESS:  Okay.
10    MR. BERKOWITZ:  I believe the verification by
11  Mr. Hipple may be dated, but I'm not positive.
12    THE WITNESS:  I don't know the date of this.
13    THE COURT:  The verification is November
14  21st, 2012, where you verify the information is true
15  and correct.  That's the last page of document -- or
16  excuse me, Exhibit 51.
17    THE WITNESS:  Okay.  And, again -- yes.  I'm
18  sorry to say, Your Honor, but, again, I would get a fax
19  of the verification, they would basically explain to me
20  what it was, okay.
21    It says here, "Plaintiff, Complete Group,
22  LLC, verifies that the statement made in the foregoing
23  complaint are true and correct to the best of his
24  knowledge, information, and belief.  I understand that
25  false statements here may be subject to penalty," okay?

Mr. Hipple - Redirect                287

1    In some cases, and this is no excuse, all

2    right?  I'm not trying to make it an excuse, they would

3    send me something like this and just the verification.

4    Because they were my attorneys, I assumed they knew

5    what they were doing and everything was correct.  I

6    would sign it, scan it, and send it back to them.  I

7    didn't physically sign this in the United States.  I

8    was in Colombia at that point in time.

9    But, again, I appreciate where he's coming

10   from.  I mean I'm not disagreeing where he's coming

11   from.  It says what it says, but I would like to check

12   that paragraph three in reference to the last document

13   I just looked at.

14   (Pause in proceedings.)

15   THE WITNESS:  I'm looking for the document

16   with the letters.  Do you remember the two letters?

17   MR. BERKOWITZ:  I'm sorry, I don't know which

18   two letters you're referring to.

19   THE WITNESS:  The ones with that --

20   THE COURT:  To Lou?

21   THE WITNESS:  -- were sent to Scientific

22   Chemical.

23   MR. BERKOWITZ:  P-18?  That's P-18.

24   THE WITNESS:  P-A-T?

25   THE COURT:  18.

Mr. Hipple – Redirect                    288

1            THE WITNESS:  18.

2            MR. BERKOWITZ:  1-8.  Plaintiff's 1-8.

3            (Pause in proceedings.)

4            THE WITNESS:  See, the dates on all this

5   stuff is so confusing.  This letter was sent out

6   December 26th to Colonial Chemical, and the date of

7   this -- see, they never put dates on these things.

8   Do you know the date of this letter?

9            MR. BERKOWITZ:  I'm sorry, I don't recall.

10           THE COURT:  December 26th, 2010 at the top.

11           MR. BERKOWITZ:  Oh, yes, I believe that is

12  the date.

13           THE WITNESS:  Okay.  Then it corresponds

14  exactly with the letter to Colonial Chemical.  I guess

15  that's why.

16           THE COURT:  Exhibit 18, they are two letters.

17           THE WITNESS:  But, the second I have no

18  knowledge of, okay.  The first letter is my signature.

19  The second letter I didn't even know existed.

20           But, again, so basically if it corresponds I

21  must have told the attorney that this is the letter I

22  sent to Colonial, okay, and that's why they put this

23  reading the way it's read, so they do match, right?

24  There is no conflict there?

25           It says about "Complete Group, LLC is now a

Mr. Hipple - Redirect                    289

1    successor in interest in the confidentiality agreement

2    excluded between SCIX, an LLC and Colonial Chemical,"

3    and this say the "Plaintiff is the owner of a certain

4    asset included but not limited to a chemical formula

5    which is used to sell to seal leaks and engines of

6    older automobiles."

7                THE COURT:  Oh, I can't speak for Mr.

8    Berkowitz, but I am sure he is going to say this is

9    consistent, because the letters suggest that complete

10   group is now the successor of interest to SCIX and now

11   is the holder and owns the formula.  And that's what

12   you are alleging in the complaint, too?

13               THE WITNESS:  Yes.

14               THE COURT:  Not you, but Complete Group is

15   alleging.

16               THE WITNESS:  Right.  And that is something

17   that I think, if I am able to, I would like to change

18   back to the original.  Okay.  I mean I can live with

19   this, okay, because they do match each other.  The

20   letters don't -- there is no conflict between the two

21   letters or the document and the letter.  They are the

22   same date.

23               THE COURT:  Well, we will have to see, but I

24   don't think looking at them they appear to be

25   consistent.

Mr. Hipple - Redirect                    290

1          THE WITNESS:  Oh, no, that's right.  I can't

2    do anything with them right now.

3          THE COURT:  I am sorry, what?

4          THE WITNESS:  It is in default, Complete

5    Group.  All right.  P-51.

6          (Pause in proceedings.)

7          MR. BERKOWITZ:  I am sorry, did you say P-51?

8          THE WITNESS:  Yes.

9          MR. BERKOWITZ:  You were just looking at

10   that.  It is the complaint.

11         THE WITNESS:  Okay.  Is that what that was?

12   Okay.  P-14.  Again, it is the license agreement.  The

13   license agreement speaks for itself.  It is a document

14   for Complete Group and Steel Seal Pro.  I don't see

15   anything wrong with it, so I am not going to address it

16   any further.

17         Okay.  Now, the next question is a statement

18   that you made in reference to Teresa not being able to

19   go to -- to go to pick up the physical assets, because

20   she didn't know where they were.

21         I assume that since you have been in the

22   collection business for a number of years that you have

23   some way of finding out where assets are.  He can't

24   answer that, right?

25         THE COURT:  Right.

Mr. Hipple - Redirect                    291

1    THE WITNESS:  Okay.  All right.  Questioning

2    Mr. Hipple.  "Mr. Hipple, do you think that Teresa had

3    any way of locating the assets when she had time before

4    I foreclosed on the assets?"

5           My answer, my answer is that I am assuming

6    that her attorney, Mr. Berkowitz, who has been in the

7    business for such a long time has many ways and plenty

8    of different people that can locate assets.  I am sure

9    he has been doing this for many years.

10          So, as far as the physical assets that were

11   there after he levied on the bank there was no reason

12   that he could not find or even tried to find, and I

13   don't believe he mentioned that, he even tried to find

14   the physical assets of SCIX, because I don't, and it is

15   my opinion, I don't believe that they were interested

16   in the physical assets.

17          (Pause in proceedings.)

18          THE WITNESS:  I just want to see what it is

19   before I mention it.  Okay.  P-130, again, is another

20   set -- is number one, two and three of the different

21   versions of what assets and intellectual properties.

22   Okay.  There is three versions, okay, and I don't know

23   which one is the best.  So, again, I have to admit that

24   there are three separate versions of that document,

25   Kevin Fogerty's and two versions by me.

Mr. Hipple - Redirect                          292

1          (Pause in proceedings.)

2          THE WITNESS:  Okay.  I am at P-24, and again

3   I will keep the same statement that I tried to make

4   earlier.  This is a document that was sent to SCIX.  I

5   have no knowledge of the document and I object to even

6   being asked about the document but, again, I have no

7   knowledge of this document.

8          (Pause in proceedings.)

9          THE WITNESS:  P-8, the judgment note.  Okay.

10  Again, I explained that earlier, that the language in

11  the second paragraph about creditor waiving all

12  previous or accrued interest and just from a standpoint

13  that that language would have to be somebody that, I

14  don't know, for some reason, why they would waiver

15  their interest, I don't know.

16          But, again, I explained this earlier, that

17  Mr. Fogerty thought the note was a $210,000 note on the

18  date and he didn't realize it had an amortization

19  schedule with interest payments, or I am sure as an

20  attorney he would have never put that information in

21  there.

22          P-12, okay.  P-12 gets back to Mr.

23  Berkowitz's statements, okay.  In reference to, okay,

24  because I came back to the United States on my

25  attorney's advice and filled out certain documents to

Mr. Hipple - Redirect                    293

1    protect my interest in my loan, that it was a

2    deliberate attempt to have SCIX go out of business.

3         Well, SCIX owed me so much money, okay, not

4    only the $210,000, the money for the J.C Consulting

5    loans and also the royalties.  So, we always hoped that

6    if it continued, SCIX, which was at the point of growth

7    over the last years, which the expert report shows,

8    okay, that Brian was starting to finally grow, okay.

