IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TERESA HIPPLE f/k/a   :   CIVIL ACTION
TERESA CONCEPCION
          :
  v.
          :
CLEMENT HIPPLE      NO.  12-1256

## MEMORANDUM OF DECISION

THOMAS J. RUETER      January 27, 2016
United States Magistrate Judge

    This case arises out of the alleged fraudulent transfer of the assets of SCIX, LLC,

and the proceeds of those assets, to defendant Clement Hipple ("Defendant") and certain other

related entities, in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"),

12 Pa. Cons. Stat. Ann. § 5101, et seq..  Plaintiff Teresa Hipple ("Plaintiff") also asserts a claim

for breach of Defendant's fiduciary duty to Plaintiff as a creditor of SCIX, LLC ("SCIX").  See

First Amended Complaint ("First Am. Compl.") (Doc. No. 27).  Additionally, Plaintiff pleads in

the First Amended Complaint that three patents remain the property of SCIX and are subject to

execution to satisfy judgments against SCIX held by Plaintiff. (First Am. Compl. ¶ 34.)  Plaintiff

seeks both legal and equitable relief including, without limitation, enjoining Defendant from

transferring any legal or equitable interest in property belonging to, inter alia, SCIX.  (First Am.

Compl.)

    The parties remaining in this case are Plaintiff and Defendant.  Other defendants

originally named in this case either have been terminated from this case or default has been

entered against them:  SCIX (default entered August 13, 2014), Steel Seal LLC ("Steel Seal

LLC," default entered July 30, 2015), Steel Seal Pro, LLC ("Steel Seal Pro," default entered August 13, 2014), Complete Group, LLC ("Complete Group," default entered July 30, 2015); and Melissa Moreno, Administratrix of the Estate of Brian M. Hipple, Deceased ("Moreno," default entered August 13, 2014).[1]  See Doc. Nos. 112, 150.

Plaintiff commenced this action on March 12, 2012.  The case was assigned to the Honorable Jan E. DuBois.  On February 12, 2015, the case was referred to the undersigned for trial pursuant to the Consent of the parties (Doc. No. 139).  A bench trial was conducted before the undersigned on July 27 through July 31, 2015.  Prior to trial, Defendant was represented by the law firm of Hill Wallack LLP.  On July 27, 2015, the first day of the trial, Defendant informed the court that he desired to discharge his counsel and proceed pro se.  After a lengthy and detailed colloquy with Defendant and defense counsel, the court discharged counsel and permitted Defendant to proceed pro se.

The following pleadings have been filed in this matter and are relevant to this Memorandum of Decision:  (1) Stipulated Facts (Doc. No. 126, filed November 17, 2014); (2) Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. No. 127, filed November 17, 2014); (3) Defendants' Trial Memorandum (Doc. No. 128, filed November 17, 2014); (4) Plaintiff's Trial Memorandum (Doc. No. 132, filed November 18, 2014); (5) Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. No. 133, filed November 18, 2014); (6) Plaintiff's Amended Findings of Fact and Conclusions of Law (Doc. No. 156, filed September 1, 2015); (7) Defendant's Supplemental Findings of Fact and Conclusions of Law (Doc. No. 158,

---

[1]     This Memorandum of Decision only addresses Plaintiff's claims against Defendant, Clement Hipple.  A default judgment hearing will be scheduled to address Plaintiff's damage claims against the defaulted former parties identified above to this litigation.

filed November 23, 2015); and (8) Trial Transcripts (Doc. Nos. 159-63, filed December 11, 2015).  This court has considered all of the testimony presented at the trial, the pleadings, as well as all of the other evidence admitted at the trial, whether or not each individual piece of evidence is specifically referred to herein, in rendering this Memorandum of Decision.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following Findings of Fact and Conclusions of Law:

## I.   FINDINGS OF FACT

### A.   Teresa Hipple and Clement Hipple

1.   Plaintiff and Defendant were married in 2001 and divorced in 2010.  Brian Hipple was the son of Defendant, but not the son of Plaintiff.

### B.   SCIX and the Steel Seal Product

2.   SCIX is a company formed in 1999, under the laws of the State of Delaware.  The exclusive business of SCIX was the sale of Steel Seal, an automotive repair product used to seal blown head gaskets.

3.   Defendant originally owned 74.25% of SCIX, Brian Hipple originally owned 24.75% of SCIX, and Scientific Chemicals, Inc. ("Scientific Chemicals") originally owned 1% of SCIX.  (Ex. P-37.)

4.   Defendant owns 100% of Scientific Chemicals.  (Ex. P-37.)

5.   SCIX was the assignee of three patents related to Steel Seal (collectively, the "Patents").

(i)     On December 12, 2000, the U.S. Patent Office issued U.S. Patent No. 6,159,276 (sealing system for combustible engines) ("Patent 1"), listing SCIX as the assignee.  SCIX remains the assignee of Patent 1.

(ii)     On December 4, 2001, the U.S. Patent Office issued U.S. Patent No. 6,324,757 (method for repairing an engine cooling system) ("Patent 2"), listing SCIX as the assignee.  SCIX remains the assignee of Patent 2.

(iii)     On November 18, 2003, the U.S. Patent Office issued U.S. Patent No. 6,647,622 (repairing an engine cooling system) ("Patent 3"), listing SCIX as the assignee.  Plaintiff recorded her Judgments against Patent 3 on February 8, 2011, and Patent 3 was assigned to Plaintiff.  (Ex. P-23.)

6.     Defendant contends that Patent 1 and Patent 2 lapsed in 2006 and are in the "public domain."  (Def.'s Supp. Findings of Fact ¶¶ 99, 107, 319, 374.)  This averment by Defendant is contrary to his assertion in his Affidavit, notarized in 2013, that "[a]t all relevant times, SCIX had three patents."  (Ex. P-25 ¶ 49.)  The two Patents lapsed because of SCIX's failure to pay required maintenance fees, but SCIX could request the Patent Office to reinstate the Patents.  (N.T., 7/30/15, at 142-44.)

7.     In 1999, SCIX entered into a confidentiality agreement with Colonial Chemical Company ("Colonial") relating to the secret formula of Steel Seal.  Colonial manufactured Steel Seal for SCIX, and SCIX marketed and sold Steel Seal over the internet using the website www.steelseal.com.

8.      SCIX never owned the Steel Seal website; the Steel Seal internet domain name (Steel Seal.com) was registered on August 27, 1999, and the original registrant was Scientific Chemicals (owned 100% by Defendant).  (Stip. Facts ¶ 8.)

9.      On December 24, 2010, Complete Group became the registrant of the Steel Seal website.  (Exs. P-38, P-51.)

10.     As of July 23, 2013, BBB Management Group, LLC ("BBBM") is the registered owner of the Steel Seal Website and is the entity currently selling Steel Seal.  BBBM is owned 100% by Defendant.  (Ex. P-38.)

