```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TERESA HIPPLE                       . Case No. 12-CV-1256-TJR
     f/k/a TERESA CONCEPCION        .
        Plaintiff,                  .
                                    . 601 Market Street
           vs.                      . Philadelphia, PA
                                    .
CLEMENT HIPPLE, et al.              . December 15, 2017
        Defendant.                  .   9:31 a.m.
. . . . . . . . . . . . . . . . . . .
```

```
                  TRANSCRIPT OF MOTION HEARING
               BEFORE UNITED STATES MAGISTRATE
                   JUDGE THOMAS J. RUETER
```

APPEARANCES:

```
For the Plaintiff       GERALD S. BERKOWITZ, ESQ.
                        BERKOWITZ AND KLEIN, LLC
                        629 B Swedesford Road
                        Swedesford Corporate Center
                        Malvern, PA  19355
                        (610) 889-3200
                        gsb@berklein.com


For the Defendant:      CLEMENT HIPPLE, PRO SE
                        9448 Kirkwood Road
                        Philadelphia, PA 19114
                        Hipple828@hotmail.com


AUDIO OPERATOR:         Dennis Taylor

TRANSCRIBED BY:         Deborah S. Anderson
                        Weber Reporting Corporation
                        2755 Commercial Street SE, #101-216
                        Salem, OR  97302
                        (970) 405-3643
```

```
               Proceedings recorded by electronic sound
         recording, transcript produced by transcription service.
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE COURT:  Good morning, everybody. |
| 3 | MR. BERKOWITZ:  Good morning, Your Honor. |
| 4 | MR. HIPPLE:  Good morning, Judge Reuter. |
| 5 | THE COURT:  All right.  The purpose of today's hearing |
| 6 | is to hear any argument or evidence any -- the parties wish to |
| 7 | present first on Plaintiff's motion to declare the registration |
| 8 | of the Steel Seal trademark to have been fraudulently obtained, |
| 9 | and also the response of Mr. Hipple, which was a motion to |
| 10 | dismiss. |
| 11 | So I'll hear from you, Mr. Berkowitz, first.  Go |
| 12 | ahead.  Good morning. |
| 13 | MR. BERKOWITZ:  Good morning, Your Honor if I might. |
| 14 | And I wanted to clarify, and I think I did in my response to |
| 15 | Mr. Hipple's motion that we're not asking the Court to exercise |
| 16 | ancillary jurisdiction to cancel or declare the trademark |
| 17 | invalid.  We're looking for a declaration that -- and based on |
| 18 | the Court's decision that the name and the trademark Steel Seal |
| 19 | is property of SCIX. |
| 20 | THE COURT:  And then once -- if I did grant your |
| 21 | request, what's your intention to file a petition with the |
| 22 | Trademark -- |
| 23 | MR. BERKOWITZ:  Yes. |
| 24 | THE COURT:  -- Office to have it canceled?  Okay. |
| 25 | MR. BERKOWITZ:  It would cancel it and then to |

```
 1   reregister it --
 2              THE COURT:  Okay.
 3              MR. BERKOWITZ:  -- under the proper ownership name.
 4              THE COURT:  Right.  And you see this as enforcement of
 5   the two Judgments, one against Mr. Hipple, the other one against
 6   SCIX?
 7              MR. BERKOWITZ:  We're really -- yes.  With respect to
 8   the transfer of assets, if I could reset the --
 9              THE COURT:  Sure, go ahead.
10              MR. BERKOWITZ:  -- clock a couple years back.
11              THE COURT:  Right.
12              MR. BERKOWITZ:  After the trial we were in the process
13   of execution and in April --
14              MR. HIPPLE:  Your Honor, can I ask some questions,
15   because I'm not certain exactly how this is supposed to work?
16              THE COURT:  Sure.
17              MR. HIPPLE:  Okay.  My question is, and again --
18              THE COURT:  You can stand right there, Mr. Hipple.
19              MR. HIPPLE:  Okay.  Again, you understand that I do
20   have the problem with the read and instincts of that nature.
21   Okay.  So I have a program here that I always use, which is
22   called Dragon Natural Speaking.  And I can talk into my
23   computer, and it will type it for me, okay?
24              And the other question I have is if Mr. Berkowitz at
25   any point in time goes away from the actual motion that he
```

1  submitted, do I have a right to object to it which he is doing

2  right now?

3        THE COURT:  Well, you have a right to object. But let

4  me just tell you.  What happened in the past here and all the

5  history, the trial record is all relevant to this motion.  So

6  I'm going to allow Mr. Hipple (sic) to talk about the trial

7  record, because it is relevant.  But you can make an objection.

8  I'm not stopping you, but Mr. Hipple -- I mean, Mr. Berkowitz is

9  properly going into the trial record, I believe.

10        MR. HIPPLE:  Okay.  Then I'm just going to make a

11 formal objection to anything that he's talking in reference to

12 the trial motions prior to this, because I never had knowledge

13 of those, okay, never received documentation on those.

14 Therefore, I am objecting to anything that took place back then.

15        THE COURT:  Well, let me stop you a minute,

16 Mr. Hipple.  When you say you didn't have access to them, you

17 were present during the trial.  You represented yourself.

18        MR. HIPPLE:  Yeah.  I was present during the trial,

19 but the motions that took place, Your Honor, after the trial,

20 okay, I never received any copies of the motions to dispute the

21 motions for which Your Honor signed.  They were all done under

22 default, okay?  I never had --

23        THE COURT:  Right.  Let me --

24        MR. HIPPLE:  -- an opportunity.  I never received it.

25 I was in Colombia.  And by now allowing him to go back to the

1   trial motions that were -- I mean, the things that took place

2   after the trial, it's not fair to me, Your Honor, because I

3   never received the documents to dispute them.

4           THE COURT:  All right.  Your objections overruled.

5   But by the way, the motion that's before us, you did get a copy

6   of Mr. Berkowitz's motion, because you did respond.

7           MR. HIPPLE:  This one here?

8           THE COURT:  Right.

9           MR. HIPPLE:  Yeah, because it had a court date, yes.

10           THE COURT:  Right.  Okay.  You may be seated

11   Mr. Hipple.

12           Go ahead, Mr. Berkowitz.

13           MR. BERKOWITZ:  Your Honor, if I could --

14           THE COURT:  Sure.

15           MR. BERKOWITZ:  -- reset us?

16           THE COURT:  Yeah.

17           MR. BERKOWITZ:  In April, and I think it was 2016 now.

18   We had filed interrogatories in aid of execution.  Mr. Hipple

19   had not responded, and we had a hearing in April and Mr. Hipple

20   was here.  And the Court directed him; he had ten days to answer

21   the interrogatories in aid of execution.

22           THE COURT:  Okay.

23           MR. BERKOWITZ:  Also in the interim, we filed a motion

24   for a charging order to obtain all of Mr. Hipple's ownership

25   interest in BBB Management.  That was filed I think on the 26th

1    of April.  We had executed on the BBBM bank account, issued a

2    Writ of Execution, and the U.S. Marshals served that and some

3    money was garnished.  We also executed on their principal place

4    of business which turned out to be a Post Office Box, a UPS

5    Store with no assets.  We had done everything we could to

6    execute.

7              After the garnishment of the bank account, Mr. Hipple

8    put BBBM into bankruptcy.  He filed a voluntary petition, put it

9    into bankruptcy and filed the disclosures that are required.

10   And in those disclosures, it turned out that between the time

11   the Court ordered him to fully disclose his assets, and the time

12   he issued his response to that, he had transferred the

13   trademark, the domain name and the website to a company called

14   Steel Seal LTD, a UK company.

15             THE COURT:  Right.

16             MR. BERKOWITZ:  Then the bankruptcy was filed, so all

17   of our execution against BBB Management stopped.

18             THE COURT:  Right.

19             MR. BERKOWITZ:  The Court's charging order was

20   subsequently granted, and all the assets of BBB Management were

21   transferred.  And you may recall that Mr. Hipple refused to

22   complete the transfer, and that transfer took place in this

23   courtroom with Mr. Hipple here.

24             THE COURT:  His membership interest.

25             MR. BERKOWITZ:  His membership interest in the

1    company.

2            THE COURT:  Right.

3            MR. BERKOWITZ:  So that at that point, we would own

4    everything that BBB Management had.

5            THE COURT:  Right.

6            MR. BERKOWITZ:  And it turned out that in that interim

7    just before the bankruptcy, the only thing that really matters,

8    the trademark, the trade name, and everything else was gone.

9            THE COURT:  Right.

10           MR. BERKOWITZ:  We were in the process of execution.

11           THE COURT:  Right.

12           MR. BERKOWITZ:  You can't execute on intangible goods

13   with the sheriff, so we're using the court process.  Mr. Hipple

14   puts the company into bankruptcy, so through the Bankruptcy

15   Court we move the trustee, the Chapter 7 Trustee moves to undo

16   as --

17           THE COURT:  Preference.

18           MR. BERKOWITZ:  -- preference transfers the movement

19   of these assets from BBB Management now to Steel Seal UK.

20           THE COURT:  Right.  You had asked me to do that, but

21   at the time I was divested of jurisdiction, right.

22           MR. BERKOWITZ:  Ultimately -- and there was a

23   complaint.  Steel Seal UK was served.  They were in court, and

24   I'm quite confident that we would have been able to undo that.

25   The actual transfer of the trade name took place after the

1    bankruptcy petition was filed.  It's all in the records.

2              The bankruptcy judge determined that the bankruptcy

3    was filed for an improper purpose.

4              THE COURT:  Did she do that like sua sponte or?

5              MR. BERKOWITZ:  Yes.  And let me -- it took me a long

6    time to understand why, but --

7              THE COURT:  Right.

8              MR. BERKOWITZ:  -- I understand why now.

9              THE COURT:  Right.

10             MR. BERKOWITZ:  As it turned out, the only creditor

11   that filed a claim against BBB Management was Teresa Concepcion.

12   There were no other creditors.  Nobody else was owed any money.

13   Because this went on -- everybody got paid.  Nobody had a

14   problem.  The judge determined that the whole purpose of this

15   was avoid the execution on the Judgment.  I think that's why the

16   Court dismissed it.  We were pursuing our rights in the

17   Bankruptcy Court.  We didn't choose to litigate in that form.

18   That was picked by Mr. Hipple.

19             THE COURT:  Right.

20             MR. BERKOWITZ:  After the charging order was granted,

21   you have now the only creditor owns the debtor, and nobody else

22   involved.  And so I think in retrospect I was a little surprised

23   by the judge doing what she did, but I don't think she was

24   wrong.

25             THE COURT:  Right.  Okay.

1        MR. BERKOWITZ:  There was, again, this wasn't just

2   another step to avoid execution.  We had done everything we

3   could.  We had everything.  We would have had the trademark, the

4   domain name, everything, and we would have been able to sell

5   that or operate it.

6        It turns out that it's still -- the website, the same

7   website from the days of SCIX and all the interim transfers and

8   BBB Management is still being used by Steel Seal UK, identical.

9   And on it, it says, you know, since 1999, the first use of the

10  product.  We want to execute on a Judgment.

11       I think the transfers were done clearly to avoid

12  execution.  There's no evidence at all that anything was paid

13  for the transfer, none.  The assets are gone.  Mr. Hipple's

14  still deriving a benefit based on the information I have.  But

15  we're not here to litigate that today.

16       We're here to execute and a determination from the

17  Court that SCIX owns that trade.  Based on the trial, I think

18  has been established.  And I think, you know, I think when the

19  Court wrote its opinion that this was not framed as an issue at

20  the time.  But I think the opinion is clear that Mr. Hipple had

21  no right to sell this product.  Can't use the name and he

22  continues to do it.

23       THE COURT:  I think it's undisputed, and I'm

24  addressing this to Mr. Hipple.  But from 1999 to at least

25  2000 -- no, excuse me, to 2010 when the repossession of the

1    assets took place, SCIX exclusively used the name Steel Seal for

2    the entire ten years.  They were the only entity that used it in

3    the marketplace.

4              MR. BERKOWITZ:  Yes.

5              THE COURT:  All right.

6              MR. BERKOWITZ:  The business has not, from the outside

7    looking in, nothing has changed since 1999 and the money's going

8    to the same place.  The only person who's been hurt is

9    Ms. Concepcion.  She can't collect her money.  We'd ask the

10   Court to exercise its jurisdiction, ancillary jurisdiction to

11   uphold its orders and enforce its orders, so --

12             THE COURT:  Okay.

13             MR. BERKOWITZ:  -- we can try and collect our

14   Judgment.

15             THE COURT:  Thank you, Mr. Berkowitz.

16             Mr. Hipple?

17             MR. HIPPLE:  Good morning, Your Honor.

18             THE COURT:  Good morning.  Okay, Honor, in reference

19   to BBB Management Group filing bankruptcy, there were other

20   creditors.  There were subcontractors.  There were -- I never

21   hired employees, Your Honor, to do the work.  I hire people as

22   subcontractors so I had no payroll or anything of that nature.

23             So during the filing of the bankruptcy, there were

24   other creditors, okay, including American Express, gentleman in

25   California, and three other people that work for me that were

1    owed money.  So there were other creditors, not just like

2    Mr. Berkowitz was stating there was no other creditors, okay, in

3    reference to the bankruptcy.

4            Also, in reference to the bankruptcy, I was just

5    advised by my attorney to file bankruptcy, okay?  That was

6    normal procedure he asked me to do.  And then at some point,

7    Mr. Berkowitz convicts -- convinces Gary Sipes (ph) to allow him

8    to take over the bankruptcy procedures.

9            THE COURT:  He's the trustee?

10            MR. HIPPLE:  He was the trustee, right.

11            THE COURT:  Right.

12            MR. HIPPLE:  And again, Mr. Berkowitz used the same

13    tactics that he has used throughout, I guess, the four or five

14    years that these things have been going on, is that make the

15    Defendant or make the Defendant pay so much in court in legal

16    fees that they can no longer afford, and that they must settle.

17            I'll give you a for an instance, okay?  My

18    grandchildren's mother, Melissa, okay, he filed a Complaint

19    against her for 90,000 -- well, for $120,000, okay?  Her legal

20    fees were approximately $40,000.  $40,000, okay?  They wound up

21    settling for a settlement of $90,000, which went to Teresa.

22            And the reason that they settled the $90,000, because,

23    I mean, I know this first -- from her -- talk -- speaking to her

24    is that Mr. Berkowitz told her attorney that if it did not

25    settle, okay, that he was going to extend it from a two-year

1   period to a four-year period.  And her attorney advised her that

2   if -- even though it was strung out, she did not have to pay the

3   money being as Judge Simmons threw the case out.  She was not

4   responsible to pay the money, okay, but her attorney advised her

5   to go ahead and pay the money because it's going to cost you

6   another $40,000 to defend this case again.  Okay, so basically

7   Teresa received the $90,000.  I'm sure she received that by now.

8           The point I'm trying to make is Mr. Berkowitz and the

9   way he operates is -- and the same thing with this original case

10  that took four years to get to the court, to make people spend

11  so much money that they can't afford, similar to my own case

12  where I can't afford to hire an attorney.

13          And by the way, Your Honor, I did try to hire an

14  attorney when I asked you for your permission for an extend.

15  And I went to a firm, I believe it was Copi and Cohen or

16  something of that nature, okay?  And --

17          THE COURT:  Cohen.

18          MR. HIPPLE:  And after they reviewed the file, they

19  came back to me and said, well, we can help you with this,

20  Mr. Hipple, but it's going to cost you from anywhere from the

21  area of 10,000 to $100,000, okay; naturally, which I don't have,

22  so that's why I'm here today on my own.

23          Okay, but again, the tactics that Mr. Berkowitz used

24  to get the $90,000 and the other part of the $90,000, Your

25  Honor, was I took that money as personal salary, okay?  It was

1   my money in my account, okay?  I paid income taxes on it, okay.

2   And what I do with my money at that time, this was prior to the

3   trial, Your Honor, okay.  What I do with my money at that time

4   is my business.  If I wanted to give it to Your Honor, it's my

5   business, okay.  So I don't understand, you know, what the logic

6   was of the $90,000 that my grandchildren's mother had to pay,

7   which has been paid and it's been settled.  So that's one part.

8   Okay.

9          THE COURT:  The question I asked Mr. Berkowitz from

10  1999 when SCIX started business until 2010, they used the name

11  Steel Seal.

12          MR. HIPPLE:  Right.  They used the name Steel Seal,

13  but SCIX, Your Honor, you'll have to remember, which I'm going

14  to get into a little later on here never -- that trademark was

15  dead as of July 1st, 2001.

16          THE COURT:  This is what I want to ask you.  I'm glad

17  you brought this up.  You attached to your motion to dismiss an

18  application or not an application, but some documents from the

19  Trademark Office that said that on April 7th of 1999, SCA --

20  SCIX applied to register the trademark Scientific Steel Seal.

21          MR. HIPPLE:  That is correct.

22          THE COURT:  But later on it was marked abandoned by

23  the Trademark Office.  Now what happened there?

24          MR. HIPPLE:  Okay.  Basically, and I researched --

25          THE COURT:  Did they withdraw it to see?