9         And it was always my position that, okay,

10   naturally he is my son, all right, it is not a stranger

11   that I lent all of this money to, and I was always

12   hoping that at one point in time that he would build

13   the company to where he could start paying me back what

14   I was entitled to and also pay Teresa what she was

15   entitled to.

16        And during Teresa's settlement for her

17   accident, right, back in the 2000s, okay, when she

18   worked for SCIX, the actual projections for the first

19   year of sales, okay, was two million, four million,

20   eight million, 12 million, because there was over half

21   a million blown head gaskets in the United States,

22   okay.  And we spent a lot of time and money on

23   advertisement, which she's very familiar with.  She had

24   a lot to do with the advertisement, okay.  She took

25   care of the talent for the actual tape.  She took --

Mr. Hipple - Redirect                    294

1       MR. BERKOWITZ:  Objection, Your Honor.  this

2   is beyond the scope of the cross.

3       THE COURT:  All right, that's all right.  Go

4   ahead.  You -- I'll overrule the objection.  Why don't

5   you finish?

6       THE WITNESS:  Yeah, she took care of the

7   talent and had a lot of input, good input in the early

8   part.  And that's why I gave her ten percent of the net

9   profit also, okay?  So what happened was these large

10  projections over the -- over the years, right, and when

11  she had her accident actually helped her, Your Honor,

12  by terminating her, okay, because she could no longer

13  work, made her settlement from her salary, which she

14  would only receive maybe about $900,000 in settlement.

15      But because she had that letter from me of

16  ten percent of the net profit and the projections that

17  we gave to the insurance company for what the

18  projections were for the Steel Seal to sell, allowed

19  her settlement to be much greater than what it would

20  have ever been.

21      So it kind of -- we all kind of had great

22  hopes of this company.  This is -- I'm sorry, but this

23  is what took place, all right?  No.

24      THE COURT:  Go ahead.

25      THE WITNESS:  Okay.

Mr. Hipple - Redirect                    295

1          THE COURT:  Finish up.

2          THE WITNESS:  That's basically it, okay --THE

3  COURT:  All right.

4          THE WITNESS:  -- on that as far as that's

5  concerned.  That was the only big to-do I had.

6          (Pause in proceedings.)

7          THE WITNESS:  Okay, P-36, there's nothing in

8  my book.  I think you gave me another volume than

9  volume one to look at.

10         (Pause in proceedings.)

11         THE WITNESS:  Okay, it's the application that

12  was submitted, okay, which I never seen and I never had

13  anything to do with, and I object to you putting it

14  into evidence.

15         And, again, the application for the credit

16  card was actually in Craig Hock's name, which shows on

17  one of the American Express credit cards.  I did not

18  have the capability of having the application because I

19  didn't have a bank account.  I did not live in the

20  country, and I did not own a home or anything like

21  that, so Craig Hock volunteered.

22         Craig Hock handled all the application

23  information, okay?  I had nothing to do with it.  And

24  it finally got approved, and as of this day, today,

25  while I'm speaking, he is the one on the credit

Mr. Hipple - Redirect                    296

1  application still.  Again, it was his doing, he dealt

2  with it, and I don't even think I was around when that

3  document was produced.

4              (Pause in proceedings.)

5              THE WITNESS:  That was 36, right?

6              MR. BERKOWITZ:  Yes, that was P-36.

7              (Pause in proceedings.)

8              THE WITNESS:  Exhibit P-47 is information for

9  the credit card under steelseal. -- or Steel Seal, LLC,

10 with the information of Steel Seal, LLC, which was

11 never applied for as a credit card, okay, and this was

12 open for one day at a bank, which I explained earlier.

13             On confidential information, I was told not

14 to use this because it was part of the -- of the

15 lawsuit, so this never went anywhere.  It never went

16 for application, it never did anything.  I had a bank

17 account for one day and then it was closed.

18             (Pause in proceedings.)

19             THE WITNESS:  P-52, I don't understand what

20 the document is in reference to.  It seems like it's a

21 timeline, and I can't remember what he spoke about, so

22 I can't -- I can't comment on it.  Oh, no, it's D-52,

23 I'm sorry.  I'm trying to rush the best I can.  Okay.

24 Okay.

25             D-52 is a document that I produced about the

Mr. Hipple - Redirect                    297

1  income I received in reference to the sale of the

2  assets that were taken.  It is 122,000 because the

3  majority of the bottles were UK bottles, and I'm making

4  the statement under oath that they were UK bottles,

5  okay.  And, as I stated earlier, that was the gross

6  sales without any G and A, any expenses, to ship,

7  transport, or whatever.  So I didn't get 122,000.

8          (Pause in proceedings.)

9          THE WITNESS:  Okay, Mr. Berkowitz opened up

10  P-91, and I'm going to take this to a finger through.

11  I'm just going to grab a different one.

12          (Pause in proceedings.)

13          THE WITNESS:  All right.  That is a sample of

14  American Express that he picked out naturally because

15  it had high numbers on it.  I'm going to P-8 -- P-98.

16  Okay, anybody can follow along if they want.  My

17  charges are $1,617.  Brian's charges are 22,000.  Yes,

18  there are personal charges for Brian on this, okay?

19          THE COURT:  This is to both of you.  I don't

20  need any more information on this Amer --

21          THE WITNESS:  Okay, fine.

22          THE COURT:  I understand the point.

23          THE WITNESS:  Okay.

24          THE COURT:  I mean there some personal --

25          THE WITNESS:  Well, he keeps bringing it up,

Mr. Hipple - Redirect                    298

1    Your Honor.

2            THE COURT:  -- but there's a lot of business

3    relations.

4            THE WITNESS:  Yeah.

5            THE COURT:  And I think Mr. Berkowitz would

6    agree with that, there's --

7            THE WITNESS:  Yeah.

8            THE COURT:  -- a lot of business charges.  So

9    let's move on.  I mean really, seriously --

10           THE WITNESS:  Okay.

11           THE COURT:  -- that's beating a dead horse.

12           THE WITNESS:  Yes.  I just thought I had to

13   respond, sir.

14           THE COURT:  All right.

15           THE WITNESS:  Okay.  All right, that is it.

16           THE COURT:  Okay.  Mr. Berkowitz, do you have

17   anything else?

18           MR. BERKOWITZ:  Are you ready, Mr. Hipple?

19           THE COURT:  I hope it's not a lot.

20           MR. BERKOWITZ:  I have no questions, Your

21   Honor.

22           THE COURT:  Good.  Okay.

23           MR. BERKOWITZ:  I'm done with this, with the

24   witness.

25           THE COURT:  Now, look, let's stop for a

Mr. Hipple - Redirect                 299

1   minute.  All right, so are there any exhibits you want

2   to introduce?  You're resting your case, right?

3          MR. HIPPLE:  Yes.  Yeah, I submitted the

4   American Express, right?  You have that, right?

5          THE COURT:  Right.

6          MR. HIPPLE:  And that -- and the re-doing of

7   the schedule, showing the total liabilities --

8          THE COURT:  All right.

9          MR. HIPPLE:  -- of the company at the time.

10  And I --

11         THE COURT:  I think we covered it.

12         MR. HIPPLE:  I think we covered it.

13         THE COURT:  But I want to make sure -- I want

14  to give you an opportunity if there's anything else

15  you --

16         MR. HIPPLE:  Just let me look on my desk real

17  quick.

18         THE COURT:  All right.

19         MR. BERKOWITZ:  Was D -- I think D-504 was

20  the timeline that I used.  I think that was admitted.

21         MR. HIPPLE:  I don't think it was ever

22  admitted.  Was it?

23         THE COURT:  No, but do you want that

24  admitted?

25         THE WITNESS:  I don't remember admitting it.

Mr. Hipple - Redirect                                    300

1    I didn't do it.

2              MR. BERKOWITZ:  I have no objection.  I had a

3    D-504 number on mine.  I --

4              THE COURT:  I think we marked it because he

5    used it.