11.     In his Supplemental Findings of Fact, Defendant asserts that Scientific Chemicals never assigned its rights in the chemical formula, the website, the domain name or the 800 telephone number to any other entity.  (Def.'s Supp. Finding of Facts ¶¶ 81-82, 262-63.) Defendant contends that the assignment of the website and domain name to Complete Group and then to BBBM were done without his knowledge.  Id.

12.     On January 1, 2001, Defendant transferred his membership interest in SCIX to Brian Hipple for one dollar, and Defendant executed the "Assignment Separate From Certificate."  (Exs. P-17, P-37.)  Defendant now admits, however, that "[t]here was a possibility that Scientific Chemical[s] could have owned 1% when the Defendant made that transfer [of his interest in SCIX to SCIX].  Defendant had no knowledge of that."  (Def.'s Supp. Findings of Fact ¶ 84.)

13.     Despite this transfer to his son, Defendant retained his "full voting rights" in SCIX.  (Ex. P-17.)

C.      **Royalties**

14.     Defendant testified that there is a royalty agreement in place pursuant to which he receives ten percent (10%) of the gross sales of the Steel Seal product.  (N.T., 7/27/15, at 151.)  Defendant acknowledged that no written royalty agreement was produced in discovery because "we could not find it . . . [b]ecause it was back in 2001."  Id. at 152.

15.     Defendant asserts that he was paid royalties from SCIX "to continue to use the website[,] chemical formula Steel Seal, and the domain name."  (Def.'s Supp. Findings of Fact ¶ 98.)  Defendant further states that royalty fees were paid only from 2006 to 2010.  Id. at ¶¶ 134, 155.  However, Defendant only provided figures of royalty fees paid from 2009 and 2010. Id. at ¶¶ 177-78.

16.     During his testimony, Defendant identified many checks from SCIX payable to "A&C Bldg & Indust Maint" and other entities, such as Defendant's divorce attorney, as "royalties."  Id. at 151-55 (citing Ex. P-19).  A&C Building & Industrial Maintenance is a janitorial service company formed and owned solely by Defendant.  (Stip. Facts ¶¶ 49-50.) Defendant explained that because he did not "have a personal account, . . . everything was paid to [A&C]."  (N.T., 7/27/15, at 154.)

17.     According to Defendant's tax returns, in 2009 Defendant received royalties in the amount of $117,991 and, in 2010 received royalties in the amount of $137,200. (Exs. P-127, P-128.)

D.      **Plaintiff's Loans to SCIX**

18.     To document loans made by Plaintiff to SCIX, on July 31, 2002, SCIX executed a $250,000 promissory note payable to Plaintiff with interest at the annual rate of eight

6

(8%) percent and a default rate of interest at twelve (12%) percent annually, plus provisions for collection of attorneys' fees and costs ("Pl.'s July 2002 Note").  (Stip. Facts ¶ 24; Ex. P-2.)

19.     To document an additional loan of $100,000 made by Plaintiff to SCIX, on August 23, 2002, SCIX executed a $100,000 promissory note payable to Plaintiff with the same terms and conditions as Plaintiff's July 2002 Note ("Pl.'s August 2002 Note," collectively "Plaintiff's Notes").  (Stip. Facts ¶ 25; Ex. P-3.)

20.     Plaintiff's Notes are not secured.

21.     Two judgments were entered by Plaintiff against SCIX on February 14, 2003 (the "Plaintiff's Judgments"), and they were recorded in the Court of Common Pleas for Bucks County at case numbers: 2003-00972 (in the amount of $101,329.50) and 2003-00974 (in the amount of $252,829.50).  Plaintiff recorded her Judgments on Patent 3.  (Stip Facts. ¶¶ 23, 26-28.)

22.     As of August 1, 2015, the unpaid balance due from SCIX to Plaintiff under Plaintiff's Notes, including simple interest, was $535,034.97 with interest accruing at the annual default rate of 12% ($111.33 per day), plus attorneys' fees and costs.  (Ex. P-132.)

23.     Payments were made by SCIX to Plaintiff on account of the monies owed by SCIX to Plaintiff until September 2010; thereafter SCIX made no further payments to Plaintiff on account of her loans/ Judgments.  (Ex. P-132.)

24.     On September 16, 2010 Plaintiff applied for and received from the Court of Common Pleas for Bucks County, a writ of execution for case no. 2003-00974, which was served on September 21, 2010 on Wachovia Bank as garnishee.  SCIX's Wachovia Bank account was frozen on September 23, 2010 as a result of Plaintiff's garnishment.  On October 13, 2010, a

judgment in the amount of $53,524.14 was entered against Wachovia Bank and in favor of

Plaintiff, and $53,524.14 from SCIX's Wachovia Bank account was paid to Plaintiff.  (Exs. P-5,

P-41.)

### E.   Defendant's Loans to SCIX

25.   Prior to January 1, 2001, Defendant also made loans to SCIX.  On October

5, 2010, Brian Hipple, on behalf of SCIX, executed a Judgment Note in the amount of $210,000

payable to Defendant ("Defendant's Note").  (Stip. Facts ¶¶ 29-30, Ex. P-8.)  Defendant's Note

states that it was "in consideration of substantial credit extended to it previously by [Defendant]."

(Ex. P-8.)  The amount of Defendant's Note was based upon a calculation prepared by SCIX's

accountant Ira Krassan.  (Ex. P-9.)[2]

---

[2]   Pursuant to the terms of Defendant's Note, Defendant waived "all previously accrued interest in connection with monies loaned by [Defendant] to debtor."  (Ex. P-9.) Plaintiff urges that this sentence means that the principal amount of Defendant's Note, with a waiver of all previously accrued interest, is $39,642.89, not the stated amount of $210,000. (N.T., 7/27/15, at 158; Ex. P-135.)  Plaintiff calculated this figure by starting with Exhibit P-8, Mr. Krassan's running tally of Defendant's loans to SCIX, and subtracting all accrued interest which, according to Defendant's Note was waived by Defendant, resulting in the lesser figure. See Exs. P-8, P-135.  During his testimony, Defendant acknowledged that his Note contained this waiver of interest language, but stated that "I don't understand it."  (N.T., 7/27/15, at 140.) Defendant further stated, "You can ask Kevin [Fogarty, Defendant's attorney who prepared the instrument] about it when he gets on the stand."  Id. at 139, 141.  Mr. Fogarty did not testify at the trial.  Later, Defendant again asserted that "[w]hen you say I waived the interest I don't understand that part," id. at 160, and then testified that the note was not signed until 2010 and that "this money was due interest before that document was produced."  Id. at 161.  The amount of debt owed to Defendant is important in this litigation.  This court, therefore, must interpret Defendant's Note and determine the amount of money that was owed to Defendant by SCIX. "Judgment notes are subject to the same rules which apply to other written contracts."  Liazis v. Kosta, 618 A.2d 450, 454 (Pa. Super. Ct. 1992), appeal denied, 637 A.2d 290 (Pa. 1993) (Table). "When interpreting a contract, 'the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.'" Bethlehem Steel Corp. v. MATX, Inc., 703 A.2d 39, 42 (Pa. Super. Ct. 1997) (quoting Halpin v. LaSalle Univ., 639 A.2d 37, 39 (Pa. Super. Ct. 1994), appeal denied, 668 A.2d 1133 (Pa. 1995)). If the words of the contract are ambiguous, the court may examine the surrounding circumstances

26.     Also on October 5, 2010, Brian Hipple, on behalf of SCIX, executed a

to determine the intent of the parties.  When determining whether a contract is ambiguous, the court must examine the contract as a whole and not as discrete parts.  Id.  When the language of a contract is "clear and unequivocal," its meaning must be determined from the contents of the document alone.  Id.  Importantly, "a court may not disregard a provision of a contract if a reasonable meaning may be ascertained therefrom."  Id. (quoting Marcinak v. Southeastern Sch. Dist., 544 A.2d 1025, 1027 (1988)).  "The intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished."  Id. (quotation omitted).