```
 1              MR. HIPPLE:  No.  Here's what happened.  I, you know,

 2    no one -- okay, millions of dollars' worth of attorneys, Your

 3    Honor, the best attorneys in town, right?

 4              THE COURT:  Right.

 5              MR. HIPPLE:  No one ever went and looked to see

 6    whether or not the trademark was actually belonging to SCIX back

 7    before the trial, okay?  The high price attorneys, Mr. Berkowitz

 8    and his attorneys never -- nobody took the time.  Everybody was

 9    focused on the fraudulent transfer, okay.  And that's basically

10    what happened.  But --

11              THE COURT:  But -- I'm sorry to interrupt you, and I

12    want to hear everything you have to say, but 2001, you filed an

13    affidavit.  In 2001, you had nothing to do with SCIX.

14              MR. HIPPLE:  Oh yes, I did, Your Honor.  I owned --

15              THE COURT:  And what --

16              MR. HIPPLE:  -- 75 percent of it in 2001.

17              THE COURT:  All right.  Let me read something to you,

18    okay?

19              MR. HIPPLE:  Okay.  Go ahead.

20              THE COURT:  Just hold on one minute.  All right.

21    During the trial there was an Exhibit Petitioner-25.  That was

22    your affidavit.  And you said, this is at paragraph 13, "After

23    January 1st, 2001, I no longer had any membership interest in

24    SCIX."  You also said, "After January 1, 2001, I no longer had

25    control over SCIX, its assets, or any decision-making relating
```

```
 1   to SCIX or its assets."

 2             MR. HIPPLE:  That is correct, Your Honor.  Yes.

 3             THE COURT:  Okay.

 4             MR. HIPPLE:  That's the time I turned the company over

 5   to my son, right.

 6             THE COURT:  Right.  So prior to that --

 7             MR. HIPPLE:  Prior to that.

 8             THE COURT:  -- in 1999, when SCIX made this

 9   application to register Scientific Steel Seal, you were still in

10   the company, right?

11             MR. HIPPLE:  Well, okay.  Let me just give you a

12   little --

13             THE COURT:  No.  Yes or no.  I just want to know.

14             MR. HIPPLE:  Yes, it's yes or no, but again --

15             THE COURT:  That's fine.  You can explain.

16             MR. HIPPLE:  Okay.

17             THE COURT:  But I just want to ask you so you have --

18   do you have some knowledge of what happened in '99 when SCIX

19   applied for this registration?

20             MR. HIPPLE:  I had --

21             THE COURT:  And then what happened?

22             MR. HIPPLE:  I paid a million dollars for the patent,

23   Your Honor, from the -- to buy the patent, okay?  I set -- then

24   I set up Brian (ph) and Teresa Hipple in a thinking tank, okay.

25   Here's a company that has a product that can repair engines.  I
```

1   was running other businesses, okay.

2           Brian and Teresa Hipple worked together for over a

3   year to come up with how they were going to sell this product,

4   okay.  Brian and Teresa Hipple applied to the United States

5   Patent Office for the patent and things of that nature.  And I

6   found out later on what happened was it was never followed up

7   correctly and therefore it became dead, okay.  The procedure was

8   never taken to the process that it needed to.

9           THE COURT:  They never followed up with the

10  procedures?

11          MR. HIPPLE:  The procedures.  So therefore the

12  Trademark Office said it was dead.  And that's in the actual

13  records, Your Honor.  If you read the actual records, it's dead.

14  Okay?

15          THE COURT:  Okay.  So it wasn't a situation where it

16  was withdrawn by somebody.  In other words, they didn't follow

17  up with the proper paperwork.  Is --

18          MR. HIPPLE:  That and the attorneys.  Not only them.

19          THE COURT:  Right.

20          MR. HIPPLE:  And the attorneys did not follow up with

21  the proper paperwork.  And, Your Honor, you have to remember,

22  okay, the name Steel Seal, okay, on the website, right, okay,

23  which Mr. Berkowitz seems to be so concerned with, all right,

24  tomorrow I can go out, which they did to Hillary Clinton, by the

25  way, and say, "New and Improved Steel Seal" "Elite Steel Seal."

1    Okay?  You don't have to have a trademark to put a name on a web

2    page and sell a product.  Okay.

3            If you go to Amazon or Google, you'll see the same

4    products 50 times, okay.  So the trademark -- I can go tomorrow

5    and open up a new company, okay, and call it "Improved Steel

6    Seal" or "Elite Steel Seal," and there's nothing anybody can do.

7    Okay, absolutely nothing, all right.

8            But to continue on, okay, which we talked about that.

9    He saw that Brian Hipple, and I actually sold Steel Seal without

10   a trademap -- mark up to 2000 -- what was it '13 or 2014?

11           THE COURT:  I'm sorry.  What'd you say again?  Repeat

12   that for me, please.

13           MR. HIPPLE:  That -- okay, that Brian sold Steel Seal

14   for all those -- to 2010, okay.

15           THE COURT:  Right.

16           MR. HIPPLE:  Then I came in, which by the way, Mr. --

17           THE COURT:  Complete Group -- with Complete Group.

18           MR. HIPPLE:  Yes, but --

19           THE COURT:  And then you licensed the --

20           MR. HIPPLE:  No.  I came in with myself personally,

21   Your Honor.  I took the assets personally, which Mr. Berkowitz,

22   after he made the --

23           THE COURT:  Let me stop you for a minute.  My

24   understanding of the record is you repossessed certain assets --

25           MR. HIPPLE:  Right.

```
 1              THE COURT:  -- from SCIX.

 2              MR. HIPPLE:  I did personally.

 3              THE COURT:  And we have that inventory of those

 4   assets.

 5              MR. HIPPLE:  Right.  That is correct.

 6              THE COURT:  You sold them to Complete Group --

 7              MR. HIPPLE:  That is correct.

 8              THE COURT:  -- in consideration.  You got stock.

 9              MR. HIPPLE:  Right.  That is --

10              THE COURT:  You and --

11              MR. HIPPLE:  Teresa -- I mean Emily Domingus (ph).

12              THE COURT:  Emily.

13              MR. HIPPLE:  Yes.

14              THE COURT:  Emily Domingus.

15              MR. HIPPLE:  Right.

16              THE COURT:  Okay.  Then you turned around or at least

17   Complete Group turned around and licensed to another entity that

18   was controlled by your son.

19              MR. HIPPLE:  That is correct, yes.

20              THE COURT:  Right.

21              MR. HIPPLE:  Still using the name Steel Seal.  And

22   when Mr. Berkowitz --

23              THE COURT:  But let me ask you something.  When you

24   repossessed it, you never repossessed the trademark?