6              MR. HIPPLE:  Here's the other copy.

7              THE COURT:  You used it, Mr. Hipple.

8              MR. HIPPLE:  Yeah, I used it.

9              THE COURT:  Right.

10             MR. HIPPLE:  I have it.

11             THE COURT:  Do you want that into evidence?

12             MR. HIPPLE:  No, I don't --

13             THE COURT:  All right, fine.

14             MR. HIPPLE:  I don't think it's necessary.

15             THE COURT:  Okay.

16             MR. BERKOWITZ:  No objection.

17             MR. HIPPLE:  No, I don't think it's

18   necessary, Your Honor.  All right.

19             THE COURT:  All right, now, let -- anything

20   else?  Okay.  Now let me just -- Mr. Berkowitz, do you

21   want to be heard on anything?

22             MR. BERKOWITZ:  Nope.

23             THE COURT:  All right.  So here's the rules

24   on closing arguments.  Now, let's talk about our timing

25   here.

Mr. Hipple - Redirect                    301

1    MR. HIPPLE:  What time is it?

2    THE COURT:  It's 5:30.

3    MR. HIPPLE:  We each get 15 minutes.

4    THE COURT:  No.  Hold on for a minute.  He

5    goes first because he has the burden of proof.  You go

6    second.  He has a chance for rebuttal.

7    MR. BERKOWITZ:  Your Honor, if it would speed

8    things up, if we could just agree to split the time if

9    Mr. Hipple goes first?

10   THE COURT:  All right.

11   MR. BERKOWITZ:  And I'll rebut and we'll be

12   done.

13   THE WITNESS:  Well, how will you rebut?

14   THE COURT:  Well, why don't you go first for

15   15 minutes and he goes and answers you in 15 minutes?

16   MR. BERKOWITZ:  I don't want to give up my

17   rebuttal time.

18   THE COURT:  Okay.

19   MR. BERKOWITZ:  That's why I said that he can

20   go --

21   THE COURT:  Why don't you do --

22   MR. BERKOWITZ:  -- and then I'll close.

23   THE COURT:  Why don't you do ten minutes, he

24   does 15, and you can do five rebuttal?

25   MR. BERKOWITZ:  Okay.

Mr. Hipple - Redirect                    302

1      THE COURT:  Does that add up to an --

2      MR. BERKOWITZ:  I don't even know --

3      THE COURT:  -- half hour?

4      MR. BERKOWITZ:  -- if I'm going to take that

5  long, Your Honor.

6      THE COURT:  All right.  So it's 5:30 now.

7  I'll give you until --

8      THE WITNESS:  You're on the clock --

9      THE COURT:  -- 5:45 and then --

10     THE WITNESS:  -- Mr. Berkowitz.

11     THE COURT:  -- unless you want to reserve

12  some rebuttal.  And then why don't you go to ten

13  minutes, and then I'll give him -- I'll give him ten

14  minutes, and then you can have five minutes rebuttal?

15     MR. BERKOWITZ:  I don't even know if I'm

16  going to --

17     THE COURT:  All right, fine.

18     MR. BERKOWITZ:  -- take that long, Your

19  Honor.

20     THE COURT:  Let's go.

21     MR. BERKOWITZ:  I think --

22     THE COURT:  Right.

23     MR. BERKOWITZ:  -- you've had the opportunity

24  to hear the evidence, fully hear the evidence.

25     THE COURT:  So just talk about the relief.  I

Mr. Hipple - Redirect                        303

1   mean that's what I want to hear about.

2            MR. BERKOWITZ:  That was --

3            THE COURT:  Because B.B. Management is not a

4   defendant.  They hold the assets now.

5            MR. BERKOWITZ:  Yes.

6            THE COURT:  Right.  Clement Hipple is the

7   defendant here.  Tell me -- tell me what you're asking

8   the Court to do here.

9            MR. BERKOWITZ:  Your Honor, the relief that

10  we're seeking --

11           THE COURT:  Right.

12           MR. BERKOWITZ:  -- falls under the equitable

13  relief under PUFTA, P-U-F-T-A.  It provides broad

14  equitable relief.  I think it's uncontested that the

15  assets of SCIX are now in the possession of B.B.B.

16  Management Group and that Mr. Hipple received about

17  $240,000 in cash from Steel Seal proceeds when he

18  obtained the money from -- in the Complete Group/Steel

19  Seal Pro lawsuit.

20           THE COURT:  You said 140.  You meant 240?

21           MR. BERKOWITZ:  240.

22           MR. HIPPLE:  240.

23           MR. BERKOWITZ:  I'm sorry if I misspoke.

24           THE COURT:  Yes, 240.

25           MR. BERKOWITZ:  240.

1    THE COURT:  Right.

2    MR. BERKOWITZ:  And that money Mr. Hipple

3 has.  What we're -- first of all, when I started this

4 collection all I wanted to do was collect the notes.

5 It was $350,000.  And, as I said before, at that time I

6 was working for SMS, as I've done, and --

7    THE COURT:  It was probably less that 350

8 because she got some money from the garnishment.

9    MR. BERKOWITZ:  It was 338,000 at the time.

10    THE COURT:  Right.

11    MR. BERKOWITZ:  And that's all I wanted.  And

12 SMS, when they controlled it, they have every time

13 agreed to a payment plan.  But when I got -- after the

14 garnishment and I did the interrogatories in aid of

15 execution and I went on the internet, everything was

16 gone.  Gone.  I had nothing to execute against.

17    It was -- under Pennsylvania law, I don't see

18 how you could find a more classic fraudulent conveyance

19 under the statute intentionally.  You don't have this

20 kind of paperwork when it's not intended to be done the

21 way it's done.

22    Whether Mr. Hipple had bad intentions or not,

23 that's the nature -- that's the name of the act.  And

24 if you look, there are badges of fraud, and you don't

25 even need those badges, although they're all present

Mr. Hipple - Redirect                                305

1    here.  The paperwork itself shows the intention.  And

2    what we want is the equitable relief so that Ms.

3    Concepcion can receive the $338,000 that she should

4    have received from SCIX.

5            THE COURT:  Do you look at the time of the --

6    what you're alleging is a fraudulent -- do you look at

7    what she's owed at that time?

8            MR. BERKOWITZ:  That's what --

9            THE COURT:  Do you freeze it?

10           MR. BERKOWITZ:  That's what I'm looking at,

11   and then the interest that starts to accrue on that.

12           THE COURT:  Okay.

13           MR. BERKOWITZ:  And that's what got us to the

14   550,000 where we are today.  And under the terms of the

15   note, and under the terms -- the equitable terms of the

16   Act and the decisions of the Third Circuit, punitive

17   damages are permitted.  And the Third Circuit has

18   approved the payment of attorneys fees as part of

19   punitive damages, and attorneys fees are due under the

20   terms of the note.

21           THE COURT:  Right.  So that would be -- if I

22   did find in your client's favor, that would be subject

23   to a later petition.

24           MR. BERKOWITZ:  Yes.

25           THE COURT:  Right.

Mr. Hipple - Redirect                    306

1    MR. BERKOWITZ:  I would file a petition --

2    THE COURT:  Right.

3    MR. BERKOWITZ:  -- for attorneys fees and --

4    THE COURT:  Right.  Right.

5    MR. BERKOWITZ:  -- go through that process.

6    THE COURT:  So you want a judgment against

7  Mr. Clement Hipple in the amount of $550,000?

8    MR. BERKOWITZ:  Yes, I do.  I want a judgment

9  against all the defendants in the amount of $550,000,

10  including -- the exact number is on P-32 -- P-132,

11  against all of the defaulting defendants.  Although,

12  you know, you see that these are all corporate entities

13  that have been stripped clean.

14    However, I want the judgment against Melissa

15  Moreno as the administratrix of the estate so that if I

16  have to pursue that because the estate did not list

17  SCIX as an asset and it didn't list Steel Seal Pro as

18  an asset, and she received a distribution, the

19  Prudential life Insurance Policy that came from the

20  assets of Steel Seal, I would like the ability to seek

21  that relief if I need to.  And I think I'm entitled to

22  because those assets were not listed.  They were just

23  stripped.  They lost their value also through the

24  process.