The waiver of interest provision of Defendant's Note is ambiguous, but the amount of the Note is not.  The amount of the loan as stated in Defendant's Note is $210,000, which is a rounded figure taken from Mr. Krassan's running tally of Defendant's loan to SCIX as of September 30, 2010.  (Ex. P-8.)  This figure clearly includes accrued compounded interest.  Id. The second paragraph of Defendant's Note provides an interest rate of ten percent.  The last sentence of paragraph two contains the waiver of "all previously accrued interest" language quoted above in this footnote.  If the court were to interpret the waiver of interest language as to eliminate all accrued interest from 1999 through October 2010, the $210,000 stated amount of the note would be rendered nonsensical and that very important term, and possibly the most important term of a note, would be rendered meaningless.  A court should not interpret a contract in such a way as to lead to absurdity or to make the contract ineffective to accomplish its purpose.  Laudig v. Laudig, 624 A.2d 651, 654 (Pa. Super. Ct. 1993).  As to the intention of the parties, the only party available to testify regarding the October 2010 Note was Defendant.  The other signatory to the instrument, Brian Hipple on behalf of SCIX, is deceased.  Defendant testified that he did not understand the meaning of the waiver of interest language, but also stated that "this money was due interest before that document was produced," denying that he waived all accrued interest.  (N.T., 7/27/15, at 161.)  Plaintiff is not a party to Defendant's Note and cannot testify as to the intent of the parties.  Speculation as to the intent of the parties is not appropriate.  This court credits Defendant's testimony that he did not agree to waive all previously accrued interest.  While it is unclear exactly what interest, if any, Defendant waived by operation of the waiver language in the Note given that the note is in the amount of $210,000, it defies logic that Defendant waived all the interest from 1999 through October 2010, and Defendant testified that this was not his understanding.  It is possible that other interest had accrued and was being waived.  As noted above, the $210,000 number is a rounded number and not the precise amount owed as set forth in Krassan's calculations.  For the purposes of this Memorandum of Decision, the amount due under Defendant's Note for loans made to SCIX over the time period from 1999 through 2010 is $210,000.

The court rejects Defendant's assertion that SCIX owes him "a conservative total of $1,614,400."  (Def.'s Supp. Findings of Fact ¶¶ 130, 337, Ex. D-501A.)  This exhibit was prepared by Defendant, not by SCIX's accountant and, at best, is self-serving and unsupported by other evidence in the record.

Security Agreement (the "Security Agreement") pursuant to which SCIX granted a security interest in the "Collateral" as defined therein and to secure the payment of the "Obligations" as defined therein.  On October 7, 2010, a UCC-1 Financing Statement was filed with the Commonwealth of Pennsylvania.  (Stip. Facts ¶ 35.)

      27.    Defendant admitted in his Affidavit that he contacted his attorney after Plaintiff garnished SCIX's bank account to determine what steps he could take to protect his financial interests in the business.  (Ex. P-25.)

**F.**    **Foreclosure by Defendant**

      28.    By letter dated October 8, 2010, Defendant made a demand on SCIX for repayment of the $210,000.  SCIX did not make payment.  By letter dated October 13, 2010, Defendant gave written notice to SCIX that he was exercising his rights as a secured creditor to take possession of its collateral (the "Collateral").  (Stip. Facts ¶¶ 36-38.)

      29.    SCIX surrendered possession of certain assets to Defendant (the "SCIX Foreclosed Assets").  Shortly thereafter, Defendant prepared a list of the assets he received from SCIX:

        (i)    2003 Infiniti G35;

        (ii)    Computer equipment (three office computers and one Laserjet 5 printer);

        (iii)    Office equipment (one chair, one filing cabinet, one desk phone, one fax machine, and one UPS printer);

        (iv)    Supplies (five packs of copy paper, one printer cartridge, twelve rolls of UPS tape, two tape machines, two cases of bubble wrap, and six rolls of tape); and

(v)      Inventory (433 cases of sixteen ounce containers Steel Seal; twenty-two cases of eight ounce containers Steel Seal; 841 sixteen ounce inserts; 3,276 sixteen ounce bottles; 12,900 sixteen ounce caps; 10,000 front labels; 14,000 back labels; 572 eight ounce bottles; 3,900 eight ounce caps; and 138 eight ounce boxes).  (Stip. Facts ¶¶ 40-41, Ex. P-130.)

### G.      Complete Group and Steel Seal Pro, and the Continued Sale of Steel Seal

30.      On October 18, 2010, Complete Group was formed under the laws of the Island of Nevis.  Defendant assigned the SCIX Foreclosed Assets to Complete Group in exchange for a fifty (50%) percent interest therein.  Emily Dominguez holds the other fifty percent (50%) interest in Complete Group.  Ms. Dominguez made no investment in Complete Group in exchange for her fifty percent interest therein.  Defendant and Ms. Dominguez are involved in a romantic relationship and reside in Cali, Colombia, South America.  (Stip. Facts ¶¶ 43-44. Exs. P-15, P-25.)

31.      On October 29, 2010, Complete Group entered into a Licensing Agreement with Steel Seal Pro, a new company formed by Brian Hipple, to market and sell Steel Seal.  Brian Hipple was the sole owner and operator of Steel Seal Pro.  (Stip. Facts ¶¶ 45-47.) Pursuant to the terms of the Licensing Agreement, Steel Seal Pro would be paid $10,000 per month, and the remainder of the proceeds from the sale of Steel Seal would be paid to Complete Group.  (Ex. P-14.)

32.      According to Section 5.4 of the Security Agreement, Defendant was required to dispose of any repossessed collateral in a commercially reasonable manner. According to Section 7.1(d) of the Security Agreement, the proceeds of the repossessed collateral

11

were to be used to repay the obligations to Defendant under Defendant's Note, and the balance of the proceeds from the sale of the collateral was to be remitted to SCIX. (Ex. P-10.)