25              MR. HIPPLE:  Well, Your Honor --
```

1          THE COURT:  In other words, you, personally never

2     repossessed the trademark or the patents from SCIX.

3          MR. HIPPLE:  That is questionable, Your Honor.  Under

4     the UCC one following, okay, there was a language in there which

5     states that I was taking all the items that were --

6          THE COURT:  Well, it was a lien.  You had --

7          MR. HIPPLE:  -- all the items that were listed, plus

8     the intellectual properties, okay?

9          THE COURT:  Well, let me stop you there.

10         MR. HIPPLE:  Okay.  Go ahead.

11         THE COURT:  You bring up a point.  All right.  UCC

12    Financing Statement, by the way, that was Trial Exhibit 311.

13    They did list, quote, "Steel Seal logo, ads, rights to the

14    name."  Okay.  But when you repossessed and exercised your right

15    as a secured creditor of SCIX, you did not take the trade name

16    and you did not take the patent rights because you listed the

17    items.

18         THE COURT:  Right.  I did not take the patent rights,

19    Your Honor, because the patent rights had lapsed.

20         THE COURT:  Well, you actually sold collateral, which

21    exceeded the debt that you owed -- that was owed to you by SCIX.

22         MR. HIPPLE:  Well, what collateral --

23         THE COURT:  I found that in the trial?

24         MR. HIPPLE:  What collateral would you say I received

25    other than?

1          THE COURT:  Well, you had a list there.

2          MR. HIPPLE:  Oh yeah, the chemical formula that you

3   gave, right, --

4          THE COURT:  Right.

5          MR. HIPPLE:  -- and everything of that nature.  Okay.

6   Yes.

7          THE COURT:  Right.

8          MR. HIPPLE:  And that's what Your Honor ruled on

9   against me.

10          THE COURT:  Right.

11          MR. HIPPLE:  But as far as the trademark, during my

12   following back then, and again, which I want to point out one

13   more thing just before we go any further with this.  Is that by

14   the time I got the information that the bank account was

15   garnished by SCIX and came here from Colombia, okay, 14 days had

16   lapsed, okay, between that time frame.  And Mr. Berkowitz had

17   the same opportunity that I had to go after the actual physical

18   assets.  He never made an attempt because he wasn't interested

19   in physical assets.  All he was interested in was the money.

20   Okay, they could have taken the physical assets, Your Honor, and

21   restarted the business, okay.

22          THE COURT:  Well, that's water over the bridge.  You

23   took it.

24          MR. HIPPLE:  Right. Okay.  But again, he had an

25   opportunity to take it, Your Honor, for 14 days.  Okay, so let

1    me go on, right?

2           THE COURT:  Right.

3           MR. HIPPLE:  Okay.  All right.  The chemical formula

4    that is listed in the United States Patent and Trademark Office,

5    the actual chemical formula, okay --

6           THE COURT:  You mean the patent?

7           MR. HIPPLE:  Yeah.  The patent --

8           THE COURT:  Right.

9           MR. HIPPLE:  -- the actual patent chemical formula

10   listed in the United States Trademarks and Office, because all

11   this research I've been doing, okay, gives you the full detail

12   and the actual chemical that is in that formula, okay, which

13   means anyone right now can go to the Patent Office, copy that

14   formula, produce the product, and sell the product, because it

15   does not have any protection, okay.

16          THE COURT:  Well, I know the patents, at least one or

17   so lapsed.

18          MR. HIPPLE:  No, no, Your Honor.  All three.  I have

19   documentation right here right now.

20          THE COURT:  Right.  All three lapsed.

21          MR. HIPPLE:  All three lapsed, because a year and a

22   half --

23          THE COURT:  But some expire on their own, right, with

24   the --

25          MR. HIPPLE:  Well, yeah -- no, the Patent Office

1    expires them because of lack of --

2           THE COURT:  Well, it's a term.  Your patents only have

3    a life of so many years.

4           MR. HIPPLE:  Well, actually 20 years.

5           THE COURT:  Okay.  But some of those, if I recall, and

6    you correct me.  You know this better than I do.  Some of those

7    patents expired because they were generated more than 20 years

8    ago.

9           MR. HIPPLE:  No, no.  That's incorrect, Your Honor.

10          THE COURT:  Okay.

11          MR. HIPPLE:  They were all generated at the same time.

12          THE COURT:  What year was that?  Do you remember?

13          MR. HIPPLE:  And somewhere around 1999 and 2000.  And

14   then when they --

15          THE COURT:  Okay.  So --

16          MR. HIPPLE:  And then the one was --

17          THE COURT:  It was not for -- I'm sorry to interrupt

18   you, but just so I make sure.  So in other words, it's not

19   because they're expired on their own, but because the filing

20   fees weren't paid?

21          MR. HIPPLE:  Right.  The Trademark Office itself, the

22   United States Patent and Trademark said no.

23          THE COURT:  Right.

24          MR. HIPPLE:  These patents are no longer no good.

25          THE COURT:  Well, because the filing fees weren't

1  paid.

2         MR. HIPPLE:  Right.  But there was a later one which I

3  was part of the patent, okay.  I came up with the idea to take

4  out the spark plug to relieve the back pressure, okay.

5         THE COURT:  Okay.

6         MR. HIPPLE:  And even that patent has lapsed.  And one

7  year and four months ago, you gave Mr. Berkowitz permission to

8  reinstate the patents and to report back to you within 90 days

9  of his progress.  This is a year-and-a-half ago, Your Honor.

10         THE COURT:  Yeah.  He's the receiver for SCIX.  Right.

11         MR. HIPPLE:  Right.  Exactly.  A year-and-a-half ago.

12  And as of this date, as of yesterday, I checked.  As of

13  yesterday, all three patents are lapsed.  Now let me just --

14         THE COURT:  Sure.

15         MR. HIPPLE:  -- let me move just one little step --

16         THE COURT:  No, go ahead.

17         MR. HIPPLE:  -- because I --

18         THE COURT:  So what's the significance of that?

19         MR. HIPPLE:  Well, the significance is everything is

20  dead, Your Honor, is the significance.  All of the patents are

21  dead and cannot be reinstated.  Not are they only dead, in 2019,

22  they will expire.  So Mr. Berkowitz is trying to paint this

23  picture here to you that, oh, we got this great thing going on

24  here.  We got the patents.  We owned the patent.  If we get the

25  trademark back we sell everything.  Nobody in their right mind,

1    Your Honor, no businessman that has any common sense is going to

2    buy a company where the patents have lapsed and have been in the

3    public domain, okay?  Especially the actual patents been in the

4    public domain since 2008, okay, and anybody can go there and

5    copy that patent, okay, and produce the product.

6              So I'm trying to paint a picture opposite of what

7    Mr. Berkowitz is trying to paint to you that these are all

8    worth -- these patents, oh, I got these three patents.  I got

9    the -- if I had the trademark I could sell this business.  No

10   businessman in the world would buy it.  Okay, no smart

11   businessman.

12             But let me see just one thing here.  Let me get one

13   more doc.  I can't find the document, but the document will

14   demonstrate if we go on with this, that it will show that --

15             THE COURT:  Would it -- just --

16             MR. HIPPLE:  -- all three patents have lapsed as of

17   yesterday.

18             THE COURT:  Okay.

19             MR. HIPPLE:  Okay.  Let me continue on, all right.

20             THE COURT:  You mean because you checked it yesterday?

21             MR. HIPPLE:  No.  I checked it yesterday.

22             THE COURT:  Yeah.

23             MR. HIPPLE:  I wanted to make sure one more day that

24   he hasn't filed, and you could --

25             THE COURT:  Well, I knew that at the time of the trial

1   that the fees weren't paid --

2           MR. HIPPLE:  Right.

3           THE COURT:  -- and therefore, you know, they weren't

4   active patents or whatever the terminology is.

5           MR. HIPPLE:  Right.  And, Your Honor, Teresa Hipple

6   received $60,000 from SCIX.  She received $60,000 from me, okay.

7   There is no reason that she could not go back and try to

8   reinstate those patents, okay?  She's had the financial, and now

9   she's just received another $90,000, okay.  So there's no reason

10  in the world that they could not have went back in this last

11  year-and-a-half, Your Honor, that you have given them to

12  reinstate the patent.  I checked.  There has not been an

13  application, okay.  No one has submitted an application to

14  reinstate the patents.  I checked with -- I spoke with the

15  attorney at the Patent Office not yesterday, but the day before,

16  okay.  And they're telling me there are no applications on file.

17  So they did absolutely nothing.  So you have to keep in your

18  mind, they are dead.  Dead, dead, dead.  And if they're --

19          THE COURT:  Well, they directly could come in and --

20          MR. HIPPLE:  Pardon me?

21          THE COURT:  Theoretically they could petition --

22  couldn't they petition the Patent Office to reinstate them after

23  they paid back fees?

24          MR. HIPPLE:  Not --

25          THE COURT:  Couldn't they do that?

```
 1              MR. HIPPLE:  Not the chemical patent, Your Honor,
 2    because it's been dead since 2008.  It's too long.  They're not
 3    going to go back, Your Honor.  And there's --
 4              THE COURT:  Well, it's --
 5              MR. HIPPLE:  -- case law on that.  I don't have to --
 6              THE COURT:  Okay.
 7              MR. HIPPLE:  I don't have the attorney case law, but I
 8    did do some reading on the internet and usually when a patent
 9    lapses for a lack of fees, payment, they don't reinstate them.
10    I mean, I read much case -- different case law on that fact.
11    Your Honor, I --
12              THE COURT:  Even though they changed the law recently,
13    I mean two or three years ago --
14              MR. HIPPLE:  But I've been -- okay --
15              THE COURT:  -- they changed it.
16              MR. HIPPLE:  -- because I had to defend myself, I
17    wasn't properly ready so much last time.  This time I've been
18    reading as far as, you know, asking for a dismissal and things
19    like that.
20              THE COURT:  Right.
21              MR. HIPPLE:  I've been trying to better or improve
22    myself in reference in front of you.
23              THE COURT:  Okay.  So what -- why should I not grant
24    the motion that Mr. Berkowitz just filed here today?
25              MR. HIPPLE:  Because, again, his motion first of all,
```

 1  SCIX never owned the trademark, okay.

 2          THE COURT:  Why do you say that?

 3          MR. HIPPLE:  Because they never owned it.  As -- it

 4  was dead in 2001.

 5          THE COURT:  It was a common law ownership of a

 6  trademark.

 7          MR. HIPPLE:  Well, I --

 8          THE COURT:  If you use it --

 9          MR. HIPPLE:  Right.

10          THE COURT:  -- acquire it, use it, adopt it for a

11  period of time you own it under the common law.  That's

12  different from registration.

13          MR. HIPPLE:  Okay.  But then let's go back to the 2010

14  issue.  Okay?

15          THE COURT:  Okay.

16          MR. HIPPLE:  When I personally filed for all the -- I

17  took the physical assets, --

18          THE COURT:  Right.

19          MR. HIPPLE:  -- plus the intellectual properties.

20  Okay.

21          THE COURT:  Well, wait a minute.  Wait.  Just stop

22  there.  When you say the "intellectual properties," you never

23  repossessed the intellectual property.  You never did.

24          MR. HIPPLE:  Well, it was part of my -- it was on the

25  form the intellectual properties.  I don't know whether I

1    identified them, but the word --

2            THE COURT:  It's not on the lists.  It's not on the

3    inventory.

4            MR. HIPPLE:  But no, okay, forget the lists, Your

5    Honor.  If you would look at the U.C.C. 1 following.

6            THE COURT:  I have the U.C.C.  I looked at it.

7            MR. HIPPLE:  All right.  See if it doesn't say --

8            THE COURT:  You had a lien on it, but you never

9    acquired it.

10           MR. HIPPLE:  Okay.  Well, then I -- when I acquired it

11   back in -- I was as shocked as anybody, Your Honor, when I

12   acquired it back in 2012.  Let me get my dates straight.

13           THE COURT:  You got to look at the Agreement.  You

14   look at the Agreement that SCIX, or excuse me, that you

15   personally entered into with Complete Group.  You basically said

16   I'm transferring certain assets.  And there's an exhibit to

17    that --

18           MR. HIPPLE:  Right.  Right.

19           THE COURT:  -- purchase agreement, and it lists the

20   assets you were selling to Complete Group.  And the trademark's

21   not on that list.

22           MR. HIPPLE:  It wasn't on that list.

23           THE COURT:  No.

24           MR. HIPPLE:  Because it wasn't there.  There was no

25   trademark.  There was no trademark.  I could not list something

1    that was not there, Your Honor.

2              THE COURT:  That's -- the common law recognizes there

3    was a trademark because SCIX owned it.  You had a common law --

4              MR. HIPPLE:  Because it used it for all those years?

5              THE COURT:  Used it and adopted it.  And it's

6    undisputed.  I mean, I just asked you that from 1999 through

7    2010, until, you know, they used it and sold it.

8              MR. HIPPLE:  Well, let's go back a little bit.

9              THE COURT:  Yeah.

10             MR. HIPPLE:  Okay --

11             THE COURT:  Tell me why that's not true.

12             MR. HIPPLE:  Well, because --

13             THE COURT:  Who else was selling Steel Seal?

14             MR. HIPPLE:  No.  Okay, well, I was actually selling

15   Steel Seal.

16             THE COURT:  Well, SCIX was.

17             MR. HIPPLE:  But I was selling Steel Seal.

18             THE COURT:  You didn't own the company after 2001,

19   Mr. Hipple.  You just admitted --

20             MR. HIPPLE:  I owned it in --

21             THE COURT:  -- that in your Affidavit.

22             MR. HIPPLE:  Okay.  I started selling Steel Seal

23   personally, Clement Hipple under BBB Management effective

24   October 2012.  So I was also -- they were gone and now I was in

25   place, okay, as selling it with the actual trademark, Your

1 Honor, not something that was not there.  I actually owned the

2 trademark, okay?

3   THE COURT:  Well, that's what we're here for today is

4 whether it was proper for you to transfer and take that.

5   MR. HIPPLE:  Of course, it was proper for me, Your

6 Honor.  It was never issued.  There was no trademark.  Here's

7 how the Trademark Office works.

8   THE COURT:  We're distinguishing between registration

9 and ownership.

10   MR. HIPPLE:  Well, Your Honor, I -- it was available,

11 okay.  It was available.  The Trademark Office attorneys go

12 through a process.  When you submit an application, they go

13 through the process and check to see whether or not that

14 trademark is being used or there's an application for that

15 trademark.  There are ten trademarks called Steel Seal that are

16 listed with the United States Patent Office for all different

17 things:  welding, and different types of product, okay?  When I

18 submitted my application for the trademark --

19   THE COURT:  In 2013, May.

20   MR. HIPPLE:  Okay.  May of 2013, okay, there was no --

21   THE COURT:  You represented that Mr. BB&M owned it at

22 that time.

23   MR. HIPPLE:  That's right.

24   THE COURT:  That company was just created at that

25 time.

1          MR. HIPPLE:  Pardon me?

2          THE COURT:  That company was just created at that time

3    right around that time.  BB&M.

4          MR. HIPPLE:  BB Management started after my son's

5    death, Your Honor.

6          THE COURT:  That -- your son died in 2012.

7          MR. HIPPLE:  '12, right.  October of 2012.  He passed

8    away.

9          THE COURT:  Right, so probably in early 2013, I mean,

10   somewhere in that time period that's --

11         MR. HIPPLE:  No.  What happened, I originally opened

12   up BB Management in 2012, and started, you know, selling Steel

13   Seal.

14         THE COURT:  Okay.

15         MR. HIPPLE:  And then I applied for the trademark in

16   2013, but I had no knowledge that it was, you know, -- that it

17   was dead at that point in time.  So it's very critical here,

18   Your Honor, because again --

19         THE COURT:  You stripped the company of all the

20   tangible assets, right, in 2010?

21         MR. HIPPLE:  '10.

22         THE COURT:  You took them as a secure -- you did it

23   legally, and I said that in my opinion you did it legally.  But

24   you took everything, but you didn't take the trademark.  You

25   didn't take the patent and the company involuntarily couldn't

1    sell Steel Seal because you took everything.  And you did it

2    legally.  I'm not saying you took it improperly, but you did it

3    legally.  But to say that they voluntarily abandoned that

4    trademark back then, I just don't think the record shows that.

5            MR. HIPPLE:  But the original trademark, Your Honor,

6    you also have to remember, I actually owned when it was filed.

7    Not Brian.  Not SCIX.  Clement Hipple.

8            THE COURT:  Why -- what evidence do you have that show

9    me that you owned it.

10           MR. HIPPLE:  Okay.  I can produce the --

11           THE COURT:  You -- go ahead.

12           MR. HIPPLE:  -- evidence.

13           THE COURT:  Produce it.

14           MR. HIPPLE:  I don't have it with me today, but I --

15           THE COURT:  Well, what is it?  Just tell me.  Describe

16   it.

17           MR. HIPPLE:  I owned 75 percent of SCIX.  Brian Hipple

18   owned 25 percent.

19           THE COURT:  As of 2001 you didn't.

20           MR. HIPPLE:  No.  I turned my 75 percent share over to

21   him, but at that time the trademark was dead.

22           THE COURT:  Wait.

23           MR. HIPPLE:  It has died.  Okay, if we go --

24           THE COURT:  Well, the registration did.

25           MR. HIPPLE:  If we go by dates, Your Honor --