25    You heard Mr. Hipple has no bank account.  We

Mr. Hipple - Redirect                    307

1    need equitable relief to know what assets he has, where

2    they are, what names they're held in, so that we can

3    execute upon them, and without that, we really have

4    nothing.

5           We know where the business of SCI went --

6    SCIX went, it went to B.B.B. Management group, although

7    we've done no discovery.  We don't know if it's still

8    there and doing what it's doing.  And so we need that

9    broad type of equitable relief so we can get paid.

10          This is exactly what the law, the

11   Pennsylvania law, was enacted for, exactly.

12          THE COURT:  On these other corporate

13   defendants, are they entitled to a separate hearing

14   other than what's in the record here today?  And help

15   me out on this because we had the two defendants and

16   Mr. Hipple consented to a default.  I entered that

17   order.

18          The other defendants, I'm not quite sure the

19   procedural history of how they -- there was a default

20   entered against them.  I know Judge DuBois said later

21   on, he'll have a hearing.

22          MR. BERKOWITZ:  This --

23          THE COURT:  But --

24          MR. BERKOWITZ:  Oh, I'm sorry.

25          THE COURT:  Go ahead.  You're saying this is

Mr. Hipple - Redirect                    308

1   the hearing?

2            MR. BERKOWITZ:  This is -- he -- what didn't

3   happen, he granted summary judgment against them.

4            THE COURT:  Right.  He didn't have a hearing?

5            MR. BERKOWITZ:  Correct, because he couldn't

6   put a dollar amount on it.

7            THE COURT:  Right.  But they have an -- the

8   corporations have a -- they have a right to be heard at

9   least to challenge the amount.  That's what I'm

10  concerned about.

11           You're asking me that this be the hearing and

12  do the corporations have an opportunity to come in and

13  contest?  They're not -- obviously -- Mr. Hipple like

14  discharged his counsel for himself and the two

15  corporations for this trial, but has the corporations

16  discharged their attorneys on the other?

17           MR. BERKOWITZ:  Yes, they were discharged.

18  They were actually released from the case.  Melissa

19  Moreno controlled those as the administratrix of the

20  estate.  She chose not to defend this case.  It's her

21  choice.

22           You know, SCIX was owned by Brian Hipple

23  other than whatever reservation of rights Mr. Hipple

24  kept.  It's gone.  You know, and only Melissa Moreno --

25           THE COURT:  Here's my --

Mr. Hipple - Redirect                    309

1        MR. BERKOWITZ:  -- could act for the company.

2        THE COURT:  Here's my question.  So Clement

3   Hipple is an individual.  The assets that were

4   transferred -- Teresa Hipple was a creditor to SCIX?

5   That's the note?

6        MR. BERKOWITZ:  Correct.

7        THE COURT:  Right.  So your allegations are

8   that SCIX transferred all its assets, made a fraudulent

9   transfer, transferred all the assets to Complete Group

10  or whatever the succeeding entity was?

11       MR. BERKOWITZ:  Yes.

12       THE COURT:  Okay.  I know there's a number on

13  it.

14       MR. BERKOWITZ:  Yeah.  No, you don't want to

15  hear it again.

16       THE COURT:  So if I misspeak, correct me.

17  SCIX has defaulted.  You want to get a judgment against

18  SCIX.  But now you're asking the Court to enter a

19  judgment against an individual who was not, and correct

20  me if I'm wrong, was not an officer of SCIX at the time

21  of the fraudulent transfer, right?

22       MR. BERKOWITZ:  Yeah.  Are we talking about

23  Melissa Moreno?

24       THE COURT:  No, I'm talking about Clement

25  Hipple.

Mr. Hipple - Redirect                    310

1          MR. BERKOWITZ:  I contend that Clement

2     Hipple, because of his reservation of the voting

3     interest of 75 percent, really controlled SCIX and he

4     was an officer in every respect.

5          And if you listened to his testimony today,

6     which I know you did, he controlled that entity

7     completely.  According to his own testimony, I disagree

8     with his analysis of the effect of a patent and a

9     formula and the ability to split the item that's being

10    patented from the formula.  I disagree with that.  But

11    you heard --

12         THE COURT:  So let's assume he controls --

13    let's assume you're absolutely right, he controlled

14    SCIX after Brian Hipple died.

15         MR. BERKOWITZ:  Even before.

16         THE COURT:  All right.  Brian Hipple died --

17    he had died previous to the fraudulent conveyance,

18    right?

19         MR. BERKOWITZ:  No.

20         THE COURT:  No?

21         MR. BERKOWITZ:  He died two years after.

22         THE COURT:  I'm sorry.  Okay.  So Brian --

23         MR. BERKOWITZ:  We've had a lot of dates.

24         THE COURT:  No, no, that's all right.  So

25    Brian Hipple is alive and well and controlling the

Mr. Hipple - Redirect                              311

1   company, and I know you're saying Mr. Clement Hipple

2   also had a role in that.

3           But you're now asking me, and let's assume it

4   was a fraudulent conveyance, that SCIX fraudulently

5   conveyed all these assets to avoid Teresa Hipple's

6   debt.  But, you're asking me to impose a judgment on

7   Clement Hipple individually for something that the

8   corporation and/or Brian Hipple may have done, and he's

9   not officially an officer of the company or owner of

10  the company.  Just tell me how I can do that.

11          MR. BERKOWITZ:  Okay.  As I believe he's an

12  officer and director.  You heard that --

13          THE COURT:  But what proof do you have other

14  than the voting -- he retained voting rights?

15          MR. BERKOWITZ:  The fact that he controlled

16  that assets in the business really.  Brian Hipple had

17  nothing.  Brian really worked for him, just like he did

18  when he went to Steel Seal Pro.

19          THE COURT:  How can I say that?  Where do I

20  look to in the record?

21          MR. BERKOWITZ:  You look -- okay, you look at

22  the record.  Steel Seal Pro was now selling Steel Seal

23  and generating a lot of revenue.  According to the way

24  it was structured in the license agreement, all of that

25  money belonged to Complete Group.

1    MR. HIPPLE:  Time is up, Your Honor.

2    MR. BERKOWITZ:  That's what it says in the

3    license agreement.  And Brian Hipple was to be paid

4    $10,000 a month for selling Steel Seal, like he had

5    done at SCIX.  He was really just an employee through a

6    corporate structure.  That's one way.

7         Clement Hipple also acceded to ultimately,

8    all the assets.  He personally controls B.B.B.

9    Management.  That is one of his assets, all proceeds

10   from the fraudulent conveyance.  That's how Mr. Hipple

11   personally fits in here.  Otherwise, we would have all

12   these corporations that can disappear, and then the

13   individual, I don't have anything, but he's got it all.

14   THE COURT:  So it's almost like a successor

15   liability -- almost like a --

16   MR. BERKOWITZ:  Well, there's --

17   THE COURT:  -- successor liability of -- I'm

18   sorry.  Go ahead.

19   MR. BERKOWITZ:  Officers and directors

20   liability.  You know, before you -- when you have a

21   company that's insolvent in Pennsylvania, you have a

22   duty to the creditors to make sure they get paid before

23   you.

24        If you look -- if you look at this, everybody

25   got paid except Teresa Hipple.  Everybody got their

1    money.  And we saw that after SCIX disappeared, there

2    was a lot of money paid out to Brian Hipple and Melissa

3    Moreno and Clement Hipple, lots of it, cars and credit

4    cards and everything else.  Everybody got their money

5    except Teresa.  She's the only one.

6              MR. HIPPLE:  Your Honor, ten minutes are up.

7              THE COURT:  All right, let me hear from you,

8    Mr. Hipple.  Thank you, Mr. Berkowitz.  And then we'll

9    give you the last five minutes.

10             MR. HIPPLE:  Your Honor, I think it's been

11   proven throughout the five days that I had no

12   involvement with SCIX.  Brian owned the company.  He

13   ran the company totally on his own.

14             Every witness here, I mean everybody that

15   spoke, including Ira, Colonial Chemical, and everybody

16   else, Brian owned the company and Brian operated the

17   company.  I had no interest in the company.  Okay.