33.     Complete Group sold 433 cases of sixteen ounce Steel Seal and twenty-two cases of eight ounce Steel Seal for the same prices as SCIX had been charging. (Stip. Facts ¶ 48, N.T., 7/28/15, at 20.)[3]

34.     The Steel Seal product repossessed by Defendant was sold in the same manner and for the same price SCIX had charged for the product. (Stip. Facts ¶ 48, Ex. P-25.) The sale price of a 16 ounce bottle of Steel Seal sold by SCIX over the internet was $44.95, and the sale price of an 8 ounce bottle of Steel Seal sold by SCIX over the internet was $25.00. (Exs. D-50, D-51, N.T., 7/28/15, at 25-26.)

35.     Defendant received $246,760 from the sale of the repossessed Steel Seal product. (Exs. P-131.)[4] Defendant acknowledged in his testimony that he had no expenses to

----

[3]     During his testimony, after Defendant agreed that the repossessed product "was sold in the same manner and for the same price as SCIX sold the product," see N.T., 7/28/15, at 20. At trial, Plaintiff's counsel calculated the proceeds Defendant would have received had the product been sold in this manner. Id. at 20-23. When Defendant realized that the figure as calculated by Plaintiff's counsel in accordance with Defendant's testimony was much higher than the amount of proceeds Defendant claimed to have obtained from the sale of the repossessed product, Defendant attempted to change his testimony and stated as follows: "I'd like to change my previous testimony that it's [sic] all sold for the same price on the internet. That is not correct. It was sold for - - some sold for the same price on the internet, and others were sold at $12 per bottle." Id. at 23. The court finds Defendant's testimony on this issue not credible. Defendant testified numerous times that the sale price of the repossessed product was the same price as that charged by SCIX.

[4]     Exhibit P-131 included in Plaintiff's trial exhibits originally reflected that the Steel Seal product repossessed by Defendant was sold for $493,988. However, at trial, the sale price of the repossessed product was calculated to be $246,760. (Exs. P-131, P-202.) See also Plaintiff's Proposed Finding of Fact ¶ 74. Therefore, the court will use the recalculated figure of $246,760 as the amount of proceeds collected by Defendant from the sale of the repossessed product.

pay regarding the same of the repossessed product and that the full sale price could be applied to repayment of Defendant's Note.  (N.T., 7/28/15, at 25.)[5]

36.    Defendant admits that the repossessed SCIX vehicle sold for $8,000.  (Ex. D-52.)

37.    The remaining repossessed assets, mainly office equipment and supplies, were sold for $4,900.12.  (Ex. D-52.)

38.    The SCIX Foreclosed Assets sold for $259,660.12.  Defendant's Note was in the amount of $210,000.  The difference of $49,660.12 should have been remitted by Defendant to SCIX.  No money was remitted to SCIX by Defendant after the SCIX Foreclosed Assets were sold.

39.    On December 26, 2010, Brian Hipple sent a letter to Lew Berghof of Colonial Chemical informing Colonial Chemical that on October 13, 2010 Defendant acquired all the assets of SCIX and that Complete Group was the successor in interest to the Confidentiality Agreement between SCIX and Colonial Chemical dated March 29, 1999.  (Ex. P-18.)  On December 26, 2010, Defendant sent a letter to Mr. Berghof informing Colonial Chemical that on October 13, 2010 Defendant had acquired the assets of SCIX, and that Complete Group was the successor in interest to the Confidentiality Agreement and that the Licensing Agreement gave Brian Hipple "the right to manufacture, produce, store and sell the Steel Seal Product."  (Ex. P-18.)

---

[5]    Defendant contends that the repossessed product was sold for $109,636.20, because it was sold at a reduced price and as part of a package.  (Ex. D-52.)  This is contrary to Defendant's testimony that the repossessed product was sold for the same price and in the same manner as it had been sold by SCIX.  See also Ex. P-25 ¶ 67 ("The product that I had repossessed was sold in the same manner and for the same price as SCIX had charged.").

40.     Steel Seal Pro used the same website, phone number, logo, assets and means of business used by SCIX, except that the proceeds from the sale of Steel Seal went to Steel Seal Pro's bank account at The First National Bank of Newtown, instead of SCIX's Wachovia Bank account.  (Exs. P-21, P-25, P-31, P-51.)

41.     Complete Group did not open a bank account in its own name until October 2012.  Until then, Steel Seal Pro made payments to Complete Group from the sales of Steel Seal to an account in the name of A&C.  A&C is a company formed and owned solely by Defendant.  (Stip. Facts ¶¶ 49-50.)

42.     All revenue collected by Steel Seal Pro were proceeds from the sale of Steel Seal.  (Ex. P-51.)

43.     After Brian Hipple's death, Defendant transferred the right  to manufacture, market and sell Steel Seal to BBBM.  As noted above, BBBM is owned 100% by Defendant.  BBBM currently sells Steel Seal through the internet using the same website, telephone numbers, internet address, logo, Patents, and means of business as used by SCIX and Steel Seal Pro.  (Exs. P-33, P-34, and P-201.)

44.     In 2011, $608,542 of proceeds from the sale of Steel Seal, and in 2012 approximately $517,922 of proceeds from the sale of Steel Seal, were paid to or for the benefit of Defendant, Brian Hipple, and Melissa Moreno.  (Ex. P-31.)

**H.     The Patents**

45.     According to Defendant, it was his and Brian Hipple's intention that the Patents were to be transferred to Defendant on October 13, 2010, although the transfer was not done in accordance with the requirements of U.S. patent law.  However, in his Affidavit,

Defendant affirmed that "I did not have SCIX transfer any of its patents to me.  At all relevant times, SCIX had three patents."  (Stip. Facts ¶¶ 13, 15-17, 19-21, 23; Exs. D-20, D-25 ¶¶ 48, 49.)

46.     On October 29, 2010, Defendant attempted to "assign" all of the assets of SCIX under the Purchase Agreement, including SCIX's intangible assets such as the Patents, to Complete Group.  (Stip. Facts ¶¶ 43-44; Exs. P-15, P-25.)  This attempted assignment was ineffectual because Defendant did not hold any rights in the Patents to assign to Complete Group.

47.     Defendant testified that he was paid royalties for the Patents at the rate of ten percent (10%) of gross sales from the sale of the Steel Seal product.  (N.T., 7/27/15, at 151.)

48.     Defendant was not entitled to royalties regarding the Patents because he did not own or hold any rights in the Patents.  The Patents were and are owned by SCIX.  (N.T., 7/27/15, at 190; 7/31/15, at 30.)

49.     On April 12, 2012, the Honorable Robert O. Baldi of the Court of Common Pleas for Bucks County ordered SCIX to reinstate Patent 3, and further ordered SCIX to sell Patent 3 and to pay the proceeds from that sale to Plaintiff on account of her Judgments.  SCIX reinstated Patent 3, but did not sell it.  (Ex. P-4.)

50.     On June 7, 2012 Plaintiff filed a motion to expand Judge Baldi's April 12, 2012 order to include all of the Patents owned by SCIX.  Defendant filed an emergency petition on behalf of himself and Complete Group to intervene and assert ownership and a security interest in the Patents.  The docket reflects an entry on September 4, 2012 that reported that Judge Baldi would not rule upon the outstanding motions and petitions noting that the parties came to an agreement to allow this matter to proceed pursuant to this federal litigation.  Id.  The

last entry on the docket is a suggestion of death filed on October 12, 2012 regarding Brian Hipple. (Exs. P-4, P-32 ¶ 6.)