```
 1              THE COURT:  For ten years they used it; sold it SCIX
 2    for ten years.  Was there a licensing agreement between you and
 3    SCIX prior to 2001 when you got out of the business?
 4              MR. HIPPLE:  A license agreement?
 5              THE COURT:  2001 you were out of it.  Your affidavit
 6    said that.
 7              MR. HIPPLE:  I thought it was 2002, Your Honor.
 8              THE COURT:  Well, look at your affidavit.  I'll give
 9    it to you.
10              THE COURT:  Well, I don't have it.  I don't have it --
11              THE COURT:  I got it right here.  Hold on.  I'll give
12    it to you.  See if I can find it here.
13              Do me a favor.  The trial exhibits are in there.  I
14    think it's the black book.  I think it's a Plaintiff's exhibit.
15              THE CLERK:  On the windowsill?
16              THE COURT:  On the windowsill, yeah.  You said it.
17              MR. HIPPLE:  I think it was 2002.
18              THE COURT:  Well, I'll show -- we'll --
19              MR. HIPPLE:  I'm not certain, and --
20              THE COURT:  I'm going to read it to you.  It's 2001.
21              MR. HIPPLE:  My memory at 72 is not that great
22    anymore.
23              THE COURT:  It's 2001.  Excuse me for standing.  My
24    back's been bothering me.
25              MR. HIPPLE:  Okay.
```

```
 1                THE CLERK:  It's not in the --

 2                THE COURT:  Here we go.  Exhibit 25, paragraph --

 3     (indiscernible).

 4                MR. HIPPLE:  Exhibit 25, Your Honor?

 5                THE COURT:  Trial Exhibit -- Plaintiff's Exhibit 25.

 6     I'll give it to you right here.

 7                THE CLERK:  (Indiscernible.)

 8                THE COURT:  You want a copy of it?  We'll get you a

 9     copy of it.

10                Yeah.  Why don't you make a copy of it?  Here.  Make a

11     photocopy of it.

12                MR. HIPPLE:  What is the date?

13                THE COURT:  It's a -- it's an affidavit you filed.

14     You filed it in this court.

15                MR. HIPPLE:  Right.  I'm sure, yeah.  Again, because

16     we were dealing with the process of a fraudulent transfer at

17     that point in time.

18                THE COURT:  Well, it's made under oath.

19                MR. HIPPLE:  No, no.  I agree with you.  Whatever it

20     says --

21                THE COURT:  You can't disown it now, Mr. Hipple.

22                THE COURT:  No, Your Honor.  I'm not trying to change

23     what --

24                THE COURT:  You may have had reasons why you wanted to

25     disassociate yourself with SCIX back then, but you're stuck with
```

1    it now.

2              MR. HIPPLE:  No.  I was not trying to disassociate

3    myself with it.

4              THE COURT:  Well, --

5              MR. HIPPLE:  What I was trying to do was to give my

6    son a business because my other two children --

7              THE COURT:  All right.

8              MR. HIPPLE:  -- took the janitorial business.

9              THE COURT:  Well, you're stuck with it.  As of 2001,

10   you had nothing to do with SCIX.  You swore upside and down in

11   the Affidavit.

12             MR. HIPPLE:  What date in 2001, Your Honor?

13             THE COURT:  Pardon?

14             MR. HIPPLE:  What date in 2001?

15             THE COURT:  January -- here's what you said, and I'm

16   going to give you a copy of it.  "After" -- quote.  This is what

17   you say.  "After January 1, 2001, I no longer had any membership

18   interest in SCIX."  Another paragraph, "After January 1, 2001, I

19   no longer had any control over SCIX" --

20             MR. HIPPLE:  Correct.

21             THE COURT:  --"its assets or any decision-making

22   relating to SCIX or its assets."

23             MR. HIPPLE:  Yes.  That is absolutely correct.

24             THE COURT:  So SCIX for a ten-year period almost ten

25   years from 2001 to 2010, adopted and used Steel Seal and sold it

```
1    on the internet.  And they were the only ones who sold it.
2              So my question to you was when you gave up your
3    ownership interest in 2001, did you have some licensing
4    agreement where you say you owned the trademark with SCIX?  I
5    don't think you did.
6              MR. HIPPLE:  I have to honest with Your Honor, I don't
7    believe I had a license agreement with that.  I turned the
8    company over to my son.
9              THE COURT:  Why do you say you owned it then?
10             MR. HIPPLE:  Well, I'm saying I owned it.  I
11   originally owned it up --
12             THE COURT:  Well, show me a document that says you
13   owned it.
14             MR. HIPPLE:  Well, I owned SCIX.  I can show you a
15   document, okay?
16             THE COURT:  You didn't own it as of 2001.
17             MR. HIPPLE:  No, but I owned it in 1999 up to 2001.
18             THE COURT:  You owned it -- when you say "you" owned
19   it, but the company owned it.  You keep saying -- there's a
20   company.
21             MR. HIPPLE:  All right.  I see.
22             THE COURT:  And by the way, the company had creditors.
23             MR. HIPPLE:  Okay.  SCIX owned it and I owned 75
24   percent of SCIX.
25             THE COURT:  But the company had creditors and
```

1    including the creditor was the Plaintiff here.

2            MR. HIPPLE:  Yeah.  The bigger --

3            THE COURT:  You just can't take thing without

4    considering the creditors.  That's --

5            MR. HIPPLE:  The creditor -- the biggest creditor back

6    in 2001 was me for about $2 million.

7            THE COURT:  Well, you had another creditor.  You had

8    Teresa Hipple as a creditor.

9            MR. HIPPLE:  No, Your Honor.  And that's my next

10   point.  Lets' go one step further, okay?

11           THE COURT:  Right.

12           MR. HIPPLE:  When Teresa Hipple made her loans to SCIX

13   back in 2001 -- 2002 to the trademark Steel Seal was already

14   dead as of that date.  Okay, and that there was no trademark

15   when Teresa Hipple loaned the money to SCIX.

16           THE COURT:  Well, that's where you're having a little

17   difference of the understanding of the law than I am.  When you

18   say there wasn't a trademark to SCIX, there wasn't a

19   registration.  And I think you're right, because in '99 --

20   first, by the way, it's a different name, but Scientific Steel

21   Seal is what -- was the application.  But the registration was

22   abandoned.  But the owners -- there's a common law ownership of

23   a trademark.

24           MR. HIPPLE:  Yeah, but --

25           THE COURT:  It's different.  Registration doesn't

1    create the ownership and that's the law.

2              MR. HIPPLE:  Okay.  But again, Your Honor --

3              THE COURT:  It's the use and adoption that creates the

4    ownership.

5              MR. HIPPLE:  If you look at the document that I sent

6    to -- that I submitted to you, I believe.  Okay, here's how it

7    was handled.  When we put this thing together, okay --

8              THE COURT:  What document did you submit to me?

9              MR. HIPPLE:  When this company was first put together,

10   the attorneys advised us to have a company called SCIX to sell

11   the product.  The company -- the attorneys ordered us to open up

12   a company Scientific Chemical, okay -- all right, to protect the

13   trademark and patents, okay?  The trademark and patents, and I

14   can give -- I can research and get you that information.

15             So what we're saying here that SCIX owned the

16   trademark, that's not correct.  It was originally owned by

17   Scientific Chemical now that I'm thinking about it.  And I can

18   produce the documentation.  I own 99 percent of Scientific

19   Chemical.

20             THE COURT:  I'm ruling on this this week, so this is

21   your opportunity to submit whatever evidence you want.

22             MR. HIPPLE:  Yeah, Your Honor, but -- you're ruling on

23   something that I didn't know what was going to take place here

24   today.

25             THE COURT:  All right.  I understand.

1          MR. HIPPLE:  So I am making a statement to you, Your

2     Honor, that in 1999 we opened up two companies by the advice of

3     our attorney:  one to sell the product in case we were sued,

4     okay.

5          THE COURT:  And what company was that?

6          MR. HIPPLE:  SCIX.

7          THE COURT:  Fine.

8          THE COURT:  That's the one that sold it.  Okay, the

9     other company was opened up to protect the trademark and the

10    patents, and that was Scientific Chemical, which I own 99

11    percent and never turned one percent of it over to Brian Hipple.

12    Okay, so technically speaking, I am the true owner of the

13    trademark, me and Mr. Barks (ph), who owned 1 percent.

14         THE COURT:  Why would you file a U.C.C. financial

15    statement against SCIX and a logo --

16         MR. HIPPLE:  Because, Your Honor --

17         THE COURT:  -- if you didn't own it?

18         MR. HIPPLE:  -- it was ten years later and my

19    knowledge and capability and nobody, Your Honor.  Look, Your

20    Honor, the attorneys theirselves (sic) did not even know what

21    was taking place.  I am making a statement under oath to you

22    that I own Scientific Chemical to protect the patents and the

23    trademarks.  Okay, and that document that I gave you says

24    Scientific Steel Seal.

25         THE COURT:  What document did you give me, because I

```
 1   don't think you gave me any documents today?
 2            MR. HIPPLE:  I can't give you?
 3            THE COURT:  No, you can.  I don't think you gave me
 4   any as of yet.
 5            MR. HIPPLE:  This is part of my motion to dismiss.
 6            THE COURT:  Oh okay.  We'll get it.
 7            THE COURT:  Yeah, okay.  I have this.  I looked at
 8   this.
 9            MR. HIPPLE:  Well, that's what I'm saying.  Well,
10   this --
11            THE COURT:  Well, wait.  Hold on.  Owner:  SCIX LLC
12   Limited. It says it right here in the Registration.
13            MR. HIPPLE:  Yeah, but it says --
14            THE COURT:  That's the owner of the trademark.
15            MR. HIPPLE:  Steel Seal or Scientific Steel Seal
16   watermark.
17            THE COURT:  Wait a minute.  Look at this, please.  Am
18   I misreading it?  It says owner --
19            MR. HIPPLE:  Applicant.
20            THE COURT:  SCIX.
21            MR. HIPPLE:  SCIX.  Okay.
22            THE COURT:  That's who we're talking about.
23            MR. HIPPLE:  Okay.  Again, so then, yes.  All right.
24   So we're back at the same stage that I originally owned it.
25   SCIX, okay.
```

```
 1              THE COURT:  Well, you're representing SCIX --

 2    someone's representing back in April 7th of 1999 that the owner

 3    of the trademark was SCIX.

 4              MR. HIPPLE:  Correct.

 5              THE COURT:  Right.

 6              MR. HIPPLE:  Not somebody.  That's the Patent Office

 7    information.  All these documents I'm giving you are from the

 8    actual Patent Office, okay?