18             There was a piece of paper that said about my

19   voting rights.  Okay, that was a mistake.  There never

20   was any meetings.  We never voted on anything, okay?

21   I lived in Colombia, Your Honor, okay?  Brian

22   controlled everything here in the United States.  It

23   was his company.

24             THE COURT:  Do you think this is fair?

25             MR. HIPPLE:  What's that?

Mr. Hipple - Redirect                     314

1    THE COURT:  Do you think what happened to Ms.

2  Hipple is fair?

3    MR. HIPPLE:  No, of course not I --

4    THE COURT:  Do you think it's fair?

5    MR. HIPPLE:  -- don't think it's fair because

6  I think --

7    THE COURT:  Do you think it's right.

8    MR. HIPPLE:  -- if Ms. Concepcion wasn't so

9  angry after the divorce, okay, and foreclosed,

10  eventually, she would have got her money.  As you could

11  see, Brian was building a business, okay?  And this

12  whole lawsuit, by her attacking, okay, caused her own

13  problems, Your Honor, okay.

14    Look at the money I'm out, Your Honor.  She's

15  out what?  350,000?  I'm out over a million dollars,

16  okay?  So let's put apples to apples here.

17    THE COURT:  But you still have the company.

18  You still have B.B.B. Management.

19    MR. HIPPLE:  Well, sure, because I --

20    THE COURT:  You're still -- you're still

21  getting revenue.

22    MR. HIPPLE:  Yeah, but because I owned the

23  chemical formula, Your Honor.  I owned the website.  I

24  owned the domain name.  I owned everything.  It's mine.

25  I could have thrown Brian out five years ago.  Then

Mr. Hipple - Redirect                    315

1   where would Ms. Concepcion be?  Nowhere.  She wouldn't

2   have even gotten an interest for five more years.

3          I could have taken control and said Brian,

4   goodbye.  I'm taking back my tangible assets, okay?

5   I'm no longer giving you the right to the chemical

6   formula.  You can no longer use my website, okay?  You

7   are done.  Hypothetically, I could have done that an

8   any point in time, Your Honor.

9          Of course I wouldn't do it.  I knew that she

10  had a loan.  I was in Colombia.  I was happy, okay?

11  Brian was paying her every month, okay?  And everything

12  was going along fine, okay?  But there was a little bit

13  of anger, as you could see in the courtroom.

14         She wouldn't even look at me most of the

15  time, okay, during my cross-examination, all right?

16  And that's the basis of this whole case.  It has

17  nothing to do with SCIX, nothing to do with her -- with

18  her money.  It's the anger of the divorce between me

19  and her, okay?  And that's the -- that's the whole key

20  here.  And she thought --

21         THE COURT:  Well, it's about money.  I mean

22  she lent money to the company.

23         MR. HIPPLE:  Okay, yes, she --

24         THE COURT:  You're not disputing that.

25         MR. HIPPLE:  She lent the money.

Mr. Hipple - Redirect                    316

1           THE COURT:  No one is disputing that the

2    money -- she lent the money, it was her own money, it

3    was generated by the auto accident, and she --

4           MR. HIPPLE:  That is correct.

5           THE COURT:  -- gave the money to SCIX.

6           MR. HIPPLE:  Right.

7           THE COURT:  It was an ongoing concern.

8    There's a lot of expectations that it would make

9    profits, and now there's no ability for SCIX to pay it

10   back because of what happened.

11          MR. HIPPLE:  Well, because --

12          THE COURT:  So you can understand the way she

13   feels.

14          MR. HIPPLE:  Definitely.  I -- 100 percent.

15   I understand.  And, again, I had the option at any

16   point in time if I wanted to be the bad guy here, Your

17   Honor, or the fraudulent guy, as they led me out to be,

18   it's just to take everything and walk away.

19          And I could come to you, Your Honor, and say

20   okay, do you want to run this company?  Everything

21   stays the same, Your Honor.  You don't have to do

22   nothing.  The website is there, the Steel Seal is being

23   manufactured, the boxes are being delivered.

24          Again, with the fraudulent conveyance, if I

25   would have sold this to this gentleman here, okay,

Mr. Hipple - Redirect                    317

1    everything would remain the same, okay?  Nothing

2    changes.  What would -- what would change?  I don't

3    know, the ownership, the person, the company.  That's

4    all that changed.

5          Everything in this kind of business, if I --

6    if I put it on the open market, okay, and try to sell

7    my chemical formula and my website, okay, nothing would

8    change.  The next person would step in the same chair,

9    sit down, and do the same operation.

10         They're trying to say it's a fraudulent

11   conveyance because it's my son and we negotiated

12   together, okay?  All right, yes, I wanted to keep my

13   son in business, of course.  Yes, I want to see my son

14   have a job, yes, okay?  I'm his father, okay?  Now my

15   son is dead because of this, basically, all right,

16   because he lived his life to build a company, okay?

17   And she took that away from him.  And she don't even

18   care.

19         So, therefore, again, I had the right to take

20   away everything, but I never did that, okay?  She's the

21   one that made the move, the anger move, okay?  It was

22   her fault.  Now I have two grandchildren that don't --

23   don't have a father.  I love my family.

24         THE COURT:  You know, it's a shame in a way

25   that I'm the fact finder here because I really would

Mr. Hipple - Redirect                              318

1   like to sit both of you down here and work this out.   I

2   really think there's an opportunity before I rule for

3   you to sit down with the lawyers and try to work this

4   out.   That's the thing I think both of you should do.

5   I said this to Mr. Berkowitz to.

6          And I don't want a response because I'm

7   deciding the case, but -- it's going to take me a while

8   to decide this case, but I think you both should make

9   an effort to resolve it because, guess what, I'm going

10  to tell you what's going to happen.   No matter how I

11  rule on this, and I may rule completely on your side,

12  but guess what, this is not going to end because, first

13  of all, there's default judgments against Melissa

14  Moreno --

15          MR. HIPPLE:   Right.

16          THE COURT:   -- who's the mother of your

17  grandchildren.   Mr. Berkowitz is not going to give up

18  that.   B.B. Management is still in business.   He still

19  has a right to sue them.

20          MR. HIPPLE:   Right.

21          THE COURT:   Okay?   I mean this is not going

22  to end.

23          MR. HIPPLE:   But what he don't under --

24          THE COURT:   So I mean you're a good man,

25  she's a good woman, but you can't -- you can't ignore

1   what she's trying to do here.  Now, she may not be

2   right.  I mean maybe at the end I will rule against

3   her.  I don't know, I'm going to look at this.

4             But she's owed this money, she put the money

5   in.  She's got her own children.  I mean we didn't get

6   into this, but I know she has her own children.  She

7   talked about it.

8             MR. HIPPLE:  Yeah, her children are grown.

9             THE COURT:  Right.

10            MR. HIPPLE:  They're on their own.

11            THE COURT:  Well, she's got to support --

12   she's got obligations too.  So she's got to -- you

13   know, this world is a tough place.  She's got

14   obligations and people to take care of too, just like

15   you do, you have two grandchildren.  But this is not

16   going to end.  I mean it's not going to end.

17            You're a good man.  I feel bad about what

18   happened to your -- I really do.  I feel horrible about

19   what happened to you losing your son.  I have four sons

20   myself.  I could imagine if something happened to my

21   sons.  But the bottom line is this is not going to end,

22   so you really should try to resolve it.

23            I don't want to get -- if you don't want to

24   resolve it, I don't want to know anything about it

25   because I'm going to call it the way it is, and

1   everybody has a right to appeal.  But you should -- you

2   should go back and, you know, search your soul and see

3   if there's any way -- and I say this to Mr. Berkowitz,

4   you can resolve this because this could go on -- we

5   heard how much everybody is spending here.

6              MR. HIPPLE:  Yes.

7              THE COURT:  I mean what you spend in legal

8   fees --

9              MR. HIPPLE:  I never expected it to be that

10  way.

11             THE COURT:  Wait.  But what you spent and

12  what Mr. Berkowitz spent dwarfs the amount involved

13  that was in controversy.