51.     In his Affidavit dated October 1, 2013, Defendant admitted that SCIX is the owner of the Patents.  (Ex. P-25.)  However, in his Emergency Petition to Intervene in the state court action filed on May 14, 2012, Defendant avers that he and Complete Group are the owners of the Patents.  (Ex. P-32.)  Defendant does not own the Patents; they are owned by SCIX.

## I.     Value of SCIX Assets

52.     Plaintiff's expert testified that at the time of the October 2010 foreclosure action, Steel Seal, the Patents and secret formula, and the right to manufacture, market and sell Steel Seal, had a value of $1,750,000.  (Ex. P-31.)

53.     Through no fault of Plaintiff's expert, the valuation of the SCIX assets is not reliable.  The expert had very few records to review in order to derive his valuation figures.  (N.T., 7/28/15, at 170-73.)  The expert testified that the lack of appropriate financial statements affected his ability to perform his tasks and stated that "[w]hen you don't have a good set of records or a basic level of records, you have to work with what you have, and that's exactly what I did in this case." Id. at 173.  The reason Plaintiff's expert lacked the proper records is because Defendant did not produce them in this litigation.  Id. at 172.

54.     Defendant's expert identified weaknesses in Plaintiff's expert's conclusions, mostly based upon a lack of proper documentation available to Plaintiff's expert. See, e.g. N.T., 7/30/15, at 137, 138-39.

55.     Defendant's expert also testified that Plaintiff's expert failed to identify the assets transferred from SCIX to Defendant and to determine whether reasonably equivalent value was received for those assets.  (N.T., 7/3-0/15, at 59-60, 70-71.)

56.     Defendant asserts that only two of the three Patents remain active.  (Def.'s Supp. Findings of Fact ¶¶ 374, 376.)  Plaintiff's expert did not consider or investigate whether all three Patents were active in rending his valuation.[6]

**J.     Steel Seal, LLC**

57.     Steel Seal, LLC was a limited liability company formed by Defendant in January 2003, under the laws of the Commonwealth of Pennsylvania.  At all times, Defendant was the sole member, officer and director of Steel Seal, LLC.  (Ex. P-25.)

58.     In his Affidavit, Defendant affirmed that "[s]ince 2003 when Steel Seal, LLC was formed, it has never had any assets, nor conducted any business operations."  (Ex. P-25, ¶ 70.)

**K.     Brian Hipple and Melissa Moreno**

59.     Brian Hipple died on September 30, 2012.  Melissa Moreno was not married to Brian Hipple but is the mother of Brian Hipple's two children and was named as Administratrix of Brian Hipple's estate.  (Stip. Facts ¶¶ 54-55.)

---

[6]     Defendant also asserts that Plaintiff's expert did not make a determination whether Defendant's repossession of the Collateral rendered SCIX insolvent.  This is correct.  However, Defendant admitted this fact in his testimony and submissions to the court.  Defendant testified at the trial that after Defendant's repossession of the Collateral, Brian Hipple and SCIX did "not have money to pay obligations."  (N.T., 7/27/15, at 142.)  Defendant also admitted that "as a creditor [he] personally owned all the assets that SCIX . . . needed to operate and sell Steel Seal."  (Def.'s Supp. Findings of Fact ¶ 133.)  This statement by Defendant did not take into consideration the Patents.

60.     At the time of Brian Hipple's death, the Steel Seal Pro bank account held more than $150,000.  (Stip. Facts ¶ 56.)

**L.     Complete Group Lawsuit**

61.     On November 28, 2012, Complete Group filed a lawsuit against Steel Seal Pro in the Bucks County Court at No. 2012-10072 (the "Complete Group Lawsuit").  (Stip. Facts ¶ 57.)

62.     A default judgment was entered against Steel Seal Pro and in favor of Compete Group in the amount of $198,377.88 ("Complete Group Judgment").  (Stip. Facts ¶ 58.)

63.     On January 30, 2012, Complete Group filed a praecipe for writ of execution with a garnishment directed to The First National Bank and Trust Company of Newtown.  On February 20, 2013 judgment against the garnishee, The First National Bank and Trust Company of Newtown, was entered in favor of Complete Group in the amount of $197,398.34.  (Stip. Facts ¶¶ 60-61.)

64.     All money garnished by Complete Group from Steel Seal Pro's bank account were proceeds from the sale of Steel Seal.  (Stip. Facts ¶ 62.)

**M.     Use of Steel Seal Proceeds**

65.     In 2011 and 2012, Steel Seal Pro purchased and paid for a life insurance policy on the life of Brian Hipple from Prudential Life Insurance Company, using proceeds from the sale of Steel Seal.  (Ex. P-31.)

66.     After Brian Hipple's death, Defendant wrote out Steel Seal Pro check number 0872 in the amount of $40,000 payable to A&C, and Defendant backdated the check to September 28, 2012 and signed the check using Brian Hipple's signature stamp.  (Ex. P-49.)

67.     SCIX and Steel Seal Pro paid Defendant's personal American Express credit card bills in sums averaging $30,000 per year from 1999 through September 2012.  (Exs. P-61 to P-110.)

**N.     J.C. Consultant & Leasing Corporation**

68.     J.C. Consultant & Leasing Corp. ("JCC") is an inactive corporation owned 100% by Defendant, with a last noted address being in the Cayman Islands.  (Ex. P-30.)

69.     JCC has four promissory notes issued by SCIX, which JCC filed in the Bucks County Court of Common Pleas in 2003.  (Exs. P-26 to P-29.)  According to the docket entries, Ex. P-30, JCC did not file a complaint in confession of judgment against SCIX as required under the Pennsylvania Rules of Civil Procedure to obtain a judgment against a debtor on a promissory note; therefore, JCC does not hold a judgment against SCIX.  See Pa. R. Civ. P. 2950, et seq.

70.     SCIX's accountant, Mr. Krassan, produced SCIX business records showing loans from Plaintiff and loans from Defendant to SCIX, and repayments made on those loans.  (Exs. P-6, P-9.)  Mr. Krassan had no business records regarding loans made to SCIX by JCC, or repayments by SCIX to JCC.

**II.     CONCLUSIONS OF LAW**

1.     The parties agree that Pennsylvania law governs this action.

2.     This court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

### A.     Fraudulent Conveyance

3.      Plaintiff alleges that the October 2010 foreclosure action by Defendant against the SCIX assets amounted to a fraudulent conveyance which must be set aside.  Under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann. § 5101, et seq. ("PUFTA"), creditors may recover  assets, monies and proceeds transferred to a third party if the plaintiff is a creditor, the transfers were made with actual fraudulent intent, and there are no viable defenses.  12 Pa. Cons. Stat. Ann. §§ 5104(a)(1), 5107(a)(1), 5108.