 9              THE COURT:  Right.  Right.

10              MR. HIPPLE:  They're (indiscernible).  All right.  Let

11    me go on.  Okay, let's go back to the fact that Teresa Hipple,

12    when she made her loans back in 2002, okay, the trademark had

13    already lapsed, okay, all right, or was dead.  Okay, and there

14    was no trademark when Teresa loaned the money to SCIX.  And you

15    can back and look at the documents of when she made the loan.

16              THE COURT:  Well, that's what I'm going to look at

17    right now.  I have the date.

18              MR. HIPPLE:  There were three loans that she had made.

19              THE COURT:  2000 -- I know 2002 were the loans.

20              MR. HIPPLE:  Right.  So --

21              THE COURT:  It was an aggregate of $350,000, I guess

22    between --

23              MR. HIPPLE:  Right.

24              THE COURT:  -- the -- and then there were no -- there

25    were Judgments recorded in February of '03 with the Bucks County
```

1   Court.

2           MR. HIPPLE:  Right.  But again, my point is that

3   the -- when she made the loans, the trademark was already dead.

4   So you're saying that she's entitled to something that was

5   already dead?

6           THE COURT:  It's not -- I'm not -- it's -- I'm looking

7   at SCIX.  SCIX was the owner.  I'm not saying who's entitled to

8   what.  All I'm just telling you is that the way I read the

9   record is that SCIX was the owner.  In fact, it was represented

10  in the Trademark Office in April 7th of '99 that they were the

11  owner.

12          MR. HIPPLE:  Right.

13          THE COURT:  And for ten years they adopted it and used

14  it.  And under the common law that's -- constitutes ownership.

15          MR. HIPPLE:  Ownership.  All right.  Let me -- let's

16  just continue on, okay?

17          THE COURT:  Sure.

18          MR. HIPPLE:  All right.  The two main -- again, two

19  concerns is the trademark Steel Seal that had lapsed in July of

20  '03 -- 2001.  The second issue is the, again, which I just spoke

21  to you about, the Chemical -- the actual chemical formula, okay,

22  has lapsed in 2008 prior to the lawsuit in 2012 and also prior

23  to the garnishment of the wages.  So that patent is gone.  Okay,

24  as far as the patent is concerned, the actual chemical patent,

25  chemical formula patent is gone.

1          And as of this date, all three patents have lapsed.

2    Teresa Hipple or Mr. Berkowitz have made no attempt to reinstate

3    any of SCI's patent, which Mr. Berkowitz was appointed by you,

4    which we talked about to act on the Court's behalf in order to

5    reinstate the patent sometime around April 2016.

6          THE COURT:  Well, I never ordered Mr. Berkowitz to do

7    that.

8          MR. BERKOWITZ:  You gave him the authority.

9          THE COURT:  I gave him the authority.

10         MR. HIPPLE:  Okay.  Let me rephrase.

11         THE COURT:  That was his option, whatever he

12   thought --

13         MR. HIPPLE:  You gave him the authority.

14         THE COURT:  -- it's whatever he thought was the

15   appropriate thing to do.

16         MR. HIPPLE:  It has also been a year and five months

17   and Teresa Hipple or Mr. Berkowitz has not made any attempt to

18   reinstate the patents, and I believe that they do not have any

19   intention to reinstate the patents, or Mr. Berkowitz fulfill his

20   duties that he was directed to by the order of the court.

21   Mr. Berkowitz was also ordered to report back to you to the

22   Court within 90 days of his progress in reference to reinstating

23   the patents.  I don't know whether he ever reported back to you.

24         THE COURT:  He filed a report.

25         MR. HIPPLE:  I am assuming that Mr. Berkowitz never

1    notified the Court within the 90-day period of his progress in

2    reference to the patents.  It seems that Mr. Berkowitz does

3    exactly what he wants to do and uses the court on his behalf,

4    and makes fraudulent -- fraudulent, okay, and I mean fraudulent

5    statements without any proof against Clement Hipple.  And

6    especially the fraudulent statement that he's put in the -- in

7    this order that I acquired the patent fraudulently without him

8    checking.

9            So I guess it gets down to what -- the order that

10   Mr. Berkowitz has submitted a notification for the fraudulent

11   allegations, he has not submitted any proof or evidence of any

12   documents that can support the five things listed in the court

13   order that he has submitted.  He has -- he just does this to get

14   in front of you, Your Honor.

15           He'll put up something that says, okay, Mr. Hipple

16   fraudulently obtained without even going to the Patent Office to

17   see what was done.  He says that I am selling Steel Seal.  I

18   haven't sold Steel Seal.  He says that I own part of Steel Seal

19   LTD.  I don't own any part.  That's McGobner (phonetic).  That

20   man has like three or four businesses.  I don't own any part of

21   him, okay.

22           And he goes on to say -- the only thing he is correct

23   with is I have not been able to pay Teresa any money, okay,

24   other than the $60,000 from the bank account right now.  But let

25   me go on.

1          Mr. Berkowitz keeps saying that Clement Hipple is

2     selling the Steel Seal, which is incorrect.  This is part of the

3     order, Your Honor, and if we deal directly with what was in the

4     order --

5          THE COURT:  You have no part of selling Steel Seal

6     anymore?  Are you telling me that under oath?

7          MR. HIPPLE:  I am telling you that under oath, that I

8     have not touched --

9          THE COURT:  Well, who's selling -- what's the story

10    with this company in Britain?  Who owns that?

11         MR. HIPPLE:  Okay, Your Honor, you got to remember.

12    This company in Britain has been operating selling Steel Seal

13    for ten years.  They have their own trademark for Steel Seal in

14    England, okay.

15         Not only do they sell Steel Seal, they sell 13 other

16    products and sealers, okay.  They have race cars with

17    advertisement of Steel Seal.  They own two racecars.  He owns a

18    welding business.  He's a (indiscernible).

19         THE COURT:  Are you getting any remuneration or any

20    money or --

21         MR. HIPPLE:  Nothing.  Zero.

22         THE COURT:  -- nothing from them?

23         MR. HIPPLE:  Zero.  I'm out of business, okay?

24         THE COURT:  Okay.  All right.

25         MR. HIPPLE:  Which I'm going to get to a little

1  further down here which you may find interesting.  Okay, and

2  again, the point I'm making is everything that Mr. Berkowitz --

3          THE COURT:  Then why do you care about this?  Why are

4  you fighting this so hard?  If you're not involved in the

5  business anymore, why are you fighting this?

6          MR. HIPPLE:  Because you ordered me to court.

7          THE COURT:  Okay.

8          MR. HIPPLE:  And if I don't appear in court, I'm held

9  in contempt of court, okay?  But I just want Your Honor to

10  understand --

11          THE COURT:  I don't think I ordered you to be --

12          MR. HIPPLE:  -- what the true facts are.

13          THE COURT:  I don't believe I ordered you to be here

14  by the way, Mr. Hipple.

15          THE COURT:  You said -- you served me.

16          THE COURT:  I said we have -- oh, maybe I did.  Okay.

17          MR. HIPPLE:  Yes.  I've been served to report.

18          THE COURT:  All right.

19          MR. HIPPLE:  Because remember I asked for an

20  extension.

21          THE COURT:  So all right.  Do you really care about

22  this?  Do you still want to oppose this request?

23          MR. HIPPLE:  Yes, I'm going to repose (sic) the

24  request, all right?

25          THE COURT:  All right.  But why do you feel so

```
 1   strongly about it if you have nothing to do with the business

 2   anymore?

 3              MR. HIPPLE:  Because I think it's unfair.

 4              THE COURT:  Okay.  All right.  All right.  I'm just

 5   asking you.  I'm just asking you.

 6              MR. HIPPLE:  My personal opinion, I think it -- for

 7   two reasons, okay?  That first of all, the company and the

 8   patents and the trademark are worthless to anybody to buy, okay?

 9              THE COURT:  Then why are you opposing it?

10              MR. HIPPLE:  Well, because I --

11              THE COURT:  If it's worthless, then why don't you just

12   make it -- we'll --

13              MR. HIPPLE:  -- I just --

14              THE COURT:  -- make it quick here.

15              MR. HIPPLE:  No, let me go one step further.

16              THE COURT:  All right.

17              MR. HIPPLE:  I tried to get $75,000 for it, okay.  We

18   finally wound up at $25,000.  I put that money in the bank

19   account so that Teresa would receive more money, okay.  That

20   money for the trademark that was sold went into my bank account,

21   which Mr. Berkowitz took the money --

22              THE COURT:  Who'd you sell the trademark to?

23              MR. HIPPLE:  Steel Seal LTD.

24              THE COURT:  Oh.

25              MR. HIPPLE:  The only person that would be able to
```

```
 1  have a use for it.
 2              THE COURT:  When did you sell it?
 3              MR. HIPPLE:  Pardon me?
 4              THE COURT:  When did you sell it?
 5              MR. HIPPLE:  Okay.  If Mr. Berkowitz can give me the
 6  date that he --
 7              THE COURT:  Oh, wait.  I think I have that date.
 8              MR. HIPPLE:  No, no, no.  That date's incorrect, Your
 9  Honor.
10              THE COURT:  This is the Complete Group sale?
11              MR. HIPPLE:  No, no.  No, this date was when
12  Mr. Berkowitz went to send a letter to Colonial Chemical telling
13  Colonial Chemical that they can no longer -- which I don't think
14  he had the right to do, but that's beside the point; went to
15  Colonial Chemical in the early part of April or in the early
16  part of March or late part of March telling them that I can --
17  they can no longer produce the product Steel Seal.
18              THE COURT:  I have April 19th, 2016.
19              MR. HIPPLE:  No.  It was way before that, Your Honor,
20  okay.  That was the actual date of the invoice.  The sale was
21  prior -- much prior than that, sometime in the late part of
22  March, or whenever Mr. Berkowitz sent the letter to Colonial
23  Chemical telling me that I can no longer produce the product.
24  And I --
25              Do you --
```

1          I don't know whether he knows the date?

2          THE COURT:  All right.  Well, he'll address the Court

3     after you're finished.

4          MR. HIPPLE:  All right.  Again, and I want to go back

5     to the five issues on the document so that he can get in front

6     of you today, because he lost the case in the Bankruptcy Court,

7     so he makes up all these fraudulent statements without one shred

8     of evidence.

9          THE COURT:  He says this in his motion.  In his motion

10    he said that on April 19th, 2016, Hipple purportedly transferred

11    from BBBM Steel Seal Limited the Steel Seal trademark, the

12    website, and the domain name.

13         MR. HIPPLE:  No.  That date is incorrect.  That was

14    the date of the invoice.  We negotiated that much prior and

15    agreed of the sale, okay, and then I finally invoiced him, okay.

16    All right.

17         Again, and I am saying in front of the Court today, is

18    that since I signed BB Management, I'm under oath saying to the

19    Court today that since I turned over the company BB Management,

20    I have not sold one bottle of Steel Seal.  I have no ownership

21    whatsoever with Steel Seal in the United Kingdom, okay, and I do

22    not have any alter egos or whatever that word means.  He uses

23    the terminology all the time.

24         THE COURT:  Alter ego?

25         MR. HIPPLE:  What is it?

1              THE COURT:  Alter ego?

2              MR. HIPPLE:  Yeah.  I don't even understand that.

3              THE COURT:  Well, it's like you -- you're actually

4       like a -- you have a straw person or somebody up front who's

5       actually the owner, but you're actually the true owner.

6              MR. HIPPLE:  Okay.  All right.  Well, that's not true.

7              THE COURT:  Okay.

8              MR. HIPPLE:  I'm saying that under oath.  I do not own

9       any part of Steel Seal LTD in the United Kingdom, okay?  I have

10      not sold Steel Seal anywhere in the United States or anywhere in

11      the world, okay.  Not one bottle, all right?

12             And again, I'll go right back to the same thing.  Not

13      one evidence or not one piece of documentation has Mr. Berkowitz

14      submitted of proof of his allegations in the five things that

15      he's stated in that statement.  Not one thing has he produced in

16      order to prove that that's correct.

17             All right, the other -- and again, this is the other

18      bad part, Your Honor, is that all the things and -- that

19      Mr. Berkowitz has done with the court, okay, after you had made

20      your decision, okay, now I'm attorney in a fact.  I guess you

21      could consider me that, right, because I defended myself.  Would

22      I be considered that or no?  No.

23             THE COURT:  You're not an attorney.  You're acting pro

24      se -- you're acting pro se by yourself for --

25             MR. HIPPLE:  Well, okay.  I'm, in fact --

```
1              THE COURT:  -- now.
2              MR. HIPPLE:  I'm by myself, okay?
3              THE COURT:  Right.
4              MR. HIPPLE:  And I would assume that it's normal
5    procedure when Mr. Berkowitz files something like his legal
6    fees.  He wanted $450,000 for his legal fees.  I never received
7    the documentation, an email, or anything from Mr. Berkowitz that
8    this document was filed.  Your court sends me a document, okay?
9              THE COURT:  Well, that happened like a year -- the
10   attorney fee issue happened like two years ago.
11             MR. HIPPLE:  But the point I'm trying to --
12             THE COURT:  Why didn't you bring that up to my
13   attention before?
14             MR. HIPPLE:  Well, because he's going back into
15   things, and what I'm trying to say, Your Honor, is
16   Mr. Berkowitz --
17             THE COURT:  But --
18             MR. HIPPLE:  -- deliberately puts things in front of
19   Your Honor, okay, and that's why I'm here defending myself
20   today.  Because I'm tired of it, okay.  He deliberately puts
21   things in your -- in front of you which I don't have an
22   opportunity to reply or to do anything with.
23             THE COURT:  Well, you sure had an opportunity to reply
24   to this.
25             MR. HIPPLE:  Well, I am replying to this.
```

```
1              THE COURT:  Yeah.  I gave you 30 days.