14             MR. HIPPLE:  Exactly.  I never expected to --

15             THE COURT:  Well --

16             MR. HIPPLE:  -- spend that kind of money.

17             THE COURT:  I know, but you really should sit

18  down and try to resolve it.  So, you know, you got five

19  more minutes to make your arguments.

20             MR. HIPPLE:  Okay.

21             THE COURT:  Okay?  I -- you know, I may order

22  the transcript.  I'm going to plough ahead and decide

23  the case, but you both have an opportunity to resolve

24  it, and I think the move should come from you to Mr.

25  Berkowitz.  You know what Mr. Berk -- I know the

Mr. Hipple - Redirect                    321

1   discussions, but he made clear what he wants, and you

2   got to make a move and talk to Mr. Berkowitz.

3           And he is a lawyer that -- he's been around a

4   long time, he knows the realities of collection.  I'm

5   sure he'll try to resolve it.  He'll try -- is that --

6   you'll try to talk --

7           MR. HIPPLE:  I'm willing --

8           THE COURT:  -- right?

9           MR. HIPPLE:  I'm willing to do, Your Honor.

10  I'm willing to --

11          THE COURT:  All right.

12          MR. HIPPLE:  -- open up all my books and

13  everything.

14          THE COURT:  Well --

15          MR. HIPPLE:  The thing that he don't

16  understand though, Your Honor --

17          THE COURT:  I don't want to talk settlement.

18  Talk about the case.  But you just heard --

19          MR. HIPPLE:  Okay.  All right.

20          THE COURT:  -- what I had to say.

21          MR. HIPPLE:  The thing that they don't

22  understand is that Brian was the key figure, okay?

23  Brian was the 100 percent of the company, okay?  And --

24  two years ago, Google changed their algorithms, okay,

25  what's called their algorithms, okay?  And they put us

Mr. Hipple - Redirect                              322

1    from page one under "organic listings" to page five,

2    three, four, and five.  We had a steady decline from

3    that point all the way down, okay?  And it keeps going

4    down.

5            We're selling 20 bottles a day when we used

6    to sell 60, okay?  And this documentation is not a lie.

7    This is true.  And if Mr. Berkowitz wants to see that

8    documentation, I would be more than happy to provide

9    it.

10           THE COURT:  All right, we're getting into the

11   settlement.  Anything else --

12           MR. HIPPLE:  The settlement, I offered a

13   settlement.

14           THE COURT:  All right.  Well, I don't want to

15   hear anymore about the settlement.

16           MR. HIPPLE:  Okay.

17           THE COURT:  I just am telling you just to --

18   there's still an opportunity to resolve this before I

19   decide.  Now --

20           MR. HIPPLE:  Well --

21           THE COURT:  -- any other points you want to

22   make on this?

23           MR. HIPPLE:  Yeah, the other points I guess I

24   want to make is when I took the company or whatever,

25   took the assets from the company, it owed so much debt

Mr. Hipple - Redirect                 323

1   that they never put in place, not only Teresa's debt,

2   all the other debt, my debt, JC Consultant debt, the

3   royalty debts, okay?

4          Sure, it was my money, but I put a lot of

5   money into this company, well over three to $4 million

6   of my own money, okay?  I never got it back.  I'm

7   hoping someday that this thing would take off.

8          So when you really look at it, and I can

9   appreciate the situation, okay, and he thinks I'm

10  making this fortune now.  We're very -- we had -- yes,

11  in his numbers, we were making a fortune, okay?  We're

12  no longer making the fortune, okay?  That's done with,

13  okay?

14         Basically, we've been trying -- we're trying

15  to do a whole new thing to put gas stations to do the

16  repairs right now all over the United States.  We need

17  to make a change different than the other websites,

18  okay, and that's what I'm in the process of doing.  I'm

19  trying to rebuild it in a different way than what Brian

20  would have done.

21         Again, the money is not there.  I made a

22  $5,000 offer to her per month so that she could live

23  off it or whatever.

24         THE COURT:  I don't want to hear about your

25  offers.

Mr. Hipple - Redirect                    324

1        MR. HIPPLE:  Oh, okay.  I'm sorry.  All

2   right.  But, basically, the company is in a down spin

3   spiral because Brian is not here operating it.  And

4   this is -- and you know my capabilities, okay?

5        Janitorial, I did very well because it was

6   one contract.  I understood the contract more than the

7   people that were writing the contracts.  So I did very

8   well in janitorial.  It repeated itself everyday, the

9   same thing, okay?  And I learned it, and I learned it

10  well, and I did very well and I made a lot of money in

11  janitorial, okay?

12       But in this business, I don't understand the

13  website.  I don't understand how the CO -- SEO company

14  works.  I don't understand none of that, okay?  I have

15  to depend on people.  In janitorial, I didn't depend on

16  nobody.  I was smarter than everybody as far as that.

17       THE COURT:  Right.

18       MR. HIPPLE:  And I'm in the position right

19  now where I'm dependent on everybody, and it just keeps

20  spiraling down because yes, they tell me okay, we can

21  do -- I've changed three to four different companies in

22  the last two and a half years, Your Honor, to try to

23  get our listings back up to the organic listing, and we

24  still have been unable to do that.

25       But, again, when you look at it -- let's look

Mr. Hipple - Redirect                325

1   at what's really taking place here.  They have accused

2   me of a fraudulent transfer, okay?  That's not true.

3   No matter who would take over, it's just moving over in

4   the chair, okay?  All right.

5          The company had so much debt, okay, I don't

6   know where possibly they could have came up with that

7   figure.  They never considered the debt at all, okay?

8   They had the books.

9          I took the debt right out of their books,

10  okay, from their submissions, okay?  They knew it, the

11  expert witness had an opportunity to look at that, and

12  he ignored it totally because he was told not to look

13  at that.

14         He was told to look at the income stream and

15  what the companies were, but don't look at the

16  liabilities side, okay?  Don't pay any attention to all

17  the liability, all right?  And never -- nothing was

18  done on the liability side.

19         My attorneys keep going with this fraudulent

20  transfer, and I kept -- and that's one of the reasons I

21  fired them.  It's not about a fraudulent transfer.

22  It's about the company, okay?  The company had no

23  assets, Brian had no net profit, okay?  He had no

24  retained earnings, okay?  Because he spent what he made

25  during the time.

Mr. Hipple - Redirect                    326

1    It's incorrect like anybody else in business,

2    as you grow, your income -- you take more income until

3    you get to a point where you start retained earnings.

4    I always had three to one retained earnings, okay, in

5    my business.  Okay, I always had plenty of money.  I

6    never bought anything on time.

7    But right now, I'm not in that position.  If

8    I was, I would give her the money.  I swear I would.

9    I'd definitely give her the money because money don't

10   matter to me anymore, Your Honor, okay?  And I'm 70

11   years old and I'm working, and it don't make sense.  It

12   really don't make sense.  I'm only working because of

13   my grandchildren.  It's the only reason I'm involved,

14   okay?

15   I'm happy in Colombia, Your Honor.  I could

16   live off my social security check.  I don't need any

17   money, okay?  So, basically, the whole case should be

18   based on -- or your decision should be based on that

19   the company, sure, it was making money.  Brian was

20   building it, yes, okay, but he had all these

21   liabilities, okay?

22   They set a figure of just basically on the

23   revenue and never looked at the liabilities.  Nobody

24   paid attention to the liabilities, even my expert

25   witness.  He's counteracting the fraudulent transfer,

Mr. Hipple - Redirect                    327

1    okay?  Nobody -- and that's -- and that was the biggest

2    problem I had with my attorneys towards the end.

3    Nobody is looking at the liabilities.

4              I did the -- I did the schedule myself.  They

5    never did a schedule, okay?  And that -- that's what

6    prompted the termination of the attorneys, okay.  Plus,

7    I just received a bill from them the other day, $40,000

8    up to date, and they charged me.