4.      The following provisions of the PUFTA are relevant to this matter:

12 Pa. Cons. Stat. Ann. § 5104

(a) General rule. – A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i)  was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b)  Certain factors. – In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1)  the transfer or obligation was to an insider;
(2)  the debtor retained possession or control of the property transferred after the transfer;
(3)  the transfer or obligation was disclosed or concealed;

20

(4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)  the transfer was of substantially all the debtor's assets;

(6)  the debtor absconded;

(7)  the debtor removed or concealed assets;

(8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

5.     With respect to present creditors, a transfer also may because constructively fraudulent under PUFTA if "the transferor incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 12 Pa. Cons. Stat. Ann. § 5105.

6.     Both sections 5104 and 5105 require proof of a transfer.  A transfer is defined under PUFTA as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." 12 Pa. Cons. Stat. Ann. § 5101(b).

7.     An "asset" is defined as the "property of the debtor," but specifically excludes "property to the extent that it is encumbered by a valid lien."  12 Pa. Cons. Stat. Ann. § 5101(b).  See also 12 Pa. Cons. Stat. Ann. § 5101 Comment 2 (same).  Under PUFTA, there is no transfer subject to avoidance where the asset transferred is encumbered by a valid lien. Siematic Mobelwerke GmbH & Co. v. Siematic Corp., 643 F.Supp. 2d 675, 691 (E.D. Pa. 2009).

8.      Under PUFTA, the term "lien" includes "a security interest created by agreement . . . or a statutory lien."  12 Pa. Cons. Stat. Ann. § 5101(b).

9.      Plaintiff fails to prove a violation of PUFTA as to Defendant because the SCIX assets transferred by SCIX to Defendant, that are alleged to be fraudulently transferred, were subject to a valid lien created by the Defendant's Security Agreement.  Defendant perfected his security interest in the assets of SCIX by filing a UCC-1 Financing Statement.  Although the parties disagree on the amount of debt owed by SCIX to Defendant, the parties agree that Defendant made loans to SCIX.  SCIX's accountant provided evidence of the amount of the loans made by Defendant to SCIX.  The Security Agreement was signed by Defendant and Brian Hipple on behalf of SCIX.

10.      Plaintiff made no attempt to secure Plaintiff's Notes against the assets of SCIX.  Although Plaintiff obtained her Judgments prior to Defendant perfecting his security interest in the Collateral, Plaintiff did not take steps to execute on her Judgments prior to Defendant perfecting his security interest the Collateral.

11.      Plaintiff otherwise has failed to prove her claim under 12 Pa. Cons. Stat. Ann. § 5104(a).  The party asserting a claim under 12 Pa. Cons. Stat. Ann. § 5104(a) for actual fraud bears the initial burden of proof to prove by clear and convincing evidence that the assets were transferred with the actual intent to hinder, delay or defraud creditors.  With respect to the October 2010 foreclosure action, Plaintiff failed to establish actual intent on the part of Defendant to hinder, delay or defraud the other creditors of SCIX, including Plaintiff.

12.     In the absence of direct evidence of actual intent, a party may assert the presence of factors set forth in § 5104(b) as circumstantial evidence to allow a court to infer the existence of fraudulent intent.

13.     Most of the factors listed in § 5104(b), namely factors 1, 2, 4, 5, 8, 9, 10 and 11, apply here and act as circumstantial evidence of Defendant's intent to hinder, delay or defraud Plaintiff's efforts to collect the obligation owed to her by SCIX.  However, because the assets foreclosed upon by Defendant were subject to a valid lien, and hence not a "transfer" avoidable under PUFTA, a violation of PUFTA cannot be found under this section.

14.     Similarly, a violation of § 5105 also has not been established by Plaintiff. Defendant sold the Foreclosed Assets for $259,660.12.  The repossessed product was sold in the same manner and for the same price as SCIX had done in the course of its business.  Plaintiff has not asserted that the vehicle and office supplies were sold for less than reasonably equivalent value.  Hence, Plaintiff fails to establish a violation under § 5105.  The evidence does not support the valuation of SCIX's assets of $1,750,000 calculated by Plaintiff's expert for the reasons stated above.

**B.     Breach of Fiduciary Duty**

15.     Plaintiff alleges that Defendant breached his fiduciary duties to Plaintiff by "fraudulently transferring assets of SCIX" to himself.  (First Am. Compl. ¶ 37.)

16.     Under Pennsylvania law, officers and directors owe a fiduciary obligation to their corporation.  See 13 Pa. Cons. Stat. Ann. § 512, 15 Pa. Cons. Stat. Ann. § 1712.4. Dominant or controlling shareholder also may owe a fiduciary duty.  See Travelers Cas. and Surety Co. v. Irex Corp., 2002 WL 32351176, at *3 (E.D. Pa. May 31, 2002).

17.     When a corporation is insolvent, the fiduciary duty of the controlling shareholders arises in favor of corporate creditors.  Id.  Under Pennsylvania law, corporate officers and directors have a fiduciary duty to creditors when a corporation acts to liquidate or is insolvent.  Heaney v. Riddle, 23 A.2d 456, 458 (Pa. 1942); Robar Dev. Corp. v. Al Minutello, 408 A.2d 851, 853 (Pa. Super. Ct. 1979); Bagel v. Bagel, 1992 WL 477052, at *15 (Bankr. E.D. Pa. 1992).

18.     Plaintiff bears the burden of proving by a preponderance of the evidence all of the elements of her breach of fiduciary duty claim.

19.     Plaintiff failed to prove by a preponderance of the evidence that Defendant was an "officer" of SCIX after January 1, 2001, or at the time of the October 2010 transaction. Pursuant to the evidence presented, Defendant retained his "full voting rights" in SCIX after he sold his ownership share in SCIX to Brian Hipple on January 1, 2001.  Defendant's testimony otherwise is contrary to the clear documentation supporting this conclusion.  Nonetheless, the record contains no evidence that Defendant was an officer, director or controlling shareholder of SCIX.  While it is true that Defendant did exert influence upon his son Brian during the operations of SCIX, Plaintiff has not proven that Defendant was a controlling shareholder of SCIX after January 1, 2001.  Therefore, Plaintiff's breach of fiduciary duty claim fails.

## C.     Conversion

20.     Plaintiff has failed to prove her claims of fraudulent conveyance or breach of fiduciary duty with respect to the October 2010 foreclosure action.  However, intertwined with these claims is a claim that Defendant committed the tort of conversion by disposing of the SCIX Foreclosed Assets and failing to remit any overpayment to SCIX to be available for payment to

SCIX's obligations to Plaintiff, and that Defendant wrongfully took money from SCIX in the form of royalty payments.  See First Am. Compl. ¶¶ 25, 34, 35, and 37.

21.     "The classic definition of conversion under Pennsylvania law is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.  Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong."  C.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc., 777 A.2d 1090, 1095 (Pa. Super. Ct. 2001) (quotation omitted).  "Money may be the subject of conversion."  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (citation omitted).  However, "to maintain an action for conversion, one must have . . . the right to immediate possession at the time of the conversion."  Grimes v. Polymer Dynamics, 2015 WL 6507870, at *5 (Pa. Super. Ct. Oct. 27, 2015) (quotation omitted).  Pennsylvania courts hold that "[a]n unsecured creditor does not have a legally enforceable property interest," and thus cannot maintain a conversion action.  Id.