2              MR. HIPPLE:  I know, but that's what -- exactly.

3              THE COURT:  You know?

4              MR. HIPPLE:  Because --

5              THE COURT:  Don't complain I'm not giving you an

6    opportunity to be heard.

7              MR. HIPPLE:  No, you -- no, Your Honor, I have to

8    agree, you definitely gave me an opportunity.

9              THE COURT:  Right.  I've always given you an

10   opportunity.

11             MR. HIPPLE:  But on September 1 we agreed that I would

12   be emailed.  September -- I mean on January 1, 2017, we -- you

13   put a motion through that I should be emailed.  Okay, the

14   problem is Your Honor, and I don't know.  You never see it, but

15   when I get an email from the United States Court, and I click on

16   the document, it says here at the bottom, please enter in your

17   information as an attorney.

18             So therefore, the only thing I get is a document

19   saying that, you know, this is being -- taking place.  But I

20   cannot open up the document for which Mr. Berkowitz sent.  Now I

21   went two steps on that, okay.  First I called the Clerk's

22   Office, right, from Colombia and requested them to email me a

23   copy of the document.  They said I'm sorry; we cannot do that.

24   Then I went one step further.  I called Your Honor's chambers

25   and spoke with one of your assistants --
```

1          THE COURT:  Right.

2          MR. HIPPLE:  -- and asked her.  I don't know whether

3   they tell you i call every now and then.

4          THE COURT:  No, I know you call.

5          MR. HIPPLE:  Okay.  And I call and call, and that I

6   have to be here at 6th and Market and go downstairs to the Clerk

7   Office to get a copy.  So basically, I see an order, come in

8   front of Your Honor, okay, but I don't know what the order says.

9   I don't know how to defend the order, okay, because I am in

10  Colombia, and I don't have a lot of money to keep bouncing back

11  and forth from Colombia.

12         Okay, so the point I'm trying to make is everything

13  that Mr. Berkowitz has done and previously has been given to him

14  under default judgment because I had not defended myself.

15  Now --

16         THE COURT:  A lot of these default judgments you

17  agreed to.

18         MR. HIPPLE:  What?

19         THE COURT:  You agreed to a lot of these default

20  judgments.

21         MR. HIPPLE:  No, I did not, Your Honor.

22         THE COURT:  You agreed to a default judgment against

23  SCIX.  You did at the beginning of the trial.

24         MR. HIPPLE:  That's on trial.

25         THE COURT:  Yeah.

1              MR. HIPPLE:  I'm talking all those -- I'm talking

2    about all the issues after you made your decision that he put in

3    front of you, okay?

4              THE COURT:  We had hearings.  You were here.

5              MR. HIPPLE:  No, I was not here.  I was only here for

6    one hearing in April, okay?

7              THE COURT:  In the charging order issue, right?

8              MR. HIPPLE:  Right.  And then I came back in July and

9    signed, because again, it was a court date.  I had to come.

10             THE COURT:  All right.

11             MR. HIPPLE:  Okay.  I came back in July and signed the

12   business over.

13             THE COURT:  Well, this particular issue before the

14   Court you've had an opportunity to review everything.  You had

15   an opportunity to be heard.

16             MR. HIPPLE:  Well, I haven't done much with it,

17   because I requested a motion for a dismiss, okay?

18             THE COURT:  All right.

19             MR. HIPPLE:  So let me just continue on.

20             THE COURT:  Go ahead.  Go ahead.

21             MR. HIPPLE:  And the other issue which I just did

22   mention is I don't know why Mr. Berkowitz could not email me.

23   I've sent him a couple of emails.  But he never emailed me one

24   docket, okay, not one docket that he has submitted to the Court,

25   okay?  And I think that --

```
 1              THE COURT:  Well, he has service.  He serves you.  I
 2    don't know how he did it, but --
 3              MR. HIPPLE:  Well, no, the served me to a postal box.
 4              THE COURT:  Well, that's the address you gave.
 5              MR. HIPPLE:  But no, I gave an email also, Your Honor,
 6    not just an address, because I live in Columbia.  You can't
 7    serve me in Colombia, Your Honor.  So again, I'm at the, you
 8    know, the disadvantage of the court at all times.
 9              THE COURT:  When you provided that address, I mean,
10    it's a --
11              MR. HIPPLE:  No.  Yeah, you asked -- no.
12              THE COURT:  -- I asked you to provide address --
13              MR. HIPPLE:  Wait a minute.
14              THE COURT:  -- in the U.S.
15              MR. HIPPLE:  You said I must give you an address in
16    the U.S.  I gave you an address in the U.S.
17              THE COURT:  All right.  So that's where he served you,
18    right?
19              MR. HIPPLE:  Yeah.  But again, but if they would at
20    least email me and allow me to open up a document, I would have
21    a much better chance to respond.
22              THE COURT:  All right.
23              MR. HIPPLE:  All right.
24              THE COURT:  I understand.
25              MR. HIPPLE:  Okay.  We talked about the attorney vocal
```

1    in kind and what their discussion was.  Okay.  All right.  This

2    is the more bigger issue.

3            THE COURT:  Go ahead.

4            MR. HIPPLE:  After I lost the case, all right, in

5    January --

6            THE COURT:  Well, you didn't lose all the case.  I

7    ruled in your favor a lot of parts.

8            MR. HIPPLE:  Yes, okay.

9            THE COURT:  It was a partial victory for

10   Mr. Berkowitz.

11           MR. HIPPLE:  Partial victory, okay.  Partial victory.

12           THE COURT:  Right.  Right.

13           MR. HIPPLE:  You know what, Your Honor?

14           THE COURT:  The Judgment was 400 and some thousand

15   dollars.  He only collected a small -- at least --

16           MR. HIPPLE:  Well, he's got over 220,000 now.

17           THE COURT:  All right.

18           MR. HIPPLE:  Okay.  Okay.  But, Your Honor, yes, you

19   were very fair with me, okay?  But the problem was all the

20   attorneys were doing, all the attorneys, my attorneys, all of

21   them were so tied up in the fraudulent transfer and we had hired

22   an accountant, all right, as a special witness.  Now if that

23   accountant would have did a cost analysis, excuse me, Your

24   Honor, but a cost analysis because four of those skids went to

25   England at $7.56 a bottle.

1          Okay, if he would have did a full analysis of the time

2     it took me to sell the actual chemical, plus the internet cost,

3     plus the postage, plus the people I hired, which was never taken

4     into consideration, you could not have made that ruling.

5          THE COURT:  Okay.

6          MR. HIPPLE:  Okay?  No way in the world could that

7     ruling have been made.

8          THE COURT:  Well, we're -- relitigating.

9          MR. HIPPLE:  I know we're relitigating.

10         THE COURT:  All -- and this is not the place to do

11    that.

12         MR. HIPPLE:  But this is the -- well, he is --

13    relitigating.

14         MR. HIPPLE:  He's -- yeah.

15         THE COURT:  So we're here about the trademark.

16         MR. HIPPLE:  Okay.  Here -- okay.  Now let's take it a

17    little further.  Back in March of 2016, okay?

18         THE COURT:  Right.

19         MR. HIPPLE:  All right.  When the -- I had contacted

20    Mr. Berkowitz and explained to him that I had the deps with the

21    attorneys, okay, because I know eventually he's going to put me

22    out of business.  I had made him an offer that once I paid the

23    attorneys that it would start paying Teresa Concepcion

24    approximately $10,000 a month until it was paid off.

25              Now whether or not he ever passed that on to Teresa

1    Concepcion or nothing, and I never heard back from him in

2    reference to that phone conversation.  All is I heard back after

3    that phone conversation in March was a letter going to Colonial

4    Chemical saying that I can no longer make the chemical.

5            So why would they not at least take into consideration

6    if I'm willing to pay them and stay in business $10,000 a month,

7    but Teresa's a -- Teresa Hipple's whole thing in this has

8    nothing to do with the money.  It's with the revenge whether you

9    want to believe that or not that's up to you.  But again, why

10   would she not take the 10,000?

11           Also, Your Honor, when she garnished the wages back in

12   2010, she was being paid principal plus eight percent interest

13   on her loan.  And in 2010, Your Honor, if I offered you eight

14   percent you would have jumped at it.  Okay, so again, why

15   garnish the wages and put somebody out of business?  Okay, and

16   that -- it just, you know, this is not about, you know, the

17   money.  I don't believe it's about the money.

18           THE COURT:  It's a lot of money.

19           MR. HIPPLE:  Yeah.  It's a lot of money.  Yeah, but

20   not me, Your Honor.  I had like a million-four, okay, tied up

21   into that company.

22           THE COURT:  Yeah, well.

23           MR. HIPPLE:  Yeah.  You forget that part, right?  That

24   part's not even an issue.

25           THE COURT:  I'm not forgetting anything.  I'm just

1  telling you --

2          MR. HIPPLE:  Yeah.

3          THE COURT:  -- you're saying it's revenge, but it's a

4  lot of money.  I mean, we all agree it's a lot of money.

5          MR. HIPPLE:  Yeah.  It's a lot of money on my side,

6  too, Your Honor.

7          THE COURT:  Yeah.  Okay, right.

8          MR. HIPPLE:  I had three notes with JC Consulting and

9  Leasing that couldn't even collect on and never got paid

10 interest.

11         THE COURT:  I understand.  I understand.

12         MR. HIPPLE:  All right.  I just wanted to say again

13 that I know how you feel about the trademark, but again, the

14 three patents are dead.  Good-bye, dead.  So what is

15 Mr. Berkowitz's concern so much when she's already received

16 money, $25,000 for the trademark, okay, to a company that has

17 use for it?

18         And he's saying well, I'm going to get -- I have all

19 these companies I'm going to sell this to, but what companies

20 are going to buy the trademark, Your Honor?  What good is a

21 trademark if you don't have the patent for the chemical formula?

22 It don't make sense.  You know, well, you say, I'm fighting

23 this.  Well what is he fighting for?  I mean, for nothing.

24         THE COURT:  That's not my concern.  He presented a

25 legal issue to me.  My job is to decide it the best I can after

1    hearing both sides.  What he does with this, Your Honor, that's

2    not in my control.  As long as he complies with court orders,

3    follows the law, that's his decision.

4             MR. HIPPLE:  Well then, Your Honor -- okay.  Then are

5    we at least in agreement, okay, that you and I are in agreement

6    that the information -- do you believe Mr. Berkowitz, which

7    makes the statement that I've obtained a trademark fraudulently

8    or do you believe the government agent, the United States Patent

9    and Trademark Office?

10            THE COURT:  I'm not here to give you my views of who I

11   believe --

12            MR. HIPPLE:  Okay.  All right.  Let me --

13            THE COURT:  All I'm -- wait, Mr. Hipple.  Let me

14   finish please.  I'm just going to look at the entire record and

15   look at the relevant law, make a decision to the best of my

16   ability.  If either side's unhappy they can appeal it.  That's

17   my job, okay?  I'm going to call it the way I see it.

18            MR. HIPPLE:  Appeal it.  I would have liked to have

19   appealed your first decision, Your Honor, but again, you know

20   what an appeal costs.

21            THE COURT:  I understand it, but --

22            MR. HIPPLE:  All right.  Just --

23            THE COURT:  -- that's the system.

24            MR. HIPPLE:  -- but that means nothing.  And again,

25   what I'm trying to say is that he's never taken the time to

1   check with the United States Trademark and Patent Office, but

2   yet he makes an allegation that I have fraudulently acquired the

3   trademark.  But yet, he won't take the time.  I won't -- I'm

4   just going to go into a just a little detail of what the

5   Trademark Office does, okay?  When they get an application, they

6   have to review it to see whether or not there's a -- because

7   I've read all their regulations, okay, whether or not there's a

8   trademark similar to that using the same type of product, okay?

9           THE COURT:  Okay.

10          MR. HIPPLE:  So there's no way that the Trademark

11  Office would issue a trademark with its -- with the same name

12  that was already in existence.  So we're in agreement with that

13  part, I hope at least, because they will reject the application

14  if there's any similarity in the trademark or if it's used for

15  the same purpose.

16          Okay, now, and since the case has been closed and now

17  Mr. Berkowitz is trying to reopen the case with fraudulent

18  information and without any facts to support his claim, that is

19  outlined in the court order that Mr. Berkowitz submitted to the

20  court without any proof or evidence of any kind, I am requesting

21  that this case remain closed and let Mr. Berkowitz take whatever

22  process is necessary as stated throughout this opening

23  statement.

24          Mr. Berkowitz has deliberately and intentionally used

25  the justice system in a wrongful manner for his own personal

1   use.  Since Mr. Berkowitz has so much time and effort invested

2   he is demonstrating that he will do anything as far as false

3   statements to the Court for his own benefit.  And that's why

4   I'm -- since Mr. Berkowitz refused my offer in March of 2016,

5   where I was willing to pay $10,000 per month to the Plaintiff.

6          Your Honor, in reference to my motion to dismiss, I

7   have produced documents from the United States Patent Office and

8   Trademark Office showing that BBB Management had received the

9   trademark Steel Seal through the legal process of the United

10  States Patent and Trademark Office.

11         It is also demonstrated BBB received the trademark

12  that there was no other trademark with the name Steel Seal for

13  the use of repair of an engine coolant system.  That was in good

14  standards with the United States Patent and Trademark Office.

15  And the document I submitted also showed the trademark for SCIX

16  was dead as of July 3rd, 2001.  And the fact that Mr. Berkowitz

17  has not submitted evidence or documentation that Clement Hipple

18  has Steel -- stolen Steel Seal, used the website and domain

19  name, or any proof that Clement Hipple has anything to do with

20  the selling of chemical formula of Steel Seal.

21         And again, Mr. Berkowitz states that it went from

22  SCIX.  It went to me.  And now it's to the guy in England.  And

23  that's all the same.  Well, of course, Your Honor, it's all the

24  same.  It's not going to change.  The next person, if they would

25  buy it, it would be the same.  They would come up with the same

1    website.  They would come up with the same chemical formula.

2    They would do everything identical.  Every company they -- that

3    passes on does the same thing.

4           What are they going to change?  So by him making the

5    statement that, oh, it was done by SCIX, oh, and then Hipple

6    then took it and then did the same thing.  And then, now the man

7    in England is doing the same thing by which the website,

8    original website in the United States was designed by them

9    because they were the web designers, okay.  So naturally,

10   they're to use the same or different website.

11          And the documentation that he submitted with his

12   motion about Steel Seal that goes back to 2001.  He didn't even

13   take anything off the internet that is actually going on because

14   now that the actual way that the vehicles are fixed is totally

15   different.  We no longer let the vehicle run for 20 minutes,

16   okay, at a speed of 1200 rpms.  We make the people -- or we

17   don't.  He makes the people drive the vehicle for five minutes.

18          So it's not -- the chemical formula has changed.  They

19   changed it in England from what I understand, okay.  The

20   procedure, because I looked on the website, has also changed,

21   okay.  They have their own procedure now.

22          THE COURT:  Right.

23          MR. HIPPLE:  It's no longer the same procedure.  And

24   you had to take this into consideration also, Your Honor, that

25   this is not a repeat of SCIX of Clement Hipple, of Complete

1    Group, okay?  Things have changed over the years.  Now Steel

2    Seal LTD is a much more aggressive than what Brian and myself

3    were, okay, as business people.

4              So they changed the formula.  They now changed the

5    website and the directions.  If you will look at the ones back

6    in the 1990 -- or 2000 and you look at what's on the website

7    now -- go to the video.  They actually use the word "bonnet."

8              They call the lid -- the hood, which is bad; they call

9    it a "bonnet."  "Raise the bonnet," they say, okay, pour the

10   chemical in and drive the vehicle.  So there's another area that

11   is completely different, okay, that the system has changed.

12             And again, Patent Number, U.S. 6159276 was closed as

13   of December 12th, 2008.  Patent Number U.S. 6324757 was closed

14   on December 4th, 2009.  Patent Number U.S. 6647622 was closed on

15   May 19, 2015.  Now Patent Number U.S. 632 -- I don't know.  The

16   one in 2008 or the one in 2009 happened to be the chemical

17   formula patent.  The last one had to do with the process that I

18   think was the patent that I put through.

19             Based on all the facts listed above, I am again

20   requesting the Court to dismiss the court order that

21   Mr. Berkowitz has submitted without any proof and not reopen

22   this case without any supporting documents or proof.  Only

23   allegations and fraudulent statements on Mr. Berkowitz's part as

24   Mr. Berkowitz is trying to use the court system for his own

25   benefit.  Mr. Berkowitz has replied to the Memorandum of Law and

1   opposed to Clement Hipple's motion for dismiss.

2           In other words, he's replied back to you.  He had a

3   second chance, Your Honor, to submit documentation, okay, when

4   he replied to my motion to dismiss.  Did you get any

5   documentation?  No.   All is you get is a bunch of words from

6   Mr. Berkowitz.  And a bunch of words that have nothing to do

7   with what is actually listed in the motion, okay?

8           The five things that are listed in the motion, okay,

9   have nothing to do with the wording that's he's using below:

10  fraudulent statement that I required a trademark.  If Your Honor

11  looks at that, that's not true, okay.  Selling Steel Seal, I

12  just told you under oath that I am not selling Steel Seal.

13  Ownership in Steel Seal LTD, I, under oath, I am telling you I

14  do not have any ownership.

15          Okay, the only thing on that is part five, where

16  actually I've realized that I owe Teresa money, okay.  And I

17  mean, I'm not in the position to pay her.  I paid her what I

18  could and she got the money from the sale of the trademark,

19  okay.  It was part of the money that was in the bank account

20  during the garnishment of the wages.

21          THE COURT:  By the way, just to make the record clear

22  this thing you handed up to me which was the app --

23          MR. HIPPLE:  I'm sorry?

24          THE COURT:  You handed me this one document up to me

25  just to make sure the record's clear.  This was Exhibit to your