9              THE COURT:  I don't want to hear about that.

10             MR. HIPPLE:  Okay.

11             THE COURT:  Okay.

12             MR. HIPPLE:  40 grand.

13             THE COURT:  Just one last question before I

14   hear from Mr. --

15             MR. HIPPLE:  Okay.

16             THE COURT:  How much -- taking -- well, let's

17   go back to was it October of 2010?  That's the critical

18   period, right?

19             MR. HIPPLE:  October what?

20             THE COURT:  Was it --

21             MR. HIPPLE:  2010, yes.

22             THE COURT:  2010.

23             MR. HIPPLE:  That's when the --

24             THE COURT:  Right?  That's when --

25             MR. HIPPLE:  -- everything --

328

1      THE COURT:  -- SCI no longer --

2      MR. HIPPLE:  They attacked --

3      THE COURT:  Right.

4      MR. HIPPLE:  -- took the money from me.

5      THE COURT:  How much did SCIX owe you?  What

6  does the trial record show?  You talked about the

7  liabilities.

8      MR. HIPPLE:  Well --

9      THE COURT:  You said they didn't -- when they

10  evaluated the company they didn't consider your

11  liabilities.  You just told me that, right?

12      MR. HIPPLE:  Right, that is correct, yeah.

13      THE COURT:  How much should they have --

14      MR. HIPPLE:  Well, the loan is a loan for JC.

15  Just the loan by itself was around 550,000, okay?

16      THE COURT:  Now, that's as of that time?

17      MR. HIPPLE:  Right.  Okay?  210,000 was my

18  personal money, okay?  And I don't know where to put a

19  figure on the royalty figures, Your Honor.  I don't

20  know what to do with that because, again, I gave you

21  another one and I think it brought it down to 300,000.

22      THE COURT:  Wait, now let's go over that.

23  You're saying that the royalties that were owed to

24  you --

25      MR. HIPPLE:  I --

1          THE COURT:  -- from SCIX --

2          MR. HIPPLE:  I knocked out five years because

3  he questioned and challenged me on I got -- I received

4  five payments.  So I took five years of royalties away.

5          THE COURT:  Right.

6          MR. HIPPLE:  Okay?  And I only added back in

7  the royalties that -- from the documentation that he

8  was showing in --

9          THE COURT:  How much --

10         MR. HIPPLE:  -- the sales.

11         THE COURT:  How much royalties were owed to

12  you back in -- what's the evidence show?

13         MR. HIPPLE:  300,000 it would have been.

14         THE COURT:  Is that in the evidence here?

15  That's what --

16         MR. HIPPLE:  Yes, uh-huh.

17         THE COURT:  -- he testified to?

18         MR. HIPPLE:  It's in his documents, yes.

19         THE COURT:  Okay.  So is that where you get

20  up to the 1.2 million?

21         MR. HIPPLE:  Yeah, around 1.2 million, yeah.

22         THE COURT:  Okay.

23         MR. HIPPLE:  It actually was a lot higher,

24  but yes.

25         THE COURT:  All right.  I heard it.  I think

1    it's Mr. Berkowitz's turn.

2           MR. HIPPLE:  Okay, Your Honor.

3           THE COURT:  Thank you.

4           MR. HIPPLE:  Thank you.

5           (Pause in proceedings.)

6           MR. BERKOWITZ:  Your Honor, when I began this

7    five years ago it was never my intention to hurt

8    anybody.  I heard for the first time about how Brian

9    Hipple died in court during the testimony.

10          THE COURT:  I know that.  You're just --

11   you're doing your job, right.

12          MR. BERKOWITZ:  I reached out to Mr. Hipple's

13   lawyer from day one trying to settle this case, more

14   times, attended settlement conference.  Every time I

15   talked to them I said don't you want to settle this

16   case?  I've seen a lot of these cases.  This is a --

17   the case is here.

18          I asked Mr. Hipple this morning do you want

19   to talk about settlement?  Whether --

20          THE COURT:  Why don't you sit down, Mr.

21   Hipple?  Sit down.

22          MR. BERKOWITZ:  -- the company is doing well

23   or not now --

24          THE COURT:  Yes, let me make it clear.  I am

25   not -- I am not going to be influenced by anyone's

1  willingness or unwillingness to settle.  I'm not

2  putting any pressure on anybody.  I'm just making an

3  observation, which I think, you know, I think is

4  obvious to everybody.  But go ahead.

5          MR. BERKOWITZ:  The -- you know, Mr. Hipple,

6  I understand looking at it from a layman's perspective.

7  I understand that.  I understand being rankled at it

8  being called the Pennsylvania Fraudulent -- Uniform

9  Fraudulent Transfer Act.  That's the name of the Act.

10          THE COURT:  Right.

11          MR. BERKOWITZ:  That's what we call it.

12          THE COURT:  Right.

13          MR. BERKOWITZ:  But, you know, everything in

14  the documents was a mistake.  The lawyer made a

15  mistake.  It doesn't say what it says.  You know the

16  documents say what they say and they mean what they

17  mean at the end of the day.

18          Teresa Hipple didn't cause her own problems.

19  She got a divorce.  She was entitled to be paid.  If

20  somebody had picked up the phone on the first day, this

21  would have been worked out.

22          I don't know if I'm -- I don't want to call

23  myself a hunting dog, but, you know, once somebody

24  takes off, that's not right.  And Ms. Concepcion was

25  left without a remedy, and my job was to bring her

332

1   remedy.

2          And the idea that this case has cost Mr.

3   Hipple a million dollars, and I don't doubt it, if

4   somebody had picked up the phone, I could have saved

5   him a lot of money.  But we had to get here today.

6          THE COURT:  Right.

7          MR. BERKOWITZ:  And you saw that this was a

8   contested case.  We have corporations, no corporate

9   formalities, and a lot of small companies are like

10   that.  And the personal expenses, that's how you pierce

11   the corporate veil.

12          And I would ask the Court to consider the

13   complaint, the amended complaint, to be amended to

14   conform to the proof at trial because there were so

15   many things that were brought out here today -- this

16   wee that give rise to other causes of actions that were

17   not pled.

18          THE COURT:  Well, I'm not going to do that.

19          MR. BERKOWITZ:  But I --

20          THE COURT:  I'm staying with whatever you

21   alleged.

22          MR. BERKOWITZ:  I understand that --

23          THE COURT:  Right.

24          MR. BERKOWITZ:  -- Your Honor.  All we want

25   is Ms. Hipple to be made whole and the attorneys fees

333

 1   to be paid.  We're entitled to that.  That's what the

 2   Act was put in place to protect, and we've never asked

 3   for anything more than that.

 4          THE COURT:  You've filed proposed findings

 5   and so did your lawyer filed proposed findings.

 6   There's a document that was submitted earlier on in

 7   this case which is proposed findings of fact and

 8   conclusions of law.  It's kind of a like a brief for me

 9   to follow.

10          MR. HIPPLE:  Right.

11          THE COURT:  So I'm going to look at both of

12   them.  I didn't have a chance to look at them.

13          MR. BERKOWITZ:  I don't think it would be

14   fair for Mr. Hipple.  I was planning to ask, and I

15   believe Ms. Bowman asked, to be allowed to update that

16   after the trial because --

17          THE COURT:  All right.

18          MR. BERKOWITZ:  -- there were --

19          THE COURT:  Do you plan to order the

20   transcript or no?  Are you --

21          MR. BERKOWITZ:  I wasn't planning to.

22          THE COURT:  Okay, fine.

23          MR. BERKOWITZ:  I -- I want --

24          THE COURT:  That's fine.  That's fine.  All

25   right, would you want -- in other words, he wants an

1  opportunity to submit -- to supplement the proposed

2  findings, and I'll give both of you lead to do that.

3  How much --

4          MR. HIPPLE:  I prefer that --

5          THE COURT:  -- time do you want?

6          MR. HIPPLE:  -- you don't because, again,

7  that's something that I'm not capable of doing, Your

8  Honor.

9          THE COURT:  Well, it's -- he -- I'm going to

10  allow it because I -- it will help me, and I need help.

11          MR. HIPPLE:  But what am I going to do on my

12  side?

13          THE COURT:  Well, that's -- either do it

14  yourself or seek help that you do it.