22.     In the instant case, Plaintiff was not a secured creditor of SCIX at the time Defendant converted the SCIX money.  Thus, Plaintiff did not have a right to immediate possession of the proceeds at the time of the conversion.  Accordingly, Plaintiff's conversion claim fails as a matter of law.  See id.

### D.     Unjust Enrichment/ Constructive Trust

23.     Despite the failure to satisfy all the elements of the tort of conversion, Plaintiff is entitled to relief on her equitable claim of unjust enrichment.  See First Am. Compl. at 7 (requesting appropriate equitable relief) and Plaintiff's Proposed Amended Conclusion of Law

(Doc. No. 156) ¶ 33 (alleging unjust enrichment).  See also Hipple v. SCIX, LLC, 2014 WL

4055830, at *8 (E.D. Pa. Aug. 14, 2014) (Judge DuBois denied Plaintiff's Motion for

Preliminary Injunction without prejudice to her right to seek equitable relief at trial.).  Under

Pennsylvania law,

> "[t]o sustain a claim of unjust enrichment, a claimant must show that the party
> against whom recovery is sought either wrongfully secured or passively received a
> benefit that it would be unconscionable for her to retain.  In order to recover, there
> must be both (1) an enrichment, and (2) an injustice resulting if recovery for the
> enrichment is denied.  A showing of knowledge or wrongful intent on the part of
> the benefited party is not necessary in order to show unjust enrichment.  Rather,
> the focus is on the resultant unjust enrichment, not on the party's intention."

Vautar v. First Nat'l Bank of PA, 2016 WL 82226, at *6 (Pa. Super. Ct. Jan. 6, 2016) (emphasis

in original) (quoting Torchia ex rel. Torchia v. Torchia, 499 A.2d 581, 582-83 (Pa. Super. Ct.

1985)).

24.     It is well established that "a court of equity has jurisdiction and, in

furtherance of justice, will afford relief if the statutory or legal remedy is inadequate, or if

equitable relief is necessary to prevent irreparable harm."  Vautar, 2016 WL 82226, at *5.

"Moreover, 'a court of equity has the power to afford relief despite the existence of a legal

remedy when, from the nature and complications of a given case, justice can be reached by

means of equity's flexible machinery.'"  Id. (citations omitted).  "Once invoked, the scope of a

district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable

remedies."  Brown v. Plata, 131 S. Ct. 1910, 1944 (2011) (quotation omitted).

25.     Under Pennsylvania and federal law, a constructive trust may be imposed

as "an equitable remedy designed to prevent unjust enrichment."  Yohe v. Yohe, 353 A.2d 417,

420-21 (Pa. 1976).  Accord Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S.

238, 250-51 (2000).  Under Pennsylvania law, "[a] constructive trust arises when a person

holding title to property is subject to an equitable duty to convey it to another on the ground that

he will be unjustly enriched if he were permitted to retain it."  Hercules v. Jones, 609 A.2d 837,

841 (Pa. Super. Ct. 1992) (citations omitted).  Justice (then Judge) Cardoza described the use and

purpose of a constructive trust as follows:

> A constructive trust is the formula through which the conscience of equity finds
> expression.  When property has been acquired in such circumstances that the
> holder of the legal title may not in good conscience retain the beneficial interest,
> equity converts him into a trustee . . ..  A court of equity in decreeing a
> constructive trust is bound by no unyielding formula.  The equity of the
> transaction must shape the measure of relief.

Beatty v. Guggenheim Exploration Co., 122 N.E. 378, 386, 389 (NY 1919).[7]  See also Healy v.

C.I.R., 345 U.S. 278, 282 (1953) ("A constructive trust is a fiction imposed as an equitable

device for achieving justice.").

   26.   Under Pennsylvania law, "[o]ne who seeks the imposition of a

constructive trust must do so by clear, direct, precise and convincing evidence."  Hercules, 609

A.2d at 841.  However,

> [i]n Pennsylvania, as in most jurisdictions, a court sitting in equity is imbued with
> considerable discretion in determining whether a constructive trust is appropriate;
> there is no fixed rule to dictate whether the facts of a case require or forbid the
> imposition of such a trust.  The certain guidelines in the law of constructive trusts
> are:  1) the ultimate test of whether to grant such a trust is whether it is necessary
> to prevent unjust enrichment; and 2) the imposition of the trust does not require
> proof that the parties intended it.

Spinner v. Fulton, 777 F.Supp. 398, 402 (M.D. Pa.), aff'd, 947 F.2d 937 (3d Cir. 1991) (citations

omitted).  It also has been said that a "court may impose a constructive trust when the facts show

---

   [7]   Pennsylvania courts have adopted Judge Cardoza's definition of a constructive
trust.  See, e.g., Chambers v. Chambers, 176 A.2d 673, 675 (Pa. 1962).

that unjust enrichment would ensue as a result of a breach of a confidential relationship, or fraud, duress, undue influence, or mistake." Id. at 403. See also Hercules, 609 A.2d at 841 (same). However, these conditions are not conclusive. All a party must show, by clear and convincing evidence, is that under "the totality of the facts . . . unjust enrichment will occur absent the imposition of the constructive trust." Spinner, 777 F.Supp. at 403. See also In re Joey's Steakhouse, LLC, 474 B.R. 167, 184-85 (E.D. Pa. 2010) ("There is, however, no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is merely whether unjust enrichment can be avoided.").

27.    This court finds, by clear and convincing evidence, that Defendant will be unjustly enriched to the detriment of Plaintiff, if permitted to retain the overpayment received from the sale of the SCIX Foreclosed Assets and the royalties.  (Pl.'s Supp. Proposed Conclusions of Law ¶ 33.)[8]

28.    Assuming Defendant were permitted to repossess and sell the Collateral in accordance with the Security Agreement to satisfy the obligation represented by Defendant's Note, paragraph seven of the Security Agreement required Defendant to return to SCIX any proceeds from the sale of the SCIX Foreclosed Assets in excess of the obligation owed to

---

[8]    For a claim of unjust enrichment to succeed, some courts have held that a plaintiff must show that plaintiff conferred benefits upon the defendant. Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. Ct. 1993), aff'd, 637 A.2d 276 (Pa. 1994).  However, it is not necessary for the plaintiff to show that she directly conferred benefits to the defendants in order to recover for unjust enrichment. Aetna, Inc. v. Health Diagnostic Laboratory Inc., 2015 WL 9460072, at *7 (E.D. Pa. Dec. 28, 2015).  "Where the plaintiff makes payments to a third party, but that third party then passes all or a part of that payment onto the defendant, courts will find that the plaintiff 'conferred a benefit' on the defendant." Id.  Where, as here, Plaintiff made hundreds of thousands of dollars in loans to her husband's closely held business which he controlled at the time with his son, the court easily finds that Plaintiff conferred a benefit upon Defendant.