```
 1  motion --
 2            MR. HIPPLE:  A, I think or B.
 3            THE COURT:  Yeah.  A to your motion.
 4            MR. HIPPLE:  Okay.
 5            THE COURT:  It's the same document.  I just want to
 6  make sure it's clear.
 7            MR. HIPPLE:  Yeah.  Can I -- am I allowed to submit
 8  more documents that I have here today?
 9            THE COURT:  Yes.  Submit them.
10            MR. HIPPLE:  Actually, I have a copy for
11  Mr. Berkowitz, too.
12            THE COURT:  Okay.  Well, why don't -- okay.  Can I
13  keep this copy which is -- do you want your limine back?
14            MR. HIPPLE:  I think this is actually in there.
15            THE COURT:  Okay.  Fine.
16            MR. HIPPLE:  Okay.  This is A through E, okay?
17            THE COURT:  Okay.  Did you show Mr. Berkowitz?
18            MR. HIPPLE:  I'm going to give him a copy right now.
19            THE COURT:  All right.
20            MR. HIPPLE:  And what these documents are, again,
21  they're documents from the United States Trademark and Patent
22  Office which demonstrates that I acquired the patent -- the
23  trademark correctly, which demonstrates that the SCIX trademark
24  died, and which demonstrates that all three patents have lapsed
25  and the date that they have lapsed.
```

1          And what it also demonstrates, which I feel is very

2    important, Your Honor, when you get to the one -- or when you've

3    reviewed the one for the patent for the chemical formula, and if

4    you read through there, it will show you exactly what the

5    contents of the chemical formula is and which I believe has

6    changed with the guy in England.  Has a different formula now

7    than what that formula says.

8          To get back to the point where I left off, is that

9    when Mr. Berkowitz had a second chance when he answered the

10   dismiss for -- the motion to dismiss, when he answered it,

11   again, all that he did was use words.  And no proof, no

12   documentation, okay.  And I'm hoping and I'm hoping that your

13   court or Your Honor will take a look at what was submitted in

14   the order and not the language after that, and say that the

15   stuff that was submitted in the order is all fraudulent on

16   Mr. Berkowitz's part.  And he has no proof, no proof whatsoever.

17         Let me go one more step.

18         THE COURT:  Sure.

19         MR. HIPPLE:  I'm almost finished, Your Honor.

20         THE COURT:  That's fine.

21         MR. HIPPLE:  Okay.  You may be in disagreement with

22   this, but I kind of read this on the internet a little bit,

23   okay.  This -- the United States Federal Court has -- I

24   understand you have to use this word, "no right."  Okay, the

25   United States Federal Court should consider that the trademark

1    Steel Seal was the property of SCIX.  SCIX no longer owned the

2    trademark Steel Seal as of July 3rd, 2001.

3              Prior to the loan, Teresa Hipple -- Teresa Concepcion

4    made to SCIX in 2002.  And prior to the trial took place in

5    January of 2016.  The Court assumes that the trademark Steel

6    Seal was owned by SCIX.  The facts now show that SCIX only owned

7    the trademark as of July 3rd, 2001.  According to the United

8    States Patent and Trademark Office, the decision that the Court

9    made in reference -- the decision that the Court made in

10   reference to SCIX only the trademark to -- belong to SCIX wasn't

11   proper.

12             The facts now show that the trademark Steel Seal did

13   not belong to SCIX after July 2001, and SCIX used the name Steel

14   Seal without owning the trademark, which Clement Hipple or BB

15   Management used it and now is it also being used by Steel Seal

16   LTD.

17             THE COURT:  Why do you say July 2001?  What's that

18   date?

19             MR. HIPPLE:  That's the date it was dead; the

20   trademark died.

21             THE COURT:  Oh, I see.  Yeah, the abandonment date on

22   the --

23             MR. HIPPLE:  The abandonment date on there.

24             THE COURT:  July 3rd, 2001.

25             MR. HIPPLE:  And what I'm trying to --

1              THE COURT:  Got you.

2              MR. HIPPLE:  -- present here is that I understand what

3     you said earlier.  You're position, but I'm saying that you made

4     a decision earlier thinking that the trademark was active, okay.

5     When you originally made your decision for the trial, okay, you

6     made it under the assumption that the trademark was action --

7     active.  We all took that into consideration because we all

8     thought that.  But now that the research and the fraudulent act

9     on Mr. Berkowitz's part about me acquiring the trademark has

10    changed, okay.

11             And again, I am begging the Court to look at the five

12    items that are listed.

13             THE COURT:  I'll look at them.  Absolutely.

14             MR. HIPPLE:  But only look at the five items that are

15    listed and tell me whether or not did I acquire it fraudulently?

16    No.  Have I sold Steel Seal?  No, under oath.  Do I own Steel

17    Seal LTD?  No.  Okay.  Do I have an alternate ego?  No.  And the

18    only thing that out of those five that is a yes question is the

19    money that I owe Teresa Hipple.  And, therefore, I plead with

20    the Court to look at that and only at that document.

21             THE COURT:  Okay.

22             MR. HIPPLE:  Okay?

23             THE COURT:  Thank you, Mr. Hipple.

24             MR. HIPPLE:  Okay, Your Honor.  I'm done.

25             THE COURT:  Thank you.

1          Mr. Berkowitz, you want to reply?

2          MR. BERKOWITZ:  Briefly.

3          THE COURT:  Sure.

4          MR. BERKOWITZ:  As you know, Your Honor, we are not

5   talking about the patents.  We're talking about the trademark.

6          THE COURT:  Right.

7          MR. BERKOWITZ:  And you correctly point out the common

8   law trademark is the owner is the first user.  And Mr. Hipple

9   didn't have a right to register that trademark in the name of

10  BBB Management, nor does Mr. Hipple have the right to sell Steel

11  Seal, nor did he have the right to transfer it just prior to the

12  bankruptcy.  The Bankruptcy Court could have undone that, but

13  the Court found the Court had jurisdiction over the case.

14         We are trying to undo what would have been undone in

15  the Bankruptcy Court in this court because we were in the

16  process of execution.  And we are trying to recapture that

17  trademark, the website, the domain name.  That website is

18  identical.  It lists a United States address in California.  If

19  you'll look on the website now, you'll see a U.S. address.

20         I don't want to address or contest everything

21  Mr. Hipple said.  Not true, the date of the transfer of the

22  trademark, the domain name, the website, those dates were taken

23  from the Petition that Mr. Hipple signed and filed with the

24  court in the Bankruptcy Court.  I didn't make those dates up.

25         I used the dates of the dockets, the court records,

1    and everything else that substantiates our right to execute on

2    those assets.  We did everything we could to execute on those

3    assets.

4            Mr. Hipple said he owned the trademark at one point.

5    Well, if he had owned the trademark when he responded to the

6    interrogatories in aid of execution, he could have listed it as

7    an asset.  He didn't do that.  We -- we're --

8            THE COURT:  Was that prior to the transfer to the

9    Steel Seal Limited?

10           MR. BERKOWITZ:  Yes.

11           THE COURT:  The garnishment --

12           MR. BERKOWITZ:  It was in --

13           THE COURT:  -- answers?

14           MR. BERKOWITZ:  -- yeah, it was bracketed.  You had

15   ordered that he respond and responded after he had

16   transferred --

17           THE COURT:  Transferred it.  Okay.

18           MR. BERKOWITZ:  -- while everything was pending.

19           THE COURT:  Right.

20           MR. BERKOWITZ:  I'd only like to point out because

21   it's obvious that you are familiar with the record, and what

22   happened in this case.  Mr. Hipple submitted, and you looked at

23   an affidavit submitted under oath.  You may recall at the trial

24   that there was an affidavit that Mr. Hipple submitted in Bucks

25   County and they're polar opposites.

1          THE COURT:  Right.  The affidavit in Bucks County

2    preceded the one that I'm talking about today.

3          MR. BERKOWITZ:  Correct.

4          THE COURT:  Right.

5          MR. BERKOWITZ:  When it served their interest to say

6    they owned the patents, they contested it.  When it served their

7    interest to say they didn't own the patents, they filed that

8    here.  We're just trying to collect on a judgment.  I have no

9    other motives. I don't do family law.  Sometimes the -- they

10   collide, but just trying to collect some money for a client.

11   And right now all I have left to collect on is the trademark.

12         THE COURT:  And the record, just to make it clear, I

13   know there's no dispute here.  You haven't collected enough to

14   satisfy these judgments.

15         MR. BERKOWITZ:  No.

16         THE COURT:  I know we're being -- simply, but I just

17   want to make sure that's clear.

18         MR. BERKOWITZ:  Not even close.

19         THE COURT:  Right.  Because I know Mr. Hipple said you

20   collected an extra 90,000 somewhere.

21         MR. BERKOWITZ:  We -- in the bankruptcy there are -- I

22   was appointed as special counsel to the Chapter 7 trustee --

23         THE COURT:  Right.

24         MR. BERKOWITZ:  -- because of my familiarity with the

25   case.