15          MR. HIPPLE:  What is -- what is the post

16  findings in reference to?

17          THE COURT:  You'll look at the -- basically,

18  it's -- it's basically saying this is what we want you

19  to find, Judge, and this is what we want you to

20  conclude.

21          MR. HIPPLE:  Okay.  Do you have any objection

22  if I hire an attorney to do that post findings?  Is

23  that illegal?

24          THE COURT:  No, it's not illegal.

25          MR. HIPPLE:  Okay.  So I can hire an attorney

1   to see the original one that she filed and then I can

2   explain?

3          THE COURT:  Right.  But I'm going to cut it

4   off and I'll give you 30 days to do it.  Does that --

5   how much time do you want?

6          MR. BERKOWITZ:  Yeah, I would --

7          THE COURT:  How much time do you need?

8          MR. BERKOWITZ:  If Mr. Hipple wants more --

9          THE COURT:  How much time do you need?

10          MR. BERKOWITZ:  I would -- 30 days would be

11   adequate for me.

12          THE COURT:  All right.  So today is the --

13   well, what's today?  August 1st.  September 1st.

14   September 1st you have to submit it to me.

15          MR. HIPPLE:  Okay.

16          THE COURT:  And I don't care who submits it

17   or who helps.  Just get it to me.

18          MR. HIPPLE:  Do you have my e-mail?  Can you

19   have your secretary send me the original one, because I

20   don't think I can find it in the documents.

21          THE COURT:  Well, it's been filed of records.

22          MR. HIPPLE:  Yeah, but, Your Honor, look back

23   there on the bench, okay?

24          MR. BERKOWITZ:  I hope Mr. Hipple will talk

25   to me before he does that.

1          THE COURT:  Hold on for a minute.  I'll give

2   you a copy of what I have so -- I should be able to get

3   a copy of these.  I got to get going soon here, so --

4          (Pause in proceedings.)

5          MR. BERKOWITZ:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          (Pause in proceedings.)

8          THE COURT:  I'll tell you what, let me -- I'm

9   not sure -- have they been filed of record, do you

10  know?

11         MR. BERKOWITZ:  I think so, but I'm not

12  positive, Your Honor.

13         THE COURT:  Yes.

14         MR. BERKOWITZ:  You know what --

15         THE COURT:  I have copies, but I want to make

16  sure to file a record so I can get a copy.  But I think

17  they probably should be.  I'm sure they are.

18         MR. HIPPLE:  Well, you have copies probably

19  somewhere, right, Mr. Berkowitz?

20         MR. BERKOWITZ:  I hope I do.

21         MR. HIPPLE:  Maybe he can just e-mail me

22  then.  I'm sure he must have it.

23         (Pause in proceedings.)

24         MR. BERKOWITZ:  I'm sure they're in your

25  file, but if you contact me --

337

1          MR. HIPPLE:  I'll -- yeah, I'll give you my

2   e-mail address before we leave because I don't --

3          MR. BERKOWITZ:  No, I want you to contact me

4   so we can talk about it.

5          MR. HIPPLE:  I'll be --

6          THE COURT:  Why don't you contact him?

7          MR. HIPPLE:  Okay.  I'll do it directly

8   through him, Your Honor.

9          THE COURT:  Ask him for the proposed

10  findings.  And it's up to you but, you know, you heard

11  what Mr. Berkowitz said, he's a realist about

12  collection of cases and he would be happy to try to

13  resolve it.

14         MR. HIPPLE:  Okay, fine.

15         THE COURT:  And, you know -- okay?  This is

16  not -- it's a very complex case and no matter how I

17  rule, somebody is going to appeal, and that's going to

18  be more money.

19         MR. HIPPLE:  Appeal?

20         THE COURT:  Right.  You have a right to

21  appeal and Mr. Berkowitz has a right to appeal.  I

22  don't know how I'm going to come out on this.  And then

23  there's further litigation, so if you can try to

24  resolve it, that's great.

25         MR. HIPPLE:  We don't need that.

338

1          THE COURT:  All right.  Are you okay then?
2    You'll give him a copy?
3          MR. BERKOWITZ:  Absolutely.
4          THE COURT:  Okay.  But do it quickly because
5    it's September 1st I want it.
6          MR. HIPPLE:  Yeah.
7          THE COURT:  Okay.
8          MR. HIPPLE:  I'll send it to you --
9          MR. BERKOWITZ:  I'll do it next week because
10   I won't respond.
11         MR. HIPPLE:  I'll send it to you in Spanish,
12   Your Honor, okay?
13         THE COURT:  Well, here, take this.  Take
14   this.
15         MR. HIPPLE:  No, in case --
16         THE COURT:  All right.
17         MR. HIPPLE:  -- you can't find it.  I want to
18   make sure --
19         THE COURT:  Fine.
20         MR. HIPPLE:  -- you have it, okay?
21         THE COURT:  Good.  All right, have a -- have
22   a good weekend.
23         MR. BERKOWITZ:  Thank you.
24         THE COURT:  I'll wait to hear from you on
25   September 1st, okay?

339

1        MR. BERKOWITZ:  Yes, Your Honor.

2        MR. HIPPLE:  Okay.

3        THE COURT:  All right, thanks.

4        MR. BERKOWITZ:  Thank you, Your Honor.

5        MR. HIPPLE:  Thank you, Your Honor.

6        THE COURT:  I may order the transcript.

7        MR. HIPPLE:  Thank you for all your patience.

8        THE COURT:  I may order this on my own, so

9   we'll see.  All right.

10        MR. HIPPLE:  Thank you, Your Honor.  I

11   appreciate your patience.

12        THE COURT:  All right.

13        (Proceedings adjourned, 6:06 p.m.)

14                    *  *  *

15

16

17

18

19

20

21

22

23

24

25

340

<u>I N D E X</u>

| <u>DEFT. HIPPLE'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| Teresa Concepcion | | | | |
| By Mr. Hipple | 7 | | | |
| | | | | |
| Clement Hipple | | | | |
| By Mr. Hipple | 21 | | 271 | |
| By Mr. Berkowitz | | 144 | | |

| <u>PLAINTIFF'S EXHIBIT</u> | | <u>ADMITTED INTO EVIDENCE</u> |
|---|---|---|
| 205 | Document | 225 |
| 36 | Document | 246 |
| 136 | Document | 252 |
| 203 | Document | 252 |

| <u>DEFENDANTS' EXHIBITS</u> | | <u>ADMITTED INTO EVIDENCE</u> |
|---|---|---|
| 503 | Credit Card Statements | 79 |
| 7 | Formation Certificate | 96 |
| 13 | Document | 97 |
| 19A | Loan Information | 101 |
| 19B | Quickbooks Information | 101 |
| 19C to 19F | Documents | 102 |
| 19 | Documents | 105 |
| 23 | Letter | 107 |

FORM 2934 ⊕ PENGAD • 1-800-631-6989 • www.pengad.com

341

1                           I N D E X

2       DEFENDANTS' EXHIBITS          ADMITTED INTO EVIDENCE

3       24                 Patent Notice          107

4       25                 Dockets                108

5       37                 AICPA Standards        113

6       38                 Document               113

7       38                 Pederson's Resume      114

8       40                 Notice of Claim        114

9       45                 Interrogatories        118

10      46 & 47            Interrogatories        119

11      48                 Document               119

12      49                 Judgment Note          120

13      50                 Snapshots              120

14      51                 Snapshots              120

15      52                 Document               121

16      55                 Document               124

17      56                 Document               125

18      58                 Document               127

19      59                 Document               128

20      60                 Document               128

21      61                 Document               128

22      62                 Document               128

23      127 & 128          C. Hipple's Returns    143

24      501                Document               165

25                              *  *  *

1

2

3

4

5

6                                    CERTIFICATION

7

8           I, Brad Anders, do hereby certify that the

9      foregoing is a true and correct transcript from the

10     electronic sound recordings of the proceedings in the

11     above-captioned matter.

12

13

14     10/4/15                         Brad Anders

15     Date                            Brad Anders

16

17

18

19

20

21

22

23

24

25