Defendant.  Defendant collected proceeds in excess of SCIX's obligation to Defendant but failed to return those amounts to SCIX to be used to pay SCIX's other obligations, specifically, its financial obligations to Plaintiff.  Defendant received $246,760 from the sale of the repossessed Steel Seal product (Exs. P-131, P-202), $8,000 from the sale of the SCIX car, and $4,900.12 from the sale of the remaining Foreclosed Assets.  The SCIX Foreclosed Assets sold for a total of $259,660.12.  Defendant's Note was in the amount of $210,000.  The difference of $49,660.12 should have been remitted by Defendant to SCIX.  No money was remitted to SCIX by Defendant after the Foreclosed Assets were sold.  Defendant wrongfully retained and failed to return to SCIX the sum of $49,660.12.

29.     SCIX remains the owner of Patent 1 and Patent 2.  Plaintiff has recorded her Judgments against Patent 3, which has been assigned to Plaintiff.

30.     The sale of the Steel Seal product by Defendant or by any of Defendant's companies, or by any entity to which Defendant has transferred the right to sell Steel Seal, was a violation of SCIX's rights in the Patents.

31.     The state court ordered Patent 3 to be sold and the proceeds applied to Plaintiff's Notes.  Defendant failed to comply with this directive.  Plaintiff alleges that the state court refused to rule upon issues regarding the remaining two Patents, instead deferring to this court to address the Patent issues raised by Plaintiff herein.  (First Am. Compl. ¶ 34.)

32.     Defendant asserts that, pursuant to a royalty agreement, he is entitled to receive ten percent (10%) of the gross sales as "royalties."  The royalties issue concerns the Patents and the domain name.  Defendant contends that the domain name Steel Seal.com and the "secret formula" are owned by his companies Scientific Chemicals, Complete Group and/or

29

BBBM, even though the Patents for the secret formula are owned by SCIX.  Defendant admits

that no written royalty agreement was produced in this litigation because it could not be located.

Defendant has suffered from a chronic inability to locate relevant documents in this case.  This

court finds that Defendant has no right to receive royalties from the sale of the Steel Seal product

for two reasons.  First, no written royalty agreement exists.  The court's finding that no royalty

agreement exists is supported by the evidence which fails to show a consistent pattern or practice

by SCIX of paying royalties to Defendant.  The evidence offered by Defendant to support an oral

royalty agreement is not credible.  For example, Defendant asserts that checks from SCIX made

payable to Defendant's attorneys regarding his divorce were actually royalty payments.  This

defies logic.  As another example, Defendant testified that the alleged royalty agreement was

signed in 2001.  (N.T., 7/27/15, at 152.)  Defendant also averred that royalty fees were paid only

from 2006 to 2010.  (Def.'s Supp. Findings of Fact at ¶¶ 134, 155.)  However, Defendant only

provided figures of alleged royalty fees paid from 2009 and 2010.  Id. at ¶¶ 177-78.  Second,

Defendant contends that at least some of the royalties were related to the "secret formula" and the

Patents.  However, Defendant does not own the Patents, and he has not demonstrated that the

"secret formula" was not derived from the Patent applications.  To put it another way, Plaintiff

has shown that the ownership of the Patents is coterminous with ownership of the secret formula.

See N.T., 7/27/15, at 179; 7/31/15, at 171-72, 182, 196-97, 285-90.

       33.    Defendant failed to establish that he was entitled to receive royalties.

According to Defendant's tax returns, in 2009 Defendant received royalties in the amount of

$117,991 and, in 2010 Defendant received royalties in the amount of $137,200.  (Exs. P-127, P-

128.)  These amounts were paid by SCIX to Defendant as "royalties," for the most part, prior to

the October 2010 transfer of assets from SCIX to Defendant.  After Defendant took these "royalty payments," SCIX stopped making payments to Plaintiff on her Notes.  See Court's Finding of Fact ¶ 23.  Plaintiff has been harmed by Defendant's unjust actions.

34.     Defendant asserts that JCC, another company of his, has judgments against SCIX.  JCC is not a party to this litigation.  The legal rights and interests of JCC are not at stake in this case, and JCC lacks standing to assert any rights or interest in this litigation.  As explained below, the monies directed to be held in constructive trust for SCIX hereunder shall be used solely to pay Plaintiff's Notes.

35.     For the sole benefit of Plaintiff, the court hereby imposes a constructive trust upon the following assets of SCIX unjustly taken by Defendant from SCIX:  (1) $49,660.12 (representing overpayment from the sale of the Foreclosed Assets), plus interest at the legal rate of six percent (6%) from October 2010 to the present; (2) $117,991 (representing royalties paid by SCIX to Defendant in 2009), plus interest at the legal rate of six percent (6%) from January 1, 2007 to the present; and (3) $137,200 (representing royalties paid by SCIX to Defendant in 2010), plus interest at the legal rate of six percent (6%) from January 1, 2011 to the present.[9]

36.     As constructive trustee, Defendant is obligated to pay Plaintiff the above described amounts.  Even if Defendant no longer possess the funds improperly taken from SCIX, this does not prevent the court from imposing a constructive trust upon Defendant and entering

---

[9]     Award of prejudgment interest is appropriate because "income from constructive trust property is for the claimant from the date the property was acquired by the defendant, not from the date of a subsequent decree recognizing the existence of a constructive trust." Restatement (Third) of Restitution & Unjust Enrichment § 55 at 303 (ALI 2015).  See also McDermott v. Party City Corp., 11 F.Supp. 2d 612, 632 (E.D. Pa. 1998) ("Under Pennsylvania law, unless otherwise  specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year.").

31

judgment against him for a sum of money.  Under Pennsylvania law, if a defendant "held property at any point in time which properly can be decreed the subject of a constructive trust, the mere fact that he does not now hold such property will not preclude the imposition of personal liability upon it for the improper disposition of such property."  Kimball v. Barr Twp., 378 A.2d 366, 370 n. 3 (Pa. Super. Ct. 1977) (citing Philadelphia v. Mancini, 246 A.2d 320 (Pa. 1968)). Accord Burns v. Kabboul, 595 A.2d 1153, 1171 (Pa. Super. Ct. 1991) ("Where by the wrongful disposition of another's property the wrongdoer acquires other property, the beneficiary of the constructive trust may claim the product in whatever form it may be.").  See also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002) ("In cases in which the plaintiff 'could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him,' the plaintiff has a right to restitution at law" and a court may enter a "judgment imposing a merely personal liability upon the defendant to pay a sum of money.") (emphasis in original).

III.    **CONCLUSION**

   For all the above reasons, judgment in the amount of $ 304,851.12 will be entered in favor of Plaintiff and against Defendant, which is the aggregate of the above amounts set forth in the court's Conclusion of Law ¶ 35, plus prejudgment interest in accordance with Pennsylvania law will be awarded.

       BY THE COURT:

        /s/ Thomas J. Rueter
       THOMAS J. RUETER
       United States Magistrate Judge