```
 1              THE COURT:  Right.  Right.

 2              MR. BERKOWITZ:  There were insider transactions,

 3   preferential payments made that are avoidable in bankruptcy.

 4              THE COURT:  Right.

 5              MR. BERKOWITZ:  All the payments that Mr. Hipple made

 6   to family members were part of those insider transactions,

 7   preferences that were avoidable.  And we move to collect that

 8   money.

 9              THE COURT:  Right.

10              MR. BERKOWITZ:  Again, those cases were thrown out.

11              THE COURT:  Right.

12              MR. BERKOWITZ:  We ultimately reached a settlement

13   with Ms. Moreno.  But the legal fees in this case, as you found

14   in the application, the legal fees of -- from Ms. Concepcion was

15   $450,000.

16              THE COURT:  Right.

17              MR. BERKOWITZ:  And for Mr. Hipple, he testified

18   before trial he had spent $400,000 avoiding paying

19   Ms. Concepcion $350,000.  This is not Ms. Concepcion's doing.

20   She's just trying to collect her money.  Thank, Your Honor.

21              THE COURT:  All right.  Thank you.

22              Anything else, Mr. Hipple, --

23              MR. HIPPLE:  Yes.

24              THE COURT:  -- and then I'll put this under

25   advisement?
```

1          MR. HIPPLE:  In reference to the statement

2     Mr. Berkowitz just made, as far as the website is concerned, if

3     Your Honor would look at the website, okay, he will see that the

4     owner of the website is Steel Seal LTD, okay.  Of course it has

5     a United States address, because it's doing business in the

6     United States.  All right.

7          So naturally, again, but I'm asking Your Honor to look

8     at the two different websites back then and the new website by

9     the new owner, okay.  That far, and I disagree with

10     Mr. Berkowitz as far, okay, what date I put on the Bankruptcy

11     Court of the sale of the trademark.  That was much -- the sale

12     and the agreement was much earlier than the actual invoice.

13          And we started at 75,000, okay.  It's what I was

14     trying to get out of him for the trademark, and we wound up at

15     25,000; and again, which Mr. Berkowitz has received.  He took

16     the money for the trademark, okay.  You have to remember that

17     part.  He accepted the trademark money.  He saw the bank

18     account, okay; the bank statements.  He saw the deposit for

19     25,000.  He accepted that when he garnished the wages, so he

20     accepted the Court, you know, the fair value of the trademark.

21     And I think even that's an -- what Mr. Berkowitz --

22          THE COURT:  Did you just sell the -- you sold other

23     things other than the trademark, right/

24          MR. HIPPLE:  What?  Pardon me?

25          THE COURT:  You didn't just sell the trademark to

1  Steel Seal Limited.  Other things went over there too, right?
2  The domain and?
3          MR. HIPPLE:  The domain -- yeah, but the domain and
4  website you can do anywhere, Your Honor.  okay.  Domain and --
5          THE COURT:  it was part of the consideration, right?
6          MR. HIPPLE:  Yeah, but no.  But no, like I explained
7  to you earlier, I can say "Elite Steel Seal" tomorrow.  I can
8  open up a website with "Elite Steel Seal" or "Improved Steel
9  Seal" or "Original Steel Seal."  They have no value, okay?
10          Mr. Berkowitz has not demonstrated or mentioned or
11  even told you, okay, I want this trademark.  I want to sell a
12  trademark, okay, that belongs to Mr. Hipple and Mr. Hipple was
13  solvent and had the right to sell it at the time.
14          The reason that the judge threw out, which he has not
15  mentioned.  The reason that the judge would not rule on the
16  bankruptcy is because Hiller and Wallack, okay, which I actually
17  got a copy of what they submitted.  And everybody followed
18  Hiller and Wallack as far as -- the problem was that he couldn't
19  go after Hiller and Wallack, okay, for the money that I had paid
20  them, because I was solvent at the time I paid them the money.
21  The corporation BBB Management was solvent, okay.
22          And they tried to sue American Express.  Okay.  Here's
23  another issue.  He tried to sue American Express for charges for
24  the web -- for the use of -- for the website, for the
25  advertisement and all these things that were brought out in

1    court that he knew were legal charges.

2              THE COURT:  All right.  Well, we're getting -- that's

3    not the issue.

4              MR. HIPPLE:  Yeah.  But he keeps going back, Your

5    Honor.  Why can't I go --

6              THE COURT:  All right.  Well, All right.

7              MR. HIPPLE:  -- back?

8              THE COURT:  But it's not relevant to the issue in

9    front of me.

10             MR. HIPPLE:  The relevant thing is Mr. Berkowitz has

11   not said to you or demonstrated to you that if he gets the

12   trademark back in his hands, okay, what does he intend to do

13   with it?

14             THE COURT:  I don't need to know that.

15             MR. HIPPLE:  Okay.

16             THE COURT:  I don't need to know that.

17             MR. HIPPLE:  So, I mean, he's already got $25,000 for

18   it, Your Honor.  And --

19             THE COURT:  All I know is I asked him and you can

20   probably all agree the judgment hasn't been satisfied.  That's

21   all I know.

22             MR. HIPPLE:  Of course the judgment has to be

23   satisfied.  If he --

24             THE COURT:  No, it's not satisfied as of today.

25             MR. HIPPLE:  If he wasn't and if I wasn't put out of

1    business, okay, and if would have accepted my $10,000 a month

2    offer, the judgment would be satisfied, Your Honor, but that's

3    not what they were looking for.  Okay, why would you put a

4    company out of business if they're offering to pay you $10,000

5    per month?  I don't understand it.  I don't understand the

6    logic.

7            He keeps crying about the judgment not being

8    satisfied, well, he had a great opportunity for the judgment to

9    be satisfied.  If I would have stayed in business, okay, I could

10   have paid the judgment.  It would have taken me a little bit of

11   time, but I could have paid it.

12           THE COURT:  Okay.

13           MR. HIPPLE:  All right.  And again, he just keeps

14   coming up with this, this trademark thing and it don't have any

15   value is what I'm trying to say.  He's asking for something that

16   has no value because -- and he says, well, Your Honor, don't

17   take into consideration the patent.  Well, excuse me.

18           What good is the trademark, Your Honor, without the

19   patents?  Okay?  The patents are gone.  They're dead.  What good

20   is the trademark without the patents?  Who are you going to sell

21   a trademark to?  For what purpose?  You got a chemical formula

22   that has a patent?

23           I mean, Your Honor, I guess what I'm asking you to do

24   is not only look at this from the legal standpoint; it's also

25   look at it from a business standpoint.  What is Mr. Berkowitz

1   going to sell?  What does he have to sell that he already

2   received $25,000 for?  And I have no control.

3          I mean, you can force me, Your Honor, to take back the

4   patent.  Well, I have no control to take back that patent.

5   That's beyond my control.  Okay.  It's sold.  I have no control

6   over that.  And again, we get right back to the same thing.

7   What is it that he wants with the trademark that he has not

8   mentioned?

9          He hasn't said, well, I have a buyer for $2.5 million

10  that is willing to pay for the trademark so that we can recover

11  what is owed to Teresa Concepcion.  I haven't heard one name,

12  one person, okay.  He hasn't mentioned anybody, okay, that he

13  has a buyer.  He hasn't shown any documentation to the Court

14  where he has document agreement of sale for the trademark.

15         So why would you recall the trademark, Your Honor,

16  when he already received $25,000 for it, and he can't

17  demonstrate to you that he has a buyer.  I don't understand the

18  purpose of what -- where -- okay, you say, what's -- why is it

19  so important to me.  Well, why is it so important to him?

20         He has not demonstrated any offer, any offer from a

21  legitimate businessman that is willing to buy the trademark.

22  He's received 25,000 for it.  Okay, maybe he thinks it was worth

23  a little bit more than that and maybe that could be negotiable,

24  okay?

25         THE COURT:  Well, I don't think he's agreeing that he

1    received 25,000 for the trademark.

2             MR. HIPPLE:  Well --

3             THE COURT:  You may say that, but I don't think

4    it's --

5             MR. HIPPLE:  Okay.  I am telling you under oath that

6    Mr. Berkowitz received $25,000 for the trademark, okay.  Under

7    oath, I am telling you --

8             THE COURT:  All right.

9             MR. HIPPLE:  -- that Mr. Berkowitz received 25,000,

10   okay?

11            THE COURT:  All right.

12            MR. HIPPLE:  And again, we have no documentation.  We

13   have no company that will -- that he can demonstrate that was

14   willing to pay for the trademark and the three patents are dead.

15   And he wants you to believe that the patents don't -- it's no

16   part of the trademark.  Well, that's totally wrong.  That is

17   totally, totally wrong, okay.

18            THE COURT:  Well, I don't understand then why are you

19   fighting this.  If you're saying it's totally worthless to him,

20   and you have no interest in the company going forward here, you

21   have no interest in Steel Seal limited, why are we here?  Why

22   disagree to him?  Let him have the trademark.

23            MR. HIPPLE:  Well, because --

24            THE COURT:  Let him have the declaration that SCIX

25   owns the trademark.

1              THE COURT:  Let's say I've been doing business with

2    somebody for ten -- I've been doing business with you for ten

3    years, --

4              THE COURT:  Right.

5              MR. HIPPLE:  -- Your Honor, and you've been fair to me

6    and you've been good to me, okay?

7              THE COURT:  Right.

8              MR. HIPPLE:  Am I right?  And you built my business

9    because you sell much more than I ever sold in the United

10   States, okay?

11             THE COURT:  Okay.  And from a business standpoint, I

12   honored your business.  I like the way that you treated me as a

13   businessman.

14             THE COURT:  Right.

15             MR. HIPPLE:  Okay.  Therefore, who's better to have

16   the trademark than Steel Seal LTD?  Okay?  They are --

17             THE COURT:  So you want to honor -- you sold it to

18   Steel Seal Limited.  You want to make sure that whatever you

19   sold to them you had a legal right to sell.

20             MR. HIPPLE:  They had the legal right.  Yes, of

21   course.

22             THE COURT:  All right.  I understand.

23             THE COURT:

24             MR. HIPPLE:  I've been dealing with them for ten

25   years, Your Honor.  I mean, I know Adam for ten years.  He's a

```
 1   very, very honest and very good guy.

 2            THE COURT:  I understand.

 3            MR. HIPPLE:  Okay?  All right?

 4            THE COURT:  I understand.  You make that -- that makes

 5   very clear there.

 6            MR. HIPPLE:  And that is my reasoning and plus I was

 7   subpoenaed to go to court.

 8            THE COURT:  All right.

 9            MR. HIPPLE:  Okay.

10            THE COURT:  Thank you very much.  I'll take this under

11   advisement.  Have a good day, everybody.

12            MR. BERKOWITZ:  Thank you.

13            MR. HIPPLE:  All right.

14            (Proceedings adjourned at 11:14 a.m.)

15                          *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

# **C E R T I F I C A T I O N**

I, Deborah Anderson, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

Deborah Anderson, CET-998

Date:  May 21, 2018